**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LARRY KLAYMAN<br>7050 W. Palmetto Park Rd<br>Boca Raton FL 33433<br><br>          Plaintiff,<br><br>v.<br><br>HON. TIMOTHY J. KELLY<br>c/o 333 Constitution Ave NW<br>Washington DC 20001<br><br>     and<br><br>HON. TREVOR N. MCFADDEN<br>c/o 333 Constitution Ave NW<br>Washington DC 20001<br><br>     and<br><br>HON. DABNEY L. FRIEDRICH<br>c/o 333 Constitution Ave NW<br>Washington DC 20001<br><br>          Defendants. | **COMPLAINT FOR INJUNCTIVE,<br>DECLARATORY, AND OTHER<br>EQUITABLE<br>RELIEF** |

**I.      INTRODUCTION**

Plaintiff LARRY KLAYMAN ("Mr. Klayman") brings this action against HON. TIMOTHY J. KELLY, HON. TREVOR N. MCFADDEN and HON. DABNEY L. FRIEDRICH for injunctive, declaratory, and other equitable relief for egregious prima facie violations of his constitutional and other legal rights.

**II.     JURISDICTION AND VENUE**

1.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction).

2.     Venue is proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2), (3) a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and Defendants are subject to personal jurisdiction in this District.

III.   **PARTIES**

**Plaintiff**

3.     LARRY KLAYMAN is an individual, natural person, who at all material times was and is a citizen of Florida.

**Defendants**

4.     HON. TIMOTHY J. KELLY ("Judge Kelly") is on information and belief an individual and a citizen of the District of Columbia. He is a judge at the U.S. District Court for the District of Columbia.

5.     HON. TREVOR N. MCFADDEN ("Judge McFadden") is on information and belief an individual and a citizen of the District of Columbia. He is a judge at the U.S. District Court for the District of Columbia.

6.     HON. DABNEY L. FRIEDRICH ("Judge Friedrich") is on information and belief an individual and a citizen of the District of Columbia. She is a judge at the U.S. District Court for the District of Columbia.

IV.    **STANDING**

7.     Mr. Klayman has standing to bring this action because he has been directly affected, harmed, and victimized by the unlawful conduct complained herein. His injuries are

proximately related to the conduct of Defendants, each and every one of them, jointly and severally.

**V.     FACTS**

8.     This case centers around the unconstitutional and other illegal actions of Defendants, each and every one of them, acting in concert, in not just violating their oath of office as federal judges but worse violating Mr. Klayman's constitutional and other legal rights and discriminating and thus retaliating against him in *In re Larry Klayman,* Attorney Grievance Docket No. 21-07 (the "Federal Disciplinary Proceeding") in this Court.

9.     The Federal Disciplinary Proceeding was a reciprocal discipline matter stemming from the District of Columbia Court of Appeals' ("DCCA") wholly unconstitutional and otherwise improper temporary suspension of Mr. Klayman in *In re: Klayman*, 20-BG-583 (the "State Disciplinary Proceeding").

10.     In the State Disciplinary Proceeding, the DCCA issued—without any cause as the disciplinary matter had not yet been adjudicated—an order to show cause as to why Mr. Klayman should not serve an interim suspension while the matter was being decided, which would take a considerable amount of additional time if a complete and thorough review of the record should ever take place. Thus, temporary interim discipline runs counter to perhaps the most fundamental and basic tenet of our judicial system – that an individual is to be provided due process and equal protection under the law, and thus presumed innocent until proven guilty under the Constitution. Disciplinary proceedings are quasi-criminal in nature, and thus this constitutional protection is at play. However, to the contrary, the judges in the DCCA flipped fundamental constitutional rights on their head, finding Mr. Klayman guilty until he can prove

himself innocent. This is a clear violation of Mr. Klayman's due process and other sacrosanct constitutional rights.

11.     Mr. Klayman therefore filed an extremely detailed response in the State Disciplinary Proceeding citing in great detail, with backup citations, substantial evidence to the order to show cause, as well as a supplement, both of which showed why interim discipline was not warranted.

12.     However, the judges in the DCCA ignored Mr. Klayman's submissions and chose instead to impose an interim suspension on January 7, 2021, while providing absolutely no findings of fact and conclusions of law as to how it came to this decision, another clear due process violation.

13.     This misconduct and constitutional violation by the DCCA in the State Court Proceeding gave rise to litigation in this Court in a case styled *Klayman v. Blackburne-Rigsby et al*, 21-cv-409 (D.D.C.). This is currently on appeal to the U.S. Court of Appeals for the District of Columbia Circuit.

14.     Indeed, Mr. Klayman's fears have come to fruition, as he has now been temporarily suspended by the DCCA for over eight months and counting, and this matter is still pending. If and when Mr. Klayman is found to have committed no ethical violations, he will have still served a lengthy suspension for absolutely no reason, with all attendant interim harm to him and his clients. This is of course, by design of the DCCA, a highly politicized and compromised body in the most politicized and compromised city in the United States.

15.     To exacerbate things and to "add insult to injury," on April 8, 2021, this Court issued an Order to Show Case as to why reciprocal discipline should not be imposed based on the State Disciplinary Proceeding. In response, Mr. Klayman submitted an extremely detailed

response, containing his response to the DCCA as why interim discipline was entirely unwarranted, as he had committed no ethical violations. Exhibit A is incorporated herein by reference in its entirety.

16.     Despite this extremely detailed response, the three Defendants, Judge Kelly, Judge Friedrich, and Judge McFadden issued an extremely brief  and cursory order on July 23, 2021, totaling just four pages in substance, imposing reciprocal discipline. Exhibit B. None of the principal arguments set forth in Mr. Klayman's response were addressed, but were instead intentionally ignored.

17.     Defendants cite LCvR 83.16(c)(1) to support their decision, but this rule is clearly unconstitutional because it denies Mr. Klayman, and others, due process under the Fifth, Fourteenth, and First Amendments  -- as it also extinguished Mr. Klayman's public interest free speech legal advocacy--  and it lacks a rational basis, is arbitrary and capricious, and should therefore be ruled to be invalid and unenforceable.

18.     This rule, along D.C. Bar Rule XI, §9(g), which authorized temporary suspension, is clearly unconstitutional because it denies Mr. Klayman, and others, due process under the Fifth, Fourteenth, and First Amendments  -- as it also extinguished Mr. Klayman's public interest free speech legal advocacy--  and it lacks a rational basis, is arbitrary and capricious, and should therefore be ruled to be invalid and unenforceable.

19.     This is underscored by the fact that as recently as June 11, 2020, in another disciplinary matter, 18-BG-100, the District of Columbia Court of Appeals made the express finding that Mr. Klayman was not unfit to practice law. "Nevertheless, we are not left with '[s]erious doubt' or 'real skepticism' that Mr. Klayman can practice ethically," and thus there

exists no reasonable basis for temporary suspension in any event, as Plaintiff is not even a threat to the legal profession, much more his clients' interests.

20.     Thus, it is clear that Defendants did not actually review the record before rendering its order, and instead made their decision on outside, impermissible factors, as set forth below. This is a clear violation of Mr. Klayman's due process rights because it has taken away meaningful and actual access to the attorney discipline system to defend himself. If the Defendants are not going to actually read and consider Mr. Klayman's submission, and instead are going to impose temporary discipline no matter what are the facts and the law, then Mr. Klayman's due process rights have clearly been violated.

21.     On information and belief, each and every one of the Defendants have communicated and worked together in collaboration to create and cause the manifest and grave injustice that has occurred. This has resulted from  their personal animus towards and dislike for Mr. Klayman, as he has been very openly critical of federal judges in this Court, and indeed these particular judges, particularly in the highly politized and toxic environment of the District of Columbia, as he wrote in his book "It Takes A Revolution: Forget the Scandal Industry!," which was dedicated to Thomas Jefferson. This greatest of Founding Fathers and presidents opposed Article III federal judges, as unelected, life tenured and thus unaccountable to We the People, predicting that they would in effect become despots and tyrants, as they would believe and act as if they are above the law with no accountability.  Mr. Klayman's highly publicized book was, not coincidentally, highly critical of each and every one of the Defendants. This book was published on October 27, 2020, before the Defendants ruled, and it was widely advertised nationally and internationally months in advance of that by Post Hill Press and other publishers and distributors.

22.     Indeed, it would appear that the panel was stacked in the Federal Court Proceeding to be comprised of judges appointed by Donald Trump to create the appearance of impartiality, but in actuality, Mr. Klayman, a conservative public interest advocate and activist, has been just as highly critical of a number of judges appointed by Donald Trump, such as Defendants herein,  as those appointed by his predecessors. As set forth above, he has been highly critical of each and every one of the Defendants in his book "It Takes a Revolution: Forget the Scandal Industry!," where he critiques each of the Defendants by name, with supporting detail. Indeed, Mr. Klayman, the founder of Judicial Watch, Inc., as well as Freedom Watch, Inc., conceived of these organizations to "watch judges," as he had experienced, as Jefferson predicted, a myriad of injustices and unethical behavior by unelected life tenured federal judges over his long career, which misconduct harmed if not extinguished the rights of his clients.

23.     The Defendants' dislike if not animus for Mr. Klayman is no secret. At a hearing in an unrelated matter where Mr. Klayman served as counsel, *Arpaio v. Zucker et al*, 18-cv-2894 (D.D.C.), the Honorable Royce Lamberth of this Court  revealed to Mr. Klayman and those who were in the audience, "I haven't had you here in a long time. It's a pleasure to have you again. I know some judges don't say that to you, but I will say it." Exhibit C. This shows that even Judge Lamberth knew of the dislike if not animus that many of his colleagues in this Court had and continue to have for Mr. Klayman.

24.     However, respectfully, it is not Defendants' job to simply brush off and dismiss their duties as federal judges that for whatever reason they do not want to do, whether it be due to personal dislike of and animus toward the Appellant, Mr. Klayman, or for other reasons.

Defendants were appointed to perform their duties of applying the law to the facts, regardless of any personal biases. This is required by the oath of office for federal judges:

> I do solemnly swear that I will administer justice **without regard to persons**, and do equal right to the poor and to the rich, and that I will impartially discharge and perform all the duties incumbent upon me as judge under the Constitution and laws of the United States. So help me God. 28 U.S.C. § 453 (emphasis added).

25.     Respectfully, while judges can be critical of attorneys in their opinions, if attorneys dare severely criticize them, as Mr. Klayman has, they are subjected to this type of treatment, misconduct and retaliation, here in clear contravention of Mr. Klayman's constitutional and other rights.

26.     Mr. Klayman has thus been severely harmed by the Defendants, as his due process rights pursuant to the Fourteenth, and the Fifth and First Amendments to the Constitution have been severely violated. On information and belief, Defendants believe that this will effectively put Mr. Klayman and his public interest advocacy, writings and other professional activities out of business, shielding them from more harsh criticism and potential litigation. Thus, in addition to his constitutional Fifth and Fourteenth Amendment due process rights,  Mr. Klayman's First Amendment rights to free speech and expression have been violated.

27.     Mr. Klayman therefore respectfully requests that this matter be transferred to another District Court where he is admitted, either the U.S. District Courts for the Southern or Middle Districts of Florida or the U.S. District Court for the Northern District of Texas, as this case will necessarily hinge upon members of this Court ruling on  the  acts of three judges on this Court, which actions were and remain in violation of Plaintiff's constitutional and other legal rights, and were also unethical in and of themselves. This creates a manifest and  strong conflict of interest. Transfer to an impartial venue is therefore necessary in the interest of Mr. Klayman's due process, First Amendment and other rights, as well as the interests of justice in general.

### FIRST CAUSE OF ACTION
*Civil Action for Deprivation of Rights*
*Against All Named Defendants*
**Fourteenth Amendment Due Process**

28.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint with the same force and effect, as if fully set forth herein again at length.

29.     Defendants' actions and omissions, each and every one of them acting in concert as joint tortfeasors, constituted a violation to Mr. Klayman constitutional rights secured by the Due Process clause of the Fourteenth Amendment.

30.     Defendants denied Mr. Klayman due process by failing to review the record, failing in good faith to even consider Mr. Klayman's arguments, and simply "rubber stamping" the DCCA's fatally flawed and unconstitutional temporary suspension order.

31.     Defendants denied Mr. Klayman due process by taking away meaningful access to the legal system, taking away his ability to meaningfully defend himself before this Court's disciplinary apparatus, and taking away his right to have his cases actually heard and considered by the judicial system.

32.     Defendants' actions were intentional, malicious, willful, wanton, and in gross and reckless disregard of Mr. Klayman's constitutional rights.

33.     Mr. Klayman prays that the imposition temporary and reciprocal discipline be rescinded pending the completion of the State Disciplinary Proceeding at the DCCA.

### SECOND CAUSE OF ACTION
*Civil Action for Deprivation of Rights*
*Against All Named Defendants*
**Fifth Amendment Due Process**

34.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint with the same force and effect, as if fully set forth herein again at length.

35.     Defendants' actions and omissions constituted a violation to Mr. Klayman constitutional rights secured by the Due Process clause of the Fifth Amendment.

36.     Defendants denied Mr. Klayman due process by failing to review the record, failing in good faith to even consider Mr. Klayman's arguments, and simply "rubber stamping" the DCCA's fatally flawed and unconstitutional temporary suspension order.

37.     Defendants denied Mr. Klayman due process by taking away meaningful access to the legal system, taking away his ability to meaningfully defend himself before the thi Court's disciplinary apparatus, and taking away his right to have his cases actually heard and considered by the judicial system.

38.     Defendants' actions were intentional, malicious, willful, wanton, and in gross and reckless disregard of Mr. Klayman's constitutional rights.

39.     Mr. Klayman prays that the imposition temporary and reciprocal discipline be rescinded pending the completion of the State Disciplinary Proceeding at the DCCA.

**THIRD CAUSE OF ACTION**
*Civil Action for Deprivation of Rights*
*Against All Named Defendants*
*First Amendment Violation*

40.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint with the same force and effect, as if fully set forth herein again at length.

41.     Defendants' actions and omissions, each and every one of them acting in concert as joint tortfeasors, constituted a violation to Mr. Klayman constitutional rights secured by the First Amendment.

42.     Defendants violation of Mr. Klayman's constitutional and other legal rights , as set forth above, will effectively put Mr. Klayman and his public interest advocacy, writings and

other professional activities out of business, shielding them from more harsh criticism and potential litigation.

43.     Defendants' are attempting to silence Mr. Klayman, and legal advocacy on behalf his activist clients such as Sheriff Joe Arpaio and Cliven Bundy to name just a few, and this is a violation of his rights of free speech under the First Amendment.

44.     Part and parcel to this, after Mr. Klayman filed another recently filed pro se complaint *Klayman v. Reo et al*, 1:21-cv-02473 (D.D.C.), this Court without notice removed Mr. Klayman's ability to file electronically in this or any other case, in a further attempt to silence and harm him, as well as to increase the cost in terms of time and expense in pursuing his constitutional and other legal rights. Under the First Amendment Mr. Klayman has the right to pursue legal remedies pro se, even if unconstitutionally and illegally suspended temporarily by this Court, any other court, or the District of Columbia Bar Disciplinary apparatus.

45.     Defendants' actions were intentional, malicious, willful, wanton, and in gross and reckless disregard of Mr. Klayman's constitutional rights.

46.     Mr. Klayman prays that the imposition temporary and reciprocal discipline be rescinded pending the completion of the State Disciplinary Proceeding at the DCCA.

### FOURTH CAUSE OF ACTION
*Challenge to Constitutionality of District of Columbia Local Civil Rule 83.16(c)(1) and District of Columbia Bar Rule XI §9(g)*

47.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint with the same force and effect, as if fully set forth herein again at length.

48.     LCvR 83.16(c)(1) states in full:

An attorney subject to these Rules who has been suspended for more than 30 days or disbarred by another court shall be automatically suspended from practice in this Court. The suspension shall be effective upon service of a Temporary Suspension and Show Cause Order in accordance with these Rules. An attorney

who has been suspended for 30 days or less by another court shall have the fact of that discipline noted by the Clerk on the Lawyer's Register maintained by this Court, and no further proceedings shall be had thereon, unless the Committee on Grievances shall determine that the facts underlying the discipline warrant a proceeding for the imposition of discipline by this Court. Notations on the Lawyers' Register do not constitute discipline imposed by the Court and they shall be available only to the Court and to the Committee and shall not be matters of public record.

49.    D.C. Bar Rule XI, §9(g) states in full:

(g) *Suspension pending final action by the Court*.
(1) Upon receipt of a report from the Board recommending discipline in the form of disbarment, suspension requiring proof of fitness as a condition of reinstatement, or suspension of one year or more without a fitness requirement, the Court shall order the attorney to show cause within thirty days why the Court should not enter an order of suspension pending final action on the Board's recommendation. The attorney shall be required to show cause even if the Board recommends as discipline a partial (but not an entire) stay of the suspension in favor of probation. Unless the Court requests, Disciplinary Counsel need not reply to the attorney's response. To prevent suspension under this subsection, the attorney shall have the burden of demonstrating a substantial likelihood of success with respect to the exceptions the attorney has taken to the Board's report.
(2) If the attorney does not make the showing required by subsection (g)(1) of this section, or if the attorney has not responded to the show cause order in the time required, the Court shall impose interim discipline as follows pending final action on the Board's recommendation:
(a) If the Board has recommended disbarment or suspension requiring proof of fitness to practice law as a condition of reinstatement, the Court shall enter an order suspending the attorney from the practice of law in the District of Columbia.
(b) If the Board has recommended suspension of one year or more without requiring proof of fitness as a condition of reinstatement, the Court shall enter an order imposing the discipline recommended by the Board.
(3) Any suspension imposed under this subsection will not limit the authority of the Court to impose greater or lesser discipline than that recommended by the Board.
(4) Suspension under this subsection shall take effect as provided in subsection 14 (f), and an attorney suspended under this subsection shall comply with the requirements of section 14 of this rule.

50.    These rules are unconstitutional in that they violate Mr. Klayman's, as well as others similarly situated, due process rights pursuant to the Fifth and Fourteenth Amendments, as well as right to freedom of speech and advocacy pursuant to the First Amendment.

51.     These rules are unconstitutional in that they presume Mr. Klayman, as well as other similarly situated, "guilty until proven innocent." As pled above, this contravenes one of the basic tenets of the American legal system – that persons are entitled to a presumption of innocence and are therefore innocent until proven guilty. This is well-settled by the Supreme Court as early as 1895. *Coffin v. United States*, 156 U.S. 432 (1895).

52.     Mr. Klayman therefore seeks declaratory relief from this Court that Local Civil Rule 83.16(c)(1) and District of Columbia Bar Rule XI §9(g) are invalid and unenforceable, as they are clearly unconstitutional.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against each of the Defendants, jointly and severally, for declaratory and preliminarily and permanent injunctive relief, and any other further relief the Court deems just and proper, for the prejudicial, intentional, reckless, illegal, unconstitutional and malicious acts of the Defendants, each and every one of them, jointly and severally, against Mr. Klayman, which are and continue to be designed to severely harm him and his family, therefore eliminating him as a public interest advocate who has been and continues to be critical of many in the federal judiciary, including these Defendants, particularly in and on the highly politicized, toxic, vindictive, and compromised District of Columbia courts.

Plaintiff prays:

(1) that the imposition temporary and reciprocal discipline be rescinded pending the completion of the State Disciplinary Proceeding at the DCCA.

(2) that Local Civil Rule 83.16(c)(1) and District of Columbia Bar Rule XI §9(g) are declared and found to be unconstitutional, void, and of no force and effect.

Dated: September 27, 2021                     Respectfully submitted,

                                              */s/ Larry Klayman*
                                              Larry Klayman, Esq.
                                              7050 W. Palmetto Park Rd
                                              Boca Raton, FL, 33433
                                              Email: leklayman@gmail.com

                                              *Plaintiff Pro Se*

# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In Re: Larry Klayman

Attorney Grievance
AG No: 21-07

## <u>LARRY KLAYMAN'S  RESPONSE TO ORDER OF APRIL 6, 2021</u>

Respondent Larry Klayman ("Mr. Klayman") hereby submits the following response to the Disciplinary Panel's order of April 6, 2021 suspending him from the practice of law pending final disposition of *In the Matter of Larry E. Klayman,* 20-BG-583 in the District of Columbia Court of Appeals (the "DCCA Matter").

Mr. Klayman respectfully requests that the suspension be lifted immediately, as he has not been suspended in the DCCA Matter as a result of any final order. The DCCA Matter has suspended him pending final disposition, which is a violation of his due process and equal protection rights, as he is presumed him innocent until proven guilty. If he is ultimately found to have committed no ethical violation by the DCCA, then he will have served a suspension for absolutely no reason. This goes against every fundamental principle of the legal system.

Furthermore, Mr. Klayman is currently challenging the DCCA Matter's temporary suspension order before this Court. *Klayman v. Blackburne-Rigsby et al*, 21-cv-409 (D.C.D.). The DCCA has no jurisdiction over a federal court like this one, and therefore Mr. Klayman respectfully cannot and should not be subject to any discipline until at least the disposition of this case, including any appeals. Mr. Klayman is attaching the Complaint filed in this instant case, which contains as an exhibit his response to the DCCA which shows exactly why reciprocal

discipline was completely unwarranted. Mr. Klayman respectfully requests that the Court thoroughly review and digest this pleading and its exhibits and defer consideration of unwarranted temporary reciprocal discipline until this matter is fully litigated, as his constitutional rights have been violated. To proceed now would compound this violation of constitutional and other rights by the judges of the DCCA.

Dated: May 6, 2021                                    Respectfully Submitted

                                                       /s/ Larry Klayman_____
                                                       Larry Klayman
                                                       7050 W. Palmetto Park Rd
                                                       Boca Raton FL 33433
                                                       561-558-5336
                                                       leklayman@gmail.com

                                                       *Pro Se*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LARRY KLAYMAN
7050 W. Palmetto Park Rd
Boca Raton FL 33433

        Plaintiff,

v.

HON. ANNA BLACKBURNE-RIGSBY
c/o 500 Indiana Ave NW
Washington DC 20001

    and

HON. CORRINE A. BECKWITH
c/o 500 Indiana Ave NW
Washington DC 20001

    and

HON. JOSHUA DEAHL
c/o 500 Indiana Ave NW
Washington DC 20001

    and

HON. CATHERINE F. EASTERLY
c/o 500 Indiana Ave NW
Washington DC 20001

    and

HON. STEPHEN H. GLICKMAN
c/o 500 Indiana Ave NW
Washington DC 20001

    And

HON. ROY W. MCLEESE
c/o 500 Indiana Ave NW
Washington DC 20001

**COMPLAINT**

1

and

HON. PHYLLIS D. THOMPSON
c/o 500 Indiana Ave NW
Washington DC 20001

and

HON. JOHN M. FERREN
c/o 500 Indiana Ave NW
Washington DC 20001

and

HON. JOHN R. FISHER
c/o 500 Indiana Ave NW
Washington DC 20001

and

HON. FRANK Q. NEBEKER
c/o 500 Indiana Ave NW
Washington DC 20001

and

HON. VANESSA RUIZ
c/o 500 Indiana Ave NW
Washington DC 20001

and

HON. JOHN M. STEADMAN
c/o 500 Indiana Ave NW
Washington DC 20001

and

HON. ERIC T. WASHINGTON
c/o 500 Indiana Ave NW
Washington DC 20001

And

HON. JULIO CASTILLO
c/o 500 Indiana Ave NW

Washington DC 20001

Defendants.

## I. INTRODUCTION

Plaintiffs LARRY KLAYMAN ("Mr. Klayman") brings this action against HON. ANNA BLACKBURNE-RIGSBY, HON. CORRINE A. BECKWITH, HON. JOSHUA DEAHL, HON. CATHERINE F. EASTERLY, HON. STEPHEN H. GLICKMAN, HON. ROY W. MCLEESE, HON. PHYLLIS D. THOMPSON, HON. JOHN M. FERREN, HON. JOHN R. FISHER, HON. FRANK Q. NEBEKER, HON. VANESSA RUIZ, HON. JOHN M. STEADMAN, HON. ERIC T. WASHINGTON, and HON. JULIO CASTILLO for violations of his constitutional rights under 42 U.S.C. § 1983.

## II. JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction) and 28 U.S.C. § 1332 (Diversity Jurisdiction) because the amount in controversy exceeds $75,000 and there is complete diversity amongst the parties.

2.      Venue is proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2), (3) a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and Defendants are subject to personal jurisdiction in this District.

## III. PARTIES

### Plaintiff

3.      LARRY KLAYMAN is an individual, natural person, who at all material times was and is a citizen of Florida.

### Defendants

4.     HON. ANNA BLACKBURNE-RIGSBY ("Judge Blacksburne-Rigsby") is on information and belief an individual and a citizen of the District of Columbia. She is the Chief Judge of the District of Columbia Court of Appeals.

5.     HON. CORRINE A. BECKWITH ("Judge Beckwith") is on information and belief an individual and a citizen of the District of Columbia. She is an Associate Judge of the District of Columbia Court of Appeals.

6.      HON. JOSHUA DEAHL ("Judge Deahl") is on information and belief an individual and a citizen of the District of Columbia. He is an Associate Judge of the District of Columbia Court of Appeals.

7.     HON. CATHERINE F. EASTERLY ("Judge Easterly") is on information and belief an individual and a citizen of the District of Columbia. She is an Associate Judge of the District of Columbia Court of Appeals.

8.     HON. STEPHEN H. GLICKMAN ("Judge Glickman") is on information and belief an individual and a citizen of the District of Columbia. He is an Associate Judge of the District of Columbia Court of Appeals.

9.     HON. ROY W. MCLEESE ("Judge McLeese") is on information and belief an individual and a citizen of the District of Columbia. He is an Associate Judge of the District of Columbia Court of Appeals.

10.     HON. PHYLLIS D. THOMPSON ("Judge Thompson") is on information and belief an individual and a citizen of the District of Columbia. She is an Associate Judge of the District of Columbia Court of Appeals.

11.    HON. JOHN M. FERREN ("Judge Ferren") is on information and belief an individual and a citizen of the District of Columbia. He is a Senior Judge of the District of Columbia Court of Appeals.

12.    HON. JOHN R. FISHER ("Judge Fisher") is on information and belief an individual and a citizen of the District of Columbia. He is a Senior Judge of the District of Columbia Court of Appeals.

13.    HON. FRANK Q. NEBEKER ("Judge Nebeker") is on information and belief an individual and a citizen of the District of Columbia. He is a Senior Judge of the District of Columbia Court of Appeals.

14.    HON. VANESSA RUIZ ("Judge Ruiz") is on information and belief an individual and a citizen of the District of Columbia. She is a Senior Judge of the District of Columbia Court of Appeals.

15.    HON. JOHN M. STEADMAN ("Judge Steadman") is on information and belief an individual and a citizen of the District of Columbia. He is a Senior Judge of the District of Columbia Court of Appeals.

16.    HON. ERIC T. WASHINGTON ("Judge Washington") is on information and belief an individual and a citizen of the District of Columbia. He is a Senior Judge of the District of Columbia Court of Appeals.

17.    HON. JULIO CASTILLO ("Mr. Castillo") is on information and belief an individual and a citizen of the District of Columbia He is the Clerk of the District of Columbia Court of Appeals.

## IV.    STANDING

18.     Mr. Klayman has standing to bring this action because he has been directly affected, harmed, and victimized by the unlawful conduct complained herein. Their injuries are proximately related to the conduct of Defendants, each and every one of them, jointly and severally.

## V.     FACTS

19.      This case centers around the actions of Defendants in violating Mr. Klayman's rights and discriminating against him in a disciplinary matter styled *In re: Klayman*, 20-BG-583. (the "Disciplinary Proceeding") Mr. Klayman's initial brief and appendix are attached to his sworn affidavit, which is attached hereto as <u>Exhibit 1</u>. This affidavit, initial brief and appendix are incorporated herein as if they are pled in the body of this Complaint. They set forth the underlying facts of the disciplinary proceeding against Mr. Klayman. Filed contemporaneously with this Complaint is also a Motion for Preliminary Injunction, which is also incorporated herein by reference.

20.     The Complainant in the Disciplinary Proceeding matter is a Muslim woman of color. Mr. Klayman is a white Jewish male. This disparity, favoritism  and the discrimination as pled herein serves as the basis for Mr. Klayman claims under the Equal Protection Clause of the Fourteenth Amendment.

21.     From the very outset of this proceeding coming before the District of Columbia Court of Appeals ("DCCA"), it more than appears that Defendants, furthered by the constitutional violations set forth herein, have prejudged this matter, which has severely prejudiced and harmed not just Mr. Klayman but also his clients.

22.     This prejudgment is manifested by prima facie violations of many of Mr. Klayman's rights, including due process under the Fourteenth and Fifth Amendments, equal

protection under the Fourteenth Amendment, rights of free speech and legal advocacy under the First Amendment, and  right to counsel of choice under the Sixth Amendment to the Constitution during the temporary suspension phase of this proceeding.

23.    On October 19, 2020 the DCCA, comprised of each and every Defendant, *sua sponte* issued, without cause the disciplinary matter had not been adjudicated by Defendants,  an order to show cause as to why Mr. Klayman should not serve an interim suspension while this matter was being decided, which could take a considerable amount of additional time if a complete and thorough review of the record should ever take place, which it must.

24.    Thus, temporary interim discipline, particularly under these egregious and extraordinary circumstances, runs counter to perhaps the most fundamental and basic tenet of our judicial system – that an individual is to be provided due process and equal protection under the law, and thus presumed innocent until proven guilty.  However, to the contrary, the Defendants and their DCCA have flipped fundamental constitutional rights on their head, finding Mr. Klayman guilty until he can prove himself innocent.

25.    Thus, Mr. Klayman filed an extremely detailed response citing in great detail, with backup citations, substantial evidence to the order to show cause, as well as a supplement, both of which showed why interim discipline was not warranted.

26.    However, Defendants  ignored Mr. Klayman's submissions and chose instead to impose an interim suspension on January 7, 2021, while providing absolutely no findings of fact and conclusions of law as to how it came to this decision. This prevents Mr. Klayman from effectively challenging this order during the final phase of this appeal, as he has no idea why the DCCA chose to impose interim discipline

27. Indeed, for this fundamental reason, Mr. Klayman filed on January 11, 2021 a Emergency Motion to Vacate Order and Issue Ruling with Factual and Legal Analysis with Established and Mandated Judicial Practice Based on Due Process and Other Constitutional Rights, but this was again summarily denied without any findings of fact and conclusions of law.

28. An order temporarily suspending Mr. Klayman is akin to a preliminary injunction, which means that Mr. Klayman should have been entitled to factual findings and conclusions of law so that he knows what he needs to address in his actual briefs. *As set forth by analogy in* District of Columbia Rule of Civil Procedure 52 (a)(1):

> Unless expressly waived by all parties, in an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record or may appear in an opinion or a memorandum of decision filed by the court and are sufficient if they state the controlling factual and legal grounds of decision.

Part (a)(2) of this Rule with regard to analogous interlocutory injunctions mandates "In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action. Similarly, the Federal Rules of Civil Procedure are substantively the same as the District of Columbia Rules of Civil Procedure See Fed. R. Civ. P. 52(a)(1) – (2):

> (1) In General. In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.
> (2) For an Interlocutory Injunction. In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action.

29. Mr. Klayman then attempted to file, pursuant to DCCA Rule 35, a Petition for Rehearing En Banc. However, Mr. Klayman was not even allowed to file this Petition, as it was rejected, by Defendants comprised of the chief judge, this three judge panel and all of the

judges of the DCCA on January 25, 2021 as "invalid material" on the basis that the January 7, 2021 order was an interim suspension pending final disposition. Carrying out the unconstitutional acts of the judges of the DCCA was its Clerk, Julio Castillo, who thus also acted unconstitutionally.

30.     However, nothing in DCCA Rule 35 prohibits the filing of a Petition for Rehearing En Banc to challenge an interim order. *See* DCCA Rule 35: "(a) When Hearing or Rehearing En Banc May Be Ordered. A majority of the judges who are in regular active service may order that an appeal or other proceeding be heard or reheard en banc. An en banc hearing or rehearing is not favored and ordinarily will not be ordered unless: (1) en banc consideration is necessary to secure or maintain uniformity of the court's decisions; or  (2) the proceeding involves a question of exceptional importance.

31.     Thus, Respondent Larry Klayman's Resubmitted Emergency Petition for Rehearing En Banc to Vacate Three Judge Panel Per Curiam Order of January 7, 2021 and Reissue Order with Factual and Legal Analysis in Accordance with established and Mandated Judicial Practice Based on Due Process and Other Constitutional Rights was refiled to point out that Rule 35 did not prohibit en banc review, but it was apparently summarily rejected again.

32.     It appears, once again, that the DCCA was simply looking for a reason to continue to deny Mr. Klayman  his due process and equal protection rights by not providing him with any required factual findings and conclusions of law, from  which he could logically base his arguments against discipline during this final phase of the proceeding.

33.     Because each and every member of the DCCA, all Defendants herein including the Court Clerk, Julio Castillo, who acted at the direction of the Defendants, refused to even consider Mr. Klayman's Petition for Rehearing En Banc, and indeed would not even allow its

filing, each and every Defendant acted upon, has condoned and ratified the constitutional violations herein.

34.     To make matters even more egregious and unconstitutional, Mr. Klayman has, until recently,  been denied his right to counsel under the Sixth Amendment to the Constitution. From the very outset of this case in the DCCA, Mr. Klayman made it very clear that he wished to be represented by Melissa Isaak, Esq. pro hac vice. In this regard, Ms. Isaak first filed an application for pro hac vice admission on November 11, 2020 and it was not until January 21, 2021 that the DCCA finally directed the clerk to enter Ms. Isaak's appearance. See Order of January 21, 2021 directing Clerk to enter the appearance of Melissa Isaak, Esq. This is an egregious and unconscionable over three-month delay, that is over nine (9) weeks, during which time  Mr. Klayman was denied his right to counsel of choice until after the DCCA had already imposed an interim suspension on him.

35.     Lastly, Mr. Klayman has informed the DCCA and Defendants on numerous occasions that he was not being served timely with orders from the court, which has caused him prejudice. As set forth in his Motion for Extension of Time of January 3, 2021, he did not learn of the briefing schedule order until sixteen (16) days after it had been issued. This is significant as he lost time to prepare for such a voluminous brief. Tellingly, the DCCA and the Defendants have even refused to address this simple matter, which can be easily fixed.

36.     All of this creates much more than a strong inference that the DCCA that all of its Defendants have prejudged the issues by denying Plaintiff Klayman is constitutional rights, notwithstanding the underlying facts of this disciplinary matter which are discussed further in detail below. This total unconstitutional breakdown of the disciplinary process requires this Court to remedy this clear wrong. Mr. Klayman thus respectfully requests that the Court

immediately grant injunctive relief and order the  lifting of the temporary suspension and order that  Defendants thoroughly review the record to prevent a further and at this point compounded miscarriage of justice.

37.     Mr. Klayman is left with no legal recourse but to file this action. Mr. Klayman has no adequate remedy at law as he has exhausted all such avenues before the Defendants. On February 9, 2021, Mr. Klayman filed an Emergency Motion of Respondent Larry Klayman to Rescind Temporary Suspension Order of January 7, 2021, but Defendants have refused to act, further evidencing that he has no adequate remedy at law. Exhibit 2.

38.     Mr. Klayman has suffered irreparable harm to my reputation and ability to practice law as a public interest attorney advocate and private practitioner. His current clients and prospective clients have been harmed as well. As set forth in Exhibit 1, as just one example, the Defendants' temporary suspension order is being used against him in *Luhn v. Scott et al*, 19-7146 (D.C.  Cir.), where Plaintiff Klayman represents Laura Luhn in her appeal. This has also irreparably harmed him and his clients in *Strange v. Islamic Republic of Iran et al*, 14-cv-435 (D.D.C), where one of the Plaintiffs that Mr. Klayman had been representing terminated his representation. As yet unknown in its entirely are those prospective clients who have not retained Plaintiff because of the unconstitutional temporary suspension. More continuing damage will follow if equitable relief is not granted preliminarily and permanently.

### FIRST CAUSE OF ACTION
*Civil Action for Deprivation of Rights*
*Against All Named Defendants*
**42 U.S.C. § 1983 – Fourteenth Amendment Due Process**

39.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint with the same force and effect, as if fully set forth herein again at length.

40.     Defendants, at all material times, were acting under the color of state law.

41.    Defendants' actions and omissions constituted a violation to Mr. Klayman constitutional rights secured by the Due Process clause of the Fourteenth Amendment.

42.    Defendants denied Mr. Klayman due process by refusing to provide any legal and factual analysis, much more findings of fact and conclusions of law,  in their orders temporarily suspending him while his disciplinary proceeding was taking place, and also by refusing to even consider his Petition for Rehearing En banc.

43.    Defendants' actions were intentional, malicious, willful, wanton, and in gross and reckless disregard of Mr. Klayman's constitutional rights.

<div align="center">

**SECOND CAUSE OF ACTION**
*Civil Action for Deprivation of Rights*
*Against All Named Defendants*
**42 U.S.C. § 1983 – Fifth Amendment Due Process**

</div>

44.    Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint with the same force and effect, as if fully set forth herein again at length.

45.    Defendants, at all material times, were acting under the color of state law.

46.    Defendants' actions and omissions constituted a violation to Mr. Klayman constitutional rights secured by the Due Process clause of the Fourteenth Amendment.

47.    Defendants denied Mr. Klayman due process by refusing to provide any legal and factual analysis, much more findings of fact and conclusions of law,  in their orders temporarily suspending him while his disciplinary proceeding was taking place, and also by refusing to even consider his Petition for Rehearing En banc.

48.    Defendants' actions were intentional, malicious, willful, wanton, and in gross and reckless disregard of Mr. Klayman's constitutional rights.

<div align="center">

**THIRD CAUSE OF ACTION**
*Civil Action for Deprivation of Rights*
*Against All Named Defendants*

</div>

**42 U.S.C. § 1983 – Fourteenth Amendment Equal Protection**

49.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint with the same force and effect, as if fully set forth herein again at length.

50.     Defendants, at all material times, were acting under the color of state law.

51.     Defendants' actions and omissions constituted a violation to Mr. Klayman constitutional rights secured by the Equal Protection Clause of the Fourteenth Amendment.

52.     Defendants engaged in discriminatory and unconstitutional behavior against Mr. Klayman due to his status as a Caucasian, white Jewish male, as opposed to the complainant who is a Muslim woman of color.

53.     Defendants' actions were intentional, malicious, willful, wanton, and in gross and reckless disregard of Mr. Klayman's constitutional rights.

<div align="center">

**FOURTH CAUSE OF ACTION**
***Civil Action for Deprivation of Rights***
***Against All Named Defendants***
**42 U.S.C. § 1983 – First Amendment**

</div>

54.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint with the same force and effect, as if fully set forth herein again at length.

55.     Defendants, at all material times, were acting under the color of state law.

56.     Defendants' actions and omissions constituted a violation to Mr. Klayman's constitutional rights secured by the Free Speech clause of the First Amendment.

57.     Defendants order temporarily suspending Mr. Klayman prevents him from engaging in free speech and advocacy as an attorney, both in a public interest capacity and as a private practitioner.

58.      Defendants' actions were intentional, malicious, willful, wanton, and in gross and reckless disregard of Mr. Klayman's constitutional rights.

**FIFTH CAUSE OF ACTION**
*Civil Action for Deprivation of Rights*
*Against All Named Defendants*
**42 U.S.C. § 1983 – Sixth Amendment Right to Counsel**

59.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint with the same force and effect, as if fully set forth herein again at length.

60.     Defendants, at all material times, were acting under the color of state law.

61.     Defendants' actions and omissions constituted a violation to Mr. Klayman constitutional rights secured by the Sixth Amendment's right to counsel of choice.

62.     Mr. Klayman was deprived of his right to be represented by Melissa Isaak Esq. until after Defendants issued an order temporarily suspending him.

63.     Defendants' actions were intentional, malicious, willful, wanton, and in gross and reckless disregard of Mr. Klayman's constitutional rights.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against each of the Defendants for declaratory and preliminarily and permanent injunctive relief, and any other further relief the Court deems just and proper, for the illegal, unconstitutional and intentional and malicious acts of the Defendants, each and every one of them, against Mr. Klayman.

Dated: February 17, 2021                    Respectfully submitted,


 */s/ Larry Klayman*
Larry Klayman
KLAYMAN LAW GROUP, P.A.
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433
Email: leklayman@gmail.com

Plaintiff Pro Se

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LARRY KLAYMAN<br><br>Plaintiff<br><br>v.<br><br>HON. ANNA BLACKBURNE-RIGSBY  et al<br><br>Defendants. | **Case Number:**  21-cv-409 |

<u>**SWORN AFFIDAVIT OF LARRY KLAYMAN**</u>

I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby swear and affirm as follows:

1.     I have personal knowledge of the following facts and if called upon as a witness, could testify competently thereto.

2.     I swear to the accuracy and veracity of Respondent's Initial Brief and Appendix, attached hereto as <u>Exhibit A</u> to the best of my knowledge and belief.

3.     I have been irreparably harmed by the conduct of the Defendants, and will continue to suffer irreparable harm. My constitutional rights have been violated by Defendants. It has long been established that the loss of constitutional freedoms, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009).

4.     I have suffered irreparable harm to my reputation and ability to practice law as a public interest attorney and advocate. and private practitioner. My current clients and prospective clients have been harmed as well. As set forth in <u>Exhibit A,</u> the Defendants' temporary suspension order is being used against me in *Luhn v. Scott et al*, 19-7146 (D.C.  Cir.), where I

1

represent Laura Luhn in her appeal. This has also irreparably harmed me and my clients in

*Strange v. Islamic Republic of Iran et al*, 14-cv-435 (D.D.C). More harm is continuing.

SWORN TO UNDER PENALTY OF PERJURY THIS 17th DAY OF FEBRUARY 2021

Larry Klayman

# EXHIBIT A

# IN THE DISTRICT OF COLUMBIA COURT OF APPEALS

_____

**In the Matter of:**

    **LARRY E. KLAYMAN, ESQ.**

**Respondent.**

**A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 334581)**

**No. 20-BG-583**
**Board Docket No: 17-BD-063**
**BDN: 2011-D028**

---

## INITIAL BRIEF OF RESPONDENT LARRY KLAYMAN

_____

Dated:  February 8, 2021

Respectfully submitted,

/s/ Melissa Isaak_____
Melissa Isaak, Esq.
2815-B Zelda Road
Montgomery, AL 36106
Tel: 334-262-8200
Melissa@protectingmen.com

# TABLE OF CONTENTS

STATEMENT OF ISSUES ........................................................1

STATEMENT OF THE CASE .................................................1

STATEMENT OF UNDERLYING FACTS OF THE CASE IN CHIEF................8

SUMMARY OF THE ARGUMENT ....................................20

THE LAW .......................................................................20

    The Temporary Suspension Order Must Be Vacated Immediately .............22

    Numerous Due Process Violations, Including Laches, Mandate
    Immediate Dismissal of the Charges Against Mr. Klayman .......................24

    There Was No Basis, Much Less Clear and Convincing Evidence, for the
    Finding that Mr. Klayman Had Committed Any Ethical Violation ............28

        "Emotional Interest" is Not An Ethical Violation ..............................28

        Mr. Klayman Did Not Fail to Abide By Ms. Sataki's Decisions
        Concerning the Objectives of Representation. ....................................33

        Mr. Klayman Did Not Fail to Communicate With Ms. Sataki..........42

        Mr. Klayman Did Not Disclose Any Client Secrets..........................44

        Mr. Klayman Did Not Fail to Withdraw from Representation..........46

        Ms. Sataki's Lack of Credibility Must Be Addressed .......................47

        The Hearing Committee and Board Exhibited Extreme Bias and
        Prejudice Towards Mr. Klayman, Which Must be Remedied...........52

    The Board's Report Evidences the Fact that it Did Not Take the Time to
    Review the Record .......................................................................57

CONCLUSION ...............................................................63

# **TABLE OF AUTHORITIES**

*Coffin v. United States*, 156 U.S. 432 (1895) ........................................................22

*Hayes v. Alabama State Bar*; 719 So 2d 787 (Ala. 1998) .....................................27

*In re Grigsby*, 815 N.W.2d 836 (Minn. 2012) ......................................................27

*In Matter of Joseph*, 60 V.I. 540 (V.I. Feb. 11, 2014) ...........................................27

*In re Vohra*, 68 A. 3d 766 (D.C. 2013) ..................................................................28

*The Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. l 1978) ...........................27

*The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001) .........................27

**STATEMENT OF ISSUES**

1.     Should the District of Columbia Court of Appeals ("DCCA") not impose discipline on Respondent Larry Klayman ("Mr. Klayman") in this disciplinary proceeding?

2.     Should the DCCA withdraw interim suspension on Mr. Klayman while this matter is decided, as it is in contravention of Mr. Klayman's due process, equal protection, Sixth Amendment right to counsel and other rights?

**STATEMENT OF THE CASE**

From the very outset of this proceeding coming before the DCCA, it more than appears that this Court has prejudged this matter, which has severely prejudiced and harmed not just Mr. Klayman but also his clients. This prejudgment is manifested by prima facie violations of many of Mr. Klayman's rights, including equal protection, due process, and Sixth Amendment right to counsel of choice during the temporary suspension phase of this proceeding.

First, even before this proceeding reached this Court, Mr. Klayman's due process, equal protection and other rights were ignored and violated. This is a very old – eleven (11) years to be exact -- disciplinary proceeding with a very voluminous record, which the Board on Professional Responsibility (the "Board") clearly never reviewed, given the numerous material errors contained in its Report and Recommendation (the "Board Report"). These material errors simply could not

1

have been possibly made had the record even been somewhat reviewed. This forced Mr. Klayman to file an "Emergency Motion for Reconsideration of Order of the Chair of the Board on Professional Responsibility and Motion to Stay Implementation of the Report and Recommendation of the Board of Professional Responsibility of October 2, 2020, Until the Board Conduct a Thorough and Bona Fide Review of the Entire Record in This Proceeding and Request for Internal Reviews" (the "Emergency Motion") as well as related supplements and motions. The Chairman of the Board, Matthew Kaiser ("Kaiser"), refused to address this, and simply sidestepped taking responsibility and then passed his responsibility on for this Court to deal with. With any real substantial discussion, and just a cursory denial, Kaiser stated:

> In any case before the Board, it is duty bound to 'review the findings and recommendations of Hearing Committees submitted to the Board, and to prepare and forward its own findings and recommendations, together with the record of proceedings before the Hearing Committee and the Board, to the Court.' D.C. Bar. R. XI, section 4(e)(7). As Respondent's Motion plainly seeks to petition to the Board to do that which it is mandated to do – and has done in the Board's report – it is denied as moot. App. 0123.

Furthermore, in the Emergency Motion, Mr. Klayman asked Kaiser if he and the Board had had *ex parte* communications with ODC and this Court on numerous occasions, which Kaiser refused to address. This creates the strong inference that ex parte communications have occurred, particularly over the temporary suspension order of January 7, 2021, as discussed below. How hard would it have

been, for instance, to simply say "no," if indeed there were to such ex parte communications?

Then, once this matter reached this Court, on October 19, 2020 the DCCA *sua sponte* issued an order to show cause as to why Mr. Klayman should not serve an interim suspension while this matter was being decided, which could take a considerable amount of additional time if a complete and thorough review of the record should ever take place, which it must. Thus, temporary interim discipline, particularly under these egregious and extraordinary circumstances, runs counter to perhaps the most fundamental and basic tenet of our judicial system – that an individual is to be provided due process and equal protection under the law, and thus presumed innocent until proven guilty. However, to the contrary, this Court has flipped fundamental constitutional rights on their head, finding Mr. Klayman guilty until he can prove himself innocent.

This is especially outrageous given the underlying facts of this disciplinary action, which, if indeed a thorough review of the record is ever undertaken, Mr. Klayman is confident would logically result in a final order of no suspension. The failure to undertake this review of the record severely prejudices not just Mr. Klayman, but also his clients. As just one example, his client, Laura Luhn has been severely prejudiced. App. 0037 – 0038. Other clients have terminated Mr. Klayman even on matters that are not before District of Columbia courts, as a

result of reading or hearing stories about the temporary discipline on the internet and elsewhere. In short, the  temporary suspension has been used strategically to harm Mr. Klayman's reputation, good will and standing with the courts before which he practices, as adversaries, "smelling blood," are using it to prejudice not just Mr. Klayman but also his clients' important interests.

In sum, the issuance of an order to show cause on January 7, 2021,  shows that this Court has already prejudged this matter and essentially made up its mind about Mr. Klayman, regardless of what the underlying facts and law are.

Because of this, Mr. Klayman filed an extremely detailed response citing in great detail, with backup citations,  substantial evidence to the order to show cause, as well as a supplement, both of which showed why interim discipline was not warranted. *See November 30, 2020 Response to Order to Show Cause and December 7, 2020 Supplement to Response to Order to Show Cause*. However, the Court appears to have ignored Mr. Klayman's submissions and chose instead to impose an interim suspension on January 7, 2021, while providing absolutely no legal or factual analysis as to how it came to this decision. This prevents Mr. Klayman from effectively challenging this order during the final phase of this appeal, as he has no idea why the Court chose to impose interim discipline.

Indeed, for this fundamental reason,  Mr. Klayman filed on January 11, 2021 a Emergency Motion to Vacate Order and Issue Ruing with Factual and Legal

Analysis with Established and Mandated Judicial Practice Based on Due Process and Other Constitutional Rights, but this was again summarily denied without any legal or factual analysis. An order temporarily suspending Mr. Klayman is akin to a preliminary injunction, which means that Mr. Klayman should have been entitled to factual findings and conclusions of law so that he knows what he needs to address in his actual briefs. *As set forth by analogy in* District of Columbia Rule of Civil Procedure 52 (a)(1):

> Unless expressly waived by all parties, in an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record or may appear in an opinion or a memorandum of decision filed by the court and are sufficient if they state the controlling factual and legal grounds of decision.

Part (a)(2) of this Rule with regard to analogous interlocutory injunctions mandates "In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action. Similarly, the Federal Rules of Civil Procedure are substantively the same as the District of Columbia Rules of Civil Procedure See Fed. R. Civ. P. 52(a)(1) – (2):

> (1) In General. In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58 (2)
> For an Interlocutory Injunction. In granting or refusing an interlocutory injunction, the court must similarly state the findings and conclusions that support its action.

Mr. Klayman then attempted to file, pursuant to DCCA Rule 35, a Petition for Rehearing En Banc. However, Mr. Klayman was not even allowed to file this Petition, as it was rejected,  apparently  by the chief judge, this three judge panel and all of the judges of this Court,  on January 25, 2021 as "invalid material" on the basis that the January 7, 2021 order was an interim suspension pending final disposition.  App. 0039. However, nothing in DCCA Rule 35 prohibits the filing of a Petition for Rehearing En Banc to challenge an interim order. *See* DCCA Rule 35.

Thus, Respondent Larry Klayman's Resubmitted Emergency Petition for Rehearing En Banc to Vacate Three Judge Panel Per Curiam Order of January 7, 2021 and Reissue Order with Factual and Legal Analysis in Accordance with established and Mandated Judicial Practice Based on Due Process and Other Constitutional Rights was refiled to point out that Rule 35 did not prohibit en banc review, but it was apparently summarily rejected again. It appears, once again, that the Court was simply looking for a reason to continue to deny Mr. Klayman  his due process and equal protection rights by not providing him with any required factual findings and conclusions of law, from  which he could logically base his arguments against discipline during this final phase of the proceeding.

To make matters even worse, Mr. Klayman has, until recently,  been denied his right to counsel under the Sixth Amendment to the Constitution. From the very

outset of this case in this Court, Mr. Klayman made it very clear that he wished to be represented by Melissa Isaak, Esq. pro hac vice. In this regard, Ms. Isaak first filed an application for *pro hac vice* admission on November 11, 2020 and it was not until January 21, 2021 that the Court finally directed the clerk to enter Ms. Isaak's appearance. *See Order of January 21, 2021 directing Clerk to enter the appearance of Melissa Isaak, Esq*. This is an egregious and unconscionable over three-month delay, that is over nine (9) weeks, during which time Mr. Klayman was denied his right to counsel of choice until after the Court had already imposed an interim suspension on him. *See Order of January 7, 2021.*

Lastly, Mr. Klayman has informed the Court on numerous occasions that he was not being served timely with orders from the Court, which has caused him prejudice. App. 0040 – 0044. As set forth in his Motion for Extension of Time of January 3, 2021, he did not learn of the briefing schedule order until sixteen (16) days after it had been issued. This is significant as he lost time to prepare for such a voluminous brief. Tellingly, the Court has even refused to address this simple matter, which can be easily fixed.

Regrettably, the numerosity and scope of these violations of Mr. Klayman's constitutional and other rights can only be seen as willful, given their frequency and magnitude.

All of this creates much more than a strong inference that the Court has prejudged the issues, notwithstanding the underlying facts of this disciplinary matter which are discussed further in detail below. This total breakdown of the disciplinary process requires this Court to remedy this clear wrong. Mr. Klayman thus respectfully requests that the Court immediately lift the temporary suspension and thoroughly review the record to prevent a further and at this point compounded miscarriage of justice.

## STATEMENT OF UNDERLYING FACTS OF THE CASE IN CHIEF

Mr. Klayman is a conservative legal activist and the founder of both Judicial Watch and Freedom Watch, as well as a former federal prosecutor and, as such, he gravitated to the Iranian freedom movement and its mission to effect regime change in the Islamic Republic of Iran. PFF 45. Mr. Klayman attended a freedom rally on the front lawn of the U.S. Capital during the late fall of 2010, when it appeared that dissidents in Iran appeared to be on the verge of overthrowing of the radical Supreme Leader and thus bringing freedom to the nation. PFF 45.

It was at this rally that Mr. Klayman encountered and briefly spoke with the complainant, Elham Sataki ("Ms. Sataki"), who was covering the event for the Persian News Network Division ("PNN") of Voice of America ("VOA"), whose headquarters was in Washington, D.C. PFF 45. After Mr. Klayman introduced himself to Ms. Sataki, who had concluded an interview, and told her about his pro-

freedom efforts, he left and descended the Capitol steps with one of his clients. PFF 45. Eventually, Mr. Klayman asked Ms. Sataki out in a personal capacity. PFF 46. On their dinner date at Clydes restaurant in Georgetown, Ms. Sataki broke down in tears sobbing, grabbing Mr. Klayman's hand from across the table. She claimed to have been sexually harassed by a co-host at VOA's PNN and then retaliated against by mostly Iranian managers who had different views about Iran's leaders, as they were pro-regime. PFF 47. Sobbing and evoking sympathy from Mr. Klayman, Ms. Sataki explained that she was destitute. PFF 106. Mr. Klayman offered to help her out of friendship as she continued to sob. PFF 47. They met again and Ms. Sataki told Mr. Klayman how her union president and representative at VOA, Mr. Tim Shamble ("Mr. Shamble") had also been trying to resolve the situation. PFF 2, 50.

Mr. Klayman had had prior experience in bringing sexual harassment and workplace retaliation cases over his long then 32 legal career in which he had continuously been a member in good standing of the District of Columbia Bar. PFF 40, 41. In addition, he had considerable experience in administrative law and litigating against the government. PFF 40. But the agreed goal, when he met with Ms. Sataki and Mr. Shamble, was to try to settle matters amicably with VOA, and to achieve Ms. Sataki's expressly stated desire to be detailed out of the DC headquarters to Ms. Sataki's home in Los Angeles, where her friends and family

were. PFF 20, 48. This would take her away from the alleged harasser, Mehdi Falahati ("Mr. Falahati"), and her managers, who had been very critical of her work performance quite apart from her sexual harassment and retaliation claims. PFF 52, 115. Mr. Shamble warned that based on his considerable experience, VOA was very difficult to deal with and was anti-employee rights. PFF 15, 50. Indeed, he stressed that VOA had been rated as the worst agency in government by the General Accounting Office ("GAO"). PFF 16.

Nonetheless, Mr. Klayman, Ms. Sataki and Mr. Shamble began efforts to settle with VOA, but they were predictably met with a hostile reception, as Mr. Shamble had predicted based on his experience as union president. As a result of this hostile reception, Mr. Klayman, Ms. Sataki, and Mr. Shamble collectively decided to use -- as is routine and acceptable strategic practice in matters such as this where the is a political and intransigent government component --  public relations and lobbying with influential Senators and Congressmen to have them intervene and coax a settlement. PFF 128, 166. Ms. Sataki agreed to this publicity, with Mr. Klayman writing positive and complimentary articles and arranging for interviews with major publications, such as the Los Angeles Times. PFF 11, 166. Indeed, a crucial piece of evidence in this proceeding is an email which Mr. Klayman sent to the LA Times, copying both Ms. Sataki and Mr. Shamble, attempting to arrange such an interview. PFF 11.

This was consistent with Ms. Sataki being provided contemporaneously with all the articles and publicity that Mr. Klayman, who along with Mr. Shamble, he had generated for her. At no time did Ms. Sataki object, and there is no contemporaneous written record of any objection. PFF 167. To the contrary, at the hearing before the Ad Hoc Hearing Committee ("AHC") she was forced to admit on several occasions that she approved of this publicity. PFF 170. In addition, several key material witnesses also corroborated this. PFF 91, 182. In fact, Ms. Sataki personally engaged in the publicizing of her case by personally handing out copies of one the articles written by Mr. Klayman on Capitol Hill! PFF 24. Extensive efforts to lobby politicians were made, often with Ms. Sataki present, but always with her informed consent. PFF 27. However, this strategy was not successful as VOA and its Board of Governors ("BBG") dug in their heels. PFF 53.

When these efforts proved unsuccessful, it was decided by Ms. Sataki, Mr. Klayman and Mr. Shamble that hard-hitting legal action would be required, PFF 53, with the aim of "convincing" VOA and its decision-maker governors at the BBG to settle. PFF 54. Accordingly, not only was an Office of Civil Rights ("OCR") complaint filed, so was a *Bivens* action against all the individual governors on the BBG. It was agreed on by all three that holding the governors

personally responsible and at risk might strategically convince them to be reasonable and settle. PFF 54.

Named in the *Bivens* action, which was based on a violation of constitutional rights over sex discrimination among other grounds, was necessarily the titular head of BBG, Mrs. Hillary Clinton, who as secretary of state presided over BBG. PFF 26, 54. Putting friendship aside for the benefit of Ms. Sataki, Mr. Klayman's friend, Ms. Blanquita Collum, a prominent conservative radio talk show host and also a BBG governor, was also named, along with all of the other governors, both Democrat and Republican appointees. PFF 25. Mrs. Clinton was neither singled out nor admittedly did the *Bivens* complaint make any politically motivated attacks on her. PFF 26, 209. She was simply named as a matter of course along with the other governors. Importantly, Mr. Sataki, who knew that Mr. Klayman was conservative and an activist like herself when he offered and then agreed to legally represent her *pro bono,* expressly approved of this strategy. PFF 26.

There was considerable evidence adduced at the hearing that the singular goal was always to get Ms. Sataki transferred to Persian New Network ("PNN") Bureau at VOA in Los Angeles and not to recoup damages. PFF 54, 76, 107, For this fundamental reason, while Ms. Sataki gratuitously offered later that Mr. Klayman could take a percentage of any damage award, this was neither a consideration nor an offer important to him. PFF 54. Instead, it was out of what he

thought at the time was a deep friendship with and caring for Ms. Sataki, that he went to an enormous legal effort to get her back home to LA where she would feel secure, and not to make money. PFF 76. Indeed, Mr. Shamble testified that he never experienced any lawyer work as hard for a VOA employee than Mr. Klayman that he even recommended him to other broadcasters at VOA who had been allegedly discriminated against. PFF 6.

This was why when Ms. Sataki, having taken some leave to travel to LA for vacation, had an emotional breakdown when she was told by VOA that she would not be transferred to LA, and was instead being offered a post at the Central News Division ("Central News") in Washington. PFF 56, 109, she told Mr. Klayman in an unhinged state that she would commit suicide if she had to go back to DC – a constant theme of Ms. Sataki, who Mr. Klayman learned much later likes to use to induce and lure people into helping her by playing the victim - even before she met Mr. Klayman. PFF 109. Ms. Sataki thus instructed Mr. Klayman to continue to do all he could to get her to LA. PFF 109.

Mr. Klayman did not seek a romantic relationship as ODC falsely and conveniently claims, but had come to deeply care for and love Ms. Sataki and sympathized with her, as he himself had been going through hard personal time and understood and related to her claimed plight. PFF 49, 79. Even though Mr. Klayman was not in good financial shape himself, he put the interests of his friend

and client before his own. PFF 73. To this day, Mr. Klayman has never asked or brought any legal action to be paid back, even after Ms. Sataki vindictively filed a bar complaint against him when she did not get what she wanted at VOA's Office of Civil Rights ("OCR") or in court. PFF 77. Importantly, there is no allegation of sexual harassment in the Specification of Charges and Ms. Sataki has never filed suit on this basis. PFF 105. Nor has there been any malpractice claim filed by her or her surrogates, who prepared a supplemental bar complaint for her. PFF 136. Importantly, and of seminal importance, this identical bar complaint was also sent simultaneously to The Florida Bar and the Pennsylvania Bar, both which found no violation of their rules of ethics, which are similar if not identical to this bar, and summarily dismissed the complaints long ago. PFF 43; Tr. 969-971, RX23, RX 30. This crucial and uncontested fact cannot and must not be overlooked!

Mr. Klayman, with Ms. Sataki's consent and knowledge - as he not only communicated orally with her and Mr. Shamble, but also routinely sent her pleadings - had also filed a motion for temporary restraining order and preliminary injunction, arguing under a landmark case styled *Wagner v. Taylor*, that the status quo should be preserved by ordering that Ms. Sataki be put back to work in the LA PNN Bureau while her administrative employment claims and the *Bivens* suit proceeded. PFF 68.

This *Bivens* case had unfortunately come to be assigned to a judge who Mr. Klayman had had great difficulty with in the past for other clients, the Honorable Colleen Kollar-Kotelly ("Judge Kotelly"), who is known to be highly partisan and to the far left. PFF 55. For this reason, with Ms. Sataki's informed knowledge, Mr. Klayman moved to have the case transferred to another judge in the DC federal court, but this was not granted.

At the time, a retired federal judge who had sat on the federal court with Judge Kotelly, The Honorable Stanley Sporkin ("Judge Sporkin"), who Mr. Klayman had appeared before and who after the jurist's retirement he had come to know out of the courtroom, was consulted by Mr. Klayman, who told him at the time that it was a "chip shot" to have put Ms. Sataki back to work in LA. PFF 58.

However, as Mr. Klayman had feared, Judge Kotelly callously ruled against Ms. Sataki and her order showed serious factual and legal errors – indeed, about 14 pages of which he later included in a motion to disqualify the judge. PFF 65. Later, Mr. Klayman would give his public opinion, to which he is entitled – and which is common for lawyers to do - that there was no factual or legal basis for Judge Kotelly's rulings. PFF 59. He would also seek to disqualify Judge Kotelly on the basis of apparent bias and thus have her orders vacated so he would proceed for Ms. Sataki before another unbiased judge. PFF 65, 66.

But when learning of Judge Kotelly's decision, Ms. Sataki, perhaps showing more of her true "self-centered self," became very abusive of Mr. Klayman, despite all he had done to help her. Mr. Klayman had seen this self-centered demeanor before as the legal and personal friendship relationships had gone forward. And because he cared deeply about and came to love Ms. Sataki, he took her abuse and disrespect to heart and wrote, as a human being, sad emails to her to try to get her to understand how much he cared about her. But this notwithstanding, Mr. Klayman also zealously and diligently continued to try to get Ms. Sataki a good broadcasting job in LA, with the use of his friendship and contacts with his close friend Ted Baehr, the head of Movieguide. PFF 63.

Seeing the difficulty in his legal relationship and friendship with Ms. Sataki, Mr. Klayman recommended that she seek other legal counsel, including Gloria Allred, the famed women's rights advocate, Mr. Klayman's friend and someone who Mr. Shamble has also recommended, attorney Tim Shea, who had had many cases before VOA. PFF 145.

It also got to this point when Ms. Sataki, taking advantage of Mr. Klayman's affection for her, asked Mr. Klayman, as she had throughout, for personal favors. Ms. Sataki, who had no credit, even asked Mr. Klayman to buy her a car, as hers had been repossessed due to her non-payment of monthly fees, and she claimed to want a cheaper one, albeit and incredibly a new Mercedes convertible,  to lower

monthly payments. PFF 62. Thus, it became apparent to Mr. Klayman that the time had come to part ways with Ms. Sataki, but he still did not want to hurt her or her legal interests. In addition to the over $30,000.00 in expenses and the approximately $250,000 dollars in time -- if he had not been representing Ms. Sataki *pro bono* – Mr. Klayman went the extra mile and used his own monies to compensate her for the loss of her former salary at VOA, and assured her that 6 months tenancy at the apartment he had rented for her was pre-paid. PFF 118, 157.

In this period, after Judge Kotelly's ruling against Ms. Sataki, Mr. Klayman and Mr. Shamble tried repeatedly to communicate with Ms. Sataki, to advise her that only the first round of her case was lost – to put her back to work in LA at VOA—but that she could now move forward not just to seek a permanent injunction in the *Bivens* case, but also file a Title VII complaint in federal court once as the OCR of VOA had ruled against her with regard to her employment claims of sexual harassment and workplace retaliation by her managers, now that administrative remedies had been exhausted. PFF 5, 32, 132. In this regard, Mr. Shamble sent communications to Ms. Sataki asking that she contact Mr. Klayman or himself, assuring her that none of her rights had been forfeited or lost. PFF 33. However, Ms. Sataki did not respond, but instead, apparently with the aid of non-lawyers who were giving her bad advice, incredulously communicated with VOA that she wanted to drop all of her civil cases. PFF 35. The letters which Ms. Sataki

claims to have sent, were either not sent to Mr. Klayman or were sent to wrong addresses and thus he did not receive them from her. PFF 69, 71,

Diligently and responsibly not wanting to see Ms. Sataki's legal rights lost while matters got sorted out, Mr. Klayman, again at his expense, filed a notice of appeal. PFF 72. And while Ms. Sataki has testified falsely that she wanted to drop the *Bivens* case, among other misleading and false testimony at the hearing, she herself, likely with the aid of her felon cousin Sam Razavi ("Mr. Razavi"), sent a notice of appeal to Judge Kotelly, which the judge placed in the case file and mailed to Mr. Klayman. PFF 67. This underscores that, as Mr. Klayman had suspected, Ms. Sataki did not want the dismissal of her cases and was getting bad advice from non-lawyers. He and Mr. Shamble had an ethical and legal duty to try to communicate directly with her and not rely on nonsensical letters obviously not written by Ms. Sataki, as they were in perfect English. PFF 70, 161.

Indeed, by way of comparison, in an email which Ms. Sataki later sent to Mr. Klayman, which falsely accused him of taking bribes to lose her case and disparaged his Judeo-Christian religious beliefs, among other outrageous and vicious insults and untruths, her lack of written English literacy comes through, as well as the other cruel and self-centered side of Ms. Sataki, which had been hidden from Mr. Klayman at the outset, but which emerged later on. BCSX 38. PFF 163.

All of this notwithstanding, the Office of Bar Disciplinary Counsel ("ODC") belatedly, and egregiously six years after Ms. Sataki had filed and abandoned her complaint, PFF 203, sought to resurrect it for its own biased strategic reasons, to incredibly argue that Mr. Klayman should be disbarred. The thrust of ODC's case is that Mr. Klayman should never have deeply cared for Ms. Sataki and that he never should have included Mrs. Clinton in the *Bivens* action. The fact that Mrs. Clinton was made an issue in private lawsuit that did not single her out, but who Mr. Klayman had sued on several occasions in his public interest capacity at Judicial Watch and Freedom Watch, underscores the political nature of ODC's actions. It is no secret that ODC and the Board are managed by leftist pro-Clinton Democrats. A simple review of Federal Election Commission records of those at ODC, and the donations and writings of Chairman Kaiser, bear this out.

The highly partisan nature of this entire proceeding is thus no basis upon which to recommend the "death sentence" of disbarment, much less any suspension, for an attorney – regardless of his public interest advocacy and political beliefs -- who has continuously been a member in good standing for almost 37 years.

Indeed, ultimately, Ms. Sataki admits that is still seeing a doctor to this day and is still on anxiety medication, eight years after Mr. Klayman's representation. This shows that her mental and other alleged problems are not the result of Mr.

Klayman, but of her own. PFF 171. As for Mr. Klayman, sadly the old adage applies that "no good deed goes unpunished," notwithstanding that it's not good to be a conservative pro-Trump white male in today's environment in the nation's capital in particular.

## SUMMARY OF THE ARGUMENT

There were no legal or factual bases to find that Mr. Klayman had committed any ethical violations, and the Board's Report, which is full of egregious errors, shows that the Board did not even review the record before issuing its Report, but instead literally "rubber-stamped" a biased Hearing Committee recommendation. Furthermore, interim discipline as set forth above is entirely unwarranted and contrary to the fundamental tenets of our judicial system.

## THE LAW

Mr. Klayman's compelling case for no discipline is three-fold. First, the temporary suspension order must be revoked immediately, as it has severely prejudiced Mr. Klayman and his clients already as it is being used against them, App. 0037 - 0038, and it contravenes the fundamental tenet that an individual is presumed "innocent until proven guilty. Second, this matter is so old that it should be dismissed on the basis of laches alone notwithstanding that was no basis for the Board to find in its Report that Mr. Klayman had committed any ethical violation.

Third, there was simply no requisite clear and convincing evidence of any misconduct period, and as such this proceed should be dismissed.[1]

Furthermore, Mr. Klayman respectfully requests again that the Court thoroughly review and digest his Proposed Findings of Fact, as well as his Counter-Findings of Fact, which were filed with the Board, but apparently never reviewed along with the record prior to issuing its Report. App. 0045 – 0077.

Lastly, at a bare minimum, if the charges against Mr. Klayman are not summarily dismissed by the Court, which they should be, this matter must be remanded to another unbiased Hearing Committee so that Mr. Klayman has a chance to receive a fair adjudication. Separately, an internal review must be conducted to determine how the Hearing Committee members were chosen and

---

[1] With regard to the fee agreement, the record is clear that Mr. Klayman and Ms. Sataki never agreed to any type of fee agreement, where Mr. Klayman would be entitled to a certain percentage of any recovery. Indeed as set forth above the goal was to have her relocated Los Angeles, where she could do broadcasting there for VOA in its offices in the federal building on Wilshire Boulevard, where she could be away from the alleged harasser and allegedly hostile management at VOA, an also have access to her doctors and psychologists. The only agreement that was made between Ms. Sataki and Mr. Klayman was that Mr. Klayman's representations was pro bono. This is shown in the record. "And, I said, well I will try to help you, and you know, I'll do it out of friendship. We're now friends." Mr. Klayman told Ms. Sataki he would legally represent her pro bono. Tr. 326-27, 976-977. Mr. Klayman has never received any money from Ms. Sataki, and has never asked her to pay him a single dollar. PFF 75. Tr. 1057. BCX 29. Mr. Klayman testified, "So I never asked to paid back, and to this day I wish her well. I pray to God that she has a good life, but I'm not the cause of her problems." Tr. 1066.

whether there were any improper *ex parte* communications with this Court, which Kaiser refused to address. App. 0123 - 0124.

## I.     The Temporary Suspension Order Must Be Vacated Immediately

The Court's October 19, 2020 order to show cause asks Mr. Klayman to show why the "court should not enter an order of suspension pending final action on the Board on Professional Responsibility's recommendation." Mr. Klayman filed an extremely detailed response and supplement, which showed conclusively that the Board's Report was rife with material errors and misstatements of material facts. Based on this, as it is clear that no discipline at all was warranted as there is simply no clear and convincing evidence of any ethics violation much less an even an interim order of temporary suspension.

The interim suspension order is clearly improper and unwarranted. Not only would this potentially lead to a longer suspension than recommended by the Board, should the Court adopt the Board's recommendation, it flies in the face of one of the basic tenets of the American legal system – that persons are entitled to a presumption of innocence and are therefore innocent until proven guilty. This is well-settled by the Supreme Court as early as 1895. *Coffin v. United States*, 156 U.S. 432 (1895).  Mr. Klayman is unaware of any case or other  authority that grants this Court authority to order him to show cause and impose interim discipline before the matter is even fully adjudicated with full constitutional due

process and equal protection rights, based on a simple non-final recommendation of the Board, which piggybacked on a biased, manifestly unjust and fatally flawed Hearing Committee recommendation.

To suspend Mr. Klayman now has resulted in the misuse of state action to deny him his due process, equal protection and other constitutional rights, including right to counsel. Mr. Klayman has been now been severely prejudiced by an inability to practice law in the District of Columbia before any final finding of misconduct. Not only has this already severely harmed Mr. Klayman, but worse the rights of his clients – both present and potential -- as well as his public interest, non-profit work, which requires the filing cases in the District of Columbia where public officials and government agencies reside and do business.

The Court must therefore adhere to the fundamental tenet that Mr. Klayman is innocent until proven guilty and allow this matter to run its fill course before any action, even temporary, is imposed.

Lastly, and equally important, in a recent opinion dated June 11, 2020 from this Court in disciplinary proceeding 18-BG-100, this Court recently made the finding that, "**we are not left with "[s]erious doubt" or "real skepticism" that Mr. Klayman can practice ethically…. Accordingly, we decline to impose a fitness requirement**." Nothing can change this recent finding, especially where the Board has only issued a Report and Recommendation, and it is clear that the

Board did not even take the time to review the record, much more adhere to the legal standard of clear and convincing evidence to consider and if appropriate find violations of ethics rules. Under these extraordinary circumstances as well – especially in a matter which has going for nearly eleven (11) years -- it is clear that interim discipline is simply not warranted or just.

And, importantly, since this Court's June 11, 2020 order which found that that " we are not left with 'serious doubt' or "real skepticism" that Mr. Klayman can practice ethically -- just a few months ago -- nothing has changed. The interim temporary suspension order of January 7, 2021, must therefore be vacated immediately.

## II.     Numerous Due Process Violations, Including Laches, Mandate Immediate Dismissal of the Charges Against Mr. Klayman

This matter is now going on eleven (11) years, that is over complete decade, and during this time period material witnesses like Professor Ronald Rotunda sadly died. Another important material witness, Ms. Sataki's psychologist Dr. Arlene Aviera, contracted serious if not terminable cancer, preventing her from testifying at the hearing. Ms. Aviera, if she had testified, would have been sympathetic to Mr. Klayman's difficulty in representing Ms. Sataki, notwithstanding her other related testimony. Moreover, her internal notes about her treatment of Ms. Sataki, if discovery had been allowed, would have been more than crucial. Indeed, as reflected on the record, it was Mr. Klayman who found and took Ms. Sataki to Dr.

Aviera, not just because she became his client, but because he cared for her. PFF #
110.

As evidence of how important Dr. Aviera's testimony would have been at
the hearing, Ms. Sataki testified that she is still seeing a doctor to this day and is
still on anxiety mediation – eight (8) years after Mr. Klayman's representation
ended. This shows that her mental and other problems were not the result of Mr.
Klayman, but her own. Tr. 201, PFF 171. Ms. Aviera's testimony would have been
crucial in this regard, as she was the psychologist who treated Ms. Sataki at the
time the events unfolded and would have been able to provide the Hearing
Committee with the proper medical diagnosis and records to back it up. Instead,
Ms. Sataki was free to simply vindictively blame all of her problems on Mr.
Klayman because she did not get what she wanted, a job in the coveted LA PNN
Bureau of VOA.

Early on in the case, given the extraordinary delay where memories had
faded, documents been misplaced or lost and as  Respondent, given the enormous
delay, believed that Ms. Sataki's complaint had been dismissed by ODC  as
identical complaints had been dismissed by his other state bars in Florida and
Pennsylvania, and where witnesses memories were likely to have faded, Mr.
Klayman moved for discovery of both Ms. Sataki and Aviera based on the
consequences and inherent prejudice caused by of this inordinate delay. The

motion was incredibly denied, with the Chair Mr. Fitch and Mr. Tigar, the two lawyer members of the Hearing Committee, disingenuously ruling that the issue of discovery could be raised again at the later hearing. Indeed, Mr. Klayman did so move again, after ODC, without proper notice, sandbagged Mr. Klayman by presenting on the first day of the hearing scores of new exhibits which had not been made available in the previous eight years, mostly consisting of Ms. Sataki's previously non-disclosed emails and other documents. Tr. 18. The Hearing Committee and Mr. Klayman were also informed for the first time by ODC that Dr. Aviera, who ODC had been listed as a witness, would not be present at the hearing to testify due to the terminal cancer she had contracted during the interminable intervening years. For these two compelling and extraordinary reasons, Respondent renewed his request for discovery of both Ms. Sataki and Aviera, the latter of which could have been taken by video conference. This renewed motion was quickly and tersely denied. Tr. 133-137.

In the Board's Report, the Chairman and his Board seriously errored, again evidencing that a thorough, complete and full review of the record had not taken place before issuance of the Board Report on October 2, 2020. The Board found wrongly at page 28, for instance, "(with) respect to Dr. Aviera Respondent could have sought permission to depose her on grounds that he needed to preserve her testimony due to her illness. He did not." But this is exactly what Respondent had

done, not once but twice. This error is so glaring that it impeaches the accuracy and

integrity of the entire Board Report.

In addition, most jurisdictions would have thrown this proceeding out on the

basis of such an enormous delay alone. As Professor Rotunda observed:

> In *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. l 1978) (per
> curiam), the Florida supreme court threw out charges because the
> prosecutor because of the Bar's delay in violation of the Florida
> rules… One can summarize this case as the Bar delaying finalization
> of two cases (where the Bar was disappointed with the recommended
> discipline) because it was confident it would secure a conviction in a
> third case still in the pipeline in the hope of securing greater overall
> disc line. The Court said, 'Whatever other objects the rule may seek to
> achieve, it obviously contemplates that *the Bar should not be free to
> withhold a referee 's report which it finds loo lenient until additional
> cases can be developed* against the affected attorney, in an effort to
> justify the more severe discipline which might be warranted by
> cumulative misconduct. The Bar's violation of the prompt filing
> requirement in this case, to allow a second grievance proceeding
> against Rubin to mature, is directly antithetical to the spirit and intent
> of the rule. In addition, it has inflicted upon Rubin the 'agonizing
> ordeal' of having to live under a cloud of uncertainties, suspicions,
> and accusations for a period in excess of that which the rules were
> designed to tolerate. RX 5.

Professional ethics expert Rotunda in the opinion he wrote before he died during

the intervening years also convincingly cited numerous other cases that held that

ODC should be subject to the principle of laches. App. 0127 - 0133. They include

*The Florida Bar v. Walter*, 784 So.2d 1085 (Fla. Sup. Ct. 2001); *In re Grigsby*, 815

N.W.2d 836 (Minn. 2012); *In Matter of Joseph*, 60 V.I. 540, 558- 59 (V.I. Feb. 11,

2014); *Hayes v. Alabama State Bar*; 719 So 2d 787, 791 (Ala. 1998). RX 5. As just

a few examples, Mr. Rotunda found that in Indiana Bar expressly limits the time to complete a disciplinary investigation in its own rules: Limitation on time to complete investigation. Unless the Supreme Court permits additional time, any investigation into a grievance shall be completed and action on the grievance shall be taken within twelve (12) months from the date the grievance is received…. If the Disciplinary Commission does not file a Disciplinary Complaint within this time, the grievance shall be deemed dismissed."

Indeed, the record is clear that Florida and Pennsylvania dismissed identical complaints very early on. PFF 43; Tr. 969-971, RX23, RX 30. The Board glaringly made no mention of this in its Report, showing that the record was definitely not reviewed and that. Mr. Kaiser and the rest of the Board just "rubber stamped" a biased and fatally flawed Hearing Committee recommendation.

## III. There Was No Basis, Much Less Clear and Convincing Evidence, for the Finding that Mr. Klayman Had Committed Any Ethical Violations

Under Board Rule 11.5, charges against Mr. Klayman must be proved by "clear and convincing" evidence. *In re Vohra*, 68 A. 3d 766, 784 (D.C. 2013). As set forth below, charges against Mr. Klayman must be dismissed because there is nothing even remotely close to "clear and convincing" evidence that Mr. Klayman had engaged in ethical misconduct.

### 1. "Emotional Interest" is Not an Ethical Violation

The Board has come up with and manufactured out of "thin air" a novel if not bizarre non-existent ethical violation for Mr. Klayman dubbed "emotional interest." This is not an ethical violation. If it was a violation, lawyers would be prohibited from representing friends, family members, or even spouses who they care about and love – or basically anyone that is not a complete stranger. It is clear that no such prohibition exists. Attorneys are people who have feelings and emotions. There is no ethical prohibition against this.

To the extent that the Board strangely and disingenuously couches this as a conflict of interest violation, it is clear that Mr. Klayman had informed consent. This is admitted by the Board in its Report, where Mr. Klayman "repeatedly communicated his feelings to [Ms. Sataki]" and "she asked him to continue with the representation." App. 0010. The Board then incredulously tries to find that Mr. Klayman did not believe that he could provide adequate representation to Ms. Sataki – a claim which is belied by the actual record in this matter. Indeed, testimony shows that Mr. Klayman throughout did everything he could to diligently represent Ms. Sataki. Likewise, he did everything possible to ensure that her legal rights were protected. The Board strained and stretched to find a violation where none existed, finding that Mr. Klayman's "emotional interest" somehow led to a lack of communication with Ms. Sataki. However, as set forth in *infra* section

29

II(A)(3), this is blatantly incorrect and Mr. Klayman kept Ms. Sataki apprised of everything going on in her case. Tr. 1011." PFF 60.

For instance, Tim Shamble ('Mr. Shamble"), Ms. Sataki's union representative and president of the union at VOA declared under oath that Mr. Klayman was "very diligent in attempting to represent Ms. Sataki, putting in many hours, and Mr. Klayman did not, to his knowledge, compromise any of Ms. Sataki's rights." PFF 3, RX 1, RX 5. Indeed, Mr. Shamble felt so strongly about Mr. Klayman's representation of Ms. Sataki that he referred Mr. Klayman to other VOA employees. PFF 6, RX 1, RX 5, Tr. 902. Mr. Shamble testified:

> I've had several employees that have hired attorneys, and they have asked for the union to cooperate with them and to, you know, help them with their cases. But, in all honesty, I've never seen one go as far and as dedicated as Mr. Klayman was towards Ms. Sataki. I felt like he went above and beyond." Tr. 903-04.

Thus, the facts and the record show that despite any "emotional interest," Mr. Klayman was undeniably able to diligently and competently represent Ms. Sataki. In fact, he worked harder for Ms. Sataki because he cared about her.

Mr. Klayman also spent a huge amount of his personal time and expense to help Ms. Sataki, including paying for her moving expenses to Los Angeles as well as medical care, over $30,000 dollars in sum, and in fact this is to be commended. PFF 62, PFF 110, Tr. 348, Tr. 350. There is nothing wrong and unethical with doing this to try to help someone that he considered a close friend that he came to

care about at the time. Indeed, if anything it was Ms. Sataki who acted improperly due to "emotional interest," when she tried to have Mr. Klayman buy her a car, (which was a new Mercedes convertible no less), as she admitted at the hearing. Tr. 429, 432-35. PFF 62. At that point Mr. Klayman realized that Ms. Sataki was simply trying to take advantage of their friendship, and he therefore recommended to Ms. Sataki to have another attorney step in to represent Ms. Sataki, including his friend, Gloria Allred, who testified on Mr. Klayman's behalf at the hearing. PFF 78, Tr. 1079-1080. Mr. Klayman and Mr. Shamble also recommended attorney Tim Shea, who had worked cases against VOA before. PFF 145, Tr. 549-550. It is not Mr. Klayman's fault that Ms. Sataki did not hire the other attorneys who Mr. Klayman had found and Mr. Shamble recommended for her. Mr. Klayman had no power over her choices.

When ultimately Ms. Sataki did not, for whatever reason, get the result she wanted, angry and unhinged, she struck back at Mr. Klayman, sending him the below offensive email which mocked and disparaged his religion and falsely accused him of taking bribes, which was entered into evidence but conspicuously never even mentioned in the Board's Report, much like the dismissals years earlier by The Florida Bar and the Pennsylvania Bar. This email underscores the verbal and other abuse Mr. Klayman had experienced with Ms. Sataki throughout, as the victim she saw herself as she apparently caused her to believe that she had all

things coming to her, including a car, and explains the basis for many of his communications with her, since as a human being with feelings for her, he felt hurt. Ms. Sataki savagely wrote:

> I do not know if you are Christian or Jewish, because whichever suits you best, you become one. But I believe in karma and what you have done with my case and losing it.´ Ms. Sataki also wrote: And what you have done with my case and losing it and not stopping working on it when I ordered you, one day you'll answer to God, even if you throw your life and play with people life. I am nobody, just a little girl who was retaliated and harassment by some VOA employee and you seed (sic) that you can help me. Not only did you not help me, but destroyed my life to nothing….

> Mr. Klayman are you happy now that you've complete destroyed and lost my case? A case with so many evidence and witnesses. Only a very bad and clueless attorney could lose it, or lost it on purps (sic) because you made a dill (sic), with the other party. PFF #163, BCSX 38.

This shows that Mr. Klayman was simply stuck in a "heads I win, tails you lose situation" with Ms. Sataki. While he did everything he could to help her, Ms. Sataki would alternate between trying to use him to buy her a new car and to take other advantage or abusing him. Mr. Klayman still did everything he could, however, to protect Ms. Sataki's legal rights because it was the ethical thing to do. Mr. Klayman's sister, Joshua Ashley Klayman, Esq., who had interacted with Ms. Sataki socially with her boyfriend, testified that she thought Ms. Sataki was using Mr. Klayman. "I mean, I vacillated between kind of liking her and being suspicious of her, quite frankly, as your sister…she was very forward in terms of requesting different things for her personally." Tr. 1527-28.

### 2. Mr. Klayman Did Not Fail to Abide By Ms. Sataki's Decisions Concerning the Objectives of Representation

The Board's finding that Mr. Klayman had violated Rule 1.2 by failing to abide by Ms. Sataki's decisions concerning the objectives of the representation is flatly unsupported by the record.

The Board makes the unsupported finding that Ms. Sataki "intended to pursue her case with minimal publicity." This flies in the face of a litany of compelling record evidence submitted by Respondent, including testimony of Ms. Sataki herself! *See* PFF 170:

Importantly, even on questioning from ODC, Ms. Sataki admits that she agreed to the use of publicity to coax a settlement so she could be detailed to the LA bureau of VOA.

Q: **Did you ultimately agree with Mr. Klayman about the publicity?**

 A**: I did.** Tr. 775.

Mr. Klayman also provided testimony from numerous witnesses that shows that Ms. Sataki's belated claim was false. This included Keya Dash - *see* PFF 91 ("Mr. Dash declared under oath that he was present when the use of publicity to coax the BBG into settlement was discussed with Ms. Sataki, and that Ms. Sataki approved of its use."); This also included Joshua Ashley Klayman, Mr. Klayman's sister and herself a distinguished Wall Street lawyer - PFF 180 ("Ms. Sataki openly

discussed the VOA case with Ms. Klayman many times. [Ms. Joshua Ashley Klayman testified] "Yes, quite openly. And I met her multiple times. It wasn't that I just met her one time. Yes, she was quite open with what the circumstances of her challenges were…. an, she was very, very open, which -- I'm not a litigator. I don't really know anything about litigations, but I was surprised that she was so open." Tr. 1524.). Furthermore, and again, she testified that she thought Ms. Sataki was using Mr. Klayman. "I mean, I vacillated between kind of liking her and being suspicious of her, quite frankly, as your sister…she was very forward in terms of requesting different things for her personally." Tr. 1527-28.

Even further buttressing Mr. Klayman's strong argument is the compelling testimony of Mr. Shamble, who was Ms. Sataki's union representative and importantly the president of her union, as Mr. Shamble was representing Ms. Sataki along with Mr. Klayman. Mr. Shamble testified that publicity was a helpful tool in dealing with an agency as notoriously difficult and anti-labor as VOA. PFF 23. Specifically, he testified "[w]e've done it. It's something that you can use to pressure managers, if they're intractable, you know, to try to get them to come to some sort of agreement. We have our own website, so we use it, too." Tr. 892-893, RX 5. The reason that publicity was often used, according to Mr. Shamble, was that BBG, of which VOA is a subcomponent, has been ranked the worst agency in

government, and is very difficult to negotiate any settlement with because of its management's attitude and approach to employees. RX 1, RX 5. PFF 7.

Perhaps as the final "nail in the coffin" for the Board's blatant error is the fact that Ms. Sataki personally participated in publicizing her case:

> Mr. Shamble and Ms. Sataki went together on one occasion to publicize her situation. "I remember one time. The VOA was on the mall here in Washington, some kind of public -- it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this." Tr. 893. The article that both Mr. Shamble and Ms. Sataki distributed was called ""Government War on a Freedom Loving Beauty. Exclusive, Larry Klayman Goes to Bat for Harassed Broadcaster Fighting for a Free Iran." Tr. 894. RX 1. PFF 24.

Furthermore, Mr. Klayman incredibly learned during the Board briefing process that Ms. Sataki had participated in making a documentary about her case against Voice of America ("VOA"), which further undercuts any possible false claim that Ms. Sataki did not agree to publicize her case.[2] The video, which is in Ms. Sataki's native language Farsi, was translated by one of Mr. Klayman's witnesses, Keya Dash, as well as a respected Farsi certified translator who used to work for VOA. App. 0119 – 0122. To be certain of and confirm the content, Mr. Klayman also had the documentary translated by Mohammad Moslehi, a certified translator who did translations for VOA. App. 0122. Mr. Moslehi translates this "smoking gun" as follows:

---

[2] https://www.youtube.com/watch?v=e3g5f61muZ4

Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.

(displaying Elham [Sataki]'s photo) former broadcaster of VOA.

Mr. Falahati, Asal has written this for us, Well: let us answer the first caller (by the name of - Translator) Hossain from Kerman. Hello, go ahead please.

(displaying photo of Mehdi Falahati) broadcaster for the VOA network

VOA: Voice of America

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one. Nobody can talk with anybody. Everybody makes insinuations against one another. The environment is very dirty.

This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham [Sataki] will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner . And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired. I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham [Sataki]) don't know what to do at this point. Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know?? That day she told me that "Legally I cannot do it and you must formally file a complaint."

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so. As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord. I hollered at him (audio censored) he laughed and said "don't tell anybody." I was not feeling well. I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot. Mr. Ali Sajjadi and Mr. Falahati were friends. At that time Mr. Sajjadi was very powerful there. They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them. And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big. And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me. And they say that Elham left, Falahati stayed. When they fired me, I was not the only girl. There are a number of others.

Caption dispalying Falahati and [Sataki] with written scripts.

The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and El ham Sattaki was fired from this network .. After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.

Display of Mehdi Falahati laughing loud.

This video can and should be viewed on YouTube at https://www.youtube.com/watch?v=e3g5f61muZ4.

Chairman Kaiser and his Board disingenuously and egregiously refused to consider this critical evidence in its order of October 2, 2020, found by a paralegal to Mr. Klayman's former counsel, Barbara Nichols. during the briefing process, and refused to allow it to be supplemented onto the record, despite its compelling

and extraordinary character and circumstances, which Kaiser admitted is the test to supplement the record. *See* Order of October 2, 2020. Nor would Kaiser and his Board even consider it. This extraordinary evidence definitively shows that Ms. Sataki perjured herself when she testified, having obviously been coached prior to the hearing to do so. In short, this was consistent with her admissions on cross examination, and contradicted her belated, contrived and false testimony that she did not want to use publicity in her case against VOA. This is another example of the Board's fundamentally flawed lack of due process, which severely prejudiced Mr. Klayman.

Thus, it was, frankly, impossible for the Board to make the finding that "Ms. Sataki intended to pursue her case with minimal publicity" in good faith if it had actually reviewed the record and the hearing testimony of Mr. Shamble, Mr. Dash, Ms. Klayman, Mr. Klayman and even Ms. Sataki's own admissions, as well as taken note of this extraordinary duly discovered evidence. Such a blatant and egregious material error shows why Mr. Klayman was forced to file his Motion for Reconsideration and Notice of Record Material with the Board on Professional Responsibility.

Similarly, the Board's finding that Mr. Klayman had failed to abide by Ms. Sataki's wishes to dismiss the case in a July 30, 2010 email is unsupported by the record, much less the requisite clear and convincing evidence. Indeed, Mr.

Klayman, on July 28, 2010, filed a notice of voluntary dismissal dismissing all but two of Ms. Sataki's claims PFF 68. The only two remaining claims at that point were for a Privacy Act claim, and for *Wagner* injunctive relief. PFF 68. Consistent with what was purported to be Ms. Sataki's wishes, Mr. Klayman filed no opposition to the pending motion for summary judgment as to the Privacy Act Claim, and Judge Kotelly had at that point already ruled against Ms. Sataki with regards to the *Wagner* injunctive relief. PFF 68. Thus, the only actions that were taken in the BBG case after July 30, 2010 were to preserve Ms. Sataki's rights on appeal, whether they be exercised by Ms. Sataki herself or with the assistance of other counsel. PFF 78. In any event, Judge Kotelly ultimately dismissed the action. PFF 68.

And importantly but also overlooked was that Mr. Klayman further convincingly and credibly testified that it was highly unlikely that any correspondence that purportedly came from as Ms. Sataki actually did originate from her, given the literate English that was used. PFF 70, 161, 163. Mr. Klayman was familiar with Ms. Sataki's admittedly poor written English, which is exemplified in BCSX 38, the August 4, 2010 letter. The letter which was written to Danforth Austin and not Mr. Klayman, was tellingly and revealingly written in perfect English. Poor written English was one of the difficulties she had experienced with VOA supervisors. PFF 70, Tr. 1041, RX 21. Thus, where it was

clear that Ms. Sataki was not the one who wrote the August 4, 2010 letter, Mr.

Klayman had, at a minimum, an ethical duty to speak with Ms. Sataki personally to

confirm her wishes before taking actions to forego all of her legal rights, include

appellate rights. In fact, as strong evidence that Ms. Sataki did not <u>actually</u> wish to

terminate her litigation, she herself filed a notice of appeal, purportedly *pro se*,

later that year. PFF 67, RSX 4, Tr. 1031.

Indeed, Mr. Shamble, who was working as Mr. Klayman's partner on behalf

of Ms. Sataki, testified as well that he also tried on numerous occasions to

communicate with Ms. Sataki, but was rebuffed as well:

> Mr. Shamble declared under oath that communication became very
> difficult and nearly non-existent with Ms. Sataki. When he and Mr.
> Klayman would try to contact Ms. Sataki, we usually got no response,
> even for months. PFF 4; RX 1, RX 5.

These uncontroverted facts render the Board's finding that Mr. Klayman had

failed to abide by Ms. Sataki's "wishes" to dismiss her cases blatantly incorrect

and entirely unsupported by the record. Mr. Klayman simply did what any ethical

lawyer would do in that situation, which is to ensure that his client did not lose her

legal rights. Ms. Sataki could have still filed a civil rights complaint when the

VOA Office of Civil Rights denied her administrative claims, finding in effect that

she had not been truth to it. And, as set forth above, as conclusive evidence that

Mr. Klayman did act pursuant to Ms. Sataki's wishes, Ms. Sataki herself filed a

notice of appeal, purportedly *pro se*, later that year, which would not have been

possible without Mr. Klayman acting to protect her legal rights. PFF 67 RSX 4, Tr. 1031.

Indeed, if there was anyone who failed to abide by Ms. Sataki's wishes, it is actually ODC, who, for its own motives, literally hunted down Ms. Sataki years after she had abandoned her complaint against Mr. Klayman, contrary to ODC's own rules and policies that would render her complaint void, to get her to participate. RX 27. As shown in PFF 169:

> Ms. Sataki had abandoned her complaint, but it was resurrected by ODC, despite two other bars having dismissed it many years earlier. In fact, internal correspondence of ODC reveals that it had to use private investigator Kevin O'Connell to try to hunt down Ms. Sataki. RX 27. The internal correspondence of ODC admits: I am trying to locate a complainant that has dropped off the map. Ms. Elham Sataki…. She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she filed. My letter to her dated 7/7/11 was not responded to, but was not returned by the USPS either. I recently tried to contact her by telephone, but her number is not in service. I'll appreciate your efforts to locate her and to provide some reliable contact information.

In sum, it was very difficult for Mr. Klayman to determine what communications were coming from Ms. Sataki or those genuinely acting on her behalf, as neither he nor Mr. Shamble could not get in contact with Ms. Sataki to confirm her real wishes. Any attorney placed in this position is simply between "a rock and a hard place," and Mr. Klayman simply thought it better to err on the side of caution to ensure that Ms. Sataki's legal rights were ultimately protected, which is any ethical lawyer's ultimate duty. In this situation, Mr. Klayman could also

have been later accused of malpractice and sued if he dismissed the actions based on a third party's communications. And, even seven (7) years later, when ODC resurrected Ms. Sataki's abandoned complaint, she still wanted to pursue her claims for alleged sexual harassment and workplace retaliation, claims which had been proven false by the Office of Civil Rights ("OCR"). PFF 155.

ODC has documents in is possession that show that when they contacted Ms. Sataki to revive her complaint against Mr. Klayman, she stated that she wanted to do so in order to have a reason to provide persons who asked why she was no longer working at VOA. Further, she implored ODC to pursue her sexual harassment claims against VOA, which further shows that she had no desire to dismiss her claims. At the hearing, Ms. Sataki confirmed and thus conclusively admitted this: "Q: That you wanted Bar Counsel to file a sexual harassment case for you. You asked them that within the last year, against VOA. A: I asked if it's doable." Tr. 489. That this was tellingly omitted in the Hearing Committee recommendation that was "rubber stamped" by the Board is shocking!

### 3. Mr. Klayman Did Not Fail to Communicate with Ms. Sataki

The Board makes an incredibly unsupported finding, particularly by clear and convincing evidence, that Mr. Klayman had violated Rule 1.4(b), which mandates that an attorney "shall explain a matter to the extent reasonably

necessary to permit the client to make informed decisions regarding the representation."

What makes the Board's finding incredibly bizarre is that there is no allegation in its Report that Mr. Klayman failed to keep Ms. Sataki informed of how her cases were going. Importantly, this claim is not in the controlling Specification of Charges, and as set forth above, in any event, Mr. Klayman kept Ms. Sataki informed of her case every step of the way.

And again, there is also no mention of this supposed violation in the controlling Specification of Charges which also simply alleges that Mr. Klayman "failed to reasonably explain a matter to his client to permit her to make an informed decision regarding the representation." As set forth above, this itself is blatantly incorrect, but in any event, nothing in the Specification of Charges even mentions the novel "violation" that the Board created – speaking with a client outside of the scope of the professional representation as an attorney.

It is truly regrettable to say the least that Chairman Kaiser and the Board would strain to try to create an ethical violation here when one clearly does not exist. Indeed, what the record and evidence <u>does</u> show is that Ms. Sataki was "….kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way. Tr. 1011." PFF 60. The Board's finding here was in clear error, much

less even coming close to establishing the clear and convincing evidentiary factual and legal threshold for an ethics violation.

### 4. Mr. Klayman Did Not Disclose Any Client Secrets

Hand in hand with the Board's incredibly strange and unsupported if not inexplicable finding without clear and convincing evidence that Mr. Klayman had failed to communicate with Ms. Sataki, is its finding that Ms. Sataki did not give informed consent for disclosure of certain "secrets" contained in articles that Mr. Klayman had written on Ms. Sataki's behalf. This is conclusively rebutted by Mr. Klayman's irrefutable and accurate Proposed Finding of Fact 24:

> Mr. Shamble and Ms. Sataki went together on one occasion to publicize her situation. "I remember one time. The VOA was on the mall here in Washington, some kind of public – it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this." Tr. 893. The article that both Mr. Shamble and Ms. Sataki distributed was called ""Government War on a Freedom Loving Beauty. Exclusive, Larry Klayman Goes to Bat for Harassed Broadcaster Fighting for a Free Iran." Tr. 894. RX 1.

How is it even remotely possible to come to the conclusion that Ms. Sataki did not consent to disclosure of these purported "secrets" when she herself was handing out the articles in question on Capitol Hill?! The only possible explanation, tongue in cheek, is that perhaps Ms. Sataki was blind or illiterate at the time and therefore unable to comprehend what she was handing out? There is nothing that supports

this in the record, much less rises to the high level of clear and convincing evidence.

Perhaps even more off base and frankly absurd is the fact that the Board expressly recognizes that Ms. Sataki was personally handing out these "secrets" on Capitol Hill, yet simply blithely and indifferently writes "[b]ecause we conclude that Respondent here violated Rule 1.4 and did not communicate appropriately with his client, we conclude that he did not and could not have obtained her informed consent to disclose her secrets." To put it mildly, this contrived "heads we win tails you lose" "Alice in Wonderland-like" construct, made without clear and convincing evidence, is nonsensical. Even, hypothetically, if Mr. Klayman had generally failed to communicate with Ms. Sataki (which is blatantly false and unsupported by the record), the Board has no rational basis to use this as a blanket and contrived  excuse to manufacture ethical violations. In other words, it must specifically analyze whether Mr. Klayman has communicated with Ms. Sataki in this particular instance. And, the Board would be hard pressed to make the finding that Mr. Klayman had failed to do so, when Ms. Sataki was personally handing out copies of her "secrets" to strangers on Capitol Hill. This egregious error by the Board was compounded by its turning a blind eye to and making a decision to not allow onto the record the newly discovered video documentary uncovered in 2019 of Ms. Sataki herself publicizing her own case and related and underlying so called

confidential "secrets." It is abundantly clear that if Ms. Sataki is personally making videos about her "secrets" and posting them online that they are not "secrets" at all! Importantly, that the Board would not even grant Mr. Klayman's request to review the newly discovered video on a Persian television station which she made explaining in detail own plight in order to decide whether to supplement the record with extraordinary, compelling exculpatory newly discovered evidence puts the nail in the coffin of the phony claim that Respondent himself revealed confidences.

Lastly, it is important to point out that ODC alleged a violation of Rule 8.4 for conduct involving dishonesty and/or misrepresentation under this claim, but neither the Hearing Committee nor the Board found that Mr. Klayman had acted dishonestly.

### 5. Mr. Klayman Did Not Fail to Withdraw From Representation

The finding by the Board that Mr. Klayman improperly failed to withdraw from representation is, once again, completely unsupported by the record, much less clear and convincing evidence. What the record does show, as set forth previously, is Mr. Klayman did not take steps to litigate the BBG case further after July 30, 2010 and only acted to preserve Ms. Sataki's appellate rights. PFF 68. And it was good that Mr. Klayman did so, because Ms. Sataki filed a notice of appeal *pro se* later on down the road. PFF 67. The Board simply states that Mr. Klayman "continued to file motions" without actually taking the time to look at the

substance of what was filed. And, then years later Ms. Sataki – after she was literally hunted down by ODC for ulterior reasons -- then asked ODC to prosecute her sexual harassment claims! Tr. 489. Again, case closed!

Furthermore, letters purportedly terminating Mr. Klayman's representation were admittedly sent to the incorrect addresses, which Mr. Klayman never received from her. PFF 71. Mr. Klayman also had a duty to confirm Ms. Sataki's purported "desires" in the August 4, 2010 letter, as it was clearly not written by her, PFF 70, Tr. 1041, RX 21, before terminating all of Ms. Sataki's rights on appeal.

Thus, the record does show that Mr. Klayman did not substantively litigate any of Ms. Sataki's cases after he was terminated, and acted only to preserve her rights on appeal. This is competent, zealous representation, not ethical misconduct.

### 6.    Ms. Sataki's Lack of Credibility Must Be Addressed

Glaringly absent from the Board's Report is any discussion of Ms. Sataki's - ODC's one material witness's - credibility, or obvious lack thereof, as she was definitively  impeached numerous times at the hearing and on other occasions, not the least of which is her blatantly false testimony that she did not want publicity for her case, which is conclusively rebutted in the previous sections.

Mr. Klayman did not want to appear to be attacking Ms. Sataki personally, and even addressed this with the Hearing Committee at the hearing, who assured Mr. Klayman that he was entitled to vigorously defend himself:

Mr. Klayman: So, you know, that's where I stand. I appreciate you're going to allow me to give an aggressive defense, but I don't want to look like the bad guy. I never have. And that's the quandary I'm in as being Respondent, and my lawyer, and the witness, and I want to keep a good demeanor, but -- and stay calm, but, you know, I'm outraged by some of the things I heard and what has been done by Bar Counsel…..

Mr. Tigar: Well, I assume, Mr. Klayman, up here, the reason they have lawyers decide these cases, as well as the hearing officers is, this is not our first rodeo, and we have all been in cases in which public opinion has been against us and in which we have faced this terrible problem of cross-examining people who come on as sympathetic, such as in the capital case, victim impact witnesses. So, we understand the situation and I adopt the Chair's position. Nobody up here is opposed to the idea of a vigorous, effective cross-examination in your exercising your rights, and I think everybody up here can be trusted to disregard whatever public attitudes may be circulating around out there, that may have led to some perceptions. Tr. 231-233.

It appears, however, that he was sandbagged by Mr. Tigar and his very deferential colleague, Hearing Committee Chairman Anthony Fitch. However, now more than ever, given the extremely high stakes, Mr. Klayman must also bring to the Court's attention Ms. Sataki's lack of credibility.

The record shows a history of making false allegations, as set forth in PFF 147-150:

Ms. Sataki filed a complaint in Los Angeles Superior Court against the manager of the apartment, Dean Proper, and accused him of sexual harassment of her friend Jessica who was staying in the apartment in the second bedroom, as well as stealing Ms. Sataki's diamond ring. Tr. 506-512. RX 12. The Court ruled against her. Tr. 519.

Ms. Sataki falsely tries to justify the court's judgment against her by untruthfully claiming that the complaint was only meant to escape the payment of rent for the apartment. Tr. 520.

In fact, the truth is that the court documents show "Judgment was entered, as stated below, on Day: 8/23/2011. Defendant does not owe plaintiff any money on plaintiffs' claim. And below it says contested. Tr. 521. RX 12.

Indeed, her claims of sexual harassment and workplace retaliation were also found by the OCR to be outright false. *See* PFF 155 ("The final determination finds that Ms. Sataki's factual claims of sexual harassment and workplace retaliation were not meritorious and thus false, as OCR had interviewed a number of witnesses. Tr. 635-640. RX 18.").

Ms. Sataki's claim that Mr. Klayman had "followed" her into the women's bathroom at the Luxe Hotel was also false. The record shows the following testimony:

Q. The sentence here, "By the way, the Luxe Hotel, Hotel Luxe, renamed the women's restroom in my honor. It's now called the Klayman Room. I could now use it for client meetings." Is that a joke?

A. That was a joke, yes.

Q. Is that a joke because you had chased Ms. Sataki into the women's room?

A. No, it's because she had ran into the women's room. I never went into the women's room. I was trying to see that she was alright. And you know, she was very emotional. She's been emotional before, and she's been emotional here, and she was emotional with others. And I was concerned about her. But I didn't go into the women's room. That was just a joke. Tr. 1467-1468.

Unsurprisingly, the Hearing Committee and Board failed to mention much less lend credence to Mr. Klayman's testimony and simply again adopted Ms. Sataki's

false statements. This is an egregious error that shows, once again, at a minimum, the record was not reviewed. Perhaps even more egregious is the possibility that the record here was reviewed but simply ignored in order to strain to find ethical violations, when no clear and convincing evidence was apparent and thus forthcoming.

Ultimately, it would appear that Ms. Sataki had become influenced by her felon cousin, Sam Razavi, who was convicted or gambling fraud in Las Vegas, Nevada, BCSX 36, 37; Tr. 737-39. PFF 162, and was pressured into making a non-meritorious complaint against Ms. Klayman. As set forth in Respondent's PFF 136:

> The idea of the supplemental complaint, BCX 23, came from Ms. Staunton and her cousin Sam Razavi ("Mr. Razavi"). Tr. 468-469. Neither of them are lawyers. Ms. Sataki admits that Ms. Staunton and Mr. Razavi prepared the supplemental complaint. Tr. 469. Tr. 301, 307, 317, 468-72, 474-75, 544.

> Mr. Razavi was the person who threatened Mr. Klayman and it was discovered that he had pled guilty to and was convicted by the 2nd District Court of the State of Nevada, Washoe County, for conspiracy to commit fraudulent acts involving gaming. BCSX 36, 37; Tr. 737-39. PFF 162.

Further instances of Ms. Sataki making false statements on the record include, but are not limited to:

> (1)     Lying about the involvement of Kathleen Staunton in the preparation of the bar      complaint against Mr. Klayman. At the hearing, she claimed under oath that Ms. Staunton helped her prepare the complaint, along with Mr. Razavi. Tr. 469. Tr. 301, 307, 317, 468-72,

474-75, 544. However, after the hearing, Mr. Klayman contacted Congressman Dana Rohrabacher's office, where Ms. Staunton worked, and was told by the congressman's chief of staff, Rick Dykema that Ms. Staunton had no involvement in the preparation of the bar complaint, and did not have any knowledge of it. App. 0125 - 0126.

(2)    Lying about having her life ruined by Mr. Klayman, and everything being "on hold" due to Mr. Klayman, when in fact, she has been gainfully employed as a Persian broadcaster in Los Angeles making $62,000 per year at Andisheh Television. Tr.565-589.

(3)    Dishonesty and infidelity with and toward one of Ms. Sataki's four ex-husbands, who had filed a sworn affidavit in his divorce case for having caught her having sex with another man in their apartment just weeks after they were married. Tr. 377-382, PFF 123.

(4)    Ms. Sataki also filed a complaint in Los Angeles Superior Court against the wife of Zia Atabay, Attaby's wife having accused Ms. Sataki of having an affair with her husband who is the head of a prominent Persian television network where Ms. Sataki then worked. As a result, Mrs. Atabay was alleged to have keyed Ms. Sataki's car. However, Ms. Sataki also falsely testified that the court ruling proved she was not having an affair with Zia Atabay, the owner of NITV. Tr. 525-526. The Chair, Mr. Fitch, acknowledged that Mr. Klayman's elicited testimony goes to Ms. Sataki's overall credibility. Tr. 527-528. PFF 150. Mr. Keya Dash testified under oath that there was such an affair and it was widely known in the close knit Iranian community. PFF 96-97. Tr.1342.

These examples all go strongly toward a finding that Ms. Sataki lacked credibility, was prone to filing retaliatory and meritless complaints – including the bar complaint against Mr. Klayman -- and was receiving bad advice from her felon cousin, who had even threatened Mr. Klayman. PFF 162, Tr. 737-39. These should have been considered by the Board in its Report, and its failure to do so was an egregious error.

Lastly, Mr. Klayman reiterates that he was always hesitant, as an accused white male, about aggressively questioning Ms. Sataki, but was reassured by Mr. Tigar and Mr. Fitch that it would not be held against him. However, as shown in the Hearing Committee's Report, Mr. Klayman was sandbagged by Messrs. Tigar and Fitch over his strong cross examination of Ms. Sataki which destroyed her credibility.

> **7.** **The Hearing Committee and Board Exhibited Extreme Bias and Prejudice Towards Mr. Klayman, Which Must Be Remedied**

Incredibly, one of the members of the Hearing Committee was Michael Tigar, an avowed and proud communist, and someone who is the ideological foe of Mr. Klayman, a staunch conservative and supporter of former President Trump. App. 0078 - 0104. To make matters worse, the Chair Anthony Fitch, while leftist but perhaps not a communist, appeared to be highly collegial with if not in awe of Mr. Tiger and acted in a manner that was overly deferential to him throughout the disciplinary process, looking to him repeatedly for "guidance." To be perfectly clear, Mr. Klayman's Proposed Findings of Fact and Counter Findings of Fact, App. 0045 - 0077, underscore the fact that the Board and the Hearing Committee never thoroughly reviewed the record, although Mr. Klayman literally begged them to do so.

As set forth in detail below, the Board's Report contained numerous egregious errors that evidence a lack of attention and review of the record. To try to set the record straight and prevent a manifest injustice, Mr. Klayman was forced to file a Notice and Motion to Review Record Material Which Will Aid Disposition, which was summarily denied – and a Motion for Reconsideration of the Order of the Chair of the Board on Professional Responsibility and Motion to Stay (the "Motion for Reconsideration") with the Board, which included a rational and legitimate request that the Board thoroughly conduct a bona fide review of the entire record, which they tellingly refused to do. The Chairman Kaiser was notably disingenuous in denying the motions with no real analysis,  finding only "after the fact" that Mr. Klayman's motion was "moot" because he had filed his Notice of Exceptions. Mr. Klayman had previously filed his Motion for Reconsideration under an emergency basis and has asked the Board to stay proceedings until the Motion for Reconsideration had been decided, but then Chairman Kaiser and the Board did not act—and when it did passed the ball to this honorable Court, shirking and ignoring its duties and responsibilities to correct a multitude of material errors by undertaking  a bona fide review process. Notably, Chairman Kaiser waited until after the deadline for Mr. Klayman to file his Notice of Exceptions to deny Respondent's legitimate request, rather than issuing a stay as would have been just.

Given this refusal and failure to address the obvious clear errors, much less lack of clear and convincing evidence, in the Board Report, Mr. Klayman is forced to wonder if Chairman Kaiser and his Board, in addition to the Hearing Committee, was biased against him due to their conflicting political beliefs and advocacy.[3] Regrettably, this type of prejudice is not unusual and is frequently reality in today's world of Washington, D.C., where extreme political polarization has reached a critical mass. Mr. Klayman is a prominent conservative activist, a pro-Trump supporter and public interest attorney, whereas, for instance, a prominent member of the Hearing Committee Michael Tigar, and the Chair Anthony Fitch to a slightly lesser extent, are the polar opposites who obviously detest all that Mr. Klayman stands for and advocates in his public interest and private legal capacity as founder of both Judicial Watch, Inc. and Freedom Watch, Inc.

---

[3] There is also a very apparent sentiment and approach of the D.C. Bar disciplinary apparatus that the mere act of a Respondent defending himself and not throwing him or herself on the "mercy of the Court" subjects the attorney to a greater likelihood of being found "guilty" with heightened sanctions. This flies in the face of the basic tenets of the American judicial system, and the Board's own rules which state that it is ODC's duty to prove a violation by clear and convincing evidence. The mere filing of a specification of charges by ODC is not in any way evidence of ethical misconduct and a respondent who believes he did not act unethically should not be punished for defending himself to the fullest extent of the law. In short, if a respondent feels and can support with facts and the law, as is true here, that he has done nothing unethical, he should not feel compelled to admit guilt and in effect throw himself on the mercy of the Court.

As for Mr. Tigar -- who a review of various transcripts during this proceeding will show that he was held in awe and accorded great deference by Hearing Committee Chair Anthony Fitch -- he remains a proud communist to this day, as he recently penned renewed allegiance to Karl Marx in his latest book "Mythologies of State and Monopoly Power, which is endorsed by none other fellow renowned communist Angela Davis and convicted domestic terrorist Bernadine Dorhn, to name just a few radical leftists. App. 0078 - 0104. As a young lawyer, it is not in dispute that he was fired by former Justice William Brennan as his clerk over this, as reported in the landmark book by famed Washington Post investigative reporter and editor Bob Woodward. App. 0078 - 0104.

As for Chairman Kaiser, he is also an ideological foe[4] of Mr. Klayman, himself having written and had published articles in defense of Hillary Clinton's "honesty," but to the contrary vilified President Donald Trump,[5] who Mr. Klayman has strongly supported. App. 0105 - 0118. Mr. Klayman's associate also uncovered numerous political contributions on the Federal Election Commission website by

---

[4] The Hearing Committee exhibited great vitriol towards Mr. Klayman based simply on the fact that he had sued the Clintons in the past, but then disingenuously reduced the 36 recommended suspension based on Mr. Klayman's public interest advocacy, which shows their incredible bias and attempt to make themselves look "fair" when they were not. One at best can call this shameless "chutzpah" of the highest magnitude.

[5] https://abovethelaw.com/2016/08/hillary-clinton-truthfulness-and-bias-in-white-collar-cases/; https://abovethelaw.com/2016/07/trump-and-tyranny/

Chairman Kaiser to Hillary Clinton and Barack Obama – who Mr. Klayman had sued in his public interest capacity at Judicial Watch and now Freedom Watch -- and most recently presidential candidate Joe Biden who Chairman Kaiser also contributed to, and a host of other leftist politicians.

While political contributions do not in and of themselves demonstrate bias, they can be cumulative circumstantial evidence of it, along with other indicia. It is clear that political beliefs should never influence  Hearing Committee and Board in matters of attorney discipline, but here it appears that they likely did --  given that a deluge irrefutable facts on the record  favor  the "acquittal" of Mr. Klayman, but were simply ignored and not even mentioned in the Hearing Committee recommendation and  Board Report. Interestingly, the highly leftist publication that Chairman Kaiser writes for, in which he vilified President Trump but ran interference for Hillary Clinton, "Above the Law,' recently wrote and published another article about Mr. Klayman, referring to him as a "nutbag" and suggested that he be disbarred.[6] The article asks and strongly suggest incredibly, "can we quarantine [Mr. Klayman's] law license?", suggesting that Mr. Klayman be

---

[6] Elizabeth Dye, *Nutbag Lawyer Larry Klayman Files $20 Trillion Suit Against China For Coronavirus 'Bioweapon'*, Above the Law, Mar. 19, 2020, available at: https://abovethelaw.com/2020/03/nutbag-lawyer-larry-klayman-files-20-trillion-suit-against-china-for-coronavirus-bioweapon/

removed from the practice of law, as has been the mission of ODC and apparently Mr. Tigar and the Hearing Committee.

In short, to ignore these indicia of bias and prejudice is simply not reality in today's world.

## II.     The Board's Report Evidences the Fact that it Did Not Take the Time to Review the Record

Upon reading the Board's Report, it was immediately evident to Mr. Klayman that the Board had failed to review and digest the record before issuing its Report, and accordingly Mr. Klayman respectfully requests that this Court now do so. In response, Kaiser disingenuously wrote:

> In any case before the Board, it is duty bound to 'review the findings and recommendations of Hearing Committees submitted to the Board, and to prepare and forward its own findings and recommendations, together with the record of proceedings before the Hearing Committee and the Board, to the Court.' D.C. Bar. R. XI, section 4(e)(7). As Respondent's Motion plainly seeks to petition to the Board to do that which it is mandated to do – and has done in the Board's Report – it is denied as moot. App. 0123 - 0124.

This statement by Kaiser evades a direct response to Mr. Klayman's legitimate request in two respects. First, he simply states that the Board did what "it is mandated to do," and then second says that this is reflected in the Board's Report. However, the problem with this non-response is that it the Board Report itself ignores Respondent's post hearing briefs and proposed findings which cite the actual record, and thus crucial and material uncontroverted facts, and reflects

that it simply adopted wholesale what was contained in the politically tainted and biased Committee recommendation. In short, the Board Report shows no evidence that the Board did as "it is mandated to do."

Conspicuously, the Board Report does not refer to a single witness's hearing testimony and related exhibits, seven (7) of whom testified for Mr. Klayman, refuting Ms. Sataki's allegations. Nor does it reflect her many admissions and impeached testimony.

To be absolutely clear, the hearing testimony of Ms. Sataki herself, if it had been reviewed, shows that she made many admissions in Mr. Klayman's favor and was impeached on numerous occasions on the truthfulness of her testimony, as set forth above. This too is detailed with great specificity in Respondent's proposed findings, all backed up with record cites to hearing testimony and supporting exhibits. App. 0045 – 0066.  To be frank, it is as if the Board's Report was written with a "do no evil, hear no evil and see no evil" predetermined mindset.

For example, at page 2 of the Board's Report which it appears was penned in whole or in large part by Chairman Kaiser since it dovetails and comports with his denial of Respondent's motions - which he gave short shrift and punted to this Court - he states:

> The Hearing Committee issued a lengthy, detailed and thoughtful
> report that determined that Respondent had violated a number of
> Rules of Professional Conduct by failing to effectively communicate
> with his client and to follow her instructions about the objectives of

the representation, representing her under a conflict of interest, and breaching his duties of confidentiality to her, among other Rule violations. But consent requires effective communication; here because Respondent was unable to effectively communicate with his client, he was unable to effectively obtain her consent.

For that reason, and as set out below, we agree that Respondent violated Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6 (a)(3), 1.7(b)(4), and 1.16 (a)(3). We recommend a sanction of an 18-month suspension with a requirement that he demonstrate a fitness to practice law before he is reinstated.

In adopting the virtually the entire Committee recommendation, with effusive and gushing praise for their "thoughtfulness," save for a brief mention of Professor Ronald Rotunda, a respected and renowned legal ethics expert, who had found that Mr. Klayman had not violated any of the above listed ethical rules but could not testify at the hearing since he had died during the unconscionable eight (8) year interim period after Ms. Sataki had filed her bar complaint, the Board's Report makes no mention of any of Mr. Klayman's material witnesses. App 0001 - 0034. These witnesses who refute Ms. Sataki's testimony and show her to be untruthful as a result of likely being coached by a hostile ODC whose admitted mission is to remove Mr. Klayman, no holds barred, from the practice of law, include Timothy Shamble, Keya Dash, Gloria Allred, the Honorable Stanley Sporkin (who also gave Mr. Klayman a strong character reference, Ashley Klayman and importantly, Mr. Klayman himself.

The testimony and documentary exhibits that relate to Timothy Shamble, Ms. Sataki's union president, who was intimately involved as in effect Mr. Klayman's partner in representing her, are particularly material and probative of the fact that there was full disclosure and informed consent for Mr. Klayman's and Mr. Shamble's recommended course of action in first attempting to settle Ms. Sataki's sexual harassment and workplace retaliation claims with Voice of America ("VOA") and then Mr. Klayman undertaking litigation on her behalf. PFF #20, Tr. 890. Mr. Shamble's testimony and related documentary evidence is set forth in detail in Respondent's proposed findings as identified above, yet no mention at all is made of him in the Board's Report, underscoring that the Board took the Committee's recommendation, which hinged solely on Ms. Sataki's contrived, false and vindictive testimony, hook, line and sinker, without doing a thorough and complete review of the record. It is this incorrectly claimed lack of communication and consent by Ms. Sataki, which Mr. Shamble and other witness testimony and related exhibits convincingly refute, upon which the Board's Report primarily hinges, itself misleadingly results in the Board "finding" a cavalcade of alleged rule violations by Mr. Klayman.

Mr. Shamble, as his testimony and documentary exhibits also establish and prove, was privy to the inability of even he, Ms. Sataki's union representative as head of the union at VOA, being able to communicate with Ms. Sataki over her

erratic and incomprehensible communications, made by persons who appeared not to be her, to no longer purse her claims versus VOA. PFF #4, RX 1, RX 5. Like Mr. Klayman Mr. Shamble sought to keep Ms. Sataki's claims alive until he and Mr. Klayman could personally communicate with her and confirm what she desired to do.

In addition, as just one other example of the obvious fact that a thorough and complete review of the record was not conducted, was the testimony of Gloria Allred, the premier litigator of sexual harassment claims by abused women. The testimony of Ms. Allred, supporting Mr. Klayman's testimony, showed that when Mr. Klayman saw that there was a potential conflict of interest over his feelings for Ms. Sataki and her manipulative "diva request" that he buy her a car, as she was attempting to take advantage of these feelings, that he sought to refer her to Ms. Allred. But Ms. Sataki herself wanted Mr. Klayman to remain as her counsel. PFF# 172 – 177.

When ultimately Ms. Sataki did not, for whatever reason, get the result she wanted, she struck back at Mr. Klayman, sending him the below email, which was entered into evidence but never even mentioned in the Board's Report. This email underscores the verbal and other abuse Mr. Klayman had experienced with Ms. Sataki throughout and explains the basis for many of his communications with her, since as a human being with feelings for her, he felt hurt. Ms. Sataki wrote:

I do not know if you are Christian or Jewish, because whichever suits you best, you become one. But I believe in karma and what you have done with my case and losing it." Ms. Sataki also wrote: "And what you have done with my case and losing it and not stopping working on it when I ordered you, one day you'll answer to God, even if you throw your life and play with people life. I am nobody, just a little girl who was retaliated and harassment by some VOA employee and you seed (sic) that you can help me. Not only did you not help me, but destroyed my life to nothing….

Mr. Klayman are you happy now that you've completely destroyed and lost my case? A case with so many evidence and witnesses. Only a very bad and clueless attorney could lose it, or lost it on purps (sic) because you made a dill (sic), with the other party. PFF #163, BCSX 38.

If the Board had conducted a thorough and complete review of the record, with the aid of Respondent's proposed findings of fact and post-hearing brief – which in great detail provided records cites for verification -- they would have seen that the alleged communication problems were not his primary doing. But in any event, when he saw that continued representation had become virtually impossible, he referred Ms. Sataki to Ms. Allred and another lawyer who handles VOA cases, Mr. Tim Shea. PFF # 36.

Despite this, it is Mr. Klayman who is vilified by both the Committee and now the Board's Report, with a career ending recommended sanction, since Mr. Klayman is now almost 70 years old, as the Board has recommended a reinstatement requirement which is tantamount to disbarment given the time it takes to litigate this.

Under these extraordinary circumstances, Chairman Kaiser and his Board were required, as is inherent and part and parcel to their own "professional responsibility," to undertake a thorough and complete review of the record, particularly given the inherent bias and prejudice of the Hearing Committee.

## **CONCLUSION**

As shown conclusively above, the bias and prejudice against Mr. Klayman, the due process, equal protection and Sixth Amendment violations, and the simple lack of clear and convincing evidence of any misconduct can support only one course of action by this Court – dismissal of this complaint in its entirety against Mr. Klayman. However, in the alternative, at a minimum, this matter must be remanded to a hearing before another Ad Hoc Hearing Committee not led by Messrs. Fitch and Tigar, Esq., so that Mr. Klayman will have a chance at a fair and unbiased proceeding. Furthermore, the Court must order an internal review to determine why and how a communist and another deferential ultra-leftist came to sit on the Hearing Committee charged with judging Mr. Klayman, a conservative public interest and pro-Trump advocate, as well as why the Board did not take any time to digest and review the record before issuing its Report, which it is mandated to do as part of its duties and professional responsibility. The Board cannot simply be allowed to ignore the record in order to create whatever finding and sanction which, for whatever reason, it desires.

Mr. Klayman had been a member continuously in good standing for several decades, and the hard work which gave rise to his undergraduate and juris doctor degrees and later law license, as well as subsequently his distinguished and successful legal career for now almost forty-four (44) years as a public interest advocate and private practitioner, should not and cannot be cavalierly taken away for political reasons, with regard to a bogus bar complaint and proceeding that are now about eleven (11) years old, and counting, App. 0677 (Klayman Biography). This is most particularly so when identical complaints had already been dismissed by two respected state bars, Florida and Pennsylvania, about nine (9) years ago.

Dated:  February 8, 2021                    Respectfully submitted,

                                            /s/ Melissa Isaak_____
                                            Melissa Isaak, Esq.
                                            2815-B Zelda Road
                                            Montgomery, AL 36106
                                            Tel: 334-262-8200
                                            Melissa@protectingmen.com

                                            Counsel for Respondent

# IN THE DISTRICT OF COLUMBIA COURT OF APPEALS

_____

**In the Matter of:**

    **LARRY E. KLAYMAN, ESQ.**

**Respondent.**

**A Member of the Bar of the District of
Columbia Court of Appeals
(Bar Registration No. 334581)**

**No. 20-BG-583
Board Docket No: 17-BD-063
BDN: 2011-D028**

---

## APPENDIX

_____

Dated:  February 8, 2021

Respectfully submitted,

/s/ Melissa Isaak_____
Melissa Isaak, Esq.
2815-B Zelda Road
Montgomery, AL 36106
Tel: 334-262-8200
Melissa@protectingmen.com

---

1. The Board on Professional Responsibility should have transmitted the entire record before the hearing Committee and itself to this Court. If this has not occurred, Respondent Larry Klayman and counsel respectfully request that they be so notified immediately

# TABLE OF CONTENTS

Board Report and Recommendation ...............................................App. 0001 - 0034

January 7, 2021 Order of the Court.................................................App. 0035 - 0036

Documents Regarding Laura Luhn ..................................................App. 0037 - 0038

Rejection Notice from the Court ...................................................... App. 0039

Emails Regarding Lack of Service ..................................................App. 0040 – 0044

Respondent's Proposed Findings ...................................................App. 0045 - 0066

Respondent's Counter Findings ....................................................App. 0067 – 0077

Michael Tigar Documents ..........................................................App. 0078 - 0104

Matthew Kaiser Documents ..........................................................App. 0105 - 0118

Translations ........................................................................App. 0119 - 0122

October 20, 2020 Board Order........................................................App. 0123 - 0124

Rick Dykema Emails..................................................................App. 0125 - 0126

Legal Opinion from Ronald Rotunda.................................................App. 0127 - 0133

Transcript of Proceedings Before Hearing Committee ..................App. 0134 - 0676

Biography of Larry Klayman...................................... .................. App.0677

THIS REPORT IS NOT A FINAL ORDER OF DISCIPLINE*

## DISTRICT OF COLUMBIA COURT OF APPEALS
## BOARD ON PROFESSIONAL RESPONSIBILITY

ISSUED

Oct 2 2020 12:24pm

Board on Professional
Responsibility

In the Matter of:               :
                                  :
     LARRY E. KLAYMAN,     :
                                  :    Board Docket No. 17-BD-063
Respondent.              :    Disciplinary Docket No. 2011-D028
                                  :
A Suspended Member of the Bar of the  :
District of Columbia Court of Appeals  :
(Bar Registration No. 334581)[1]    :

## REPORT AND RECOMMENDATION OF THE
## BOARD ON PROFESSIONAL RESPONSIBILITY

A lawyer's ability to communicate with her client is at the heart of the attorney-client relationship. Not only does a lawyer have a duty to communicate with her client under Rule 1.4, but effective communication undergirds an attorney's ability to ethically represent her client in many other ways. If a lawyer cannot effectively communicate with her client, the client cannot agree to a strategy, consent to have confidential information shared, or waive a conflict of interest. In most representations, an inability to communicate with the client is, in many ways, an inability to ethically represent that client.

This case shows the challenges that arise when that communication breaks down. Here, after agreeing to an attorney-client relationship at a restaurant, over dinner, Respondent developed romantic feelings towards his client. This caused a

---

[1] During the pendency of this matter before the Board, the Court entered an order suspending Respondent for 90 days. *See In re Klayman*, 228 A.3d 713, 720 (D.C. 2020) (*Klayman I*).

---

* Consult the 'Disciplinary Decisions' tab on the Board on Professional Responsibility's website (www.dcattorneydiscipline.org) to view any prior or subsequent decisions in this case.

breakdown in his ability to effectively communicate with his client. As his client described it:

> He would nonstop text or email, or [make] phone calls, and talked to me that I talk [sic] about respect, that I'm not respecting him, and why I'm not taking him to the gatherings.

> Then he explained his feelings to me and told me that he loves me and then he told me that he never loved anyone the way he loved me ever in his life and that nobody is going to love me the way he loved me, no other man can ever love me the way he loves me.

FF 31.

In Respondent's own words, his "emotions had rendered [him] non-functional even as a lawyer." FF 44. As a result of his emotional attachment to his client, he lost the ability to effectively communicate with her. For example, at one point, while driving, Respondent berated his client so much she leapt from his car and ran into a hotel lobby and hid in the women's bathroom; Respondent followed her in. Respondent wanted to talk to his client about his feelings. His client wanted to talk about her case.

The Hearing Committee issued a lengthy, detailed, and thoughtful report that determined that Respondent violated a number of Rules of Professional Conduct by failing to effectively communicate with his client and to follow her instructions about the objectives of the representation, representing her under a conflict of interest, and breaching his duties of confidentiality to her, among other Rule violations. Respondent's defense to many of these findings is that he had his client's consent. But consent requires effective communication; here, because Respondent

was unable to effectively communicate with his client, he was unable to effectively obtain her consent.

For that reason, and as set out below, we agree that Respondent violated Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3). We recommend a sanction of an 18-month suspension with a requirement that he demonstrate a fitness to practice law before he is reinstated.

## I.    PROCEDURAL BACKGROUND

Respondent was charged with failing to abide by his client's objectives for a representation in violation of Rule 1.2(a), failing to communicate with his client in violation of Rule 1.4(b), failing to enter into a written engagement agreement in violation of Rule 1.5(b), failing to have a written fee agreement for a contingent fee case in violation of 1.5(c), revealing client confidences in violation of Rules 1.6(a)(1) and 1.6(a)(3), representing a client with a conflict of interest in violation of Rule 1.7(b)(4), representing a client after he was fired in violation of Rule 1.16(a)(3), and engaging in dishonesty and/or misrepresentation in violation of Rule 8.4(c). The Hearing Committee unanimously recommended that the Board conclude that Disciplinary Counsel established by clear and convincing evidence that Respondent violated Rules 1.2(a), 1.4(b), 1.5(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3). The Hearing Committee recommended that the Board find that Disciplinary Counsel did not prove by clear and convincing evidence that

3

Respondent violated Rule 8.4(c). Disciplinary Counsel disagrees with this determination but does not take exception to it.[2]

The Hearing Committee recommended that Respondent be suspended for 33 months and that he be required to prove his fitness to practice law prior to reinstatement. Disciplinary Counsel asks that the Board adopt both the Hearing Committee's findings of fact and conclusions of law but takes exception to the recommended sanction, arguing that Respondent should be disbarred instead.

In addition, Respondent asks that the Board dismiss the pending charges due to the delay in prosecution. In the alternative, he asks that the Board reject the Hearing Committee's findings of fact, on grounds that they are not supported by the record, and that the Board reject the Hearing Committee's conclusions of law.[3] He further argues that the proposed 33-month suspension with a fitness requirement is not consistent with discipline in similar cases.

Unless otherwise specified, we adopt the detailed and careful factual findings of the Hearing Committee. As set out in more detail below, we conclude that

---

[2] Given the absence of a substantive objection to the Hearing Committee's recommendation, we see no reason on the face of the record to disturb its conclusion that Disciplinary Counsel did not prove by clear and convincing evidence that Respondent violated Rule 8.4(c).

[3] Respondent appears to concede the Rule 1.5(b) violation in stating that he failed to provide a written fee agreement because he "suffered from a not uncommon misunderstanding of the Rules believing that because he did not intend to charge a fee, he did not need a fee letter or other writing." Resp. Br. to Board at 32. As discussed below, we conclude that Respondent violated Rule 1.5(c) by not providing a contingent fee agreement in writing.

4

Disciplinary Counsel has proven violations of Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3). We recommend that Respondent be suspended from the practice of law for 18 months and that he be required to prove his fitness to practice law before he is reinstated.

## II.    STANDARD OF REVIEW

The Board must accept Hearing Committee findings of fact where there is substantial evidence to support them "even where evidence may support a contrary view as well." *In re Robbins*, 192 A.3d 558, 564 (D.C. 2018) (per curiam) "[T]he Hearing Committee is not required to enumerate every fact that has possible relevance to an issue in its report." *Id.*; *see also In re Szymkowicz*, 124 A.3d 1078, 1084 (D.C. 2015) (per curiam) (the Court will not disregard the findings of the hearing committee even where there is substantial evidence pointing in the opposite direction); *In re Godette*, 919 A.2d 1157, 1163 (D.C. 2007) ("This court must accept a finding that is supported by substantial evidence in the record as a whole, 'even though there may also be substantial evidence in the record to support a contrary finding.'"). When making its own findings of fact, the Board employs a "clear and convincing evidence" standard. Board Rule 13.7. The Board reviews *de novo* the Hearing Committee's legal conclusions and its determinations of ultimate fact. *In re Bradley*, 70 A.3d 1189, 1194 (D.C. 2013) (per curiam).

5

### III.   FACTUAL BACKGROUND

Respondent met E.S.[4] at a speech on the steps of the United States Capitol in November 2009. E.S. was a reporter for Voice of America (VOA); she was there covering a press conference that Respondent was also attending. They exchanged business cards, and he called her a number of times in the days that followed. When she learned that he was a lawyer, E.S. asked him for help with a legal problem: she had made a sexual harassment allegation against a coworker and was not satisfied with her employer's response. Respondent asked E.S. to dinner. Respondent agreed to represent E.S. with her sexual harassment case over dinner. *See* FF 8. Respondent and E.S. verbally agreed that he would represent her on a contingent fee basis, but no written agreement was ever executed between them. FF 9.

In February 2010, Respondent began negotiating with VOA on E.S.'s behalf and advising her about her case. E.S. was stationed in Washington, D.C. She wanted to move to Los Angeles, to be away from the man she had brought a sexual harassment claim against. This request was denied because E.S. was an on-air reporter; VOA did not have a television studio in Los Angeles where she could do her job. Respondent was, at the time, living in Los Angeles. He advised E.S. to move to Los Angeles despite VOA's position that she could not work from California. Respondent insisted that E.S. stay in Los Angeles – and not show up at work in Washington, D.C. He paid the rent on an apartment to facilitate her relocation to Los

---

[4] We refer to Respondent's client by her initials because her name is not material to the resolution of any issues before the Board.

Angeles. In May 2010, when E.S. was deemed Absent Without Leave for not coming to work after she followed Respondent's advice, Respondent provided her with funds equivalent to her salary, claiming that he would simply take the amounts out of whatever recovery he eventually secured. *See* FF 51-52.

During this time, while working on her case, Respondent began to share with E.S. the intense romantic feelings he had for her. In a May 8, 2010 email, he told her that she ought to find a new lawyer because his feelings for her were so strong. *See* FF 42-43. She pleaded with him to stay involved in her case. He wrote to the therapist that he had hired to develop portions of E.S.'s claim for damages that his "own emotions had rendered [him] non-functional even as a lawyer." FF 44. Yet Respondent continued to represent E.S.

His emotional interest in E.S. infected his ability to communicate with her. He brought her to an event in Los Angeles but became jealous when she did not speak to him as much as he would have liked. As he drove her home, he berated her so much that she ran out of his car when it was stopped at a traffic light and into a nearby hotel, then into the women's bathroom in the hotel lobby. Respondent followed her into the bathroom to continue to yell at her. A hotel receptionist intervened and helped E.S. flee the hotel – and Respondent – by the back door.

He brought her to meet with members of Congress to attempt to get Congressional pressure on her case. At one point, the Chief of Staff for Congressman Rohrbacher approached E.S., after watching Respondent and E.S.'s body language during a meeting, to ask if E.S. was afraid of Respondent.  FF 48.

7

Beyond his personal feelings for E.S., Disciplinary Counsel alleged – and the Hearing Committee found – that Respondent's litigation strategy was driven by a desire to harm then Secretary of State Hillary Clinton and by a desire for publicity for himself.[5] He filed suit on behalf of E.S. against VOA and named the members of the Broadcasting Board of Governors individually – the Board is chaired *ex officio* by the Secretary of State, who, at the time, was Hillary Clinton.

Over E.S.'s initial objection, Respondent engineered a public relations campaign that he said would help her case. Each article on the case also promoted Respondent's interests and notoriety as an attorney. The public statements Respondent either made or caused someone else to make also revealed information that E.S. had asked him to keep nonpublic and that was embarrassing to her or otherwise damaging to her professional standing – particularly her political views, which could harm her reputation as a journalist.

After months of Respondent's conduct, E.S. told him she wanted to end her lawsuit against VOA. She sent an email to VOA saying that she had instructed Respondent to dismiss her claims. Instead of withdrawing from the case, Respondent sent a number of intemperate emails to E.S. over the next several months and continued to file pleadings in her case.

---

[5] Respondent has previously engaged in extensive litigation relating to Secretary Clinton and her husband.

8

## IV.    DISCUSSION

### Rule 1.7(b)(4)

Disciplinary Counsel alleged, and the Hearing Committee found, that Respondent had a personal interest conflict of interest under Rule 1.7(b)(4) in his representation of E.S.

Rule 1.7(b)(4) provides that "a lawyer shall not represent a client with respect to a matter if . . . [t]he lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests."

However, a lawyer can represent a client when there is a personal interest conflict if Rule 1.7(c)'s requirements are met. Rule 1.7(c) provides that a lawyer may represent a client despite a personal interest conflict if:

> (1)   "[e]ach potentially affected client provides informed consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation" and

> (2)   "[t]he lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client."

Disciplinary Counsel charged that Respondent violated Rule 1.7(b)(4) in three ways: by representing E.S. despite his strong personal feelings for her; by turning

9

her case into a vehicle to attack Hillary Clinton to further an alleged personal vendetta; and by using E.S.'s case to promote himself at her expense.

We consider each in turn.

*Emotional Conflict*

Respondent concedes that he had a strong emotional interest in E.S. He argues, however, that he disclosed his feelings for her and that she elected to continue with the representation so, as a result, he had informed consent to continue with the representation under Rule 1.7(c).

While it is true that Respondent repeatedly communicated his feelings to E.S., and that she asked him to continue with the representation, that is not sufficient to satisfy Rule 1.7(c). Assuming E.S. effectively consented to the conflicted representation, Respondent could not have "reasonably believe[d] that [he could] provide competent and diligent representation to [her]." Rule 1.7(c)(2).

In light of Respondent's own statement at the time that he was "non-functional . . . as a lawyer" because of his romantic interests in E.S., we have little trouble concluding that Respondent could not reasonably believe that he could have provided competent and diligent representation to her. In light of this statement to E.S.'s therapist – and his conduct at the time – he both did not believe he could provide appropriate representation to her and even if he thought he could represent her despite his feelings, that belief would not have been reasonable.

10

As a result, regardless of whether E.S. provided informed consent to the representation – a proposition we are skeptical of but do not resolve – Respondent's representation of her was not permissible under Rule 1.7(c).[6]

As a result, we agree with the Hearing Committee that Respondent violated Rule 1.7(b)(4) by representing E.S. in light of his emotional interest in her.

*Hillary Clinton and Publicity Conflict*

We do not reach the same conclusion with the alleged conflicts of interest involving Respondent's interest in suing Hillary Clinton or seeking publicity.

There is little doubt that Respondent has a history of bringing litigation against Secretary Clinton and her husband. And, clearly, Respondent is able to get attention in the media and uses that as a strategy in his legal work; he benefits from media attention. We, therefore, assume without deciding that Respondent has a personal interest both in bringing litigation against the Clintons and in publicizing his work.

We are concerned, however, about the effect of a rule that treats these personal dispositions as the same as the kind of interests that clearly generate a personal interest conflict under Rule 1.7(b)(4). The kinds of conflicts described in the Rule, the commentary, and relevant ethics opinions are concrete: a financial interest that would be adversely affected; a property interest that would be impacted; or a lawyer's interest in securing employment. *See* D.C. Ethics Opinions 210 and 367

---

[6] Respondent argues that this conflict is overstated because his feelings were unreciprocated and he did not have a physical relationship with E.S. As discussed above, we do not find that precludes a conflict of interest based on his intense romantic interest in her.

11

(dealing with lawyers seeking employment from an adverse party). In contrast, Respondent's two purported conflicts – his desire for publicity and his predisposition towards the Clintons – are more amorphous. These are less an "interest" of Respondent than a predisposition. We are troubled by a rule that requires lawyers to disclose these less obvious philosophical approaches to clients. *See, e.g.*, D.C. Ethics Opinion 367 (discussing D.C. Ethics Opinion 210 and advising a criminal defense lawyer that she does not need to disclose an application with a prosecutor's office that is not adverse to her client because "[a]lthough a client in a criminal matter may prefer that his lawyer be completely 'defense oriented' and not consider becoming a prosecutor with any employer while defending him, this preference does not mean that a potential or actual conflict of interest exists").

Lawyers have varied philosophical or habitual approaches to the practice of law. In the exercise of their professional judgment, some criminal defense lawyers may encourage their clients to cooperate with prosecutors more frequently than others. Some lawyers starting their practices may want publicity for their cases both to boost the lawyer's practice and the client's cause.[7] Some lawyers may prefer to bring cases against a particular defendant, or industry, motivated by a political or other ideological opposition to that industry's practices. If Disciplinary Counsel's expansive reading about Rule 1.7(b)(4) were adopted, it would create additional disclosure obligations for lawyers that go well beyond what attorneys are normally

---

[7] Of course, if the lawyer harms her client's case in the pursuit of publicity, that is a different problem and a different rule violation, depending on the nature of the harm.

12

required or expected to disclose. And we have seen no authority from Disciplinary Counsel for the proposition that a "personal interest" in Rule 1.7(b)(4) should be read so broadly.

Accordingly, we do not find that Respondent violated Rule 1.7(b)(4) based on a conflict of interest arising from a desire for publicity or litigation against the Clintons.

This is not to say, however, that a lawyer should let her desire for publicity or philosophical views ride roughshod over the interests of her client. But that restriction is found in Rule 1.2, not Rule 1.7.

### Rule 1.2(a)

Rule 1.2(a) obligates a lawyer to "abide by a client's decisions concerning the objectives of the representation . . . and . . . consult with the client as to the means by which they are to be pursued." Comment [1] to Rule 1.2 states that "[t]he client has ultimate authority to determine the purposes to be served by legal representation . . . ."

The Hearing Committee determined that Respondent failed to abide by E.S.'s objectives or consult with her about the means of the litigation, violating Rule 1.2(a), in five different ways: (i) he filed a motion to disqualify the judge in E.S.'s case because the judge was appointed by Secretary Clinton's husband; (ii) he named Secretary Clinton as a defendant in an action against VOA when she was not involved in any decision relating to E.S.; (iii) he filed a motion to have E.S.'s case re-assigned after he lost the motion to disqualify, based on the same arguments about

the judge's bias; (iv) he did not dismiss the entire case when directed by E.S. to do so; and (v) he wrote and/or facilitated a string of articles about E.S.'s case. HC Rpt. at 115.

Respondent argues that Rule 1.2 does not require the client's informed consent to a course of action. According to Respondent, if a client does not like the strategy employed by a lawyer, the client is free to discharge the lawyer, but may not exercise his or her own judgment as to the best legal strategy. Moreover, Respondent argues that he did consult with his client and that she was aware of the approach he took.[8]

As a factual matter, we agree with the Hearing Committee's findings of fact, which are supported by substantial evidence. E.S. made clear to Respondent from the outset of the representation that she intended to pursue her case with minimal

---

[8] As evidence that he consulted with his client, Respondent points to five declarations that she allegedly drafted and filed. However, only two of the five declarations are admitted into evidence – RX 3 (RRDE 0652-668) and DX 11 (11-58 to 11-64). Respondent points to a docket sheet (DX 3) as evidence that she filed the other declarations, but the actual declarations were not offered into evidence, and a docket sheet merely showing that they were filed is insufficient to demonstrate the content of the declarations.

Additionally, Respondent attaches, as Appendix 1, to his brief a letter addressed to Judge Kollar-Kotelly purportedly written by E.S. Respondent asserts that the letter evidences the fact that E.S. was aware of all filings in the case. Resp. Br. to Board at 28. We construe this language in Respondent's brief as a motion to supplement the record and admit this letter into evidence. However, because it is uncross-examined hearsay, we accord it no weight in our consideration of this matter. *See* Board Rules 11.3, 13.7. E.S. testified during the hearing and could presumptively have been cross-examined to provide an evidentiary foundation for the letter but was not.

14

publicity. Respondent's litigation strategy substantially ignored this clear – and reasonable – desire of the client. Respondent's decisions to name Secretary Clinton, distribute news stories about the case, and file a motion to disqualify the judge because she is biased against Respondent based on the President who appointed her, conflicted with the express desires of the client. It does not matter that Respondent may have later advised his client that he took these actions since he did not consult her before doing so.

We also disagree with Respondent's application of Rule 1.2 to these facts. While it is true that lawyers do not need informed consent to each aspect of the means of pursuing a client's objectives, here, E.S. told Respondent what mattered to her. Respondent simply went his own way. When a lawyer has notice that a client does not want her to use a particular means to achieve a result, the lawyer must respect that desire.

Similarly, by refusing to dismiss the case after having been directed to, Respondent violated Rule 1.2. E.S. wanted her case dismissed; Respondent ignored that lawful objective of the client.

On the other hand, we do not agree that Respondent violated Rule 1.2 when he filed the re-assignment motion. Such motions are reasonably ministerial and would not cause the matter to become more high profile that it was prior to the filing of the motion.

15

## Rule 1.4(b)

Rule 1.4(b) requires that a lawyer communicate with her client; an attorney "shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." This Rule provides that the attorney "must be particularly careful to ensure that decisions of the client are made only after the client has been informed of all relevant considerations." Rule 1.4, cmt. [2]. The Rule places the burden on the attorney to "initiate and maintain the consultative and decision-making process if the client does not do so and [to] ensure that the ongoing process is thorough and complete." *Id.*

A lawyer is obligated to communicate with his or her client in such a way as to allow the client to make decisions about the representation and to be informed about what is happening in the case. Normally, this Rule is applied to require a lawyer to disclose information; it does not often address the manner in which the lawyer relates the information.

Here, by contrast, Respondent engaged in a lengthy and emotional series of communications with E.S. not to keep her abreast of developments in her case, but because of his feelings for her. By April 2010, Respondent had begun sending "nonstop" text and email messages or phone calls explaining his feelings to E.S., insisting that she was "not respecting him" or "taking him to the gatherings." FF 31; *see* FF 35 (April 9, 2010 email from Respondent discussing that a "friend" may be perceived as a "girlfriend, boyfriend, wife, husband or whatever"); FF 36 (April 23, 2010 message from Respondent stating "I am very sad because I really do love u . .

16

. ."); FF 38 (April 23, 2019 email from Respondent discussing his love for E.S.); FF 39 (email from Respondent to E.S. complaining that he was a "low priority" in her life).

While this is not the typical Rule 1.4 violation, there is simply no conclusion one can reach but that E.S. did not have the kind of communication with Respondent that a client ought to receive from her lawyer. In light of Respondent's frequent and highly inappropriate communications about his emotional states, and his intimidating and berating manner of speaking with her, any communications about E.S.'s case were drowned out by his other interests. We find, therefore, that Respondent failed to comply with Rule 1.4.

### Rule 1.5(c)

Respondent is alleged to have violated two provisions of Rule 1.5. First, Rule 1.5(b) requires that a client receive a written agreement that describes the basic financial relationship for the representation absent an exception not present here. Second, Rule 1.5(c) requires a written fee agreement in every contingent fee case.

The Hearing Committee found that from the initial dinner when Respondent agreed to represent E.S., this representation was a contingent fee representation. FF 10. That finding is supported by substantial evidence – the testimony of E.S. As a result, we adopt the Hearing Committee's finding that this was a contingent fee representation. Because a contingent fee agreement must be in writing, and this agreement was not, Respondent violated Rule 1.5(c).

17

## Rule 1.6

Disciplinary Counsel alleged, and the Hearing Committee found, that Respondent disclosed client secrets – confidential information about E.S.'s work experiences, alleged political views, personal appearance, physical health, mental health and/or financial condition – without E.S.'s consent and, therefore, violated Rule 1.6(a)(1).[9] Further, the Hearing Committee found that Respondent did so for his own advantage in violation of Rule 1.6(a)(3).

Respondent acknowledges that he shared this information on the internet. However, he contends that all of the information that was posted on the internet was already contained in information that had been filed in E.S.'s lawsuit in the United States District Court for the District of Columbia. As a result, he contends that his disclosures were not confidences or secrets or, if they were, they were "clearly protected free speech" under the First Amendment. Resp. Br. to Board at 35. Moreover, Respondent contends that E.S. consented to have this information made public. We consider each in turn.

---

[9] Specifically, the Hearing Committee found that "Respondent disclosed client secrets without his client's consent in violation of Rules 1.6(a)(1) and 1.6(e)(1)." HC Rpt. at 128. We first note that Respondent was not charged with a violation of Rule 1.6(e)(1). Nor could he have been; Rule 1.6(e) provides an enumerated list of instances when "[a] lawyer may use or reveal client confidences or secrets," including "with the informed consent of the client," Rule 1.6(e)(1). Because Rule 1.6(e) operates as an exception to Rule 1.6(a), if Rule 1.6(e) doesn't allow a lawyer's conduct, she violates Rule 1.6(a), not Rule 1.6(e).

18

*The Record Before the Hearing Committee*

At the start, we acknowledge some frustration with Respondent's argument that his internet disclosures either did not involve secrets or were protected by the First Amendment if they did. These arguments were not raised before the Hearing Committee; they appeared for the first time in Respondent's brief before the Board. Respondent has done little to show that each statement of embarrassing information Respondent put on the internet was contained in the public materials available on the federal court's docket. In short, the state of the record is poor and the arguments before us are not fully developed.

However, the Court of Appeals has not licensed a waiver doctrine in this situation; a party does not forfeit his or her ability to raise an argument before the Board by failing to raise it before a Hearing Committee. And such a rule – while convenient at times – may not be consistent with the Court's Rules and its requirements for our review of a Hearing Committee's Report. In light of our obligation to make a determination that the Hearing Committee's Report is supported by substantial evidence, as well as the Board's express authority to make its own findings of fact employing a "clear and convincing" standard, it is not clear how the waiver doctrine would function when, as here, Respondent makes arguments to the Board. *See* Board Rule 13.7. Thus, absent further guidance from the Court, we decline to conclude that a respondent's arguments to the Board are limited to those made to a hearing committee. Accordingly, we believe that we are obligated to address this issue to the extent we can on the record before us.

19

*Were These Secrets?*

In his press campaign, Respondent disclosed a number of sensitive and embarrassing details about E.S. which then were posted on the internet. The Hearing Committee found that E.S. clearly expressed to Respondent that she did not want many of her personal details to get publicity, specifically her political views, personal appearance, health, and finances. This finding was supported by substantial evidence and, therefore, we adopt it. Indeed, E.S. testified that she told Respondent not to write the stories he was publishing. Tr. 400; FF 57.

Respondent argues that this sensitive information was not a confidence or secret within the meaning of Rule 1.6(b) because it was contained in documents filed in the United States District Court. Respondent asserts that the confidences and secrets which were revealed had all been included in those filings, but does not address where, specifically, those statements were contained. For purposes of resolving this issue, we assume that the sensitive information was contained in the filings on the federal court's docket. But, to be perfectly clear, we do not make such a finding.

Respondent contends that because this information was some place on the federal court's docket, Rule 1.6 no longer prohibits its disclosure. We disagree. Rule 1.6(b) describes what counts as a client secret: "'secret' refers to other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be

20

App.0020

detrimental, to the client." There is no "prior disclosure" exception to the definition of "secret" in the plain language of Rule 1.6(b).

Comment [8] to Rule 1.6 is highly relevant to this question, and is inconsistent with Respondent's position: "This ethical precept [that a lawyer must maintain client confidences and secrets], unlike the evidentiary privilege, exists without regard to the nature or source of the information or the fact that others share the knowledge. It reflects not only the principles underlying the attorney-client privilege, but the lawyer's duty of loyalty to the client."

Thus, under the plain language of Comment [8], the mere fact that public filings in a court docket contain the statements later publicized on the internet does not mean that the information is no longer subject to the requirements of Rule 1.6.

The embarrassing information here was nominally public. A person with detailed knowledge of where to look, how to search on a federal court's docket, and a PACER account, could have found the information. Importantly, information that is in the federal courts' CM/ECF system does not appear in an internet search. For all but a very few people, the information was effectively "secret." Respondent took that nominally public information and made it easily retrievable by any person in the world who knows the client's name and has internet access. We believe this is precisely the kind of conduct meant to be covered by Comment [8] to Rule 1.6. *Cf.* ABA Ethics Opinion 479 at 2 ("A number of courts and other authorities conclude that information is not generally known merely because it is publicly available or might qualify as a public record or as a matter of public record.").

<center>21</center>

The information that Respondent broadcast would have been difficult to find but for his actions. He made it easily accessible to billions. This violates Rule 1.6.

*The First Amendment*

Separately, Respondent argues that his disclosure of this information was protected by the First Amendment. Respondent points to the Virginia Supreme Court's decision in *Hunter v. State Bar of Virginia*, 744 S.E.2d 611 (Va. 2013). There, the Virginia Supreme Court concluded that a restriction on a lawyer's First Amendment right to free expression cannot be limited by a rule of professional conduct that prohibits the disclosure of a fact that has already been publicly disclosed. Specifically, the *Hunter* court determined that there is no compelling government interest in regulating such speech. *Id.* at 619-620.

Importantly, *Hunter* examined Virginia law. Virginia's version of Rule 1.6 does not have a corollary of Comment [8]; the duty of confidentiality in Virginia is not grounded – in part – in the duty of loyalty as it is in the District of Columbia. Thus, *Hunter* is of limited value in resolving the question here.

Regardless of the Rule in Virginia, in the District of Columbia clients reasonably expect – and should expect – that a lawyer will not share their secrets, even those which had to be disclosed in a court proceeding or in a court filing, to the wider world. There is, in short, a compelling government interest in requiring lawyers to be loyal to their clients.

Above, we concluded that Respondent violated Rule 1.6 by converting nominally public but difficult to find information into information easily found on

22

the internet with a search engine, because to do so would violate Respondent's duty of loyalty to keep embarrassing information learned in a representation from public disclosure. Respondent asserts that to so conclude would violate the First Amendment. We disagree; there is a compelling government interest in requiring that lawyers are loyal to their clients.

There are other cases of lawyers sharing client information that may be harder. Under the rationale set forth here, one could argue, perhaps, a lawyer who shares at lunch with a colleague, or with her spouse, information that is in a public filing but is not known to anyone outside of the case violates Rule 1.6. Similarly, a lawyer who shares a proposition of law from a reported case that contains embarrassing information about her client may run afoul of one particularly aggressive reading of this decision.

We do not think such readings would be well founded, however. The core question in resolving whether a disclosure of public but difficult to find information is whether the lawyer acted disloyally by sharing her client's information. When determining whether a lawyer acted loyally, the reason for the disclosure by the lawyer matters. A lawyer who reveals information in the client's interests is very likely acting loyally. A lawyer revealing client secrets for self-aggrandizement, however, is more likely to run afoul of Comment [8] to Rule 1.6. While there may be hard cases of routine lawyer behavior that suggest *de minimis* violations of an aggressive reading of this decision, those issues are not before us now.

23

*Informed Consent*

Finally, Respondent argues that E.S. gave her informed consent to these disclosures and, as a result, they were therefore authorized by Rule 1.6(e)(1). Indeed, at one point, E.S. was handing out articles with this information in them to members of the public. FF 47.

At the heart of Rule 1.6(e)(1)'s requirement of informed consent is that the lawyer communicate with his client. Because we conclude that Respondent here violated Rule 1.4 and did not communicate appropriately with his client, we conclude that he did not and could not have obtained her informed consent to disclose her secrets.[10]

As a result, we conclude that Respondent violated Rule 1.6 by sharing his client's sensitive information on the internet.

## Rule 1.16(a)(3)

Rule 1.16(a)(3) provides that "a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if . . . [t]he lawyer is discharged."

The Hearing Committee found that Respondent violated this Rule when, following his client's termination of his representation, he failed to withdraw and made at least six post-termination filings. HC Rpt. at 120-23. Respondent argues that

---

[10] Informed consent is defined as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Rule 1.0(e)

24

he had the obligation to communicate with his client concerning the "basic mechanics of his termination" and that, under the circumstances, he could not simply withdraw from the representation. Resp. Br. to Board at 52-53.

Had Respondent taken a few weeks or a month to accomplish the mechanics of termination, without continuing to file motions in the case, perhaps this conclusion would be different. But Respondent continued as E.S.'s counsel for over five months, continuing to file motions that did far more than preserve the status quo while he divined whether his client truly wanted him out of the case. As a result, we agree with the Hearing Committee's conclusion that Respondent violated Rule 1.16.

## Delay

Respondent argues that the lengthy delay in bringing this case should require dismissal of the charged Rule violations or, at a minimum, mitigation of the recommended sanction.

The Court of Appeals has never dismissed a disciplinary case on the basis of delay. *See In re Ponds*, 888 A.2d 234, 243 (D.C. 2005). In order for undue delay to amount to a violation of due process and serve as the basis for such a dismissal, the delay must be coupled with actual prejudice to the respondent, such that the respondent's defense to the charges was sufficiently impaired. *In re Williams*, 513 A.2d 793, 796-97 (D.C. 1986). As the Court explained:

> A disciplinary sanction differs from a criminal conviction. Although both protect the public, they do so in different ways. Most importantly, an attorney is in a continuing position of trust toward clients, the courts, and society in general. A member of the bar has accepted the onerous responsibility of participating in the administration of justice. We grant the license to practice law as a privilege, not as a right, and we do so

only on the strict condition that the attorney aspire to the highest standards of ethical conduct. Consequently, "[t]he purpose of a disciplinary proceeding is to question the continued fitness of a lawyer to practice his [or her] profession." *District of Columbia Bar v. Kleindienst*, [345 A.2d 146, 147 (D.C. 1975) (en banc) (per curiam)] . . . .

Any betrayal of the trust which the attorney is sworn to keep demands appropriate discipline; a delay in prosecution, without more, cannot override this necessity. The contrary conclusion would mean that, when licensing applicants, we would engage in a form of deceit: our endorsement of an unqualified attorney would belie our simultaneous assertion that attorneys possess the integrity and competence which they must constantly demonstrate in order to earn the privilege of practicing law in the District of Columbia. Speedy trial principles, which in criminal cases are a constitutionally required curb on the abuse of government power, in the disciplinary system take second place to other societal interests. We conclude, for these reasons, that an undue delay in prosecution is not in itself a proper ground for dismissal of charges of attorney misconduct. . . . .

We might hold differently if respondent had shown that the undue delay impaired his defense. **A delay coupled with actual prejudice could result in a due process violation, in which case we would be unable to agree with a finding that misconduct had actually been shown**.

*Id.* (emphasis added) (internal citations omitted).

On the other hand, mitigation of a sanction for undue delay is warranted when "the circumstances of the individual case [are] sufficiently unique and compelling to justify lessening what would otherwise be the sanction necessary to protect the public interest." *In re Fowler*, 642 A.2d 1327, 1331 (D.C. 1994); *see In re Howes*, 39 A.3d 1, 19 n.24 (D.C. 2012) (the gravity of the respondent's misconduct outweighed any mitigation of even a lengthy twelve-year delay). Determining whether "unique and compelling circumstances" exist requires consideration of

26

whether the respondent suffered prejudice as a result of the delay, such as impairment of the defense (lost witnesses, dimmed memory, etc.); anxiety caused to the respondent; and whether the respondent was suspended during the course of the proceedings. *In re Brown*, Bar Docket No. 88-97, at 26 (BPR Dec. 10, 2003), *recommendation adopted*, 851 A.2d 1278 (D.C. 2004) (per curiam) (sanction mitigated due to six and a half year undue delay where the respondent had been suspended from the Bar during that time and had no hand in causing the delay).

Here, roughly seven years elapsed between the events underlying this matter and the filing of the Specification of Charges. Respondent makes four main arguments in support of his claim that the delay deprived him of the opportunity to fairly defend himself in this matter. Prior to the hearing date, Respondent's expert witness (Professor Ronald Rotunda) passed away and E.S.'s psychiatrist (Dr. Aviera) became unavailable to testify because she was suffering from the effects of cancer. Respondent also points to both his and E.S.'s faded memories concerning events that occurred during the course of the representation and files that he lost or discarded during the pendency of the matter.

Respondent's arguments fail to demonstrate sufficient prejudice to dismiss the pending charges or to warrant mitigation of the recommended sanction. First, Professor Rotunda offered an expert report which was admitted into evidence and considered by the Hearing Committee. Moreover, any testimony that he may have offered as a "professional ethics expert" would have been exceedingly limited in scope. *See Steele v. D.C. Tiger Market*, 854 A.2d 175, 181 (D.C. 2004) ("[E]xpert

testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." (internal quotations omitted)). With respect to Dr. Aviera, Respondent could have sought permission to depose her on grounds that he needed to preserve her testimony due to her illness. He did not. Finally, Respondent's general arguments that his and E.S.'s memories had faded and that he lost or destroyed his client files by the date of the hearing are also unpersuasive. Respondent fails to point to any hearing testimony demonstrating that either he or E.S. had faded memories concerning a material issue that would have impacted the fairness of the proceeding. Additionally, Respondent received notice of the disciplinary complaint close in time to the underlying events. *See* DX 2 (Respondent's response to disciplinary complaint filed by E.S.). He should have acted to preserve his file and other case-related materials.[11]

Because Respondent suffered no actual prejudice in this matter and we do not find that there are sufficiently unique and compelling circumstances here, we determine that neither dismissal of the disciplinary charges nor mitigation would be appropriate.

---

[11] Respondent complains that he was denied discovery of his email communications between himself and E.S. and that he was "forced to defend himself without the full record of his communications with his client." Resp. Br. to Board at 19. But E.S. produced, and Respondent reviewed, all email correspondence in her possession between herself and Respondent. *See* Tr. 20, 271. Also, Respondent had notice of this investigation. He could have simply not deleted his emails.

## V.    SANCTION

In determining the appropriate sanction for a disciplinary Rule violation, the factors we are to consider include (1) the nature and seriousness of the misconduct, (2) the prejudice to the client, (3) whether the conduct involved dishonesty or misrepresentation, (4) violation of other disciplinary rules, (5) Respondent's prior disciplinary history, (6) Respondent's attitude toward the underlying conduct, and (7) mitigating or aggravating circumstances. *See In re Martin*, 67 A.3d 1032, 1053 (D.C. 2013) (citation omitted); *In re Hutchinson*, 534 A.2d 919, 924 (D.C. 1987) (en banc). The disciplinary system does not seek to punish lawyers; rather, its purposes are to maintain the integrity of the legal profession, protect the public and the courts, and deter future or similar misconduct by the respondents and others. *Hutchinson*, 534 A.2d at 924; *In re Reback*, 513 A.2d 226, 231 (D.C. 1986) (en banc). In addition, sanctions imposed must not "foster a tendency toward inconsistent dispositions for comparable conduct or . . . otherwise be unwarranted." D.C. Bar Rule XI, § 9(h)(1).

The Hearing Committee painstakingly analyzed the appropriate sanction for each of Respondent's Rule violations, considering mitigating and aggravating factors. The Hearing Committee reasoned

> a suspension of some duration would be appropriate for each of Respondent's most serious Rule violations or groups of Rule violations, including approximately 15 months solely for the Rule 1.2(a) and 1.4(b) violations . . . and 12-18 months for the Rule 1.7(b)(4) violations . . . six months solely for the Rule 1.15 [sic] (b) & (c) violations, as well as perhaps an informal admonition for the Rule 1.16(a)(3) violation. We have also determined that there is only one arguably mitigating factor – substantial litigation and related work on matters in the public, non-commercial realm. Finally, we have identified numerous, mostly very

29

serious, and mostly very troubling aggravating factors, including (i) Respondent's recalcitrant refusal to acknowledge any of his missteps, (ii) Respondent's indisputable lack of remorse, (iii) the numerous and pervasive violations, (iv) Respondent's dismissive, self-pitying but groundless attitude toward this proceeding and abusive conduct herein and (v) the grave impact upon and prejudice to the client that resulted from Respondent's Rules violations. Thus we are convinced that strong deterrent, preventive and remedial measures are necessary in this matter and conclude that a suspension of 36 months would be appropriate, would be consistent with prior dispositions in this jurisdiction for comparable overall misconduct, and would serve as a meaningful deterrent to others who might share Respondent's disregard for the Rules that govern the basic elements of the attorney-client relationship. However, in light of the significant weight which the Court of Appeals accorded in [*In re*] *Hager*[, 812 A.2d 904 (D.C. 2002)] and [*In re Wemhoff*[, Board Docket No. 14-BD-056 (BPR Nov. 20, 2015), appended Hearing Committee Report at 19, *recommendation adopted where no exceptions filed*, 142 A.3d 573 (D.C. 2016) (per curiam)] to substantial pro bono work throughout an attorney's career that is perhaps similar to Respondent's record of advocacy on public matters, we recommend a suspension of 33 months instead of 36 months.

HC Rpt. at 160-61.[12]

We concur with the Hearing Committee's careful analysis of the factors applicable to the sanction. Yet, we agree with Respondent that the recommended 33-

---

[12] During the pendency of this matter before the Board, the Court issued *Klayman I*, suspending Respondent from the practice of law for 90 days for engaging in misconduct in violation of Rule 1.9 (conflict of interest). In accordance with the Court's recent guidance in *In re Askew*, 225 A.3d 388, 399 (D.C. 2020) (per curiam), we do not treat this decision as an aggravating factor, but consider Respondent's violations in this case as if they were before the Board simultaneously with the violations sanctioned in the aforementioned matter. Thus, the sanction recommendation herein is inclusive of the misconduct at issue in *Klayman I*.

month suspensory sanction is not consistent with prior disciplinary cases involving comparable misconduct, as required by D.C. Bar Rule XI, § 9(h)(1).[13]

"[T]he choice of sanction is not an exact science but may depend on the facts and circumstances of each particular proceeding . . . . Indeed, each of these decisions emerges from a forest of varying considerations, many of which may be unique to the given case." *In re Edwards*, 870 A.2d 90, 94 (D.C. 2005) (internal quotations and citations omitted). Here, Respondent failed to effectively communicate with his client, follow her instructions about the objectives of the representation, provide a representation free of conflict of interest, or protect her confidences and secrets. The latter two instances of misconduct are the most concerning, coupled with Respondent's lack of remorse.

*In re Hager*, 812 A.2d 904 (D.C. 2002), and *In re Koeck*, 178 A.3d 463 (D.C. 2018) (per curiam), are instructive. In *In re Hager*, the respondent was suspended for one year for violations of, *inter alia*, Rules 1.2(a) (abiding by client's decisions); 1.4(a) (communication); 1.7(b)(4) (conflict of interest); 1.16(d) (failure to protect client interests upon termination of representation); 5.6(b) (agreement restricting right to practice); and 8.4(c) (dishonesty). 812 A.2d at 913-15, 917, 919-920. In *In re Koeck*, the respondent was suspended for 60 days for violating Rule 1.6(a)

---

[13] Disciplinary Counsel has argued that disbarment is the appropriate sanction. We simply do not see this case as equivalent to the other cases where the Court of Appeals has imposed disbarment for a crime of moral turpitude, flagrant dishonesty, or intentional or reckless misappropriation.

31

(revealing a client confidence or secret without authorization or other justification).
178 A.3d at 463-64.

Considering the factors as discussed by the Hearing Committee and taking into account the 90-day sanction recommendation imposed in *Klayman I*, we recommend that Respondent be suspended from the practice of law for 18 months.

In addition, we agree with the Hearing Committee that a fitness requirement is appropriate in accordance with the *Roundtree* factors. "[T]o justify requiring a suspended attorney to prove fitness as a condition of reinstatement, the record in the disciplinary proceeding must contain clear and convincing evidence that casts a serious doubt upon the attorney's continuing fitness to practice law." *In re Cater*, 887 A.2d 1, 6 (D.C. 2005). "To determine whether the requisite serious doubt has been substantiated, it may be 'useful' to consider the criteria we evaluate to determine if an attorney should be reinstated to the bar under *In re Roundtree*, 503 A.2d 1215, 1217 (D.C. 1985)." *In re Lattimer*, 223 A.3d 437, 453 (D.C. 2020) (per curiam).

Respondent engaged in numerous serious Rule violations that strike at the heart of the attorney-client relationship. He appears not to appreciate the seriousness of that misconduct. Further, his treatment of E.S. during the representation itself and following its termination was deeply troubling. Indeed, the Hearing Committee found that, in response to his client's complaint about his misconduct, he "denied that he sought a romantic relationship with [her,] . . . suggested that 'she imagines that people are sexually coming on to her,' 'often claims sexual harassment' or

32

'perhaps, she is just lying.'" HC Rpt. at 23 n.15. To the contrary, the Hearing Committee found, in part based on emails from Respondent, that Respondent was pursuing his client romantically and that his client was not lying on this front. While a respondent has every right to vigorously defend herself in a disciplinary matter, disparaging one's client to avoid taking responsibility for her misconduct is simply a bridge too far.

In sum, we find clear and convincing evidence that casts a serious doubt upon Respondent's continuing fitness to practice law.[14]

## VI.   CONCLUSION

For the reasons set forth above, the Board finds that Respondent violated Rules 1.2(a), 1.4(b), 1.5(c), 1.6(a)(1), 1.6(a)(3), 1.7(b)(4), and 1.16(a)(3). With respect to the misconduct at issue in the instant matter, as well as that in *Klayman I*, the Board recommends that Respondent be suspended for a period of 18 months and be required to demonstrate his fitness to practice as a condition of reinstatement. The Board further recommends that the Court direct Respondent's attention to the

---

[14] Before the Board, Respondent argues that a fitness requirement is not necessary because he has voluntarily undertaken a number of CLE requirements and he offers to take additional CLE courses "to stay current and heighten his awareness of ethical issues in his practice of law." Resp. Br. to Board at 63. Additionally, he volunteers to advise any future client of his litigation history with United States District Court Judge Kollar-Kotelly and to withdraw from any representation that would require him to appear before her. *Id*. Finally, he argues that he was suffering from financial and medical stress during the period in which the misconduct occurred. Resp. Br. to Board at 62 n.15. While these may all be worthwhile steps, the Board is not convinced these measures are adequate to prevent future harm to clients and views these issues as matters that would appropriately be raised during the reinstatement process. *See* Board Rule 9.1(c).

33

requirements of D.C. Bar R. XI, § 14, and their effect on eligibility for reinstatement.
*See* D.C. Bar R. XI, § 16(c).

BOARD ON PROFESSIONAL RESPONSIBILITY

By: _____
      Matthew G. Kaiser

All members of the Board concur in this Report and Recommendation except
Ms. Larkin, who is recused.

App.0034

# District of Columbia
# Court of Appeals

No. 20-BG-583

```
F I L E D

JAN 07 2021

DISTRICT OF COLUMBIA
COURT OF APPEALS
```

IN THE MATTER OF                         **2017 BDN 63**
LARRY E. KLAYMAN                         **2011 DDN 28**

A Member of the Bar of the
District of Columbia Court of Appeals

**Bar Reg. No.  334581**

BEFORE:   Thompson and Deahl, Associate Judges, and Ferren, Senior Judge.

### O R D E R

On consideration of the Board on Professional Responsibility's Report and Recommendation, this court's October 19, 2020, order directing respondent to show cause why he should not be suspended pending final action on the Board's report, and the response and supplemental response thereto, it is

ORDERED that Larry E. Klayman is hereby suspended from the practice of law in the District of Columbia pending final disposition of this proceeding.  See D.C. Bar R. XI, § 9(g).  It is

FURTHER ORDERED that respondent's attention is directed to D.C. Bar R. XI, § 14, which sets forth various notice requirements and procedures pertaining to suspended attorneys, and D.C. Bar R. XI, § 16(c), which addresses the timing of eligibility for reinstatement and the necessary compliance with R. XI, § 14, including filing the required affidavit.

**PER CURIAM**

App.0035

Copies e-mailed to:

Larry Klayman

James T. Phalen, Esquire
Executive Attorney, Board on Professional Responsibility

Matthew Kaiser, Esquire
Chair, Board on Professional Responsibility

Hamilton P. Fox, Esquire
Disciplinary Counsel

Henry Clay Smith, III, Esquire
Assistant Disciplinary Counsel


oio

 **Gmail**

Oliver Peer <oliver.peerfw@gmail.com>

## Re: Luhn v. Scott, No. 19-7146 (D.C. Cir.)

**Larry Klayman** <klaymanlaw@gmail.com>                    Wed, Feb 3, 2021 at 11:12 AM
To: "Dick, Anthony J." <ajdick@jonesday.com>
Cc: Larry Klayman <klaymanlaw@gmail.com>, "Carvin, Michael A." <macarvin@jonesday.com>, Oliver Peer
<oliverpeerfw@gmail.com>

> This does not apply to federal court which must decide on reciprocal discipline if the temporary suspension becomes final.
> The federal court is not a District of Columbia court.
>
> Thus filing what you suggest with the DC Circuit to prejudice Ms.. Luhn at this time would be an ethical violation on your
> part for which you will be held to account. Couple this with the harassment of Ms..Luhn by sending an unidentified process
> server to her home in the dead of night -- vindictively and maliciously harming her more emotionally -- in retaliation over
> her sworn testimony in the McHenry sexual harassment case implicating your clients in a pattern and practice of sexual
> abuse, cover-up and defamation  -- harm compounded by her four prior suicide attempts which you and your clients
> caused.
>
> Your threats against me are part of this pattern and practice of Fox News and it co-defendant Suzanne Scott.
>
> Govern yourselves accordingly.
>
>
>
> Larry Klayman
>
> On Wed, Feb 3, 2021, 10:55 AM Dick, Anthony J. <ajdick@jonesday.com> wrote:
>
>> Mr. Klayman,
>>
>>
>> It is our understanding that the D.C. Court of Appeals issued an interim order suspending your license to practice law
>> on January 7.  Based on that understanding, we believe that your continued representation of a client in the D.C. Circuit
>> is a violation of the rules against the unauthorized practice of law.
>>
>>
>> As you know, D.C. Rule of Professional Conduct 5.5 prohibits the unauthorized practice of law within the District of
>> Columbia following a lawyer's suspension. *See, e.g.*, *In re Soininen*, 853 A.2d 712, 716-18 (D.C. 2004) (describing
>> attorney's unauthorized practice of law "during the period of interim suspension").   Rule 8.3 requires us to "inform the
>> appropriate professional authority" if we are aware of a violation.
>>
>>
>> In addition, D.C. Circuit Rule 46(a)(2)(B) states that "a member of the [DC Circuit]'s bar is subject to suspension or
>> disbarment by the [DC Circuit] if a member (A) has been suspended or disbarred from practice in any other court; or (B)
>> is guilty of conduct unbecoming a member of the court's bar."  In view of this rule, we also conclude that you cannot
>> continue to represent a client before the D.C. Circuit.
>>
>>
>> Best regards,
>>
>>
>> Anthony

App.0037

--------------------
Anthony Dick (bio)
Partner
**JONES DAY® - One Firm Worldwide**[SM]
51 Louisiana Ave NW
Washington DC 20001-2113
Office +1.202.879.7679


***This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.***

 Gmail

**Oliver Peer <oliver.peerfw@gmail.com>**

---

## Fwd: D.C. Court of Appeals E-Filing Rejection Notice - 20-BG-0583 - IN RE LARRY E. KLAYMAN, BOARD DOCKET NO. 17-BD-063, BAR REGISTRATION NO. 334581

**Larry Klayman** <klaymanlaw@gmail.com>
To: Oliver Peer <oliver.peerfw@gmail.com>

Fri, Jan 22, 2021 at 2:07 PM

---------- Forwarded message ---------
From: <noreply1@dcappeals.gov>
Date: Fri, Jan 22, 2021 at 2:04 PM
Subject: D.C. Court of Appeals E-Filing Rejection Notice - 20-BG-0583 - IN RE LARRY E. KLAYMAN, BOARD DOCKET NO. 17-BD-063, BAR REGISTRATION NO. 334581
To: <leklayman@gmail.com>

This is a notice to inform you that the PETITION - Petition For Rehearing En Banc filed on 20-BG-0583 has been rejected by the Court Clerk for the following reason(s):

Invalid material

Clerk's Comments: Rule 35. Petition for Hearing or Rehearing En Banc; En Banc Determination. (a) When Hearing or Rehearing En Banc May Be Ordered. A majority of the judges who are in regular active service and who are not disqualified may order that an appeal or other proceeding be heard or reheard en banc. The order issued January 7, 2021, was an INTERIM suspension order pending FINAL disposition. Please see paragraph 2 of the January 7, 2021, order. You are currently ineligible to request a Petition for rehearing or rehearing en banc.

Please see Clerk's comments. If appropriate, please follow the directions below to edit and resubmit this filing to the court.

Steps to Edit and Resubmit a Rejected eFiling:

1. Click this link to login and open the rejected eFiling:https://efile.dcappeals.gov/filing/summary.do?eservice=true&electronicFilingID=40952
2. Each heading of this screen ("Edit E-Filing", "Documents", and "Service List") has an "Edit" link on the far right of the screen that will allow you to make changes to each section.
3. Make the necessary change and select "Continue" to be brought back to the main "Edit E-Filing" screen.
4. Once you have completed your changes, at the bottom of the screen, click the checkbox to agree to the DCCA eFiling Terms and Conditions and click "Submit to Court" to resubmit your eFiling.

This e-mail was sent to leklayman@gmail.com by the D.C. Court of Appeals E-Filing website.

Do not respond to this system generated e-mail notification. If you have questions or need assistance contact the Clerk's office at efilehelp@dcappeals.gov. For technical help contact efiletech@dcappeals.gov.

---

This e-mail and any attachments may contain confidential and privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this e-mail and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.

App.0039

 **Gmail**

Oliver Peer <oliver.peerfw@gmail.com>

---

## File request for 20-BG-583 (in re Klayman)

**Oliver Peer** <oliver.peerfw@gmail.com>                    Wed, Dec 30, 2020 at 10:28 AM
To: File Room <fileroom@dcappeals.gov>, "Brannon, Kevin" <kbrannon@dcappeals.gov>

Good afternoon,

Can you please rush send the Court's December 14, 2020 briefing schedule that was filed in this matter? Mr. Klayman did not receive it. Thank you very much.

Regards,
Oliver Peer
Klayman Law Group P.A.

 **Gmail**

Oliver Peer <oliver.peerfw@gmail.com>

---

## November 25, 2020 Order in In re Klayman (20-BG-583)

**Oliver Peer** <oliver.peerfw@gmail.com>                                          Thu, Dec 3, 2020 at 9:45 AM
To: File Room <fileroom@dcappeals.gov>, "Brannon, Kevin" <kbrannon@dcappeals.gov>, Larry Klayman
<leklayman@gmail.com>

Good afternoon,

Can you please send the November 25, 2020 order granting Ms. Isaak's *pro hac vice* application in this matter? Thank
you.

Regards,
Oliver Peer
Klayman Law Group P.A.

 **Gmail**

Oliver Peer <oliver.peerfw@gmail.com>

---

## November 12, 2020 Order in 18-BG-0100

**Oliver Peer** <oliver.peerfw@gmail.com>                                    Fri, Nov 20, 2020 at 10:27 AM
To: "Brannon, Kevin" <kbrannon@dcappeals.gov>, File Room <fileroom@dcappeals.gov>

Good Afternoon,

Can you please send a copy of the Court's November 12, 2020 Order in *In Re Klayman*, 18-BG-0100? Thank you.

Regards,
Oliver Peer
Klayman Law Group P.A.

App.0042



**Oliver Peer <oliver.peerfw@gmail.com>**

---

# Order to Show Cause Filed in In Re Klayman (20-BG-583)

**Oliver Peer** <oliver.peerfw@gmail.com>                                        Tue, Oct 20, 2020 at 9:19 AM
To: fileroom@dcappeals.gov, "Brannon, Kevin" <kbrannon@dcappeals.gov>, Larry Klayman <leklayman@gmail.com>

Good afternoon,

Can you please send the October 19, 2020 order to show cause filed in In re Klayman (20-BG-583) at your earliest convenience? Thank you.

Regards,
Oliver Peer
Klayman Law Group P.A.

 **Gmail**

Oliver Peer <oliver.peerfw@gmail.com>

---

## Document Request for In re Klayman

**Oliver Peer** <oliver.peerfw@gmail.com>                                    Mon, Aug 3, 2020 at 9:53 AM
To: "Brannon, Kevin" <KBrannon@dcappeals.gov>, fileroom@dcappeals.gov

Good afternoon,

Can you please send the 7/31 order filed in Appeal 18-BG-100? Thank you.

Regards,
Oliver Peer
Klayman Law Group P.A.
[Quoted text hidden]

## APPENDIX – PROPOSED FINDINGS OF FACT

### Tim Shamble

1.      Mr. Shamble has been with VOA since 1996, and he is currently the local union president, AFG Local 1812, a title he has held since 2000. Tr. 881.

2.      Mr. Shamble was the union representative who was consulted by Ms. Sataki and Mr. Klayman with regard to Ms. Sataki's claims of workplace sexual harassment and workplace retaliation at VOA. RX 1, RX 5.

3.      Mr. Shamble declared under oath that Mr. Klayman was very diligent in attempting to represent Ms. Sataki, putting in many hours, and Mr. Klayman did not, to his knowledge, compromise any of Ms. Sataki's rights. RX 1, RX 5.

4.      Mr. Shamble declared under oath that communication became very difficult and nearly non-existent with Ms. Sataki. When he and Mr. Klayman would try to contact Ms. Sataki, we usually got no response, even for months.  RX 1, RX 5.

5.      Mr. Shamble declared under oath that during these periods of no communication from Ms. Sataki, Mr. Klayman attempted to protect Ms. Sataki's rights so that they would not be forfeited. It is Mr. Shamble's opinion that Mr. Klayman acted professionally and ethically by trying to protect Ms. Sataki's rights even after she would not communicate with him. RX 1, RX 5. Ms. Sataki admits that she knew Mr. Klayman and Mr. Shamble tried to reach her. Tr. 539.

6.      Mr. Shamble declared under oath that he had given Mr. Klayman's name and number as a reference to at least one other aggrieved VOA employees who requested the name of an aggressive attorney, as he was impressed by Mr. Klayman's willingness to doggedly defend Ms. Sataki under difficult circumstances. RX 1, RX 5. Tr. 902.

that she had hired an attorney she had met, and she brought you in to discuss the case. So I met you in my office." Tr. 889.

Regardless, the record is replete with instances where Ms. Sataki expressly agreed to, and even participated in, the publicity of her case. Mr. Klayman testified that publicity was agreed to up front, in the very beginning. Tr. 979-80. "So that was the reason for the publicity. She agreed to it, Tim agreed to it, and there will be other witness that will testify in this proceeding that she agreed to the publicity." Tr. 980. At the hearing before the AHC, Ms. Sataki was forced to admit on several occasions that she approved of this publicity. PFF 170. "Q: Did you ultimately agree with Mr. Klayman about the publicity?" "A: I did." Tr. 775." In addition, several key material witnesses also corroborated this. PFF 91, 182. In fact, Ms. Sataki personally engaged in the publicizing of her case by personally with Mr. Shamble handing out copies of one the articles written by Mr. Klayman on Capitol Hill. PFF 24.

**PFF 11** – Like all emails, the date that it was sent is on the actual email. This is how emails work. Regardless, the date of the email does not affect the veracity of the contents of the email, which is the relevant part.

ODC does not oppose the finding that Ms. Sataki never responded to the email between Mr. Klayman, Ms. Sataki, and two other VOA broadcasters who Mr. Klayman was also seeking to help about an interview with the Los Angeles Times. RX 5. Tr. 906-07. The fact that she said nothing indicating that she did not want to do the interview is completely relevant, as it severely undercuts ODC's ex post facto manufactured assertion that Ms. Sataki was not on board with publicizing her case. Whether she had an <u>obligation</u> to answer is the completely irrelevant query. Her failure to object to publicity, once again, strongly evidences that at the time, she was in favor of using publicity.

App.0046

**PFF 22** - This is a totally false and misleading response, completely unsupported by any evidence on the record. The record can only support the finding that it was Ms. Sataki who refused to accept the job offered to her at the Central News Division in Washington because she believed that she was being set up to be fired, as her English was poor and the Central News broadcast in English to other countries that she had no interest in as an Iranian. PFF 22. Ms. Sataki then instructed Mr. Klayman to continue to do all he could to get her to LA, which undercuts ODC's patently false assertion. PFF 109, Tr. 346. It was Ms. Sataki's own decision to not return to work at VOA headquarters in Central News, lest she commit suicide – a regular theme and continuing of hers. PFF 109, Tr. 981-92.

It was Ms. Sataki's idea and desire to get relocated to Los Angeles ("LA") from the very beginning. PFF 18. Ms. Sataki wanted to be in LA to be away from her alleged harasser, to be closer to her family, friends, and doctors, and to escape criticism from her managers. PFF 52, 115. Ms. Sataki testified that she was comfortable anywhere in LA, and that many Iranian broadcasters wanted to be in LA, in part due to its large Iranian population. PFF 113, 117.

**PFF 24** – This is another totally false and misleading response, completely unsupported by any evidence on the record. Mr. Klayman testified that publicity was agreed to up front, in the very beginning. Tr. 979-80. "So that was the reason for the publicity. She agreed to it, Tim agreed to it, and there will be other witness that will testify in this proceeding that she agreed to the publicity." Tr. 980. At the hearing before the AHC, Ms. Sataki was forced to admit on several occasions that she approved of this publicity. PFF 170. "Q: Did you ultimately agree with Mr. Klayman about the publicity?" "A: I did." Tr. 775." In addition, several key material witnesses also corroborated this. PFF 91, 182. In fact, Ms. Sataki personally engaged in the publicizing of her case by personally handing out copies of one the articles written by Mr. Klayman on Capitol Hill. PFF 24. Ms. Sataki admits that she had shared intimate details about her situation with

App.0047

everyone, including Mr. Klayman that night. "… I explained to you my problem with VOA. … So I don't know why this conversation was so intimate to you (about her alleged harassment, workplace retaliation, and mental state), because it was definitely not intimate to me. **Everybody knew. In that case, I had an intimate conversation with everybody.**" Tr. 329 (emphasis added). PFF 104.  Personally engaging the the publicity of one's case, the way that Ms. Sataki did, is not consistent with the actions of a person who was allegedly "reluctant" to use publicity, particularly since as a broadcaster, she understood the value of publicity.

**PFF 26** - Ms. Sataki was kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way. Tr. 1011, PFF 60. Ms. Sataki, at the time, never objected to including the BBG, which included Ms. Hillary Clinton. There is nothing on the record that supports the false assertion that she did.

Ms. Clinton was not singled out. PFF 26. She simply happened to on the BBG at the time, and was joined and sued along with every other sitting member. Indeed, had this been a decision in furtherance of Mr. Klayman's personal politics, it is clear that his and Mr. Keya Dash's personal friend and noted conservative radio talk show host, Ms. Blanquita Collum, would not have been included in the lawsuit. PFF 25, 54. However, Ms. Collum was included, which undercuts ODC's frankly ridiculous and desperate proposition that Ms. Clinton was singled out in furtherance of Mr. Klayman's personal "crusade." Even ODC's own expert, Joel Bennett ("Mr. Bennett") admits that Mr. Bennett "[i]n all of the hundreds of pages of exhibits, I do not recall any individual attack on Mrs. Clinton." PFF 209.  In sum, ODC's contrived proposition fails on its face, as it is impossible for it to argue that Ms. Clinton was singled out when the fact remains that every member of the BBG was individually named in the *Bivens* suit.

**PFF 27** -  There is nothing on the record that supports this false assertion. Mr. Shamble and Ms. Sataki went together on occasion to publicize her situation. "I remember one time. The

16

App.0048

VOA was on the mall here in Washington, some kind of public -- it might have been a recruitment fair or something. But we had an article and both her and I were distributing it to people in the vicinity, tried to let people know and to let the agency know that, you know, we were going to publicize this." Tr. 893. The article that both Mr. Shamble and Ms. Sataki distributed was called ""Government War on a Freedom Loving Beauty. Exclusive, Larry Klayman Goes to Bat for Harassed Broadcaster Fighting for a Free Iran." Tr. 894. RX 1.

Ms. Sataki was aware that Mr. Klayman and Mr. Shamble lobbied congressmen and senators to try to get them to intercede on her behalf. Tr. 454. They include John Boehner, Tom Coburn of Oklahoma, who was on the Foreign Affairs Committee at VOA, and John McCain. Tr. 912-14. During meetings with these Senators, Mr. Klayman and Mr. Shamble on Ms. Sataki's behalf took press materials to give to them and Ms. Sataki did not object to this publicizing, even though she was aware that they were taking them to those meetings. Tr. 913-14.

Mr. Keya Dash testified that he was at Morton's with Mr. Klayman and Ms. Sataki and they noticed that John Boehner was also at the restaurant, "sitting a table over from us." Tr. 1345-46. Mr. Dash testified that Mr. Klayman and Ms. Sataki went over to Mr. Boehner to "plead her case to him and enlist his support." Tr. 1346. "He seemed very interested in it. In fact he seemed to side with her. And that it was a good interaction." Tr. 1347. Mr. Dash testified that he was aware that Respondent and Ms. Sataki sought Mr. Boehner's help to resolve the situation at VOA after that. "Yes, I am aware that that was the entire purpose." Tr. 1347. Mr. Dash further declared under oath that he was aware that Ms. Sataki personally went with Mr. Klayman to meet with Mr. Boehner's staff in the Capitol Building in this regard. PFF 88, RX 5.

**PFF 35** -  Mr. Klayman only knew of the letter because it was forwarded to him by Mr. Shamble. However, it was clear to Mr. Klayman that the letter was not written by Ms. Sataki. The August 4, 2010 'termination' letter was not in Ms. Sataki's poor written English. "That's why

App.0049

[Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21. Whereas Mr. Klayman was familiar with Ms. Sataki's poor written English, and which is exemplified in BCSX 38, the August 4, 2010 letter, which was written to Danforth Austin and not Mr. Klayman, was written in perfect English. PFF 70. In contrast, an email written by Ms. Sataki baselessly accusing him of having been bribed and mocking his religious beliefs demonstrates her poor written English. BCSX 38.

**PFF 36** - It is highly disingenuous, if not flat-out dishonest to attack Respondent's PFF for lack of date specificity after, for no legitimate reason, waiting nearly a decade to file a Specification of Charges, after records have been lost and memories have faded. ODC admits that Mr. Klayman "confirmed his recommendation of Tim Shea, Esquire to Ms. Sataki on May 8, 2010." DCPFF 30.

### Larry Klayman

**PFF 43** – ODC's assertion is patently false. The dismissed dispositions ruled upon by Florida and Pennsylvania are completely relevant as they show the lack of merit of this instant proceeding. Ms. Sataki admitted that she filed identical bar complaints in Florida and Pennsylvania. Tr. 968. BCX 23. Pennsylvania and Florida disciplinary records show that these identical complaints were dismissed by these bars many years ago, as Mr. Klayman has no disciplinary record in this regard. Tr. 969-971. RX23 (Florida); RX 30 (Pennsylvania). Put another way, if Mr. Klayman had been disciplined in these other jurisdictions, there would be some record of it. There is not.

**PFF 44** – Mr. Klayman's grounds for believing that the ODC had dismissed its investigation are that nothing was done for many years after Ms. Sataki filed her Complaint and Supplemental Complaint. Ms. Sataki abandoned her non-meritorious complaint, by ODC's own rules and policies, when she failed to respond to Mr. Klayman's submissions - the same ones he

App.0050

had provided to The Florida Bar and Pennsylvania Bar. ODC's letter to Ms. Sataki, warning her of the consequences of not communicating with it, namely that the matter would be considered abandoned, are set forth clearly in this letter to her as early as July 7, 2011: "If we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations." RSX 6.

**PFF 46** – Mr. Klayman testified that Ms. Sataki gave him a "kiss on the cheek, Persian style." Tr. 975-76. Mr. Klayman testified that "It was no sooner than about five to ten minutes before she broke down in tears and grabbed my hand…" Tr. 976. It is now clear that Ms. Sataki was trying to evoke personal sympathy to lure Mr. Klayman into representing her.

**PFF 47** - There is simply no evidence on the record for this assertion. It is indeed well-established that Mr. Klayman represented Ms. Sataki on principle, and *pro bono*. PFF 47, 74. Since the goal of the representation was to have Ms. Sataki transferred to LA, and not to seek monetary damages, there was no reason to enter into a contingent fee agreement. PFF 54. Ms. Sataki admitted that Ms. Sataki she had no money to pay for a lawyer and backs off claim that she discussed offering him 40% of any recovery when the representation began. PFF 106.

> Q: It's not true that that 40 percent came up at that time at that dinner. It did not come up, did it?
> A. I don't remember.
> Q. Then why did you just say that? Tr. 333.

At no point in time did Mr. Klayman and Ms. Sataki actually agree that Mr. Klayman would be paid 40% of any recovery. PFF 75, 199. Ms. Sataki's gratuitous offer of a contingent fee was just that: an offer. PFF 54. There is no documentary or other evidence that Mr. Klayman or Ms. Sataki agreed on any type of fee structure, other than Mr. Klayman's *pro bono* representation. Indeed, Mr. Klayman only raised the speculative issue of a possible contingent fee going forward toward the end of his legal representation, as the professional relationship and friendship became

19

App.0051

untenable for both he and Ms. Sataki, as any damage award would be years down the line and also speculative at best. PFF 75. ODC would be hard pressed to assert that it is an ethical violation to discuss a potential fee agreement, which is <u>at most</u> what occurred in this case.

**PFF 50** – This is another blatantly false and misleading claim by ODC. The record is replete with instances where Ms. Sataki expressly agreed to, and even participated in, the publicity of her case. Mr. Klayman testified that publicity was agreed to up front, in the very beginning. Tr. 979-80. "So that was the reason for the publicity. She agreed to it, Tim agreed to it, and there will be other witness(es) that will testify in this proceeding that she agreed to the publicity." Tr. 980. At the hearing before the AHC, Ms. Sataki was forced to admit on several occasions that she approved of this publicity. PFF 170. "Q: Did you ultimately agree with Mr. Klayman about the publicity?" "A: I did." Tr. 775." In addition, several key material witnesses also corroborated this. PFF 91, 182. In fact, Ms. Sataki personally engaged in the publicizing of her case by personally handing out copies of one the articles written by Mr. Klayman on Capitol Hill. PFF 24.

**PFF 52** – This is another blatantly false and misleading assertion by ODC that entirely unsupported by the record. It was Ms. Sataki's idea to get relocated to LA from the very beginning. PFF 18, Ms. Sataki wanted to be in LA to be away from her alleged harasser, to be closer to her family, friends, and physicians and to escape criticism from her managers. PFF 52, 115. Ms. Sataki testified that she was comfortable anywhere in LA, and that many Iranian broadcasters wanted to be in LA, in part due to its large Iranian population. PFF 113, 117. Ms. Sataki herself testified that she wanted to be transferred to LA. "I said that I have written a proposal, yes, I'm trying to transfer myself to Los Angeles." Tr. 334.

**PFF 54** – Mr. Klayman never expected to be compensated for his work. It is indeed well-established that Mr. Klayman represented Ms. Sataki on principle, and *pro bono*. PFF 47, 74. Since the goal of the representation was to have Ms. Sataki transferred to LA, and not to seek

20

App.0052

monetary damages, which were highly speculative and years down the line at best, there was no reason to enter into a contingent fee agreement. PFF 54. An email from Mr. Klayman to Ms. Sataki dated May 19, 2010 said, "You don't owe me money and I did what I did from my heart." Tr. 665-666, BCSX 10, PFF 158. This dispels any notion that Mr. Klayman expected to be reimbursed.

**PFF 57** – Mr. Klayman's PFF is totally relevant as to why Ms. Sataki needed to leave Washington D.C., and is supported by the evidentiary record. Mr. Dash testified that:

> Well, her reputation was something of an opportunist who advances herself, and when she reaches the point of no return, alleges sexual discrimination, sexual harassment. This was something I had told [Mr. Klayman] at the time." Tr. 1348.

The record also shows that it was Ms. Sataki who wanted to leave Washington and get relocated to Los Angeles. Ms. Sataki herself refused to accept the job offered to her at the Central News Division in Washington because she believed that she was being set up to be fired, as her English was poor and the Central News broadcast in English to other countries that she had no interest in as an Iranian. PFF 22. It was Ms. Sataki's idea to be in, and try to get relocated to Los Angeles from the very beginning. PFF 18, Ms. Sataki wanted to be in LA to be away from her alleged harasser, to be closer to her family and friends, and to escape criticism from her managers. PFF 52, 115. Ms. Sataki testified that she was comfortable anywhere in LA, and that many Iranian broadcasters wanted to be in LA, in part due to its large Iranian population. PFF 113, 117.

**PFF 58** – This is another patently false and unsupported assertion by ODC. Mr. Klayman put on the record his Motion to Disqualify Jude Kotelly, which contained 14 pages of her factual errors as proof of her bias towards Ms. Sataki and Mr. Klayman. Tr. 1034. RX 3.

Mr. Klayman's testified that, at the time, the Honorable Stanley Sporkin ("Judge Sporkin") described the relief to have Ms. Sataki put back to work in LA as a "chip shot." PFF 58. Tr. 1009-1010. The fact that Judge Sporkin did not use the same words, after nine years of inexcusable

delay from ODC in bringing this case, does not render his testimony contradictory. Judge Sporkin is now in extremely poor health, and was in a wheelchair, but still felt compelled to testify on Mr. Klayman's behalf. ODC admits that Judge Sporkin would have granted an evidentiary hearing, which Judge Kotelly refused to do. Tr. 1171-77.

**PFF 59** – Mr. Klayman's "opinion" is not being set forth to prove the truth of the matter asserted, but simply to show why a motion for reconsideration of Judge Kotelly's decision to deny preliminary relief was filed. It is therefore relevant.

**PFF 60** – The facts and testimony clearly show that Ms. Sataki was informed every step of the way. "Ms. Sataki was kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way." PFF 60, Tr. 1011.

**PFF 62** – Ms. Sataki's false, ex post facto claim that she did not ask Mr. Klayman to buy her a car is undercut by her own testimony. Ms. Sataki admits that she was "incapable of buying the car [her]self because [she] had no credit…." Tr. 433. Ms. Sataki admits that she and Mr. Klayman went to a Mercedes dealership in Van Nuys, California together. Tr. 434. Ms. Sataki admits that her car had been repossessed. Tr. 434. Ms. Sataki admits that she wanted a car with a lower monthly payment. "was trying to make my payment go lower. That's why I was looking at cars. If I could trade my car in and make the payments lower as I had money issues. That was why I was looking at cars." Tr. 435. Added together, it is clear that Mr. Klayman's reason for being present at the dealership was that Ms. Sataki wanted him to buy her a car.

This was part and parcel to Ms. Sataki's pattern of trying to get Mr. Klayman to do personal favors for her. Ms. Sataki also asked Mr. Klayman to find her friend, Kaveh, a bankruptcy attorney and then berated him over who he found. Tr. 1021-22.

**PFF 64** – Mr. Sam Razavi's felonious history is especially relevant, given that it shows his character for dishonesty, as he was **convicted of gambling fraud**. This is pertinent because the

idea of the supplemental complaint, BCX 23, came from, at least in part, Mr. Razavi. Tr. 468-469.. Ms. Sataki claimed under oath that Ms. Kathleen Staunton ("Ms. Staunton") and Mr. Razavi prepared the supplemental complaint. Tr. 469. Tr. 301, 307, 317, 468-72, 474-75, 544. Neither of them are lawyers.

ODC's assertion that there is no reliable evidence to support the allegations about Mr. Razavi is another outright falsehood. BCSX 36 is a January 26, 2011 email from Matt Garrison, a California licensed private investigator who uncovered Mr. Razavi's felonious history. Tr. 737. BCSX 36.

**PFF 66** – This is another twisted recitation of the record. There is testimony that Ms. Sataki knew about the Motion to Disqualify Judge Kotelly. Tr. 1166, 1170. Ms. Sataki was kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way. Tr. 1011. Mr. Klayman told both Ms. Sataki and Mr. Shamble that Judge Kotelly could be a problem early on. PFF 39.

**PFF 67** – ODC again seeks to mislead the AHC regarding the timeline of events. Ms. Sataki never terminated Mr. Klayman in July of 2010 via email. The email at issue simply says to dismiss the pending cases, and Mr. Klayman obeyed her directive. PFF 68. In fact, the July 30, 2010 email tells Mr. Klayman to continue the case against her alleged harasser, Mr. Falahati and others, which conclusively disproves ODC's false assertion that she sought to terminate Mr. Klayman's representation at that time. PFF 68. The August 4, 2010 'termination" letter was not in Ms. Sataki's otherwise poor written English. "That's why [Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21. Another "termination" letter of November 15, 2010 was incorrectly sent to the wrong address at 2000 Pennsylvania Ave, which Mr. Klayman never received from her. RX 8. Tr. 1042-43. Ms. Sataki admits this. "So that was a mistake." Tr. 540. RX 8. ODC admits that Ms. Sataki filed a notice of appeal, *pro se* and designated it pro per as

23

App.0055

is the designation under California law. This shows that she had legal help if not representation but failed to inform either Mr. Shamble or Mr. Klayman about it, while failing to communicate with either of them.

**PFF 69** - Mr. Klayman knew of the letter only because it was forwarded to him by Mr. Shamble. However, it was clear to Mr. Klayman that the letter was not written by Ms. Sataki. The August 4, 2010 'termination" letter was not in Ms. Sataki's poor written English. "That's why [Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21. Whereas Mr. Klayman was familiar with Ms. Sataki's poor written English, and which is exemplified in BCSX 38, the August 4, 2010 letter, which was written to Danforth Austin and not Mr. Klayman, was written in perfect English. PFF 70.

**PFF 72** – Not ethically wanting to see Ms. Sataki's legal rights lost while matters got sorted out, Mr. Klayman, again at his expense, filed a notice of appeal. PFF 72. And while Ms. Sataki has testified falsely that she wanted to drop the *Bivens* case, she herself admittedly sent a notice of appeal to Judge Kotelly, which the judge placed in the case file and mailed to Mr. Klayman. PFF 67. This underscores that, as Mr. Klayman had suspected, Ms. Sataki did not want the dismissal of her cases and was getting bad and negligent advice likely from non-lawyers. He and Mr. Shamble had an ethical and legal duty to try to communicate directly with her and not rely on counterproductive and nonsensical letters obviously not written by Ms. Sataki, as they were in perfect English. PFF 70, 161.

To the extent that ODC still maintains its conclusively disproven theory that Ms. Sataki terminated Mr. Klayman as her attorney in July of 2010, it must be pointed out that in that same email, she asks Mr. Klayman to continue representation on her behalf. Thus, the actions that were taken in the BBG case after July 30, 2010 were to preserve Ms. Sataki's rights on appeal, whether

App.0056

they be exercised by Ms. Sataki herself or with the assistance of other counsel. PFF 78. In any event, Judge Kotelly ultimately dismissed the action. PFF 68.

**PFF 74-75** – There is absolutely <u>nothing</u> in the record that supports ODC's false and fabricated allegation that any fee agreement was ever reached between Mr. Klayman and Ms. Sataki. It is indeed well-established that Mr. Klayman represented Ms. Sataki on principle, and *pro bono*. PFF 47, 74. Since the goal of the representation was to have Ms. Sataki transferred to LA, and not to seek monetary damages, there was no reason to enter into a contingent fee agreement. PFF 54. Ms. Sataki admitted that Ms. Sataki she had no money to pay for a lawyer and backs off claim that she discussed offering him 40% of any recovery when the representation began. PFF 106. At no point in time did Mr. Klayman and Ms. Sataki agree that Mr. Klayman would be paid 40% of any recovery. PFF 75, 199. Ms. Sataki's gratuitous offer of a contingent fee was just that: an offer. PFF 54. There is no documentary or other evidence that Mr. Klayman or Ms. Sataki <u>agreed</u> on any type of fee structure, other than Mr. Klayman's *pro bono* representation. Indeed, Mr. Klayman only raised the speculative issue of a possible contingent fee going forward toward the end of his legal representation, as the professional relationship and friendship became untenable for both he and Ms. Sataki. PFF 75

**PFF 76** – Mr. Klayman was simply trying to get Ms. Gloria Allred to accept Ms. Sataki's case. Nothing changes the fact that the goal of Mr. Klayman and Ms. Sataki's representation was was to have Ms. Sataki transferred to LA, and not to seek monetary damages, which were pled for tactical purposed to coax a settlement by making the Defendants feel at personal risk. PFF 54.

**PFF 78** – Mr. Klayman wanted to, and recommended and also actively sought other counsel for Ms. Sataki. This included Tim Shea and Gloria Allred. PFF 36, Tr. 929; PFF 78; 1079-80. Ms. Sataki took no action, so Mr. Klayman, as the attorney of record, still had an ethical duty to protect Ms. Sataki's legal rights in the interim. ODC cannot possibly, but apparently is,

App.0057

asserting that merely recommending and then trying to find another attorney absolves the current attorney of his duties, where no formal withdrawal has been entered.

**PFF 83** – The articles at issue did not reveal any confidential information, given the fact that Ms. Sataki was personally going around telling everyone about her intimate issues. "... I explained to you my problem with VOA. ... So I don't know why this conversation was so intimate to you (about her alleged harassment, workplace retaliation, and mental state), because it was definitely not intimate to me. **Everybody knew. In that case, I had an intimate conversation with everybody.**" Tr. 329 (emphasis added). PFF 104. This is all an ex post facto "issue" fabricated by ODC to give their Specification of Charges the appearance of merit.

Mr. Klayman received no compensation for the articles. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki. PFF 83. Tr. 1199-1230.

## Keya Dash

**PFF 86-91** – There is absolutely nothing on the record that supports the assertion that Mr. Dash's affidavit is not totally credible. If seeking outside help to draft something renders something not credible, it must be noted that Ms. Sataki admits that she did not write the Initial Complaint, Tr. 538, or the Supplemental Complaint. Tr. 469. Tr. 301, 307, 317, 468-72, 474-75, 544. By ODC's own ridiculous logic, Ms. Sataki's credibility must also be destroyed. Furthermore, Mr. Dash testified: And also I've been thinking about this while I've been testifying on other things. I think I showed this to an attorney, as well, my own attorney, as well. And it could be that he originated [the affidavit]" Tr. 1376.

**PFF 90** – Mr. Dash testified under oath and swore to that he was unaware of any romantic communications that Respondent sent to Ms. Sataki. "Mr. Klayman and I are friends, and I think I

App.0058

would have come to know if there was some sort of over-romantic desire on his behalf. I would have known about that. He never expressed it to me." Tr. 1375-76.

**PFF 95** – Mr. Dash was not assisting in the "prosecuting" of her case, as he is not a lawyer. Mr. Dash was only trying to help Mr. Klayman as a friend. Mr. Dash decided to help Ms. Sataki, for the most part due to Mr. Klayman's urging him to do so. Tr. 1349-50. PFF 98. Mr. Dash simply attempted to enlist the help of Ms. Cullum, a member of the BBG at VOA, and who employed his brother at VOA. Tr. 1350-51.

Regardless, the record is replete with instances of Ms. Sataki approving of, not objecting to, and personally publicizing her case to just about anyone who would listen, as set forth in detail above.

**PFF 96** – Mr. Dash's opinions and observations are totally relevant because it demonstrates Ms. Sataki's propensity and reputation in the Iranian community as someone who alleges sexual discrimination and sexual harassment as a means to advance herself. Ms. Sataki's reputation comes into even clearer focus later on, with regard to her fabricated and failed lawsuit against Dean Proper, PFF 147-148, where she falsely accused him of stealing her diamond ring that she had lost, and which was only admittedly filed to avoid paying rent. Then there is Ms. Sataki's complaint against the wife of Zia Atabay, who she was accused of having an affair with. This Complaint was against Mrs. Atabay for having allegedly keyed her car. In short, Ms. Sataki falsely testified that the Court's ruling proved that she had not committed adultery with a married man, when the case only dealt with her car having been keyed. PFF 150.

## Elham Sataki

**PFF 107** – ODC repeats this false and unsubstantiated assertion, which is contravened by the actual facts and testimony on the record, which clearly shows that it was Ms. Sataki's idea, and continued goal, to be relocated to Los Angeles in order to (1) be away from her alleged harasser,

App.0059

(2) because she thought she was being set to to be fired in Central News, and (3) she was very comfortable in Los Angeles, where her family, friends, and over 1 million other Iranians live. *See* Resp. to PFF 22.

**PFF 108** – Ms. Sataki's testimony here is, once again, belied by the actual facts and testimony on the record, including her own. Ms. Sataki threatened to commit suicide if she had to return to work at VOA headquarters in Central News. PFF 109, Tr. 981-92. *See* Resp. to PFF 22. Indeed, if Ms. Sataki wanted so badly to return to her job in Washington, she could always have done so, even after the termination of Mr. Klayman's representation. There is nothing on the record to suggest that she made any such effort, as this is just another ex post facto meritless assertion likely conjured up with the complicity of ODC.

**PFF 109** – This is another recycled version of the same unsubstantiated and false assertion by ODC. *See* Resp. to PFF 108. The record can only support the finding that Ms. Sataki wanted to be relocated to Los Angeles. This is admitted by Ms. Sataki and conceded by ODC here. Tr. 346. Her false testimony that she wanted alternatively to go back to Washington is completely disproved by overwhelming testimony, including her threat to commit suicide if she had to return to work at VOA headquarters in Central News. PFF 109, Tr. 981-92. *See also* Resp. to PFF 22.

**PFF 115, 122-23** – Ms. Sataki's reputation is totally relevant, as it shows her character for making false and unsubstantiated claims, as well as alleging sexual harassment, which was not even alleged by Ms. Sataki in her bar complaint or resulting Specification of Charges, but on the eve of trial manufactured after the fact nine years later by ODC. These traits speak directly to Ms. Sataki's credibility, or lack thereof. *See* Resp. to PFF 96,

**PFF 128** – This is the same recycled, flat out false assertion made by ODC. The record clearly and unequivocally shows that Ms. Sataki approved of, and <u>even personally participated in</u> the publicizing of her case. Ms. Sataki admitted that she was publicizing her case to everyone.

App.0060

""… I explained to you my problem with VOA. … So I don't know why this conversation was so intimate to you (about her alleged harassment, workplace retaliation, and mental state), because it was definitely not intimate to me. **Everybody knew. In that case, I had an intimate conversation with everybody.**" Tr. 329 (emphasis added). PFF 104. *See also* Resp. to PFF 24.

**PFF 135** – Mr. Klayman has only recently discovered that Ms. Sataki lied under oath and committed perjury at the hearing when she said that Ms. Kathleen Staunton ("Ms. Staunton") helped her prepare the Supplemental Complaint. Attached hereto as Exhibit 2 is an email from Mr. Richard Dykema, the Chief of Staff/Legislative Director for Rep. Dana Rohrabacher that says:

> Kathleen Staunton says she had no involvement in the preparation of the complaint against you, and in fact had no knowledge of the complaint until she saw the information that you provided.

This again underscores the manifest injustice done to Mr. Klayman throughout these proceedings by ODC opposing the compelling need for discovery and then strategically choosing to only call Ms. Sataki as its lone material witness, and then apparently suborning perjurious hearsay from Ms. Sataki. Had Mr. Klayman been allowed discovery he would have discovered this blatant lie by Ms. Sataki, under oath, that Ms. Staunton had helped her prepare the Supplemental Bar Complaint. This is further, conclusive proof of Ms. Sataki's character for dishonesty, which ODC has gladly capitalized on in its quest to disbar Mr. Klayman, regardless of how little actual merit their assertions have.

**PFF 146 – 150** – This is another patently false assertion that is contravened by the established record. Ms. Sataki flat out admits that she fabricated a lawsuit against Dean Proper, accusing him of stealing her diamond ring and sexually harassing her friend, simply in order to get out of paying rent on her apartment:

> It was about the rent. It wasn't because of I accused -- we accused him for the ring or we wanted the money for the ring or anything like that. It was about the rent, because we wanted to terminate the rent right there and then and move out, and they said "You have

App.0061

to stay until the end of the agreement." It was about that. Because of this incident, I just wanted to terminate it and move out, but I lost the case, so I had to pay and stay until the end of the contract. It was only about the rent. It wasn't about this. Tr. 519-20.

*See also* <u>Resp. to PFF 96.</u>

**PFF 153** – In what has emerged as a disturbing trend, Ms. Sataki's testimony is again squarely contravened by the actual facts. Ms. Sataki admits to being gainfully employed and continuing with her broadcasting career since she and Mr. Klayman parted ways. Tr. 561-568. Ms. Sataki makes $62,000 per year plus health insurance benefits. Tr. 620-21. Ms. Sataki apparently blames Mr. Klayman for not becoming a broadcasting megastar and international icon, which was clearly not a realistic goal for her career, particularly given the fact only a very select few achieve that status. This is especially true given Ms. Sataki's lack of comfort working strictly in English. *See* <u>Resp. to PFF 22.</u>

Furthermore, Ms. Sataki has testified that she is still seeing a doctor to this day and is still on anxiety medication, nine years after Mr. Klayman's representation. "**And I have a new doctor too that is working with me, and I actually had to increase the dose of my anxiety medication….**" Tr. 201. This shows that her mental and other problems are not the result of Mr. Klayman, but of her own. Tr. 201. PFF 171.

**PFF 155** - A review of OCR's decision shows that a thorough investigation was done and it shows that her claims were not only non-meritorious, but also simply false. OCR interviewed a myriad of witnesses in order to reach this factual determination. Crucially, Ms. Sataki chose not to appeal OCR's decision or file a Title VII civil action, even after being advised by both Mr. Klayman and Mr. Shamble that she had that right, which means that she, in effect, accepted the veracity of OCR's ruling. <u>PFF 33.</u>

**PFF 158** - An email from Mr. Klayman to Ms. Sataki dated May 19, 2010 said, "You don't owe me money and I did what I did from my heart." Tr. 665-666, BCSX 10, PFF 158. This

App.0062

dispels any notion that Mr. Klayman expected to be reimbursed. Any talk of reimbursement was only in the very unlikely situation that they actually received any type of money settlement, which again, was not the goal of the representation. Mr. Klayman testified:

> This was very, very expensive AND that it's unlikely that this will ever be remunerated in any final judgment. … to get a judgment against the government, you know, we'll all be close to expiring by the time that happens, and that was not what we were trying to do. We were trying to put her back to work in Los Angeles. But I was getting to the point where I didn't feel that I was being respected, as I said. It was a difficult relationship, and if I continued on, I'm suggesting 50 percent of any recovery of what's fair. But we never agreed either 40 percent or 50 percent, previously…. So it was not that I was demanding 50 percent, because I was trying to get out of the case at that point. I was trying to make a point that I put in a a lot of time and expense, and to this day, after the representation ended, for whatever reason. I've never asked her to pay me back. I've never asked anyone to pay me back" Tr. 1056-1057

**PFF 170** – This is again the same recycled misleading assertion by ODC that has been conclusively disproven by the evidence and the record. *See* Resp. to PFF 10. Tellingly, ODC here even admits that Ms. Sataki "stopped protesting" publicizing her case, which means that Ms. Sataki agreed to publicity. Thus, there can be no ethical violation in this regard. To the extent that ODC is trying to portray an attorney giving advice to his client to pursue a course of action and legal strategy (in this case, agreed publicity) as an ethical violation, it is clear that none exists. This is the function of a lawyer, and what Mr. Klayman was retained to do – to advise on the best legal strategy.

### Gloria Allred

**PFF 173** – ODC copies and pastes its objection to PFF 76 here, so for the sake of brevity, *see* Resp. to PFF 76.

### Joshua Ashley Klayman

**PFF 180-84** – ODC conveniently omits that Ms. Sataki was discussing her case not only in front of Ms. Klayman, but also her boyfriend at the time, who was clearly not family. Ms. Klayman testified, "She certainly was publicizing everything **to my then boyfriend** and me, but I

App.0063

don't recall her explicitly saying, like, "Yes, I," you know -- however she was actively publicizing it to me. And she seemed very onboard with whatever the strategy was." Tr. 1525-26 (emphasis added).

ODC's meritless and false assertion is further contravened by its only material witness's own testimony: "I explained to you my problem with VOA. … So I don't know why this conversation was so intimate to you (about her alleged harassment, workplace retaliation, and mental state), because it was definitely not intimate to me. **Everybody knew. In that case, I had an intimate conversation with everybody.**" Tr. 329 (emphasis added). PFF 104.

### The Honorable Stanley Sporkin

**PFF 190-91** – Much greater weight must be given to Mr. Klayman's testimony given the inexcusable and unjustified delay by ODC in bringing the Specification of Charges. Mr. Klayman testified that, at the time, Judge Sporkin described the relief to put Ms. Sataki back to work in LA as a "chip shot." And that he would have put Ms. Sataki to to work in Los Angeles. PFF 58, 190-91. Tr. 1009-1010, 1174-75. The fact that Judge Sporkin did not use the same words, after years of inexcusable delay from ODC in bringing this case, does not render his testimony contradictory. Judge Sporkin is now in extremely poor health, and was in a wheelchair, but still felt duty bound and compelled to testify on Mr. Klayman's behalf. ODC admits that Judge Sporkin would have granted an evidentiary hearing, which Judge Kotelly refused to do. Tr. 1171-77. Importantly, Judge Sporkin testified that "Yes, I found [Mr. Klayman] to be an ethical lawyer and a good lawyer." Tr. 1172.

### Legal Ethics Expert Professor Ronald Rotunda

**PFF 192-203** – Mr. Rotunda was one of the leading experts on professional ethics in the United States before his death, which given the passage of nine years of delay also prevented him from testifying live. PFF 192. Mr. Rotunda's opinion was based on evidence which was

32

App.0064

consistent with what was adduced at hearing. His opinions, at a minimum, are relevant and should serve as guide to the AHC. Indeed, he had actually reviewed the evidence and the facts and had a lot to say.

ODC's assertion the Mr. Rotunda's legal opinion is irrelevant is belied by the fact that they called their own "expert" to provide his legal opinion. ODC is talking out of both sides of its mouth here.

### Joel Bennett

**PFF 204-212** – ODC's mischaracterization of Mr. Bennett's testimony is alarmingly off base and easily disproven by even a quick glace at the record. Mr. Bennett was actually forced to admit, on questioning from AHC member Mr. Tigar, that it is reasonable judgment in a *Bivens*-type action to name agency employees or officials as defendants. Tr. 820. PFF 207.

> Q: MR. TIGAR: Alright. Would that be a reasonable judgment of a lawyer? Not necessarily you?
> A: Right. Tr. 820.
> Q: MR. TIGAR: No, I'm talking about the individual harasser. I'm talking about individuals connected with the decision-making process?
> A: Oh, I've never seen that done. You could always sue the head of the agency.

Mr. Bennett further admits that when the head of an agency receives notice of misconduct and fails to take action, that one would be able to name that individual in a *Bivens* claim. He testifies, "I would think you'd have to show notice and failure to take action…." Tr. 825-826. PFF 208. It is, frankly, disturbing that ODC would claim that Mr. Bennett testified that it was unreasonable to name Ms. Clinton in the *Bivens* suit, when even a cursory review of the underlined actual testimony shows that he testified that it was within the reasonable judgment of the attorney. **THIS IS THE POLAR OPPOSITE OF WHAT ODC FALSELY CLAIMS THAT MR. BENNETT TESTIFIED.**

33

App.0065

Further disproving ODC's politically-motivated theories that Ms. Clinton was "unfairly" targeted is Mr. Bennett's testimony that Mr. Klayman did not attack Mrs. Clinton in naming her in the *Bivens* action. Mr. Bennett testifies, "[i]n all of the hundreds of pages of exhibits, I do not recall any individual attack on Mrs. Clinton."

### Kevin O'Connell

**PFF 213** - On cross examination by Mr. Klayman, Kevin O'Connell is forced to admit that he is not an expert in the internet and that something which is placed on the internet, "really it never gets off of the internet." Tr. 445.

Dated: November 19, 2018        Respectfully submitted,

*Frederick J. Sujat*

Frederick J. Sujat, Esq.
1525 Windjammer Way
Hollywood, FL, 33019
Tel: 954-815-5221
fsujat@yahoo.com
D.C. Bar No: 214650

Larry Klayman, Esq.
c/o 2020 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20006
Tel: 310-595-0800
leklayman@gmail.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was served by mail and email this 19th day of November, 2018, on H. Clay Smith, III, Assistant Bar Disciplinary Counsel at 515 5th Street, N.W., Building A, Room 117, Washington, D.C. 20001 and filed with the Board of

34

**DISTRICT OF COLUMBIA COURT OF APPEALS**
**BOARD ON PROFESSIONAL RESPONSIBILITY**
**AD HOC HEARING COMMITTEE**

_____

In the Matter of:
     **LARRY E. KLAYMAN, ESQ.**

                                 **Board Docket No. 17- BD-063**

**Respondent.**                        **Bar Docket No. 2011-D028**

A Member of the Bar of the District of
  Columbia Court of Appeals

(Bar Registration No. 334581)

_____

**MOTION FOR LEAVE TO FILE SUPPLEMENT TO RESPONDENT LARRY
KLAYMAN'S POST-HEARING BRIEF AND PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**
_____

     Respondent Larry Klayman ("Mr. Klayman") hereby moves for leave and submits the

following supplement to his post hearing brief, given the Ad Hoc Hearing Committee ("AHC")

order of October 29, 2018 where Mr. Klayman it asked him to "admit or deny, with explanation,

with each of [ODC's] PFF's…."   In conjunction with this, Respondent Larry Klayman

respectfully requests that the AHC also carefully review the findings of fact included in

Respondent's post hearing brief and findings of fact and conclusions of law as they accurately set

forth the hearing testimony and exhibits which show that there is "no clear and convincing"

evidence to warrant a finding of an ethics violation and sanctions.

     This supplement was prepared as suggested by the AHC's order of October 29, 2018, to

aid the AHC in its analysis of the evidence.

     Any proposed finding of fact by ODC which is not otherwise listed below is not subject to

being admitted by Respondent.

**RESPONSE TO ODC'S PROPOSED FINDINGS OF FACT**

App.0067

OPF #6 – Respondent introduced himself as a lawyer, and proposed that she cover another story involving Iran…They exchanged business cards **OPPOSED.**

Respondent's Fact - After Mr. Klayman introduced himself, Ms. Sataki ran over to him and gave him her card with her personal cell phone number on it and asked him to call her. PPF 45.

OPF #8 – Respondent invited Ms. Sataki to dinner to further discuss her problems at work. There, he also offered to help her career in the media and suggested she consider hiring Gloria Allred to represent her in connection with the VOA matter. **OPPOSED.**

Respondent's Fact - Mr. Klayman had asked Ms. Sataki to dinner in a personal capacity. Tr. 325, 976. PPF 46. About five to ten minutes of getting personally acquainted, Mr. Sataki "broke down in tears and grabbed my hand and said, 'Larry, I really have big problems. I've been sexually harassed by my co-anchor, … she described it, Mehdi Falahati and before that I was unfairly criticized for my abilities and I need help. And, I said, well I will try to help you, and you know, I'll do it out of friendship. We're now friends.'" Mr. Klayman told Ms. Sataki he would legally represent her *pro bono*. Tr. 326-27, 332-33, 976-977. PPF 47.

OPF #9 – They agreed that Respondent would receive 40 percent of any recovery. **OPPOSED**

Respondent's Fact - Mr. Klayman told Ms. Sataki he would legally represent her *pro bono*. Tr. 326-27, 332-33, 976-977. PPF 47, 74. Ms. Sataki told Mr. Klayman that she had no money to pay for a lawyer and backs off a claim that she discussed offering him 40% of any recovery. Tr. 332-33. PPF 106.

OPF #9 - They later agreed that Respondent would pay Ms. Sataki 's expenses in connection with her move to Los Angeles, for which he would be reimbursed from any recovery over and above his contingency fee…. Respondent did not provide Ms. Sataki a written retainer agreement or any other document setting forth the basis of his fee, the expenses for which she would be responsible, or the scope of his representation. **OPPOSED.**

2

App.0068

Respondent's Fact - Mr. Klayman reiterated that Ms. Sataki did not owe him anything going into the future. Tr. 1075; BCX 29. "So I never asked to paid back, and to this day I wish her well. I pray to God that she has a good life, but I'm not the cause of her problems." Tr. 1066." PPF 77. An email from Mr. Klayman to Ms. Sataki dated May 19, 2010 said, "You don't owe me money and I did what I did from my heart." Tr. 665-666. BCSX 10." PPF 158.  Mr. Klayman only asked for 50% if the matter proceeded any further after realizing that he was getting used by Ms. Sataki, but no agreement was ever reached, and has to this day never asked Ms. Sataki to pay him back a single dollar. Tr. 1057. PPF 75.

OPF # 10 - Ms. Sataki told Respondent that she wanted her case to be handled very quietly because she did not want anyone to know about the sexual harassment…. Respondent initially agreed to respect his client's wishes. **OPPOSED**.

Respondent's Fact – Ms. Sataki admits agreed to the use of publicity and even engaged in garnering and distributing publicity for her cases herself, along with Mr. Shamble. This is corroborated by numerous witnesses, including but not limited to Tim Shamble, Keya Dash, and Joshua Ashley Klayman. PPF 9- 11, 24, 91, 170, 182.

OPF # 13 - Without a place to live or any income, Ms. Sataki was not prepared to move. Id. at 361. Nevertheless, she agreed to pursue Respondent's legal strategy of attempting to force the VOA to transfer her to Los Angeles. because Respondent assured her that it would be easy and could be accomplished within two weeks. **OPPOSED**.

Respondent' Fact - Ms. Sataki was the one who wanted to move to LA, her home town, and where her friends, family and physicians were located. It was mutually agreed that the goal of the representation was to have Ms. Sataki detailed to work in LA.  PPF 18, 48, 54, 76, 107.

App.0069

OPF #14 - Respondent thereafter discussed with Ms. Sataki a strategy for publicizing her case. Tr. 772 (Sataki). Ms. Sataki told him she did not favor publicizing her case. Tr. 397 - 405. Respondent did not discuss the specific type of publicity he contemplated. **OPPOSED**,

Respondent's Fact - Ms. Sataki admits to having agreed to the use of publicity and even engaged in garnering and distributing publicity for her case herself, along with Mr. Shamble. This is corroborated by numerous witnesses, including but not limited to Tim Shamble, Keya Dash, and Joshua Ashley Klayman. PPF 9- 11, 24, 91, 170, 182. Ms. Sataki was kept informed of Mr. Klayman's strategy and actions on her behalf every step of the way. Tr. 1011. PPF 60.

OPF # 18 - Ms. Sataki resisted adding Ms. Clinton and other defendants because she believed it would "hurt [her] case "and she told Respondent the case was "getting too big." **OPPOSED**.

Respondent's Fact – Then Secretary of State Hillary Clinton was on the BBG at the time that Mr. Klayman and Mr. Shamble were trying to reach a settlement. Tr. 912, 388. Ms. Sataki admits that she was aware that Secretary of State Hillary Clinton was included as a defendant in the BBG *Bivens* action because Mrs. Clinton was at the time "the number one governor sitting over that board." Tr. 479, 481. PPF 26.

OPF # 18 – Proceeding against the PNS and VOA on behalf of Ms. Sataki did not require suing Ms. Clinton and the other members of the BBG. **OPPOSED**.

Respondent's Fact – ODC's own "expert" admits that it was within the reasonable judgment of the attorney to sue agency officials as defendants. PPF 207.

OPF # 19 – In April 20 10, Ms. Sataki became aware that Respondent was pursuing a romantic relations hip with her. **OPPOSED**.

Respondent's Fact – Respondent did not pursue a romantic relationship with Ms. Sataki. For instance, there is no evidence that Mr. Klayman claimed to be anything more than close friends with Ms. Sataki. Mr. Klayman has offered testimony by Mr. Dash that states that Mr. Klayman

App.0070

never sought a romantic relationship with Ms. Sataki, and he did not seek a sexual relationship! RFF 90. Indeed, the testimony clearly supports this, as Mr. Klayman told Ms. Sataki, "I'm not your boyfriend. I don't want to be your boyfriend." RFF 79. This is corroborated by numerous material witnesses. PFF 79, 90, 186. Documents submitted by ODC where Mr. Klayman purportedly professes his "love" for Ms. Sataki could just as easily show platonic love. For instance, as set forth in ODC's FF 24, Mr. Klayman listed seven attributes of <u>friendship</u>, not romantic relationships. Bar Counsel Supplemental Exhibit ("BCSX") 1.

OPF #32 - The article quoted Respondent discussing his client' s sexual harassment case and disclosing that she "suffers serious health problems" because of the stress created by the conflict. The article also promoted Respondent's autobiography '·WHORES: Why and How I Came to Fight the Establishment." DX 23 at 23-36. **OPPOSED**.

Respondent's Fact - The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Tr. 1202. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki with her consent. Tr. 1199-1230. BCX 23-12, 23-14, 23-19, 23-22, 23-25, 23-27, 23-30, 23-33, 23-36, 23-41. PFF 83.

OPF# 33 – Respondent recommended Ms. Sataki not accept the government's offer of accommodation. **OPPOSED**.

Respondent's Fact – Ms. Sataki herself admits that she would not accept employment at Central News. Ms. Sataki threatened to commit suicide if she had to stay in Washington. Tr. 981-92. Ms. Sataki instructed Mr. Klayman to "get [her] back to LA." Tr. 346. PFF 108. In addition, Ms. Sataki believed that she was being set up to be fired, as her English was poor and the Central News Division broadcast in English to other countries that she had no interest in as an Iranian.

App.0071

PFF 22.

OPF# 41 – It also included a promotion for Respondent's autobiography. **OPPOSED**.

Respondent's Fact - The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Tr. 1202. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki. Tr. 1199-1230. PFF 83.

OPF # 42-43. Ms. Sataki also reminded Respondent, "PLEASE always remember YOU WILL GET 40% WHEN YOU FINISH THE CASE…." Respondent wrote back to Ms. Sataki the next day, describing the time and expenses he had put into the representation and then escalating his demand for compensation: "So at this point I think 50 percent of any recovery is fair and that is what I require. " He also promised to send her a written retainer agreement. **OPPOSED**.

Respondent's Fact: Ms. Sataki gratuitously "offered" 40% to Mr. Klayman via email on May 30, 2010, but this was never agreed to, and in any event not important to Mr. Klayman. BCSX 11. Mr. Klayman only asked for 50% if the matter proceeded any further after realizing that he was getting used by Ms. Sataki, but no agreement was ever reached, and has to this day never asked Ms. Sataki to pay him back a single dollar. Tr. 1057. PFF 75.

OPF # 44 – Despite his previous promise to continue with financial support, on June I, 2010, Respondent wrote Ms. Sataki that he would have no further financial involvement in leasing her apartment.... **OPPOSED**.

Respondent's Fact - Mr. Klayman assured Ms. Sataki in email of November 21, 2010, that her rent was paid for as they both moved on. Mr. Klayman reiterated that Ms. Sataki did not owe him anything going into the future. Tr. 1075; BCX 29. "So I never asked to paid back, and to this day I

6

App.0072

wish her well. I pray to God that she has a good life, but I'm not the cause of her problems." Tr. 1066. PFF 77.

OPF # 48 – Respondent's autobiography was promoted within the article. **OPPOSED**.

Respondent's Fact - The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Tr. 1202. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki. Tr. 1199-1230. PFF 83.

OPF # 53 - Ms. Stanton asked Ms. Sataki if s he was "o.k. with [Respondent] because we get the vibe that you re afraid of him." Tr. 115. Ms. Sataki explained to Ms. Stanton that she was not o.k. because "by then [she] was completely mentally destroyed because of the rollercoaster [Respondent] was putting [her] through." **OPPOSED**.

Respondent's Fact - Ms. Sataki's speaking falsely that she never wanted to do anything in court and implied that she did not want to be in LA and that was all Mr. Klayman's idea is likely what caused Kathleen Staunton to prepare the supplemental bar complaint, not that Ms. Staunton perceived that Ms. Sataki was scared of Mr. Klayman, as Ms. Sataki stated through rank uncorroborated and unreliable hearsay testimony. Tr. 1086-88; BCSX 20. PFF 81.

OPF # 57 - The next day, Respondent again wrote Ms. Sataki, reporting that he had followed her instructions by dismissing all cases against VOA, but that he did not dismiss the case before Judge Koller-Kotelly involving her relocation to work in Los Angeles. **OPPOSED**.

Respondent's Fact - Mr. Klayman, on July 28, 2018 filed a notice of voluntary dismissal

App.0073

dismissing all but two of Ms. Sataki's claims.[1] The only two remaining claims at that point were for a Privacy Act claim, and for *Wagner* injunctive relief. This occurred before Ms. Sataki's purported July 30 email which only asked Mr. Klayman to "withdraw all the pending lawsuits that are on my behalf and/or in my name." BCSX 21. Ms. Sataki asks Mr. Klayman to continue to pursue the "sexual harassment case against Medhi Falahati…and Ali Sajjadi and Susan Jackson…." BCSX 21. This email does not discuss publicity. Consistent with what was purported to be Ms. Sataki's wishes, Mr. Klayman filed no opposition to the pending motion for summary judgment as to the Privacy Act Claim, and Judge Kotelly had at that point already ruled against Ms. Sataki with regards to the *Wagner* injunctive relief, and therefore dismissed the action entirely. PFF 68.

OPF # 59 – The next day, Respondent wrote Ms. Sataki, acknowledging he had received a copy of her August 4, 2010 letter to Mr. Austin. **OPPOSED**.

Respondent's Fact – The August 4, 2010 letter to Mr. Austin was written in perfect English, in contrast to Ms. Sataki's poor written English. "The August 4, 2010 'termination" letter was not in Ms. Sataki's English. "That's why [Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21. PFF 70.

OPF # 62 - Rather than answering Respondent's messages, Ms. Sataki filed a disciplinary complaint, reporting that she had terminated him as her attorney and wanted him to stop attempting to communicate with her. **OPPOSED**,

Respondent's Fact - Ms. Sataki admits that the handwriting on the original ODC complaint is not hers and thus does not appear to have come from her. Tr. 538. PFF 151.

OPF # 63 - Throughout October, 20 10, WND published further articles written by Respondent

---

[1] *Sataki v. BBG*, 1:10-cv-00534, ECF No. 67. For clarification, the notice of voluntary dismissal filed on July 28, 2010 dismissed all but one of Ms. Sataki's claims, but that was done in error, which was corrected on August 6, 2010. ECF No. 68.

App.0074

that described his representation of Ms. Sataki, linked to his previous articles, and promoted his autobiography. **OPPOSED**.

Respondent's Fact - The articles as Ms. Sataki agreed were intended to coax settlement and influence Senators to lobby for her and Mr. Klayman did not use them to promote himself or to sell books. Tr. 455-56. The ad which www.wnd.com inserted into the articles was for WND to sell books it had purchased. Tr. 1202. Mr. Klayman made no money on the articles which he wrote to help Ms. Sataki. Tr. 1199-1230. PFF 83.

OPF # 65 – Despite having been terminated by Ms. Sataki and directed to voluntarily dismiss the *Sataki v. BBG* civil action…. **OPPOSED.**

Respondent's Fact - Ms. Sataki's purported "termination" letter of August 4, 2010 was sent to VOA's Dan Austin and Mr. Shamble, but not to Mr. Klayman. Tr. 1038-39. RX 21. PFF 69. The August 4, 2010 'termination" letter was not in Ms. Sataki's English. "That's why [Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21. PFF 70. Another "termination" letter of November 15, 2010 was incorrectly sent to the wrong addresses at 2000 Pennsylvania Ave, and another incorrect location, 2001 Massachusetts Ave, which Mr. Klayman never received from her. RX 8. Tr. 1042-43, 1046. Ms. Sataki admits this. "So that was a mistake." Tr. 540. RX 8. PFF 71.

OPF # 68 - On December 25, 20I0, WND published Respondent's article, which discussed his representation of his former client, Ms. Sataki, and falsely claimed, "[a]n ultra-leftist, pro-Clinton and ethically corrupt federal judge - Colleen Kollar-Kotelly - had just dishonestly denied, without factual or legal bases, my request for Elham to be put back to work at the Los Angeles office of VOA." DX 23 at 23 - 12. **OPPOSED**.

Respondent's Fact - Mr. Klayman providing his opinion about a jurist that he as counsel actually appeared before, was supported by about 14 pages of her factual errors. PFF 65. That Judge

App.0075

Kotelly would simply ignore her grave errors, despite the fact that they were meticulously laid out for her in detail, clearly evidences the extrajudicial bias and prejudice against Mr. Klayman (and Ms. Sataki) that he had experienced from Judge Kotelly again and again. Mr. Klayman, upon being assigned Judge Kotelly, warned both Mr. Shamble and Ms. Sataki that the assignment could raise serious problems. PFF 39, 130 Furthermore, Judge Sporkin told Mr. Klayman that it would have been a "chip shot" to grant the relief sought by Ms. Sataki in order to preserve the status quo, and that he personally would have ruled to put Ms. Sataki to work in LA. PFF 191.

OPF # 69 –He filed a Notice of Appeal on January 19, 2011, despite having been terminated by his client. **OPPOSED**.

Respondent's Fact - Ms. Sataki's purported "termination" letter of August 4, 2010 was sent to VOA's Dan Austin and Mr. Shamble, but not to Mr. Klayman. Tr. 1038. RX 21. PFF 69. The August 4, 2010 'termination" letter was not in Ms. Sataki's English. "That's why [Mr. Klayman] needed to be able to talk to her (before I dismissed cases)." Tr. 1041. RX 21. PFF 70.  Another "termination" letter of November 15, 2010 was incorrectly sent to the wrong addresses at 2000 Pennsylvania Ave, and another incorrect location, 2001 Massachusetts Ave, which Mr. Klayman never received from her. RX 8. Tr. 1042-43, 1046. Ms. Sataki admits this. "So that was a mistake." Tr. 540. RX 8. PFF 71. Mr. Klayman filed a notice of appeal in the BBG case in the meantime to ensure that Ms. Sataki's legal rights were preserved. Tr. 1043-1044. PFF 72. Ms. Sataki herself filed a notice of appeal, mooting out the false claim that she wanted the case dismissed.  RSX 4. Tr. 1031. Tr. 1031.

OPF # 70 – Ms. Sataki continued to suffer harm from the publicity Respondent inflicted on her through his legal strategy and public pronouncements. **OPPOSED**.

Respondent's Facts - Ms. Sataki admits to being gainfully employed and continuing with her broadcasting career since she and Mr. Klayman parted ways. Tr. 561-568. Ms. Sataki makes

$62,000 per year plus health insurance benefits. Tr. 620-21. PFF 153. Ms. Sataki is still seeing a doctor to this day and is still on anxiety medication, eight years after Mr. Klayman's representation. This shows that her mental and other problems are not the result of Mr. Klayman, but of her own. Tr. 201. PFF 171.

Dated:  October 31, 2018

Respectfully submitted,

Larry Klayman, Esq.
c/o 2020 Pennsylvania Avenue #800
Washington, D.C. 20006
Tel: 310-595-0800
leklayman@gmail.com
D.C. Bar No.:  334581

Frederick J. Sujat, Esq.
1525 Windjammer Way
Hollywood, FL, 33019
Tel: 954-815-5221
fsujat@yahoo.com
D.C. Bar No: 214650

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was served by email and Federal Express on October 31, 2018, on H. Clay Smith, III, Assistant Bar Disciplinary Counsel at 515 5th Street, N.W., Building A, Room 117, Washington, D.C. 20001 and filed with the Board of Professional Responsibility on that same date.

Larry Klayman, Esq.

App.0077

# 'Free speech' advocate works to silence Larry Klayman

**Exclusive: Jack Cashill exposes radical ideology of lawyer pushing punishment**

 **By [Jack Cashill](#)**

**Published January 1, 2020 at 5:38pm**

In July of 2019, a hearing committee of the District of Columbia Bar Board of Professional Responsibility made a recommendation that Judicial Watch founder Larry Klayman be suspended, a recommendation now under appeal, from the practice of law in the district for 33 months.

The three-person committee strangely and inexplicably included only two attorneys, both of whom are of the left, and one of whom, Michael Tigar, is proudly far left.

How far left? Consider the following review on the jacket of Tigar's most recent book: "'An incisive, unsparing, creative, brilliant critique of capitalist law and its dire human consequences.' – BERNARDINE DOHRN, co-editor with Bill Ayers, Race Discourse: Against White Supremacy."

In the book, "Mythologies of State and Monopoly Power," Tigar emphasizes the Marxist notion that "the law is not what is says but what it does." Not liking the "dire human consequences" of the law as it exists, Tigar is not above twisting the law to his own ends.

Klayman suspects that Tigar, something of a superstar in Marxist circles, was recruited by the committee chairman, Anthony Fitch to sit on the committee with him. The two appeared chummy throughout the proceeding, and Fitch seemed downright deferential.

Throughout the proceeding, Tigar could barely conceal his disdain for the conservative, pro-capitalist, pro-Israel, pro-Trump activist Klayman.

In testifying as to why he founded Judicial Watch, Klayman explained his objections to the fact that federal judges were often chosen on the basis of political contributions by their law firms, labor unions or corporations.

As a result, said Klayman, "the best and the brightest" do not always make their way onto the bench. At this, Tigar grew visibly angry and shot back that his son, Jon Tigar, also a graduate of Berkeley Law School, was a federal judge.

President Barack Obama had appointed young Tigar to the federal bench in San Francisco. Klayman said he did not mean to impugn Tigar's son, but Judge Tigar deserved impugning. Tigar is the same federal judge who willy-nilly enjoined President Trump's asylum policy for illegal immigrants.

In its [article on Klayman's recommended suspension,](#) the Washington Post observed, that the "conservative" Klayman "is a notably combative litigant whose no-holds-barred tactics and robust use of the Freedom of Information Act have made him a dreaded – and sometimes loathed – inquisitor."

The Post also noted that Klayman writes for "WorldNetDaily, a right-wing news aggregator site." As to the left-wing politics of Fitch and Tigar, the Post predictably made no mention at all and failed to take seriously Klayman's claim that "It was a very politicized hearing committee."

The case itself has little to do with politics. It involves Klayman's pro-bono defense of a female Persian broadcaster at Voice of America. When she did not get the result she wanted, she turned on Klayman.

Both the Florida and Pennsylvania Bars dismissed identical complaints six years earlier. Following Trump's election, the head of the D.C. Bar Disciplinary Counsel resurrected the complaint six years after the woman had abandoned it.

Klayman believes that it was his high-profile legal advocacy on Trump's behalf that awakened legal radicals to the political potential of what is now a 10-year-old case.

"For Tigar, I am a conservative scalp," says Klayman, who is still able to practice law in D.C. during the appeal, "and one that he obviously harbors an animus toward, particularly given my support of Trump."

The 78-year-old Tigar has been an unapologetic disciple of the hard left from his student days. In his memoir, he boasts of his fond feelings for the brothers Castro and his attendance at the notorious Soviet-sponsored World Festival of Youth and Students in Helsinki in 1962.



Tigar's radicalism alarmed even liberal Supreme Court Chief Justice Earl Warren. According to Tigar, in 1965 Warren ordered Justice William Brennan to fire Tigar, then clerking for Brennan, and Brennan did just that.

Michael Tigar with Ramon Castro, the oldest of the Castro brothers, in 1978.

Tigar has not mellowed as he has grown older.
In fact, he has turned as the larger progressive movement has from defending free speech to suppressing it.

"Of all the remarkable developments of the past decade," argues British author Frank Furedi, "none has been more sinister than the West's gradual surrender of mankind's most important values: the twin ideals of freedom of speech and expression."

In Washington, that "surrender" has been imposed almost exclusively on the political right. Enforcing it are attorneys like Tigar and Fitch, the Democrats in Congress, federal judges of the Jon Tigar mold, and the intel agencies, all with the indispensable support of an increasingly leftist media.

The same Michael Tigar who supported the free speech movement while a law student at Berkeley in the 1960s is now working actively to silence Larry Klayman. It is hard to interpret Tigar's behavior otherwise.



The #1
*New York Times*
Bestseller

# THE
# BRETHREN
## INSIDE THE SUPREME COURT

# BOB WOODWARD
# SCOTT ARMSTRONG

"Explosive. . . . The most controversial book on the Supreme Court yet written."
—*Los Angeles Times Book Review*

...mutation for a rebuttal. Douglas called his close friend, Clark ....., a former Secretary of Defense under President Johnson. ...... has sicked his gorillas on me," he told him. It was the work ... son and Mitchell, and Ford was the front man. Douglas knew .... adumistration was willing to play politics with the Court and ... it had used "friendly persuasion" to get Fortas off the bench. .... asked Clifford to lead the defense. Clifford declined. He rea- ....d that he was too closely identified with the Democratic Party; .. whole thing would look too much like a political brawl. ...... finally engaged Simon Rifkind, a onetime classmate at ........ Law School. Rifkind was also a Democrat, but had ....d as a federal judge for years.

... attacks and investigations preoccupied Douglas. He was ... determined to outlast the Nixon presidency. But since there ... no forum for him as a Supreme Court Justice to defend him- ... he declined public comment. He turned inward and brooded, ...... friends late at night. If they succeeded in impeaching and ...victing him, what would be left of all the values and freedoms .. had fought for all his life? How could the Court remain inde- ......lent? His "side," already damaged by the departure of Warren ... Fortas, would be irreparably weakened. The liberals were in ....... Black, old and slowing up, had good and bad days. His ...mory problems cropped up at unpredictable times. Even ..... as Black aged he was becoming more conservative. He was .. longer a certain liberal vote.

Marshall was weak—a correct vote, a follower, but no leader, no ...ter. He was not one to speak up articulately or forcefully. That ...t Brennan. "Bill's not a troublemaker," Douglas told an associate. ...ennan was indeed a true friend, another correct vote, but really .. man of the center, an organizer for the moderate-liberal position. ...ennan was too willing to compromise. When things got tough, ...uglas felt, Brennan did not stand up for his principles. In 1966, ...ennan hired a University of California at Berkeley law gradu- ..., Michael Tigar, as a clerk. Tigar had been a leading radical ac- ...ist. When conservative columnists attacked Brennan, it became .. political issue. Brennan fired Tigar the week he arrived to start ...rk. As Douglas saw it, Brennan sacrificed the clerk to protect his

App.0082

personal position and his relationships with the moderate and conservative Justices. Douglas called it "scandalous," a "shocking cave-in."

During the impeachment investigation, friends and advisers from the old days would come to have lunch with Douglas, to help develop strategy and to offer suggestions. Douglas was often near tears of outrage. He felt powerless. Always suspicious, he was sure that the investigators would resort to any tactic, no matter how low or even illegal. He was more than ever convinced that his phone was tapped, that his office and perhaps even the conference room were bugged. (Even before Nixon's arrival, he had persuaded Earl Warren to have the conference room checked for listening devices. None was found.)

"Let's take a walk in the hall," Douglas told a friend who had come to discuss strategy. Many times during that year, Douglas came to Brennan's chambers and asked him to walk in the halls to discuss something privately. "I've got to go meet Bill out in the hall," Brennan would say to his clerks, his eyes twinkling. None of the other Justices seemed to take the investigation seriously enough, Douglas thought. Everyone seemed unconcerned.

Nixon wasn't sure that impeachment of Douglas was a very good idea. The evidence was thin, and Burger had signaled him that the attack was not good for the Court. Also, the President was more concerned with foreign affairs, particularly with the military escalation in Southeast Asia.

Later, when Nixon called Mitchell and said Ford should be told to "turn it off," Mitchell indicated that it would be difficult, since he himself had supplied Ford with some ammunition.* But he could put some distance between the administration and the impeachment move in a speech he was about to give to the Bar Association of the District of Columbia.

Mitchell's draft, condemning "irresponsible and malicious" criticism of the Court, was sent to Nixon, who forwarded it to Burger. Burger found it perfectly appropriate. When Burger tried to call

---

* See William Safire: *Before the Fall: An Inside View of the Pre-Watergate White House.*



"Tigar's tireless striving for justice stretches his arms towards perfection."
—WILLIAM J. BRENNAN, SUPREME COURT JUSTICE

# MYTHOLOGIES OF STATE
# AND MONOPOLY POWER

## MICHAEL E. TIGAR

MICHAEL E. TIGAR HAS WORKED FOR OVER FIFTY years with movements for social change as a human rights lawyer, law professor, and writer. As an attorney, Tigar argued seven cases before the U.S. Supreme Court, worked in opposition to the death penalty, and participated in international human rights cases. In 1980, with co-counsel Samuel Buffone, Tigar successfully represented the families of former Chilean Ambassador Orlando Letelier and Ronni Karpen Moffitt, who were killed by agents of Augusto Pinochet's military junta. His clients, over the years, have included H. Rap Brown (Jamil Abdullah Al-Amin), Angela Y. Davis, Leonard Peltier, and Lynne Stewart. As a professor, Tigar has taught at law schools in the United States, France, South Africa, and Japan. He is Emeritus Professor at Duke Law School and American University Washington College of Law. Tigar's literary career encompasses fifteen books, three plays, and scores of articles and essays. His book, *Law and the Rise of Capitalism*, first published by Monthly Review Press, has been translated into Spanish, Portuguese, Greek, Turkish, and Chinese. His memoir, published in 2002, is *Fighting Injustice*.



# Mythologies of State and Monopoly Power

## MICHAEL E. TIGAR

**MR**
MONTHLY REVIEW PRESS
*New York*

# Contents

Introduction: Mythologies, Mental Shortcuts,
Rationalizations, Impressions | 7

### 1. Mythologies of Racism | 19
~ Fear, Loathing, and Myth I: The Japanese Internment
and Manipulated Fear | 19
~ Fear, Loathing, and Myth II: "Separate but Equal" and
the Land Where Supreme Court Justices Dwell | 22
~ The Last Gasp of "Separate but Equal" | 27
~ The Persistence of Racist Mythologies | 31

### 2. Mythologies of Criminal Justice | 37
~ Palladiums and Citadels | 37
~ Mass Incarceration and Social Control | 38
~ The Mythology of Fair Trial | 40
~ Plea Bargains: The Mythology of Consent | 45
~ Point: Orlando Hall, the "Other," and
Ineffective Counsel | 49
Objectively Ineffective | 53
~ Counterpoint: Clarence Darrow Confronts
Racist Mythology | 55
~ Albert Camus's *The Stranger*: Mythologies of
Trial and Colonial Mentality | 62
~ Battling for Defendant Rights | 68

### 3. Mythologies of Free Expression | 73
~ The Marketplace of Ideas | 73
~ State Repression | 75
~ Who Owns the Streets? | 77
~ But for Colporteurs, Maybe Anything Goes | 86
~ Abolishing "Feudalism": A Mythology of Freedom | 88
~ The Evanescence of Custom | 94
~ SLAPP-Happy: Fries with That | 95
~ A Lawsuit Lovely as a Tree | 98
~ Radio Days: The Property Norm Devours
the Mythology of Free Expression | 101
~ As Seen on TV | 104
— The Pentagon Papers: Privatizing John Adams's
"General Knowledge" | 107

### 4. Mythologies of Worker Rights | 111
~ Who Is Intimidating Whom? | 111
~ Contract, Conspiracy, and Worker Consent | 114
~ The Nineteenth-Century Worker in the Courts | 119
~ Shakespeare on Worker Consent | 122
~ Smithfield Redux: Community Organizing and
Employer Consent | 123
~ Sickening Opposition to Workers' Rights | 125

### 5. Mythologies of International Human Rights | 129
— The *Kiobel* Case: "United States Law . . . Does Not
Rule the World" | 129
~ O Tortured Workers, Won't You Make Me
a Mercedes-Benz | 136

Notes | 147
Index | 159

INTRODUCTION

# Mythologies, Mental Shortcuts, Impressions

THIS BOOK IS A COLLECTION of essays. Some of them focus on how mythologies mask state repression of democratic rights in the fields of racism, criminal justice, free expression, worker rights, and international human rights. Others deal with the ways that ordinary private law categories of property, contract, and tort perform the same social function.

Mythologies are structures of words and images that portray people, institutions, and events in ways that mask an underlying reality. In the days when France used the guillotine, the executioner cried, just after the blade dropped, "*Au nom du peuple français, justice est faite.*" In the name of the French people, justice is done. This cry had no rational relation to discourse about what is fair, right, decent, or in accord with evidence about conduct. "Justice" was a name given to an event, to elevate the act of killing into an acceptable and rational process.

To proclaim "Justice" committed two solecisms. First, it appropriated justice as the exclusive property of the state. Second, it assigned a fictitious value to the word, invoking a mythology of the universality of language.

In the United States, there is a department that calls itself Justice. Colloquially, we use the term "criminal justice

scene, for example, the Rouen Cathedral, over and over. Each of those paintings gives us a different impression of the same scene.

All of these terms, which I often use interchangeably, refer to ways of seeing and interpreting the world around us. As I say, most of them are harmless and even useful ways of getting through the day. Some, however, are ways we fool ourselves, or permit ourselves to be fooled, about what is really going on. William James said, "A great many people think they are thinking when they are merely rearranging their prejudices."

In human rights litigation, and indeed in all law practice, we must deconstruct the myths that have grown up around our clients, the groups to which they belong, and the conduct attributed to them. Based on our client's race, social class, sexual orientation, or some other characteristic, the state rationalizes its treating our client especially harshly.

When we litigate cases, we confront not only the evidence adduced and the legal principles being argued, but also the socially, culturally, and historically determined attitudes of judges and jurors. In a jury trial, we use *voir dire* to uncover those. We look up the biographies and prior decisions of judges.

I am a human rights lawyer. My most important task is to expose, analyze, and combat the mythologies that dominate legal ideology. These mythologies form a systematic justification for the way that state power and private economic power is wielded. The essays in this book focus on how mythologies may be understood and exposed. This "myth-busting" lies at the heart of the lawyer's work. We undertake to represent clients who are marginalized. To borrow a phrase from artist and art critic John Berger, we mediate between what is given and what is desired.

The essays in this collection address five groups of mythologies that help to rationalize the present system of social relations: racism, criminal justice, free expression, worker rights, and human rights. They deconstruct what the state and the wielders of monopoly power tell us, in order to seek out what is really going on.

Throughout these essays, I repeat a theme: the law is not what it says, but what it does. What "it does" is so often based on assumptions that time and the tide of events have shown to be false. Karl Marx wrote, "The law shows its *a posteriori* to the people, as God to his servant Moses." As Anatole France famously wrote: "'The majestic equality of the laws, which forbid the rich as well as the poor to sleep under bridges, to beg in the streets and to steal bread."

The "law" is itself an ideology, constructed to define, defend, and enforce a system of social relations. Its mythologies are enshrined as precedents. Jonathan Swift wrote in *Gulliver's Travels*:

> It is a maxim among these lawyers, that whatever hath been done before may legally be done again: and therefore they take special care to record all the decisions formerly made against common justice and the general reason of mankind. These, under the name of precedents, they produce as authorities, to justify the most iniquitous opinions; and the judges never fail of decreeing accordingly.

If we focus only on what "the law" says, we catch ourselves saying that "the law has evolved," which is like saying that "the market has crashed," or "the bank has failed," or "the car did not stop at the red light." This formulation reifies and mystifies legal rules, and if accepted leads to alienation

CURRENT AFFAIRS | LEGAL STUDIES

"Beautifully written, learned, and profoundly insightful. In a better world, Michael Tigar would be a justice on the United States Supreme Court."—MICHAEL STEVEN SMITH, Co-host, *Law and Disorder Radio*

"Elegant, brilliant, and timely . . . a breath of fresh air, busting open the mythologies of state power that overwhelm us. Tigar provides analytical tools that inspire and empower."—ROXANNE DUNBAR-ORTIZ, author, *Loaded: A Disarming History of the Second Amendment*

"Tigar identifies the vulnerabilities in, and cuts the heart out of, the destructive mythologies he addresses. These essays are particularly timely because the forces of greed, ignorance, and bigotry are now so firmly in power."—JERRY COHEN, former general counsel, United Farm Workers

"Tigar explores important issues through the lens of his extraordinary personal and professional experience, and through his analysis of some of the most important cases decided by the nation's courts. This book is a must-read."—ANGELA J. DAVIS, Professor, Washington College of Law; author, *Arbitrary Justice: The Power of the American Prosecutor*

"An incisive, unsparing, creative, and brilliant critique of capitalist law and its dire human consequences."—BERNARDINE DOHRN, co-editor with Bill Ayers, *Race Course: Against White Supremacy*

"Like Clarence Darrow, Tigar is a 'defender of the damned.' Ignore what he says, and we are all damned by a justice system that he shows to be anything but just."—CHARLES GLASS, author, *They Fought Alone: The True Story of the Starr Brothers, British Secret Agents in Nazi-Occupied France*

"For anyone concerned with the rule of law, or more generally with the real significance of freedom and justice, this highly informed and carefully argued study should be essential reading."—NOAM CHOMSKY

ISBN 978-1-5836774-2-1



Cover image: Honoré Daumier, *The Defender*, 1865.

MONTHLY REVIEW PRESS | NEW YORK



App.0093

Case 1:21-cv-02456-AJB-LB Document 111 Filed 09/28/21 Page 197 of 824

Listen ☰

# Attorney Michael Tigar: The Mythologies of State and Monopoly Power

00:00                                                          00:00

Podcast: **Play in new window** | **Download** (Duration: 57:21 — 65.6MB) | **Embed**

LISTEN LIVE ON KKFI
Every Tuesday at
9:00am

ABOUT THE SHOW



**Law and Disorder**
Law and Disorder is a
weekly, independent
radio program airing on
several stations across
the United States. Law
and Disorder gives
listeners access to rare
legal perspectives on
issues concerning civil

**Attorney Michael Tigar: The Mythologies of State and Monopoly Power**

The American criminal justice system is buttressed, sustained and perpetuated by various myths. These myths dominate legal ideology. The most important of these myths concern racism, criminal justice, free expression, workers rights, and international human rights. Ordinary private law categories of property, contract, and tort perform the same social function, Michael Tigar writes in his important new book Mythologies of State and Monopoly Power.

Michael Tigar has worked for more than 50 years with movements for social change as a human rights lawyer, law professor, and writer. He believes that busting these myths is the work of movement lawyers.

Noam Chomsky has written that for anyone concerned with the rule of law, or more generally with the real significance of freedom and justice, Michael Tigars book is a highly informed and carefully argued study that should be essential reading.

App.0094

liberties, privacy, right to dissent and the horrendous practices of torture exercised by the US government.

The book is beautifully written, learned, and profoundly insightful. In a better world Michael Tigar would be a justice of the United States Supreme Court.

http://tigarbytes.blogspot.com/

Guest " Michael Tigar, emeritus professor of law at Duke University and at Washington College of Law. He has been a lawyer working on social change issues since the 1960s. He has argued numerous cases in United States Supreme Court and many Circuit Courts of Appeal. His books include Law and the Rise of Capitalism, Fighting Injustice , and the forthcoming Mythologist of State and Monopoly Power.

Law & Disorder host Michael Steven Smith, Michael Tiger and guest host attorney Jim Lafferty



SHARE THIS EPISODE



ON-AIR GUIDE

PROGRAMS

Music

News & Public Affairs

Arts & Culture

EVENTS

SUPPORT

Donate

Underwriting

Fundraisers

VOLUNTEER

ABOUT

CONTACT

WEBSITE ISSUE

Office: (816) 931.3122

On-Air Studio: (816) 931.KKFI (5534)

Toll-Free: (888) 931.0901

Fax: (816) 931.7078



Sr. Michel Tigar
Esq. 1308 18 St. N.W.
Washington, D.C.
EE.UU.

REPUBLICA DE CUBA
PRESIDENTE DEL CONSEJO DE ESTADO Y DEL GOBIERNO

App.0097

ar friend Tigar,

uly sorry with you. I would have liked to write to you immediately to express my utmost confidence in thanks for. His omitted or and sincere to send to our country a magnificent example. Saint Gertrude I can assure you that multiple ons and responsibilities have occupied my attention and all my time during these months, which prevented me from ally expressing my greatest recognition. Did you still ask for the generosity to excuse us for this involuntary delay? will know, the "Phoenix bull ", which he sent us, arrived in Cuba in good condition, after several long and inevitable of quarantine. His state of health is satisfactory, he adapts reliably, and we think he will soon be, in conditions of enter tion, I think it will be a valuable contribution to the development of our mass of Santa Gertrudis, which we take care of re, and the father of high quality animals, I am informed of all the effort and concerns caused by bringing our country to llion so select. That is why, although your gift is very valuable, even more valuable and more important for us is your of friendship and sympathy. Believe me that I feel in a debt of deep and sincere gratitude towards you.

l have liked to greet you personally, along with other distinguished friends, on my recent visit to New York, but, as you he circumstances were not the most favorable. I confess that we will find the opportunity to hold this meeting, It may be own country. Why not in Cuba?

e crying cordial greetings from your friend,

astro Ruz

*estimado amigo ligar:*

*siento verdaderamente apenado con usted. Hubiere deseado escribirle de inmediato para expresarle mi más pro fiando decimiento por. su gesto omitios o y sincero de enviar a nuestro pais un magnifiieo ejemplar. Santa Gertrudis. Puedo urarle que múltiples obligaciones y responsabilidades kan ocupado mi atención y todo mi tiempo durante estos meses, lo impidió expresarle de manera personal mi mayor reconocimiento ¿PocLró pedirle aun la generosidad de que nos ulpe por esta demora involuntaria?*

*no ya conocerá, el toro Phoenix", que nos envió, llegó a Cuba con buenas condiciones, después de varios largos e itables periodos de cuarentena. Su estado de salud es satisfiactorio, se adapta fiavorablemente, y pensamos que pronto rá, en condiciones de entrar en producción. Creo que será un aporte de gran valor al desarrollo de nuestra masa de ta Gertrudis, que cuidamos con esmero, y padre de animales de gran calidad. Estoy infiormado de todo el esfiuerzo y las cupaciones que le ocasionó el hacer llegar a nuestro pais a este semental tan selecto. Por eso, aunque su obsequio es osísimo, todavía más valioso y más importante es para nosotros su gesto de amistad y de simpatía. Créeme que me siento na deuda de profiunda y sincera gratitud hacia usted.*

*ría deseado saludarle personalmente, junto a otros distinguidos amigos, en mi reciente visita a Nueva Vork, pero, como , las circunstancias no fiueron entonces las más propicias. Confilo en que hallaremos la oportunidad para sostener este uentro, Quizás sea en su propio pais. ¿V por qué no en Cuba?*

*iba más cordial saludo de su amigo,*

# 2 married couples on bomb case

## 1 pair works for Nichols, the other for McVeigh

**By Karen Abbott**
*Rocky Mountain News Staff Writer*

12-11-96
R.M.N.

Both Oklahoma bombing defendants now have married couples on their legal defense teams.

"What about this case is not unusual?" a spokeswoman for one of the attorneys said.

Jane Tigar, who married Michael Tigar of Austin, Texas on Oct. 22, last week filed court documents officially adding her to the defense team for Terry Nichols. Michael Tigar is Nichols' chief defense attorney.

A spokeswoman in the Nichols team's Denver office said Jane Tigar joined the Nichols team in the summer of 1995, while she still was a law student at Columbia University. She was admitted to the Colorado bar in October.

The defense team for bombing suspect Timothy McVeigh, meanwhile, includes husband-and-wife lawyers Richard Burr and Mandy Welch of Houston. Both are specialists in defending against the death penalty.

Asked about the coincidence of two married couples being involved in the case as defense lawyers, lawyer Rob Nigh of the McVeigh team said from Enid, Okla., "The case is such that you call upon every available resource."

"Dick Burr knew that one of the best people to help him was Mandy Welch," Nigh said.

McVeigh and Nichols could face death sentences if they are convicted of the April 19, 1995, bombing of Oklahoma City's Alfred P. Murrah Federal Building. The blast killed 168 people and injured more than 500.

The two men will be tried in Denver's federal courthouse — McVeigh first, starting March 31. No trial date has been set for Nichols.

Each defendant has a court-appointed, taxpayer-funded defense team of about five lawyers. About 10 federal prosecutors, also paid by taxpayers, are working on the case. No side has been willing to disclose exactly how many lawyers are at work on the case, and expense records are sealed by court order until the case is over.

App.0099

REPUBLICA DE CUBA

PRESIDENTE DEL CONSEJO DE ESTADO Y DEL GOBIERNO

Ciudad de la Habana,
6 de diciembre de 1979

Sr. Michael Tigar
Washington, D.C.

Muy estimado amigo Tigar:

Me siento verdaderamente apenado con usted. Hubiese deseado escribirle de inmediato para expresarle mi más profundo agradecimiento por su gesto amistoso y sincero de enviar a nuestro país un magnífico ejemplar Santa Gertrudis. Puedo asegurarle que múltiples obligaciones y responsabilidades han ocupado mi atención y todo mi tiempo durante estos meses, lo que impidió expresarle de manera personal mi mayor reconocimiento ¿Podré pedirle aún la generosidad de que nos disculpe por esta demora involuntaria?

Como ya conocerá, el toro "Phoenix", que nos envió, llegó a Cuba con buenas condiciones, después de varios largos e inevitables períodos de cuarentena. Su estado de salud es satisfactorio, se adapta favorablemente, y pensamos que pronto estará en condiciones de entrar en producción. Creo que será un aporte de gran valor al desarrollo de nuestra masa de Santa Gertrudis, que cuidamos con esmero, y padre de animales de gran calidad. Estoy informado de todo el esfuerzo y las preocupaciones que le ocasionó el hacer llegar a nuestro país a este semental tan selecto. Por eso, aunque su obsequio es valiosísimo, todavía más valioso y más importante es para nosotros su gesto de amistad y de simpatía. Créame que me siento en una deuda de profunda y sincera gratitud hacia usted.

Habría deseado saludarle personalmente, junto a otros distinguidos amigos, en mi reciente visita a Nueva York, pero, como sabe, las circunstancias no fueron entonces las más propicias. Confío en que hallaremos la oportunidad para sostener este encuentro. Quizás sea en su propio país. ¿Y por qué no en Cuba?

Reciba el más cordial saludo de su amigo,

Fidel Castro Ruz

WIKIPEDIA

# Michael Tigar

**Michael Edward Tigar** (born January 18, 1941 in Glendale, California)[1] is an American criminal defense attorney known for representing controversial clients. He is also an emeritus (retired) member of the Duke Law School and American University, Washington College of Law faculties.

| Michael Tigar | |
|---|---|
| **Born** | January 18, 1941 |
| **Nationality** | United States |
| **Alma mater** | University of California, Berkeley (B.A., J.D) |
| **Occupation** | Lawyer |

## Contents

Early life and education

Career in law

Notable cases and clients

Personal life

Books

Notes

References

External links

## Early life and education

Tigar earned his Bachelor of Arts from the University of California, Berkeley in 1962 and his J.D. from the University of California, Berkeley School of Law in 1966. As an undergraduate, he was elected to the ASUC (Associated Students of the University of California) Senate as a SLATE candidate. He also ran unsuccessfully for Student Body President. He interviewed Bertrand Russell during the 1962 Cuban Missile Crisis for Pacifica Radio. In law school he was a member of Order of the Coif and served as editor-in-chief of the *California Law Review*.

## Career in law

In 1966, he was hired as a law clerk by Justice William J. Brennan of the United States Supreme Court. Brennan, however, fired him the week he began his job, following complaints made by conservative columnists and FBI director J. Edgar Hoover, because of Tigar's activist background.[2][3] Tigar taught at the UCLA School of Law during the period 1968-1972. He taught evidence courses and a course in Selective Service Law. In 1967, he became the first Editor-in-Chief of the *Selective Service Law Reporter* (Public Law Education Institute, 1968–1973).[4] Tigar was a partner in the firm of Williams & Connolly of Washington, DC (1975–'78), where he worked closely with legendary trial attorney Edward Bennett Williams. He then formed his own firm with partner Samuel J. Buffone.[5] Tigar was a professor of law at the University of Texas School of Law from 1983 to 1998, holding the Joseph D. Jamail Centennial Chair in Law from '87-'98.[6] With a grant from

App.0101

Texas plaintiffs' lawyers he and Jane B. Tigar founded the UNROW Human Rights Impact Litigation Clinic, where he served as the Clinic's first Executive Director and Supervising Attorney. He was then a professor at American University's Washington College of Law starting in 1998,[7] and later also at Duke Law School.

In his teaching, Tigar has worked with law students in clinical programs where students are counsel or law clerks in significant human rights litigation. He has made several trips to South Africa, working with organizations of African lawyers engaged in the struggle to end apartheid, and after the release of Nelson Mandela from prison, to lecture on human rights issues and to advise the African National Congress on issues in drafting a new constitution. He has been actively involved in efforts to bring to justice members of the Chilean junta, including former President Pinochet. Of Tigar's career, Justice William J. Brennan has written that his "tireless striving for justice stretches his arms towards perfection."

In 1999, the California Attorneys for Criminal Justice held a ballot for "Lawyer of the Century." Tigar was third in the balloting, behind Clarence Darrow and Thurgood Marshall. In 2003, the Texas Civil Rights Project named its new building in Austin, Texas, (purchased with a gift from attorney Wayne Reaud) the "Michael Tigar Human Rights Center."

In retirement, Tigar is professor of the practice of law emeritus at Duke Law School,[8] and research professor emeritus at the American University, Washington College of Law.[9] He has been visiting professor at the law faculty of the Paul Cézanne University, Aix-en-Provence, and has lectured at law schools in several countries.

In 2016, Tigar donated his papers to the University of Texas Law School Library, which held a symposium to launch the collection in 2018.[10]

# Notable cases and clients

- Fernando Chavez, Cesar Chavez's son, who refused induction into the military based on his pacifist beliefs.
- Lynne Stewart, who was charged with conspiracy and providing material support to terrorists
- Terry Nichols, of the Oklahoma City bombing
- Angela Davis, activist charged with murder, kidnapping, and conspiracy for her alleged involvement in the death of Judge Harold Haley[11]
- Kiko Martinez, Chicano activist
- John Demjanjuk, a Ukrainian-born immigrant accused of having been "Ivan the Terrible," a notorious Nazi concentration camp guard, whose conviction by courts in Israel was overturned but was stripped of U.S. citizenship on other grounds. He was retried by the U.S. Justice department and was convicted. Tiger represented Demjanjuk at the trial and appeal. Demjanjuk was deported to Germany where he died in prison.
- Scott McClellan, former press secretary to President George W. Bush, who testified before Congress regarding the role of the Bush Administration in the leak regarding the identity of former CIA agent Valerie Plame.

Tigar has argued seven cases before the United States Supreme Court,[12] and over 100 federal appellate cases. He has tried cases in all parts of the United States. In addition to activist clients, he has represented Sen. Kay Bailey Hutchison, Rep. Ronald Dellums, Rep. John M. Murphy (during the Abscam scandal), former Gov. John Connally, Fantasy Films and Mobil Oil.

App.0102

# Personal life

Tigar has been married four times. He has been married to journalist-turned-attorney Jane Blanksteen Tigar since 1996.[3] He has three children by previous marriages,[13] including United States Federal Judge Jon S. Tigar.[14], addiction medicine specialist and capital case mitigation expert Katherine McQueen, M.D., and business consultant Elizabeth Torrey Tigar.

# Books

- *A Practice Manual of Selective Service Law* (1968)
- *Law Against the People* (1971) (co-author)
- *Law and the Rise of Capitalism* (1978) (co-author) review (https://www.jstor.org/pss/1340351)
- *The ministry of culture: Connections among art, money and politics* (1980) (contributor)
- *Federal Appeals: Jurisdiction and Practice* (1993)
- *Persuasion: the Litigator's Art* (1999, 2003)
- *Fighting Injustice* (2002)
- *Examining Witnesses* (2d ed., 2003). ISBN 1-59031-256-2
- *Thinking about Terrorism: The Threat to Civil Liberties in Times of National Emergency* (2007)
- *Trial Stories* (2008) (with Davis, ed.)
- *Nine Principles of Litigation and Life* (2009)
- *Mythologies of State and Monopoly Power* (2018) ISBN 978-1-58367-743-8

# Notes

1. Vile, J.R. (2001). *Great American Lawyers: An Encyclopedia* (https://books.google.com/books?id=XR1NPiqp5aQC). **1**. ABC-CLIO. p. 663. ISBN 9781576072028. Retrieved December 13, 2014.
2. Bob Woodward, *The Brethren: Inside the Supreme Court* (1979), p. 77.
3. Romano, Lois (1997-09-29). "A Man of Independent Means" (https://www.washingtonpost.com/wp-srv/national/longterm/oklahoma/stories/tn-lawyer.htm). Washington Post. Retrieved August 4, 2014.
4. LLMC, Book Preservation. "Military Law" (http://www.llmc.com/Historical_Millaw.asp#page_21). *LLMC Central*. Law Library Microform Consortium. Retrieved July 28, 2014.
5. BuckleySandler, Professionals. "Samuel J. Buffone" (http://www.buckleysandler.com/professionals-bio-detail/samuel-j-buffone). *buckleysandler.com*. BuckleySandler LLP. Retrieved September 1, 2014.
6. "http://www.utexas.edu/student/registrar/gopherfiles/catalog/cat-law/The_Faculty" (https://web.archive.org/web/20160124025050/http://www.utexas.edu/student/registrar/gopherfiles/catalog/cat-law/The_Faculty). utexas.edu. Archived from the original (http://www.utexas.edu/student/registrar/gopherfiles/catalog/cat-law/The_Faculty) on January 24, 2016. Retrieved December 13, 2014. External link in |title= (help)
7. Association of American Law Schools Directory of Law Teachers 2007-08, p. 1095
8. "Michael E. Tigar | Duke University School of Law" (http://www.law.duke.edu/fac/tigar/). law.duke.edu. Retrieved December 13, 2014.
9. "Tigar, Michael - Faculty - American University Washington College of Law" (http://www.wcl.american.edu/faculty/tigar/). wcl.american.edu. Retrieved December 13, 2014.
10. "The Michael Tigar Papers" (https://law.utexas.edu/tigar-event/). *School of Law*. University of Texas at Austin. Retrieved 22 November 2018.

App.0103

11. "Judge removes himself in Angela Davis case" (https://news.google.com/newspapers?id=hLkqAA AAIBAJ&sjid=S2YEAAAAIBAJ&pg=7271%2C480811). *Sarasota Herald-Tribune*. Sarasota, Florida. AP. March 18, 1971. p. 5-A.

12. using search term "Tigar" (http://www.oyez.org)

13. Vile, John R. *Great American Lawyers*. New York: ABC-CLIO, 2001.

14. Yulico, Nick (December 28, 2001). "Davis Nominates Santa Clara Judge to Sixth District Court of Appeal" (http://www.metnews.com/articles/judg122801.htm). *Metropolitan News-Enterprise*. Retrieved December 22, 2012.

# References

- Browning, John G. "Legally Speaking: When a Lawyer Goes Too Far" (http://www.setexasrecord.c om/arguments/202358-legally-speaking-when-a-lawyer-goes-too-far), "At trial, [Lynne Stewart] was represented by noted defense attorney Michael Tigar (a favorite of the left whose past clients have included '60s radical Angela Davis and Oklahoma City bombing defendant Terry Nichols), who argued..." *Southeast Texas Record,* 2007-10-10. Retrieved 2007-10-20.
- The Professional Education Group https://www.proedgroup.com/michael-tigar

# External links

- Books by Michael Tigar (https://books.google.com/books?as_auth=Michael+E+Tigar&ots=brvvr9t US1&sa=X&oi=print&ct=title&cad=author-navigational)
- Washington College of Law, American Univ., faculty page (http://www.wcl.american.edu/faculty/tig ar)
- Duke Law School faculty page (http://law.duke.edu/fac/tigar)
- TigarBytes (blog) (http://tigarbytes.blogspot.com)

Retrieved from "https://en.wikipedia.org/w/index.php?title=Michael_Tigar&oldid=933036534"

This page was last edited on 29 December 2019, at 16:51 (UTC).

Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

App.0104

Case 1:21-cv-02576-JEB Document 1-1 Filed 09/28/21 Page 207 of 824

MENU

Send Tips   Advertise   About








**POLITICS, WHITE-COLLAR CRIME**

# Hillary Clinton, Truthfulness, And Bias In White-Collar Cases

Hillary's issues are no different than those facing defendants every day.

By MATT KAISER

Aug 4, 2016 at 10:36 AM

**46**
SHARES



**Top Articles**

READ MORE



MENU

Here's something that happens in just about every criminal investigation — some notion settles in the prosecutor's mind that is wrong, but that organizes how the prosecutor views every bad fact in the case.

To have an example to make this concrete, let's say that your client has applied for a series of bank loans, and the prosecutor thinks that each one contains a false statement. The question is whether your client knew those false statements were false when they were made.

Suppose there are no emails or contemporaneous writings. The only things we have to go on are the nature of the false statements and whatever else we know about your client. Suppose, further, that the false statements don't decide the issue. It's not like the guy is reporting $8 million of income on a loan application when he only made $80,000, but it's also not the case that he said he owed $325,000 on his mortgage when he, in fact, owed $326,872. The false statements are frequent enough and serious enough to draw attention, but not so serious and frequent that they, on their own, push things over the edge into being indicted.

Most importantly, assume that the prosecutor thinks your client is worth spending her time investigating because she believes that he is shady. Not in any specific way — there's no one thing that she can run to ground that shows that the client is shady — its more just that the client has been around things that have been shady. Maybe he worked for a mortgage broker with a bad reputation for a while. Perhaps he was sued for fraud, but the case was dropped before the allegations were really addressed. Little things like that build up; and in a world where a prosecutor doesn't

give your guy the benefit of the doub[t]                                                                keep the government digging until it

This happens all the time in white-co[llar]                                                        ed through the lens of a dirty window —

I once had a magistrate judge at a det[ention hearing]                                  likely to be a danger to the community                                        judge said, "I know what roller-skating rinks are all about." I didn't. I still don't. I thought

**Top Articles**

READ MORE

App.0106

MENU

feet. I suspect that's not where the judge was coming from.

The hearing didn't work out well for my client.

This is a recurring and maddening problem with white-collar cases; people who are flawed, to be sure, but often one flaw is mistaken for another. The client who is an idiot who doesn't know how to fill out a form is taken as a liar who is defrauding the bank. Or, to take a real-life example, the woman whose husband can't fill out a financial aid form is seen as structuring.

The same thing happens in political campaigns, which is one reason why election season can be tremendously interesting for lawyers of all stripes.

Clinton is widely believed to be a frequent liar and untrustworthy. Something like 40% of the population thinks she's untrustworthy.

But is that accurate?

Happily, PolitiFact rates politicians for truthfulness, putting politicians' statements on a six-point scale ranging from true to pants on fire. As of June 26, for the 2016 campaign for both Democrats and Republicans, Hillary Clinton had one "pants on fire" statement — the same as Chris Christie, Jeb Bush, and Rand Paul. And fewer than Marco Rubio or Ted Cruz. Ben Carson had four. Donald Trump had 30.

Compare the false statements made by Hillary Clinton with, say, John Kasich. When you combine the three categories of false _____s. The same three categories for Hillary _____

Five percent of Kasich's were rated pa_____ were.

(To be fair, far more of Clinton's state_____ race in a high-profile way for much lo_____

**Top Articles**

READ MORE

App.0107



Case 1:21-cv-00246-JEB Document 11-1 Filed 09/28/21 Page 210 of 824



**MENU**

an untrustworthy liar.

Much of this comes from a bias in how we interpret data. When you've just bought a red Honda, you notice there are a lot more red Hondas on the road. When you think Hillary Clinton is a liar, you jump on each untruth. We forget McCain — or John Glenn — were part of the Keating Five because we don't think of them as generally corrupt. Yet an investigation where Hillary Clinton is cleared of wrongdoing becomes a reason she's not trustworthy.

And part of it is, as Jill Abramson said recently, that Hillary Clinton is a really closed-off person who is distrustful of the media. Like many good lawyers, "her instinct is to withhold." From refusing to release documents about Whitewater to refusing to release the transcripts of her speeches to investment banks, Clinton's gut reaction is to see more disclosure as the enemy.

This looks a lot like what I see happen with clients. We take a flaw that's regrettable but benign and reinterpret it as evidence of corruption.

Every new "pants on fire" rating for Clinton reinforces the idea that she's a liar — while the same pants on fire statement from another candidate won't. Every new thing that has to be explained to a prosecutor reinforces the prior belief that the prosecutor is right that your client is shady.

The best response, I think, is a counter-narrative. It's to replace one organizing principle for the data with another. It can be a delicate client relations issue, but if your client keeps making false statements becau[se] ⬚ an idiot. Merely batting away facts — simply doesn't shake the perception t[hat]

**Top Articles**

READ MORE

And, of course, just because somethin[g] someone, doesn't mean it isn't true.




MENU

investigations and indicted cases. His twitter handle is @mattkaiser. His email is mkaiser@kaiserdillon.com He'd love to hear from you if you're inclined to say something nice.

**46**
SHARES

 

**TOPICS**

Election 2016, Hillary Clinton, Politics, Prosecutors, White-Collar Crime




**Love ATL? Le**
**Sign up for**

Top Articles

READ MORE



**MENU**

Send Tips    **Advertise**    **About**    

**WHITE-COLLAR CRIME**

# Trump And Tyranny

All those expansions of executive power could come back to haunt us…

By MATT KAISER

Jul 28, 2016 at 2:49 PM

**48**
SHARES   



Many folks are saying that Donald Trump is a unique threat to American democracy. The Washington Post ran a unique editorial calling Donald Trump just that. As it summed up:

> [Trump] doesn't seem to care
> power. He has threatened tha



> independent press. He went a
> exacerbating his contempt for
> the judge should be disqualifi



**MENU**

×

encouraged and celebrated violence at his rallies. The U.S. democratic system is strong and has proved resilient when it has been tested before. We have faith in it. But to elect Mr. Trump would be to knowingly subject it to threat.

Orin Kerr has a piece in the Post about what the Department of Justice would look like under Trump; it's chilling. Here's Kerr's punchline:



> What would a Trump Justice Department look like?
>
> It would be pretty damn frightening, I think. Trump has two long-standing passions when it comes to law and law enforcement. His first passion is the suppression of protest and dissent. And his second passion is bringing lots of legal actions against his critics and threatening many more to get his way.

And, perhaps most dramatically, John Kasich — a man from Trump's own party who is no longer running for President — released a new ad against Donald Trump, of a former POW basically calling Trump Hitler. Paraphrasing — and name checking — Martin Niemöller, the Kasich ad walks through each of the groups Trump has attacked, Mexicans, Muslims, black people, journalists, and ends by telling viewers that if Donald Trump comes after you, you'd better hope there's someone left to defend you.

I've talked to at least one person — an educated person who generally believes in the rule of law — who wonders if maybe we're in a version of that hypothetical about whether someone should kill Hitler if they time travel back to Germany in 1939.

Despite all of that, 538 currently says there is a 47.2% chance that Donald Trump will be our next President.

Apparently Orin Kerr is not as influ



American democracy is built on chec
power. Trump could not be as bad as



MENU

years ago, the Atlantic had a piece that may undermine that confidence. The titled "[All the Infrastructure a Tyrant Would Need, Courtesy of Bush and Obama](#)," notes — "More and more, we're counting on having angels in office and making ourselves vulnerable to devils."

Here's the key bit:



> Behold the items on an aspiring tyrant's checklist that [Bush and Obama] have provided their successors:
>
> - *A precedent that allows the president to kill citizens in secret without prior judicial or legislative review*
>
> - *The power to detain prisoners indefinitely without charges or trial*
>
> - *Ongoing warrantless surveillance on millions of Americans accused of no wrongdoing, converted into a permanent database so that data of innocents spied upon in 2007 can be accessed in 2027*
>
> - *Using ethnic profiling to choose the targets of secret spying, as the NYPD did with John Brennan's blessing*
>
> - *Normalizing situations in which the law itself is secret — and whatever mischief is hiding in those secret interpretations*
>
> - *The permissibility of droning to death people whose identities are [not even known to those doing the killing](#)*
>
> - *The ability to [collect DNA](#)  they haven't been convic...*



responsibly, what makes you

, of course, exactly why government power should be restrained. The mantra of government is "Trust us. We have the interests of the country at heart." That may be right, today. But weakening the checks on government power to make one bad person — a terrorist, or a drug dealer, or a murderer — go to prison, makes tyranny easier when the next enemy of the state is just a Muslim, a Mexican, or a journalist.

But you shouldn't create a system of laws for the best case scenario; you should create one to make sure the worst case scenario doesn't happen.

And it looks like we may have put too much trust in the right people in office, just as exactly the wrong guy may be about to waltz in there.

---

*Matt Kaiser is a white-collar defense attorney at KaiserDillon. He's represented stockbrokers, tax preparers, doctors, drug dealers, and political appointees in federal investigations and indicted cases. His twitter handle is @mattkaiser. His email is mkaiser@kaiserdillon.com He'd love to hear from you if you're inclined to say something nice.*

**48**
SHARES



**TOPICS**

Crime, Department of Justice, Donald Trump, Executive Orders, Orin Kerr, Politics, White-Collar Crime





App.0113

🇺🇸 **An official website of the United States government**
Here's how you know

Home › Campaign finance data › Browse data › Individual contributions

# Individual contributions

Viewing **49** filtered results for: Reset filters

| "Matthew Kaiser" | | Maryland |

| Contributor name | Recipient | State | Employer | Receipt date | Amount |
|---|---|---|---|---|---|
| KAISER, MATTHEW | BIDEN FOR PRESIDENT | MD | TMAC | 08/13/2020 | $100.00 |
| KAISER, MATTHEW | BIDEN FOR PRESIDENT | MD | KAISERDILLON PLLC | 08/05/2020 | $2,800.00 |
| KAISER, MATTHEW | ACTBLUE | MD | PRIVATE | 07/27/2020 | $25.00 |
| KAISER, MATTHEW | ACTBLUE | MD | PRIVATE | 07/11/2020 | $100.00 |
| KAISER, MATTHEW | BIDEN FOR PRESIDENT | MD | TMAC | 07/11/2020 | $100.00 |
| KAISER, MATTHEW | ACTBLUE | MD | PRIVATE | 06/13/2020 | $100.00 |
| KAISER, MATTHEW | BIDEN FOR PRESIDENT | MD | TMAC | 06/13/2020 | $100.00 |

| Contributor name | Recipient | State | Employer | Receipt date | Amount | |
|---|---|---|---|---|---|---|
| KAISER, MATTHEW | ACTBLUE | MD | PRIVATE | 05/15/2020 | $100.00 | |
| KAISER, MATTHEW | ACTBLUE | MD | PRIVATE | 04/20/2020 | $15.00 | |
| KAISER, MATTHEW | ACTBLUE | MD | PRIVATE | 04/14/2020 | $50.00 | |
| KAISER, MATTHEW | GINA ORTIZ JONES FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 10/24/2018 | $500.00 | |
| KAISER, MATTHEW | HEIDI FOR SENATE | MD | KAISER LEGRAND & DILLON | 10/18/2018 | $500.00 | |
| KAISER, MATTHEW | MCCASKILL FOR MISSOURI | MD | KAISER LEGRAND & DILLON | 10/18/2018 | $500.00 | |
| KAISER, MATTHEW | GILLIBRAND FOR SENATE | MD | KAISER LEGRAND & DILLON | 10/18/2018 | $500.00 | |
| KAISER, MATTHEW | DNC SERVICES CORP./DEM. NAT'L COMMITTEE | MD | ZUCKERMAN SPAEDER LLP | 09/30/2018 | $500.00 | |
| KAISER, MATTHEW | BETO FOR TEXAS | MD | KAISER LEGRAND & DILLON | 09/28/2018 | $500.00 | |
| KAISER, MATTHEW | LIZ FOR INDIANA | MD | KAISER LEGRAND & DILLON | 09/25/2018 | $500.00 | |
| KAISER, MATTHEW | DEBBIE FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | SUSIE LEE FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | XOCHITL FOR NEW MEXICO | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |

App.0115

| Contributor name | Recipient | State | Employer | Receipt date | Amount | |
|---|---|---|---|---|---|---|
| KAISER, MATTHEW | EASTMAN FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $1,000.00 | |
| KAISER, MATTHEW | EASTMAN FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | DR KIM SCHRIER FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | JESSE COLVIN FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | LAUREN UNDERWOOD FOR CONGRESS | MD | KAISERDILLON PLLC | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | LIZ FOR INDIANA | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | LIZ FOR INDIANA | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | ELIZABETH PANNILL FLETCHER FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | HALEY STEVENS FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | JESSICA MORSE FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | FRIENDS OF JAHANA HAYES | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | FRIENDS OF DANA BALTER | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |
| KAISER, MATTHEW | GINA ORTIZ JONES FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 09/10/2018 | $500.00 | |

App.0116

| Contributor name | Recipient | State | Employer | Receipt date | Amount | |
|---|---|---|---|---|---|---|
| KAISER, MATTHEW | LAUREN BAER FOR CONGRESS | MD | KAISERDILLON PLLC | 09/06/2018 | $500.00 | |
| KAISER, MATTHEW | CINDY AXNE FOR CONGRESS | MD | KAISERDILLON PLLC | 09/06/2018 | $500.00 | |
| KAISER, MATTHEW | CINDY AXNE FOR CONGRESS | MD | KAISERDILLON PLLC | 07/11/2018 | $500.00 | |
| KAISER, MATTHEW | LAUREN BAER FOR CONGRESS | MD | KAISERDILLON PLLC | 07/10/2018 | $500.00 | |
| KAISER, MATTHEW | ELIZABETH PANNILL FLETCHER FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 06/04/2018 | $500.00 | |
| KAISER, MATTHEW | FINKENAUER FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 06/04/2018 | $500.00 | |
| KAISER, MATTHEW | DEBBIE FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 06/04/2018 | $500.00 | |
| KAISER, MATTHEW | GINA ORTIZ JONES FOR CONGRESS | MD | KAISER LEGRAND & DILLON | 06/04/2018 | $500.00 | |
| KAISER, MATTHEW | KEN HARBAUGH FOR CONGRESS | MD | KAISERDILLON | 05/29/2018 | $250.00 | |
| KAISER, MATTHEW | ACTBLUE | MD | KAISERDILLON PLLC | 11/15/2016 | $100.00 | |
| KAISER, MATTHEW | HILLARY FOR AMERICA | MD | KAISERDILLON PLLC | 08/01/2016 | $2,700.00 | |
| KAISER, MATTHEW | HILLARY VICTORY FUND | MD | KAISERDILLON PLLC | 08/01/2016 | $2,700.00 | |
| KAISER, MATTHEW | OBAMA FOR AMERICA | MD | ZUCKERMAN SPAEDER LLP | 10/16/2008 | $200.00 | |

App.0117

| Contributor name | Recipient | State | Employer | Receipt date | Amount | |
|---|---|---|---|---|---|---|
| KAISER, MATTHEW | OBAMA FOR AMERICA | MD | ZUCKERMAN SPAEDER LLP | 09/30/2008 | $30.00 | |
| KAISER, MATTHEW | OBAMA FOR AMERICA | MD | ZUCKERMAN SPAEDER LLP | 01/27/2008 | $500.00 | |
| KAISER, MATTHEW | OBAMA FOR AMERICA | MD | ZUCKERMAN SPAEDER LLP | 01/04/2008 | $50.00 | |

Results per page:   50

Showing 1 to 49 of 49 entries

App.0118

 Gmail

Oliver Peer <oliver.peerfw@gmail.com>

---

## Fwd: Sataki Documentary

**Larry Klayman** <klaymanlaw@gmail.com>                           Mon, Oct 12, 2020 at 9:35 AM
To: Oliver Peer <oliver.peerfw@gmail.com>

---

---------- Forwarded message ---------
From: **Keya Dash** <keyadash@gmail.com>
Date: Sat, Aug 24, 2019 at 6:20 AM
Subject: Re: Sataki Documentary
To: Larry Klayman <leklayman@gmail.com>

Hi Larry,

It jumps right into some clips in Ellie's voice referring to VOA. They are kind of disjointed. The format is like an interview but you don't hear the questions, you only hear the answers. She never names you or refers to you. The only time she talks about lawyers she says no lawyer would take her case. It could be there are more parts that aren't included in this edit. Clearly this is heavily edited. I think the intended audience is the general Iranian public.

Following are the things she says.

She says when she's behind her desk and not posting attention she's getting harrassed. She says VOA is known to be the worst American government agencies, that the people there protect each other and they is a dirty setting.

She says that the show on VOA that she shared with Falahati was created by both of them but he often tried to make her go out with him which she didn't want to do. To go out with him would have been unprofessional because they were doing the show together and the relationship would affect the show. What if they'd argued one day and it was obvious to viewers they were going out?

The problem is that he didn't know how to accept no for an answer. She says she stopped showing up to work because each time he'd say tonight let's have coffee or tonight let's have dinner. She was exhausted for having to say no to him.

She says she complained to Susan, their executive producer, she told Susan that she doesn't know what more to do at this point, that he's taking liberties with her when she's behind the desk not paying attention. She asked Susan to privately handle the issue and Susan said that she couldn't, that Ellie needed to file a public complaint.

Two times, Fallahati came to her when she was behind the desk not paying attention and, she says the clothes that she was wearing and her bra strap--and then everything is bleeped out. She says she yelled at him--and it's bleeped again. She then says "unfortunately..."--and an echo effect is used before the sentence can be continued.

After a clip of her holding her head in her hand with music playing, she then resumes talking, dug that she laughed that no one saw, that she was seeing a psychiatrist, that she was not feeling good, and that that is all documented. She was going to a doctor and taking mood stabilizers.

Fallahati is a sick man and he didn't only harass Ellie. The system in VOA has problems. James d Chalangi supported her story, and he beared witness as to what happened. Another lady named Mahmunir also beared witness in her favor and incurred problems. Mr. Sajadi and Mr. Falahati were friends and at the time Sajadi had a lot of authority there. They were holding each other's hands (a Persian expression meaning helping each other, conspiring, working together in an effort) and Susan fell into their team.

No attorney would accept her case because her case had gotten very big. When the case for very big, when the issue became the board of governors, the board had to cover for itself. In defending themselves, they said Elham left and Fallahati stayed. As for Fallahati, she wasn't the only girl and there are a number of others.

I'm sorry for the delay. I've been traveling and didn't see the email.

Best,

App.0119

Keya

Thank you,

**Keya Dash**
 +1 (703) 963-7531
 +1 (703) 962-1707
 +1 (703) 962-1726
 keyadash@gmail.com

Sent from my iPhone

On Aug 21, 2019, at 1:40 PM, Larry Klayman <leklayman@gmail.com> wrote:

This is the video. Thanks Keya

---------- Forwarded message ---------
From: **Barbara Nichols** <ban@bogoradrichards.com>
Date: Wed, Aug 21, 2019 at 10:25 AM
Subject: Sataki Documentary
To: Larry Klayman <leklayman@gmail.com>

Larry,

The YouTube video at the link below is some kind of documentary about Ms. Sataki's case which was uploaded 11/5/2016, around the time you were gathering files and providing them to Bar Counsel. From the comments, I can see that she is discussing her case and from what I can tell she never mentions you but who knows. We were just wondering if you had a friend who could watch this and let us know what this is saying and if anything she said might be a "smoking gun" since the video is not in English.

https://www.youtube.com/watch?v=e3g5f61muZ4

<image002.png>

[Quoted text hidden]

App.0120

Whenever I am at my desk and I am not paying attention, he allows himself, to touch me under variety of pretexts.

<div align="center">(displaying Elham Sattaki's photo)<br>former broadcaster of VOA</div>

Mr. Falahati, Asal has written this for us,
Well: let us answer the first caller (by the name of - Translator) Hossein from Kerman.
Hello, go ahead please.

<div align="center">(displaying photo of Mehdi Falahati)<br>broadcaster for the VOA network<br>VOA: Voice of America</div>

Voice of America has been recognized as the worst entity of American government. Therefore, lots of such coteries and issues exist there. Everybody says that the atmosphere is of a security one.   Nobody can talk with anybody. Everybody makes insinuations against one another.   The environment is very dirty.
This week is second evening of being online with the subject of presidential elections in Iran and it's outcome, with your phone calls, emails and online weblogs and websites that Elham Sattaki will introduce to you.

Regarding Mr. Falahati: He repeatedly asked me to go out with him. I didn't want to do it. Mr. Falahati and I started the ONLINE show together and we were performing it together. Aside from other aspects, it was very unprofessional.

When two individuals appear on camera and conduct a show, going out on a date, since it can directly affect the show is not right. They may fight with each other and that will affect the show, and vice-versa. He was not the type of person that I would accept his offer, and say that, all right let's go on a date.

The problem was, he did not know how to take a no. After a while I reached to the point that I was always calling sick and did not go to work. Since I wanted to start working, and Mr. Falahati wanted to come to my desk and again ask me let's go have a coffee or have dinner.   And this no, and saying no to him repeatedly had become exhausting for me, had made me very tired.   I went to Suzanne who was our executive producer and told her the situation, that he (Mr. Falahati) does so. and I (Elham Sattaki) don't know what to do at this point.   Personally, I am not able to handle it.

The situation will go over the board of the status of going out for dinner, and he will come to my desk and while I am not paying attention, under various excuses touch me. Since I was afraid, I told her (Suzanne) that, can you handle it without anybody to know??   That day she told me that "Legally I cannot do it and you must formally file a complaint."

2

Mr. Falahati wanted to take revenge, since I complained and stated that the situation was so.  As I was behind my desk, twice he came to my desk (audio censored) the dress that I had on and my bra-cord.  I hollered at him (audio censored) he laughed and said "don't tell anybody."  I was not feeling well.
I was seeing psychiatrist. I was seeing psychologist. I was not feeling well. All the documents are available. Everything related (to this matter) exists. I was seeing doctor and the doctor was prescribing relaxing pills for me to take.

At this point, I am just saying, Mr. Falahati is a sick person that has not done so just with me, but the system of VOA has problem. Jamshid Chalangi testified for me. Look what happened? Mahmonir, another lady testified for me. She suffered a lot.  Mr. Ali Sajjadi and Mr. Falahati were friends.  At that time Mr. Sajjadi was very powerful there.  They all got together. And even Suzanne who was my executive producer and was mad from this incident, she teamed up with them.  And this caused the problem to be difficult for me, and no attorney was taking my case, because this case had become very big.  And when the case became so big, then the Board of Governors had to defend itself, and defending itself caused the case to become against me.  And they say that Elham left, Falahati stayed.  When they fired me, I was not the only girl. There are a number of others.

Caption dispalying Falahati and Sattaki with written scripts.

The law suit against Mehdi Falahati due to the VOA influence did not get to anywhere, and Elham Sattaki was fired from this network..
After a short period of time Jamshid Chalangi and Ms. Mahmonir Rahimi were fired from this network.

Display of Mehdi Falahati laughing loud.

Certified to be a true translation from the Farsi video and audio original

_____
Mohammad T Moslehi

State of __MD__ County of __Montgomery__
Subscribed and sworn before me on __9/12/20__
                                    (Date)
_____
(Notary Signature)

App.0122

DISTRICT OF COLUMBIA COURT OF APPEALS
BOARD ON PROFESSIONAL RESPONSIBILITY



ISSUED

Oct 20 2020 10:45am

Board on Professional
Responsibility

In the Matter of:                          :
                                           :
   LARRY E. KLAYMAN,                       :
                                           :  Board Docket No.17-BD-063
Respondent.                                :  Disciplinary Docket No. 2011-D028
                                           :
                                           :
A Suspended Member of the Bar of the       :
District of Columbia Court of Appeals      :
(Bar Registration No. 334581)              :
                                           :

<u>ORDER</u>

     Upon consideration of Respondent's Emergency Motion for Reconsideration of Order

of the Chair of the Board of Professional Responsibility and Motion to Stay Implementation of

the Report and Recommendation of the Board of Professional Responsibility of October 2,

2020, Until the Board Conducts a Thorough and Bona Fide Review of the Entire Record in this

Proceeding and Request for Internal Reviews, Disciplinary Counsel's Response thereto, and

Respondent's Reply to Disciplinary Counsel's Response, and it appearing that this matter is

now pending in the Court of Appeals,[1] and is no longer pending before the Board, it is hereby

     ORDERED that Respondent's Emergency Motion for Reconsideration of Order of the

Chair of the Board of Professional Responsibility and Motion to Stay Implementation of the

Report and Recommendation of the Board of Professional Responsibility of October 2, 2020,

---

[1] The Board's Report and Recommendation was filed with the Court of Appeals on October 2, 2020, and the Court has begun proceedings in this matter (*see* Order, *In re Klayman,* D.C. App. No. 20-BG-583 (Oct. 19, 2020) (directing Respondent to show cause "why the court should not enter an order of suspension pending final action on the Board on Professional Responsibility's recommendation.")).

Until the Board Conducts A Thorough and Bona Fide Review of the Entire Record in this

Proceeding and Request for Internal Reviews is denied as moot.

BOARD ON PROFESSIONAL RESPONSIBILITY

By: _____

Matthew G. Kaiser
Chair

cc:

Larry E. Klayman, Esquire
leklayman@gmail.com

And to:

Henry Clay Smith, III, Esquire
Assistant Disciplinary Counsel
Office of Disciplinary Counsel
smithc@dcodc.org

App.0124

 Gmail

Oliver Peer <oliver.peerfw@gmail.com>

---

## Fwd: DC Bar complaint

**Larry Klayman** <leklayman@gmail.com>                                    Fri, Nov 16, 2018 at 7:52 AM
To: Oliver Peer <oliver.peerfw@gmail.com>

---------- Forwarded message ---------
From: **Dykema, Rick** <Rick.Dykema@mail.house.gov>
Date: Mon, Oct 22, 2018 at 1:35 PM
Subject: RE: DC Bar complaint
To: Larry Klayman <leklayman@gmail.com>

Mr. Klayman—

 Kathleen Staunton says she had no involvement in the preparation of the complaint against you, and in fact had no knowledge of the complaint until she saw the information that you provided.

--Rick

Richard T. (Rick) Dykema

Chief of Staff/Legislative Director

Rep. Dana Rohrabacher

**From:** Larry Klayman <leklayman@gmail.com>
**Sent:** Monday, October 22, 2018 1:48 PM
**To:** Dykema, Rick <Rick.Dykema@mail.house.gov>
**Subject:** Fwd: Transcript

Sworn testimony from Sataki showing that Kathleen Staunton and her cousin Sam Razavi (a convicted felon) prepared the bar complaint for her.

There is much more testimony in this regard.

Pl call me asap as I need to speak with the congressman and obtain a sworn declaration as my initial brief is due this Friday.

Thank you,

App.0125

Larry Klayman, Esq.

310 595 0800

---------- Forwarded message ---------
From: **Oliver Peer** <oliver.peerfw@gmail.com>
Date: Mon, Oct 22, 2018 at 10:44 AM
Subject: Transcript
To: Larry Klayman <leklayman@gmail.com>

**CHAPMAN** UNIVERSITY | FOWLER SCHOOL OF LAW

ONE UNIVERSITY DRIVE
ORANGE, CALIFORNIA 92866
WWW.CHAPMAN.EDU

Ronald D. Rotunda
*The Doy & Dex Henley Chair and*
*Distinguished Professor of Jurisprudence*
Email: rrotunda@chapman.edu
(714) 628-2698 • Fax (714) 628-2576
http://www1.chapman.edu/~rrotunda/
www.ronaldrotunda.com

19 December 2016

Larry Klayman, Esq.
Klayman Law Firm
c/o 2020 Pennsylvania Ave., N.W.
#800
Washington, D.C. 20006

RE:   Bar Complaint of Oct. 20, 2011
VIA:   Email, leklayman@gmail.com

Dear Mr. Klayman:

You have asked me to evaluate the Office of Bar Counsel Complaint dated October 20, 2011. Despite the fact that it is dated about six years ago, you received it only recently. Perhaps that is because the Office of Bar Counsel (OBC) sent it to the wrong address. OBC may have sent it to 2000 Pennsylvania Ave. N.W., Suite 345, while your office is at 2020 Pennsylvania Ave, NW, Suite 345.

I have evaluated the OBC Complaint of Oct. 20, 2011, and discussed the matter with you. You should feel free to show this letter to the OBC if you wish.

A very surprising item about this complaint is that it was filed over five years ago about alleged events that occurred in December 2009 and shortly thereafter. The complainant, Elham Sataki, made similar complaints to the Pennsylvania Bar and the Florida Bar, both of which dismissed the complaint years ago. For some reason, the OBC sat on this complaint for years and now is resurrecting it.

Because of the passage of time — the reasons for this delay are unknown — relevant evidence cannot be found and memories fade.

> For example, you told me that you recall a phone voice mail from someone speaking in a belligerent tone who claimed to be speaking for Ms. Sataki. This person said that you should not contact her. You had been trying, unsuccessfully, to contact Ms. Sataki to see if she wanted to appeal, and you filed a notice of appeal

App.0127

- 2 -

to protect her rights. The union representative, who was representing Ms. Sataki in her employment dispute, also was unsuccessful in contacting her. Shortly after that, Ms. Sataki did so and you and her Union Representative, Mr. Shamble, did not pursue the appeal. You have moved since then and you are unable to find this voice mail. The tone and substance of this voice mail is very relevant to the complaint, but it no longer exists (or, you cannot find it) because of the passage of time.

The caselaw shows that OBC is subject to laches. In *Florida Bar v. Rubin*, 362 So.2d 12 (Fla. Sup. Ct. 11978)(per curiam), the Florida supreme court threw out charges because the prosecutor because of the Bar's delay in violation of the Florida rules.[1] One can summarize this case as the Bar delaying finalization of two cases (where the Bar was disappointed with the recommended discipline) because it was confident it would secure a conviction in a third case still in the pipeline in the hope of securing greater overall discipline. The Court said,

> Whatever other objects the rule may seek to achieve, it obviously contemplates that *the Bar should not be free to withhold a referee's report which it finds too lenient until additional cases can be developed* against the affected attorney, in an effort to justify the more severe discipline which might be warranted by cumulative misconduct. The Bar's violation of the prompt filing requirement in this case, to allow a second grievance proceeding against Rubin to mature, is directly antithetical to the spirit and intent of the rule. In addition, it has inflicted upon Rubin the "agonizing ordeal" of having to live under a cloud of uncertainties, suspicions, and accusations for a period in excess of that which the rules were designed to tolerate.

*The Florida Bar v. Rubin*, 362 So. 2d 12, 15 (footnotes omitted)(emphasis added). As *Rubin* concluded, "The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct." 362 So. 2d 12, 16.

*Rubin* is no judicial orphan. Later, *The Florida Bar v. Walter*, 784 So. 2d 1085, 1087 (Fla. Sup. Ct. 2001) ruled that a *seven-year interim* between the lawyer's alleged misconduct and the filing of the Bar's complaint, makes "it 'unjust or unfair' to require Walter [the lawyer] now to answer the Bar's charges in this matter. That the Bar may have diligently pursued Chesnoff's statement does not render this seven-year interim a "reasonable time," especially considering that

---

[1]    "On January 6, 1978 fourteen months after the Bar received referee White's report and eight months after it had received referee Carey's the Bar filed both referees' reports with the Court." "Referee White's report, which recommended a public reprimand, was not filed with us until fourteen months after its receipt by the Bar. Rubin contends that this filing clearly was not prompt, and that the Bar's violation of the rule denies him due process" *The Florida Bar v. Rubin*, 362 So. 2d 12, 14 (Fla. 1978)(footnote omitted).

App.0128

- 3 -

the delay is not attributable to Walter." The court ruled that the lawyer does not have "to defend against the Bar's charges after so many years have passed."[2]

See also, *In re Grigsby*, 815 N.W.2d 836 (Minn. 2012), concluding that a discipline prosecutor's failure to charge out a matter for an unreasonably long time violates the ethics rules. *Grigsby* involved a case where the lawyer did not even dispute the facts, and the lawyer's violations were "obvious," yet the court rejected the disciplinary hearing:

> Finally, it is also worth noting the procedural irregularities in this discipline matter. Grigsby was suspended for 60 days on April 16, 2009. Grigsby's single instance of misconduct resulting in this disciplinary proceeding took place sometime during April and May 2009, and the Assistant County Attorney informed the Director of it on June 3, 2009. T*he facts of this case are simple and undisputed, Grigsby's violations are obvious*, and Grigsby complied with the Director's investigation. The Director *did not file a petition for disciplinary action until May 31, 2011, 727 days after notice of the misconduct*. Because Grigsby, understandably, did not seek readmission while under investigation for practicing law while suspended, he has effectively been suspended from the practice of law since April 16, 2009, or for over 3 years. The purpose of any disciplinary proceeding, as noted earlier, is to protect the public; *the delay here tends to weaken the Director's argument that protection of the public requires a reinstatement hearing* and we decline to do so notwithstanding the legitimate concerns discussed earlier.

*In re Disciplinary Action against Grigsby*, 815 N.W.2d 836, 846–47, 2012 WL 2814088 (Minn.), *reinstatement granted sub nom. In re Disciplinary Action Against Grigsby*, 822 N.W.2d 291, 2012 WL 5355573 (Minn. 2012)(emphasis added).

In evaluating Minnesota cases, William J. Wernz, Minnesota Legal Ethics: A Treatise (6th ed. 2016) reviews the cases concludes that the Office of Bar Counsel is subject to a "Special Promptness Requirement?" Rule 3.2 of the Rules of Professional Conduct applies to Bar Counsel and that "general delay in investigation" could violate Rule 3.2.[3]

---

[2]    Cited and quoted with approval in, *The Florida Bar v. Kane*, 202 So.3d 11, 19 (Fla. Sup. Ct. 2016):

> The Court has made clear that the Bar has an obligation to process disciplinary cases in a fair and just manner. *See Fla. Bar v. Rubin*, 362 So.2d 12, 16 (Fla.1978) ("The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct.").

[3]    Wernz, Minnesota Legal Ethics; A Treatise 779-80, § II(D) (2016).

- 4 -

Rule 3.2 ("Expediting Litigation"), Model Rules of Professional Conduct, corresponds to Rule 3.2 of the D.C. Rules of Professional Conduct. As Comment 1 to the D.C. Rules asks, "The question is whether a competent lawyer acting in good-faith would regard the course of action as having some substantial purpose other than delay."[4]

In this case, OBC should explain why any competent Bar Counsel, acting in good faith, would regard the delay of 6 years since the complaint was filed and 7 years since the alleged violation occurred would this delay "as having some substantial purpose other than delay." Why has OBC waited so long?

In Indiana, when the Bar Counsel did not act with reasonable promptness, the Court imposed a new rule making clear what states like Minnesota and Florida thought were already clear. Rule 23, Disciplinary Commission and Proceedings now provides, Section 10(h):

> *Limitation on time to complete investigation.* Unless the Supreme Court permits additional time, any investigation into a grievance *shall be completed and action on the grievance shall be taken within twelve (12) months from the date grievance is received* (or the date a response is demanded to a Disciplinary Commission grievance). The purpose of the deadline is to enable the Supreme Court to promote a fair and efficient process and not to create substantive or procedural rights. Requests for additional time shall be submitted to the Supreme Court and shall briefly describe the circumstances necessitating the request. No response or objection shall be allowed. Delays caused by a respondent's noncooperation or requests for extensions of time, and periods during which the respondent is suspended from practice, shall not be counted toward the 12-month period. *If the Disciplinary Commission does not file a Disciplinary Complaint within this time, the grievance shall be deemed dismissed.*[5]

The Virgin Islands also recognizes laches applied to Bar Counsel. No "legal authority precludes this Court or the EGC from applying the common law doctrine of laches to a grievance. 'Laches, an equitable defense, is distinct from the statute of limitations, a creature of law,' and precludes an action if 'an omission to assert a right for an unreasonable and unexplained length of 'time and under circumstances prejudicial to the adverse party.' Thus, "[l]aches ... may be found even if the applicable statute of limitations has not yet run." *In Matter of Joseph*, 60 V.I. 540, 558–59, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014)(internal citations omitted). Thus, the "laches defense may apply to attorney discipline proceedings in certain very narrowly defined circumstances, such as when the delay in instituting the disciplinary proceedings results in prejudice to the respondent." *Id.*

---

[4]     http://www.dcbar.org/bar-resources/legal-ethics/amended-rules/rule3-02.cfm

[5]     http://www.in.gov/judiciary/files/order-rules-2016-1103-adm-disc.pdf (last two emphases added).

App.0130

- 5 -

That is what is occurring hear because memories have faded and some evidence cannot be found. The evidence collected by the Pennsylvania and Florida Bars — both of which dismissed the complaint — no longer exists. Perhaps the D.C. Bar has some evidence, but it has not given it to Mr. Klayman. One of the papers in the files the D.C. Bar refers to a draft complaint and an opinion from a lawyer who practices in the employment area, but neither the Bar Counsel nor the expert have reviewed all of the relevant files and documents of Ms. Sataki's case. Mr. Klayman has sent you a copy.

The Virgin Islands Supreme Court sets out a test that *presumes* prejudice in a case like this: "we shall only presume prejudice with respect to the laches defense when there is a substantial delay in the initiation of disciplinary proceedings." *In Matter of Joseph*, 60 V.I. 540, 559, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014). Here there is a substantial delay.

See also, *id., Joseph, id.,* citing, *In re Wade*, 814 P.2d 753, 764 (Ariz. 1991); *In re Siegel,* 708 N.E.2d 869, 871 (Ind. 1999) ("There may be factual situations in which the expiration of time destroys the fundamental fairness of the entire proceeding."); *Anne Arundel County Bar Ass'n, Inc. v. Collins,* 325 A.2d 724, 728 (Md. 1974) (laches applicable to attorney discipline proceedings if "prejudice or circumstances making it inequitable to grant the relief sought"). *Tennessee Bar Ass'n v. Berke,* 344 S.W.2d 567, 571–72 (Tenn. 1961) (dismissing disciplinary proceedings for laches when grievance filed nine years after alleged misconduct occurred with no explanation for the delay and respondent was not responsible for the delay). *In Matter of Joseph,* 60 V.I. 540, 559, 2014 WL 547513, at *7 (V.I. Feb. 11, 2014).

Similarly., in *Hayes v. Alabama State Bar,* 719 So. 2d 787, 791 (Ala. 1998), the State Bar suspended lawyers convicted of misdemeanors for "serious crimes" and charged them with additional rules infractions. The Supreme Court held, inter alia, that the State Bar's delay in pursuing remaining formal charges following resolution of criminal proceedings warranted dismissal.[6]

---

[6]     *Hayes v. Alabama State Bar,* 719 So. 2d 787, 791, 1998 WL 321956 (Ala. 1998)(footnote omitted)(emphasis added):

In *Noojin [Noojin v. Alabama State Bar,* 577 So.2d 420 (Ala.1990),], this Court examined an attorney's contentions that the Alabama State Bar had erred in delaying disciplinary proceedings against him. It held that the culmination of a federal criminal matter was not "good cause" for *delaying disciplinary proceedings for nearly a year,* and it barred the Alabama State Bar from proceeding on the charges pending against the attorney. As in *Noojin,* we consider in the present case whether the Bar had "good cause" to defer or delay the disciplinary proceedings against the attorneys. Rule 14, Ala.R.Disc.P. The Bar asserts that it "stayed" the proceedings on the formal charges based on the attorneys' alleged attempts to obtain discovery for their criminal cases. Aside from this assertion, the Bar has not attempted to provide a reason for its continued delay in regard to the formal charges against the attorneys.[5] Therefore, if we accept the Bar's only explanation of "good

App.0131

- 6 -

Let me now leave the subject of laches and turn to the actual complaint, filed in 2011. Ms. Sataki makes several complaints.

FIRST, she claims that Mr. Klayman was not competent to handle her case and thus violated RULE 1.1. Pennsylvania and Florida have already rejected that claim. In addition, Ms. Sataki has never filed any lawsuit claiming that there was malpractice or sexual harassment by Mr. Klayman. She also claims that he used incorrect procedures and failed to make deadlines. She does not indicate what deadlines he missed. He did tell me that he filed a notice of appeal to protect her rights when she did not bother to respond to his requests asking her if she wanted to appeal. Her union representative also could not get in contact with her. Eventually, she bothered to respond and ordered him and Mr. Shamble (her Union Representative) not to pursue appeals, so they complied. If an error was made below, the normal way we correct it is by appeal.

The OBC says that it has an opinion by a lawyer as to the alleged malpractice, but OBC has not disclosed it to Mr. Klayman so neither he nor anyone else could answer it. OBC also says that it has a complaint, which suggests OBC has prejudged the matter, by showing its complaint to someone who is not part of the Office of Bar Counsel.

SECOND, she claims Mr. Klayman violated RULE 1.3 by revealing information to the public that was not secret client information and not confidential client information. Mr. Klayman told me that when he wrote to talked about the case it was only after his client's prior permission. She and Mr. Shamble thought that publicity would help her case by encouraging the Voice of America to settle rather than suffer bad publicity.

THIRD, she claims that Mr. Klayman did not disclose the fee until several months after the case began, and thus violated RULE 1.5. Mr. Klayman tells me that he did disclose the fee when they first talked about the case. The fee was zero — he did it as a pro bono matter. Several months later, when the case got more difficult than either of them expected, he told the client that he would have charge a fee. Or, of course, she would retain another lawyer and he could transfer the files to that other lawyer. She chose not to hire a new lawyer and he proposed a contingent fee. She never signed a fee agreement because she was hard to contact and the case ended at her request. He never charged her any fee.

FOURTH, she claims a violation of RULE 1.6, by disclosing client confidences. Mr. Klayman has told me that he had her permission before he disclosed anything. She and her Union

---

cause" for delay, there remains a period of over a year, from February 14, 1997, to now, during which the Bar has taken no action to proceed on the merits of the formal charges. Under our *Noojin* analysis, we find that this delay in proceeding on the remaining formal charges is excessive. Therefore, because of the inordinate delay on the part of the Bar in pursuing the remaining formal charges against the attorneys, those charges are dismissed.

App.0132

- 7 -

Representative, Mr. Shamble, thought that publicity would help her case, and she was probably right — although not pursuing an appeal undercut her case.

FIFTH, she claims that Mr. Klayman violated RULE 1.7 because he used her case for his purposes. Leaving aside the rather vague nature of those charges, Mr. Klayman says that his only motivation was to help her as a friend because she was in trouble and had other problems. He would be willing to disclose these other problems to you if Ms. Sataki waives her attorney-client privilege. After all, we do not want a situation where the OBC seeks to discipline Mr. Klayman in this case because he used what the OBC later claims is information protected by Rule 1.6. Since Mr. Klayman will not be talking to Ms. Sataki about this case, the OBC should ask for this waiver.

Sixth, Ms. Sataki says Mr. Klayman violated RULE 3.3 because he was dishonest in telling people he was her lawyer when he was not her lawyer. Mr. Klayman has told me that he never told people he was her lawyer after she discharged him. He (and her union representative) tried to contact her unsuccessfully to ask her if he wanted to appeal. Her complaint[7] says that her brother told Mr. Klayman to terminate the representation, but the caller did not identify himself as her brother, Mr. Klayman would not recognize the brother's voice, and her brother did not represent that he was her agent with authority.[8]

I am troubled that the OBC has sat on this case for nearly six years and another one involving Mr. Klayman for nearly eight years. In my view, the complaint of Oct. 20, 2011 should be dismissed, particularly under these circumstances. The OBC has not even asserted that it learned something in the intervening years to justify reopening this old complaint.

Sincerely,

Ronald D. Rotunda
Doy & Dee Henley Chair and Distinguished Professor of Law

---

[7]     I refer to the complaint as "her complaint" but I do not mean to imply that she wrote it. Mr. Klayman tells me that when he knew her, her English was not good enough to draft a complaint like this one.

[8]     Mr. Klayman has met her brother once, but does not know him well enough to recognize her voice, and he has met her mother once. Both times, he met them at the residence of Ms. Sataki, because the mother and the brother invited him — they wanted to meet the lawyer who was representing their sister/daughter. Ms. Sataki claims that he showed up "unannounced." If she is telling the truth it is only because she did not talk to her brother or mother on this matter.



RECEIVED

June 13, 2018

Board on Professional
Responsibility

**Date:** May 30, 2018

**Case:** In The Matter Of: Larry E. Klayman



Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

In The Matter Of: Larry E. Klayman
May 30, 2018

Page 1

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - - X

In the Matter of,               : Board Docket No.

LARRY E. KLAYMAN,               : 17-BD-063

              Respondent.    :

- - - - - - - - - - - - - - - - X

              Wednesday, May 30, 2018

              Washington, DC


              HEARING


Reported by

   Kim M. Brantley, C.S.R.

In The Matter Of: Larry E. Klayman
May 30, 2018

|  | Page 2 |
|---|---|
| 1 | Hearing, taken at the Board on Professional |
| 2 | Responsibility, 430 E Street, NW, Washington, DC, |
| 3 | commencing at 9:28 a.m., before the Ad Hoc Hearing |
| 4 | Committee, and before Kim M. Brantley, C.S.R., a |
| 5 | Court Reporter and Notary Public in and for the |
| 6 | District of Columbia, when were present on behalf |
| 7 | of the respective parties: |
| 8 | |
| 9 | APPEARANCES: |
| 10 | AD HOC HEARING COMMITTEE: |
| 11 | WARREN ANTHONY FITCH, ESQUIRE |
| 12 | Chair |
| 13 | MS. MARY LARKIN |
| 14 | Public Member |
| 15 | MICHAEL TIGAR, ESQUIRE |
| 16 | Attorney Member |
| 17 | |
| 18 | On behalf of the DC Attorney Disciplinary |
| 19 | System: |
| 20 | H. CLAY SMITH, III, ESQUIRE |
| 21 | |
| 22 | |

|  | Page 4 |
|---|---|
| 1 | I N D E X |
| 2 | OPENING STATEMENTS:          PAGE: |
| 3 | By Mr. Smith              36 |
| 4 | By Mr Sujat               42 |
| 5 | By Mr. Klayman            49 |
| 6 | |
| 7 | WITNESS:          DIRECT: |
| 8 | Ms. Elham Sataki      69 |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES CONTINUED: |
| 2 | On behalf of Respondent: |
| 3 | FREDERICK J. SUJAT, ESQUIRE |
| 4 | Law Office of Frederick J. Sujat |
| 5 | 1525 Windjammer Way |
| 6 | Hollywood, Florida 33019 |
| 7 | (954) 815-5221 |
| 8 | Email: fsujat@yahoo.com |
| 9 | ALSO PRESENT: |
| 10 | LARRY E. KLAYMAN, ESQUIRE |
| 11 | Respondent |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

|  | Page 5 |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (In the Matter of Larry E. Klayman, Bar |
| 3 | Docket No. 2011-D028.) |
| 4 | CHAIRMAN FITCH: This matter is before |
| 5 | a hearing committee pursuant to Rule XI of the DC |
| 6 | Court of Appeals governing attorney practice in |
| 7 | the District of Columbia. |
| 8 | I'm Tony Fitch. I'm the Chair of this |
| 9 | ad hoc hearing committee. |
| 10 | I'd like to swear the court reporter at |
| 11 | this time, if I may. |
| 12 | (Court Reporter sworn.) |
| 13 | CHAIRMAN FITCH: Let me ask the |
| 14 | members, other members of the hearing committee, |
| 15 | to introduce themselves, please. |
| 16 | MS. LARKIN: Hi, I'm Mary Larkin. |
| 17 | MR. TIGAR: Good morning. I'm Michael |
| 18 | Tigar. |
| 19 | CHAIRMAN FITCH: This hearing will be |
| 20 | an adversary proceeding to determine whether |
| 21 | discipline should be imposed on the Respondent. |
| 22 | All proceedings before the hearing |

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 6 | Page 8 |
|---|---|
| 1 committee are, by rule, open to the public. | 1 perfectly ok on counsels' table. |
| 2     In this proceeding the witnesses will | 2     I imagine this morning we'll take one |
| 3 be examined under oath or affirmation. | 3 break.  But again, any time anybody wants to have |
| 4     May I have those present at counsel | 4 a break for one reason or another, stretch one's |
| 5 table introduce themselves, please. | 5 legs for three minutes, or deal with some pressing |
| 6     MR. SMITH:  Clay Smith, on behalf of | 6 matter for a few minutes, just speak up.  It's |
| 7 the Office of Disciplinary Counsel. | 7 really not a problem whatsoever. |
| 8     MR. SUJAT:  Good morning, your Honor. | 8     Even though I hope to take only one |
| 9 My name is Frederick Sujat. | 9 break this morning, I myself tend toward a bit of |
| 10     CHAIRMAN FITCH:  Counsel for -- | 10 a late lunch, like shooting toward 1:00 o'clock. |
| 11     MR. SUJAT:  Counsel for Mr. Klayman, | 11 It just makes the afternoon a little bit easier. |
| 12 the Respondent. | 12     But again, it doesn't make any |
| 13     CHAIRMAN FITCH:  We haven't previously | 13 difference to me whether we break at noon or break |
| 14 met.  It's nice to meet you. | 14 at 12:30 or break at 1:00 or anything else.  I'm |
| 15     MR. KLAYMAN:  And I'm Larry Klayman, | 15 open to hearing suggestions from anybody at the |
| 16 the Respondent, and currently serving in | 16 appropriate time for any reason. |
| 17 transition to Mr. Sujat as co-counsel.  As your | 17     Mr. Smith, do you have any preliminary |
| 18 Honor has noted on one of his orders, it's | 18 matters? |
| 19 perfectly ok. | 19     MR. SMITH:  No, no preliminary matters |
| 20     CHAIRMAN FITCH:  We'll turn to | 20 from Disciplinary Counsel. |
| 21 preliminary matters, if we may.  Putting aside for | 21     CHAIRMAN FITCH:  Respondent's team, |
| 22 just a moment any supplicant matters, I anticipate | 22 preliminary matters? |

| Page 7 | Page 9 |
|---|---|
| 1 and hope that we'll go pretty close to 5:00 | 1     MR. KLAYMAN:  Yes, your Honor. |
| 2 o'clock today, if that's of any help in people's | 2     I'm introducing Mr. Sujat, but, because |
| 3 planning, and I could be tempted to go even | 3 we're in transition, I just met with Mr. Sujat for |
| 4 somewhat later. | 4 the first time yesterday.  He lives in Florida. |
| 5     If anyone has any problems with that, | 5 I'm spending most of my time in California these |
| 6 one should not hesitate to speak up, and that will | 6 days, and consequently, because your Honor and the |
| 7 simply be the end of that possibility. | 7 hearing committee wanted to proceed this week with |
| 8     Tomorrow I may need to leave a bit | 8 Ms. Sataki, we would ask, you know, once the |
| 9 early, and so that consideration is what underlies | 9 petitioner presents its case, that there be time |
| 10 my thought that I might want to go a little bit | 10 for Mr. Sujat to be able to prepare with me to go |
| 11 later this evening, depending upon how the | 11 through all the different exhibits, which he |
| 12 evidence is flowing and how schedules are looking. | 12 hasn't had a chance to do yet. |
| 13 It's pleasantly cool in here right now. | 13     He has gone through the Specification |
| 14 It's a little muggy outside, I couldn't help but | 14 of Charges and preliminary matters, but we would |
| 15 notice.  I'm happy for things to be fairly | 15 need time, and I would propose that this hearing |
| 16 informal.  This room has at times gotten a bit | 16 be reconvened at the time that we talked about in |
| 17 warm, and if counsel want to doff their coats, | 17 July, July 2nd, to give him time. |
| 18 that's perfectly all right.  We may do the same. | 18     I need time also to get Mr. Sporkin up |
| 19     In fact I have no problem whatsoever | 19 to speed, Judge Sporkin.  I have met with him, but |
| 20 with business casual as well as business dress. | 20 he needs time to digest all the documents. |
| 21 It's entirely up to the individuals. | 21     There are allegations, based upon the |
| 22     Coffee and water and so on are | 22 expert here, that, you know, I didn't have a |

3  (Pages 6 to 9)

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 10 | Page 12 |

**Page 10**

1  reasonable chance of winning this case, and also
2  dealing with other issues that we've gone through
3  before.  I'm not going to belabor that, but
4  consequently we need time, respectfully, for Mr.
5  Sujat to get up to speed, and consequently, for
6  that reason, we would ask that the hearing be
7  adjourned after they present their case and then
8  reconvened at a point that's mutually agreeable to
9  the different parties.
10      CHAIRMAN FITCH:  I think that
11  adjourning for a few days at the end of
12  Disciplinary Counsel's case is at least
13  tentatively anticipated probably by everybody, and
14  tentatively and implicitly -- maybe explicitly
15  anticipated as a possibility in the hearing
16  committee's order last week.
17      So, we will address that.  I think it's
18  probably best addressed say at the beginning, as I
19  mentioned in the order, at the beginning of Friday
20  afternoon's session where you will have had a
21  couple, two and a half days of proceedings.
22      We will have some idea where we are if

**Page 12**

1  involves some issues of an allegation that I
2  sought a romantic relationship with the
3  complainant.
4      If I am compelled to do
5  cross-examination, I want to make it clear that
6  I'm serving as both a lawyer and as a Respondent
7  and as a witness.
8      I don't want to seem like I'm being
9  heavy handed, you know, in a case like this where
10  that issue is out there with a woman, which I
11  respect.  As I said, Gloria Allred is a friend of
12  mine.
13      So consequently, that's why we need the
14  additional time, in part, because I've got to get
15  Mr. Sujat up to speed, and I don't think, even
16  though this is a judge-tried case in a way, that
17  it puts me at a disadvantage in having to be very
18  assertive with Ms. Sataki, because I'm looking --
19  in terms of demeanor and everything else, and it
20  gets melded together.
21      So I would hope that we'd have more
22  time than just a few days after this case ends.

**Page 11**

1  we address it at the beginning of Friday
2  afternoon's session and then have -- by then
3  Disciplinary Counsel's case might be over with.  I
4  don't know.
5      But even if we proceed on Friday
6  afternoon addressing that issue, at the beginning
7  of Friday afternoon we will give everybody a
8  little time to have some noodling time over that,
9  even though other work will be going on as well.
10      So that's the way we're going to
11  proceed.
12      There probably won't be any need for
13  it, but there will be a rule on witnesses in this
14  matter, and it is entirely the obligation of
15  counsel to check and be sure that the rule on
16  witnesses is being complied with.
17      Mr. Smith, do you want to do an opening
18  statement?
19      MR. KLAYMAN:  Your Honor, may I raise a
20  few other things?
21      CHAIRMAN FITCH:  Oh, sure.
22      MR. KLAYMAN:  Ok.  This is a case which

**Page 13**

1  If you can't do it until early July, you know,
2  when initially you were all free, then at least a
3  couple of weeks to regroup so I can go through
4  everything with him and get Mr. Sporkin up to
5  speed, Judge Sporkin up to speed, too.
6      As you know, regrettably, Professor
7  Rotunda died recently.  There is expert testimony
8  being provided by the petitioner here, and it's
9  important that I have my expert, as well.  It's
10  just a matter of fairness and due process.
11      Then there is another issue here is
12  that, the witness that's listed by Mr. Smith, the
13  petitioner, the investigator, Kevin O'Connor, I
14  have no idea what he's going to say, and all it
15  says is he's testifying with regard to publicity.
16      Any of his testimony is most likely
17  hearsay, rank hearsay.  He wasn't involved in this
18  matter.  What he allegedly learned he learned in
19  talking to people.
20      So I would request an opportunity to be
21  able to depose Mr. O'Connor to see where he's
22  going to testify to prevent unfair surprise,

4  (Pages 10 to 13)

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 14 |
| --- |

1  because I just don't know where he's going on
2  this.
3         So, those are some issues up front and
4  the hiatus would give me an opportunity to learn
5  more about what he's going to say so I can prepare
6  and Mr. Sujat can prepare.  Because we have no
7  idea what he's going to say.
8         The statement on the witness list says,
9  "Mr. O'Connell, an investigator employed by the
10  Office of Disciplinary Counsel, will testify about
11  his investigation and Respondent's published
12  articles concerning his representation of Ms.
13  Sataki."  I mean, that's all going to be hearsay
14  testimony, your Honor, and we don't know anything
15  about that testimony.  It just doesn't seem to
16  make sense that he'd be testifying about that.
17         So, we need that time, and it's
18  important, because, as I said, I retained Mr.
19  Sujat recently and I had been looking for counsel
20  and we had interim cases.  It wasn't that it was
21  delayed because I was looking for counsel, but I
22  needed to find somebody who, at low cost, could

| Page 15 |
| --- |

1  represent me, because I can't afford, you know,
2  $2- $350,000 in legal fees here.
3         So, that's very, very important.  I
4  wanted to stress that.
5         And then, of course, we'll have to,
6  based on the testimony, you know, schedule our
7  witnesses and such.
8         Your Honor has given us until Friday
9  with regard to remote testimony, and we'll comply
10  with that order and give you a motion on that.
11         So I just ask for flexibility here on
12  fairness and due process, and equal protection.
13         So, that's my suggestion, and it's
14  difficult -- as you know, I've been a lawyer for
15  40 years, been in good standing with the Bar for
16  that period of time, and other bars.  It's hard to
17  be co-counsel and a Respondent at the same time.
18  It creates an inherent conflict and, you know, I'm
19  appearing in two different roles, which can be
20  misinterpreted --
21         CHAIRMAN FITCH:  If I may --
22         MR. KLAYMAN:  If you know what I mean.

| Page 16 |
| --- |

1         CHAIRMAN FITCH:  If I may address these
2  points: with respect to your point about
3  cross-examination, I've determined, with a
4  reasonable degree of assurance, that there's no
5  one sitting behind this table with me who is a
6  shrinking violet, and I think we know that
7  cross-examination needs to be very explorative
8  many, many times.
9         Any kind of cross-examination, and I
10  speak as a former witness, can be unpleasant, and
11  some cross-examinations are more difficult for the
12  witness and for counsel than others.
13         So, you can rest assured that your
14  proper cross-examination, even if intensive, is
15  not going to be curtailed so long as it is
16  reasonable in length, and we certainly expect that
17  a good deal of latitude will be provided in that
18  regard.
19         With respect to the expert witness, I
20  think I've addressed that already.  We'll be able
21  to revisit that on Friday afternoon, or before, if
22  people want to.  Again, it's perfectly all right.

| Page 17 |
| --- |

1         With respect to the investigator's
2  testimony, we'll have to see what the investigator
3  has to say.  If it's hearsay, we'll have to take
4  that into consideration under the rules, but the
5  rules in large part prohibit me from excluding
6  hearsay testimony.
7         I didn't write the rules, I may not
8  like the rules, but that is the rule, broadly,
9  broadly speaking, and with possible exception of,
10  in some circumstances, what's provided for in
11  another rule, and I'm referring in particular to
12  Rule XI.3 and the possible effect of Rule XI.3, of
13  Rule VII.16(a).
14         With respect to remote testimony, we'll
15  get there when we get there on Friday.
16         It would be preferable to receive that
17  motion, if it is to be filed, before we adjourn on
18  Friday.  I'm not sure I can force you to do that,
19  given my order.  I should have thought about that
20  at the time, but in addition to receiving the
21  motion, all of us might want to hear more argument
22  on that motion, and you might want to comment on

In The Matter Of: Larry E. Klayman
May 30, 2018

|  | Page 18 |
|--|---------|

1   that motion.
2        If we don't get that motion until after
3   we adjourn, we either come back on Monday, or we
4   have more argument. So I have to leave that to
5   you.
6        I should have thought that out a little
7   bit more beforehand. I apologize.
8        Mr. Smith, opening statement.
9        MR. SMITH: Yes, but before I do that,
10  there was one preliminary matter I wanted to bring
11  to the hearing committee's attention.
12       Last Thursday afternoon I received from
13  my witness, Ms. Sataki, a compendium of emails
14  that I had not previously been given from her
15  which reflect what was taking place during the
16  course of the period in issue before us. These
17  are emails that were exchanged between herself and
18  Mr. Klayman.
19       After my secretary had prepared them
20  and put them in one package Friday morning, I
21  emailed them to Respondent's counsel. And, out of
22  a spirit of cooperation -- and certainly I'm sure

|  | Page 19 |
|--|---------|

1   that the Respondent and his counsel were
2   surprised, as I was, to receive these emails.
3   They are relevant to these proceedings, and I
4   guess I should ask the hearing committee for some
5   guidance with respect to whether or not these
6   documents may be received during our case in chief
7   or whether it's something that the committee wants
8   to think about.
9       But I have with me the emails that I
10  received, the cover letter at least, and our
11  transmittal of the documents to Respondent and his
12  counsel, forwarded to Respondent's counsel on
13  Friday. I have taken copies and given them
14  supplemental exhibit numbers, and I'm sure that
15  Respondent has something to say about all that,
16  and, you know, I'd be happy to respond, but at
17  this point I do have copies of the cover email to
18  let him know if --
19       Do you need to see these?
20       CHAIRMAN FITCH: Well, one thing
21  Respondent knows that I don't know is what
22  quantity of material we're talking about.

|  | Page 20 |
|--|---------|

1       MR. SMITH: I have taken the liberty of
2  putting them together and we have selected 38 that
3  we would like to have introduced at some point.
4       Again these documents are email
5  exchanges between Respondent and Ms. Sataki, so he
6  presumably is aware of them as he authored many of
7  them.
8       Some of the documents that we received
9  were duplicative and, you know, were already part
10  of our exhibits, but there were others that were
11  clear copies of things that we had and others that
12  showed email exchange in place of some of the
13  conversations in context.
14       MR. KLAYMAN: If I may respond.
15       CHAIRMAN FITCH: You may of course.
16  But give me one minute.
17       (Brief pause.)
18       CHAIRMAN FITCH: I'll hear from the
19  Respondent's team.
20       MR. KLAYMAN: Your Honor, as we set
21  forth previously, we believed that we hadn't been
22  provided all of the documentation that Bar Counsel

|  | Page 21 |
|--|---------|

1   had or had access to timely, and this confirms it.
2   I'll get to what Mr. Smith is talking about now,
3   but before that he also sent to Mr. Sujat, late
4   last week, a thumb drive that contains
5   correspondence between me and Bar Counsel.
6       Now this case is eight years old. As
7   I've said before a lot of information was
8   discarded or lost. A lot of evidence was
9   discarded or lost. And that's why I asked for all
10  these communications. I thought the case had been
11  dismissed because both Florida and Pennsylvania
12  had dismissed it eight years ago, and didn't keep
13  that stuff.
14       We didn't get a thumb drive until last
15  Friday. And then, knowing that I was in
16  California and I'm the one who is knowledgeable
17  about this case, not Mr. Sujat -- he hadn't been
18  even brought up to partial speed at that time --
19  it was sent to him. So I didn't get it until
20  Saturday morning, and I haven't had a chance to
21  look at all of that stuff yet.
22       But these emails, to come in at the

6 (Pages 18 to 21)

In The Matter Of:  Larry E. Klayman
May 30, 2018

---

Page 22

1  last minute.  And in fact Bar Counsel claims that
2  they got it on the 24th.  They could have filed a
3  motion last week in terms of having this material
4  used.  It catches us by surprise and I would ask
5  that it be excluded, because the witness lists
6  have been provided, the exhibit lists were
7  provided, the disks were provided.
8        To come in at this point with that
9  information, and particularly to try to use it
10  today, would be totally unfair and improper.
11        They never even filed a motion last
12  week with regard to it, to put you on notice,
13  rather than just coming in here and trying to
14  create a fait accompli that we've got all this
15  stuff.
16        Some of this stuff is highly
17  prejudicial, and some of it needs to be -- I need
18  to be able to object in advance, as we do with
19  exhibits as to whether it comes in.
20        So I would ask that it not be provided
21  to the hearing committee, but give me an
22  opportunity to go through it.

---

Page 23

1        We didn't get it until Friday of last
2  week.  This isn't fair.  And particularly in light
3  of the fact that we're now eight years into this
4  case, the evidence will show that, even after Ms.
5  Sataki filed her complaint in 2010, she didn't
6  communicate with Bar Counsel for three and a half,
7  four years, and in fact there are internal
8  policies in the letter that was given to her that
9  said that, "If we don't hear from you, we will
10  assume you're not proceeding with the case."
11        All of a sudden the case gets
12  resurrected from the dead in 2016 for what I've
13  maintained were improper reasons, generally to get
14  into here.
15        But this whole proceeding, the way it's
16  been handled by Bar Counsel, is just
17  inappropriate, and to spring this on everybody now
18  is inappropriate, and I would ask that this
19  information be excluded.  There were time periods
20  to present evidence and there were time periods to
21  be able to object.  I haven't had a chance to do
22  that.  And to just give it to the hearing

---

Page 24

1  committee now would be highly prejudicial.
2        And that's why I've also advocated
3  that, after they finish their case, based upon the
4  evidence that's before us now, that we take a
5  break and figure out what to do generally about
6  getting Mr. Sujat up to speed, about dealing with
7  this other stuff and how to proceed.  We need a
8  reasonable period of time to prepare.  And that's
9  only just.
10        You know, and again, I respect this
11  committee.  I respect the DC Bar.  I've been a
12  member in good standing continuously for
13  thirtysomething years, 38 years or so, but I need
14  an opportunity to defend myself, because these are
15  very heavy allegations that are not true.  I need
16  to be able to at least present my case with proper
17  preparation.
18        It's not right to spring this on at the
19  last minute like this, right before the hearing.
20  It also violates the rules, and it violates your
21  order, your Honor.
22        CHAIRMAN FITCH:  Mr. Smith, let me turn

---

Page 25

1  to the thumb drive issue first.
2        Was there anything in the thumb drive
3  that was not previously in your files?
4        MR. SMITH:  No, sir.
5        CHAIRMAN FITCH:  Mr. Klayman, I share
6  your concern about new group of documents, and I
7  certainly am not going to rule right now that they
8  are going to be admitted or heard.
9        As Mr. Tigar pointed out to me in Rule
10  VII.19 is applicable here, and whether to allow
11  the admission of or testimony about the group of
12  emails that we're now discussing is in the
13  discretion of the hearing committee chair, and, in
14  eventually exercising that discretion, this
15  hearing committee chair is going to consult with
16  the other two members of the hearing committee, as
17  well.
18        So, Mr. Smith, when you get to the
19  point where those documents might in your view
20  come into play in the natural course of things,
21  you need to give us a heads up and we'll discuss
22  it further.  For example, it might be that all

---

App.0141

In The Matter Of: Larry E. Klayman
May 30, 2018

| Page 26 | Page 28 |
|---|---|

Page 26

1 those emails pertain to one or two areas of
2 concern. You could sort of, if that's the case,
3 identify for yourself when those areas of concern
4 are being reached.
5 Speaking of areas of concern, I think I
6 did not address the investigator's testimony issue
7 that you raised, and there we'll have to see what
8 the investigator is going to testify about. It
9 might be hearsay, it might not be hearsay. We'll
10 just have to see.
11 MR. TIGAR: May I add something, Mr.
12 Chair?
13 CHAIRMAN FITCH: Yes.
14 MR. TIGAR: With respect to the
15 investigator's testimony, some of those hearsay
16 issues of course are resolved, if we were using
17 the federal rules of evidence, by Rule 803,
18 Subdivision 8, and of course you'll have the
19 opportunity to test the credibility of any
20 declarants upon which you would rely in Rule 806,
21 if you were in federal court.
22 But I share with the Chair this concern

Page 28

1 potential witness?
2 Someone wanted to make a comment.
3 Mr. Klayman?
4 MR. KLAYMAN: Yes. This points to an
5 issue, to the gist of unfair surprise, but as Mr.
6 Tigar said, following accepted norms with respect
7 to pretrial procedure and discovery.
8 Now some of this material may actually
9 be helpful to me. I haven't had a chance to take
10 a look at it. But, on the other side of the coin,
11 you can't just come in on the day of trial and try
12 to jam this stuff forward. And that's why I asked
13 that the hearing committee not look at it until I
14 have an opportunity to look at it --
15 CHAIRMAN FITCH: No, we're not going
16 to.
17 MR. KLAYMAN: -- and see what it is.
18 CHAIRMAN FITCH: We're not going to.
19 We have not seen it.
20 MR. KLAYMAN: And I don't understand
21 why, given the fact that we were doing this
22 transition, it was clear that Mr. Sujat was not

Page 27

1 that nobody at this proceeding should get
2 confronted with testimony that they can't
3 effectively challenge with cross-examination.
4 And Mr. Chair, with respect to the
5 belated production here, for whatever my vote is
6 going to be worth here, I'll be looking to the
7 balancing test under Federal Rule of Civil
8 Procedure 37, which deals with the obligation of a
9 party to make discovery and with the question of
10 the circumstances under which the sanction of
11 exclusion can be used, because the federal courts
12 take seriously the failure to make discovery in a
13 timely way.
14 CHAIRMAN FITCH: And if I may add here,
15 that is usual guidance. The dynamic here is
16 somewhat different because of the difference in
17 the evidentiary rules between the federal system
18 and this system.
19 MR. TIGAR: Oh, yes, I understand that.
20 I mean, this is guidance, not control.
21 CHAIRMAN FITCH: May I assume that the
22 gentleman who entered the room just now is not a

Page 29

1 going to be up to speed, why even the thumb drive
2 was sent to Florida rather than to me, at which
3 point I had to get it Saturday morning as I was
4 leaving to come here.
5 CHAIRMAN FITCH: Well, he did enter an
6 appearance of counsel.
7 MR. KLAYMAN: Yes.
8 CHAIRMAN FITCH: But there's been --
9 MR. KLAYMAN: That's the equity that
10 I'm talking about, the fairness.
11 CHAIRMAN FITCH: The Respondent's team
12 has also made some observations this morning and
13 previously about the length of time in which this
14 case has been pending.
15 This committee has no jurisdiction over
16 why the case has taken as long as it has or the
17 reasons, if any, why it was brought. That's a
18 matter purely for the Board.
19 This committee is obligated to
20 consider, as the evidence comes in, whether a
21 passage of length of time is affecting the
22 presentation of testimony because of lost memories

8 (Pages 26 to 29)

In The Matter Of: Larry E. Klayman
May 30, 2018

Page 30

1  or otherwise.  We're not allowed to rule upon
2  that, but we are obligated, required to report on
3  any observations that we have in that regard.
4        This is a legal question that, for us,
5  as in all the legal questions here, we make only
6  recommendations.  The Board makes the
7  determination.
8        But the Respondent's team absolutely is
9  entitled in its closing argument and/or in its
10  briefing to point out the ways, if any, in which
11  the passage of time or other circumstances have
12  affected the presentation of testimony.
13        I suppose, if those points are made,
14  Mr. Smith will do rebuttal on them.  We'll take it
15  under consideration and we'll make our report.
16        MR. KLAYMAN:  One other point here...
17        Your Honor is aware of my position that
18  this case was brought for an improper purpose.
19  I'm not going to belabor that.  It's not what I'm
20  talking about now.  But we have, sitting in the
21  room here today, Mr. James Peterson, who is from
22  my former group, Judicial Watch, who I've had a

Page 31

1  lot of contentious relationship wit over the last
2  14 years.  And, you know, I wonder how he learned
3  of this case going forward today.  It wasn't
4  something out there in the public domain.  How
5  Judicial Watch learned it, I have been very
6  contentious with them.
7        So that's another reason why
8  documentation which they may seek to use against
9  me in some way and other things that are being
10  said, there's an issue here.  And because we have
11  been at loggerheads.
12        I got a judgment against them in Miami
13  back in 2014, which is my home, in South Florida,
14  against them for malicious defamation, for
15  defaming me; $181,000, plus punitive -- including
16  punitive damages.
17        It's very hard to get that kind of a
18  judgment with a public figure.  I'm a public
19  figure.
20        So, this is -- you know, was Mr.
21  Peterson tipped off by Bar Counsel?  I mean, it's
22  not something which is generally out there, and

Page 32

1  this troubles me, and I'm concerned that they
2  could try to use things that Ms. Sataki said and
3  others say to try to harm me.
4        Mr. Peterson shows up at nearly every
5  case that I'm involved in for Freedom Watch, and I
6  believe it's an intimidation tactic, too.
7        I'm a big boy and I can defend myself.
8  And I believe in myself and what I do, being
9  ethical, but that's part of the problem I have
10  here with regard to the things that are going on
11  with Bar Counsel, including this last-minute
12  document thing.  And it confirms what I've said,
13  that I wasn't given all the documents.  It
14  confirms that.  Ok?
15        So I just raise these issues here.  You
16  know, I'm prepared to defend this on the merits,
17  but there are other things swirling around here
18  that I don't think completely meet your eye yet.
19        CHAIRMAN FITCH:  Well, with respect to
20  the -- if I may so call them, the "new emails,"
21  Mr. Smith will have to provide further explanation
22  than he has so far, either through the

Page 33

1  presentation of some evidence or through some
2  representations.
3        As to your question about this
4  gentleman -- I apologize.  I've forgotten his name
5  already --
6        MR. KLAYMAN:  Peterson.
7        CHAIRMAN FITCH:  That's beyond the ken
8  of this committee and I leave it to Mr. Smith -- I
9  have to leave it to Mr. Smith to deal with,
10  address, or not address the point that you raise.
11        If there's nothing further, how about
12  opening statements?
13        MR. SMITH:  And if I may comment on the
14  gentleman in the back, if I've met him before I
15  have no recollection of meeting him before, and if
16  the hearing committee sees fit and Respondent
17  insists upon it -- I mean, how he learned about
18  this hearing I would imagine is because these are
19  matters of public record.  But I have never spoken
20  to him about this matter and, if they want
21  something on the record about that, you know,
22  that's up to the hearing committee.

9 (Pages 30 to 33)

App.0143

In The Matter Of: Larry E. Klayman
May 30, 2018

Page 34

1 But I just have to say, I don't -- I've
2 never met this gentleman before, at least I don't
3 recall ever having met this gentleman before, and
4 I certainly didn't notify him or Judicial Watch
5 that a hearing was taking place today.
6 MR. KLAYMAN: And if I might add in
7 there, just briefly, there are other people in Bar
8 Counsel's office that may have: Deputy Bar
9 Counsel, Bar Counsel.
10 CHAIRMAN FITCH: As I said, I have no
11 choice but to leave it to Mr. Smith and the Board.
12 MR KLAYMAN: Let me add just one other
13 thing, just briefly, is that Bar Counsel, Hamilton
14 Fox, when I was going through severance
15 negotiations with Judicial Watch, was with
16 Sutherland, Asbill and Brennan, and Sutherland
17 Asbill and Brennan negotiated my severance
18 agreement. Their partner, Herb Beller -- you may
19 know Mr. Beller -- and Mr. Hamilton Fox actually
20 defended a deposition that Judicial Watch had
21 noticed with regard to my dispute on breaching the
22 severance agreement. I brought a case over that.

Page 35

1 So, you know, there is an involvement
2 here with Judicial Watch that unfortunately seems
3 to now be infecting this proceeding, which it
4 shouldn't, and it's not just Mr. Smith, whether he
5 did that or did Bar Disciplinary Counsel, Deputy
6 Counsel, Deputy Bar Disciplinary Counsel,
7 Elizabeth Herman, who signed the Specification of
8 Charges, who has shown hostility to me, or other
9 Deputy Bar Counsel Julia Porter has shown
10 hostility to me, doesn't mean that this wasn't
11 orchestrated in some way.
12 CHAIRMAN FITCH: Again, that's the
13 business of the Board. There's nothing I can do
14 about it one way or the other.
15 MR. TIGAR: I would add that the
16 pendency of this proceeding and the date and place
17 where it's to be held is on the Bar website.
18 Anybody could find it. It says "In Re: Larry
19 Klayman."
20 MR. KLAYMAN: If you're looking for it,
21 yes. I'm just saying -- I'm old enough, I'm 66,
22 I'm going to be 67 in July, that I -- sometimes

Page 36

1 two and two equals four, and that's what I'm
2 saying here.
3 I don't know if you read some of the
4 pleadings, but I've made -- it's been my
5 position --
6 CHAIRMAN FITCH: It must be nice to be
7 a whipper snapper of 67. I envy you.
8 MR. KLAYMAN: Thanks, I know. But it's
9 not that young. I've been around a long time. As
10 my grandmother used to say, "I wasn't born
11 yesterday."
12 OPENING STATEMENT BY DISCIPLINARY COUNSEL:
13 BY MR. SMITH:
14 MR. SMITH: Good morning, members of
15 the committee.
16 You all have the read the Specification
17 of Charges in this case and you've also seen the
18 Bar exhibits that have been previously submitted,
19 so I think you have a pretty good idea of what
20 this case is about.
21 Ms. Sataki will testify that she
22 retained Respondent to represent her in an

Page 37

1 employment-related matter with her job at the
2 Voice of America. She had wanted this case to be
3 prosecuted simply and quietly because of her
4 concerns that people in her community would take
5 allegations of sexual harassment a little stronger
6 than they might be perceived in other communities.
7 Respondent undertook this case and
8 attempted to kill a fly with a shotgun. As you
9 have seen in some of the pleadings that have been
10 filed, this became a rather large and
11 unnecessarily complex litigation.
12 There were aspects of the case that had
13 nothing to do with Ms. Sataki's claim. The
14 addition of Hillary Clinton was not a necessary
15 witness in this case, and, as I think it would
16 become obvious, the reason that Hillary Clinton
17 was identified as a witness was to give this case
18 a little more juice, to play into a narrative that
19 was unnecessary for the prosecution of this case
20 and that did not benefit Ms. Sataki at all.
21 During the course of the
22 representation, through no fault of her own, the

10 (Pages 34 to 37)

In The Matter Of: Larry E. Klayman
May 30, 2018

## Page 38

1  Respondent began to have romantic feelings towards
2  her. These feelings were not reciprocated. But
3  during the course of the representation, the
4  desires of Mr. Klayman to have a personal
5  relationship with Ms. Sataki became more and more
6  obvious, more and more frustrating for Ms. Sataki,
7  more and more unbearable for Ms. Sataki.
8      She will testify about specific
9  instances where Mr. Klayman exhibited bouts of
10 jealousy, where Mr. Klayman berated her and where
11 Mr. Klayman humiliated her because of her
12 relationships that did not involve him.
13     The evidence will show that Ms. Sataki
14 became so frustrated with the continued pursuit of
15 her, a pursuit, by the way, which included Mr.
16 Klayman's attempt to recruit a psychologist who
17 was treating Ms. Sataki for the sexual harassment
18 she had suffered while at the Voice of America to
19 advocate on his behalf, to understand his emotions
20 towards her and his frustrations with her refusal
21 to have a more intimate relationship with him.
22     Ultimately Ms. Sataki grew tired of the

## Page 39

1  courtship and wanted only to focus on her case.
2  When it became clear to her that the conflict
3  between Mr. Klayman's desires to have a courtship
4  with her and the objectives of proceeding with her
5  case were not working, she terminated the
6  representation.
7      Notwithstanding the termination of the
8  representation, Mr. Klayman continued to contact
9  Ms. Sataki, and I think the evidence will show
10 that those communications became darker. They
11 became darker after it became clear that a
12 relationship between Respondent and Ms. Sataki was
13 not going to happen, was never going to happen,
14 and again, I think the evidence will show that the
15 relationship -- that the level of communications
16 became much darker and much more frustrating and
17 much more troubling to Ms. Sataki.
18     Also, after the representation had
19 ended, in addition to the continued communications
20 over her objections, Mr. Klayman continued to make
21 reference to a case that she had initially wanted
22 to be kept quiet. This was manifested in

## Page 40

1  publications in a periodical known as the World
2  Daily Net. And in these articles, Mr. Klayman not
3  only talked about Ms. Sataki's case, but he talked
4  about it in the context of his professional
5  prowess and also in the context of his efforts to
6  sell a book that he had written.
7      One of the articles characterizes the
8  judge who had handled the Sataki matter, Colleen
9  Kollar-Kotelly, as being dishonest and having
10 ulterior motives in the disposition of his
11 prosecution of her claim. He said that there were
12 no facts, no evidence or legal analysis which
13 supported the judge's decision.
14     The evidence will show that that was a
15 false statement, and we believe that that false
16 statement, which calls into question the integrity
17 of the judicial process, was dishonest and should
18 be viewed as such under the rules which prohibit
19 dishonesty in the District of Columbia.
20     That is what Disciplinary Counsel
21 intends to show during its case in chief. If the
22 hearing committee has any questions, I'd be happy

## Page 41

1  to entertain them.
2      CHAIRMAN FITCH: I think there are no
3  questions.
4      I will venture an observation, that the
5  relevance of some of the anticipated evidence that
6  you listed doesn't leap right out at me.
7      MR. SMITH: I'm sorry, I didn't hear
8  you.
9      CHAIRMAN FITCH: It does not leap right
10 out at me. I'll leave that for you to address.
11     MR. SMITH: In what way?
12     CHAIRMAN FITCH: But I think we want to
13 be careful in of course deducing in the
14 complaining witness' testimony that there's not an
15 undue emphasis on alleged improprieties by the
16 Respondent.
17     We'll get there as we go along.
18     MR. SMITH: All right. Thank you, your
19 Honor.
20     CHAIRMAN FITCH: I don't want a soap
21 opera over the next few days.
22     Respondent's team, do you care to make

11 (Pages 38 to 41)

App.0145

In The Matter Of: Larry E. Klayman
May 30, 2018

|  | Page 42 |
| --- | --- |

1   an opening statement?

2     OPENING STATEMENT BY COUNSEL FOR RESPONDENT:

3       BY MR. SUJAT:

4     MR. SUJAT: Good morning, your Honor,

5   and members of the committee.

6     CHAIRMAN FITCH: Good morning again.

7     MR. SUJAT: My name is Frederick John

8   Sujat. I am appearing before the Board as counsel

9   for Mr. Larry Klayman, the Respondent in this

10   proceeding.

11     I do want to point out, I don't want to

12   be too repetitive, but I didn't have a lot of time

13   to prepare. I was just brought into this within

14   the past week or so, and there's just voluminous

15   material that I have been going through and still

16   need to take a close look at that.

17     But I am doing the best I can.

18     MR. TIGAR: Well, you were a military

19   JAG officer.

20     MR. SUJAT: That's right.

21     MR. TIGAR: It's been a lot of years

22   since I've tried a general court martial, but I

|  | Page 43 |
| --- | --- |

1   think you'll do just fine.

2     MR. SUJAT: Ok. Thank you, sir.

3     Yes, in fact, I have been a member of

4   the Bar for many years. I retired after 30 years

5   with the DC National Guard. I've been with the DC

6   Bar since 1975. And, you know, during my time in

7   the National Guard, I was a staff judge advocate

8   general. That was basically like a general

9   counsel for the National Guard and I reported

10   directly to the commanding general. In the

11   District of Columbia they call the head general

12   the commanding general. All of the other

13   jurisdictions they are the adjutant general.

14     So, in any case, I've retired as a full

15   colonel, and, you know, I continue to practice

16   law.

17     I have known Mr. Klayman for some time

18   during my practice of law on international trade

19   matters, and I find him to be passionate about

20   free trade and promoting a level playing field for

21   all participants.

22     From my experience with Mr. Klayman,

|  | Page 44 |
| --- | --- |

1   Mr. Klayman was respected by U.S. regulators,

2   foreign governments, and the many clients he

3   successfully represented in antidumping and

4   countervailing duty proceedings.

5     Mr. Klayman believes very strongly in

6   issues and he believes in his clients, and he

7   represents them zealously, from everything I can

8   see.

9     Now, in this matter the complainant

10   filed a complaint making various allegations

11   without any objective independent of the issues.

12   I think that's one of the basic issues here. And

13   by the way, Mr. Klayman, after I'm done, will

14   spend a little bit of time, you know, backing up

15   what I'm saying here.

16     But from everything that I have been

17   able to see, Mr. Klayman provided zealous

18   representations of the complainant in her sexual

19   harassment claims against the Voice of America.

20   This was a very difficult entity I could see to

21   deal with.

22     Mr. Klayman did not receive any

|  | Page 45 |
| --- | --- |

1   payments from Ms. Sataki and he provided

2   representation pro bono. If there was any mention

3   or discussion of contingency fees in any of the

4   record, that was only perspective and was not

5   reduced to writing.

6     The key point here is that Mr. Klayman

7   was trying to get Ms. Sataki back to work. I

8   mean, that was the basic objective and, again, Mr.

9   Klayman was passionate in his representation, and

10   he supported her claims and he just never left a

11   stone unturned. I mean, he really worked very

12   hard at this as an attorney should.

13     Mr. Klayman even provided her with

14   financial assistance, but he steered clear of any

15   romantic involvement. He certainly cared deeply

16   about her as a close friend, and, you know, I can

17   say Mr. Klayman is, you know, very, very strong

18   and supportive of his clients and unfortunately I

19   guess it got to a point where Ms. Sataki did not

20   appreciate his efforts and time on her behalf and

21   she was recommended to seek other counsel. In

22   fact, Mr. Klayman provided names of counsel for

In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 46

1 her to go to, but apparently she took no action.
2      When she asked Mr. Klayman and Mr.
3 Klayman became aware that she didn't want him to
4 represent her, he stopped the representation
5 immediately.
6      There was another issue that came up:
7 the use of the media.  Well, I mean, use of media
8 to pursue one's case has become the norm these
9 days.  I mean, you just turn on the nightly news
10 programs and the commentaries and you see this.
11      It was, you know, a strategy to use the
12 media to prod the Voice of America to settle this
13 case, and Ms. Sataki was supportive of these
14 efforts.
15      If you take a look at any of the
16 communications at issue, you could see that Mr.
17 Klayman said nothing harmful about her case, nor
18 anything harmful about her, in fact quite to the
19 contrary.  He was very supportive of her and
20 complimentary of her.
21      And this is corroborated by witnesses
22 of Respondent.  And I think this is really

Page 47

1 critical in this case, because there are a lot of
2 allegations that are unsupported and self-serving
3 from complainant.  But complainant has offer no,
4 that I've seen, contemporaneous witnesses the
5 activity and the actions involved, whereas Mr.
6 Klayman has those -- even eight years after this
7 happened, he has people that were actually
8 involved, you know, live witnesses, as to what was
9 going on.
10      So I think that really means a lot
11 here, when someone brings an action, you know,
12 like this, based upon, you know, basically just
13 self-serving statements.
14      You know, I don't want to get
15 religious, but, you know, I believe in the wisdom
16 of the Bible, and I know in the Bible you have to
17 have two witnesses to support allegations that she
18 made, and I don't see any such witnesses here for
19 Ms. Sataki.
20      And also this issue of conflict of, you
21 know, there just is so support for that.  Never
22 was there a conflict between Mr. Klayman's

Page 48

1 personal interests and the actions that he took in
2 her best interest.  And that was the key thing.
3 He was working in her best interest, not in his
4 interest at all, in getting the result that he was
5 seeking, and that is, you know, basically to get
6 her back to work and to right certain wrongs that
7 were done.
8      So, in my opinion, Larry did an
9 excellent job in representing her and he did it in
10 the best way he knew, the most effective way, and
11 it was clear that, you know, Ms. Sataki, as time
12 proceeded, as you can see from the evidence Ms.
13 Sataki became uncooperative and unresponsive.
14 This is shown by witnesses who were alive at the
15 time.  Her dissatisfaction and blame were not
16 supported by the facts and really should not be
17 given any weight.
18      In fact, you know, she, from what we
19 can see, continues to pursue her career as a
20 newscaster.
21      So, I just wanted to say that we ask
22 that this matter be dismissed, as it was promptly

Page 49

1 dismissed by the Pennsylvania and Florida bars.
2 Thank you.
3     Mr. Klayman.
4     OPENING STATEMENT ON BEHALF OF RESPONDENT:
5     BY MR. KLAYMAN:
6     MR. KLAYMAN:  Thank you, members of the
7 committee.
8     I'll be relatively brief because I'll
9 be testifying in this case, and of course I'm
10 wearing a lot of different hats here, which is
11 regrettable.
12     But I just want to give you an overview
13 here, and that is that I met Ms. Sataki because I
14 was representing many interests in the Iranian
15 community.  I believe in the Iranian freedom
16 movement.  Back in 2009 I had actually brought a
17 lawsuit against the regime for murdering Akbar
18 Mohammadi and torturing his brother, Manuchehr.
19 They were the leaders of the student movement to
20 try to overturn the regime and they were killed
21 and then tortured in an Iran prison.
22     I got to know others in the community

13  (Pages 46 to 49)

In The Matter Of: Larry E. Klayman
May 30, 2018

---

Page 50

1 and went to a demonstration on Capitol Hill where
2 we were protesting for Iranian freedom. It looked
3 like Iran could possibly change the regime at that
4 time, and Voice of America was going to be
5 possibly instrumental in that soon.
6 While I was there, there was a
7 newscaster, Ms. Sataki, who I learned was doing an
8 interview. I went over to her, I told her a
9 little bit about the case, asked if VOA was
10 interested in covering it, and left.
11 As I was leaving, she ran over to me
12 and gave me her card with her personal phone
13 number on it, not Voice of America, but her cell
14 phone number, and said, "Please call me."
15 Later I called her and the relationship
16 began in a personal way. We had invited her to
17 dinner at Clyde's in Georgetown, and during that
18 dinner she grabbed my hand and said, "Larry, I
19 have no money. Can you help me? I've been
20 sexually harassed."
21 And my heart went out to her.
22 The evidence will show that over the

---

Page 51

1 course of time I was going through a difficult
2 period in my life, too, and I sympathized with
3 that. My heart went out to her. And I started to
4 care about her later deeply. And I did everything
5 I could to try to get her in a place where she
6 wouldn't feel like she was harassed.
7 And so, here's kind of the bottom line
8 here, which I'll testify to in depth, is that my
9 objective, because she didn't feel like she could
10 be in VOA headquarters over here with the alleged
11 harasser, was to get her back to work in the field
12 office of the Persian News Network at Voice of
13 America in Los Angeles. On Wilshire Boulevard
14 there is a federal building. They have an office
15 there.
16 Ms. Sataki had come from Los Angeles,
17 she -- although her English was not that good --
18 and I don't mean that in a negative way, but she
19 had actually escaped Iran with her family and went
20 to Sweden. She's fluent in Swedish and Farci, not
21 as much in English.
22 So Los Angeles is the home of over a

---

Page 52

1 million Iranians. People joke about it, they call
2 it "Tehrangeles," and so there that was the
3 logical place to try to get her to be situated.
4 At the beginning of the case, and
5 you're going to hear testimony, and this is what
6 Mr. Sujat is saying, is that we have actually
7 witnesses here, not just, you know, statements by
8 the litigants here, but we have actually
9 independent witnesses. The union representative
10 and president of the AFL-CIO, Tim Shamble, will be
11 testifying. And I immediately began working with
12 him, and he told me, he said, "This is a very
13 hostile agency. It's been ranked the worst in
14 government." He says, "They mistreat their
15 employees," and we became very close, Mr. Shamble
16 and I, and Ms. Sataki. We had various meetings to
17 conduct strategy.
18 I tried to settle the case. I didn't
19 want it to get into litigation, because I cared
20 about Ms. Sataki. I didn't want there to be undue
21 litigation here for litigation's sake. And it was
22 clear I was helping her as a friend. I never

---

Page 53

1 asked for money. This only came up at the end
2 when she proposed that I get 40 percent. And I
3 said -- at that point we kind of cut it off, and
4 because -- then I recommended other counsel,
5 because I realized it was getting too personal.
6 I recommended to her Gloria Allred, who
7 is a friend of mine, and a lawyer named Tim Shea.
8 She didn't even ask me -- because I was
9 defraying some of the expenses. She was bankrupt.
10 She had no money. So to get her out of the
11 vicinity of DC, I actually used my own money and
12 rented an apartment for her -- she had the keys --
13 paid for moving expenses and tried to help her as
14 best I could.
15 I've never asked for anything in
16 exchange, to this day. I've put out at least
17 $15,000 in my own money, and I've never, ever
18 asked for that back. And testimony will bear that
19 out.
20 But here's what happened, and then I'll
21 move on. We tried to negotiate a solution. Voice
22 of America wouldn't put her back to work in Los

---

14 (Pages 50 to 53)

In The Matter Of: Larry E. Klayman
May 30, 2018

## Page 54

1 Angeles. She was out in Los Angeles on leave at
2 the time. She had what appeared to be a nervous
3 breakdown, because she couldn't bear going back
4 there. She was offered an opportunity to go to
5 the Central News Bureau, which is mostly dealing
6 with Arabic countries. As you know Iranians are
7 Persians, generally, Kurds, Persians and others.
8 They're not Arabic. She didn't want to go back to
9 work there.
10    The agency said, "Look, we'll make sure
11 that you're not in the same vicinity and that
12 you'll report to other people, not to this
13 newscaster that harassed you, you claimed." She
14 didn't want to do that. She had that opportunity.
15 She wanted to be in Los Angeles.
16    And that's where her physicians were.
17 So I found a psychologist for her, two of them. I
18 got an apartment. I rented it for her. I paid
19 her moving costs. And we then sought to litigate.
20 And the litigation that occurred until the
21 relationship ended was all equitable. It was not
22 really going after damages. My goal was just to

## Page 55

1 get her out there. I was representing her pro
2 bono.
3    And a lot of the cases that I
4 brought -- or the cases I brought were strategic
5 and to try to get a settlement, and so, too, were
6 the articles that I wrote. And Mr. Shamble was
7 there. He knows that she approved the publicity.
8 She's a newscaster. She understands, you know,
9 the value of publicity. And as we all live in
10 Washington, D.C., we know that positive publicity
11 can drive a case and can influence decision
12 makers. It's an integral part of legal practice
13 these days. So that's what that was about.
14    Now as far as Hillary Clinton -- and
15 this is why I say this case is being brought for a
16 purpose which is not transparent to this
17 committee -- Hillary Clinton happened to be the
18 head of the Board of Governors, the Secretary of
19 State. There were no personal allegations with
20 regard to Hillary Clinton...
21    But there are those in Bar Counsel's
22 office, perhaps not Mr. Smith, who are politically

## Page 56

1 different than me. I've been out there and made
2 contributions to former presidents and
3 presidential candidates, and I am a figure who's a
4 public figure who has advocated for conservative
5 and Libertarian principals and other things like
6 that. "I don't understand why Hillary Clinton is
7 even part of this." She was head of the Board of
8 Governors. Who else are you going to sue? And
9 there are cases that say you can sue the Board of
10 Governors and name individuals. There was a case
11 before Judge Huvelle in the federal court that
12 allowed a case to proceed in that regard. I
13 researched that.
14    And I was trying by bringing the
15 so-called Bivens Act initially to say, "Hey, look,
16 this is what I've learned over the course of my
17 time." Mr. Sujat knows that, because we were
18 working together on international trade matters.
19 We worked together in my law firm. We had to make
20 it clear that if you made an illegal decision
21 against a client -- she was one of our clients --
22 that there was personal accountability.

## Page 57

1 So I was trying to say to the Board of
2 Governors, "You have a personal responsibility
3 here in trying to get a settlement here."
4    Now that's important. I'm not going to
5 belabor it further.
6    The evidence will show -- I've got
7 witnesses, including Mr. Shamble, Mr. Key Dash,
8 whose brother worked for Voice of America in the
9 accounting department, from a prominent Iranian
10 family here. He will testify that he was present
11 and he saw that she approved the publicity.
12    Mr. Shamble with testify to that. He
13 will prove that I acted properly towards her at
14 all times.
15    We even tried to lobby senators on
16 Capitol Hill: Senator McCain, Speaker of the House
17 Boehner, Senator Coburn. Mr. Shamble was with me.
18 Ms. Sataki was aware of that. We tried every way
19 to settle it. Litigation was the last
20 alternative.
21    And the fact that this agency is the
22 worst in government and doesn't want to treat its

15 (Pages 54 to 57)

In The Matter Of: Larry E. Klayman
May 30, 2018

Page 58

1  employees fairly is not my fault. I should not be
2  made the scapegoat because Ms. Sataki may be
3  unhappy that she's no longer with Voice of
4  America.
5        As far as Judge Kotelly is concerned,
6  I'm entitled to my viewpoint on whether there was
7  adequate evidence. And you'll see from the
8  pleadings, and this is why Mr. Sujat needs to
9  review them, and Mr. Sporkin, too, in a deeper
10  way.
11       I asked Mr. Sporkin at the time, Judge
12  Sporkin, who had been retired, I said, "What would
13  you do, your Honor?" And he said "Easy. I'd put
14  her back to work in LA. It's a chip shot."
15       There's a case called Wagner v. Taylor
16  where you want to preserve the status quo. He can
17  bring a case in federal court while the EEO
18  complaint is pending, and we had filed an Equal
19  Opportunity Commission complaint to ask the
20  federal judge to preserve the status quo so
21  nobody's hurt.
22       In this case Ms. Sataki was not asking

Page 59

1  for the harasser to be removed from Voice of
2  America. She was saying, "I'm willing to go to
3  Los Angeles. That's how we'll solve this."
4        Judge Sporkin told me, "Larry, that's
5  an easy question."
6        Judge Kotelly, without giving us a
7  hearing, a preliminary injunction hearing on the
8  evidence, accepted everything the government had
9  written, meaning Voice of America, and dismissed
10  everything that -- we had affidavits from
11  psychologists, from Mr. Shamble, from others at
12  Voice of America. Because I represented others at
13  Voice of America, too. They were having problems
14  there, other broadcasters in the Persian News
15  Network. And I had 17 pages when I moved for
16  reconsideration of Judge Kotelly of her factual
17  errors in the case. So I was on firm ground with
18  that, and you'll see that in the evidence.
19       But here's the bottom line -- you'll
20  hear my testimony in depth, and Mr. Sujat needs to
21  get up to speed on that -- but when this case was
22  filed, back in 2010, and later supplemented, I'm

Page 60

1  not sure I ever even saw the supplement at the
2  time, but on that supplement it says that
3  simultaneous complaints were being filed with my
4  other two bars, Florida and Pennsylvania. I
5  responded to all three at the same time. Florida
6  and Pennsylvania ultimately were dismissed. They
7  didn't find anything.
8        After those initial complaints, this
9  case sat for three, three and a half, maybe four
10  years in Bar Counsel's office. Ms. Sataki hadn't
11  contacted anybody. There are documents that are
12  part of my exhibits where Bar Counsel goes out to
13  try to find her. But there's also a letter that
14  was sent that said, "If we don't hear from you, we
15  assume that you are abandoning the case, after,
16  you know, the initial complaint, if you don't
17  respond to what Mr. Klayman provides."
18       She abandoned it. They brought it --
19  they resurrected this for their purposes, not for
20  hers.
21       The supplemental complaint is written
22  by someone who appears to have, not just a great

Page 61

1  command of English, if you look at the first
2  complaint and the supplemental complaint, it's
3  somebody who has some kind of legal knowledge.
4  It's not her.
5        And consequently, over the course of
6  time, when Judge Kotelly denied putting her back
7  to work when the EEO complaint was continuing
8  forward, it hadn't ripened into whether you could
9  file a Title VII action yet for sexual harassment,
10  we tried to contact Ms. Sataki, Mr. Shamble and I.
11  She was not communicative. That's why I was
12  calling, was to say, "Hey, you still have rights.
13  Even though Kotelly didn't put you back to work,
14  Judge Kotelly, you have rights once the
15  administrative complaint is over to proceed."
16       The documentation showing alleged
17  termination earlier was sent to the wrong address,
18  assuming they were sent at all. It wasn't my
19  address. The address was wrong. So I never got
20  that. And even an email communication that will
21  be in the record didn't appear to come from Ms.
22  Sataki. It wasn't in her way of talking and

16  (Pages 58 to 61)

Page 62

1  writing.  So Mr. Shamble and I had to confirm
2  whether she wanted to proceed or not.
3        And during that time period, the
4  evidence will show that I couldn't let her rights
5  lapse.  I would be committing malpractice.  So I
6  had to protect her and move forward.
7        I even filed a Notice of Appeal with
8  regard to Ms. Sataki's order, because even though
9  she was denied a preliminary injunction, there was
10  still a prayer to get permanent injunctive relief
11  under Wagner. Taylor to put her back to work in
12  Los Angeles.
13        So I did everything I could diligently.
14  Did I care about Ms. Sataki?  Yes.  Mr. Sujat said
15  I feel passionate about all my clients.  But yes,
16  I cared about her.
17        And I realized that when that became
18  too great when she actually asked me to go out and
19  buy her a car, I said, "This can't go forward,"
20  and I said, "You've got to go out and find another
21  lawyer."  And I gave her two names.
22        And that's where we are today.  And I

Page 63

1  don't understand why we're here, given all that's
2  going on and given the fact that the two bars have
3  dismissed this.
4        One of the things that isn't apparent,
5  and it deals with the other things I'm saying, and
6  I'm going to testify about this, and I hope to get
7  testimony from people in the Bar Counsel office,
8  there were statements made to me in the course of
9  this proceeding by Ms. Herman, "I don't like the
10  way you practice law."  This is not about how
11  Larry Klayman practices law.  It's about whether I
12  violated the Code of Professional Responsibility.
13  Maybe they do it differently, but there are other
14  ways to do it.
15        And Ms. Herman just happens to have
16  given to President Obama and other people, and
17  I've filed cases, against all presidents,
18  including the Bushes, and I don't know where that
19  motivation is.
20        I asked, "Did you ever meet with Ms.
21  Sataki," and she told me, in effect, "None of your
22  business."  She was the supervisor here, so it was

Page 64

1  claimed.
2        I asked, "Does it matter that two bars
3  dismissed it," and she said, "I can care less."
4        So that's why this case, and I don't
5  need to belabor it now, is very troubling to me.
6        And Mr. Smith was telling me, and I'll
7  testify to this, "Mr. Klayman, it's out of my
8  hands.  I'm not really in control here."
9        And there are other things that went
10  on.  I won't get into it now.
11        But I think what's really telling here
12  is that, when the complaints were filed, Ms.
13  Sataki wasn't communicative with them for three
14  and a half years, maybe four, between 2010, 2014,
15  when they went out to find her.  And then this
16  case languishes for now going on eight years, and
17  Professor Rotunda, who is going to be an expert,
18  too, he pointed out how there's authority that,
19  when cases are that old, if you revive them for
20  some strategic purpose, if you hang back, that
21  they're dismissed.  In fact Florida dismisses them
22  and other states dismissed them, too.  I realize

Page 65

1  that the Board has not reached that issue in its
2  existence.
3        But all the equities and the law and
4  the witnesses, as Mr. Sujat points out, bear out
5  what I'm saying.
6        We thank you for your time.  Thank you
7  for listening to me.  I wish that I didn't have to
8  get up here and do this opening statement and be a
9  witness at the same time, but this is the
10  situation we find ourselves in right now.
11        Thank you.
12        CHAIRMAN FITCH:  What do you anticipate
13  the evidence will show about the date of the
14  demonstration that you mentioned?  It must have
15  been 2009?
16        MR. KLAYMAN:  Around 2009, yeah.
17        CHAIRMAN FITCH:  Right.
18        MR. KLAYMAN:  And you know another -- I
19  represented other broadcasters, because there was
20  a division in that office, you'll hear my
21  testimony, in the Persian News Network, that was
22  being run by the son of an ayatollah in Tehran who

17 (Pages 62 to 65)

In The Matter Of: Larry E. Klayman
May 30, 2018

---

**Page 66**

1  was an advisor to Supreme Leader, and Ms. Sataki's
2  family was in the government of the Shah and other
3  broadcasters were pro-Shah. So there was no
4  division there. And what was being broadcast out
5  of Voice of America was viewed by other
6  broadcasters to be favorable towards the regime,
7  not towards the United States.
8      It was a very controversial situation,
9  and Ms. Sataki felt that she was being
10  discriminated against because her family was in
11  the government of the Shah. That's why they fled
12  to Sweden.
13      So, it was part and parcel to my trying
14  to help the Iranian community, which I believed
15  in. I believe in freedom, and I felt a number of
16  broadcasters there and other Iranians too tried to
17  win their freedom and to try to get justice for
18  what's been done to them if they protested.
19      So that's me. That's who Larry Klayman
20  is. I'm sure you know that I am a public interest
21  advocate as well as a private lawyer. Thank you.
22      CHAIRMAN FITCH:  Mr. Smith, do you

---

**Page 67**

1  want to call your first witness now, or do you
2  want to take our morning break now?
3      MR. SMITH:  That is totally up to the
4  committee. I'm prepared to bring my witness on
5  now. If you guys would like a break, then I have
6  no problem with that.
7      CHAIRMAN FITCH:  Let's proceed for
8  maybe 20, 30 minutes, 'till you reach a transition
9  point.
10      (Brief pause.)
11      (Ms. Sataki on the witness stand.)
12      CHAIRMAN FITCH:  Good morning.
13      THE WITNESS:  Good morning.
14      CHAIRMAN FITCH:  Remain standing for
15  just one minute, please.
16      What is your full name.
17      THE WITNESS:  Elham Sataki.
18      CHAIRMAN FITCH:  I need to swear you in
19  as a witness.
20      Do you solemnly swear or affirm the
21  testimony you are about to give in this proceeding
22  will be the truth, the whole truth and nothing but

---

**Page 68**

1  the truth?
2      THE WITNESS:  Yes.
3      CHAIRMAN FITCH:  Please be seated.
4      And say something like "testing, one
5  two three, four, five."
6      THE WITNESS:  "Testing, one, two,
7  three, four, five."
8      CHAIRMAN FITCH:  You're going to need
9  to be very careful to stay close to the
10  microphones. You can adjust them.
11      THE WITNESS:  Both of them or just one?
12      CHAIRMAN FITCH:  I think both of them.
13      THE WITNESS:  Ok.
14      CHAIRMAN FITCH:  And don't get offended
15  if I say, you know, or do like that (raise your
16  voice). Ok?
17      Go ahead, Mr. Smith.
18
19
20
21
22

---

**Page 69**

1  Whereupon,
2      ELHAM SATAKI,
3  called as a witness by Disciplinary Counsel, and,
4  after having been first duly sworn, was examined
5  and testified as follows:
6      DIRECT EXAMINATION BY DISCIPLINARY COUNSEL
7          BY MR. SMITH:
8  Q.  Good morning, Ms. Sataki.
9  A.  Good morning.
10  Q.  Ms. Sataki, how old are you?
11  A.  Forty-seven.
12  Q.  Where do you currently reside? Where
13  do you live?
14  A.  In Los Angeles.
15  Q.  Where are you from originally?
16  A.  From Iran.
17  Q.  How long did you live in Iran?
18  A.  Twelve years.
19  Q.  When you left Iran, where did you live?
20  A.  Sweden.
21  Q.  How long did you live in Sweden?
22  A.  Around 20, 15 years.

---

18 (Pages 66 to 69)

In The Matter Of: Larry E. Klayman
May 30, 2018

---

Page 70

1      Q.  Did you work while you were in Sweden?
2    Did you have a job while you were in Sweden?
3      A.  Most of the time I was in school, but,
4    yes, I worked, too, worked summer jobs and after
5    school I worked, yes.
6      Q.  What level of schooling did you finish
7    while you were in Sweden?
8      A.  College.
9      Q.  What college did you go to?
10     A.  The University of Stockholm.
11     Q.  What was your major?
12     A.  Psychology.
13     Q.  After you left Sweden, where did you
14   move?
15     A.  To the United States.
16       CHAIRMAN FITCH:  I didn't hear that.
17       THE WITNESS:  To United States.
18   BY MR. SMITH:
19     Q.  Once you arrived in the United States,
20   where did you live?
21     A.  I lived in different places, and
22   finally I settled down in Los Angeles first, but

---

Page 71

1    then I moved to Washington, D.C.
2      Q.  Did you attend school once you moved to
3    the United States?
4      A.  I went to a beauty school, yes, in
5    Texas.
6      Q.  What part of Texas?
7      A.  Houston.
8      Q.  What kind of training did you get
9    there?
10     A.  Cosmetology.
11     Q.  Now you said you moved to Los Angeles.
12   Were you employed while you were in Los Angeles?
13     A.  Yes.
14     Q.  What kind of jobs did you have there?
15     A.  I had both cosmetology job and I was
16   working for different TV channels.
17     Q.  What TV channels were you working for?
18     A.  I was working for Iran TV and also Jame
19   Jam TV.
20     Q.  What kind of work were you doing at
21   those TV stations?
22     A.  Co-hosting or anchoring.

---

Page 72

1      Q.  Co-hosting or anchoring what?
2      A.  Co-hosting programs, TV programs.  I
3    started with entertainment, then I went and
4    started doing more news and politics.
5      Q.  How long were you doing
6    broadcasting work in Los Angeles?
7      A.  In Los Angeles about six years.
8      Q.  There came a time that you moved to the
9    District of Columbia?
10     A.  Yes.
11     Q.  When was that?
12     A.  2007.
13     Q.  Did you have a job when you moved here?
14     A.  Yes.
15     Q.  Where were you working?
16     A.  Voice of America.
17     Q.  What were you doing at Voice of
18   America?
19     A.  I was working as an international
20   reporter, that was -- so I was either anchoring
21   for them or covering stories.  I would go out with
22   my producer and cameraman and cover stories.

---

Page 73

1      Q.  These are programs that were aired on
2    television?
3      A.  Yes.
4      Q.  Again what kind of stories did you
5    cover?
6      A.  Political issues, human rights,
7    students' rights, women's rights.
8      Q.  Did there come a time when you met Mr.
9    Klayman?
10     A.  Yes.
11     Q.  Do you recognize him in the courtroom
12   here today?
13     A.  Yes.
14     Q.  Can you point to him please?
15     A.  He's sitting right there (pointing).
16     Q.  Could you tell the committee how it was
17   that you came to meet Mr. Klayman?
18     A.  I was outside the Capitol covering the
19   story.  I was there with my cameraman.
20     Q.  Do you remember what the story was?
21     A.  It was a Persian congressman from Iran
22   that was there and didn't want to go back to Iran

---

19  (Pages 70 to 73)

In The Matter Of:  Larry E. Klayman
May 30, 2018

<table>
<tr><td>

**Page 74**

1  and he was speaking, yes.  So I went there to see
2  if I can get an interview with him.
3      Q.   Do you remember about when that was?
4      A.   End of 2009, sometime in November
5  maybe.
6      Q.   Could you describe your interaction
7  with Mr. Klayman when you first met him.
8      A.   He came up to me and started talking to
9  me, and he said that he's doing something.  He's
10 involved with some story about Iran and something
11 with the flag.  I don't remember exactly what it
12 was.  And he gave me his business card, he took my
13 business card, and he wanted me to cover that
14 story.
15     Q.   Did you cover that story?
16     A.   No, I didn't.
17     Q.   Why not?
18     A.   Because I explained to him that my
19 executive producer would choose who is going to be
20 covering it.  I'm going to pass it on, his
21 business card, and explain to my executive
22 producer, then she is going to have to contact him

</td><td>

**Page 76**

1  an update regarding that.  But then he just was
2  started talking about other things, too.
3      Q.   Now, you were having trouble at your
4  job, correct?
5      A.   Yes.
6      Q.   But you --
7          MR. SUJAT:  Your Honor, I object.
8  That's a leading question.
9          CHAIRMAN FITCH:  It is a leading
10 question.  I think it's a proper transition
11 question.
12 BY MR. SMITH:
13     Q.   What were the working conditions like
14 at your job for you at that time?
15     A.   I was going through a sexual harassment
16 that I had trouble at work.
17     Q.   Can you tell the committee about that
18 sexual harassment that you were experiencing.
19     A.   My co-anchor wanted to -- my co-host
20 wanted to date me or go out with me.  He kept
21 asking me out on coffee or drink, or dinner.  He
22 kept saying that -- and I wouldn't go.  And he

</td></tr>
<tr><td>

**Page 75**

1  and she sends outs the reporters.  It's not my
2  choice.
3      Q.   When you had that conversation, was
4  that when you met him on the steps of the Capitol,
5  or did you have that conversation at another time,
6  about your supervisor having to approve the story?
7      A.   Well, he called me at my desk at work
8  and he asked me, "Do you know who is going to be
9  covering it?  What's going on?  I want you to
10 cover it."
11         He wanted me to cover it because he
12 said that he saw me working, the first time he saw
13 me, and he likes the way I work and he wants me to
14 cover the story.
15     Q.   Did you have any other conversations
16 with him after that call that he made -- that came
17 to your desk?
18     A.   I did have -- I mean, we talked -- I
19 can't exactly remember what was the second
20 conversation.  I mean, the second or third
21 conversation I want to say was about this.  I
22 mean, that was the reason he would call me and get

</td><td>

**Page 77**

1  would say to me things like, "You're behind.  You
2  can't catch up.  When we get together with other
3  people and talk over drinks about the program, you
4  are not there.  So that affects our program."  Or
5  he wanted to match his clothes with me.  And it
6  was constant him calling and asking me out,
7  constantly, constantly, on a daily basis, or he
8  would call or text me at home.  And it was going
9  on for months.
10         And finally he did something that
11 bothered me really bad, and I realized that,
12 because I'm not going out with him, he's trying to
13 get me in trouble with work.
14         So I went to my executive producer and
15 I told her that, "This is what's going on.  Could
16 you please help me, because I'm afraid that I'm
17 going to lose -- he's going to make -- just
18 because I'm not going out with him, he's going to
19 make trouble and I'm going to lose my position."
20     Q.   Did you seek legal counsel in
21 connection with that matter?
22     A.   No.  At that point it was just my

</td></tr>
</table>

20  (Pages 74 to 77)

App.0154

In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 78

1   executive producer, and it was between me and her
2   and then Delia Johnson, someone else that she took
3   me to.
4          So it was within VOA, and they were
5   trying to resolve the situation, but it ended up
6   surprising -- I mean, I was surprised one day.  I
7   went to work and they asked me to meet them, and I
8   was meeting with them, Alex, the chief, and
9   everybody was sitting there and they told me
10  they're going to remove me from co-hosting and
11  they're -- not that I'm doing a bad job or
12  anything, but they just think that it's better for
13  me to move to this other program.
14         So they moved me to this other program,
15  and the chief of the union, when he found out, he
16  got -- he told me, "From now on do not attend any
17  meeting without me, because they retaliated
18  against you, just because you talked about this
19  and told them that" -- because the guy that I had
20  problem with, he one day did something to me that
21  I was -- it was very, very upsetting to me, and
22  that was made -- that I went to them.

Page 79

1          So they basically separated us, but I
2   was the one who lost my position and he stayed at
3   his position.
4      Q.   Did there come a time that you did --
5          MR. TIGAR:  Excuse me...
6          What is the name of the union person
7   that you mentioned?
8          THE WITNESS:  Tim Shamble.
9          MR. TIGAR:  That's Mr. Shamble?
10         THE WITNESS:  Yes.
11         MR. TIGAR:  All right, thank you.
12  BY MR. SMITH:
13     Q.   Did there come a time that you did
14  consult with a lawyer about this problem that you
15  were having at work?
16     A.   Yes.  It was with Mr. Klayman.
17     Q.   Do you recall when it was that you had
18  the conversation with Mr. Klayman about this case?
19     A.   When he asked me why I can't cover the
20  story, why can't I go to the executive producer
21  and say that "Mr. Klayman, the person who has the
22  event, is requesting you and wants you to cover

Page 80

1   the story," I explained to him that I can't do
2   that, because I'm in a tough situation right now
3   with my bosses.
4      Q.   Ok.
5      A.   And when he asked me, I explained more
6   what's going on.  And plus that I guess he's an
7   attorney, so I explained to him and then -- and
8   see if I can somehow get some help.
9      Q.   Do you remember where you were when you
10  discussed the case with Mr. Klayman?
11     A.   I know we had dinner.  I don't remember
12  if the first time I talked to him regarding this
13  case was over the phone or the dinner.  I want to
14  say I think it was over the phone -- well, it was
15  over the phone, because I explained to him -- the
16  conversations was phone conversations, and that's
17  how he found out that I have trouble with work.
18     Q.   So what was the purpose of the dinner
19  that you were having with Mr. Klayman?
20     A.   We talked about my problem and then
21  also he told me about what he wanted to do and
22  also about that he can help me with other things

Page 81

1   like stories or documentaries or movies or stuff
2   like that.
3      Q.   And you said other things that he
4   wanted to do.  What were the other things that he
5   wanted to do?
6      A.   Like outside VOA work he can help me to
7   do other TV work, like we can make a documentary
8   and he can help me with the writing, and so on the
9   side I can start working with other TV work, or
10  like -- or a movie and that he was writing
11  something and I can help him with that, things
12  like that, that we can help each other as working
13  on television.
14     Q.   Did you have a conversation with him
15  about him representing you in this case?
16     A.   We first talked and he said that he
17  knows -- I'm trying to remember -- this attorney
18  in LA.  He said maybe she can help you.  And then
19  we decided that he can represent me.
20     Q.   Did you ever contact the attorney in
21  Los Angeles?
22     A.   We sent him an email.  Mr. Klayman

21 (Pages 78 to 81)

In The Matter Of:  Larry E. Klayman
May 30, 2018

---

Page  82

1  helped me to send -- to send her an email.  I'm
2  trying to remember her name now.  She's always on
3  TV with this kind of cases.
4      I can't remember her name now.
5      Q.  Ok.  So, at this dinner that you --
6      A.  Gloria Allred.
7      Q.  Ok.  So at this dinner that you had
8  with Mr. Klayman, you discussed your case but you
9  did not hire him at that time?
10      A.  Right.
11      MR. KLAYMAN:  Leading, objection,
12  leading.  You gave her testimony.
13      CHAIRMAN FITCH:  I would be careful of
14  that, Mr. Smith.
15  BY MR. SMITH:
16      Q.  Did there come a time that you did hire
17  Mr. Klayman to be your lawyer in this matter?
18      A.  I think it was sometime in the
19  beginning of 2010, I want to say in January that
20  we talked about this and I started seriously
21  working on, yes, me hiring him.
22      In February I sent an email to Mr.

---

Page  83

1  Shamble with information about Mr. Klayman, that
2  he's going to be representing me.
3      Q.  Did you have a fee agreement with Mr.
4  Klayman?
5      A.  I'm sorry?
6      Q.  Did you have a fee agreement or
7  arrangement with Mr. Klayman?
8      A.  Well, we talked about that, at the end,
9  whatever it is, that it's going to be 40 percent
10  goes to him.
11      Q.  Ok, were --
12      A.  Which he later changed it to 50
13  percent.
14      Q.  Were there any other arrangements you
15  had with respect to the representation, financial
16  arrangements?
17      A.  Well, in the beginning when he -- when
18  I moved -- he moved me to Los Angeles and he paid
19  for everything.
20      Q.  Ok.  Was that part of the
21  representation agreement?
22      A.  Well, that's what he said, that he --

---

Page  84

1  because I told him that I can't afford moving to
2  LA, and he said he's going to pay for everything,
3  but then he gets his money back when he gets his
4  40 percent.  All that's going to be included
5  there, on top of that.
6      Q.  Did you ever have a writing from Mr.
7  Klayman reflecting the terms of this
8  attorney/client relationship?
9      A.  I don't understand the question.
10      Q.  Did Mr. Klayman give you a written
11  agreement, representation agreement?
12      A.  I don't believe so.  I don't know.  I
13  really don't know.
14      I know we had emails going back and
15  forth later regarding this, but I don't remember
16  that now.  I don't know.
17      In my mind I don't remember.
18      Q.  Let me ask you to look at what has been
19  marked in Bar Counsel's book of exhibits as
20  Exhibit Number 1.  It is the blue book before you.
21  I'll come over.
22

---

Page  85

1      CHAIRMAN FITCH:  What exhibit number?
2      MR. SMITH:  Bar Exhibit Number 1.  For
3  the record it is an Office of Bar Counsel
4  complaint form dated November 2nd, 2010.
5      (Witness peruses document.)
6  BY MR. SMITH:
7      Q.  Have you had a chance to look at this?
8      A.  Yes.
9      Q.  Did you mail this correspondence to the
10  Office of Disciplinary Counsel at or about --
11      MR. SUJAT:  A leading question.  I
12  object, your Honor.
13      MR. SMITH:  I'm laying a foundation to
14  introduce the document.
15      CHAIRMAN FITCH:  Overruled.
16  BY MR. SMITH:
17      Q.  Did you mail this letter to the Office
18  of Bar Counsel on or about November 2nd, 2010?
19      A.  Yes.
20      Q.  Was this your handwriting on the second
21  page of this document?
22      A.  No.

---

22  (Pages 82 to 85)

In The Matter Of: Larry E. Klayman
May 30, 2018

| Page 86 |
|---|

1   Q.  Whose handwriting is that?
2   A.  The person who helped me writing this.
3   Q.  Who is that person?
4   A.  I don't remember now.
5   Q.  Before you sent this letter in --
6      CHAIRMAN FITCH:  What was the answer of
7   that question?
8      MR. SMITH:  She does not remember.
9      THE WITNESS:  I don't remember who
10  helped me writing it.
11  BY MR. SMITH:
12  Q.  Before you mailed this letter in, did
13  you read what was written here?
14  A.  Yes.
15  Q.  Did you talk to the person who was
16  writing this to tell them what was going on in
17  your case?
18  A.  Yes.
19  Q.  And you agree with everything that's
20  written down in here?
21  A.  Yes.
22  Q.  In the first sentence of the letter it

| Page 87 |
|---|

1   says, "He does not represent me and he keeps
2   calling me and texting me."
3      Would you tell the hearing committee
4   briefly what you're referring to there.
5   A.  Well, I asked him, I told him that I
6   don't want to -- I don't want him to represent me
7   any more, but after I -- after I asked him not to
8   represent me any more, I don't want him to
9   represent me any more, he wouldn't stop calling,
10  texting and emailing me.  He would still calling,
11  texting, emailing me regarding the case, or
12  regarding other things.
13  Q.  I'd like to go back to the
14  representation when you first hired Mr. Klayman to
15  represent you in the matter.
16     What discussions did you have with Mr.
17  Klayman about how he was going to pursue your case
18  against Voice of America?
19  A.  Well, there was -- he told me that he's
20  going to try to settle with them and talk to them.
21     You know, I mean, it was so much legal
22  stuff that he would tell me that "I'm going to

| Page 88 |
|---|

1   talk to this person and talk to that person," and,
2   you know, it was letters that he was sending in.
3   Q.  Have you ever had any legal training?
4   Have you ever had any legal training in the law?
5   A.  No.
6   Q.  Did you understand any of the legal
7   terms or conversations that Mr. Klayman was
8   telling you about how he was proceeding with your
9   case?
10     CHAIRMAN FITCH:  I'm going to strike
11  that question.  No foundation yet for that.
12     There is no foundation for -- there
13  hadn't been a discussion.
14     MR. SMITH:  Ok.
15  BY MR. SMITH:
16  Q.  What did you tell Mr. Klayman about how
17  you wanted to proceed in this case?
18  A.  Well, because it was a sexual
19  harassment case, and because of the community and
20  my background, I wanted it to be very quietly
21  handled.  I even, the first time when I went to my
22  executive producer and I told my executive

| Page 89 |
|---|

1   producer what my co-host did to me, I asked him to
2   keep it off the record, because I didn't want
3   anybody to know.  I just needed help.
4      Because just -- the way it is, the
5   sexual harassment is just something that it's not
6   fun to be out there and everybody find out about
7   it, so.
8   Q.  Tell me about your community and how
9   they perceive, in the context of what you were
10  saying -- what is the --
11  A.  Well, regarding the sexual harassment
12  case, to this day they're still asking me "Was I
13  raped by Mr. Falahati"?  "How was I raped by Mr.
14  Falahati?"  "Where was I raped by Mr. Falahati?"
15  "What did he do?"
16     So sexual harassment, in the Persian
17  community, is rape.  It's the actual act of
18  intercourse and rape.
19     So to this day I have to answer all
20  those questions.
21  Q.  So describe for the committee the
22  conversation you had with Mr. Klayman about these

23  (Pages 86 to 89)

In The Matter Of:  Larry E. Klayman
May 30, 2018

---

**Page 90**

1  concerns.
2      A.  That I want this to be handled as quiet
3  as possible, so nobody finds out.  And I did this
4  complaint because I -- I still wanted to keep my
5  image.  My image was just this person that -- I
6  didn't want it to change and I didn't want too
7  much talk regarding about my personal life.  I
8  wanted people to look at the Sataki that is
9  covering the stories and not know about my private
10  life.
11      Because I was not open about my private
12  life in front of the camera.  People would ask me,
13  I would never answer.  I would always leave it
14  without answer when they asked me about my private
15  life.
16      Q.  Did Mr. Klayman respond to you when you
17  said that you wanted to proceed with the case
18  quietly?
19      A.  Yes.  He did.  I mean, that's what he
20  was supposed to do in the beginning, yes.
21      Q.  He --
22      A.  But then it changed later.

---

**Page 91**

1      Q.  How did it change?
2      A.  He started writing articles, and so it
3  came out in the internet regarding the case.
4      Q.  Did you ever have conversations with
5  Mr. Klayman about publicizing your case?
6      A.  I did.  I asked him not to do it, but
7  then later I -- when he explained to me how much
8  it's going to help my case -- because he was going
9  back and forth with the people, the VOA management
10  and the stuff that he said that, "It's going to
11  take, say, no-brainer.  It's very easy.  It's only
12  going to take two weeks," or whatever, and it's
13  going to be easy, a task, like you said to me, he
14  said how easy it's going to be to transfer me from
15  DC to LA and work out of the LA office.
16      All of those stuff that I listen to him
17  because he's the attorney, he knows best, and none
18  of that happened.
19      So then he -- I mean, the complaint
20  from the person, the person -- the sexual
21  harassment person, my boss, his boss and all that,
22  it went up to Board of Governors and suing

---

**Page 92**

1  everybody, and the case got so big that all this
2  he said that it's just in my benefit.
3      So, I started listening to him.
4      May I add something?
5      Q.  Please.
6      CHAIRMAN FITCH:  Wait a minute.  With
7  respect to what?
8      MR. SMITH:  To the last question I
9  would imagine.
10      CHAIRMAN FITCH:  Do you have something
11  to add to your last answer?
12      THE WITNESS:  Yes.
13      CHAIRMAN FITCH:  That relates to that
14  question?
15      THE WITNESS:  Yes.
16      CHAIRMAN FITCH:  Go ahead.
17      THE WITNESS:  That the reason that I
18  didn't want this to get so huge and so public is
19  just the Persian community and how they react to
20  it.
21      Just to give you an example, after that
22  it got so public and everybody found out, they

---

**Page 93**

1  opened Facebook pages, fake Facebook pages under
2  my name with pornographic pictures in it, which,
3  together, with Mr. Klayman, we went to FBI to shut
4  it down.  But in there they were threatening me,
5  threatening my life and all that.
6      So that was one of the reasons that I
7  didn't -- I wanted to keep this case so private,
8  because I didn't want all this to get so huge and
9  so big and hit everywhere.
10      MR. KLAYMAN:  Objection, your Honor.  A
11  lot of that was hearsay.  No foundation.
12      MR. SMITH:  So, just --
13      CHAIRMAN FITCH:  Wait a minute.  Mr.
14  Klayman raises a perfectly good question.  I'm
15  trying to decide how to deal with this.
16      Give us a moment.
17      (Off-the-record discussion amongst
18  hearing committee members.)
19      CHAIRMAN FITCH:  I think that we are
20  going to strike that answer as hearsay.  That's
21  too far removed.
22      If you want to ask a different question

---

In The Matter Of: Larry E. Klayman
May 30, 2018

Page 94

1   about -- and maybe this is what she was saying,
2   about the effect on her, you may, if you want, if
3   any, you may if you want ask that question if I
4   think the possible effect on her has some
5   relevance potentially to something in this case,
6   some aspect of this case.
7          So I think that's where we stand on
8   this.
9          MR. SMITH:  If I might just make the
10  observation, with respect to hearsay, the Board's
11  rule does permit hearsay, that the testimony that
12  is elicited that may contain hearsay generally
13  goes to the weight but not admissibility.
14         I would also like to point out that Ms.
15  Sataki was speaking from her personal experience
16  and events that she actually participated in and
17  so I don't know that what she was saying was
18  necessarily hearsay.
19         But in any event, just to I guess
20  clarify it, as we move forward, that the Board's
21  rule permits hearsay.
22         CHAIRMAN FITCH:  Well, I understand

Page 95

1   that.  But there is also the other rule I referred
2   to, there's some discretion with respect to
3   hearsay.
4          But this is so removed.  I certainly
5   will accept testimony as to what she saw in this
6   regard, or what she heard -- and maybe what she
7   heard, not for the truth of it, but how it
8   affected her.
9          So why don't we march along that way.
10         MR. SMITH:  All right, thank you.
11         So at this point I would ask that the
12  committee not strike the testimony that she just
13  gave.  Just consider it and give it whatever
14  weight you feel is appropriate at the time that
15  you all are making your factual findings in this
16  case.
17         CHAIRMAN FITCH:  I'm inclined to strike
18  it as just too far afield.
19         MR. SMITH:  All right.
20         CHAIRMAN FITCH:  But I think that you
21  should continue, if you wish, to adduce the points
22  properly.

Page 96

1   BY MR. SMITH:
2          Q.   What is the effect of the publicity
3   that you feared going into this case?
4          MR. SUJAT:  I object, your Honor.
5          CHAIRMAN FITCH:  Yeah, I think that's
6   not an accurate foundation.
7          Did there come a time when you
8   observed -- did you see the articles, some or all
9   of the articles that Mr. Klayman is alleged to
10  have written and published?
11         Did you see those articles.
12         THE WITNESS:  I did, yes.  I saw the
13  articles.
14         CHAIRMAN FITCH:  How did that come
15  about that you saw the articles?
16         THE WITNESS:  He sent me the link.
17         CHAIRMAN FITCH:  "He"?
18         THE WITNESS:  Mr. Klayman sent me the
19  link of the articles.
20         CHAIRMAN FITCH:  Did there come a time
21  when you saw other written material referring to
22  or otherwise relating to those articles?

Page 97

1          THE WITNESS:  Yes.  It was other
2   internet articles or some --
3          CHAIRMAN FITCH:  Other what?
4          THE WITNESS:  Some Persian sites, they
5   translated the article and so they published it,
6   or some of the people published it on their
7   Facebooks and stuff like that.
8          CHAIRMAN FITCH:  What if anything was
9   your reaction to seeing, first of all, the
10  articles that Mr. Klayman is alleged to have
11  published?
12         THE WITNESS:  My reaction was just -- I
13  was thinking how that's going to all affect me, in
14  the big picture.  Now everybody knows and how it's
15  going to affect me.
16         CHAIRMAN FITCH:  What if anything was
17  your reaction to seeing other articles about the
18  alleged articles that you had referred to?
19         THE WITNESS:  My reaction?
20         CHAIRMAN FITCH:  Mm-hmm.
21         THE WITNESS:  It was just -- at that
22  point my concentration, everything, was just being

25  (Pages 94 to 97)

In The Matter Of: Larry E. Klayman
May 30, 2018

---

Page 98

1 able to win the case and go back to work. So I
2 was just thinking how all these are going to be
3 affected. Is it going to be positive, like Mr.
4 Klayman told me, or is it going to backfire?
5 CHAIRMAN FITCH: Did you see all of the
6 articles that Mr. Klayman is alleged to have
7 written and published at the same time, or did you
8 see them one by one or two by two over a period?
9 THE WITNESS: I believe that as they
10 were coming out he would send me the link.
11 CHAIRMAN FITCH: And did you have any
12 communications with Mr. Klayman about the articles
13 that you had seen in any given point in time?
14 THE WITNESS: Yes.
15 CHAIRMAN FITCH: What do you remember
16 about those communications?
17 THE WITNESS: Well, in the beginning I
18 was completely against it. But then when he
19 explained to me how it's going to help my case, I
20 said, "Ok. We'll go forward."
21 Because he believed that that's going
22 to affect my case positively. It's going to help

---

Page 99

1 my case.
2 CHAIRMAN FITCH: Let me direct your
3 attention to the complaint. The complaint is
4 dated -- it's Exhibit Number 1, which you probably
5 have still in front of you. It's dated 11/2/10,
6 but there's a date above which may be a file stamp
7 of December 3, '10.
8 Do you recall with any more specificity
9 when you sent this to Mr. Smith's office?
10 THE WITNESS: Exact date?
11 CHAIRMAN FITCH: Do you think it was
12 before Thanksgiving or after Thanksgiving of that
13 year, for example?
14 If you don't know, you don't know.
15 THE WITNESS: I don't remember.
16 CHAIRMAN FITCH: There was an
17 assumption in my question. Let me ask you a
18 question: did you, yourself, mail this complaint
19 to Disciplinary Counsel, or did someone else do so
20 on your behalf?
21 If you don't remember, just tell me.
22 THE WITNESS: I don't remember.

---

Page 100

1 CHAIRMAN FITCH: Ok. And finally,
2 after the time that you filed this complaint, did
3 you have any communications with Mr. Klayman about
4 his alleged publication of these articles?
5 THE WITNESS: No.
6 MR. TIGAR: You mentioned Facebook
7 posts?
8 THE WITNESS: Yes.
9 MR. TIGAR: Did you see posts on
10 Facebook?
11 THE WITNESS: Yes.
12 MR. TIGAR: Were they posts that said
13 that you were posting it, or were there other
14 people that posted it?
15 THE WITNESS: Well, it was a Facebook
16 under my name, my -- looked like it's my account,
17 but it wasn't. So it made to look to public that
18 it's me.
19 MR. TIGAR: On one or more of these
20 Facebook accounts -- let's call them the phony
21 Facebook accounts, alright, on one or more of
22 those there were pornographic pictures?

---

Page 101

1 THE WITNESS: Yes.
2 MR. TIGAR: What was the effect of that
3 on you? What did that make you feel like?
4 THE WITNESS: At first it scared -- I
5 mean, I know that there is no pornographic
6 pictures or videos of me, but at first it scared
7 me so much because I thought maybe they took my
8 face and put it on other body or so. So that
9 scared me.
10 But when I actually looked at it and
11 saw that it was other people's pictures with my
12 name, but it was terrifying. It was really bad.
13 It was bad, and then the messages I was getting
14 was really, really bad.
15 It was saying in details exactly how --
16 what they're going to do, piece by piece, with my
17 body.
18 So, the threatening part of it was very
19 scary.
20 MR. TIGAR: Understood, ok. Thank you
21 very much. Take your time.
22 CHAIRMAN FITCH: Mr. Smith?

---

26 (Pages 98 to 101)

In The Matter Of: Larry E. Klayman
May 30, 2018

| Page 102 | Page 104 |
|---|---|

**Page 102**

BY MR. SMITH:

Q. I'd like to go back where I was trying to go with my questions about the timeframe that you were having discussions with Mr. Klayman about publicity in the case.

CHAIRMAN FITCH: About what?

MR. SMITH: The timeframe when Mr. Klayman and she were first having discussions about publicity in her case.

CHAIRMAN FITCH: First having discussions about publicity in the case, ok.

BY MR. SMITH:

Q. And you testified that there were concerns that you had?

A. Yes.

Q. Would you please explain to the hearing committee what those concerns were at that time that you had when you were discussing publicity?

CHAIRMAN FITCH: Now, "at that time," is this the time as the case, as the word was getting underway and they were talking about bringing the case, or is this at some other time

**Page 103**

later on?

MR. SMITH: When they first had discussions about publicity in the case.

CHAIRMAN FITCH: Oh, ok. Alright. Because I just want the witness to be clear that I was asking questions about later in 2010, and now Mr. Smith, quite properly, is asking you about an earlier period, as the possibility of doing something about the situation was being discussed.

If I have ruined your memory of the question, he'll ask it again.

THE WITNESS: My concern was just people -- everybody find out about this. I want -- I didn't want people to know that I have a sexual harassment case going, that I complained about my coworker, and what people is going to say, how people are going to look at me.

And I just -- I didn't want people to find out.

MR. TIGAR: May I ask, when did you first say that, or when did you first make that

**Page 104**

statement, that idea to Mr. Klayman? When did you first make that idea to Mr. Klayman?

THE WITNESS: When he first told me about let's -- he's going to write an article.

MR. TIGAR: Now were these in the first couple of meetings that you had that you described that he called you at your office?

THE WITNESS: No, this was later on in the case after he communicated with the management and we didn't get what we wanted and as the case was going forward.

MR. TIGAR: Can you put a date, an approximate date on it? Was it before or after you talked to Mr. Shamble?

THE WITNESS: After I talked to Mr. Shamble.

MR. TIGAR: Was it still in 2010 do you think?

THE WITNESS: Yes.

MR. TIGAR: Alright.

THE WITNESS: It was in the beginning of 2010.

**Page 105**

MR. TIGAR: Thank you.

THE WITNESS: Sometime in the beginning, sometime maybe -- maybe March. I don't know.

MR. TIGAR: Ok.

THE WITNESS: Or April, I don't know. But the first six months.

MR. TIGAR: Mm-hmm.

BY MR. SMITH:

Q. Ms. Sataki, there came a time that you stopped going to work at Voice of America?

A. Yes.

Q. Where were you living at the time?

A. In DC.

Q. There came a time that you moved from DC to Los Angeles?

A. Yes.

Q. Could you tell the hearing committee the circumstances of that move.

A. Well, Mr. Klayman helped me with that move. He paid for my car and my -- to be moved to California and also all my stuff to be moved, my

27 (Pages 102 to 105)

App.0161

In The Matter Of: Larry E. Klayman
May 30, 2018

---

**Page 106**

1 furniture, everything, to be moved to California.

2     Q. Whose decision was it that you should

3 move to California?

4     MR. KLAYMAN: Objection, leading.

5     CHAIRMAN FITCH: Overruled.

6 BY MR. SMITH:

7     Q. You can answer the question.

8     A. I asked him -- well, we talked about it

9 that the fact that there is an office, VOA has an

10 office in LA, and it would be great, and I told

11 him that I had written a proposal to VOA for them

12 to transfer me to LA and work from there. And he

13 said, "Under the circumstances and everything

14 that's going on I can get you that transfer."

15     Q. What were your financial

16 circumstances --

17     CHAIRMAN FITCH: Now when in 2010 did

18 you move to Los Angeles?

19     THE WITNESS: I think it was sometime

20 in April maybe. I think.

21     CHAIRMAN FITCH: No.

22     THE WITNESS: Sometime there, end of

---

**Page 107**

1 April maybe.

2 BY MR. SMITH:

3     Q. What were your financial circumstances

4 at the time that you moved?

5     A. Paycheck to paycheck. I was living

6 paycheck to paycheck to paycheck.

7     So if I missed one paycheck from VOA, I

8 do not have my car payment or rent or food.

9     Q. So, how were you going to survive

10 financially under those circumstances?

11     A. Well, I --

12     MR. SUJAT: Your Honor, objection, a

13 leading question.

14     MR. SMITH: What leading question? I'm

15 not putting words in her mouth. I just asked a

16 simple question.

17 BY MR. SMITH:

18     Q. How were you going to survive?

19     MR. KLAYMAN: Your Honor, there is no

20 foundation. She said she was living paycheck to

21 paycheck --

22     CHAIRMAN FITCH: Well, no, there most

---

**Page 108**

1 certainly is. There's evidence. I might believe

2 it, I might not believe it. But there's certainly

3 a foundation.

4     So that objection is overruled. The

5 question stands.

6     So you may answer the question.

7     THE WITNESS: I thought the -- well, I

8 thought that I'm going to get my paychecks from

9 VOA during that time, and I didn't -- I thought

10 that -- I mean, I believed that Mr. Klayman was

11 going to help me and in a very short time I'm

12 going to be transferred to the LA office and just

13 work from there while the sexual harassment case

14 is being enrolled and resolved.

15     So I thought that I'm going to have my

16 paychecks from VOA.

17 BY MR. SMITH:

18     Q. So Mr. Klayman was assisting you

19 financially when you moved to California?

20     A. Yes, he was.

21     CHAIRMAN FITCH: That's struck.

22

---

**Page 109**

1 BY MR. SMITH:

2     Q. And can you describe what that

3 financial arrangement was, again, please?

4     A. He paid for my car and all my stuff,

5 moved it to LA.

6     And also my credit was ruined. I

7 didn't have credit, so I couldn't rent an

8 apartment, and he helped me rent an apartment and

9 he paid the apartment for me.

10     Q. How much per month was that apartment?

11     A. How much what?

12     Q. How much money per month did the

13 apartment cost?

14     A. I think it was 2,000 something, 2,000

15 something, I think. I don't remember. Or maybe

16 3,000. Maybe it was 3,000, because you probably

17 remember much better than I do now.

18     Q. Let me ask you to look at what has been

19 marked as Bar Exhibit Number 23.

20     CHAIRMAN FITCH: Mr. Smith, why don't

21 we take a short break?

22     MR. SMITH: Alright.

---

App.0162

In The Matter Of:  Larry E. Klayman
May 30, 2018

## Page 110

1  CHAIRMAN FITCH:  Would that be alright
2  with you?
3  MR. SMITH:  Yes.
4  CHAIRMAN FITCH:  Is about ten minutes
5  sensible?  Let's stand in recess for ten minutes,
6  which will be approximately 11:45.
7  (Recess taken.)
8  CHAIRMAN FITCH:  Mr. Smith, I think you
9  may resume.
10  MR. SMITH:  Thank you.
11  BY MR. SMITH:
12  Q.  Before I get into Bar Exhibit Number
13  23, Ms. Sataki, I'd like to -- and this question
14  may have already been answered, but out of an
15  abundance of caution and to protect the record,
16  I'd just like to ask the question.
17  With respect to the monies that Mr.
18  Klayman had paid for your -- given to you while
19  you were in Los Angeles -- that's the context of
20  the question -- did you have an understanding
21  about whether or not Mr. Klayman was going to be
22  reimbursed for that money that he was giving you

## Page 111

1  in connection with your rent and other things?
2  MR. SUJAT:  Your Honor, I object.  It's
3  a very vague question.
4  CHAIRMAN FITCH:  I'm sorry, counsel, I
5  didn't hear the basis of your objection.
6  MR. SUJAT:  It's vague, not germane.
7  CHAIRMAN FITCH:  What?
8  MR. SUJAT:  It's a vague question, and
9  it needs more detail, more foundation.
10  CHAIRMAN FITCH:  Let's go with it and
11  we'll see what happens.  Overruled.
12  THE WITNESS:  Yes, the money was going
13  to be paid back to Mr. Klayman once we win the
14  case and he takes that money together with his 40
15  then later 50 percent that he said he was going to
16  take.
17  BY MR. SMITH:
18  Q.  Thank you.
19  A.  So that money was going to be -- so he
20  would take the money from that amount once we win
21  the case.
22  Q.  Thank you.

## Page 112

1  Now have you had a chance to look at
2  what's been marked as Bar Exhibit Number 23?
3  A.  Yes.
4  Q.  That's your signature on the second
5  page, for the record, 23-3?
6  A.  Yes.
7  Q.  On the pages that have been marked 23-4
8  through 23-6, you've had a chance to look at
9  those?
10  A.  Yes.
11  Q.  Now, did you write this part of the
12  ethical complaint?
13  A.  Yes.
14  Q.  Was that your writing or did somebody
15  help you write that?
16  A.  I -- with the English I always need
17  help.
18  Q.  Ok.
19  A.  Someone to help me write it, yes.
20  Q.  So who helped you with this?
21  A.  I had -- I had my cousin and I had this
22  other lady that helped me.

## Page 113

1  Q.  Who was the other lady that helped you?
2  A.  Katherine.
3  Q.  How did you come to know Katherine?
4  A.  I had met her one time when me and Mr.
5  Klayman, we went to her boss's office regarding my
6  case.  He wanted to meet with -- because he wanted
7  me to meet with him to help my case.
8  Q.  So how did Katherine come to help you
9  with writing this complaint?
10  A.  When we were in that office he -- she
11  later contacted -- well, once I was by myself in
12  the office for a moment, she talked to me and she
13  gave me her phone number.  She told me that -- she
14  asked me to call her, she wants to talk to me, and
15  she asked me if I'm ok.  I said, yes, and she said
16  that I -- "I have to talk to you.  You don't seem
17  ok."  So I called her.
18  Q.  And what did you all discuss?
19  A.  Mr. Klayman.
20  Q.  Tell the committee --
21  MR. KLAYMAN:  Your Honor, this is all
22  hearsay.

29  (Pages 110 to 113)

In The Matter Of: Larry E. Klayman
May 30, 2018

1    CHAIRMAN FITCH:  She can recount --
2    MR. KLAYMAN:  We're getting into
3  hearsay.
4    CHAIRMAN FITCH:  No, we're not.  She's
5  going to recount what she said to Katherine and
6  what she remembers Katherine saying to her.
7    MR. KLAYMAN:  Well, that would be
8  hearsay what Katherine said to her.
9    CHAIRMAN FITCH:  Well, we'll see.
10  BY MR. SMITH:
11    Q.  Please.
12    A.  I --
13    Q.  What did you tell Katherine?
14    A.  Well, she told me that -- she was in
15  the office with Mr. Klayman and me and her boss.
16  I don't remember her boss's name right now.  And
17  what Katherine told me was that her secretary --
18    CHAIRMAN FITCH:  No, no no --
19    THE WITNESS:  What I --
20    CHAIRMAN FITCH:  Right now he has asked
21  you what you said to her.
22    THE WITNESS:  What I said to her.

1    She asked me if I'm ok, and I don't
2  seem ok, and "Is everything ok with Mr. Klayman,
3  because we get the vibe that you're afraid of
4  him."
5    And I explained to her why I'm not ok,
6  and I told her what's going on.
7  BY MR. SMITH:
8    Q.  And what was going on?  Very briefly,
9  what was going on?
10    A.  At that time he -- Mr. Klayman wanted
11  to have more than a client/attorney relationship
12  with me, and it was -- by then I was completely
13  mentally destroyed because of the roller coaster
14  he was putting me through, because it was for
15  months that he wanted to have a relationship with
16  me and me saying no, and it was ongoing and
17  ongoing and it wouldn't stop, and it was -- and so
18  many different ways that it was very, very, very
19  uncomfortable.
20    CHAIRMAN FITCH:  Now, when was this
21  telephone conversation with Katherine.
22    THE WITNESS:  Maybe sometime in June.

1    CHAIRMAN FITCH:  Of?
2    THE WITNESS:  2010.  And I don't
3  remember exactly, 2010.  Sometimes I can't
4  remember.
5    CHAIRMAN FITCH:  I can't remember what
6  I had for dinner last night, but just do your
7  best.
8  BY MR. SMITH:
9    Q.  In looking at Page 23-2 of the
10  complaint, down at the bottom, go back to 23-2.
11    A.  Yes.
12    Q.  The date on this is October 20th, 2011.
13  Is that about the time that you submitted this
14  complaint to the Office of Disciplinary Counsel?
15    A.  Yes.
16    Q.  Ok.  Now this complaint is different
17  from the first complaint that you filed, is it
18  not?  It's a little more detailed?
19    A.  It's more detailed.
20    Q.  Before this complaint was filed, did
21  you participate in what was going to be in this
22  letter?

1    A.  It's everything that I experienced.
2    Q.  And you explained this to Katherine?
3    A.  Yes.
4    Q.  Before it was submitted did you read it
5  to make sure that it reflected what was happening?
6    A.  Yes.
7    Q.  On 23-5, if you could look there, you
8  mention in the third paragraph that begins with
9  "adding insult to injury."
10    A.  Yes.
11    Q.  Read that to yourself, please.
12    (Witness reads document.)
13    A.  Yes.
14    Q.  When did you first notice that Mr.
15  Klayman was using the professional relationship as
16  an opportunity to pursue a personal relationship
17  with you?
18    MR. SUJAT:  Objection, your Honor.
19  This is a leading question.
20    CHAIRMAN FITCH:  I think I have to
21  sustain that objection.
22

In The Matter Of:  Larry E. Klayman
May 30, 2018

---

**Page 118**

BY MR. SMITH:
Q.   Did there come a time when Mr. Klayman attempted to pursue a personal relationship with you?
A.   Yes.
Q.   Do you recall when that was?
A.   It was sometime in April.
Q.   April of?
A.   April, 2010.
Q.   Can you tell the hearing committee how you became aware of that.
A.   It started that he started getting upset why I'm not inviting him to the gatherings or to places that I go and I don't take him with me.  That made him upset.  And so I had arguments with him.  He would nonstop text or email, or phone calls, and talked to me that I talk about respect, that I'm not respecting him, and why I'm not taking him to the gatherings.
Then he explained his feelings to me and told me that he loves me and then he told me that he never loved anyone the way he loved me

---

**Page 119**

ever in his life and that nobody is going to love me the way he loved me, no other man can ever love me the way he loves me.
And so this was going on, and he -- and I through the whole time asked him to be my friend, but the most I can -- he's my attorney and the most I can do is a friendship, nothing more than friendship.  Then he would lecture me on a friendship, what a friendship is, and then he would put lines of emails that a friend wouldn't do this or a friend wouldn't do that, meaning that I would -- if I was a friend I would invite him to places that I go, or I would care more about what happens to him or what's going on with him in his life, so I'm not even acting as a friend.
So, I -- the reason I couldn't, even as a friend, take him anywhere was because of his body language or the way he would look at me.
I was in a sexual harassment case and I couldn't have my attorney in public acting in the body language and the eye contact the way that

---

**Page 120**

people are going to say that, "Oh, she's in a sexual harassment case, now she's having a" -- "look what kind of body language or how -- she has something going on with her attorney?"
So that would be -- so therefore I didn't want him anywhere with me.  And we actually -- can I give an example?
Q.   Yes.
A.   He -- there was a gathering, award evening, and I -- we went -- we went together, we went to that evening place.  The whole time he wanted me to meet with people that helps my case or helps me find a new job, and we went to that award evening, and the table that we sat, the way I sat, I sat with my face toward the stage and he was sitting next to me.  So basically I was turned toward the stage, and my back kind of toward him.  And during the evening I talked to other people and all that, and that upset him very much.
So, when we left the place and we were outside waiting on the valet parking for the car, he got very upset.  He got very, very upset.  He

---

**Page 121**

got -- there was no control on him.  He couldn't control himself.  He was arguing with me, arguing, arguing, and his body language.  He was making a scene that everybody could see.  And I did my best to control him, to calm him down, so people don't see, and wondering, "What's going on with Sataki and her attorney?  Why her attorney's acting like that and why is this body language?  What are they fighting about?"
So finally to calm him down, I said, "You either calm down and be quiet right now or I'm walking away."  And he got quiet.  So at that point the car came, the valet person brought the car, and we got into the car.  And in the car it was no stopping.  He was going on and on and on, talking, talking, talking, about all the different occasions that I didn't invite him or I don't care about him.  He cares about me so much, he gives me so much love, everything, I don't even give him friendship, and my back was toward him during the time that -- during the event that we were there -- and it was nonstop.  It was too that --

---

31 (Pages 118 to 121)

In The Matter Of: Larry E. Klayman
May 30, 2018

---

Page 122

1  "Why you were talking to that person?" "Why
2  didn't you look at me?" "Why didn't you talk to
3  me?" "Why you're ashamed of me?" "Why you're
4  ashamed of" -- "Why you so afraid that people are
5  going to think that I'm your boyfriend?" "Why you
6  so scared of that?" "You don't even treat me as
7  a friend."
8          So it was just going on so much, and
9  the next red light -- I knew the area. The next
10 red light I opened the door and I ran out of the
11 car. And I ran across the street because the car
12 was going this way, and I ran across the street.
13 I ran into the hotel. It was a hotel, the Luxe
14 Hotel, and he turned around. He parked the car.
15 He followed me into the hotel, and when I saw him
16 coming in, I ran into the ladies' bathroom.
17         He followed me to the ladies' bathroom
18 and the person, the receptionist came to the
19 ladies' bathroom, asked him to step out, because
20 he can't be in the ladies' bathroom.
21         She asked me if I'm ok. I said yes.
22 She brought me -- she said, "Stay here. I'm going

---

Page 123

1  to bring you some water." She brought me some
2  water and she asked me if she should call the
3  police. I said, "No, just please call me a taxi
4  and I want to go home and I want to stay here
5  until he's gone, then call me a taxi and I leave."
6          And she said, ok.
7          So, he -- then she helped me and she
8  called a taxi, and the taxi came to the back of
9  the building and I left from the back door and
10 took the taxi home.
11         And this was just one example of so
12 many different occasions that, the roller coaster
13 that I had to go through with him all the time,
14 whether he was complaining why I'm not spending
15 time with my mom and him, whether I want him --
16         CHAIRMAN FITCH: If I may interrupt,
17 beginning with the words, "this was just one
18 example," that becomes nonresponsive to this
19 particular question and that will be struck.
20         From, beginning with, "this is just one
21 example," for about three sentences or whatever it
22 will be.

---

Page 124

1          But I may ask another question, of
2  course.
3          MR. SUJAT: Your Honor, I'd also like
4  to object if I could to the hearsay of what this
5  lady was -- she was reporting what the lady was
6  saying about the incident. That was before this
7  point that you're making.
8          CHAIRMAN FITCH: You're referring to --
9  to Katherine?
10         MR. SUJAT: No, there was a lady that
11 came out with the glass of water. Maybe the court
12 reporter can read it back.
13         THE WITNESS: That was in the hotel.
14         CHAIRMAN FITCH: In the hotel.
15         Overruled.
16 BY MR. SMITH:
17     Q. Now, this incident at this movie event,
18 would you tell the hearing committee when that
19 was, approximately.
20     A. Sometime in May.
21     Q. Now, were you under a doctor's care
22 during the time that Mr. Klayman was representing

---

Page 125

1  you in the case?
2      A. Yes.
3      Q. Who were you seeing?
4      A. Dr. Aviera and Dr. Long.
5      Q. What was the purpose of these doctors?
6      A. Mr. Klayman set me up with those
7  doctors to help me out with my -- for the sexual
8  harassment and the stage of what was going on.
9      Q. What kind of medicine did Dr. Aviera
10 practice?
11     A. It was actually -- oh, Dr. Aviera is a
12 psychologist.
13     Q. How did she know?
14     A. We had sessions. We had twice or three
15 times a week sessions that she would help me. It
16 started with the sexual harassment on my coworker,
17 but it went to Mr. Klayman and everything that I
18 had to deal with him on a daily basis. She
19 started helping me with that.
20     Q. Were you under medication at that time?
21     A. Yes.
22     Q. What kind of medication?

---

32 (Pages 122 to 125)

In The Matter Of:  Larry E. Klayman
May 30, 2018

---

Page 126

1    A.  I was taking sleeping pills and I was
2  taking antianxiety and anti-depression.
3    Q.  Were these prescribed by your doctors?
4    A.  Yes.
5    Q.  Let me ask about Dr. Aviera.  Have you
6  spoken with her recently?
7    A.  A few months ago, yes.
8    Q.  Can you tell the hearing committee
9  anything that was going on in Dr. Aviera's life?
10    A.  Yes.  Unfortunately she's sick and --
11  stage four cancer, so she can't see patients any
12  more.  She told me --
13    MR. SUJAT:  Your Honor, I object.  This
14  is hearsay.
15    CHAIRMAN FITCH:  That's sustained.
16  BY MR. SMITH:
17    Q.  When was the last time you met with Mr.
18  Aviera?
19    A.  A few months ago.
20    Q.  Ok.
21    A.  A few months ago.  I don't remember
22  when.

---

Page 127

1    Q.  Was that a part of your treatment?
2    A.  Yes.
3    Q.  Did there come a time when she stopped
4  treating you?
5    A.  Yes.
6    Q.  When was that?
7    A.  As she got sicker and as she wouldn't
8  see patients, she couldn't see patients in her
9  office anymore.
10    Q.  So when was the last time that you saw
11  her?
12    A.  So the last time I didn't actually see
13  her.  I text messaged, text messaged her, and she
14  said that --
15    MR. SUJAT:  Your Honor, this would be
16  hearsay about text messages.
17    MR. SMITH:  It's not for the truth of
18  the assertion, but certainly for the fact of what
19  Dr. Aviera told her.
20    CHAIRMAN FITCH:  I think that's right.
21  Go ahead.
22    THE WITNESS:  After I saw her in a

---

Page 128

1  session, it took a few months, then I texted her
2  and she answered me.  She explained to me that
3  she's very sick, but she only sees certain
4  patients over the phone from home.
5    And the last time I asked --
6    MR. SUJAT:  Your Honor, I'm object.
7  This is hearsay.
8    CHAIRMAN FITCH:  Overruled.
9    MR. SUJAT:  She's going into repeating
10  what she heard --
11    CHAIRMAN FITCH:  Overruled.  Go ahead.
12    THE WITNESS:  So, basically she's --
13  and the last time I texted her, unfortunately, I
14  haven't heard from her, and I hope she's ok.
15  BY MR. SMITH:
16    Q.  Let me ask you to look at what has been
17  marked as Bar Exhibit Number 24.
18    MR. TIGAR:  Did you say 24?
19    MR. SMITH:  Twenty-four.
20    MR. TIGAR:  Could I ask a question
21  about 23?
22    You had that in front of you just a

---

Page 129

1  moment ago.
2    THE WITNESS:  Yes.
3    MR. TIGAR:  Do you remember, there are
4  a number of things in there that are emails.  Now
5  do you remember receiving those at or about the
6  time of the various dates that they bear?
7    Was that question clear?
8    THE WITNESS:  The emails?
9    MR. TIGAR:  In other words, you
10  attached some emails that you say are from Mr.
11  Klayman?  Do you remember getting those from him?
12    THE WITNESS:  Yes.
13    MR. TIGAR:  Alright.
14
15    MR. TIGAR:  And 24 the witness has in
16  front of her now?
17    THE WITNESS:  Yes.
18    MR. TIGAR:  Did you receive that from
19  Mr. Klayman?
20    MR. SMITH:  Excuse me, I was going to
21  go into it.
22    MR. TIGAR:  You're going to do it ?

---

33 (Pages 126 to 129)

App.0167

In The Matter Of: Larry E. Klayman
May 30, 2018

Page 130

1 Alright, that's probably better.
2        MR. SMITH: Ok.
3        MR. TIGAR: Sorry.
4        MR. SMITH: And we will get back to the
5 emails in 23 as well, but thank you for that.
6        MR. TIGAR: Mm-hmm.
7 BY MR. SMITH:
8    Q. For the record, Bar Exhibit 24 is a
9 letter addressed to Arlene and it is CC'd to
10 "Ellie" and it's dated April 7, 2010.
11       Have you seen this document prior to
12 today?
13    A. Yes.
14    Q. When did you first see this document,
15 if you recall?
16    A. It was about the same time that he
17 emailed it to Dr. Aviera.
18    Q. Who showed you a copy of this letter?
19    A. Dr. Aviera.
20    Q. Look at Bar Exhibit Number 25.
21       For the record it is a letter dated May
22 9th, 2010, and again addressed to "Arlene."

Page 131

1       Have you had a chance to look at that?
2    A. Yes.
3    Q. Other than today, do you recall the
4 first time you saw this letter?
5    A. Probably about the same time, but I
6 didn't pay much attention because I knew about all
7 this.
8       But Dr. Aviera showed me the letter.
9    Q. Ok, Dr. Aviera showed you the letter.
10      Did you have a conversation with Dr.
11 Aviera about either of the two letters, the April
12 letter or the May letter?
13   A. I had conversation -- yes.
14   Q. Ok.
15   A. And emails.
16   Q. With respect to the April letter, Bar
17 Exhibit Number 24 --
18      MR. KLAYMAN: Your Honor I would object
19 to any testimony that gets into about what Dr.
20 Aviera said.
21      CHAIRMAN FITCH: That gets into what?
22      MR. KLAYMAN: That gets into what Dr.

Page 132

1 Aviera might have said.
2        CHAIRMAN FITCH: Well, we have to take
3 it step by step I think.
4        I guess the pending question is --
5 BY MR. SMITH:
6    Q. Did you have a conversation with Dr.
7 Aviera?
8        CHAIRMAN FITCH: About? The April
9 letter.
10       MR. SMITH: About the April letter.
11       CHAIRMAN FITCH: Or the letter that has
12 an April date at the top. Ok.
13       THE WITNESS: Yes.
14 BY MR. SMITH:
15   Q. Can you tell the hearing committee
16 about that conversation.
17       MR. KLAYMAN: Your Honor, objection,
18 hearsay.
19       She can testify what she said, but she
20 can't testify what Dr. Aviera said. That would be
21 hearsay.
22       CHAIRMAN FITCH: Well, given the

Page 133

1 relaxed rules of evidence, and because at least
2 she is here to be cross-examined, let's go down
3 that road and see what happens.
4       Overruled --
5       MR. KLAYMAN: At this point, for the
6 record, as your Honor may recall, I had requested
7 to be able to depose Dr. Aviera. That would have
8 alleviated this issue, and I was denied.
9       That's why I also needed her file,
10 because this is just selective things that are
11 being produced by Bar Counsel from her file, not
12 the whole file.
13      So this is a highly prejudicial area of
14 testimony for her to be testifying, A, without my
15 having discovery, which I requested early on, and
16 B without Dr. Aviera to testify.
17      MR. SMITH: Disciplinary Counsel does
18 not have Dr. Aviera's file. What we have is what
19 we have produced.
20      We have established that Dr. Aviera is
21 unavailable because of serious health concerns and
22 that's why she's not testifying here today, even

34 (Pages 130 to 133)

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 134 | Page 136 |
|---|---|
| 1 remotely. | 1 I'm getting sandbagged and ambushed, as I was |
| 2     And the document does speak for itself. | 2 going to be early on in this case. |
| 3 Ms. Sataki, certainly who was a party to any | 3     It's not right, it's not proper and |
| 4 conversation she had with Dr. Aviera.  She recall | 4 it's not even ethical. |
| 5 and can describe what it was that she was feeling | 5     THE WITNESS:  I'm so sorry. |
| 6 at the time, certainly, and what Dr. Aviera may | 6     Katherine is not from VOA. |
| 7 have said. | 7     CHAIRMAN FITCH:  I think that argument |
| 8     Again, because of the relaxed rules | 8 contains a number of elements, some of which are |
| 9 here, everything that Ms. Sataki may say about Dr. | 9 apples, some of which are oranges. |
| 10 Aviera are statements that go to weight, not | 10     We've done our best to apply the rules |
| 11 admissibility. | 11 of the Board, rules that do not favor depositions |
| 12     MR. KLAYMAN:  First of all, if I may | 12 and set up a compelling-need standard. |
| 13 respond to that, Mr. Smith is in part testifying | 13     The other observation is that this |
| 14 for himself on that.  It's clear that I wanted | 14 document, Number 24, has been in the exhibits from |
| 15 discovery up front. | 15 the time that they were initially due in |
| 16     Relaxed rules does not mean that you | 16 preliminary form. |
| 17 bring in testimony that can't be corroborated, | 17     Mr. Smith, why don't you -- I'm not |
| 18 that can't be refuted in any way. | 18 convinced of what the relevance is of Dr. Aviera's |
| 19     I as Respondent am being put in a Catch | 19 views.  I'm certainly going to hear what the |
| 20 22 situation: heads I win, tails I lose, not being | 20 complaining witness, Ms. Sataki, said to Dr. |
| 21 able to refute that. | 21 Aviera, and maybe what Ms. Sataki's reactions were |
| 22     So, again, this is much like the | 22 to Dr. Aviera's comments, if any. |

| Page 135 | Page 137 |
|---|---|
| 1 documents that were just produced after it was | 1     So why don't you proceed along those |
| 2 told to me by Bar Counsel that they had produced | 2 lines, if you would. |
| 3 everything.  This is unfair surprise, and it's | 3     MR. SMITH:  Thank you. |
| 4 completely contrary to any norms of litigation | 4 BY MR. SMITH: |
| 5 practice, even before a hearing tribunal or even a | 5     Q.  So the question, Ms. Sataki, was, did |
| 6 court.  It just doesn't work.  It doesn't fly. | 6 you have a conversation with Dr. Aviera concerning |
| 7 It's not proper. | 7 this letter? |
| 8     So relaxed rules does not mean that you | 8     A.  Yes. |
| 9 get to do whatever you want, and you get to do a | 9     Q.  Can you share with the hearing |
| 10 number on the Respondent and he doesn't get the | 10 committee what that conversation was? |
| 11 opportunity to know what the testimony is when he | 11     MR. KLAYMAN:  Your Honor, hearsay, ok? |
| 12 reasonably requested discovery. | 12     She can say what she said, but she |
| 13     And the same thing with the | 13 can't testify to what Dr. Aviera said. |
| 14 investigator, and the same thing with Ms. Sataki, | 14     CHAIRMAN FITCH:  Yes, let's start off |
| 15 herself, because we're first learning today that | 15 with that, Mr. Smith. |
| 16 there is this person named Katherine from the VOA | 16 BY MR. SMITH: |
| 17 who was preparing these ethics complaints. | 17     Q.  Alright.  What did you say to Dr. |
| 18     Well, I was at odds with VOA, for her, | 18 Aviera once you became aware of this letter? |
| 19 in making very strong statements about what VOA | 19     A.  I mean, I can't exactly remember.  It |
| 20 had not done properly. | 20 was such along time, exact that day.  But I can |
| 21     So all of this stuff, I should have had | 21 say that what I told Dr. Aviera was exactly what a |
| 22 the opportunity to take some discovery here, and | 22 patient says to the psychologist, and everything |

35 (Pages 134 to 137)

App.0169

Page 138

1  that Mr. Klayman was doing to me and all and the
2  fact that he's explaining his love to me and all
3  that.
4      And I asked Dr. Aviera to have a
5  session with Mr. Klayman, together, and she
6  agreed, and I asked Mr. Klayman to come to the
7  office so the three of us can have -- can speak.
8      I don't remember exact, but I think
9  these are during that time, these letters are
10  during that time.  I do remember that before he
11  attended to that meeting at the Lincoln Center
12  that Dr. Aviera sent a letter about what he wants
13  to talk about and how he feels about the whole
14  thing, but we did have a session, the three of us
15  together, with Dr. Aviera.
16  BY MR. SMITH:
17      Q.  What was the purpose of that session?
18      A.  I wanted to explain to Mr. Klayman in
19  front of Dr. Aviera that he is only my attorney
20  and nothing but attorney, and he will never, ever
21  be anything but attorney, not even a friend.
22      And he was asking me, "Is it because

Page 139

1  I'm not Persian that I can't be your boyfriend?"
2  And I said, "If you were the last man on Earth you
3  can't be my boyfriend.  You are only my attorney
4  and handling my case."
5      I wanted to do that in front of Dr.
6  Aviera so I have a witness.
7      Q.  At your meeting with Dr. Aviera, did
8  you say those things?
9      A.  Yes, I did.
10      Q.  How were your remarks received by Mr.
11  Klayman?
12      A.  Mr. Klayman left the meeting halfway.
13  He left the meeting.  He kind of got upset and he
14  left and me and Dr. Aviera continued the session.
15      CHAIRMAN FITCH:  Am I correct in
16  understanding that there was in fact a meeting
17  among Dr. Aviera, Ms. Sataki and Mr. Klayman?
18      THE WITNESS:  Yes.
19      CHAIRMAN FITCH:  Thank you.
20  BY MR. SMITH:
21      Q.  So looking back at Bar Exhibit Number
22  25 --

Page 140

1      CHAIRMAN FITCH:  Madam witness, we had
2  a discussion earlier this morning that you were
3  not privy to, and it was about the all important
4  matter of scheduling and lunch.
5      We are inclined to go to about 1:00
6  p.m. if that's alright with you.  But if you're
7  getting bushed or anything, like anyone else here,
8  speak up.
9      THE WITNESS:  Thanks.
10      MR. TIGAR:  It's okay?
11      THE WITNESS:  Yes.
12  BY MR. SMITH:
13      Q.  If you could refer to Bar Exhibit
14  Number 25.
15      A.  Yes.
16      Q.  Do you recall whether this letter was
17  written before or after the meeting that you had
18  amongst you, Mr. Klayman and Dr. Aviera?
19      MR. KLAYMAN:  Your Honor, lacks
20  foundation.  There's no showing she ever saw the
21  letter, whatever it is.
22      CHAIRMAN FITCH:  Right now it's just a

Page 141

1  reference point of a date.
2      Overruled.
3      THE WITNESS:  What was the question?
4  I'm sorry.  Can I ask?
5  BY MR. SMITH:
6      Q.  My question to you was, this letter,
7  was it written before or after the meeting amongst
8  you, Mr. Klayman and Dr. Aviera?
9      A.  I can guess that it is more, but --
10      MR. KLAYMAN:  Your Honor, it calls for
11  speculation.
12      CHAIRMAN FITCH:  We're not going to
13  allow it.
14      THE WITNESS:  I don't, I don't -- I
15  can't remember.
16  BY MR. SMITH:
17      Q.  Let me ask you to look at Bar Exhibit
18  Number 26.  For the record, it is an email
19  correspondence dated Saturday the 8th of May,
20  2010, from Larry Klayman to Ellie Sataki.
21      (Witness peruses document.)
22      Q.  Do you remember getting this letter?

36 (Pages 138 to 141)

In The Matter Of: Larry E. Klayman
May 30, 2018

Page 142

1  A. Yes.
2  Q. What was your reaction when you got
3  this letter?
4  A. At this point my reaction is the same
5  as all the other times that I -- I'm just upset,
6  hurt and angry that he can't concentrate on my
7  case and instead of concentrating on my case and
8  the fact that I'm jobless, career-less, and he's
9  still concentrating on his feelings for me, and
10 that was my reaction.
11     I begged him, I plead to him, I
12 screamed, I cried, begging him, "Please, please,
13 stay my attorney and focus on my case, not on me."
14 Q. Did you ever have any romantic
15 interactions with Mr. Klayman?
16 A. Absolutely not.
17 Q. Did you ever have any physical contact
18 with Mr. Klayman, other than like a handshake?
19 A. No.
20 Q. Did Mr. Klayman ever attempt to kiss
21 you?
22 A. One time when he -- they gave Mr.

Page 143

1  Falahati a disciplinary -- they asked him to stay
2  home for two weeks, and he had to stay home until
3  they resolved the case and see what's going on,
4  and investigate the case, my sexual harassment
5  case. Mr. Klayman called me and he said, "We're
6  going to go celebrate. We're winning. You will
7  win the case. This looks great."
8      So he took me out and he explained the
9  whole case to me, what happened, that now he's
10 going to be put at home and not come to the
11 office. And he ordered champagne to celebrate
12 that, and we had dinner, and that is the time that
13 he got a little bit -- he got too close and he
14 tried to kiss me.
15 Q. Can you describe what happened?
16 A. Nothing happened, because nothing was
17 supposed to have happened.
18     I pushed him away and then I asked him
19 to, "Please let's stay on this case and continue
20 the way it is. This is a good step. I'm hoping
21 that it's going to continue this way."
22 Q. Referring back to Bar Exhibit Number

Page 144

1  26.
2      Let me ask you to look at Bar Exhibit
3  Number 27. For the record, it is a letter dated
4  July 30th, 2010, from Elham Sataki to Larry
5  Klayman.
6      CHAIRMAN FITCH: You've moved in number
7  27.
8      MR. SMITH: I'm making reference -- I
9  was asking -- I should move all these exhibits.
10     CHAIRMAN FITCH: No, no, I wasn't
11 asking you to move that. You'll be fine, don't
12 worry about it.
13     You were about to go to Exhibit 27?
14     MR. SMITH: Yes.
15     CHAIRMAN FITCH: May I ask a question
16 about Exhibit 26?
17     MR. SMITH: Yes.
18     CHAIRMAN FITCH: On Page 2 of that
19 exhibit, do you see how way down the page there
20 purports to be an email from Mr. Klayman to you,
21 Saturday, 8, May, 14:16.
22     THE WITNESS: Yes, where he says that

Page 145

1  he wants someone else to take over the case, that
2  email?
3      MR. TIGAR: Yes.
4      CHAIRMAN FITCH: That's what I'm
5  referring to. I'm not sure I asked you what he
6  was saying.
7      THE WITNESS: Oh, I'm sorry.
8      CHAIRMAN FITCH: But he does refer a
9  Tim Shea as someone who can take over the legal
10 representation, correct.
11     THE WITNESS: Yes.
12     CHAIRMAN FITCH: Did Mr. Shea call you
13 on Monday or Tuesday or Wednesday or whatever?
14     THE WITNESS: I don't remember.
15     CHAIRMAN FITCH: And did you make any
16 effort to contact Mr. Shea.
17     THE WITNESS: I don't remember.
18     CHAIRMAN FITCH: Ok. Go ahead, Mr.
19 Smith.
20 BY MR. SMITH:
21 Q. Ok, looking at Bar Exhibit Number 27,
22 please. Did anyone help you write this letter?

37 (Pages 142 to 145)

App.0171

In The Matter Of: Larry E. Klayman
May 30, 2018

## Page 146

1    A.  Yes.
2    Q.  Who was that?
3    A.  Katherine.
4    Q.  What is Katherine's last name, if you
5  recall?
6    A.  I have it there.  I can't remember.
7  Styles -- she -- I don't remember her last name.
8    Q.  And --
9    A.  I have it in my notes.
10   Q.  With whom did Katherine work?
11   A.  She worked for a congressman that I met
12  through Mr. Klayman.  Mr. Klayman took me to that
13  congressman's office in California.  That's where
14  I met Katherine.
15   Q.  It was in California?
16   A.  Yes.
17   Q.  And you became friends with Katherine?
18   A.  Yes.
19   Q.  Before this letter was written to Mr.
20  Klayman, did you help prepare it?
21   A.  Yes.
22   Q.  Did you agree with everything that was

## Page 147

1  in there?
2    A.  Of course, yes, absolutely.
3    Q.  Alright.  Take a look at paragraph
4  three of the letter.
5    A.  Yes.
6    Q.  Could you just read that to the hearing
7  committee?
8    A.  "I want to withdraw all the pending
9  lawsuits that are on my behalf and/or in my name.
10  I want only to follow a sexual harassment case
11  against Mr. Falahati as the main harasser and only
12  Alusat Jaffee (phon) and Susan Jackson as
13  Falahati's supporters.  They did so by not
14  pursuing my complaint and retaliating against me
15  in the work place."
16   Q.  At that point did you expect Mr.
17  Klayman to no longer be working on your cases?
18   A.  Yes.  I even asked him to let --
19        MR. KLAYMAN:  Objection, I'm sorry.
20        Several points of objection on it:
21  NUMBER one, that was a totally leading question;
22  number two, the document, itself, doesn't even say

## Page 148

1  what that leading question suggests and elicits.
2        So I move to strike the question and
3  the answer.
4        CHAIRMAN FITCH:  I need the question
5  repeated.
6        THE COURT REPORTER:  "At that point did
7  you expect Mr. Klayman to no longer be working on
8  your cases?"
9        CHAIRMAN FITCH:  Overruled.
10  BY MR. SMITH:
11   Q.  Would you please look at the last
12  sentence on the second page of the letter.  If you
13  would read that for the hearing committee.
14   A.  "I know that you want the best for me,
15  but I also believe that my case has become a more
16  personal/political fight that you have with VOA or
17  that system in general."
18   Q.  Would you tell the hearing committee
19  what you meant by that.
20   A.  Mr. Klayman, during those months, he
21  had two concentrations: one, his love for me and
22  him pursuing me; two, this case became more --

## Page 149

1        MR. KLAYMAN:  Objection, your Honor.
2  She can't -- she's speculating as to my frame of
3  mind, and that's an improper response and I ask
4  that it be stricken and for her not to testify for
5  me what's in my head.
6        CHAIRMAN FITCH:  I think on the first
7  point there's been adequate foundation laid for
8  her to tell us what her conclusion is.
9        On the second point, I think there has
10  not been an adequate foundation.  Her first point
11  being the emotional one and the second point being
12  other asserted purposes.
13        MR. SMITH:  Well, I think that the
14  foundation is set forth in the plain language of
15  her sentence, and I wanted her to explain to you
16  and for the record what she meant by, this became
17  more than a political/personal -- excuse me, that
18  "it became more of a personal/political fight,"
19  and from her perspective --
20        CHAIRMAN FITCH:  She can point to
21  tangible --
22        MR. SMITH:  Yes, as you --

38 (Pages 146 to 149)

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 150 | Page 152 |
|---|---|

**Page 150**

1    CHAIRMAN FITCH:  --indications.

2    MR. SMITH:  Yes, she was in the process

3  of doing that before the objection.

4    CHAIRMAN FITCH:  Well, I'm not so sure

5  of that.  But, at any rate, we all know where we

6  stand now.

7    MR. SMITH:  Alright.

8    THE WITNESS:  Well, my -- it became

9  more of a political fight for Mr. Klayman --

10    MR. KLAYMAN:  Same objection, your

11  Honor.

12    CHAIRMAN FITCH:  You said that in your

13  letter, in your email.  What was the basis for

14  saying that?

15    THE WITNESS:  Because he was talking

16  all the time about the different politicians that

17  he's meeting regarding my case and different

18  congressmen and the fact that he made the cases so

19  big and I'm suing everybody up to Hillary Clinton,

20  when I felt that -- I felt that this is me, little

21  Elham Sataki, here on this side and her attorney,

22  and everybody else on the other side together,

**Page 151**

1  because he put the whole VOA and everybody against

2  me, together, because he sued everybody.

3    So, the case became too big and too

4  huge and it didn't have to be that way.  I just

5  wanted it to be against the person who sexually

6  harassed me and the two supervisors.

7    CHAIRMAN FITCH:  Ok, Mr. Smith.  You

8  have her reasons for making that observation, and

9  Mr. Klayman can do with them what he wants to on

10  cross-examination and the committee members will

11  be convinced or not be convinced.

12    MR. SMITH:  Thank you.

13  BY MR. SMITH:

14    Q.  Please take a look at Bar Exhibit

15  Number 28.

16    CHAIRMAN FITCH:  May I ask a question,

17  Mr. Smith, of number 27, please?

18    MR. SMITH:  Yes.

19    CHAIRMAN FITCH:  Down the first page,

20  down at the bottom of 27-1, you wrote, "Why don't

21  you work" -- this is an email from you to Mr.

22  Klayman, correct?

**Page 152**

1    THE WITNESS:  Yes.

2    CHAIRMAN FITCH:  And you wrote, "Why

3  don't you work with a lawyer that Tim introduced

4  to you and let him do the negotiations?"

5    Who was that lawyer?

6    THE WITNESS:  The lawyer that Tim

7  Shamble introduced -- and also Mr. Klayman told me

8  that Tim Shamble introduced this lawyer, his name

9  was Tim, too, Tim Shea.

10    CHAIRMAN FITCH:  What was the name?

11    THE WITNESS:  Tim Shea, I believe.

12    CHAIRMAN FITCH:  Oh, it was Tim Shea.

13  I thought you told me --

14    THE WITNESS:  Tim Shea, S-h-e-a.

15    CHAIRMAN FITCH:  Oh, I thought you told

16  me a few minutes ago that you didn't remember.

17    THE WITNESS:  I didn't remember if I

18  contacted him or not, but I asked Mr. Klayman and

19  Tim Shamble to.

20    CHAIRMAN FITCH:  Ok, so did there come

21  a time when you met with Mr. Shea?

22    THE WITNESS:  I didn't meet with him,

**Page 153**

1  no.

2    CHAIRMAN FITCH:  Ok.

3    THE WITNESS:  I didn't meet with him.

4    CHAIRMAN FITCH:  How did you know that

5  Tim Shamble introduced Tim Shea to Mr. Klayman?

6    THE WITNESS:  Mr. Klayman told me.

7    CHAIRMAN FITCH:  Ok.  In the preceding

8  paragraph you wrote, "I want to withdraw all the

9  pending lawsuits that are on my behalf and/or in

10  my name.  I want only to follow a sexual

11  harassment case against Mehdi Falahati" -- close

12  enough.

13    THE WITNESS:  Yes.

14    CHAIRMAN FITCH:  What did you have in

15  mind when you said, "I want only to follow a

16  sexual harassment case"?  Did you have in mind

17  something that was already pending or some other

18  measure or step?

19    THE WITNESS:  I meant that I -- I don't

20  want, because he sued the Board of Governors and

21  all the others, and I meant that I don't want to

22  sue all these people.  I only want it limited to

39 (Pages 150 to 153)

App.0173

In The Matter Of: Larry E. Klayman
May 30, 2018

| Page 154 | Page 156 |
|---|---|

**Page 154**

1  these three people.
2      CHAIRMAN FITCH:  And when you wrote
3  that second sentence, "I want only to follow a
4  sexual harassment case," I suggest to you there
5  are two possibilities: you had in mind some
6  specific case -- or three possibilities: you had
7  in mind some specific already pending case, or you
8  had in mind some possible other case, or you
9  didn't have any of that in mind, or you don't
10  remember.
11      THE WITNESS:  I don't remember.  I
12  don't think I have anything in mind.
13      CHAIRMAN FITCH:  Ok.
14      THE WITNESS:  It was just maybe the way
15  I -- the sentence, the way I wrote it.
16      CHAIRMAN FITCH:  I'm sorry, Mr. Smith.
17  Go ahead.
18  BY MR. SMITH:
19      Q.   Take a look at Bar Exhibit Number 28.
20      CHAIRMAN FITCH:   Well, let me go back,
21  I'm sorry.
22      You testified that Mr. Klayman had told

**Page 155**

1  you that he had met or had communications with Mr.
2  Shea.
3      Is that right?  Is that what he told
4  you, or not?
5      THE WITNESS:  He told me that, yes.
6      CHAIRMAN FITCH:  Ok.  Did he say that
7  he had met in person with Mr. Shea or telephone
8  conversation with Mr. Shea or emails, pigeons or
9  whatever?
10      THE WITNESS:  I don't know.
11      CHAIRMAN FITCH:  Ok.  Do you remember
12  whether he told you anything about the substance
13  of a Shea/Klayman communication?
14      THE WITNESS:  I just remember that he
15  said that he's not a good option to handle this
16  case.
17      MR. KLAYMAN:  Did he, Mr. Klayman,
18  tell you why he thought Mr. Shea was not a good
19  option?
20      THE WITNESS:  I don't remember.
21      CHAIRMAN FITCH:  Did Mr. Klayman ever
22  say anything to you about any other communications

**Page 156**

1  with Mr. Shea?
2      THE WITNESS:  No.
3      CHAIRMAN FITCH:  Try it again, Mr.
4  Smith.  Maybe I won't interrupt you this time.
5      MR. SMITH:  Oh, ok.
6  BY MR. SMITH:
7      Q.   Bar Exhibit Number 28.  For the record
8  this is a letter dated August 4th, 2010 addressed
9  to a Mr. Danforth Austin from Elham Sataki.
10      (Witness reads document.)
11      Q.   Did someone help you write this
12  particular letter?
13      A.   Yes.
14      Q.   Who is that?
15      A.   Kathleen.
16      Q.   And looking on Page 28.2, the paragraph
17  with the sentence that's kind of sitting there in
18  the middle that begins with, "I wish also"...
19      A.   Twenty-eight one?
20      Q.   Yeah -- no, 28-2.
21      A.   Twenty-eight dash two.  "I wish
22  also" --

**Page 157**

1      Q.   If you could read into the record from
2  where it begins "I wish also."
3      A.   "I wish also to inform you that I have
4  instructed Larry Klayman to withdraw any and all
5  civil action that he may have filed in my name and
6  that he's no longer representing me."
7      Q.   Let me ask you to back up.  Who is
8  Danforth Austin?
9      A.   He was at that point the I don't know,
10  higher decision for VOA, Voice of America, like
11  higher than the Persian News Network.  Yes, I
12  believe he was the chief of VOA at that time.
13  BY MR. SMITH:
14      Q.   And I guess to state the obvious, but
15  why did you send him this letter?
16      A.   Well, what exactly what it says here,
17  to inform them that I don't want the lawsuit
18  against everybody, the whole VOA, and also that
19  Mr. Klayman is not representing me any more.
20      MR. TIGAR:  Excuse my, may I ask you,
21  would you take a look at the letter.  It says at
22  the top, "A very important letter to Mr. Austin."

40 (Pages 154 to 157)

In The Matter Of: Larry E. Klayman
May 30, 2018

| Page 158 |
|---|

1    Now did you send a copy of this letter
2  to anyone, other than to Mr. Austin and to Mr.
3    THE WITNESS: No, it could be that I
4  sent it to myself for my own record that I know
5  that this is.
6    MR. TIGAR: So you sent the letter --
7  as I understand, you sent the letter to Mr. Austin
8  by regular mail?
9    THE WITNESS: I emailed it, plus I
10  mailed it, too. I put it in the mail, in an
11  envelope and mailed it to him.
12    MR. TIGAR: Did you send a copy to Mr.
13  Klayman?
14    THE WITNESS: I don't remember.
15    MR. TIGAR: Thank you.
16  BY MR. SMITH:
17    Q. Let me ask you to take a look at Bar
18  Exhibit Number 29.
19    CHAIRMAN FITCH: Here I go again, Mr.
20  Smith.
21    In Exhibit 28, where you said that you
22  instructed Mr. Klayman to "withdraw any and all

| Page 159 |
|---|

1  civil actions that you may have found in my name,
2  what were you referring to there?
3    THE WITNESS: Because at that point Mr.
4  Klayman had a lawsuit against everybody in VOA,
5  and the Board of Governors and up to Hillary
6  Clinton, and that's what I wanted. I wanted to
7  withdraw all that.
8    CHAIRMAN FITCH: That's a fair answer.
9  Let me ask a better question.
10    When you used the word "instructed," "I
11  have instructed Larry Klayman," what were you
12  referring to there?
13    THE WITNESS: I asked him to do that.
14    CHAIRMAN FITCH: Ok. And did you ask
15  him verbally or in writing or both?
16    What exactly are you referring to
17  there, if you remember?
18    THE WITNESS: I emailed to Mr. Klayman
19  and verbally asked him to do that.
20    CHAIRMAN FITCH: Do you recall,
21  vis-a-vis the August 5th date on this letter --
22  the August 4th date on this letter, when you sent

| Page 160 |
|---|

1  such an email to Mr. Klayman?
2    (Witness peruses document.)
3    THE WITNESS: I don't remember exactly
4  what day. I probably could go back to the emails
5  and check.
6    CHAIRMAN FITCH: Well, we see something
7  about that, as Mr. Tigar reminded me in 27, which
8  was five days before your letter to Austin, and I
9  am curious as to whether there's anything else
10  that you have in mind when you said that?
11    THE WITNESS: No.
12    CHAIRMAN FITCH: Ok. Now you also
13  said, on Page 28-2, "I have instructed Larry
14  Klayman that he is no longer representing me."
15    What are you referring to in the way of
16  an instruction or a statement there?
17    THE WITNESS: I told Mr. Klayman, I told
18  him that I don't want him to represent me any
19  more.
20    CHAIRMAN FITCH: Do you recall whether
21  you expressly, specifically, as you seem to be
22  indicating, did that on one occasion or more than

| Page 161 |
|---|

1  one occasion?
2    THE WITNESS: I'm sorry, I don't --
3    CHAIRMAN FITCH: When you say in this
4  he letter that you instructed him -- that "he is
5  no longer representing me," do you recall when you
6  said that?
7    THE WITNESS: It must be sometime in
8  July, end of July. Sometime end of July.
9    CHAIRMAN FITCH: Mr. Smith?
10  BY MR. SMITH:
11    Q. Let me ask you to take a look at Bar
12  Exhibit Number 1 again, at Page 1-3.
13    MR. TIGAR: I'm sorry, counsel, what's
14  the exhibit?
15    MR. SMITH: Exhibit Number 1 at Page
16  1-3.
17  BY MR. SMITH:
18    Q. Did someone help you write this letter?
19    A. Yes.
20    Q. Who was that?
21    A. Katherine.
22    Q. Can you read the first sentence in this

41 (Pages 158 to 161)

In The Matter Of: Larry E. Klayman
May 30, 2018

| Page 162 | Page 164 |
|---|---|

**Page 162**

1 letter, if you would, into the record.

2     CHAIRMAN FITCH: Tell me again what

3 exhibit you have.

4     MR. SMITH: One at Page 1-3.

5 BY MR. SMITH:

6     Q. Can you read that first sentence into

7 the record, please.

8     A. "Please be advised that effective

9 immediately your services are terminated

10 forthwith. You are to provide no further legal

11 service on my behalf in any case whatsoever.

12     "Please provide me with a complete copy

13 of my file and complete all service rendered via

14 certified mail to my address above."

15     Q. Now you had already sent him letters,

16 correspondence in July, terminating him?

17     A. Yes.

18     Q. Why did you send this letter --

19     CHAIRMAN FITCH: That question is

20 struck. I think that's an inaccurate

21 representation of what we've just heard about two

22 parts of that sentence.

**Page 163**

1     MR. SMITH: Ok.

2     CHAIRMAN FITCH: Just ask a question.

3 BY MR. SMITH:

4     Q. Prior to this letter, had you

5 previously terminated Mr. Klayman from

6 representation?

7     A. Yes.

8     Q. When was that?

9     A. Sometime end of July, 2010.

10     Q. Why did you send him this letter, which

11 is, for the record, dated November 15th, 2010

12 terminating his services?

13     A. Because he was still sending me emails

14 and text messages or phone calls about the case,

15 and he was acting like he is still representing

16 me.

17     MR. SMITH: I have no further questions

18 along these lines.

19     I think this would be a good time for

20 us to take our 1:00 o'clock lunch, and then I can

21 resume after we return.

22     CHAIRMAN FITCH: We certainly will

**Page 164**

1 resume after we return. There are no Ping-Pong

2 tables here we are suggesting with taking

3 evidence.

4     It's 12:58. Is that enough time? We

5 stand in adjournment until 1:45.

6     MR. KLAYMAN: I didn't hear when we

7 were going to resume.

8     CHAIRMAN FITCH: 1:45.

9     (Whereupon at 12:58 p.m. a luncheon

10 recess was taken.)

11

12

13

14

15

16

17

18

19

20

21

22

**Page 165**

1     A F T E R N O O N    S E S S I O N

2     (Whereupon at 2:04 p.m. the hearing resumed.)

3     MR. KLAYMAN: Your Honor, may I put

4 something on the record outside of the hearing of

5 the witness.

6     CHAIRMAN FITCH: We are now back on the

7 record at approximately 2:03, more or less by

8 general compromise among counsel and others.

9     Mr. Klayman, do you have one or more

10 preliminary matters?

11     MR. KLAYMAN: Some administrative

12 matters.

13     Your Honor, I apologize. I have post

14 nasal drip and I didn't get, I forget what they

15 call it, that clears out your throat this morning.

16     CHAIRMAN FITCH: Life will go on.

17     MR. KLAYMAN: So I will --

18     CHAIRMAN FITCH: Not a problem. Life

19 will go on.

20     MR. KLAYMAN: Just, in terms of

21 administration and how to proceed, is that last

22 week your Honor ordered that I file exhibits, my

42 (Pages 162 to 165)

In The Matter Of:  Larry E. Klayman
May 30, 2018

| | |
|---|---|
| Page 166 | Page 168 |

**Page 166**

1  exhibits by 4:00 o'clock on Friday, which I did.
2  It was a big rush, not your fault, but I hadn't
3  gotten a lot of the documents back from Mr. Smith
4  until just a few days before that.
5      I had given to him when, I first
6  learned that this thing was still there, still
7  alive, all the pleadings that I had filed and the
8  file of Tim Shamble, and I gave him two boxes, ok,
9  of the stuff, about that high.  And you can see my
10  exhibit binders are pretty deep, because I wanted
11  the hearing committee to know how much work I had
12  done and how hard I had tried for Ms. Sataki, as
13  well as for the expert to say that what I filed
14  was viable and professional.
15      CHAIRMAN FITCH:  I do note, Mr.
16  Klayman, there's no charge here about lack of
17  zealousness.  There's no charge of lack of
18  competency.
19      MR. KLAYMAN:  I understand that.  There
20  was, actually.  In the beginning, when I first
21  talked to Mr. Smith, he said that's the only issue
22  in this case as to whether you abandoned the

**Page 167**

1  client and were not competent and zealous.  And
2  then when I satisfied him with that, then it
3  became something else, it became the publicity.
4  It became other things, like naming Hillary
5  Clinton.  I mean, it's like pulling a rabbit out
6  of a hat.
7      But the point I'm getting to is that --
8  and then I'll get to that in my testimony, is that
9  I put this together.  It was so quick to put it
10  together that we had FedEx put it together and
11  they shipped it out to Meghan Borrazas and the
12  clerk and it was filed.
13      But we had two copies that were made,
14  one for me to use and one for potentially the
15  witness.  You have copies.  And the one for the
16  witness got all jumbled, and when I went to pick
17  it up last Saturday, I saw that Federal Express
18  had really just made a -- shuffled it.  So I had
19  to have my only associate fix it yesterday, and he
20  was to FedEx it to me early today.  But it didn't
21  arrive in time for me to leave the hotel and come
22  here.

**Page 168**

1      So what I'm basically getting at is
2  that there's some questions I want to ask Ms.
3  Sataki, based upon my exhibits.  I don't have
4  another binder.  I just have one set.  But I would
5  respectfully ask, particularly in light of the
6  fact that Mr. Sujat is new to this case, and that
7  we have these administrative things, that after
8  the direct testimony concludes today, that I go
9  back to the hotel and get those binders and then
10  prepare with Mr. Sujat for the cross tomorrow,
11  that we take a break before I cross Ms. Sataki.
12      That would be more efficient, because
13  we will be able to go through the testimony in a
14  more orderly and correct way, and I'll have the
15  exhibit books that I don't have right now to use.
16  I just have one set.
17      So, that is my suggestion, and I ask
18  you to consider that, that once we stop with the
19  direct today, that we begin with the cross
20  tomorrow and then everything will be more
21  organized when I have the books.
22      Your Honor might remember, and again I

**Page 169**

1  don't fault you for this, but I had asked for
2  Friday to have more time to, you know, check it
3  and put it together.
4      CHAIRMAN FITCH:  You did.
5      MR. KLAYMAN:  Thank you.
6      CHAIRMAN FITCH:  Thoughts, Mr. Smith?
7      MR. SMITH:  I have no objection.
8      CHAIRMAN FITCH:  Have you finished your
9  direct with Ms. Sataki?
10      MR. SMITH:  No, I have not.
11      MR. TIGAR:  I'm sorry, I didn't hear
12  him.  He said he's not finished?
13      CHAIRMAN FITCH:  No, he's not finished.
14      MR. SMITH:  No, I'm not finished.
15      CHAIRMAN FITCH:  Well, then you should
16  resume your direct.
17      And we will take under advisement Mr.
18  Klayman's uncontested request.
19      (Witness Ms. Sataki resumes the stand.)
20      CHAIRMAN FITCH:  Ms. Sataki has
21  rejoined us.
22      And Ms. Sataki, as I'm required to do

43 (Pages 166 to 169)

App.0177

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 170 | Page 172 |
|---|---|

**Page 170**

1  for every witness after every substantial break,
2  even one of just an hour or so, you are reminded
3  that you remain under oath.
4      THE WITNESS:  Yes, sir.
5      CHAIRMAN FITCH:  Mr. Smith.
6      MR. SMITH:  Thank you.
7      CHAIRMAN FITCH:  Mr. Smith is resuming
8  his direct examination.
9      CONTINUED DIRECT EXAMINATION
10      BY DISCIPLINARY COUNSEL
11      BY MR. SMITH:
12      Q.  Ms. Sataki, I wanted to refer you again
13  to your testimony in connection with Bar Exhibit
14  27.  For purposes of speeding things along, that
15  was the letter where you had asked Mr. Klayman to
16  withdraw all pending lawsuits on your behalf.
17      A.  Yes.
18      Q.  Could you tell the hearing committee
19  why it is that you decided to ask Mr. Klayman to
20  do that at that time.
21      A.  You mean that November 15?
22      Q.  No, no, no, no.

**Page 171**

1      A.  No, I'm sorry.
2      Q.  In July.  What was that July or May.
3      A.  Oh, the first time.
4      Q.  The May 30?
5      CHAIRMAN FITCH:  You're perfectly
6  welcome to take a minute to back and look at 27.
7      THE WITNESS:  Yes, sorry, I had the
8  November 15th in front of me.  That's why.
9  BY MR. SMITH:
10      Q.  Ok.
11      A.  Would you please repeat the question.
12      Q.  Could you explain to the hearing
13  committee, why is that you decided at that
14  time to ask Mr. Klayman to withdraw from those
15  matters?
16      A.  It was in October, right?
17      Q.  No, May.
18      A.  It's in May?
19      Q.  May 30th?
20      CHAIRMAN FITCH:  No, no, no, no.  If
21  we're talking about Exhibit 27 --
22      MR. SMITH:  Yes.  July 30th -- I'm

**Page 172**

1  sorry.  July 30th, 27-1.
2      THE WITNESS:  Well, I wanted him to
3  stop -- one, like I said, he included some people
4  in the lawsuit that it made the lawsuit too big
5  and made all those people that were governors,
6  everybody, that came against -- in front of me and
7  me by myself.  I didn't think that that's good.
8      I didn't want that.  I just wanted the
9  person and the two people, supervisors, only that.
10  BY MR. SMITH:
11      Q.  Was there anything else?  Was there
12  another reason why you didn't want him involved in
13  your case?
14      A.  All together not involved in my case?
15      Yes, it was because he couldn't stay
16  professional.  He couldn't stay only as my
17  attorney, and he -- from end of April until this
18  time, I was in a roller coaster with him.  He
19  would represent me and then he would say that he
20  can't represent me.
21      I mean, as a matter of fact it was
22  himself the first time when he said that he cannot

**Page 173**

1  represent me any more because he is too
2  emotionally involved with me; he is in love with
3  me and I'm slamming the doors on his face, and
4  he's running on empty fuel, and he can't represent
5  me any more, and he's going to get a colleague,
6  somebody that works with him to work with me, or
7  even us not talk to each other and get a third
8  person in between us to go in between the two of
9  us.
10      So, all this stuff that I was going,
11  because it wasn't a -- I kept asking him, "Please,
12  stay professional."  But he couldn't.  He couldn't
13  cope with.  As soon as he would see or hear that
14  I'm talking to someone, that would be a problem
15  with him, and then he had to go investigate that
16  person or ask his FBI person to investigate that
17  person, whoever I'm talking to, why I'm talking to
18  that person.
19      So it was the whole time a roller
20  coaster, emotional roller coaster, and
21  psychologically I couldn't do it any more.
22      I couldn't -- at that point, the fact

44 (Pages 170 to 173)

In The Matter Of: Larry E. Klayman
May 30, 2018

## Page 174

1  that I'm becoming homeless, I'm losing my career,
2  my job, everything, my case, everything, it came
3  secondary. Because I had to -- what was first was
4  that I had to rescue myself from Mr. Klayman that
5  is -- that is mentally abusing me by the words
6  that he is saying about me or the people around me
7  and constantly texting me, calling me, messaging
8  me. Or when I'm supposed to meet with him, he
9  would get -- when I asked him that, "I meet with
10 you at the restaurant across the street," he would
11 get upset, why he's not allowed in my apartment?
12 I couldn't allow him in my apartment. He would
13 show up on my doorstep, downstairs.
14        And I just had to set a stop at one
15 point that, even though that I was taking the
16 risk -- well, obviously 100 percent I took the
17 risk and I lost everything, but I had to --
18        (Witness breaks down emotionally.)
19        THE WITNESS: I had to put a stop on
20 his abusive relationship, the weight of --
21 constantly the things he was saying, accusations
22 that, or putting me down, or when he asked me to

## Page 175

1  go find a job and I find a job, "Oh, that person
2  wants to sleep with you. That's why he gives you
3  a job."
4        I mean, that's so unprofessional, and
5  I -- I couldn't. I had to stop it.
6        I knew at that point that I'm losing
7  everything. But I had to stop -- I have to stop
8  it.
9        (Witness breaks down emotionally.)
10 MR. SMITH: Could I --
11 CHAIRMAN FITCH: Absolutely. Have the
12 witness take a deep breath and we'll proceed.
13 MR. SMITH: Could we take just a few
14 minutes?
15 CHAIRMAN FITCH: If the witness wants
16 to step outside, that's fine. I think now is not
17 the time for a witness examining an attorney to
18 consult.
19 MR. SMITH: I'm not going to consult.
20 I just want to give her some time alone, if that's
21 alright with you.
22 CHAIRMAN FITCH: It is.

## Page 176

1        (Witness exits courtroom.)
2        (Brief pause.)
3        (Ms. Sataki returns to the witness
4  stand.)
5        CHAIRMAN FITCH: Go ahead, Mr. Smith.
6  BY MR. SMITH:
7        Q. If you could look at Bar Exhibit Number
8  23.
9        CHAIRMAN FITCH: You got away from the
10 microphone there, Mr. Smith. We're looking at
11 what number?
12 MR. SMITH: Bar Exhibit 23.
13 CHAIRMAN FITCH: Twenty-three.
14 BY MR. SMITH:
15        Q. Could you tell me, if you would look at
16 what's marked at the bottom Pages 23-50 through
17 23-54, four pages, five pages.
18        Ms. Sataki, what are these documents
19 that we're looking at now?
20        A. Text messages.
21        Q. And who are involved in these text
22 messages?

## Page 177

1        A. Mr. Klayman.
2        Q. And? Mr. Klayman and who else?
3        A. And me.
4        MR. KLAYMAN: Excuse me, what exhibit
5  is this? I thought you said 24.
6        MR. SMITH: Twenty-three.
7        CHAIRMAN FITCH: It's Exhibit 23,
8  towards the end of the exhibit, starting Page 50
9  to about 70.
10 BY MR. SMITH:
11        Q. How did you acquire copies of these
12 text messages?
13        A. I'm sorry?
14        Q. How did you get copies of these text
15 messages?
16        MR. KLAYMAN: Your Honor, I'm going to
17 object to this. We have an objection on
18 authentication. These are not actual text
19 messages. They seem to be reprints of things
20 which -- I'm not even clear what they are, but I
21 have an objection on authenticity of this.
22        CHAIRMAN FITCH: Well, she's gotten

App.0179

In The Matter Of: Larry E. Klayman
May 30, 2018

1  pretty down that rule of authenticity by saying
2  they were text messages and they were text
3  messages between her and Mr. Klayman.
4          We may decide at some point that's
5  inaccurate, but right now it's perfect
6  authentication, as far as it goes.
7          MR. KLAYMAN: Well, your Honor, in that
8  regard there's no linkage between this document
9  and text messages that were sent, nor was there
10  any testimony as to how these alleged messages
11  were taken off of a phone and put on a piece of
12  paper.
13         We don't know whether or not they
14  were -- they're genuine or whether they were not
15  genuine.
16         CHAIRMAN FITCH: We're trying to
17  determine that. I'll bet you a lot of money that
18  Mr. Smith is going to ask that question right now,
19  because either he was planning to do or you
20  reminded him to.
21         But one way or the other, so far so
22  good. The objection as to authentication is

1  overruled.
2  BY MR. SMITH:
3     Q. Ms. Sataki --
4     A. Yes.
5     Q. Can you tell us how copies of these
6  text messages were made?
7     A. When I asked how I can make a copy of
8  it, of that phone, and that -- the place I don't
9  remember at that time. I think I was with
10  Verizon, and they helped me with it.
11    Q. Mm-hmm.
12    A. How to make copies of the text messages
13  from the phone.
14    Q. And do you recall about when it was
15  that you asked Verizon to give you this
16  assistance?
17    A. I don't remember exact date, no. It
18  was that I still have that phone, so I could do
19  it.
20    Q. And do these messages reflect --
21        CHAIRMAN FITCH: Well, before you ask
22  that question, these messages may purport to be

1  from a 2010 period.
2          When did you ask Verizon approximately?
3  2011, 2012, 2014, 2017?
4          THE WITNESS: About maybe 2010 or
5  '11 -- I mean 2011 or so. Around that time.
6  BY MR. SMITH:
7     Q. If you look at Bar Exhibit 23-2 --
8     A. 23-2?
9     Q. Yeah. What is the date that you filed
10  this with the Office of Disciplinary Counsel, or
11  submitted it?
12        MR. KLAYMAN: What exhibit is that?
13        MR. SMITH: 23-2.
14        THE WITNESS: It's October 20th, 2011.
15  Is that that date?
16  BY MR. SMITH:
17    Q. So does that refresh your recollection
18  at all as to when you may have asked Verizon to
19  assist you with getting copies of those text
20  messages?
21    A. So it's about that time. It's
22  around -- that's why 2010, 2011. So it must be

1  2011.
2     Q. Do these messages, do they appear in
3  this document to accurately reflect text
4  conversations you were having with Mr. Klayman at
5  that time?
6     A. Yes.
7          MR. KLAYMAN: Objection, your Honor.
8  There are a number of purported communications,
9  and to ask the question which encompasses all of
10  them is overly broad and vague and not
11  sufficiently specific.
12         MR. SMITH: I can certainly ask that
13  question --
14         CHAIRMAN FITCH: After you had these
15  copies made, Ms. Sataki, did you review the
16  entries on the document?
17         THE WITNESS: I'm sorry, I didn't
18  understand the question.
19         CHAIRMAN FITCH: There are a bunch of
20  entries here. By "entries," I mean the lines that
21  say something --
22         THE WITNESS: The lines, ok.

46 (Pages 178 to 181)

App.0180

In The Matter Of: Larry E. Klayman
May 30, 2018

## Page 182

1    CHAIRMAN FITCH: Did you review these
2  words after you had Verizon make this for you?
3    THE WITNESS: Yes.
4    CHAIRMAN FITCH: Did you find any
5  errors or anything that was inconsistent with your
6  memory while you reviewed these entries?
7    THE WITNESS: I'm sorry, I don't
8  understand the question. I apologize. You
9  mean --
10    CHAIRMAN FITCH: You told me that you
11  reviewed these entries.
12    THE WITNESS: Uh-huh.
13    CHAIRMAN FITCH: Speaking generally,
14  were there any instances in which, as you reviewed
15  these entries, do you recall now, did you spot any
16  errors that conflicted or anything that conflicted
17  with your recollection about these matters?
18    THE WITNESS: You mean something that I
19  don't recognize?
20    CHAIRMAN FITCH: Did you see any
21  mistakes here or anything that seemed to be wrong?
22    THE WITNESS: No.

## Page 183

1    CHAIRMAN FITCH: Mr. Smith?
2  BY MR. SMITH:
3    Q.  Why did you include these emails with
4  your complaint, your ethical complaint?
5    MR. KLAYMAN: Objection. They're not
6  emails. They're purported text messages.
7    MR. SMITH: Excuse me, text messages.
8  Thank you.
9    THE WITNESS: Because I wanted to show
10  how much text messages he sent me. And also some
11  of them are from the time that I didn't want to
12  hear from him and he was still texting me, and
13  some of them I would even give the phone to my
14  friend to respond to him and say that, Ellie's --
15  "Ellie's sleeping" or "She's not feeling good" or
16  "She can't answer," so he would quit texting me.
17    So I would give my phone to my friend
18  to text him back and answer him, but still be
19  polite, because I didn't want to make him mad.
20    On 23-53, at the end of the page, you
21  can see my friend says, "Hi, Larry. This is
22  Lollie (phon). Ellie is with me and sick. She

## Page 184

1  wanted me to answer her phone and read her text
2  message. So forgive me."
3    These are just to show with my
4  complaint -- I just wanted to show how it was a
5  constant, nonstop text messaging, and constant,
6  nonstop phone calls, and constant, nonstop emails
7  to me.
8    And it was not -- even if it's not
9  about the case, I didn't want any contact with him
10  if it wasn't about the case. Or at some point I
11  didn't want to have any contact with him at all,
12  even about the case. I didn't want that.
13  BY MR. SMITH:
14    Q.  Why is that?
15    A.  Because to him the whole thing was a
16  joke, and I mean, I was a toy for him. But to me
17  this was my life that he was playing with. He was
18  just -- he was making a joke out of that, "The
19  Hotel Luxe bathroom is going to be renamed to
20  Larry Klayman office from now on and he's going to
21  have his client meetings there."
22    That evening was very nerve-racking for

## Page 185

1  me. Unfortunately Dr. Aviera is not here to
2  testify to that. But I had a session with Dr.
3  Aviera after that evening. And for someone to
4  make a joke out of an incident like that, that it
5  got to point that I had to get out of his car and
6  run away. That was big for me. That was huge.
7    And there was a lot of other things,
8  too, that he would get upset. As soon as he would
9  get upset, he would become another Larry Klayman.
10  He wasn't an attorney that I hired. He was
11  another person.
12    Q.  What would upset him?
13    MR. KLAYMAN: Objection, that puts
14  herself into my mental state.
15    CHAIRMAN FITCH: Well, let's see if she
16  speculates or points to some circumstances.
17    Overruled.
18    THE WITNESS: If I wouldn't answer his
19  feelings, his love, that would upset him.
20  BY MR. SMITH:
21    Q.  Are there any other examples?
22    A.  Yes.

47 (Pages 182 to 185)

In The Matter Of: Larry E. Klayman
May 30, 2018

---

Page 186

1    My brother was in town from Sweden with
2    his family and friends, and I didn't introduce Mr.
3    Klayman to my brother first when he got there, and
4    I just went up -- he came downstairs for me to
5    sign a paper, but I didn't have my brother stay
6    there with me to say hi to him. That upset him.
7    I disrespected him, according to him, but I didn't
8    see any point in -- my attorney wants me to sign a
9    paper, and I'm in that area with my brother and
10   the family from Sweden. I told them to go do what
11   their tourist stuff, and I catch up with them. He
12   gets upset why I don't -- that upsets him.
13       Q.  Did he tell you why that upset him?
14       A.  I disrespected him and I'm not
15   including him in my life.
16       I'm going to a friend's house with my
17   mom and I'm not answering his call, or I'm not
18   calling him as he told me to call. I had left my
19   phone at home or something. And he gets upset why
20   I didn't somehow find his phone and call him from
21   there, that I'm probably trying to hide him
22   because I want to marry a rich -- I don't want the

---

Page 187

1    rich Persian people know that maybe I have a
2    relationship, any kind of relationship with him.
3        MR. KLAYMAN: Objection.
4        THE WITNESS: These are stuff that
5    would make him mad, angry, and it would put me on
6    roller coaster: want to represent me; cannot
7    represent me; is going to represent me; cannot
8    represent me.
9    BY MR. SMITH:
10       Q.  Ms. Sataki, I'm going to ask you to
11   look at, still within Bar Exhibit 23, 23-45.
12       CHAIRMAN FITCH:  Are you finished with
13   this particular --
14       MR. SMITH: Yes.
15       CHAIRMAN FITCH: -- set of entries?
16       MR. SMITH: Yes.
17       CHAIRMAN FITCH:  Look at please,
18   ma'am, 23-50. "Please call today, Mark Woodland,
19   of CBN.
20       It's about the fifth line from the top.
21   Do you know what CBN is?
22       THE WITNESS: 23-59. It was a -- there

---

Page 188

1    was a time that he wanted me to work with this TV
2    station, TV channel, or radio, and it was a
3    Christian TV or radio station, and he also told
4    them that I'm a Muslim girl that just accepted
5    Christ in my life and he wanted me --
6        MR. KLAYMAN: Objection, hearsay,
7    hearsay.
8        CHAIRMAN FITCH: Objection. You were
9    present.
10       THE WITNESS: So he wanted me to work
11   for them.
12       CHAIRMAN FITCH: First things first, I
13   asked you what CBN were. I thought CBN was a
14   broadcast network.
15       Does that stand for Christian --
16       THE WITNESS: Christian Broadcast
17   Network.
18       CHAIRMAN FITCH: Do you know why Mr.
19   Klayman wanted you to contact Mr. Mark Woodland?
20       THE WITNESS: To work for them.
21       CHAIRMAN FITCH: You see about one,
22   two, three, four, five, six, seven, eight, nine

---

Page 189

1    lines from the bottom, "Meeting with Senator
2    McCain at 10:30 a.m. this morning."
3        Do you see that down there?
4        THE WITNESS: Where it says --
5        CHAIRMAN FITCH: Count up from the
6    bottom of this page.
7        THE WITNESS: Ok.
8        CHAIRMAN FITCH: One, two, three, four,
9    five, six, seven, eight -- nine lines up. It
10   says, "Meeting with Senator McCain at 10:30 a.m.
11   this morning."
12       THE WITNESS: Yes.
13       CHAIRMAN FITCH: In addition to that
14   item, did Mr. Klayman tell you any other times
15   that he was meeting with Senator McCain or his
16   office people about your case?
17       THE WITNESS: I don't remember.
18       CHAIRMAN FITCH: And do you see only
19   four lines up he has written, "Seeing Gloria
20   Allred."
21       Do you see that?
22       THE WITNESS: Yes, I do.

---

48 (Pages 186 to 189)

App.0182

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 190 | Page 192 |
|---|---|

**Page 190**

1  CHAIRMAN FITCH:  Did you at any time
2  confer with Ms. Allred?
3  THE WITNESS:  No, I didn't.
4  CHAIRMAN FITCH:  Did Mr. Klayman tell
5  you anything more in addition to this that he was
6  going to discuss your case with Gloria Allred.
7  THE WITNESS:  Yes, he did.
8  CHAIRMAN FITCH:  Ok, so he told you on
9  at least one more occasion, other than this
10  occasion.
11  THE WITNESS:  In an email.
12  CHAIRMAN FITCH:  Ok.
13  THE WITNESS:  And he said she didn't
14  accept my case.
15  CHAIRMAN FITCH:  Look at the very top
16  of the next page.  Do you see a reference to Tony
17  Guido (phon)?
18  THE WITNESS:  Yes.
19  CHAIRMAN FITCH:  Do you know who "Tony
20  Guido, who has no legal identity," is?
21  THE WITNESS:  I do.  It's my friend.
22  CHAIRMAN FITCH:  Ok.  Look at the next

**Page 191**

1  page toward the bottom.  I'm on 23-52, four lines
2  up from the bottom: "Please call Kathleen if you
3  have not as yet."
4  Is Kathleen the same person who I
5  thought had the name of Katherine?
6  THE WITNESS:  Yes.
7  CHAIRMAN FITCH:  Ok.  And is Kathleen
8  the right spelling as far as you know or
9  pronunciation, or is it Katherine?
10  THE WITNESS:  It's Kathleen.
11  CHAIRMAN FITCH:  Kathleen, ok.
12  THE WITNESS:  Stasio.
13  CHAIRMAN FITCH:  And was it Mr. Klayman
14  who had originally put you together with Kathleen
15  and the Representatives District Office?
16  THE WITNESS:  Yes.
17  CHAIRMAN FITCH:  You may move on, Mr.
18  Smith.
19  BY MR. SMITH:
20  Q.  During the break, did you consult with
21  some notes concerning your memories about the
22  case?

**Page 192**

1  A.  On 23-2?
2  Q.  No, no.  I'm asking you during the
3  break, during the lunch period --
4  A.  Uh-huh.
5  Q.  -- did you have an opportunity to
6  consult with some of your notes about this case?
7  Do you recall looking at some notes
8  that you had made?
9  A.  Yes.
10  Q.  Ok.  In those notes were you able to
11  get the full name for Kathleen?  Do you recall the
12  full name for Kathleen?
13  A.  Yes.
14  Q.  And what is her full name or last name?
15  A.  I have it in my notes.  It's Stasio,
16  S-t- --
17  CHAIRMAN FITCH:  I think it's not so
18  terribly important.
19  Did you review your notes with respect
20  to any other information?
21  THE WITNESS:  No.  I was looking for
22  Kathleen's name, because Mr. Klayman said she was

**Page 193**

1  working for VOA, and she's not, and that's why I
2  was trying to find her email address and
3  everything.  And I have it in my notes, so I can
4  provide it to proof that she was not working for
5  VOA.
6  CHAIRMAN FITCH:  Well, I remember when
7  that was said in here.  I understand that.
8  Did you review your notes to try to
9  remember anything else that is in your notes?
10  THE WITNESS:  Not according to this, I
11  didn't exactly.  I have some notes to just kind
12  of put these events together, yes.
13  BY MR. SMITH:
14  Q.  Do you recall who Kathleen worked for,
15  who the congressman was?
16  A.  Congressman Rober (phon).  I looked at
17  it.  It's there.  I'm sorry.
18  CHAIRMAN FITCH:  I don't care who the
19  congress-person is.
20  MR. SMITH:  Alright.
21  BY MR. SMITH:
22  Q.  Let me ask you to look at --

49 (Pages 190 to 193)

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 194 |
| --- |

1    A.  Roper (phon) --
2        MR. KLAYMAN:  Your Honor, I can help
3    here, if it's helpful.
4        CHAIRMAN FITCH:  Alright, go ahead, Mr.
5    Smith.  Clear it up.
6        MR. KLAYMAN:  It's Rohrabacher, Dana
7    Rohrabacher, congressman from Orange County.
8    BY MR. SMITH:
9        Q.  Alright, if we could look at Bar
10   Exhibit 23-45.
11       MR. KLAYMAN:  I'm sorry, Mr. Smith, I
12   didn't hear that exhibit again.  I'm sorry.
13       MR. SMITH:  23-45.
14       THE WITNESS:  Yes.
15   BY MR. SMITH:
16       Q.  For the record, it is an email from
17   Larry Klayman to Elham Sataki dated June 21st,
18   2010.
19       Do you recall when you received this
20   email?
21       A.  Yes.
22       Q.  Can you tell the hearing committee --

| Page 195 |
| --- |

1        CHAIRMAN FITCH:  Now, wait a minute.
2    I'm not sure that we accept that representation as
3    a record.
4        I don't see anything about email here.
5    I hear posted June 11th, 2010, and I see a title,
6    and I see a "By Larry Klayman," and above all that
7    I see a "Friday, 9/16/2011," which may or may not
8    be a printout date by somebody for some reason.
9        But that's all I see there.
10       MR. SMITH:  Alright.
11   BY MR. SMITH:
12       Q.  Ms. Sataki, looking at this document,
13   can you tell me who sent this document?
14       A.  Mr. Klayman.
15       Q.  Ok, and who was it sent to?
16       A.  To me.
17       Q.  And how was it sent?  By what medium?
18       A.  I received it as an email.
19       Q.  On what date does it appear to have
20   been sent?
21       A.  Monday, June 21st, 2010.
22       Q.  Thank you.

| Page 196 |
| --- |

1        Can you please tell the hearing
2    committee what this email meant to you?
3        A.  Again, the roller coaster that he was
4    putting me through, and the games that he was
5    playing, and the whole thing, my whole life, my
6    career, and my case was a game to him.  He just
7    felt like --
8        Honestly I have no idea what went
9    through his mind and why he would send this email.
10   I don't know.  But he did.  And it's just -- for a
11   person in my situation that have a no income, no
12   job, and everything is on the line, my attorney --
13   supposedly someone with my attorney's email
14   address sending me an email notifying me that my
15   attorney died last week.
16       This is what -- it meant to me, my
17   focus was only on my case and it was again another
18   way to drop me from tenth or twentieth floor and
19   think, "Oh, ok, I don't have anybody to represent
20   me."
21       I don't know.  I don't know why he sent
22   me this email.  I don't understand.

| Page 197 |
| --- |

1        CHAIRMAN FITCH:  Is it your testimony
2    that you have a recollection that this document
3    was emailed to you by Mr. Klayman?
4        THE WITNESS:  Yes, sir.
5        CHAIRMAN FITCH:  Ok.
6        THE WITNESS:  It was from his email
7    address, but in the text it says -- it's a third
8    person that is emailing me.
9        CHAIRMAN FITCH:  Ok, excuse me, wrong
10   page.
11   BY MR. SMITH:
12       Q.  Let me ask you to take a look at Bar
13   Exhibit Number 23 --
14       CHAIRMAN FITCH:  Let me clarify the
15   record that, in the last little exchange, I was
16   mistaken about the document being addressed -- and
17   Ms. Sataki I believe had before her the document
18   that Mr. Smith actually wanted her to address,
19   which is Exhibit 23-45, and that 23-45 has been
20   testified to by Ms. Sataki in that my observations
21   were erroneous with respect to this document,
22   because I was looking at another document.

50 (Pages 194 to 197)

App.0184

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 198 | Page 200 |
|---|---|

**Page 198**

1       So, the last few questions the record
2   should show is that there was testimony about a
3   document that constitutes Exhibit 23-45.
4       THE WITNESS:  I just --
5       CHAIRMAN FITCH:  I think he wants to
6   ask you another question.
7   BY MR. SMITH:
8       Q.  Was there something else you wanted to
9   share about the exhibit we were just looking at?
10      A.  I just included this to show again a
11  pattern of the games that he was playing with me
12  during that time, the most difficult time in my
13  life, and this is what he was putting me through.
14      Q.  Now recently you sent me a compendium
15  of correspondence between Mr. Klayman and
16  yourself.
17      A.  Yes.
18      CHAIRMAN FITCH:  Have we reached the
19  point where these are the --
20      MR. SMITH:  I'm gust going to --
21      CHAIRMAN FITCH:  -- if I may say so the
22  "new" documents?

**Page 200**

1   so I can survive.  Because otherwise there was a
2   time that I was, I wanted to take my life and
3   that's how I wanted to have revenge against Mr.
4   Falahati and Mr. Klayman, because I felt that
5   those two -- and -- and I had a Will and I had all
6   the evidence and the papers there, and once I
7   died, people are going to come and see what they
8   did to me.  Because I didn't have the strength to
9   do it and go through everything.  And I didn't for
10  the past years.
11      Then, once I decided that I'm not going
12  to kill myself, and I'm going to try to start --
13  live again, so I had to put this aside and work.
14      So I was working.  And for this hearing
15  I took my two weeks vacation out from work for
16  2018.  So that's when a few days ago, last week I
17  guess, I started going to a lot of -- at that time
18  it's not easy to relive everything.  Because I
19  didn't want to crash again in my life, I wouldn't
20  go through everything.  I put everything aside and
21  out of my mind.
22      But to get prepared for this hearing,

| Page 199 | Page 201 |
|---|---|

**Page 199**

1       MR. SMITH:  Yes, I'm going to ask about
2   the circumstances under which she came to find
3   them.
4       CHAIRMAN FITCH:  Go ahead.
5       MR. SMITH:  Alright.
6       CHAIRMAN FITCH:  In that respect.
7       MR. SMITH:  Alright.
8   BY MR. SMITH:
9       Q.  Under what circumstances was it that
10  you just got around to sending me that package of
11  emails that you recently sent to me?
12      A.  As you can see, this whole thing
13  happened eight years ago, and I finally was
14  rescued from Mr. Klayman, I at that point I was
15  homeless, had no job, and I slept in my car two
16  nights, later on.  So my focus during the last
17  eight years was to recover, economically and with
18  a job.
19      And the only way that I could survive
20  and my doctors to help me not to take so much
21  medication, in a way maybe I think I just brushed
22  everything under the rug and put everything aside

**Page 201**

1   because I forgot so much, it was such a long time
2   ago, so I started going through emails.  And I
3   actually had a bunch of emails unopened from Mr.
4   Klayman in the "History" of my emails, and the
5   only way I could do it was I got the time off.
6   Because I couldn't work and do this.  I knew that
7   I'm going to crash.  And I have a new doctor too
8   that is working with me, and I actually had to
9   increase the dose of my anxiety medication, and
10  that is when I went through all of those emails,
11  and I emailed you all the stuff that I did.
12      And I know it was late.  I apologize
13  for that.  But I had to somehow have the support
14  for not crashing and going to that dark hole again
15  in my life, that is was seven, eight years ago.
16      CHAIRMAN FITCH:  Is this part of your
17  examination the last subject matter of your direct
18  examination?
19      MR. SMITH:  Well, I don't know.  I
20  guess it depends on a few things, but there are
21  some more questions that I want to ask.
22      I'm not ready to wrap up at this

App.0185

In The Matter Of:  Larry E. Klayman
May 30, 2018

Page 202

1  moment, if that's your question.
2      CHAIRMAN FITCH:  No.  Maybe I didn't
3  make myself clear.
4      You want to introduce this group of
5  documents that you received in the past few days,
6  correct?
7      MR. SMITH:  Yes, that's correct.
8      CHAIRMAN FITCH:  And you want to
9  examine the witness, at least to authenticate the
10  documents and maybe to explain things in the
11  documents, correct?
12      MR. SMITH:  That's correct.
13      CHAIRMAN FITCH:  And there will come a
14  time, if permitted, that you will have finished --
15      MR. SMITH:  Yes.
16      CHAIRMAN FITCH:  -- those documents.
17  Ok.
18      Do you have other lines of direct
19  examination that you want to adduce?
20      MR. SMITH:  Well, I do want to follow
21  up on a few things, you know, that I think may
22  have been left unsaid.  But I think in terms of a

Page 203

1  subject matter, yes, that would be how I would
2  conclude my direct examination would be with
3  walking Ms. Sataki through these documents, which
4  I think corroborate a timeline of events which
5  she's testified to from memory.
6      CHAIRMAN FITCH:  Well, I think we have
7  here the interplay of Rule VII.16, and Rule XI.3.
8  VII.16 is titled "Disposition of Motions," but it
9  refers to all motions directly to the manner in
10  which the hearing is to be conducted.
11      Now, I think we're falling under that
12  rubric, because the time for submission of
13  exhibits has passed, and therefore you are, in
14  affect, moving for leave to introduce exhibits,
15  notwithstanding the passage of that deadline,
16  correct?
17      MR. SMITH:  That's correct.
18      CHAIRMAN FITCH:  The rule instructs
19  that the evidence, if oral, should be heard by the
20  hearing committee, and, if documentary, shall be
21  included in the record, and the hearing committee
22  shall include it its report for the Board a

Page 204

1  recommendation for disposing of the motion...
2      Except that if the hearing committee
3  determines that the evidence is privileged,
4  irrelevant or merely cumulative, the Chair may
5  exclude the evidence after allowing the opponent
6  to make a proffer on the record.
7      I think that one would not find this
8  evidence to be privileged, irrelevant or merely
9  cumulative.  We're not sure, because we haven't
10  seen the documents.
11      So, it appears that the documents will
12  at least get into the record.
13      The question is, where to go from
14  there?
15      I think that the Respondent's team must
16  be concerned that these documents, if admitted and
17  heard about, would be unduly prejudicial to him.
18  But I don't know how to address that conundrum,
19  because we're required to include the documents in
20  the record and give a recommendation to the Board.
21      I think one possibility, and then maybe
22  we'll take a break a little early, is to presume

Page 205

1  they're going to be in the record if the Chair,
2  with the advice of the other members, decides not
3  to receive evidence on them, we would leave them
4  in the record; we will not have seen them, at
5  least until after the hearing is over; and Mr.
6  Klayman will have the choice of whether to cross
7  examine all those documents or not to do so.
8  Because they are going to be in the record, I have
9  no choice under Rule VII.16, and I think that we
10  probably can't make a report without looking at
11  them.  Even if we could, the Board's going to look
12  at them, and the Board can find that certain
13  factual determinations, factual findings, findings
14  of fact, are in fact erroneous, and it's possible
15  that one or more of such instances could be
16  affected by one or more of these documents,
17  vis-a-vis some other documentary or verbal
18  evidence.
19      So that's where I'm leading right now,
20  thinking out loud as much as anything, and that's
21  why I really would like for you to wrap up the
22  other portions of your case, let us think about it

52 (Pages 202 to 205)

In The Matter Of: Larry E. Klayman
May 30, 2018

Page 206

1  a little bit. You take a few minutes, Mr. Smith,
2  to think about the loose ends you want to tie up
3  with respect to the rest of your case, and the
4  committee will make a decision about whether to
5  proceed on the basis that I'm tentatively laying i
6  out and noodling it over, or some other basis.
7      Let's take a break. Ten or fifteen
8  minutes will do you, Mr. Smith?
9      MR. SMITH: Yes, I could actually like
10 to plow right ahead with -- I think I know what
11 loose ends I need to tie up.
12     CHAIRMAN FITCH: Well, let's do that,
13 and then we'll take a break, and then I will hear
14 further from both of you.
15     MS. SMITH: Ok, thank you.
16 BY MR. SMITH:
17     Q. Ms. Sataki, you mentioned that you had
18 been under medication for anxiety.
19     A. Yes.
20     Q. Are you under medication right now
21 during your testimony.
22     A. Not now, no.

Page 207

1      Q. Thank you.
2      Let me ask you to take a look at Bar
3  Exhibit 23-47 and 48.
4      Can you describe for the hearing
5  committee what these -- well, first of all, who
6  authored this document?
7      A. Mr. Klayman.
8      Q. And who is it addressed to?
9      A. To me.
10     Q. What date was it delivered?
11     A. August 1st, 2010.
12     Q. By what medium did you receive this
13 document?
14     A. Email.
15     Q. Could you tell the hearing committee
16 what this document was conveying to you?
17     A. It's --
18     CHAIRMAN FITCH: Why don't we let the
19 document speak for itself.
20 BY MR. SMITH:
21     Q. How did you feel upon receiving this
22 document?

Page 208

1      A. I felt the same. It was again -- every
2  time I would receive an email like that, I have to
3  think and see, what is it that make him upset
4  again now? Is it the fact that I'm talking to
5  Tony Guido, or is it that -- what is it that
6  again? It was basically a -- he would be ok when
7  I'm not in touch with anyone, or if I'm not -- if
8  I'm doing something he doesn't like, then he would
9  send me an email like that again.
10     Q. Who was Tony Guido?
11     A. It was my friend. One of the people
12 that he had, his FBI friend to background check.
13     Mr. Klayman would have his FBI friend
14 background check --
15     MR. KLAYMAN: Objection, your Honor,
16 lack of foundation.
17     CHAIRMAN FITCH: No question pending.
18     MR. KLAYMAN: I have no FBI friend.
19 There is no evidence. Lacks foundation.
20 BY MR. SMITH:
21     Q. Do you know why Mr. Guido was
22 investigated?

Page 209

1      A. No.
2      MR. KLAYMAN: Lacks foundation. Same
3  objection.
4  BY MR. SMITH:
5      Q. Let me ask you to take a look at Bar
6  Exhibit 23-8 and 23-9 --
7      CHAIRMAN FITCH: Let me ask --
8      THE WITNESS: The 23-48?
9      CHAIRMAN FITCH: I'm sorry, how do you
10 know that Mr. Guido was investigated?
11     THE WITNESS: Mr. Klayman told me that.
12     CHAIRMAN FITCH: Go ahead, Mr. Smith.
13 BY MR. SMITH:
14     Q. 23-8 and nine.
15     A. Oh, eight, I'm sorry. I was on the
16 wrong page.
17     CHAIRMAN FITCH: What number?
18     MR. SMITH: Sorry, Bar Exhibit 23-8 and
19 nine.
20     CHAIRMAN FITCH: No need to apologize.
21 It's my slowness, not yours.
22     THE WITNESS: 23-8. That's an email

53 (Pages 206 to 209)

| Page 210 | Page 212 |
|---|---|

**Page 210**

1  from Mr. Klayman to me.  Legal representation
2  agreement.
3  BY MR. SMITH:
4      Q.  Ok.  What is he proposing as his fee in
5  this agreement?
6      A.  250,000.
7      Q.  Well, in terms of recovery, if you look
8  at I guess the fourth sentence down.
9      A.  Yes, he says that he -- at this point,
10  for the time that he put down for my case, 40
11  percent is not enough, so he wants 50 percent.
12      Q.  Ok.  Your understanding about your fee
13  agreement had been what?
14          What was your understanding about the
15  terms of the fee agreement?
16      A.  At forty percent.
17      Q.  Alright.  And this email was sent -- I
18  don't see a date on Bar Exhibit 23-8, but at 23-9
19  there's a date there.
20      A.  Yes, I sent him an email, and that
21  upset him, so he sent me that email right after.
22      Q.  Ok.

**Page 211**

1      A.  So I sent him an email on May 30th,
2  2010, and then, this, the 23-8, is his answer to
3  my email.
4      Q.  Ok, thank you.
5      CHAIRMAN FITCH:  I note for the record
6  that the upper right-hand corner of Page 23-8
7  bears a date and a time, 2/23/11, 1:39 a.m.
8      MR. SMITH:  I don't know that that's
9  necessarily --
10      CHAIRMAN FITCH:  Well, that's going to
11  be my point.  Perhaps she can tell us whether or
12  not that's a typical format for her email
13  provider, which appears to be Yahoo.
14      THE WITNESS:  I can provide the date of
15  this.  I have it -- I can provide date and time
16  for 23-8 when that email was sent.  I have it.  I
17  have the whole email conversation, so I can
18  provide the date.
19      CHAIRMAN FITCH:  Is the date up there
20  that I just referred to, is that the date you
21  copied the document out onto paper?
22      THE WITNESS:  At the very top to the

**Page 212**

1  right?
2      CHAIRMAN FITCH:  Mm-hmm.
3      THE WITNESS:  Yes, that's when I copied
4  it.  It's --
5      CHAIRMAN FITCH:  Ok.
6      THE WITNESS:  -- from 2011, but the
7  email is from 2010.
8      MR. SMITH:  I have no more questions of
9  Ms. Sataki, pending the Chair's ruling on the
10  supplemental exhibits.
11      CHAIRMAN FITCH:  Understood.
12          In our roughly informal environment, if
13  a bolt of lightening reminds you of some other
14  points, we can accommodate either party.
15          Let's stand in recess until maybe 3:25,
16  please.
17          Are you gentlemen going to stay here
18  and work, or you're going to go somewhere else and
19  work or not work?
20      MR. KLAYMAN:  Before 3:25?
21      CHAIRMAN FITCH:  Between now and 3:25.
22      MR. KLAYMAN:  I mean we're going to

**Page 213**

1  walk outside I think.
2      CHAIRMAN FITCH:  Well, then we will
3  stay here and confer.  But if you want to work at
4  your desk, we're happy to go elsewhere.
5      MR. KLAYMAN:  Yes, I would say, your
6  Honor, again, particularly, in light of the
7  documents, and Mr. Sujat's recent representation,
8  we need sometime to deal with --
9      CHAIRMAN FITCH:  That's all I want to
10  know.  You're going to able to argue.
11          All I want to know right now is is it
12  more convenient for you to stay there or go
13  outside?
14      MR. KLAYMAN:  Yes, I understand.
15      CHAIRMAN FITCH:  And which is the
16  answer?  You want to stay there or you want to go
17  outside?
18      MR. KLAYMAN:  No, we'll go outside.
19      CHAIRMAN FITCH:  We'll stay here.
20      (Recess taken.)
21      CHAIRMAN FITCH:  If it's satisfactory
22  to everybody, we'll return to the record at about

54 (Pages 210 to 213)

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 214 | Page 216 |
|---|---|

**Page 214**

1  3:26.

2  We've thought it through, and I'm

3  addressing the issue of the entry of the most

4  recently produced documents, which as I recall

5  were provided by Disciplinary Counsel to the

6  Respondent's team this past Friday afternoon.

7  We've thought through the issue as best

8  we can.  We have thought about the thinking out

9  loud proposal or idea, or notion that I had

10  surfaced.  We're still going to hear from the

11  parties, but I'll tell you ahead of time that,

12  given the requirements of the rule, I think we

13  have no alternative but to inspect the documents

14  overnight and determine first thing tomorrow

15  morning whether some or all of the documents will

16  come into evidence in the sense -- they're all

17  coming into the record, as we said, but coming

18  into evidence in the sense that Disciplinary

19  Counsel can adduce testimony if he wishes from the

20  witness about the documents and the contents

21  thereof.

22  This is again of these situations where

**Page 216**

1  afternoon, or, we could hear from another witness,

2  Mr. Smith.

3  MR. SMITH:  Well, my expert witness

4  needs a two-hour --

5  CHAIRMAN FITCH:  No, we thought that

6  was the case.

7  MR. SMITH:  And Mr. O'Connell, who had

8  been with us this morning, I'm not sure that he is

9  still here.

10  CHAIRMAN FITCH:  Ok.

11  MR. SMITH:  Because I anticipated that

12  we would be finishing up with Ms. Sataki today, so

13  I don't know if my witnesses are available now.

14  CHAIRMAN FITCH:  I'm not going to push

15  you on that.

16  I want you to be certain that the

17  testimony of those two witnesses is as efficient

18  as possible.  We've got tomorrow and we've got

19  Friday.  I guess we have Saturday, if need be.

20  We've got late Friday night.  But we're going to

21  get this current witness done.

22  MR. SMITH:  I can promise you that my

| Page 215 | Page 217 |
|---|---|

**Page 215**

1  you have to balance out things, but I think that,

2  if we decide the documents are unduly prejudicial,

3  we will be able not to let those documents at all

4  affect our deliberations in the case.

5  We think that it's possible, we'll

6  simply find out, that the documents will cover

7  much the same ground as has been covered before.

8  Indeed, Mr. Smith, I certainly think

9  it's possible that some or all of the documents

10  may be cumulative.  I mean, we've heard a good

11  deal of testimony about certain situations and

12  reactions and so on.  So you're going to need to

13  convince us that they're not cumulative.

14  All of that we can cover tomorrow

15  morning.  As I said, I'll willing to hear argument

16  this afternoon, but I'd just as soon not.  I'd

17  just as soon hear argument tomorrow morning.  But

18  if anybody wants to be heard this afternoon, we'll

19  do it.

20  We're inclined to adopt, go down the

21  road I just described, and if we do that, we will

22  either stand in recess for the rest of the

**Page 217**

1  examination of both Mr. Bennett and Mr. O'Connell

2  will be very short and sweet, and, to the extent

3  that there is an extension of their testimony, it

4  will be as a result of cross-examination or any

5  questions that the committee may have with them.

6  CHAIRMAN FITCH:  And we're going to

7  certainly allow a reasonable amount of extensive

8  cross-examination by Respondent's team, if they

9  wish.

10  We have noted that the testimony of the

11  complaining witness thus far amounts to less than

12  180 minutes, which is less than three hours.  I

13  think we'd be hard pressed to be persuaded that

14  there needs to be 15 hours.  I'd be hard pressed

15  to be persuaded that there needs to be nine hours.

16  Other than that, we'll see, but this

17  witness is out here this week.

18  You want to argue or make comments

19  right now, for the Respondent's team?

20  MR. KLAYMAN:  I will address it in the

21  morning in light of your comments.

22  CHAIRMAN FITCH:  I think that's ideal.

55 (Pages 214 to 217)

App.0189

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 218 | Page 220 |
|---|---|

**Page 218**

1   THE WITNESS:  May I say something?

2   CHAIRMAN FITCH:  Well -- about

3   scheduling issues?

4   THE WITNESS:  No, about the last thing

5   that we left.

6   CHAIRMAN FITCH:  Pardon?

7   THE WITNESS:  The last item, right

8   before recess that we have -- we were talking

9   about 23-8.

10   MR. TIGAR:  Oh, 23-8.

11   CHAIRMAN FITCH:  Oh, 23-8, right.

12   Does your thought --

13   THE WITNESS:  It's not thought.  It's

14   just I wanted to ask you just to read that

15   sentence, only --

16   CHAIRMAN FITCH:  Well, I don't want to

17   hear that.  I want to hear if there is --

18   THE WITNESS:  Well, may I read it?

19   CHAIRMAN FITCH:  -- if there's some

20   administrative aspect or date aspect or so on.

21   But we have the document before us and --

22   THE WITNESS:  Ok.

**Page 220**

1   THE WITNESS:  Ok.

2   MR. TIGAR:  We're going to need an

3   electronic copy exhibit of the exhibits in

4   question for our overnight --

5   MR. SMITH:  I had actually already put

6   together, as I had said, a copy of the exhibits

7   that I felt were relevant.

8   CHAIRMAN FITCH:  Have they been

9   digitized?

10   MR. SMITH:  I'll bet you that my

11   secretary has, but I can't -- if you give me --

12   MS. LARKIN:  Do you have hard copies?

13   CHAIRMAN FITCH:  Yes, he has them.

14   MR. TIGAR:  If they have, counsel,

15   would you please ask the Executive Attorney to

16   email us a copy.

17   MR. SMITH:  I have not given anybody

18   these documents, pending your ruling what to do.

19   CHAIRMAN FITCH:  You are going to give

20   them to me right now?

21   MR. SMITH:  Now I'm going to give them

22   to you and Respondent's counsel.

| Page 219 | Page 221 |
|---|---|

**Page 219**

1   CHAIRMAN FITCH:  And I think that,

2   although there's no reason for you to know this,

3   Mr. Smith and Mr. Klayman, later in the case, as

4   they're doing their closing arguments, and as they

5   do their legal briefs, they will be, in effect

6   saying, "You three people need to read such and

7   such, such and such, and such and such."

8   So, anything that you and Mr. Smith

9   want us to read carefully will get read, or Mr.

10   Klayman --

11   THE WITNESS:  I'm sorry, I didn't mean

12   to be rude or ask you to read something.

13   CHAIRMAN FITCH:  No, no.

14   THE WITNESS:  I thought maybe I can

15   read it.

16   CHAIRMAN FITCH:  Perfectly sensible

17   suggestion, and careful witnesses are appreciated.

18   But I think that we don't have a question pending

19   right now.  I think the answer was complete

20   before.

21   So that's the way we're going to go on

22   that.

**Page 221**

1   MR. KLAYMAN:  May I interject one point

2   here.

3   CHAIRMAN FITCH:  Sure.

4   MR. KLAYMAN:  It appears that what Mr.

5   Smith has done is giving to you -- because he just

6   represented that they are only some of the

7   documents, that there are documents in there that

8   may be favorable -- I mean, I have taken a quick

9   glance at them -- to Respondent's case, ok.

10   Apparently he's pulled them out.  So, therefore

11   it's highly prejudicial if you look at them

12   tonight.

13   You know, I want a representation from

14   Mr. Smith that there are documents that you

15   removed that are not in this package.

16   MR. SMITH:  As I said, I selected the

17   documents that I felt were relevant to our case

18   and made copies of them and have made them

19   available to the parties.

20   Respondent and his counsel were given

21   copies of everything on last Friday, one day after

22   I had received them.

App.0190

In The Matter Of: Larry E. Klayman
May 30, 2018

<table>
<tr><td colspan="2">

Page 222

If there are documents that are not in
this compendium that he feels he would like to use
as exhibits in this case in the ordinary course of
examination, he's certainly free to do so.

But what I have done, for the
convenience of the hearing committee and for
purposes of Disciplinary Counsel's case in chief,
is put these together in an exhibit form so that
we could use them as we saw fit.

CHAIRMAN FITCH: But you have otherwise
complied with the open and complete file rule?

MR. SMITH: He has copies of
everything, and again, to the extent that there
are exhibits which he feels we should have put in,
or documents that he feels we should have put in
that are not included in the 38 with you, he is
certainly free to copy and make use of those
documents during cross-examination regarding his
case in chief.

CHAIRMAN FITCH: If there's any
logistical problem there, I will impose upon Board
staff to assist.

</td></tr>
</table>

**Page 224**

CHAIRMAN FITCH: Have a good evening.

(Witness is excused.)

MR. KLAYMAN: Your Honor, I reserve the
bulk of my argument for tomorrow morning. I only
got a quick glance at these documents because they
were provided last Friday to me.

Mr. Smith could have certainly put the
Board on notice, the hearing committee on notice,
or even filed a motion or asked for consent to use
them, but he never did that, not even with Mr.
Sujat. We had a conversation.

There are documents in here which deal
with her past -- and that's why I asked politely
to not have her here -- her past history with men.
And one of those documents that I was able to see
is an affidavit from her former husband --

MR. SMITH: Before we go any further, I
don't know where he's going with this, other than
to try to color your view of the witness. But, to
the extent that we're going to have full argument
about this tomorrow and about these documents and
whatever documents he wants or does not want in

**Page 223**

MR. KLAYMAN: May I address something
without the presence of the witness here?

CHAIRMAN FITCH: Ms. Sataki, we are
going to adjourn in a few minutes for the day to
deal with these always aggravating lawyer-like
problems.

Mr. Smith will notify you as to what
time you should return tomorrow, but presumptively
you should come back at 9:30. There might be a
little bit of delay before you're called. I'll
let you and Mr. Smith juggle those logistics. But
I think we're going to start at 9:30.

And you should not discuss your
testimony with any other living human being
tonight --

THE WITNESS: Yes, sir.

CHAIRMAN FITCH: -- before probably
resuming tomorrow.

THE WITNESS: Yes, sir.

CHAIRMAN FITCH: We appreciate your
patience.

THE WITNESS: Thank you.

**Page 225**

there, I think that's fair.

But if he's going to start bad-mouthing
the witness, you know, at this point, I mean, it's
--

MR. KLAYMAN: I've been very polite.

CHAIRMAN FITCH: Are you saying that the
documents -- are you, Mr. Klayman, saying that the
documents you just referred to are part of the
larger package in its entirety?

MR. KLAYMAN: Yes, yes.

CHAIRMAN FITCH: Or a part of the
proffered exhibits?

MR. KLAYMAN: I might add throughout
this entire -- part of the larger package.
They're not in there. He pulled them out. I'm a
hundred percent certain.

CHAIRMAN FITCH: Well, then why are we
addressing it? Why do you want to bring those to
my attention?

MR. KLAYMAN: Well, because they're
actually helpful to my case.

And, you know, I haven't in any way

57 (Pages 222 to 225)

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 226 | Page 228 |
|---|---|

**Page 226**

1  ever bad-mouthed Ms. Sataki.  The only thing I've
2  ever said was not in that vein throughout the
3  pleadings or anything else.
4       CHAIRMAN FITCH:  I know that.
5       MR. KLAYMAN:  And therefore it's okay
6  to come in here -- and let me be a little bit
7  emotional -- this is why I prefer not to represent
8  myself but Mr. Sujat to speed, and say from
9  my heart I'd be a little emotional.
10       But it's okay to smear me, but if I say
11  anything in response to my own defense, then
12  somehow I'm going to bad-mouth somebody.  I'm not
13  bad-mouthing anybody.
14       There's a document in there --
15       CHAIRMAN FITCH:  No one's saying that.
16       MR. KLAYMAN:  There's a document in
17  there from her husband, a sworn affidavit, that
18  two weeks after they were married he caught her in
19  bed with another man, in their house.  Ok?
20       She has problems with men, and it goes
21  way back.
22       CHAIRMAN FITCH:  So what?  That may

**Page 227**

1  very well adversely impact upon her credibility.
2       MR. KLAYMAN:  Well, that's what I'm
3  saying --
4       CHAIRMAN FITCH:  That sounds like good
5  news for you.
6       MR. KLAYMAN:  -- he removed that --
7       MR. SMITH:  You don't know what I've
8  removed, Larry Klayman -- Mr. Klayman.  I mean --
9       MR. KLAYMAN:  Did you remove it?
10       MR. SMITH:  Look, I know that I saw the
11  document, and if I deemed it a relevant document,
12  it's going to be in the compendium.  If I didn't
13  deem it relevant to my case, then I did not.
14       But you have the opportunity, you have
15  the documents.  So if you feel like you can use
16  it, you can put it in.
17       MR. TIGAR:  I think I hear what's being
18  said, and personally I'm not being helped by this
19  sidebar conversation.
20       Under rule of evidence 106, which is
21  the common-law rule of completeness, I will, and
22  I'm sure the committee will, "entertain the

**Page 228**

1  admissibility of any document not offered by the
2  other side, or any portion of a document not
3  offered by the other side that both ought in
4  fairness to be considered with it."
5       So, to that extent, I think you can be
6  reassured, if I'm understanding your argument
7  properly, that no evil will befall your situation
8  as a result of what we're going to do.
9       MR. KLAYMAN:  I understand you.
10       MR. TIGAR:  I would like an opportunity
11  to look at these things overnight so I can be more
12  comfortable on that.
13       MR. KLAYMAN:  I understand.
14       I just want to make it clear here, and
15  I'm standing here as the Respondent, the witness
16  and the counsel.  It's a position I don't really
17  want to be in.  That's why Mr. Sujat's here and we
18  need time for him to prepare.
19       But the reality is that all this stuff
20  is sprung on me at the last minute.  They opposed
21  my taking Dr. Aviera's deposition.  It's clear she
22  has some emotional issues here, to put it mildly.

**Page 229**

1  They opposed my taking her deposition.  She
2  herself said she didn't remember any of this stuff
3  until recently, didn't even open emails, yet I was
4  unable to take discovery, and they opposed that.
5       And then pulling the rug out from under
6  me at the last minute, they submit all this stuff
7  to y'all, and it's not even fair.  It's not only
8  unfair, it's not due process and equal protection.
9  I mean, we're eight years into the case.  She
10  can't remember things that she claims.
11       So this proceeding, through no fault of
12  your own, is out of control.  And it is near total
13  denial of due process.  And I'll argue that in
14  greater detail tomorrow, but for him to -- for Mr.
15  Smith to sit there and say, you know, "I can do
16  whatever I want" when he submits this stuff, on
17  the eve of trial, didn't even bother to tell Mr.
18  Sujat that he was going to produce them -- he
19  could have filed a motion when he got them on
20  Thursday, say, "I got these documents, I'm
21  moving.  Will you consent?"  He didn't do that.
22  But he sprung it on us today, and that's not right

58  (Pages 226 to 229)

In The Matter Of:  Larry E. Klayman
May 30, 2018

| Page 230 | |
| --- | --- |

1  and it's not ethical.  It's not professional.

2      MR. SMITH:  May I --

3      CHAIRMAN FITCH:  Our understanding is

4  that the documents were provided last Friday.  It

5  is what it is.

6      With respect to the concern, if any,

7  for the complaining witness' reputation, emotional

8  reaction or anything else, other than being sure

9  that she or any other witness is not abused,

10  Respondent's primary concern and interest has to

11  be the Respondent's defense.  We understand that.

12      I once had a hearing in which the

13  Respondent kept saying essentially, "I'm pulling

14  my punches because I don't want to hurt so and

15  so."  And I finally told that Respondent, "Get

16  over it."

17      I'm only concerned about you defending

18  yourself, period.  I'll take care if need be of a

19  witness.  You take care of yourself.  And I think

20  that's where we are.

21      I have no concern whatsoever about a

22  good, hard hitting cross-examination.

| Page 231 | |
| --- | --- |

1      MR. KLAYMAN:  In today's environment,

2  your Honor, you know the -- and I believe in

3  women's rights.  Gloria Allred would not be my

4  friend.  I just had lunch with her two weeks ago.

5  The man is always at a disadvantage, nearly

6  always, with some exceptions, and consequently we

7  need time to prepare -- and I might add, on the

8  record, keep in mind there has never been a

9  lawsuit filed or any allegation of sexual

10  harassment or malpractice or anything.  And she

11  obviously had some advice through this Kathleen

12  Stanton, and I'll get into that in

13  cross-examination, and in my own testimony.  And

14  it's all kind of like I'm being ambushed without

15  even the opportunity to have --

16      And they opposed it, to get some

17  information after eight years, when documents were

18  lost, witnesses were disbursed, couldn't be found,

19  and then to do this on the eve of trial, it is

20  unethical, in and of itself.

21      So, you know, that's where I stand.  I

22  appreciate you're going to allow me to give an

| Page 232 | |
| --- | --- |

1  aggressive defense, but I don't want to look like

2  the bad guy.  I never have.  And that's the

3  quandary I'm in as being Respondent, and my

4  lawyer, and the witness, and I want to keep a good

5  demeanor, but -- and stay calm, but, you know, I'm

6  outraged by some of the things I heard and what

7  has been done by Bar Counsel.

8      And I'll be moving at the close of the

9  evidence to dismiss this case on a variety of

10  different grounds.  And I know there's some gray

11  in the area -- gray law in the area here about

12  that, but I do believe you have that authority,

13  you have that inherent authority.  And other bars

14  have done that.  And Professor Rotunda's opinion,

15  you have an opportunity to review it, may his soul

16  rest in peace, finds that law available in most

17  jurisdictions.

18      CHAIRMAN FITCH:  But he does not say

19  that he finds it available in this jurisdiction.

20      MR. KLAYMAN:  I don't think the issue

21  has been reached yet.

22      CHAIRMAN FITCH:  He does not say either

| Page 233 | |
| --- | --- |

1  way.

2      MR. KLAYMAN:  I don't think it's ever

3  been.  I may be my own advocate in a case as

4  egregious as this.

5      CHAIRMAN FITCH:  He's entitled to his

6  opinion.

7      Mr. Tigar, do you have an observation?

8      MR. TIGAR:  Well, I assume, Mr.

9  Klayman, up here, the reason they have lawyers

10  decide these cases, as well as the hearing

11  officers is, this is not our first rodeo, and we

12  have all been in cases in which public opinion has

13  been against us and in which we have faced this

14  terrible problem of cross-examining people who

15  come on as sympathetic, such as in the capital

16  case, victim impact witnesses.

17      So, we understand the situation and I

18  adopt the Chair's position.  Nobody up here is

19  opposed to the idea of a vigorous, effective

20  cross-examination in your exercising your rights,

21  and I think everybody up here can be trusted to

22  disregard whatever public attitudes may be

In The Matter Of: Larry E. Klayman
May 30, 2018

Page 234

1  circulating around out there, that may have led to
2  some perceptions.
3      CHAIRMAN FITCH: We will stand in
4  adjournment until 9:30 tomorrow morning.
5      And, we are still on the record, I just
6  want counsel, all counsel to keep in mind of the
7  time and schedule that I mentioned earlier.
8      (Whereupon at 3:50 p.m., the hearing
9  was in recess until Thursday, June 31, at 9:30
10  a.m.)
11
12
13
14
15
16
17
18
19
20
21
22

Page 235

1      CERTIFICATE OF NOTARY PUBLIC
2      I, KIM M. BRANTLEY, the officer before whom
3  the foregoing hearing was taken, do hereby,
4  certify that the proceedings were taken by me in
5  stenotype and thereafter reduced to typewriting
6  under my direction; that said hearing is a true
7  record of the proceedings; that I am neither
8  counsel for, related to, nor employed by any of
9  the parties to the action in which this hearing
10  was taken; and, further, that I am not a relative
11  or employee of any counsel or attorney employed by
12  the parties hereto, nor financially or otherwise
13  interested in the outcome of this action.
14
15      _____
        KIM M. BRANTLEY, C.S.R.
16      Notary Public in and for
        the District of Columbia
17
18
19
20  My commission expires: October 31, 2019
21
22

60  (Pages 234 to 235)

**A**

**a.m** 2:3 189:2,10
211:7 234:10
**abandoned** 60:18
166:22
**abandoning** 60:15
**able** 9:10 13:21
16:20 22:18 23:21
24:16 44:17 98:1
133:7 134:21
168:13 192:10
213:10 215:3
224:15
**absolutely** 30:8
142:16 147:2
175:11
**abundance** 110:15
**abused** 230:9
**abusing** 174:5
**abusive** 174:20
**accept** 95:5 190:14
195:2
**accepted** 28:6 59:8
188:4
**access** 21:1
**accommodate**
212:14
**accompli** 22:14
**account** 100:16
**accountability**
56:22
**accounting** 57:9
**accounts** 100:20,21
**accurate** 96:6
**accurately** 181:3
**accusations** 174:21
**acquire** 177:11
**act** 56:15 89:17
**acted** 57:13
**acting** 119:15,21
121:7 163:15
**action** 46:1 47:11
61:9 157:5 235:9
235:13
**actions** 47:5 48:1
159:1
**activity** 47:5
**actual** 89:17 177:18
**ad** 2:3,10 5:9
**add** 26:11 27:14
34:6,12 35:15
92:4,11 225:13
231:7
**adding** 117:9
**addition** 17:20
37:14 39:19

189:13 190:5
**additional** 12:14
**address** 10:17 11:1
16:1 26:6 33:10
33:10 41:10 61:17
61:19,19 162:14
193:2 196:14
197:7,18 204:18
217:20 223:1
**addressed** 10:18
16:20 130:9,22
156:8 197:16
207:8
**addressing** 11:6
214:3 225:18
**adduce** 95:21
202:19 214:19
**adequate** 58:7
149:7,10
**adjourn** 17:17 18:3
223:4
**adjourned** 10:7
**adjourning** 10:11
**adjournment** 164:5
234:4
**adjust** 68:10
**adjutant** 43:13
**administration**
165:21
**administrative**
61:15 165:11
168:7 218:20
**admissibility** 94:13
134:11 228:1
**admission** 25:11
**admitted** 25:8
204:16
**adopt** 215:20
233:18
**advance** 22:18
**adversary** 5:20
**adversely** 227:1
**advice** 205:2 231:11
**advised** 162:8
**advisement** 169:17
**advisor** 66:1
**advocate** 38:19
43:7 66:21 233:3
**advocated** 24:2
56:4
**affect** 97:13,15
98:22 203:14
215:4
**affidavit** 224:16
226:17
**affidavits** 59:10

**affirm** 67:20
**affirmation** 6:3
**afford** 15:1 84:1
**afield** 95:18
**AFL-CIO** 52:10
**afraid** 77:16 115:3
122:4
**afternoon** 8:11 11:6
11:7 16:21 18:12
214:6 215:16,18
216:1
**afternoon's** 10:20
11:2
**agency** 52:13 54:10
57:21
**aggravating** 223:5
**aggressive** 232:1
**ago** 21:12 126:7,19
126:21 129:1
152:16 199:13
200:16 201:2,15
231:4
**agree** 86:19 146:22
**agreeable** 10:8
**agreed** 138:6
**agreement** 34:18,22
83:3,6,21 84:11
84:11 210:2,5,13
210:15
**ahead** 68:17 92:16
127:21 128:11
145:18 154:17
176:5 194:4 199:4
206:10 209:12
214:11
**aired** 73:1
**Akbar** 49:17
**Alex** 78:8
**alive** 48:14 166:7
**allegation** 12:1
231:9
**allegations** 9:21
24:15 37:5 44:10
47:2,17 55:19
**alleged** 41:15 51:10
61:16 96:9 97:10
97:18 98:6 100:4
178:10
**allegedly** 13:18
**alleviated** 133:8
**allow** 25:10 141:13
174:12 217:7
231:22
**allowed** 30:1 56:12
174:11
**allowing** 204:5

**Allred** 12:11 53:6
82:6 189:20 190:2
190:6 231:3
**alright** 100:21
103:4 104:20
109:22 110:1
129:13 130:1
137:17 140:6
147:3 150:7
175:21 193:20
194:4,9 195:10
199:5,7 210:17
**alternative** 57:20
214:13
**Alusat** 147:12
**ambushed** 136:1
231:14
**America** 37:2 38:18
44:19 46:12 50:4
50:13 51:13 53:22
57:8 58:4 59:2,9
59:12,13 66:5
72:16,18 87:18
105:11 157:10
**amount** 111:20
217:7
**amounts** 217:11
**analysis** 40:12
**anchoring** 71:22
72:1,20
**and/or** 30:9 147:9
153:9
**Angeles** 51:13,16
51:22 54:1,1,15
59:3 62:12 69:14
70:22 71:11,12
72:6,7 81:21
83:18 105:16
106:18 110:19
**angry** 142:6 187:5
**answer** 86:6 89:19
90:13,14 92:11
93:20 106:7 108:6
148:3 159:8
183:16,18 184:1
185:18 211:2
213:16 219:19
**answered** 110:14
128:2
**answering** 186:17
**ANTHONY** 2:11
**anti-depression**
126:2
**antianxiety** 126:2
**anticipate** 6:22
65:12

**anticipated** 10:13
10:15 41:5 216:11
**antidumping** 44:3
**anxiety** 201:9
206:18
**anybody** 8:3,15
35:18 60:11 89:3
196:19 215:18
220:17 226:13
**anymore** 127:9
**apartment** 53:12
54:18 109:8,8,9
109:10,13 174:11
174:12
**apologize** 18:7 33:4
165:13 182:8
201:12 209:20
**apparent** 63:4
**apparently** 46:1
221:10
**Appeal** 62:7
**Appeals** 1:1 5:6
**appear** 61:21 181:2
195:19
**appearance** 29:6
**APPEARANCES**
2:9 3:1
**appeared** 54:2
**appearing** 15:19
42:8
**appears** 60:22
204:11 211:13
221:4
**apples** 136:9
**applicable** 25:10
**apply** 136:10
**appreciate** 45:20
223:20 231:22
**appreciated** 219:17
**appropriate** 8:16
95:14
**approve** 75:6
**approved** 55:7
57:11
**approximate**
104:13
**approximately**
110:6 124:19
165:7 180:2
**April** 105:6 106:20
107:1 118:7,8,9
130:10 131:11,16
132:8,10,12
172:17
**Arabic** 54:6,8
**area** 122:9 133:13

186:9 232:11,11
**areas** 26:1,3,5
**argue** 213:10
  217:18 229:13
**arguing** 121:2,2,3
**argument** 17:21
  18:4 30:9 136:7
  215:15,17 224:4
  224:20 228:6
**arguments** 118:15
  219:4
**Arlene** 130:9,22
**arrangement** 83:7
  109:3
**arrangements**
  83:14,16
**arrive** 167:21
**arrived** 70:19
**article** 97:5 104:4
**articles** 14:12 40:2
  40:7 55:6 91:2
  96:8,9,11,13,15
  96:19,22 97:2,10
  97:17,18 98:6,12
  100:4
**Asbill** 34:16,17
**ashamed** 122:3,4
**aside** 6:21 199:22
  200:13,20
**asked** 21:9 28:12
  46:2 50:9 53:1,15
  53:18 58:11 62:18
  63:20 64:2 75:8
  78:7 79:19 80:5
  87:5,7 89:1 90:14
  91:6 106:8 107:15
  113:14,15 114:20
  115:1 119:5
  122:19,21 123:2
  128:5 138:4,6
  143:1,18 145:5
  147:18 152:18
  159:13,19 169:1
  170:15 174:9,22
  179:7,15 180:18
  188:13 224:9,13
**asking** 58:22 76:21
  77:6 89:12 103:6
  103:7 138:22
  144:9,11 173:11
  192:2
**aspect** 94:6 218:20
  218:20
**aspects** 37:12
**asserted** 149:12
**assertion** 127:18

**assertive** 12:18
**assist** 180:19
  222:22
**assistance** 45:14
  179:16
**assisting** 108:18
**associate** 167:19
**assume** 23:10 27:21
  60:15 233:8
**assuming** 61:18
**assumption** 99:17
**assurance** 16:4
**assured** 16:13
**attached** 129:10
**attempt** 38:16
  142:20
**attempted** 37:8
  118:3
**attend** 71:2 78:16
**attended** 138:11
**attention** 18:11
  99:3 131:6 225:19
**attitudes** 233:22
**attorney** 2:16,18
  5:6 45:12 80:7
  81:17,20 91:17
  119:6,21 120:4
  121:7 138:19,20
  138:21 139:3
  142:13 150:21
  172:17 175:17
  185:10 186:8
  196:12,15 220:15
  235:11
**attorney's** 121:7
  196:13
**attorney/client** 84:8
**August** 156:8
  159:21,22 207:11
**Austin** 156:9 157:8
  157:22 158:2,7
  160:8
**authenticate** 202:9
**authentication**
  177:18 178:6,22
**authenticity** 177:21
  178:1
**authored** 20:6
  207:6
**authority** 64:18
  232:12,13
**available** 216:13
  221:19 232:16,19
**Aviera** 125:4,9,11
  126:5,18 127:19
  130:17,19 131:8,9

131:11,20 132:1,7
  132:20 133:7,16
  133:20 134:4,6,10
  136:21 137:6,13
  137:18,21 138:4
  138:12,15,19
  139:6,7,14,17
  140:18 141:8
  185:1,3
**Aviera's** 126:9
  133:18 136:18,22
  228:21
**award** 120:9,14
**aware** 20:6 30:17
  46:3 57:18 118:11
  137:18
**ayatollah** 65:22

─────────
**B**
─────────
**B** 133:16
**back** 18:3 31:13
  33:14 45:7 48:6
  49:16 51:11 53:18
  53:22 54:3,8
  58:14 59:22 61:6
  61:13 62:11 64:20
  73:22 84:3,14
  87:13 91:9 98:1
  102:2 111:13
  116:10 120:17
  121:20 123:8,9
  124:12 130:4
  139:21 143:22
  154:20 157:7
  160:4 165:6 166:3
  168:9 171:6
  183:18 223:9
  226:21
**backfire** 98:4
**background** 88:20
  208:12,14
**backing** 44:14
**bad** 77:11 78:11
  101:12,13,14
  232:2
**bad-mouth** 226:12
**bad-mouthed** 226:1
**bad-mouthing**
  225:2 226:13
**balance** 215:1
**balancing** 27:7
**bankrupt** 53:9
**Bar** 5:2 15:15 20:22
  21:5 22:1 23:6,16
  24:11 31:21 32:11
  34:7,8,9,13 35:5,6

35:9,17 36:18
  43:4,6 55:21
  60:10,12 63:7
  84:19 85:2,3,18
  109:19 110:12
  112:2 128:17
  130:8,20 131:16
  133:11 135:2
  139:21 140:13
  141:17 143:22
  144:2 145:21
  151:14 154:19
  156:7 158:17
  161:11 170:13
  176:7,12 180:7
  187:11 194:9
  197:12 207:2
  209:5,18 210:18
  232:7
**bars** 15:16 49:1
  60:4 63:2 64:2
  232:13
**based** 9:21 15:6
  24:3 47:12 168:3
**basic** 44:12 45:8
**basically** 43:8 47:12
  48:5 79:1 120:16
  128:12 168:1
  208:6
**basis** 77:7 111:5
  125:18 150:13
  206:5,6
**bathroom** 122:16
  122:17,19,20
  184:19
**bear** 53:18 54:3
  65:4 129:6
**bears** 211:7
**beauty** 71:4
**becoming** 174:1
**bed** 226:19
**befall** 228:7
**began** 38:1 50:16
  52:11
**begged** 142:11
**begging** 142:12
**beginning** 10:18,19
  11:1,6 52:4 82:19
  83:17 90:20 98:17
  104:21 105:3
  123:17,20 166:20
**begins** 117:8 156:18
  157:2
**behalf** 2:6,18 3:2
  6:6 38:19 45:20
  49:4 99:20 147:9

153:9 162:11
  170:16
**belabor** 10:3 30:19
  57:5 64:5
**belated** 27:5
**believe** 32:6,8 40:15
  47:15 49:15 66:15
  84:12 98:9 108:1
  108:2 148:15
  152:11 157:12
  197:17 231:2
  232:12
**believed** 20:21
  66:14 98:21
  108:10
**believes** 44:5,6
**Beller** 34:18,19
**benefit** 37:20 92:2
**Bennett** 217:1
**berated** 38:10
**best** 10:18 42:17
  48:2,3,10 53:14
  91:17 116:7 121:4
  136:10 148:14
  214:7
**bet** 178:17 220:10
**better** 78:12 109:17
  130:1 159:9
**beyond** 33:7
**Bible** 47:16,16
**big** 32:7 92:1 93:9
  97:14 150:19
  151:3 166:2 172:4
  185:6
**binder** 168:4
**binders** 166:10
  168:9
**bit** 7:8,10,16 8:9,11
  18:7 44:14 50:9
  143:13 206:1
  223:10 226:6
**Bivens** 56:15
**blame** 48:15
**blue** 84:20
**Board** 1:2,4 2:1
  29:18 30:6 34:11
  35:13 42:8 55:18
  56:7,9 57:1 65:1
  91:22 136:11
  153:20 159:5
  203:22 204:20
  205:12 222:21
  224:8
**Board's** 94:10,20
  205:11
**body** 101:8,17

119:19,22 120:3
  121:3,8
**Boehner** 57:17
**bolt** 212:13
**bono** 45:2 55:2
**book** 40:6 84:19,20
**books** 168:15,21
**born** 36:10
**Borrazas** 167:11
**boss** 91:21,21
  114:15
**boss's** 113:5 114:16
**bosses** 80:3
**bother** 229:17
**bothered** 77:11
**bottom** 51:7 59:19
  116:10 151:20
  176:16 189:1,6
  191:1,2
**Boulevard** 51:13
**bouts** 38:9
**boxes** 166:8
**boy** 32:7
**boyfriend** 122:5
  139:1,3
**Brantley** 1:22 2:4
  235:2,15
**breaching** 34:21
**break** 8:3,4,9,13,13
  8:14 24:5 67:2,5
  109:21 168:11
  170:1 191:20
  192:3 204:22
  206:7,13
**breakdown** 54:3
**breaks** 174:18
  175:9
**breath** 175:12
**Brennan** 34:16,17
**brief** 20:17 49:8
  67:10 176:2
**briefing** 30:10
**briefly** 34:7,13 87:4
  115:8
**briefs** 219:5
**bring** 18:10 58:17
  67:4 123:1 134:17
  225:18
**bringing** 56:14
  102:22
**brings** 47:11
**broad** 181:10
**broadcast** 66:4
  188:14,16
**broadcasters** 59:14
  65:19 66:3,6,16

**broadcasting** 72:6
**broadly** 17:8,9
**brother** 49:18 57:8
  186:1,3,5,9
**brought** 21:18
  29:17 30:18 34:22
  42:13 49:16 55:4
  55:4,15 60:18
  121:13 122:22
  123:1
**brushed** 199:21
**building** 51:14
  123:9
**bulk** 224:4
**bunch** 181:19 201:3
**Bureau** 54:5
**bushed** 140:7
**Bushes** 63:18
**business** 7:20,20
  35:13 63:22 74:12
  74:13,21
**buy** 62:19

**C**

**C** 5:1
**C.S.R** 1:22 2:4
  235:15
**California** 9:5
  21:16 105:22
  106:1,3 108:19
  146:13,15
**call** 32:20 43:11
  50:14 52:1 67:1
  75:16,22 77:8
  100:20 113:14
  123:2,3,5 145:12
  165:15 186:17,18
  186:20 187:18
  191:2
**called** 50:15 58:15
  69:3 75:7 104:7
  113:17 123:8
  143:5 223:10
**calling** 112:7 77:6
  87:2,9,10 174:7
  186:18
**calls** 40:16 118:17
  141:10 163:14
  184:6
**calm** 121:5,10,11
  232:5
**camera** 90:12
**cameraman** 72:22
  73:19
**cancer** 126:11
**candidates** 56:3

**capital** 233:15
**Capitol** 50:1 57:16
  73:18 75:4
**car** 62:19 105:21
  107:8 109:4
  120:21 121:13,14
  121:14,14 122:11
  122:11,14 185:5
  199:15
**card** 50:12 74:12,13
  74:21
**care** 41:22 51:4
  62:14 64:3 119:13
  121:17 124:21
  193:18 230:18,19
**cared** 45:15 52:19
  62:16
**career** 48:19 174:1
  196:6
**career-less** 142:8
**careful** 41:13 68:9
  82:13 219:17
**carefully** 219:9
**cares** 121:18
**case** 9:9 10:1,7,12
  11:3,22 12:9,16
  12:22 19:6 21:6
  21:10,17 23:4,10
  23:11 24:3,16
  26:2 29:14,16
  30:18 31:3 32:5
  34:22 36:17,20
  37:2,7,12,15,17
  37:19 39:1,5,21
  40:3,21 43:14
  46:8,13,17 47:1
  49:9 50:9 52:4,18
  55:11,15 56:10,12
  58:15,17,22 59:17
  59:21 60:9,15
  64:4,16 79:18
  80:10,13 81:15
  82:8 86:17 87:11
  87:17 88:9,17,19
  89:12 90:17 91:3
  91:5,8 92:1 93:7
  94:5,6 95:16 96:3
  98:1,19,22 99:1
  102:5,9,11,20,22
  103:3,16 104:9,10
  108:13 111:14,21
  113:6,7 119:20
  120:2,12 125:1
  136:2 139:4 142:7
  142:7,13 143:3,4
  143:5,7,9,19

145:1 147:10
  148:15,22 150:17
  151:3 153:11,16
  154:4,6,7,8
  155:16 162:11
  163:14 166:22
  168:6 172:13,14
  174:2 184:9,10,12
  189:16 190:6,14
  191:22 192:6
  196:6,17 205:22
  206:3 210:10
  215:4 216:6 219:3
  221:9,17 222:3,7
  222:19 225:21
  227:13 229:9
  232:9 233:3,16
**cases** 14:20 55:3,4
  56:9 63:17 64:19
  82:3 147:17 148:8
  150:18 233:10,12
**casual** 7:20
**catch** 77:2 134:19
  186:11
**catches** 22:4
**caught** 226:18
**caution** 110:15
**CBN** 187:19,21
  188:13,13
**CC'd** 130:9
**celebrate** 143:6,11
**cell** 50:13
**Center** 138:11
**Central** 54:5
**certain** 48:6 128:3
  205:12 215:11
  216:16 225:16
**certainly** 16:16
  18:22 25:7 34:4
  45:15 95:4 108:1
  108:2 127:18
  134:3,6 136:19
  163:22 181:12
  215:8 217:7 222:4
  222:17 224:7
**CERTIFICATE**
  235:1
**certified** 162:14
**certify** 235:4
**chair** 2:12 5:8
  25:13,15 26:12,22
  27:4 204:4 205:1
**Chair's** 212:9
  233:18
**CHAIRMAN** 5:4
  5:13,19 6:10,13

6:20 8:21 10:10
  11:21 15:21 16:1
  19:20 20:15,18
  24:22 25:5 26:13
  27:14,21 28:15,18
  29:5,8,11 32:19
  33:7 34:10 35:12
  36:6 41:2,9,12,20
  42:6 65:12,17
  66:22 67:7,12,14
  67:18 68:3,8,12
  68:14 70:16 76:9
  82:13 85:1,15
  86:6 88:10 92:6
  92:10,13,16 93:13
  93:19 94:22 95:17
  95:20 96:5,14,17
  96:20 97:3,8,16
  97:20 98:5,11,15
  99:2,11,16 100:1
  101:22 102:6,10
  102:19 103:4
  106:5,17,21
  107:22 108:21
  109:20 110:1,4,8
  111:4,7,10 114:1
  114:4,9,18,20
  115:20 116:1,5
  117:20 123:16
  124:8,14 126:15
  127:20 128:8,11
  131:21 132:2,8,11
  132:22 136:7
  137:14 139:15,19
  140:1,22 141:12
  144:6,10,15,18
  145:4,8,12,15,18
  148:4,9 149:6,20
  150:1,4,12 151:7
  151:16,19 152:2
  152:10,12,15,20
  153:2,4,7,14
  154:2,13,16,20
  155:6,11,21 156:3
  158:19 159:8,14
  159:20 160:6,12
  160:20 161:3,9
  162:2,19 163:2,22
  164:8 165:6,16,18
  166:15 169:4,6,8
  169:13,15,20
  170:5,7 171:5,20
  175:11,15,22
  176:5,9,13 177:7
  177:22 178:16
  179:21 181:14,19

182:1,4,10,13,20
183:1 185:15
187:12,15,17
188:8,12,18,21
189:5,8,13,18
190:1,4,8,12,15
190:19,22 191:7
191:11,13,17
192:17 193:6,18
194:4 195:1 197:1
197:5,9,14 198:5
198:18,21 199:4,6
201:16 202:2,8,13
202:16 203:6,18
206:12 207:18
208:17 209:7,9,12
209:17,20 211:5
211:10,19 212:2,5
212:11,21 213:2,9
213:15,19,21
216:5,10,14 217:6
217:22 218:2,6,11
218:16,19 219:1
219:13,16 220:8
220:13,19 221:3
222:10,20 223:3
223:17,20 224:1
225:6,11,17 226:4
226:15,22 227:4
230:3 232:18,22
233:5 234:3
**challenge** 27:3
**champagne** 143:11
**chance** 9:12 10:1
21:20 23:21 28:9
85:7 112:1,8
131:1
**change** 50:3 90:6
91:1
**changed** 83:12
90:22
**channel** 188:2
**channels** 71:16,17
**characterizes** 40:7
**charge** 166:16,17
**Charges** 9:14 35:8
36:17
**check** 11:15 160:5
169:2 208:12,14
**chief** 19:6 40:21
78:8,15 157:12
222:7,19
**chip** 58:14
**choice** 34:11 75:2
205:6,9
**choose** 74:19

**Christ** 188:5
**Christian** 188:3,15
188:16
**circulating** 234:1
**circumstances**
17:10 27:10 30:11
105:19 106:13,16
107:3,10 185:16
199:2,9
**civil** 27:7 157:5
159:1
**claim** 37:13 40:11
**claimed** 54:13 64:1
**claims** 22:1 44:19
45:10 229:10
**clarify** 94:20
197:14
**Clay** 2:20 6:6
**clear** 12:5 20:11
28:22 39:2,11
45:14 48:11 52:22
56:20 103:6 129:7
134:14 177:20
194:5 202:3
228:14,21
**clears** 165:15
**clerk** 167:12
**client** 56:21 167:1
184:21
**client/attorney**
115:11
**clients** 44:2,6 45:18
56:21 62:15
**Clinton** 37:14,16
55:14,17,20 56:6
150:19 159:6
167:5
**close** 7:1 42:16
45:16 52:15 68:9
143:13 153:11
232:8
**closing** 30:9 219:4
**clothes** 77:5
**Clyde's** 50:17
**co-anchor** 76:19
**co-counsel** 6:17
15:17
**co-host** 76:19 89:1
**co-hosting** 71:22
72:1,2 78:10
**coaster** 115:13
123:12 172:18
173:20,20 187:6
196:3
**coats** 7:17
**Coburn** 57:17

**Code** 63:12
**coffee** 7:22 76:21
**coin** 28:10
**colleague** 173:5
**Colleen** 40:8
**college** 70:8,9
**colonel** 43:15
**color** 224:19
**Columbia** 1:1 2:6
5:7 40:19 43:11
72:9 235:16
**come** 18:3 21:22
22:8 25:20 28:11
29:4 51:16 61:21
73:8 79:4,13
82:16 84:21 96:7
96:14,20 113:3,8
118:2 127:3 138:6
143:10 152:20
167:21 200:7
202:13 214:16
223:9 226:6
233:15
**comes** 22:19 29:20
**comfortable** 228:12
**coming** 22:13 98:10
122:16 214:17,17
**command** 61:1
**commanding** 43:10
43:12
**commencing** 2:3
**comment** 17:22
28:2 33:13
**commentaries**
46:10
**comments** 136:22
217:18,21
**commission** 58:19
235:20
**committee** 2:4,10
5:5,9,14 6:1 9:7
19:4,7 22:21 24:1
24:11 25:13,15,16
28:13 29:15,19
33:8,16,22 36:15
40:22 42:5 49:7
55:17 67:4 73:16
76:17 87:3 89:21
93:18 95:12
102:17 105:18
113:20 118:10
124:18 126:8
132:15 137:10
147:7 148:13,18
151:10 166:11
170:18 171:13

194:22 196:2
203:20,21 204:2
206:4 207:5,15
217:5 222:6 224:8
227:22
**committee's** 10:16
18:11
**committing** 62:5
**common-law**
227:21
**communicate** 23:6
**communicated**
104:9
**communication**
61:20 155:13
**communications**
21:10 39:10,15,19
46:16 98:12,16
100:3 155:1,22
181:8
**communicative**
61:11 64:13
**communities** 37:6
**community** 37:4
49:15,22 66:14
88:19 89:8,17
92:19
**compelled** 12:4
**compelling-need**
136:12
**compendium** 18:13
198:14 222:2
227:12
**competency** 166:18
**competent** 167:1
**complainant** 12:3
44:9,18 47:3,3
**complained** 103:16
**complaining** 41:14
123:14 136:20
217:11 230:7
**complaint** 23:5
44:10 58:18,19
60:16,21 61:2,2,7
61:15 85:4 90:4
91:19 99:3,3,18
100:2 112:12
113:9 116:10,14
116:16,17,20
147:14 183:4,4
184:4
**complaints** 60:3,8
64:12 135:17
**complete** 162:12,13
219:19 222:11
**completely** 32:18

98:18 115:12
135:4
**completeness**
227:21
**complex** 37:11
**complied** 11:16
222:11
**complimentary**
46:20
**comply** 15:9
**compromise** 165:8
**concentrate** 142:6
**concentrating**
142:7,9
**concentration**
97:22
**concentrations**
148:21
**concern** 25:6 26:2,3
26:5,22 103:13
230:6,10,21
**concerned** 32:1
58:5 204:16
230:17
**concerning** 14:12
137:6 191:21
**concerns** 37:4 90:1
102:14,17 133:21
**conclude** 203:2
**concludes** 168:8
**conclusion** 149:8
**conditions** 76:13
**conduct** 52:17
**conducted** 203:10
**confer** 190:2 213:3
**confirm** 62:1
**confirms** 21:1 32:12
32:14
**conflict** 15:18 39:2
47:20,22
**conflicted** 182:16
182:16
**confronted** 27:2
**congress-person**
193:19
**congressman** 73:21
146:11 193:15,16
194:7
**congressman's**
146:13
**congressmen**
150:18
**connection** 77:21
111:1 170:13
**consent** 224:9
229:21

consequently 9:6
10:4,5 12:13 61:5
231:6
conservative 56:4
consider 29:20
95:13 168:18
consideration 7:9
17:4 30:15
considered 228:4
constant 77:6 184:5
184:5,6
constantly 77:7,7
174:7,21
constitutes 198:3
consult 25:15 79:14
175:18,19 191:20
192:6
contact 39:8 61:10
74:22 81:20
119:22 142:17
145:16 184:9,11
188:19
contacted 60:11
113:11 152:18
contain 94:12
contains 21:4 136:8
contemporaneous
47:4
contentious 31:1,6
contents 214:20
context 20:13 40:4
40:5 89:9 110:19
contingency 45:3
continue 43:15
95:21 143:19,21
continued 3:1 38:14
39:8,19,20 139:14
170:9
continues 48:19
continuing 61:7
continuously 24:12
contrary 46:19
135:4
contributions 56:2
control 27:20 64:8
121:1,2,5 229:12
controversial 66:8
conundrum 204:18
convenience 222:6
convenient 213:12
conversation 75:3,5
75:20,21 79:18
81:14 89:22
115:21 131:10,13
132:6,16 134:4
137:6,10 155:8

211:17 224:11
227:19
conversations
20:13 75:15 80:16
80:16 88:7 91:4
181:4
conveying 207:16
convince 215:13
convinced 136:18
151:11,11
cool 7:13
cooperation 18:22
cope 173:13
copied 211:21
212:3
copies 19:13,17
20:11 167:13,15
177:11,14 179:5
179:12 180:19
181:15 220:12
221:18,21 222:12
copy 130:18 158:1
158:12 162:12
179:7 220:3,6,16
222:17
corner 211:6
correct 76:4 139:15
145:10 151:22
168:14 202:6,7,11
202:12 203:16,17
correspondence
21:5 85:9 141:19
162:16 198:15
corroborate 203:4
corroborated 46:21
134:17
cosmetology 71:10
71:15
cost 14:22 109:13
costs 54:19
counsel 6:4,7,10,11
7:17 8:20 11:15
14:10,19,21 16:12
18:21 19:1,12,12
20:22 21:5 22:1
23:6,16 29:6
31:21 32:11 34:9
34:9,13 35:6,6,9
36:12 40:20 42:2
42:8 43:9 45:21
45:22 53:4 60:12
63:7 69:3,6 77:20
85:3,10,18 99:19
111:4 116:14
133:11,17 135:2
161:13 165:8

170:10 180:10
214:5,19 220:14
220:22 221:20
228:16 232:7
234:6,6 235:8,11
Counsel's 10:12
11:3 34:8 55:21
60:10 84:19 222:7
counsels' 8:1
Count 189:5
countervailing 44:4
countries 54:6
County 194:7
couple 10:21 13:3
104:6
course 15:5 18:16
20:15 25:20 26:16
26:18 37:21 38:3
41:13 49:9 51:1
56:16 61:5 63:8
124:2 147:2 222:3
court 1:1 2:5 5:6,10
5:12 26:21 42:22
56:11 58:17
124:11 135:6
148:6
courtroom 73:11
176:1
courts 27:11
courtship 39:1,3
cousin 112:21
cover 19:10,17
72:22 73:5 74:13
74:15 75:10,11,14
79:19,22 215:6,14
covered 215:7
covering 50:10
72:21 73:18 74:20
75:9 90:9
coworker 103:17
125:16
crash 200:19 201:7
crashing 201:14
create 22:14
creates 15:18
credibility 26:19
227:1
credit 109:6,7
cried 142:12
critical 47:1
cross 168:10,11,19
205:6
cross-examination
12:5 16:3,7,9,14
27:3 151:10 217:4
217:8 222:18

230:22 231:13
233:20
cross-examinations
16:11
cross-examined
133:2
cross-examining
233:14
cumulative 204:4,9
215:10,13
curious 160:9
current 216:21
currently 6:16
69:12
curtailed 16:15
cut 53:3

                D

D 4:1 5:1
D.C 55:10 71:1
daily 40:2 77:7
125:18
damages 31:16
54:22
Dana 194:6
Danforth 156:9
157:8
dark 201:14
darker 39:10,11,16
dash 57:7 156:21
date 35:16 65:13
76:20 99:6,10
104:12,13 116:12
132:12 141:1
159:21,22 179:17
180:9,15 195:8,19
207:10 210:18,19
211:7,14,15,18,19
211:20 218:20
dated 85:4 99:4,5
130:10,21 141:19
144:3 156:8
163:11 194:17
dates 129:6
day 28:11 53:16
78:6,20 89:12,19
137:20 160:4
221:21 223:4
days 9:6 10:11,21
12:22 41:21 46:9
55:13 160:8 166:4
200:16 202:5
DC 1:9 2:2,18 5:5
24:11 43:5,5
53:11 91:15
105:14,16

dead 23:12
deadline 203:15
deal 8:5 16:17 33:9
44:21 93:15
125:18 213:8
215:11 223:5
224:12
dealing 10:2 24:6
54:5
deals 27:8 63:5
December 99:7
decide 93:15 178:4
215:2 233:10
decided 81:19
170:19 171:13
200:11
decides 205:2
decision 40:13
55:11 56:20 106:2
157:10 206:4
declarants 26:20
deducing 41:13
deem 227:13
deemed 227:11
deep 166:10 175:12
deeper 58:9
deeply 45:15 51:4
defamation 31:14
defaming 31:15
defend 24:14 32:7
32:16
defended 34:20
defending 230:17
defense 226:11
230:11 232:1
defraying 53:9
degree 16:4
delay 223:10
delayed 14:21
Delia 78:2
deliberations 215:4
delivered 207:10
demeanor 12:19
232:5
demonstration 50:1
65:14
denial 229:13
denied 61:6 62:9
133:8
department 57:9
depending 7:11
depends 201:20
depose 13:21 133:7
deposition 34:20
228:21 229:1
depositions 136:11

**depth** 51:8 59:20
**Deputy** 34:8 35:6,9
**describe** 74:6 89:21
   109:2 134:5
   143:15 207:4
**described** 104:6
   215:21
**desires** 38:4 39:3
**desk** 75:7,17 213:4
**destroyed** 115:13
**detail** 111:9 229:14
**detailed** 116:18,19
**details** 101:15
**determination** 30:7
**determinations**
   205:13
**determine** 5:20
   178:17 214:14
**determined** 16:3
**determines** 204:3
**died** 13:7 196:15
   200:7
**difference** 8:13
   27:16
**different** 9:11 10:9
   15:19 27:16 49:10
   56:1 70:21 71:16
   93:22 115:18
   116:16 121:16
   123:12 150:16,17
   232:10
**differently** 63:13
**difficult** 15:14
   16:11 44:20 51:1
   198:12
**digest** 9:20
**digitized** 220:9
**diligently** 62:13
**dinner** 50:17,18
   76:21 80:11,13,18
   82:5,7 116:6
   143:12
**direct** 4:7 69:6 99:2
   168:8,19 169:9,16
   170:8,9 201:17
   202:18 203:2
**direction** 235:6
**directly** 43:10
   203:9
**disadvantage** 12:17
   231:5
**disbursed** 231:18
**discarded** 21:8,9
**disciplinary** 2:18
   6:7 8:20 10:12
   11:3 14:10 35:5,6

36:12 40:20 69:3
   69:6 85:10 99:19
   116:14 133:17
   143:1 170:10
   180:10 214:5,18
   222:7
**discipline** 5:21
**discovery** 27:9,12
   28:7 133:15
   134:15 135:12,22
   229:4
**discretion** 25:13,14
   95:2
**discriminated**
   66:10
**discuss** 25:21
   113:18 190:6
   223:13
**discussed** 80:10
   82:8 103:10
**discussing** 25:12
   102:18
**discussion** 45:3
   88:13 93:17 140:2
**discussions** 87:16
   102:4,8,11 103:3
**dishonest** 40:9,17
**dishonesty** 40:19
**disks** 22:7
**dismiss** 232:9
**dismissed** 21:11,12
   48:22 49:1 59:9
   60:6 63:3 64:3,21
   64:22
**dismisses** 64:21
**disposing** 204:1
**disposition** 40:10
   203:8
**dispute** 34:21
**disregard** 233:22
**disrespected** 186:7
   186:14
**dissatisfaction**
   48:15
**District** 1:1 2:6 5:7
   40:19 43:11 72:9
   191:15 235:16
**division** 65:20 66:4
**Docket** 1:4 5:3
**doctor** 201:7
**doctor's** 124:21
**doctors** 125:5,7
   126:3 199:20
**document** 32:12
   85:5,14,21 117:12
   130:11,14 134:2

136:14 141:21
   147:22 156:10
   160:2 178:8 181:3
   181:16 195:12,13
   197:2,16,17,21,22
   198:3 207:6,13,16
   207:19,22 211:21
   218:21 226:14,16
   227:11,11 228:1,2
**documentaries** 81:1
**documentary** 81:7
   203:20 205:17
**documentation**
   20:22 31:8 61:16
**documents** 9:20
   19:6,11 20:4,8
   25:6,19 32:13
   60:11 135:1 166:3
   176:18 198:22
   202:5,10,11,16
   203:3 204:10,11
   204:16,19 205:7
   205:16 213:7
   214:4,13,15,20
   215:2,3,6,9
   220:18 221:7,7,14
   221:17 222:1,15
   222:18 224:5,12
   224:15,21,22
   225:7,8 227:15
   229:20 230:4
   231:17
**doff** 7:17
**doing** 28:21 42:17
   50:7 71:20 72:4,5
   72:17 74:9 78:11
   103:9 138:1 150:3
   208:8 219:4
**domain** 31:4
**door** 122:10 123:9
**doors** 173:3
**doorstep** 174:13
**dose** 201:9
**downstairs** 174:13
   186:4
**Dr** 125:4,4,9,11
   126:5,9 127:19
   130:17,19 131:8,9
   131:10,19,22
   132:6,20 133:7,16
   133:18,20 134:4,6
   134:9 136:18,20
   136:22 137:6,13
   137:17,21 138:4
   138:12,15,19
   139:5,7,14,17

140:18 141:8
   185:1,2 228:21
**dress** 7:20
**drink** 76:21
**drinks** 77:3
**drip** 165:14
**drive** 21:4,14 25:1,2
   29:1 55:11
**drop** 196:18
**due** 13:10 15:12
   136:15 229:8,13
**duly** 69:4
**duplicative** 20:9
**duty** 44:4
**dynamic** 27:15

_____

**E**

**E** 1:5 2:2 3:10 4:1
   5:1,1,2 165:1,1
**earlier** 61:17 103:8
   140:2 234:7
**early** 7:9 13:1
   133:15 136:2
   167:20 204:22
**Earth** 139:2
**easier** 8:11
**easy** 58:13 59:5
   91:11,13,14
   200:18
**economically**
   199:17
**EEO** 58:17 61:7
**effect** 17:12 63:21
   94:2,4 96:2 101:2
   219:5
**effective** 48:10
   162:8 233:19
**effectively** 27:3
**efficient** 168:12
   216:17
**effort** 145:16
**efforts** 40:5 45:20
   46:14
**egregious** 233:4
**eight** 21:6,12 23:3
   47:6 64:16 188:22
   189:9 199:13,17
   201:15 209:15
   229:9 231:17
**either** 18:3 32:22
   72:20 121:11
   131:11 178:19
   212:14 215:22
   232:22
**electronic** 220:3
**elements** 136:8

**Elham** 4:8 67:17
   69:2 144:4 150:21
   156:9 194:17
**elicited** 94:12
**elicits** 148:1
**Elizabeth** 35:7
**Ellie** 130:10 141:20
   183:22
**Ellie's** 183:14,15
**email** 3:8 19:17
   20:4,12 61:20
   81:22 82:1,22
   118:16 141:18
   144:20 145:2
   150:13 151:21
   160:1 190:11
   193:2 194:16,20
   195:4,18 196:2,9
   196:13,14,22
   197:6 207:14
   208:2,9 209:22
   210:17,20,21
   211:1,3,12,16,17
   212:7 220:16
**emailed** 18:21
   130:17 158:9
   159:18 197:3
   201:11
**emailing** 87:10,11
   197:8
**emails** 18:13,17
   19:2,9 21:22
   25:12 26:1 32:20
   84:14 119:10
   129:4,8,10 130:5
   131:15 155:8
   160:4 163:13
   183:3,6 184:6
   199:11 201:2,3,4
   201:10 229:3
**emotional** 149:11
   173:20 226:7,9
   228:22 230:7
**emotionally** 173:2
   174:18 175:9
**emotions** 38:19
**emphasis** 41:15
**employed** 14:9
   71:12 235:8,11
**employee** 235:11
**employees** 52:15
   58:1
**employment-rela...**
   37:1
**empty** 173:4
**encompasses** 181:9

**ended** 39:19 54:21
78:5
**ends** 12:22 206:2,11
**English** 51:17,21
61:1 112:16
**enrolled** 108:14
**enter** 29:5
**entered** 27:22
**entertain** 41:1
227:22
**entertainment** 72:3
**entire** 225:14
**entirely** 7:21 11:14
**entirety** 225:9
**entitled** 30:9 58:6
233:5
**entity** 44:20
**entries** 181:16,20
181:20 182:6,11
182:15 187:15
**entry** 214:3
**envelope** 158:11
**environment**
212:12 231:1
**envy** 36:7
**equal** 15:12 58:18
229:8
**equals** 36:1
**equitable** 54:21
**equities** 65:3
**equity** 29:9
**erroneous** 197:21
205:14
**errors** 59:17 182:5
182:16
**escaped** 51:19
**ESQUIRE** 2:11,15
2:20 3:3,10
**essentially** 230:13
**established** 133:20
**ethical** 32:9 112:12
136:4 183:4 230:1
**ethics** 135:17
**eve** 229:17 231:19
**evening** 7:11
120:10,11,14,18
184:22 185:3
224:1
**event** 79:22 94:19
121:21 124:17
**events** 94:16 193:12
203:4
**eventually** 25:14
**everybody** 10:13
11:7 23:17 78:9
89:6 92:1,22

97:14 103:14
121:4 150:19,22
151:1,2 157:18
159:4 172:6
213:22 233:21
**evidence** 7:12 21:8
23:4,20 24:4
26:17 29:20 33:1
38:13 39:9,14
40:12,14 41:5
48:12 50:22 57:6
58:7 59:8,18 62:4
65:13 108:1 133:1
164:3 200:6
203:19 204:3,5,8
205:3,18 208:19
214:16,18 227:20
232:9
**evidentiary** 27:17
**evil** 228:7
**exact** 99:10 137:20
138:8 179:17
**exactly** 74:11 75:19
101:15 116:3
137:19,21 157:16
159:16 160:3
193:11
**examination** 69:6
170:8,9 201:17,18
202:19 203:2
217:1 222:4
**examine** 202:9
205:7
**examined** 6:3 69:4
**examining** 175:17
**example** 25:22
92:21 99:13 120:7
123:11,18,21
**examples** 185:21
**excellent** 48:9
**exception** 17:9
**exceptions** 231:6
**exchange** 20:12
53:16 197:15
**exchanged** 18:17
**exchanges** 20:5
**exclude** 204:5
**excluded** 22:5
23:19
**excluding** 17:5
**exclusion** 27:11
**excuse** 79:5 129:20
149:17 157:20
177:4 183:7 197:9
**excused** 224:2
**executive** 74:19,21

77:14 78:1 79:20
88:22,22 220:15
**exercising** 25:14
233:20
**exhibit** 19:14 22:6
84:20 85:1,2 99:4
109:19 110:12
112:2 128:17
130:8,20 131:17
139:21 140:13
141:17 143:22
144:2,13,16,19
145:21 151:14
154:19 156:7
158:18,21 161:12
161:14,15 162:3
166:10 168:15
170:13 171:21
176:7,12 177:4,7
177:8 180:7,12
187:11 194:10,12
197:13,19 198:3,9
207:3 209:6,18
210:18 220:3
222:8
**exhibited** 38:9
**exhibits** 9:11 20:10
22:19 36:18 60:12
84:19 136:14
144:9 165:22
166:1 168:3
203:13,14 212:10
220:3,6 222:3,14
225:12
**existence** 65:2
**exits** 176:1
**expect** 16:16 147:16
148:7
**expenses** 53:9,13
**experience** 43:22
94:15
**experienced** 117:1
**experiencing** 76:18
**expert** 9:22 13:7,9
16:19 64:17
166:13 216:3
**expires** 235:20
**explain** 74:21
102:16 138:18
149:15 171:12
202:10
**explained** 74:18
80:1,5,7,15 91:7
98:19 115:5 117:2
118:20 128:2
143:8

**explaining** 138:2
**explanation** 32:21
**explicitly** 10:14
**explorative** 16:7
**Express** 167:17
**expressly** 160:21
**extension** 217:3
**extensive** 217:7
**extent** 217:2 222:13
224:20 228:5
**eye** 32:18 119:22

_____

**F**

**F** 165:1
**face** 101:8 120:15
173:3
**Facebook** 93:1,1
100:6,10,15,20,21
**Facebooks** 97:7
**faced** 233:13
**fact** 7:19 22:1 23:3
23:7 28:21 43:3
45:22 46:18 48:18
57:21 63:2 64:21
106:9 127:18
138:2 139:16
142:8 150:18
168:6 172:21
173:22 205:14,14
208:4
**facts** 40:12 48:16
**factual** 59:16 95:15
205:13,13
**failure** 27:12
**fair** 23:2 159:8
225:1 229:7
**fairly** 7:15 58:1
**fairness** 13:10
15:12 29:10 228:4
**fait** 22:14
**fake** 93:1
**Falahati** 89:13,14
89:14 143:1
147:11 153:11
200:4
**Falahati's** 147:13
**falling** 203:11
**false** 40:15,15
**family** 51:19 57:10
66:2,10 186:2,10
**far** 32:22 55:14
58:5 93:21 95:18
178:6,21 191:8
217:11
**Farci** 51:20
**fault** 37:22 58:1

166:2 169:1
229:11
**favor** 136:11
**favorable** 66:6
221:8
**FBI** 93:3 173:16
208:12,13,18
**feared** 96:3
**February** 82:22
**federal** 26:17,21
27:7,11,17 51:14
56:11 58:17,20
167:17
**FedEx** 167:10,20
**fee** 83:3,6 210:4,12
210:15
**feel** 51:6,9 62:15
95:14 101:3
207:21 227:15
**feeling** 134:5
183:15
**feelings** 38:1,2
118:20 142:9
185:19
**feels** 138:13 222:2
222:14,15
**fees** 15:2 45:3
**felt** 66:9,15 150:20
150:20 196:7
200:4 208:1 220:7
221:17
**field** 43:20 51:11
**fifteen** 206:7
**fifth** 187:20
**fight** 148:16 149:18
150:9
**fighting** 121:9
**figure** 24:5 31:18
31:19 56:3,4
**file** 61:9 99:6 133:9
133:11,12,18
162:13 165:22
166:8 222:11
**filed** 17:17 22:2,11
23:5 37:10 44:10
58:18 59:22 60:3
62:7 63:17 64:12
100:2 116:17,20
157:5 166:7,13
167:12 180:9
224:9 229:19
231:9
**files** 25:3
**finally** 70:22 77:10
100:1 121:10
199:13 230:15

**financial** 45:14
83:15 106:15
107:3 109:3
**financially** 107:10
108:19 235:12
**find** 14:22 35:18
43:19 60:7,13
62:20 64:15 65:10
89:6 103:14,20
120:13 175:1,1
182:4 186:20
193:2 199:2 204:7
205:12 215:6
**findings** 95:15
205:13,13
**finds** 90:3 232:16
232:19
**fine** 43:1 144:11
175:16
**finish** 24:3 70:6
**finished** 169:8,12
169:13,14 187:12
202:14
**finishing** 216:12
**firm** 56:19 59:17
**first** 9:4 25:1 61:1
67:1 69:4 70:22
74:7 75:12 80:12
81:16 86:22 87:14
88:21 97:9 101:4
101:6 102:8,10
103:2,22,22 104:2
104:3,5 105:7
116:17 117:14
130:14 131:4
134:12 135:15
149:6,10 151:19
161:22 162:6
166:5,20 171:3
172:22 174:3
186:3 188:12,12
207:5 214:14
233:11
**fit** 33:16 222:9
**Fitch** 2:11 5:4,8,13
5:19 6:10,13,20
8:21 10:10 11:21
15:21 16:1 19:20
20:15,18 24:22
25:5 26:13 27:14
27:21 28:15,18
29:5,8,11 32:19
33:7 34:10 35:12
36:6 41:2,9,12,20
42:6 65:12,17
66:22 67:7,12,14

67:18 68:3,8,12
68:14 70:16 76:9
82:13 85:1,15
86:6 88:10 92:6
92:10,13,16 93:13
93:19 94:22 95:17
95:20 96:5,14,17
96:20 97:3,8,16
97:20 98:5,11,15
99:2,11,16 100:1
101:22 102:6,10
102:19 103:4
106:5,17,21
107:22 108:21
109:20 110:1,4,8
111:4,7,10 114:1
114:4,9,18,20
115:20 116:1,5
117:20 123:16
124:8,14 126:15
127:20 128:8,11
131:21 132:2,8,11
132:22 136:7
137:14 139:15,19
140:1,22 141:12
144:6,10,15,18
145:4,8,12,15,18
148:4,9 149:6,20
150:1,4,12 151:7
151:16,19 152:2
152:10,12,15,20
153:2,4,7,14
154:2,13,16,20
155:6,11,21 156:3
158:19 159:8,14
159:20 160:6,12
160:20 161:3,9
162:2,19 163:2,22
164:8 165:6,16,18
166:15 169:4,6,8
169:13,15,20
170:5,7 171:5,20
175:11,15,22
176:5,9,13 177:7
177:22 178:16
179:21 181:14,19
182:1,4,10,13,20
183:1 185:15
187:12,15,17
188:8,12,18,21
189:5,8,13,18
190:1,4,8,12,15
190:19,22 191:7
191:11,13,17
192:17 193:6,18
194:4 195:1 197:1

197:5,9,14 198:5
198:18,21 199:4,6
201:16 202:2,8,13
202:16 203:6,18
206:12 207:18
208:17 209:7,9,12
209:17,20 211:5
211:10,19 212:2,5
212:11,21 213:2,9
213:15,19,21
216:5,10,14 217:6
217:22 218:2,6,11
218:16,19 219:1
219:13,16 220:8
220:13,19 221:3
222:10,20 223:3
223:17,20 224:1
225:6,11,17 226:4
226:15,22 227:4
230:3 232:18,22
233:5 234:3
**five** 68:5,7 160:8
176:17 188:22
189:9
**fix** 167:19
**flag** 74:11
**fled** 66:11
**flexibility** 15:11
**floor** 196:18
**Florida** 3:6 9:4
21:11 29:2 31:13
49:1 60:4,5 64:21
**flowing** 7:12
**fluent** 51:20
**fly** 37:8 135:6
**focus** 39:1 142:13
196:17 199:16
**follow** 147:10
153:10,15 154:3
202:20
**followed** 122:15,17
**following** 28:6
**follows** 69:5
**food** 107:8
**force** 17:18
**foregoing** 235:3
**foreign** 44:2
**forget** 165:14
**forgive** 184:2
**forgot** 201:1
**forgotten** 33:4
**form** 85:4 136:16
222:8
**format** 211:12
**former** 16:10 30:22
56:2 224:16

**forth** 20:21 84:15
91:9 149:14
**forthwith** 162:10
**forty** 210:16
**Forty-seven** 69:11
**forward** 28:12 31:3
61:8 62:6,19
94:20 98:20
104:11
**forwarded** 19:12
**found** 54:17 78:15
80:17 92:22 159:1
231:18
**foundation** 85:13
88:11,12 93:11
96:6 107:20 108:3
111:9 140:20
149:7,10,14
208:16,19 209:2
**four** 23:7 36:1 60:9
64:14 68:5,7
126:11 176:17
188:22 189:8,19
191:1
**fourth** 210:8
**Fox** 34:14,19
**frame** 149:2
**Frederick** 3:3,4 6:9
42:7
**free** 13:2 43:20
222:4,17
**freedom** 32:5 49:15
50:2 66:15,17
**Friday** 10:19 11:1,5
11:7 15:8 16:21
17:15,18 18:20
19:13 21:15 23:1
166:1 169:2 195:7
214:6 216:19,20
221:21 224:6
230:4
**friend** 12:11 45:16
52:22 53:7 119:6
119:10,11,12,16
119:18 122:7
138:21 183:14,17
183:21 190:21
208:11,12,13,18
231:4
**friend's** 186:16
**friends** 146:17
186:2
**friendship** 119:7,8
119:9,9 121:20
**front** 14:3 90:12
99:5 128:22

129:16 134:15
138:19 139:5
171:8 172:6
**frustrated** 38:14
**frustrating** 38:6
39:16
**frustrations** 38:20
**fsujat@yahoo.com**
3:8
**fuel** 173:4
**full** 43:14 67:16
192:11,12,14
224:20
**fun** 89:6
**furniture** 106:1
**further** 25:22 32:21
33:11 57:5 162:10
163:17 206:14
224:17 235:10

---

**G**

**G** 5:1
**game** 196:6
**games** 196:4 198:11
**gathering** 120:9
**gatherings** 118:13
118:19
**general** 42:22 43:8
43:8,10,11,12,13
148:17 165:8
**generally** 23:13
24:5 31:22 54:7
94:12 182:13
**gentleman** 27:22
33:4,14 34:2,3
**gentlemen** 212:17
**genuine** 178:14,15
**Georgetown** 50:17
**germane** 111:6
**getting** 24:6 48:4
53:5 101:13
102:21 114:2
118:12 129:11
136:1 140:7
141:22 167:7
168:1 180:19
**girl** 188:4
**gist** 28:5
**give** 9:17 11:7 14:4
15:10 20:16 22:21
23:22 25:21 37:17
49:12 67:21 84:10
92:21 93:16 95:13
120:7 121:19
175:20 179:15
183:13,17 204:20

220:11,19,21
231:22
**given** 15:8 17:19
18:14 19:13 23:8
28:21 32:13 48:17
63:1,2,16 98:13
110:18 132:22
166:5 214:12
220:17 221:20
**gives** 121:18 175:2
**giving** 59:6 110:22
221:5
**glance** 221:9 224:5
**glass** 124:11
**Gloria** 12:11 53:6
82:6 189:19 190:6
231:3
**go** 7:1,3,10 9:10
13:3 22:22 41:17
46:1 54:4,8 59:2
62:18,19,20 68:17
70:9 72:21 73:22
76:20,22 79:20
87:13 92:16 98:1
98:20 102:2,3
111:10 116:10
118:14 119:13
123:4,13 127:21
128:11 129:21
133:2 134:10
140:5 143:6
144:13 145:18
154:17,20 158:19
160:4 165:16,19
168:8,13 173:8,15
175:1 176:5
186:10 194:4
199:4 200:9,20
204:13 209:12
212:18 213:4,12
213:16,18 215:20
219:21 224:17
**goal** 54:22
**goes** 60:12 83:10
94:13 178:6
226:20
**going** 10:3 11:9,10
13:14,22 14:1,5,7
14:13 16:15 25:7
25:8,15 26:8 27:6
28:15,18 29:1
30:19 31:3 32:10
34:14 35:22 39:13
39:13 42:15 47:9
50:4 51:1 52:5
54:3,22 56:8 57:4

63:2,6 64:16,17
68:8 74:19,20,22
75:8,9 76:15 77:8
77:12,15,17,18
77:18,19 78:10
80:6 83:2,9 84:2,4
84:14 86:16 87:17
87:20,22 88:10
91:8,8,10,12,13
91:14 93:20 96:3
97:13,15 98:2,3,4
98:19,21,22
101:16 103:16,17
103:18 104:4,11
105:11 106:14
107:9,18 108:8,11
108:12,15 110:21
111:12,15,19
114:5 115:6,8,9
116:21 119:1,4,14
120:1,4 121:6,15
122:5,8,12,22
125:8 126:9 128:9
129:20,22 136:2
136:19 141:12
143:3,6,10,21
164:7 173:5,10
175:19 177:16
178:18 184:19,20
186:16 187:7,10
190:6 198:20
199:1 200:7,11,12
200:17 201:2,7,14
205:1,8,11 211:10
212:17,18,22
213:10 214:10
215:12 216:14,20
217:6 219:21
220:2,19,21 223:4
223:12 224:18,20
225:2 226:12
227:12 228:8
229:18 231:22
**good** 5:17 6:8 15:15
16:17 24:12 36:14
36:19 42:4,6
51:17 67:12,13
69:8,9 93:14
143:20 155:15,18
163:19 172:7
178:22 183:15
215:10 224:1
227:4 230:22
232:4
**gotten** 7:16 166:3
177:22

**governing** 5:6
**government** 52:14
57:22 59:8 66:2
66:11
**governments** 44:2
**governors** 55:18
56:8,10 57:2
91:22 153:20
159:5 172:5
**grabbed** 50:18
**grandmother** 36:10
**gray** 232:10,11
**great** 60:22 62:18
106:10 143:7
**greater** 229:14
**grew** 38:22
**ground** 59:17 215:7
**grounds** 232:10
**group** 25:6,11
30:22 202:4
**Guard** 43:5,7,9
**guess** 19:4 45:19
80:6 94:19 132:4
141:9 157:14
200:17 201:20
210:8 216:19
**guidance** 19:5
27:15,20
**Guido** 190:17,20
208:5,10,21
209:10
**gust** 198:20
**guy** 78:19 232:2
**guys** 67:5

---

**H**

**H** 2:20
**half** 10:21 23:6 60:9
64:14
**halfway** 139:12
**Hamilton** 34:13,19
**hand** 50:18
**handed** 12:9
**handle** 155:15
**handled** 23:16 40:8
88:21 90:2
**handling** 139:4
**hands** 64:8
**handshake** 142:18
**handwriting** 85:20
86:1
**hang** 64:20
**happen** 39:13,13
**happened** 47:7
53:20 55:17 91:18
143:9,15,16,17

199:13
**happening** 117:5
**happens** 63:15
111:11 119:14
133:3
**happy** 7:15 19:16
40:22 213:4
**harassed** 50:20
51:6 54:13 151:6
**harasser** 51:11 59:1
147:11
**harassment** 37:5
38:17 44:19 61:9
76:15,18 88:19
89:5,11,16 91:21
103:16 108:13
119:20 120:2
125:8,16 143:4
147:10 153:11,16
154:4 231:10
**hard** 15:16 31:17
45:12 166:12
217:13,14 220:12
230:22
**harm** 32:3
**harmful** 46:17,18
**hat** 167:6
**hats** 49:10
**he'll** 103:12
**head** 43:11 55:18
56:7 149:5
**headquarters** 51:10
**heads** 25:21 134:20
**health** 133:21
**hear** 17:21 20:18
23:9 41:7 52:5
59:20 60:14 65:20
70:16 111:5
136:19 164:6
169:11 173:13
183:12 194:12
195:5 206:13
214:10 215:15,17
216:1 218:17,17
227:17
**heard** 25:8 95:6,7
128:10,14 162:21
203:19 204:17
215:10,18 232:6
**hearing** 1:11 2:1,3
2:10 5:5,9,14,19
5:22 8:15 9:7,15
10:6,15 18:11
19:4 22:21 23:22
24:19 25:13,15,16
28:13 33:16,18,22

34:5 40:22 59:7,7
87:3 93:18 102:16
105:18 118:10
124:18 126:8
132:15 135:5
137:9 147:6
148:13,18 165:2,4
166:11 170:18
171:12 194:22
196:1 200:14,22
203:10,20,21
204:2 205:5 207:4
207:15 222:6
224:8 230:12
233:10 234:8
235:3,6,9
**hearsay** 13:17,17
14:13 17:3,6 26:9
26:9,15 93:11,20
94:10,11,12,18,21
95:3 113:22 114:3
114:8 124:4
126:14 127:16
128:7 132:18,21
137:11 188:6,7
**heart** 50:21 51:3
226:9
**heavy** 12:9 24:15
**held** 35:17
**help** 7:2,14 50:19
53:13 66:14 77:16
80:8,22 81:6,8,11
81:12,18 89:3
91:8 98:19,22
108:11 112:15,17
112:19 113:7,8
125:7,15 145:22
146:20 156:11
161:18 194:2
199:20
**helped** 82:1 86:2,10
105:20 109:8
112:20,22 113:1
123:7 179:10
227:18
**helpful** 28:9 194:3
225:21
**helping** 52:22
125:19
**helps** 120:12,13
**Herb** 34:18
**hereto** 235:12
**Herman** 35:7 63:9
63:15
**hesitate** 7:6
**Hey** 56:15 61:12

**hi** 5:16 183:21
186:6
**hiatus** 14:4
**hide** 186:21
**high** 166:9
**higher** 157:10,11
**highly** 22:16 24:1
133:13 221:11
**Hill** 50:1 57:16
**Hillary** 37:14,16
55:14,17,20 56:6
150:19 159:5
167:4
**hire** 82:9,16
**hired** 87:14 185:10
**hiring** 82:21
**history** 201:4
224:14
**hit** 93:9
**hitting** 230:22
**hoc** 2:3,10 5:9
**hole** 201:14
**Hollywood** 3:6
**home** 31:13 51:22
77:8 123:4,10
128:4 143:2,2,10
186:19
**homeless** 174:1
199:15
**Honestly** 196:8
**Honor** 6:8,18 9:1,6
11:19 14:14 15:8
20:20 24:21 30:17
41:19 42:4 58:13
76:7 85:12 93:10
96:4 107:12,19
111:2 113:21
117:18 124:3
126:13 127:15
128:6 131:18
132:17 133:6
137:11 140:19
141:10 149:1
150:11 165:3,13
165:22 168:22
177:16 178:7
181:7 194:2
208:15 213:6
224:3 231:2
**hope** 7:1 8:8 12:21
63:6 128:14
**hoping** 143:20
**hostile** 52:13
**hostility** 35:8,10
**hotel** 122:13,13,14
122:15 124:13,14

167:21 168:9
184:19
**hour** 170:2
**hours** 217:12,14,15
**house** 57:16 186:16
226:19
**Houston** 71:7
**huge** 92:18 93:8
151:4 185:6
**human** 73:6 223:14
**humiliated** 38:11
**hundred** 225:16
**hurt** 58:21 142:6
230:14
**husband** 224:16
226:17
**Huvelle** 56:11

**I**

**idea** 10:22 13:14
14:7 36:19 104:1
104:2 196:8 214:9
233:19
**ideal** 217:22
**identified** 37:17
**identify** 26:3
**identity** 190:20
**III** 2:20
**illegal** 56:20
**image** 90:5,5
**imagine** 8:2 33:18
92:9
**immediately** 46:5
52:11 162:9
**impact** 227:1
233:16
**implicitly** 10:14
**important** 13:9
14:18 15:3 57:4
140:3 157:22
192:18
**impose** 222:21
**imposed** 5:21
**improper** 22:10
23:13 30:18 149:3
**improprieties** 41:15
**inaccurate** 162:20
178:5
**inappropriate**
23:17,18
**incident** 124:6,17
185:4
**inclined** 95:17
140:5 215:20
**include** 183:3
203:22 204:19

**included** 38:15 84:4
172:3 198:10
203:21 222:16
**including** 1:15
32:11 57:7 63:18
186:15
**income** 196:11
**inconsistent** 182:5
**increase** 201:9
**independent** 44:11
52:9
**indicating** 160:22
**indications** 150:1
**individuals** 7:21
56:10
**infecting** 35:3
**influence** 56:11
**inform** 157:3,17
**informal** 7:16
212:12
**information** 21:7
22:9 23:19 83:1
192:20 231:17
**inherent** 15:18
232:13
**initial** 60:8,16
**initially** 13:2 39:21
56:15 136:15
**injunction** 59:7
62:9
**injunctive** 62:10
**injury** 117:9
**insists** 33:17
**inspect** 214:13
**instances** 38:9
182:14 205:15
**instructed** 157:4
158:22 159:10,11
160:13 161:4
**instruction** 160:16
**instructs** 203:18
**instrumental** 50:5
**insult** 117:9
**integral** 55:12
**integrity** 40:16
**intends** 40:21
**intensive** 16:14
**interaction** 74:6
**interactions** 142:15
**intercourse** 89:18
**interest** 48:2,3,4
66:20 230:10
**interested** 50:10
235:13
**interests** 48:1 49:14
**interim** 14:20

**interject** 221:1
**internal** 23:7
**international** 43:18
56:18 72:19
**internet** 91:3 97:2
**interplay** 203:7
**interrupt** 123:16
156:4
**interview** 50:8 74:2
**intimate** 38:21
**intimidation** 32:6
**introduce** 5:15 6:5
85:14 186:2 202:4
203:14
**introduced** 20:3
152:3,7,8 153:5
**introducing** 9:2
**investigate** 143:4
173:15,16
**investigated** 208:22
209:10
**investigation** 14:11
**investigator** 13:13
14:9 17:2 26:8
135:14
**investigator's** 17:1
26:6,15
**invite** 119:12
121:17
**invited** 50:16
**inviting** 118:13
**involve** 38:12
**involved** 13:17 32:5
47:5,8 74:10
172:12,14 173:2
176:21
**involvement** 35:1
45:15
**involves** 12:1
**Iran** 49:21 50:3
51:19 69:16,17,19
71:18 73:21,22
74:10
**Iranian** 49:14,15
50:2 57:9 66:14
**Iranians** 52:1 54:6
66:16
**irrelevant** 204:4,8
**issue** 11:6 12:10
13:11 18:16 25:1
26:8 28:5 31:10
46:6,16 47:20
65:1 133:8 166:21
214:3,7 232:20
**issues** 10:2 12:1
14:3 26:16 32:15

44:6,11,12 73:6
218:3 228:22
**item** 189:14 218:7

**J**

**J** 3:3,4
**Jackson** 147:12
**Jaffee** 147:12
**JAG** 42:19
**jam** 28:12 71:19
**Jame** 71:18
**James** 30:21
**January** 82:19
**jealousy** 38:10
**job** 37:1 48:9 70:2
71:15 72:13 76:4
76:14 78:11
120:13 174:2
175:1,1,3 196:12
199:15,18
**jobless** 142:8
**jobs** 70:4 71:14
**John** 42:7
**Johnson** 78:2
**joke** 52:1 184:16,18
185:4
**judge** 9:19 13:5
40:8 43:7 56:11
58:5,11,20 59:4,6
59:16 61,6,14
**judge's** 40:13
**judge-tried** 12:16
**judgment** 31:12,18
**judicial** 30:22 31:5
34:4,15,20 35:2
40:17
**juggle** 223:11
**juice** 37:18
**Julia** 35:9
**July** 9:17,17 13:1
35:22 144:4 161:8
161:8,8 162:16
163:9 171:2,2,22
172:1
**jumbled** 167:16
**June** 115:22 194:17
195:5,21 234:9
**jurisdiction** 29:15
232:19
**jurisdictions** 43:13
232:17
**justice** 66:17

**K**

**Katherine** 113:2,3
113:8 114:5,6,8

114:13,17 115:21
117:2 124:9
135:16 136:6
146:3,10,14,17
161:21 191:5,9
**Katherine's** 146:4
**Kathleen** 156:15
191:2,4,7,10,11
191:14 192:11,12
193:14 231:11
**Kathleen's** 192:22
**keep** 21:12 89:2
90:4 93:7 231:8
232:4 234:6
**keeps** 87:1
**ken** 33:7
**kept** 39:22 76:20,22
173:11 230:13
**Kevin** 13:13
**key** 45:6 48:2 57:7
**keys** 53:12
**kill** 37:8 200:12
**killed** 49:20
**Kim** 1:22 2:4 235:2
235:15
**kind** 16:9 31:17
51:7 53:3 61:3
71:8,14,20 73:4
82:3 120:3,17
125:9,22 139:13
156:17 187:2
193:11 231:14
**kiss** 142:20 143:14
**Klayman** 1:5 3:10
4:5 5:2 6:11,15,15
9:1 11:19,22
15:22 18:18 20:14
20:20 25:5 28:3,4
28:17,20 29:7,9
30:16 33:6 34:6
34:12 35:19,20
36:8 38:4,9,10,11
39:8,20 40:2 42:9
43:17,22 44:1,5
44:13,17,22 45:6
45:9,13,17,22
46:2,3,17 47:6
49:3,5,6 60:17
63:11 64:7 65:16
65:18 66:19 73:9
73:17 74:7 79:16
79:18,21 80:10,19
81:22 82:8,11,17
83:1,4,7 84:7,10
87:14,17 88:7,16
89:22 90:16 91:5

93:3,10,14 96:9
96:18 97:10 98:4
98:6,12 100:3
102:4,8 104:1,2
105:20 106:4
107:19 108:10,18
110:18,21 111:13
113:5,19,21 114:2
114:7,15 115:2,10
117:15 118:2
124:22 125:6,17
129:11,19 131:18
131:22 132:17
133:5 134:12
137:11 138:1,5,6
138:18 139:11,12
139:17 140:18,19
141:8,10,20
142:15,18,20
143:5 144:5,20
146:12,12,20
147:17,19 148:7
148:20 149:1
150:9,10 151:9,22
152:7,18 153:5,6
154:22 155:17,17
155:21 157:4,19
158:13,22 159:4
159:11,18 160:1
160:14,17 163:5
164:6 165:3,9,11
165:17,20 166:16
166:19 169:5
170:15,19 171:14
174:4 177:1,2,4
177:16 178:3,7
180:12 181:4,7
183:5 184:20
185:9,13 186:3
187:3 188:6,19
189:14 190:4
191:13 192:22
194:2,6,11,17
195:6,14 197:3
198:15 199:14
200:4 201:4 205:6
207:7 208:13,15
208:18 209:2,11
210:1 212:20,22
213:5,14,18
217:20 219:3,10
221:1,4 223:1
224:3 225:5,7,10
225:13,20 226:5
226:16 227:2,6,8
227:8,9 228:9,13

231:1 232:20
233:2,9
**Klayman's** 38:16
39:3 47:22 169:18
**knew** 48:10 122:9
131:6 175:6 201:6
**know** 9:8,22 11:4
12:9 13:1,6 14:1
14:14 15:1,6,14
15:18,22 16:6
19:16,18,21 20:9
24:10 31:2,20
32:16 33:21 34:19
35:1 36:3,8 43:6
43:15 44:14 45:16
45:17 46:11 47:8
47:11,12,14,15,16
47:21 48:5,11,18
49:22 52:7 54:6
55:8,10 60:16
63:18 65:18 66:20
68:15 75:8 80:11
84:12,13,14,16
87:21 88:2 89:3
90:9 94:17 99:14
99:14 101:5
103:15 105:4,6
113:3 125:13
135:11 148:14
150:5 153:4
155:10 157:9
158:4 166:11
169:2 178:13
187:1,21 188:18
190:19 191:8
196:10,21,21
201:12,19 202:21
204:18 206:10
208:21 209:10
211:8 213:10,11
216:13 219:2
221:13 224:18
225:3,22 226:4
227:7,10 229:15
231:2,21 232:5,10
**knowing** 21:15
**knowledge** 61:3
**knowledgeable**
21:16
**known** 40:1 43:17
**knows** 19:21 55:7
56:17 81:17 91:17
97:14
**Kollar-Kotelly** 40:9
**Kotelly** 58:5 59:6
59:16 61:6,13,14

**Kurds** 54:7

**L**

**LA** 58:14 81:18
84:2 91:15,15
106:10,12 108:12
109:5
**lack** 166:16,17
208:16
**lacks** 140:19 208:19
209:2
**ladies'** 122:16,17,19
122:20
**lady** 112:22 113:1
124:5,5,10
**laid** 149:7
**language** 119:19,22
120:3 121:3,8
149:14
**languishes** 64:16
**lapse** 62:5
**large** 17:5 37:10
**larger** 225:9,14
**Larkin** 2:13 5:16,16
220:12
**Larry** 1:5 3:10 5:2
6:15 35:18 42:9
48:8 50:18 59:4
63:11 66:19
141:20 144:4
157:4 159:11
160:13 183:21
184:20 185:9
194:17 195:6
227:8
**last-minute** 32:11
**late** 8:10 21:3
201:12 216:20
**latitude** 16:17
**law** 3:4 43:16,18
56:19 63:10,11
65:3 88:4 232:11
232:16
**lawsuit** 49:17
157:17 159:4
172:4,4 231:9
**lawsuits** 147:9
153:9 170:16
**lawyer** 12:6 15:14
53:7 62:21 66:21
79:14 82:17 152:3
152:5,6,8 232:4
**lawyer-like** 223:5
**lawyers** 233:9
**laying** 85:13 206:5
**Leader** 66:1

**leaders** 49:19
**leading** 76:8,9
82:11,12 85:11
106:4 107:13,14
117:19 147:21
148:1 205:19
**leap** 41:6,9
**learn** 14:4
**learned** 13:18,18
31:2,5 33:17 50:7
56:16 166:6
**learning** 135:15
**leave** 7:8 18:4 33:8
33:9 34:11 41:10
54:1 90:13 123:5
167:21 203:14
205:3
**leaving** 29:4 50:11
**lecture** 119:8
**led** 234:1
**left** 45:10 50:10
69:19 70:13
120:20 123:9
139:12,13,14
186:18 202:22
218:5
**legal** 15:2 30:4,5
40:12 55:12 61:3
77:20 87:21 88:3
88:4,6 145:9
162:10 190:20
210:1 219:5
**legs** 6:3
**length** 16:16 29:13
29:21
**let's** 67:7 100:20
104:4 110:5
111:10 133:2
137:14 143:19
185:15 206:7,12
212:15
**letter** 19:10 23:8
60:13 85:17 86:5
86:12,22 116:22
130:9,18,21 131:4
131:8,9,12,12,16
132:9,10,11 137:7
137:18 138:12
140:16,21 141:6
141:22 142:3
144:3 145:22
146:19 147:4
148:12 150:13
156:8,12 157:15
157:21,22 158:1,6
158:7 159:21,22

160:8 161:4,18
162:1,18 163:4,10
170:15
**letters** 88:2 131:11
138:9 162:15
**level** 39:15 43:20
70:6
**Libertarian** 56:5
**liberty** 20:1
**life** 51:2 90:7,10,12
90:15 93:5 119:1
119:15 126:9
165:16,18 184:17
186:15 188:5
196:5 198:13
200:2,19 201:15
**light** 23:2 122:9,10
168:5 213:6
217:21
**lightening** 212:13
**likes** 75:13
**limited** 153:22
**Lincoln** 138:11
**line** 51:7 59:19
187:20 196:12
**lines** 119:10 137:2
163:18 181:20,22
189:1,9,19 191:1
202:18
**link** 96:16,19 98:10
**linkage** 178:8
**list** 14:8
**listed** 13:12 41:6
**listen** 91:16
**listening** 65:7 92:3
**lists** 22:5,6
**litigants** 52:8
**litigate** 54:19
**litigation** 37:11
52:19,21 54:20
57:19 135:4
**litigation's** 52:21
**little** 7:10,14 8:11
11:8 18:6 37:5,18
44:14 50:9 116:18
143:13 150:20
197:15 204:22
206:1 223:10
226:6,9
**live** 47:8 55:9 69:13
69:17,19,21 70:20
200:13
**lived** 70:21
**lives** 9:4
**living** 105:13 107:5
107:20 223:14

**lobby** 57:15
**loggerheads** 31:11
**logical** 52:3
**logistical** 222:21
**logistics** 223:11
**Lollie** 183:22
**long** 16:15 29:16
36:9 69:17,21
72:5 125:4 201:1
**longer** 58:3 147:17
148:7 157:6
160:14 161:5
**look** 21:21 28:10,13
28:14 42:16 46:15
54:10 56:15 61:1
84:18 85:7 90:8
100:17 103:18
109:18 112:1,8
117:7 119:19
120:3 122:2
128:16 130:20
131:1 141:17
144:2 147:3
148:11 151:14
154:19 157:21
158:17 161:11
171:6 176:7,15
180:7 187:11,17
190:15,22 193:22
194:9 197:12
205:11 207:2
209:5 210:7
221:11 227:10
228:11 232:1
**looked** 50:2 100:16
101:10 193:16
**looking** 7:12 12:18
14:19,21 27:6
35:20 116:9
139:21 145:21
156:16 176:10,19
192:7,21 195:12
197:22 198:9
205:10
**looks** 143:7
**loose** 206:2,11
**Los** 51:13,16,22
53:22 54:1,15
59:3 62:12 69:14
70:22 71:11,12
72:6,7 81:21
83:18 105:16
106:18 110:19
**lose** 77:17,19
134:20
**losing** 174:1 175:6

**lost** 21:8,9 29:22
79:2 174:17
231:18
**lot** 21:7,8 31:1
42:12,21 47:1,10
49:10 55:3 93:11
166:3 178:17
185:7 200:17
**loud** 205:20 214:9
**love** 119:1,2 121:19
138:2 148:21
173:2 185:19
**loved** 118:22,22
119:2
**loves** 118:21 119:3
**low** 14:22
**lunch** 8:10 140:4
163:20 192:3
231:4
**luncheon** 164:9
**Luxe** 122:13 184:19

**M**

**M** 1:22 2:4 235:2
235:15
**ma'am** 187:18
**mad** 183:19 187:5
**Madam** 140:1
**mail** 85:9,17 99:18
158:8,10 162:14
**mailed** 86:12
158:10,11
**main** 147:11
**maintained** 23:13
**major** 70:11
**makers** 55:12
**making** 44:10 95:15
121:3 124:7
135:19 144:8
151:8 184:18
**malicious** 31:14
**malpractice** 62:5
231:10
**man** 119:2 139:2
226:19 231:5
**management** 91:9
104:9
**manifested** 39:22
**manner** 203:9
**Manuchehr** 49:18
**march** 95:9 105:3
**Mark** 187:18
188:19
**marked** 84:19
109:19 112:2,7
128:17 176:16

**married** 226:18
**marry** 186:22
**martial** 42:22
**Mary** 2:13 5:16
**match** 77:5
**material** 19:22 22:3
28:8 42:15 96:21
**matter** 1:4 5:2,4 8:6
11:14 13:10,18
18:10 29:18 33:20
37:1 40:8 44:9
48:22 64:2 77:21
82:17 87:15 140:4
172:21 201:17
203:1
**matters** 6:21,22
8:18,19,22 9:14
33:19 43:19 56:18
165:10,12 171:15
182:17
**McCain** 57:16
189:2,10,15
**mean** 14:13 15:22
27:20 31:21 33:17
35:10 45:8,11
46:7,9 51:18
75:18,20,22 78:6
87:21 90:19 91:19
101:5 108:10
134:16 135:8
137:19 167:5
170:21 172:21
175:4 180:5
181:20 182:9,18
184:16 212:22
215:10 219:11
221:8 225:3 227:8
229:9
**meaning** 59:9
119:11
**means** 47:10
**meant** 148:19
149:16 153:19,21
196:2,16
**measure** 153:18
**media** 46:7,7,12
**medication** 125:20
125:22 199:21
201:9 206:18,20
**medicine** 125:9
**medium** 195:17
207:12
**meet** 6:14 32:18
63:20 73:17 78:7
113:6,7 120:12
152:22 153:3

174:8,9
**meeting** 33:15 78:8
78:17 138:11
139:7,12,13,16
140:17 141:7
150:17 189:1,10
189:15
**meetings** 52:16
104:6 184:21
**Meghan** 167:11
**Mehdi** 153:11
**melded** 12:20
**member** 2:14,16
24:12 43:3
**members** 5:14,14
25:16 36:14 42:5
49:6 93:18 151:10
205:2
**memories** 29:22
191:21
**memory** 103:11
182:6 203:5
**men** 224:14 226:20
**mental** 185:14
**mentally** 115:13
174:5
**mention** 45:2 117:8
**mentioned** 10:19
65:14 79:7 100:6
206:17 234:7
**merely** 204:4,8
**merits** 32:16
**message** 184:2
**messaged** 127:13,13
**messages** 101:13
127:16 163:14
176:20,22 177:12
177:15,19 178:2,3
178:9,10 179:6,12
179:20,22 180:20
181:2 183:6,7,10
**messaging** 174:7
184:5
**met** 6:14 9:3,19
33:14 34:2,3
49:13 73:8 74:7
75:4 113:4 126:17
146:11,14 152:21
155:1,7
**Miami** 31:12
**Michael** 2:15 5:17
**microphone** 176:10
**microphones** 68:10
**middle** 156:18
**mildly** 228:22
**military** 42:18

million 52:1
mind 84:17 149:3
  153:15,16 154:5,7
  154:8,9,12 160:10
  196:9 200:21
  231:8 234:6
mine 12:12 53:7
minute 20:16 22:1
  24:19 67:15 92:6
  93:13 171:6 195:1
  228:20 229:6
minutes 8:5,6 67:8
  110:4,5 152:16
  175:14 206:1,8
  217:12 223:4
misinterpreted
  15:20
missed 107:7
mistaken 197:16
mistakes 182:21
mistreat 52:14
Mm-hmm 97:20
  105:8 130:6
  179:11 212:2
Mohammadi 49:18
mom 123:15 186:17
moment 6:22 93:16
  113:12 129:1
  202:1
Monday 18:3
  145:13 195:21
money 50:19 53:1
  53:10,11,17 84:3
  109:12 110:22
  111:12,14,19,20
  178:17
monies 110:17
month 109:10,12
months 77:9 105:7
  115:15 126:7,19
  126:21 128:1
  148:20
morning 5:17 6:8
  8:2,9 18:20 21:20
  29:3,12 36:14
  42:4,6 67:2,12,13
  69:8,9 140:2
  165:15 189:2,11
  214:15 215:15,17
  216:8 217:21
  224:4 234:4
motion 15:10 17:17
  17:21,22 18:1,2
  22:3,11 204:1
  224:9 229:19
motions 203:8,9

motivation 63:19
motives 40:10
mouth 107:15
move 53:21 62:6
  70:14 78:13 94:20
  105:19,21 106:3
  106:18 144:9,11
  148:2 191:17
moved 59:15 71:1,2
  71:11 72:8,13
  78:14 83:18,18
  105:15,21,22
  106:1 107:4
  108:19 109:5
  144:6
movement 49:16,19
movie 81:10 124:17
movies 81:1
moving 53:13 54:19
  84:1 203:14
  229:21 232:8
muggy 7:14
murdering 49:17
Muslim 188:4
mutually 10:8

**N**

N 4:1 5:1 165:1,1,1
name 6:9 33:4 42:7
  56:10 67:16 79:6
  82:2,4 93:2
  100:16 101:12
  114:16 146:4,7
  147:9 152:8,10
  153:10 157:5
  159:1 191:5
  192:11,12,14,14
  192:22
named 53:7 135:16
names 45:22 62:21
naming 167:4
narrative 37:18
nasal 165:14
National 43:5,7,9
natural 25:20
near 229:12
nearly 32:4 231:5
necessarily 94:18
  211:9
necessary 37:14
need 7:8 9:15,18
  10:4 11:12 12:13
  14:17 19:19 22:17
  24:7,13,15 25:21
  42:16 64:5 67:18
  68:8 112:16 148:4

206:11 209:20
  213:8 215:12
  216:19 219:6
  220:2 228:18
  230:18 231:7
needed 14:22 89:3
  133:9
needs 9:20 16:7
  22:17 58:8 59:20
  111:9 216:4
  217:14,15
negative 51:18
negotiate 53:21
negotiated 34:17
negotiations 34:15
  152:4
neither 235:7
nerve-racking
  184:22
nervous 54:2
Net 40:2
network 51:12
  59:15 65:21
  157:11 188:14,17
never 22:11 33:19
  34:2 39:13 45:10
  47:21 52:22 53:15
  53:17 61:19 90:13
  118:22 138:20
  224:10 231:8
  232:2
new 25:6 32:20
  120:13 168:6
  198:22 201:7
news 46:9 51:12
  54:5 59:14 65:21
  72:4 157:11 227:5
newscaster 48:20
  50:7 54:13 55:8
nice 6:14 36:6
night 116:6 216:20
nightly 46:9
nights 199:16
nine 188:22 189:9
  209:14,19 217:15
no-brainer 91:11
nobody's 58:21
nonresponsive
  123:18
nonstop 118:16
  121:22 184:5,6,6
noodling 11:8 206:6
noon 8:13
norm 46:8
norms 28:6 135:4
Notary 2:5 235:1

235:16
note 166:15 211:5
noted 6:18 217:10
notes 146:9 191:21
  192:6,7,10,15,19
  193:3,8,9,11
notice 7:15 22:12
  62:7 117:14 224:8
  224:8
noticed 34:21
notify 34:4 223:7
notifying 196:14
notion 214:9
notwithstanding
  39:7 203:15
November 74:4
  85:4,18 163:11
  170:21 171:8
number 50:13,14
  66:15 84:20 85:1
  85:2 99:4 109:19
  110:12 112:2
  113:13 128:17
  129:4 130:20
  131:17 135:10
  136:8,14 139:21
  140:14 141:18
  143:22 144:3,6
  145:21 147:21,22
  151:15,17 154:19
  156:7 158:18
  161:12,15 176:7
  176:11 181:8
  197:13 209:17
numbers 19:14
NW 2:2

**O**

O 5:1 165:1,1,1
o'clock 7:2 8:10
  163:20 166:1
O'Connell 14:9
  216:7 217:1
O'Connor 13:13,21
oath 6:3 170:3
Obama 63:16
object 22:18 23:21
  76:7 85:12 96:4
  111:2 124:4
  126:13 128:6
  131:18 177:17
objection 82:11
  93:10 106:4
  107:12 108:4
  111:5 117:18,21
  132:17 147:19,20

149:1 150:3,10
  169:7 177:17,21
  178:22 181:7
  183:5 185:13
  187:3 188:6,8
  208:15 209:3
objections 39:20
objective 44:11
  45:8 51:9
objectives 39:4
obligated 29:19
  30:2
obligation 11:14
  27:8
observation 41:4
  94:10 136:13
  151:8 233:7
observations 29:12
  30:3 197:20
observed 96:8
obvious 37:16 38:6
  157:14
obviously 174:16
  231:11
occasion 160:22
  161:1 190:9,10
occasions 121:17
  123:12
occurred 54:20
October 116:12
  171:16 180:14
  235:20
odds 135:18
Off-the-record
  93:17
offended 68:14
offer 47:3
offered 54:4 228:1
  228:3
office 3:4 6:7 14:10
  34:8 51:12,14
  55:22 60:10 63:7
  65:20 85:3,10,17
  91:15 99:9 104:7
  106:9,10 108:12
  113:5,10,12
  114:15 116:14
  127:9 138:7
  143:11 146:13
  180:10 184:20
  189:16 191:15
officer 42:19 235:2
officers 233:11
oh 11:21 27:19
  103:4 120:1
  125:11 145:7

152:12,15 156:5
171:3 175:1
196:19 209:15
218:10,11
**ok** 6:19 8:1 11:22
32:14 43:2 68:13
68:16 80:4 82:5,7
83:11,20 88:14
98:20 100:1
101:20 102:11
103:4 105:5
112:18 113:15,17
115:1,2,2,5
116:16 122:21
123:6 126:20
128:14 130:2
131:9,14 132:12
137:11 145:18,21
151:7 152:20
153:2,7 154:13
155:6,11 156:5
159:14 160:12
163:1 166:8
171:10 181:22
189:7 190:8,12,22
191:7,11 192:10
195:15 196:19
197:5,9 202:17
206:15 208:6
210:4,12,22 211:4
212:5 216:10
218:22 220:1
221:9 226:19
**okay** 140:10 226:5
226:10
**old** 21:6 35:21
64:19 69:10
**once** 9:8 61:14
70:19 71:2 111:13
111:20 113:11
137:18 168:18
200:6,11 230:12
**one's** 8:4 46:8
226:15
**ongoing** 115:16,17
**open** 6:1 8:15 90:11
222:11 229:3
**opened** 93:1 122:10
**opening** 4:2 11:17
18:8 33:12 36:12
42:1,2 49:4 65:8
**opera** 41:21
**opinion** 48:8 232:14
233:6,12
**opponent** 204:5
**opportunity** 13:20

14:4 22:22 24:14
26:19 28:14 54:4
54:14 58:19
117:16 135:11,22
192:5 227:14
228:10 231:15
232:15
**opposed** 228:20
229:1,4 231:16
233:19
**option** 155:15,19
**oral** 203:19
**Orange** 194:7
**oranges** 136:9
**orchestrated** 35:11
**order** 10:16,19
15:10 17:19 24:21
62:8
**ordered** 143:11
165:22
**orderly** 168:14
**orders** 6:18
**ordinary** 222:3
**organized** 168:21
**originally** 69:15
191:14
**ought** 228:3
**outcome** 235:13
**outraged** 232:6
**outs** 75:1
**outside** 7:14 73:18
81:6 120:21 165:4
175:16 213:1,13
213:17,18
**overly** 181:10
**overnight** 214:14
220:4 228:11
**overruled** 85:15
106:5 108:4
111:11 124:15
128:8,11 133:4
141:2 148:9 179:1
185:17
**overturn** 49:20
**overview** 49:12

---

**P**

**P** 5:1
**p.m** 140:6 164:9
165:2 234:8
**package** 18:20
199:10 221:15
225:9,14
**page** 4:2 85:21
112:5 116:9
144:18,19 148:12

151:19 156:16
160:13 161:12,15
162:4 177:8
183:20 189:6
190:16 191:1
197:10 209:16
211:6
**pages** 59:15 93:1,1
112:7 176:16,17
176:17
**paid** 53:13 54:18
83:18 105:21
109:4,9 110:18
111:13
**paper** 178:12 186:5
186:9 211:21
**papers** 200:6
**paragraph** 117:8
147:3 153:8
156:16
**parcel** 66:13
**Pardon** 218:6
**parked** 122:14
**parking** 120:21
**part** 12:14 17:5
20:9 32:9 55:12
56:7 60:12 66:13
71:6 83:20 101:18
112:11 127:1
134:13 201:16
225:8,11,14
**partial** 21:18
**participants** 43:21
**participate** 116:21
**participated** 94:16
**particular** 17:11
123:19 156:12
187:13
**particularly** 22:9
23:2 168:5 213:6
**parties** 2:7 10:9
214:11 221:19
235:9,12
**partner** 34:18
**parts** 162:22
**party** 27:9 134:3
212:14
**pass** 74:20
**passage** 29:21
30:11 203:15
**passed** 203:13
**passionate** 43:19
45:9 62:15
**patience** 223:21
**patient** 137:22
**patients** 126:11

127:8,8 128:4
**pattern** 198:11
**pause** 20:17 67:10
176:2
**pay** 84:2 131:6
**paycheck** 107:5,5,6
107:6,6,7,20,21
**paychecks** 108:8,16
**payment** 107:8
**payments** 45:1
**peace** 232:16
**pendency** 35:16
**pending** 29:14
58:18 132:4 147:8
153:9,17 154:7
170:16 208:17
212:9 219:18
220:18
**Pennsylvania** 21:11
49:1 60:4,6
**people** 13:19 16:22
34:7 37:4 47:7
52:1 54:12 63:7
63:16 77:3 90:8
90:12 91:9 97:6
100:14 103:14,15
103:17,18,19
120:1,12,18 121:5
122:4 153:22
154:1 172:3,5,9
174:6 187:1
189:16 200:7
208:11 219:6
233:14
**people's** 7:2 101:11
**perceive** 89:9
**perceived** 37:6
**percent** 53:2 83:9
83:13 84:4 111:15
174:16 210:11,11
210:16 225:16
**perceptions** 234:2
**perfect** 178:5
**perfectly** 6:19 7:18
8:1 16:22 93:14
171:5 219:16
**period** 15:16 18:16
24:8 51:2 62:3
98:8 103:8 180:1
192:3 230:18
**periodical** 40:1
**periods** 23:19,20
**permanent** 62:10
**permit** 94:11
**permits** 94:21
**permitted** 202:14

**Persian** 51:12 59:14
65:21 73:21 89:16
92:19 97:4 139:1
157:11 187:1
**Persians** 54:7,7
**person** 79:6,21 86:2
86:3,15 88:1,1
90:5 91:20,20,21
121:13 122:1,18
135:16 151:5
155:7 172:9 173:8
173:16,16,17,18
175:1 185:11
191:4 196:11
197:8
**personal** 38:4 48:1
50:12,16 53:5
55:19 56:22 57:2
90:7 94:15 117:16
118:3
**personal/political**
148:16 149:18
**personally** 227:18
**perspective** 45:4
149:19
**persuaded** 217:13
217:15
**pertain** 26:1
**peruses** 85:5 141:21
160:2
**Peterson** 30:21
31:21 32:4 33:6
**petitioner** 9:9 13:8
13:13
**phon** 147:12 183:22
190:17 193:16
194:1
**phone** 50:12,14
80:13,14,15,16
113:13 118:17
128:4 163:14
178:11 179:8,13
179:18 183:13,17
184:1,6 186:19,20
**phony** 100:20
**physical** 142:17
**physicians** 54:16
**pick** 167:16
**picture** 97:14
**pictures** 93:2
100:22 101:6,11
**piece** 101:16,16
178:11
**pigeons** 155:8
**pills** 126:1
**Ping-Pong** 164:1

**place** 18:15 20:12
34:5 35:16 51:5
52:3 120:11,20
147:15 179:8
**places** 70:21 118:14
119:13
**plain** 149:14
**planning** 7:3
178:19
**play** 25:20 37:18
**playing** 43:20
184:17 196:5
198:11
**plead** 142:11
**pleadings** 36:4 37:9
58:8 166:7 226:3
**pleasantly** 7:13
**please** 5:15 6:5
50:14 67:15 68:3
73:14 77:16 92:5
102:16 109:3
114:11 117:11
123:3 142:12,12
143:19 145:22
148:11 151:14,17
162:7,8,12 171:11
173:11 187:17,18
191:2 196:1
212:16 220:15
**plow** 206:10
**plus** 31:15 80:6
158:9
**point** 10:8 16:2
19:17 20:3 22:8
25:19 29:3 30:10
30:16 33:10 42:11
45:6,19 53:3 67:9
73:14 77:22 94:14
95:11 97:22 98:13
121:13 124:7
133:5 141:1 142:4
147:16 148:6
149:7,9,10,11,20
157:9 159:3 167:7
173:22 174:15
175:6 178:4
184:10 185:5
186:8 198:19
199:14 210:9
211:11 221:1
225:3
**pointed** 25:9 64:18
**pointing** 73:15
**points** 16:2 28:4
30:13 65:4 95:21
147:20 185:16

212:14
**police** 123:3
**policies** 23:8
**polite** 183:19 225:5
**politely** 224:13
**political** 73:6 150:9
**political/personal**
149:17
**politically** 55:22
**politicians** 150:16
**politics** 72:4
**pornographic** 93:2
100:22 101:5
**Porter** 35:9
**portion** 228:2
**portions** 205:22
**position** 30:17 36:5
77:19 79:2,3
228:16 233:18
**positive** 55:10 98:3
**positively** 98:22
**possibilities** 154:5,6
**possibility** 7:7
10:15 103:8
204:21
**possible** 17:9,12
90:3 94:4 154:8
205:14 215:5,9
216:18
**possibly** 50:3,5
**post** 165:13
**posted** 100:14
195:5
**posting** 100:13
**posts** 100:7,9,12
**potential** 28:1
**potentially** 94:5
167:14
**practice** 5:6 43:15
43:18 55:12 63:10
125:10 135:5
**practices** 63:11
**prayer** 62:10
**preceding** 153:7
**prefer** 226:7
**preferable** 17:16
**prejudicial** 22:17
24:1 133:13
204:17 215:2
221:11
**preliminary** 6:21
8:17,19,22 9:14
18:10 59:7 62:9
136:16 165:10
**preparation** 24:17
**prepare** 9:10 14:5,6

24:8 42:13 146:20
168:10 228:18
231:7
**prepared** 18:19
32:16 67:4 200:22
**preparing** 135:17
**prescribed** 126:3
**presence** 223:2
**present** 2:6 3:9 6:4
10:7 23:20 24:16
57:10 188:9
**presentation** 29:22
30:12 33:1
**presents** 9:9
**preserve** 58:16,20
**president** 52:10
63:16
**presidential** 56:3
**presidents** 56:2
63:17
**pressed** 217:13,14
**pressing** 8:5
**presumably** 20:6
**presume** 204:22
**presumptively**
223:8
**pretrial** 28:7
**pretty** 7:1 36:19
166:10 178:1
**prevent** 13:22
**previously** 6:13
18:14 20:21 25:3
29:13 36:18 163:5
**primary** 230:10
**principals** 56:5
**printout** 195:8
**prior** 130:11 163:4
**prison** 49:21
**private** 66:21 90:9
90:11,14 93:7
**privileged** 204:3,8
**privy** 140:3
**pro** 45:2 55:1
**pro-Shah** 66:3
**probably** 10:13,18
11:12 99:4 109:16
130:1 131:5 160:4
186:21 205:10
223:17
**problem** 7:19 8:7
32:9 67:6 78:20
79:14 80:20
165:18 173:14
222:21 233:14
**problems** 7:5 59:13
223:6 226:20

**procedure** 27:8
28:7
**proceed** 9:7 11:5,11
24:7 56:12 61:15
62:2 67:7 88:17
90:17 137:1
165:21 175:12
206:5
**proceeded** 48:12
**proceeding** 5:20 6:2
23:10,15 27:1
35:3,16 39:4
42:10 63:9 67:21
88:8 229:11
**proceedings** 5:22
10:21 19:3 44:4
235:4,7
**process** 13:10 15:12
40:17 150:2 229:8
229:13
**prod** 46:12
**produce** 229:18
**produced** 133:11
133:19 135:1,2
214:4
**producer** 72:22
74:19,22 77:14
78:1 79:20 88:22
89:1
**production** 27:5
**professional** 1:2 2:1
40:4 63:12 117:15
166:14 172:16
173:12 230:1
**Professor** 13:6
64:17 232:14
**proffer** 204:6
**proffered** 225:12
**program** 77:3,4
78:13,14
**programs** 46:10
72:2,2 73:1
**prohibit** 17:5 40:18
**prominent** 57:9
**promise** 216:22
**promoting** 43:20
**promptly** 48:22
**pronunciation**
191:9
**proof** 193:4
**proper** 16:14 24:16
76:10 135:7 136:3
**properly** 57:13
95:22 103:7
135:20 228:7
**proposal** 106:11

214:9
**propose** 9:15
**proposed** 53:2
**proposing** 210:4
**prosecuted** 37:3
**prosecution** 37:19
40:11
**protect** 62:6 110:15
**protection** 15:12
229:8
**protested** 66:18
**protesting** 50:2
**prove** 57:13
**provide** 32:21
162:10,12 193:4
211:14,15,18
**provided** 13:8
16:17 17:10 20:22
22:6,7,7,20 44:17
45:1,13,22 214:5
224:6 230:4
**provider** 211:13
**provides** 60:17
**prowess** 40:5
**psychologically**
173:21
**psychologist** 38:16
54:17 125:12
137:22
**psychologists** 59:11
**Psychology** 70:12
**public** 2:5,14 6:1
31:4,18,18 33:19
56:4 66:20 92:18
92:22 100:17
119:21 233:12,22
235:1,16
**publication** 100:4
**publications** 40:1
**publicity** 13:15
55:7,9,10 57:11
96:2 102:5,9,11
102:18 103:3
167:3
**publicizing** 91:5
**published** 14:11
96:10 97:5,6,11
98:7
**pulled** 221:10
225:15
**pulling** 167:5 229:5
230:13
**punches** 230:14
**punitive** 31:15,16
**purely** 29:18
**purport** 179:22

In The Matter Of: Larry E. Klayman
May 30, 2018

**purported** 181:8
183:6
**purports** 144:20
**purpose** 30:18
55:16 64:20 80:18
125:5 138:17
**purposes** 60:19
149:12 170:14
222:7
**pursuant** 5:5
**pursue** 46:8 48:19
87:17 117:16
118:3
**pursuing** 147:14
148:22
**pursuit** 38:14,15
**push** 216:14
**pushed** 143:18
**put** 18:20 22:12
53:16,22 58:13
61:13 62:11 101:8
104:12 119:10
134:19 143:10
151:1 158:10
165:3 167:9,9,10
169:3 174:19
178:11 187:5
191:14 193:12
199:22 200:13,20
210:10 220:5
222:8,14,15 224:7
227:16 228:22
**puts** 12:17 185:13
**putting** 6:21 20:2
61:6 107:15
115:14 174:22
196:4 198:13

**Q**

**quandary** 232:3
**quantity** 19:22
**question** 27:9 30:4
33:3 40:16 59:5
76:8,10,11 84:9
85:11 86:7 88:11
92:8,14 93:14,22
94:3 99:17,18
103:12 106:7
107:13,14,16
108:5,6 110:13,16
110:20 111:3,8
117:19 123:19
124:1 128:20
129:7 132:4 137:5
141:3,6 144:15
147:21 148:1,2,4

151:16 159:9
162:19 163:2
171:11 178:18
179:22 181:9,13
181:18 182:8
198:6 202:1
204:13 208:17
219:18 220:4
**questions** 30:5
40:22 41:3 89:20
102:3 103:6
163:17 168:2
198:1 201:21
212:8 217:5
**quick** 167:9 221:8
224:5
**quiet** 39:22 90:2
121:11,12
**quietly** 37:3 88:20
90:18
**quit** 183:16
**quite** 46:18 103:7
**quo** 58:16,20

**R**

**R** 5:1 165:1
**rabbit** 167:5
**radio** 188:2,3
**raise** 11:19 32:15
33:10 68:15
**raised** 26:7
**raises** 93:14
**ran** 50:11 122:10
122:11,12,13,16
**rank** 13:17
**ranked** 52:13
**rape** 89:17,18
**raped** 89:13,13,14
**rate** 150:5
**reach** 67:8
**reached** 26:4 65:1
198:18 232:21
**react** 92:19
**reaction** 97:9,12,17
97:19 142:2,4,10
230:8
**reactions** 136:21
215:12
**read** 36:3,16 86:13
117:4,11 124:12
147:6 148:13
157:1 161:22
162:6 184:1
218:14,18 219:6,9
219:9,12,15
**reads** 117:12

156:10
**ready** 201:22
**reality** 228:19
**realize** 64:22
**realized** 53:5 62:17
77:11
**really** 8:7 45:11
46:22 47:10 48:16
54:22 64:8,11
77:11 84:13
101:12,14,14
167:18 205:21
228:16
**reason** 8:4,16 10:6
31:7 37:16 75:22
92:17 119:17
172:12 195:8
219:2 233:9
**reasonable** 10:1
16:4,16 24:8
217:7
**reasonably** 135:12
**reasons** 23:13 29:17
93:6 151:8
**reassured** 228:6
**rebuttal** 30:14
**recall** 34:3 79:17
99:8 118:6 130:15
131:3 133:6 134:4
140:16 146:5
159:20 160:20
161:5 179:14
182:15 192:7,11
193:14 194:19
214:4
**receive** 17:16 19:2
44:22 129:18
205:3 207:12
208:2
**received** 18:12 19:6
19:10 20:8 139:10
194:19 195:18
202:5 221:22
**receiving** 17:20
129:5 207:21
**receptionist** 122:18
**recess** 110:5,7
164:10 212:15
213:20 215:22
218:8 234:9
**reciprocated** 38:2
**recognize** 73:11
182:19
**recollection** 33:15
180:17 182:17
197:2

**recommendation**
204:1,20
**recommendations**
30:6
**recommended**
45:21 53:4,6
**reconsideration**
59:16
**reconvened** 9:16
10:8
**record** 33:19,21
45:4 61:21 85:3
89:2 110:15 112:5
130:8,21 133:6
141:18 144:3
149:16 156:7
157:1 158:4 162:1
162:7 163:11
165:4,7 194:16
195:3 197:15
198:1 203:21
204:6,12,20 205:1
205:4,8 211:5
213:22 214:17
231:8 234:5 235:7
**recount** 114:1,5
**recover** 199:17
**recovery** 210:7
**recruit** 38:16
**red** 122:9,10
**reduced** 45:5 235:5
**refer** 140:13 145:8
170:12
**reference** 39:21
141:1 144:8
190:16
**referred** 95:1 97:18
211:20 225:8
**referring** 17:11
87:4 96:21 124:8
143:22 145:5
159:2,12,16
160:15
**refers** 203:9
**reflect** 18:15 179:20
181:3
**reflected** 117:5
**reflecting** 84:7
**refresh** 180:17
**refusal** 38:20
**refute** 134:21
**refuted** 134:18
**regard** 13:15 15:9
16:18 22:12 30:3
32:10 34:21 55:20
56:12 62:8 95:6

178:8
**regarding** 76:1
80:12 84:15 87:11
87:12 89:11 90:7
91:3 113:5 150:17
222:18
**regime** 49:17,20
50:3 66:6
**regrettable** 49:11
**regrettably** 13:6
**regroup** 13:3
**regular** 158:8
**regulators** 44:1
**reimbursed** 110:22
**rejoined** 169:21
**related** 235:8
**relates** 92:13
**relating** 96:22
**relationship** 12:2
31:1 38:5,21
39:12,15 50:15
54:21 84:8 115:11
115:15 117:15,16
118:3 174:20
187:2,2
**relationships** 38:12
**relative** 235:10
**relatively** 49:8
**relaxed** 133:1 134:8
134:16 135:8
**relevance** 41:5 94:5
136:18
**relevant** 19:3 220:7
221:17 227:11,13
**relief** 62:10
**religious** 47:15
**relive** 200:18
**rely** 26:20
**remain** 67:14 170:3
**remarks** 139:10
**remember** 73:20
74:3,11 75:19
80:9,11 81:17
82:2,4 84:15,17
86:4,8,9 98:15
99:15,21,22
109:15,17 114:16
116:3,4,5 126:21
129:3,5,11 137:19
138:8,10 141:15
141:22 145:14,17
146:6,7 152:16,17
154:10,11 155:11
155:14,20 158:14
159:17 160:3
168:22 179:9,17

In The Matter Of:  Larry E. Klayman
May 30, 2018

189:17 193:6,9
229:2,10
**remembers** 114:6
**reminded** 160:7
170:2 178:20
**reminds** 212:13
**remote** 15:9 17:14
**remotely** 134:1
**remove** 78:10 227:9
**removed** 59:1 93:21
95:4 221:15 227:6
227:8
**renamed** 184:19
**rendered** 162:13
**rent** 107:8 109:7,8
111:1
**rented** 53:12 54:18
**repeat** 171:11
**repeated** 148:5
**repeating** 128:9
**repetitive** 42:12
**report** 30:2,15
54:12 203:22
205:10
**reported** 1:21 43:9
**reporter** 2:5 5:10
5:12 72:20 124:12
148:6
**reporters** 75:1
**reporting** 124:5
**represent** 15:1
36:22 46:4 81:19
87:1,6,8,9,15
160:18 172:19,20
173:1,4 187:6,7,7
187:8 196:19
226:7
**representation**
14:12 37:22 38:3
39:6,8,18 45:2,9
46:4 83:15,21
84:11 87:14
145:10 162:21
163:6 195:2 210:1
213:7 221:13
**representations**
33:2 44:18
**representative** 52:9
**Representatives**
191:15
**represented** 44:3
59:12 65:19 221:6
**representing** 48:9
49:14 55:1 81:15
83:2 124:22 157:6
157:19 160:14

161:5 163:15
**represents** 44:7
**reprints** 177:19
**reputation** 230:7
**request** 13:20
169:18
**requested** 133:6,15
135:12
**requesting** 79:22
**required** 30:2
169:22 204:19
**requirements**
214:12
**rescue** 174:4
**rescued** 199:14
**researched** 56:13
**reserve** 224:3
**reside** 69:12
**resolve** 78:5
**resolved** 26:16
108:14 143:3
**respect** 12:11 16:2
16:19 17:1,14
19:5 24:10,11
26:14 27:4 28:6
32:19 83:15 92:7
94:10 95:2 110:17
118:18 131:16
192:19 197:21
199:6 206:3 230:6
**respected** 44:1
**respectfully** 10:4
168:5
**respecting** 118:18
**respective** 2:7
**respond** 19:16
20:14 60:17 90:16
134:13 183:14
**responded** 60:5
**Respondent** 1:6 3:2
3:11 5:21 6:12,16
12:6 15:17 19:1
19:11,15,21 20:5
33:16 36:22 37:7
38:1 39:12 41:16
42:2,9 46:22 49:4
134:19 135:10
221:20 228:15
230:13,15 232:3
**Respondent's** 8:21
14:11 18:21 19:12
20:19 29:11 30:8
41:22 204:15
214:6 217:8,19
220:22 221:9
230:10,11

**response** 149:3
226:11
**responsibility** 1:2
2:2 57:2 63:12
**rest** 16:13 206:3
215:22 232:16
**restaurant** 174:10
**result** 48:4 217:4
228:8
**resume** 110:9
163:21 164:1,7
169:16
**resumed** 165:2
**resumes** 169:19
**resuming** 170:7
223:18
**resurrected** 23:12
60:19
**retained** 14:18
36:22
**retaliated** 78:17
**retaliating** 147:14
**retired** 43:4,14
58:12
**return** 163:21
164:1 213:22
223:8
**returns** 176:3
**revenge** 200:3
**review** 58:9 181:15
182:1 192:19
193:8 232:15
**reviewed** 182:6,11
182:14
**revisit** 16:21
**revive** 64:19
**rich** 186:22 187:1
**right** 7:13,18 16:22
24:18,19 25:7
41:6,9,18 42:20
48:6 65:10,17
73:15 79:11 80:2
82:10 95:10,19
114:16,20 121:11
127:20 136:3
140:22 155:3
168:15 171:16
178:5,18 191:8
205:19 206:10,20
210:21 212:1
213:11 217:19
218:7,11 219:19
220:20 229:22
**right-hand** 211:6
**rights** 61:12,14
62:4 73:6,7,7

231:3 233:20
**ripened** 61:8
**risk** 174:16,17
**road** 133:3 215:21
**Rober** 193:16
**rodeo** 233:11
**Rohrabacher** 194:6
194:7
**roles** 15:19
**roller** 115:13
123:12 172:18
173:19,20 187:6
196:3
**romantic** 12:2 38:1
45:15 142:14
**room** 7:16 27:22
30:21
**Roper** 194:1
**Rotunda** 13:7 64:17
**Rotunda's** 232:14
**roughly** 212:12
**rubric** 203:12
**rude** 219:12
**rug** 199:22 229:5
**ruined** 103:11
109:6
**rule** 5:5 6:1 11:13
11:15 17:8,11,12
17:12,13 25:7,9
26:17,20 27:7
30:1 94:11,21
95:1 178:1 203:7
203:7,18 205:9
214:12 222:11
227:20,21
**rules** 17:4,5,7,8
24:20 26:17 27:17
40:18 133:1 134:8
134:16 135:8
136:10,11
**ruling** 212:9 220:18
**run** 65:22 185:6
**running** 173:4
**rush** 166:2

————————
**S**
————————
**S** 5:1 165:1,1,1
**S-h-e-a** 152:14
**S-t-** 192:16
**sake** 52:21
**sanction** 27:10
**sandbagged** 136:1
**sat** 60:9 120:14,15
120:15
**Sataki** 4:8 9:8 12:18
14:13 18:13 20:5

23:5 32:2 36:21
37:20 38:5,6,7,13
38:17,22 39:9,12
39:17 40:8 45:1,7
45:19 46:13 47:19
48:11,13 49:13
50:7 51:16 52:16
52:20 57:18 58:2
58:22 60:10 61:10
61:22 62:14 63:21
64:13 66:9 67:11
67:17 69:2,8,10
90:8 94:15 105:10
110:13 121:6
134:3,9 135:14
136:20 137:5
139:17 141:20
144:4 150:21
156:9 166:12
168:3,11 169:9,19
169:20,22 170:12
176:3,18 179:3
181:15 187:10
194:17 195:12
197:17,20 203:3
206:17 212:9
216:12 223:3
226:1
**Sataki's** 37:13 40:3
62:8 66:1 136:21
**satisfactory** 213:21
**satisfied** 167:2
**Saturday** 21:20
29:3 141:19
144:21 167:17
216:19
**saw** 57:11 60:1
75:12,12 95:5
96:12,15,21
101:11 122:15
127:10,22 131:4
140:20 167:17
222:9 227:10
**saying** 35:21 36:2
44:15 52:6 59:2
63:5 65:5 76:22
89:10 94:1,17
101:15 114:6
115:16 124:6
145:6 150:14
174:6,21 178:1
219:6 225:6,7
226:15 227:3
230:13
**says** 13:15 14:8
35:18 52:14 60:2

87:1 137:22
144:22 157:16,21
183:21 189:4,10
197:7 210:9
scapegoat 58:2
scared 101:4,6,9
122:6
scary 101:19
scene 121:4
schedule 15:6 234:7
schedules 7:12
scheduling 140:4
218:3
school 70:3,5 71:2,4
schooling 70:6
screamed 142:12
seated 68:3
second 75:19,20
85:20 112:4
148:12 149:9,11
154:3
secondary 174:3
secretary 18:19
55:18 114:17
220:11
see 13:21 17:2
19:19 26:7,10
28:17 44:8,17,20
46:10,16 47:18
48:12,19 58:7
59:18 74:1 80:8
96:8,11 98:5,8
100:9 111:11
114:9 121:4,6
126:11 127:8,8,12
130:14 133:3
143:3 144:19
160:6 166:9
173:13 182:20
183:21 185:15
186:8 188:21
189:3,18,21
190:16 195:4,5,6
195:7,9 199:12
200:7 208:3
210:18 217:16
224:15
seeing 97:9,17
125:3 189:19
seek 31:8 45:21
77:20
seeking 48:5
seen 28:19 36:17
37:9 47:4 98:13
130:11 204:10
205:4

sees 33:16 128:3
selected 20:2
221:16
selective 133:10
self-serving 47:2,13
sell 40:6
Senator 57:16,17
189:1,10,15
senators 57:15
send 82:1,1 98:10
157:15 158:1,12
162:18 163:10
196:9 208:9
sending 88:2
163:13 196:14
199:10
sends 75:1
sense 14:16 214:16
214:18
sensible 110:5
219:16
sent 21:3,19 29:2
60:14 61:17,18
81:22 82:22 86:5
96:16,18 99:9
138:12 158:4,6,7
159:22 162:15
178:9 183:10
195:13,15,17,20
196:21 198:14
199:11 210:17,20
210:21 211:1,16
sentence 86:22
148:12 149:15
154:3,15 156:17
161:22 162:6,22
210:8 218:15
sentences 123:21
separated 79:1
serious 133:21
seriously 27:12
82:20
service 162:11,13
services 162:9
163:12
serving 6:16 12:6
session 10:20 11:2
128:1 138:5,14,17
139:14 185:2
sessions 125:14,15
set 20:20 125:6
136:12 149:14
168:4,16 174:14
187:15
settle 46:12 52:18
57:19 87:20

settled 70:22
settlement 55:5
57:3
seven 188:22 189:9
201:15
severance 34:14,17
34:22
sexual 37:5 38:17
44:18 61:9 76:15
76:18 88:18 89:5
89:11,16 91:20
103:16 108:13
119:20 120:2
125:7,16 143:4
147:10 153:10,16
154:4 231:9
sexually 50:20
151:5
Shah 66:2,11
Shamble 52:10,15
55:6 57:7,12,17
59:11 61:10 62:1
79:8,9 83:1
104:14,16 152:7,8
152:19 153:5
166:8
share 25:5 26:22
137:9 198:9
Shea 53:7 145:9,12
145:16 152:9,11
152:12,14,21
153:5 155:2,7,8
155:18 156:1
Shea/Klayman
155:13
shipped 167:11
shooting 8:10
short 108:11 109:21
217:2
shot 58:14
shotgun 37:8
show 23:4 38:13
39:9,14 40:14,21
50:22 57:6 62:4
65:13 174:13
183:9 184:3,4
198:2,10
showed 20:12
130:18 131:8,9
showing 61:16
140:20
shown 35:8,9 48:14
shows 32:4
shrinking 16:6
shuffled 167:18
shut 93:3

sick 126:10 128:3
183:22
sicker 127:7
side 28:10 81:9
150:21,22 228:2,3
sidebar 227:19
sign 186:5,8
signature 112:4
signed 35:7
simple 107:16
simply 7:7 37:3
215:6
simultaneous 60:3
sir 25:4 43:2 170:4
197:4 223:16,19
sit 229:15
sites 97:4
sitting 16:5 30:20
73:15 78:9 120:16
156:17
situated 52:3
situation 65:10 66:8
78:5 80:2 103:9
134:20 196:11
228:7 233:17
situations 214:22
215:11
six 72:7 105:7
188:22 189:9
slamming 173:3
sleep 175:2
sleeping 126:1
183:15
slept 199:15
slowness 209:21
smear 226:10
Smith 2:20 4:3 6:6
6:6 8:17,19 11:17
13:12 18:8,9 20:1
21:2 24:22 25:4
25:18 30:14 32:21
33:8,9,13 34:11
35:4 36:13,14
41:7,11,18 55:22
64:6 66:22 67:3
68:17 69:7 70:18
76:12 79:12 82:14
82:15 85:2,6,13
85:16 86:8,11
88:14,15 92:8
93:12 94:9 95:10
95:19 96:1 101:22
102:1,7,12 103:2
103:7 105:9 106:6
107:2,14,17
108:17 109:1,20

109:22 110:3,8,10
110:11 111:17
114:10 115:7
116:8 118:1
124:16 126:16
127:17 128:15,19
129:17,20 130:2,4
130:7 132:5,10,14
133:17 134:13
136:17 137:3,4,15
137:16 138:16
139:20 140:12
141:5,16 144:8,14
144:17 145:19,20
148:10 149:13,22
150:2,7 151:7,12
151:13,17,18
154:16,18 156:4,5
156:6 157:13
158:16,20 161:9
161:10,15,17
162:4,5 163:1,3
163:17 166:3,21
169:6,7,10,14
170:5,6,7,11
171:9,22 172:10
175:10,13,19
176:5,6,10,12,14
177:6,10 178:18
179:2 180:6,13,16
181:12 183:1,2,7
184:13 185:20
187:9,14,16
191:18,19 193:13
193:20,21 194:5,8
194:11,13,15
195:10,11 197:11
197:18 198:7,20
199:1,5,7,8
201:19 202:7,12
202:15,20 203:17
206:1,8,9,15,16
207:20 208:20
209:4,12,13,18
210:3 211:8 212:8
215:8 216:2,3,7
216:11,22 219:3,8
220:5,10,17,21
221:5,14,16
222:12 223:7,11
224:7,17 227:7,10
229:15 230:2
Smith's 99:9
snapper 36:7
so-called 56:15
soap 41:20

In The Matter Of:  Larry E. Klayman
May 30, 2018

solemnly 67:20
solution 53:21
solve 59:3
somebody 14:22
   35:5 61:3 112:14
   173:6 195:8
   226:12
somewhat 7:4
   27:16
son 65:22
soon 50:5 173:13
   185:8 215:16,17
sorry 41:7 83:5
   111:4 130:3 136:5
   141:4 145:7
   147:19 154:16,21
   161:2,13 169:11
   171:1,7 172:1
   177:13 181:17
   182:7 193:17
   194:11,12 209:9
   209:15,18 219:11
sort 26:2
sought 12:2 54:19
soul 232:15
sounds 227:4
South 31:13
speak 7:6 8:6 16:10
   134:2 138:7 140:8
   207:19
Speaker 57:16
speaking 17:9 26:5
   74:1 94:15 182:13
specific 38:8 154:6
   154:7 181:11
specifically 160:21
Specification 9:13
   35:7 36:16
specificity 99:8
speculates 185:16
speculating 149:2
speculation 141:11
speed 9:19 10:5
   12:15 13:5,5
   21:18 24:6 29:1
   59:21 226:8
speeding 170:14
spelling 191:8
spend 44:14
spending 9:5
   123:14
spirit 18:22
spoken 33:19 126:6
Sporkin 9:18,19
   13:4,5 58:9,11,12
   59:4

spot 182:15
spring 23:17 24:18
sprung 228:20
   229:22
staff 43:7 222:22
stage 120:15,17
   125:8 126:11
stamp 99:6
stand 67:11 94:7
   110:5 150:6 164:5
   169:19 176:4
   188:15 212:15
   215:22 231:21
   234:3
standard 136:12
standing 15:15
   24:12 67:14
   228:15
stands 108:5
Stanton 231:12
start 81:9 137:14
   200:12 223:12
   225:2
started 51:3 72:3,4
   74:8 76:2 82:20
   91:2 92:3 118:12
   118:12 125:16,19
   200:17 201:2
starting 177:8
Stasio 191:12
   192:15
state 55:19 157:14
   185:14
statement 11:18
   14:8 18:8 36:12
   40:15,16 42:1,2
   49:4 65:8 104:1
   160:16
statements 4:2
   33:12 47:13 52:7
   63:8 134:10
   135:19
states 64:22 66:7
   70:15,17,19 71:3
station 188:2,3
stations 71:21
status 58:16,20
stay 68:9 122:22
   123:4 142:13
   143:1,2,19 172:15
   172:16 173:12
   186:5 212:17
   213:3,12,16,19
   232:5
stayed 79:2
steered 45:14

stenotype 235:5
step 122:19 132:3,3
   143:20 153:18
   175:16
steps 75:4
Stockholm 70:10
stone 45:11
stop 87:9 115:17
   168:18 172:3
   174:14,19 175:5,7
   175:7
stopped 46:4
   105:11 127:3
stopping 121:15
stories 72:21,22
   73:4 81:1 90:9
story 73:19,20
   74:10,14,15 75:6
   75:14 79:20 80:1
strategic 55:4 64:20
strategy 46:11
   52:17
street 2:2 122:11,12
   174:10
strength 200:8
stress 15:4
stretch 8:4
stricken 149:4
strike 88:10 93:20
   95:12,17 148:2
strong 45:17 135:19
stronger 37:5
strongly 44:5
struck 108:21
   123:19 162:20
student 49:19
students' 73:7
stuff 21:13,21 22:15
   22:16 24:7 28:12
   81:1 87:22 91:10
   91:16 97:7 105:22
   109:4 135:21
   166:9 173:10
   186:11 187:4
   201:11 228:19
   229:2,6,16
Styles 146:7
Subdivision 26:18
subject 201:17
   203:1
submission 203:12
submit 229:6
submits 229:16
submitted 36:18
   116:13 117:4
   180:11

substance 155:12
substantial 170:1
successfully 44:3
sudden 23:11
sue 56:8,9 153:22
sued 151:2 153:20
suffered 38:18
sufficiently 181:11
suggest 154:4
suggesting 164:2
suggestion 15:13
   168:17 219:17
suggestions 8:15
suggests 148:1
suing 91:22 150:19
Sujat 3:3,4 4:4 6:8
   6:9,11,17 9:2,3,10
   10:5 12:15 14:6
   14:19 21:3,17
   24:6 28:22 42:3,4
   42:7,8,20 43:2
   52:6 56:17 58:8
   59:20 62:14 65:4
   76:7 85:11 96:4
   107:12 111:2,6,8
   117:18 124:3,10
   126:13 127:15
   128:6,9 168:6,10
   224:11 226:8
   229:18
Sujat's 213:7
   228:17
summer 70:4
supervisor 63:22
   75:6
supervisors 151:6
   172:9
supplement 60:1,2
supplemental 19:14
   60:21 61:2 212:10
supplemented
   59:22
supplicant 6:22
support 47:17,21
   201:13
supported 40:13
   45:10 48:16
supporters 147:13
supportive 45:18
   46:13,19
suppose 30:13
supposed 90:20
   143:17 174:8
supposedly 196:13
Supreme 66:1
sure 11:15,21 17:18

18:22 19:14 54:10
   60:1 66:20 117:5
   145:5 150:4 195:2
   204:9 216:8 221:3
   227:22 230:8
surfaced 214:10
surprise 13:22 22:4
   28:5 135:3
surprised 19:2 78:6
surprising 78:6
survive 107:9,18
   199:19 200:1
Susan 147:12
sustain 117:21
sustained 126:15
Sutherland 34:16
   34:16
swear 5:10 67:18
   67:20
Sweden 51:20
   66:12 69:20,21
   70:1,2,7,13 186:1
   186:10
Swedish 51:20
sweet 217:2
swirling 32:17
sworn 5:12 69:4
   226:17
sympathetic 233:15
sympathized 51:2
system 2:19 27:17
   27:18 148:17

───────────────

         T

T 165:1
table 6:5 8:1 16:5
   120:14
tables 164:2
tactic 32:6
tails 134:20
take 8:2,8 17:3 24:4
   27:12 28:9 30:14
   37:4 42:16 46:15
   67:2 91:11,12
   101:21 109:21
   111:16,20 118:14
   119:18 132:2
   135:22 145:1,9
   147:3 151:14
   154:19 157:21
   158:17 161:11
   163:20 168:11
   169:17 171:6
   175:12,13 197:12
   199:20 200:2
   204:22 206:1,7,13

207:2 209:5 229:4
230:18,19
**taken** 2:1 19:13
20:1 29:16 110:7
164:10 178:11
213:20 221:8
235:3,4,10
**takes** 111:14
**talk** 77:3 86:15
87:20 88:1,1 90:7
113:14,16 118:17
122:2 138:13
173:7
**talked** 9:16 35:5
40:3,3 75:18
78:18 80:12,20
81:16 82:20 83:8
104:14,15 106:8
113:12 118:17
120:18 166:21
**talking** 13:19 19:22
21:2 29:10 30:20
61:22 74:8 76:2
102:21 121:16,16
121:16 122:1
150:15 171:21
173:14,17,17
208:4 218:8
**tangible** 149:21
**task** 91:13
**taxi** 123:3,5,8,8,10
**Taylor** 58:15 62:11
**team** 8:21 20:19
29:11 30:8 41:22
204:15 214:6
217:8,19
**Tehran** 65:22
**Tehrangeles** 52:2
**telephone** 115:21
155:7
**television** 73:2
81:13
**tell** 73:16 76:17
86:16 87:3,22
88:16 89:8 99:21
105:18 113:20
114:13 118:10
124:18 126:8
132:15 148:18
149:8 155:18
162:2 170:18
176:15 179:5
186:13 189:14
190:4 194:22
195:13 196:1
207:15 211:11

**telling** 64:6,11 88:8
**tempted** 7:3
**ten** 110:4,5 206:7
**tend** 8:9
**tentatively** 10:13,14
206:5
**tenth** 196:18
**terminated** 39:5
162:9 163:5
**terminating** 162:16
163:12
**termination** 39:7
61:17
**terms** 12:19 22:3
84:7 88:7 165:20
202:22 210:7,15
**terrible** 233:14
**terribly** 192:18
**terrifying** 101:12
**test** 26:19 27:7
**testified** 69:5
102:13 154:22
197:20 203:5
**testify** 13:22 14:10
26:8 36:21 38:8
51:8 57:10,12
63:6 64:7 132:19
132:20 133:16
137:13 149:4
185:2
**testifying** 13:15
14:16 49:9 52:11
133:14,22 134:13
**testimony** 13:7,16
14:14,15 15:6,9
17:2,6,14 25:11
26:6,15 27:2
29:22 30:12 41:14
52:5 53:18 59:20
63:7 65:21 67:21
82:12 94:11 95:5
95:12 131:19
133:14 134:17
135:11 167:8
168:8,13 170:13
178:10 197:1
198:2 206:21
214:19 215:11
216:17 217:3,10
223:14 231:13
**testing** 68:4,6
**Texas** 71:5,6
**text** 77:8 118:16
127:13,13,16
163:14 176:20,21

177:12,14,18
178:2,2,9 179:6
179:12 180:19
181:3 183:6,7,10
183:18 184:1,5
197:7
**texted** 128:1,13
**texting** 87:2,10,11
174:7 183:12,16
**thank** 41:18 43:2
49:2,6 65:6,6,11
66:21 79:11 95:10
101:20 105:1
110:10 111:18,22
130:5 137:3
139:19 151:12
158:15 169:5
170:6 183:8
195:22 206:15
207:1 211:4
223:22
**Thanks** 36:8 140:9
**Thanksgiving**
99:12,12
**thereof** 214:21
**thing** 19:20 32:12
34:13 48:2 135:13
135:14 138:14
166:6 184:15
196:5 199:12
214:14 218:4
226:1
**things** 7:15 11:20
20:11 25:20 31:9
32:2,10,17 56:5
63:4,5 64:9 76:2
77:1 80:22 81:3,4
81:11 87:12 111:1
129:4 133:10
139:8 167:4 168:7
170:14 174:21
177:19 185:7
188:12 201:20
202:10,21 215:1
228:11 229:10
232:6
**think** 10:10,17
12:15 16:6,20
19:8 26:5 32:18
36:19 37:15 39:9
39:14 41:2,12
43:1 44:12 46:22
47:10 64:11 68:12
76:10 78:12 80:14
82:18 93:19 94:4
94:7 95:20 96:5

99:11 104:18
106:19,20 109:14
109:15 110:8
117:20 122:5
127:20 132:3
136:7 138:8 149:6
149:9,13 154:12
162:20 163:19
172:7 175:16
179:9 192:17
196:19 198:5
199:21 202:21,22
203:4,6,11 204:7
204:15,21 205:9
205:22 206:2,10
208:3 213:1
214:12 215:1,5,8
217:13,22 219:1
219:18,19 223:12
225:1 227:17
228:5 230:19
232:20 233:2,21
**thinking** 97:13 98:2
205:20 214:8
**third** 75:20 117:8
173:7 197:7
**thirtysomething**
24:13
**thought** 7:10 17:19
18:6 21:10 101:7
108:7,8,9,15
152:13,15 155:18
177:5 188:13
191:5 214:2,7,8
216:5 218:12,13
219:14
**Thoughts** 169:6
**threatening** 93:4,5
101:18
**three** 8:5 23:6 60:5
60:9,9 64:13 68:5
68:7 123:21
125:14 138:7,14
147:4 154:1,6
188:22 189:8
217:12 219:6
**throat** 165:15
**thumb** 21:4,14 25:1
25:2 29:1
**Thursday** 18:12
229:20 234:9
**tie** 206:2,11
**Tigar** 2:15 5:17,18
25:9 26:11,14
27:19 28:6 35:15
42:18,21 79:5,9

79:11 100:6,9,12
100:19 101:2,20
103:21 104:5,12
104:17,20 105:1,5
105:8 128:18,20
129:3,9,13,15,18
129:22 130:3,6
140:10 145:3
157:20 158:6,12
158:15 160:7
161:13 169:11
218:10 220:2,14
227:17 228:10
233:7,8
**till** 67:8
**Tim** 52:10 53:7
79:8 145:9 152:3
152:6,8,9,9,11,12
152:14,19 153:5,5
166:8
**time** 5:11 8:3,16 9:4
9:5,9,15,16,17,18
9:20 10:4 11:8,8
12:14,22 14:17
15:16,17 17:20
21:18 23:19,20
24:8 29:13,21
30:11 36:9 42:12
43:6,17 44:14
45:20 48:11,15
50:4 51:1 54:2
56:17 58:11 60:2
60:5 61:6 62:3
65:6,9 70:3 72:8
73:8 75:5,12
76:14 79:4,13
80:12 82:9,16
88:21 95:14 96:7
96:20 98:7,13
100:2 101:21
102:17,19,20,22
105:10,13,15
107:4 108:9,11
113:4 115:10
116:13 118:2
119:5 120:11
121:21 123:13,15
124:22 125:20
126:17 127:3,10
127:12 128:5,13
129:6 130:16
131:4,5 134:6
136:15 137:20
138:9,10 142:22
143:12 150:16
152:21 156:4

157:12 163:19
164:4 167:21
169:2 170:20
171:3,14 172:18
172:22 173:19
175:17,20 179:9
180:5,21 181:5
183:11 188:1
190:1 198:12,12
200:2,17 201:1,5
202:14 203:12
208:2 210:10
211:7,15 214:11
223:8 228:18
231:7 234:7
**timeframe** 102:3,7
**timeline** 203:4
**timely** 21:1 27:13
**times** 7:16 16:8
57:14 125:15
142:5 189:14
**tipped** 31:21
**tired** 38:22
**title** 61:9 195:5
**titled** 203:8
**today** 7:2 22:10
30:21 31:3 34:5
62:22 73:12
130:12 131:3
133:22 135:15
167:20 168:8,19
187:18 216:12
229:22
**today's** 231:1
**told** 50:8 52:12 59:4
63:21 77:15 78:9
78:16,19 80:21
84:1 87:5,19
88:22 98:4 104:3
106:10 113:13
114:14,17 115:6
118:21,21 126:12
127:19 135:2
137:21 152:7,13
152:15 153:6
154:22 155:3,5,12
160:17,17 182:10
186:10,18 188:3
190:8 209:11
230:15
**tomorrow** 7:8
168:10,20 214:14
215:14,17 216:18
223:8,18 224:4,21
229:14 234:4
**tonight** 221:12

223:15
**Tony** 5:8 190:16,19
208:5,10
**top** 84:5 132:12
157:22 187:20
190:15 211:22
**tortured** 49:21
**torturing** 49:18
**total** 229:12
**totally** 22:10 67:3
147:21
**touch** 208:7
**tough** 80:2
**tourist** 186:11
**town** 186:1
**toy** 184:16
**trade** 43:18,20
56:18
**training** 71:8 88:3,4
**transfer** 91:14
106:12,14
**transferred** 108:12
**transition** 6:17 9:3
28:22 67:8 76:10
**translated** 97:5
**transmittal** 19:11
**transparent** 55:16
**treat** 57:22 122:6
**treating** 38:17
127:4
**treatment** 127:1
**trial** 28:11 229:17
231:19
**tribunal** 135:5
**tried** 42:22 52:18
53:13,21 57:15,18
61:10 66:16
143:14 166:12
**trouble** 76:3,16
77:13,19 80:17
**troubles** 32:1
**troubling** 39:17
64:5
**true** 24:15 235:6
**trusted** 233:21
**truth** 67:22,22 68:1
95:7 127:17
**try** 22:9 28:11 32:2
32:3 49:20 51:5
52:3 55:5 60:13
66:17 87:20 156:3
193:8 200:12
224:19
**trying** 22:13 45:7
56:14 57:1,3
66:13 77:12 78:5

81:17 82:2 93:15
102:2 178:16
186:21 193:2
**Tuesday** 145:13
**turn** 6:20 24:22
46:9
**turned** 120:16
122:14
**TV** 71:16,17,18,19
71:21 72:2 81:7,9
82:3 188:1,2,3
**Twelve** 69:18
**twentieth** 196:18
**Twenty-eight**
156:19,21
**Twenty-four**
128:19
**Twenty-three**
176:13 177:6
**twice** 125:14
**two** 10:21 15:19
25:16 26:1 36:1,1
47:17 54:17 60:4
62:21 63:2 64:2
68:5,6 91:12 98:8
98:8 131:11 143:2
147:22 148:21,22
151:6 154:5
156:21 162:21
166:8 167:13
172:9 173:8
188:22 189:8
199:15 200:5,15
216:17 226:18
231:4
**two-hour** 216:4
**typewriting** 235:5
**typical** 211:12

---

**U**

**U.S** 44:1
**Uh-huh** 182:12
192:4
**ulterior** 40:10
**ultimately** 38:22
60:6
**unable** 229:4
**unavailable** 133:21
**unbearable** 38:7
**uncomfortable**
115:19
**uncontested** 169:18
**uncooperative**
48:13
**underlies** 7:9
**understand** 27:19

28:20 38:19 56:6
63:1 84:9 88:6
94:22 158:7
166:19 181:18
182:8 193:7
196:22 213:14
228:9,13 230:11
233:17
**understanding**
110:20 139:16
210:12,14 228:6
230:3
**understands** 55:8
**Understood** 101:20
212:11
**undertook** 37:7
**underway** 102:21
**undue** 41:15 52:20
**unduly** 204:17
215:2
**unethical** 231:20
**unfair** 13:22 22:10
28:5 135:3 229:8
**unfortunately** 35:2
45:18 126:10
128:13 185:1
**unhappy** 58:3
**union** 52:9 78:15
79:6
**United** 66:7 70:15
70:17,19 71:3
**University** 70:10
**unnecessarily** 37:11
**unnecessary** 37:19
**unopened** 201:3
**unpleasant** 16:10
**unprofessional**
175:4
**unresponsive** 48:13
**unsaid** 202:22
**unsupported** 47:2
**unturned** 45:11
**update** 76:1
**upper** 211:6
**upset** 118:13,15
120:19,22,22
139:13 142:5
174:11 185:8,9,12
185:19 186:6,12
186:13,19 208:3
210:21
**upsets** 186:12
**upsetting** 78:21
**use** 22:9 31:8 32:2
46:7,7,11 167:14
168:15 222:2,9,17

28:20 38:19 56:6
63:1 84:9 88:6
94:22 158:7
166:19 181:18
182:8 193:7
196:22 213:14
228:9,13 230:11
233:17

224:9 227:15
**usual** 27:15

---

**V**

**v** 58:15
**vacation** 200:15
**vague** 111:3,6,8
181:10
**valet** 120:21 121:13
**value** 55:9
**variety** 232:9
**various** 44:10 52:16
129:6
**vein** 226:2
**venture** 41:4
**verbal** 205:17
**verbally** 159:15,19
**Verizon** 179:10,15
180:2,18 182:2
**viable** 166:14
**vibe** 115:3
**vicinity** 53:1 54:11
**victim** 233:16
**videos** 101:6
**view** 25:19 224:19
**viewed** 40:18 66:5
**viewpoint** 58:6
**views** 136:19
**vigorous** 233:19
**VII** 61:9
**VII.16** 203:7,8
205:9
**VII.16(a)** 17:13
**VII.19** 25:10
**violated** 63:12
**violates** 24:20,20
**violet** 16:6
**vis-a-vis** 159:21
205:17
**VOA** 50:9 51:10
78:4 81:6 91:9
106:9,11 107:7
108:9,16 135:16
135:18,19 136:6
148:16 151:1
157:10,12,18
159:4 193:1,5
**voice** 37:2 38:18
44:19 46:12 50:4
50:13 51:12 53:21
57:8 58:3 59:1,9
59:12,13 66:5
68:16 72:16,17
87:18 105:11
157:10
**voluminous** 42:14

**vote** 27:5

---

## W

**Wagner** 58:15
62:11
**wait** 92:6 93:13
195:1
**waiting** 120:21
**walk** 213:1
**walking** 121:12
203:3
**want** 7:10,17 11:17
12:5,8 16:22
17:21,22 33:20
41:12,20 42:11,11
46:3 47:14 49:12
52:19,20 54:8,14
57:22 58:16 67:1
67:2 73:22 75:9
75:21 80:13 82:19
87:6,6,8 89:2 90:2
90:6,6 92:18 93:8
93:22 94:2,3
103:5,15,15,19
120:6 123:4,4,15
135:9 147:8,10
148:14 153:8,10
153:15,20,21,22
154:3 157:17
160:18 168:2
172:8,12 175:20
183:11,19 184:9
184:11,12 186:22
186:22 187:6
200:19 201:21
202:4,8,19,20
206:2 213:3,9,11
213:16,16 216:16
217:18 218:16,17
219:9 221:13
224:22 225:18
228:14,17 229:16
230:14 232:1,4
234:6
**wanted** 9:7 15:4
18:10 28:2 37:2
39:1,21 48:21
54:15 62:2 74:13
75:11 76:19,20
77:5 80:21 81:4,5
88:17,20 90:4,8
90:17 93:7 104:10
113:6,6 115:10,15
120:12 134:14
138:18 139:5
149:15 151:5

159:6,6 166:10
170:12 172:2,8
183:9 184:1,4
188:1,5,10,19
197:18 198:8
200:2,3 218:14
**wants** 8:3 19:7
75:13 79:22
113:14 138:12
145:1 151:9 175:2
175:15 186:8
198:5 210:11
215:18 224:22
**warm** 7:17
**WARREN** 2:11
**Washington** 1:9 2:2
55:10 71:1
**wasn't** 13:17 14:20
31:3 32:13 35:10
36:10 61:18,22
64:13 100:17
144:10 173:11
184:10 185:10
**Watch** 30:22 31:5
32:5 34:4,15,20
35:2
**water** 7:22 123:1,2
124:11
**way** 3:5 11:10
12:16 23:15 27:13
31:9 35:11,14
38:15 41:11 44:13
48:10,10 50:16
51:18 57:18 58:10
61:22 63:10 75:13
89:4 95:9 118:22
119:2,3,19,22
120:14 122:12
134:18 143:20,21
144:19 151:4
154:14,15 160:15
168:14 178:21
196:18 199:19,21
201:5 219:21
225:22 226:21
233:1
**ways** 30:10 63:14
115:18
**we'll** 6:20 7:1 8:2
15:5,9 16:20 17:2
17:3,14 25:21
26:7,9 30:14,15
41:17 54:10 59:3
98:20 111:11
114:9 175:12
204:22 206:13

213:18,19,22
215:5,18 217:16
**we're** 9:3 11:10
19:22 23:3 25:12
28:15,18 30:1
63:1 114:2,4
135:15 141:12
143:5,6 171:21
176:10,19 178:16
203:11 204:9,19
212:22 213:4
214:10 215:20
216:20 217:6
219:21 220:2
223:12 224:20
228:8 229:9
**we've** 10:2 22:14
136:10 162:21
214:2,7 215:10
216:18,18,20
**wearing** 49:10
**website** 35:17
**Wednesday** 1:8
145:13
**week** 9:7 10:16 21:4
22:3,12 23:2
42:14 125:15
165:22 196:15
200:16 217:17
**weeks** 13:3 91:12
143:2 200:15
226:18 231:4
**weight** 48:17 94:13
95:14 134:10
174:20
**welcome** 171:6
**went** 50:1,8,21 51:3
51:19 64:9,15
71:4 72:3 74:1
77:14 78:7,22
88:21 91:22 93:3
113:5 120:10,10
120:11,13 125:17
167:16 186:4
196:8 201:10
**whatsoever** 7:19
8:7 162:11 230:21
**whipper** 36:7
**willing** 59:2 215:15
**Wilshire** 51:13
**win** 66:17 98:1
111:13,20 134:20
143:7
**Windjammer** 3:5
**winning** 10:1 143:6
**wisdom** 47:15

**wish** 65:7 95:21
156:18,21 157:2,3
217:9
**wishes** 214:19
**wit** 31:1
**withdraw** 147:8
153:8 157:4
158:22 159:7
170:16 171:14
**witness** 4:7 12:7
13:12 14:8 16:10
16:12,19 18:13
22:5 28:1 37:15
37:17 65:9 67:1,4
67:11,13,17,19
68:2,6,11,13 69:3
70:17 79:8,10
85:5 86:9 92:12
92:15,17 96:12,16
96:18 97:1,4,12
97:19,21 98:9,14
98:17 99:10,15,22
100:5,8,11,15
101:1,4 103:5,13
104:3,8,15,19,21
105:2,6 106:19,22
108:7 111:12
114:19,22 115:22
116:2 117:12
124:13 127:22
128:12 129:2,8,12
129:15 132:13
136:5,20 139:6,18
140:1,9,11 141:3
141:14,21 144:22
145:7,11,14,17
150:8,15 152:1,6
152:11,14,17,22
153:3,6,13,19
154:11,14 155:5
155:10,14,20
156:2,10 158:3,9
158:14 159:3,13
159:18 160:2,3,11
160:17 161:2,7
165:5 167:15,16
169:19 170:1,4
171:7 172:2
174:18,19 175:9
175:12,15,17
176:1,3 180:4,14
181:17,22 182:3,7
182:12,18,22
183:9 185:18
187:4,22 188:10
188:16,20 189:4,7

189:12,17,22
190:3,7,11,13,18
190:21 191:6,10
191:12,16 192:21
193:10 194:14
197:4,6 198:4
202:9 209:8,11,22
211:14,22 212:3,6
214:20 216:1,3,21
217:11,17 218:1,4
218:7,13,18,22
219:11,14 220:1
223:2,16,19,22
224:2,19 225:3
228:15 230:9,19
232:4
**witness'** 41:14
230:7
**witnesses** 6:2 11:13
11:16 15:7 46:21
47:4,8,17,18
48:14 52:7,9 57:7
65:4 216:13,17
219:17 231:18
233:16
**woman** 12:10
**women's** 73:7 231:3
**wonder** 31:2
**wondering** 121:6
**Woodland** 187:18
188:19
**word** 102:20 159:10
**words** 107:15
123:17 129:9
174:5 182:2
**work** 11:9 45:7
48:6 51:11 53:22
54:9 58:14 61:7
61:13 62:11 70:1
71:20 72:6 75:7
75:13 76:16 77:13
78:7 79:15 80:17
81:6,7,9 91:15
98:1 105:11
106:12 108:13
135:6 146:10
147:15 151:21
152:3 166:11
173:6 188:1,10,20
200:13,15 201:6
212:18,19,19
213:3
**worked** 45:11 56:19
57:8 70:4,4,5
146:11 193:14
**working** 39:5 48:3

| | | | | |
|---|---|---|---|---|
| 52:11 56:18 71:16 | 64:16 69:18,22 | 65:16 74:4 | **24th** 22:2 | **69** 4:8 |
| 71:17,18 72:15,19 | 72:7 199:13,17 | **2010** 23:5 59:22 | **25** 130:20 139:22 | |
| 75:12 76:13 81:9 | 200:10 201:15 | 64:14 82:19 85:4 | 140:14 | **7** |
| 81:12 82:21 | 229:9 231:17 | 85:18 103:7 | **250,000** 210:6 | **7** 130:10 |
| 147:17 148:7 | **yesterday** 9:4 36:11 | 104:17,22 106:17 | **26** 141:18 144:1,16 | **70** 177:9 |
| 193:1,4 200:14 | 167:19 | 116:2,3 118:9 | **27** 144:3,7,13 | |
| 201:8 | **young** 36:9 | 130:10,22 141:20 | 145:21 151:17 | **8** |
| **works** 173:6 | | 144:4 156:8 163:9 | 160:7 170:14 | **8** 26:18 144:21 |
| **World** 40:1 | **Z** | 163:11 180:1,4,22 | 171:6,21 | **803** 26:17 |
| **worry** 144:12 | **zealous** 44:17 167:1 | 194:18 195:5,21 | **27-1** 151:20 172:1 | **806** 26:20 |
| **worst** 52:13 57:22 | **zealously** 44:7 | 207:11 211:2 | **28** 151:15 154:19 | **815-5221** 3:7 |
| **worth** 27:6 | **zealousness** 166:17 | 212:7 | 156:7 158:21 | **8th** 141:19 |
| **wouldn't** 51:6 | | **2011** 116:12 180:3 | **28-2** 156:20 160:13 | |
| 53:22 76:22 87:9 | **0** | 180:5,14,22 181:1 | **28.2** 156:16 | **9** |
| 115:17 119:10,11 | | 212:6 | **29** 158:18 | **9/16/2011** 195:7 |
| 127:7 185:18 | **1** | **2011-D028** 5:3 | **2nd** 9:17 85:4,18 | **9:28** 2:3 |
| 200:19 | **1** 84:20 85:2 99:4 | **2012** 180:3 | | **9:30** 223:9,12 234:4 |
| **wrap** 201:22 205:21 | 161:12,15 | **2014** 31:13 64:14 | **3** | 234:9 |
| **write** 17:7 104:4 | **1-3** 161:12,16 162:4 | 180:3 | **3** 99:7 | **954** 3:7 |
| 112:11,15,19 | **1:00** 8:10,14 140:5 | **2016** 23:12 | **3,000** 109:16,16 | **9th** 130:22 |
| 145:22 156:11 | 163:20 | **2017** 180:3 | **3:25** 212:15,20,21 | |
| 161:18 | **1:39** 211:7 | **2018** 1:8 200:16 | **3:26** 214:1 | |
| **writing** 45:5 62:1 | **1:45** 164:5,8 | **2019** 235:20 | **3:50** 234:8 | |
| 81:8,10 84:6 86:2 | **10** 99:7 | **20th** 116:12 180:14 | **30** 1:8 43:4 67:8 | |
| 86:10,16 91:2 | **10:30** 189:2,10 | **21st** 194:17 195:21 | 171:4 | |
| 112:14 113:9 | **100** 174:16 | **22** 134:20 | **30th** 144:4 171:19 | |
| 159:15 | **106** 227:20 | **23** 109:19 110:13 | 171:22 172:1 | |
| **written** 40:6 59:9 | **11** 180:5 195:5 | 112:2 128:21 | 211:1 | |
| 60:21 84:10 86:13 | **11/2/10** 99:5 | 130:5 176:8,12 | **31** 234:9 235:20 | |
| 86:20 96:10,21 | **11:45** 110:6 | 177:7 187:11 | **33019** 3:6 | |
| 98:7 106:11 | **12:30** 8:14 | 197:13 | **350,000** 15:2 | |
| 140:17 141:7 | **12:58** 164:4,9 | **23-2** 116:9,10 180:7 | **36** 4:3 | |
| 146:19 189:19 | **14** 31:2 | 180:8,13 192:1 | **37** 27:8 | |
| **wrong** 61:17,19 | **14:16** 144:21 | **23-3** 112:5 | **38** 20:2 24:13 | |
| 182:21 197:9 | **15** 69:22 170:21 | **23-4** 112:7 | 222:16 | |
| 209:16 | 217:14 | **23-45** 187:11 | | |
| **wrongs** 48:6 | **15,000** 53:17 | 194:10,13 197:19 | **4** | |
| **wrote** 55:6 151:20 | **1525** 3:5 | 197:19 198:3 | **4:00** 166:1 | |
| 152:2 153:8 154:2 | **15th** 163:11 171:8 | **23-47** 207:3 | **40** 15:15 53:2 83:9 | |
| 154:15 | **17** 59:15 | **23-48** 209:8 | 84:4 111:14 | |
| | **17-BD-063** 1:5 | **23-5** 117:7 | 210:10 | |
| **X** | **180** 217:12 | **23-50** 176:16 | **42** 4:4 | |
| **X** 1:3,7 4:1 | **181,000** 31:15 | 187:18 | **430** 2:2 | |
| **XI** 5:5 | **1975** 43:6 | **23-52** 191:1 | **48** 207:3 | |
| **XI.3** 17:12,12 203:7 | **1st** 207:11 | **23-53** 183:20 | **49** 4:5 | |
| | | **23-54** 176:17 | **4th** 156:8 159:22 | |
| **Y** | **2** | **23-59** 187:22 | | |
| **y'all** 229:7 | **2** 144:18 | **23-6** 112:8 | **5** | |
| **Yahoo** 211:13 | **2-** 15:2 | **23-8** 209:6,14,18,22 | **5:00** 7:1 | |
| **yeah** 65:16 96:5 | **2,000** 109:14,14 | 210:18 211:2,6,16 | **50** 83:12 111:15 | |
| 156:20 180:9 | **2/23/11** 211:7 | 218:9,10,11 | 177:8 210:11 | |
| **year** 99:13 | **2:03** 165:7 | **23-9** 209:6 210:18 | **5th** 159:21 | |
| **years** 15:15 21:6,12 | **2:04** 165:2 | **24** 128:17,18 | | |
| 23:3,7 24:13,13 | **20** 67:8 69:22 | 129:15 130:8 | **6** | |
| 31:2 42:21 43:4,4 | **2007** 72:12 | 131:17 136:14 | **66** 35:21 | |
| 47:6 60:10 64:14 | **2009** 49:16 65:15 | 177:5 | **67** 35:22 36:7 | |



RECEIVED

June 13, 2018

Board on Professional
Responsibility

**Date:** May 31, 2018

**Case:** In The Matter Of: Larry E. Klayman



Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

App.0218

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 260

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - - X

In the Matter of,                    : Board Docket No.

LARRY E. KLAYMAN,                    : 17-BD-063

                  Respondent.   :

- - - - - - - - - - - - - - - - X

                    Th rsday, May 31, 2018

                    Washington, DC


                    HEARING












Reported by

    Kim M. Brantley, C.S.R.

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 261 | |
|---|---|

1 Hearing, taken at the Board on Professional
2 Responsibility, 430 E Street, NW, Washington, DC,
3 commencing at 9:30 a.m., before the Ad Hoc Hearing
4 Committee, and before Kim M. Brantley, C.S.R., a
5 Court Reporter and Notary Public in and for the
6 District of Columbia, when were present on behalf
7 of the respective parties:
8
9 APPEARANCES:
10    AD HOC HEARING COMMITTEE:
11    WARREN ANTHONY FITCH, ESQUIRE
12    Chair
13    MS. MARY LARKIN
14    Public Member
15    MICHAEL TIGAR, ESQUIRE
16    Attorney Member
17
18 On behalf of the DC Attorney Disciplinary
19 System:
20    H. CLAY SMITH, III, ESQUIRE
21
22

| Page 263 | | |
|---|---|---|

I N D E X

| WITNESS: | DIRECT: | CROSS: |
|---|---|---|
| Ms. Elham Sataki | 292 | 322, 448 |
| Mr. Kevin O'Connell | 440 | 445 |

| Page 262 | |
|---|---|

1 APPEARANCES CONTINUED:
2 On behalf of Respondent:
3    FREDERICK J. SUJAT, ESQUIRE
4    Law Office of Frederick J. Sujat
5    1525 Windjammer Way
6    Hollywood, Florida 33019
7    (954) 815-5221
8    Email: fsujat@yahoo.com
9 ALSO PRESENT:
10    LARRY E. KLAYMAN, ESQUIRE
11    Respondent
12
13
14
15
16
17
18
19
20
21
22

| Page 264 | |
|---|---|

1 P R O C E E D I N G S
2    CHAIRMAN FITCH: If everybody is
3 settled in and organized, I think we can go on the
4 record.
5    Good morning, we're reconvening pretty
6 promptly at 9:30 a.m., and I observe that all
7 counsel and parties are present and that all three
8 hearing committee members are present.
9    Are there any purely routine
10 administrative matters that need to be addressed?
11    Hearing none, the hearing committee has
12 pending before it Disciplinary Counsel's motion to
13 admit exhibits SX1 through SX38, and I'll be happy
14 to hear brief argument, if anybody wishes, on that
15 motion, it being Disciplinary Counsel's motion.
16    MR. SMITH: Thank you. Good morning.
17    CHAIRMAN FITCH: Morning.
18    MR. SMITH: I'll just reiterate what I
19 had said yesterday about the circumstances under
20 which we obtained those documents.
21    You heard the testimony of Ms. Sataki,
22 and to characterize it she had essentially pushed

2 (Pages 261 to 264)

In The Matter Of:  Larry E. Klayman
May 31, 2018

---

Page 265

1  this matter aside for a long time because it was
2  very painful for her to have to revisit the facts
3  and circumstances of what took place several years
4  ago between her and Mr. Klayman.
5      In preparation for the hearing,
6  however, she summoned up the courage to kind of
7  look into things and found a bunch of emails that
8  she had not even opened and started, you know,
9  digging into it and realized that there was a lot
10 more that she could share with the disciplinary
11 system I guess to corroborate her story, because
12 these are the things that she was looking at, you
13 know, to get ready for the hearing.
14     In addition to that I note that all of
15 the documents which are correspondence either
16 authored by or addressed to Mr. Klayman cannot
17 come as any sort of surprise, given that he was
18 either the author or the recipient of all of the
19 documents that we have put together as SX1 through
20 38.  I believe that this information will help
21 inform the hearing committee of exactly what was
22 happening.  It corroborates what Ms. Sataki was

---

Page 267

1      This is a case by Bar Counsel, not by
2  Ms. Sataki.  And although Ms. Sataki, you know,
3  has written correspondence that you'll see that
4  she needs this to validate future employment, she
5  needs this because her life's been on hold for
6  eight years.  Obviously this Bar proceeding is not
7  going to change the status quo, which is not my
8  fault, in any event.  I did my best and I tried
9  extremely hard for her.  You're going to see that
10 later today and throughout this hearing.
11     But you can't come in under the rules
12 at the last minute.  These documents weren't
13 provided until 9:30 Friday.  They weren't even
14 sent to me.  And they were sent to Mr. Sujat.  Mr.
15 Smith knows that I was in California; he was in
16 Florida.  Why wouldn't you send them to me?
17     On top of that, there was a zip drive,
18 which contained my correspondence.  Because, as
19 I've been telling the committee, they didn't
20 produce everything to me.  That's proven to be
21 true, but what Mr. Smith has said in the past has
22 proven not to be true.  They didn't produce

---

Page 266

1  saying, that there are other emails which post
2  dated the termination of the relationship, which I
3  think are also relevant to her ethical complaint
4  to our office and for this committee's review.
5      CHAIRMAN FITCH:  And Mr. Klayman is
6  approaching the podium.
7      MR. KLAYMAN:  Yes, thank you, your
8  Honors.  Good morning.
9      CHAIRMAN FITCH:  Hello.
10     MR. KLAYMAN:  I'll keep it relatively
11 brief, too, but also to the point -- again, I
12 apologize, I have a little post nasal drip every
13 morning.
14     CHAIRMAN FITCH:  Not a problem.
15     MR. KLAYMAN:  This case is eight years
16 old.  It's approaching a new world indoor record,
17 and for Mr. Smith to come up here, and I'm not
18 personalizing this, and say that Ms. Sataki just
19 looked for these documents is very disingenuous,
20 because he had a duty and an obligation at the
21 outset to ask her what documents you have, and to
22 look for them.

---

Page 268

1  everything to me.
2      He then produced a zip drive that he
3  had, which he claimed apparently he tried to have
4  delivered to a mail drop on Pennsylvania Avenue,
5  and then it sat around for weeks when it came
6  back.  But yet he told you they had produced
7  everything.
8      And then on top of that, you know, of
9  course he had an opportunity, even last Friday
10 with Mr. Sujat -- Mr. Sujat will testify to say,
11 "I want to have these documents moved into
12 evidence.  Will you consent?"  He never said that.
13 He just said, "Here are the documents."  He could
14 have filed a motion.  He could have sought our
15 consent.  Instead he comes in at the last minute
16 and tries to jam these into the hearing.
17     In light of everything else that has
18 gone on here, the delay, eight years -- four --
19 three and a half years Ms. Sataki, no one even
20 tried to contact her.  She abandoned the case by
21 the policies of the Disciplinary Counsel, itself.
22 Because they give you a letter when they

---

3  (Pages 265 to 268)

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 269 | Page 271 |
|---|---|

**Page 269**

1  acknowledge opening an investigation. I'm going
2  to show you that letter in the course of this
3  proceeding, make it an exhibit into evidence, that
4  if you don't contact the Bar promptly after that,
5  your case is considered to be abandoned.
6       They resurrected it after six years,
7  for their own strategic reasons, and we'll get
8  into that later, too.
9       So, this is all in an effort to deny
10  me, either intentionally or in a grossly negligent
11  fashion -- I believe intentionally -- my due
12  possess rights and equal protection rights, and to
13  not give me an opportunity.
14       As you know and as I've said, it's all
15  over the record, I thought this case was
16  dismissed. Florida and Pennsylvania had dismissed
17  it. I got rid of files. I moved around. I lost
18  files. I had to recreate them.
19       So to say right now that Mr. Klayman's
20  had all this stuff, that's also very disingenuous,
21  at best.
22       Now the rules provide for at least ten

**Page 270**

1  days notice before a hearing, and that was not
2  given either.
3       So, your Honor, out of fairness and the
4  rules of this Board, which it has to live by --
5  and sometimes I get the feeling, and again I've
6  told you how I hate being my own lawyer here, I
7  think because sometimes I have to be aggressive,
8  and it's not the proceeding I want too be
9  aggressive in...
10       But they had an obligation to protect
11  me as well as to protect the interest of the Bar,
12  and they believe that they don't have to play by
13  the same rules that respondents have to play back
14  or I have to play by.
15       And they think, and I'm not saying
16  anything with you. I have -- the hearing
17  committee and I know that you'll do a neutral and
18  fair proceeding here, at least as of right now.
19  But they think that they have you in their hip
20  pocket, that because it's so close here, it's so
21  incestuous in a way, that they can do whatever
22  they want and get away with it. And that's just

**Page 271**

1  not the way it's supposed to be. They think
2  they're above the law.
3       So I strongly urge this committee to
4  not allow this information on the record or into
5  evidence, not just because it's totally unfair and
6  there's due process rights. It's not even a
7  question of what's in the documents, because I
8  read them. Some of it is even helpful. Most of
9  it is.
10       But this is not right and you cannot
11  have this kind of a proceeding, because it's
12  becoming an extreme example of abuse of process by
13  the Disciplinary Counsel, and therefore it should
14  all be excluded, if for no other reason than to
15  set rules that people have to live by.
16       I've had to live by them. When I
17  wanted an extension, I asked for an extension, and
18  the Chair ruled.
19       But to slip it in at the last minute,
20  that's just slick, and frankly it's unethical, and
21  these documents should be excluded and not become
22  part of the record.

**Page 272**

1       Thank you.
2       CHAIRMAN FITCH: Any rebuttal from the
3  movant?
4       MR. SMITH: Well, I think Mr. Klayman
5  made a few mischaracterizations of how a lot of
6  these things took place.
7       I actually have, and I can submit it
8  later, a copy of the respective flash drive. I
9  don't know that a lot of our response really goes
10  substantively to the question of whether or not
11  the documents that we have asked, the supplemental
12  exhibits be admitted or not, but because there are
13  certain representations made about Bar Counsel's
14  conduct with respect to discovery, because not
15  everything has been made available to the
16  committee.
17       I just wanted to share with you that on
18  May 24th we did send to Mr. Klayman's counsel a
19  copy of the flash drive that we had originally
20  sent to Mr. Klayman at his address on May 4th, as
21  we had represented in our motions.
22       On May 23rd we had received from the

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 273

1    United States Postal Service the letter that we
2    had delivered to Mr. Klayman at his address on
3    Pennsylvania Avenue, and on the letter it had
4    "refused."
5         Immediately upon receiving that we sent
6    it to his counsel, because at that time he had
7    just entered his appearance.  We assumed that he
8    was counsel of record, that we should not be
9    communicating with Mr. Klayman, for no other
10   reason than that.
11        So we did send that information
12   immediately to his counsel, the flash drive.  We
13   sent it to him by Federal Express to make sure
14   that he would get it in a timely manner.
15        And so the same is true with respect to
16   our receiving the documents from Ms. Sataki on the
17   eve of this hearing, and I only say these things
18   because there are a lot of nefarious spins being
19   made, a lot of accusations being made about the
20   conduct, character and intent of Disciplinary
21   Counsel in proceeding with this case.
22        To that extent, it is a collateral

Page 274

1    issue, but the record is complete with these
2    accusations, and I felt that it was necessary to
3    get on the record to respond to that to let the
4    committee know that there is documentary evidence
5    which we can submit which will rebut the
6    accusations of impropriety and demonstrate that we
7    moved with all deliberate speed to make sure that
8    Respondent and his counsel were made aware of and
9    given copies of the documents which we had
10   represented that we would give them as soon as
11   possible.
12        And again I know that Respondent has
13   said that he failed to maintain a copy of his
14   documents throughout the years.  Well,
15   Disciplinary Counsel is not responsible for how
16   Mr. Klayman cared for his belongings and his
17   possessions, and, to the extent that we maintained
18   a file which contained things that he should have
19   been maintaining and made available to him, that I
20   think is in the spirit of fair play of exactly
21   what we're doing.
22        But again, at the end of the day, the

Page 275

1    person responsible for maintaining custody and
2    control of, you know, the correspondence that, you
3    know, we shared between us, and that he had access
4    to, and all the documents quite frankly that he is
5    claiming are somehow the product of unfair play,
6    again, you know, this is stuff that he has had a
7    direct hand in, and things that he -- if he did
8    not, he certainly could have if not should have
9    had copies of all these things and maintained
10   these things throughout the years.
11        You can't castigate and disparage
12   Disciplinary Counsel for, you know, good faith
13   efforts to get this information that he should
14   have had back to him.
15        CHAIRMAN FITCH:  Ok, Mr. Sujat, you
16   want to respond?
17        MR. KLAYMAN:  Mr. Sujat is going to
18   respond.
19        MR. SUJAT:  Can I speak as well?
20        CHAIRMAN FITCH:  Briefly.
21        MR. SUJAT:  I will be very brief.
22        I just wanted to point out some factual

Page 276

1    matters.  I don't want to get into a big
2    explanation, but simply to say that the new
3    evidence that was provided at the last minute came
4    to me by email on Friday, 9:30.  So, I just wanted
5    to let the Board know that it was May 25th that I
6    actually received it.
7         Also on the thumb drive, the thumb
8    drive was sent on Thursday, but it was sent by
9    FedEx, so I didn't get it until Friday, as well.
10   And then Friday I immediately went to the FedEx
11   and had it delivered overnight to Mr. Klayman for
12   the weekend, so that, you know, he would have it.
13        But, you know, this was all dropped on
14   us at the last minute.
15        And also I just want to say in terms of
16   keeping records... Usually lawyers keep records
17   for five years.  In this case we're talking about
18   it will be six years of waiting for the
19   proceedings.
20        That's it.
21        CHAIRMAN FITCH:  Each of the three
22   members of the hearing committee reviewed SX1

5  (Pages 273 to 276)

App.0223

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 277 |
| --- |

through SX38.  Yesterday evening we each spent
about 45 minutes to an hour on reviewing the
documents for purposes of ruling on their
admissibility.

The documents frankly don't contain
anything new.  The themes in the documents and the
subject matters in the documents are those which
were covered in yesterday's evidentiary
proceedings.  And so the question arose whether
those documents were cumulative and therefore
subject to exclusion under the applicable rule.

The Disciplinary Counsel twice used the
word "corroborate," and the documents, perhaps
because they do in fact cover the same subject
matter, potentially, at least in Disciplinary
Counsel's view, support or corroborate in written
form the testimony of the complaining witness.
And so it certainly is not unusual in evidentiary
proceedings for documents to be adduced to
corroborate testimony.  Or visa versa, I suppose,
for that matter.

Indeed, I suppose if these documents

| Page 279 |
| --- |

the next period of time and to evaluate the
documents for their weight, if any, at the end of
the case, as we work our way through all the
evidence that we hear.

Now, Mr. Smith, the documents do
corroborate.  But I'm also correct that the
documents do not explore any new ground.  So I'm
admitting the documents, but I do not want to hear
repetitive testimony.  You had the opportunity to
bring out your themes, in some instances several
times, so you need to figure out -- you may not
want to ask any questions at all.  The documents
are in.  But I'm not going to let you walk her
through the documents.

We know, at least we have heard the
story, that you wish to present, in the theories.
It's perfectly sensible.  We may or may not agree
with them now.  Since we haven't reached any
decision, we're still hearing evidence, we may or
may not agree with you at the end of the hearing.
But we do know where your theories are.

Now you may have some new theories, and

| Page 278 |
| --- |

had been available sooner, the form of examination
might well have taken marching the witness, the
complaining witness through the documents in a
chronological fashion, the manner in which they in
fact are arranged, starting in April and running
through the end of the year, and a tad further.

In addition, Mr. Klayman pointed out
that in fact the documents, "some," quote unquote,
or "most," quote unquote, are helpful to
Respondent.  So who knows what the answer to that
is.

Disciplinary Counsel presumably has
made a judgement that on the balance -- or perhaps
in their entirety -- the documents are helpful to
him, and that's a judgment that he's entitled to
make.

The Respondent's team may very well
find that the documents are helpful to any number
of their theories.

On balance we think that we are
required, under the rule, to admit the documents
and to proceed through the evidentiary case over

| Page 280 |
| --- |

I suppose you may be able to adduce those,
although you did rest yesterday, subject to this
motion.  But we're not going to hear her repeat
testimony that she has already given.  That road
is taken.  There will be a lot of "asked and
answered."

Do you want to call your next witness?

MR. KLAYMAN:  Your Honor, may I raise
one procedural issue here?

CHAIRMAN FITCH:  I'm sorry?

MR. KLAYMAN:  May I raise one issue
that dovetails with your ruling here, just real
quick, if I may?

CHAIRMAN FITCH:  Go ahead.

MR. KLAYMAN:  Yes.

Yesterday I pointed out the likelihood,
because we hadn't had a chance to look at the
documents yet, that there were some documents that
were not provided.  They were incomplete.  Ms.
Sataki herself I believe testified at that she
didn't open everything.  And there are documents
in that package which talk about me trying to

In The Matter Of:  Larry E. Klayman
May 31, 2018

---

Page 281

1  contact her, because I don't know whether she's
2  the one that's communicating or not, and Mr.
3  Shamble, as well.
4        That person -- we don't have the
5  document that was sent apparently to me or I
6  learned of in some way with regard to how that
7  person intended to proceed with the case or advise
8  her or whoever.
9        I'm responding to her, sending emails
10 to her, you know, at the end of the package,
11 saying, "I'm sending it to you, but you send it to
12 this person." It's probably this person Mehran
13 Razavi, R-a-z-a-v-i, and this was the person who
14 threatened me. You'll hear that testimony. I
15 used to have the cell phone voicemail. I don't
16 have it any more, it's so long ago. And that's
17 why I checked out that number that called me and I
18 found out that he was a convicted felon for fraud,
19 gambling fraud in Las Vegas. This is the person I
20 was dealing with.
21       We don't have his communication to me,
22 but we have my response to him, and I'm sending

---

Page 282

1  this to Ms. Sataki, because I don't know what his
2  email address is and he won't respond to my
3  telephone calls, calling me back.
4        So that's the problem with this, it's
5  incomplete documentation. And she herself
6  admitted she didn't open all of it. That's an
7  issue that I throw out that I think we have to
8  grapple with at some point throughout this
9  hearing. I will be questioning her about that,
10 and I trust that Mr. Smith will not tip her off
11 and coach her while she's on the stand here or at
12 various meetings during breaks and lunch.
13       But we have to find out all about that.
14 Because that's really important. Because I was
15 getting instructions that were basically throwing
16 everything I had done in the trash. It didn't
17 make any sense, that basically said that
18 unilateral disarmament, and we hope for the best.
19       I had an obligation to talk to Ms.
20 Sataki about it directly and I was getting
21 communicated to by somebody else, and that's why
22 Mr. Shamble tried to get ahold of her, too, and

---

Page 283

1  that's why I took the actions I did in terms of
2  trying to protect her rights until I could figure
3  out what she really wanted to do, with informed
4  consent, by not by some convicted felon in Las
5  Vegas named Razavi.
6        So that's the big issue here. And, you
7  know, at the appropriate time and the appropriate
8  place, I leave it to your Honors how to proceed
9  about that, but I will be questioning about these
10 things.
11       CHAIRMAN FITCH: Well, that's at least
12 the first appropriate place, you raise it here,
13 after having highlighted it. That's a
14 consideration.
15       Mr. Smith?
16       MR. SMITH: Alright --
17       CHAIRMAN FITCH: You want a minute or
18 so?
19       MR. SMITH: Yes, just give me a minute
20 regarding the Chair's directions.
21       CHAIRMAN FITCH: Try to make it five
22 minutes or less.

---

Page 284

1        MR. SMITH: Alright.
2        (Recess taken.)
3        MR. SMITH: I do have a housekeeping
4  issue.
5        It occurred to me when you had made
6  your remarks about you were going to admit the
7  documents SX1 through 36 and that I had not
8  formally asked or moved in the admission of the
9  documents that we had discussed yesterday with Ms.
10 Sataki.
11       CHAIRMAN FITCH: Why don't we hold off
12 moving documents in until the end of your case.
13       MR. SMITH: Alright. Well, I know that
14 there have been some questions about the
15 authenticity, so in the event that there were
16 going to be any objections to a specific document,
17 I felt it was good while we still had Ms. Sataki
18 on the stand to authenticate that which is not
19 going to be consented to by the Respondent in
20 connection with the additional documents.
21       CHAIRMAN FITCH: Well, I think you can
22 certainly do that. If you think you need to do

---

7 (Pages 281 to 284)

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 285

1  every one of those...
2      MR. SMITH: Well, I mean that really
3  depends on the Respondent. That's why I wanted to
4  bring it up now before I brought Ms. Sataki back.
5      CHAIRMAN FITCH: Well, I don't have Mr.
6  Klayman's objections.
7      MR. KLAYMAN: I would propose the way
8  your Honor has proposed, that at the end we go
9  through, it's more efficient.
10     CHAIRMAN FITCH: But his concern is
11 that if you raise, later today or whenever, later
12 this morning, authenticity issues and the witness
13 has already gone, that he will not have
14 authenticated, potentially, some of the exhibits.
15 Then we'd be put in a position of having to decide
16 on the face of them whether they are authentic or
17 not.
18     So I think that's a reasonable
19 consideration. I think Mr. Klayman -- can you
20 pull up his objections?
21     I think he has objected to the
22 authenticity, maybe all of the exhibits. But we

Page 286

1  at least can get that before us.
2      I think what you need to do is tell her
3  to look at number 23-28, or number SX1, and say
4  "Did you write this email?"
5      MR. SMITH: Well, with respect to
6  documents that were discussed yesterday, I'd like
7  to go through them now and find out from Mr.
8  Klayman objects to.
9      If he is going to consent to any of
10 them, then perhaps we can truncate this process
11 and, you know, I won't need to ask Ms. Sataki the
12 questions. But at this point I think it would
13 just be perhaps more expedient if we know whether
14 Mr. Klayman is going to object to any of the
15 documents that were discussed yesterday and then
16 move forward to the ones today in the supplemental
17 exhibits that we have submitted.
18     MR. KLAYMAN: Your Honor, he's going to
19 have an opportunity, Mr. Smith, to redirect Ms.
20 Sataki. I would suggest that we do this after the
21 redirect and go through these documents.
22     It's premature now before I have a

Page 287

1  chance to elicit her testimony on any of these
2  documents for me to agree to anything.
3      CHAIRMAN FITCH: It appears that --
4  keep scrolling.
5      It appears that there is an
6  authentication objection at least to DX1 -- and
7  there are some other objections, but DX1-28 and --
8      MR. TIGAR: I think there's an
9  authentication objection, Mr. Chairman, to all of
10 the numbered exhibits one through 28.
11     CHAIRMAN FITCH: I seem to be missing
12 Mr. Smith's exhibits -- oh, no, I'm not.
13     We have more than 28 exhibits in here,
14 and Mr. Klayman surely is going to have the right
15 and the opportunity to make his position clear on
16 those, as well.
17     So, Mr. Klayman has made a suggestion.
18 I'll leave it up to you, Mr. Smith.
19     MR. SMITH: Well, again, my suggestion
20 is I think we did lay a foundation for the
21 authenticity of the documents in our examination
22 of Ms. Sataki, with respect to the documents that

Page 288

1  she testified to, for example Bar Exhibit 1, which
2  was the ethical complaint that she filed that's
3  dated November 2nd, 2010.
4      I would go through those documents now
5  that we have already had her testify to and
6  determine whether or not there's anything else we
7  need to do to satisfy Respondent about their
8  authenticity.
9      I'll move them in, and if he objects
10 and the hearing committee doesn't rule, then, you
11 know, we'll just deal with that. But I'd like to
12 do that exercise now before I bring Ms. Sataki in.
13     MR. KLAYMAN: Your Honor --
14     CHAIRMAN FITCH: You're saying you're
15 going to address which documents now?
16     MR. SMITH: All the documents that she
17 testified to yesterday, which actually weren't
18 that many.
19     CHAIRMAN FITCH: Right.
20     MR. SMITH: So if we could just go
21 through that now, and I actually think I may have
22 asked to move in Bar Exhibit Number 1 yesterday.

8 (Pages 285 to 288)

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 289 | Page 291 |

Page 289

1 I don't recall whether there was any discussion of
2 that at all. But, again, if I might just go
3 through the few documents that I went through
4 yesterday.
5 MR. KLAYMAN: Here's the problem, and
6 number one, and this is a good example of it, is
7 that she testified that that wasn't her
8 handwriting on that document. So I've got to be
9 able to probe that. I don't understand why --
10 CHAIRMAN FITCH: Well, sure, you can
11 probe it. No question of that.
12 MR. KLAYMAN: So it may not be an
13 authentic document.
14 Ordinarily it's at the end of your
15 presentation, your examination that you move to
16 have the documents in. It's not over yet.
17 CHAIRMAN FITCH: Mr. Smith, it appears
18 to me that Mr. Klayman is saying that he objects
19 to the absence of authentication of Exhibit Number
20 1.
21 MR. SMITH: Correct, and so --
22 CHAIRMAN FITCH: I think that if he is

Page 291

1 to object to the authentication.
2 MR. SMITH: He does --
3 CHAIRMAN FITCH: And the only
4 constraint is that we lose this witness tomorrow
5 afternoon, evening, whatever, and that's when
6 cross-examination ends. If Mr. Klayman wants to
7 use time for authentication issues, that's his
8 right, but we're not going beyond tomorrow night
9 with this witness.
10 (Brief pause.)
11 (Ms. Sataki returns to the witness
12 stand.)
13 CHAIRMAN FITCH: Good morning.
14 THE WITNESS: Thank you. Morning.
15 CHAIRMAN FITCH: As I said I would, I
16 remind you, Ms. Sataki, that you remain under
17 oath. You remain under oath.
18 THE WITNESS: Yes.
19 CHAIRMAN FITCH: Mr. Smith...
20
21
22

Page 290

1 going to object to all this, you need to go
2 through them with her.
3 MR. SMITH: Well, I did yesterday, and
4 I remind you that she's the one who testified that
5 she did not write it herself, but that she did
6 read it, she agreed with it.
7 CHAIRMAN FITCH: I have notes about
8 what was said about the documents covered
9 yesterday. I have to leave it to you as to
10 whether you think you have adequately
11 authenticated them knowing that there are -- there
12 seem to be -- not "seem to be," there are
13 authentication objections.
14 MR. SMITH: Yes, and that's why I
15 wanted to --
16 CHAIRMAN FITCH: But I don't want you
17 to take more time moving them in right now.
18 Call her, and if you think you need to
19 authenticate something, authenticate it. If there
20 are 50 you think you need to authenticate,
21 authenticate 50 of them.
22 I mean, Mr. Klayman has a perfect right

Page 292

1 CONTINUED CROSS-EXAMINATION
2 BY DISCIPLINARY COUNSEL
3 BY MR. SMITH:
4 Q. Morning, Ms. Sataki.
5 A. Good morning.
6 Q. I handed you a copy of what has been
7 previously marked as Supplemental Exhibit Number
8 31. For the record it is an email which appears
9 to be dated October 24th, 2010 from Mr. Klayman to
10 you -- or excuse me -- October 19th --
11 A. October --
12 Q. Excuse me, October 19th, 2010, to Kevin
13 Sataki.
14 A. Yes.
15 Q. And above that is a forwarding message
16 suggesting that it was sent to you, for the
17 record.
18 I'll ask you to take a look at that
19 document, please.
20 MR. KLAYMAN: Your Honor, that's not
21 the document on Exhibit 31.
22 MR. SMITH: Supplemental Exhibit Number

9 (Pages 289 to 292)

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 293

1    31, your Honor.
2    CHAIRMAN FITCH: I'm sorry.
3    MS. LARKIN: Supplemental Exhibit
4    Number 31.
5    THE WITNESS: Yes.
6    BY MR. SMITH:
7    Q. Do you recall receiving this document
8    on or about October 24th, 2010?
9    A. Yes.
10   Q. And who did you receive it from?
11   A. My brother forwarded it to me.
12   Q. What is the substance of the letter?
13   What is going on there?
14   MR. KLAYMAN: Your Honor, objection.
15   There is no showing that her brother forwarded it
16   to her.
17   CHAIRMAN FITCH: She has testified that
18   he did and we'll credit or not credit that
19   testimony.
20   BY MR. SMITH:
21   Q. Let me ask you to look at the
22   forwarding message --

Page 294

1    MR. KLAYMAN: Let me make a suggestion
2    if I may.
3    MR. SMITH: Larry, please, please.
4    MR. KLAYMAN: I'm trying to assist you.
5    Let me voir dire after each of these.
6    CHAIRMAN FITCH: We will not be doing
7    that.
8    BY MR. SMITH:
9    Q. If you could look in the middle of the
10   page where it says "forwarded message".
11   A. Yes.
12   Q. And who is the letter from?
13   A. Mr. Klayman.
14   Q. And who is it addressed to?
15   A. To my brother, Kevin Sataki.
16   Q. In other words, there is a forwarded
17   message in the middle of the page?
18   A. It was to me.
19   Q. Does that refresh your recollection as
20   to where you might have gotten a copy of this
21   letter from?
22   A. Yes, my brother. He emailed me or

Page 295

1    called me and told me there was a letter from Mr.
2    Klayman.
3    Q. So you did hear about this letter from
4    your brother?
5    A. Yes.
6    Q. Have you had a chance to read the
7    letter?
8    A. Yes.
9    Q. Can you tell the hearing committee what
10   was going on in that letter, the communication.
11   A. It was --
12   MR. KLAYMAN: Your Honor, objection.
13   Your Honor asked him not to elicit testimony that
14   was cumulative. Now he's getting into testimony.
15   He's back-dooring examination on these documents,
16   which I move to exclude.
17   MR. SMITH: There has been absolutely
18   no testimony whatsoever about the substance of
19   what's in this letter.
20   CHAIRMAN FITCH: Overruled.
21   THE WITNESS: The letter is about -- to
22   my brother and it's about me not cooperating or me

Page 296

1    not meeting with the other people at CBN. They
2    were offering me a job.
3    Also the letter is about that Mr.
4    Klayman is trying to get me a book deal, and it's
5    to my benefit, because it will kind of restart my
6    career, and the book deal is going to help me, and
7    both as a prestige and both money.
8    So it's about that, and plus that he is
9    explaining to my brother, that someone as my
10   manager talked to the CBN people regarding that,
11   if we're going to meet, Mr. Klayman shouldn't be
12   there.
13   MR. SMITH: At this time --
14   MR. KLAYMAN: Your Honor, wait. I ask
15   for reconsideration.
16   Your Honor, my concern was just to get
17   authentication and you instructed Mr. Smith not to
18   get into testimony because --
19   CHAIRMAN FITCH: No, no, no, no. I
20   instructed him not to get into repetitive
21   testimony, to the extent possible. I have
22   determined that this is not repetitive.

10 (Pages 293 to 296)

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 297 | Page 299 |
|---|---|
| 1      Go ahead, Mr. Smith. | 1      Q. And you agreed with what was said? |
| 2    BY MR. SMITH: | 2      A. Yes. |
| 3      Q. Now what's the date of this letter, | 3      MR. SMITH: Alright. At this time I'd |
| 4   this communication to you, Ms. Sataki? | 4   like to move Bar Exhibit 1 into evidence. |
| 5      A. October 19th, 2010. | 5      MR. SUJAT: Your Honor, again, these |
| 6      Q. Had you still had an attorney/client | 6   are leading questions. |
| 7   relationship with Mr. Klayman on this date? | 7      CHAIRMAN FITCH: Yeah, but you didn't |
| 8      A. No. | 8   object to them and they were just transitional |
| 9      Q. Did you authorize him to discuss your | 9   questions. |
| 10   story with anyone at that point? | 10      Objection or not to its admission? |
| 11      A. No. | 11   He's moved in its admission. |
| 12      Q. Thanks. No further questions on this | 12      MR. SUJAT: I object to the questions. |
| 13   particular document. | 13      CHAIRMAN FITCH: I didn't ask you that. |
| 14      MR. SMITH: At this point I will | 14      He has moved it in. He has moved for |
| 15   attempt to elicit testimony that will authenticate | 15   the admission of Supplemental Exhibit Number 1. |
| 16   the documents that are forth in Disciplinary | 16   Does the Respondent's team object or not object? |
| 17   Counsel's Supplemental Exhibits 1 through 38. | 17      MR. SUJAT: Object. |
| 18      CHAIRMAN FITCH: Or any others that you | 18      MR. KLAYMAN: Yes, your Honor, we |
| 19   are worried about, but go ahead. | 19   strongly object to that. I would like to be able |
| 20      MR. SMITH: Alright. | 20   to voir dire on this. |
| 21    BY MR. SMITH: | 21      CHAIRMAN FITCH: That request is |
| 22      Q. Ms. Sataki, can you look at the book of | 22   denied. |

| Page 298 | Page 300 |
|---|---|
| 1   exhibits in front of you, Bar Exhibit Number 1. | 1      Every objection is considered to be a |
| 2   We talked about this document yesterday. Please | 2   strong objection. |
| 3   take your time. | 3      Go ahead, Mr. Smith. |
| 4      Do you remember submitting this to the | 4    BY MR. SMITH: |
| 5   Office of Disciplinary Counsel on or about | 5      Q. Ms. Sataki, can you please turn to Bar |
| 6   November 2nd, 2010? | 6   Exhibit Number 23. I'll asking you to look at |
| 7      A. Yes. | 7   what has been marked at the bottom of the page as |
| 8      Q. Did you mail it to the Office of | 8   Bar numbers 23-2 through 23-72. |
| 9   Disciplinary Counsel? | 9      For the record, it is a document on the |
| 10      A. I don't remember exactly. I would say | 10   letterhead of the Office of Disciplinary Counsel |
| 11   I did because usually that's what I was supposed | 11   dated October 20th, 2011. |
| 12   to do. | 12      Ms. Sataki, did you submit this |
| 13      Q. Ok. Is this your signature on the | 13   document to the Office of Disciplinary Counsel on |
| 14   bottom of Page 1-2? | 14   or about October 20th, 2011? |
| 15      A. Yes. | 15      A. Yes. |
| 16      Q. The details of the complaint above | 16      Q. If you recall, how did you submit it to |
| 17   that, did you write that personally or did someone | 17   us? |
| 18   else write it? | 18      A. I want to say that I was advised that I |
| 19      A. Someone else write it for me. | 19   have to mail it. |
| 20      Q. Did you read it before it was | 20      Q. Ok. |
| 21   submitted? | 21      A. I mean, I don't remember exactly, but I |
| 22      A. Yes. | 22   was getting advice at that time and I was supposed |

11 (Pages 297 to 300)

In The Matter Of:  Larry E. Klayman
May 31, 2018

---

Page 301

1 to mail everything certified mail.  So probably
2 that's how I do it.
3     Q.  Who is giving you that voice?
4     A.  Katherine.
5     Q.  If you look at pages 23-4 through 23-6.
6     CHAIRMAN FITCH:  Did you mean to say
7 -26 or just 26?
8     MR. SMITH:  Twenty-three, thank you.
9 Yes, 23-6.
10 BY MR. SMITH:
11     Q.  Did you write this or did someone else
12 type that up for you?
13     A.  I got help to type it.
14     Q.  Who helped you?
15     A.  Katherine did.
16     Q.  Ok, and did you read this before you
17 sent it to the Office of Disciplinary Counsel?
18     A.  Yes, it's not my word --
19     Q.  I'm sorry?
20     A.  Yes, we -- together we write this.  She
21 helped me with the English.
22     Q.  And you agreed with everything that was

---

Page 302

1 in there?
2     A.  Yes.
3     Q.  If you could look at the exhibits that
4 are in there.  Looking at 23-8 and 23-9 and 23-10,
5 just briefly, what are these documents?
6     A.  It's a letter from me to Mr. Klayman.
7     Q.  What date?  What date is that?
8     A.  That's May 30th, 2010.
9     Q.  Did you send that letter to Mr.
10 Klayman?
11     A.  Yes, I did, email.
12     Q.  On the first page, what is that?
13     A.  That's Mr. Klayman's email back to me.
14     Q.  Ok.  And you received that --
15     A.  The day after, on May 1st.
16     Q.  Through what medium?
17     A.  Email.
18     Q.  Can you look at pages 23-12 through
19 23-43?
20     (Witness peruses documents.)
21     A.  Yes.
22     Q.  Do you remember including this as part

---

Page 303

1 of the submissions you made to Disciplinary
2 Counsel accompanying your cover letter?
3     A.  Yes.
4     Q.  Do you remember how you got copies of
5 these documents?
6     A.  Email.
7     Q.  Through email?
8     A.  Through email.
9     CHAIRMAN FITCH:  When you say "email,"
10 you mean someone sent it to you, sent the
11 documents to you, or when you say "email" do you
12 mean going to a website?
13     THE WITNESS:  Mr. Klayman emailed it to
14 me.
15     CHAIRMAN FITCH:  Go ahead, Mr. Smith.
16 BY MR. SMITH:
17     Q.  Would you look at Page 23-45 of the
18 exhibit.  Can you tell the date of this exhibit?
19     A.  June 21st, 2010.
20     Q.  Do you know who authored this exhibit?
21     A.  I don't know.
22     Q.  Well --

---

Page 304

1     A.  I mean, it says that -- it looks like
2 it's a third party notifying me through Mr.
3 Klayman's email.
4     Q.  Did you receive this on or about June
5 21st of 2010?
6     A.  Yes.
7     Because at the bottom it says "add a
8 name," so it doesn't have a name, third party.
9     Q.  I understand.
10     Look at Bar Exhibit 23-47 and 48.
11     CHAIRMAN FITCH:  Say that again,
12 please.
13     MR. SMITH:  23-47 and 48.
14     CHAIRMAN FITCH:  Mm-hmm.
15 BY MR. SMITH:
16     Q.  Can you tell me, what is this document?
17     A.  I didn't want the things that -- that I
18 didn't like, and then he sent me an email and in
19 the email he's unhappy.
20     Q.  What date -- don't talk about what's in
21 the email.
22     What's the date of this email?

---

12 (Pages 301 to 304)

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 305 |
|---|

1     A.  This email is August 1st, 2010.
2     Q.  Do you remember receiving it on or
3 about that date?
4     A.  Yes.
5     Q.  The next page, 23-48, was that part of
6 the email?
7     A.  Yes.
8     Q.  Thank you.
9     Can you look at Exhibits 23 through 50.
10 I actually believe you testified about this
11 yesterday.
12     Mr. Chair, I think you had a number of
13 questions, which I think I'd be repeating, so,
14 perhaps I won't ask the questions that you asked
15 about this particular group of documents
16 yesterday.
17     You had asked --
18     CHAIRMAN FITCH:  I think my questions
19 were about the contents of the document.
20     Why don't you ask her what it is and if
21 she received it.
22     MR. SMITH:  Alright.

| Page 306 |
|---|

1 BY MR. SMITH:
2     Q.  Now could you describe for the hearing
3 committee what this collection of documents is
4 again?
5     A.  Text messages.
6     Q.  How did you receive a copy, this
7 particular copy of those text messages --
8     CHAIRMAN FITCH:  I'm incorrect.  She
9 testified as to how she obtained these.
10     When you move them in, I'm going to
11 allow them in.
12     MR. SMITH:  Alright.
13 BY MR. SMITH:
14     Q.  Look at Page 23-56.  Would you tell the
15 hearing committee, just describe what the document
16 is, not what's in it, but just what the document
17 is.
18     A.  It's me asking Mr. Klayman not to --
19     Q.  No, no, not what's in the document.
20     What's the date of the document?
21     A.  Oh, the date, I'm sorry.  The date is
22 November 15th, 2010.

| Page 307 |
|---|

1     Q.  Ok, and did you participate in writing
2 this letter?
3     A.  Yes.
4     Q.  Did anyone help you write this letter?
5     A.  Yes.
6     Q.  Who was that?
7     A.  Katherine.
8     Q.  Did you send it out on or about
9 November 15th, 2010?
10     A.  Yes.
11     Q.  Looking at Bar Exhibit 23-58 through
12 23-72, take a look at that.
13     CHAIRMAN FITCH:  That's a pleading that
14 purports to be signed by Mr. Klayman.  No further
15 authentication is needed.
16     MR. SMITH:  Ok.
17     Then I hereby move into evidence Bar
18 Exhibit Number 23.
19     CHAIRMAN FITCH:  That's --
20     MR. KLAYMAN:  Objection on the grounds
21 previously stated.
22     CHAIRMAN FITCH:  Admitted.

| Page 308 |
|---|

1     I note that, counting the separate
2 portions of that exhibit, plus number one -- one,
3 two, three, four, five, six, seven, eight, nine,
4 covered 10 items in --
5     MR. SMITH:  One exhibit.
6     CHAIRMAN FITCH:  Well, a little bit
7 less than that, 13 and 29 -- 16 minutes.  At that
8 rate we're likely to be at this for at least two
9 hours.  I think that Mr. Smith is not changing his
10 case, other than calling one less witness.
11     MR. SMITH:  I just have a few more
12 documents after this one.
13     CHAIRMAN FITCH:  Well, you authenticate
14 as you want to.  I'm simply observing that there
15 is a firm deadline on when cross-examination ends
16 and this is cutting into time for
17 cross-examination.
18     MR. SMITH:  I appreciate that --
19     CHAIRMAN FITCH:  It's not your fault.
20 I'm not addressing that to you, by any means.  I'm
21 addressing that and bringing that to the attention
22 of the Respondent's time.

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 309 | Page 311 |
|---|---|

**Page 309**

1    MR. KLAYMAN:  Let me make a suggestion,
2  your Honor.  I understand your concerns.  It was
3  not my intent to --
4    CHAIRMAN FITCH:  What's your solution?
5    MR. KLAYMAN:  Yeah, here's my solution,
6  ok.  It's better to have a solution than an
7  intent, it is indeed.
8    My solution is I have a real big
9  problem with these two exhibits, ok?  With other
10  exhibits I can go through with Mr. Smith at the
11  end of the day and maybe we can agree on a lot and
12  just have them come in.
13    CHAIRMAN FITCH:  That should have been
14  done a long time ago.  There are no stipulations
15  in this case.  There was apparent discussion of
16  exhibits and objections.  I hold each counsel
17  equally responsible for that.  I'm not happy with
18  either counsel, but we are where we are.
19    Mr. Smith, you said you had some
20  additional authentication concerns?
21    MR. KLAYMAN:  Your Honor, may I put on
22  the record --

**Page 310**

1    MR. TIGAR:  May I briefly add
2  something?
3    It would help if at the recess maybe
4  both sides could get something done.
5    MR. KLAYMAN:  Yeah.
6    MR. TIGAR:  Let me tell you how I
7  looked at these, alright?
8    Many of these documents are authentic
9  under Federal Rule of Evidence 901(b)(4), and
10  therefore they would be admissible here.
11    Many others, under 904(b)(1), have now
12  been identified by the witness as to authorship
13  and date.
14    The hearsay objections that were
15  interposed are mostly not really available because
16  they're not offered for the truth of the matter
17  asserted or that they are statements by Mr.
18  Klayman himself or they're records of regularly
19  conducted activity.
20    Of course the rules of evidence don't
21  apply to authentication decisions, which means
22  that the admission into evidence doesn't deprive

**Page 311**

1  the Respondent of the opportunity to come back and
2  attack the credibility, even of the foundational
3  evidence.
4    So, with that in mind, one hopes that,
5  perhaps at the recess, the parties can just hand
6  in a list and say, "We're not going to fight about
7  this any more."
8    MR. KLAYMAN:  Yeah, I think that's a
9  good suggestion.
10    MR. TIGAR:  Yes.
11    MR. KLAYMAN:  So we don't want to take
12  your time up unnecessarily.  We don't want to take
13  anybody's time up.
14    But Mr. Smith did have an opportunity
15  as he was going through them to say that's what he
16  was going to do yesterday.
17    And one other point with regard -- you
18  see, I have a really -- sorry for the of the word,
19  "strong objection," a very big objection to both
20  complaints, because it appears they were prepared
21  by someone else who is not a lawyer.  In fact Bar
22  Counsel should be looking into the unauthorized

**Page 312**

1  practice of law, and therefore they're void.
2  They're void legally and for public policy and
3  should not even be considered.  We have a serious
4  issue about the unauthorized practice of law by
5  Ms. Stanton and Mr. Razavi.
6    CHAIRMAN FITCH:  That objection is
7  heard and it's overruled.
8    We could take a recess now.
9    MR. SMITH:  I think that would be a
10  good idea.
11    CHAIRMAN FITCH:  If you counsel will
12  consult and go from there.
13    MR. SMITH:  Alright, thank you.
14    CHAIRMAN FITCH:  Keep in mind that,
15  even though we're not on the record, it's eating
16  into the hours available between now and tomorrow
17  evening.
18    We will stand in recess and the hearing
19  committee will slip away and let you folks have a
20  moderately convenient place to confer.  You'll be
21  able to find us either in the room or David can
22  call downstairs.

14  (Pages 309 to 312)

App.0232

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 313 |
|---|

1    MR. SMITH: Ok. And the witness will
2  be excused and can wait -- I guess you'll get the
3  little room over there.
4    THE WITNESS: Yes.
5    CHAIRMAN FITCH: That's ok.
6    (Recess taken.)
7    CHAIRMAN FITCH: We are back on the
8  record at 10:44, and I understand that the parties
9  have some representations.
10    MR. KLAYMAN: Yes, your Honor. I've
11  gone through -- Mr. Smith gave me a list of what
12  he wants to have authenticated. I will agree to
13  Exhibit 24, 25, 26, 27.
14    28, I object. I need to do some voir
15  dire on 28. I can do that during the cross.
16    I will agree to 29.
17    With regard to Supplemental Exhibits 1
18  through 39, I don't object to the authenticity of
19  the documents that are there, but I do object to
20  having them admitted into evidence under the rule
21  of completeness, as I previously argued.
22    So, we're trying to move this thing

| Page 314 |
|---|

1  along in good faith. I hope that helps.
2    CHAIRMAN FITCH: I think it is helpful
3  and appreciated, and the other objection,
4  obviously, is preserved, as well as objection to
5  28, as I understand.
6    MR. KLAYMAN: Yes, 28.
7    MR. SMITH: Well, at this time, then, I
8  would like to move in Bar Exhibits 1, 23, 24, 25,
9  26, 27 and 29, as there do not appear to be any
10  objections to those.
11    CHAIRMAN FITCH: They are --
12    MR. TIGAR: I'm sorry, did you say 28,
13  as well?
14    CHAIRMAN FITCH: No, he did not say 28.
15    MR. SMITH: No.
16    MR. KLAYMAN: I didn't look at 23.
17    CHAIRMAN FITCH: 23 is what we just had
18  examination on.
19    MR. KLAYMAN: Yes, Honor. I object to
20  the entry of that. It's not an authentic
21  document, in my opinion, and it was written by
22  somebody else who was practicing law who is not a

| Page 315 |
|---|

1  lawyer, and Bar Counsel should have investigated
2  this before this case went forward.
3    So I have a strong objection to that.
4    CHAIRMAN FITCH: Well, I observe that
5  in this jurisdiction Bar Counsel does not have
6  jurisdiction over unauthorized practice of law.
7    They are admitted, specifically
8  specifics one, 23, 24, 25, 26, 27, 29 and SX1
9  through 39.
10    So that's where we are with respect to
11  exhibits.
12    MR. SMITH: Alright. And I will remove
13  the admission of Exhibit 28 after Ms. Sataki's
14  been voir dired --
15    CHAIRMAN FITCH: That would be fine.
16    MR. SMITH: -- by Mr. Klayman.
17    I wasn't thinking about it, but I was
18  just wondering if I have any more questions I want
19  to ask Ms. Sataki before I release her for cross,
20  and I don't think that I do.
21    So I think, to move things along, I
22  rest my direct examination at this time of Ms.

| Page 316 |
|---|

1  Sataki with the right to redirect if we see fit.
2    I'll bring her back in for
3  cross-examination.
4    CHAIRMAN FITCH: Thank you.
5    (Ms. Sataki resumes the witness stand.)
6    CHAIRMAN FITCH: Good morning again,
7  Ms. Sataki.
8    The lawyers and hearing committee have
9  finished the administrative business that we had,
10  and Mr. Smith has notified us that he has
11  completed his direct examination or first round of
12  questioning of you. Now Mr. Klayman and his team
13  have the right to ask you questions.
14    MR. KLAYMAN: Your Honor, may I just
15  voir dire, and then, with your indulgence, go to
16  the restroom and then come back and get into the
17  cross itself, just get into this particular
18  document.
19    It will just take me two minutes.
20    CHAIRMAN FITCH: Voir dire on number
21  28?
22    MR. KLAYMAN: Yes, and then just go to

15 (Pages 313 to 316)

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 317 | Page 319 |
|---|---|

**Page 317**

1  the restroom real quick.

2      CHAIRMAN FITCH:  Ok.

3      VOIR DIRE ON BEHALF OF RESPONDENT:

4  BY MR. KLAYMAN:

5      Q.  Turning your attention to Exhibit 28,

6  Ms. Sataki -- how are you this morning?

7      A.  Ok.  Yes.

8      Q.  Yes.  Who wrote this document?

9      A.  I wrote it, with help.

10     Q.  Who helped you?

11     A.  Katherine helped me and my cousin

12  helped me.

13     Q.  What's the name of your cousin?

14     A.  Mehran Razavi.

15     Q.  Neither of those people are lawyers --

16     CHAIRMAN FITCH:  Spell that, please,

17  for the court reporter.

18     THE WITNESS:  M-e-h-r-a-n, last name is

19  R-a-z-a-v-i.

20  BY MR. KLAYMAN:

21     Q.  Mr. Razavi is not a lawyer, is he?

22     A.  No.

**Page 318**

1      Q.  What does he do for a living?

2      A.  He's doing loan for people, in the loan

3  business.

4      Q.  You're aware that he was convicted of a

5  crime for fraudulent gaming in Las Vegas?

6      A.  No, I'm not.

7      MR. SMITH:  Objection.  I don't know

8  how that relates to the voir dire of the document.

9      CHAIRMAN FITCH:  It's tenuous, but

10  overruled.

11     MR. KLAYMAN:  I'll get back into it

12  later, your Honor, in the context of things.

13  BY MR. KLAYMAN:

14     Q.  With regard to Kathleen, her last name

15  is Stanton.  Is that her last name?

16     A.  Yes.

17     Q.  How is that spelled?

18     A.  I don't know how it's spelled.  I have

19  it in my paperwork.

20     Q.  She's not a lawyer, is she?

21     A.  She's not a lawyer.  I couldn't have a

22  lawyer help me with anything at that time.

**Page 319**

1      Q.  That's not the question.  Please just

2  answer my question.

3      This document was never sent to me,

4  Larry Klayman, was it?

5      A.  I remember I tried to find an address

6  for you, and I don't remember what address,

7  whether it was in DC or California that I sent it,

8  but I don't know if it was correct address.  We

9  tried to find you.

10     Q.  You did that -- I'm sorry.

11     A.  Go ahead.

12     Q.  You did have my email address, didn't

13  you?

14     A.  I had your email address, yes.

15     Q.  So you could have emailed it to me?

16     A.  Yes.

17     Q.  But you didn't.

18     A.  I don't remember if I did or didn't.

19     Q.  There's no showing on this document

20  that you did, correct?

21     A.  Correct.

22     MR. KLAYMAN:  Your Honor, I object to

**Page 320**

1  it on the basis that it's a document which is void

2  as having been committed by people who are not

3  lawyers and they're practicing as lawyers.

4      As far as its authenticity, I don't

5  know one way or the other whether it's authentic.

6  I never got it.

7      So I object.

8      CHAIRMAN FITCH:  The objection is

9  overruled and, upon Mr. Smith's standing motion,

10  Exhibit 28 is admitted into the record of this

11  case.

12     We will stand in a five-minute recess.

13     (Recess taken.)

14     MR. SMITH:  If I could ask the

15  committee one administrative issue if I may --

16     CHAIRMAN FITCH:  Wait just a minute.

17     We are back on the record at 11:00 a.m.

18  and Mr. Smith has an administrative issue.

19     MR. SMITH:  I don't know how long

20  cross-examination is going to go today, but one of

21  my witnesses, Mr. Kevin O'Connell, informed me

22  that he will not be available tomorrow.

16 (Pages 317 to 320)

In The Matter Of:  Larry E. Klayman
May 31, 2018

## Page 321

1    I anticipate my examination of him will
2    probably be no more than five or ten minutes,
3    maximum, and I can't imagine there will be a lot
4    of cross-examination based upon what his testimony
5    will be.
6        So, keeping in mind that the Chair
7    indicated yesterday that you might want to finish
8    up early today, I was hoping, even if Ms. Sataki's
9    cross-examination continues, that we could carve
10   out about a half an hour or so for Mr. O'Connell's
11   testimony, and then resume cross-examination
12   before the end of the day.
13       CHAIRMAN FITCH:  We will take Mr.
14   O'Connell at the beginning of the afternoon
15   session, after our approximately 45-minute to
16   one-hour lunch break.
17       MR. SMITH:  Thank you.
18       CHAIRMAN FITCH:  And Mr. Klayman is
19   entitled to cross examine the witness.
20       Go ahead, Mr. Klayman.
21
22

## Page 322

1    CROSS-EXAMINATION ON BEHALF OF RESPONDENT:
2        BY MR. KLAYMAN:
3    Q.  Ms. Sataki, how are you today?
4    A.  Thank you.
5    Q.  Now I believe you testified that we
6    first met on Capitol Hill in front of the Capitol
7    during a demonstration for Iranian freedom,
8    correct?
9    A.  Correct.
10   Q.  You were there giving an interview or
11   doing an interview with someone, correct?
12   A.  Correct.
13   Q.  And I came over and introduced myself
14   and I said to you, "I represent Akbar Mohammadi
15   and his brother Manouchehr Mohammadi in a case
16   against the regime for having killed Akbar and
17   tortured Manouchehr, and would you be interested
18   in that, correct?
19   A.  Yes.
20   Q.  And it was a very brief conversation?
21   A.  Yes.
22   Q.  And I walked away.  I was with somebody

## Page 323

1    at the time, and I was walking down the Capitol
2    steps, correct?
3    A.  I don't remember the details, but, ok,
4    correct.
5        Because I was there working with my
6    cameraman.  I didn't pay attention to the details
7    about how you were walking or where.
8    Q.  And you ran after me and gave me your
9    card that had your personal cell phone number on
10   the back, correct?
11   A.  I didn't "run" after you.
12       You gave me your business card and you
13   said, "Do you have one?"  I said "no," and my
14   cameraman said, "I have your card."  And then I
15   gave you my card, yes.
16   Q.  And it had your personal cell phone
17   number on it --
18   A.  My personal cell phone number is -- was
19   always on my business cards, all of my cards.
20   Q.  And you then asked me to call you,
21   correct?
22   A.  You asked me to cover a story.  I said

## Page 324

1    you can call me at my office number, correct.
2    Q.  No, when you handed me the card, you
3    simply said "You can call me," correct?
4    A.  When -- I always, when someone approach
5    me regarding work, when you -- you asked me, you
6    wanted me to cover the event, and I said, "You can
7    call me at my office and we can talk about it, and
8    I have to talk to my executive producer about it,"
9    yes.
10   Q.  You just acknowledged that the
11   conversation was very brief.  That was longer than
12   any alleged conversation.
13       MR. SMITH:  Objection, mischaracterizes
14   the testimony.
15       CHAIRMAN FITCH:  The observation is
16   struck.
17       THE WITNESS:  Ok, the conversation was
18   very brief.  It was about me covering the story
19   that you wanted me to cover.
20   BY MR. KLAYMAN:
21   Q.  After that initial encounter, I called
22   you, correct?

17  (Pages 321 to 324)

In The Matter Of: Larry E. Klayman
May 31, 2018

---

**Page 325**

1    A. Yes.
2    Q. And I left a message on your cell
3  phone, correct?
4    A. I don't remember if it was my cell
5  phone or desk, but correct.
6    Q. Right. And it took you a while to call
7  me back, correct?
8    A. Yes.
9    Q. And when you called me back, you told
10  me, "I've been having some problems. Sorry I
11  didn't call you back sooner."
12    A. Yes.
13    Q. And when we talked on the phone, I
14  asked you if you'd like to have dinner sometime in
15  the future, and you said "yes," correct?
16    A. Yes.
17    Q. And I invited you to come to Clyde's
18  restaurant in Georgetown, correct?
19    A. Yes.
20    Q. That evening when you walked in, I had
21  a table and you were at the bar. Do you remember?
22    A. I don't remember --

---

**Page 326**

1    Q. Initially.
2    A. -- exactly, maybe. Maybe I was waiting
3  for you at the bar. I don't know.
4    Q. And I came over to greet you and, in
5  terms of custom, you gave me a kiss on the cheek,
6  correct?
7    A. I don't remember that. If that is the
8  custom, you shake hand or give a hug or kiss or
9  not cheek. I don't know.
10    If you say that is, I don't want to --
11  I don't know.
12    Q. Ok, but you kissed me on the cheek --
13    A. I kissed you on the
14    Q. Yes.
15    A. No, not correct.
16    Q. We then got our table and talked a
17  little bit. Do you remember that?
18    A. Yes.
19    Q. The table was in the back of Clyde's,
20  not in the first part, in the bar area, but the
21  back, and we had a table for two, correct?
22    A. Yes.

---

**Page 327**

1    Q. And in the course of that conversation
2  you grabbed my hand and said, "Larry, I've got a
3  big problem," correct?
4    A. Not correct.
5    Q. And you started crying, correct?
6    A. Maybe, yeah -- I don't remember, but
7  maybe.
8    Because at that time I was going
9  through that tough time and depression, so crying
10  was a part of my daily routine.
11    Q. You weren't crying because of anything
12  I said or did at that time?
13    A. No.
14    Q. After you grabbed my hand and started
15  crying, you said, "Larry, I have no money. I am
16  completely bankrupt. And I have this legal
17  problem at Voice of America."
18    Do you remember that?
19    A. I didn't say I don't -- no, it didn't
20  go that way.
21    I didn't grab your hand. Definitely
22  not. Absolutely not.

---

**Page 328**

1    And I -- we were talking, the
2  conversation -- within the conversation my problem
3  with VOA came up and I explained to you what's
4  going on there, and also I explained to you,
5  because you were an attorney, that I just found
6  out that someone did fraud on my credit card. So
7  I was dealing with that. And I explained that to
8  you.
9    Because you were an attorney, again, I
10  thought maybe you can give me some advice. That's
11  why I shared that with you.
12    Q. Now, you didn't really know me very
13  well at that time, did you? In fact you never met
14  me before except on the mall in front of the
15  Capitol?
16    A. Yes.
17    Q. And you were sharing some very intimate
18  details with me that night, correct?
19    A. That's not intimate.
20    Q. Are you saying that -- well, let's back
21  up a little bit.
22    You were talking to me --

---

18 (Pages 325 to 328)

In The Matter Of:  Larry E. Klayman
May 31, 2018

## Page 329

1    A.  We talked over the phone before we met,
2  and I had already explained to you that I probably
3  cannot cover this story that you want me to cover
4  because my executive producer has to assign the
5  assignment to the reporters, and she most likely
6  is not going to do that.  And then I explained to
7  you why, because of my problem with VOA.
8        So we had all these conversations
9  already over the phone, and that went to the
10  dinner, when we had the conversation.
11        So I don't know why this conversation
12  was so intimate to you, because it was definitely
13  not intimate to me.  Everybody knew.  In that
14  case, I had intimate conversation with everybody.
15    Q.  You don't have any record of our having
16  a detailed conversation over the phone before I
17  invited you to dinner at Clyde's, do you?
18    A.  We had a detailed conversation over the
19  phone.  I explained to you about this.
20    Q.  You have records on other things, but
21  you don't have records on that, do you?
22    A.  On -- on what?

## Page 330

1    Q.  On the conversation that you claim we
2  had --
3    A.  I didn't record our conversation.
4    Q.  -- that you claim we had in detail over
5  the phone?
6    A.  I didn't record our conversation.  The
7  record I have is the emails and text messages you
8  sent me.  But our phone conversations, I don't
9  have any of those records, otherwise I would have
10  had lots of phone conversations from you to me if
11  I had that records and recorded our conversations.
12    Q.  The communications that you submitted
13  to Bar Counsel here in this case, you submitted
14  them because they were favorable to you, correct?
15    A.  I just submitted all the evidence.
16    Q.  As you perceived them to be, ok?  You
17  perceived them to be favorable to you?
18    A.  I just submitted all the evidence.
19    Q.  But yet you don't have any record of
20  this conversation we had before you met me at
21  Clyde's?
22        MR. SMITH:  Argumentative.

## Page 331

1        THE WITNESS:  Why would I have a record
2  of our conversation the first time I met you,
3  before you started sexually harassing me?  Why
4  would I -- I didn't know at that time that that's
5  what you going to do to me.
6        MR. KLAYMAN:  I move to strike that
7  comment as not responsive.
8        CHAIRMAN FITCH:  Well, we've had
9  argumentativeness both ways.
10        The question is struck and the answer
11  is struck.
12        MR. KLAYMAN:  Alright, well I'm going
13  to ask a follow-up question, your Honor.
14  BY MR. KLAYMAN:
15    Q.  Ms. Sataki, it's now been eight years.
16  You never filed a sexual harassment case against
17  me, did you?
18    A.  I filed this complaint, yes.
19    Q.  And the complaint makes no mention of
20  sexual harassment?
21    A.  Well, in all the evidence it shows that
22  you were sexually harassing me.

## Page 332

1    Q.  Now, during that conversation, you then
2  told me, sobbing, what you claimed had happened to
3  you at Voice of America with your co-anchor, Mehdi
4  Falahati, correct?
5    A.  I was sobbing to every person who I was
6  talking at that time, because I was going through
7  a deep depression, and every time I talk about
8  that, I would cry.  That's just how it was.  Not
9  only with you, but with everybody.
10    Q.  And you asked me if I would help you,
11  correct?
12    A.  You offered me to help.
13    Q.  No, you asked me, correct?
14    A.  You offered me.
15    Q.  And I told you that I would help you as
16  a friend, did I not?
17    A.  You told me you help me, yes.
18    Q.  Yeah, and that you had no money, that I
19  would help you and not charge you, correct?
20    A.  Yes.  We talked about that.  At the end
21  you're going to get 40 percent.
22        I explained, I don't have any money to

19 (Pages 329 to 332)

App.0237

In The Matter Of: Larry E. Klayman
May 31, 2018

<div style="float:left; width:48%;">

Page 333

1 pay for a lawyer, but then you said that I -- we
2 can -- at the end, "because this is a strong case
3 and I'm going to help you with that," and we get
4 40 percent. We talked about that.
5   Q. It's not true that that 40 percent came
6 up at that time at that dinner.
7      It did not come up, did it?
8   A. I don't remember.
9   Q. Then why did you just say that?
10   A. Well, we -- is it we're still talking
11 about that particular dinner?
12   Q. Yes.
13   A. Only?
14   Q. Yes, at Clyde's.
15   A. Ok. Maybe it didn't, but definitely --
16 the percentage of it maybe didn't come up, but the
17 fact that, "We're going to definitely win,"
18 according to you, "that you have a strong case,"
19 and you're going to collect your money at the end,
20 that came up.
21   Q. During that dinner I didn't get into
22 detail with you about what had happened or whether

Page 334

1 even you had a lawsuit that could be brought, or
2 anything to that effect, did I? I just was
3 listening to you at that time, and I said I would
4 try to help you if you asked me.
5      That's all I said at dinner, correct?
6   A. No. We talked about this, too. That
7 was why I met with you again.
8   Q. And later we did meet and we went
9 through what happened, what you claimed happened
10 to you, correct?
11   A. Exactly.
12   Q. And you told me, did you not, that "My
13 goal is to get back to work out of the presence of
14 the alleged harasser, Falahati, and to go book to
15 work with the Persian news network in Los
16 Angeles."
17   A. I said that I have written a proposal,
18 yes, and I'm trying to transfer myself to Los
19 Angeles.
20      I mentioned that to you, yes.
21   Q. Yes, and your goal was to go back to
22 Los Angeles, because that's where you're from?

</div>

<div style="float:right; width:48%;">

Page 335

1   A. Well, I'm from -- I was raised in
2 Sweden. I was born in Iran. I mean, I'm from a
3 lot of different places before DC.
4   Q. Yeah, when did you move to Los Angeles?
5   CHAIRMAN FITCH: Let me stop there.
6      There was a question that asked in
7 general terms whether Ms. Sataki said her goal was
8 to be reemployed, and I don't think we got an
9 answer to that question. We jumped ahead.
10   MR. KLAYMAN: I'll ask it again.
11   CHAIRMAN FITCH: We jumped ahead to LA.
12 BY MR. KLAYMAN:
13   Q. You told me earlier your goal was to
14 get out of the presence -- I'll go through it
15 again -- get out of the presence of the alleged
16 harasser, Falahati, and be transferred to Los
17 Angeles, because you like Los Angeles a lot more
18 than Washington, D.C., you had spent many years
19 there, had family there, et cetera.
20      You did say that to me during that
21 dinner, right?
22   A. Yes.

Page 336

1   Q. And we really didn't discuss at that
2 dinner whether you could get damages for what had
3 happened to you?
4      The goal was to go back to LA and work
5 for Persia News Network, for Voice of America
6 there?
7   A. Yes.
8   Q. And I later met with you and we went
9 through a lot more detail, correct?
10   A. Correct.
11   Q. And at that time I agreed to try to
12 help you, and I told you that I wasn't going to
13 charge you for my legal services, that it was
14 being offered in friendship.
15   A. Could you repeat yourself?
16   Q. When we met I told you that I would try
17 to help you, that I wasn't going to charge you for
18 my legal services because it was offered in
19 friendship.
20   A. Yes, you said that.
21   Q. You had told me in the course of the
22 conversations that you were working with the

</div>

20 (Pages 333 to 336)

App.0238

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 337

1  president of the union, your representative, Tim
2  Shamble, at VOA, before you met with me?
3      A.  Yes.
4      CHAIRMAN FITCH:  Now we're talking
5  right at this point about the meeting, subsequent
6  meeting?
7      MR. KLAYMAN:  Yes.
8      CHAIRMAN FITCH:  Ok.
9  BY MR. KLAYMAN:
10     Q.  And that I should contact Mr. Shamble.
11 You told me to contact him?
12     A.  Yes.
13     Q.  And you're aware that I did contact
14 him, correct?
15     A.  Yes.
16     Q.  And we later had meetings with Mr.
17 Shamble?
18     A.  Yes.
19     Q.  And during those meetings, Mr. Shamble
20 explained how difficult it is to try to get Voice
21 of America to do anything that's positive for an
22 employee.

Page 338

1      Do you remember that?
2      A.  Yes.
3      Q.  That he said it's the worst -- it's
4  been ranked the worst agency in Washington, D.C.
5  by the General Accounting Office?
6      A.  Yes.
7      Q.  But that we would try to negotiate your
8  move from Voice of America in Washington, D.C. to
9  Los Angeles?
10     A.  Yes.
11     Q.  You're aware that we then sought to
12 negotiate that move, Mr. Shamble and I?
13     A.  Yes.
14     Q.  And we held some meetings with the
15 general counsel of Voice of America, someone named
16 Elmer Dorsey and other people to try to resolve it
17 amicably?
18     Do you remember that?
19     A.  Yes.
20     Q.  Now around that time, you were going to
21 take some leave, were you not, some vacation time
22 I believe.  Correct my if I'm wrong --

Page 339

1      A.  Yes.
2      Q.  To go to Los Angeles, correct?
3      A.  Yes.
4      CHAIRMAN FITCH:  When one says, "around
5  that time," can we pin it down to a month?
6      MR. KLAYMAN:  Early 2009.
7      CHAIRMAN FITCH:  Or season.  Ok.
8  BY MR. KLAYMAN:
9      Q.  Correct?
10     A.  No.  Not early 2009.  Early 2010.
11     MR. KLAYMAN:  Excuse me, I'm sorry.
12     CHAIRMAN FITCH:  That sounds right.
13     MR. KLAYMAN:  That was my mistake.
14 BY MR. KLAYMAN:
15     Q.  And you told Susan Jackson, who was one
16 of your supervisors, that you were going to LA for
17 personal reasons to see someone that you had a
18 love interest in, correct?
19     A.  No.
20     Q.  She's claimed that, though, hasn't
21 she?
22     A.  She has.  You said she has.  I don't

Page 340

1  know.
2      Q.  Well, we're going to go through some
3  documents later.
4      A.  Ok.
5      Q.  I just want to get this out.
6      And during that time --
7      A.  But, even if that's the case, on my
8  free time, on my leave, vacation, I go to see
9  whomever.  Why is that any business of Susan
10 Jackson or anybody at VOA?
11     CHAIRMAN FITCH:  I think, Ms. Sataki,
12 think more carefully about the question he asks
13 and then answer that question rather than making
14 additional observations.
15     If Mr. Smith wants to bring out
16 additional observations, he'll do so when it's his
17 turn.
18     THE WITNESS:  Yes, sir.
19     CHAIRMAN FITCH:  Again.
20     And we'll strike that observation.
21 BY MR. KLAYMAN:
22     Q.  And during that time period, you're

21 (Pages 337 to 340)

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 341

1 aware that I had submitted documentation, Mr.
2 Shamble and I, to Voice of America, before you
3 went to Los Angeles on your leave, arguing that
4 you should be transferred there, correct?
5     A.  Yes.
6     Q.  And the reason was, primarily, that you
7 wanted to be out of the presence of the alleged
8 harasser, Mehdi Falahati.
9     A.  Yes.
10    Q.  You also could function doing your job
11 in Los Angeles.
12    A.  Yes.
13    Q.  In fact, you had maintained that Susan
14 Jackson and others at VOA had already told you,
15 even before this alleged harassment, that you
16 could go there periodically to do packages in the
17 LA office --
18    A.  Yes.
19    Q.  -- of PNN?
20    A.  Yes.
21    Q.  You are aware that they were making
22 allegations at the time, as well, that you didn't

Page 342

1 have the capability to do those packages on your
2 own.
3       Do you remember that?
4     A.  After we complained that that was
5 their -- yeah.  That's what they started, yes.
6     Q.  And they maintained that the person who
7 was helping you do those packets was someone by
8 the name of Kaveh, K-a-v-e-h, correct?
9     A.  Correct.
10    Q.  Kaveh worked at Voice of America?
11    A.  Correct.
12    Q.  What was his position?
13    A.  At the time he was just like me.  He
14 was making packages, doing packages, reporting,
15 cameraman, editor.
16    Q.  Now you actually were living with Kaveh
17 then in Roslyn, Virginia here, correct?
18    A.  Correct.
19    Q.  And at the time that you told me this,
20 I said, "This is not a good situation because
21 you're claiming that a coworker came on to you and
22 harassed you, and you're also living with a

Page 343

1 coworker," correct?
2     A.  I don't remember that, that you said
3 that.
4     Q.  I said, "I don't think that's good for
5 it ever came out," correct?
6     A.  Say that again.
7     Q.  Do you remember that?
8     A.  That you said it's good if everything
9 came out?
10    Q.  No, I said, "This could be a problem if
11 it comes out that you're living with Kaveh."  You
12 asked me to keep it secret, do you remember?
13    A.  It was -- yes.
14    Q.  And during the time that you were in
15 Los Angeles, I got a response from Voice of
16 America with regard to Mr. Shamble and my request
17 to have you transferred there, correct?
18    A.  Yes.
19    Q.  That response was very, very negative.
20 Do you remember that?
21    A.  Yes.
22    Q.  But it did offer you -- they said,

Page 344

1 "We're not transferring you to Los Angeles, but
2 you may work in the Central News Bureau and we'll
3 keep you away in the building from Mr. Falahati."
4       Do you remember that?
5     A.  Keeping you what?
6     Q.  "We'll separate you from Mr. Falahati,
7 and we'll have you work, we'll transfer you" --
8 this was their proposal -- "to another section of
9 Voice of America, which is called the Central News
10 Bureau, which broadcasts to Middle Eastern, Arabic
11 countries"?
12    A.  Yes, which is on the same floor and
13 same hallway, exactly same area.
14    Q.  They also said, "We'll make sure that
15 Mr. Falahati doesn't harass you again, as you've
16 alleged"?
17    A.  Yes.
18    Q.  And you didn't find that acceptable,
19 did you?
20    A.  We together, you as my attorney and me,
21 we didn't find that acceptable.  You were advising
22 me through the whole thing.

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 345

1    Q.   You told me --
2    A.   And I was listening to you.
3    Q.   You told me, Ms. Sataki, you told me
4    that, "They broadcast in English and Arabic, and I
5    don't speak Arabic, that my English is not that
6    good.  And that, in any event, I don't have any
7    interest in Arabic countries.  I'm a Persian.  I'm
8    not an Arab."
9         You told me that?
10   A.   I don't recall that, but --
11   Q.   It makes sense though, right?
12   A.   I don't recall that.  Because Persia --
13   the Central News is in English only.  I don't know
14   why you would bring up the Arabic part of it.
15   Q.   But your English is not that good, is
16   it, and that's why you had people write complaints
17   for you?
18   A.   Yes, my English is not that good.  But
19   I was not hired by the Central News English side.
20   I was hired by the Persia News Network, which is
21   on the Farsi side.
22   Q.   The bottom line is you didn't want to

Page 346

1    work in that bureau, not just because Falahati was
2    in that area, but because that was not a country
3    that was your major interest, which was Iran?
4    A.   And I told you at that time that
5    they're trying to get me in trouble and retaliate,
6    because if they put me there and I can't do the
7    assignment that they want me to do, then they're
8    going to fire me.
9    Q.   You thought you were being set up, in
10   effect?
11   A.   Exactly, and I explained that to you
12   and you agreed with me.
13   Q.   But then you told me, "Larry, get me
14   back to LA," right?  "Get me to LA."
15   A.   I said, "Either back to my desk or LA.
16   I don't want to be at Central News.  Either to my
17   old position, to my desk, or LA."
18   Q.   And I tried that and Mr. Shamble and
19   VOA said, "No.  Here's the choice: work in Central
20   News Bureau, or, you know, you're not going to be
21   working at all," correct?
22   A.   Correct.

Page 347

1    Q.   And VOA in effect threatened you?
2    They said, "If you don't show up at a certain time
3    at the Central News Bureau, we're going to cut off
4    your salary, we're going to cut off your leave,
5    and we're going to do all that stuff."
6    A.   Yes.
7    Q.   Now, this upset -- you were in LA at
8    the time you found this out.  You were there on
9    leave, correct?
10   A.   Yes.
11   Q.   And I was there, too, at the time,
12   correct?
13   A.   Yes.
14   Q.   And at that point you got very, very
15   emotional and started crying uncontrollably.  Do
16   you remember that?
17   A.   Yes.
18   Q.   And shaking -- and shaking?
19   A.   Shaking, crying, yes.  I was shaking
20   and crying all day long, every day.  To everybody,
21   not only you, everybody, because I was depressed
22   at that time.  Not only you, everyone.

Page 348

1    Q.   I didn't ask you whether you told other
2    people.  I just asked you if you told me, and I
3    actually observed you in that state, correct?
4    A.   Yeah, because you were the one who told
5    me the news, that this is what's going on.
6    Q.   Yeah.
7    A.   So, of course, that was my first
8    reaction.
9    Q.   And I thought -- and I suggested at the
10   time that you go see a psychologist.  Do you
11   remember?
12   A.   Yes.
13   Q.   And I took you to two psychologists.
14   Do you remember that?
15   A.   Yes.
16   Q.   One had been recommended to me by my
17   Persian friend, Ben Kersangi (phon), remember, the
18   first one?
19   A.   I don't remember the details.  I just
20   remember you helped me to find two
21   psychologists -- one psychologist, one
22   psychiatrist, and I started seeing them.  Yes,

23 (Pages 345 to 348)

In The Matter Of:  Larry E. Klayman
May 31, 2018

---

Page 349

1    sir.
2         Q.   And we decided not to use -- you
3    decided not to use that psychologist, and then I
4    found the name of another psychologist through a
5    former client of mine, Alice Elise.
6         Do you remember that?
7         A.   I don't remember.
8         Q.   You did meet Alice, though?  You
9    remember her?
10        A.   I remember my two -- at that point I
11   was very sick, so, I remember that I saw a few
12   doctors, yes.
13        Q.   Yes.  And I took you to see -- I got
14   the name of a psychologist from Alice, you
15   remember that, and then that psychologist, because
16   she was representing Alice -- because Alice had
17   been a sexual harassment victim, as well, I had
18   represented her -- represented that someone else
19   could perhaps help, you and that person was Arlene
20   Aviera.
21        Do you remember that?
22        A.   Yes.

---

Page 350

1         Q.   And then I took you to Arlene Aviera?
2         A.   Yes.
3         Q.   I believe that we sat down with Arlene,
4    we'll call her Arlene, and you explained your
5    situation and started crying and sobbing again?
6         A.   Yes.
7         Q.   You remember that?
8         A.   Yes.
9         Q.   And I asked Arlene in front of you,
10   "Can you please help Elham."
11        Do you remember that?
12        A.   Yes.
13        Q.   And I said, "If she can't pay the fees,
14   Dr. Aviera, don't worry about it, I'll pay them."
15        A.   Yes.
16        Q.   You then began to see Dr. Aviera?
17        A.   I'm sorry, what?
18        Q.   You then set up a schedule to be
19   counseled by Dr. Aviera?
20        A.   Yes.
21        Q.   And I was not present during those
22   counseling sessions.  That was with you and Dr.

---

Page 351

1    Aviera?
2         A.   You "were" present or "not present"?
3         Q.   Not.
4         A.   Not, yes.
5         Q.   And in and around this time period we
6    had discussions with Tim Shamble, your union
7    represent, president for the AFL-CIO, Voice of
8    America, as to what we now could do to get you
9    back to work in Los Angeles at the Persia News
10   Network.
11        A.   Yes.
12        Q.   And we decided that, if we could show
13   that you had a medical reason why you had to be in
14   Los Angeles, that we could qualify for a
15   reasonable medical accommodation move to Los
16   Angeles.
17        A.   Yes.
18        Q.   And therefore we submitted
19   documentation from Dr. Aviera, from the prior
20   psychologist that you saw, and also from a doctor
21   named Long, an internist, to Voice of America with
22   various documentation arguing that you needed to

---

Page 352

1    be in Los Angeles because those were where your
2    physicians were, that's where your family was,
3    that's where your friends were, and besides, you
4    could do your work out of the Persia News Network
5    on Wilshire Boulevard at the federal building,
6    which was run by Voice of America.
7         Do you remember that?
8         A.   Yes.
9         Q.   One of the reasons why there is a
10   Persia News Network division in Los Angeles is
11   because Los Angeles has a very big Persian
12   population, correct?
13        A.   Correct.
14        Q.   You're aware of that, there's over one
15   million Persians, or Iranians, however you want to
16   say it?
17        A.   Yes.
18        Q.   Los Angeles.  And sometimes people joke
19   about it, they call Los Angeles "Tehrangeles"
20   rather than Los Angeles, because it's so heavily
21   populated.
22        A.   Correct.

---

In The Matter Of: Larry E. Klayman
May 31, 2018

---

Page 353

1    Q.  In fact, in Beverly Hills, California,
2  where I had my office at the time, is generally
3  highly populated, the stores and everything else,
4  with Persians who are very industrious and run
5  those stores, and own those stores?
6      You're aware of that?
7    A.  Yes.
8    Q.  You know the famous men's haberdashery
9  Bijan on Rodeo Drive, very famous, owned by
10 Mr. Bijan.
11   A.  Yes, I know that.
12   Q.  Did you ever work for him?
13   A.  No.
14   Q.  Did you ever ask to work for him?
15   A.  Did what?
16   Q.  Did you ever ask for a job there?
17   A.  Briefly we talked once when I was
18 living there and I went by his boutique and he was
19 standing outside his boutique.
20   Q.  Was that before or after I represented
21 you?
22   A.  Way before.

---

Page 354

1    Q.  Ok.  But you did work for a clothing
2  store out there, didn't you, at one time?
3    A.  Not clothing store.
4    Q.  Not Bijan but a different clothing
5  store.
6    A.  Not clothing store.  I was working for
7  Hermes perfume.
8    Q.  Hermes, H-e-r-m-e-s?
9    A.  Yes.
10   Q.  We tried for a reasonable medical
11 accommodation and we submitted all this
12 documentation, correct?
13   A.  Yes.
14   Q.  And we got sworn affidavits from Dr.
15 Aviera and the others as to your medical
16 condition?
17   A.  And Dr. Long, yes.
18   Q.  Yes.  We said that, you know, you also
19 needed to be there because, you know, you were
20 having a nervous breakdown, you had a bleeding
21 ulcer before when you were criticized unfairly at
22 Voice of America in Washington, that this was

---

Page 355

1  compounding that bleeding ulcer and that you were
2  on the verge of even thinking about killing
3  yourself.  Or it could happen.
4      Do you remember that?
5    A.  I had bleeding ulcer.  I wasn't going
6  to kill myself.  I ended up in the hospital
7  because of bleeding ulcer.
8    Q.  Ok, but you previously testified that,
9  you know, you felt that way after you were
10 harassed at Voice of America.
11     Do you remember that?
12   A.  When I had bleeding ulcer?
13   Q.  No.  The bleeding ulcer -- well, let's
14 back up.
15     The bleeding ulcer you claim resulted
16 from unfair criticism of you by Susan Jackson and
17 others at Voice of America --
18   A.  Joy Wagner, that day.  Yes, she yelled
19 at me.
20   Q.  Right.
21   A.  And she came and apologized later.
22     But --

---

Page 356

1    Q.  Go ahead.
2    A.  -- yes, the bleeding ulcer was because
3  of the way I was treated at VOA unfairly, yes.
4    Q.  You Joy Wagner was criticizing your
5  work?
6    A.  Not criticizing.  She accused me of
7  something that later on she came and apologized
8  because she realized that it was accusations and
9  not true.
10   Q.  At the time she criticized your work
11 and said somebody else is doing the packages --
12   A.  Yes.
13   Q.  -- that it was Kaveh, that your Farsi
14 is not very good, it's not literal.
15     Do you remember that?
16   A.  Yes.
17   Q.  And that, "You have to work harder.
18 You just can't get by on the fact that you're
19 beautiful."
20     Do you remember she said that, too?
21   A.  She said that to me?
22     (Mr. Klayman nods head in the

---

25  (Pages 353 to 356)

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 357

1 affirmative.)
2     A.  Ok.
3     Q.  So all of these things together --
4     CHAIRMAN FITCH:  Is that answer a "yes"
5 or is that answer "I don't remember"?
6     THE WITNESS:  She said to me,
7 "Beautiful girls always have to work harder to
8 prove themself, so other people don't think that
9 they're in front of the camera because of their
10 face."
11 BY MR. KLAYMAN:
12     Q.  All of these things together, that
13 created the bleeding ulcer, you claim, correct?
14 Because you take things to heart.
15     A.  Yes.
16     Q.  And during this time period when you
17 were telling me all of this, it was clear to you
18 that I was sympathizing with you and wanted to
19 help you?
20     A.  Yes.
21     Q.  You ultimately, even after we
22 resubmitted all of this stuff that I'm talking

Page 358

1 about -- the medical statements and affidavits and
2 this and that -- they denied again you're being
3 transferred to LA?
4     A.  Yes.
5     Q.  And you told me, "Larry, I can't go
6 back there.  I'll kill myself if I go back there."
7     You said that, didn't you?
8     A.  I don't remember.  Maybe I said it.  I
9 don't remember.
10     Q.  And at that point I said to you,
11 "Ellie, I'll do whatever I can to help you, and
12 I've had a lot of experience dealing with
13 government agencies.  I've been a lawyer for so
14 many years.  I'll do my best, but I can't
15 guarantee any result, but it seems to me you have
16 a strong case."
17     A.  And you said, "I'm going to transfer
18 you within two weeks to LA."  I remember the
19 week -- exactly "two weeks," you said that.
20     Q.  Ok.
21     A.  You said, "That's going to be easy."
22     Q.  But you didn't --

Page 359

1     A.  "You have a case," you said.
2     Q.  Whether or not that's true or not,
3 which I refute, and I'll testify later, but --
4     MR. SMITH:  Objection, argumentative.
5 BY MR. KLAYMAN:
6     Q.  Whether or not that's true or not --
7     CHAIRMAN FITCH:  It's an understandable
8 situation when lawyer and Respondent are the same,
9 and I think Mr. Klayman has tread a pretty good
10 line so far.  He may have overstepped there a
11 little bit, but the war will go on.
12 BY MR. KLAYMAN:
13     Q.  So, you said to me, "I can't go back
14 there, Larry, you know.  It'll destroy me."
15 Correct?
16     A.  Correct.
17     Q.  And at that point you said to me, "I'd
18 like to get an apartment here and live here.  I
19 have nothing.  My family is not helping me.  Can
20 you help me get an apartment?"
21     A.  No, not correct.
22     Q.  In fact, you told me where you wanted

Page 360

1 to live.  You wanted to live in the valley, San
2 Fernando Valley, on Ventura Boulevard.
3     Remember you said, "That's where I want
4 to live and I lived there before in Sherman Oaks
5 and I loved that area and want" --
6     A.  You jumped ahead a little bit.  Can we
7 go back?
8     Q.  I ask the questions.  I'm going to --
9     CHAIRMAN FITCH:  No, that's a perfectly
10 fair point.  I take the answer to be that in the
11 period being discussed, immediately following the
12 VOA decision, that the witness believes that that
13 particular conversation did not take place at that
14 point in time.
15     MR. KLAYMAN:  Ok, well, I'll try to put
16 it in context.
17 BY MR. KLAYMAN:
18     Q.  At the time you were in LA you were
19 staying with your friend Nella (phon)?
20     A.  Yes.
21     Q.  And her husband Abdy?
22     A.  Yes.

26 (Pages 357 to 360)

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 361 | Page 363 |
|---|---|

**Page 361**

1  Q. Nella is not Persian, Abdy is. Nella
2  is Hispanic?
3  A. She's Filipino.
4  Q. Filipino, ok.
5  And therefore you needed a place to
6  stay. You couldn't stay there forever?
7  A. Not forever. They were my friends. I
8  could stay there temporarily. Not forever.
9  Q. So you told me you'd like to live in
10 the valley, in Sherman Oaks, and you told me, "I
11 like this apartment. I've seen it in Sherman Oaks
12 on Ventura Boulevard."
13 A. That is after you told me that, "We can
14 transfer you to LA," and I said, "I have an
15 apartment in DC. I have to live there. If I'm
16 not living there, I can't stay with Nella. I have
17 to get my own place and I cannot afford my own
18 place in LA now, because I don't know what's
19 happening with the paycheck, if I don't go back to
20 my work in DC."
21 Q. But you told me that you could never go
22 back there, that it would destroy you.

**Page 362**

1  You just testified to that, correct?
2  A. Yes, but if I had no choice, I had to
3  go back. I needed to have a job.
4  But you said that, "No, we can transfer
5  you to LA. I know what I'm doing. I'm setting up
6  your doctors, and once you are seeing your doctors
7  here in LA, they're going to have to agree that
8  you go see your doctors while you're working in
9  LA."
10 You explained that to me, how the legal
11 way works, and that's why you set up all my
12 doctors in LA, not in Washington, D.C.
13 Q. You know that I was working very hard
14 for you. You know that?
15 A. Yes.
16 Q. Ok. And I didn't ask you to pay me,
17 correct?
18 A. Correct.
19 Q. And I then said, you know, "If you
20 really want that apartment there, Ellie, I'll try
21 to get the apartment for you, so you can stay here
22 and you don't have to be back in DC."

**Page 363**

1  A. It wasn't that I -- "You really want
2  the apartment?"
3  We talked about that, after you said,
4  "I can get you transferred to LA, now that you
5  have your doctors set up in LA, so let's move you
6  to LA."
7  I told you that I can't afford moving
8  to LA because I don't have money. You said,
9  "Ellie, I'll help you."
10 I had an apartment at that time in DC,
11 which I had commitment. I couldn't just get up
12 and leave. I had to give them notice in DC. So I
13 couldn't just do it overnight, all of that. I
14 explained all that to you, Mr. Klayman.
15 So, it was a strategy that we both were
16 going forward, you as my attorney, and me as a
17 client, that how this strategy is working is for
18 me being setting up with the doctors in LA and
19 then move to LA.
20 So, when all that happened, I found an
21 apartment that it was brand new and you don't pay
22 two months of rent and pay four months, and you

**Page 364**

1  get two months free, something like that. And I
2  explained that to you, there is such a thing.
3  It's a good deal.
4  Q. And that's where you wanted to be,
5  because a lot of Persians live around that area,
6  particularly Muslims --
7  A. No, sir. It was because that apartment
8  was two months free apartment.
9  Q. Isn't it true, just as a general rule,
10 that you felt very comfortable there because that
11 was the Persian community generally in the valley
12 that was of Muslim decent and the Persian
13 community in Beverly Hills is of Jewish decent?
14 A. The Persian community in LA is big.
15 Q. Yeah.
16 A. And for me -- Muslim, Jewish,
17 Christian -- there is no difference between that
18 for me.
19 Q. Ok. But I'm saying, you felt
20 comfortable there?
21 A. I'm comfortable anywhere in LA.
22 If we had the same deal on Westwood or

27 (Pages 361 to 364)

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 365

1  Beverly Hills or Santa Monica, anywhere, we could
2  have got that deal.
3       So, the only reason was because it was
4  a good deal for that apartment.  They were
5  offering two months free rent.
6       Q.  And I then leased that for you because
7  you had no credit, correct?
8       A.  Correct.
9       Q.  And I paid the four months advanced
10 rent and got you six months?
11      A.  Correct.
12      Q.  That was a two-bedroom apartment,
13 correct?
14      A.  Correct.
15      Q.  So, it's something that you wanted,
16 that apartment, correct, so you could have your
17 family and friends there, correct?
18      A.  The two-bedroom and one-bedroom, the
19 price was so close, but at that time -- I don't
20 remember exactly, but we said, "Ok, we get this."
21      Q.  But you wanted a two-bedroom and we got
22 that?

Page 366

1       A.  Ok, we got that.
2       Q.  Ok.
3       A.  Yes.
4       Q.  And in fact you got the keys.  I never
5  got the set of keys?
6       A.  Absolutely not.  Of course.  That was
7  given.
8       Q.  And I didn't ask you for the keys, did
9  I?
10      A.  No.
11      Q.  Now, around that time period, we
12 realized that we had to do something stronger than
13 just be sending documentation in and asking for
14 them to be reasonable, correct?
15      A.  Correct.
16      Q.  Because, as Tim Shamble was saying,
17 these people are not reasonable.  They mistreat
18 their employees.  He's the union rep.
19      CHAIRMAN FITCH:  Do you recall what was
20 the first month of the lease on the apartment?
21      THE WITNESS:  I think it was April, if
22 I'm not mistaken.

Page 367

1       CHAIRMAN FITCH:  Fair enough.  Thank
2  you.
3       MR. KLAYMAN:  I'm going to introduce
4  something later.
5       CHAIRMAN FITCH:  I asked her.  That's
6  all.
7       MR. KLAYMAN:  No, it's fine, your
8  Honor, I'm glad you did.  But I'm just trying to
9  get the thing to flow here, then we'll go back.
10 BY MR. KLAYMAN:
11      Q.  One of the reasons, by the way, that
12 Voice of America didn't want to transfer you it
13 was believed is because a lot of people in the
14 Persia News Network in Washington wanted to be
15 transferred to LA, because of the weather and
16 because there's a nice Persian community there.
17      So, that was one of the reasons that
18 they denied you, because they said, "Well, we
19 can't set a precedent to send Elham Sataki there
20 when all these other people want to go there,
21 too."
22      A.  That is why you set up my doctors

Page 368

1  there, so we have a reason for why I have to be
2  transferred.
3       Q.  But you were aware of Voice of
4  America's general resistance to transfer people to
5  LA, generally, correct?
6       A.  No, not aware of it.
7       Because the manager, the editing
8  manager asked me to write a proposal, and I did,
9  and that proposal, they were looking at it and
10 they were considering it actually at the time.  It
11 wasn't approved, but they were looking at it to
12 see maybe.
13      And also that maybe if, not
14 transferring me, but me going back and forth and
15 spending more time in LA and doing interviews and
16 come back to DC.
17      There was a talk about all that.
18      Q.  Right.  But, going back to Mr. Shamble,
19 he said this is -- frankly he had told us in the
20 beginning that they're difficult?
21      A.  Yes, that they are difficult.  Yes.
22      Q.  They're difficult and it's hard to

28  (Pages 365 to 368)

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 369

1 reason with them.
2 So you were aware of that all this
3 time, correct?
4 A. Yes. Yes.
5 Q. At that point, you know, we sat down
6 and discussed legal strategy with Mr. Shamble and
7 you and me, correct?
8 A. Correct.
9 Q. And we decided that we have to file
10 some lawsuits, correct?
11 A. Correct.
12 Q. And you were aware at around that time
13 also that during the meetings that I had to try to
14 settle this case that they were very contentious,
15 that Tim Shamble was there, as well, but they were
16 very contentious from Voice of America's
17 perspective, kind of nasty, correct?
18 A. Correct.
19 Q. Was it not a positive to have you get
20 an apartment in LA and not go back and live with
21 Kaveh because Kaveh was one of your coworkers and
22 you were claiming that you were sexually harassed

Page 370

1 by a coworker?
2 I did say that to you, did I not?
3 A. I didn't see your reason.
4 I mean, people can be working together
5 and be roommates. There's no problem in that, and
6 if my co-anchor sexually harassed me, it had
7 nothing to do with Kaveh that I was roommate with.
8 I don't see why there is a problem there.
9 I didn't agree with you then either.
10 Q. I wasn't talking about what my
11 perception would be but that they would perhaps
12 try to use that against you when discovery started
13 to occur in the litigation. Because they would
14 find out.
15 A. Well, at the same time I told you that
16 you can use it against them that Kaveh was witness
17 to all the phone calls and everything that he was
18 doing. So, we could use Kaveh as the witness,
19 because he was my roommate, and Kaveh agreed to be
20 the witness.
21 So, we could use it in our benefit, and
22 I told you that at the time.

Page 371

1 Q. Ms. Sataki, and I don't mean this to be
2 abrasive. It's hard for me now because I'm a
3 lawyer and Respondent, in effect, defendant, but
4 it was also known in the Persian community, was it
5 not, that you had had an affair with someone by
6 the name of ia of NITV in Los Angeles when you
7 were a broadcaster there.
8 A. It wasn't known by Persian TV -- I mean
9 by Persian community. It was something that was
10 said, but it was not true and it was proven
11 it was not true.
12 Q. And it was out there, correct?
13 A. It was -- it came out there because I
14 got an interview with the prince of Iran and
15 someone said, "She slept with this person. That's
16 how she got the interview."
17 But then we -- my boyfriend at the time
18 came. We went -- and everything was clarified,
19 and the person who said it took it back and
20 apologized.
21 Q. But in fact, you got into a fight --
22 CHAIRMAN FITCH: What's the relevance

Page 372

1 --
2 MR. KLAYMAN: Because --
3 CHAIRMAN FITCH: -- of this discussion
4 about formulating legal strategy and maybe moving
5 toward a lawsuit?
6 MR. KLAYMAN: Perception of -- let me
7 ask this question to clear it up.
8 BY MR. KLAYMAN:
9 Q. If that was true, and I'm not saying it
10 was or it wasn't, that would have been another
11 relationship with a coworker --
12 A. No.
13 Q. -- having a relationship --
14 A. It's not true.
15 Q. -- with ia, the owner of NITV?
16 A. It's not true.
17 And I had proof of it. I had people.
18 I had my boss. Everybody. That was not true,
19 definitely not true.
20 And that was completely behind me.
21 Everything was resolved. I had witnesses. And
22 the person who said it took it back.

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 373 | Page 375 |

**Page 373**

1       And my boss at the time, that I was
2 working in Jame Jam, Mr. Bibiyan, he had those
3 people to come and apologize and everything was
4 clarified.
5       I don't know why that is even relevant
6 here. I don't understand it.
7       CHAIRMAN FITCH: I think I've heard
8 everything she could say, even though I was
9 speaking with her.
10       MR. KLAYMAN: Ok.
11 BY MR. KLAYMAN:
12     Q. There was, after that alleged -- or
13 during that alleged affair, the wife of   ia
14 actually keyed your car, do you remember? Or you
15 keyed hers, one or the other?
16       MR. SMITH: Objection, I mean, I think
17 we've gotten the flavor of where this is going and
18 I don't know that there is any relevance going
19 forward other than rumors and innuendo, which she
20 denied.
21       CHAIRMAN FITCH: I think Mr. Klayman
22 has a theory or sub-theory that he thought he

**Page 374**

1 advised Ms. Sataki that some relationships with
2 VOA employees might be problematic in pursuit of
3 her employment goals.
4       She has denied the existence of one of
5 those relationships and that's where the record
6 stands. I doubt that any further exploration of
7 that will --
8       MR. KLAYMAN: I just have one question.
9       CHAIRMAN FITCH: Sure.
10 BY MR. KLAYMAN:
11     Q. You did have an issue with   ia's wife,
12 correct?
13       CHAIRMAN FITCH: And how does that add
14 onto this?
15       MR. KLAYMAN: I'll ask the next
16 question.
17 BY MR. KLAYMAN:
18     Q. This resulted in court litigation?
19     A. Yes.
20       That's why I said everything was
21 resolved on my behalf. It was proven that what
22 she said was wrong and then in court actually they

**Page 375**

1 gave her -- me a restraining order against her and
2 then later on she said that she never said it.
3 Because I had --
4       When the time that she said that
5 supposedly I had an affair with her husband, my
6 boyfriend was there with me. I was in DC for an
7 interview.
8       CHAIRMAN FITCH: We don't need to --
9       THE WITNESS: So everybody is
10 already -- but Mr. Klayman is going on --
11       CHAIRMAN FITCH: Sir, we have in
12 evidence now --
13       MR. KLAYMAN: Yeah.
14       CHAIRMAN FITCH: -- for our
15 consideration one way or the other, that the
16 matter resulted in litigation and that litigation,
17 according to this witness, absolved her.
18       But we still have the situation of you
19 having concerns, you allege, about relationships
20 and their legal effect.
21       So why don't we move on now.
22       MR. KLAYMAN: Ok. It's with regret

**Page 376**

1 that I had to get into that.
2 BY MR. KLAYMAN:
3     Q. Now, in fact, that was the basis of my
4 counseling you, one of the bases, you know, to --
5 even though you told me that you couldn't go back
6 to DC or it would destroy you, to get an apartment
7 in Los Angeles and to live in Los Angeles and
8 let's try to get you located there, because of the
9 perception that you had relationships with
10 coworkers, that was part of it?
11       MR. SMITH: I don't understand the
12 question. There were a lot of --
13       CHAIRMAN FITCH: I think the question
14 doesn't add anything to the evidence already in
15 the record for our considerations.
16       And I think we're up to the point where
17 the evidence may show, at least the complaining
18 witness agrees, that the apartment was found, a
19 six-month lease was undertaken, with obligations
20 of two free and four months of lease. Maybe the
21 lease was longer, but at least that's what payment
22 was made. And there is information in the record

App.0248

In The Matter Of:  Larry E. Klayman
May 31, 2018

| | Page 377 |
|---|---|

1  as to what was the reason for doing that.

2      I note that the superior court action,

3  according to one of the exhibits, an allegation

4  was filed on March 1, which is obviously before

5  April 1, but maybe that is not a time confusion,

6  or maybe it doesn't make any difference.  But I do

7  note that.

8      MR. KLAYMAN:  Again, I don't like

9  asking these questions, your Honor, but I want to

10  put it in sequence here.  I'm not trying to --

11      CHAIRMAN FITCH:  Ask your question.

12  Move on.

13      MR. KLAYMAN:  -- to beat up on the

14  witness.  I'm trying to get the facts out.

15  BY MR. KLAYMAN:

16      Q.  How many times have you been married?

17      MR. SMITH:  Objection.

18      CHAIRMAN FITCH:  Objection sustained.

19  BY MR. KLAYMAN:

20      Q.  You were married to one guy who, where

21  there's documentation that Mr. Smith submitted,

22  earlier today, new documentation that you came up

| | Page 378 |
|---|---|

1  with late last week, where there's an affidavit of

2  a former husband who claims that a few weeks after

3  you were married, he walked into your dwelling and

4  found you with somebody else in bed.

5      CHAIRMAN FITCH:  Wait a minute.

6      MR. KLAYMAN:  There's documentation in

7  there, your Honor.

8      CHAIRMAN FITCH:  Right, it was

9  admitted.

10      MR. KLAYMAN:  Yes.  Bar Counsel

11  submitted it.

12      CHAIRMAN FITCH:  I don't see --

13      MR. KLAYMAN:  The question --

14      CHAIRMAN FITCH:  -- what it adds to

15  your theory about concerns for legal strategy.

16      MR. KLAYMAN:  One question.

17  BY MR. KLAYMAN:

18      Q.  Was that person  ia?

19      CHAIRMAN FITCH:  Was that person what?

20      THE WITNESS:  No.

21      CHAIRMAN FITCH:  I'm sorry, I didn't

22  hear the question.

| | Page 379 |
|---|---|

1  BY MR. KLAYMAN:

2      Q.  Was the person that your ex-husband

3  said he found you in bed with  ia?

4      A.  There was no person.

5      The ex-husband married me to get the

6  Green Card --

7      CHAIRMAN FITCH:  I still haven't --

8      THE WITNESS:  -- and I --

9      CHAIRMAN FITCH:  I still haven't heard

10  the question.  Was the last word in the question

11  "dead"?

12      MR. KLAYMAN:  No, it was not.

13  BY MR. KLAYMAN:

14      Q.  Was that person that your ex-husband

15  said he found you in bed with, a few weeks after

16  you were married, in your house --

17      A.  He didn't --

18      CHAIRMAN FITCH:  Madam, neither I nor

19  the court reporter can process or type down --

20      THE WITNESS:  I'm sorry.

21      CHAIRMAN FITCH:  More than one at a

22  time.

| | Page 380 |
|---|---|

1      Now, what is the question?  Mr. Klayman

2  has a right to put his question.

3      MR. KLAYMAN:  And they put it into

4  evidence, your Honor, Bar Counsel.

5  BY MR. KLAYMAN:

6      Q.  Was that person that your ex-husband

7  signed a sworn affidavit that's now part of the

8  record, the evidentiary record, that he came home

9  one day and found you in bed with another man, a

10  few weeks after you were married, was that  ia of

11  NITV?

12      A.  No.

13      MR. KLAYMAN:  That's helpful.  I regret

14  I ask these questions.

15  BY MR. KLAYMAN:

16      Q.  So, the bottom line is this, is it not,

17  Ms. Sataki: there was a concern, I mean, it was

18  common knowledge at VOA, whether true or not, that

19  these allegations were out there concerning you?

20      A.  Which means, if you had gone to court,

21  if you would have concentrated on my case, instead

22  of on me and my family and my friends, and we

31  (Pages 377 to 380)

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 381

1  would have gone to court, we could have proved
2  that these documentations are false.
3       CHAIRMAN FITCH:  The only thing I'm
4  interested in, if I may rephrase this question...
5       Did you, at this period of time, it
6  seems to be the spring of 2010, did you have an
7  understanding that there were rumors at VOA that
8  you had romantic affairs with other VOA members,
9  employees.
10       THE WITNESS:  No, I was not worried
11  because I knew that's false.
12       CHAIRMAN FITCH:  I'm sorry?
13       THE WITNESS:  I was not worried about
14  it because I knew it was false.
15       CHAIRMAN FITCH:  I didn't ask you about
16  that.
17       I asked you, if you had an
18  understanding that those rumors were out there.
19       THE WITNESS:  I found out through Mr.
20  Klayman.
21       CHAIRMAN FITCH:  So the answer is yes.
22       Ok.  I think that is admissible,

Page 382

1  whatever it may be worth, in support of his
2  picture that he needs, in his view, to paint about
3  the various strategic difficulties and problems
4  and alternatives.
5       Not that he's charged, I might note,
6  with either incompetence or lack of zealousness,
7  but right now I'd like you just to proceed.
8       MR. KLAYMAN:  No one can ever say I'm
9  not zealous.
10       CHAIRMAN FITCH:  Fair enough.
11  BY MR. KLAYMAN:
12       Q.  Ms. Sataki, before you even applied for
13  a job at VOA, you were working at various Persian
14  news networks in the valley in LA as a
15  commentator, host, announcer, whatever?
16       A.  Yes.
17       Q.  And one of them was NITV, correct?
18       A.  I was working for Jame Jam, not NITV,
19  but some of my tapes was played in NITV studio,
20  yes.
21       Q.  In fact I guess there are tens of
22  Persian networks in Los Angeles, in the valley,

Page 383

1  Persian networks, radio networks, correct?
2       A.  Yes.
3       Q.  And therefore there's a lot of
4  employment opportunity there for someone such as
5  yourself.  In fact you took advantage of it before
6  you went to VOA?
7       A.  Yes.
8       Q.  In fact you promoted that on the
9  application to become a host or to get a job with
10  VOA that you had prior experience being a host and
11  an announcer and a reporter with Persian news
12  networks in Los Angeles?
13       A.  Yes.
14       Q.  Now getting back to our sitting down
15  about writing a complaint --
16       CHAIRMAN FITCH:  That strikes me as a
17  good transition point, and I appreciate you're
18  identifying it.
19       Why don't we take a ten-minute break.
20       MR. KLAYMAN:  Ok.
21       CHAIRMAN FITCH:  We will stand in
22  recess for about ten minutes, beginning here at

Page 384

1  high noon.
2       (Recess taken.)
3       CHAIRMAN FITCH:  We are returning to
4  Mr. Klayman's cross-examination at 12:08.
5  BY MR. KLAYMAN:
6       Q.  I just want to back up with one
7  question.
8       Ms. Sataki, you are aware, are you not,
9  you were aware at the time that when you made your
10  complaint that Mr. Falahati harassed you, and you
11  filed that yourself first, internally, he claimed
12  that you were coming on to him?
13       A.  He claimed what?
14       Q.  He claimed that you were coming on to
15  him, that you had actually made the advances and
16  had an interest in him?
17       A.  I did?
18       Q.  That he did.
19       Well, let me say it again.
20       The first thing that happened before I
21  even entered the scene, when Mr. Shamble was
22  there, is that you had filed a complaint with

App.0250

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 385

1    Voice of America internally with their human
2    resources department against Mr. Falahati.
3        A.  Yes.
4        Q.  You were aware that his response was
5    that you, I'm using slang, s-l-a-n-g, you had come
6    on to him, that you had had an interest in him,
7    not him in you?
8        A.  I don't remember that.
9        Q.  At the time that you filed that
10   administrative complaint -- internal complaint
11   rather, you also were being harassed by your
12   managers, you claimed, correct?
13       A.  Retaliated, yes.
14       Q.  And you were retaliated against, you
15   believed, as you told me, because your family
16   had -- and your dad in particular, had been in the
17   shah's government before you all fled to Sweden?
18       A.  Not because of that.
19           I told you I was retaliated because of
20   my filing the sexual harassment.  But there was in
21   VOA, at that time, it was two groups that was
22   working -- two or three groups that were Persians,

Page 386

1    about two hundred people, working for VOA, with
2    different political views.  And the person, my
3    managing editor, he was more left, and my
4    background from my family, they were more right.
5        So, and that was not only me and him,
6    it was the whole two hundred people, that
7    political view -- people had different political
8    views and it was a lot of fights between all of
9    them.
10
11       Q.  And it just so happened --
12           MR. TIGAR:  Excuse me, just to clarify,
13   when you say "more to the right," you mean those
14   folks would be more likely to support the Shah?
15           THE WITNESS:  Yes.
16           MR. TIGAR:  Alright.
17           THE WITNESS:  So my family more support
18   of the Shah, while the managing editor and the
19   person who wanted to go out with me, they were
20   more left.
21   BY MR. KLAYMAN:
22       Q.  And you were aware, having lived in

Page 387

1    this country for a while -- when did you come to
2    the United States?
3        A.  '99.
4        Q.  And in the course of your duties and
5    responsibilities working for Persian networks in
6    the valley and elsewhere you came to an
7    understanding that conservatives in this country
8    would be more supportive of the Shah, people on
9    the left would have been more supportive of
10   deposing the Shah during the time of Jimmy Carter,
11   our former president?
12       A.  Yes.
13       Q.  You were aware that the lawyer that you
14   asked to represent you is viewed as a conservative
15   activist?
16           MR. TIGAR:  I'm sorry, I didn't hear
17   that.
18   BY MR. KLAYMAN:
19       Q.  I'm sorry, you were aware that, at the
20   time I started helping you, you were aware that
21   Larry Klayman, as viewed in the community, was a
22   conservative, sympathetic to the Shah.

Page 388

1        A.  Ok?
2        Q.  Ok.  So we were both viewed as coming
3    from the right at Voice of America?
4        A.  Ok?
5        Q.  Now the Voice of America has a board of
6    governors.  You're aware of that?
7        A.  Yes.
8        Q.  And sitting on that board of governors
9    are both republicans and democrats.  Are you aware
10   of that?
11       A.  Yes.
12       Q.  And the head of Voice of America, the
13   head of the board of governors at the time, was
14   the Secretary of State of the United States, at
15   the time, Hillary Clinton?
16       A.  Yes.
17       Q.  Now, in fact one of the board of
18   governors at the time was someone named Blanquita
19   Cullum, who was at the time I told you a
20   conservative talk show host, active in republican
21   circles.
22       A.  Yes.

App.0251

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 389

1    Q. And, we'll get to this a little bit
2  later, but actually you're aware I tried to lobby
3  Blanquita to resolve this, peacefully?
4    A. Yes.
5    Q. And Blanquita didn't want to deal with
6  it.
7    A. Yes.
8    Q. And the reason is, and the reason I
9  asks these questions, is that there was this very
10  controversial division in Persia News Network
11  between the pro-shah people and the pro-regime
12  people, correct?
13    A. Correct.
14    Q. And it was perceived by you and by
15  others that were to the right, as you put it, that
16  the news that was being broadcast into Iran at
17  that time, during the Obama administration, was
18  pro regime, favorable to the regime of Ayatollah
19  Khomeini?
20    A. It was -- they were talking about it,
21  yes. It was more because of the people that they
22  hired.

Page 390

1    Q. Right. And the supervisor of Mr.
2  Falahati was someone named Mr. Sajadi. I'm
3  probably not pronouncing it right.
4    A. Yes.
5    Q. Sajadi, S-a-j-a-d-i.
6    A. Yes.
7    Q. And it was known that Mr. Sajadi was
8  one of the people on the left that was in favor of
9  broadcasting pro-Iranian content into Iran?
10    A. Yes.
11    Q. And it was also known that his father
12  at the time was an Ayatollah in Tehran who was an
13  advisor to the supreme leader, Ayatollah Khomeini?
14    A. Yes.
15    Q. And that was a very unusual situation,
16  was it not, in your opinion?
17    A. Yes.
18    Q. Why would Voice of America be
19  broadcasting, from your opinion and of the other
20  broadcasters, propaganda that was to prop up the
21  regime and Tehran, rather than take it down?
22  Correct?

Page 391

1    A. Correct.
2    Q. And you're aware in the course of the
3  time I represented you I also represented some
4  other broadcasters at Voice of America with regard
5  to work place discrimination, particularly over
6  this division of politics, that they felt they
7  were being retaliated against because they were
8  pro-Shah?
9    A. Yes.
10    Q. One of them was a friend of ours, Mr.
11  Chalangi, right?
12    A. Yes.
13    Q. How is that spelled?
14    A. Mr. Chalangi, C-h-a-l-a-n-g-i.
15    Q. So the bottom line -- I use the word
16  "bottom line" meaning the general issue here -- is
17  that there was a lot of politics swirling around
18  Voice of America at the time I was trying to get
19  you back to work in Los Angeles.
20    A. Ok.
21    Q. Yes?
22    A. Yes.

Page 392

1    CHAIRMAN FITCH: What was the -- read
2  me the question. I missed the actual terminology.
3    THE COURT REPORTER: "So the bottom
4  line -- I use the words 'bottom line' meaning the
5  general issue here -- is that there was a lot of
6  politics swirling around Voice of America at the
7  time I was trying to get you back to work in Los
8  Angeles."
9    MR. KLAYMAN: She answered yes.
10    CHAIRMAN FITCH: Yes.
11  BY MR. KLAYMAN:
12    Q. So when we sat down to prepare legal
13  actions, we had to take that into account,
14  correct?
15    A. You're advice was that, correct.
16    Q. Yes, we had to understand the realities
17  of what we were dealing with at Voice of America?
18    A. That was your advice, yes.
19    Q. But you were aware there was this
20  political --
21    A. Everybody were aware of it, yes.
22    Q. So you were aware that the initial

34 (Pages 389 to 392)

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 393

1  complaints that I drafted, that I actually sat
2  down with you, did I not, we met for many hours
3  going through and preparing complaints against
4  both Mr. Falahati and Voice of America aimed at
5  getting you back to work in Los Angeles.
6       A.  Yes.
7       Q.  Now you're aware that when the,
8  complaint that we prepared about Mr. Falahati, you
9  told me that you don't think he has much money,
10  that he wouldn't really be able to pay any damages
11  in the end.
12      A.  Yes.
13      Q.  But you just wanted to do this on
14  principal?
15      A.  Yes.
16      Q.  And I did it for you, correct?
17      A.  Yes.
18      Q.  And I filed it, correct?
19      A.  Yes.
20      Q.  We also prepared with Tim Shamble at
21  the time an administrative complaint with the EEO,
22  an EEO employment complaint.

Page 394

1       You remember that?
2       A.  Yes.
3       Q.  And you were aware that that had to run
4  its course inside EEO before you could then bring
5  a lawsuit in court.
6       In other words, there had to be first
7  an initial determination by EEO, and after that,
8  if it wasn't favorable, then we could bring a
9  lawsuit?
10      A.  Yes, again, I'm no lawyer.  When my
11  lawyer tells me that these are the procedure, I
12  say yes.
13      Q.  So we filed that complaint.
14      A.  Yes.
15      Q.  And Mr. Shamble helped us with that.
16      A.  Yes.
17      Q.  And we also filed a complaint against
18  the board of governors at VOA, and it was for
19  violation of your Constitutional rights of free
20  speech with association, that's First Amendment,
21  you weren't given due process under the Fifth
22  Amendment, and with regard to harassment under the

Page 395

1  Fourth Amendment -- I'm not going to get too
2  technical as a lawyer here.
3       But you're aware that I brought a case
4  for you like that, as a well?
5       A.  Yes.
6       Q.  And at the time I told you that, a lot
7  of what we're doing is tying to force them into a
8  settlement.  We were always trying to force them
9  into a settlement by raising the stakes for them,
10  correct?
11      A.  Yes.
12      Q.  And in addition to that, what could
13  sometimes influence -- what frequently influences
14  the government in this town is publicity, is to
15  get favorable publicity, because people in
16  administrative agencies and judges tend to react
17  to cases that are known and are out there for the
18  public to know about.
19      MR. SMITH:  I object to the form of the
20  question.  He's asking her opinion --
21      CHAIRMAN FITCH:  I understand your
22  objection.  I think it's marginally ok, a little

Page 396

1  discursive.
2       MR. SMITH:  Well, then he needs to lay
3  a foundation as to whether or not she understands
4  about publicity.
5       CHAIRMAN FITCH:  Well, his question is
6  whether she understood that or knew what.
7       MR. SMITH:  That wasn't his question.
8  He asked her if that was true, and I would just
9  ask that he lay a foundation.
10      MR. KLAYMAN:  I object to this speaking
11  objection, your Honor.
12      CHAIRMAN FITCH:  Well, that concern is
13  overruled, because it helps me to think through
14  things.
15      But anyway, I think your question is
16  ok.  You can repeat it, if we want to.
17      MR. KLAYMAN:  Can I have it read back?
18  Let's read it back.
19      THE COURT REPORTER:  "And in addition
20  to that, what could sometimes influence -- what
21  frequently influences the government in this town
22  is publicity, is to get favorable publicity,

35 (Pages 393 to 396)

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 397 | Page 399 |
|---|---|

**Page 397**

1  because people in administrative agencies and
2  judges tend to react to cases that are known and
3  are out there for the public to know about."
4  BY MR. KLAYMAN:
5  Q.  I told you that, right?
6  A.  You told me that and I responded that I
7  don't want it to be --
8  CHAIRMAN FITCH:  Ma'am --
9  THE WITNESS:  Yes?
10  CHAIRMAN FITCH:  I asked did he tell
11  you that.
12  THE WITNESS:  Yes, he told me that.
13  CHAIRMAN FITCH:  You said yes.
14  THE WITNESS:  Yes, he told me that.
15  BY MR. KLAYMAN:
16  Q.  And we talked about that in the
17  presence of Mr. Shamble as well, correct?
18  A.  Correct.
19  Q.  And that we agreed we would get some
20  positive publicity here to try to coerce VOA into
21  a favorable settlement so you could be in LA,
22  correct?

**Page 398**

1  A.  Correct.
2  Q.  And --
3  A.  But I didn't agree to do it.  You
4  explained all this to me.
5  CHAIRMAN FITCH:  Ok, that's his only
6  question.
7  THE WITNESS:  Ok.  Sorry.  I'm sorry.
8  BY MR. KLAYMAN:
9  Q.  You are aware that, and you testified
10  to this yesterday, that I believed that you had
11  agreed to that and I wrote articles that were very
12  favorable to you.
13  You're aware of that?
14  A.  Yes.
15  Q.  And I sent you copies of them at the
16  time.
17  A.  Yes.
18  Q.  Emailed them to you.
19  A.  Yes, you did.
20  Q.  And there's nothing in writing that
21  ever tells me at the time that you didn't want me
22  to do that, correct?

**Page 399**

1  A.  Not correct.
2  Q.  The only time that comes up --
3  CHAIRMAN FITCH:  Wait a minute.  The
4  problem with the question is "at that time" is
5  unclear.
6  Are you talking about before you filed
7  the superior court complaint on March 1, if that's
8  when it was filed?
9  MR. KLAYMAN:  Yes.
10  CHAIRMAN FITCH:  Or are you talking
11  about --
12  MR. KLAYMAN:  Yes, around the time
13  period of these filings of these complaints.
14  CHAIRMAN FITCH:  Ok.  And your
15  question is...
16  BY MR. KLAYMAN:
17  Q.  That I sent you copies of some of the
18  columns I had written that were very favorable to
19  you and you did not tell me that you didn't like
20  them or I shouldn't have done it.
21  CHAIRMAN FITCH:  Well, that's a
22  compound question.

**Page 400**

1  Did he send you copies of some articles
2  that he had written?
3  THE WITNESS:  Yes, he did.
4  CHAIRMAN FITCH:  Ok.  Go ahead.
5  BY MR. KLAYMAN:
6  Q.  At that time you did not tell me,
7  "Don't write any more."
8  A.  I did.
9  Q.  There's nothing in writing that you
10  presented to that effect at that time, did you?
11  A.  We talked to each other.  I explained
12  to you on the phone why I don't want articles out
13  there.
14  Q.  But you are aware that I copied you on
15  an email to Los Angeles Times where I was trying
16  to get an interview for you?
17  You're aware of that, I copied you on
18  that email with Mr. Shamble?
19  A.  I don't remember it, but, yes.  If you
20  say so, then that's correct.
21  Q.  Turn to Exhibit D, in the beginning of
22  your counsel's -- not your counsel's, but Bar

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 401 | |
|---|---|

1   Counsel's -- he's hot really your counsel.
2        CHAIRMAN FITCH:  Exhibit what?
3        MR. KLAYMAN:  Exhibit D, Respondent's
4   Answer to Affirmative Defenses.
5        THE WITNESS:  Do I have it?
6        CHAIRMAN FITCH:  Mr. Klayman is
7   referring to Bar Counsel's book, which is that
8   book over there, the light blue cover (pointing).
9        THE WITNESS:  Yes.
10       CHAIRMAN FITCH:  And he wants you to
11  turn to --
12       MR. KLAYMAN:  Page D as in dog, 23,
13  D-23.
14  BY MR. KLAYMAN:
15       Q.  If you need some help, I can help you.
16       A.  No, that's ok.  Thank you.  D-23?
17       Q.  Mm-hmm.  Do you see that?  That's,
18  "Subject: LA Times," from Larry Klayman, with my
19  Gmail address.
20       A.  I --
21       Q.  D-23.
22       MR. KLAYMAN:  Can I help her, your

| Page 402 | |
|---|---|

1   Honor?
2        CHAIRMAN FITCH:  You may.
3        (Brief pause.)
4   BY MR. KLAYMAN:
5        Q.  Do you see that?  It's an email from
6   me, Larry Klayman, LEKlayman@gmail.com.  That's my
7   email address, right?  "Subject: LA Times," sent
8   June 10th, 2010, to TimShamble@verizon.net, and
9   EllieSataki@yahoo.com, to MahmonirRahimi@gmail.com
10  and to JohnGChalangi@gmail.com.
11       You see that?
12       A.  Yes.
13       Q.  And you see you're copied on it?
14       A.  Yes.
15       Q.  And it says, "Mr. Shamble, please call
16  Paul Richter of LA Times, DC Bureau.  He is the
17  top Iran reporter for the newspaper.  His number
18  is (202) 824-8300 and his email address is
19  PaulRichter@LATimes.com.  If we can get one
20  national story, this can help move things along.
21  Thanks.  Larry."
22       You see that?

| Page 403 | |
|---|---|

1        A.  Yes.
2        Q.  So I was copying you on that, correct?
3        A.  Correct.
4        Q.  And you never sent me back anything
5   saying, "Larry don't do this.  I don't want to
6   have an interview with the LA Times."
7        A.  Correct, I -- correct.
8        Q.  Now, I'm also copying Mahmonir Rahimi.
9   She also was someone, a contractor at Voice of
10  America, at the time, correct?
11       A.  Yes.
12       Q.  And she was having employment
13  difficulties.
14       A.  Yes.
15       Q.  Remember?
16       A.  Yes.
17       Q.  I was trying to help her out with that,
18  too.
19       A.  Yes.
20       Q.  And you're aware I never charging her
21  anything either.
22       A.  Yes.

| Page 404 | |
|---|---|

1        Q.  And the same thing for Mr. Chalangi who
2   was a broadcaster at Voice of America.
3        A.  Yes.
4        Q.  And I was trying to help him out
5   because he was being discriminated against, too,
6   right?
7        A.  Correct.
8        Q.  And you're aware I never charged him
9   anything?
10       A.  Correct.
11       Q.  So I was trying to help all of you,
12  correct?
13       A.  All of us lost our jobs.
14       Q.  Well, that was not my fault.
15       In fact all of those people were viewed
16  to be to the right, pro-Shah, correct?
17       MR. TIGAR:  I'm sorry, I didn't hear
18  the question.
19  BY MR. KLAYMAN:
20       Q.  All those people were viewed by
21  managers at Voice of America as being pro-Shah
22  regime, they were part of that political

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 405 | Page 407 |
|---|---|

**Page 405**

1 controversy.
2      Isn't that correct?
3      A.  Yes.  They can't fire people on their
4 political view.
5      Q.  Now, getting back to these lawsuits
6 that we talked about, one against Mr. Falahati,
7 who you knew did not have any money and could
8 never pay damages in any event, and then we filed
9 a case against the board of governors, naming all
10 of them, including Mrs. Clinton, and other board
11 of governors, including Blanquita Cullum who was
12 my friend, I did it for you, correct?
13      A.  You did it for me?
14      Q.  I was representing you.
15      A.  Unfortunately you're the one asking
16 questions and I have to just only say yes or no --
17      Q.  Right?
18      A.  -- and I can't explain the backgrounds.
19      Q.  You'll have an opportunity with Mr.
20 Smith if he wants to redirect.
21      I actually wound up bringing in a
22 friend of mine, Blanquita Cullum --

**Page 406**

1      A.  Did you get help?  Did you get anywhere
2 with it?
3      Q.  Fortunately I'm not on the witness
4 stand right now.  I will be later if you want to
5 stay.
6      CHAIRMAN FITCH:  Enough dialog.  Let's
7 have a question.
8      MR. KLAYMAN:  Ok.  I'm trying to put a
9 little humor in it.
10      CHAIRMAN FITCH:  I chuckled.
11 BY MR. KLAYMAN:
12      Q.  It's a fact that I really put myself on
13 the line for you because I believed in you.  You
14 knew that I believed in you?
15      A.  You said that several times, yes.
16      Q.  Now, you are aware that I then amended
17 that complaint later to put in -- and I'm just
18 talking technical lawyer language here, to ask for
19 a temporary restraining order and a preliminary
20 injunction from the court, that you go to work in
21 Los Angeles while your EEO case was progressing
22 administratively at Voice of America.

**Page 407**

1      A.  Ok --
2      Q.  Are you aware of that?
3      A.  Yes.
4      Q.  And you may not remember the name of
5 the case, but maybe you do.  The name of the case,
6 it says that the federal court can actually
7 preserve the status quo while an administrative
8 employment action is going through the courts --
9 is going through the agency, it's called Wagner V.
10 Taylor.
11      Do you remember that?
12      A.  No.
13      Q.  Ok.  I then filed a whole bunch of
14 documents -- lawyers call them pleadings -- with
15 the court in that case against the board of
16 governors.  Actually it was case that I filed,
17 separate, to get you back to work in Los Angeles.
18      You remember that?
19      A.  Yes.
20      Q.  And I told you at the time that we had
21 drawn a very difficult judge that I had been in
22 front of in the past.

**Page 408**

1      You remember that?
2      A.  Yes, I remember that.
3      CHAIRMAN FITCH:  I'm sorry, what was
4 the answer?
5      THE WITNESS:  That it was a very
6 difficult judge, and that he had problem with that
7 judge.
8 BY MR. KLAYMAN:
9      Q.  And her name was Colleen
10 Kollar-Kotelly, correct?
11      A.  Correct, I remember that.
12      Q.  And I told you that I had had other
13 cases with her where I had difficulty, right?
14      A.  Yes.
15      Q.  And that what I perceived to be one of
16 the difficulties was, that Judge Kotelly is to the
17 left, far left, and her husband had represented
18 someone in the Monica Lewinsky investigation on
19 behalf of the president, Bill Clinton, and that I
20 had filed many lawsuits against Mr. Clinton during
21 his administration when I was at Judicial Watch.
22      Do you remember that, I told you that?

38 (Pages 405 to 408)

In The Matter Of: Larry E. Klayman
May 31, 2018

---

Page 409

1     A.  Yes.

2     Q.  And I also told you that, you know,

3 there's a possibility she might not like you

4 either, since you're conservative and to the

5 right.

6       Remember I told you that?

7     A.  No, I don't remember that.

8     Q.  Alright.

9     A.  Because I never announced --

10    I'm a reporter.  I never announce my

11 political views for anybody.  So, I can't go in

12 front of a judge and say, "I'm a conservative,"

13 "I'm a" -- I don't do that.

14     Q.  But you're aware that --

15     A.  That's --

16     Q.  You're aware from my background that

17 I've always been nonpartisan.  I've brought cases

18 against Republicans --

19     A.  Yes, but I didn't think that your

20 background was going to make -- be a problem for

21 my case.

22     Q.  But I just told you there was an issue

---

Page 410

1 there that you just acknowledged, correct?

2     A.  Yes.

3     Q.  For that reason, I filed pleadings to

4 try to get the case sent to another judge, Judge

5 John Roberts, who the case had initially been

6 assigned to, but then somehow it got reassigned to

7 Judge Kotelly.

8       You remember that?

9     A.  Yes.

10     Q.  But that request for reassignment was

11 denied by the court, correct?

12     A.  Yes.

13     Q.  Now, that notwithstanding, we tried to

14 do the best we could with Judge Kotelly.  You

15 remember that I filed a lot of different things

16 with her and argued that you should be put back to

17 work to preserve the status quo in Los Angeles.

18       You remember that?

19     A.  Yes.

20     Q.  Now you remember I also told you at the

21 time that I called what then was a friend of mine,

22 a former federal judge -- Stanley Sporkin is his

---

Page 411

1 name, he was not a judge any more, he had retired.

2 He was in private legal practice -- and I asked

3 him, "Judge Sporkin, what would you do under the

4 circumstances?  Would you put her back to work in

5 Los Angeles," and he said --

6     CHAIRMAN FITCH:  Well, we're getting a

7 little compound here.

8 BY MR. KLAYMAN:

9     Q.  You're aware that I raised that I'll --

10     MR. KLAYMAN:  I'll back up.  I'll break

11 it down.  Good suggestion.

12 BY MR. KLAYMAN:

13     Q.  You're aware that I said I called a

14 retired federal judge, a friend of mine, whose

15 name is Stanley Sporkin --

16     CHAIRMAN FITCH:  That's enough right

17 there.

18     MR. KLAYMAN:  Ok.

19     CHAIRMAN FITCH:  Do you recall him

20 telling you that?

21     THE WITNESS:  I don't remember, no.

22

---

Page 412

1 BY MR. KLAYMAN:

2     Q.  Would it refresh your recollection if I

3 was to tell you that Judge Sporkin said that he

4 would have put you back to work.  It was a "chip

5 shot"?

6     A.  I'm sorry, what?

7     Q.  Would it refresh your recollection if I

8 told you that a judge friend of mine said, "I

9 would put Ms. Sataki back in work in LA.  It's

10 easy."

11     A.  During that time you said so many

12 things that, you probably said that, I don't

13 remember.  Because it was -- it was so many things

14 that you were --

15     CHAIRMAN FITCH:  You've answered the

16 question.  You don't remember.

17 BY MR. KLAYMAN:

18     Q.  Now, in submitting the various court

19 documents -- we call them pleadings -- to Judge

20 Kotelly, do you remember that I asked her for a

21 very quick, a very quick decision called a

22 temporary restraining order?  I wanted you to have

---

39 (Pages 409 to 412)

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 413 | Page 415 |
|---|---|

**Page 413**

1 it done quickly?

2     A. I don't remember, but if you say you

3 did, then I'm sure you did.

4     CHAIRMAN FITCH: No, just tell us

5 whether or not you remember.

6     THE WITNESS: Ok, I don't remember.

7 I'm sorry.

8 BY MR. KLAYMAN:

9     Q. You're aware that we prepared a lot of

10 different affidavits and pleadings from Dr.

11 Aviera, from Dr. Long. We submitted stuff from

12 the first psychologist. I prepared a long

13 affidavit with you about what had happened in

14 Voice of America. I prepared a long affidavit

15 with Mr. Tim Shamble, the union rep. We had a

16 sworn affidavit from Mahmonir Rahimi, R-a-h-i-m-i,

17 who we also identified who was asking issues, who

18 said she would testify for you. She did. And we

19 submitted all this stuff to Judge Kotelly.

20     You remember that, because we were

21 working on it together, right?

22     A. Yes.

**Page 414**

1     Q. And in fact you would come over to my

2 office in Los Angeles and we'd work on this stuff?

3     A. Yes.

4     MR. TIGAR: Excuse me. Just so I can

5 get my head around these times --

6     MR. KLAYMAN: Sure.

7     MR. TIGAR: -- at the time of which

8 you're speaking, Ms. Sataki, were you living in

9 Los Angeles.

10     THE WITNESS: Yes.

11     MR. TIGAR: And so the conversations of

12 which you're speaking took place in Los Angeles --

13     MR. KLAYMAN: Right, your Honor.

14     MR. TIGAR: -- concerning the pending

15 case that was in the U.S. District Court in the

16 District of Columbia.

17     MR. KLAYMAN: Yes. As you know I'm a

18 licensed attorney. That's why I'm here.

19     MR. TIGAR: No, no, that's not the

20 question. I was just trying to figure out where

21 everybody was.

22

**Page 415**

1 BY MR. KLAYMAN:

2     Q. So we submitted all this stuff to

3 Kotelly, and you're aware that I asked her for an

4 evidentiary hearing where you could testify and

5 we'd bring everybody else in to testify.

6     Remember?

7     A. Yes.

8     Q. And she wouldn't give us that

9 evidentiary hearing. Do you remember she wouldn't

10 give it to us?

11     A. I don't remember, but --

12     Q. Yeah. And ultimately she made a

13 decision and ruled against you claiming that you

14 were not entitled for reasonable medical

15 accommodation to be back in Los Angeles.

16     Do you remember that?

17     A. Yes.

18     Q. And she accepted everything that VOA

19 said and nothing that you and our witnesses said.

20     CHAIRMAN FITCH: That question is

21 struck.

22     MR. KLAYMAN: Compound?

**Page 416**

1     CHAIRMAN FITCH: That question is

2 struck. The question is struck.

3     MR. KLAYMAN: Ok, I'll rephrase it.

4 BY MR. KLAYMAN:

5     Q. You are aware that Judge Kotelly making

6 that ruling accepted as truth everything that the

7 Voice of America witnesses were saying and did not

8 accept as truth what you were saying?

9     CHAIRMAN FITCH: That question is

10 struck also. She has no idea what Judge Kotelly

11 may have configured to herself.

12     MR. KLAYMAN: I'll lay a foundation.

13 BY MR. KLAYMAN:

14     Q. You did see the opinion of Judge

15 Kotelly, didn't you? I sent it to you, remember.

16     A. You sent so many emails at that time

17 in June, I was completely -- completely -- I can't

18 say I read it, no.

19     MR. TIGAR: Excuse me, counsel, what is

20 the exhibit number of Judge Kotelly's opinion to

21 which you're referring, on anybody's exhibit list?

22     MR. KLAYMAN: There are several. In

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 417 | Page 419 |
|---|---|
| 1 the books of -- | 1 we hadn't won that phase in the case? |
| 2     MR. TIGAR:  No, I'm talking about the | 2     A.  I was upset that we didn't win that |
| 3 one to which you just referred. | 3 phase of the case, yes. |
| 4     MR. KLAYMAN:  I was going to tie that | 4     Q.  Yeah, and in fact you blamed me. |
| 5 back later. | 5     A.  Because you were concentrating on your |
| 6     MR. TIGAR:  You're going to get to it. | 6 love for me instead of the court on a daily basis |
| 7     MR. KLAYMAN:  I was going to go through | 7 and love letters to me.  So I was upset that you |
| 8 it and say you're very clear what the hearing | 8 didn't concentrate on our case enough.  That's why |
| 9 committee should look at.  We'll do it | 9 we lost. |
| 10 systematically. | 10     Q.  You just said you didn't read any |
| 11 BY MR. KLAYMAN: | 11 pleadings, so you don't know how I concentrated or |
| 12     Q.  You are aware that I did send you the | 12 not with the court. |
| 13 decision? | 13     CHAIRMAN FITCH:  That's struck; |
| 14     A.  I don't know.  You probably did. | 14 argumentative. |
| 15     Q.  And -- | 15 BY MR. KLAYMAN: |
| 16     A.  If you say you did, I'm sure you did. | 16     Q.  Now, there's nothing wrong, is there, |
| 17     Q.  And I explained to you -- | 17 Ms. Sataki, for a husband to represent his wife in |
| 18     A.  Because I received so many emails from | 18 a legal proceeding? |
| 19 you at that point during that time, I wasn't | 19     MR. SMITH:  Objection. |
| 20 honestly opening all of them any more. | 20     CHAIRMAN FITCH:  I don't see -- that's |
| 21     Q.  You're aware that I was upset with that | 21 sustained. |
| 22 decision because I felt that you should have had a | 22 |

| Page 418 | Page 420 |
|---|---|
| 1 hearing.  We should have brought the witnesses in | 1 BY MR. KLAYMAN: |
| 2 and had them testify like we're doing, you know, | 2     Q.  There's nothing wrong with caring for |
| 3 now. | 3 somebody, is there? |
| 4     A.  During what date are we talking about | 4     MR. SMITH:  Objection. |
| 5 now?  Would you please tell me. | 5     MR. KLAYMAN:  No, there's nothing -- |
| 6     Q.  When Kotelly made her decision. | 6 that's part of the case, and I object to that |
| 7     A.  Do you remember what date it was? | 7 objection. |
| 8 When was it?  May, June?  When was it?  About what | 8     CHAIRMAN FITCH:  That question is too |
| 9 time? | 9 general. |
| 10     Q.  In June, around there. | 10     THE WITNESS:  The way you cared about |
| 11     A.  Ok. | 11 me -- |
| 12     Q.  Ok. | 12     CHAIRMAN FITCH:  No, question.  There's |
| 13     A.  Ok. | 13 no question. |
| 14     Q.  Yeah. | 14     THE WITNESS:  I'm sorry. |
| 15     CHAIRMAN FITCH:  The only question is, | 15 BY MR. KLAYMAN: |
| 16 did you understand that after Judge Kotelly | 16     Q.  There's nothing wrong in a lawyer |
| 17 entered her ruling that Mr. Klayman was upset? | 17 caring about the wellbeing of his client, is |
| 18     THE WITNESS:  No, I didn't understand | 18 there? |
| 19 how he felt. | 19     CHAIRMAN FITCH:  She can't answer |
| 20 BY MR. KLAYMAN: | 20 questions like that.  Too general, too |
| 21     Q.  Do you remember I actually spoke with | 21 speculative. |
| 22 you at the time and you were upset at me because | 22 |

41  (Pages 417 to 420)

App.0259

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 421

1 BY MR. KLAYMAN:
2    Q.  But it's true you just said you didn't
3 read any of the stuff I sent you because you
4 didn't open it up.
5    A.  I didn't open some of your emails and I
6 opened some.  So I don't know which one -- I
7 couldn't tell now what I opened and what I didn't
8 open.
9    Q.  But you don't remember ever reading the
10 decisions of Judge Kotelly, do you?
11    A.  Yes.  I remember you telling me that,
12 yes.
13    Q.  And do you remember me telling you that
14 she made a number of factual and legal errors,
15 mistakes, in those rulings, over the phone?
16    A.  It's very vague.  I don't remember a
17 whole lot.
18      So, if you say that -- that's
19 probably.  I don't remember details from that.
20    Q.  And you remember my saying that this
21 was just the first phase, it wasn't over, that we
22 hadn't lost the case.  It's just that she didn't

Page 423

1 testimony?
2    A.  Of course I was upset.  Anybody would
3 be.
4    Q.  Ok.
5    A.  I was penniless at that time.  I needed
6 a job.
7    Q.  At that time I had, on your behalf,
8 prepaid rent and gotten you two free months for
9 your apartment at the Serrano on Ventura
10 Boulevard.  You had a place to live.
11    A.  Yes.
12    Q.  And as you testified yesterday I
13 actually paid to have your car sent here, correct?
14    A.  Yes.
15    Q.  That was a red Mercedes?
16    A.  Yes.
17    Q.  And you were also asking me during the
18 course of this time period to help your friend
19 Kaveh out, who needed to file for bankruptcy.
20      Do you remember that?
21    A.  I asked you -- no.  I asked you what I
22 should do, because I didn't file for bankruptcy.

Page 422

1 grant the temporary restraining order and
2 preliminary injunction that puts you back to work.
3      You remember that, right?
4    A.  Yes.
5    Q.  And in fact we had a request in the
6 complaint for a permanent injunction, which means
7 we could go further with more time, get testimony,
8 take discovery, and then revisit this issue later
9 after you being in Los Angeles.
10      Do you remember I said that?
11    A.  Yes.
12    Q.  So we hadn't lost the case, correct?
13 We just didn't win round one, right?
14    A.  I don't know.
15    Q.  But at that time you blamed me and you
16 were very, very upset and angry.
17    A.  Because you have texting, calling and
18 emailing me so much about your love that my case
19 was not important any more.  That's why I was
20 upset with you.
21    Q.  But you were upset at the result in
22 round one also, correct, according to your

Page 424

1 I asked should I do that or not.  I just asked you
2 that.
3    Q.  I'm not talking about you.  I'm talking
4 about -- you had no credit, right.
5    A.  I had no credit, yes.
6    Q.  But Kaveh -- K-a-v-e-h, for the court
7 reporter -- the friend, coworker that you had
8 lived with in Virginia, he was having financial
9 difficulties, and you asked me to find him a
10 lawyer that could do bankruptcy, correct?
11    A.  Correct.
12    Q.  And I did that and I never charged
13 Kaveh for my time, correct?
14    A.  That's something between you and Kaveh.
15 I asked you would you help him.  You said yes, but
16 whatever that is, please don't mix that with me.
17      It was your choice to either have any
18 communication with Kaveh or help him or not.  It
19 had nothing to do with me.
20    Q.  But you asked me --
21    A.  I only asked you do you know anybody,
22 could you refer anybody to him, would you help.

42 (Pages 421 to 424)

In The Matter Of:  Larry E. Klayman
May 31, 2018

|  | Page 425 |
|---|---|

1  You could have said no.
2      Q.  You asked me for a favor to help your
3  friend?
4      A.  No, I didn't ask you for a favor.  I
5  didn't say, "I'm asking you for a favor."  I just
6  said, "This is what's going on.  He needs an
7  attorney.  Can you refer someone or not?"
8      Q.  Didn't you use the phrase frequently,
9  "Will you do me a favor?"  Don't you say that
10 frequently?
11     A.  That you do me a favor?
12     Q.  Me or anybody else.  That's a phrase
13 that you used frequently, "Will you do me a
14 favor?"
15         CHAIRMAN FITCH:  And what's your
16 question about that?
17         MR. KLAYMAN:  That she uses that
18 phrase.
19         THE WITNESS:  Well, I mean, that's just
20 something that I sometimes -- like a lot of people
21 say, "to be honest with you," or "Would you do me
22 a favor?"

|  | Page 426 |
|---|---|

1      That's just something that in
2  conversations you use.
3  BY MR. KLAYMAN:
4      Q.  Right.
5      A.  -- it has nothing to do with --
6      Q.  Well, do I not have a right, when you
7  ask me to do you a favor, to believe that I'm
8  doing you a favor?
9          MR. SMITH:  Objection to what she
10 thinks he has a right to have.
11         CHAIRMAN FITCH:  I'm going to overrule
12 that, out of an abundance of caution.
13         MR. KLAYMAN:  Can you read the question
14 back, please.
15         THE COURT REPORTER:  "Well, do I not
16 have a right, when you ask me to do you a favor,
17 that I believe that I'm doing you a favor?"
18         THE WITNESS:  No, you didn't do me a
19 favor.  I asked you if you know anybody, can you
20 talk to Kaveh, and you did.
21 BY MR. KLAYMAN:
22     Q.  So up to this point in time, Ms.

|  | Page 427 |
|---|---|

1  Sataki, you're very unappreciative of anything
2  that I did for you.
3          CHAIRMAN FITCH:  I'll strike that.
4          THE WITNESS:  No, I was not.  Even in
5  an email --
6          MR. SMITH:  Don't answer that.
7          CHAIRMAN FITCH:  You don't need to
8  answer that.
9  BY MR. KLAYMAN:
10     Q.  Now, during around this time period,
11 you also asked me to go out and buy you a car, did
12 you not?
13     A.  No, I did not.
14         CHAIRMAN FITCH:  Now, we're talking
15 about the post TRO decision.
16         MR. KLAYMAN:  No, leading up to Judge
17 Kotelly's decision while she was in Los Angeles.
18         CHAIRMAN FITCH:  Well, you shifted back
19 in time --
20         MR. KLAYMAN:  Yeah.
21         CHAIRMAN FITCH:  Before you filed the
22 TRO, for example?

|  | Page 428 |
|---|---|

1          MR. KLAYMAN:  In and around that time
2  period.
3          CHAIRMAN FITCH:  Ok, so --
4          MR. KLAYMAN:  In and around that time
5  period and thereafter.
6          CHAIRMAN FITCH:  I'll take a
7  representation from you, counsel, was the U.S.
8  District Court action filed on or about April 2nd?
9          MR. KLAYMAN:  I'll have to look, your
10 Honor.  I'm going to go through it systematically.
11         I'm just trying to get the general
12 narrative out there, then I'll go back.
13         CHAIRMAN FITCH:  What time period are
14 you asking her about now?
15         MR. KLAYMAN:  I'm asking the time she
16 moved to LA and I had paid for her car to be
17 transported LA.  Thereafter she wanted to buy a
18 new car and asked me to go with her to buy a new
19 car.
20 BY MR. KLAYMAN:
21     Q.  Correct?
22         CHAIRMAN FITCH:  Ok, we're talking

43 (Pages 425 to 428)

In The Matter Of: Larry E. Klayman
May 31, 2018

<table>
<tr><td>

Page 429

1 spring of 2010.
2 THE WITNESS: Maybe I asked you to -- I
3 don't remember that. Maybe I asked you, because I
4 had no credit and that was --
5 CHAIRMAN FITCH: Wait just a minute.
6 He may want to write down what you say.
7 THE WITNESS: Yes, I'm sorry.
8 CHAIRMAN FITCH: Go ahead.
9 MR. KLAYMAN: I think she answered the
10 question.
11 CHAIRMAN FITCH: Ok.
12 BY MR. KLAYMAN:
13 Q. Now I'm going to show you what is
14 Respondent's Exhibit 9. You have a binder from
15 me. If you may turn to that.
16 (Brief pause.)
17 CHAIRMAN FITCH: Mr. Klayman, are you
18 trying to find --
19 MR. KLAYMAN: Yes -- my book fell
20 apart. It's Exhibit 9.
21 CHAIRMAN FITCH: It purports to be an
22 email exchange around 8, May, of 2010. That's

</td><td>

Page 431

1 THE WITNESS: So --
2 CHAIRMAN FITCH: Well, ok. You've read
3 it now, correct? Now he has a question for you.
4 BY MR. KLAYMAN:
5 Q. Yes. Have you ever seen this before,
6 this memorandum?
7 A. I don't remember it. Maybe it was --
8 When is this date? Do you know what
9 date?
10 CHAIRMAN FITCH: You've answered his
11 question. He asked you a question. You said you
12 don't remember the memorandum.
13 BY MR. KLAYMAN:
14 Q. There's a date on the top which is
15 April 7th, 2010 when it was sent by facsimile to
16 Arlene Aviera, the psychologist, when I sent it to
17 her.
18 CHAIRMAN FITCH: I think we're waiting
19 for a question --
20 MR. KLAYMAN: Yeah.
21 CHAIRMAN FITCH: -- from you.
22

</td></tr>
<tr><td>

Page 430

1 what I have.
2 MR. KLAYMAN: Yes.
3 CHAIRMAN FITCH: She's welcome to use
4 my copy.
5 MR. KLAYMAN: Wait, oh, here it is.
6 It's Exhibit 9, Respondent's Exhibit 9. Turn to
7 the third page. I've got it.
8 MS. LARKIN: Is this also Exhibit 26-1
9 in the Board book?
10 MR. KLAYMAN: It probably is. Yeah.
11 BY MR. KLAYMAN:
12 Q. Turn I think to the third page. This
13 is a memorandum that I wrote to Arlene Aviera,
14 correct? That was the meeting that you testified
15 about that we were all going to meet together.
16 You see that?
17 A. I'm reading this email from -- this
18 letter from Arlene. Is that what you want
19 me to read?
20 Q. Yes.
21 CHAIRMAN FITCH: Yes.
22 (Witness reads document.)

</td><td>

Page 432

1 BY MR. KLAYMAN:
2 Q. Well, so you think you've seen this
3 before?
4 A. Yes.
5 Q. And in that second paragraph I write to
6 Dr. Aviera, "Last week I perceived her," meaning
7 you, "Ellie, to be very aggressive toward me when
8 a lawyer I got for Kaveh to handle the bankruptcy
9 did not behave correctly."
10 Remember that? You blamed me about a
11 lawyer that I got for Kaveh?
12 A. I don't remember exactly, but ok.
13 Q. And then it says, "Despite all this,
14 today she asked me if I would go with her to buy a
15 car, which I'm happy to do when I have time (today
16 I could not). I did not find this request -- I
17 did find this request a bit out of place at this
18 moment in time, given all that has gone on in the
19 last few days between us."
20 You see that?
21 A. Yes.
22 Q. Now, if we didn't have a close

</td></tr>
</table>

44 (Pages 429 to 432)

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 433

1  friendship or a personal relationship in addition
2  to a professional relationship, you wouldn't have
3  asked me to go buy you a car, would you?
4      A.  I definitely didn't ask you to buy me a
5  car.  Absolutely not
6      Q.  Well, you were incapable of buying the
7  car yourself because you had no credit, correct?
8      A.  Correct.  But I didn't ask you to buy
9  me a car.  Definitely, absolutely not.
10     Q.  Well, if someone else was going to buy
11 you the car, then he would have gone with you,
12 correct?
13     A.  I didn't need a car.  I had my car.
14     Q.  But you were the one who wanted --
15     A.  Which I drove the same car for years
16 after, that red car that you mentioned.
17     CHAIRMAN FITCH:  Let him ask another
18 question.
19 BY MR. KLAYMAN:
20     Q.  I wasn't going to buy a car for me, was
21 I?
22     A.  I don't know.

Page 434

1      Q.  And in fact we did go to a Mercedes
2  dealership in Van Nuys, California not far from
3  where you live?
4      A.  Yes.  May I -- may I explain why?
5      CHAIRMAN FITCH:  Yes.
6      THE WITNESS:  Do you remember --
7  May I explain --
8      CHAIRMAN FITCH:  Yes.
9      THE WITNESS:  -- why we went?
10     CHAIRMAN FITCH:  Yes.
11     THE WITNESS:  They repoed my car, and
12 me, him and my brother, he -- he came with us,
13 because he's an attorney, and maybe, so, did they
14 have the right to come to my garage and tow my car
15 and take it or not.
16     So he came out there with us to help
17 us, as an attorney advisor.
18     But all he did, he made a big scene and
19 he threatened Van Nuys Keys Mercedes, that he's
20 gonna them, that this is not -- and he made a huge
21 scene and we walked out and he made everything
22 even worse.

Page 435

1      CHAIRMAN FITCH:  Alright, I think
2  you've told us why --
3      THE WITNESS:  So that's the only car
4  thing I remember.
5      I'm sorry.
6  BY MR. KLAYMAN:
7      Q.  You wanted a new car, didn't you?
8      A.  No.
9      Q.  You were looking at cars that day, were
10 you not?
11     A.  I was looking at cars.  I always look
12 at cars.
13     Q.  Now, let me ask you this: if --
14     A.  I didn't want a new car, no.
15     Q.  If we weren't --
16     A.  I was trying to make my payment go
17 lower.  That's why I was looking at cars.  If I
18 could trade my car in and make the payments lower
19 as I had money issues.  That was why I was looking
20 at cars.
21     Q.  Was I being -- you felt as if -- that
22 you could ask me to do anything and I would do it

Page 436

1  for you, correct, virtually anything?
2      A.  Not anything.
3      Q.  Right.
4      A.  Anything that had to do with -- as a
5  lawyer, that could advise me.
6      Q.  If our relationship was simply that I
7  was going to try to help you come back to Los
8  Angeles and file lawsuits on your behalf if
9  necessary, that doesn't mean that you'd ask me to
10 help your friend Kaveh or to go with you to a car
11 agency?
12     MR. SMITH:  Objection as argumentative.
13 That not really even a question.
14     MR. KLAYMAN:  It isn't argumentative.
15 I'm asking.
16     CHAIRMAN FITCH:  Is that the whole
17 question?
18     MR. KLAYMAN:  Yeah.
19     CHAIRMAN FITCH:  Sustained.
20     MR. SMITH:  How is she supposed to get
21 inside his head?
22     CHAIRMAN FITCH:  Sustained.

45 (Pages 433 to 436)

In The Matter Of: Larry E. Klayman
May 31, 2018

---

Page 437

1        MR. KLAYMAN: I'll ask it a different
2   way.
3   BY MR. KLAYMAN:
4        Q.  You felt that you could ask me to do
5   anything and I would do it for you?
6        A.  No.
7        Q.  My role --
8        A.  You said that.  That is your sentence.
9            You always wrote to me, texted me and
10  told me that, "You can ask me anything and I will
11  do that for you."
12           It's your sentence.  Not mine.
13       Q.  Assuming what you say is true, you
14  asked me to help Kaveh in my time, at my expense?
15       A.  I didn't ask you to help Kaveh.  I
16  asked you if you knew an attorney.
17       CHAIRMAN FITCH:  Asked and answered.
18       MR. KLAYMAN:  Ok.
19           This is a good breaking point, your
20  Honor.  It's 1:00 o'clock.
21       CHAIRMAN FITCH:  Sure.
22           We will stand in recess beginning here

---

Page 438

1   at 1:01 until 2:00 p.m., at which time we will
2   interrupt this witness' testimony to take
3   testimony from a witness, Mr. O'Connell, who is
4   not available tomorrow.
5        MR. SMITH:  Thank you.
6        MR. KLAYMAN:  And we'll invoke the rule
7   for that.
8        CHAIRMAN FITCH:  I'm sorry?
9        MR. KLAYMAN:  We'll invoke the rule for
10  Ms. Sataki not to be here.
11       CHAIRMAN FITCH:  Oh, yeah, sure.  Sure.
12           You're reminded again not to discuss
13  your testimony with anybody else.  And in
14  addition, if you want to report a little bit later
15  than 1:00 o'clock, that would be --
16       THE WITNESS:  2:00 o'clock.
17       CHAIRMAN FITCH:  A little bit later
18  than 2:00 o'clock.  I think we would be taking
19  another witness from at least 2:00 to 2:15, but
20  not much longer.
21           (Whereupon at 1:03 p.m. a luncheon
22  recess was taken.)

---

Page 439

1   A F T E R N O O N   S E S S I O N
2        (Whereupon at 1:58 p.m. the hearing
3   resumed.)
4        CHAIRMAN FITCH:  We are back on the
5   record at 1:58.
6        MR. KLAYMAN:  Yes, I just want to renew
7   my objections to the testimony of the
8   investigator, so it's clear on the record, in that
9   I requested discovery.  I have no idea what he's
10  going to say.  It's unfair surprise, for the
11  record.
12       CHAIRMAN FITCH:  The objection is noted
13  and preserved.
14       Mr. Smith, you can go ahead.
15       (Kevin O'Connell on the witness stand.)
16       CHAIRMAN FITCH:  Respondent's
17  cross-examination has been suspended as an
18  accommodation to Disciplinary Counsel putting on a
19  witness today who is unavailable tomorrow.
20       May I ask the witness to raise your
21  right hand.  Do you solemnly swear or affirm the
22  testimony you give in this matter will be the

---

Page 440

1   truth and nothing but the truth?
2        THE WITNESS:  I do.
3        CHAIRMAN FITCH:  What is your full
4   name?
5        THE WITNESS:  Kevin E. O'Connell.
6        CHAIRMAN FITCH:  Go ahead, Mr. Smith.
7   Whereupon,
8            KEVIN O'CONNELL
9   called as a witness on behalf of Disciplinary
10  Counsel, and, after having been first duly sworn,
11  was examined and testified as follows:
12      DIRECT EXAMINATION BY DISCIPLINARY COUNSEL:
13       BY MR. SMITH:
14       Q.  Good afternoon, Mr. O'Connell.
15       A.  Good afternoon.
16       Q.  Could you please tell the hearing
17  committee your occupation.
18       A.  I am an investigator with the Office of
19  Disciplinary Counsel.
20       Q.  Prior to joining the Office of
21  Disciplinary Counsel, did you attend any colleges
22  or universities?

---

46 (Pages 437 to 440)

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 441 | Page 443 |
|---|---|

**Page 441**

1  A. I went to the University of Maryland.
2  Q. Did you get a degree there?
3  A. I got two degrees: one in English and
4  the other in accounting.
5  Q. After you graduated from the University
6  of Maryland, with whom were you employed?
7  A. The FBI.
8  Q. That would be the Federal Bureau of
9  Investigation?
10  A. Correct.
11  Q. What did you do at the Federal Bureau
12  of Investigation?
13  A. I was an investigator. I worked mostly
14  white collar matters.
15  Q. How long did you work with the FBI?
16  A. Twenty-six years.
17  Q. How long have you been working with the
18  Office of Disciplinary Counsel?
19  A. Thirteen years.
20  Q. Could you describe what your job
21  responsibilities are.
22  A. I am basically there to assist the

**Page 443**

1  Q. When did you first look into that
2  issue?
3  A. Initially in February of 2015.
4  Q. Have you looked at it recently?
5  A. I looked at it yesterday.
6  Q. Those numbers --
7  A. The same numbers were there, yeah.
8  Q. As part of the research, did you
9  determine whether or not there are any articles
10  that still appear on World Net Daily that refer to
11  Ms. Elham Sataki?
12  A. Yes. I believe there are two.
13  Q. Do you remember who authored those
14  articles?
15  A. I think Mr. Klayman authored one of
16  them.
17  Q. Ok, let me show you what you actually
18  gave me yesterday, to refresh your recollection.
19  MR. SMITH: I'll make this available to
20  everybody.
21  CHAIRMAN FITCH: Did you tender --
22  MR. SMITH: I'm showing him just to

**Page 442**

1  lawyers with whatever cases they have. Whatever
2  things they may need done, I do.
3  Q. Now, are you familiar with Disciplinary
4  Counsel's investigation of Mr. Larry Klayman?
5  A. Yes.
6  Q. Have you been asked to do any research
7  in connection with that investigation?
8  A. Yes.
9  Q. Could you tell the hearing committee
10  what that research was?
11  A. You had asked me to do some online
12  research on the company World Net Daily.
13  Q. What did your research entail?
14  A. It's a website that was started I think
15  in May of 1997. It's I guess a conservative
16  website that consists of opinion pieces and news.
17  Q. In your research, did you learn what
18  the circulation is of readers of the World Net
19  Daily?
20  A. They stated on the website that it's
21  five million views per month and 40 million pages
22  viewed per month.

**Page 444**

1  refresh his recollection.
2  THE WITNESS: I apologize, there's two
3  authored by Mr. Klayman.
4  CHAIRMAN FITCH: I see.
5  BY MR. SMITH:
6  Q. Would you read into the record,
7  identify what the articles are, please.
8  A. One is dated April the 23rd, 2010, and
9  the caption is "$150M case claims anti-freedom
10  bias at Voice of America."
11  The second one is dated June the 11th,
12  2010, and it's titled, "Cockroaches and judges."
13  Q. Both of those articles reference are
14  with reference to Ms. Sataki?
15  A. Yes.
16  Q. Just to be clear, I might be repeating
17  myself, but these articles that you just
18  described, they're still available online?
19  A. Yes, they were there yesterday.
20  MR. SMITH: Ok, thank you.
21  I have no further questions.
22  MR. KLAYMAN: Ok.

47 (Pages 441 to 444)

App.0265

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 445 | Page 447 |
|---|---|

**Page 445**

1  CHAIRMAN FITCH: Cross-examination.
2  CROSS-EXAMINATION ON BEHALF OF RESPONDENT:
3       BY MR. KLAYMAN:
4  Q.  Mr. O'Connor, you're not an expert in
5  the internet, are you?
6  A.  No.
7  Q.  You just happened to be looking online?
8  A.  Yes.
9  Q.  You're aware that once something is
10  placed on the internet, it really never gets off
11  the internet.
12      You're aware of that, based on your
13  experience?
14  A.  Well, I'm not an expert, but that's
15  what I hear, yes.
16  Q.  And that it even attempts to remove it
17  will not get it off the internet?
18  A.  I don't know. I'm not an expert.
19  MR. KLAYMAN: No further questions.
20  CHAIRMAN FITCH: Any redirect?
21  MR. SMITH: Nothing from Disciplinary
22  Counsel.

**Page 447**

1  MR. SMITH: About what time tomorrow do
2  you think you'll be finished?
3  MR. KLAYMAN: I don't know.
4  MR. SMITH: Because, again, I have a
5  witness that needs a two-hour window to get here
6  once he knows he's going to be testifying.
7      So, if, you know, I could get some
8  clarity on that.
9  MR. KLAYMAN: We don't have -- I don't
10  know. It depends on when I start going through
11  very specific documents and everything. I could
12  be all day tomorrow.
13  MR. SMITH: I mean, in which case I
14  guess we can reconvene Monday with the testimony
15  of my expert. I'd like to give him some knowledge
16  tonight, if at all possible.
17  CHAIRMAN FITCH: Well, he's a lawyer.
18  He knows these things are uncertain, and we're
19  scheduled to discuss scheduling matters tomorrow
20  probably at 1:00 or 2:00 p.m.
21      But before somebody --
22  MR. SMITH: If he's definitely not

**Page 446**

1  CHAIRMAN FITCH: Thank you, sir.
2  (Witness Kevin O'Connell is excused.)
3  MR. SMITH: I'll see if Ms. Sataki has
4  returned.
5  CHAIRMAN FITCH: I thought I saw her
6  right around -- maybe back in the room. I wasn't
7  sure if that door was locked or not.
8  (Brief pause.)
9  CHAIRMAN FITCH: Yes? No?
10  MR. SMITH: She's here. She's getting
11  herself together.
12  MR. KLAYMAN: Your Honor, what time are
13  we leaving today? I forgot.
14  CHAIRMAN FITCH: Well, we'll break kind
15  of when there's a natural place to break
16  hopefully. But 4:45'ish.
17  MR. SMITH: While we're waiting for Ms.
18  Sataki to come in, if I can get some sense from
19  Respondent how -- it if we don't finish today with
20  the cross-examination of Ms. Sataki -- do you
21  believe you'll be finished with cross-examination?
22  MR. KLAYMAN: No.

**Page 448**

1  going to be testifying tomorrow, then I would like
2  to let him know that, so if he had any plans to
3  get away...
4  CHAIRMAN FITCH: Well, he's on call,
5  so.
6  MR. SMITH: Yeah, he is.
7  CHAIRMAN FITCH: So he'll have to go
8  with the flow. We'll see.
9  MR. SMITH: Ok.
10  (Ms. Elham Sataki returns to the
11  witness stand.)
12  CHAIRMAN FITCH: Ms. Sataki has resumed
13  the stand, and she shall bear in mind that she is
14  still under oath.
15  THE WITNESS: Yes.
16  CHAIRMAN FITCH: And Mr. Klayman may
17  resume his cross-examination.
18  CONTINUED CROSS-EXAMINATION
19  ON BEHALF OF RESPONDENT
20       BY MR. KLAYMAN:
21  Q.  Ms. Sataki, you're aware that I was
22  trying to resolve everything with VOA along with

App.0266

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 449 |
| --- |

<sup></sup>

1    Mr. Shamble amicably, that we did lobbying of
2    senators and congressmen and others in trying to
3    resolve it amicably with VOA.
4         You're aware of that?
5    A.  Don't remember.
6    Q.  I call your attention to a particular
7    evening --
8         CHAIRMAN FITCH:  I'm sorry, I guess
9    it's my hearing.  I didn't understand the answer.
10        THE WITNESS:  I said I don't remember.
11   BY MR. KLAYMAN:
12   Q.  Do you remember having dinner with me
13   and Key Dash at Morton's restaurant one night?
14   A.  Vaguely.
15   Q.  On Connecticut Avenue?
16   A.  Vaguely.
17   Q.  Yes?
18   A.  Yes.  Vaguely, yes.
19   Q.  And we were sitting there, and sitting
20   across the table from us, at a different table,
21   was an individual by the name of John Boehner, who
22   I had told you was going to be the next Speaker of

| Page 451 |
| --- |

1         Do you remember that?
2    A.  I do, but vaguely.  Not exact.
3    Q.  And you explained to him your
4    situation, you wanted to go back to LA, correct?
5    A.  Vaguely.
6    Q.  And he then said to you -- he then
7    pulled a card out, a business card and said, "This
8    is my chief of staff.  Contact her.  We'll take
9    care of it."
10        You remember that?
11   A.  Again, I remember the whole evening,
12   but not in details, the way you ask me in details.
13   I can't answer the questions yes when you say
14   remember.
15        I can't say yes, I can't say no.  I'm
16   sorry.
17        THE WITNESS:  Because he's asking me in
18   details about an evening that I vaguely remember.
19        I remember such an evening exists, but
20   not in details like that.  I'm sorry.
21
22   BY MR. KLAYMAN:

| Page 450 |
| --- |

1    the House.
2    A.  Again, vaguely.  I remember -- not very
3    clear.  Vaguely, yes.
4    Q.  And you remember that I said to you,
5    "Let's go over and talk to Mr. Boehner, because
6    he's going to be a very powerful person soon in
7    the house, and maybe he can help us resolve your
8    desire to go back to Los Angeles and your
9    harassment case."
10        You remember that?
11   A.  Yes.
12   Q.  And I walked over with you to Mr.
13   Boehner, and I said, "John, how you doing?
14   Haven't seen you for a few years."
15        And he said, "Larry, how you doing?"
16        You remember that?
17   A.  No.
18   Q.  And then I introduced you.  And I said,
19   "This is my client, Elham Sataki.  She has a
20   problem with the Voice of America."  And I said to
21   you, "Ellie, please explain it to Congressman
22   Boehner, you know, in a relatively brief way."

| Page 452 |
| --- |

1    Q.  And you remember that the purpose
2    though was to go over and ask him for his help to
3    resolve it, resolve the matter with VOA.
4    A.  Yes.
5    Q.  And that he did give you a business
6    card and said "contact this person," have "you and
7    Larry contact this person"?
8    A.  I don't remember that part.
9    Q.  And after the conversation was over,
10   you remember he leaned over and gave you a kiss on
11   the cheek?
12   A.  I don't remember that part.
13   Q.  And we later did contact that person at
14   Mr. Boehner's office, Congressman Boehner, and we
15   went up there and met with him and asked for their
16   help to resolve the matter amicably with VOA.
17   A.  Again, I don't -- I don't -- it's such
18   a long time ago from the time that I was going
19   through a very tough time, so I can't -- my memory
20   from that time is very tough.  I'm sorry.
21   Q.  You do remember going up to Capitol
22   Hill and the Capitol and meeting with staff of

49 (Pages 449 to 452)

App.0267

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 453

1   then Speaker John Boehner?
2       A.  Not exactly.
3           I'm not saying that it didn't happen.
4   I just -- I don't have it right now in front of my
5   eyes that I can exactly say what happened.
6       Q.  You're aware that the Speaker of the
7   House of Representatives is the third most
8   powerful person in the United States government?
9   You're aware of that?
10      A.  Yes.
11      Q.  That if the president or vice president
12  dies --
13          MR. SMITH:  Objection.  I think she's
14  testified that she understands he's a powerful
15  man.  For God's sakes --
16          CHAIRMAN FITCH:  I'm going to let him
17  ask the question.
18  BY MR. KLAYMAN:
19      Q.  You're aware that if the president,
20  vice president die, he becomes the president?
21          CHAIRMAN FITCH:  I'm going to strike --
22  I sustain the objection.

Page 454

1           MR. KLAYMAN:  Just a little history.
2   BY MR. KLAYMAN:
3       Q.  But you know he's a very powerful
4   person, just generally?
5       A.  Yes, he's a very powerful person.
6       Q.  You are aware also that Mr. Shamble and
7   I approached, a U.S. senator by the name of Tom
8   Coburn from Oklahoma?
9       A.  I don't remember.
10      Q.  Does it refresh your recollection that
11  Mr. Coburn sat on a committee that oversaw the
12  Voice of America in the U.S. Senate?
13      A.  I don't remember.
14      Q.  You're aware that I also approached
15  Senator John McCain to help you?
16      A.  You mentioned that in your emails.
17      Q.  So therefore you're aware of it?
18      A.  Yes.
19      Q.  And you knew that Senator John McCain
20  had actually run for president himself in 2008?
21          You're aware of that?
22      A.  Yes.

Page 455

1       Q.  So he also was a very powerful person?
2       A.  Yes.
3       Q.  And you know that I asked him to help
4   you --
5       A.  Yes.
6       Q.  -- to resolve this.  Ok.
7       A.  Well, you said that you did.
8           I'm not -- I don't know if you did or
9   not.  That's what you said.
10      Q.  You are aware, also, that I approached
11  Senator Joe Lieberman to try to help you, a
12  democrat?
13      A.  I don't know.  I don't remember.
14      Q.  You have heard of Senator Joe
15  Lieberman, though, correct?
16      A.  Yes.
17      Q.  He also is a very powerful person on
18  Capitol Hill, or was.  You knew that?
19      A.  Yes.
20      Q.  You're aware that when we met with
21  these people we would give -- I would give them
22  copies of some of the favorable articles I wrote

Page 456

1   about you and what was happening in VOA with, not
2   just your case, but also other broadcasters who
3   had been allegedly discriminated against?
4           You're aware of that?
5       A.  Yes.
6       Q.  In addition to that lobbying, you are
7   aware that I also approached senator Dana,
8   D-a-n-a, Rohrbacher, R-o-h-r-b-a-c-h-e-r, correct?
9       A.  Correct.
10      Q.  And I told you that Congressman
11  Rohrbacher was from Orange County, California, not
12  far from where you were living at the apartment on
13  Ventura Boulevard.
14      A.  Correct.
15      Q.  That from California he might be
16  inclined to help you, in particular.
17      A.  Correct.
18      Q.  And I think you had some connection to
19  Orange County yourself, didn't you?  You have some
20  relatives there, friends?
21      A.  I knew someone in Orange County, yes.
22      Q.  And I also told you that Dana

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 457 | Page 459 |
|---|---|

**Page 457**

1  Rohrbacher actually had been involved in Iranian
2  issues before we were going to go see him,
3  correct?
4      A.  Correct.
5      Q.  In fact, he had been trying to bring
6  about freedom in Iran all these years.
7      A.  Ok.
8      Q.  Do you remember that?
9      A.  No, I don't remember that.
10     Q.  And I told you that in fact actually he
11  had been a person that was involved in the
12  Iran-Contra investigation during the Reagan
13  administration?
14     A.  I don't remember.
15     Q.  He worked with Oliver North.  I told
16  you that.
17     A.  I don't remember.
18     Q.  Ok.  Now we went up to see congressman
19  Rohrbacher,  didn't we?  I set up an appointment.
20  We sent up to see him?
21     A.  Yes.
22         CHAIRMAN FITCH:  I'm sorry, to whom

**Page 459**

1  were out in the hallway and Kathleen Stanton -- or
2  we'll call her Kathleen, you were calling her
3  that -- hugged you and said, "I feel you're like
4  my daughter.  I'll take care of you."
5         Do you remember that?
6      A.  Yes.
7      Q.  After that meeting occurred, you know
8  that I was trying to get them to do something to
9  intervene at VOA to get this matter resolved in
10  your favor.
11     A.  Yes.
12     Q.  Now you've previously testified that
13  Kathleen Stanton was the one who prepared the
14  supplemental complaint?
15     A.  Yes.
16     Q.  Which was Exhibit 23 of Bar Counsel's
17  exhibits.  It's already in evidence.  Would you
18  turn to Exhibit 23.
19         Are you there?
20     A.  Wait, 23?
21     Q.  Yes.
22     A.  Yes.

**Page 458**

1  does the pronoun "we" refer?
2         MR. KLAYMAN:  Her and I.  Ms. Sataki
3  and I.
4  BY MR. KLAYMAN:
5      Q.  We went up there one afternoon, right?
6      A.  Yes.
7      Q.  And we met Congressman Rohrbacher.
8      A.  Yes.
9      Q.  And he said he would help us, correct?
10     A.  Yes.
11     Q.  We also met Kathleen Stanton at that
12  time, correct?
13     A.  Correct.
14     Q.  She was his chief of staff in the
15  California office.
16     A.  Yes.
17     Q.  And we told Ms. Stanton and Congressman
18  Rohrbacher your story and why we needed help --
19     A.  Yes.
20     Q.  -- to get you back to LA.
21     A.  Yes.
22     Q.  And after we had these meetings, we

**Page 460**

1      Q.  Now this was filed, or at least it says
2  filed or received October 24th, 2011, and the
3  original Bar complaint, Exhibit 1, I believe, to
4  Bar Counsel's exhibits, was filed about a year
5  earlier on December 3rd, 2010.  It has a date of
6  11/2/2010, but there's a stamp of December 3rd on
7  the top.
8         You see there was a year between those
9  Bar complaints?
10     A.  I don't understand your question now.
11     Q.  There was a delay of a year between the
12  first complaint that you say you filed with the
13  Bar, Exhibit 1, and the second supplemental
14  complaint that you said you filed on October 24th,
15  2011, that Kathleen Stanton prepared for you, as
16  you testified.
17         You see that?
18         CHAIRMAN FITCH:  I'm not sure if she
19  has the other one in front of her.
20         MR. KLAYMAN:  It's in the same binder,
21  your Honor.
22         CHAIRMAN FITCH:  But we have seen the

51 (Pages 457 to 460)

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 461

1  evidence for almost two days.
2  BY MR. KLAYMAN:
3      Q.  Let me turn first to Exhibit 23.
4          You've never had any legal training,
5  have you?
6      A.  No.
7      Q.  Ms. Sataki.  You wouldn't know how to
8  do a citation of a law case in proper form for
9  legal tribunals or courts, would you?
10     A.  No.
11     Q.  As you previously testified, your
12 English is not that good, correct?
13         CHAIRMAN FITCH:  Asked and answered.
14         MR. KLAYMAN:  Ok, that's fine.
15 BY MR. KLAYMAN:
16     Q.  Now, what were the circumstances of
17 your sitting down with Ms. Stanton to prepare the
18 attachment to the cover page of this supplemental
19 complaint, which is Exhibit 23?
20         I turn your attention to Page 24-4 of
21 this exhibit.
22     A.  I don't think we're on the same page.

Page 462

1  Is it this white -- is it this?  I'm not sure
2  which one is it.
3          MR. TIGAR:  Counsel, did you mean 23-4?
4          MR. KLAYMAN:  Yes.  What did I say?
5          MS. LARKIN:  Twenty-four.
6          MR. TIGAR:  You said 24.
7          MR. KLAYMAN:  I'm sorry.
8  BY MR. KLAYMAN:
9      Q.  Do you see that?
10     A.  Yes.
11     Q.  During that interim period, between
12 your first Bar complaint and the supplemental
13 complaint, and after the meeting that we had
14 Congressman Rohrbacher and Ms. Stanton, Ms.
15 Stanton told you that she could solve your issue
16 herself, didn't she?
17         She said, "I'll solve, it."
18     A.  What do you mean --
19     Q.  "You don't need Mr. Klayman."
20     A.  I don't understand.
21     Q.  She told you, did she not, after we
22 first met her -- well, let me back up.

Page 463

1          After we first met her in the office
2  that day with me, and before that congressman, you
3  had later meetings with her or talked to her later
4  on the phone, correct?
5      A.  After the first time that we met in the
6  office, yes, I had conversations with her
7  afterwards.
8      Q.  Conversations, some of them were in
9  person?
10     A.  Yes.
11     Q.  You would visit her and she would visit
12 you?
13     A.  Yes.
14     Q.  Where did you visit her?
15     A.  We would meet up in restaurants.
16     Q.  Where were those restaurants?
17     A.  I don't remember.
18     Q.  Were they in Orange County or were they
19 down --
20     A.  I don't remember.
21     Q.  She started to take you under her wing
22 as her daughter, correct, as she said she would?

Page 464

1      A.  Yes.
2      Q.  These were personal meetings?
3      A.  Yes -- I don't understand the question.
4  What do you mean by "personal meetings"?
5      Q.  Well, if it had been a matter of
6  professional matters of the congressional office,
7  you would have met in the office, correct, not in
8  restaurants.
9      A.  No, it wasn't professional.  It was
10 personal.
11     Q.  Right.
12         And during those meetings she told you,
13 did she not, to the effect, "You don't need Larry
14 Klayman.  We can solve it.  Congressman and I can
15 solve this question for you"?
16     A.  No, she didn't say that.  Absolutely
17 not.
18     Q.  During those meetings you talked about
19 your situation with Voice of America sometimes,
20 didn't you?
21     A.  No.
22     Q.  Well, when was it that you talked with

52 (Pages 461 to 464)

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 465

1  her about preparing this supplemental complaint,
2  which is Exhibit Number 3?
3       A.  I don't remember exact date.
4       We were talking over the phone a lot,
5  and we would visit each other, and she didn't want
6  to -- it wasn't about VOA.  She saw what's going
7  on with Mr. Klayman, and, from the body language,
8  the first time we were in the office, and she
9  approached me and she told me, "Something is
10 wrong.  Are you afraid of this man?"  That is how
11 the conversation started.
12      And that is why the first hug that she
13 gave me in the hallway and told me that I -- "I
14 feel that you are like my daughter."
15      Later on she said, "I felt that" -- "I
16 felt fear in your eyes, and the body language of
17 the two of you was not the right kind of body
18 language, that you're afraid of something.  What
19 is it?"
20      And I explained to her what it is.
21      Q.  In fact I was in the hallway at the
22 time, too, correct?

Page 466

1       A.  Yes.
2       Q.  And in fact Ms. Stanton is not a
3  psychologist or a psychiatrist, is she?
4       A.  She's not.  But --
5       Q.  And in fact, you don't know whether I
6  ever had --
7       A.  But her secretary, her secretary told
8  her that, too, and she --
9       MR. KLAYMAN:  Object and I move to
10 strike.
11      CHAIRMAN FITCH:  It's struck.
12      MR. KLAYMAN:  I move to strike the
13 whole thing as hearsay.
14      CHAIRMAN FITCH:  No, you asked her and
15 she told you.
16 BY MR. KLAYMAN:
17      Q.  But you're aware I never had much
18 contact with her after that, Ms. Stanton?
19      A.  I don't know.
20      Q.  In your presence I mean.  That was the
21 only time we ever met, in your presence?
22      A.  Yes.

Page 467

1       Q.  You're aware, you know, I was in
2  contact with her by the telephone, to try to get
3  the matter resolved with VOA, correct?
4       MR. SMITH:  I don't understand that
5  question, because there was kind of like a
6  testimony going on before --
7       MR. KLAYMAN:  I'll go back.
8  BY MR. KLAYMAN:
9       Q.  Are you aware that was the only time
10 that I met with Ms. Stanton in your presence was
11 that one day?
12      A.  In my presence, yes.
13      Q.  Yes.  And that the subsequent contact I
14 had with her was by phone trying to get your
15 situation with VOA resolved in their office?
16      A.  I don't know about that, but if you
17 say --
18      Q.  I told you that I was trying use them
19 to get it resolved.
20      A.  Yes, you told me that.
21      Q.  So you're telling me that Ms. Stanton
22 came up with that impression just in one meeting

Page 468

1  in the office?
2       A.  Yes.
3       Q.  How did the idea of a Bar complaint
4  against me come about?  You didn't suggest it to
5  her.  That was her idea, right?
6       A.  No, it was my idea.
7       Q.  What did you ask her to do?
8       CHAIRMAN FITCH:  I'm sorry, when you
9  say Bar complaint, are you referring to the first
10 one before?
11      MR. KLAYMAN:  Exhibit 23.
12      CHAIRMAN FITCH:  The supplemental.
13      MR. KLAYMAN:  Yeah, the supplemental.
14      CHAIRMAN FITCH:  So the question is,
15 how did the idea of filing this supplemental
16 complaint come about?
17      MR. KLAYMAN:  Let me rephrase the
18 question.
19 BY MR. KLAYMAN:
20      Q.  You say it was your idea, correct?
21      A.  Correct.  Ing this.
22      So, it was my cousin, it was Kathleen

53 (Pages 465 to 468)

App.0271

In The Matter Of:  Larry E. Klayman
May 31, 2018

|  | Page 469 |
|---|---|

1   and --
2       Q.  Is that Sam Razavi?
3       A.  Yes.
4       Q.  The one who was convicted of fraud in
5   Las Vegas?
6       A.  I don't know anything about that.  It's
7   you FBI-checking every single person that belongs
8   to my -- that's my relatives or friends.
9       Q.  Who is not a lawyer, is he?
10      A.  No, he's not.
11      Q.  Ms. Stanton is not a lawyer, correct?
12      A.  No.
13      Q.  Now, there were legal citations, Sataki
14  vs. Falahati, case number and everything, in the
15  supplemental complaint.
16          Did Ms. Stanton bring in a lawyer to
17  help with this complaint?
18      A.  I don't have knowledge.
19      Q.  Was there somebody in her office that
20  she was working with?
21      A.  No.
22      Q.  You prepared this complaint in her

|  | Page 470 |
|---|---|

1   office?
2       A.  No.
3       Q.  Where was it prepared?
4       A.  I don't remember.
5       Q.  Now this complaint's pretty
6   important --
7           CHAIRMAN FITCH:  Sorry, what was the
8   answer?
9           THE WITNESS:  I don't remember.
10          It could have been in a restaurant, in
11  a coffee shop or -- we never met in her office.
12  BY MR. KLAYMAN:
13      Q.  Sam Razavi has no legal training, does
14  he?
15      A.  No.
16      Q.  Now you say he prepared it, too?
17      A.  He helped me.
18      Q.  He's the one who called me and
19  threatened me, didn't he?
20      A.  Nobody ever threatened you.  You
21  called --
22          CHAIRMAN FITCH:  No, please.

|  | Page 471 |
|---|---|

1           THE WITNESS:  Ok.  I'm sorry.
2   BY MR. KLAYMAN:
3       Q.  Ms. Stanton advised you to get another
4   lawyer at the time?
5       A.  I don't remember.
6       Q.  What was your response?
7       A.  I don't remember.
8       Q.  We'll call him Sam, Sam R., to make it
9   easy.
10          He advised you to get another lawyer at
11  the time?
12      A.  I don't remember.
13      Q.  So basically they stepped into my role
14  as the lawyer in the case?
15          CHAIRMAN FITCH:  Objection sustained.
16  BY MR. KLAYMAN:
17      Q.  So you were then going to rely on them
18  for legal advice in the future.
19          CHAIRMAN FITCH:  Objection sustained.
20  BY MR. KLAYMAN:
21      Q.  Is that what you're saying?
22      A.  No.

|  | Page 472 |
|---|---|

1           CHAIRMAN FITCH:  Objection sustained.
2           MR. KLAYMAN:  On what basis?
3           CHAIRMAN FITCH:  You're asking for
4   speculation.  I think if you ask it differently, I
5   might let it in.
6   BY MR. KLAYMAN:
7       Q.  They told you they would help you with
8   your legal matters, Ms. Stanton?
9       A.  No, they didn't.
10          May I say what they were helping me
11  with?
12          CHAIRMAN FITCH:  No.
13          THE WITNESS:  No, ok.
14  BY MR. KLAYMAN:
15      Q.  At page Exhibit 23-6, you list a number
16  of alleged violations of the Rules of Professional
17  Conduct in the District of Columbia Bar.
18          Do you see that?
19          (Witness peruses document.)
20      Q.  You see that?
21      A.  Yes.
22      Q.  You've never reviewed the Rules of

54  (Pages 469 to 472)

Page 473

1  Professional Conduct for the District of Columbia
2  par, have you?  You've never seen them?
3       A.  If you mean these are rules, some of
4  these are my words.  I said that.
5       Q.  I'm talking about the actual -- it's a
6  simple question.
7       You've never actually read the Rules of
8  Professional Conduct of the District of Columbia
9  Bar, have you?
10      A.  I'm sorry, I don't understand the
11 question.  What is the question?
12      CHAIRMAN FITCH:  Have you ever picked
13 up a book --
14      THE WITNESS:  A law book?
15      CHAIRMAN FITCH:  No.  A book that has
16 the rules of the District of Columbia regarding
17 ethical obligations?
18      THE WITNESS:  No, sir.
19 BY MR. KLAYMAN:
20      Q.  So who was it who put these rules in
21 this supplemental complaint at Page 23-6?
22      A.  I don't remember.  I have different

Page 474

1  people.
2       Q.  Do you have somebody in addition to
3  your cousin Sam, in addition to Kathleen?
4       A.  No, it was the two of them, and then
5  they would call on their people if they needed
6  some help.  And I don't know who.  I don't know
7  the other people.
8       Sam probably would call someone and get
9  help, to help me.
10      Q.  Surely you must have asked Sam if he
11 was getting help.
12      A.  No, I didn't ask him.  All I needed was
13 to get help, so I didn't help him.
14      Q.  It's likely this Sam called a lawyer,
15 correct?
16      A.  I don't know --
17      CHAIRMAN FITCH:  This is all
18 speculation.  I'm not going to take into
19 consideration her speculations to you.  I'm not
20 going to allow speculative questions.
21
22 BY MR. KLAYMAN:

Page 475

1       Q.  Before Sam and Kathleen helped you
2  prepare this, you didn't give to them copies of
3  any court pleadings in the cases I filed for you,
4  had you?
5       A.  I don't remember what I gave them.  We
6  were looking at your emails and stuff together,
7  but I don't remember exactly what.
8       Q.  You're not aware of them having
9  knowledge of any of the documents I filed in the
10 various cases?
11      A.  I don't remember.  I don't know.  They
12 may, they may not.
13      Q.  The first sentence of this, "I believe
14 Larry Klayman ignored my wishes" -- this is Page
15 23-4 -- "and best interest in the cases where he
16 represented me.  He failed to competently and
17 diligently work on those cases, causing them to be
18 dismissed.  Using my cases to promote himself at
19 my expense, he failed to explain the terms of the
20 fee to me and unilaterally changed the amount of
21 his fee, and behaved so unprofessionally towards
22 me that I feared for my safety."

Page 476

1       You didn't write that, did you?
2       A.  I did.
3       Q.  That's not your English, is it?
4       A.  No, but I can say the words and they
5  can put it in right English.
6       Q.  Now, if you can't remember showing them
7  any documentation about my failure to diligently
8  and competently represent you, and if you can't
9  remember seeing pleadings yourself, which you
10 testified to, how are you able to make a statement
11 that I wasn't competent and diligent in working
12 for you?
13      A.  Could you repeat your question?
14      MR. KLAYMAN:  Can we repeat that.
15      THE WITNESS:  The last part of your
16 question, how do I remember what?
17      MR. KLAYMAN:  Yeah, let's just hear the
18 whole thing.
19      THE COURT REPORTER:  "Now, if you can't
20 remember showing them any documentation about my
21 failure to diligently and competently represent
22 you, and if you can't remember seeing pleadings

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 477

1  yourself, which you testified to, how are you able
2  to make a statement that I wasn't competent and
3  diligent in working for you?"
4       THE WITNESS: I haven't seen all the
5  documents, because of all the different emails
6  that I would get from him, so therefore I can't
7  say that I have seen every single documents.
8       But some of the documents that I've
9  seen, this is the conclusion I got from them.
10 BY MR. KLAYMAN:
11      Q. But you're not a lawyer, correct?
12      A. No, I'm not a lawyer.
13      Q. So you're not qualified to assess
14 whether I acted competently for you and diligently
15 for you or not.
16      CHAIRMAN FITCH: Objection sustained.
17      There's no competency or diligence
18 allegation in this case.
19      MR. KLAYMAN: It deals with
20 truthfulness.
21      CHAIRMAN FITCH: And you have had
22 opportunity, and will continue to have an

Page 478

1  opportunity, to try to establish points --
2       MR. KLAYMAN: No, I --
3       CHAIRMAN FITCH: -- you want to
4  establish, which go to the witness' credibility --
5       MR. KLAYMAN: Correct.
6       CHAIRMAN FITCH: -- but we're done with
7  competently and diligently.
8       MR. KLAYMAN: Before we go on
9  further...
10 BY MR. KLAYMAN:
11      Q. Let me go back to the first page of
12 this supplemental complaint, 23-2.
13      Is there anything that you had put on
14 that page which is incorrect?
15      A. 23-2?
16      Q. Yes. Is there anything on there which
17 is incorrect?
18      A. It's the page of the addresses and
19 stuff? Is that --
20      Q. Yeah, the first page.
21      What I'm saying is, what's put there in
22 your view is accurate, correct, at the time you

Page 479

1  wrote it?
2       A. You mean with the date and my name and
3  address?
4       Q. No, you don't see anything on there
5  that's wrong, do you? You don't see anything on
6  there that you put incorrectly, do you?
7       A. No, I don't think so.
8       Q. Now, let's go down to the bottom of
9  Page 23-4.
10      You are aware in the last paragraph
11 that Secretary of State Hillary Clinton was joined
12 as a defendant with other members of the board of
13 governors because she was the number one governor
14 sitting over that board, correct?
15      CHAIRMAN FITCH: Compound question.
16      First, were you aware that Hillary
17 Clinton was named as a defendant?
18      THE WITNESS: I was.
19      CHAIRMAN FITCH: And the other part is,
20 do you have any understanding of why she was named
21 as a defendant?
22      THE WITNESS: No.

Page 480

1  BY MR. KLAYMAN:
2       Q. And the reason is is because you knew
3  that she was a --
4       A. No, I didn't agree.
5       Q. You knew that she --
6       A. I thought that that's going to hurt my
7  case.
8       Because we were having too many people.
9  We have too many people in our case. The case was
10 getting too big. Remember I kept telling you
11 that, that it's getting -- the case is getting too
12 big? We're almost suing the whole half of the
13 United States now, half of the government.
14 Remember I used to tell you that?
15      I said, "Let's just keep the case
16 small, the actual people, the boss and not get
17 everybody in." And I thought that it's going to
18 hurt me more, getting half of the government
19 involved.
20      Q. You've never actually litigated against
21 the government, have you? You've never had a case
22 against the government?

56 (Pages 477 to 480)

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 481

1        CHAIRMAN FITCH:  Argumentative.  We
2  know she's not a lawyer.
3  BY MR. KLAYMAN:
4        Q.  But you are aware that Hillary Clinton
5  sat on top of the board of governors at Voice of
6  America, in her official position.
7        You are aware of that?
8        A.  Yes.
9        Q.  Now turn to Page 3 -- 23-6 --
10        CHAIRMAN FITCH:  Say that again.
11  BY MR. KLAYMAN:
12        Q.  Page 23-6, second paragraph, third line
13  in, "Instead, the idea that I was being
14  represented is a ruse.  Mr. Klayman is a charlatan
15  who preys on his clients, exploiting them for his
16  own purposes."
17        Now, you never talked to any of my
18  other clients, have you?
19        A.  No.
20        Q.  So you have no way of knowing whether I
21  exploited them for my own purposes?
22        A.  I heard about one other client of yours

Page 482

1  and what you did.  Other people told me about
2  that.
3        I didn't directly talk to her, but
4  other people told me about that.
5        Q.  Then you said, "I'm convinced that Mr.
6  Klayman violated the Rules of Professional Conduct
7  during his representation of me."
8        Those are your words, right?
9        A.  Yes.
10        Q.  But, again, you've never read the Rules
11  of Professional Conduct, correct?
12        A.  Correct -- well, I -- I don't
13  understand it now.  What was --
14        Could you please explain yourself a
15  little bit more now?
16        I don't understand the question --
17        Q.  I don't have to.  I'm just asking
18  questions.
19        A.  -- and I don't understand where you're
20  going.
21        Q.  I don't have to.  In all due respect
22  and with all due courtesy, I don't have to

Page 483

1  explain.
2        CHAIRMAN FITCH:  No, no.
3        THE WITNESS:  Ok.
4        CHAIRMAN FITCH:  Mr. Smith is writing
5  down notes like crazy.  He has the right --
6        THE WITNESS:  Ok, I'm sorry.
7        CHAIRMAN FITCH:  -- to ask you to
8  elaborate on X, Y,  , A, B, C.
9        THE WITNESS:  Ok.
10  BY MR. KLAYMAN:
11        Q.  Now you claim to have terminated me,
12  and we'll get into that with greater specificity
13  later.  But after you terminated me, did you seek
14  to hire another lawyer to represent you?
15        A.  No one would represent me after what
16  you did to the case.
17        Q.  I'm just asking you a question.
18        Did you contact a lawyer and ask them
19  to represent you after you claim you've terminated
20  me?
21        A.  Long after.
22        Q.  Who did you contact?

Page 484

1        A.  I don't remember.  A few attorneys to
2  take a look at the case.
3        Q.  And they told you that there was no
4  case to bring because the statute of limitations
5  had already run.
6        Do you know what a statute of
7  limitations is?
8        A.  They just told me -- you want me
9  exactly to tell you?
10        They didn't say anything like that.
11        Do you want me to tell you what they
12  told me?
13        Q.  No, I want you to answer my question.
14        A.  They didn't say anything like that to
15  me, no.
16        Q.  How long after you claimed to have
17  terminated me did you contact a lawyer?
18        A.  Maybe six, seven, eight months later,
19  or more, or less.  I don't remember.  I don't
20  remember the exact time.
21        Q.  I'm going to show you what has been
22  marked as Respondent's Exhibit Number 7.

57 (Pages 481 to 484)

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 485 | Page 487 |
|---|---|

**Page 485**

1    MR. KLAYMAN: If you can take that up
2    for Ms. Sataki.
3        MR. SUJAT: I'll take it up. I have it
4    right here.
5    BY MR. KLAYMAN:
6        Q. Do you see Respondent's Exhibit 7?
7        It's short so I'll read it. It was
8    sent by Mr. Shamble on January 27th, 2011...
9        "Elham, Larry tells me that, since he
10   met the deadline to file for a final decision in
11   your OCR investigation, that's the EEO
12   investigation, of sexual harassment and
13   retaliation, and now that 180 days have passed
14   since your complaint was filed last year, you now
15   have the right to sue in federal court for sexual
16   harassment and retaliation. Therefore, all your
17   rights were protected and your chance to address
18   them are in a different forum.
19       "Larry tells me that you are not
20   communicating with him. He has told me that he
21   would like to discuss this with you, specifically
22   the fact that the federal judge, Kollar-Kotelly,

**Page 486**

1    would not order you to be allowed to go back to
2    work in Los Angeles, and had also ruled that your
3    sexual harassment and retaliation claims could not
4    be pursued before the 180-day period had elapsed.
5        "So there really were no deadlines
6    missed. He can explain this in more detail than I
7    can, but he says you won't speak with him.
8        "He also tells me that the part of the
9    case involving your return to work was appealed to
10   the higher court. He did this even though you
11   have not communicated with him in order to
12   preserve your rights, if you wish to pursue this.
13       "The appeal is still out there, but it
14   must be moved forward soon if you want to do so.
15       "I think you really ought to talk with
16   him just to get a better picture. Tim."
17       Do you see that?
18       A. Yes.
19       Q. You got that email from Tim Shamble,
20   correct?
21       A. Yes.
22       Q. And you read it?

**Page 487**

1        A. Yes.
2        Q. But you didn't go to see another lawyer
3    in time to actually bring a lawsuit for sexual
4    harassment against VOA.
5        You waited six months and your time had
6    lapsed, correct?
7        A. Correct, because you threatened to sue
8    me and everybody if I would have seen any other
9    lawyer.
10       MR. KLAYMAN: Move to strike,
11   nonresponsive. Calls for a yes or no.
12       CHAIRMAN FITCH: Let me consult with
13   the committee members. That was a close call.
14       (Off-the-record discussion between the
15   committee members.)
16       CHAIRMAN FITCH: Let me hear it again.
17       MR. KLAYMAN: Can you read the question
18   and response.
19       CHAIRMAN FITCH: Question and answer.
20       THE COURT REPORTER: "But you didn't go
21   to see another lawyer in time to actually bring a
22   sexual harassment lawsuit against VOA.

**Page 488**

1        "You waited six months and your time
2    had lapsed, correct?
3        "Answer: Correct, because you
4    threatened to sue me and everybody if I would have
5    seen any other lawyer."
6        MR. KLAYMAN: Nonresponsive.
7        CHAIRMAN FITCH: The motion to strike
8    is denied.
9    BY MR. KLAYMAN:
10       Q. Now, you were also talking to Ms.
11   Stanton and cousin Sam and you talked to them
12   about going to see another lawyer? Did they
13   recommend a lawyer for you?
14       A. I don't remember.
15       Q. In fact, there is correspondence that
16   you sent to Mr. Smith in the last year --
17       MR. KLAYMAN: Which I've asked Mr.
18   Smith for several times, which I don't have, and
19   I'm going to ask him again. I'd like it by
20   tomorrow morning.
21       CHAIRMAN FITCH: That is struck. Bring
22   that up later.

In The Matter Of:  Larry E. Klayman
May 31, 2018

<table>
<tr><td>

Page 489

1    MR. KLAYMAN:  Ok.
2   BY MR. KLAYMAN:
3    Q.  That you wanted Bar Counsel to file a
4   sexual harassment case for you.  You asked them
5   that within the last year, against VOA.
6    A.  I asked if it's doable.
7    Q.  And you asked Bar Counsel to do it for
8   you, correct?
9    A.  I asked if it's doable.
10    I asked, once this is over, can I
11   take -- once I prove --
12    THE WITNESS:  Can I say exactly what
13   I -- I don't know.
14    Is it just yes or no, or I can say what
15   I asked?
16    I asked, once this is over, and so we
17   can prove and show why I couldn't have him as my
18   attorney any more, that he was not capable to work
19   as my attorney any more because he had more
20   interest, so, then is there any way that I can
21   pick the VOA case up, because then we can show
22   that I didn't fail to apply.  It was that I had

</td><td>

Page 491

1    I said, when I was in a bad state of
2   mind, in a hole eight years ago, I was so angry
3   and hurt for what Mr. Klayman did and before.
4    So, in that state of mind, I was going
5   to take my life and then everybody would find out
6   what happened.
7    Because, to this day, I haven't been
8   able to tell anyone that -- anyone what Mr.
9   Klayman did to me and why I couldn't have him
10   represent me any more.
11    "To this day, everybody's asking me,
12   "Did you wrongly accuse your coworker for sexual
13   harassment?  How come that he's still working
14   there and you're not?"  People are still wondering
15   why.
16    But I cannot go and say that my own
17   attorney that's representing me for a sexual
18   harassment case is suddenly falling in love with
19   me and cannot at all, as you said yourself,
20   several times, that "a car cannot run on empty
21   fuel" and you cannot represent me because you're
22   too in love with me and you're feelings are coming

</td></tr>
<tr><td>

Page 490

1   this problem that I had to resolve before I go
2   back to VOA.
3   BY MR. KLAYMAN:
4    Q.  What did Bar Counsel tell you?
5    A.  He said he doesn't know.  He can't
6   advise me on that.
7    Q.  So you think that this case right now
8   that you're here on today is going to somehow
9   revive your sexual harassment claim against VOA?
10    A.  No, I don't think that.  It was just
11   asking I asked.  That's not why I'm here.
12    Q.  You also told Bar Counsel that you
13   wanted to pursue the case now because you wanted
14   to be able to say to future employers, or explain
15   to them, why your career had not gone as well as
16   you had wanted, correct?
17    A.  Correct.
18    Q.  So basically you want, as you testified
19   yesterday, revenge against me and Mr. Falahati to
20   explain why you're unhappy with your professional
21   and personal life?
22    A.  No, I did not say that.

</td><td>

Page 492

1   in the middle of this.
2    I can't say that, because it's -- I
3   always think what people are going to think and
4   say that, "So, her own lawyer now?"
5    So therefore, I wanted this to be
6   resolved here.
7   BY MR. KLAYMAN:
8    Q.  Over the lunch break you talked about
9   your testimony, not with Mr. Smith, but with some
10   other people, didn't you?
11    A.  Over what?
12    Q.  Over our lunch today, you talked about
13   your testimony, not with Mr. Smith, but with some
14   other people.
15    You talked with Sam?
16    A.  No, I didn't.
17    Q.  You talked with Kathleen?
18    A.  No, I didn't.
19    Q.  Now, assuming what you say is correct,
20   you're aware that I advised you --
21    A.  I didn't.  That is correct.
22    Q.  That's your opinion.

</td></tr>
</table>

59 (Pages 489 to 492)

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 493 | Page 495 |
|---|---|

**Page 493**

1    A.  I'm under oath --
2         CHAIRMAN FITCH:  She stated as a fact,
3    Mr. Klayman --
4         MR. KLAYMAN:  Alright, fine.  I don't
5    mean to get into it.
6         CHAIRMAN FITCH:  -- what he did with
7    the adversary.
8         MR. KLAYMAN:  I don't mean to get into
9    it.
10   BY MR. KLAYMAN:
11        Q.  But you are aware that I told you to go
12   get another lawyer and I recommended Tim Shea and
13   Gloria Allred?
14        A.  Yes.
15        Q.  You're aware of that.
16        A.  But then you said -- you said, "He's
17   not capable."  I have the email that you sent me,
18   that you said "He's not capable.  He's not a good
19   attorney for this."
20        And also you said, again, in an email,
21   I have it, that you said that if I'm -- you and
22   Tim Shamble think that I have something going on

**Page 494**

1    under the table, that I'm agreeing with VOA to get
2    back at -- if that is the case then you put
3    hundreds of thousands of dollars in time and you
4    want the money back.  So --
5         MR. KLAYMAN:  I move to strike.
6    Nonresponsive, your Honor.  I mean, she's
7    obviously -- I mean, this is just a coaching
8    session.
9         CHAIRMAN FITCH:  It's going to be
10   sustained.  Your motion is sustained.
11        What is struck is the question and
12   answer in their entirety.  They came after
13   testimony by the complaining witness that
14   Respondent did recommend Tim Shea and Gloria
15   Allred.
16        MR. KLAYMAN:  Right.
17        CHAIRMAN FITCH:  But the next question
18   and answer are struck.
19   BY MR. KLAYMAN:
20        Q.  And you are aware that Gloria Allred is
21   the most prominent, famous lawyer for women in
22   sexual harassment cases in the United States?

**Page 495**

1    A.  Yes.
2    Q.  And you're aware that she's my friend?
3    A.  But you told me that she won't
4    represent me.  You emailed me that.
5    Q.  I just asked you whether you're aware
6    that she's my friend.
7    A.  Yes.
8    Q.  And that I asked her to represent you.
9    A.  Yes.
10   Q.  And you did have occasion to talk with
11   Ms. Allred with regard to possible representation,
12   correct?
13   A.  I'm sorry?
14   Q.  You did talk to her, yourself?
15   A.  Yes, I did.
16        Do you know want to know what she told
17   me?
18        THE WITNESS:  Can I tell the court what
19   she told me?
20        CHAIRMAN FITCH:  Well, that's up to him
21   right now.
22   BY MR. KLAYMAN:

**Page 496**

1    Q.  Yesterday you said you wanted revenge
2    against me.  Remember that?
3    A.  I just explained what I said yesterday.
4         Yes -- I didn't say I wanted revenge
5    against you.  I said I was in a dark place in my
6    life.  I was gonna take my life and die, and then
7    everybody would get their hands on all the emails
8    and all the evidence and then know what you did to
9    me.
10        Because I was not strong enough to face
11   everything.
12   Q.  And you remember --
13   A.  So I didn't say revenge.
14   Q.  You remember about a year ago I was
15   sitting in a cafe on the corner of Camden and
16   Wilshire Boulevard --
17   A.  Yes.
18   Q.  -- Camden and Brighton in Beverly
19   Hills.
20   A.  Yes.
21   Q.  And I was sitting there with someone
22   who is my chief of staff and you ran over in a

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 497

1  really violent way --
2        A.  No.
3        Q.  -- and yelled --
4        A.  No.  Absolutely not
5        CHAIRMAN FITCH:  Wait a minute.  Let
6  him finish his question and then you'll give your
7  full answer.
8        THE WITNESS:  I'm sorry, I'm sorry.
9  BY MR. KLAYMAN:
10       Q.  And yelled, "This man ruined my life.
11  He's a terrible person."
12       You said that to me and my chief of
13  staff.  You screamed it.
14       CHAIRMAN FITCH:  Answer the question
15  now.
16       THE WITNESS:  It's not correct.
17       CHAIRMAN FITCH:  Ok.
18       THE WITNESS:  I did go up to them and
19  talk to him, but that's not -- not the way he's
20  describing.
21
22  BY MR. KLAYMAN:

Page 498

1        Q.  And then it was clear that I didn't
2  even recognize you after all these years, correct?
3  I looked bewildered.
4        THE WITNESS:  That's his -- that's
5  not -- he knew exactly why.
6        CHAIRMAN FITCH:  I take it your answer
7  is that you don't know whether he was bewildered
8  or not?
9        THE WITNESS:  Exactly.  Thank you.
10  BY MR. KLAYMAN:
11       Q.  Now, when you ran up to me, what I do
12  remember, you had heavy makeup on.  Remember that?
13       A.  I have what?
14       Q.  Heavy makeup.
15       CHAIRMAN FITCH:  What's the relevance
16  of that?
17       MR. KLAYMAN:  I'm going to tie it up.
18       CHAIRMAN FITCH:  Tell me what the
19  relevance is.
20       THE WITNESS:  I don't remember that --
21       CHAIRMAN FITCH:  Now, woah.
22       Tell me what the relevance is.

Page 499

1        MR. KLAYMAN:  The relevance is that,
2  your Honor -- in all due respect, again, I'm in
3  the role of the lawyer and the Respondent,
4  correct?
5        CHAIRMAN FITCH:  That's fine.  Tell
6  me --
7        MR. KLAYMAN:  I wish I had a lawyer who
8  had time to elicit the facts --
9        CHAIRMAN FITCH:  Just tell me the
10  relevance.
11       MR. KLAYMAN:  She came in here trying
12  to look like a victim.  She's always very well
13  made up, very prim and proper.  She wants to be
14  the victim in front of you and look like --
15       CHAIRMAN FITCH:  I see no equation
16  between makeup and victimhood.
17       MR. KLAYMAN:  That's --
18       CHAIRMAN FITCH:  The question is not
19  permitted.
20       MR. KLAYMAN:  But you asked me to --
21       CHAIRMAN FITCH:  That's right, and
22  you've told me the relevance and it's not a

Page 500

1  convincing explanation.
2        MR. KLAYMAN:  She wants to look --
3        CHAIRMAN FITCH:  There is no connection
4  between makeup and victimhood.
5        MR. KLAYMAN:  I'm not saying that.
6        You see, look, you put me in this
7  role --
8        CHAIRMAN FITCH:  I didn't put you in --
9        MR. KLAYMAN:  You said I could be as
10  aggressive as I needed to be.
11       CHAIRMAN FITCH:  You don't need to be
12  that aggressive beyond the bounds of relevance.
13       MR. KLAYMAN:  It's not aggressive,
14  because --
15       All I'm trying to say is, in a nice
16  way -- and I didn't ask the question until you
17  asked me where I was coming from, and I was
18  truthful with you -- is that she wanted to look
19  down and out when she same in here.
20       Ok, so she's usually, from what I
21  remember and what I saw then, someone who, you
22  know, is totally -- looks as good as she possibly

In The Matter Of:  Larry E. Klayman
May 31, 2018

|   | Page 501 |
|---|---|
| 1 | can.  I'm not saying she doesn't look good. |
| 2 | I'm just saying, she wanted to create |
| 3 | an impression somehow -- |
| 4 | MR. SMITH:  That sounds like the stuff |
| 5 | of a closing argument. |
| 6 | CHAIRMAN FITCH:  Mr. Smith, I don't |
| 7 | need any -- |
| 8 | MR. KLAYMAN:  But you asked me. |
| 9 | CHAIRMAN FITCH:  I did ask you, and you |
| 10 | told me, and it's not convincing. |
| 11 | MR. KLAYMAN:  Your Honor, I'm giving |
| 12 | you an honest answer. |
| 13 | I respect your ruling -- |
| 14 | CHAIRMAN FITCH:  Alright.  Move on. |
| 15 | MR. KLAYMAN:  -- and I'm giving you an |
| 16 | honest answer. |
| 17 | CHAIRMAN FITCH:  Ok. |
| 18 | MR. KLAYMAN:  I could dodge around -- |
| 19 | CHAIRMAN FITCH:  Move on. |
| 20 | MR. KLAYMAN:  -- it and be a |
| 21 | politician, but I -- |
| 22 | CHAIRMAN FITCH:  Move on. |

|   | Page 502 |
|---|---|
| 1 | MR. KLAYMAN:  Ok.  It's exactly why I |
| 2 | didn't want to have to do this examination. |
| 3 | BY MR. KLAYMAN: |
| 4 | Q.  I'm going to turn your attention to -- |
| 5 | MR. KLAYMAN:  Your Honor, I apologize. |
| 6 | I'm just trying to find the exhibit. |
| 7 | CHAIRMAN FITCH:  It's alright. |
| 8 | MR. KLAYMAN:  And I really do -- I |
| 9 | don't want to get emotional here.  I just want |
| 10 | this to be a very easy-going examination, |
| 11 | honestly. |
| 12 | BY MR. KLAYMAN: |
| 13 | Q.  Turning your attention to Exhibit 16, |
| 14 | Respondent's Exhibit 16. |
| 15 | CHAIRMAN FITCH:  I think it's in this |
| 16 | book.  Madam?  (Indicating). |
| 17 | BY MR. KLAYMAN: |
| 18 | Q.  Before that I'm going to go back a |
| 19 | little bit.  You say that -- |
| 20 | MR. TIGAR:  Counsel, I don't know that |
| 21 | the witness -- can I ask the witness, do you have |
| 22 | Respondent's Exhibit 1-6, 16? |

|   | Page 503 |
|---|---|
| 1 | THE WITNESS:  Is this, I'm not -- |
| 2 | CHAIRMAN FITCH:  No, in the white book, |
| 3 | Number 16. |
| 4 | MR. TIGAR:  It is the Serrano Encino |
| 5 | Residential -- |
| 6 | CHAIRMAN FITCH:  Mr. Klayman wants to |
| 7 | go back to ask about something else. |
| 8 | MR. KLAYMAN:  Yeah, I'm gonna go back. |
| 9 | BY MR. KLAYMAN: |
| 10 | Q.  Ms. Sataki, you're aware that when I |
| 11 | started to receive communications from Sam, |
| 12 | whoever, with regard to the case -- we'll pinpoint |
| 13 | the times later -- that what I was saying is that, |
| 14 | if these people are going to be intervening in |
| 15 | legal affairs that I'm bringing for you, that I've |
| 16 | put in a lot of time, and not you would have to |
| 17 | pay me, but they should pay me for all the time if |
| 18 | they were going to mess up these cases. |
| 19 | MR. SMITH:  That's like one really long |
| 20 | complicated question that I don't quite |
| 21 | understand. |
| 22 | CHAIRMAN FITCH:  I'm sorry, Mr. Smith? |

|   | Page 504 |
|---|---|
| 1 | MR. SMITH:  That's one long, |
| 2 | complicated question and I don't understand -- |
| 3 | CHAIRMAN FITCH:  I don't understand it. |
| 4 | Sustained. |
| 5 | MR. KLAYMAN:  I'll withdraw it.  I'll |
| 6 | withdraw it. |
| 7 | BY MR. KLAYMAN: |
| 8 | Q.  Let's go back to 16.  That's the lease |
| 9 | agreement that I signed to rent the amount for you |
| 10 | on Ventura Boulevard, correct?  It was at the |
| 11 | Serrano Encino. |
| 12 | A.  Correct. |
| 13 | Q.  And it shows that I paid a security |
| 14 | deposit of $3,050, correct? |
| 15 | A.  Correct. |
| 16 | Q.  And four months of rent at $2,287.50? |
| 17 | A.  Correct. |
| 18 | Q.  And you were able to stay there two |
| 19 | months beyond the four, because we were getting -- |
| 20 | you were getting or I was getting, since I'm the |
| 21 | lessee, two free months? |
| 22 | A.  Yes. |

62  (Pages 501 to 504)

In The Matter Of:  Larry E. Klayman
May 31, 2018

---

Page 505

1      Q.  Now, there came a point in time, and
2  I'll turn your attention to Exhibit 12, and I'll
3  see if I can find the pages for you.
4      (Brief pause.)
5      Q.  There came a point in time when you
6  actually brought a lawsuit against the apartment,
7  correct?
8      A.  Correct.
9      Q.  Correct?
10     A.  Yes.
11     Q.  I turn your attention to a page, which
12 is part of that exhibit, and I can find it for
13 you, the first page says SC100, Plaintiff's Claim
14 and Order to Go to Small Claims Court, filed July
15 13th, 2011.
16     MR. SMITH:  How far is the exhibit into
17 the --
18     MR. TIGAR:  I'm sorry, counsel, what
19 exhibit is this?
20     THE WITNESS:  This is not during the
21 time that he paid for the apartment.  This is
22 after, long after that.

---

Page 506

1      MR. KLAYMAN:  I didn't ask that
2  question.
3      CHAIRMAN FITCH:  We're going to let him
4  get to where we can understand.
5      MR. SMITH:  I'd like to be able to find
6  the document that he's referring to, as well,
7  because none of these --
8      CHAIRMAN FITCH:  Alright, we're in
9  Respondent's Exhibit 12.
10     MR. KLAYMAN:  I'll tell you how many
11 pages in it is.  One, two, three, four, five, six,
12 seven -- eight.  Eight pages into it.
13     MR. SMITH:  Alright.  Thank you.
14     CHAIRMAN FITCH:  Now, wait a minute.
15 My eighth page is a blank page.  You want me to
16 count the very first page as Page 1.
17     MR. KLAYMAN:  Maybe they put an extra
18 page in there.
19     CHAIRMAN FITCH:  One, two, three, four,
20 five, six, seven -- ok, ignore the blank page.
21 Eight.
22     MR. KLAYMAN:  Ok.

---

Page 507

1      CHAIRMAN FITCH:  And there is a file
2  stamp of October 1, 1998, correct?
3      MR. SMITH:  That's what I see.
4      CHAIRMAN FITCH:  Upper right-hand
5  corner.
6      MR. KLAYMAN:  I don't see that.  My
7  eyes are bad.
8      MR. SMITH:  Are you sure you're in the
9  same exhibit?
10     MR. KLAYMAN:  This is the page
11 (indicating).
12     MR. KLAYMAN:  Can I just show the page
13 I'm talking about.
14     CHAIRMAN FITCH:  You can show me the
15 page that you're talking about.
16     MR. KLAYMAN:  Yes, then we can key it
17 in for Ms. Sataki.
18     CHAIRMAN FITCH:  If you could bring it
19 a little closer for me.
20     MR. KLAYMAN:  Yes.
21     MR. SMITH:  I'd like to know where
22 we're at.

---

Page 508

1      MR. KLAYMAN:  Here.
2      CHAIRMAN FITCH:  He's going to show you
3  the page that he's interested in.
4      THE WITNESS:  Is it this one?  It looks
5  like this.
6      CHAIRMAN FITCH:  Hold on, just a
7  minute.
8      It's a page, is it not, Mr. Klayman,
9  that has SC100-A at the top left-hand corner?
10     MR. KLAYMAN:  Yes.
11     CHAIRMAN FITCH:  And the bottom, toward
12 the bottom left-hand corner 7/13/11?
13     MR. KLAYMAN:  Yes.
14     CHAIRMAN FITCH:  Ok.
15     MR. KLAYMAN:  And it purports to have
16 Ms. Sataki's signature.
17     CHAIRMAN FITCH:  Mr. Smith, it's kind
18 of toward the end, maybe 20 pages back from the
19 end.
20     MR. SMITH:  Ok.
21     CHAIRMAN FITCH:  That's a very rough
22 20, 25 maybe.  It's there.

---

In The Matter Of: Larry E. Klayman
May 31, 2018

---

**Page 509**

1    (Witness reads document.)
2    BY MR. KLAYMAN:
3    Q.  You see that?  That's your signature,
4    isn't it, Ms. Sataki?
5    A.  Yes.
6    Q.  This is the complaint you filed against
7    Serrano Encino Luxury Apartments and Dean Proper.
8    A.  Yes.
9    Q.  Who is Dean Proper?
10   A.  He was working in the office.
11   Q.  In the office at the apartment?
12   A.  Yes.
13   Q.  The rental office?
14   A.  Yes.
15   Q.  What were his duties and
16   responsibilities?
17   A.  I don't know exactly.
18       Because he was the manager there.  He
19   was signing the papers.  I don't know exactly his
20   title or his duties.
21
22   BY MR. KLAYMAN:

---

**Page 510**

1    Q.  Turn to the next page.  It says
2    "Declaration."
3        CHAIRMAN FITCH:  Mr. Smith, you're more
4    or less with us?
5        MR. SMITH:  Yes.
6        CHAIRMAN FITCH:  Thank you.
7    BY MR. KLAYMAN:
8    Q.  It says, "Declaration."  This is
9    something that you swore to, correct, under
10   penalties of perjury, looking at the bottom?
11   A.  Yes.
12   Q.  And it says, "From June 13th, 2011, to
13   June 26th, 2011 I was visiting my family in
14   Sweden.  Out of courtesy I notified Dean Proper,
15   the assistant property manager, of my absence just
16   before I left.  My friend Jessica was staying in
17   my apartment while I was in Sweden.
18       "On Wednesday, June 15th, at around
19   2:00 p.m., while Jessica was in the guest bedroom,
20   she hears the doorbell ring and, as she was half
21   naked laying in bed, it took some time to get up
22   and answer the door.

---

**Page 511**

1        "By the time she got out of the room to
2    answer the door, she was shocked, to say the
3    least, to see a man standing by the kitchen (Dean
4    Proper).
5        "She got scared and ran back to the
6    room and put something on and told the man, who
7    she knew was the assistant property manager, to
8    wait there.
9        "She went back after a few short
10   moments to see what the man wanted.  The man was
11   already out of the apartment and on his way to the
12   elevator when Jessica asked him, 'What do you
13   want?'  And he replied, 'I had a package for
14   Ellie?  Is she not home?'  She replied, 'No.  Why
15   don't you leave the package with me?'  And he
16   says, 'No, I have to give it to Ellie and leave.'
17       "He of course had no package with him
18   when he came to the apartment and was suddenly in
19   such a rush to get out of the apartment.
20       "He was told by Ellie just a few days
21   before she left that she was going to be visiting
22   family in Sweden.  So he very well knew that Ellie

---

**Page 512**

1    was not going to be home.
2        "In June 2010 my expensive ring
3    suddenly vanished from my apartment without any
4    reasonable explanation.  A police report was filed
5    but the ring was never found.
6        "A few times I felt like things had
7    shifted in my closet and again no reasonable
8    explanations until now.
9        "Mr. Dean Proper's visits are the only
10   explanation."
11       Did you write that?
12   A.  Yes.
13   Q.  Who helped you write it?  That's not in
14   your English.
15   A.  Me -- it doesn't matter.  Do I have to
16   tell you?
17   Q.  Yes, I'm asking the question.
18       CHAIRMAN FITCH:  What is --
19       MR. SMITH:  I'll going to have to ask
20   for a proffer as to relevance.
21       CHAIRMAN FITCH:  Well, I --
22       MR. SMITH:  It's a collateral issue.

---

64 (Pages 509 to 512)

App.0282

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 513 | Page 515 |
|---|---|
| 1     THE WITNESS: It's a friend. Can I | 1     reading of the wording. |
| 2   just say a friend. | 2     BY MR. KLAYMAN: |
| 3     CHAIRMAN FITCH: Wait a minute. | 3     Q. Is that the implication? |
| 4     I see the potential relevance of the | 4     CHAIRMAN FITCH: No, it's not. |
| 5   filing this action, as to the witness' | 5     MR. SMITH: Objection. |
| 6   credibility. Nothing else. I don't see the | 6     CHAIRMAN FITCH: Objection sustained. |
| 7   relevance of whatever the answer may be to that | 7     BY MR. KLAYMAN: |
| 8   question. | 8     Q. Now, you also mentioned that you're now |
| 9     So the objection is sustained. | 9   blaming Dean Proper for stealing your diamond |
| 10     MR. KLAYMAN: Ok. | 10   ring? |
| 11     CHAIRMAN FITCH: You did testify, did | 11     A. I'm not. |
| 12   you -- tell me if I'm wrong -- that you had | 12     Q. It says, "Mr. Dean Proper's visits are |
| 13   assistance in writing the complaint? | 13   the only explanation." The prior paragraph |
| 14     THE WITNESS: Yes. | 14   claimed that your ring suddenly vanished? |
| 15     CHAIRMAN FITCH: Ok. | 15     A. I said that, but I never blamed him |
| 16   BY MR. KLAYMAN: | 16   directly. There was a question mark how my ring |
| 17     Q. Jessica did not help you write that | 17   vanished. I don't know. |
| 18   complaint, did she? | 18     But usually you get a note if the |
| 19     MR. SMITH: Objection. She just said | 19   manager or anybody is entering your unit, and they |
| 20   she had help writing the complaint. | 20   knew that I'm in Sweden. So they didn't -- I |
| 21     CHAIRMAN FITCH: I sustained that | 21   didn't get any email from the management, nor did |
| 22   objection. | 22   we get any note that anybody's entering the unit. |

| Page 514 | Page 516 |
|---|---|
| 1     MR. SMITH: Thank you. | 1     So, when you're renting an apartment, |
| 2   BY MR. KLAYMAN: | 2   the building rules is that they notify you before |
| 3     Q. These observations that you swore to | 3   they enter your unit. |
| 4   under oath, they're yours about somebody breaking | 4     Q. I'm going to read the last two |
| 5   into apartment and in effect sexually harassing | 5   paragraphs again, just so -- |
| 6   somebody because they were naked in bed. | 6     MR. SMITH: Objection. This is a |
| 7     A. No. There is no -- | 7   collateral matter. |
| 8     CHAIRMAN FITCH: You don't need to | 8     If we are going to try to find out if |
| 9   answer that. It speaks -- | 9   Dean Proper is guilty of whatever, it's not going |
| 10     I am mistaken. You may ask that | 10   to be resolved in this proceeding. It's not going |
| 11   question again, and we'll get an answer. | 11   to be resolved in cross-examination. |
| 12   BY MR. KLAYMAN: | 12     It's a waste of time, it's irrelevant, |
| 13     Q. This was your perception that Dean | 13   and I have a strenuous objection to it. |
| 14   Proper was sexually harassing Jessica, not | 14     MR. KLAYMAN: I'm going to tie it up. |
| 15   Jessica's. | 15     CHAIRMAN FITCH: You're not going to |
| 16     A. Absolutely not | 16   reread what has been 3read out loud and by one or |
| 17     Q. You testified -- | 17   more of us up here. |
| 18     A. There was never anything filed or | 18   BY MR. KLAYMAN: |
| 19   anything said about sexual harassment. | 19     Q. The last two paragraphs, I'm not going |
| 20     Q. But you're claiming that he broke in | 20   to reread them, what you are saying is that Dean |
| 21   effect because she was naked in bed? | 21   Proper is the only explanation for your ring |
| 22     CHAIRMAN FITCH: That's not a fair | 22   vanishing. |

65 (Pages 513 to 516)

In The Matter Of: Larry E. Klayman
May 31, 2018

## Page 517

1　　　　CHAIRMAN FITCH: Is that what you are
2　trying -- you may answer whether or not that's
3　what you were trying to say.
4　　　　THE WITNESS: No, that was not what I
5　was trying to say.
6　　　　CHAIRMAN FITCH: Why is that not what
7　you were trying to say?
8　　　　THE WITNESS: I was not trying to say
9　that is the only explanation. I was not accusing
10　him that he definitely do it.
11　　　　It was that he was not to enter my
12　unit. That's it. Not that he --
13　BY MR. KLAYMAN:
14　　　Q. Does not the last line say that, that
15　Mr. Dean Proper's visits were the only
16　explanation?
17　　　A. We never accused him and he never
18　complained about that. Nothing like that ever
19　happened.
20　　　　CHAIRMAN FITCH: Well, Mr. Klayman has
21　a perfectly good question there.
22　　　　When you said, "Mr. Dean Proper's

## Page 518

1　visits are the only explanation," ok, you said
2　that, correct? You wrote those seven or eight
3　words, correct, "Mr. Dean Proper's visits are the
4　only explanation"?
5　　　　Do you see those words?
6　　　　THE WITNESS: Yes, I see that.
7　　　　CHAIRMAN FITCH: Ok, you wrote those
8　words?
9　　　　THE WITNESS: Yes.
10　　　　CHAIRMAN FITCH: Ok.
11　　　　What does that refer to? What does
12　that sentence refer to?
13　　　　Does it refer to expensive rings
14　suddenly vanished, or does it refer to "things
15　being shifted in my closet"?
16　　　　THE WITNESS: It was just something
17　that we -- all together. We didn't accuse him of
18　anything specially, and we never -- it was just
19　something that all together was written in there.
20　　　　CHAIRMAN FITCH: Then whom were you
21　accusing of what in this complaint?
22　　　　THE WITNESS: No, the complaint was

## Page 519

1　just that he was not entering my unit without
2　notification, and only the certain things that
3　happened in the unit, we put it there.
4　　　　CHAIRMAN FITCH: We have that
5　testimony. We'll judge its credibility.
6　　　　Do you wish to bring out anything more
7　about how this case was ended?
8　　　　MR. KLAYMAN: Yes.
9　BY MR. KLAYMAN:
10　　　Q. In fact the court ruled against you,
11　right?
12　　　A. Yes.
13　　　Q. And a judgment was entered for Dean
14　Proper and the apartment?
15　　　A. It wasn't because of this.
16　　　　CHAIRMAN FITCH: Well --
17　　　　THE WITNESS: It wasn't because of
18　this.
19　　　　It was about the rent.
20　　　　CHAIRMAN FITCH: About what?
21　　　　THE WITNESS: It was about the rent.
22　It wasn't because of I accused -- we accused him

## Page 520

1　for the ring or we wanted the money for the ring
2　or anything like that.
3　　　　It was about the rent, because we
4　wanted to terminate the rent right there and then
5　and move out, and they said "You have to stay
6　until the end of the agreement." It was about
7　that.
8　　　　Because of this incident, I just wanted
9　to terminate it and move out, but I lost the case,
10　so I had to pay and stay until the end of the
11　contract.
12　　　　It was only about the rent. It wasn't
13　about this.
14　　　　CHAIRMAN FITCH: Do you have any other
15　questions about this?
16　　　　MR. KLAYMAN: Yeah.
17　BY MR. KLAYMAN:
18　　　Q. I'm going to turn your attention to
19　another page in this exhibit, which will clear
20　this up.
21　　　　"Herein it states" --
22　　　　MR. SMITH: What are we looking at now?

App.0284

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 521 | Page 523 |
|---|---|

**Page 521**

1 What exhibit?  You said you have another
2 document --
3         MR. KLAYMAN:  It's part of the same
4 exhibit.
5         MR. SMITH:  Alright, which page?
6         MR. KLAYMAN:  This is the court file.
7         CHAIRMAN FITCH:  He we know that, Mr.
8 Klayman.  Is it a few pages past where we were
9 before?
10         MR. KLAYMAN:  Yeah.  I'm showing him
11 where it is, and I'll show your Honor too.
12         (Brief pause.)
13         MR. KLAYMAN:  And I'll show you.
14         CHAIRMAN FITCH:  Is it after what we
15 were looking at before?
16         MR. KLAYMAN:  Yeah.
17         It says, "Judgment was entered, as
18 stated below, on Day:  8/23/2011.  Defendant does
19 not owe plaintiff any money on plaintiff's claim."
20         And below it says "contested."
21         CHAIRMAN FITCH:  Wait a minute.
22         It's a page that says "Judgment was

**Page 523**

1 examination, but we'll take a break first for ten
2 minutes here at 3:25.
3         MR. KLAYMAN:  Just a few more
4 questions.
5 BY MR. KLAYMAN:
6     Q.  There was a court hearing on this case
7 where you testified, the other side testified?
8     A.  Yes.
9     Q.  And the judge didn't believe your
10 testimony and believed the defendants?
11         MR. SMITH:  Objection.  Objection.
12         CHAIRMAN FITCH:  That's sustained.
13 We're going to take a break here.
14         MR. KLAYMAN:  Ok, we'll take a break.
15         (Recess taken.
16         CHAIRMAN FITCH:  I think we're back on
17 the record at 3:37.
18         MR. KLAYMAN:  Excuse me, ok.
19         CHAIRMAN FITCH:  Mr. Klayman, you were
20 going to say...?
21         MR. KLAYMAN:  I'm going to move Exhibit
22 12 into evidence, the portion that I had

| Page 522 | Page 524 |
|---|---|

**Page 522**

1 entered as stated below on" date?
2         MR. KLAYMAN:  Yes.
3         CHAIRMAN FITCH:  And where does the
4 judgment appear?
5         MR. KLAYMAN:  Well, there's a finding
6 there, "Defendant does not owe plaintiff any money
7 on plaintiffs' claim."
8         CHAIRMAN FITCH:  Where is that?
9         MR. KLAYMAN:  Right below it.  The next
10 two pages.
11         CHAIRMAN FITCH:  Oh, this little print.
12         MR. KLAYMAN:  Yes.
13         CHAIRMAN FITCH:  "Does not owe
14 plaintiff any money."
15         MS. LARKIN:  Did you find it?
16         THE WITNESS:  I don't understand what
17 the question is and --
18         CHAIRMAN FITCH:  We're waiting for more
19 examination or testimony.  This document speaks
20 for itself for whatever value it may have to one
21 or two issues in this case.
22         We need to move on to other

**Page 524**

1 questioned her about, this claim against Dean
2 Proper and Serrano Apartments.
3         CHAIRMAN FITCH:  Mr. Smith?
4         MR. SMITH:  I believe it's a collateral
5 issue and I would object to it on that grounds.
6         CHAIRMAN FITCH:  We need to figure out
7 which particular pages we're talking about, but I
8 think your motion was clear enough for our
9 purposes and --
10         MR. KLAYMAN:  I can specify later.
11         CHAIRMAN FITCH:  -- those pages are
12 admitted.
13 BY MR. KLAYMAN:
14     Q.  Ms. Sataki, you had told me, long
15 before you brought this lawsuit against the
16 Serrano Apartments and Dean Proper, that there was
17 somebody in your apartment, a guy who you think
18 had stolen that ring.
19     A.  I never said a guy.  I never said that.
20     Q.  He was a boyfriend?
21     A.  No, I never said that.
22         You always assumed that.  It was your

67 (Pages 521 to 524)

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 525 | Page 527 |
|---|---|

**Page 525**

1 word, not mine. So, these are your thoughts that
2 you are saying that I said it.
3    Q. You actually also asked me to help you
4 file an insurance claim, did you not?
5    A. No.
6    Q. In fact I refused to do that, claiming
7 it would be fraudulent. Do you remember that?
8    A. No, I never did that.
9    Q. Now, you've had other lawsuits in the
10 Superior Court of Los Angeles, have you not, that
11 you brought that you have filed?
12    A. Other lawsuits?
13    Q. Other cases, other complaints. You
14 filed other complaints?
15    A. Yes.
16    Q. What other cases did you file,
17 complaints, in the courts of Los Angeles?
18    A. One of them, it was against ia
19 Atabay's wife, because she wrongly accused me of
20 something, and it was proven in court that what
21 she accused me of, and what you just said, and
22 VOA, that was --

**Page 526**

1    CHAIRMAN FITCH: Ok, that's --
2    THE WITNESS: That was one of them.
3    CHAIRMAN FITCH: We've covered that and
4 we're not going further into that.
5    MR. KLAYMAN: Let me ask one question
6 on that.
7    CHAIRMAN FITCH: We've covered that.
8 We're not going further into that.
9    MR. KLAYMAN: But that was not what the
10 finding was about, your Honor.
11    CHAIRMAN FITCH: We have evidence that
12 she filed it. Whatever she said earlier. That's
13 it.
14 BY MR. KLAYMAN:
15    Q. Do you have another one that you filed?
16    You filed at least five, didn't you?
17    A. I don't remember. Do you want to --
18    Q. Yes.
19    A. Ok.
20    CHAIRMAN FITCH: Mr. Klayman --
21    THE WITNESS: Why --
22    CHAIRMAN FITCH: Mr. Klayman, as far as

**Page 527**

1 relevancy is concerned here, of all this line of
2 examination, you're not suggesting that the
3 results of those lawsuits say anything about her
4 credibility or honesty, are you?
5    MR. FITCH: Well, the last one --
6    CHAIRMAN FITCH: Because lawsuits could
7 go -- I said, just the results. Lawsuits could go
8 either way.
9    Go ahead, I'm sorry.
10    MR. KLAYMAN: Well, lawsuits involve
11 weighing evidence, so, obviously the court in this
12 lawsuit over the credibility of the apartment and
13 Dean Proper, the judge believed the defendants and
14 not her.
15    That's what I'm saying.
16    THE WITNESS: Jessica was my roommate
17 and I had to do that. This is --
18    CHAIRMAN FITCH: Ma'am, ma'am --
19    THE WITNESS: I'm sorry.
20    MR. KLAYMAN: It speaks for itself.
21    CHAIRMAN FITCH: Thank you.
22    Mr. Smith has essentially a running

**Page 528**

1 collateral matter objection, and the results of
2 those lawsuits, the reasons for those results are
3 too speculative.
4    Now, how she handled the complaint and
5 what she said in her complaints and whether
6 they're internally consistent or contradicted by
7 other evidence, to some extent I'm willing to hear
8 that, because that goes to the overall credibility
9 of a witness.
10    MR. KLAYMAN: What it deals with, your
11 Honor -- and I ask respectively for some latitude.
12    CHAIRMAN FITCH: I've given you a great
13 deal of latitude.
14    MR. KLAYMAN: I know you did. I know
15 you did, and I appreciate that. I'm not
16 criticizing you in any way.
17    But I had previously asked to take a
18 deposition and you said, well, we can deal with it
19 at the hearing, and that's why I'm appreciative of
20 you giving me some latitude here.
21    I would have liked to have gotten this
22 out sooner, because it appears that, from what I

68 (Pages 525 to 528)

In The Matter Of:  Larry E. Klayman
May 31, 2018

Page 529

1  know, and I'm asking for more information, that
2  she has a pattern and practice of making false
3  claims against others when she doesn't get what
4  she wants.
5      That's the relevance.
6      CHAIRMAN FITCH:  That's arguably
7  relevant.
8      Falsity is not established by the
9  result of the lawsuit.  It's established by what's
10  said and what other evidence might affect one's
11  judgment of the accuracy or falsity or
12  truthfulness of the allegations.
13      Now we've heard of this lawsuit.  We've
14  talked with her about her complaint, so on and so
15  forth.  We heard about the lawsuit involving a
16  wife.
17      You may ask her specifically about
18  another lawsuit.
19      MR. KLAYMAN:  Yes, that's what I'm
20  doing.
21      CHAIRMAN FITCH:  Carefully, narrow the
22  question down.

Page 530

1      MR. KLAYMAN:  I'm trying to learn from
2  her -- I've been trying to get files from the
3  courthouse in Van Nuys.  Some of them were in the
4  basement, which flooded.  So I have my associate
5  up here today trying to get them.  But I wanted to
6  find out from her what other cases she filed,
7  because I know that there are at least five, from
8  what I understand, from the process service, legal
9  service that went out there to get them.  And some
10  of them were underwater, apparently.
11      CHAIRMAN FITCH:  I'm concerned that,
12  even for cross-examination, that you don't have,
13  in these other cases, a basis for pursuing --
14      MR. KLAYMAN:  I don't know unless I --
15      CHAIRMAN FITCH:  -- this because you
16  just said you haven't seen them.  They may be
17  underwater.
18      MR. KLAYMAN:  That's why I'm asking
19  questions here, and that's why I wanted to take
20  discovery of her.
21      MR. SMITH:  But this should not be
22  discovery.

Page 531

1      MR. KLAYMAN:  Well, it should be under
2  the circumstances of what --
3      CHAIRMAN FITCH:  That's right.  That's
4  entirely correct.
5      MR. KLAYMAN:  No.  What your Honor said
6  was that, "You can ask the questions at the
7  hearing and I will then hold it under" --
8      CHAIRMAN FITCH:  That's exactly what I
9  said.
10      MR. KLAYMAN:  I'm paraphrasing, "under
11  advisement and then I'll let you know whether I
12  will allow you to take more discovery" -- "or take
13  discovery."  I didn't have any.
14      So, I'm trying to figure out what cases
15  she filed.  It may be relevant or lead to relevant
16  evidence.  The rule is, as Mr. Tigar knows,
17  relevant or evidence that may lead to relevant
18  evidence, and I thank you for the latitude.
19      CHAIRMAN FITCH:  Mr. Smith?
20      MR. SMITH:  This is not discovery.
21  There is a disciplinary hearing to determine
22  whether or not Mr. Klayman engaged in unethical

Page 532

1  conduct, based upon the evidence that we have
2  before the Board.
3      If he wants to score some points and
4  attack Mrs. Sataki's credibility, he had plenty of
5  time to work on that.  He has known since the last
6  fall that this matter was petitioned for a
7  hearing.
8      So, if he just decided within the last
9  few weeks to try to conduct some discovery in Van
10  Nuys, California and they had a flood, that's not
11  on us.  That's on him.
12      But whatever defense he wants to mount,
13  if it's with respect to some collateral matters,
14  he's had plenty of time to get that together.  He
15  did not need a deposition with Ms. Sataki.  He
16  does not even need to waste our time now.
17      MR. KLAYMAN:  In all due respect -- and
18  I don't want to get into a fight with Mr. Smith,
19  because we've had some good decorum, under the
20  circumstances -- the fact that we are here today,
21  eight years later, is not my doing.  It's Bar
22  Counsel's doing.  And I did seek to get these

69 (Pages 529 to 532)

In The Matter Of:  Larry E. Klayman
May 31, 2018

## Page 533

1  documents earlier.  They have been underwater in
2  the basement of the Van Nuys Superior Courthouse.
3      So all I wanted to do was ask some
4  simple questions as to what other cases she filed,
5  because I can't get those documents.  And it
6  wasn't just in the last two weeks.
7      Mr. Smith has a tendency to say things
8  he doesn't know.
9      CHAIRMAN FITCH:  If she says, "Somebody
10  had a car accident and I filed a complaint," what
11  are you going to do with that?
12      MR. KLAYMAN:  Well, I don't know.  I'm
13  going to see if I can find the file.
14      But she may also say that I filed three
15  other sexual harassment cases against people, and
16  the last case comes dangerously close of accusing
17  this guy of breaking into the apartment because
18  the friend's naked.  There's a certain show of
19  paranoia here, your Honor.
20      CHAIRMAN FITCH:  That's why I let you
21  go into this one case, but I think it goes to
22  credibility, 108 or the other.  I'm not sure what

## Page 534

1  else it goes to.
2      Now that we have that evidence, I'm not
3  sure what else there is to explore.
4      I guess -- I buy one point.
5      Have you filed any other --
6      Well, let me think about even the
7  relevance of that.
8      (Off-the-record discussion between
9  committee members.)
10      CHAIRMAN FITCH:  Have you filed any
11  other sexual harassment cases?
12      THE WITNESS:  No, sir.
13  BY MR. KLAYMAN:
14      Q.  Have you accused others of sexual
15  harassment?
16      A.  No.
17      MR. KLAYMAN:  Now, this, your Honor,
18  points out, as well, why I wanted the deposition,
19  at least the documents.  Because when I asked for
20  the deposition of Ms. Sataki I also asked for
21  documents, related documents, a subpoena duces
22  tecum.

## Page 535

1      The same thing is true for Dr. Aviera,
2  because I wanted to get her whole file, because
3  all we got were little pieces of it that Mr. Smith
4  deemed he wanted to give us.
5      But this case that I just brought out
6  is extremely important, because it shows the
7  potential that there's a paranoia here, that
8  there's an emotional issue that she just blames
9  others.
10      CHAIRMAN FITCH:  We heard evidence on
11  that, Mr. Klayman.  The deposition issue ruling is
12  not going to be revisited.  I think you need to
13  move on to other issues, other charges in this
14  case.
15      MR. KLAYMAN:  May I see what other
16  cases that she filed?
17      CHAIRMAN FITCH:  No, sir.
18      MR. KLAYMAN:  Your Honor, I respect
19  your rulings, but let me just put this on the
20  record.
21      CHAIRMAN FITCH:  Sure.
22      MR. KLAYMAN:  I don't agree with them,

## Page 536

1  but I respect them.
2      CHAIRMAN FITCH:  I understand that.
3      MR. KLAYMAN:  The reason the file of
4  Dr. Aviera is very important is because this
5  person seems to have an emotional problem, and --
6      CHAIRMAN FITCH:  I understand that.
7      MR. KLAYMAN:  You know, we've seen it
8  on the stand.  Yesterday she testified about me,
9  and it's the same reaction she is testifying or at
10  least dealing with in other issues.  She doesn't
11  seem to be stable.  Therefore, that's why I wanted
12  that file.
13      You just don't accuse people of
14  stealing a diamond ring and you don't accuse
15  people of breaking in because your friend is naked
16  in bed unless you have a problem.  And that's why
17  I needed that file.
18      THE WITNESS:  I did not accuse.  My
19  roommate --
20      CHAIRMAN FITCH:  Wait a minute.
21      But you've been allowed to do that
22  examination.  That is part of your theory, one of

In The Matter Of: Larry E. Klayman
May 31, 2018

---

Page 537

1  your theories. I understand all that. And we'll
2  evaluate that evidence when the time comes, but
3  we're done with other cases.
4      MR. KLAYMAN: I respect your ruling.
5  BY MR. KLAYMAN:
6      Q. I turn your attention back to Exhibit 1
7  of Bar Counsel's exhibits. It happens to be
8  Exhibit 4 of Respondent's exhibits.
9      MS. LARKIN: Excuse me, can you please
10  ask Mr. Smith to show her which exhibits he wants.
11      CHAIRMAN FITCH: Yes, it will get us
12  moving more quickly.
13      MR. KLAYMAN: Yes.
14      MS. LARKIN: Thank you.
15      MR. KLAYMAN: I was trying to be
16  courteous.
17  BY MR. KLAYMAN:
18      Q. Ok, you see Exhibit 1 of Bar Counsel's
19  exhibits?
20      CHAIRMAN FITCH: I think she has it in
21  front of her, yes.
22      THE WITNESS: Yes.

---

Page 538

1  BY MR. KLAYMAN:
2      Q. Ok. You say this wasn't your
3  handwriting, that's what you testified to
4  yesterday, on this complaint, correct?
5      A. Correct.
6      Q. Whose handwriting was it?
7      CHAIRMAN FITCH: Asked and answered.
8      MR. KLAYMAN: Maybe she remembers at
9  this point.
10      CHAIRMAN FITCH: Asked and answered.
11  BY MR. KLAYMAN:
12      Q. Turn to 1-2. It says, "He does not
13  represent me and he keeps calling me and texting
14  me. He's called me many times off hours and I
15  keep telling him not to call me and text me.
16      "I told him I have terminated my
17  acceptance of my representation. I have asked him
18  to stop communicating with me and all my
19  references. I asked him not to represent me on
20  any interviews in any and all matters and I asked
21  him not to fax me, not to email me.
22      "He keeps calling, texting and emailing

---

Page 539

1  me and I want to stop him -- I want him to stop."
2      A. Ok.
3      Q. Yes, now you are aware, based upon
4  previous testimony this afternoon, that both Mr.
5  Shamble and I were trying to get ahold of you so
6  you wouldn't lose any of your legal rights,
7  correct?
8      A. Correct.
9      Q. Ok. And that's why I was trying to get
10  ahold of you.
11      MR. SMITH: Objection.
12      CHAIRMAN FITCH: Sustained.
13  BY MR. KLAYMAN:
14      Q. Now, turn to the next page. This is a
15  letter which you claim was sent to me terminating
16  my services on or about November 15th, 2010.
17      That's the date that you claim you
18  terminated by services, correct?
19      A. Correct.
20      Q. Now look at the address there. Klayman
21  Law Firm, 2000 Pennsylvania Avenue, Northwest,
22  Suite 345, Washington, D.C., 20006.

---

Page 540

1      Are you aware that's not my address?
2      A. That was the only address I could find
3  of you.
4      Q. You're aware that the address is
5  actually 2020 Pennsylvania Avenue, Northwest?
6      A. So that was a mistake.
7      Q. So, since you had the wrong address,
8  isn't it likely that I never got this letter, even
9  if you sent it?
10      MR. SMITH: Objection. About what she
11  knows is likely about, you know --
12      CHAIRMAN FITCH: I think that's well
13  taken. Sustained.
14  BY MR. KLAYMAN:
15      Q. Based on your experience, when you
16  address something to the wrong place, the post
17  office doesn't have any place to deliver it,
18  correct, based on your experience in mailing
19  letters?
20      A. I don't know if you received this
21  letter or not. I don't know the -- I can't
22  remember if I emailed you the same letter or not.

---

71 (Pages 537 to 540)

In The Matter Of: Larry E. Klayman
May 31, 2018

---

**Page 541**

1  So I couldn't -- I couldn't answer that question.
2      Q.  I turn your attention to -- this is in
3  my book.  If Mr. Smith can assist here -- Exhibit
4  7 of Respondent's exhibits.
5      That's the document that I previously
6  showed you that was in the exhibit book of Mr.
7  Smith, Bar Counsel, correct?
8      That's where Mr. Shamble was trying to
9  get ahold of you, saying "You need to talk to your
10  lawyer, Larry Klayman, because you have rights
11  that should be pursued or you're going to lose
12  them," correct?
13      A.  Correct.
14      MR. KLAYMAN:  Your Honor, I move
15  Exhibit 7 into evidence.
16      CHAIRMAN FITCH:  It's admitted.
17      MR. SMITH:  No objection.
18  BY MR. KLAYMAN:
19      Q.  I turn your attention to Exhibit 8,
20  Respondent's Exhibit 8, and that's the same letter
21  I just showed you that was attached to your
22  original complaint, you purportedly write to me a

---

**Page 542**

1  letter on November 15th, 2010, to 2000
2  Pennsylvania Avenue.
3      Do you see that?
4      (Witness peruses document.)
5      Q.  Do you see that?
6      A.  Yes.
7      Q.  That's the same letter I just had you
8  testify to, correct, about the wrong address?
9      A.  Yes.
10      MR. KLAYMAN:  Your Honor, I move this
11  into evidence, Exhibit 8, this page.  I'm going to
12  get to other ones.
13  BY MR. KLAYMAN:
14      Q.  Turn to the next page --
15      MR. SMITH:  No objection.
16      CHAIRMAN FITCH:  That letter is
17  admitted, that letter that purports to be
18  11/15/10.
19  BY MR. KLAYMAN:
20      Q.  Now the next page appears to be -- tell
21  me if I'm wrong, it's the same letter, but
22  addressed to a different place in different type

---

**Page 543**

1  set.
2      MR. SMITH:  What page are you looking
3  at?
4      MR. KLAYMAN:  It's the page after the
5  letter of November 15th, 2010.
6      CHAIRMAN FITCH:  The second page of
7  Exhibit RX --
8      MR. SMITH:  Is May 10th --
9      MR. KLAYMAN:  No, it's November 15th,
10  2010.
11      MR. SMITH:  That's not the next page in
12  my exhibit.
13      MR. KLAYMAN:  I believe it is, unless
14  it inadvertently was left out.
15      It's slightly different.  Let me get
16  into that.
17  BY MR. KLAYMAN:
18      Q.  This letter identified of November 15th
19  was addressed to 2001 Massachusetts Avenue,
20  correct?
21      A.  Yes.
22      Q.  The way it's written is somewhat

---

**Page 544**

1  different --
2      CHAIRMAN FITCH:  I'm sorry, doesn't it
3  say 201 on Mass Avenue?
4      MR. KLAYMAN:  What did I say, your
5  Honor?
6      CHAIRMAN FITCH:  I think you said
7  2001.
8      MR. KLAYMAN:  Oh, 201.
9  BY MR. KLAYMAN:
10      Q.  It's written in a different syntax,
11  between the two letters?
12      MR. SMITH:  I don't even know what
13  "syntax" means.
14      MR. KLAYMAN:  Well, I do, but it's a
15  different way of expressing some thoughts.
16      Alright, let me read the second one.
17  BY MR. KLAYMAN:
18      Q.  Let me just ask this: who helped you
19  write this letter?
20      A.  It's either Kathleen or Sam.
21      Q.  Sam Razavi?
22      A.  My cousin Sam, yes.

---

72 (Pages 541 to 544)

In The Matter Of: Larry E. Klayman
May 31, 2018

## Page 545

1    Q. And it's addressed to 201 Massachusetts
2 Avenue, correct?
3    A. Yes.
4    Q. It of doesn't have an office suite on
5 this, does it?
6    A. No.
7    Q. You're aware that I never had an office
8 at 2001 Massachusetts Avenue?
9    MR. SMITH: 201.
10 BY MR. KLAYMAN:
11    Q. 201, I'm sorry.
12    A. Again I'm not aware of it. So I
13 thought -- unfortunately I got the wrong address.
14    Q. So unfortunately it was never delivered
15 to me by the post office?
16    A. I don't know that.
17    MR. SMITH: Can I have an objection.
18    CHAIRMAN FITCH: She doesn't know.
19 BY MR. KLAYMAN:
20    Q. But based on your experience, if you
21 don't address something properly, it doesn't get
22 to the recipient?

## Page 546

1    A. You want my experience?
2    MR. SMITH: Objection.
3    CHAIRMAN FITCH: No.
4    Objection sustained to that form of
5 that question.
6    MR. KLAYMAN: Your Honor, can I get a
7 response to that?
8    CHAIRMAN FITCH: To what?
9    MR. KLAYMAN: That if you don't address
10 a letter properly, I --
11    CHAIRMAN FITCH: I sustained the
12 objection.
13    MR. KLAYMAN: Ok.
14    I move this letter into evidence as
15 well.
16    MR. SMITH: No objection.
17    CHAIRMAN FITCH: It's admitted.
18 BY MR. KLAYMAN:
19    Q. Turn to Exhibit 9. That is an email of
20 May 8th, 2010 from Larry Klayman to you at your
21 email address.
22    You see that, right?

## Page 547

1    A. Yes.
2    Q. And I state in the third paragraph,
3 "It's not healthy for you or me. You will get
4 better representation with someone else like Tim
5 Shea who does not have an emotional conflict and
6 can keep his mind clear."
7    You see that?
8    A. Yes.
9    Q. So what I'm recommending is, because of
10 personality issues between us, it's better if you
11 get another lawyer, Tim Shea.
12    MR. SMITH: Objection.
13 BY MR. KLAYMAN:
14    Q. You understood that to mean that?
15    CHAIRMAN FITCH: Overruled. It speaks
16 for itself, but...
17 BY MR. KLAYMAN:
18    Q. You understood me to mean that?
19    CHAIRMAN FITCH: I'm sorry?
20    THE WITNESS: I can only answer yes or
21 no on this?
22 BY MR. KLAYMAN:

## Page 548

1    Q. Yes.
2    CHAIRMAN FITCH: What do you understand
3 his question to be?
4    THE WITNESS: He says that he
5 recommended another attorney and -- he recommended
6 another attorney or Tim Shea.
7    CHAIRMAN FITCH: I think we better
8 start over again, the question.
9    MR. KLAYMAN: Could we read it back.
10    THE COURT REPORTER: "So what I'm
11 recommending is, because of personality issues
12 between us, it's better if you get another lawyer,
13 Tim Shea."
14    THE WITNESS: There wasn't a
15 personality issues.
16    It was him not being able to function
17 because he was so in love with me and too busy to
18 write love letters and be upset about me not
19 including him with my friends and family.
20    Tim Shea, yes, he did it in this email,
21 but in another email, which is provided, he said
22 Tim Shea is not a good attorney for this.

In The Matter Of: Larry E. Klayman
May 31, 2018

---

**Page 549**

1  CHAIRMAN FITCH: Well, I have to strike
2  that answer as nonresponsive.
3  MR. KLAYMAN: There's no question.
4  THE WITNESS: Ok.
5  CHAIRMAN FITCH: I have to strike that
6  answer as nonresponsive.
7  Do you or do you not --
8  You want present understanding or
9  understanding at the time?
10  MR. KLAYMAN: Present understanding.
11  CHAIRMAN FITCH: Do you or do you not
12  at the present time understand that when he said
13  in that third paragraph that he was suggesting a
14  change of counsel?
15  THE WITNESS: Yes, I understand.
16  BY MR. KLAYMAN:
17  Q. And turn to the next page, which is an
18  email of May 8th, 2010, sent on the same day as
19  the prior one, wherein I state, "Ellie, in case
20  you did not see my text this morning, I thought of
21  someone who can take over your legal
22  representation. His name is Tim Shea. Tim

---

**Page 550**

1  Shamble also knows him and he has experience for
2  clients for VOA/PNN, Persia News Network."
3  Do you see that?
4  A. Yes.
5  Q. And that in your present understanding,
6  I'm also recommending that you go talk to Tim Shea
7  to consider retaining him as counsel?
8  A. Yes. The date is May 8th, 2010. Is
9  that the one you mean?
10  Q. Yes.
11  MR. KLAYMAN: Your Honor, I move both
12  of these into evidence.
13  MR. SMITH: No objection.
14  CHAIRMAN FITCH: Admitted.
15  MR. KLAYMAN: The next page I
16  previously elicited testimony, but frankly I don't
17  remember whether I moved it into evidence -- this
18  is the page where it says -- and we elicited
19  testimony. I don't want to waste time by going
20  over it, but just to identify, "Last week I
21  perceived her to be very aggressive toward me when
22  a lawyer I got" --

---

**Page 551**

1  CHAIRMAN FITCH: Do you want to move it
2  into evidence?
3  MR. KLAYMAN: Yes, I just want to move
4  it into evidence.
5  MR. SMITH: No objection.
6  CHAIRMAN FITCH: That is admitted.
7  MR. TIGAR: He's doing it a piece at a
8  time. Alright.
9  CHAIRMAN FITCH: It's the third page on
10  Exhibit 9.
11  MR. TIGAR: Alright.
12  BY MR. KLAYMAN:
13  Q. I turn your attention to Exhibit 11.
14  It says, "Ellie, I put in about $250,000 of time
15  and expense just to have you detailed to Los
16  Angeles. If you had not moved here, you likely
17  would be dead by now.
18  "This time and expense will not be
19  recuperated" --
20  MR. SMITH: Point of order, we can't
21  have Mr. Klayman read all these documents --
22  MR. KLAYMAN: I'm not reading them all.

---

**Page 552**

1  MR. SMITH: -- into evidence. If there
2  is a question he has for the witness based upon
3  the letter, I think that's fine, but he's already
4  read the letter a few times.
5  CHAIRMAN FITCH: Mr. Smith, it's not
6  uncommon for a lawyer to read two or three
7  sentences of a document and say that it says that,
8  is it?
9  So, Mr. Klayman will be moderate in his
10  reading --
11  MR. KLAYMAN: Yes.
12  CHAIRMAN FITCH: -- we'll be alright.
13  Go ahead, Mr. Klayman.
14  BY MR. KLAYMAN:
15  Q. Just those three sentences.
16  Now, I was telling you that what I had
17  done for you, up to that point in time, that I put
18  in about, if you calculated it, around $250,000 of
19  time and expense.
20  You understood that, correct?
21  CHAIRMAN FITCH: Do you understand that
22  in his letter he was saying that he had devoted

---

74 (Pages 549 to 552)

In The Matter Of: Larry E. Klayman
May 31, 2018

## Page 553

1 about $250,000 worth of time and expenses to your
2 matter, that he was saying that?
3 THE WITNESS: Yes.
4 CHAIRMAN FITCH: Did you understand
5 that he was suggesting a 50 percent contingency
6 fee?
7 MR. KLAYMAN: No, I didn't ask that
8 question, your Honor.
9 CHAIRMAN FITCH: Strike that.
10 BY MR. KLAYMAN:
11 Q. You understood what I was saying is
12 that that's what I put in so far to get you back
13 to LA, correct?
14 A. Correct.
15 Q. At that point I hadn't moved forward in
16 trying to collect any damages for you, correct?
17 I was just trying to get you back to LA, correct?
18 CHAIRMAN FITCH: What does this --
19 MR. KLAYMAN: If I can ask the
20 question.
21 CHAIRMAN FITCH: No, I have a question
22 first, about authentication.

## Page 554

1 What date does this purport to be.
2 MR. KLAYMAN: February 22nd, 2011.
3 CHAIRMAN FITCH: Thank you.
4 MR. SMITH: No, I don't think so.
5 MR. KLAYMAN: It's on the top.
6 MR. SMITH: I think that's the date we
7 had established because this document will be
8 authenticated through Ms. Sataki earlier and that
9 date was the date that she copied the document off
10 of her computer.
11 The testimony was that this letter was
12 actually -- because if you see on Page 2, the same
13 date is up there.
14 MR. KLAYMAN: Your Honor, I'm asking
15 questions.
16 CHAIRMAN FITCH: No, he has a right to
17 make representations.
18 MR. KLAYMAN: Not in front of her.
19 MR. SMITH: Well, she authenticated the
20 document.
21 MR. KLAYMAN: But the subject we didn't
22 get into.

## Page 555

1 CHAIRMAN FITCH: Go ahead, Mr. Smith.
2 MR. KLAYMAN: This is stuff she didn't
3 get into.
4 MR. SMITH: So she testified that this
5 letter was part of her May 30th, 2010
6 communication with Mr. Klayman with the subject
7 line --
8 CHAIRMAN FITCH: I think Mr. Smith
9 accurately represents the record.
10 MR. KLAYMAN: We'll go back and look at
11 it, but I think that's not proper to be doing this
12 while I'm questioning. It's a way of giving the
13 witness the answer.
14 CHAIRMAN FITCH: Well, it's not proper
15 creating a confusing record. You and I have an
16 obligation to try to clarify it.
17 MR. KLAYMAN: Well, I didn't
18 intentionally do that.
19 CHAIRMAN FITCH: I didn't say you did.
20 MR. KLAYMAN: I don't know where the
21 date comes from. So I'm asking.
22 BY MR. KLAYMAN:

## Page 556

1 Q. Now, up to the point whatever date is
2 the accurate date for this letter --
3 A. Yes.
4 Q. -- up to that point I had only been
5 trying to get you back to Los Angeles, correct?
6 A. Correct.
7 Q. And therefore, what I was saying is, if
8 I go further here, and because of our difficult
9 relationship, to be diplomatic, then I'm asking
10 for 50 percent, because it's so difficult to
11 represent you, for whatever reason?
12 A. It's okay. Fifty percent is fine.
13 Q. Ok.
14 A. It was fine with me. No problem.
15 Q. But we never got to that agreement, did
16 we, because at that point it was clear that I
17 wasn't going to be representing you any more, so
18 we never put it into writing, correct?
19 CHAIRMAN FITCH: At what time?
20 MR. KLAYMAN: In and around the time
21 this was written.
22 CHAIRMAN FITCH: In 2010.

75 (Pages 553 to 556)

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 557

1    MR. SMITH: May 30th, 2010.
2  BY MR. KLAYMAN:
3    Q. All I'd been doing was trying to get
4  you back to LA. There was no damages in it.
5    MR. SMITH: Is there a question?
6    MR. KLAYMAN: Yes.
7    CHAIRMAN FITCH: I think there is. Why
8  don't you ask it again.
9    MR. KLAYMAN: Yeah, I'll ask it again,
10  break it up.
11  BY MR. KLAYMAN:
12    Q. Up to that point in time -- well, you
13  already asked and answered that, so I won't get
14  into that.
15    But what I was talking about, Ms.
16  Sataki, is if I continued to represent you, given
17  the difficulty in our relationship, regardless of
18  what the cause was, then I'm saying then I want 50
19  percent going forward, correct?
20    A. Correct.
21    Q. But we never got to that point, because
22  representation ceased before I ever started to

Page 558

1  pursue any damage claims, correct?
2    CHAIRMAN FITCH: I don't understand the
3  question --
4    THE WITNESS: I don't understand it.
5    It's your letter. You said this is
6  what you wanted.
7  BY MR. KLAYMAN:
8    Q. Let me rephrase it.
9    You understood it to mean that what I
10  was saying is that, if I go forward on legal
11  representation to get damages, then I'm proposing
12  50 percent of any recovery, correct.
13    It's yes or no.
14    CHAIRMAN FITCH: May I note that
15  there's an allegation that both of these actions
16  has been filed by this date.
17    MR. KLAYMAN: I'll testify when I
18  testify during the case, but I'll give you a
19  proffer here, and that is that no action had been
20  taken to pursue damage claims up to that point in
21  time. Ok? That's the point I'm making.
22    CHAIRMAN FITCH: The superior court --

Page 559

1    MR. KLAYMAN: And I'm making the case
2  that the cases were filed for strategic reasons to
3  try to coerce in effect a settlement up to that
4  point in time.
5    So what I'm trying to say, your Honor,
6  and I'd like to get a response on this and her
7  understanding, is this is what it would be if I
8  had to go forward and make this into a case where
9  it is discovery and you're looking for damages,
10  and you went to trial, because at that time I
11  perceived that there was a difficulty in the
12  relationship, and I was recommending that she find
13  other counsel. I didn't think that I could
14  continue to represent her any more.
15    So, it was prospected, and we never got
16  to the point, never agreeing on this to get a
17  contingent fee agreement in writing. That's the
18  point I'm trying to make.
19    And I hate to have done that in front
20  of her, but you asked me, so I told you.
21    And that will be my testimony.
22    CHAIRMAN FITCH: I note there is a case

Page 560

1  filed on April 2nd a month before this where there
2  are compensatory damages in excess of $100M, as
3  well as punitive damages.
4    MR. KLAYMAN: That's right, but I
5  hadn't taken any action to --
6    CHAIRMAN FITCH: No, that's not what
7  you said, Mr. Klayman.
8    What do you want to ask her about this
9  document?
10    MR. KLAYMAN: Well, let me ask what I
11  said, and I'll testify under oath.
12  BY MR. KLAYMAN:
13    Q. Is that these cases were filed in order
14  to coax a settlement --
15    CHAIRMAN FITCH: Right, I've heard all
16  that.
17    MR. KLAYMAN: At this point she claims
18  I was terminated or about to be terminated, she
19  claims. And what I'm saying is that --
20    CHAIRMAN FITCH: Well, wait a minute.
21  I'm not sure there is evidence of that.
22    MR. KLAYMAN: I'll testify.

76 (Pages 557 to 560)

App.0294

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 561 | Page 563 |
|---|---|

**Page 561**

1    CHAIRMAN FITCH:  The termination letter
2  says November.
3    MR. KLAYMAN:  That's fine.  I'll
4  testify to it.
5    I just wanted to ask her questions, and
6  now it's regrettable that I had to put that on the
7  record in this fashion.
8  BY MR. KLAYMAN:
9    Q.  I turn your attention to Exhibit 13.
10    CHAIRMAN FITCH:  Do you want to move
11  RX11 into evidence?
12    MR. KLAYMAN:  Yes.
13    MR. SMITH:  No objection.
14    CHAIRMAN FITCH:  No objection.  It's
15  submitted.
16  BY MR. KLAYMAN:
17    Q.  Now this is a document which I've
18  submitted.  I took it off the internet, Ms.
19  Sataki, but I'm just going to ask you some
20  questions.
21    It shows that you did a special report
22  with Elham Sataki on weightlifting in 2017, a

**Page 562**

1  special report with Elham Sataki for N-I-A-C.
2    What is N-I-A-C?
3    A.  NIAC.
4    Q.  What does that stand for?
5    A.  National Iranian American Council.
6    Q.  That's a very prominent organization,
7  is it not?
8    A.  Yes.
9    Q.  And the bottom one, "Elham Sataki
10  reports on J-C-P-O-A 2017," what's that?
11    A.  What was the question, I'm sorry?
12    Q.  What is J-C-P-O-A?  It says, "Elham
13  Sataki supports J-C-P-O-A, in 2017."
14    A.  That's the agreement that Mr. Thump
15  didn't sign, the agreement between Iran.
16    Q.  So you've been doing broadcasting in
17  the last few years?
18    A.  This is my user channel and I'm doing
19  it on my free time with my cell phone camera.
20    It is not -- it's not -- I didn't get
21  paid for this and I'm not -- and I was not working
22  for any TV channel.

**Page 563**

1    This is on my day off.
2  BY MR. KLAYMAN:
3    Q.  I'll let the videos speak for
4  themselves that can be found on the internet, but
5  you have had employment since you and I stopped
6  working together, correct?
7    A.  Correct.
8    Q.  Where have you been employed?
9    A.  Andisheh TV.
10    Q.  That's one of the --
11    A.  Journals, yes.
12    Q.  Are you still employed there?
13    A.  No.
14    Q.  When did you first get employment after
15  our relationship ended?
16    A.  We never had a relationship.
17    Q.  I'm not talking about that way.  I mean
18  after I stopped representing you.
19    CHAIRMAN FITCH:  That's not your role
20  to admonish her.  Your role is to ask me to
21  admonish her.
22    What employment have you had beginning

**Page 564**

1  in January of 2011 until the present being?
2    THE WITNESS:  I have been working for a
3  skin care company.
4    CHAIRMAN FITCH:  I didn't --
5    THE WITNESS:  I have been working for a
6  skin care company, that's my main job, it's
7  cosmetics.  It's a cosmetic company out of New
8  York and I'm their rep in Los Angeles.
9    CHAIRMAN FITCH:  Go ahead, Mr. Klayman.
10  BY MR. KLAYMAN:
11    Q.  Yes, now after I stopped representing
12  you, what was your first job after that?
13    A.  I was working for Andisheh TV in Los
14  Angeles.  It was a TV station.
15    Q.  As a television host?
16    A.  Yes.
17    Q.  And did you have a co-host?
18    A.  Yes.
19    Q.  Who was that?
20    A.  It was a girl, Leida (phon), and then
21  it was a guy, Asha (phon) later on, and then
22  another guy, Medhi, and then mainly I had a bunch

77 (Pages 561 to 564)

In The Matter Of:  Larry E. Klayman
May 31, 2018

| Page 565 | Page 567 |
|---|---|

**Page 565**

1  of girls.
2  Q.  You were paid for that?
3  A.  Yes.
4  Q.  How long did you stay with Andisheh?
5  A.  I stayed with them maybe a year or two
6  and then I quit working there and then I started
7  working for them again for about a year, so.
8  Q.  For how long?
9  A.  About a year.
10  Q.  A year?
11  A.  Mm-hmm.
12  Q.  Why did you stop working with them and
13  then start again?
14  A.  Because of the money.  I couldn't
15  afford working for them.  I had to go get a better
16  job that pays more, because I couldn't afford to
17  pay my rent.
18  Q.  Between the first time that you left
19  and then when you came back to Andisheh, who were
20  you working for in that intermediary time period?
21  A.  For a cosmetic line.
22  Q.  What's the name of it?

**Page 566**

1  A.  3Lab.
2  Q.  How is that spelled?
3  A.  Number three, L-a-b.
4  Q.  What do they sell?
5  A.  Skin care.
6  Q.  So when you left Andisheh again for the
7  second time, did you go back to work for that
8  company?
9  A.  Yes, I was --
10  Q.  Or did you go somewhere else?
11  A.  I was working for the cosmetic company
12  throughout the whole time.  So I was holding two
13  jobs, both the TV and the cosmetic.
14  Q.  So the cosmetic company gave you a
15  raise after you left Andisheh for the second time
16  from what you had been making before?
17  A.  No.
18  Q.  What's your annual income?
19  CHAIRMAN FITCH:  What's the relevance
20  of that?
21  MR. KLAYMAN:  She claims, your Honor,
22  that I destroyed her life and that her life's been

**Page 567**

1  on hold for eight years.  That's in the record.
2  And obviously that's not the case.
3  CHAIRMAN FITCH:  I'm not sure why her
4  claim is relevant to the allegation -- to the
5  charges.
6  MR. KLAYMAN:  It deals with
7  credibility, because she's saying that her life's
8  been on hold, based on a Bar complaint, for eight
9  years.
10  Her life has not been on hold.  She's
11  doing broadcasting like she was doing before, and
12  she's making money with --
13  THE WITNESS:  I can't --
14  CHAIRMAN FITCH:  Woah, woah.
15  Mr. Smith?
16  MR. KLAYMAN:  And she's making money
17  with a professional that she had previously
18  testified that she was an expert in, or at least
19  involved in, when she worked for Hermes,
20  H-e-r-m-e-s.
21  So, obviously her life has continued
22  and she's not on hold and I didn't ruin her life,

**Page 568**

1  and she was doing broadcasting like she was doing
2  before.
3  CHAIRMAN FITCH:  You may be heard, Mr.
4  Smith.
5  MR. SMITH:  I mean, you know, if he
6  wants to open this can of worms, quite frankly,
7  I'm prepared to let him do it, and then during my
8  redirect we will have a much better non-discovery
9  type discussion about exactly what has happened in
10  Ms. Sataki's life as a result of her having lost
11  her job at the Voice of America because of her
12  unfortunate association with Mr. Klayman.
13  CHAIRMAN FITCH:  I can think of another
14  issue that may be relevant.
15  So I need to ask you to answer this
16  question of your salary at the present time.
17  THE WITNESS:  My salary at the present?
18  MR. KLAYMAN:  It may not be salary.  It
19  may be commission.  Income.
20  MR. SMITH:  I mean let her testify
21  about it.
22  THE WITNESS:  It's salary.  I'm making

78 (Pages 565 to 568)

In The Matter Of: Larry E. Klayman
May 31, 2018

<table>
<tr><td>

Page 569

1  $62,000 year.

2      MR. KLAYMAN: Thank you.

3      CHAIRMAN FITCH: Mm-hmm.

4  BY MR. KLAYMAN:

5    Q. I turn your attention to Respondent's

6  Exhibit 17.

7      CHAIRMAN FITCH: Did you say

8  Respondent's 17?

9      MR. KLAYMAN: Yes.

10  BY MR. KLAYMAN:

11    Q. This is a letter May 3rd, 2010 from the

12  American Federation of Government Employees, Local

13  1812, from Mr. Tim Shamble.

14      You've seen this letter before, haven't

15  you. Take an opportunity and read it.

16      (Witness reads document.)

17    Q. Tell me when you're done, Ms. Sataki,

18  please.

19    A. Ok.

20    Q. You've seen that letter before, have

21  you not?

22    A. Yes.

</td><td>

Page 571

1  don't remember, and strong legal action or

2  whatever the standard, either what it means.

3      MR. KLAYMAN: Well, let me rephrase it.

4  BY MR. KLAYMAN:

5    Q. We had to be very forceful and bring

6  hard-hitting lawsuits against VOA because they

7  were being very, very aggressive with you and your

8  witnesses and other people who were similarly

9  situated?

10    A. Yes, that's correct.

11    Q. And that was a reason why we had to

12  name the board of governors in the complaint?

13      MR. SMITH: Objection.

14  BY MR. KLAYMAN:

15    Q. If you know.

16      CHAIRMAN FITCH: Do you know why the

17  board of governors was named?

18      THE WITNESS: No.

19  BY MR. KLAYMAN:

20    Q. You are aware that I asked my friend,

21  Blanquita Cohen, on the board of governors, and I

22  informed you of that, that this whole thing had to

</td></tr>
<tr><td>

Page 570

1    Q. And in fact what it reflects is that

2  the Voice of America, the individuals there that

3  we were trying to negotiate with, were actually

4  threatening witnesses, correct?

5    A. Correct.

6    Q. So trying to deal with VOA was not an

7  easy matter, even by Mr. Shambles' analysis,

8  correct?

9    A. Correct.

10    Q. And therefore, what would be required

11  would be strong legal action to get them to change

12  their ways.

13      That's what --

14      MR. SMITH: Objection.

15  BY MR. KLAYMAN:

16    Q. That's what I told you, right? Right?

17    A. Could you repeat your question. I

18  don't --

19      CHAIRMAN FITCH: Did he tell you in the

20  context of this letter that strong legal action is

21  necessary?

22      THE WITNESS: I don't remember. I

</td><td>

Page 572

1  be cleaned up.

2      You're aware that I lobbied her to do

3  that, correct?

4      CHAIRMAN FITCH: Did he tell you that

5  he had lobbied this potentially sympathetic member

6  of the board of governors?

7      THE WITNESS: Yes, he told me that he

8  did that.

9  BY MR. KLAYMAN:

10    Q. And she didn't come to our help?

11    A. Right.

12    Q. So therefore we had to bring a very

13  hard-hitting lawsuit to try to force them, coerce

14  them into doing the right thing: putting you back

15  in Los Angeles, correct?

16      CHAIRMAN FITCH: I think asked and

17  answered.

18      MR. KLAYMAN: I move this document into

19  evidence, your Honor.

20      MR. SMITH: No objection.

21      CHAIRMAN FITCH: It is admitted.

22      MR. KLAYMAN: Did you say "no

</td></tr>
</table>

79 (Pages 569 to 572)

In The Matter Of: Larry E. Klayman
May 31, 2018

| Page 573 | Page 575 |
|---|---|

**Page 573**

1  objection"?

2  MR. SMITH: I said no objection.

3  BY MR. KLAYMAN:

4  Q. There's another letter dated May 18th,

5  2010 behind that from the Criminal Division of the

6  U.S. Department of Justice to Mr. Shamble...

7  "Dear, Mr. Shamble, this response to

8  your letter dated May 3rd, 2010 regarding witness

9  tampering and obstruction of justice in the Voice

10  of America. The Federal Bureau of investigation

11  is the investigative arm of the Depart of Justice

12  upon which we rely to conduct the initial fact

13  finding in federal criminal cases.

14  "Therefore, if you believe that a

15  criminal statute has been violated, you may

16  contact the Washington Field Office of the FBI at

17  601 4th Street, Northwest, Washington, D.C.,

18  20535.

19  "It will first determine whether a

20  federal investigation may be warranted and, if

21  appropriate, refer the matter to a United States

22  attorney for a final determination regarding legal

**Page 575**

1  Q. Yes. You previously testified that I

2  had the FBI investigate you, right?

3  A. Not me, every guy or my cousin, or any

4  guys. Not me.

5  Q. There's no showing on any of the

6  documentation that I had the FBI investigate

7  anybody that you know, correct?

8  A. I have the emails, correct, that you

9  said it to me, that you did.

10  Q. What I told you was that the FBI was

11  asked to investigate the witness tampering in your

12  case, correct?

13  A. Correct.

14  MR. KLAYMAN: I move that document in

15  evidence, your Honor.

16  MR. SMITH: No objection.

17  CHAIRMAN FITCH: Page 3 of RX17 is also

18  admitted.

19  BY MR. KLAYMAN:

20  Q. I turn your attention to Exhibit 18.

21  This is a letter to Ms. Delia Johnson, director

22  Office of Civil Rights, and Tim Shamble, your

**Page 574**

1  action.

2  "You may also contact the FBI by

3  calling (202) 278-2000. We trust this information

4  is helpful.

5  "Please do not hesitate to contact this

6  office if we may be of assistance with this or any

7  other matter. Sincerely, Teely (phon) Rammam,

8  R-a-m-m-a-m, Principal Assistant Attorney General

9  and Chief of Staff," copies to Paul Kamer (phon)

10  Assistant Attorney General --

11  CHAIRMAN FITCH: This strikes me as not

12  an efficient use of time.

13  MR. KLAYMAN: Ok.

14  CHAIRMAN FITCH: I doubt that you're

15  going to table this or anything significant about

16  CC'ing people.

17  BY MR. KLAYMAN:

18  Q. In short it was a letter, previously

19  made a reference --

20  CHAIRMAN FITCH: Question.

21

22  BY MR. KLAYMAN:

**Page 576**

1  union rep that I was working with, you were

2  working with.

3  You can take an opportunity to read it.

4  I don't want to read it in the record because I

5  don't want to take up more time.

6  Take a look at it , read it, and tell

7  me -- just read it first.

8  (Witness reads document.)

9  CHAIRMAN FITCH: Is your question

10  whether she's seen this letter before?

11  MR. KLAYMAN: No, I'll get to that.

12  That's fine.

13  BY MR. KLAYMAN:

14  Q. You've seen this letter before, haven't

15  you?

16  A. I don't know about it.

17  Q. What Mr. Shamble is asking is that OCR

18  issue -- yeah, OCR, that's civil rights, that's

19  the EEOC complaint that was filed, "It's your

20  decision. Don't sit on it because you want to be

21  -- because Ms. Sataki wants to move forward with

22  her legal claims if that decision is not

80 (Pages 573 to 576)

In The Matter Of:  Larry E. Klayman
May 31, 2018

<table>
<tr><td>

Page 577

1  favorable."
2      That's what you take this letter to
3  mean?
4      A.  Did you ask your question?  I'm sorry.
5      MR. KLAYMAN:  Can we read it back.
6      CHAIRMAN FITCH:  At the bottom of the
7  letter on the left, you see there's a carbon copy
8  that purports to be a CC to you?
9      THE WITNESS:  At the bottom of -- are
10  we at the Delia Johnson letter?
11      CHAIRMAN FITCH:  Do you see that at the
12  bottom left of this document there purports to be
13  a CC to you, a copy to you?
14      THE WITNESS:  Oh, yes.
15      CHAIRMAN FITCH:  Ok.
16      THE WITNESS:  Yes, I saw it.
17      CHAIRMAN FITCH:  Just ask the question.
18  BY MR. KLAYMAN:
19      Q.  So you did get this letter?
20      A.  Yes --
21      CHAIRMAN FITCH:  She said she
22  doesn't --

</td><td>

Page 579

1  letter, did you have any knowledge that they were
2  pursuing avenues of relief on your behalf?
3      THE WITNESS:  No.
4      MR. KLAYMAN:  I would move this into
5  evidence, this letter.
6      MR. SMITH:  No objection.
7      CHAIRMAN FITCH:  Admitted.
8  BY MR. KLAYMAN:
9      Q.  Next letter from Delia Johnson to Mr.
10  Shamble, January 5th, 2011.  Take a moment to look
11  at that, Ms. Sataki, and tell me if you have seen
12  it in and around this time period, January 5th,
13  2011.  Or saw it?
14      (Witness reads document.)
15      A.  This was CC'd to me, too?
16      Q.  The letter speaks for itself.
17      I'm asking you whether you saw it in or
18  around January 5th, 2011.
19      A.  I probably had missed it.
20      MR. KLAYMAN:  I move this letter into
21  evidence, your Honor.
22      MR. SMITH:  No objection.

</td></tr>
<tr><td>

Page 578

1      THE WITNESS:  I don't remember, so.
2      CHAIRMAN FITCH:  She said she doesn't
3  remember.
4  BY MR. KLAYMAN:
5      Q.  But you understand it to mean Mr.
6  Shamble and I were trying to push OCR, Office of
7  Civil Rights --
8      MR. SMITH:  Objection to what she
9  understood.  She said she didn't remember getting
10  the letter.
11      CHAIRMAN FITCH:  She said she didn't
12  understand what was in the letter.
13      MR. KLAYMAN:  I can just ask the
14  question generally.
15      CHAIRMAN FITCH:  Did you understand in
16  early 2011 that Mr. Shamble and Mr. Klayman were
17  continuing to pursue possible claims on your
18  behalf?
19      THE WITNESS:  I see that it's CC'd to
20  me, but I don't remember that I saw this
21  particular email.
22      CHAIRMAN FITCH:  Leaving aside this

</td><td>

Page 580

1      CHAIRMAN FITCH:  It's admitted.
2      MR. KLAYMAN:  Your Honor, there's going
3  to be a lot of questions on this one here, so I'm
4  wondering if this might be an appropriate break
5  point for the day.
6      CHAIRMAN FITCH:  Ok.  When you say this
7  one here, you mean the rest of exhibit --
8      MR. KLAYMAN:  Well, the exhibit book,
9  but this particular exhibit that comes up inside
10  of 18, the March 25th, 2011 --
11      CHAIRMAN FITCH:  Ok, that's my only --
12      MR. KLAYMAN:  -- matter.  I have a lot
13  of questions on this.
14      CHAIRMAN FITCH:  Ok, we're going to
15  call it a day, Ms. Sataki.  Would you wait outside
16  in the -- is the door to that little room open, as
17  far as you know right now?
18      MR. SMITH:  Yes.
19      CHAIRMAN FITCH:  Would you wait in that
20  little room just for a minute.  We're going to
21  talk scheduling, so I may need to have you come --
22      THE WITNESS:  I come back in again?

</td></tr>
</table>

81 (Pages 577 to 580)

App.0299

In The Matter Of:  Larry E. Klayman
May 31, 2018

## Page 581

1    CHAIRMAN FITCH:  We'll come out and get
2  you in a minute.
3    (Witness exits courtroom.)
4    How much cross-examination are you
5  going to have, Mr. Smith?
6    MR. SMITH:  You mean redirect?
7    CHAIRMAN FITCH:  That's a good point.
8    MR. SMITH:  I guess it depends how much
9  more is brought out during cross.
10    Right now I don't anticipate it would
11  be more than 10, 15 minutes as it stands now.
12    CHAIRMAN FITCH:  Ok.  Because we're
13  going to reserve time for him to redirect
14  tomorrow, so --
15    MR. KLAYMAN:  I'll be courteous in that
16  regard, your Honor.  We have a lot to go through,
17  particularly since we have all these new
18  supplemental exhibits that have been admitted.
19    CHAIRMAN FITCH:  Well, whatever.  I
20  mean, there will come a time when I'll say thank
21  you very much -- I hope I don't have to do
22  that -- and give Mr. Smith the time that he

## Page 582

1  estimates.  If he estimates 20 minutes or 30
2  minutes, he's going to get 30 minutes.  And
3  whether that occurs depends on how late we go
4  tomorrow.  I'd like to stop at 5:00 p.m., but --
5    MR. KLAYMAN:  I'll do my best, your
6  Honor.
7    CHAIRMAN FITCH:  But these things have
8  gone later before, and I'm sure I can ruin the
9  court reporter's evening, so do we want to start
10  at 9:30 tomorrow.  Or do we want to start earlier?
11    MR. KLAYMAN:  9:30 is fine.  I can't
12  say for sure until we hear the answers, if I can
13  fit everything in tomorrow.
14    MR. SMITH:  Is it safe for me to
15  release Mr. Bennett from testifying tomorrow?
16    MR. KLAYMAN:  I wouldn't say that,
17  because we don't know how it's going to go.
18    CHAIRMAN FITCH:  Well, say we finish up
19  here at 3:00 o'clock, is there any harm in having
20  Mr. Bennett --
21    CHAIRMAN FITCH:  You're paying hotel
22  expenses and so on.

## Page 583

1    MR. SMITH:  He needs his two hours
2  window.
3    MR. KLAYMAN:  Unless Bar Counsel wants
4  to pay mine, like they're paying Ms. Sataki's...
5    CHAIRMAN FITCH:  You are directed to
6  leave him on call.
7    MR. SMITH:  Alright.
8    CHAIRMAN FITCH:  There being nothing
9  further that I know of in the way of
10  administrative matters, or evidentiary, we will
11  recess here at 4:37, and resume at 9:30 tomorrow
12  morning.
13    I note that, after the approximately
14  but slightly less than three hours of direct
15  examination of this witness, we've had four hours
16  of cross-examination so far of this witness.
17    MR. KLAYMAN:  Your Honor, insofar -- I
18  understand and I appreciate the leeway, but to the
19  extent that -- she's my witness, too, so what I'm
20  trying to do is get in testimony that I would
21  elicit in my case, as well, for efficiency's sake.
22    CHAIRMAN FITCH:  It's entirely common

## Page 584

1  to accomplish both those purposes at one time.
2  That's fine.
3    MR. KLAYMAN:  Although I don't know
4  what will come up, you know, if she's back in LA
5  and maybe some remote testimony.  But I'm not
6  suggesting that she be forced to come back here.
7    CHAIRMAN FITCH:  We stand in
8  adjournment.  Thank very much.
9    (Whereupon at 4:39 p.m. the hearing
10  stood in recess until Friday, June 1, 2018, at
11  9:30 a.m.)
12
13
14
15
16
17
18
19
20
21
22

82  (Pages 581 to 584)

**A**

**a.m** 261:3 264:6
320:17 584:11
**abandoned** 268:20
269:5
**Abdy** 360:21 361:1
**able** 280:1 289:9
299:19 312:21
393:10 476:10
477:1 490:14
491:8 504:18
506:5 548:16
**abrasive** 371:2
**absence** 289:19
510:15
**absolutely** 295:17
327:22 366:6
433:5,9 464:16
497:4 514:16
**absolved** 375:17
**abundance** 426:12
**abuse** 271:12
**accept** 416:8
**acceptable** 344:18
344:21
**acceptance** 538:17
**accepted** 415:18
416:6
**access** 275:3
**accident** 533:10
**accommodation**
351:15 354:11
415:15 439:18
**accompanying**
303:2
**accomplish** 584:1
**account** 392:13
**accounting** 338:5
441:4
**accuracy** 529:11
**accurate** 478:22
556:2
**accurately** 555:9
**accusations** 273:19
274:2,6 356:8
**accuse** 491:12
518:17 536:13,14
536:18
**accused** 356:6
517:17 519:22,22
525:19,21 534:14
**accusing** 517:9
518:21 533:16
**acknowledge** 269:1
**acknowledged**
324:10 410:1

**acted** 477:14
**action** 377:2 407:8
428:8 513:5
558:19 560:5
570:11,20 571:1
574:1
**actions** 283:1
392:13 558:15
**active** 388:20
**activist** 387:15
**activity** 310:19
**actual** 392:2 473:5
480:16
**Ad** 261:3,10
**add** 304:7 310:1
374:13 376:14
**addition** 265:14
278:7 395:12
396:19 433:1
438:14 456:6
474:2,3
**additional** 284:20
309:20 340:14,16
**address** 272:20
273:2 282:2
288:15 319:5,6,8
319:12,14 401:19
402:7,18 479:3
485:17 539:20
540:1,2,4,7,16
542:8 545:13,21
546:9,21
**addressed** 264:10
265:16 294:14
542:22 543:19
545:1
**addresses** 478:18
**addressing** 308:20
308:21
**adds** 378:14
**adduce** 280:1
**adduced** 277:19
**adequately** 290:10
**adjournment** 584:8
**administration**
389:17 408:21
457:13
**administrative**
264:10 316:9
320:15,18 385:10
393:21 395:16
397:1 407:7
583:10
**administratively**
406:22
**admissibility** 277:4

**admissible** 310:10
381:22
**admission** 284:8
299:10,11,15
310:22 315:13
**admit** 264:13
278:21 284:6
**admitted** 272:12
282:6 307:22
313:20 315:7
320:10 378:9
524:12 541:16
542:17 546:17
550:14 551:6
572:21 575:18
579:7 580:1
581:18
**admitting** 279:8
**admonish** 563:20
563:21
**advanced** 365:9
**advances** 384:15
**advantage** 383:5
**adversary** 493:7
**advice** 300:22
328:10 392:15,18
471:18
**advise** 281:7 436:5
490:6
**advised** 300:18
374:1 471:3,10
492:20
**advisement** 531:11
**advising** 344:21
**advisor** 390:13
434:17
**affair** 371:5 373:13
375:5
**affairs** 381:8
503:15
**affect** 529:10
**affidavit** 378:1
380:7 413:13,14
413:16
**affidavits** 354:14
358:1 413:10
**affirm** 439:21
**affirmative** 357:1
401:4
**afford** 361:17 363:7
565:15,16
**AFL-CIO** 351:7
**afraid** 465:10,18
**afternoon** 291:5
321:14 440:14,15
458:5 539:4

**agencies** 358:13
395:16 397:1
**agency** 338:4 407:9
436:11
**aggressive** 270:7,9
432:7 500:10,12
500:13 550:21
571:7
**ago** 265:4 281:16
309:14 452:18
491:2 496:14
**agree** 279:17,20
287:2 309:11
313:12,16 362:7
370:9 398:3 480:4
535:22
**agreed** 290:6 299:1
301:22 336:11
346:12 370:19
397:19 398:11
**agreeing** 494:1
559:16
**agreement** 504:9
520:6 556:15
559:17 562:14,15
**agrees** 376:18
**ahead** 280:14 297:1
297:19 300:3
303:15 319:11
321:20 335:9,11
356:1 360:6 400:4
429:8 439:14
440:6 527:9
552:13 555:1
564:9
**ahold** 282:22 539:5
539:10 541:9
**aimed** 393:4
**Akbar** 322:14,16
**Alice** 349:5,8,14,16
349:16
**allegation** 377:3
477:18 558:15
567:4
**allegations** 341:22
380:19 529:12
**allege** 375:19
**alleged** 324:12
334:14 335:15
341:7,15 344:16
373:12,13 472:16
**allegedly** 456:3
**allow** 271:4 306:11
474:20 531:12
**allowed** 486:1
536:21

**Allred** 493:13
494:15,20 495:11
**alright** 283:16
284:1,13 297:20
299:3 305:22
306:12 310:7
312:13 315:12
331:12 386:16
409:8 435:1 493:4
501:14 502:7
506:8,13 521:5
544:16 551:8,11
552:12 583:7
**alternatives** 382:4
**amended** 406:16
**Amendment** 394:20
394:22 395:1
**America** 327:17
332:3 336:5
337:21 338:8,15
341:2 342:10
343:16 344:9
351:8,21 352:6
354:22 355:10,17
367:12 385:1
388:3,5,12 390:18
391:4,18 392:6,17
393:4 403:10
404:2,21 406:22
413:14 416:7
444:10 450:20
454:12 464:19
481:6 568:11
570:2 573:10
**America's** 368:4
369:16
**American** 562:5
569:12
**amicably** 338:17
449:1,3 452:16
**amount** 475:20
504:9
**analysis** 570:7
**Andisheh** 563:9
564:13 565:4,19
566:6,15
**Angeles** 334:16,19
334:22 335:4,17
335:17 338:9
339:2 341:3,11
343:15 344:1
351:9,14,16 352:1
352:10,11,18,19
352:20 371:6
376:7,7 382:22
383:12 391:19

In The Matter Of:  Larry E. Klayman
May 31, 2018

392:8 393:5
400:15 406:21
407:17 410:17
411:5 414:2,9,12
415:15 422:9
427:17 436:8
450:8 486:2
525:10,17 551:16
556:5 564:8,14
572:15
**angry** 422:16 491:2
**announce** 409:10
**announced** 409:9
**announcer** 382:15
383:11
**annual** 566:18
**answer** 278:10
319:2 331:10
335:9 340:13
357:4,5 360:10
381:21 401:4
408:4 420:19
427:6,8 449:9
451:13 470:8
484:13 487:19
488:3 494:12,18
497:7,14 498:6
501:12,16 510:22
511:2 513:7 514:9
514:11 517:2
541:1 547:20
549:2,6 555:13
568:15
**answered** 280:6
392:9 412:15
429:9 431:10
437:17 461:13
538:7,10 557:13
572:17
**answers** 582:12
**ANTHONY** 261:11
**anti-freedom** 444:9
**anticipate** 321:1
581:10
**anybody** 264:14
340:10 409:11
423:2 424:21,22
425:12 426:19
438:13 515:19
575:7
**anybody's** 311:13
416:21 515:22
**anyway** 396:15
**apart** 429:20
**apartment** 359:18
359:20 361:11,15

362:20,21 363:2
363:10,21 364:7,8
365:4,12,16
366:20 369:20
376:6,18 423:9
456:12 505:6,21
509:11 510:17
511:11,18,19
512:3 514:5 516:1
519:14 524:17
527:12 533:17
**Apartments** 509:7
524:2,16
**apologize** 266:12
373:3 444:2 502:5
**apologized** 355:21
356:7 371:20
**apparent** 309:15
**apparently** 268:3
281:5 530:10
**appeal** 486:13
**appealed** 486:9
**APPEALS** 260:1
**appear** 314:9
443:10 522:4
**appearance** 273:7
**APPEARANCES**
261:9 262:1
**appears** 287:3,5
289:17 292:8
311:20 528:22
542:20
**applicable** 277:11
**application** 383:9
**applied** 382:12
**apply** 310:21
489:22
**appointment**
457:19
**appreciate** 308:18
383:17 528:15
583:18
**appreciated** 314:3
**appreciative** 528:19
**approach** 324:4
**approached** 454:7
454:14 455:10
456:7 465:9
**approaching** 266:6
266:16
**appropriate** 283:7
283:7,12 573:21
580:4
**approved** 368:11
**approximately**
321:15 583:13

**April** 278:5 366:21
377:5 428:8
431:15 444:8
560:1
**Arab** 345:8
**Arabic** 344:10
345:4,5,7,14
**area** 326:20 344:13
346:2 360:5 364:5
**arguably** 529:6
**argued** 313:21
410:16
**arguing** 341:3
351:22
**argument** 264:14
501:5
**argumentative**
330:22 359:4
419:14 436:12,14
481:1
**argumentativeness**
331:9
**Arlene** 349:19
350:1,3,4,9
430:13,18 431:16
**arm** 573:11
**arose** 277:9
**arranged** 278:5
**articles** 398:11
400:1,12 443:9,14
444:7,13,17
455:22
**Asha** 564:21
**aside** 265:1 578:22
**asked** 271:17
272:11 280:5
284:8 288:22
295:13 305:14,17
323:20,22 324:5
325:14 332:10,13
334:4 335:6
343:12 348:2
350:9 367:5 368:8
381:17 387:14
396:8 397:10
411:2 412:20
415:3 423:21,21
424:1,1,9,15,20
424:21 425:2
426:19 427:11
428:18 429:2,3
431:11 432:14
433:3 437:14,16
437:17 442:6,11
452:15 455:3
461:13 466:14

474:10 488:17
489:4,6,7,9,10,15
489:16 490:11
495:5,8 499:20
500:17 501:8
511:12 525:3
528:17 534:19,20
538:7,10,17,19,20
557:13 559:20
571:20 572:16
575:11
**asking** 300:6
306:18 366:13
377:9 395:20
405:15 413:17
423:17 425:5
428:14,15 436:15
451:17 472:3
482:17 483:17
490:11 491:11
512:17 529:1
530:18 554:14
555:21 556:9
576:17 579:17
**asks** 340:12 389:9
**asserted** 310:17
**assess** 477:13
**assign** 329:4
**assigned** 410:6
**assignment** 329:5
346:7
**assist** 294:4 441:22
541:3
**assistance** 513:13
574:6
**assistant** 510:15
511:7 574:8,10
**associate** 530:4
**association** 394:20
568:12
**assumed** 273:7
524:22
**assuming** 437:13
492:19
**Atabay's** 525:19
**attached** 541:21
**attachment** 461:18
**attack** 311:2 532:4
**attempt** 297:15
**attempts** 445:16
**attend** 440:21
**attention** 308:21
317:5 323:6 449:6
461:20 502:4,13
505:2,11 520:18
537:6 541:2,19

551:13 561:9
569:5 575:20
**attorney** 261:16,18
328:5,9 344:20
363:16 414:18
425:7 434:13,17
437:16 489:18,19
491:17 493:19
548:5,6,22 573:22
574:8,10
**attorney/client**
297:6
**attorneys** 484:1
**August** 305:1
**authentic** 285:16
289:13 310:8
314:20 320:5
**authenticate** 284:18
290:19,19,20,21
297:15 308:13
**authenticated**
285:14 290:11
313:12 554:8,19
**authentication**
287:6,9 289:19
290:13 291:1,7
296:17 307:15
309:20 310:21
553:22
**authenticity** 284:15
285:12,22 287:21
288:8 313:18
320:4
**author** 265:18
**authored** 265:16
303:20 443:13,15
444:3
**authorize** 297:9
**authorship** 310:12
**available** 272:15
274:19 278:1
310:15 312:16
320:22 438:4
443:19 444:18
**Avenue** 268:4 273:3
449:15 539:21
540:5 542:2
543:19 544:3
545:2,8
**avenues** 579:2
**Aviera** 349:20
350:1,14,16,19
351:1,19 354:15
413:11 430:13
431:16 432:6
535:1 536:4

In The Matter Of: Larry E. Klayman
May 31, 2018

**aware** 274:8 318:4
337:13 338:11
341:1,21 352:14
353:6 368:3,6
369:2,12 384:8,9
385:4 386:22
387:13,19,20
388:6,9 389:2
391:2 392:19,21
392:22 393:7
394:3 395:3 398:9
398:13 400:14,17
403:20 404:8
406:16 407:2
409:14,16 411:9
411:13 413:9
415:3 416:5
417:12,21 445:9
445:12 448:21
449:4 453:6,9,19
454:6,14,17,21
455:10,20 456:4,7
466:17 467:1,9
475:8 479:10,16
481:4,7 492:20
493:11,15 494:20
495:2,5 503:10
539:3 540:1,4
545:7,12 571:20
572:2
**Ayatollah** 389:18
390:12,13

**B**

**B** 483:8
**back** 268:6 270:13
275:14 282:3
285:4 302:13
311:1 313:7 316:2
316:16 318:11
320:17 323:10
325:7,9,11 326:19
326:21 328:20
334:13,21 336:4
346:14,15 351:9
355:14 358:6,6
359:13 360:7
361:19,22 362:3
362:22 367:9
368:14,16,18
369:20 371:19
372:22 376:5
383:14 384:6
391:19 392:7
393:5 396:17,18
403:4 405:5

**basically** 282:15,17
441:22 471:13
490:18
**basis** 320:1 376:3
419:6 472:2
530:13
**bear** 448:13
**beat** 377:13
**beautiful** 356:19
357:7
**becoming** 271:12
**bed** 378:4 379:3,15
380:9 510:21
514:6,21 536:16
**bedroom** 510:19
**began** 350:16
**beginning** 321:14
368:20 383:22
400:21 437:22
563:22
**behalf** 261:6,18
262:2 317:3 322:1
374:21 408:19
423:7 436:8 440:9
445:2 448:19
578:18 579:2
**behave** 432:9
**behaved** 475:21
**believe** 265:20
269:11 270:12
280:20 305:10
322:5 338:22
350:3 426:7,17
443:12 446:21
460:3 475:13
523:9 524:4
543:13 573:14
**believed** 367:13
385:15 398:10
406:13,14 523:10
527:13
**believes** 360:12
**belongings** 274:16
**belongs** 469:7
**Ben** 348:17
**benefit** 296:5
370:21
**Bennett** 582:15,20
**best** 267:8 269:21
282:18 358:14
410:14 475:15
582:5
**better** 309:6 486:16
547:4,10 548:7,12
565:15 568:8
**Beverly** 353:1

**364:13 365:1**
496:18
**bewildered** 498:3,7
**beyond** 291:8
500:12 504:19
**bias** 444:10
**Bibiyan** 373:2
**big** 276:1 283:6
309:8 311:19
327:3 352:11
364:14 434:18
480:10,12
**Bijan** 353:9,10
354:4
**Bill** 408:19
**binder** 429:14
460:20
**bit** 308:6 326:17
328:21 359:11
360:6 389:1
432:17 438:14,17
482:15 502:19
**blamed** 419:4
422:15 432:10
515:15
**blames** 535:8
**blaming** 515:9
**blank** 506:15,20
**Blanquita** 388:18
389:3,5 405:11,22
571:21
**bleeding** 354:20
355:1,5,7,12,13
355:15 356:2
357:13
**blue** 401:8
**board** 260:2,4
261:1 270:4 276:5
388:5,8,13,17
394:18 405:9,10
407:15 430:9
479:12,14 481:5
532:2 571:12,17
571:21 572:6
**body** 465:7,16,17
**Boehner** 449:21
450:5,13,22
452:14 453:1
**Boehner's** 452:14
**book** 296:4,6
297:22 334:14
401:7,8 429:19
430:9 473:13,14
473:15 502:16
503:2 541:3,6
580:8

**books** 417:1
**born** 335:2
**boss** 372:18 373:1
480:16
**bottom** 298:14
300:7 304:7
345:22 380:16
391:15,16 392:3,4
479:8 508:11,12
510:10 562:9
577:6,9,12
**Boulevard** 352:5
360:2 361:12
423:10 456:13
496:16 504:10
**bounds** 500:12
**boutique** 353:18,19
**boyfriend** 371:17
375:6 524:20
**brand** 363:21
**Brantley** 260:22
261:4
**break** 321:16
383:19 411:10
446:14,15 492:8
523:1,13,14
557:10 580:4
**breakdown** 354:20
**breaking** 437:19
514:4 533:17
536:15
**breaks** 282:12
**brief** 264:14 266:11
275:21 291:10
322:20 324:11,18
402:3 429:16
446:8 450:22
505:4 521:12
**briefly** 275:20
302:5 310:1
353:17
**Brighton** 496:18
**bring** 279:10 285:4
288:12 316:2
340:15 345:14
394:4,8 415:5
457:5 469:16
484:4 487:3,21
488:21 507:18
519:6 571:5
572:12
**bringing** 308:21
405:21 503:15
**broadcast** 345:4
389:16
**broadcaster** 371:7

**407:17 410:16**
411:4,10 412:4,9
415:15 417:5
422:2 426:14
427:18 428:12
436:7 439:4 446:6
450:8 451:4
458:20 462:22
467:7 478:11
486:1 490:2 494:2
494:4 502:18
503:7,8 504:8
508:18 511:5,9
523:16 537:6
548:9 553:12,17
555:10 556:5
557:4 565:19
566:7 572:14
577:5 580:22
584:4,6
**back-dooring**
295:15
**background** 386:4
409:16,20
**backgrounds**
405:18
**bad** 491:1 507:7
**balance** 278:13,20
**bankrupt** 327:16
**bankruptcy** 423:19
423:22 424:10
432:8
**bar** 267:1,6 269:4
270:11 272:13
288:1,22 298:1
299:4 300:5,8
304:10 307:11,17
311:21 314:8
315:1,5 325:21
326:3,20 330:13
378:10 380:4
400:22 401:7
459:16 460:3,4,9
460:13 462:12
468:3,9 472:17
473:9 489:3,7
490:4,12 532:21
537:7,18 541:7
567:8 583:3
**based** 321:4 445:12
532:1 539:3
540:15,18 545:20
552:2 567:8
**basement** 530:4
533:2
**bases** 376:4

404:2
**broadcasters**
390:20 391:4
456:2
**broadcasting** 390:9
390:19 562:16
567:11 568:1
**broadcasts** 344:10
**broke** 514:20
**brother** 293:11,15
294:15,22 295:4
295:22 296:9
322:15 434:12
**brought** 285:4
334:1 395:3
409:17 418:1
505:6 524:15
525:11 535:5
581:9
**building** 344:3
352:5 516:2
**bunch** 265:7 407:13
564:22
**bureau** 344:2,10
346:1,20 347:3
402:16 441:8,11
573:10
**business** 316:9
318:3 323:12,19
340:9 451:7 452:5
**busy** 548:17
**buy** 427:11 428:17
428:18 432:14
433:3,4,8,10,20
534:4
**buying** 433:6

**C**

C 264:1 483:8
**C-h-a-l-a-n-g-i**
391:14
**C.S.R** 260:22 261:4
**cafe** 496:15
**calculated** 552:18
**California** 267:15
319:7 353:1 434:2
456:11,15 458:15
532:10
**call** 280:7 290:18
312:22 323:20
324:1,3,7 325:6
325:11 350:4
352:19 402:15
407:14 412:19
448:4 449:6 459:2
471:8 474:5,8

487:13 538:15
580:15 583:6
**called** 281:17 295:1
324:21 325:9
344:9 407:9
410:21 411:13
412:21 440:9
470:18,21 474:14
538:14
**calling** 282:3
308:10 422:17
459:2 538:13,22
574:3
**calls** 282:3 370:17
487:11
**Camden** 496:15,18
**camera** 357:9
562:19
**cameraman** 323:6
323:14 342:15
**capability** 342:1
**capable** 489:18
493:17,18
**Capitol** 322:6,6
323:1 328:15
452:21,22 455:18
**caption** 444:9
**car** 373:14 423:13
427:11 428:16,18
428:19 432:15
433:3,5,7,9,11,13
433:13,15,16,20
434:11,14 435:3,7
435:14,18 436:10
491:20 533:10
**carbon** 577:7
**card** 323:9,12,14,15
324:2 328:6 379:6
451:7,7 452:6
**cards** 323:19,19
**care** 451:9 459:4
564:3,6 566:5
**cared** 274:16
420:10
**career** 296:6 490:15
**carefully** 340:12
529:21
**caring** 420:2,17
**cars** 435:9,11,12,17
435:20
**Carter** 387:10
**carve** 321:9
**case** 266:15 267:1
268:20 269:5,15
273:21 276:17
278:22 279:3

281:7 284:12
308:10 309:15
315:2 320:11
322:15 329:14
330:13 331:16
333:2,18 340:7
358:16 359:1
369:14 380:21
395:3 405:9
406:21 407:5,5,15
407:16 409:21
410:4,5 414:15
419:1,3,8 420:6
421:22 422:12,18
444:9 447:13
450:9 456:2 461:8
469:14 471:14
477:18 480:7,9,9
480:11,15,21
483:16 484:2,4
486:9 489:4,21
490:7,13 491:18
494:2 503:12
519:7 520:9
522:21 523:6
533:16,21 535:5
535:14 549:19
558:18 559:1,8,22
567:2 575:12
583:21
**cases** 395:17 397:2
408:13 409:17
442:1 475:3,10,15
475:17,18 494:22
503:18 525:13,16
530:6,13 531:4
533:4,15 534:11
535:16 537:3
559:2 560:13
573:13
**castigate** 275:11
**cause** 557:18
**causing** 475:17
**caution** 426:12
**CBN** 296:1,10
**CC** 577:8,13
**CC'd** 578:19
579:15
**CC'ing** 574:16
**ceased** 557:22
**cell** 281:15 323:9,16
323:18 325:2,4
562:19
**Central** 344:2,9
345:13,19 346:16
346:19 347:3

**certain** 272:13
347:2 519:2
533:18
**certainly** 275:8
277:18 284:22
**certified** 301:1
**cetera** 335:19
**Chair** 261:12
271:18 305:12
321:6
**Chair's** 283:20
**Chairman** 264:2,17
266:5,9,14 272:2
275:15,20 276:21
280:10,14 283:11
283:17,21 284:11
284:21 285:5,10
287:3,9,11 288:14
288:19 289:10,17
289:22 290:7,16
291:3,13,15,19
293:2,17 294:6
295:20 296:19
297:18 299:7,13
299:21 301:6
303:9,15 304:11
304:14 305:18
306:8 307:13,19
307:22 308:6,13
308:19 309:4,13
312:6,11,14 313:5
313:7 314:2,11,14
314:17 315:4,15
316:4,6,20 317:2
317:16 318:9
320:8,16 321:13
321:18 324:15
331:8 335:5,11
337:4,8 339:4,7
339:12 340:11,19
357:4 359:7 360:9
366:19 367:1,5
371:22 372:3
373:7,21 374:9,13
375:8,11,14
376:13 377:11,18
378:5,8,12,14,19
378:21 379:7,9,18
379:21 381:3,12
381:15,21 382:10
383:16,21 384:3
392:1,10 395:21
396:5,12 397:8,10
397:13 398:5
399:3,10,14,21
400:4 401:2,6,10

402:2 406:6,10
408:3 411:6,16,19
412:15 413:4
415:20 416:1,9
418:15 419:13,20
420:8,12,19
425:15 426:11
427:3,7,14,18,21
428:3,6,13,22
429:5,8,11,17,21
430:3,21 431:2,10
431:18,21 433:17
434:5,8,10 435:1
436:16,19,22
437:17,21 438:8
438:11,17 439:4
439:12,16 440:3,6
443:21 444:4
445:1,20 446:1,5
446:9,14 447:17
448:4,7,12,16
449:8 453:16,21
457:22 460:18,22
461:13 466:11,14
468:8,12,14 470:7
470:22 471:15,19
472:1,3,12 473:12
473:15 474:17
477:16,21 478:3,6
479:15,19 481:1
481:10 483:2,4,7
487:12,16,19
488:7,21 493:2,6
494:9,17 495:20
497:5,14,17 498:6
498:15,18,21
499:5,9,15,18,21
500:3,8,11 501:6
501:9,14,17,19,22
502:7,15 503:2,6
503:22 504:3
506:3,8,14,19
507:1,4,14,18
508:2,6,11,14,17
508:21 510:3,6
512:18,21 513:3
513:11,15,21
514:8,22 515:4,6
516:15 517:1,6,20
518:7,10,20 519:4
519:16,20 520:14
521:7,14,21 522:3
522:8,11,13,18
523:12,16,19
524:3,6,11 526:1
526:3,7,11,20,22

527:6,18,21
528:12 529:6,21
530:11,15 531:3,8
531:19 533:9,20
534:10 535:10,17
535:21 536:2,6,20
537:11,20 538:7
538:10 539:12
540:12 541:16
542:16 543:6
544:2,6 545:18
546:3,8,11,17
547:15,19 548:2,7
549:1,5,11 550:14
551:1,6,9 552:5
552:12,21 553:4,9
553:18,21 554:3
554:16 555:1,8,14
555:19 556:19,22
557:7 558:2,14,22
559:22 560:6,15
560:20 561:1,10
561:14 563:19
564:4,9 566:19
567:3,14 568:3,13
569:3,7 570:19
571:16 572:4,16
572:21 574:11,14
574:20 575:17
576:9 577:6,11,15
577:17,21 578:2
578:11,15,22
579:7 580:1,6,11
580:14,19 581:1,7
581:12,19 582:7
582:18,21 583:5,8
583:22 584:7
**Chalangi** 391:11,14
404:1
**chance** 280:17
287:1 295:6
485:17
**change** 267:7
549:14 570:11
**changed** 475:20
**changing** 308:9
**channel** 562:18,22
**character** 273:20
**characterize** 264:22
**charge** 332:19
336:13,17
**charged** 382:5
404:8 424:12
**charges** 535:13
567:5
**charging** 403:20

**charlatan** 481:14
**checked** 281:17
**cheek** 326:5,9,12
452:11
**chief** 451:8 458:14
496:22 497:12
574:9
**chip** 412:4
**choice** 346:19 362:2
424:17
**Christian** 364:17
**chronological** 278:4
**chuckled** 406:10
**circles** 388:21
**circulation** 442:18
**circumstances**
264:19 265:3
411:4 461:16
531:2 532:20
**citation** 461:8
**citations** 469:13
**civil** 575:22 576:18
578:7
**claim** 330:1,4
355:15 357:13
483:11,19 490:9
505:13 521:19
522:7 524:1 525:4
539:15,17 567:4
**claimed** 268:3
332:2 334:9
339:20 384:11,13
384:14 385:12
484:16 515:14
**claiming** 275:5
342:21 369:22
415:13 514:20
525:6
**claims** 378:2 444:9
486:3 505:14
529:3 558:1,20
560:17,19 566:21
576:22 578:17
**clarified** 371:18
373:4
**clarify** 386:12
555:16
**clarity** 447:8
**CLAY** 261:20
**cleaned** 572:1
**clear** 287:15 357:17
372:7 417:8 439:8
444:16 450:3
498:1 520:19
524:8 547:6
556:16

**client** 349:5 363:17
420:17 450:19
481:22
**clients** 481:15,18
550:2
**Clinton** 388:15
405:10 408:19,20
479:11,17 481:4
**close** 270:20 365:19
432:22 487:13
533:16
**closer** 507:19
**closet** 512:7 518:15
**closing** 501:5
**clothing** 354:1,3,4,6
**Clyde's** 325:17
326:19 329:17
330:21 333:14
**co-anchor** 332:3
**co-host** 564:17
**coach** 282:11
**coaching** 494:7
**coax** 560:14
**Coburn** 454:8,11
**Cockroaches**
444:12
**coerce** 397:20 559:3
572:13
**coffee** 470:11
**Cohen** 571:21
**collar** 441:14
**collateral** 273:22
512:22 516:7
524:4 528:1
532:13
**collect** 333:19
553:16
**collection** 306:3
**Colleen** 408:9
**colleges** 440:21
**Columbia** 260:1
261:6 414:16
472:17 473:1,8,16
**columns** 399:18
**come** 265:17 266:17
267:11 309:12
311:1 316:16
325:17 333:7,16
368:16 373:3
385:5 387:1 414:1
434:14 436:7
446:18 468:4,16
491:13 572:10
580:21,22 581:1
581:20 584:4,6

**comes** 268:15
343:11 399:2
533:16 537:2
555:21 580:9
**comfortable** 364:10
364:20,21
**coming** 384:12,14
388:2 491:22
500:17
**commencing** 261:3
**comment** 331:7
**commentator**
382:15
**commission** 568:19
**commitment**
363:11
**committed** 320:2
**committee** 261:4,10
264:8,11 265:21
267:19 270:17
271:3 272:16
274:4 276:22
288:10 295:9
306:3,15 312:19
316:8 320:15
417:9 440:17
442:9 454:11
487:13,15 534:9
**committee's** 266:4
**common** 380:18
583:22
**communicated**
282:21 486:11
**communicating**
273:9 281:2
485:20 538:18
**communication**
281:21 295:10
297:4 424:18
555:6
**communications**
330:12 503:11
**community** 364:11
364:13,14 367:16
371:4,9 387:21
**company** 442:12
564:3,6,7 566:8
566:11,14
**compensatory**
560:2
**competency** 477:17
**competent** 476:11
477:2
**competently** 475:16
476:8,21 477:14
478:7

**complained** 342:4
517:18
**complaining** 277:17
278:3 376:17
494:13
**complaint** 266:3
288:2 298:16
331:18,19 383:15
384:10,22 385:10
385:10 393:8,21
393:22 394:13,17
399:7 406:17
422:6 459:14
460:3,12,14
461:19 462:12,13
465:1 468:3,9,16
469:15,17,22
473:21 478:12
485:14 509:6
513:13,18,20
518:21,22 528:4
529:14 533:10
538:4 541:22
567:8 571:12
576:19
**complaint's** 470:5
**complaints** 311:20
345:16 393:1,3
399:13 460:9
525:13,14,17
528:5
**complete** 274:1
**completed** 316:11
**completely** 327:16
372:20 416:17,17
**completeness**
313:21
**complicated** 503:20
504:2
**compound** 399:22
411:7 415:22
479:15
**compounding**
355:1
**computer** 554:10
**concentrate** 419:8
**concentrated**
380:21 419:11
**concentrating**
419:5
**concern** 285:10
296:16 380:17
396:12
**concerned** 527:1
530:11
**concerning** 380:19

414:14
concerns 309:2,20
  375:19 378:15
conclusion 477:9
condition 354:16
conduct 272:14
  273:20 472:17
  473:1,8 482:6,11
  532:1,9 573:12
conducted 310:19
confer 312:20
configured 416:11
conflict 547:5
confusing 555:15
confusion 377:5
congressional 464:6
congressman
  450:21 452:14
  456:10 457:18
  458:7,17 462:14
  463:2 464:14
congressmen 449:2
Connecticut 449:15
connection 284:20
  442:7 456:18
  500:3
consent 268:12,15
  283:4 286:9
consented 284:19
conservative
  387:14,22 388:20
  409:4,12 442:15
conservatives 387:7
consider 550:7
consideration
  283:14 285:19
  375:15 474:19
considerations
  376:15
considered 269:5
  300:1 312:3
considering 368:10
consistent 528:6
consists 442:16
Constitutional
  394:19
constraint 291:4
consult 312:12
  487:12
contact 268:20
  269:4 281:1
  337:10,11,13
  451:8 452:6,7,13
  466:18 467:2,13
  483:18,22 484:17
  573:16 574:2,5

contain 277:5
contained 267:18
  274:18
content 390:9
contentious 369:14
  369:16
contents 305:19
contested 521:20
context 318:12
  360:16 570:20
contingency 553:5
contingent 559:17
continue 477:22
  559:14
continued 262:1
  292:1 448:18
  557:16 567:21
continues 321:9
continuing 578:17
contract 520:11
contractor 403:9
contradicted 528:6
control 275:2
controversial
  389:10
controversy 405:1
convenience 448:17
convenient 312:20
conversation
  322:20 324:11,12
  324:17 327:1
  328:2,2 329:10,11
  329:14,16,18
  330:1,3,6,20
  331:2 332:1
  360:13 452:9
  465:11
conversations
  329:8 330:8,10,11
  336:22 414:11
  426:2 463:6,8
convicted 281:18
  283:4 318:4 469:4
convinced 482:5
convincing 500:1
  501:10
cooperating 295:22
copied 400:14,17
  402:13 554:9
copies 274:9 275:9
  303:4 398:15
  399:17 400:1
  455:22 475:2
  574:9
copy 272:8,19
  274:13 292:6

294:20 306:6,7
  430:4 577:7,13
copying 403:2,8
corner 496:15
  507:5 508:9,12
correct 279:6
  289:21 319:8,20
  319:21 322:8,9,11
  322:12,18 323:2,4
  323:10,21 324:1,3
  324:22 325:3,5,7
  325:15,18 326:6
  326:15,21 327:3,4
  327:5 328:18
  330:14 332:4,11
  332:13,19 334:5
  334:10 336:9,10
  337:14 338:22
  339:2,9,18 341:4
  342:8,9,11,17,18
  343:1,5,17 346:21
  346:22 347:9,12
  348:3 352:12,13
  352:22 354:12
  357:13 359:15,16
  359:21 362:1,17
  362:18 365:7,8,11
  365:13,14,16,17
  366:14,15 368:5
  369:3,7,8,10,11
  369:17,18 371:12
  374:12 382:17
  383:1 385:12
  389:12,13 390:22
  391:1 392:14,15
  393:16,18 395:10
  397:17,18,22
  398:1,22 399:1
  400:20 403:2,3,7
  403:7,10 404:7,10
  404:12,16 405:2
  405:12 408:10,11
  410:1,11 422:12
  422:22 423:13
  424:10,11,13
  428:21 430:14
  431:3 433:7,8,12
  436:1 441:10
  451:4 455:15
  456:8,9,14,17
  457:3,4 458:9,12
  458:13 461:12
  463:4,22 464:7
  465:22 467:3
  468:20,21 469:11
  474:15 477:11

478:5,22 479:14
  482:11,12 486:20
  487:6,7 488:2,3
  489:8 490:16,17
  492:19,21 495:12
  497:16 498:2
  499:4 504:10,12
  504:14,15,17
  505:7,8,9 507:2
  510:9 518:2,3
  531:4 538:4,5
  539:7,8,18,19
  540:18 541:7,12
  541:13 542:8
  543:20 545:2
  552:20 553:13,14
  553:16,17 556:5,6
  556:18 557:19,20
  558:1,12 563:6,7
  570:4,5,8,9
  571:10 572:3,15
  575:7,8,12,13
correctly 432:9
correspondence
  265:15 267:3,18
  275:2 488:15
corroborate 265:11
  277:13,16,20
  279:6
corroborates
  265:22
cosmetic 564:7
  565:21 566:11,13
  566:14
cosmetics 564:7
Council 562:5
counsel 264:7 267:1
  268:21 271:13
  272:18 273:6,8,12
  273:21 274:8,15
  275:12 277:12
  278:12 292:2
  298:5,9 300:10,13
  301:17 303:2
  309:16,18 311:22
  312:11 315:1,5
  330:13 338:15
  378:10 380:4
  401:1 416:19
  428:7 439:18
  440:10,12,19,21
  441:18 445:22
  462:3 489:3,7
  490:4,12 502:20
  505:18 541:7
  549:14 550:7

559:13 583:3
counsel's 264:12,15
  272:13 277:16
  297:17 400:22,22
  401:1,7 442:4
  459:16 460:4
  532:22 537:7,18
counseled 350:19
counseling 350:22
  376:4
count 506:16
counting 308:1
countries 344:11
  345:7
country 346:2
  387:1,7
County 456:11,19
  456:21 463:18
courage 265:6
course 268:9 269:2
  310:20 327:1
  336:21 348:7
  366:6 387:4 391:2
  394:4 423:2,18
  511:17
court 260:1 261:5
  317:17 374:18,22
  377:2 379:19
  380:20 381:1
  392:3 394:5
  396:19 399:7
  406:20 407:6,15
  410:11 412:18
  414:15 419:6,12
  424:6 426:15
  428:8 475:3
  476:19 485:15
  486:10 487:20
  495:18 505:14
  519:10 521:6
  523:6 525:10,20
  527:11 548:10
  558:22 582:9
courteous 537:16
  581:15
courtesy 482:22
  510:14
courthouse 530:3
  533:2
courtroom 581:3
courts 407:8 461:9
  525:17
cousin 317:11,13
  468:22 474:3
  488:11 544:22
  575:3

In The Matter Of: Larry E. Klayman
May 31, 2018

cover 277:14 303:2
323:22 324:6,19
329:3,3 401:8
461:18
covered 277:8
290:8 308:4 526:3
526:7
covering 324:18
coworker 342:21
343:1 370:1
372:11 424:7
491:12
coworkers 369:21
376:10
crazy 483:5
create 501:2
created 357:13
creating 555:15
credibility 311:2
478:4 513:6 519:5
527:4,12 528:8
532:4 533:22
567:7
credit 293:18,18
328:6 365:7 424:4
424:5 429:4 433:7
crime 318:5
criminal 573:5,13
573:15
criticism 355:16
criticized 354:21
356:10
criticizing 356:4,6
528:16
cross 263:2 313:15
315:19 316:17
321:19 581:9
cross-examination
291:6 292:1
308:15,17 316:3
320:20 321:4,9,11
322:1 384:4
439:17 445:1,2
446:20,21 448:18
516:11 530:12
581:4 583:16
cry 332:8
crying 327:5,9,11
327:15 347:15,19
347:20 350:5
Cullum 388:19
405:11,22
cumulative 277:10
295:14
custody 275:1
custom 326:5,8

cut 347:3,4
cutting 308:16

**D**

D 263:1 264:1
400:21 401:3,12
D-23 401:13,16,21
D-a-n-a 456:8
D.C 335:18 338:4,8
362:12 539:22
573:17
dad 385:16
daily 327:10 419:6
442:12,19 443:10
damage 558:1,20
damages 336:2
393:10 405:8
553:16 557:4
558:11 559:9
560:2,3
Dana 456:7,22
dangerously 533:16
dark 496:5
Dash 449:13
date 297:3,7 302:7
302:7 303:18
304:20,22 305:3
306:20,21,21
310:13 418:4,7
431:8,9,14 460:5
465:3 479:2 522:1
539:17 550:8
554:1,6,9,9,13
555:21 556:1,2
558:16
dated 266:2 288:3
292:9 300:11
444:8,11 573:4,8
daughter 459:4
463:22 465:14
David 312:21
day 274:22 302:15
309:11 321:12
347:20,20 355:18
380:9 435:9
447:12 463:2
467:11 491:7,11
521:18 549:18
563:1 580:5,15
days 270:1 432:19
461:1 485:13
511:20
DC 260:9 261:2,18
319:7 335:3
361:15,20 362:22
363:10,12 368:16

375:6 376:6
402:16
dead 379:11 551:17
deadline 308:15
485:10
deadlines 486:5
deal 288:11 296:4,6
364:3,22 365:2,4
389:5 528:13,18
570:6
dealership 434:2
dealing 281:20
328:7 358:12
392:17 536:10
deals 477:19 528:10
567:6
Dean 509:7,9
510:14 511:3
512:9 514:13
515:9,12 516:9,20
517:15,22 518:3
519:13 524:1,16
527:13
Dear 573:7
December 460:5,6
decent 364:12,13
decide 285:15
decided 349:2,3
351:12 369:9
532:8
decision 279:19
360:12 412:21
415:13 417:13,22
418:6 427:15,17
485:10 576:20,22
decisions 310:21
421:10
Declaration 510:2,8
decorum 532:19
deemed 535:4
deep 332:7
defendant 371:3
479:12,17,21
521:18 522:6
defendants 523:10
527:13
defense 532:12
Defenses 401:4
definitely 327:21
329:12 333:15,17
372:19 433:4,9
447:22 517:10
degree 441:2
degrees 441:3
delay 268:18
460:11

Delia 575:21 577:10
579:9
deliberate 274:7
deliver 540:17
delivered 268:4
273:2 276:11
545:14
democrat 455:12
democrats 388:9
demonstrate 274:6
demonstration
322:7
denied 299:22
358:2 367:18
373:20 374:4
410:11 488:8
deny 269:9
Depart 573:11
department 385:2
573:6
depends 285:3
447:10 581:8
582:3
deposing 387:10
deposit 504:14
deposition 528:18
532:15 534:18,20
535:11
depressed 347:21
depression 327:9
332:7
deprive 310:22
describe 306:2,15
441:20
described 444:18
describing 497:20
desire 450:8
desk 325:5 346:15
346:17
Despite 432:13
destroy 359:14
361:22 376:6
destroyed 566:22
detail 330:4 333:22
336:9 486:6
detailed 329:16,18
551:15
details 298:16
323:3,6 328:18
348:19 421:19
451:12,12,18,20
determination
394:7 573:22
determine 288:6
443:9 531:21
573:19

determined 296:22
devoted 552:22
dialog 406:6
diamond 515:9
536:14
die 453:20 496:6
dies 453:12
difference 364:17
377:6
different 335:3
354:4 386:2,7
410:15 413:10
437:1 449:20
473:22 477:5
485:18 542:22,22
543:15 544:1,10
544:15
differently 472:4
difficult 337:20
368:20,21,22
407:21 408:6
556:8,10
difficulties 382:3
403:13 408:16
424:9
difficulty 408:13
557:17 559:11
digging 265:9
diligence 477:17
diligent 476:11
477:3
diligently 475:17
476:7,21 477:14
478:7
dinner 325:14
329:10,17 333:6
333:11,21 334:5
335:21 336:2
449:12
diplomatic 556:9
dire 294:5 299:20
313:15 316:15,20
317:3 318:8
direct 263:2 275:7
315:22 316:11
440:12 583:14
directed 583:5
directions 283:20
directly 282:20
482:3 515:16
director 575:21
dired 315:14
disarmament
282:18
disciplinary 261:18
264:12,15 265:10

App.0307

In The Matter Of: Larry E. Klayman
May 31, 2018

268:21 271:13
273:20 274:15
275:12 277:12,15
278:12 292:2
297:16 298:5,9
300:10,13 301:17
303:1 439:18
440:9,12,19,21
441:18 442:3
445:21 531:21
**discovery** 272:14
370:12 422:8
439:9 530:20,22
531:12,13,20
532:9 559:9
**discriminated**
404:5 456:3
**discrimination**
391:5
**discursive** 396:1
**discuss** 297:9 336:1
438:12 447:19
485:21
**discussed** 284:9
286:6,15 360:11
369:6
**discussion** 289:1
309:15 372:3
487:14 534:8
568:9
**discussions** 351:6
**disingenuous**
266:19 269:20
**dismissed** 269:16
269:16 475:18
**disparage** 275:11
**District** 260:1 261:6
414:15,16 428:8
472:17 473:1,8,16
**division** 352:10
389:10 391:6
573:5
**doable** 489:6,9
**Docket** 260:4
**doctor** 351:20
**doctors** 349:12
362:6,6,8,12
363:5,18 367:22
**document** 281:5
284:16 289:8,13
292:19,21 293:7
297:13 298:2
300:9,13 304:16
305:19 306:15,16
306:19,20 314:21
316:18 317:8

318:8 319:3,19
320:1 430:22
472:19 506:6
509:1 521:2
522:19 541:5
542:4 552:7 554:7
554:9,20 560:9
561:17 569:16
572:18 575:14
576:8 577:12
579:14
**documentary** 274:4
**documentation**
282:5 341:1
351:19,22 354:12
366:13 377:21,22
378:6 476:7,20
575:6
**documentations**
381:2
**documents** 264:20
265:15,19 266:19
266:21 267:12
268:11,13 271:7
271:21 272:11
273:16 274:9,14
275:4 277:3,5,6,7
277:10,13,19,22
278:3,8,14,18,21
279:2,5,7,8,12,14
280:18,18,21
284:7,9,12,20
286:6,15,21 287:2
287:21,22 288:4
288:15,16 289:3
289:16 290:8
295:15 297:16
302:5,20 303:5,11
305:15 306:3
308:12 310:8
313:19 340:3
407:14 412:19
447:11 475:9
477:5,7,8 533:1,5
534:19,21,21
551:21
**dodge** 501:18
**dog** 401:12
**doing** 274:21 294:6
318:2 322:11
341:10 342:14
356:11 362:5
368:15 370:18
377:1 395:7 418:2
426:8,17 450:13
450:15 529:20

532:21,22 551:7
555:11 557:3
562:16,18 567:11
567:11 568:1,1
572:14
**dollars** 494:3
**door** 446:7 510:22
511:2 580:16
**doorbell** 510:20
**Dorsey** 338:16
**doubt** 374:6 574:14
**dovetails** 280:12
**downstairs** 312:22
**Dr** 350:14,16,19,22
351:19 354:14,17
413:10,11 432:6
535:1 536:4
**drafted** 393:1
**drawn** 407:21
**drip** 266:12
**drive** 267:17 268:2
272:8,19 273:12
276:7,8 353:9
**drop** 268:4
**dropped** 276:13
**drove** 433:15
**duces** 534:21
**due** 269:11 271:6
394:21 482:21,22
499:2 532:17
**duly** 440:10
**duties** 387:4 509:15
509:20
**duty** 266:20
**dwelling** 378:3
**DX1** 287:6
**DX1-28** 287:7

_____

**E**

**E** 260:5 261:2
262:10 263:1
264:1,1 439:1,1
440:5
**earlier** 335:13
377:22 460:5
526:12 533:1
554:8 582:10
**early** 321:8 339:6
339:10,10 578:16
**Eastern** 344:10
**easy** 358:21 412:10
471:9 570:7
**easy-going** 502:10
**eating** 312:15
**editing** 368:7
**editor** 342:15 386:3

386:18
**EEO** 393:21,22
394:4,7 406:21
485:11
**EEOC** 576:19
**effect** 334:2 346:10
347:1 371:3
375:20 400:10
464:13 514:5,21
559:3
**efficiency's** 583:21
**efficient** 285:9
574:12
**effort** 269:9
**efforts** 275:13
**eight** 266:15 267:6
268:18 308:3
331:15 484:18
491:2 506:12,12
506:21 518:2
532:21 567:1,8
**eighth** 506:15
**either** 265:15,18
269:10 270:2
309:18 312:21
346:15,16 370:9
382:6 403:21
409:4 424:17
527:8 544:20
571:2
**elaborate** 483:8
**elapsed** 486:4
**elevator** 511:12
**Elham** 263:3
350:10 367:19
443:11 448:10
450:19 485:9
561:22 562:1,9,12
**elicit** 287:1 295:13
297:15 499:8
583:21
**elicited** 550:16,18
**Elise** 349:5
**Ellie** 358:11 362:20
363:9 432:7
450:21 511:14,16
511:20,22 549:19
551:14
**EllieSataki@yah...**
402:9
**Elmer** 338:16
**email** 262:8 276:4
282:2 286:4 292:8
302:11,13,17
303:6,7,8,9,11
304:3,18,19,21,22

305:1,6 319:12,14
400:15,18 402:5,7
402:18 427:5
429:22 430:17
486:19 493:17,20
515:21 538:21
546:19,21 548:20
548:21 549:18
578:21
**emailed** 294:22
303:13 319:15
398:18 495:4
540:22
**emailing** 422:18
538:22
**emails** 265:7 266:1
281:9 330:7
416:16 417:18
421:5 454:16
475:6 477:5 496:7
575:8
**emotional** 347:15
502:9 535:8 536:5
547:5
**employed** 441:6
563:8,12
**employee** 337:22
**employees** 366:18
374:2 381:9
569:12
**employers** 490:14
**employment** 267:4
374:3 383:4
393:22 403:12
407:8 563:5,14,22
**empty** 491:20
**Encino** 503:4
504:11 509:7
**encounter** 324:21
**ended** 355:6 519:7
563:15
**ends** 291:6 308:15
**engaged** 531:22
**English** 301:21
345:4,5,13,15,18
345:19 441:3
461:12 476:3,5
512:14
**entail** 442:13
**enter** 516:3 517:11
**entered** 273:7
384:21 418:17
519:13 521:17
522:1
**entering** 515:19,22
519:1

**entirely** 531:4
583:22
**entirety** 278:14
494:12
**entitled** 278:15
321:19 415:14
**entry** 314:20
**equal** 269:12
**equally** 309:17
**equation** 499:15
**errors** 421:14
**ESQUIRE** 261:11
261:15,20 262:3
262:10
**essentially** 264:22
527:22
**establish** 478:1,4
**established** 529:8,9
554:7
**estimates** 582:1,1
**et** 335:19
**ethical** 266:3 288:2
473:17
**evaluate** 279:1
537:2
**eve** 273:17
**evening** 277:1
291:5 312:17
325:20 449:7
451:11,18,19
582:9
**event** 267:8 284:15
324:6 345:6 405:8
**everybody** 264:2
329:13,14 332:9
347:20,21 372:18
375:9 392:21
414:21 415:5
443:20 480:17
487:8 488:4 491:5
496:7
**everybody's** 491:11
**evidence** 268:12
269:3 271:5 274:4
276:3 279:4,19
299:4 307:17
310:9,20,22 311:3
313:20 330:15,18
331:21 375:12
376:14,17 380:4
459:17 461:1
496:8 523:22
526:11 527:11
528:7 529:10
531:16,17,18
532:1 534:2

535:10 537:2
541:15 542:11
546:14 550:12,17
551:2,4 552:1
560:21 561:11
572:19 575:15
579:5,21
**evidentiary** 277:8
277:18 278:22
380:8 415:4,9
583:10
**ex-husband** 379:2,5
379:14 380:6
**exact** 451:2 465:3
484:20
**exactly** 265:21
274:20 298:10
300:21 326:2
334:11 344:13
346:11 358:19
365:20 432:12
453:2,5 475:7
484:9 489:12
498:5,9 502:1
509:17,19 531:8
568:9
**examination** 278:1
287:21 289:15
295:15 314:18
315:22 316:11
321:1 440:12
502:2,10 522:19
523:1 527:2
536:22 583:15
**examine** 321:19
**examined** 440:11
**example** 271:12
288:1 289:6
427:22
**excess** 560:2
**exchange** 429:22
**exclude** 295:16
**excluded** 271:14,21
**exclusion** 277:11
**excuse** 292:10,12
339:11 386:12
414:4 416:19
523:18 537:9
**excused** 313:2
446:2
**executive** 324:8
329:4
**exercise** 288:12
**exhibit** 269:3 288:1
288:22 289:19
292:7,21,22 293:3

298:1 299:4,15
300:6 303:18,18
303:20 304:10
307:11,18 308:2,5
313:13 315:13
317:5 320:10
400:21 401:2,3
416:20,21 429:14
429:20 430:6,6,8
459:16,18 460:3
460:13 461:3,19
461:21 465:2
468:11 472:15
484:22 485:6
502:6,13,14,22
505:2,12,16,19
506:9 507:9
520:19 521:1,4
523:21 537:6,8,18
541:3,6,15,19,20
542:11 543:7,12
546:19 551:10,13
561:9 569:6
575:20 580:7,8,9
**exhibits** 264:13
272:12 285:14,22
286:17 287:10,12
287:13 297:17
298:1 302:3 305:9
309:9,10,16
313:17 314:8
315:11 377:3
459:17 460:4
537:7,8,10,19
541:4 581:18
**existence** 374:4
**exists** 451:19
**exits** 581:3
**expedient** 286:13
**expense** 437:14
475:19 551:15,18
552:19
**expenses** 553:1
582:22
**expensive** 512:2
518:13
**experience** 358:12
383:10 445:13
540:15,18 545:20
546:1 550:1
**expert** 445:4,14,18
447:15 567:18
**explain** 405:18
434:4,7 450:21
475:19 482:14
483:1 486:6

490:14,20
**explained** 328:3,4,7
329:2,6,19 332:22
337:20 346:11
350:4 362:10
363:14 364:2
398:4 400:11
417:17 451:3
465:20 496:3
**explaining** 296:9
**explanation** 276:2
500:1 512:4,10
515:13 516:21
517:9,16 518:1,4
**explanations** 512:8
**exploited** 481:21
**exploiting** 481:15
**exploration** 374:6
**explore** 279:7 534:3
**Express** 273:13
**expressing** 544:15
**extension** 271:17,17
**extent** 273:22
274:17 296:21
528:7 583:19
**extra** 506:17
**extreme** 271:12
**extremely** 267:9
535:6
**eyes** 453:5 465:16
507:7

——————
**F**
——————
**F** 439:1
**face** 285:16 357:10
496:10
**facsimile** 431:15
**fact** 277:14 278:5,8
311:21 328:13
333:17 341:13
353:1 356:18
359:22 366:4
371:21 376:3
382:21 383:5,8
388:17 404:15
406:12 414:1
419:4 422:5 434:1
457:5,10 465:21
466:2,5 485:22
488:15 493:2
519:10 525:6
532:20 570:1
573:12
**facts** 265:2 377:14
499:8
**factual** 275:22

421:14
**fail** 489:22
**failed** 274:13
475:16,19
**failure** 476:7,21
**fair** 270:18 274:20
360:10 367:1
382:10 514:22
**fairness** 270:3
**faith** 275:12 314:1
**Falahati** 332:4
334:14 335:16
341:8 344:3,6,15
346:1 384:10
385:2 390:2 393:4
393:8 405:6
469:14 490:19
**fall** 532:6
**falling** 491:18
**false** 381:2,11,14
529:2
**falsity** 529:8,11
**familiar** 442:3
**family** 335:19 352:2
359:19 365:17
380:22 385:15
386:4,17 510:13
511:22 548:19
**famous** 353:8,9
494:21
**far** 320:4 359:10
408:17 434:2
456:12 505:16
526:22 553:12
580:17 583:16
**Farsi** 345:21 356:13
**fashion** 269:11
278:4 561:7
**father** 390:11
**fault** 267:8 308:19
404:14
**favor** 390:8 425:2,4
425:5,9,11,14,22
426:7,8,16,17,19
459:10
**favorable** 330:14
330:17 389:18
394:8 395:15
396:22 397:21
398:12 399:18
455:22 577:1
**fax** 538:21
**FBI** 441:7,15
573:16 574:2
575:2,6,10
**FBI-checking** 469:7

In The Matter Of: Larry E. Klayman
May 31, 2018

**fear** 465:16
**feared** 475:22
**February** 443:3
554:2
**federal** 273:13
310:9 352:5 407:6
410:22 411:14
441:8,11 485:15
485:22 573:10,13
573:20
**Federation** 569:12
**FedEx** 276:9,10
**fee** 475:20,21 553:6
559:17
**feel** 459:3 465:14
**feeling** 270:5
**feelings** 491:22
**fees** 350:13
**fell** 429:19
**felon** 281:18 283:4
**felt** 274:2 284:17
355:9 364:10,19
391:6 417:22
418:19 435:21
437:4 465:15,16
512:6
**Fernando** 360:2
**Field** 573:16
**Fifth** 394:21
**Fifty** 556:12
**fight** 311:6 371:21
532:18
**fights** 386:8
**figure** 279:11 283:2
414:20 524:6
531:14
**file** 274:18 369:9
423:19,22 436:8
485:10 489:3
507:1 521:6 525:4
525:16 533:13
535:2 536:3,12,17
**filed** 268:14 288:2
331:16,18 377:4
384:11,22 385:9
393:18 394:13,17
399:6,8 405:8
407:13,16 408:20
410:3,15 427:21
428:8 460:1,2,4
460:12,14 475:3,9
485:14 505:14
509:6 512:4
514:18 525:11,14
526:12,15,16
530:6 531:15

533:4,10,14 534:5
534:10 535:16
558:16 559:2
560:1,13 576:19
**files** 269:17,18
530:2
**filing** 385:20 468:15
513:5
**filings** 399:13
**Filipino** 361:3,4
**final** 485:10 573:22
**financial** 424:8
**find** 278:18 282:13
286:7 312:21
319:5,9 344:18,21
348:20 370:14
424:9 429:18
432:16,17 491:5
502:6 505:3,12
506:5 516:8
522:15 530:6
533:13 540:2
559:12
**finding** 522:5
526:10 573:13
**fine** 315:15 367:7
461:14 493:4
499:5 552:3
556:12,14 561:3
576:12 582:11
584:2
**finish** 321:7 446:19
497:6 582:18
**finished** 316:9
446:21 447:2
**fire** 346:8 405:3
**firm** 308:15 539:21
**first** 283:12 302:12
316:11 322:6
326:20 331:2
348:7,18 366:20
384:11,20 394:6
394:20 413:12
421:21 440:10
443:1 460:12
461:3 462:12,22
463:1,5 465:8,12
468:9 475:13
478:11,20 479:16
505:13 506:16
523:1 553:22
563:14 564:12
565:18 573:19
576:7
**fit** 316:1 582:13
**FITCH** 261:11

264:2,17 266:5,9
266:14 272:2
275:15,20 276:21
280:10,14 283:11
283:17,21 284:11
284:21 285:5,10
287:3,11 288:14
288:19 289:10,17
289:22 290:7,16
291:3,13,15,19
293:2,17 294:6
295:20 296:19
297:18 299:7,13
299:21 301:6
303:9,15 304:11
304:14 305:18
306:8 307:13,19
307:22 308:6,13
308:19 309:4,13
312:6,11,14 313:5
313:7 314:2,11,14
314:17 315:4,15
316:4,6,20 317:2
317:16 318:9
320:8,16 321:13
321:18 324:15
331:8 335:5,11
337:4,8 339:4,7
339:12 340:11,19
357:4 359:7 360:9
366:19 367:1,5
371:22 372:3
373:7,21 374:9,13
375:8,11,14
376:13 377:11,18
378:5,8,12,14,19
378:21 379:7,9,18
379:21 381:3,12
381:15,21 382:10
383:16,21 384:3
392:1,10 395:21
396:5,12 397:8,10
397:13 398:5
399:3,10,14,21
400:4 401:2,6,10
402:2 406:6,10
408:3 411:6,16,19
412:15 413:4
415:20 416:1,9
418:15 419:13,20
420:8,12,19
425:15 426:11
427:3,7,14,18,21
428:3,6,13,22
429:5,8,11,17,21
430:3,21 431:2,10

431:18,21 433:17
434:5,8,10 435:1
436:16,19,22
437:17,21 438:8
438:11,17 439:4
439:12,16 440:3,6
443:21 444:4
445:1,20 446:1,5
446:9,14 447:17
448:4,7,12,16
449:8 453:16,21
457:22 460:18,22
461:13 466:11,14
468:8,12,14 470:7
470:22 471:15,19
472:1,3,12 473:12
473:15 474:17
477:16,21 478:3,6
479:15,19 481:1
481:10 483:2,4,7
487:12,16,19
488:7,21 493:2,6
494:9,17 495:20
497:5,14,17 498:6
498:15,18,21
499:5,9,15,18,21
500:3,8,11 501:6
501:9,14,17,19,22
502:7,15 503:2,6
503:22 504:3
506:3,8,14,19
507:1,4,14,18
508:2,6,11,14,17
508:21 510:3,6
512:18,21 513:3
513:11,15,21
514:8,22 515:4,6
516:15 517:1,6,20
518:7,10,20 519:4
519:16,20 520:14
521:7,14,21 522:3
522:8,11,13,18
523:12,16,19
524:3,6,11 526:1
526:3,7,11,20,22
527:6,18,21
528:12 529:6,21
530:11,15 531:3,8
531:19 533:9,20
534:10 535:10,17
535:21 536:2,6,20
537:11,20 538:7
538:10 539:12
540:12 541:16
542:16 543:6
544:2,6 545:18

546:3,8,11,17
547:15,19 548:2,7
549:1,5,11 550:14
551:1,6,9 552:5
552:12,21 553:4,9
553:18,21 554:3
554:16 555:1,8,14
555:19 556:19,22
557:7 558:2,14,22
559:22 560:6,15
560:20 561:1,10
561:14 563:19
564:4,9 566:19
567:3,14 568:3,13
569:3,7 570:19
571:16 572:4,16
572:21 574:11,14
574:20 575:17
576:9 577:6,11,15
577:17,21 578:2
578:11,15,22
579:7 580:1,6,11
580:14,19 581:1,7
581:12,19 582:7
582:18,21 583:5,8
583:22 584:7
**five** 276:17 283:21
308:3 321:2
442:21 506:11,20
526:16 530:7
**five-minute** 320:12
**flash** 272:8,19
273:12
**flavor** 373:17
**fled** 385:17
**flood** 532:10
**flooded** 530:4
**floor** 344:12
**Florida** 262:6
267:16 269:16
**flow** 367:9 448:8
**folks** 312:19 386:14
**follow-up** 331:13
**following** 360:11
**follows** 440:11
**force** 395:7,8
572:13
**forced** 584:6
**forceful** 571:5
**forever** 361:6,7,8
**forgot** 446:13
**form** 277:17 278:1
395:19 461:8
546:4
**formally** 284:8
**former** 349:5 378:2

387:11 410:22
**formulating** 372:4
**forth** 297:16 368:14
529:15
**Fortunately** 406:3
**forum** 485:18
**forward** 286:16
315:2 363:16
373:19 486:14
553:15 557:19
558:10 559:8
576:21
**forwarded** 293:11
293:15 294:10,16
**forwarding** 292:15
293:22
**found** 265:7 281:18
328:5 347:8 349:4
363:20 376:18
378:4 379:3,15
380:9 381:19
512:5 563:4
**foundation** 287:20
396:3,9 416:12
**foundational** 311:2
**four** 268:18 308:3
363:22 365:9
376:20 504:16,19
506:11,19 583:15
**Fourth** 395:1
**frankly** 271:20
275:4 277:5
368:19 550:16
568:6
**fraud** 281:18,19
328:6 469:4
**fraudulent** 318:5
525:7
**Frederick** 262:3,4
**free** 340:8 364:1,8
365:5 376:20
394:19 423:8
504:21 562:19
**freedom** 322:7
457:6
**frequently** 395:13
396:21 425:8,10
425:13
**Friday** 267:13
268:9 276:4,9,10
584:10
**friend** 332:16
348:17 360:19
391:10 405:12,22
410:21 411:14
412:8 423:18

424:7 425:3
436:10 495:2,6
510:16 513:1,2
536:15 571:20
**friend's** 533:18
**friends** 352:3 361:7
365:17 380:22
456:20 469:8
548:19
**friendship** 336:14
336:19 433:1
**front** 298:1 322:6
328:14 350:9
357:9 407:22
409:12 453:4
460:19 499:14
537:21 554:18
559:19
**fsujat@yahoo.com**
262:8
**fuel** 491:21
**full** 440:3 497:7
**function** 341:10
548:16
**further** 278:6
297:12 307:14
374:6 422:7
444:21 445:19
478:9 526:4,8
556:8 583:9
**future** 267:4 325:15
471:18 490:14

---

**G**

**G** 264:1
**gambling** 281:19
**gaming** 318:5
**garage** 434:14
**general** 335:7 338:5
338:15 364:9
368:4 391:16
392:5 420:9,20
428:11 574:8,10
**generally** 353:2
364:11 368:5
454:4 578:14
**Georgetown** 325:18
**getting** 282:15,20
295:14 300:22
383:14 393:5
405:5 411:6
446:10 474:11
480:10,11,11,18
504:19,20,20
578:9
**girl** 564:20

**girls** 357:7 565:1
**give** 268:22 269:13
274:10 283:19
326:8 328:10
363:12 415:8,10
439:22 447:15
452:5 455:21,21
475:2 497:6
511:16 535:4
558:18 581:22
**given** 265:17 270:2
274:9 280:4 366:7
394:21 432:18
528:12 557:16
**giving** 301:3 322:10
501:11,15 528:20
555:12
**glad** 367:8
**Gloria** 493:13
494:14,20
**Gmail** 401:19
**go** 264:3 280:14
285:8 286:7,21
288:4,20 289:2
290:1 297:1,19
300:3 303:15
309:10 312:12
316:15,22 319:11
320:20 321:20
327:20 334:14,21
335:14 336:4
339:2 340:2,8
341:16 348:10
356:1 358:5,6
359:11,13 360:7
361:19,21 362:3,8
367:9,20 369:20
376:5 386:19
400:4 406:20
409:11 417:7
422:7 427:11
428:10,12,18
429:8 432:14
433:3 434:1
435:16 436:10
439:14 440:6
448:7 450:5,8
451:4 452:2 457:2
467:7 478:4,8,11
479:8 486:1 487:2
487:20 490:1
491:16 493:11
497:18 502:18
503:7,8 504:8
505:14 527:7,7,9
533:21 550:6

552:13 555:1,10
556:8 558:10
559:8 564:9
565:15 566:7,10
581:16 582:3,17
**goal** 334:13,21
335:7,13 336:4
**goals** 374:3
**God's** 453:15
**goes** 272:9 528:8
533:21 534:1
**going** 267:7,9 269:1
275:17 279:13
280:3 284:6,16,19
286:9,14,18
287:14 288:15
290:1 291:8
293:13 295:10
296:6,11 303:12
306:10 311:6,15
311:16 320:20
327:8 328:4 329:6
331:5,12 332:6,21
333:3,17,19
336:12,17 338:20
339:16 340:2
346:8,20 347:3,4
347:5 348:5 355:5
358:17,21 360:8
362:7 363:16
367:3 368:14,18
373:17,18 375:10
393:3 395:1 407:8
407:9 409:20
417:4,6,7 425:6
426:11 428:10
429:13 430:15
433:10,20 436:7
439:10 447:6,10
448:1 449:22
450:6 452:18,21
453:16,21 457:2
465:6 467:6
471:17 474:18,20
480:6,17 482:20
484:21 488:12,19
490:8 491:4 492:3
493:22 494:9
498:17 502:4,18
503:14,18 506:3
508:2 511:21
512:1,19 516:4,8
516:9,10,14,15,19
520:18 523:13,20
523:21 526:4,8
533:11,13 535:12

541:11 542:11
550:19 556:17
557:19 561:19
574:15 580:2,14
580:20 581:5,13
582:2,17
**gonna** 434:20 496:6
503:8
**good** 264:5,16
266:8 275:12
284:17 289:6
291:13 292:5
311:9 312:10
314:1 316:6
342:20 343:4,8
345:6,15,18
356:14 359:9
364:3 365:4
383:17 411:11
437:19 440:14,15
461:12 493:18
500:22 501:1
517:21 532:19
548:22 581:7
**gotten** 294:20
373:17 423:8
528:21
**government** 358:13
385:17 395:14
396:21 453:8
480:13,18,21,22
569:12
**governor** 479:13
**governors** 388:6,8
388:13,18 394:18
405:9,11 407:16
479:13 481:5
571:12,17,21
572:6
**grab** 327:21
**grabbed** 327:2,14
**graduated** 441:5
**grant** 422:1
**grapple** 282:8
**great** 528:12
**greater** 483:12
**Green** 379:6
**greet** 326:4
**grossly** 269:10
**ground** 279:7
**grounds** 307:20
524:5
**group** 305:15
**groups** 385:21,22
**guarantee** 358:15
**guess** 265:11 313:2

382:21 442:15
447:14 449:8
534:4 581:8
**guest** 510:19
**guilty** 516:9
**guy** 377:20 524:17
524:19 533:17
564:21,22 575:3
**guys** 575:4

**H**

**H** 261:20
**H-e-r-m-e-s** 354:8
567:20
**haberdashery**
353:8
**half** 268:19 321:10
480:12,13,18
510:20
**hallway** 344:13
459:1 465:13,21
**hand** 275:7 311:5
326:8 327:2,14,21
439:21
**handed** 292:6 324:2
**handle** 432:8
**handled** 528:4
**hands** 496:7
**handwriting** 289:8
538:3,6
**happen** 355:3 453:3
**happened** 332:2
333:22 334:9,9
336:3 363:20
384:20 386:11
413:13 445:7
453:5 491:6
517:19 519:3
568:9
**happening** 265:22
361:19 456:1
**happens** 537:7
**happy** 264:13
309:17 432:15
**harass** 344:15
**harassed** 342:22
355:10 369:22
370:6 384:10
385:11
**harasser** 334:14
335:16 341:8
**harassing** 331:3,22
514:5,14
**harassment** 331:16
331:20 341:15
349:17 385:20

394:22 450:9
485:12,16 486:3
487:4,22 489:4
490:9 491:13,18
494:22 514:19
533:15 534:11,15
**hard** 267:9 362:13
368:22 371:2
**hard-hitting** 571:6
572:13
**harder** 356:17
357:7
**harm** 582:19
**hate** 270:6 559:19
**he'll** 340:16 448:7
**head** 356:22 388:12
388:13 414:5
436:21
**healthy** 547:3
**hear** 264:14 279:4,8
280:3 281:14
295:3 378:22
387:16 404:17
445:15 476:17
487:16 528:7
582:12
**heard** 264:21
279:15 312:7
373:7 379:9
455:14 481:22
529:13,15 535:10
560:15 568:3
**hearing** 260:11
261:1,3,10 264:8
264:11,11 265:5
265:13,21 267:10
268:16 270:1,16
273:17 276:22
279:19,20 282:9
288:10 295:9
306:2,15 312:18
316:8 415:4,9
417:8 418:1 439:2
440:16 442:9
449:9 523:6
528:19 531:7,21
532:7 584:9
**hears** 510:20
**hearsay** 310:14
466:13
**heart** 357:14
**heavily** 352:20
**heavy** 498:12,14
**held** 338:14
**Hello** 266:9
**help** 265:20 296:6

301:13 307:4
310:3 317:9
318:22 332:10,12
332:15,17,19
333:3 334:4
336:12,17 349:19
350:10 357:19
358:11 359:20
363:9 401:15,15
401:22 402:20
403:17 404:4,11
406:1 423:18
424:15,18,22
425:2 434:16
436:7,10 437:14
437:15 450:7
452:2,16 454:15
455:3,11 456:16
458:9,18 469:17
472:7 474:6,9,9
474:11,13,13
513:17,20 525:3
572:10
**helped** 301:14,21
317:10,11,12
348:20 394:15
470:17 475:1
512:13 544:18
**helpful** 271:8 278:9
278:14,18 314:2
380:13 574:4
**helping** 342:7
359:19 387:20
472:10
**helps** 314:1 396:13
**Hermes** 354:7,8
567:19
**hesitate** 574:5
**high** 384:1
**higher** 486:10
**highlighted** 283:13
**highly** 353:3
**Hill** 322:6 452:22
455:18
**Hillary** 388:15
479:11,16 481:4
**Hills** 353:1 364:13
365:1 496:19
**hip** 270:19
**hire** 483:14
**hired** 345:19,20
389:22
**Hispanic** 361:2
**history** 454:1
**Hoc** 261:3,10
**hold** 267:5 284:11

309:16 508:6
531:7 567:1,8,10
567:22
**holding** 566:12
**hole** 491:2
**Hollywood** 262:6
**home** 380:8 512:1
**home ʼ** 511:14
**honest** 425:21
501:12,16
**honestly** 417:20
502:11
**honesty** 527:4
**Honor** 270:3 280:8
285:8 286:18
288:13 292:20
293:1,14 295:12
295:13 296:14,16
299:5,18 309:2,21
313:10 314:19
316:14 318:12
319:22 331:13
367:8 377:9 378:7
380:4 396:11
402:1 414:13
428:10 437:20
446:12 460:21
494:6 499:2
501:11 502:5
521:11 526:10
528:11 531:5
533:19 534:17
535:18 541:14
542:10 544:5
546:6 550:11
553:8 554:14
559:5 566:21
572:19 575:15
579:21 580:2
581:16 582:6
583:17
**Honors** 266:8 283:8
**hope** 282:18 314:1
581:21
**hopefully** 446:16
**hopes** 311:4
**hoping** 321:8
**hospital** 355:6
**host** 382:15 383:9
383:10 388:20
564:15
**hot** 401:1
**hotel** 582:21
**hour** 277:2 321:10
**hours** 308:9 312:16
393:2 538:14

583:1,14,15
**house** 379:16 450:1
450:7 453:7
**housekeeping** 284:3
**hug** 326:8 465:12
**huge** 434:20
**hugged** 459:3
**human** 385:1
**humor** 406:9
**hundred** 386:1,6
**hundreds** 494:3
**hurt** 480:6,18 491:3
**husband** 360:21
375:5 378:2
408:17 419:17

**I**

**idea** 312:10 416:10
439:9 468:3,5,6
468:15,20 481:13
**identified** 310:12
413:17 543:18
**identify** 444:7
550:20
**identifying** 383:18
**ignore** 506:20
**ignored** 475:14
**III** 261:20
**imagine** 321:3
**immediately** 273:5
273:12 276:10
360:11
**implication** 515:3
**important** 282:14
422:19 470:6
535:6 536:4
**impression** 467:22
501:3
**impropriety** 274:6
**inadvertently**
543:14
**incapable** 433:6
**incestuous** 270:21
**incident** 520:8
**inclined** 456:16
**including** 302:22
405:10,11 548:19
**income** 566:18
568:19
**incompetence**
382:6
**incomplete** 280:19
282:5
**incorrect** 306:8
478:14,17
**incorrectly** 479:6

In The Matter Of: Larry E. Klayman
May 31, 2018

indicated 321:7
indicating 502:16
  507:11
individual 449:21
individuals 570:2
indoor 266:16
indulgence 316:15
industrious 353:4
influence 395:13
  396:20
influences 395:13
  396:21
inform 265:21
information 265:20
  271:4 273:11
  275:13 376:22
  529:1 574:3
informed 283:3
  320:21 571:22
Ing 468:21
initial 324:21
  392:22 394:7
  573:12
initially 326:1
  410:5 443:3
injunction 406:20
  422:2,6
innuendo 373:19
inside 394:4 436:21
  580:9
insofar 583:17
instances 279:10
instructed 296:17
  296:20
instructions 282:15
insurance 525:4
intended 281:7
intent 273:20 309:3
  309:7
intentionally
  269:10,11 555:18
interest 270:11
  339:18 345:7
  346:3 384:16
  385:6 475:15
  489:20
interested 322:17
  381:4 508:3
interim 462:11
intermediary
  565:20
internal 385:10
internally 384:11
  385:1 528:6
internet 445:5,10
  445:11,17 561:18

563:4
internist 351:21
interposed 310:15
interrupt 438:2
intervene 459:9
intervening 503:14
interview 322:10,11
  371:14,16 375:7
  400:16 403:6
interviews 368:15
  538:20
intimate 328:17,19
  329:12,13,14
introduce 367:3
introduced 322:13
  450:18
investigate 575:2,6
  575:11
investigated 315:1
investigation 269:1
  408:18 441:9,12
  442:4,7 457:12
  485:11,12 573:10
  573:20
investigative
  573:11
investigator 439:8
  440:18 441:13
invited 325:17
  329:17
invoke 438:6,9
involve 527:10
involved 457:1,11
  480:19 567:19
involving 486:9
  529:15
Iran 335:2 346:3
  371:14 389:16
  390:9 402:17
  457:6 562:15
Iran-Contra 457:12
Iranian 322:7 457:1
  562:5
Iranians 352:15
irrelevant 516:12
issue 274:1 280:9
  280:11 282:7
  283:6 284:4 312:4
  320:15,18 374:11
  391:16 392:5
  409:22 422:8
  443:2 462:15
  512:22 524:5
  535:8,11 568:14
  576:18
issues 285:12 291:7

413:17 435:19
  457:2 522:21
  535:13 536:10
  547:10 548:11,15
It'll 359:14
items 308:4

_____ J _____
J 262:3,4
J-C-P-O-A 562:10
  562:12,13
Jackson 339:15
  340:10 341:14
  355:16
jam 268:16 373:2
  382:18
Jame 373:2 382:18
January 485:8
  564:1 579:10,12
  579:18
Jessica 510:16,19
  511:12 513:17
  514:14 527:16
Jessica's 514:15
Jewish 364:13,16
Jimmy 387:10
job 296:2 341:10
  353:16 362:3
  382:13 383:9
  423:6 441:20
  564:6,12 565:16
  568:11
jobs 404:13 566:13
Joe 455:11,14
John 410:5 449:21
  450:13 453:1
  454:15,19
JohnGChalangi...
  402:10
Johnson 575:21
  577:10 579:9
joined 479:11
joining 440:20
joke 352:18
Journals 563:11
Joy 355:18 356:4
judge 407:21 408:6
  408:7,16 409:12
  410:4,4,7,14,22
  411:1,3,14 412:3
  412:8,19 413:19
  416:5,10,14,20
  418:16 421:10
  427:16 485:22
  519:5 523:9
  527:13

judgement 278:13
judges 395:16
  397:2 444:12
judgment 278:15
  519:13 521:17,22
  522:4 529:11
Judicial 408:21
July 505:14
jumped 335:9,11
  360:6
June 303:19 304:4
  402:8 416:17
  418:8,10 444:11
  510:12,13,18
  512:2 584:10
jurisdiction 315:5,6
justice 573:6,9,11

_____ K _____
K-a-v-e-h 342:8
  424:6
Kamer 574:9
Katherine 301:4,15
  307:7 317:11
Kathleen 318:14
  458:11 459:1,2,13
  460:15 468:22
  474:3 475:1
  492:17 544:20
Kaveh 342:8,10,16
  343:11 356:13
  369:21,21 370:7
  370:16,18,19
  423:19 424:6,13
  424:14,18 426:20
  432:8,11 436:10
  437:14,15
keep 266:10 276:16
  287:4 312:14
  343:12 344:3
  480:15 538:15
  547:6
keeping 276:16
  321:6 344:5
keeps 538:13,22
kept 480:10
Kersangi 348:17
Kevin 263:4 292:12
  294:15 320:21
  439:15 440:5,8
  446:2
key 449:13 507:16
keyed 373:14,15
keys 366:4,5,8
  434:19
Khomeini 389:19

390:13
kill 355:6 358:6
killed 322:16
killing 355:2
Kim 260:22 261:4
kind 265:6 271:11
  296:5 369:17
  446:14 465:17
  467:5 508:17
kiss 326:5,8 452:10
kissed 326:12,13
kitchen 511:3
Klayman 260:5
  262:10 265:4,16
  266:5,7,10,15
  272:4,20 273:2,9
  274:16 275:17
  276:11 278:7
  280:8,11,15 285:7
  285:19 286:8,14
  286:18 287:14,17
  288:13 289:5,12
  289:18 290:22
  291:6 292:9,20
  293:14 294:1,4,13
  295:2,12 296:4,11
  296:14 297:7
  299:18 302:6,10
  303:13 306:18
  307:14,20 309:1,5
  309:21 310:5,18
  311:8,11 313:10
  314:6,16,19
  315:16 316:12,14
  316:22 317:4,20
  318:11,13 319:4
  319:22 321:18,20
  322:2 324:20
  331:6,12,14
  335:10,12 337:7,9
  339:6,8,11,13,14
  340:21 356:22
  357:11 359:5,9,12
  360:15,17 363:14
  367:3,7,10 372:2
  372:6,8 373:10,11
  373:21 374:8,10
  374:15,17 375:10
  375:13,22 376:2
  377:8,13,15,19
  378:6,10,13,16,17
  379:1,12,13 380:1
  380:3,5,13,15
  381:20 382:8,11
  383:20 384:5
  386:21 387:18,21

In The Matter Of: Larry E. Klayman
May 31, 2018

392:9,11 396:10
396:17 397:4,15
398:8 399:9,12,16
400:5 401:3,6,12
401:14,18,22
402:4,6 404:19
406:8,11 408:8
411:8,10,12,18
412:1,17 413:8
414:6,13,17 415:1
415:22 416:3,4,12
416:13,22 417:4,7
417:11 418:17,20
419:15 420:1,5,15
421:1 425:17
426:3,13,21 427:9
427:16,20 428:1,4
428:9,15,20 429:9
429:12,17,19
430:2,5,10,11
431:4,13,20 432:1
433:19 435:6
436:14,18 437:1,3
437:18 438:6,9
439:6 442:4
443:15 444:3,22
445:3,19 446:12
446:22 447:3,9
448:16,20 449:11
451:22 453:18
454:1,2 458:2,4
460:20 461:2,14
461:15 462:4,7,8
462:19 464:14
465:7 466:9,12,16
467:7,8 468:11,13
468:17,19 470:12
471:2,16,20 472:2
472:6,14 473:19
474:22 475:14
476:14,17 477:10
477:19 478:2,5,8
478:10 480:1
481:3,11,14 482:6
483:10 485:1,5
487:10,17 488:6,9
488:17 489:1,2
490:3 491:3,9
492:7 493:3,4,8
493:10 494:5,16
494:19 495:22
497:9,22 498:10
498:17 499:1,7,11
499:17,20 500:2,5
500:9,13 501:8,11
501:15,18,20

502:1,3,5,8,12,17
503:6,8,9 504:5,7
506:1,10,17,22
507:6,10,12,16,20
508:1,8,10,13,15
509:2,22 510:7
513:10,16 514:2
514:12 515:2,7
516:14,18 517:13
517:20 519:8,9
520:16,17 521:3,6
521:8,10,13,16
522:2,5,9,12
523:3,5,14,18,19
523:21 524:10,13
526:5,9,14,20,22
527:5,10,20
528:10,14 529:19
530:1,14,18 531:1
531:5,10,22
532:17 533:12
534:13,17 535:11
535:15,18,22
536:3,7 537:4,5
537:13,15,17
538:1,8,11 539:13
539:20 540:14
541:10,14,18
542:10,13,19
543:4,9,13,17
544:4,8,9,14,17
545:10,19 546:6,9
546:13,18,20
547:13,17,22
548:9 549:3,10,16
550:11,15 551:3
551:12,21,22
552:9,11,13,14
553:7,10,19 554:2
554:5,14,18,21
555:2,6,10,17,20
555:22 556:20
557:2,6,9,11
558:7,17 559:1
560:4,7,10,12,17
560:22 561:3,8,12
561:16 563:2
564:9,10 566:21
567:6,16 568:12
568:18 569:2,4,9
569:10 570:15
571:3,4,14,19
572:9,18,22 573:3
574:13,17,22
575:14,19 576:11
576:13 577:5,18

578:4,13,16 579:4
579:8,20 580:2,8
580:12 581:15
582:5,11,16 583:3
583:17 584:3
**Klayman's** 269:19
272:18 285:6
302:13 304:3
384:4
**knew** 329:13
381:11,14 396:6
405:7 406:14
437:16 454:19
455:18 456:21
480:2,5 498:5
511:7,22 515:20
**know** 265:8,13
267:2 268:8
269:14 270:17
272:9 274:4,12
275:2,3,6,12
276:5,12,13
279:15,21 281:1
281:10 282:1
283:7 284:13
286:11,13 288:11
303:20,21 318:7
318:18 319:8
320:5,19 326:3,9
326:11 328:12
329:11 331:4
340:1 345:13
346:20 353:8,11
354:18,19 355:9
359:14 361:18
362:5,13,14,19
369:5 373:5,18
376:4 395:18
397:3 409:2
414:17 417:14
418:2 419:11
421:6 422:14
424:21 426:19
431:8 433:22
445:18 447:3,7,10
448:2 450:22
454:3 455:3,8,13
459:7 461:7 466:5
466:19 467:1,16
469:6 474:6,6,16
475:11 481:2
484:6 489:13
490:5 495:16,16
496:8 498:7
500:22 502:20
507:21 509:17,19

515:17 521:7
528:14,14 529:1
530:7,14 531:11
533:8,12 536:7
540:11,20,21
544:12 545:16,18
555:20 568:5
571:15,16 575:7
576:16 580:17
582:17 583:9
584:3,4
**knowing** 290:11
481:20
**knowledge** 380:18
447:15 469:18
475:9 579:1
**known** 371:4,8
390:7,11 395:17
397:2 532:5
**knows** 267:15
278:10 447:6,18
531:16 540:11
550:1
**Kollar-Kotelly**
408:10 485:22
**Kotelly** 408:16
410:7,14 412:20
413:19 415:3
416:5,10,15 418:6
418:16 421:10
**Kotelly's** 416:20
427:17

---

**L**

**L-a-b** 566:3
**LA** 335:11 336:4
339:16 341:17
346:14,14,15,17
347:7 358:3,18
360:18 361:14,18
362:5,7,9,12
363:4,5,6,8,18,19
364:14,21 367:15
368:5,15 369:20
382:14 397:21
401:18 402:7,16
403:6 412:9
428:16,17 451:4
458:20 553:13,17
557:4 584:4
**lack** 382:6
**language** 406:18
465:7,16,18
**lapsed** 487:6 488:2
**LARKIN** 261:13
293:3 430:8 462:5

522:15 537:9,14
**Larry** 260:5 262:10
294:3 319:4 327:2
327:15 346:13
358:5 359:14
387:21 401:18
402:6,21 403:5
442:4 450:15
452:7 464:13
475:14 485:9,19
541:10 546:20
**Las** 281:19 283:4
318:5 469:5
**late** 378:1 582:3
**latitude** 528:11,13
528:20 531:18
**law** 262:4 271:2
312:1,4 314:22
315:6 461:8
473:14 539:21
**lawsuit** 334:1 372:5
394:5,9 487:3,22
505:6 524:15
527:12 529:9,13
529:15,18 572:13
**lawsuits** 369:10
405:5 408:20
436:8 525:9,12
527:3,6,7,10
528:2 571:6
**lawyer** 270:6
311:21 315:1
317:21 318:20,21
318:22 333:1
358:13 359:8
371:3 387:13
394:10,11 395:2
406:18 420:16
424:10 432:8,11
436:5 447:17
469:9,11,16 471:4
471:10,14 474:14
477:11,12 481:2
483:14,18 484:17
487:2,9,21 488:5
488:12,13 492:4
493:12 494:21
499:3,7 541:10
547:11 548:12
550:22 552:6
**lawyers** 276:16
316:8 317:15
320:3,3 407:14
442:1
**lay** 287:20 396:2,9
416:12

In The Matter Of: Larry E. Klayman
May 31, 2018

laying 510:21
lead 531:15,17
leader 390:13
leading 299:6
   427:16
leaned 452:10
learn 442:17 530:1
learned 281:6
lease 366:20 376:19
   376:20,21 504:8
leased 365:6
leave 283:8 287:18
   290:9 338:21
   340:8 341:3 347:4
   347:9 363:12
   511:15 583:6
leave.' 511:16
leaving 446:13
   578:22
leeway 583:18
left 325:2 386:3,20
   387:9 390:8
   408:17,17 510:16
   511:21 543:14
   565:18 566:6,15
   577:7,12
left-hand 508:9,12
legal 327:16 336:13
   336:18 362:10
   369:6 372:4
   375:20 378:15
   392:12 411:2
   419:18 421:14
   461:4,9 469:13
   470:13 471:18
   472:8 503:15
   530:8 539:6
   549:21 558:10
   570:11,20 571:1
   573:22 576:22
legally 312:2
Leida 564:20
LEKlayman@gm...
   402:6
lessee 504:21
let's 328:20 355:13
   363:5 376:8
   396:18 406:6
   450:5 476:17
   479:8 480:15
   504:8
letter 268:22 269:2
   273:1,3 293:12
   294:12,21 295:1,3
   295:7,10,19,21
   296:3 297:3 302:6

302:9 303:2 307:2
   307:4 430:18
   539:15 540:8,21
   540:22 541:20
   542:1,7,16,17,21
   543:5,18 544:19
   546:10,14 552:3,4
   552:22 554:11
   555:5 556:2 558:5
   561:1 569:11,14
   569:20 570:20
   573:4,8 574:19
   575:21 576:10,14
   577:2,7,10,19
   578:10,12 579:1,5
   579:9,16,20
letterhead 300:10
letters 419:7 540:19
   544:11 548:18
Lewinsky 408:18
licensed 414:18
Lieberman 455:11
   455:15
life 490:21 491:5
   496:6,6 497:10
   566:22 567:10,21
   567:22 568:10
life's 267:5 566:22
   567:7
light 268:17 401:8
liked 528:21
likelihood 280:16
limitations 484:4,7
line 345:22 359:10
   380:16 391:15,16
   392:4 406:13
   481:12 517:14
   527:1 555:7
   565:21
line' 392:4
list 311:6 313:11
   416:21 472:15
listening 334:3
   345:2
literal 356:14
litigated 480:20
litigation 370:13
   374:18 375:16,16
little 266:12 308:6
   313:3 326:17
   328:21 359:11
   360:6 389:1
   395:22 406:9
   411:7 438:14,17
   454:1 482:15
   502:19 507:19

522:11 535:3
   580:16,20
live 270:4 271:15
   271:16 359:18
   360:1,1,4 361:9
   361:15 364:5
   369:20 376:7
   423:10 434:3
lived 360:4 386:22
   424:8
living 318:1 342:16
   342:22 343:11
   353:18 361:16
   414:8 456:12
loan 318:2,2
lobbied 572:2,5
lobby 389:2
lobbying 449:1
   456:6
Local 569:12
located 376:8
locked 446:7
long 265:1 281:16
   309:14 320:19
   347:20 351:21
   354:17 413:11,12
   413:14 441:15,17
   452:18 483:21
   484:16 503:19
   504:1 505:22
   524:14 565:4,8
longer 324:11
   376:21 438:20
look 265:7 266:22
   280:17 286:3
   292:18 293:21
   294:9 297:22
   300:6 301:5 302:3
   302:18 303:17
   304:10 305:9
   306:14 307:12
   314:16 417:9
   428:9 435:11
   443:1 484:2
   499:12,14 500:2,6
   500:18 501:1
   539:20 555:10
   576:6 579:10
looked 266:19
   310:7 443:4,5
   498:3
looking 265:12
   302:4 307:11
   311:22 368:9,11
   435:9,11,17,19
   445:7 475:6

510:10 520:22
   521:15 543:2
   559:9
looks 304:1 500:22
   508:4
Los 334:15,18,22
   335:4,16,17 338:9
   339:2 341:3,11
   343:15 344:1
   351:9,14,15 352:1
   352:10,11,18,19
   352:20 371:6
   376:7,7 382:22
   383:12 391:19
   392:7 393:5
   400:15 406:21
   407:17 410:17
   411:5 414:2,9,12
   415:15 422:9
   427:17 436:7
   450:8 486:2
   525:10,17 551:15
   556:5 564:8,13
   572:15
lose 291:4 539:6
   541:11
lost 269:17 404:13
   419:9 421:22
   422:12 520:9
   568:10
lot 265:9 272:5,9
   273:18,19 280:5
   309:11 321:3
   335:3,17 336:9
   358:12 364:5
   367:13 376:12
   383:3 386:8
   391:17 392:5
   395:6 410:15
   413:9 421:17
   425:20 465:4
   503:16 580:3,12
   581:16
lots 330:10
loud 516:16
love 339:18 419:6,7
   422:18 491:18,22
   548:17,18
loved 360:5
lower 435:17,18
lunch 282:12
   321:16 492:8,12
luncheon 438:21
Luxury 509:7

M 260:22 261:4
M-e-h-r-a-n 317:18
ma'am 397:8
   527:18,18
Madam 379:18
   502:16
Mahmonir 403:8
   413:16
MahmonirRahim...
   402:9
mail 268:4 298:8
   300:19 301:1,1
mailing 540:18
main 564:6
maintain 274:13
maintained 274:17
   275:9 341:13
   342:6
maintaining 274:19
   275:1
major 346:3
makeup 498:12,14
   499:16 500:4
making 340:13
   341:21 342:14
   416:5 529:2
   558:21 559:1
   566:16 567:12,16
   568:22
mall 328:14
man 380:9 453:15
   465:10 497:10
   511:3,6,10,10
management
   515:21
manager 296:10
   368:7,8 509:16
   510:15 511:7
   515:19
managers 385:12
   404:21
managing 386:3,18
manner 273:14
   278:4
Manouchehr
   322:15,17
March 377:4 399:7
   580:10
marching 278:2
marginally 395:22
mark 515:16
marked 292:7
   300:7 484:22
married 377:16,20
   378:3 379:5,16
   380:10

| | | | | |
|---|---|---|---|---|
| **MARY** 261:13 | 462:13 467:22 | 283:19 320:16 | **morning** 264:5,16 | 407:4,5 408:9 |
| **Maryland** 441:1,6 | **meetings** 282:12 | 378:5 399:3 429:5 | 264:17 266:8,13 | 411:1,15 440:4 |
| **Mass** 544:3 | 337:16,19 338:14 | 497:5 506:14 | 285:12 291:13,14 | 449:21 454:7 |
| **Massachusetts** | 369:13 458:22 | 508:7 513:3 | 292:4,5 316:6 | 479:2 549:22 |
| 543:19 545:1,8 | 463:3 464:2,4,12 | 521:21 536:20 | 317:6 488:20 | 565:22 571:12 |
| **matter** 260:4 265:1 | 464:18 | 560:20 580:20 | 549:20 583:12 | **named** 283:5 |
| 277:15,21 310:16 | **Mehdi** 332:3 341:8 | 581:2 | **Morton's** 449:13 | 338:15 351:21 |
| 375:16 439:22 | **Mehran** 281:12 | **minutes** 277:2 | **motion** 264:12,15 | 388:18 390:2 |
| 452:3,16 459:9 | 317:14 | 283:22 308:7 | 264:15 268:14 | 479:17,20 571:17 |
| 464:5 467:3 | **member** 261:14,16 | 316:19 321:2 | 280:3 320:9 488:7 | **naming** 405:9 |
| 512:15 516:7 | 572:5 | 383:22 523:2 | 494:10 524:8 | **narrative** 428:12 |
| 528:1 532:6 553:2 | **members** 264:8 | 581:11 582:1,2,2 | **motions** 272:21 | **narrow** 529:21 |
| 570:7 573:21 | 276:22 381:8 | **mischaracterizati...** | **mount** 532:12 | **nasal** 266:12 |
| 574:7 580:12 | 479:12 487:13,15 | 272:5 | **movant** 272:3 | **nasty** 369:17 |
| **matters** 264:10 | 534:9 | **mischaracterizes** | **move** 286:16 288:9 | **national** 402:20 |
| 276:1 277:7 | **memorandum** | 324:13 | 288:22 289:15 | 562:5 |
| 441:14 447:19 | 430:13 431:6,12 | **missed** 392:2 486:6 | 295:16 299:4 | **natural** 446:15 |
| 464:6 472:8 | **memory** 452:19 | 579:19 | 306:10 307:17 | **necessary** 274:2 |
| 532:13 538:20 | **men's** 353:8 | **missing** 287:11 | 313:22 314:8 | 436:9 570:21 |
| 583:10 | **mention** 331:19 | **mistake** 339:13 | 315:21 331:6 | **need** 264:10 279:11 |
| **maximum** 321:3 | **mentioned** 334:20 | 540:6 | 335:4 338:8,12 | 284:22 286:2,11 |
| **McCain** 454:15,19 | 433:16 454:16 | **mistaken** 366:22 | 351:15 363:5,19 | 288:7 290:1,18,20 |
| **me '** 511:15 | 515:8 | 514:10 | 375:21 377:12 | 313:14 375:8 |
| **mean** 285:2 290:22 | **Mercedes** 423:15 | **mistakes** 421:15 | 402:20 466:9,12 | 401:15 427:7 |
| 300:21 301:6 | 434:1,19 | **mistreat** 366:17 | 487:10 494:5 | 433:13 442:2 |
| 303:10,12 304:1 | **mess** 503:18 | **mix** 424:16 | 501:14,19,22 | 462:19 464:13 |
| 335:2 370:4 371:1 | **message** 292:15 | **Mm-hmm** 304:14 | 520:5,9 522:22 | 500:11 501:7 |
| 371:8 373:16 | 293:22 294:10,17 | 401:17 565:11 | 523:21 535:13 | 514:8 522:22 |
| 380:17 386:13 | 325:2 | 569:3 | 541:14 542:10 | 524:6 532:15,16 |
| 425:19 436:9 | **messages** 306:5,7 | **moderate** 552:9 | 546:14 550:11 | 535:12 541:9 |
| 447:13 462:3,18 | 330:7 | **moderately** 312:20 | 551:1,3 561:10 | 568:15 580:21 |
| 464:4 466:20 | **met** 322:6 328:13 | **Mohammadi** | 572:18 575:14 | **needed** 307:15 |
| 473:3 479:2 493:5 | 329:1 330:20 | 322:14,15 | 576:21 579:4,20 | 351:22 354:19 |
| 493:8 494:6,7 | 331:2 334:7 336:8 | **moment** 432:18 | **moved** 268:11 | 361:5 362:3 423:5 |
| 547:14,18 550:9 | 336:16 337:2 | 579:10 | 269:17 274:7 | 423:19 458:18 |
| 558:9 563:17 | 393:2 452:15 | **moments** 511:10 | 284:8 299:11,14 | 474:5,12 500:10 |
| 568:5,20 577:3 | 455:20 458:7,11 | **Monday** 447:14 | 299:14 428:16 | 536:17 |
| 578:5 580:7 581:6 | 462:22 463:1,5 | **money** 296:7 | 486:14 550:17 | **needs** 267:4,5 382:2 |
| 581:20 | 464:7 466:21 | 327:15 332:18,22 | 551:16 553:15 | 396:2 425:6 447:5 |
| **meaning** 391:16 | 467:10 470:11 | 333:19 363:8 | **moving** 284:12 | 583:1 |
| 392:4 432:6 | 485:10 | 393:9 405:7 | 290:17 363:7 | **nefarious** 273:18 |
| **means** 308:20 | **MICHAEL** 261:15 | 435:19 494:4 | 372:4 537:12 | **negative** 343:19 |
| 310:21 380:20 | **middle** 294:9,17 | 520:1 521:19 | **Muslim** 364:12,16 | **negligent** 269:10 |
| 422:6 544:13 | 344:10 492:1 | 522:6,14 565:14 | **Muslims** 364:6 | **negotiate** 338:7,12 |
| 571:2 | **million** 352:15 | 567:12,16 | | 570:3 |
| **Medhi** 564:22 | 442:21,21 | **Monica** 365:1 | **N** | **neither** 317:15 |
| **medical** 351:13,15 | **mind** 311:4 312:14 | 408:18 | **N** 263:1 264:1 | 379:18 |
| 354:10,15 358:1 | 321:6 448:13 | **month** 339:5 | 439:1,1,1 | **Nella** 360:19 361:1 |
| 415:14 | 491:2,4 547:6 | 366:20 442:21,22 | **N-I-A-C** 562:1,2 | 361:1,16 |
| **medium** 302:16 | **mine** 349:5 405:22 | 560:1 | **naked** 510:21 514:6 | **nervous** 354:20 |
| **meet** 296:11 334:8 | 410:21 411:14 | **months** 363:22,22 | 514:21 533:18 | **Net** 442:12,18 |
| 349:8 430:15 | 412:8 437:12 | 364:1,8 365:5,9 | 536:15 | 443:10 |
| 463:15 | 525:1 583:4 | 365:10 376:20 | **name** 304:8,8 | **network** 334:15 |
| **meeting** 296:1 | **minute** 267:12 | 423:8 484:18 | 317:13,18 318:14 | 336:5 345:20 |
| 337:5,6 430:14 | 268:15 271:19 | 487:5 488:1 | 318:15 342:8 | 351:10 352:4,10 |
| 452:22 459:7 | 276:3,14 283:17 | 504:16,19,21 | 349:4,14 371:6 | 367:14 389:10 |

550:2
**networks** 382:14,22
  383:1,1,12 387:5
**neutral** 270:17
**never** 268:12 319:3
  320:6 328:13
  331:16 361:21
  366:4 375:2 403:4
  403:20 404:8
  405:8 409:9,10
  424:12 445:10
  461:4 466:17
  470:11 472:22
  473:2,7 480:20,21
  481:17 482:10
  512:5 514:18
  515:15 517:17,17
  518:18 524:19,19
  524:21 525:8
  540:8 545:7,14
  556:15,18 557:21
  559:15,16 563:16
**new** 266:16 276:2
  277:6 279:7,22
  363:21 377:22
  428:18,18 435:7
  435:14 564:7
  581:17
**news** 334:15 336:5
  344:2,9 345:13,19
  345:20 346:16,20
  347:3 348:5 351:9
  352:4,10 367:14
  382:14 383:11
  389:10,16 442:16
  550:2
**newspaper** 402:17
**NIAC** 562:3
**nice** 367:16 500:15
**night** 291:8 328:18
  449:13
**nine** 308:3
**NITV** 371:6 372:15
  380:11 382:17,18
  382:19
**nods** 356:22
**non-discovery**
  568:8
**nonpartisan** 409:17
**nonresponsive**
  487:11 488:6
  494:6 549:2,6
**noon** 384:1
**North** 457:15
**Northwest** 539:21
  540:5 573:17

**Notary** 261:5
**note** 265:14 308:1
  377:2,7 382:5
  515:18,22 558:14
  559:22 583:13
**noted** 439:12
**notes** 290:7 483:5
**notice** 270:1 363:12
**notification** 519:2
**notified** 316:10
  510:14
**notify** 516:2
**notifying** 304:2
**notwithstanding**
  410:13
**November** 288:3
  298:6 306:22
  307:9 539:16
  542:1 543:5,9,18
  561:2
**number** 278:18
  281:17 286:3,3
  288:22 289:6,19
  292:7,22 293:4
  298:1 299:15
  300:6 305:12
  307:18 308:2
  316:20 323:9,17
  323:18 324:1
  402:17 416:20
  421:14 465:2
  469:14 472:15
  479:13 484:22
  503:3 566:3
**numbered** 287:10
**numbers** 300:8
  443:6,7
**Nuys** 434:2,19
  530:3 532:10
  533:2
**NW** 261:2

**O**

**O** 264:1 439:1,1,1
**o'clock** 437:20
  438:15,16,18
  582:19
**O'Connell** 263:4
  320:21 321:14
  438:3 439:15
  440:5,8,14 446:2
**O'Connell's** 321:10
**O'Connor** 445:4
**Oaks** 360:4 361:10
  361:11
**oath** 291:17,17

448:14 493:1
  514:4 560:11
**Obama** 389:17
**object** 286:14 290:1
  291:1 299:8,12,16
  299:16,17,19
  313:14,18,19
  314:19 319:22
  320:7 395:19
  396:10 420:6
  466:9 524:5
**objected** 285:21
**objection** 287:6,9
  293:14 295:12
  299:10 300:1,2
  307:20 311:19,19
  312:6 314:3,4
  315:3 318:7 320:8
  324:13 359:4
  373:16 377:17,18
  395:22 396:11
  419:19 420:4,7
  426:9 436:12
  439:12 453:13,22
  471:15,19 472:1
  477:16 513:9,19
  513:22 515:5,6
  516:6,13 523:11
  523:11 528:1
  539:11 540:10
  541:17 542:15
  545:17 546:2,4,12
  546:16 547:12
  550:13 551:5
  561:13,14 570:14
  571:13 572:20
  573:1,2 575:16
  578:8 579:6,22
**objections** 284:16
  285:6,20 287:7
  290:13 309:16
  310:14 314:10
  439:7
**objects** 286:8 288:9
  289:18
**obligation** 266:20
  270:10 282:19
  555:16
**obligations** 376:19
  473:17
**observation** 324:15
  340:20
**observations**
  340:14,16 514:3
**observe** 264:6
  315:4

**observed** 348:3
**observing** 308:14
**obstruction** 573:9
**obtained** 264:20
  306:9
**obviously** 267:6
  314:4 377:4 494:7
  527:11 567:2,21
**occasion** 495:10
**occupation** 440:17
**occur** 370:13
**occurred** 284:5
  459:7
**occurs** 582:3
**OCR** 485:11 576:17
  576:18 578:6
**October** 292:9,10
  292:11,12 293:8
  297:5 300:11,14
  460:2,14 507:2
**Off-the-record**
  487:14 534:8
**offer** 343:22
**offered** 310:16
  332:12,14 336:14
  336:18
**offering** 296:2
  365:5
**office** 262:4 266:4
  298:5,8 300:10,13
  301:17 324:1,7
  338:5 341:17
  353:2 414:2
  440:18,20 441:18
  452:14 458:15
  463:1,6 464:6,7
  465:8 467:15
  468:1 469:19
  470:1,11 509:10
  509:11,13 540:17
  545:4,7,15 573:16
  574:6 575:22
  578:6
**official** 481:6
**oh** 287:12 306:21
  430:5 438:11
  522:11 544:8
  577:14
**ok** 275:15 298:13
  300:20 301:16
  302:14 307:1,16
  309:6,9 313:1,5
  317:2,7 323:3
  324:17 326:12
  330:16 333:15
  337:8 339:7 340:4

354:1 355:8 357:2
  358:20 360:15
  361:4 362:16
  364:19 365:20
  366:1,2 373:10
  375:22 381:22
  383:20 388:1,2,4
  391:20 395:22
  396:16 398:5,7
  399:14 400:4
  401:16 406:8
  407:1,13 411:18
  413:6 416:3
  418:11,12,13
  423:4 428:3,22
  429:11 431:2
  432:12 437:18
  443:17 444:20,22
  448:9 455:6 457:7
  457:18 461:14
  471:1 472:13
  483:3,6,9 489:1
  497:17 500:20
  501:17 502:1
  506:20,22 508:14
  508:20 513:10,15
  518:1,7,10 523:14
  523:18 526:1,19
  537:18 538:2
  539:2,9 546:13
  549:4 556:13
  558:21 569:19
  574:13 577:15
  580:6,11,14
  581:12
**okay** 556:12
**Oklahoma** 454:8
**old** 266:16 346:17
**Oliver** 457:15
**once** 353:17 362:6
  445:9 447:6
  489:10,11,16
**one's** 529:10
**one-bedroom**
  365:18
**one-hour** 321:16
**ones** 286:16 542:12
**online** 442:11
  444:18 445:7
**open** 280:21 282:6
  421:4,5,8 568:6
  580:16
**opened** 265:8 421:6
  421:7
**opening** 269:1
  417:20

In The Matter Of: Larry E. Klayman
May 31, 2018

opinion 314:21
  390:16,19 395:20
  416:14,20 442:16
  492:22
opportunity 268:9
  269:13 279:9
  286:19 287:15
  311:1,14 383:4
  405:19 477:22
  478:1 569:15
  576:3
Orange 456:11,19
  456:21 463:18
order 375:1 406:19
  412:22 422:1
  486:1,11 505:14
  551:20 560:13
Ordinarily 289:14
organization 562:6
organized 264:3
original 460:3
  541:22
originally 272:19
ought 486:15
outset 266:21
outside 353:19
  580:15
overall 528:8
overnight 276:11
  363:13
overrule 426:11
overruled 295:20
  312:7 318:10
  320:9 396:13
  547:15
oversaw 454:11
overstepped 359:10
owe 521:19 522:6
  522:13
owned 353:9
owner 372:15

**P**

P 264:1
p.m 438:1,21 439:2
  447:20 510:19
  582:4 584:9
package 280:22
  281:10 511:13,15
  511:17
packages 341:16
  342:1,14,14
  356:11
packets 342:7
page 294:10,17
  298:14 300:7

302:12 303:17
305:5 306:14
401:12 430:7,12
461:18,20,22
472:15 473:21
475:14 478:11,14
478:18,20 479:9
481:9,12 505:11
505:13 506:15,15
506:16,16,18,20
507:10,12,15
508:3,8 510:1
520:19 521:5,22
539:14 542:11,14
542:20 543:2,4,6
543:11 549:17
550:15,18 551:9
554:12 575:17
pages 301:5 302:18
  442:21 505:3
  506:11,12 508:18
  521:8 522:10
  524:7,11
paid 365:9 423:13
  428:16 504:13
  505:21 562:21
  565:2
painful 265:2
paint 382:2
papers 509:19
paperwork 318:19
par 473:2
paragraph 432:5
  479:10 481:12
  515:13 547:2
  549:13
paragraphs 516:5
  516:19
paranoia 533:19
  535:7
paraphrasing
  531:10
part 271:22 302:22
  305:5 326:20
  327:10 345:14
  376:10 380:7
  404:22 420:6
  443:8 452:8,12
  476:15 479:19
  486:8 505:12
  521:3 536:22
  555:5
participate 307:1
particular 297:13
  305:15 306:7
  316:17 333:11

360:13 385:16
449:6 456:16
524:7 578:21
580:9
particularly 364:6
  391:5 581:17
parties 261:7 264:7
  311:5 313:8
party 304:2,8
passed 485:13
pattern 529:2
Paul 402:16 574:9
PaulRichter@LA...
  402:19
pause 291:10 402:3
  429:16 446:8
  505:4 521:12
pay 323:6 333:1
  350:13,14 362:16
  363:21,22 393:10
  405:8 503:17,17
  520:10 565:17
  583:4
paycheck 361:19
paying 582:21
  583:4
payment 376:21
  435:16
payments 435:18
pays 565:16
peacefully 389:3
penalties 510:10
pending 264:12
  414:14
penniless 423:5
Pennsylvania 268:4
  269:16 273:3
  539:21 540:5
  542:2
people 271:15
  296:1,10 317:15
  318:2 320:2
  338:16 345:16
  348:2 352:18
  357:8 366:17
  367:13,20 368:4
  370:4 372:17
  373:3 386:1,6,7
  387:8 389:11,12
  389:21 390:8
  395:15 397:1
  404:15,20 405:3
  425:20 455:21
  474:1,5,7 480:8,9
  480:16 482:1,4
  491:14 492:3,10

492:14 503:14
533:15 536:13,15
571:8 574:16
perceived 330:16
  330:17 389:14
  408:15 432:6
  550:21 559:11
percent 332:21
  333:4,5 553:5
  556:10,12 557:19
  558:12
percentage 333:16
perception 370:11
  372:6 376:9
  514:13
perfect 290:22
perfectly 279:17
  360:9 517:21
perfume 354:7
period 279:1
  340:22 351:5
  357:16 360:11
  366:11 381:5
  399:13 423:18
  427:10 428:2,5,13
  462:11 486:4
  565:20 579:12
periodically 341:16
perjury 510:10
permanent 422:6
permitted 499:19
Persia 336:5 345:12
  345:20 351:9
  352:4,10 367:14
  389:10 550:2
Persian 334:15
  345:7 348:17
  352:11 361:1
  364:11,12,14
  367:16 371:4,8,9
  382:13,22 383:1
  383:11 387:5
Persians 352:15
  353:4 364:5
  385:22
person 275:1 281:4
  281:7,12,12,13,19
  332:5 342:6
  349:19 371:15,19
  372:22 378:18,19
  379:2,4,14 380:6
  386:2,19 450:6
  452:6,7,13 453:8
  454:4,5 455:1,17
  457:11 463:9
  469:7 497:11

536:5
personal 323:9,16
  323:18 339:17
  433:1 464:2,4,10
  490:21
personality 547:10
  548:11,15
personalizing
  266:18
personally 298:17
perspective 369:17
peruses 302:20
  472:19 542:4
petitioned 532:6
phase 419:1,3
  421:21
phon 348:17 360:19
  564:20,21 574:7,9
phone 281:15 323:9
  323:16,18 325:3,5
  325:13 329:1,9,16
  329:19 330:5,8,10
  370:17 400:12
  421:15 463:4
  465:4 467:14
  562:19
phrase 425:8,12,18
physicians 352:2
pick 489:21
picked 473:12
picture 382:2
  486:16
piece 551:7
pieces 442:16 535:3
pin 339:5
pinpoint 503:12
place 265:3 272:6
  283:8,12 312:20
  360:13 361:5,17
  361:18 391:5
  414:12 423:10
  432:17 446:15
  496:5 540:16,17
  542:22
placed 445:10
places 335:3
plaintiff 521:19
  522:6,14
plaintiff's 505:13
  521:19
plaintiffs' 522:7
plans 448:2
play 270:12,13,14
  274:20 275:5
played 382:19
pleading 307:13

**pleadings** 407:14
410:3 412:19
413:10 419:11
475:3 476:9,22
**please** 292:19 294:3
294:3 298:2 300:5
304:12 317:16
319:1 350:10
402:15 418:5
424:16 426:14
440:16 444:7
450:21 470:22
482:14 537:9
569:18 574:5
**plenty** 532:4,14
**plus** 296:8 308:2
**PNN** 341:19
**pocket** 270:20
**podium** 266:6
**point** 266:11 275:22
282:8 286:12
297:10,14 311:17
337:5 347:14
349:10 358:10
359:17 360:10,14
369:5 376:16
383:17 417:19
426:22 437:19
505:1,5 534:4
538:9 551:20
552:17 553:15
556:1,4,16 557:12
557:21 558:20,21
559:4,16,18
560:17 580:5
581:7
**pointed** 278:7
280:16
**pointing** 401:8
**points** 478:1 532:3
534:18
**police** 512:4
**policies** 268:21
**policy** 312:2
**political** 386:2,7,7
392:20 404:22
405:4 409:11
**politician** 501:21
**politics** 391:6,17
392:6
**populated** 352:21
353:3
**population** 352:12
**portion** 523:22
**portions** 308:2
**position** 285:15

287:15 342:12
346:17 481:6
**positive** 337:21
369:19 397:20
**possess** 269:12
**possessions** 274:17
**possibility** 409:3
**possible** 274:11
296:21 447:16
495:11 578:17
**possibly** 500:22
**post** 266:1,12
427:15 540:16
545:15
**Postal** 273:1
**potential** 513:4
535:7
**potentially** 277:15
285:14 572:5
**powerful** 450:6
453:8,14 454:3,5
455:1,17
**practice** 312:1,4
315:6 411:2 529:2
**practicing** 314:22
320:3
**precedent** 367:19
**preliminary** 406:19
422:2
**premature** 286:22
**prepaid** 423:8
**preparation** 265:5
**prepare** 392:12
461:17 475:2
**prepared** 311:20
393:8,20 413:9,12
413:14 459:13
460:15 469:22
470:3,16 568:7
**preparing** 393:3
465:1
**presence** 334:13
335:14,15 341:7
397:17 466:20,21
467:10,12
**present** 261:6 262:9
264:7,8 279:16
350:21 351:2,2
549:8,10,12 550:5
564:1 568:16,17
**presentation**
289:15
**presented** 400:10
**preserve** 407:7
410:17 486:12
**preserved** 314:4

439:13
**president** 337:1
351:7 387:11
408:19 453:11,11
453:19,20,20
454:20
**prestige** 296:7
**presumably** 278:12
**pretty** 264:5 359:9
470:5
**previous** 539:4
**previously** 292:7
307:21 313:21
355:8 459:12
461:11 528:17
541:5 550:16
567:17 574:18
575:1
**preys** 481:15
**price** 365:19
**prim** 499:13
**primarily** 341:6
**prince** 371:14
**principal** 393:14
574:8
**print** 522:11
**prior** 351:19 383:10
440:20 515:13
549:19
**private** 411:2
**pro** 389:18
**pro-Iranian** 390:9
**pro-regime** 389:11
**pro-shah** 389:11
391:8 404:16,21
**probably** 281:12
301:1 321:2 329:2
390:3 412:12
417:14 421:19
430:10 447:20
474:8 579:19
**probe** 289:9,11
**problem** 266:14
282:4 289:5 309:9
327:3,17 328:2
329:7 343:10
370:5,8 399:4
408:6 409:20
450:20 490:1
536:5,16 556:14
**problematic** 374:2
**problems** 325:10
382:3
**procedural** 280:9
**procedure** 394:11
**proceed** 278:22

281:7 283:8 382:7
**proceeding** 267:6
269:3 270:8,18
271:11 273:21
419:18 516:10
**proceedings** 276:19
277:9,19
**process** 271:6,12
286:10 379:19
394:21 530:8
**produce** 267:20,22
**produced** 268:2,6
**producer** 324:8
329:4
**product** 275:5
**professional** 260:2
261:1 433:2 464:6
464:9 472:16
473:1,8 482:6,11
490:20 567:17
**proffer** 512:20
558:19
**progressing** 406:21
**prominent** 494:21
562:6
**promote** 475:18
**promoted** 383:8
**promptly** 264:6
269:4
**pronoun** 458:1
**pronouncing** 390:3
**proof** 372:17
**prop** 390:20
**propaganda** 390:20
**proper** 461:8
499:13 509:7,9
510:14 511:4
514:14 515:9
516:9,21 519:14
524:2,16 527:13
555:11,14
**Proper's** 512:9
515:12 517:15,22
518:3
**properly** 545:21
546:10
**property** 510:15
511:7
**proposal** 334:17
344:8 368:8,9
**propose** 285:7
**proposed** 285:8
**proposing** 558:11
**prospected** 559:15
**protect** 270:10,11
283:2

**protected** 485:17
**protection** 269:12
**prove** 357:8 489:11
489:17
**proved** 381:1
**proven** 267:20,22
371:10 374:21
525:20
**provide** 269:22
**provided** 267:13
276:3 280:19
548:21
**psychiatrist** 348:22
466:3
**psychologist** 348:10
348:21 349:3,4,14
349:15 351:20
413:12 431:16
466:3
**psychologists**
348:13,21
**public** 261:5,14
312:2 395:18
397:3
**publicity** 395:14,15
396:4,22,22
397:20
**pull** 285:20
**pulled** 451:7
**punitive** 560:3
**purely** 264:9
**purport** 554:1
**purportedly** 541:22
**purports** 307:14
429:21 508:15
542:17 577:8,12
**purpose** 452:1
**purposes** 277:3
481:16,21 524:9
584:1
**pursue** 486:12
490:13 558:1,20
578:17
**pursued** 486:4
541:11
**pursuing** 530:13
579:2
**pursuit** 374:2
**push** 578:6
**pushed** 264:22
**put** 265:19 285:15
309:21 346:6
360:15 377:10
380:2,3 389:15
406:8,12,17
410:16 411:4

412:4,9 473:20
476:5 478:13,21
479:6 494:2 500:6
500:8 503:16
506:17 511:6
519:3 535:19
551:14 552:17
553:12 556:18
561:6
**puts** 422:2
**putting** 439:18
572:14

---

**Q**

**qualified** 477:13
**qualify** 351:14
**question** 271:7
272:10 277:9
289:11 319:1,2
331:10,13 335:6,9
340:12,13 372:7
374:8,16 376:12
376:13 377:11
378:13,16,22
379:10,10 380:1,2
381:4 384:7 392:2
395:20 396:5,7,15
398:6 399:4,15,22
404:18 406:7
412:16 414:20
415:20 416:1,2,9
418:15 420:8,12
420:13 425:16
426:13 429:10
431:3,11,11,19
433:18 436:13,17
453:17 460:10
464:3,15 467:5
468:14,18 473:6
473:11,11 476:13
476:16 479:15
482:16 483:17
484:13 487:17,19
494:11,17 497:6
497:14 499:18
500:16 503:20
504:2 506:2
512:17 513:8
514:11 515:16
517:21 522:17
526:5 529:22
541:1 546:5 548:3
548:8 549:3 552:2
553:8,20,21 557:5
558:3 562:11
568:16 570:17

574:20 576:9
577:4,17 578:14
**questioned** 524:1
**questioning** 282:9
283:9 316:12
555:12
**questions** 279:12
284:14 286:12
297:12 299:6,9,12
305:13,14,18
315:18 316:13
360:8 377:9
380:14 389:9
405:16 420:20
444:21 445:19
451:13 474:20
482:18 520:15
523:4 530:19
531:6 533:4
554:15 561:5,20
580:3,13
**quick** 280:13 317:1
412:21,21
**quickly** 413:1
537:12
**quit** 565:6
**quite** 275:4 503:20
568:6
**quo** 267:7 407:7
410:17
**quote** 278:8,9

---

**R**

**R** 264:1 439:1
471:8
**R-a-h-i-m-i** 413:16
**R-a-m-m-a-m**
574:8
**R-a-z-a-v-i** 281:13
317:19
**R-o-h-r-b-a-c-h-e-r**
456:8
**radio** 383:1
**Rahimi** 403:8
413:16
**raise** 280:8,11
283:12 285:11
439:20 566:15
**raised** 335:1 411:9
**raising** 395:9
**Rammam** 574:7
**ran** 323:8 496:22
498:11 511:5
**ranked** 338:4
**rate** 308:8
**Razavi** 281:13

283:5 312:5
317:14,21 469:2
470:13 544:21
**reached** 279:18
**react** 395:16 397:2
**reaction** 348:8
536:9
**read** 271:8 290:6
295:6 298:20
301:16 392:1
396:17,18 416:18
419:10 421:3
426:13 430:19
431:2 444:6 473:7
482:10 485:7
486:22 487:17
516:4 544:16
548:9 551:21
552:4,6 569:15
576:3,4,6,7 577:5
**readers** 442:18
**reading** 421:9
430:17 515:1
551:22 552:10
**reads** 430:22 509:1
569:16 576:8
579:14
**ready** 265:13
**Reagan** 457:12
**real** 280:12 309:8
317:1
**realities** 392:16
**realized** 265:9
356:8 366:12
**really** 272:9 282:14
283:3 285:2
310:15 311:18
328:12 336:1
362:20 363:1
393:10 401:1
406:12 436:13
445:10 486:5,15
497:1 502:8
503:19
**reason** 271:14
273:10 341:6
351:13 365:3
368:1 369:1 370:3
377:1 389:8,8
410:3 480:2 536:3
556:11 571:11
**reasonable** 285:18
351:15 354:10
366:14,17 415:14
512:4,7
**reasons** 269:7

339:17 352:9
367:11,17 528:2
559:2
**reassigned** 410:6
**reassignment**
410:10
**rebut** 274:5
**rebuttal** 272:2
**recall** 289:1 293:7
300:16 345:10,12
366:19 411:19
**receive** 293:10
304:4 306:6
503:11
**received** 272:22
276:6 302:14
305:21 417:18
460:2 540:20
**receiving** 273:5,16
293:7 305:2
**recess** 284:2 310:3
311:5 312:8,18
313:6 320:12,13
383:22 384:2
437:22 438:22
523:15 583:11
584:10
**recipient** 265:18
545:22
**recognize** 498:2
**recollection** 294:19
412:2,7 443:18
444:1 454:10
**recommend** 488:13
494:14
**recommended**
348:16 493:12
548:5,5
**recommending**
547:9 548:11
550:6 559:12
**reconsideration**
296:15
**reconvene** 447:14
**reconvening** 264:5
**record** 264:4
266:16 269:15
271:4,22 273:8
274:1,3 292:8,17
300:9 309:22
312:15 313:8
320:10,17 329:15
330:3,6,7,19
331:1 374:5
376:15,22 380:8,8
439:5,8,11 444:6

523:17 535:20
555:9,15 561:7
567:1 576:4
**recorded** 330:11
**records** 276:16,16
310:18 329:20,21
330:9,11
**recovery** 558:12
**recreate** 269:18
**recuperated** 551:19
**red** 423:15 433:16
**redirect** 286:19,21
316:1 405:20
445:20 568:8
581:6,13
**reemployed** 335:8
**refer** 424:22 425:7
443:10 458:1
518:11,12,13,14
573:21
**reference** 444:13,14
574:19
**references** 538:19
**referred** 417:3
**referring** 401:7
416:21 468:9
506:6
**reflects** 570:1
**refresh** 294:19
412:2,7 443:18
444:1 454:10
**refused** 273:4 525:6
**refute** 359:3
**regard** 281:6
311:17 313:17
318:14 343:16
391:4 394:22
495:11 503:12
581:16
**regarding** 283:20
296:10 324:5
473:16 573:8,22
**regardless** 557:17
**regime** 322:16
389:18,18 390:21
404:22
**regret** 375:22
380:13
**regrettable** 561:6
**regularly** 310:18
**reiterate** 264:18
**related** 534:21
**relates** 318:8
**relationship** 266:2
297:7 372:11,13
433:1,2 436:6

556:9 557:17
559:12 563:15,16
**relationships** 374:1
374:5 375:19
376:9
**relatively** 266:10
450:22
**relatives** 456:20
469:8
**release** 315:19
582:15
**relevance** 371:22
373:18 498:15,19
498:22 499:1,10
499:22 500:12
512:20 513:4,7
529:5 534:7
566:19
**relevancy** 527:1
**relevant** 266:3
373:5 529:7
531:15,15,17,17
567:4 568:14
**relief** 579:2
**rely** 471:17 573:12
**remain** 291:16,17
**remarks** 284:6
**remember** 298:4,10
300:21 302:22
303:4 305:2 319:5
319:6,18 323:3
325:4,21,22 326:7
326:17 327:6,18
333:8 338:1,18
342:3 343:2,7,12
343:20 344:4
347:16 348:11,14
348:17,19,20
349:6,7,9,10,11
349:15,21 350:7
350:11 352:7
355:4,11 356:15
356:20 357:5
358:8,9,18 360:3
365:20 373:14
385:8 394:1
400:19 403:15
407:4,11,18 408:1
408:2,11,22 409:6
409:7 410:8,15,18
410:20 411:21
412:13,16,20
413:2,5,6,20
415:6,9,11,16
416:15 418:7,21
421:9,11,13,16,19

421:20 422:3,10
423:20 429:3
431:7,12 432:10
432:12 434:6
435:4 443:13
449:5,10,12 450:2
450:4,10,16 451:1
451:10,11,14,18
451:19 452:1,8,10
452:12,21 454:9
454:13 455:13
457:8,9,14,17
459:5 463:17,20
465:3 470:4,9
471:5,7,12 473:22
475:5,7,11 476:6
476:9,16,20,22
480:10,14 484:1
484:19,20 488:14
496:2,12,14
498:12,12,20
500:21 525:7
526:17 540:22
550:17 570:22
571:1 578:1,3,9
578:20
**remembers** 538:8
**remind** 290:4
291:16
**reminded** 438:12
**remote** 584:5
**remove** 315:12
445:16
**renew** 439:6
**rent** 363:22 365:5
365:10 423:8
504:9,16 519:19
519:21 520:3,4,12
565:17
**rental** 509:13
**renting** 516:1
**rep** 366:18 413:15
564:8 576:1
**repeat** 280:3 336:15
396:16 476:13,14
570:17
**repeating** 305:13
444:16
**repetitive** 279:9
296:20,22
**rephrase** 381:4
416:3 468:17
558:8 571:3
**replied** 511:13,14
**repoed** 434:11
**report** 438:14 512:4

561:21 562:1
**Reported** 260:21
**reporter** 261:5
317:17 379:19
383:11 392:3
396:19 402:17
409:10 424:7
426:15 476:19
487:20 548:10
**reporter's** 582:9
**reporters** 329:5
**reporting** 342:14
**reports** 562:10
**represent** 322:14
351:7 387:14
419:17 476:8,21
483:14,15,19
491:10,21 495:4,8
538:13,19 556:11
557:16 559:14
**representation**
428:7 482:7
495:11 538:17
547:4 549:22
557:22 558:11
**representations**
272:13 313:9
554:17
**representative**
337:1
**Representatives**
453:7
**represented** 272:21
274:10 349:18,18
353:20 391:3,3
408:17 475:16
481:14
**representing**
349:16 405:14
491:17 556:17
563:18 564:11
**represents** 555:9
**republican** 388:20
**republicans** 388:9
409:18
**request** 299:21
343:16 410:10
422:5 432:16,17
**requested** 439:9
**required** 278:21
570:10
**reread** 516:16,20
**research** 442:6,10
442:12,13,17
443:8
**reserve** 581:13

**Residential** 503:5
**resistance** 368:4
**resolve** 338:16
389:3 448:22
449:3 450:7 452:3
452:3,16 455:6
490:1
**resolved** 372:21
374:21 459:9
467:3,15,19 492:6
516:10,11
**resources** 385:2
**respect** 272:14
273:15 286:5
287:22 315:10
482:21 499:2
501:13 532:13,17
535:18 536:1
537:4
**respective** 261:7
272:8
**respectively** 528:11
**respond** 274:3
275:16,18 282:2
**responded** 397:6
**Respondent** 260:6
262:2,11 274:8,12
278:10 284:19
285:3 288:7 311:1
317:3 322:1 359:8
371:3 445:2
446:19 448:19
494:14 499:3
**Respondent's**
278:17 299:16
308:22 401:3
429:14 430:6
439:16 484:22
485:6 502:14,22
506:9 537:8 541:4
541:20 569:5,8
**respondents** 270:13
**responding** 281:9
**response** 272:9
281:22 343:15,19
385:4 471:6
487:18 546:7
559:6 573:7
**responsibilities**
387:5 441:21
509:16
**Responsibility**
260:2 261:2
**responsible** 274:15
275:1 309:17
**responsive** 331:7

**rest** 280:2 315:22
580:7
**restart** 296:5
**restaurant** 325:18
449:13 470:10
**restaurants** 463:15
463:16 464:8
**restraining** 375:1
406:19 412:22
422:1
**restroom** 316:16
317:1
**resubmitted** 357:22
**result** 358:15
422:21 529:9
568:10
**resulted** 355:15
374:18 375:16
**results** 527:3,7
528:1,2
**resume** 321:11
448:17 583:11
**resumed** 439:3
448:12
**resumes** 316:5
**resurrected** 269:6
**retaining** 550:7
**retaliate** 346:5
**retaliated** 385:13
385:14,19 391:7
**retaliation** 485:13
485:16 486:3
**retired** 411:1,14
**return** 486:9
**returned** 446:4
**returning** 384:3
**returns** 291:11
448:10
**revenge** 490:19
496:1,4,13
**review** 266:4
**reviewed** 276:2
472:22
**reviewing** 277:2
**revisit** 265:2 422:8
**revisited** 535:12
**revive** 490:9
**Richter** 402:16
**rid** 269:17
**right** 269:19 270:18
271:10 287:14
288:19 290:17,22
291:8 316:1,13
325:6 335:21
337:5 339:12
345:11 346:14

355:20 368:18
378:8 380:2 382:7
386:4,13 388:3
389:15 390:1,3
391:11 397:5
402:7 404:6,16
405:17 406:4
408:13 409:5
411:16 413:21
414:13 422:3,13
424:4 426:4,6,10
426:16 434:14
436:3 439:21
446:6 453:4 458:5
464:11 465:17
468:5 476:5 482:8
483:5 485:4,15
490:7 494:16
495:21 499:21
519:11 520:4
522:9 531:3
546:22 554:16
560:4,15 570:16
570:16 572:11,14
575:2 580:17
581:10
**right-hand** 507:4
**rights** 269:12,12
271:6 283:2
394:19 485:17
486:12 539:6
541:10 575:22
576:18 578:7
**ring** 510:20 512:2,5
515:10,14,16
516:21 520:1,1
524:18 536:14
**rings** 518:13
**road** 280:4
**Roberts** 410:5
**Rodeo** 353:9
**Rohrbacher** 456:8
456:11 457:1,19
458:7,18 462:14
**role** 437:7 471:13
499:3 500:7
563:19,20
**romantic** 381:8
**room** 312:21 313:3
446:6 511:1,6
580:16,20
**roommate** 370:7,19
527:16 536:19
**roommates** 370:5
**Roslyn** 342:17
**rough** 508:21

**round** 316:11
422:13,22
**routine** 264:9
327:10
**ruin** 567:22 582:8
**ruined** 497:10
**rule** 277:11 278:21
288:10 310:9
313:20 364:9
438:6,9 531:16
**ruled** 271:18
415:13 486:2
519:10
**rules** 267:11 269:22
270:4,13 271:15
310:20 472:16,22
473:3,7,16,20
482:6,10 516:2
**ruling** 277:3 280:12
416:6 418:17
501:13 535:11
537:4
**rulings** 421:15
535:19
**rumors** 373:19
381:7,18
**run** 323:11 352:6
353:4 394:3
454:20 484:5
491:20
**running** 278:5
527:22
**ruse** 481:14
**rush** 511:19
**RX** 543:7
**RX11** 561:11
**RX17** 575:17

_____
**S**

**S** 264:1 439:1,1,1
**S-a-j-a-d-i** 390:5
**s-l-a-n-g** 385:5
**safe** 582:14
**safety** 475:22
**Sajadi** 390:2,5,7
**sake** 583:21
**sakes** 453:15
**salary** 347:4 568:16
568:17,18,22
**Sam** 469:2 470:13
471:8,8 474:3,8
474:10,14 475:1
488:11 492:15
503:11 544:20,21
544:22
**San** 360:1

**Santa** 365:1
**sat** 268:5 350:3
369:5 392:12
393:1 454:11
481:5
**Sataki** 263:3 264:21
265:22 266:18
267:2,2 268:19
273:16 280:20
282:1,20 284:10
284:17 285:4
286:11,20 287:22
288:12 291:11,16
292:4,13 294:15
297:4,22 300:5,12
315:19 316:1,5,7
317:6 322:3
331:15 335:7
340:11 345:3
367:19 371:1
374:1 380:17
382:12 384:8
412:9 414:8
419:17 427:1
438:10 443:11
444:14 446:3,18
446:20 448:10,12
448:21 450:19
458:2 461:7
469:13 485:2
503:10 507:17
509:4 524:14
532:15 534:20
554:8 557:16
561:19,22 562:1,9
562:13 569:17
576:21 579:11
580:15
**Sataki's** 315:13
321:8 508:16
532:4 568:10
583:4
**satisfy** 288:7
**saw** 349:11 351:20
446:5 465:6
500:21 577:16
578:20 579:13,17
**saying** 266:1 270:15
281:11 288:14
289:18 328:20
364:19 366:16
372:9 403:5 416:7
416:8 421:20
453:3 471:21
478:21 500:5
501:1,2 503:13

516:20 525:2
527:15 541:9
552:22 553:2,11
556:7 557:18
558:10 560:19
567:7
**says** 294:10 304:1,7
339:4 402:15
407:6 432:13
460:1 486:7
505:13 510:1,8,12
511:16 515:12
521:17,20,22
533:9 538:12
548:4 550:18
551:14 552:7
561:2 562:12
**SC100** 505:13
**SC100-A** 508:9
**scared** 511:5
**scene** 384:21
434:18,21
**schedule** 350:18
**scheduled** 447:19
**scheduling** 447:19
580:21
**score** 532:3
**screamed** 497:13
**scrolling** 287:4
**season** 339:7
**second** 432:5
444:11 460:13
481:12 543:6
544:16 566:7,15
**secret** 343:12
**secretary** 388:14
466:7,7 479:11
**section** 344:8
**security** 504:13
**see** 267:3,9 311:18
316:1 339:17
340:8 348:10
349:13 350:16
362:8 368:12
370:3,8 378:12
401:17 402:5,11
402:13,22 416:14
419:20 430:16
432:20 444:4
446:3 448:8 457:2
457:18,20 460:8
460:17 462:9
472:18,20 479:4,5
485:6 486:17
487:2,21 488:12
499:15 500:6

505:3 507:3,6
509:3 511:3,10
513:4,6 518:5,6
533:13 535:15
537:18 542:3,5
546:22 547:7
549:20 550:3
554:12 577:7,11
578:19
**seeing** 348:22 362:6
476:9,22
**seek** 483:13 532:22
**seen** 361:11 431:5
432:2 450:14
460:22 473:2
477:4,7,9 487:8
488:5 530:16
536:7 569:14,20
576:10,14 579:11
**sell** 566:4
**Senate** 454:12
**senator** 454:7,15,19
455:11,14 456:7
**senators** 449:2
**send** 267:16 272:18
273:11 281:11
302:9 307:8
367:19 400:1
417:12
**sending** 281:9,11,22
366:13
**sense** 282:17 345:11
446:18
**sensible** 279:17
**sent** 267:14,14
272:20 273:5,13
276:8,8 281:17
292:16 301:17
303:10,10 304:18
319:3,7 330:8
398:15 399:17
402:7 403:4 410:4
416:15,16 421:3
423:13 431:15,16
457:20 485:8
488:16 493:17
539:15 540:9
549:18
**sentence** 437:8,12
475:13 518:12
**sentences** 552:7,15
**separate** 308:1
344:6 407:17
**sequence** 377:10
**serious** 312:3
**Serrano** 423:9

503:4 504:11
509:7 524:2,16
**service** 273:1 530:8
530:9
**services** 336:13,18
539:16,18
**session** 321:15
494:8
**sessions** 350:22
**set** 271:15 346:9
350:18 362:11
363:5 366:5
367:19,22 457:19
543:1
**setting** 362:5
363:18
**settle** 369:14
**settled** 264:3
**settlement** 395:8,9
397:21 559:3
560:14
**seven** 308:3 484:18
506:12,20 518:2
**sexual** 331:16,20
349:17 385:20
485:12,15 486:3
487:3,22 489:4
490:9 491:12,17
494:22 514:19
533:15 534:11,14
**sexually** 331:3,22
369:22 370:6
514:5,14
**Shah** 386:14,18
387:8,10,22
**shah's** 385:17
**shake** 326:8
**shaking** 347:18,18
347:19,19
**Shamble** 281:3
282:22 337:2,10
337:17,19 338:12
341:2 343:16
346:18 351:6
366:16 368:18
369:6,15 384:21
393:20 394:15
397:17 400:18
402:15 413:15
449:1 454:6 485:8
486:19 493:21
539:5 541:8 550:1
569:13 573:6,7
575:22 576:17
578:6,16 579:10
**Shambles'** 570:7

**share** 265:10
272:17
**shared** 275:3
328:11
**sharing** 328:17
**Shea** 493:12 494:14
547:5,11 548:6,13
548:20,22 549:22
550:6
**Sherman** 360:4
361:10,11
**shifted** 427:18
512:7 518:15
**shocked** 511:2
**shop** 470:11
**short** 485:7 511:9
574:18
**shot** 412:5
**show** 269:2 347:2
351:12 376:17
388:20 429:13
443:17 484:21
489:17,21 507:12
507:14 508:2
521:11,13 533:18
537:10
**showed** 541:6,21
**showing** 293:15
319:19 443:22
476:6,20 521:10
575:5
**shows** 331:21
504:13 535:6
561:21
**sick** 349:11
**side** 345:19,21
523:7
**sides** 310:4
**sign** 562:15
**signature** 298:13
508:16 509:3
**signed** 307:14 380:7
504:9
**significant** 574:15
**signing** 509:19
**similarly** 571:8
**simple** 473:6 533:4
**simply** 276:2
308:14 324:3
436:6
**Sincerely** 574:7
**single** 469:7 477:7
**sir** 340:18 349:1
364:7 375:11
446:1 473:18
534:12 535:17

**sit** 576:20
**sitting** 383:14 388:8
449:19,19 461:17
479:14 496:15,21
**situated** 571:9
**situation** 342:20
350:5 359:8
375:18 390:15
451:4 464:19
467:15
**six** 269:6 276:18
308:3 365:10
484:18 487:5
488:1 506:11,20
**six-month** 376:19
**skin** 564:3,6 566:5
**slang** 385:5
**slept** 371:15
**slick** 271:20
**slightly** 543:15
583:14
**slip** 271:19 312:19
**small** 480:16
505:14
**Smith** 261:20
264:16,18 266:17
267:15,21 272:4
279:5 282:10
283:15,16,19
284:1,3,13 285:2
286:5,19 287:18
287:19 288:16,20
289:17,21 290:3
290:14 291:2,19
292:3,22 293:6,20
294:3,8 295:17
296:13,17 297:1,2
297:14,20,21
299:3 300:3,4
301:8,10 303:15
303:16 304:13,15
305:22 306:1,12
306:13 307:16
308:5,9,11,18
309:10,19 311:14
312:9,13 313:1,11
314:7,15 315:12
315:16 316:10
318:7 320:14,18
320:19 321:17
324:13 330:22
340:15 359:4
373:16 376:11
377:17,21 395:19
396:2,7 405:20
419:19 420:4

426:9 427:6
436:12,20 438:5
439:14 440:6,13
443:19,22 444:5
444:20 445:21
446:3,10,17 447:1
447:4,13,22 448:6
448:9 453:13
467:4 483:4
488:16,18 492:9
492:13 501:4,6
503:19,22 504:1
505:16 506:5,13
507:3,8,21 508:17
508:20 510:3,5
512:19,22 513:19
514:1 515:5 516:6
520:22 521:5
523:11 524:3,4
527:22 530:21
531:19,20 532:18
533:7 535:3
537:10 539:11
540:10 541:3,7,17
542:15 543:2,8,11
544:12 545:9,17
546:2,16 547:12
550:13 551:5,20
552:1,5 554:4,6
554:19 555:1,4,8
557:1,5 561:13
567:15 568:4,5,20
570:14 571:13
572:20 573:2
575:16 578:8
579:6,22 580:18
581:5,6,8,22
582:14 583:1,7
**Smith's** 287:12
320:9
**sobbing** 332:2,5
350:5
**solemnly** 439:21
**solution** 309:4,5,6,8
**solve** 462:15,17
464:14,15
**somebody** 282:21
314:22 322:22
356:11 378:4
420:3 447:21
469:19 474:2
514:4,6 524:17
533:9
**somewhat** 543:22
**soon** 274:10 450:6
486:14

**sooner** 278:1
325:11 528:22
**sorry** 280:10 293:2
301:19 306:21
311:18 314:12
319:10 325:10
339:11 350:17
378:21 379:20
381:12 387:16,19
398:7,7 404:17
408:3 412:6 413:7
420:14 429:7
435:5 438:8 449:8
451:16,20 452:20
457:22 462:7
468:8 470:7 471:1
473:10 483:6
495:13 497:8,8
503:22 505:18
527:9,19 544:2
545:11 547:19
562:11 577:4
**sort** 265:17
**sought** 268:14
338:11
**sounds** 339:12
501:4
**speak** 275:19 345:5
486:7 563:3
**Speaker** 449:22
453:1,6
**speaking** 373:9
396:10 414:8,12
**speaks** 514:9
522:19 527:20
547:15 579:16
**special** 561:21
562:1
**specially** 518:18
**specific** 284:16
447:11
**specifically** 315:7
485:21 529:17
**specificity** 483:12
**specifics** 315:8
**specify** 524:10
**speculation** 472:4
474:18
**speculations** 474:19
**speculative** 420:21
474:20 528:3
**speech** 394:20
**speed** 274:7
**Spell** 317:16
**spelled** 318:17,18
391:13 566:2

In The Matter Of: Larry E. Klayman
May 31, 2018

spending 368:15
spent 277:1 335:18
spins 273:18
spirit 274:20
spoke 418:21
Sporkin 410:22
　411:3,15 412:3
spring 381:6 429:1
stable 536:11
staff 451:8 452:22
　458:14 496:22
　497:13 574:9
stakes 395:9
stamp 460:6 507:2
stand 282:11
　284:18 291:12
　312:18 316:5
　320:12 383:21
　406:4 437:22
　439:15 448:11,13
　536:8 562:4 584:7
standard 571:2
standing 320:9
　353:19 511:3
stands 374:6 581:11
Stanley 410:22
　411:15
Stanton 312:5
　318:15 458:11,17
　459:1,13 460:15
　461:17 462:14,15
　466:2,18 467:10
　467:21 469:11,16
　471:3 472:8
　488:11
start 447:10 548:8
　565:13 582:9,10
started 265:8 327:5
　327:14 331:3
　342:5 347:15
　348:22 350:5
　370:12 387:20
　442:14 463:21
　465:11 503:11
　557:22 565:6
starting 278:5
state 348:3 388:14
　479:11 491:1,4
　547:2 549:19
stated 307:21
　442:20 493:2
　521:18 522:1
statement 476:10
　477:2
statements 310:17
　358:1

states 273:1 387:2
　388:14 453:8
　480:13 494:22
　520:21 573:21
station 564:14
status 267:7 407:7
　410:17
statute 484:4,6
　573:15
stay 361:6,6,8,16
　362:21 406:5
　504:18 520:5,10
　565:4
stayed 565:5
staying 360:19
　510:16
stealing 515:9
　536:14
stepped 471:13
steps 323:2
stipulations 309:14
stolen 524:18
stood 584:10
stop 335:5 538:18
　539:1,1 565:12
　582:4
stopped 563:5,18
　564:11
store 354:2,3,5,6
stores 353:3,5,5
story 265:11 279:16
　297:10 323:22
　324:18 329:3
　402:20 458:18
strategic 269:7
　382:3 559:2
strategy 363:15,17
　369:6 372:4
　378:15
Street 261:2 573:17
strenuous 516:13
strike 331:6 340:20
　427:3 453:21
　466:10,12 487:10
　488:7 494:5 549:1
　549:5 553:9
strikes 383:16
　574:11
strong 300:2 311:19
　315:3 333:2,18
　358:16 496:10
　570:11,20 571:1
stronger 366:12
strongly 271:3
　299:19
struck 324:16

331:10,11 415:21
　416:2,2,10 419:13
　466:11 488:21
　494:11,18
studio 382:19
stuff 269:20 275:6
　347:5 357:22
　413:11,19 414:2
　415:2 421:3 475:6
　478:19 501:4
　555:2
sub-theory 373:22
subject 277:7,11,14
　280:2 401:18
　402:7 554:21
　555:6
submissions 303:1
submit 272:7 274:5
　300:12,16
submitted 286:17
　298:21 330:12,13
　330:15,18 341:1
　351:18 354:11
　377:21 378:11
　413:11,19 415:2
　561:15,18
submitting 298:4
　412:18
subpoena 534:21
subsequent 337:5
　467:13
substance 293:12
　295:18
substantively
　272:10
suddenly 491:18
　511:18 512:3
　515:14 518:14
sue 485:15 487:7
　488:4
suggest 286:20
　468:4
suggested 348:9
suggesting 292:16
　527:2 549:13
　553:5 584:6
suggestion 287:17
　287:19 294:1
　309:1 311:9
　411:11
suing 480:12
suite 539:22 545:4
Sujat 262:3,4
　267:14 268:10,10
　275:15,17,19,21
　299:5,12,17 485:3

summoned 265:6
superior 377:2
　399:7 525:10
　533:2 558:22
supervisor 390:1
supervisors 339:16
supplemental
　272:11 286:16
　292:7,22 293:3
　297:17 299:15
　313:17 459:14
　460:13 461:18
　462:12 465:1
　468:12,13,15
　469:15 473:21
　478:12 581:18
support 277:16
　382:1 386:14,17
supportive 387:8,9
supports 562:13
suppose 277:20,22
　280:1
supposed 271:1
　298:11 300:22
　436:20
supposedly 375:5
supreme 390:13
sure 273:13 274:7
　289:10 344:14
　374:9 413:3 414:6
　417:16 437:21
　438:11,11 446:7
　460:18 462:1
　507:8 533:22
　534:3 535:21
　560:21 567:3
　582:8,12
surely 287:14
　474:10
surprise 265:17
　439:10
Susan 339:15 340:9
　341:13 355:16
suspended 439:17
sustain 453:22
sustained 377:18
　419:21 436:19,22
　471:15,19 472:1
　477:16 494:10,10
　504:4 513:9,21
　515:6 523:12
　539:12 540:13
　546:4,11
swear 439:21
Sweden 335:2
　385:17 510:14,17

511:22 515:20
swirling 391:17
　392:6
swore 510:9 514:3
sworn 354:14 380:7
　413:16 440:10
SX1 264:13 265:19
　276:22 284:7
　286:3 315:8
SX38 264:13 277:1
sympathetic 387:22
　572:5
sympathizing
　357:18
syntax 544:10,13
system 261:19
　265:11
systematically
　417:10 428:10

**T**

T 439:1
table 325:21 326:16
　326:19,21 449:20
　449:20 494:1
　574:15
tad 278:6
take 290:17 292:18
　298:3 307:12
　311:11,12 312:8
　316:19 321:13
　338:21 357:14
　360:10,13 383:19
　390:21 392:13
　422:8 428:6
　434:15 438:2
　451:8 459:4
　463:21 474:18
　484:2 485:1,3
　489:11 491:5
　496:6 498:6 523:1
　523:13,14 528:17
　530:19 531:12,12
　549:21 569:15
　576:3,5,6 577:2
　579:10
taken 261:1 278:2
　280:5 284:2 313:6
　320:13 384:2
　438:22 523:15
　540:13 558:20
　560:5
talk 280:22 282:19
　304:20 324:7,8
　332:7 368:17
　388:20 426:20

In The Matter Of: Larry E. Klayman
May 31, 2018

Page 609

450:5 482:3
486:15 495:10,14
497:19 541:9
550:6 580:21
**talked** 296:10 298:2
325:13 326:16
329:1 332:20
333:4 334:6
353:17 363:3
397:16 400:11
405:6 463:3
464:18,22 481:17
488:11 492:8,12
492:15,17 529:14
**talking** 276:17
328:1,22 332:6
333:10 337:4
357:22 370:10
389:20 399:6,10
406:18 417:2
418:4 424:3,3
427:14 428:22
465:4 473:5
488:10 507:13,15
524:7 557:15
563:17
**tampering** 573:9
575:11
**tapes** 382:19
**Taylor** 407:10
**team** 278:17 299:16
316:12
**technical** 395:2
406:18
**tecum** 534:22
**Teely** 574:7
**Tehran** 390:12,21
**Tehrangeles** 352:19
**telephone** 282:3
467:2
**television** 564:15
**tell** 286:2 295:9
303:18 304:16
306:14 310:6
397:10 399:19
400:6 412:3 413:4
418:5 421:7
440:16 442:9
480:14 489:4,11
490:4 491:8
495:18 498:18,22
499:5,9 506:10
512:16 513:12
542:20 569:17
570:19 572:4
576:6 579:11

**telling** 267:19
357:17 411:20
421:11,13 467:21
480:10 538:15
552:16
**tells** 394:11 398:21
485:9,19 486:8
**temporarily** 361:8
**temporary** 406:19
412:22 422:1
**ten** 269:22 321:2
383:22 523:1
**ten-minute** 383:19
**tend** 395:16 397:2
**tendency** 533:7
**tender** 443:21
**tens** 382:21
**tenuous** 318:9
**terminate** 520:4,9
**terminated** 483:11
483:13,19 484:17
538:16 539:18
560:18,18
**terminating** 539:15
**termination** 266:2
561:1
**terminology** 392:2
**terms** 276:15 283:1
326:5 335:7
475:19
**terrible** 497:11
**testified** 280:20
288:1,17 289:7
290:4 293:17
305:10 306:9
322:5 355:8 362:1
398:9 423:12
430:14 440:11
453:14 459:12
460:16 461:11
476:10 477:1
490:18 514:17
523:7,7 536:8
538:3 555:4
567:18 575:1
**testify** 268:10 288:5
359:3 413:18
415:4,5 418:2
513:11 542:8
558:17,18 560:11
560:22 561:4
568:20
**testifying** 447:6
448:1 536:9
582:15
**testimony** 264:21

277:17,20 279:9
280:4 281:14
287:1 293:19
295:13,14,18
296:18,21 297:15
321:4,11 324:14
422:7 423:1 438:2
438:3,13 439:7,22
447:14 467:6
492:9,13 494:13
519:5 522:19
523:10 539:4
550:16,19 554:11
559:21 583:20
584:5
**text** 306:5,7 330:7
538:15 549:20
**texted** 437:9
**texting** 422:17
538:13,22
**thank** 264:16 266:7
272:1 291:14
301:8 305:8
312:13 316:4
321:17 322:4
367:1 401:16
438:5 444:20
446:1 498:9
506:13 510:6
514:1 527:21
531:18 537:14
554:3 569:2
581:20 584:8
**Thanks** 297:12
402:21
**themes** 277:6
279:10
**themself** 357:8
**theories** 278:19
279:16,21,22
537:1
**theory** 373:22
378:15 536:22
**thing** 313:22 344:22
364:2 367:9 381:3
384:20 404:1
435:4 466:13
476:18 535:1
571:22 572:14
**things** 265:7,12
272:6 273:17
274:18 275:7,9,10
283:10 304:17
315:21 318:12
329:20 357:3,12
357:14 396:14

402:20 410:15
412:12,13 442:2
447:18 512:6
518:14 519:2
533:7 582:7
**think** 264:3 266:3
270:7,15,19 271:1
272:4 274:20
278:20 282:7
284:21,22 285:18
285:19,21 286:2
286:12 287:8,20
288:21 289:22
290:10,18,20
305:12,13,18
308:9 311:8 312:9
314:2 315:20,21
335:8 340:11,12
343:4 357:8 359:9
366:21 373:7,16
373:21 376:13,16
381:22 393:9
395:22 396:13,15
409:19 429:9
430:12 431:18
432:2 435:1
438:18 442:14
443:15 447:2
453:13 456:18
461:22 472:4
479:7 486:15
490:7,10 492:3,3
493:22 502:15
523:16 524:8,17
533:21 534:6
535:12 537:20
540:12 544:6
548:7 552:3 554:4
554:6 555:8,11
557:7 559:13
568:13 572:16
**thinking** 315:17
355:2
**thinks** 426:10
**third** 304:2,8 430:7
430:12 453:7
481:12 547:2
549:13 551:9
**Thirteen** 441:19
**thought** 269:15
328:10 346:9
348:9 373:22
446:5 480:6,17
545:13 549:20
**thoughts** 525:1
544:15

**thousands** 494:3
**threatened** 281:14
347:1 434:19
470:19,20 487:7
488:4
**threatening** 570:4
**three** 264:7 268:19
276:21 308:3
385:22 506:11,19
533:14 552:6,15
566:3 583:14
**throw** 282:7
**throwing** 282:15
**thumb** 276:7,7
**Thump** 562:14
**Thursday** 260:8
276:8
**tie** 417:4 498:17
516:14
**Tigar** 261:15 287:8
310:1,6 311:10
314:12 386:12,16
387:16 404:17
414:4,7,11,14,19
416:19 417:2,6
462:3,6 502:20
503:4 505:18
531:16 551:7,11
**Tim** 337:1 351:6
366:16 369:15
393:20 413:15
486:16,19 493:12
493:22 494:14
547:4,11 548:6,13
548:20,22 549:22
549:22 550:6
569:13 575:22
**time** 265:1 273:6
279:1 283:7
290:17 291:7
296:13 298:3
299:3 300:22
308:16,22 309:14
311:12,13 314:7
315:22 318:22
323:1 327:8,9,12
328:13 331:2,4
332:6,7 333:6
334:3 336:11
338:20,21 339:5
340:6,8,22 341:22
342:13,19 343:14
346:4 347:2,8,11
347:22 348:10
351:5 353:2 354:2
356:10 357:16

360:14,18 363:10
365:19 366:11
368:10,15 369:3
369:12 370:15,22
371:17 373:1
375:4 377:5
379:22 381:5
384:9 385:9,21
387:10,20 388:13
388:15,18,19
389:17 390:12
391:3,18 392:7
393:21 395:6
398:16,21 399:2,4
399:12 400:6,10
403:10 407:20
410:21 412:11
414:7 416:16
417:19 418:9,22
422:7,15 423:5,7
423:18 424:13
426:22 427:10,19
428:1,4,13,15
432:15,18 437:14
438:1 446:12
447:1 452:18,18
452:19,20 458:12
463:5 465:8,22
466:21 467:9
471:4,11 478:22
484:20 487:3,5,21
488:1 494:3 499:8
503:16,17 505:1,5
505:21 510:21
511:1 516:12
532:5,14,16 537:2
549:9,12 550:19
551:8,14,18
552:17,19 553:1
556:19,20 557:12
558:21 559:4,10
562:19 564:1
565:18,20 566:7
566:12,15 568:16
574:12 576:5
579:12 581:13,20
581:22 584:1
**timely** 273:14
**times** 279:11
377:16 400:15
401:18 402:7,16
403:6 406:15
414:5 488:18
491:20 503:13
512:6 538:14
552:4

**TimShamble@ve...**
402:8
**tip** 282:10
**title** 509:20
**titled** 444:12
**today** 267:10
285:11 286:16
320:20 321:8
322:3 377:22
432:14,15 439:19
446:13,19 490:8
492:12 530:5
532:20
**told** 268:6 270:6
295:1 325:9 332:2
332:15,17 334:12
335:13 336:12,16
336:21 337:11
339:15 341:14
342:19 345:1,3,3
345:9 346:4,13
348:1,2,4 358:5
359:22 361:9,10
361:13,21 363:7
368:19 370:15,22
376:5 385:15,19
388:19 393:9
395:6 397:5,6,12
397:14 407:20
408:12,22 409:2,6
409:22 410:20
412:8 435:2
437:10 449:22
456:10,22 457:10
457:15 458:17
462:15,21 464:12
465:9,13 466:7,15
467:18,20 472:7
482:1,4 484:3,8
484:12 485:20
490:12 493:11
495:3,16,19
499:22 501:10
511:6,20 524:14
538:16 559:20
570:16 572:7
575:10
**Tom** 454:7
**tomorrow** 291:4,8
312:16 320:22
438:4 439:19
447:1,12,19 448:1
488:20 581:14
582:4,10,13,15
583:11
**tonight** 447:16

**top** 267:17 268:8
402:17 431:14
460:7 481:5 508:9
554:5
**tortured** 322:17
**totally** 271:5 500:22
**tough** 327:9 452:19
452:20
**tow** 434:14
**town** 395:14 396:21
**trade** 435:18
**training** 461:4
470:13
**transfer** 268:6 270:6
344:7 358:17
361:14 362:4
367:12 368:4
**transferred** 335:16
341:4 343:17
358:3 363:4
367:15 368:2
**transferring** 344:1
368:14
**transition** 383:17
**transitional** 299:8
**transported** 428:17
**trash** 282:16
**tread** 359:9
**treated** 356:3
**trial** 559:10
**tribunals** 461:9
**tried** 267:8 268:3
268:20 282:22
319:5,9 346:18
354:10 389:2
410:13
**tries** 268:16
**TRO** 427:15,22
**trouble** 346:5
**true** 267:21,22
273:15 333:5
356:9 359:2,6
364:9 371:10,11
372:9,14,16,18,19
380:18 396:8
421:2 437:13
535:1
**truncate** 286:10
**trust** 282:10 574:3
**truth** 310:16 416:6
416:8 440:1,1
**truthful** 500:18
**truthfulness** 477:20
529:12
**try** 283:21 334:4
336:11,16 337:20

338:7,16 360:15
362:20 369:13
370:12 376:8
397:20 410:4
436:7 455:11
467:2 478:1 516:8
532:9 555:16
559:3 572:13
**trying** 280:22 283:2
294:4 296:4
313:22 334:18
346:5 367:8
377:10,14 391:18
392:7 395:8
400:15 403:17
404:4,11 406:8
414:20 428:11
429:18 435:16
448:22 449:2
457:5 459:8
467:14,18 499:11
500:15 502:6
517:2,3,5,7,8
530:1,2,5 531:14
537:15 539:5,9
541:8 553:16,17
556:5 557:3 559:5
559:18 570:3,6
578:6 583:20
**turn** 300:5 340:17
400:21 401:11
429:15 430:6,12
459:18 461:3,20
481:9 502:4 505:2
505:11 510:1
520:18 537:6
538:12 539:14
541:2,19 542:14
546:19 549:17
551:13 561:9
569:5 575:20
**Turning** 317:5
502:13
**TV** 371:8 562:22
563:9 564:13,14
566:13
**Twenty-four** 462:5
**Twenty-six** 441:16
**Twenty-three** 301:8
**twice** 277:12
**two** 308:3,8 309:9
316:19 326:21
348:13,20 349:10
358:18,19 363:22
364:1,8 365:5
376:20 385:21,22

386:1,6 423:8
441:3 443:12
444:2 461:1
465:17 474:4
504:18,21 506:11
506:19 516:4,19
522:10,21 533:6
544:11 552:6
565:5 566:12
583:1
**two-bedroom**
365:12,18,21
**two-hour** 447:5
**tying** 395:7
**type** 301:12,13
379:19 542:22
568:9

**U**

**U.S** 414:15 428:7
454:7,12 573:6
**ulcer** 354:21 355:1
355:5,7,12,13,15
356:2 357:13
**ultimately** 357:21
415:12
**unappreciative**
427:1
**unauthorized**
311:22 312:4
315:6
**unavailable** 439:19
**uncertain** 447:18
**unclear** 399:5
**uncommon** 552:6
**uncontrollably**
347:15
**understand** 289:9
304:9 309:2 313:8
314:5 373:6
376:11 392:16
395:21 418:16,18
449:9 460:10
462:20 464:3
467:4 473:10
482:13,16,19
503:21 504:2,3
506:4 522:16
530:8 536:2,6
537:1 548:2
549:12,15 552:21
553:4 558:2,4
578:5,12,15
583:18
**understandable**
359:7

understanding
381:7,18 387:7
479:20 549:8,9,10
550:5 559:7
understands 396:3
453:14
understood 396:6
547:14,18 552:20
553:11 558:9
578:9
undertaken 376:19
underwater 530:10
530:17 533:1
unethical 271:20
531:22
unfair 271:5 275:5
355:16 439:10
unfairly 354:21
356:3
unfortunate 568:12
unfortunately
405:15 545:13,14
unhappy 304:19
490:20
unilateral 282:18
unilaterally 475:20
union 337:1 351:6
366:18 413:15
576:1
unit 515:19,22
516:3 517:12
519:1,3
United 273:1 387:2
388:14 453:8
480:13 494:22
573:21
universities 440:22
University 441:1,5
unnecessarily
311:12
unprofessionally
475:21
unquote 278:8,9
unusual 277:18
390:15
Upper 507:4
upset 347:7 417:21
418:17,22 419:2,7
422:16,20,21
423:2 548:18
urge 271:3
use 291:7 349:2,3
370:12,16,18,21
391:15 392:4
425:8 426:2 430:3
467:18 574:12

user 562:18
uses 425:17
usually 276:16
298:11 500:20
515:18

**V**

V 407:9
vacation 338:21
340:8
vague 421:16
vaguely 449:14,16
449:18 450:2,3
451:2,5,18
validate 267:4
valley 360:1,2
361:10 364:11
382:14,22 387:6
value 522:20
Van 434:2,19 530:3
532:9 533:2
vanished 512:3
515:14,17 518:14
vanishing 516:22
various 304:1,2
351:22 382:3,13
412:18 475:10
Vegas 281:19 283:5
318:5 469:5
Ventura 360:2
361:12 423:9
456:13 504:10
verge 355:2
versa 277:20
vice 453:11,20
victim 349:17
499:12,14
victimhood 499:16
500:4
videos 563:3
view 277:16 382:2
386:7 405:4
478:22
viewed 387:14,21
388:2 404:15,20
442:22
views 386:2,8
409:11 442:21
violated 482:6
573:15
violation 394:19
violations 472:16
violent 497:1
Virginia 342:17
424:8
virtually 436:1

visa 277:20
visit 463:11,11,14
465:5
visiting 510:13
511:21
visits 512:9 515:12
517:15 518:1,3
VOA 328:3 329:7
337:2 340:10
341:14 346:19
347:1 356:3
360:12 374:2
380:18 381:7,8
382:13 383:6,10
385:21 386:1
394:18 397:20
415:18 448:22
449:3 452:3,16
456:1 459:9 465:6
467:3,15 487:4,22
489:5,21 490:2,9
494:1 525:22
570:6 571:6
VOA/PNN 550:2
voice 301:3 327:17
332:3 336:5
337:20 338:8,15
341:2 342:10
343:15 344:9
351:7,21 352:6
354:22 355:10,17
367:12 368:3
369:16 385:1
388:3,5,12 390:18
391:4,18 392:6,17
393:4 403:9 404:2
404:21 406:22
413:14 416:7
444:10 450:20
454:12 464:19
481:5 568:11
570:2 573:9
voicemail 281:15
void 312:1,2 320:1
voir 294:5 299:20
313:14 315:14
316:15,20 317:3
318:8
vs 469:14

**W**

Wagner 355:18
356:4 407:9
wait 296:14 313:2
320:16 378:5
399:3 429:5 430:5

459:20 497:5
506:14 511:8
513:3 521:21
536:20 560:20
580:15,19
waited 487:5 488:1
waiting 276:18
326:2 431:18
446:17 522:18
walk 279:13
walked 322:22
325:20 378:3
434:21 450:12
walking 323:1,7
want 268:11 270:8
270:22 275:16
276:1,15 279:8,12
280:7 283:17
290:16 300:18
304:17 308:14
311:11,12 315:18
321:7 326:10
329:3 340:5
345:22 346:7,16
352:15 360:3,5
362:20 363:1
367:12,20 377:9
384:6 389:5
396:16 397:7
398:21 400:12
403:5 406:4 429:6
430:18 435:14
438:14 439:6
465:5 478:3 484:8
484:11,13 486:14
490:18 494:4
495:16 502:2,9,9
506:15 526:17
532:18 539:1,1
546:1 549:8
550:19 551:1,3
557:18 560:8
561:10 576:4,5,20
582:9,10
wanted 271:17
272:17 275:22
276:4 283:3 285:3
290:15 324:6,19
341:7 357:18
359:22 360:1
364:4 365:15,21
367:14 386:19
393:13 412:22
428:17 433:14
435:7 451:4 489:3

490:13,13,16
492:5 496:1,4
500:18 501:2
511:10 520:1,4,8
530:5,19 533:3
534:18 535:2,4
536:11 558:6
561:5
wants 291:6 313:12
340:15 401:10
405:20 499:13
500:2 503:6 529:4
532:3,12 537:10
568:6 576:21
583:3
war 359:11
warranted 573:20
WARREN 261:11
Washington 260:9
261:2 335:18
338:4,8 354:22
362:12 367:14
539:22 573:16,17
wasn't 289:7
315:17 336:12,17
355:5 363:1
368:11 370:10
371:8 372:10
394:8 396:7
417:19 421:21
433:20 446:6
464:9 465:6
476:11 477:2
519:15,17,22
520:12 533:6
538:2 548:14
556:17
waste 516:12
532:16 550:19
Watch 408:21
way 265:9 270:21
271:1 279:3 281:6
285:7 320:5
327:20 353:22
355:9 356:3
362:11 367:11
375:15 420:10
437:2 450:22
451:12 481:20
489:20 497:1,19
500:16 511:11
527:8 528:16
543:22 544:15
555:12 563:17
583:9
ways 331:9 570:12

In The Matter Of:  Larry E. Klayman
May 31, 2018

**we'll** 269:7 288:11
293:18 340:20
344:2,6,7,7,14
350:4 367:9 389:1
417:9 438:6,9
446:14 448:8
451:8 459:2 471:8
483:12 503:12
514:11 519:5
523:1,14 537:1
552:12 555:10
581:1
**we're** 264:5 274:21
276:17 279:19
280:3 291:8
296:11 308:8
311:6 312:15
313:22 333:10,17
337:4 340:2 344:1
347:3,4,5 376:16
395:7 411:6 418:2
427:14 428:22
431:18 446:17
447:18 461:22
478:6 480:12
506:3,8 507:22
522:18 523:13,16
524:7 526:4,8
537:3 580:14,20
581:12
**we've** 331:8 373:17
526:3,7 529:13,13
532:19 536:7
583:15
**weather** 367:15
**website** 303:12
442:14,16,20
**Wednesday** 510:18
**week** 358:19 378:1
432:6 550:20
**weekend** 276:12
**weeks** 268:5 358:18
358:19 378:2
379:15 380:10
532:9 533:6
**weighing** 527:11
**weight** 279:2
**weightlifting**
561:22
**welcome** 430:3
**wellbeing** 420:17
**went** 276:10 289:3
315:2 329:9 334:8
336:8 341:3
353:18 371:18
383:6 434:9 441:1

452:15 457:18
458:5 511:9 530:9
559:10
**weren't** 267:12,13
288:17 327:11
394:21 435:15
**Westwood** 364:22
**whatsoever** 295:18
**white** 441:14 462:1
503:2
**wife** 373:13 374:11
419:17 525:19
529:16
**willing** 528:7
**Wilshire** 352:5
496:16
**win** 333:17 419:2
422:13
**Windjammer** 262:5
**window** 447:5
583:2
**wing** 463:21
**wish** 279:16 486:12
499:7 519:6
**wishes** 264:14
475:14
**withdraw** 504:5,6
**witness** 263:2
277:17 278:2,3
280:7 285:12
291:4,9,11,14,18
293:5 295:21
302:20 303:13
308:10 310:12
313:1,4 316:5
317:18 321:19
324:17 331:1
340:18 357:6
360:12 366:21
370:16,18,20
375:9,17 376:18
377:14 378:20
379:8,20 381:10
381:13,19 386:15
386:17 397:9,12
397:14 398:7
400:3 401:5,9
406:3 408:5
411:21 413:6
414:10 418:18
420:10,14 425:19
426:18 427:4
429:2,7 430:22
431:1 434:6,9,11
435:3 438:3,16,19
439:15,19,20

440:2,5,9 444:2
446:2 447:5
448:11,15 449:10
451:17 470:9
471:1 472:13,19
473:14,18 476:15
477:4 479:18,22
483:3,6,9 489:12
494:13 495:18
497:8,16,18 498:4
498:9,20 502:21
502:21 503:1
505:20 508:4
509:1 513:1,14
517:4,8 518:6,9
518:16,22 519:17
519:21 522:16
526:2,21 527:16
527:19 528:9
534:12 536:18
537:22 542:4
547:20 548:4,14
549:4,15 552:2
553:3 555:13
558:4 564:2,5
567:13 568:17,22
569:16 570:22
571:18 572:7
573:8 575:11
576:8 577:9,14,16
578:1,19 579:3,14
580:22 581:3
583:15,16,19
**witness'** 438:2
478:4 513:5
**witnesses** 320:21
372:21 415:19
416:7 418:1 570:4
571:8
**woah** 498:21
567:14,14
**women** 494:21
**won** 419:1
**wondering** 315:18
491:14 580:4
**word** 277:13 301:18
311:18 379:10
391:15 525:1
**wording** 515:1
**words** 294:16 392:4
394:6 473:4 476:4
482:8 518:3,5,8
**work** 279:3 324:5
334:13,15 336:4
344:2,7 346:1,19
351:9 352:4

353:12,14 354:1
356:5,10,17 357:7
361:20 391:5,19
392:7 393:5
406:20 407:17
410:17 411:4
412:4,9 414:2
422:2 441:15
475:17 486:2,9
489:18 532:5
566:7
**worked** 342:10
441:13 457:15
567:19
**working** 323:5
336:22 346:21
354:6 362:8,13
363:17 370:4
373:2 382:13,18
385:22 386:1
387:5 413:21
441:17 469:20
476:11 477:3
491:13 509:10
562:21 563:6
564:2,5,13 565:6
565:7,12,15,20
566:11 576:1,2
**works** 362:11
**world** 266:16
442:12,18 443:10
**worms** 568:6
**worried** 297:19
381:10,13
**worry** 350:14
**worse** 434:22
**worst** 338:3,4
**worth** 382:1 553:1
**wouldn't** 267:16
393:10 415:8,9
433:2 461:7 539:6
582:16
**wound** 405:21
**write** 286:4 290:5
298:17,18,19
301:11,20 307:4
345:16 368:8
400:7 429:6 432:5
476:1 512:11,13
513:17 541:22
544:19 548:18
**writing** 307:1
383:15 398:20
400:9 483:4
513:13,20 556:18
559:17

**written** 267:3
277:16 314:21
334:17 399:18
400:2 518:19
543:22 544:10
556:21
**wrong** 338:22
374:22 419:16
420:2,16 465:10
479:5 513:12
540:7,16 542:8,21
545:13
**wrongly** 491:12
525:19
**wrote** 317:8,9
398:11 430:13
437:9 455:22
479:1 518:2,7

| X |
| --- |

**X** 260:3,7 263:1
483:8

| Y |
| --- |

**Y** 483:8
**yeah** 299:7 309:5
310:5 311:8 327:6
332:18 335:4
342:5 348:4,6
364:15 375:13
415:12 418:14
419:4 427:20
430:10 431:20
436:18 438:11
443:7 448:6
468:13 476:17
478:20 503:8
520:16 521:10,16
557:9 576:18
**year** 278:6 460:4,8
460:11 485:14
488:16 489:5
496:14 565:5,7,9
565:10 569:1
**years** 265:3 266:15
267:6 268:18,19
269:6 274:14
275:10 276:17,18
331:15 335:18
358:14 433:15
441:16,19 450:14
457:6 491:2 498:2
532:21 562:17
567:1,9
**yelled** 355:18 497:3
497:10

In The Matter Of: Larry E. Klayman
May 31, 2018

yesterday 264:19
  277:1 280:2,16
  284:9 286:6,15
  288:17,22 289:4
  290:3,9 298:2
  305:11,16 311:16
  321:7 398:10
  423:12 443:5,18
  444:19 490:19
  496:1,3 536:8
  538:4
yesterday's 277:8
York 564:8

**Z**

Z 483:8
zealous 382:9
zealousness 382:6
Zia 371:6 372:15
  373:13 378:18
  379:3 380:10
  525:18
Zia's 374:11
zip 267:17 268:2

**0**

**1**

1 288:1,22 289:20
  297:17 298:1
  299:4,15 313:17
  314:8 377:4,5
  399:7 460:3,13
  506:16 507:2
  537:6,18 584:10
1-2 298:14 538:12
1-6 502:22
1:00 437:20 438:15
  447:20
1:01 438:1
1:03 438:21
1:58 439:2,5
10 308:4 581:11
10:44 313:8
100M 560:2
108 533:22
10th 402:8 543:8
11 551:13
11/15/10 542:18
11/2/2010 460:6
11:00 320:17
11th 444:11
12 505:2 506:9
  523:22
12:08 384:4
13 308:7 561:9

13th 505:15 510:12
15 581:11
150M 444:9
1525 262:5
15th 306:22 307:9
  510:18 539:16
  542:1 543:5,9,18
16 308:7 502:13,14
  502:22 503:3
  504:8
17 569:6,8
17-BD-063 260:5
18 575:20 580:10
180 485:13
180-day 486:4
1812 569:13
18th 573:4
1997 442:15
1998 507:2
19th 292:10,12
  297:5
1st 302:15 305:1

**2**

2 554:12
2,287.50 504:16
2:00 438:1,16,18,19
  447:20 510:19
2:15 438:19
20 508:18,22 582:1
2000 539:21 542:1
20006 539:22
2001 543:19 544:7
  545:8
2008 454:20
2009 339:6,10
201 544:3,8 545:1,9
  545:11
2010 288:3 292:9
  292:12 293:8
  297:5 298:6 302:8
  303:19 304:5
  305:1 306:22
  307:9 339:10
  381:6 402:8 429:1
  429:22 431:15
  444:8,12 460:5
  512:2 539:16
  542:1 543:5,10
  546:20 549:18
  550:8 555:5
  556:22 557:1
  569:11 573:5,8
2011 300:11,14
  460:2,15 485:8
  505:15 510:12,13

554:2 564:1
578:16 579:10,13
579:18 580:10
2015 443:3
2017 561:22 562:10
  562:13
2018 260:8 584:10
202 402:18 574:3
2020 540:5
20535 573:18
20th 300:11,14
21st 303:19 304:5
22nd 554:2
23 300:6 305:9
  307:18 314:8,16
  314:17 315:8
  401:12 459:16,18
  459:20 461:3,19
  468:11
23-10 302:4
23-12 302:18
23-2 300:8 478:12
  478:15
23-28 286:3
23-4 301:5 462:3
  475:15 479:9
23-43 302:19
23-45 303:17
23-47 304:10,13
23-48 305:5
23-56 306:14
23-58 307:11
23-6 301:5,9 472:15
  473:21 481:9,12
23-72 300:8 307:12
23-8 302:4
23-9 302:4
23rd 272:22 444:8
24 313:13 314:8
  315:8 462:6
24-4 461:20
24th 272:18 292:9
  293:8 460:2,14
25 313:13 314:8
  315:8 508:22
250,000 551:14
  552:18 553:1
25th 276:5 580:10
26 301:7,7 313:13
  314:9 315:8
26-1 430:8
26th 510:13
27 313:13 314:9
  315:8
278-2000 574:3
27th 485:8

28 287:10,13
  313:14,15 314:5,6
  314:12,14 315:13
  316:21 317:5
  320:10
29 308:7 313:16
  314:9 315:8
292 263:3
2nd 288:3 298:6
  428:8 560:1

**3**

3 465:2 481:9
  575:17
3,050 504:14
3:00 582:19
3:25 523:2
3:37 523:17
30 582:1,2
30th 302:8 555:5
  557:1
31 260:8 292:8,21
  293:1,4
322 263:3
33019 262:6
345 539:22
36 284:7
38 265:20 297:17
39 313:18 315:9
3Lab 566:1
3rd 460:5,6 569:11
  573:8
3read 516:16

**4**

4 537:8
4:37 583:11
4:39 584:9
4:45'ish 446:16
40 332:21 333:4,5
  442:21
430 261:2
440 263:4
445 263:4
448 263:3
45 277:2
45-minute 321:15
48 304:10,13
4th 272:20 573:17

**5**

5:00 582:4
50 290:20,21 305:9
  553:5 556:10
  557:18 558:12
5th 579:10,12,18

**6**

601 573:17
62,000 569:1

**7**

7 484:22 485:6
  541:4,15
7/13/11 508:12
7th 431:15

**8**

8 429:22 541:19,20
  542:11
8/23/2011 521:18
815-5221 262:7
824-8300 402:18
8th 546:20 549:18
  550:8

**9**

9 429:14,20 430:6,6
  546:19 551:10
9:30 261:3 264:6
  267:13 276:4
  582:10,11 583:11
  584:11
901(b)(4) 310:9
904(b)(1) 310:11
954 262:7
99 387:3



RECEIVED

June 20, 2018

Board on Professional
Responsibility

**Date:** ne 1, 2018

**Case:** In Re: Larry E. Klayman



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

In Re:  Larry E. Klayman
June 1, 2018

Page 615

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - X

In the Matter of,                : Board Docket No.

LARRY E. KLAYMAN,                : 17-BD-063

             Respondent.    :

- - - - - - - - - - - - - - - X

                    Friday,   ne 1, 2018

                    Washington, DC


                HEARING












Reported by

    Kim M. Brantley, C.S.R.

In Re:  Larry E. Klayman
June 1, 2018

## Page 616

1  Hearing, taken at the Board on Professional
2  Responsibility, 430 E Street, NW, Washington, DC,
3  commencing at 9:30 a.m., before the Ad Hoc Hearing
4  Committee, and before Kim M. Brantley, C.S.R., a
5  Court Reporter and Notary Public in and for the
6  District of Columbia, when were present on behalf
7  of the respective parties:
8
9  APPEARANCES:
10    AD HOC HEARING COMMITTEE:
11    WARREN ANTHONY FITCH, ESQUIRE
12    Chair
13    MS. MARY LARKIN
14    Public Member
15    MICHAEL TIGAR, ESQUIRE
16    Attorney Member
17
18    On behalf of the DC Attorney Disciplinary
19    System:
20       H. CLAY SMITH, III, ESQUIRE
21
22

## Page 618

1                I N D E X
2  WITNESS:          DIRECT:      CROSS:
3  Ms. Elham Sataki      769        620
4  Joel Bennett          795        823
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

## Page 617

1    APPEARANCES CONTINUED:
2    On behalf of Respondent:
3       FREDERICK J. SUJAT, ESQUIRE
4       Law Office of Frederick J. Sujat
5       1525 Windjammer Way
6       Hollywood, Florida 33019
7       (954) 815-5221
8       Email: fsujat@yahoo.com
9    ALSO PRESENT:
10      LARRY E. KLAYMAN, ESQUIRE
11      Respondent
12   and
13      MEGHAN BORRA  AS,
14      BOPR Staff
15
16
17
18
19
20
21
22

## Page 619

1            P R O C E E D I N G S
2      CHAIRMAN FITCH:  If we're all settled
3  in, back on the record.
4      Good morning.  I observe that the three
5  hearing committee members and the Respondent and
6  Disciplinary Counsel are all here.
7      Mr. Smith, any preliminary matters?
8      MR. SMITH:  Nothing from Disciplinary
9  Counsel.  Thank you.
10     CHAIRMAN FITCH:  Any preliminary
11 matters from Respondent?
12     MR. SUJAT:  Nothing at this time, your
13 Honor.
14     CHAIRMAN FITCH:  I think we should
15 resume the cross-examination of Ms. Sataki.
16     (Ms. Elham Sataki resumes the witness
17 stand.)
18     THE WITNESS:  Good morning.
19     CHAIRMAN FITCH:  Good morning.
20
21
22

2  (Pages 616 to 619)

In Re: Larry E. Klayman
June 1, 2018

| Page 620 |
|---|

1  CONTINUED CROSS-EXAMINATION
2  ON BEHALF OF RESPONDENT:
3       BY MR. KLAYMAN:
4  Q.  Good morning, Ms. Sataki.
5  A.  Good morning.
6       CHAIRMAN FITCH:  I remind you that you
7  remain under oath.
8       THE WITNESS:  Yes.
9       CHAIRMAN FITCH:  Go ahead, Mr. Klayman,
10 if you wish.
11 BY MR. KLAYMAN:
12 Q.  Ms. Sataki, yesterday, towards the end
13 of the day, you testified that you were employed
14 by a cosmetic company and before that by Andisher
15 Television in Los Angeles, a Persian broadcasting
16 network, throughout the last eight years, correct?
17 A.  Correct.
18 Q.  And that your current salary is
19 $65,000.
20 A.  $62,000.
21 Q.  Do you get commissions in addition to
22 that?

| Page 621 |
|---|

1  A.  No.
2  Q.  Are there any other benefits that you
3  get with your job?
4  A.  Health insurance.
5  Q.  How much is that worth per month?
6       MR. SMITH:  Objection.
7       THE WITNESS:  I don't know.
8  BY MR. KLAYMAN:
9  Q.  Alright, I'm going to ask if I may
10 approach, or I'll give it to Mr. Smith, a pleading
11 that was filed in this case, which I'm going to
12 ask be make part of the record.
13      MR. KLAYMAN:  It's for Ms. Sataki.  May
14 I approach?
15      CHAIRMAN FITCH:  Mr. Smith, will you
16 hand it to her.
17      MR. KLAYMAN:  And I have copies for the
18 hearing committee.  I have actually two, I
19 apologize.
20      It's a matter of the record in this
21 case, but I'm going to ask that it be attached and
22 admitted as an exhibit, a Respondent's exhibit.

| Page 622 |
|---|

1       MR. SMITH:  Did you mean to give me
2  this document?
3       MR. KLAYMAN:  No.  You're right.
4  BY MR. KLAYMAN:
5  Q.  I want to you to turn to the third page of
6  this exhibit --
7       MR. KLAYMAN:  Which I'll ask to be
8  marked Respondent's Supplemental Exhibit 1.
9       CHAIRMAN FITCH:  Well, no, we don't
10 want to mark it that, because -- oh, Respondent's
11 Supplemental Exhibit 1.  But you want the whole
12 document?
13      MR. KLAYMAN:  Yes.
14      CHAIRMAN FITCH:  So the top of this
15 one, if Ms. Borrazas agrees, we will do RX-1.
16      Ms. Borrazas?  Does calling this R --
17      MS. BORRA AS:  RX?
18      CHAIRMAN FITCH:  No, no, not RX,
19 because that's the denomination that we'll be
20 using in the briefs, in the report for
21 Respondent's exhibits.
22      I guess RSX.

| Page 623 |
|---|

1       MR. KLAYMAN:  Ok, RSS?
2       CHAIRMAN FITCH:  And could I have a
3  proffer, Mr. Klayman?
4       MR. KLAYMAN:  Yes.  I'm going to ask
5  questions about the email that she wrote, going to
6  issues of credibility -- purports to have written.
7  BY MR. KLAYMAN:
8  Q.  Would you please turn to Page 3.  That
9  is an email --
10      MR. SMITH:  And for the record it is
11 identified as Attachment 1.
12 BY MR. KLAYMAN:
13 Q.  Attachment 1 to that Exhibit RSS1,
14 that's an email which purports to come from you,
15 Ms. Sataki, from your email address,
16 EllieSataki@yahoo.com, to Clay Smith, CC Elham
17 Sataki, "Subject: Hearing."
18      MR. KLAYMAN:  May I read it, your
19 Honor?  It's very short.  I'll try not to read
20 much today.
21      CHAIRMAN FITCH:  Continue.
22      MR. KLAYMAN:  Ok.

In Re: Larry E. Klayman
June 1, 2018

---

Page 624

BY MR. KLAYMAN:

Q. "Hello, Mr. Smith. As you know I work full time. I requested time off for this hearing and I had to use vacation time to be able to make it. I talked to my boss to see if I can change the date and they said that they already had done the schedule and vacation time for orders according to the time off that I needed, as this is very important.

"I hope and pray that we can still keep the date. Otherwise, if I have to quit my job, I will make it in July, because, as you know, this is very important to me.

"My life has been on hold for the past eight years since Mr. Klayman completely ruined my career and my life. I hope we don't have to extend it even more. Best, Elham Sataki," with your phone number.

Ms. Sataki, this is English, which is not -- it's not your English, is it? You had somebody write this, correct?

A. Not correct.

---

Page 625

You know me, eight -- within eight years, I could learn more English.

Q. Well, let me ask you --

A. This is my writing.

Q. Before you wrote this, did you consult with anyone about what you were going to put in it?

A. No.

Q. I take it, though, that Mr. Smith, Bar Counsel, asked you to write this email?

A. He asked me, yes, to write an email and explain why I would have to get -- why I feel that I need to keep these things, yes.

Q. And before you wrote the email, you discussed with Mr. Smith what you were going to put in this email, correct?

A. Well, I -- I explained to him over the phone why I need to keep the date, and he says, "Ok, put it in an email and send it to me."

Q. So you went over the matters in this email with Mr. Smith before you sent it to him?

MR. SMITH: Objection, vague.

---

Page 626

THE WITNESS: I don't understand.

MR. KLAYMAN: Alright, let me rephrase it.

BY MR. KLAYMAN:

Q. You told Mr. Smith what you were going to say in this email before you sent him this email?

A. Not the last part, no. I just explained to Mr. Smith that it's going to interrupt with my schedule and my job, so please let's try to keep the date.

That part I talked to Mr. Smith about, not the last part.

Q. Did Mr. Smith ask you to be able to talk with your employer to see if the scheduling could be worked out?

A. Yes.

Q. And what did you say?

A. I said I will talk to them and see if I can.

Q. Did Mr. Smith ask to talk to your employer?

---

Page 627

A. If Mr. Smith can talk to my employer?

Q. Yes, to see if he could work it out, so the employer would know there was a legitimate reason why you needed to reschedule.

MR. SMITH: Please restate the question.

BY MR. KLAYMAN:

Q. Did Mr. Smith --

CHAIRMAN FITCH: That question is struck.

BY MR. KLAYMAN:

Q. Did Mr. Smith ask to talk to your employer about the schedule?

A. I explained to Mr. Smith that I talked to my employer and it's not doable. It's going to hurt my -- the schedule.

Q. The question was did Mr. Smith ask you if it would be ok if he talked with your employer?

A. No.

Q. Now the last sentence, "My life has been on hold for the past eight years since Mr. Klayman completely ruined my career and my life."

---

4 (Pages 624 to 627)

In Re: Larry E. Klayman
June 1, 2018

Page 628

1    You see that?
2    A.  Yes.
3    Q.  Now that's not true --
4    MR. SMITH:  Objection.
5    CHAIRMAN FITCH:  Asked and answered.
6    That's a different subject matter from
7    the other paragraphs.  It's been covered.
8    Sustained.
9    THE WITNESS:  Do -- I'm sorry, I'm
10   answering something now?
11   CHAIRMAN FITCH:  No, there's no
12   question right now.
13   MR. TIGAR:  He sustained the objection.
14   THE WITNESS:  Ok, I'm sorry.
15   BY MR. KLAYMAN:
16   Q.  I turn your attention to Exhibit 18.
17   We were on Exhibit 18 when we left off yesterday.
18   CHAIRMAN FITCH:  Mr. Klayman is
19   referring, I believe, to Respondent's Exhibit 18.
20   MR. KLAYMAN:  Exactly.  Thank you, your
21   Honor.
22   I'm going to get a little water.

Page 629

1    CHAIRMAN FITCH:  Sure.
2    BY MR. KLAYMAN:
3    Q.  I turn your attention to the letter to
4    you from Delia Johnson, director, Office of Civil
5    Rights, in that package.
6    If you would like Mr. Smith to help you
7    find that letter, it's March 23rd, 2011.
8    MR. SMITH:  The third letter in.
9    MR. KLAYMAN:  Yes.  But, to identify
10   the letter, it's March 23rd, 2011 to Ms. Elham
11   Sataki from Delia Johnson.
12   BY MR. KLAYMAN:
13   Q.  Do you see that letter, Ms. Sataki?
14   You can take your time --
15   A.  Thank you.
16   Q.  -- and read it.
17   (Witness reads document.)
18   Q.  Now this letter is addressed to you,
19   correct?
20   A.  Correct.
21   Q.  And that was your address at the
22   apartment that I rented for you in the Valley,

Page 630

1    correct?
2    A.  Correct.
3    Q.  And it's dated March 23rd, 2011, and it
4    says "Dear Ms. Sataki."  That's telling that you
5    there was final agency action on your EEO
6    complaint, your employment complaint against Voice
7    of America and that, there in closing, the
8    findings of the office of civil rights, as part of
9    the EEO complaint, we handed it to you, correct?
10   A.  Correct.
11   Q.  Now when you got this letter, you read
12   the findings, did you not?
13   A.  I don't remember it.
14   Q.  Now the findings that are made here
15   were very important to your life, professionally
16   and personally, correct?
17   A.  Correct.
18   Q.  So you would have logically read the
19   findings, correct?
20   A.  Correct.
21   Q.  So does that refresh your recollection
22   as to whether you read these findings?

Page 631

1    A.  You mean the money that they said --
2    the 1,614?  Is that what you --
3    Q.  The attachment to the letter says --
4    you can turn the page, "Final Decision in the
5    Discrimination Complaint of Elham Sataki.
6    OCR-10-11."  It starts with "Background."
7    So take an opportunity and look at all
8    the documents, that one and the documents after
9    that one, to the very end before Respondent's
10   Exhibit 19.  You can take your time and look at
11   it.
12   (Witness peruses documents.)
13   A.  You want me to read all this?
14   Q.  No.  I just want you to identify it to
15   confirm that you read it when you received it on
16   or about March 23rd, 2011.
17   CHAIRMAN FITCH:  Just for the clarity
18   of the record, Mr. Klayman, you referred at one
19   point to a document behind the Decision memo, and
20   I understand why you did so.
21   I suggest that the entire 19 pages that
22   follow the final decision cover letter be

In Re: Larry E. Klayman
June 1, 2018

## Page 632

1  considered one document.
2  MR. KLAYMAN: Yes.
3  CHAIRMAN FITCH: Because it's divided
4  into Background and then Analysis, which is why I
5  think you bifurcated it.
6  MR. KLAYMAN: That's a good session.
7  CHAIRMAN FITCH: But it seems to be all
8  one document for the purposes of --
9  MR. KLAYMAN: Ok.
10  But, in any event, I'm showing it to
11  Ms. Sataki to refresh her recollection.
12  (Witness reads document.)
13  THE WITNESS: Again, from that time I
14  don't remember much, so, I can't say that I
15  exactly -- I can't go back to March 23rd, 2011 and
16  exactly remember receiving this. Unfortunately I
17  can't say that, because I don't remember.
18  BY MR. KLAYMAN:
19  Q. The decision by the Office of Civil
20  Rights was with regard to your substantive claims
21  of sexual harassment and workplace retaliation,
22  correct?

## Page 633

1  A. Correct.
2  Q. This is what we were putting in all the
3  time and expense to get, was an initial
4  determination from Office of Civil Rights,
5  correct?
6  A. Correct.
7  Q. So therefore, it would have been very
8  important for you to know what it is the Office of
9  Civil Rights ruled, correct?
10  A. Correct.
11  Q. So, does that help you remember,
12  whether you read this?
13  A. No, because I was very sick at that
14  time.
15  Q. So you gave it to other people to read?
16  You gave it to your cousin Sam --
17  A. I don't remember.
18  Q. -- to read?
19  A. I don't remember. I don't remember.
20  Q. You gave it to Kathleen to read?
21  A. I don't remember.
22  Q. So this was really very unimportant to

## Page 634

1  you. Is that what you're saying?
2  A. It was very important to me, but it was
3  very unfortunate that I was very sick during that
4  time.
5  Q. Well, you had an opportunity to read it
6  after that. Did you read it after that?
7  A. I don't remember.
8  Q. Up to today you don't know whether
9  you've read it?
10  A. I don't know.
11  Q. Up to today, you don't know whether you
12  gave it to somebody else to help you understand
13  what was in it?
14  A. No.
15  Q. But you did understand this was the
16  decision on your claims of sexual harassment?
17  A. I don't remember that I received this,
18  I'm sorry. I don't remember, I apologize.
19  At that time I was just very sick and
20  was trying to survive and not get -- not be
21  homeless. So, I can't remember this particular --
22  I remember the big picture, what

## Page 635

1  happened during that time. But this particular --
2  if you're asking about this particular event, or
3  this particular letter, unfortunately I don't
4  remember.
5  Q. That is your address, is it not?
6  A. Yes, it is.
7  Q. I turn your attention to the Final
8  Decision and go to Page 4, please, wherein it says
9  "Excepted Claims," and they have a list of 13.
10  Take an opportunity and review those
11  13, if you will. I'll ask you some questions.
12  I'm not going to read all of it.
13  (Witness reads document.)
14  Q. And I'll turn your attention in
15  particular to number three. So, when you've had a
16  chance to read it, let me know.
17  (Witness reads document.)
18  Q. Number three deals with your having
19  alleged unwarranted verbal and physical sexual
20  advances from another employee.
21  Was that Mr. Falahati?
22  A. Yes.

App.0336

In Re: Larry E. Klayman
June 1, 2018

| Page 636 | Page 638 |
|---|---|

**Page 636**

1  Q.  And then you allege, "When she
2  rejected" -- when you rejected his sexual
3  advances, that Mr. Falahati told people that you
4  weren't doing a good job and engaged in other acts
5  of harassment and intimidation.
6      That was part of your complaint,
7  correct?
8  A.  Correct.
9  Q.  Now we go to number four.
10     You're also alleging that one day, when
11  you refused Falahati's sexual advances, that he
12  grabbed and fondled your bra straps and repeated
13  the act later in the week, correct?
14  A.  Correct.
15  Q.  And then you're alleging that he
16  started a campaign to have you replaced as co-host
17  of Straight Talk, correct?
18  A.  Correct.
19  Q.  Then in number five, you alleged that
20  "There was a continuous daily campaign by Falahati
21  and management officials to publicly disparage the
22  plaintiff's language ability in Farsi, spread

**Page 637**

1  false rumors and publish false statements to the
2  staff regarding her newscasting abilities,
3  manufactured false complaints from viewers about
4  her newscasting abilities, spread false rumors to
5  the staff that she was receptive to workplace
6  romantic liaisons," l-i-a-i-s-o-n-s -- "and
7  falsely accused her of having an affair with
8  another Persian broadcaster."
9      Those were also your allegations,
10  correct?
11  A.  Correct.
12  Q.  Number six.
13     Your other allegations were also that
14  false allegations and rumors resulted in you being
15  removed from your position as co-anchor of
16  Straight Talk and relegated to menial jobs,
17  correct?
18  A.  Correct.
19  Q.  And then seven, that the individual who
20  sexually harassed you, Mr. Falahati, was
21  subsequently placed back on the Straight Talk
22  program while you got nothing, correct?

**Page 638**

1  A.  Correct.
2  Q.  And then you alleged "Complainant's
3  reasonable accommodation request to be detailed to
4  Los Angeles was denied" and that you were
5  threatened by the Deputy General Counsel with
6  being removed from the Persia News Network and
7  placed in the Central News Bureau, which is in the
8  physical vicinity of the sexual harasser.
9      That's correct, right?
10  A.  Yes.
11  Q.  And number nine, you also --
12     CHAIRMAN FITCH:  What's the point of
13  reading all of this?
14     MR. KLAYMAN:  Because I'm laying a
15  foundation for the question --
16     CHAIRMAN FITCH:  Yes, yes, but for
17  what?
18     MR. KLAYMAN:  I'll go to this part,
19  your Honor.  They were short, so I was trying to
20  paraphrase to a certain extent.
21     MR. SMITH:  If I could suggest, rather
22  than reading all that in the record, could you

**Page 639**

1  just ask the witness whether she read paragraph
2  six and whether she agrees with it as opposed to
3  actually reading the --
4     CHAIRMAN FITCH:  Whatever foundation he
5  wants to lay, it's laid and I want a question.
6     MR. KLAYMAN:  I'm trying to create a
7  good record for the transcript, too, which we're
8  going to have to use as to what we're talking
9  about.
10     CHAIRMAN FITCH:  The document is going
11  to be in evidence.  Ask a question.
12     MR. KLAYMAN:  Yes, I understand.
13     CHAIRMAN FITCH:  Consider the
14  foundation laid.
15  BY MR. KLAYMAN:
16  Q.  Go to Analysis, and I'll ask you
17  questions.  I won't read, ok, but I want you to
18  read pages five -- excuse me, Page 9, 10, 11, 12,
19  13 --
20  A.  You want me to read all these now?
21  Q.  Yes, please read it.
22     CHAIRMAN FITCH:  Objection sustained.

7 (Pages 636 to 639)

App.0337

In Re: Larry E. Klayman
June 1, 2018

---

Page 640

1    This is a waste of your time, counsel.
2    MR. KLAYMAN: Alright, then I'll ask
3  the question, a general question.
4  BY MR. KLAYMAN:
5    Q. It is correct that the Office of Civil
6  Rights interviewed a number of people inside of
7  VOA and elsewhere and found that your claims were
8  false?
9    MR. SMITH: Objection.
10    CHAIRMAN FITCH: Now, what is the --
11    Wait a minute. Do not answer.
12    What is the relevance of whether her
13  claims were false or not? They were pursued.
14  They were lost. She could have lost this for any
15  number of reasons. This is the same thing as
16  trying to say that a court decision proves some
17  falsity or dishonesty. Not so.
18    Next question.
19    MR. KLAYMAN: Well, let me explain.
20  You asked me to explain.
21    CHAIRMAN FITCH: I'm sorry?
22    MR. KLAYMAN: You asked me to explain.

---

Page 641

1    CHAIRMAN FITCH: And it's not a
2  sufficient explanation.
3    MR. KLAYMAN: I didn't give an
4  explanation, your Honor.
5    CHAIRMAN FITCH: Well, you just did.
6  You told me, I asked you to explain it, quote
7  unquote.
8    MR. KLAYMAN: Yeah, and I would like to
9  put on the record what the reason for this is.
10    CHAIRMAN FITCH: That's perfectly ok.
11    MR. KLAYMAN: Ok. The reason for the
12  record is that she -- I relied upon certain
13  information that she gave to me to make various
14  claims.
15    CHAIRMAN FITCH: Of course.
16    MR. KLAYMAN: I put in my time,
17  expense. I tried to do what I could to make her
18  whole again and to understand that she had a place
19  to live and moving expenses and everything else.
20    Based upon these findings, it would
21  appear that she did not tell me the truth in this
22  process.

---

Page 642

1    CHAIRMAN FITCH: That does not go to
2  that.
3    And also, given all of the credibility
4  challenges, it's repetitive and cumulative, and
5  I'm not even sure that it's otherwise relevant to
6  any of the charges in this case.
7    MR. KLAYMAN: Well, it goes to
8  credibility, your Honor. You recognize that
9  credibility is a big issue, and that's why we're
10  not --
11    CHAIRMAN FITCH: I'm actually not sure
12  of that. You can argue that to me at the end. I
13  have an open mind as to whether it is, given the
14  charges in this case, that the evidence has been
15  adduced by both sides.
16    But we certainly have had enough of
17  this -- and I'm holding up Exhibit 18 -- kind of
18  evidence.
19    MR. KLAYMAN: Your Honor, we just went
20  through a document. I've been very light. I have
21  not tried to be abrasive in any way.
22    CHAIRMAN FITCH: No one has said you've

---

Page 643

1  been abrasive, and that comment, whether you've
2  been abrasive or not, or gracious or not, has
3  nothing to do with this legal evidentiary issue.
4    MR. KLAYMAN: Well, it does, because I
5  don't want to -- you know, I had wanted some time
6  to be able to have Mr. Sujat do the
7  cross-examination, but the reality is this: is
8  that, yes, credibility is always a huge part in
9  every proceeding, and we just went through a
10  document that she sent to Mr. Smith where it
11  simply wasn't true that her career had been
12  ruined. She continued on as before.
13    THE WITNESS: It's the only -- I'm
14  sorry.
15    MR. KLAYMAN: So, this is very
16  important in weighing credibility.
17    CHAIRMAN FITCH: A, I'm not sure of
18  that, but B, we know your point. The document,
19  which speaks for itself, rejects her claims. It
20  doesn't necessarily make them false, but you have
21  a theory that it makes them false --
22    MR. KLAYMAN: It does so --

---

8 (Pages 640 to 643)

In Re: Larry E. Klayman
June 1, 2018

| Page 644 |
| --- |

1      CHAIRMAN FITCH: -- and I understand
2  that.  And I'm going to take, and in fact the
3  three of us are going to take that into
4  consideration.
5      MR. KLAYMAN:  It does so in great
6  detail, in great detail.
7      CHAIRMAN FITCH:  We're going to read
8  all these documents.
9      MR. KLAYMAN:  No, we're not going to
10  read it all, your Honor.
11      CHAIRMAN FITCH:  No, no, we the three
12  of us fact-finders, we're going to read these
13  documents.
14      MR. KLAYMAN:  Ok.  I respect your
15  rulings, your Honor.  I don't agree with them, but
16  I respect your rulings and will obey them.
17      But, the issues I'm allowed to probe on
18  certain things that are said here that OCR
19  rejected and said were not true and get into
20  specifics of that and why she didn't give me the
21  information to adequately defend her or decide
22  whether I wanted to defend her at all in these

| Page 645 |
| --- |

1  matters.
2      You know, I spent a lot of time and
3  expense, and frankly I feel as if I was not dealt
4  with fairly.
5      So, that's where we are today.
6      Now as a zealous advocate and former
7  counsel to her, I did my best, even after this, to
8  get her a good result.  But candidly, when I read
9  this --
10      CHAIRMAN FITCH:  But we know that that
11  evidence is here and you're not charged with not
12  doing your best for her.
13      I keep reminding you.  There is no lack
14  of zealousness charged here.  There is no lack of
15  competency charged here.
16      You have, in addition, on the issue of
17  whether or not you handled the termination issue
18  correctly, you have introduced evidence of that
19  also, but you may want to introduce more evidence
20  on that.
21      MR. KLAYMAN:  It also bears on this,
22  and thank you for hearing me out, and it's

| Page 646 |
| --- |

1  regrettable that I have to say this in front of
2  Ms. Sataki, but it bears on her honesty.  It bears
3  on truthfulness.  It bears on candor.
4      I mean, we just heard testimony that
5  she never read this.  Obviously no one is ever
6  going to believe that.  That's inconceivable,
7  since this was so important she claims I ruined
8  her life, that she wouldn't read this?
9      So this is why credibility is so
10  important.
11      CHAIRMAN FITCH:  This is a repetitive
12  argument.  That is not being heard.
13      Q.  I turn your attention to Exhibit Number
14  20.  Take an opportunity to review it.  This is
15  the EEO OCR complaint that you filed and signed.
16  Or that was filed for you, and you signed it on
17  Page 3.
18      A.  Yes.
19      Q.  Correct?
20      A.  Correct.
21      MR. KLAYMAN:  Your Honor, I move
22  Exhibit 18 and 19 into evidence.

| Page 647 |
| --- |

1      MR. SMITH:  No objection.
2      CHAIRMAN FITCH:  Wait a minute, we have
3  skipped over --
4      MR. KLAYMAN:  I'm sorry, I'm sorry.
5      CHAIRMAN FITCH:  Eighteen is admitted.
6      MR. KLAYMAN:  Yes.
7      CHAIRMAN FITCH:  And you have moved 20?
8      MR. KLAYMAN:  20.
9      MR. SMITH:  No objection to 18 or 20.
10      MR. KLAYMAN:  By the way, let me say
11  this one other thing in the hearing --
12      CHAIRMAN FITCH:  Let me make clear for
13  your sake that all pages of 18 are admitted.
14      Now, did you want to say something
15  about 20, before I admit it?
16      MR. KLAYMAN:  No, that's all.
17      But I want to say something just
18  generally here bearing on some of the testimony,
19  very briefly, for the record.
20      What I want to say is that my
21  questioning her on the letter she sent to Mr.
22  Smith is no reflection on you or anybody on the

9 (Pages 644 to 647)

App.0339

In Re: Larry E. Klayman
June 1, 2018

| Page 648 | Page 650 |
|---|---|

**Page 648**

1  committee.  I don't in any way view that you did
2  anything improper in not continuing her testimony
3  or anything like that, but I did want to --
4  CHAIRMAN FITCH:  Must say that had
5  never crossed my mind.
6  MR. KLAYMAN:  Well, I thought maybe
7  because you're showing a little bit of --
8  CHAIRMAN FITCH:  It's a perfectly good
9  cross-examination.  Nicely done.
10  MR. KLAYMAN:  Alright, alright.
11  Thanks.
12  BY MR. KLAYMAN:
13  Q.  I turn your attention to Exhibit 19.
14  That's a Freedom of Information Act request that I
15  filed for you, correct?
16  CHAIRMAN FITCH:  That question is
17  struck.  It seems to be an inaccurate question.
18  MR. KLAYMAN:  I'll just ask that it be
19  admitted into the record.  That's all.
20  CHAIRMAN FITCH:  It is with the
21  response.
22  MR. KLAYMAN:  Ok.  Yes, correct.

**Page 650**

1  A.  Yes.
2  MR. SMITH:  Objection; one question at
3  a time.
4  MR. KLAYMAN:  I heard two distinct
5  yeses.
6  BY MR. KLAYMAN:
7  Q.  Turn to the letter of February 22nd,
8  2010, and the attachments, which is an email from
9  Tim Shamble to me.  Blanquita's cell, (703)
10  307-9510.  She gives the home number.
11  So I just want to ask a general
12  question on this and not take up much time...
13  You are aware that we were trying to
14  settle this thing amicably, and even because of my
15  friendship with Blanquita Cullum believed that we
16  had a really good chance of doing --
17  A.  That's what you said at that time, yes.
18  Q.  And Blanquita Cullum sat on the board
19  of governors at the time.
20  A.  You told me that, yes.
21  MR. KLAYMAN:  Your Honor, I ask that
22  that be admitted as Respondent's Exhibit 24.

| Page 649 | Page 651 |
|---|---|

**Page 649**

1  MR. TIGAR:  That's Exhibit 19?
2  MR. KLAYMAN:  Yes.
3  MR. TIGAR:  That's the one addressed to
4  UPS Box 345 at 2000 Pennsylvania?
5  MR. KLAYMAN:  Yes.
6  BY MR. KLAYMAN:
7  Q.  Now, turn to Exhibit 24.
8  CHAIRMAN FITCH:  We have admitted
9  number 19 in evidence.
10  Did I say admitted for 19?
11  MR. KLAYMAN:  Yes.
12  CHAIRMAN FITCH:  It is, indeed.
13  BY MR. KLAYMAN:
14  Q.  Take a quick look at that.  This is
15  something that you and I prepared together on
16  February 21st, 2010, a letter to Paul Kollmer
17  Dorsey.
18  Do you see that?
19  A.  Yes.
20  Q.  And we prepared that together, didn't
21  we?  Because we were trying to resolve all these
22  matters.

**Page 651**

1  MR. SMITH:  No objection.
2  CHAIRMAN FITCH:  All of RX24 is
3  admitted.
4  MR. KLAYMAN:  Yes.
5  BY MR. KLAYMAN:
6  Q.  Exhibit 25 is a letter of May 12th,
7  2010 addressed to you, care of the UPS Store,
8  "Dear Ms. Sataki," and it's from the International
9  Broadcasting Bureau.
10  Take an opportunity and look at that
11  letter.  It's only two pages.
12  (Witness reads document.)
13  CHAIRMAN FITCH:  Again, for clarity of
14  the record, Mr. Klayman may have correctly said
15  May 10.  I heard March 10, but it purports to be
16  May 10, as I think --
17  MR. KLAYMAN:  It is May 12th, your
18  Honor.
19  CHAIRMAN FITCH:  May 12th?
20  MR. KLAYMAN:  Yes.
21  CHAIRMAN FITCH:  Thank you.
22

10  (Pages 648 to 651)

In Re: Larry E. Klayman
June 1, 2018

Page 652

1  BY MR. KLAYMAN:
2      Q.  Tell me when you're finished reading
3  it.
4      A.  You want me to read the whole email to
5  the end?
6      Q.  Well, it's only two pages.  I'm going
7  to ask you questions about it.  I can ask you
8  without it.
9          What I'm going to ask you is, on or
10  about May 12th, 2010, you were advised that they
11  were not -- International Broadcasting Bureau of
12  the Broadcasting Board of Governors was not going
13  to agree to you being stationed in Los Angeles,
14  correct?
15      A.  Correct.
16      Q.  And instead, they offered you to be
17  stationed in another part of Voice of America in
18  Washington, DC, and that's in paragraph four.  So
19  if you could look at that.
20      A.  Yes.
21      Q.  You didn't want to do that, correct?
22      A.  You advised me not to do that.

Page 653

1      Q.  Wait.  Didn't you previously testify
2  that you didn't want to be in the vicinity of the
3  harasser?
4      A.  You advised me to say that.  You were
5  my attorney --
6      Q.  So you were willing to be in the same
7  building with Medhi Falahati?
8      A.  If it would cost my job, if it would
9  cost my job -- I lost my career.  I lost my job,
10  and I lost a government job that could provide a
11  future for me.
12          So if I had to deal with that and --
13      THE WITNESS: I don't know, can I
14  continue talking or I have to stop?
15      CHAIRMAN FITCH:  Yes, you're answering
16  the question.  Go ahead.
17      THE WITNESS:  Before you started
18  representing me, Tim Shamble and Delia Johnson,
19  they all were involved in this and they were
20  trying to resolve it within and see what they're
21  going to do.
22          So I was still working there.  It was a

Page 654

1  tough situation, but I was trying to handle it.  I
2  was still working there.
3          But then when you came in and you
4  explained my rights that, "No, you don't have to
5  do that.  We can do this.  We can take you to LA.
6  We can do that," so then I started doing as my
7  attorney tells me, as I'm not an attorney and my
8  attorney knows best.  But --
9  BY MR. KLAYMAN:
10      Q.  Ms.- --
11      A.  Before that, choosing between a career
12  and my job, and if I have to just stay tough and
13  take it and continue and hope for the better, I
14  would have done it.
15      Q.  You previously testified earlier in
16  this hearing that if you had to go back to
17  Washington and work at Voice of America here you
18  would kill yourself.
19          You remember you testified to that?
20      A.  No, I didn't say that.
21      Q.  Well, the record is clear.
22          Now --

Page 655

1      A.  The only time I said I would kill
2  myself was during the time that I was very, very
3  sick and I lost everything and I was -- that's
4  what I said.  That is after you weren't
5  representing me any more and everything went down.
6          That's the only time I said I would --
7  I even thought about it.
8          Please don't bring that to everything.
9      Q.  Ms. Sataki, who did you talk to last
10  night about your testimony in this case?
11      A.  I'm sorry, what?
12      Q.  Who did you talk to yesterday evening,
13  after we finished, about your testimony in this
14  case?
15          You talked to Sam.  You talked to
16  Kathleen.
17          Who did you talk to?
18      A.  No.
19      MR. KLAYMAN:  We'll let the record
20  speak for itself.  Move on, next exhibit.
21      THE WITNESS:  I haven't talked to
22  Kathleen for a long, long, long time.

11 (Pages 652 to 655)

In Re: Larry E. Klayman
June 1, 2018

Page 656

1    CHAIRMAN FITCH: We have your answer.
2    MR. TIGAR: We have your answer. Thank
3  you. We heard.
4    THE WITNESS: I'm sorry.
5    MR. KLAYMAN: We heard. No, it's okay.
6    MR. KLAYMAN: Your Honor, rather than
7  to belabor things here, because, you know, there's
8  no point, I'm just getting completely conflicting
9  testimony to previous testimony, I'll just ask
10  that Exhibit 25 be entered in as an exhibit.
11    CHAIRMAN FITCH: Twenty-five is
12  admitted.
13    MR. KLAYMAN: I'll ask that Exhibit 28
14  be admitted into evidence.
15    CHAIRMAN FITCH: Give me a moment,
16  please.
17    MR. SMITH: Twenty-eight?
18    CHAIRMAN FITCH: And Mr. Smith a
19  moment.
20    MR. SMITH: No objection to 25. Let me
21  take a look at 28.
22    And assuming that 28 is a letter dated

Page 657

1  June 16th, 2010 and another letter dated June
2  22nd, 2010, Bar Exhibit 28 --
3    MR. TIGAR: Just for my -- 28 is the
4  one which the first is the June 16th, 2010 letter?
5    MR. KLAYMAN: Yes.
6    MR. TIGAR: Thank you.
7    CHAIRMAN FITCH: And Mr. Smith I think
8  does not object to either pages?
9    MR. SMITH: No, no, I was just trying
10  to make sure, because I know that Mr. Klayman had
11  said that his Bar exhibits may have been out of
12  order. So I was just trying to make sure that
13  what I was looking at was what everybody else was
14  looking at.
15    I have no objection.
16    CHAIRMAN FITCH: Ok, 28, Respondent's
17  28 is in its entirety.
18    MR. KLAYMAN: Exhibit 29, I ask for it
19  to be admitted. We can deal with the other
20  exhibits later, if your Honor prefers, at the end
21  of this proceeding. Because I don't intend to ask
22  her questions about 29 or 30. How ever you wish.

Page 658

1  We can take care of it now and just have them
2  entered into evidence now.
3    CHAIRMAN FITCH: Yes.
4    MR. SMITH: Well, assuming that Bar
5  Exhibit 29 is a civil complaint, Larry Klayman vs.
6  Judicial Watch, Elham Sataki vs. Broadcasting
7  Board of Governors, and Elham Sataki vs. Medhi
8  Falahati, I have no objection to that.
9    And to the extent that Bar Exhibit 30
10  is a Certificate of Disciplinary History for Larry
11  Klayman, I don't object to its admission.
12    MR. KLAYMAN: Thank you.
13    CHAIRMAN FITCH: Are all the documents
14  in 29 part of one judicial submission? I mean,
15  there's --
16    MR. KLAYMAN: You're right, your Honor.
17  They're not all the same.
18    CHAIRMAN FITCH: They may all be
19  judicial submissions.
20    MR. KLAYMAN: They are judicial
21  submissions. They're all judicial submissions and
22  they speak for themselves.

Page 659

1    CHAIRMAN FITCH: That's right.
2    MR. KLAYMAN: So you'll be able to
3  identify what they are, and if you have any
4  questions I'll be happy to answer you, even after
5  the hearing concludes.
6    MR. SMITH: No objection.
7    CHAIRMAN FITCH: They're admitted
8  without objection.
9    MR. KLAYMAN: Thank you.
10    CHAIRMAN FITCH: RX 29 is admitted
11  without objection in its entirety.
12  BY MR. KLAYMAN:
13    Q. I'm going to turn your attention to the
14  supplemental petitioner's exhibits. We're going
15  to go through some of them right now.
16    CHAIRMAN FITCH: Say that again.
17    MR. KLAYMAN: The supplemental exhibits
18  of the petitioner, the Office of Bar Counsel.
19    CHAIRMAN FITCH: Ok. Does the witness
20  have that package?
21    (Brief pause.)
22    MR. SMITH: Alright.

12 (Pages 656 to 659)

In Re: Larry E. Klayman
June 1, 2018

Page 660

1 BY MR. KLAYMAN:
2 Q. I'm going to turn your attention to
3 Exhibit 5, SX5. Do you see that?
4 A. Yes.
5 Q. It's an email that I sent you on May
6 8th, 2010, "Legal Representation". You sent it,
7 as is reflected on the top, to Mr. Smith on May
8 24th, 2018, correct?
9 A. Correct.
10 Q. Now you remember receiving it because
11 you actually just pulled it up the other day.
12 That's what you testified, correct?
13 MR. SMITH: Objection.
14 CHAIRMAN FITCH: Overruled. Go ahead.
15 THE WITNESS: Would you --
16 BY MR. KLAYMAN:
17 Q. You remember getting this document in
18 and around May 8th, 2010, this email from me?
19 A. Yes.
20 MR. KLAYMAN: I won't read it, your
21 Honor. It'll save time.
22

Page 661

1 BY MR. KLAYMAN:
2 Q. I turn your attention to Petitioner's
3 Supplemental Exhibit 7. You remember getting this
4 email from me on or about May 9th, 2010?
5 A. I don't remember it from then, but I do
6 remember it from two weeks ago, when I looked at
7 it.
8 Q. You have no reason not to believe that
9 you got it and saw it on May 9th, 2010, correct?
10 A. I'm sorry, what?
11 Q. You have no reason not to believe that
12 you didn't see it on or about May 9th, 2010?
13 A. It was in some emails of yours that I
14 wouldn't even open it. I would leave it unopened,
15 because -- so.
16 Even a week ago when I started going
17 through all of your emails, I had a bunch of
18 unopened emails from that time that I opened and
19 started going through all of them last week.
20 CHAIRMAN FITCH: No, he didn't ask you
21 about opening.
22 He asked you, is there any reason to

Page 662

1 believe that it was not sent from him to you on
2 May 9th.
3 THE WITNESS: No, sir.
4 BY MR. KLAYMAN:
5 Q. Now, you said that some emails you
6 didn't open, but you were aware that I was trying
7 to communicate with you about your case.
8 Wouldn't you want to know what's going
9 on in your cases, to read about your cases?
10 A. About my case, yes, but there was a
11 lot other emails, too. So I -- at that point I
12 didn't know which one is about my case, which one
13 is about you getting in arguments with me.
14 Q. Did you ask anybody else to communicate
15 with me, so you would understand what was going on
16 on your case, if you wouldn't open some emails?
17 A. No, I don't think so. I don't
18 remember.
19 Q. In fact, you could have contacted Mr.
20 Shamble and asked him what's happening. But you
21 didn't, did you?
22 A. I contacted Mr. Shamble later. Not at

Page 663

1 this date, but later.
2 Q. At all times you had the ability to
3 talk to Mr. Shamble about your cases, correct?
4 A. Correct.
5 Q. And you knew that Mr. Shamble was
6 working closely with me on your behalf.
7 A. Yes.
8 THE WITNESS: May I -- is this email
9 about the case, this particular email that --
10 MR. KLAYMAN: There's no question
11 pending, your Honor.
12 CHAIRMAN FITCH: Let him ask you
13 another question.
14 THE WITNESS: Ok, I'm sorry. I'm
15 sorry.
16 BY MR. KLAYMAN:
17 Q. Turn your attention to Supplemental
18 Exhibit 9. This is an email from me, Larry
19 Klayman, to you on May 19th, 2010.
20 Do you see that?
21 A. Yes.
22 MR. KLAYMAN: May I read this, your

13 (Pages 660 to 663)

In Re: Larry E. Klayman
June 1, 2018

| Page 664 | Page 666 |
|---|---|

**Page 664**

1  Honor?  It's extremely short.
2       CHAIRMAN FITCH:  Go ahead.
3  BY MR. KLAYMAN:
4       Q.   Ok.  "I did not realize payday had
5  passed with all that is going on.  Please email me
6  the bank name, location, routing number and
7  account number and I will have Vanessa wire the
8  money into your account tomorrow morning.  I have
9  always told you what I mean and I make good on my
10  commitments.  Larry."
11       You see that?
12       A.   Yes.
13       Q.   It is true, is it not, that I offered
14  to pay monies when your salaries were cut off by
15  VOA and asked for your bank account number so I
16  could wire money into your account so you would
17  have money to eat and live?
18       A.   Yes.
19       Q.   Turn to Petitioner's Supplemental
20  Exhibit Number 10.  This is an email of May 19th,
21  2010 to you from me, correct?
22       A.   Correct.

**Page 666**

1       A.   Yes.
2       Q.   Turn to Supplemental Exhibit 14.  This
3  is an email from me dated June 16th, 2010, which
4  you forwarded to Mr. Smith last Thursday, May 24,
5  2018, that we didn't see until the next day,
6  wherein I state --
7       MR. KLAYMAN:  I'm just going to read
8  small portions, your Honor.
9  BY MR. KLAYMAN:
10       Q.   "Ellie, next time have somebody write
11  your emails.  This email is poorly written by
12  someone who knows nothing about what has
13  occurred."
14       You see that?
15       What I'm talking about, based on your
16  knowledge, is that something was sent to me
17  purporting to give you legal advice on how this
18  case -- how your cases should proceed?
19       MR. SMITH:  Objection.
20  BY MR. KLAYMAN:
21       Q.   Correct?
22       A.   Not correct.

**Page 665**

1       MR. KLAYMAN:  If I may, your Honor, I'm
2  going to read two lines at the bottom.
3       CHAIRMAN FITCH:  Go ahead.
4  BY MR. KLAYMAN:
5       Q.   "In this email I'm sending you a legal
6  brief of what I've prepared on your behalf to
7  submit in legal proceedings."  And I say, "Please
8  read the legal brief I sent earlier and you will
9  see what I'm doing about it, as you put it.  I've
10  never tried to own you," in quotes, "'by having
11  you owe me money.'  I just wanted to be treated
12  with respect with the realization that I am an
13  important person."
14       You remember my saying that, correct?
15       A.   Correct.
16       Q.   And then in the last sentence, "You
17  don't owe me anything.  I did what I did from the
18  heart.  That's me.  That's why I am not persons
19  who think" -- that's enough.
20       You will acknowledge that I told you
21  you don't owe me any money and I did what I did
22  from my heart?

**Page 667**

1       CHAIRMAN FITCH:  Objection is
2  overruled.
3  BY MR. KLAYMAN:
4       Q.   When you called up all your emails to
5  give to Mr. Smith last week, you didn't send all
6  of the emails that you had concerning your cases
7  to him, did you?
8       A.   I don't understand your question.
9       Q.   I believe you testified earlier that
10  you didn't open all -- to this day you haven't
11  owned all of your emails from me --
12       A.   I didn't say "to this day."  I said to
13  last week.  To this day, when I sent these.
14       Q.   But you did not forward to Mr. Smith
15  all of the emails that relate to the legal
16  proceedings that I brought on your behalf and
17  matters related to that?
18       A.   Not all legal, because I didn't think
19  that that's -- no, I didn't.
20       THE WITNESS:  With that -- I don't
21  really understand it.  Is it that from the time
22  that he was representing me until --

14 (Pages 664 to 667)

In Re: Larry E. Klayman
June 1, 2018

| Page 668 |
|---|

1    MR. TIGAR: There's no question.
2    You've answered.
3    MR. KLAYMAN: There's no question.
4    THE WITNESS: Ok, I'm sorry.
5    BY MR. KLAYMAN:
6    Q. Turn to Petitioner's Supplemental
7    Exhibit 16, Office of Bar Counsel. That's an
8    email which I sent to you on June 23rd, 2010.
9    You remember receiving it, correct?
10   A. Yes.
11   Q. And in there I'm trying to make you
12   feel optimistic that you have a good life ahead of
13   you, correct?
14   MR. SMITH: Objection.
15   MR. KLAYMAN: That she understood it.
16   MR. SMITH: Objection.
17   CHAIRMAN FITCH: It's overruled.
18   THE WITNESS: Can you repeat your
19   question.
20   MR. KLAYMAN: Madame Court Reporter,
21   can you read it back.
22   We have a very good court reporter.

| Page 669 |
|---|

1    She gets things exact.
2    THE COURT REPORTER: "And in there I'm
3    trying to make you feel optimistic that you have a
4    good life ahead of you, correct?"
5    THE WITNESS: In the email, that's what
6    he's writing.
7    BY MR. KLAYMAN:
8    Q. Turn to Bar Counsel's Supplemental
9    Exhibit 17. This is an email which I sent to you
10   on June 23rd, 2010.
11   You remember receiving that at that
12   time, correct?
13   A. Correct.
14   Q. You were aware in and around that time
15   period that I was in a very serious car crash on
16   the 405, correct?
17   A. So you told me. I don't know. You
18   told me that.
19   Q. Yes. And that evening, when I walked
20   up the exit, I called you, because your apartment
21   was very close to where I had crashed the car, and
22   I called you for help, and you did not respond to

| Page 670 |
|---|

1    my call, did you? I left a message.
2    A. Correct.
3    Q. And you're aware that I got into that
4    car crash after Judge Kotelly issued her decision
5    and I was not in a happy state myself at that
6    point in time.
7    You're aware of that?
8    MR. SMITH: Objection. He's asking her
9    whether she knows his feelings. I mean, how does
10   she know his feelings?
11   MR. KLAYMAN: Because we were in
12   communication, Mr. Smith?
13   MR. SMITH: No, you were not --
14   MR. KLAYMAN: No, I don't want your
15   testimony, please.
16   MR. SMITH: I don't want yours.
17   MR. KLAYMAN: Fine, I've listed you as
18   a witness. I've listed you as a witness, so we'll
19   have to address that issue later.
20   CHAIRMAN FITCH: I've lost track of the
21   question.
22   MR. KLAYMAN: Can we read it back.

| Page 671 |
|---|

1    THE COURT REPORTER: "That evening,
2    when I walked up the exit, I called you, because
3    your apartment was very close to where I had
4    crashed the car, and I called you for help, and
5    you did not respond to my call, did you? I left a
6    message.
7    "Answer: Correct.
8    "Question: And you're aware that I got
9    into that car crash after Judge Kotelly issued her
10   decision and I was not in a happy state myself at
11   that point in time.
12   You're aware of that?"
13   CHAIRMAN FITCH: Ok, now wait just a
14   minute.
15   When you say "that decision," are you
16   referring to the denial of the TRO?
17   MR. KLAYMAN: Yes, yes. Thank you,
18   your Honor.
19   BY MR. KLAYMAN:
20   Q. You may respond.
21   CHAIRMAN FITCH: Just a second.
22   Read it back.

15 (Pages 668 to 671)

In Re: Larry E. Klayman
June 1, 2018

## Page 672

1    THE COURT REPORTER: "And you're aware
2  that I got into that car crash after Judge Kotelly
3  issued her decision and I was not in a happy state
4  myself at that point in time.
5    You're aware of that?"
6    MR. SMITH: It's a compound question.
7    CHAIRMAN FITCH: I'm sorry?
8    MR. SMITH: There's a compound
9  question.
10   There are two distinct questions in
11  there, one, whether or not she was aware that he
12  had just received a decision from Judge
13  Kollar-Kotelly, and the next, what his state of
14  mind was with respect to that.
15   It's two questions, and the second
16  question is certainly improper.
17   CHAIRMAN FITCH: Well, it is improper.
18  One at a time is a fair point.
19  BY MR. KLAYMAN:
20   Q. You're aware that the date that I got
21  into the cash where I totalled my car was the date
22  where Judge Kotelly issued her decision for you to

## Page 673

1  be sent back to LA at the Persia News Network
2  there?
3    A. That's what you told me.
4    Q. And you're aware that my car was
5  totalled?
6    A. That's what you told me.
7    Q. And you're aware that I had a
8  concussion and had to go to Kaiser Permanente?
9    A. That's what you told me.
10   Q. And you didn't answer the phone when I
11  called you to ask you for help when I came up the
12  exit close to your apartment, correct?
13   A. Correct.
14   Q. And you didn't respond to the voicemail
15  that I left.
16   A. Correct.
17   Q. Turn to Exhibit 18.
18   CHAIRMAN FITCH: Give me a moment,
19  please.
20   MR. KLAYMAN: Sure.
21   (Brief pause.)
22   MR. KLAYMAN: I'm not going to ask

## Page 674

1  questions about 18. We'll move on.
2    CHAIRMAN FITCH: That's alright. Just
3  give me a moment.
4    MR. KLAYMAN: Ok. They're already in
5  evidence.
6    CHAIRMAN FITCH: Just let the old guy
7  plod along here a little bit.
8    Mr. Smith, do your exhibits include the
9  TRO denial or a docket number?
10   MR. SMITH: Yes.
11   MR. KLAYMAN: I'm going to go back
12  to --
13   CHAIRMAN FITCH: Have they been
14  admitted into evidence?
15   MR. SMITH: Not as of yet. I can move
16  it all into evidence.
17   CHAIRMAN FITCH: But you're going to
18  admit them?
19   MR. SMITH: I am going to move all of
20  my exhibits into evidence, yes, thank you.
21   CHAIRMAN FITCH: Ok. I note that
22  because the committee may want to take into

## Page 675

1  consideration the various dates that have been
2  purported here.
3    MR. SMITH: I appreciate that and I was
4  waiting, since the Respondent had previously
5  objected to all of our exhibits, I was going to
6  move them in when appropriate.
7    I can move them all in now.
8    CHAIRMAN FITCH: Now, no, he's in his
9  case --
10   MR. SMITH: Alright.
11   CHAIRMAN FITCH: Not in his case.
12  Later. We're preserving everybody's rights.
13   I'm sorry, Mr. Klayman.
14  BY MR. KLAYMAN:
15   Q. Ok, now, it is true, is it not, Ms.
16  Sataki, that the day after I got into that
17  near-fatal car cash, that was the day that Judge
18  Kotelly had issued a decision not to put you back
19  to work in Los Angeles?
20   A. Again, it's what you told me. I was
21  not there. I didn't see the car crash. I don't
22  know.

16 (Pages 672 to 675)

In Re: Larry E. Klayman
June 1, 2018

Page 676

1    Q.  We did have a conversation, however,
2  the next day, talking about what Judge Kotelly had
3  ruled, did we not, a telephone conversation?
4    A.  I think so.  I mean, it's such a long
5  time ago.  I'm sure that's -- yes.
6    Q.  And you were -- I'm sorry, go on.
7    A.  I just don't remember exactly
8  everything from eight years ago.  I mean, there
9  was so many.
10    But, yes, we had a conversation.
11    Q.  And you were very upset and you blamed
12  me in the conversation?
13    A.  Not correct.
14    Q.  Well, you were willing to talk to me
15  the day after my crash, but you weren't willing to
16  give me any help when I almost killed myself on
17  the highway, correct?
18    A.  Your words, sir.  I don't know that.
19    Q.  Ok.  Turn your attention to Bar
20  Counsel's Supplemental Exhibit 19.  That's an
21  email that I sent to you on June 29th, 2010,
22  correct?

Page 677

1    A.  Correct.
2    Q.  You remember receiving it around that
3  time, correct?
4    A.  Honestly I don't remember if I just --
5  I received it at that time, yes.
6    MR. KLAYMAN:  In the fourth paragraph,
7  your Honor, if I may read that?
8    CHAIRMAN FITCH:  Sure.
9  BY MR. KLAYMAN:
10    Q.  "In fact, working as hard as I have to
11  try to get you back to the Persia News Network
12  gets me nothing, assuming I ever wanted a
13  percentage of the damages we could have won in
14  court, which I never asked for.  I told you to
15  keep it all.
16    "There is no money in having you return
17  to Persia News Network.  There is with the damage
18  claims.  And I have spent several hundred thousand
19  dollars in time and expense fighting to get you
20  back to a $75,000-a-year job in a network that is
21  a cesspool of corruption.  But that's what you
22  wanted."

Page 678

1    Now, I told you that, correct?
2    A.  Yes.
3    Q.  Well, let me ask you this question: in
4  this email I'm also saying some of the pitfalls
5  that we have to get over are with regard to rumors
6  about your past that are circulating inside of
7  Voice of America, correct?
8    A.  Yes.
9    Q.  Then I'm urging you in this email to --
10    THE WITNESS:  Can I add anything to
11  that, or no?
12    MR. KLAYMAN:  No, I think that's
13  enough.
14    Your Honor, I move that in.  Mr. Smith
15  has no objection to it going into evidence.
16    MR. SMITH:  It's already admitted and
17  received into evidence.
18  BY MR. KLAYMAN:
19    Q.  Attached to this email is an affidavit
20  of your former husband, Bamboos Pourgol,
21  B-a-m-b-o-o-s P-o-u-r-g-o-l.
22    Do you see that?

Page 679

1    A.  Yes.
2    Q.  And I was concerned about what he had
3  sworn to under oath, that it could be used against
4  you, correct?
5    A.  Correct.
6    And I explained to you how we can have
7  our own people to -- we had witnesses, too, right,
8  Mr. Klayman?
9    Q.  There's no question.
10    A.  I'm sorry.
11    Q.  I'm not under oath.
12    A.  Ok, I'm sorry.  I can't ask -- I'm
13  sorry.
14    Q.  You can give them to Mr. Smith.  He can
15  ask me when I'm on the stand.
16    A.  Ok, I apologize.
17    Q.  I'm sure you will.
18    A.  I apologize.
19    Q.  The witnesses that you had me go to to
20  try to prove your case, they were discussed in
21  that Office of Civil Rights' final determination,
22  correct, which you remember?

17 (Pages 676 to 679)

In Re: Larry E. Klayman
June 1, 2018

## Page 680

1  Assuming that you ever read it, are you
2 aware that the Office of Civil Rights ever talked
3 to those witnesses and discredited their
4 testimony?
5  MR. SMITH: I'm just going to again
6 object to the form of the question. There were a
7 couple of questions in there, so if we could --
8  MR. KLAYMAN: This is the last
9 question.
10  CHAIRMAN FITCH: Well, I think we're on
11 the last question.
12  THE WITNESS: Please repeat your
13 question.
14 BY MR. KLAYMAN:
15  Q. You're aware that the Office of Civil
16 Rights, in making a final determination rejecting
17 your discrimination and work place retaliation
18 claims, interviewed the witnesses whose names you
19 gave to me and that the Office of Civil Rights
20 found those witnesses not to be credible?
21  MR. SMITH: Objection.
22  CHAIRMAN FITCH: Sustained.

## Page 681

1  THE WITNESS: Do I answer it?
2  CHAIRMAN FITCH: When he objects and I
3 say "sustained" -- he's objecting to a question.
4 When I say "sustained," it means that you don't
5 need to answer the question.
6  MR. KLAYMAN: I'm not going to belabor
7 this, your Honor, because you have the decision
8 and you all can read it. Ok.
9 BY MR. KLAYMAN:
10  Q. Turn to Bar Counsel's Exhibit 20.
11  MR. SMITH: Supplemental Exhibit 20,
12 for the record.
13  CHAIRMAN FITCH: I'm sorry?
14  MR. SMITH: Supplemental Exhibit 20,
15 for the record.
16  CHAIRMAN FITCH: Thank you.
17 BY MR. KLAYMAN:
18  Q. Now, this is an email which I sent to
19 you on July 26, 2010, correct?
20  A. Correct.
21  Q. I'm just talking about the first one.
22 Do you remember receiving it in and around that

## Page 682

1 time?
2  A. No.
3  Q. What was your response?
4  A. No.
5  Q. Take an opportunity to look at it now,
6 assuming you're correct that you didn't read it or
7 see it before.
8  (Witness reads document.)
9  Q. And then I will also ask you about the
10 email at the bottom, which is on July 26, 2010,
11 which was also sent to you, where it says "Talked
12 with Kathleen of Congressman Rohrbacher's office."
13 You see that?
14  A. Yes.
15  MR. KLAYMAN: Your Honor, may I read
16 this? It's short.
17  CHAIRMAN FITCH: Go ahead.
18  MR. KLAYMAN: May I do that?
19  CHAIRMAN FITCH: I said go ahead.
20  MR. KLAYMAN: Oh, thank you.
21 BY MR. KLAYMAN:
22  Q. "Talked with Kathleen of Congressman

## Page 683

1 Rohrbacher's office and she told me that you told
2 her that 'You never wanted to do anything in
3 court' and implied that you did not want to be in
4 LA and that it was all my idea.
5  "Saying anything stuff like that
6 not other shows further how you view me but hurts
7 your case. If you undercut your lawyer, it speaks
8 poorly of you. Indeed I sense that Kathleen and
9 the congressman are now backing off and have less
10 enthusiasm to help you.
11  "I suggest you let me deal with the
12 congressman from this point forward. Larry."
13  Do you remember getting that email?
14  A. Again, I got a lot of emails during
15 that time and I didn't open all of them.
16  So, I did get it at that time, but I
17 know about this email, yes.
18  Q. Turn to Bar Counsel's Supplemental
19 Exhibit 21. These are emails dated July 30th,
20 2010.
21  Look at the one at the bottom that I
22 sent to you.

18 (Pages 680 to 683)

In Re:  Larry E. Klayman
June 1, 2018

| Page 684 | Page 686 |
|---|---|

**Page 684**

1    MR. KLAYMAN:  If I may read this.  It's
2  short, your Honor.  We're moving along pretty well
3  here.
4    CHAIRMAN FITCH:  Go ahead.
5  BY MR. KLAYMAN:
6    Q.  "This email contains many false
7  statements and is dishonest.  I am in Phoenix and
8  will respond in greater detail later.
9    "In the meantime, please refrain from
10 more dishonest emails written by your friend.  It
11 does not serve anyone's interest, including yours.
12    "At a minimum I would have expected
13 honesty from you.  The way you deal with me and
14 the lack of respect is very disappointing, to say
15 the least.  It's a question of not just honesty,
16 but no class.  Larry."
17    Do you see that?
18    A.  Yes.
19    Q.  Now, what we don't have here in this
20 package is the email that was sent to me by your
21 friend.
22    A.  You do.  It's right under.  If you

**Page 685**

1  continue, please.
2    And it was -- I didn't say it was sent
3  by my friend.  I said that -- but you continue.
4  That's my email.  You responded -- you see, it
5  says "Dear, Larry"?
6    You responded to that.
7    Q.  You're right, I'm sorry.
8    A.  You have the email.
9    Q.  Now you testified previously that
10 Kathleen helped you with that, right?
11    A.  Yes.
12    Q.  And that you told her what to write?
13    A.  Yes.
14    Q.  But you never told me that Kathleen was
15 helping you write emails to me, did you?
16    A.  No.
17    Q.  You are aware that Kathleen was not a
18 lawyer and is not a lawyer?
19    A.  Yes.
20    Q.  I turn your attention to --
21    CHAIRMAN FITCH:  Give me a second to
22 catch up on something that I'm doing here.

**Page 686**

1    MR. KLAYMAN:  Sure.
2    (Brief pause.)
3    CHAIRMAN FITCH:  Go ahead, Mr. Klayman.
4  Thank you.
5  BY MR. KLAYMAN:
6    Q.  I turn your attention to Respondent's
7  Exhibit 23.
8    MR. SMITH:  Respondent's Exhibit 23?
9    MR. KLAYMAN:  I'm sorry, Bar Counsel's
10 Supplemental Exhibit 23.
11 BY MR. KLAYMAN:
12    Q.  This is an email that I sent to you on
13 July 31st, 2010, correct?
14    A.  Correct.
15    Q.  You remember receiving it around that
16 time?
17    A.  Again, yes, around that time.  Yes.
18    Q.  And I write at the top, "Whoever wrote
19 in email either intentionally falsified the facts
20 or was ill informed by you.
21    "In any event, you did not write this,
22 because it is not in your English syntax,"

**Page 687**

1  s-y-n-t-a-x.
2    You see that?
3    A.  Yes.
4    Q.  And what I'm referring to is the letter
5  that Kathleen wrote for you that was sent to me
6  that you just testified to, correct?
7    A.  Yes.
8    Again, my words.  She helped me with
9  the English.
10    Q.  I'm going to turn to the fifth
11 paragraph where in I wrote --
12    MR. KLAYMAN:  I'm not going to read the
13 whole thing, your Honor, the whole letter.
14 BY MR. KLAYMAN:
15    Q.  "During periods that you were lucid,
16 you would tell me how you hated VOA and its
17 management, how they hated you because they see
18 you as a monarchist, and PNN, the Persian branch
19 of VOA, as being run by communists loyal to
20 Tehran.
21    "You asked me to take legal action, and
22 I knew, because I knew that had early feelings for

19 (Pages 684 to 687)

In Re:  Larry E. Klayman
June 1, 2018

## Page 688

1  you, I referred you to Gloria Allred.  However,
2  Gloria, a friend of mine, and you did not seem to
3  relate well and you said you felt more comfortable
4  if I would help you.  I agreed."
5       You remember my writing that to you,
6  correct?
7       A.   These are your words.
8       Q.   You remember my writing that to you,
9  correct?
10      A.   Yes.
11      Q.   And you never responded to refute what
12  wrote, did you?
13      A.   I asked -- I even called Gloria myself.
14  She said she won't represent me since you
15  represented me.  I even got an email from her.
16      Q.   Why don't we have that email?  Have you
17  been withholding that from Mr. Smith and everybody
18  else?
19      A.   I'm sorry, I forgot it.
20      Q.   Ok, now you forgot it.
21           You're under oath, Ms. Sataki.  You're
22  obligated to tell the truth.  You did not --

## Page 689

1       MR. SMITH:  Objection.  He does not
2  need to be admonishing the witness about her role
3  or anything else.
4       THE WITNESS:  I did not email Gloria at
5  this time.  It was about two years ago when I was
6  watching her on TV with her daughter, and I just
7  sent letter an email regarding this whole thing,
8  and she said she doesn't want to have anything to
9  do with this, and she said it before, too.  She
10  emailed me back.
11      I completely -- I didn't think that
12  email would be relevant here now.  So...
13      MR. KLAYMAN:  Your Honor, because --
14      THE WITNESS:  Because it was years
15  after this.
16      But there is emails here, Mr. Klayman,
17  that you said Gloria Allred is not going to accept
18  me as a client and also that --
19      I don't know.  Can I continue?
20      MR. KLAYMAN:  Your Honor, this presents
21  a problem.  I would ask that before we reconvene
22  again -- I know we're going to discuss scheduling

## Page 690

1  and stuff -- that we get all the documents.
2       There is a rule of completeness.  She
3  can't just submit what she wants.  I'm not saying
4  that Mr. Smith did anything wrong here, but
5  there's an obligation to do some kind of due
6  diligence to find out if all the documents have
7  been turned over, not just the stuff that Bar
8  Counsel and that Ms. Sataki thinks are helpful to
9  them.
10      This is a very important piece of
11  evidence that she just contradicted herself three
12  times on and came up with a new story, and it will
13  speak for itself.  It's on the record, about Ms.
14  Allred.  And Ms. Allred is going to be a witness
15  in this case.  So we need that email and we need
16  any other emails that she has that relate to this
17  case.
18      That's why I wanted to take discovery
19  early on, with a subpoena, because we need this
20  stuff.  I need that to be able to defend myself
21  here.  Due process, equal protection, the rest.
22      And, you know, you've not been dealt

## Page 691

1  with, the hearing committee, fairly either.  And
2  this is not -- this is not right, and we just went
3  through that letter earlier today where she said
4  that her career is ruined.  That's obviously not
5  the case.
6       So, you know, we both have issues here
7  with the way this matter has been handled.  I need
8  everything that she's got to defend myself, and
9  this is a material piece of evidence.
10      CHAIRMAN FITCH:  Mr. Klayman has
11  suggested that we will deal with this issue at
12  some later point in time.  He has preserved it.
13  We'll get there.
14      MR. KLAYMAN:  What I'm going to ask
15  for, and I don't argue it now, is to get a service
16  to come in to be appointed to -- as is accepted
17  and in a way that preserves everybody's privacy,
18  go through the computer and determine what needs
19  to be produced here.
20      This happens frequently in litigation.
21  I'm sure that you and Mr. Tigar, you know, have
22  gone through that yourself in various cases.

In Re:  Larry E. Klayman
June 1, 2018

1    So that's what we're going to need to
2  do.
3    MR. SMITH:  I'm going to have to
4  respond to all of this right now, if you don't
5  mind, just very briefly.
6    This is not a civil proceeding.  This
7  is not a formal proceeding.  This is a
8  disciplinary proceeding.
9    A pleading got filed earlier.  I cited
10  to a case where the court had just kind of
11  informed that these proceedings should not be
12  raised to the elevation of a civil or a criminal
13  proceeding, with all of the rules and whatnot that
14  are attendant thereto.
15    We should not be entertaining --
16    CHAIRMAN FITCH:  Mr. Smith, I let you
17  get that sentence in because Mr. Klayman had done
18  a little preview of positions that might be taken
19  on the request that he says he's going to make.
20  But he hasn't made the request yet, and we can
21  just go to the next question here.
22

1  BY MR. KLAYMAN:
2    Q.  The second page of this letter again
3  discusses -- you say you received it, the
4  difficulties that we were facing with regard to
5  what Voice of America believed was your past with
6  regard to a number of different matters that I
7  don't need to get into now, correct?
8    A.  Correct.
9    CHAIRMAN FITCH:  We've done about an
10  hour and a half, Mr. Klayman.
11    MR. KLAYMAN:  We can take a break, your
12  Honor.
13    CHAIRMAN FITCH:  Whatever works for
14  you.
15    MR. KLAYMAN:  Yeah, that's good.  We're
16  making due process.
17    CHAIRMAN FITCH:  We'll make it a little
18  bit longer session, probably, after we come back
19  from the break.  But we'll break now.
20    MR. KLAYMAN:  Take a break?
21    CHAIRMAN FITCH:  Yeah.
22    MR. KLAYMAN:  Thank you.

1    CHAIRMAN FITCH:  The usual, 10, 12
2  minutes.  Whatever works best for people.  We
3  stand in recess here at 10:55.
4    And the witness will remember not to
5  speak with anyone about her testimony.
6    THE WITNESS:  Yes, sir.
7    (Recess taken.)
8    CHAIRMAN FITCH:  We are back on the
9  record at 11:10, and the witness is present and I
10  think that Mr. Klayman wants to continue his
11  cross-examination.
12    MR. KLAYMAN:  Yes, thank you.
13  BY MR. KLAYMAN:
14    Q.  Turn your attention, Ms. Sataki, to Bar
15  Counsel's Exhibit 25, Supplemental Exhibit 25.
16  This is an email that I sent you on August 2nd,
17  2010.
18    You remember receiving it around that
19  time, correct?
20    A.  I don't remember.  Not around that
21  time.
22    Q.  It says, "I have followed your

1  instructions and dismissed all of the cases
2  against VOA, except the part about having you work
3  in LA.
4    "This aspect of the case is not against
5  anyone personally and I intend to appeal the
6  judge's decision to a higher court."
7    You see that?
8    A.  Yes.
9    Q.  So you were aware that I followed your
10  instructions, correct?
11    MR. SMITH:  Objection.  She said she
12  didn't recall.
13    CHAIRMAN FITCH:  No, overruled.
14    MR. SMITH:  It's asking for past
15  recollection.
16    MR. KLAYMAN:  That's inserting
17  testimony to the witness.  That's totally
18  inappropriate.
19    CHAIRMAN FITCH:  Overruled.
20    His question is -- you want to ask it
21  again or you want me to?  Do you prefer to do it?
22

In Re:  Larry E. Klayman
June 1, 2018

| Page 696 | Page 698 |
|---|---|

**Page 696**

BY MR. KLAYMAN:

Q.   Yeah, are you aware that I followed your directions and dismissed the cases you asked me to dismiss?

A.   No, I was not aware because I didn't open your emails any more at that time.

Q.   You didn't bother calling anyone else, such as Mr. Shamble, to find out whether the cases had been dismissed either, did you?

A.   I had a couple of conversations with Mr. Shamble during that time, phone conversations.

Q.   Did you ask him whether your cases had been dismissed?

A.   I don't remember if I have conversation.  It was long time ago.

Q.   So basically, Ms. Sataki, in all due respect, you remember what you want to remember and forget what you want to forget.

A.   No, sir.  I said that I don't remember much from eight years ago.

Q.   Only when it's something that's negative towards me do you remember it.

**Page 697**

A.   Sir, the emails here that I had to review last week made that I remembered a lot of stuff from that time now.

Q.   Turn your attention to Office of Bar Counsel's Exhibit 26.

MR. SMITH:  Supplemental Exhibit 26?

MR. KLAYMAN:  Supplemental Exhibit 26.

BY MR. KLAYMAN:

Q.   This is an email that I sent to you on or about August 5th, 2010.

You remember receiving it, do you not?

A.   I don't remember I received it at that time.

Q.   This letter refers to the letter which was sent to Dan Austin, which I believe Kathleen Stanton wrote for you, in the first sentence?

A.   What's your question?  I'm sorry.

Q.   The first sentence, "This letter that you sent to Dan Austin and Tim Shamble but not me makes no sense and is counterproductive for the following reasons."

You see that?

**Page 698**

A.   Yes.

Q.   You're referring to the letter that Kathleen Stanton had written for you to Dan Austin of Voice of America, correct?

CHAIRMAN FITCH:  No, she didn't.  This is your letter, but your question was --

MR. KLAYMAN:  Yeah.  The reference is to that.

CHAIRMAN FITCH:  I thought your question started to her, you were referring to --

MR. KLAYMAN:  I can rephrase it.

CHAIRMAN FITCH:  Ok.

BY MR. KLAYMAN:

Q.   The reference that I make there with regard to the letter to Dan Austin, that's the one that was prepared by Kathleen Stanton for you?

A.   That particular letter, I don't remember who helped me with that letter, but someone did help me with that letter, and we sent it then -- I sent it to Dan Austin, yes.

Q.   Whoever that person was, that person wasn't a lawyer, correct?

**Page 699**

A.   Correct.

At that time I didn't have a lawyer any more.

Q.   I didn't ask you a question.

MR. KLAYMAN:  I move to strike.

CHAIRMAN FITCH:  It is struck.

BY MR. KLAYMAN:

Q.   I turn your attention to Bar Counsel's Supplemental Exhibit 27.  It's an email of August 19th, 2010 sent by me to you.  I'm looking at the one on the bottom, initially at 12:46 p.m.

Do you see that?

A.   Yes.

Q.   You remember receiving this email on or about August 19th, 2010, correct?

A.   I don't remember receiving that on that date.

Q.   Around that time?

A.   Again, I opened a lot of emails and I revisited that time last week.

Q.   Ms. Sataki, when it suits you, you like to play the victim, correct?

22 (Pages 696 to 699)

In Re: Larry E. Klayman
June 1, 2018

## Page 700

1    A.  I'm sorry, what?
2    Q.  When it suits you, you play the victim.
3        MR. SMITH:  Objection.
4        CHAIRMAN FITCH:  Sustained.
5    BY MR. KLAYMAN:
6    Q.  Nobody prevented you from opening
7    emails at that point in time in August 19th, 2010,
8    correct?
9    A.  Correct.
10   Q.  I'm just going to read the first
11   sentence...
12       " Your actions and failure to
13   communicate have harmed not only your interest and
14   mine, but also Tim Shamble's and the union.  Tim
15   really went all out for you and does not deserve
16   this."
17       In fact, Mr. Shamble did go all out for
18   you, didn't he?
19       MR. SMITH:  Objection.  I don't really
20   know what that means, "going all out".
21       MR. KLAYMAN:  I think it's common --
22       CHAIRMAN FITCH:  Overruled.

## Page 701

1        THE WITNESS:  He did help me with some
2    stuff, yes.  But I don't know what "all out," what
3    you mean, but he helped me, yes.
4    BY MR. KLAYMAN:
5    Q.  He did a lot of things for you to try
6    to resolve your situation, correct?
7    A.  Yes.  He was the chief of the union.  I
8    mean, that was -- I went to him first.  He --
9    Q.  And he worked closely with me, correct?
10   A.  He worked closely with you, yes.  I
11   introduced you to him.
12   Q.  And based on your experience in dealing
13   with Mr. Shamble, he's a very good person?
14   A.  Yes, he is.
15   Q.  Isn't that true?  Very sincere?
16   A.  I don't --
17   Q.  He's honest, isn't he?  You found him
18   to be honest?
19   A.  Yes.
20   Q.  I turn your attention to Office of Bar
21   Counsel's Supplemental Exhibit 28.  I turn your
22   attention to the third paragraph.

## Page 702

1        The first question is: You do remember
2    receiving this email from me on or about August
3    22nd, 2010, "Subject: Legal Matters and Meeting.
4    Urgent."
5    A.  I don't remember receiving it at that
6    time.
7    Q.  But you do remember receiving it in or
8    around that time, correct?
9    A.  No.
10   Q.  You do remember receiving it generally?
11   A.  In general?  Yes, I had it in my
12   emails.
13   Q.  So, the third paragraph, "It's not fair
14   that you blame me for not getting the results you
15   wanted sooner.  In this regard I was reviewing the
16   report of the Office of Civil Rights the other day
17   and Joy Wagner, your supervisor, stated at Page 40
18   that the first time that you went to Los Angeles
19   in 2010, when you broke down and I found Dr.
20   Arlene Aviera for you, you had told Joy Wagner
21   before you left that 'you,' had a romantic
22   interest in Los Angeles, because (you) left in

## Page 703

1    February, 2010 to see there gentlemen on
2    Valentine's Day."
3        That's an accurate statement, isn't it?
4    A.  It's what?
5    Q.  That's an accurate statement, is it
6    not?
7    A.  No, it's not.
8    Q.  That's what you told Joy Wagner,
9    correct?
10   A.  No, I didn't.
11   Q.  You told Joy Wagner that so you could
12   get leave, correct?
13   A.  I didn't tell her that I have a
14   romantic -- I didn't say that.
15   Q.  I'm referring to Page 40 of the final
16   decision of the Office of Civil Rights.
17       I take it that you went to Page 40 to
18   see what I was saying here?
19   A.  What is question -- what's the
20   question?  What I told Joy Wagner or what Joy
21   Wagner told the committee?
22       Which one is the question?

23 (Pages 700 to 703)

In Re:  Larry E. Klayman
June 1, 2018

| Page 704 | Page 706 |
|---|---|

**Page 704**

1   Q.  Well, when you talked to Joy Wagner,
2  you weren't telling her the truth, were you?
3       You told her something that was false,
4  that you were going for another reason other than
5  what you told me.
6       MR. SMITH:  Objection.  I really
7  don't --
8       THE WITNESS:  I'm confused, I'm sorry.
9       MR. SMITH:  There's a lot there.
10       MR. KLAYMAN:  Ok, let me break it town.
11  BY MR. KLAYMAN:
12   Q.  You didn't tell me that you were going
13  to LA to pursue a romantic relationship with
14  someone on Valentine's Day, correct?
15   A.  I didn't do that.  Because I didn't go
16  to LA to pursue a romantic relationship with
17  somebody.  I didn't.  Why should I say that?
18   Q.  Or quote, "You had a romantic interest
19  in Los Angeles because you left in February, 2010
20  to see this gentleman on Valentine's Day."
21       You told that to Joy Wagner, didn't
22  you?

**Page 705**

1   A.  I did not tell that to Joy Wagner.
2   Q.  Turn to the second page and the
3  paragraph at the top where it says -- I'm reading
4  the sentence, "Therefore I look forward to meeting
5  to hash out the issues and you can invite Nella,
6  Abdy and/or Janet, if you so desire."
7       Those are your friends, correct?
8   A.  Correct.
9   Q.  You introduced me to your friends, did
10  you not?
11   A.  You picked me up at their house to take
12  me to the doctor when I was staying -- in the
13  beginning when I was staying at their place.
14   Q.  In fact, we all had dinner at Nella's
15  and Abdy's house in Calabasas, correct?
16   A.  Yes, in the beginning.
17   Q.  Yes, ok.  And in fact we saw Nella
18  later at her work place.  We went to visit her, on
19  Ventura Boulevard.
20   A.  I don't remember that, but, we probably
21  did.  You say that, we probably did it.
22   Q.  "When I had previously referred to the

**Page 706**

1  low-class sleazy people you hang around, I was not
2  referring to them.  I was referring to people like
3  the person who stole your diamond ring and the
4  long list of other sleazy people, including
5  persons with no legal identity in this country,
6  who have abused you in the past and perhaps
7  currently.
8       "I was recently contacted in this
9  regard by an investigator who found our legal
10  relationship on the internet and I gave her your
11  telephone number since I was concerned that you
12  could be in some other danger or other peril.  I
13  pray that this is not the case."
14       You see that?
15   A.  Yes.
16   Q.  So you remember my saying these things
17  to you, that I was contacted by an investigator
18  and I was concerned about it was all about
19  considering the kinds of people you hung around
20  with in the past?
21   A.  Not from that time.  Again, I didn't
22  open your emails at this time any more.

**Page 707**

1   Q.  Turn to the next page.
2       MR. SMITH:  Which page?
3       MR. KLAYMAN:  Bar Counsel's
4  Supplemental Exhibit 29.
5  BY MR. KLAYMAN:
6   Q.  This is an email that I sent to you on
7  or about September 10th, 2010, and you remember
8  receiving it on or about that day, correct?
9   A.  Not on that day.  I don't remember on
10  that day.
11   Q.  You received it another day.  You read
12  it on another day, I should say.
13   A.  Read it last week, yes.
14   Q.  Turn your attention to Bar Counsel's
15  Supplemental Exhibit 30.  This is an email that I
16  sent to you on September 10th, 2010.
17       Do you see that?
18   A.  Yes.
19   Q.  You received it on or about that date,
20  correct?
21   A.  You sent it that date, correct.
22   Q.  And you read it on or about that date,

In Re: Larry E. Klayman
June 1, 2018

## Page 708

1  correct?
2      A.  Again, I wouldn't open your emails
3  around that time any more.
4      Q.  I'm going to read this.  It's very
5  short: "Ellie, the cost expended on your behalf
6  for legal and related matters, including advanced
7  living expenses, rent, movers for transporting
8  your car, travel expenses, plane tickets, et
9  cetera, to and from LAX, court filing fees,
10  polygraph examination costs, process servers, and
11  other independent legal contractors, excluding of
12  my time and working on the cases and settlement
13  negotiations, comes to in excess of $30,000."
14      You see that?
15      A.  Yes.
16      Q.  And then I wrote, "These monies I had
17  hoped and still hope to collect from litigation
18  concerning VOA and its managers."
19      You see that?
20      A.  Yes.
21      Q.  And then I wrote, "Interference by
22  third parties in my ability to collect these

## Page 709

1  amounts, and in addition to that legal fees, will
2  result in legal action against these third
3  parties."
4      You see that?
5      A.  Yes.
6      Q.  So I was saying, if they're interfering
7  in the case and messing the cases up, such that I
8  can't even perhaps even recoup the expenses, and I
9  never -- that's what I'm saying, is it not?
10      MR. SMITH:  Objection.  That's what
11  he's saying now.
12      MR. KLAYMAN:  Alright, let me break it
13  down.
14      And I ask Mr. Smith not to make
15  speaking objections, because he's done that a
16  couple of times.
17      CHAIRMAN FITCH:  He has a right to
18  explain his objection.
19      MR. KLAYMAN:  I agree, but it's in a
20  way that's permitted under the Federal Rules of
21  Civil Procedure.
22      CHAIRMAN FITCH:  Which I think that

## Page 710

1  was.
2      MR. KLAYMAN:  Yeah, I agree.
3      But I want to ask this question, and
4  I'll rephrase it because it was too long anyway.
5  BY MR. KLAYMAN:
6      Q.  What I'm saying is, I'm not going to
7  ever ask you to pay me anything, whether it's
8  legal fees or costs, but if something comes back
9  ultimately, if we ever pursue the damage claims,
10  then I should be reimbursed.
11      MR. SMITH:  Objection.  The document
12  speaks for itself.  The witness need not
13  testify --
14      CHAIRMAN FITCH:  I think he can elicit
15  general questions about her understanding in that
16  regard.  That's the general understanding as to
17  the accuracy or not of what he is asserting here.
18      It's a fair examination.
19      MR. KLAYMAN:  Can we read that back,
20  Madame Court Reporter.
21      THE COURT REPORTER:  "What I'm saying
22  is, I'm not going to ever ask you to pay me

## Page 711

1  anything, whether it's legal fees or costs, but if
2  something comes back ultimately, if we ever pursue
3  the damage claims, then I should be reimbursed."
4  BY MR. KLAYMAN:
5      Q.  That's what I was saying to you,
6  correct?
7      A.  Correct.
8      Q.  And what I was also saying was, if
9  someone else interferes improperly and prevents
10  these cases from going forward in some improper
11  way, then I'll hold them legally accountable.  Not
12  you.
13      A.  But nobody interfered.  There was --
14      Q.  You did testify several times that two
15  non-lawyers were writing letters for you which
16  contained legal advice, including legal citations.
17      A.  No, I didn't say legal advice, sir.  I
18  just said they helped me with English.  That's it.
19      It's all my words.
20      Q.  But these people weren't lawyers,
21  correct?
22      CHAIRMAN FITCH:  Asked and answered.

App.0355

In Re: Larry E. Klayman
June 1, 2018

Page 712

1    MR. KLAYMAN:  Alright, we've gone
2  through that.
3  BY MR. KLAYMAN:
4    Q.  I turn your attention to Bar Counsel's
5  Supplemental Exhibit 31.  The top of the page is
6  an email that I sent to your brother, Kevin
7  Sataki@Hotmail.com.  Correct?
8    A.  Correct.
9    Q.  Dated October 19th, 2010, correct?
10    A.  Correct.
11    Q.  And your brother, Kevin, forwarded that
12  to you in and around that time, correct?
13    A.  He forwarded that to me, yes.
14    Q.  And you did read it in and around that
15  time?
16    A.  I read it last week.
17    Q.  So you wouldn't even read an email
18  that's coming from your brother?
19    A.  I know it's forwarded from you -- it
20  was from you to him, and that's why.  So I didn't
21  open it.
22    Q.  If your brother was sending it to you,

Page 713

1  would you not think that it was important for you
2  to read it?
3    CHAIRMAN FITCH:  Sustained.
4    MR. KLAYMAN:  Ok.  It calls for
5  speculation.
6  BY MR. KLAYMAN:
7    Q.  Given that it came from your brother,
8  in your own mind at that time, wouldn't it take on
9  greater significance to read the email?
10    A.  My brother explained to me that Mr.
11  Klayman sent me an email.  "I forwarded it to you,
12  but if it bothers you, don't read it."
13    Q.  Well, you don't know whether it bothers
14  you until you read it?
15    A.  I knew it was going to bother me.  My
16  brother explained that to me.
17    Q.  Well, let's go through it.
18    Take a look at it.  You've seen it
19  since?
20    A.  I read it last week.  Yes, sir.
21    Q.  Now what I'm saying in this email is
22  that you had a chance to get a job with CBN,

Page 714

1  Christian Broadcasting Network, correct?
2    A.  Correct.
3    Q.  And an individual by the name of Ted
4  Baehr, B-a-e-h-r -- you've met Ted Baehr, did you
5  not?  I introduced you to him.
6    A.  Yes.
7    Q.  And Mr. Bear is the head of a group,
8  public interest group, called Movieguide, correct?
9    A.  Correct.
10    Q.  And he puts on a miniature Academy
11  Awards each year promoting family films, correct?
12    A.  Yes, that's what you told me.
13    Q.  Good, wholesome films for families.
14    And he also runs a group called the
15  Christian Film and Television Commission.
16    You're aware of that?
17    A.  Again, these are things you told me.
18  Yes.
19    Q.  Now, is it not true that you said "I'd
20  like to meet Ted Baehr" --
21    A.  You said I'd like -- you wanted me to
22  meet him, yes.

Page 715

1    Q.  Well, it's true I told you who he was
2  and what he does.
3    A.  Yes, you told me about that.
4    Q.  And that you'd like to meet him because
5  you wanted to get some spirituality in your life?
6    A.  Your words.
7    Q.  So you didn't want spirituality?
8    CHAIRMAN FITCH:  Objection.
9    MR. SMITH:  Objection.
10    CHAIRMAN FITCH:  Objection sustained.
11  BY MR. KLAYMAN:
12    Q.  Did you want to pursue a more spiritual
13  life at that time?
14    CHAIRMAN FITCH:  You don't have to
15  answer that.
16    MR. KLAYMAN:  Ok.
17    CHAIRMAN FITCH:  Relevance.
18  BY MR. KLAYMAN:
19    Q.  Dr. Beahr, he's actually a doctor --
20    CHAIRMAN FITCH: Struck.
21  BY MR. KLAYMAN:
22    Q.  You're aware that he is a doctor --

26 (Pages 712 to 715)

App.0356

In Re: Larry E. Klayman
June 1, 2018

1  MR. KLAYMAN: I agree, your Honor.
2  BY MR. KLAYMAN:
3  Q. You're aware that he had a doctorate,
4  Dr. Beahr?
5  A. I don't know.
6  Q. And you were aware at the time that he
7  was very prominent in Hollywood?
8  A. Your words. That's what you told me.
9  Q. You met with Dr. Beahr on several
10  occasions, did you not?
11  A. I believe one time. I don't -- I
12  think -- was that the person we went to their
13  house?
14  Q. You went to his house, right?
15  A. Yes.
16  Q. And he was there and he tried to help
17  you with your psychological issues and other
18  issues, right, to mentor you?
19  MR. SMITH: Objection. This is a
20  compound question at this point.
21  MR. KLAYMAN: It's leading.
22

1  BY MR. KLAYMAN:
2  Q. He tried to help you?
3  CHAIRMAN FITCH: That's alright. It's
4  overruled.
5  BY MR. KLAYMAN:
6  Q. He tried to help you, correct?
7  MR. SMITH: Objection. Because there
8  were two different things that he asked about what
9  he was helping her with. It's a yes or no
10  question.
11  CHAIRMAN FITCH: No, but now he's asked
12  a general question and she can handle it one way
13  or the other.
14  THE WITNESS: Yes, he was praying for
15  me.
16  BY MR. KLAYMAN:
17  Q. Yes, and you prayed with him?
18  A. Yes, he told -- he told me, "Let's do
19  it this way." And I was standing there, and he
20  was praying and I was listening.
21  Q. He didn't force to you pray with him,
22  did he?

1  A. Well, no --
2  CHAIRMAN FITCH: I think we've gone far
3  enough. We know what the alleged help allegedly
4  was.
5  BY MR. KLAYMAN:
6  Q. Ted Baehr said that he would try to
7  help you find a good job, correct, in Hollywood?
8  A. Correct.
9  Q. And in fact he made an effort along
10  with me to try to get you a job at CBN, correct?
11  A. Correct.
12  Q. And you were aware at the time that CBN
13  had a bureau in the valley, in Los Angeles,
14  correct?
15  A. Yes.
16  Q. And that CBN broadcasted into Iran,
17  correct?
18  A. I'm not that familiar with this. So,
19  dash.
20  CHAIRMAN FITCH: That's fine. You
21  don't know. Next question.
22

1  BY MR. KLAYMAN:
2  Q. You were aware generally that CBN would
3  broadcast into Iran, just like Voice of America?
4  CHAIRMAN FITCH: She said yes on that
5  part.
6  MR. KLAYMAN: Alright.
7  BY MR. KLAYMAN:
8  Q. So this was a really good
9  opportunity -- you viewed this as a good
10  opportunity for you because you could do what you
11  wanted to do at VOA through CBN, broadcast into
12  Iran and give freedom messages.
13  THE WITNESS: Is it a yes or no
14  question, or I can --
15  BY MR. KLAYMAN:
16  Q. Yes or no?
17  A. Not necessarily, no.
18  CHAIRMAN FITCH: Ok.
19  BY MR. KLAYMAN:
20  Q. But you never actually had a chance to
21  interview with CBN, did you?
22  A. No.

27 (Pages 716 to 719)

In Re: Larry E. Klayman
June 1, 2018

---

Page 720

1  Q. Because, and I'm going to read it,
2  second paragraph, "The last time that Ellie was to
3  be interviewed, then by CBN" -- I'm writing to
4  your brother -- "which I had arranged for her with
5  a friend who runs Movieguide, a prestigious
6  broadcasting company with the bureau in LA" -- I'm
7  talking about CBN, "and which televises into Iran
8  in the Middle East, someone who identified herself
9  as her manager intervened and scared CBN away from
10  interviewing her."
11        You are aware that CBN was called by
12  someone who purported to be your manager?
13        You asked somebody to call --
14        CHAIRMAN FITCH: Your question is
15  whether she was aware of what is --
16        MR. KLAYMAN: No, let me withdraw it.
17  BY MR. KLAYMAN:
18        Q. You asked someone to call CBN on your
19  behalf, correct?
20        A. Honestly, I don't remember. Honestly.
21        CHAIRMAN FITCH: Ok.
22        THE WITNESS: I mean, I can't say yes,

---

Page 721

1  but I don't remember.
2        CHAIRMAN FITCH: That's fine.
3        He has a right to ask and you have a
4  right to tell us truthfully what you do or don't
5  remember. That's fine.
6  BY MR. KLAYMAN:
7        Q. This refreshes your recollection, does
8  it not, that you asked someone to call CBN about
9  this possible job?
10        A. I remember Mr. Ted, I remember that
11  whole big picture, but I don't remember the
12  details.
13        I'm sorry. I don't remember the
14  details.
15        Q. Then I write to your brother, "The CBN
16  job would have provided much more income and been
17  a great position that would have allowed Ellie to
18  realize her potential. CBN broadcasts in both
19  Farsi and English and has a wide, global reach.
20        "The so-called manager told CBN's
21  executive, Mark Woodland," W-o-o-d-l-a-n-d, "who
22  had traveled to LA to meet with Ellie, that, while

---

Page 722

1  'he is a Muslim,' he did not mind her working for
2  a Christian-owned company, (this should have never
3  been said. It was unnecessary), then imposed
4  conditions on her employment before Ellie was ever
5  interviewed, (that she wanted much more), and that
6  I was not to be present at the meeting since Ellie
7  was going to sue me."
8        You see that?
9        A. Yes.
10        Q. That person who called CBN, that was
11  Sam Razzazi, wasn't it, your cousin?
12        A. I don't know. I don't remember.
13        Q. You asked him to call them.
14        A. I don't remember.
15        Q. Continuing, "anyway, this scared the
16  CBN executive Mark Woodland away since he could
17  not figure out what was going on and why Ellie did
18  not talk to him herself (She never called him back
19  despite several calls to her) and why Ellie's
20  so-called manager was threatening me, as I am
21  close with CBN.
22        "All of this had nothing to do with

---

Page 723

1  Ellie interviewing at CBN, and in fact I told
2  Ellie in emails, before the so-called manager
3  intervened (He obviously is not a manager since an
4  entertainment manager would never have said these
5  things), that I would not be present at the
6  interview."
7        You see that?
8        Does that refresh your recollection as
9  to what you instructed Sam Razzazi or someone else
10  to do?
11        A. No.
12        These are all your words. I don't --
13  it doesn't refresh anything for me.
14        Q. You wanted a job at that time. You
15  wanted a job, a good paying job, correct?
16        A. Correct.
17        Q. So --
18        A. You explained to me that as a Muslim
19  girl -- and these are in the emails, too -- that
20  you explained to them that I turned to Christ and
21  it's going be to programs that I'm going to say
22  that I'm going Muslim now -- now I'm Christian and

---

28 (Pages 720 to 723)

In Re: Larry E. Klayman
June 1, 2018

| Page 724 | Page 726 |
|---|---|

**Page 724**

1 that's how I'm going to do the programs.
2     I didn't want to do that. I didn't
3 want to say that.
4     Q. In fact you told me that you wanted to
5 become a Christian, didn't you?
6     A. No.
7     Q. You told me that you didn't want to be
8 part of the Muslim faith any more.
9     A. The fact that I don't want to be a part
10 of the Muslim faith doesn't mean that I want to be
11 Christian. I believe in God and our religion.
12     Q. But you also said you wanted to hear
13 what Ted Baehr had to say and find out for
14 yourself?
15     A. You wanted me that. You wanted me
16 that, and I said ok.
17     Q. You're not prejudiced towards
18 Christian, are you?
19     A. Absolutely not.
20     MR. SMITH: Objection.
21     CHAIRMAN FITCH: Overruled. Overruled.
22 There is no basis in the record.

**Page 725**

1     MR. KLAYMAN: I'm just trying to show
2 that there was no --
3     CHAIRMAN FITCH: It's overruled.
4     MR. KLAYMAN: No lack of respect.
5     CHAIRMAN FITCH: It's overruled.
6     MR. KLAYMAN: Ok.
7     CHAIRMAN FITCH: The objection is not
8 overruled, but it's sustained.
9     MR. KLAYMAN: I was just trying to show
10 that there was no impediment for her to call.
11 That's all.
12     CHAIRMAN FITCH: You have adduced
13 substantial evidence through this document for
14 that. You made an effort.
15     MR. KLAYMAN: Ok.
16     CHAIRMAN FITCH: In that for one reason
17 or another the efforts may not have come to
18 fruition.
19     MR. KLAYMAN: I didn't want it taken in
20 a way that there is any criticism of any faith,
21 just whether she didn't have the hesitancy.
22 That's all.

**Page 726**

1 BY MR. KLAYMAN:
2     Q. Then I say at the end that we were also
3 talking about getting a book deal, right?
4     A. I read this email last week about the
5 book deal.
6     This is your word to my brother eight
7 years -- seven years ago.
8     Q. The book deal would be for you and not
9 for me, correct? Correct?
10     CHAIRMAN FITCH: Was it your
11 understanding that, in the book deal, theoretical
12 book deal, it would be a deal for you or a deal
13 for Mr. Klayman?
14     THE WITNESS: Well, in here it says
15 it's for me.
16     CHAIRMAN FITCH: And did you have any
17 other understanding?
18     THE WITNESS: I didn't --
19     CHAIRMAN FITCH: Additional
20 understanding?
21     THE WITNESS: I didn't have any
22 understanding at all during that time.

**Page 727**

1     CHAIRMAN FITCH: Ok.
2     Next question.
3 BY MR. KLAYMAN:
4     Q. And in fact, some of the columns that I
5 wrote for you, particularly the first one, you
6 know, I was really --
7     MR. SMITH: Objection. Let's identify
8 what columns we're talking about.
9     MR. KLAYMAN: We'll deal with that
10 later. I'll withdraw the question and we'll get
11 to those, ok?
12 BY MR. KLAYMAN:
13     Q. That whole issue of your getting a job
14 with CBN and a book, you never responded to this
15 email, so you never told me that you weren't
16 interested, correct?
17     A. Mr. Klayman, I was not responding to
18 you at this point at all.
19     Q. I take it you did respond to Kevin,
20 though, right, your brother? Correct?
21     A. I talked to my brother.
22     Q. You emailed him back, didn't you?

29 (Pages 724 to 727)

In Re: Larry E. Klayman
June 1, 2018

1    A. I talked to him.
2    Q. That's one of the emails that you
3  decided on your own weren't relevant to give to
4  Bar Counsel or to me --
5    MR. SMITH: Objection.
6  BY MR. KLAYMAN:
7    Q. -- or to me.
8    A. I talked to my brother. I didn't email
9  him back.
10    Q. So what did you talk to him about this?
11    A. Family matters.
12    CHAIRMAN FITCH: Woah, woah. Objection
13  sustained.
14  BY MR. KLAYMAN:
15    Q. So you did talk to your brother
16  about --
17    CHAIRMAN FITCH: Objection sustained.
18    MR. KLAYMAN: Ok.
19  BY MR. KLAYMAN:
20    Q. Turn to Bar Disciplinary Counsel's
21  Exhibit 32. That's an email I sent on or about
22  November 25th, 2010: "Ellie, all the best wishes

1  me. I know you would not do this.
2    "Keep yourself well and believe, as
3  this is stronger than any psychologist. God bless
4  you and your family. Larry."
5    You remember receiving that in or
6  around that date?
7    A. I read this email last week.
8    Q. The person that called and threatened
9  me, that was your cousin, Sam Razzazi, wasn't it?
10    A. I'm not aware of anybody calling you
11  and threatening you.
12    Q. In fact, you are aware that Sam Razzazi
13  has a criminal record?
14    CHAIRMAN FITCH: Don't answer --
15    THE WITNESS: No, I'm not aware of
16  that.
17  BY MR. KLAYMAN:
18    Q. Turning your attention to Office of Bar
19  Counsel's Supplemental Exhibit 34, this is an
20  email that I sent to you on January 14th, 2011,
21  correct?
22    A. I opened this email last week.

1  to you, your mom, brother and the rest of your
2  family for Thanksgiving. I hope that you're well.
3  If you get a chance, it would be nice if you could
4  call Mahmonir and wish her a nice Thanksgiving. I
5  had a glass of wine with her the other evening. I
6  had been helping her and Jamshid, both of who were
7  also retaliated against. I'm sure both Mahmonir
8  and Jamshid would love to hear from you. Best
9  wishes. Larry."
10    Do you remember getting this email from
11  me in November, 2010?
12    A. I read this email last week when I
13  opened it.
14    Q. Turn your attention to Bar Disciplinary
15  Supplemental Exhibit 33. It's an email to you
16  dated December 25th, 2010, "Subject: "Good
17  morning," wherein I state very short, "This is my
18  Christmas message of you and my friends, Ellie. I
19  wish you the very best. So too does God. The
20  column (inaudible) daily explains how you are part
21  of the most profound experience in my life.
22    "Someone called me today and threatened

1    Q. Well, let's talk about it. If you
2  could take a look at it -- you read it last week?
3    A. Yes.
4    Q. So you know what's in it?
5    A. Yes.
6    Q. And in this email I'm talking about
7  someone who sent me something and somebody who
8  threatened me, correct?
9    A. You're talking about this, correct?
10    Q. Yes. And I'm sending this to you,
11  because I don't know who that is, correct?
12    A. Ok.
13    CHAIRMAN FITCH: Woah, woah, woah.
14    He sent it to you. Yes.
15    What was the next part of that?
16  BY MR. KLAYMAN:
17    Q. You understand, having read this, that
18  I sent it to you, because I don't know who to
19  respond to, what that person said to me and the
20  threats to me.
21    A. I don't understand it. What's the
22  reason that you sent it to me?

In Re:  Larry E. Klayman
June 1, 2018

---

Page 732

1  Q.  Because I didn't know who sent me a
2  communication that threatened me.
3  A.  So, whoever threatening you, you sent
4  me an email?
5  Q.  You are aware that, having read this,
6  that I say I was threatened during that period by
7  an anonymous person.
8  A.  Again --
9  CHAIRMAN FITCH:  No, you've already
10  said you weren't aware of any threats.
11  He's asking you now are you aware that
12  he says he was -- he says now that he was
13  threatened.
14  THE WITNESS:  I was not communicating
15  with him at that time.  So I wouldn't be aware of
16  it.
17  BY MR. KLAYMAN:
18  Q.  But you're aware now --
19  CHAIRMAN FITCH:  He's asking you
20  whether you understand now that he says now that
21  he was threatened.
22  THE WITNESS:  Now, yes, I do.

---

Page 733

1  CHAIRMAN FITCH:  Ok.
2  BY MR. KLAYMAN:
3  Q.  And I'm writing you, having read this,
4  you're understanding that I'm sending it to you so
5  you could send it to the person who threatened me,
6  correct?
7  CHAIRMAN FITCH:  Mr. Klayman, it speaks
8  for itself.  I don't see what her --
9  MR. KLAYMAN:  Alright, I'm going to
10  move on.  Let me move on.
11  BY MR. KLAYMAN:
12  Q.  The fourth paragraph, "However,
13  whatever your legal status, you must be in contact
14  directly with Ms. Sataki.  Please tell her to
15  contact me or the union president of the AFL-CIO,
16  Tim Shamble, to bring her up to date on the legal
17  matters.
18  "We cannot advise you as you are not
19  our client."
20  You see that?
21  A.  Where are we at now?  I'm sorry, I lost
22  it.

---

Page 734

1  Q.  The fourth paragraph in that email that
2  I sent you.
3  A.  Which --
4  Q.  Exhibit --
5  CHAIRMAN FITCH:  It's the one that
6  starts with the word "however".
7  THE WITNESS:  Ok, I saw it, I'm sorry.
8  Ok, so what's the question?
9  BY MR. KLAYMAN:
10  Q.  Yes, you're aware that what I'm saying
11  to this person, I'm asking you to forward it to
12  the person who threatened me, that we can't talk
13  to you about Ms. Sataki's legal matters, because
14  you're not Ms. Sataki, and please have her contact
15  either me or Tim Shamble so she could be brought
16  up to date on the status of her cases.
17  That's what I'm saying.  You understand
18  that, correct, in this letter?
19  A.  I understand that you wrote this in
20  this letter, yes.  I just read it and I understand
21  the sentence, yes.
22  Q.  And in and around this time period, you

---

Page 735

1  did not contact Mr. Shamble to learn of the status
2  of your legal matters, correct?
3  A.  I don't remember when I contacted Mr.
4  Shamble.  I don't remember the dates.
5  Q.  I turn your attention to Bar
6  Disciplinary Counsel Exhibit 35.  It's an email I
7  sent to you January 16th, 2011: "Communication
8  with Elham Sataki to protect her legal rights and
9  fully inform her of her obligations.  To, Mehran,
10  Razavi, alias Sam Razzazi, Sam Razz, et. al."
11  You received this email from me on or
12  about January 16, 2011, correct?
13  A.  I read this email last week.
14  Q.  Now, Mehran Razavi, that's your cousin
15  Sam, correct?
16  A.  Yes.
17  Q.  And he also goes by the name Sam
18  Razzazi, correct?
19  A.  No, Sam Razavi.  You misspelled it,
20  though.
21  Q.  Ok, so he's got two names there.  And
22  he's also got another name called Sam Razz,

---

In Re: Larry E. Klayman
June 1, 2018

| Page 736 | Page 738 |
|---|---|

**Page 736**

1  R-a-z-z, correct?
2  A. No. His American name is Sam. His
3  Persian name is Mehran. And the last name is the
4  same, Razavi.
5  Q. Now, having read this last week, you
6  were aware that, after I got this communication
7  from the anonymous person who threatened me, that
8  I had that person identified through a private
9  investigator, correct?
10  CHAIRMAN FITCH: Struck.
11  THE WITNESS: I don't know --
12  CHAIRMAN FITCH: It's struck. You
13  don't need to answer that question.
14  THE WITNESS: I'm sorry.
15  BY MR. KLAYMAN:
16  Q. You know generally that you can take a
17  telephone number and trace who it belongs to. A
18  private investigator can do that.
19  CHAIRMAN FITCH: Struck.
20  MR. KLAYMAN: Ok.
21
22  BY MR. KLAYMAN:

**Page 737**

1  Q. I turn your attention to Bar Counsel
2  Supplemental Exhibit 36. This is an email I sent
3  to you on January 26th, 2011, "Subject: Mehran
4  Razavi, Private Investigator's Initial Report."
5  I'm forwarding an email from Matt
6  Garrison, who is the private investigator who
7  worked with me: "Mr. Klayman, with regards to your
8  subject, Mehran Razavi, our investigation revealed
9  that he was arrested for, pled guilty to and was
10  convicted by the 2nd District Court of the State
11  of Nevada, Washoe County, for conspiracy to commit
12  fraudulent acts involving gaming.
13  "Our investigation also that subject
14  Razavi entered a plea of guilty on January 27,
15  2006 and that he was convicted and sentenced on
16  March 8th, 2006.
17  "The specific codes that apply may be
18  located at"... and the investigator gives that.
19  You know that to be the case, that your
20  cousin, Sam Razavi, whatever name he used, was in
21  fact convicted.
22  MR. SMITH: Objection.

**Page 738**

1  BY MR. KLAYMAN:
2  Q. You knew of that?
3  CHAIRMAN FITCH: That question, now
4  being in the record, is struck.
5  MR. KLAYMAN: I'm asking if she knew
6  that he has been convicted of a crime.
7  CHAIRMAN FITCH: It is struck.
8  BY MR. KLAYMAN:
9  Q. This is the person that you asked to
10  communicate with me and threatened me, correct?
11  CHAIRMAN FITCH: It is struck,
12  likewise.
13  BY MR. KLAYMAN:
14  Q. Turn to Office of Bar Counsel's
15  Supplemental Exhibit 37. This is an email that I
16  sent to you that was addressed to Mr. Razavi on or
17  about January 26, 2011, correct?
18  A. I saw this email last week.
19  Q. Yes.
20  A. I read this email last week.
21  Q. Have you discussed any of these emails
22  with regard to Sam Razavi with him since the time

**Page 739**

1  that you read it?
2  A. No.
3  Q. Have you discussed it with anybody?
4  A. I'm sorry, what?
5  Q. Have you discussed these emails that I
6  just went over, that deal with my being threatened
7  by Mr. Razavi, with anyone?
8  A. No. I just pulled them up -- I'm
9  sorry.
10  CHAIRMAN FITCH: That's fine.
11  BY MR. KLAYMAN:
12  Q. I turn your attention to an email which
13  I sent to you on September 15th, 2011.
14  CHAIRMAN FITCH: The one in SX38?
15  MR. KLAYMAN: Yes.
16  THE WITNESS: Where are we now?
17  CHAIRMAN FITCH: SX38.
18  THE WITNESS: Ok.
19  MR. SMITH: The last page of all that
20  package of documents.
21
22  BY MR. KLAYMAN:

In Re: Larry E. Klayman
June 1, 2018

## Page 740

1    Q.  "Subject: It is your fault that I lost
2  my case." And I'm referring to an email which you
3  sent to me, September 11th at 5:28 a.m.
4      Do you see that?
5      Do you see the email that you sent to
6  me on September 11th at 5:28 a.m.?
7    A.  I don't see the time. I'm sorry.
8    Q.  Alright, don't worry about the time.
9    A.  September 15th, 2011?
10    CHAIRMAN FITCH:  Let me explain to you.
11    Look about halfway down, and you see,
12  after the words "Larry Klayman," there's the words
13  that say on Sunday, September 11th, 2011 at
14  5:28 a.m. --
15    THE WITNESS:  Ok.
16    CHAIRMAN FITCH:  -- "Elham Sataki
17  wrote," and then there's some words --
18    THE WITNESS:  Yes.
19    CHAIRMAN FITCH:  -- that may be your
20  email. He's asking you about that.
21    THE WITNESS:  Thank you.
22    CHAIRMAN FITCH: Then there's an email

## Page 741

1  above it which seems to be arguably about five
2  hours later that purports to be from him to you.
3    Now he's going to ask you about one or
4  more aspects of the two emails that appear on this
5  page.
6    THE WITNESS:  Yes.
7  BY MR. KLAYMAN:
8    Q.  I'm reading the one that you sent to me
9  on September 11th, 2011: "Mr. Klayman, are you
10  happy now that you've completely destroyed and
11  lost my case? A case with so many evidence and
12  witnesses. Only a very bad and clueless attorney
13  could lose it, or lost it on purps (sic) because
14  he made a dill (sic), with the other party."
15    What you're suggesting is that I lost
16  your case because I was bribed by VOA and
17  therefore lost it on purpose, correct?
18    A.  Yes, that's what I'm suggesting
19  there -- well, not bribed. It's just -- I was
20  very upset at that time and I just -- I wrote that
21  email.
22    The state of mind that I was in at that

## Page 742

1  moment was the way I felt and I just put it down,
2  the way I felt.
3    Q.  You had no evidence or facts to say
4  that I had been bribed to lose your case?
5    A.  Did I use the word -- let me see. What
6  did I write?
7    (Witness reads document.)
8    Q.  Let me refer your attention to what you
9  said. That I lost it on "purps (sic). You mean
10  a perk of giving somebody something. And "he made
11  a dill (sic)," d-i-l-l. You meant d-e-a-l?
12    A.  Yes.
13    Q.  But you had no facts or evidence at
14  that time, or ever, to show that I had been bribed
15  to lose your case?
16    A.  No.
17    Q.  So that was untrue, correct? You just
18  said it. But you knew it not to be true.
19    A.  It was just a feeling I had at that
20  time, and I didn't say it to anybody else. I
21  wrote it to you. I didn't say it to anybody else.
22    I sent you an email and sent you about

## Page 743

1  my feelings regarding the case, not anybody else.
2    Q.  I didn't ask you whether you sent it to
3  anybody else. But I take it you did share it with
4  your cousin Sam?
5    A.  I didn't share it with anybody, nobody.
6    Q.  I take it --
7    A.  As you see, it's 5:00 o'clock in the
8  morning and in that state of mind that I was, I
9  mailed this email to you.
10    Q.  And you shared it with Kathleen, too?
11    A.  I didn't share it with anybody, nobody.
12    Q.  I'm not talking necessarily at 5:28
13  a.m.
14    A.  Nobody. I never said anything about
15  this to nobody at no time.
16    Q.  But do you often say things that you
17  don't have facts to back up?
18    CHAIRMAN FITCH:  Struck.
19  BY MR. KLAYMAN:
20    Q.  "I do not know if you are Christian or
21  Jewish, because whichever suits you best, you
22  become one. But I believe in karma and what you

33 (Pages 740 to 743)

In Re: Larry E. Klayman
June 1, 2018

Page 744

1  have done with my case and losing it."
2          Now, why are you disparaging my faith?
3          MR. SMITH:  Objection.
4          CHAIRMAN FITCH:  That is sustained.
5          THE WITNESS:  I have to answer?
6          CHAIRMAN FITCH:  You don't have to
7  answer that.
8  BY MR. KLAYMAN:
9          Q.  I did tell you in the course of our
10 having worked together and done other things
11 together that I was born Jewish and became a
12 Christian.
13         I told you that, right?
14         CHAIRMAN FITCH:  Sustained.
15 BY MR. KLAYMAN:
16         Q.  So you knew that?
17         CHAIRMAN FITCH:  Sustained.
18 BY MR. KLAYMAN:
19         Q.  "And what you have done with my case
20 and losing it and not stopping working on it when
21 I ordered you, one day you'll answer to God, even
22 if you throw your life and play with people life.

Page 745

1          "I am nobody, just a little girl who
2  was retaliated and harassment by some VOA employee
3  and you seed (sic) that you can help me.
4          "Not only did you not help me, but
5  destroyed my life to nothing.  Ellie Sataki.
6          Correct?
7          A.  Yes.
8          Q.  You also had accused VOA of destroying
9  your life to nothing, correct?
10         A.  I'm sorry, what?
11         Q.  You had accused VOA of destroying your
12 life, Voice of America?  Those are the people that
13 you accused of destroying your life?
14         A.  Well, I'm sorry, but I don't know how
15 they tied in together.
16         Q.  Yes or no?  You did accuse Voice of
17 America of destroying your life, correct?
18         A.  Some of the lies that they and
19 executive producer said that's -- that's what I
20 said.
21         Q.  Ms. Sataki, since the time that you
22 went to Los Angeles, as you testified previously,

Page 746

1  you've been employed during that period, correct?
2          CHAIRMAN FITCH:  Asked and answered.
3          MR. KLAYMAN:  Ok.
4  BY MR. KLAYMAN:
5          Q.  And in fact, even when you were in Los
6  Angeles, before these cases were resolved, you
7  were working for Andisheh Television in the
8  valley?
9          CHAIRMAN FITCH:  Asked and answered.
10         MR. KLAYMAN:  Your Honor, this might be
11 good time to take lunch, because I'm going into
12 another area right now.
13         Ok, so I thank you for your indulgence.
14         CHAIRMAN FITCH:  Ok, we will break on
15 the early side.
16         MR. KLAYMAN:  I'm sorry?
17         CHAIRMAN FITCH:  That's fine.  Six of
18 one, and half a dozen of in another.
19         MR. KLAYMAN:  Thank you.
20         CHAIRMAN FITCH:  Let's return at 1:00
21 o'clock.  That's just short of an hour for lunch.
22

Page 747

1          (Whereupon at 12:02 p.m. a luncheon
2  recess was taken.)
3  A F T E R N O O N   S E S S I O N
4          (Whereupon at 12:57 p.m. the hearing
5  resumed.)
6          CHAIRMAN FITCH:  We are back on the
7  record at 12:57.
8          Mr. Smith, do you or do the parties
9  jointly have any thoughts on scheduling?
10         MR. SMITH:  I have not spoken with
11 Respondent or his counsel about scheduling going
12 forward.  No, sir.
13         CHAIRMAN FITCH:  Ok, Respondent?
14         MR. KLAYMAN:  Yes, what we would
15 propose -- I think I mentioned this before -- that
16 we would propose to resume when we were going to
17 originally perhaps continue this matter to the 2nd
18 of July, give Mr. Sujat time to get up to speed.
19 He's in Florida; I'm in California, but we'll meet
20 up.  I'll go to Florida and meet with him and go
21 through everything with him, and it also gives me
22 time to get Mr. Sporkin, Judge Sporkin up to

34  (Pages 744 to 747)

In Re: Larry E. Klayman
June 1, 2018

| Page 748 |
| --- |

1  speed. He's not in really great health, so I have
2  to go out to his house and go through everything
3  with him.
4      In light of also, your Honor, the fact
5  that there are some documents here that are out
6  there that haven't been provided, such as the ones
7  we identified at the end of the morning session,
8  dealing with Gloria Allred, are super important.
9  This will give us time to come up with a way to
10 produce everything that's relevant or may lead to
11 relevant evidence, and obviously I need that time
12 to digest it. Fred needs to digest it, and I'd
13 like him to be fully briefed when we start up
14 again.
15     So we would request to July 2nd,
16 respectfully.
17     CHAIRMAN FITCH: Any further thoughts,
18 Mr. Smith?
19     MR. SMITH: About scheduling?
20     CHAIRMAN FITCH: Yes.
21     MR. SMITH: No -- well, I mean,
22 certainly if Respondent wants to get something

| Page 749 |
| --- |

1  from Gloria Allred, perhaps Gloria Allred can
2  provide documents, but discovery in this -- I
3  suppose there will be motions and I welcome
4  motions along those lines so that we can fully
5  articulate the rules of the Disciplinary System
6  in discovery going forward.
7      But having said that, July 2nd or any
8  time in July is find. I do have a hearing that is
9  scheduled to start I believe August 8th, so I
10 would not want proceedings to kind of bleed into
11 that, but if we're talking about the 2nd week
12 in July --
13     CHAIRMAN FITCH: It won't.
14     MR. KLAYMAN: -- then that's fine with
15 me.
16     CHAIRMAN FITCH: We'll confer during
17 the first break, the three of us.
18     MR. KLAYMAN: I appreciate Mr. Smith's
19 consent to that.
20     CHAIRMAN FITCH: If the witness is
21 here...
22     (Elham Sataki resumes the witness

| Page 750 |
| --- |

1  stand.)
2      CHAIRMAN FITCH: Afternoon.
3      THE WITNESS: Good afternoon.
4      CONTINUED CROSS-EXAMINATION
5      ON BEHALF OF RESPONDENT:
6      BY MR. KLAYMAN:
7  BY MR. KLAYMAN:
8      Q. Good afternoon, Ms. Sataki.
9      CHAIRMAN FITCH: Give me one second to
10 do one other thing.
11     (Brief pause.)
12     Thank you, go ahead.
13 BY MR. KLAYMAN:
14     Q. Ms. Sataki, good afternoon.
15     A. Good afternoon.
16     Q. I turn your attention to Exhibit 23 of
17 Bar Counsel's exhibits.
18     CHAIRMAN FITCH: Say that again.
19     MR. KLAYMAN: Exhibit 23 of Bar
20 Counsel's exhibits, petitioner.
21     CHAIRMAN FITCH: This is the blue book
22 now, Ms. Sataki.

| Page 751 |
| --- |

1  BY MR. KLAYMAN:
2      Q. And I turn your attention to the pages
3  of 23-33, 23-34, 23-35. Do you see that article
4  that's entitled "The Government War on a
5  Freedom-Loving Beauty: Larry Klayman Goes to Bat
6  For Harassed Broadcaster Fighting For a Free
7  Iran."
8      A. What's the question, I'm sorry?
9      Q. Do you see it?
10     A. Yes.
11     Q. Do you remember that article that I
12 wrote on your behalf?
13     A. Yes, I do.
14     Q. And in fact, it's a very complimentary
15 article of you, is it not?
16     A. Yes.
17     Q. Go to pages 23-30, 23-31 to 23-33.
18 This is an article which I wrote called "A Voice
19 For Persian Freedom: Larry Klayman explains why
20 Iran is the most important country in world," end
21 quote. May 1st, 2010.
22     You remember seeing that article?

35 (Pages 748 to 751)

In Re: Larry E. Klayman
June 1, 2018

Page 752

1  A.  Yes.
2  Q.  This article is also complimentary of
3  you, is it not?
4  A.  What is it again?
5  Q.  This article is also complimentary of
6  you.
7       If you want, you can take time to
8  review it.
9       (Witness reads document.)
10  A.  Ok.
11  Q.  Isn't it?
12  A.  Yes.
13  Q.  So this article is also complimentary
14  of you, correct?
15  A.  Ok.
16  Q.  Now in this article, as you understand
17  it, I was trying to make the point that we need a
18  voice for Persian freedom, which is people like
19  you at Voice of America who are going to tell the
20  truth to the Iranian people, correct?
21  A.  That's what it says in the article.
22  Yes, sir.

Page 753

1  Q.  Right, and I say at the end, "God bless
2  the Persian people and God bless the real America,
3  true to its own principals, that can again summon
4  the will to broadcast its message of freedom
5  around the world."
6       That was the theme of the article as
7  understand it, yes?
8  A.  I understand it, yes.
9  Q.  So, in effect, what I was saying was
10  don't discriminate against people like Ms. Sataki,
11  because they're going to -- they're good for
12  America and they're good for Persian freedom?
13  Correct?
14  A.  That's what you're saying in the
15  article.
16  Q.  Yes.
17  A.  Thank you.
18  Q.  I'm not going to go through all of the
19  articles, because they speak for themselves, but
20  you were a broadcaster at Voice of America,
21  correct?
22  A.  Correct.

Page 754

1  Q.  And your mission was to change the way
2  people think in Iran and around the world to bring
3  freedom to your native country?
4  A.  Well, as employee of Voice of America,
5  our mission is to provide balanced news.
6  Q.  When you got the job at VOA, you were
7  very proud to have that done?
8  A.  Very proud, yes.
9  Q.  And the reason was you were going to be
10  able to influence the world some way, through
11  broadcasting?
12  A.  I -- I don't know if I would influence
13  the world by broadcasting from VOA.
14  Q.  No, I'm not saying you would control
15  the world -- I'm not saying you controlled the
16  world.  No one can.  But I'm saying you would have
17  your little role to play in making Iran a better
18  place.
19       MR. SMITH:  Asked and answered.
20       CHAIRMAN FITCH:  Overruled.
21       Go ahead and answer the question,
22  please.

Page 755

1       THE WITNESS:  We wanted to -- yes, I
2  mean, Voice of America was providing balanced news
3  and providing the news to people.  That's to tell
4  the truth and that's what we were hoping was going
5  to happen.
6  BY MR. KLAYMAN:
7  Q.  So, by broadcasting, by publicizing the
8  views of Voice of America, you could play a role
9  in trying to change things in Iran.
10      You felt that, correct?
11  A.  Yes.
12  Q.  Now, isn't it true, given your
13  experience as a broadcaster and someone in the
14  media, that publicity can influence events, just
15  generally speaking?
16  A.  In general, yes, but not always.
17  Q.  But that the media plays a big role in
18  educating people and can play a role in getting
19  certain actions to happen with media.
20      That's your experience, correct?
21  A.  Not always.
22  Q.  When you and I were working together,

36 (Pages 752 to 755)

In Re: Larry E. Klayman
June 1, 2018

1 didn't I say to you that one of the reasons that I
2 was so interested in your case and the other
3 broadcasters is because, during the Reagan
4 administration, Voice of America was used to help
5 bring down the Soviet Union by broadcasting into
6 the Soviet Union to its people?
7     A.  You said that.  That's your words, yes.
8         I don't know.  Those are your words,
9 yes.
10     Q.  And that you were performing a valuable
11 role as a broadcaster in helping to change the
12 regime in Iran some day by communicating with the
13 people of Iran who were oppressed.
14     A.  That was not my role.  I couldn't say
15 that.  I could never say that.
16     Q.  No, I didn't say that you would say
17 that publicly, but we talked about that.
18     A.  Again, as a broadcast journalist, I
19 can't say that.
20     Q.  You are aware that the role of Voice of
21 America is to be a propaganda -- and I mean that
22 in a positive way -- organ for the United States

1 government to promote freedom.
2         That's the purpose of Voice of America?
3     A.  Yes, and to provide balanced news.
4     Q.  So isn't it true that favorable
5 articles on behalf of you and your other
6 broadcasters, in the media, based on your
7 experience, could be used to try to change the
8 attitudes of your managers at Voice of America?
9         MR. SMITH:  Could I have that question
10 read back, please.
11         THE COURT REPORTER:  "So isn't it true
12 that favorable articles on behalf of you and your
13 other broadcasters, in the media, based on your
14 experience, could be used to try to change the
15 attitudes of your managers at Voice of America?"
16         THE WITNESS:  Based on my experience
17 now?  No, it's not true.
18 BY MR. KLAYMAN:
19     Q.  But we believed that at the time, did
20 we not?
21     A.  No, I didn't.  You said that.
22     Q.  Now, the first article that I showed

1 you, "The government war on a freedom loving
2 beauty," we actually discussed in front of Mr.
3 Shamble that article, did we not?
4         Those are pages 23 to 35 of Bar
5 Counsel's Exhibit 23.
6         We actually discussed that with Mr.
7 Shamble?
8     A.  If you say we did, we did.
9         I -- I don't remember that particular
10 date.
11     Q.  And, in front of Mr. Shamble, you
12 understood that we were going to use publicity to
13 try to change the attitude of your managers and
14 their approach towards you to try to get a
15 settlement.
16     A.  Again, it was you saying that that's
17 going to happen.
18         I -- I was -- I did raise my concern
19 that it could backfire on me and also everybody's
20 going to find out about it.
21     Q.  But, notwithstanding your testimony,
22 which obviously I disagree with, we did discuss

1 this in front of Mr. Shamble, the use of
2 publicity?
3     A.  We finally, yes, did that.
4     Q.  Now, I never told you, did I, that I
5 was going to be using publicity to try to sell my
6 autobiography, did I?
7         I never said that to you?
8         MR. TIGAR:  I'm sorry, I didn't hear
9 the question.
10 BY MR. KLAYMAN:
11     Q.  Yes, I never discussed with you or told
12 you that I was going to use publicity concerning
13 you and the other broadcasters to sell my book
14 about my professional career.
15         I never told you that.
16     A.  We talked about that, the fact that
17 publicity always is going to help everybody.  You
18 always said that.
19     Q.  And you never told Mr. Shamble, did
20 you, not to use publicity to help you?  You never
21 told him that.
22     A.  Not to use publicity to help me?

37 (Pages 756 to 759)

In Re:  Larry E. Klayman
June 1, 2018

## Page 760

1    Q.  You never told him.

2        Let me say is again.

3        You never instructed Mr. Shamble not to

4    use publicity to try to get a settlement for you

5    for Voice of America.

6        MR. SMITH:  That was like a double

7    negative.  You never did not do ever --

8        CHAIRMAN FITCH:  It is, but I think

9    it's the best one could do.

10       Do you understand the question?

11       THE WITNESS:  I don't think I even had

12   that conversation with Mr. Shamble.

13       I probably had maybe very few, one, two

14   or three conversations with Mr. Shamble.  It was

15   mostly you who have conversations with Mr. Shamble

16   and I had conversations with you.

17       So this particular question --

18       CHAIRMAN FITCH:  You can ask it again.

19   BY MR. KLAYMAN:

20       Q.  Yes, the question is you never --

21       MR. KLAYMAN:  Sorry, your Honor.

22       CHAIRMAN FITCH:  It's up to you.

## Page 761

1        I request that you ask it the following

2    way: Did you ever tell Mr. Shamble not to use

3    publicity or publicity for your case?

4    BY MR. KLAYMAN:

5        Q.  Do you ever tell Mr. Shamble not to use

6    publicity to try to get a favorable result for you

7    with Voice of America?

8        A.  I don't believe we ever discussed that

9    subject with Mr. Shamble.

10       Q.  The question is, did you ever tell him

11   not to use publicity?

12       A.  I don't remember.  I don't remember.

13       CHAIRMAN FITCH:  In your previous

14   answer I believe you said "I don't believe we ever

15   discussed -- that I ever discussed that subject

16   with Mr. Shamble."

17       THE WITNESS:  Exactly.

18       CHAIRMAN FITCH:  I think you have a

19   negative answer.

20       MR. KLAYMAN:  I just want to be clear

21   if I ask one more question.

22

## Page 762

1    BY MR. KLAYMAN:

2        Q.  But on your own, you never went to Mr.

3    Shamble and said to him, "Please don't use

4    publicity on my behalf and please tell Mr. Klayman

5    not to use publicity" --

6        A.  I --

7        Q.  Let me finish, please.

8        MR. SMITH:  It's a compound question.

9        CHAIRMAN FITCH:  It is, actually.

10       MR. KLAYMAN:  Compounds are sometimes

11   ok.

12       CHAIRMAN FITCH:  I agree.  But give it

13   a try.

14       MR. KLAYMAN:  Ok, let me give it a try.

15   BY MR. KLAYMAN:

16       Q.  The question was you never, ever went

17   to Mr. Shamble and said, "Don't use publicity on

18   my behalf and please instruct Mr. Klayman not to

19   use publicity on my behalf, too"?

20       You never said that to Mr. Shamble.

21   You never went to Mr. Shamble with that.

22       A.  No, I didn't.

## Page 763

1        Q.  Ms. Sataki, after you filed your

2    initial complaint --

3        MR. KLAYMAN:  Excuse me, your Honor.

4    I'm just looking for something.

5        CHAIRMAN FITCH:  Perfectly alright.

6        (Brief pause.)

7        MR. KLAYMAN:  We're making really good

8    progress in terms of time.

9    BY MR. KLAYMAN:

10       Q.  Turning your attention to Respondent's

11   exhibit -- it's your original complaint, that

12   someone had written in their handwriting.

13       CHAIRMAN FITCH:  That's struck.

14   BY MR. KLAYMAN:

15       Q.  Exhibit 1, which is dated November

16   20th, 1970 -- excuse me, that's the date of your

17   birth.  It was dated November 2nd, 2010 and

18   apparently filed on November 3rd.

19       MR. SMITH:  Is that Respondent's

20   Exhibit Number 4?

21       MR. KLAYMAN:  No, it's your Exhibit

22   Number 1.

In Re: Larry E. Klayman
June 1, 2018

| Page 764 |
| --- |

1     CHAIRMAN FITCH: White notebook for
2  Exhibit 1.
3     MR. SMITH: Now we're back to
4  Disciplinary Counsel's exhibits, Exhibit 1.
5     CHAIRMAN FITCH: Ms. Sataki has it.
6     MR. KLAYMAN: I'm doing this from a
7  point of reference to lay a foundation.
8  BY MR. KLAYMAN:
9     Q. Referring to Exhibit 1, that's your
10  original complaint, and Exhibit 23 is the
11  supplement which was filed about a year later on
12  or about October 24th, correct? And that's
13  Exhibit 23?
14     CHAIRMAN FITCH: Mr. Klayman, in your
15  exhibits, the original complaint dated 11/2/2010
16  is I think Exhibit 4.
17     MR. KLAYMAN: Thank you, your Honor.
18     Again we had Kinko's do this quickly so
19  we could make the deadline last week.
20     MR. SMITH: I think he's now using Bar
21  Counsel's Exhibit Number 1, which is Respondent's
22  Exhibit Number 23.

| Page 765 |
| --- |

1     CHAIRMAN FITCH: Ok.
2  BY MR. KLAYMAN:
3     Q. Also turning to Exhibit 23, that was
4  filed on or about October 24th, 2011, a year
5  later, correct?
6     A. Correct.
7     Q. Now, after you filed this, you received
8  correspondence from Bar Counsel saying that your
9  case was being processed by them, correct?
10     A. Yes.
11     Q. And that was shortly after you filed
12  your complaint?
13     CHAIRMAN FITCH: We have a vague
14  pronoun here. "This" being number one or number
15  23?
16     MR. KLAYMAN: Exhibit 23, I'm talking
17  about 23. I'm talking about actually both of
18  them.
19  BY MR. KLAYMAN:
20     Q. But after these documents were
21  received, you received correspondence from Bar
22  Counsel shortly thereafter?

| Page 766 |
| --- |

1     A. Ok, yes.
2     Q. Now, for three and a half years after
3  that, you never had any contact with Bar Counsel,
4  correct, for several years after that?
5     A. Probably correct. I don't -- I
6  don't --
7     CHAIRMAN FITCH: He's asking you
8  approximately, and when you say probably, I think
9  you're saying yes, that's approximately the
10  period.
11     THE WITNESS: About. I don't know
12  exactly.
13     CHAIRMAN FITCH: Fair enough.
14  BY MR. KLAYMAN:
15     Q. Several years, correct?
16     A. Ok.
17     Q. And eventually someone contacted you
18  from Bar Counsel and told you that this case was
19  going forward, correct?
20     A. Correct.
21     Q. And that was about three to four years
22  after you filed your initial complaints, correct?

| Page 767 |
| --- |

1     A. About.
2     Q. It wasn't you that contacted Bar
3  Counsel. They contacted you at that time?
4     A. Yes.
5     Q. During that three- to four-year period,
6  you didn't submit anything further to Bar Counsel,
7  correct?
8     A. Correct.
9     MR. KLAYMAN: Your Honor, I'm just
10  going to double-check everything, but I think that
11  my cross is concluded as for now, subject to other
12  documents that may come to light.
13     CHAIRMAN FITCH: We all like to check
14  things.
15     MR. KLAYMAN: I'm moving along at your
16  suggestion.
17     CHAIRMAN FITCH: We all have too many
18  "oops".
19     (Brief pause.)
20     MR. KLAYMAN: Let me just make sure
21  that I moved most of my exhibits into evidence at
22  some point.

App.0369

In Re: Larry E. Klayman
June 1, 2018

## Page 768

1    Did I move Exhibit 16 into evidence,
2  which is --
3    CHAIRMAN FITCH:  Give me a minute here
4  to get ready to go along with you.
5    Ok, go ahead.
6    MR. KLAYMAN:  And Exhibit 19 as well,
7  was that moved into evidence?
8    CHAIRMAN FITCH:  Exhibit 16 is admitted
9  without objection.
10    I thought 19 was admitted.  It is.
11    MR. KLAYMAN:  Just double-checking.
12    CHAIRMAN FITCH:  20 has been admitted.
13    MR. KLAYMAN:  Thank you.
14    CHAIRMAN FITCH:  For your information,
15  Mr. Klayman, I have RS18 admitted in its entirety,
16  same for 19, same for 20.
17    MR. KLAYMAN:  And we have also that
18  court case we talked about yesterday admitted.
19  That was Exhibit 12.
20    CHAIRMAN FITCH:  And I have a number of
21  others that were admitted.
22    MR. KLAYMAN:  Ok, alright.

## Page 769

1    Your Honor, I have no further questions
2  at this time.
3    CHAIRMAN FITCH:  Any redirect, Mr.
4  Smith?
5    MR. SMITH:  Yeah, if you could indulge
6  me about five minutes to kind of make sure I have
7  everything organized properly.
8    CHAIRMAN FITCH:  Make it 10.
9    MR. SMITH:  Alright.
10    CHAIRMAN FITCH:  If you want to work at
11  your desk, we'll step outside.  Another little
12  break, for better or worse.
13    (Recess taken.)
14    CHAIRMAN FITCH:  Go ahead, Mr. Smith.
15    MR. SMITH:  Alright, thank you, Mr.
16  Chairman.
17    REDIRECT EXAMINATION
18    ON BEHALF OF DISCIPLINARY COUNSEL
19    BY MR. SMITH:
20  Q.  Good afternoon, Ms. Sataki.
21  A.  Good afternoon.
22  Q.  Earlier in your testimony you discussed

## Page 770

1  publicity.  In Mr. Klayman's examination you
2  discussed publicity.  Let me show you what has
3  been marked already as Disciplinary Counsel's
4  Exhibit D, Page 23-D.
5    CHAIRMAN FITCH:  Which, I'm sorry?
6    MR. SMITH:  The blue book.
7    CHAIRMAN FITCH:  What number?
8    MR. SMITH:  D and it's D-23.
9    CHAIRMAN FITCH:  You mean you have a D
10  exhibit in your book?  Do you mean DX23?
11    MR. SMITH:  No, I mean D -- actually
12  it's Respondent's Answer.
13    CHAIRMAN FITCH: DXD.
14    MR. KLAYMAN:  Sorry, I don't know where
15  Mr. Smith is referring.
16    CHAIRMAN FITCH:  It's at the very
17  beginning of his blue book.
18    MR. SMITH:  It's the Specification of
19  Charges that you filed, Bar exhibit in the
20  Specification of Charges.
21    CHAIRMAN FITCH:  He has an A, B, C, D
22  in the beginning of his blue book.

## Page 771

1    MR. KLAYMAN:  Exhibit D.  Ok.
2    MR. SMITH:  For the record, it looks to
3  be a communication dated June 10th, 2010 from
4  Larry Klayman to --
5    CHAIRMAN FITCH:  No, I seem to be
6  entirely wrong.  I thought you told me it was
7  Exhibit D in your blue book.
8    Is that wrong?
9    MR. SMITH:  Yes.  No.
10    CHAIRMAN FITCH:  It's Respondent's
11  Answer?
12    MR. SMITH:  To the Specification of
13  Charges.
14    CHAIRMAN FITCH:  I thought you said
15  something else.  That's fine.  I thought you said
16  communication.
17    MR. TIGAR:  And you're on 23 of that?
18    MR. SMITH:  23-I.
19    MR. TIGAR:  It's Bates numbered D-23?
20    MR. SMITH:  Correct.
21    MR. SMITH:  And again, for the record,
22  it is a communication dated June 10, 2010 from

40 (Pages 768 to 771)

In Re:  Larry E. Klayman
June 1, 2018

---

**Page 772**

1  Larry Klayman to T. Shamble.

2     Are we all on the same exhibit now?

3     MR. KLAYMAN:  I have it.

4  BY MR. SMITH:

5     Q.  Ms. Sataki, it suggests that a courtesy

6  copy of this email was sent to you.

7     Do you remember receiving it?

8     A.  Yes, yes.  That's just I probably

9  received it, but I don't remember --

10    Q.  Ok.

11    A.  -- exactly that moment that I wrote

12  this.

13    MR. TIGAR:  I'm sorry, Mr. Smith.

14  Could I ask you to move the microphone down.

15  She's a broadcaster, she knows.  Yes.

16    THE WITNESS:  I'm sorry.

17    MR. TIGAR:  Ok.

18  BY MR. SMITH:

19    Q.  Do you recall having conversations with

20  Mr. Klayman about publicity in your case?

21    A.  Yes.

22    Q.  At what point in the representation, if

---

**Page 773**

1  you recall, did you have those conversations?

2     A.  Maybe after two months.  So say we

3  started about in February, so sometime March,

4  sometime there probably.  I don't know exactly.

5     Q.  And so looking at this date of June

6  10th, you had had conversations with Mr. Klayman

7  prior to June 10th, 2010?

8     A.  Yes.

9     Q.  Could you tell the committee what it

10  was that you told Mr. Klayman with respect to your

11  views about publicity?

12    A.  Well, I thought that the publicity is

13  going to --

14    To start with, I didn't want the case

15  to go out and have everybody find out, and

16  especially publicity with everybody.  So, then

17  everybody is going to question me, "What's going

18  on?  What happened?"

19    And it was a sexual harassment case.

20  It wasn't something -- it's not something that a

21  woman is comfortable to be asked about all the

22  time.  Especially someone like me or, then people

---

**Page 774**

1  nonstop start asking about that, how -- what the

2  sexual harassment, how it was, and they want me to

3  describe it.  And also they think that sexual

4  harassment means rape.  So they asked me, and

5  still ask me to this day, how I was raped and

6  where I was raped.

7     Q.  And did you --

8     A.  So that was my concern.

9     Q.  Did you express this concern to Mr.

10  Klayman?

11    A.  Yes, I did.

12    Q.  Did he respond to those concerns?

13    A.  He did, but he believed that publicity

14  is going to help our case.

15    Q.  How many times did you have this

16  conversation about publicity?

17    A.  Several times --

18    MR. KLAYMAN:  Objection, that's leading

19  and it presumes number of times.  He's giving the

20  witness --

21    CHAIRMAN FITCH:  Let's rephrase it.

22    MR. SMITH:  I asked how many times did

---

**Page 775**

1  you --

2     CHAIRMAN FITCH:  No, "Did you have such

3  a conversation one time or more than one time?"

4  BY MR. SMITH:

5     Q.  Did you have such a conversation with

6  Mr. Klayman more than one time?

7     A.  Yes.

8     Q.  How many times did you have one?

9     A.  I don't know, a few times.  I can't

10  recall exactly how many times.

11    It was a conversation back and forth

12  until --

13    Q.  Ok.  Did you ultimately agree with Mr.

14  Klayman about publicity?

15    A.  I did.

16    Q.  Ok.  Could you tell the committee what

17  it was that persuaded you to ultimately agree to

18  the publicity?

19    A.  Because he was my attorney, and as an

20  attorney I thought he was best and that's going to

21  probably help my case and help me out.

22    So he basically convinced me that

---

41 (Pages 772 to 775)

In Re: Larry E. Klayman
June 1, 2018

---

Page 776

1   that's for my best interest.
2      Q.  Now, in addition to the articles that
3   you have been shown previously that Mr. Klayman
4   authored that were on the World Net Daily, are you
5   aware of any other publicity that your case has
6   had?
7      A.  I know there is a link on YouTube that
8   Mr. Klayman had a -- it was a conference in
9   National Press Club, and he had some speakers
10  there, and I -- I found out later.  I saw that
11  link way after the event.  Someone actually told
12  me and sent me the link.  And it was November
13  17th, 2010 that he had my picture blown up, a
14  picture, and he listed the picture and told
15  everybody that he's representing me and I work for
16  VOA.
17      MR. KLAYMAN:  Objection.  Move to
18  strike, hearsay.
19      CHAIRMAN FITCH:  Ask her how she knows
20  that a poster or photograph or whatever was shown.
21      MR. SMITH:  Alright.
22

---

Page 777

1  BY MR. SMITH:
2      Q.  How do you know that all of the things
3  you just described are in this YouTube video?
4      A.  I saw it.
5      Q.  You watched it yourself?
6      A.  I watched it myself.  It's on YouTube.
7      Q.  So you're reporting what you saw?
8      A.  Yes.
9      Q.  To your knowledge, is that YouTube
10  video still available online?
11      A.  As far as two days ago, yes.
12      Q.  Do you recall how it could be found,
13  searched, if the committee, for example, wanted to
14  take a look at it?
15      A.  I believe that if you put the date and
16  Mr. Klayman's name, "Larry Klayman, "National
17  Press Club," November 17th, 2010, it will come up.
18      MR. TIGAR:  Excuse me, Mr. Chairman,
19  I'm going to interrupt here.
20      If there's something that either party
21  wants the committee to hear, it wouldn't be right
22  for us to go out in the community and start doing

---

Page 778

1  investigation.
2      We prefer to have it that you present
3  it and show it to the committee and we look at it.
4  Other wise it's extrajudicial receipt of evidence.
5      MR. SMITH:  It was an unartfully
6  crafted question, but I think we all know.
7      I will make an effort to get a copy of
8  that, at or least the link available, so that it
9  can become a part of the record.
10      CHAIRMAN FITCH:  Well, no, hold on
11  there.
12      MR. SMITH:  Or request that it become a
13  part of the record, move that it become a part of
14  the record.
15      CHAIRMAN FITCH:  You can request.
16      MR. SMITH:  And I'm not doing it at
17  this time.
18      CHAIRMAN FITCH:  I'm sorry.  Go ahead.
19  BY MR. SMITH:
20      Q.  Do you recall whether or not there were
21  any conversations about the specific types of
22  publicity that Mr. Klayman planned on having with

---

Page 779

1  respect to your case?
2      A.  No, we didn't.
3      Q.  No, you don't recall or no, you did not
4  have any specific --
5      A.  I did not have the specific
6  conversation with him.
7      Q.  I ask you to look at what has been
8  marked in the supplemental Bar Counsel exhibits as
9  number 23.
10      A.  Yes.
11      Q.  Alright, in paragraph four, Mr. Klayman
12  states that he referred you to Gloria Allred, and
13  then if you look at the next paragraph down, he
14  says, "I successfully represented other parties in
15  sexual harassment cases over the years.  Gloria is
16  not skilled in suing the government, but rather
17  prior employers, so it's thought that I would be
18  better in that event."
19      Does that refresh your recollection at
20  all about your conversation with Mr. Klayman about
21  retaining Gloria Allred?
22      A.  Yes.

---

202-347-3700        Ace-Federal Reporters, Inc.        866-928-6509

App.0372

In Re: Larry E. Klayman
June 1, 2018

1    Q.   Could you please tell the committee how
2   that is so.
3    A.   This was during the difficult time,
4   when it was starting to get more difficult and
5   difficult between -- to communicate with Mr.
6   Klayman.
7        So, I -- as he emailed me before
8   regarding -- and we talked before regarding Gloria
9   and also Tim Shea, so I emailed him and asked him,
10  and also I told him, "Why don't we have Gloria
11  help us?"  And also I asked about Tim Shea, "Why
12  can't we have Tim Shea help with this?"
13       So, as me and him, we couldn't
14  communicate any more, because of the unfortunate
15  situation that we were in.
16   Q.   And if you would look at Page 3 of that
17  exhibit, there appears to be a communication dated
18  July 15th --
19       CHAIRMAN FITCH:  Let me interrupt,
20  because we all have to go over the record, the
21  documents and find them in the record.
22       As I count the references to Ms.

1   Allred, they're in the fifth and sixth paragraphs
2   of this document.  I think you said fourth and
3   fifth.
4        MR. SMITH:  Thank you.
5        CHAIRMAN FITCH:  Ask your question
6   again.  I interrupted you.
7   BY MR. SMITH:
8    Q.   At Page 3 of this document there is a
9   communication dated July 30th, 2010.
10   A.   Yes.
11   Q.   Is this the email that you were
12  referring to that Mr. Klayman was replying to?
13   A.   Yes.  That's the email that I wrote him
14  and that was his reply.
15   Q.   Would you tell the hearing committee
16  why it was that Tim Shea was not hired by you to
17  pursue this matter.
18   A.   It was because Mr. Klayman said that he
19  evaluated him and realized that he can't be an
20  asset, "he won't be able to handle this case."
21   Q.   Yesterday there was I think some
22  examination with respect to a car.  Mr. Klayman

1   had asked you whether or not you had asked him to
2   assist you in purchasing a car.
3        Do you recall that testimony?
4    A.   Yes --
5    Q.   Those questions?
6    A.   Yes.
7    Q.   What was your reply?
8        MR. KLAYMAN:  Objection, asked and
9   answered, your Honor.
10       MR. TIGAR:  Ok.
11  BY MR. SMITH:
12   Q.   Well, your testimony was that you did
13  not ask him to buy you a car.
14       MR. KLAYMAN:  Wait, wait, wait.  That's
15  not a correct way of questioning, your Honor.
16  Objection.  He should not be telling --
17       CHAIRMAN FITCH:  He may ask her the
18  perfectly normal transition:  "Did you testify
19  that," blah, blah, blah, blah, blah blah.
20       MR. SMITH:  Thank you.
21       CHAIRMAN FITCH:  Go ahead and ask that
22  question.

1        MR. SMITH:  Alright.
2   BY MR. SMITH:
3    Q.   As I recall your testimony was Mr.
4   Klayman did not -- you did not ask Mr. Klayman to
5   help you purchase a car?
6    A.   No, I did not.
7    Q.   Was there any situation where Mr.
8   Klayman was involved in a car situation with you?
9    A.   Yes.
10   Q.   Could you explain what that situation
11  was, please.
12   A.   My car was towed away from my garage
13  because they repoed my car and took it to the
14  dealership.  And my brother was staying with me at
15  that time, so he found out and he came upstairs
16  and told me.
17       As me and my brother going to the
18  dealership to see what's going on, Mr. Klayman, I
19  asked an attorney, so I had asked advice what we
20  should do and say, and he said he's going to come
21  and meet us there.
22       He came, and basically we couldn't

App.0373

In Re: Larry E. Klayman
June 1, 2018

Page 784

1  resolve it that moment with Mr. Klayman, because
2  he started telling the people that he's going to
3  sue them.
4       Then later me and my brother and a
5  friend went back and we resolved the situation.
6       MR. KLAYMAN: Your Honor, I object to
7  what she's recounting, which is hearsay, that I
8  said I was going to sue them.
9       CHAIRMAN FITCH: Overruled.
10  BY MR. SMITH:
11      Q.  During your testimony -- and I'll just
12  make a reference to the Bar exhibits which began
13  at I guess about Bar Exhibit Number 24, which for
14  the record is an email dated August 1st, 2010,
15  through Bar Exhibit 37, which is an email dated
16  January 26th, 2011, all from Mr. Klayman to you.
17  And from the record, it does not appear that you
18  responded to any of those emails.
19      So here's my question -- and during
20  your testimony --
21      MR. KLAYMAN: Objection, your Honor.
22      CHAIRMAN FITCH: Well, let me hear his

Page 785

1  objection.
2       MR. KLAYMAN: This is really, no lack
3  of respect to Mr. Smith, it's a jumbled way of
4  asking a question. He's got a question on top of
5  a question, and I don't think anybody knows
6  exactly what the question was.
7       So I ask that he please rephrase a more
8  precise question, because it's vague and
9  ambiguous.
10      MR. SMITH: There was no question.
11      MR. KLAYMAN: He's telling her --
12      CHAIRMAN FITCH: I'm leave that to Mr.
13  Smith.
14      MR. KLAYMAN: What he is doing is he's
15  giving her the testimony and then asking a
16  question. And that's inappropriate.
17      CHAIRMAN FITCH: I don't think it's
18  inappropriate.
19      Go ahead, Mr. Smith, wherever you were.
20  BY MR. SMITH:
21      Q.  So my statement is, earlier today Mr.
22  Klayman examined you on Supplemental Exhibits 24

Page 786

1  through 37 and 24, the period beginning August
2  1st, 2010, and 37 was a document ending on --
3  excuse me, that was sent on January 21st -- 26th,
4  2011.
5       You testified that you only recently
6  opened up all of those emails and therefore did
7  not respond to any of them.
8       Can you tell the hearing committee why
9  it was that you stopped opening up emails that you
10  were receiving from Mr. Klayman that are referred
11  to in Bar exhibits 24 through 37?
12      A.  Because I was receiving -- during a few
13  months earlier, the emails I was receiving and
14  text messages and calls from Mr. Klayman, most of
15  them was not regarding my case, but it was
16  regarding stuff that was really hurting me, and it
17  got to a point that physically, mentally,
18  psychologically I just couldn't deal with it any
19  more. So I had to shut down. I couldn't.
20      I couldn't, because it was his wording
21  was abusive and he wouldn't respect me or the
22  people around me. He would disrespect me, and I

Page 787

1  had to prove myself often.
2       So basically the conversations and
3  everything was mostly non-case related. So
4  therefore I just -- it got to a point that
5  psychologically and mentally I couldn't deal with
6  it any more.
7       Q.  When you say that he disrespected you,
8  could you give the hearing committee as many
9  examples as a you can think of how you were
10  disrespected.
11      A.  The people -- I "hang out with ghetto
12  Persians" and "classless Persians," and I'm
13  becoming one of them.
14      He would accuse me of having
15  relationships with this person and that person.
16  Every person that I would interact with, he would
17  accuse me that I have a relationship with that
18  person and it got exhausting.
19      It was -- I was dealing -- it was a
20  vicious cycle and never ending and if felt like
21  I'm in an abusive relationship instead of a
22  client/attorney, and I had to prove myself all the

44 (Pages 784 to 787)

In Re: Larry E. Klayman
June 1, 2018

1  time, and I was in a trial all the time and I had
2  to all the time tell him that, "No, what you're
3  saying is not true."
4       So that was -- I -- I would go to a
5  friend's house with my mom, and if I wouldn't turn
6  his call that evening, then we would have -- help
7  would break down for a few things.  Then
8  everything would be ok.  Then we could go back to
9  the case again, and then some other things would
10  come up.
11       Like I would go to a play and didn't
12  invite him, and then he would get upset again and
13  then I would -- he would just beat on me again for
14  days with text messages, calls and emails.  And
15  that was going on.
16       It was always something going on.  I
17  mean, it's so many different things.
18  Q.  Can you think of anything which you may
19  have done which led Mr. Klayman to believe that it
20  was ok to question you about your personal
21  relationships?
22  A.  Definitely not.

1  and I -- at this particular time, it was 5:28
2  a.m., I was very sad.  I used to take medication
3  to go to sleep, and I woke up and I just really
4  thinking about what happened to me, and everything
5  that happened to me.  I woke up crying and upset
6  and just looking back at everything.
7       Unfortunately I can't say that I was in
8  a perfect state of mind, that I was thinking
9  clearly when I sent that email.
10  MR. SMITH:  Thank you.  I have no
11  further questions.
12  MR. KLAYMAN:  Can I recross?
13  CHAIRMAN FITCH:  About what?
14  MR. KLAYMAN:  The matters that he got
15  into in this regard.
16  CHAIRMAN FITCH:  Which specific --
17  MR. KLAYMAN:  I won't need more than 15
18  minutes.
19  CHAIRMAN FITCH:  Which specific
20  matters?
21  MR. KLAYMAN:  This matter here, Exhibit
22  38.

1       I asked him over and over and over
2  again, "Please leave my private life to myself and
3  you're not to interfere, and it's not right."
4       And he -- I even asked him, when he --
5  the first time he used the word "Persian ghetto,"
6  I asked him, very nicely, that "This is not right
7  and please do not say that again."  But he again
8  repeated himself regarding that.  And I asked him
9  nicely -- I mean, I asked him all the time not to
10  do that.
11  Q.  Let me ask you to take a look at
12  Supplemental Exhibit Number 38.
13  MR. SMITH:  For the record, it is an
14  email dated Sunday, September 11th, 2011, which
15  appears to have been sent at 5:28 a.m. from Ms.
16  Sataki to Mr. Klayman.
17  THE WITNESS:  Yes.
18  BY MR. SMITH:
19  Q.  Can you tell the hearing committee what
20  your mental and physical state of being was at
21  that time?
22  A.  This was a very, very difficult time,

1  CHAIRMAN FITCH:  That examination and
2  testimony about SX38 was totally rebuttal within
3  the scope.  You may not examine it further.
4  MR. KLAYMAN:  Then the recitation of
5  what happened with the car.  This was new
6  information.
7  CHAIRMAN FITCH:  That has been covered
8  in cross-examination and in the rebuttal -- the
9  redirect.  That was solely within the scope.
10  You may not examine on that.
11  MR. KLAYMAN:  Ok.  Those were the
12  two -- hold on, your Honor.
13  (Brief pause.)
14  CHAIRMAN FITCH:  Ms. Sataki.
15  THE WITNESS:  Yes?
16  CHAIRMAN FITCH:  We have completed your
17  testimony.  As with any witness can be tiring
18  and, as Mr. Klayman said, the difference in time
19  zones probably adds to that.  We all understand
20  that.  But you are excused.
21  THE WITNESS:  Thank you.
22  CHAIRMAN FITCH:  That means we're

45 (Pages 788 to 791)

In Re:  Larry E. Klayman
June 1, 2018

| Page 792 | Page 794 |
|---|---|

**Page 792**

1  finished.
2       THE WITNESS:  We're finished, yeah?
3       CHAIRMAN FITCH:  With your testimony.
4       And we will stand in recess here at
5  2:15 until Mr. Bennett arrives.
6       (Brief pause.)
7       CHAIRMAN FITCH:  Back on the record.
8       The hearing committee wants to address
9  again, not necessarily conclusively, the
10  scheduling issue.
11       We think that this hearing may resume
12  on Monday, June 25 and proceed for the five
13  weekdays of that week.
14       The parties can address that now or
15  they can take a few minutes to think about it and
16  we can address it later.
17       MR. KLAYMAN:  That's acceptable to
18  Respondent.
19       CHAIRMAN FITCH:  That being the
20  schedule.
21       MR. KLAYMAN:  We agree to those dates.
22       MR. SMITH:  Disciplinary Counsel agrees

**Page 793**

1  to those dates as well.
2       CHAIRMAN FITCH:  We're on.
3       And now we'll stand in recess pending
4  Mr. Bennett's appearance.
5       (Recess taken.)
6       (Joel Bennett on the witness stand.)
7       CHAIRMAN FITCH:  We are back on the
8  record at 3:20 p.m., and I understand that Mr.
9  Smith has called his next witness.
10       What is your name, sir?
11       THE WITNESS:  Joel Bennett.
12       CHAIRMAN FITCH:  Would you raise your
13  right hand, please.
14       Do you swear or affirm that the
15  testimony you are about to give will be the truth,
16  the whole truth and nothing but the truth?
17       THE WITNESS:  I do.
18       MR. KLAYMAN:  Your Honor, I would like
19  to voir dire the expert at the appropriate time.
20       CHAIRMAN FITCH:  You may be seated.
21       The party calling the expert has the
22  right to do the first voir dire.

**Page 794**

1       MR. SMITH:  As a preliminary matter,
2  while we were off the record I passed along to
3  everyone, the Respondent and his counsel and the
4  hearing committee members, a curriculum vitae for
5  Mr. Joel Bennett.
6       It had originally been submitted in our
7  book of exhibits as Exhibit 50.  There was a
8  typographical error that Mr. Bennett noted and
9  brought to our attention, so a corrected version
10  has been provided.
11       If the committee sees fit, you can
12  replace the Bar Exhibit 50 that was initially in
13  your book with the corrected version.
14       I'll have Mr. Bennett testify as to
15  what the discrepancy was.
16       CHAIRMAN FITCH:  That's fine.
17       MR. SMITH:  I didn't give a copy to
18  Carly.
19       MR. TIGAR:  At the risk of causing
20  difficulty, I would appreciate it if you all would
21  put it up on the Justice website in electronic
22  form, so that would make it easier for me to put

**Page 795**

1  it with the other things that I have to look at.
2       MR. SMITH:  Not a problem.
3       CHAIRMAN FITCH:  Go ahead, Mr. Smith.
4       MR. SMITH:  Thank you, your Honor.
5  Whereupon,
6            JOEL BENNETT
7  called as a witness on behalf of Disciplinary
8  Counsel, and after having been first duly sworn,
9  was examined and testified as follows:
10       DIRECT EXAMINATION ON BEHALF OF BAR COUNSEL:
11       BY MR. SMITH:
12  Q.  Could you please state your name again,
13  for the record.
14  A.  Joel Bennett.
15  Q.  What is your occupation, sir?
16  A.  Attorney.
17  Q.  How long have you been an attorney?
18  A.  I've been a member of the District of
19  Columbia Bar continuously since 1972.
20  Q.  Are you licensed anywhere other than
21  the District of Columbia?
22  A.  I'm admitted to several other courts,

46  (Pages 792 to 795)

In Re: Larry E. Klayman
June 1, 2018

Page 796

1    but I'm not licensed in any other states.
2        Q.   Did you receive an undergraduate
3    degree?
4        A.   Yes.
5        Q.   Where was that?
6        A.   Brown University.
7        Q.   What year was that?
8        A.   1968.
9        Q.   What was your major?
10       A.   American civilization.
11       Q.   Did you attend law school?
12       A.   Yes.
13       Q.   Where did you attend law school?
14       A.   Georgetown.
15       Q.   Did you get a degree?
16       A.   Yes.
17       Q.   In what year?
18       A.   February of 1972.
19       Q.   Have you been practicing as a lawyer
20   since 1972?
21       A.   Yes.
22       Q.   With whom have you been employed?

Page 797

1        A.   My first job after law school was
2    clerking for a United States district judge in
3    Chicago, Richard McLaren.  That was about seven
4    months, from February to September.  Then I joined
5    the Federal Trade Commission as a trial in the
6    Bureau of Consumer Protection.  I worked there
7    from 1972 to 1975.
8            In 1975 I joined the firm of Stein,
9    Mitchell and Mezinas (phon) as an associate.  I
10   worked there from I believe it was May of 1975 to
11   October of 1976.
12           October of 1976 I started my own solo
13   practice in DC.  I merged with two other lawyers
14   in I believe it was early 1980 or 1981.  The firm
15   was initially called Bennett, Diso (phon) and
16   Greenberg.  We brought in a fourth partner.  It
17   was called Bennett, Diso, Greenberg and Thomas.
18           In 1984 I went back to being a solo
19   practitioner, and I've been a solo practitioner in
20   DC continuously since 1984.
21       Q.   Is there a particular field of the law
22   that you practice primarily?

Page 798

1        A.   For most of my career and private
2    practice, my primary area of practice has been
3    employment law, including employment
4    discrimination cases, especially against the
5    federal government.
6        Q.   For about how much of your career have
7    you been doing employment law?
8        A.   I took my first case in 1973 pro bono
9    when I was still employed at the Federal Trade
10   Commission, and when I went out on my own in 1976
11   I started doing it heavily in 1976 to the present.
12       Q.   About how many cases would you say that
13   you have handled in your career, federal
14   employment discrimination cases?
15       A.   I've represented more than three
16   hundred federal employees since 1973.  I've also
17   handled several employment discrimination cases on
18   the defense side for law firms and other
19   employers.
20       Q.   Do you participate in any continuing
21   legal education programs?
22       A.   I have.  I've been both a student and a

Page 799

1    lecturer in many CLE programs over the last 40
2    some odd years.
3        Q.   Those CLEs deal with employment law
4    issues?
5        A.   Many of them have, yes.
6        Q.   Have you been active in the Bar?
7        A.   Yes, I have.
8        Q.   What have you done with respect to the
9    District of Columbia Bar?
10       A.   The District of Columbia Bar, I have
11   the cofounder and first chair of the Law Practice
12   Management Section.  Now they're called
13   Communities, I think.  I also --
14           CHAIRMAN FITCH:  For reasons that
15   puzzle us all.
16           THE WITNESS:  I also was a member of
17   the steering committee of the Labor and Employment
18   Law Section for several years.  These are all
19   elected posts.  Then I was also a member of the
20   steering committee of the litigation section and I
21   also chaired the litigation section of the
22   District of Columbia Bar.

In Re: Larry E. Klayman
June 1, 2018

<table>
<tr><td>

**Page 800**

1    I also was appointed to chair the
2  Membership Benefits Committee, I believe it was
3  when David Isabel was the president.
4       Q.  Have you ever written any publications?
5       A.  Yes.  In 1984 I was contacted by Law
6  Journal Seminars Press to write a book on Winning
7  Attorney's Fees Against the U.S. Government.  That
8  was initially published in 1984.  It was updated
9  annually for about 40 years, and now it's not
10 being updated any more.  But it's still available
11 online on Lexis and Westlaw.
12      I also participated in writing the
13 first edition of How to Start and Build a Law
14 Practice In the District of Columbia, and I was
15 the sole author of the second and third editions
16 of that book, which is published by the Bar
17 Association of the District of Columbia, the
18 voluntary Bar.
19      I've also been the author of many
20 articles published in law journals on a variety of
21 topics, including employment law, litigation, law
22 office management, and so on.

</td><td>

**Page 802**

1  case was before Judge John Bates in the United
2  States District Court for the District of
3  Columbia, and there I was testifying --
4       It's a complicated case.  I was
5  testifying on behalf after lawyer who had a
6  dispute about a client over fees, and I honestly
7  can't remember whether he was the plaintiff or the
8  defendant, because they had claims against each
9  other.
10      Q.  Now, could you remind me of how many
11 federal employment related discrimination cases
12 you've been involved with since 1973.
13      A.  More than three hundred.
14      Q.  And of that number, could you estimate
15 the number of times you've had to file pleadings
16 in those cases?
17      A.  Well, for federal employees, cases are
18 handled at different levels.  First you're at the
19 agency, then you have the option of going to the
20 Equal Employment Opportunity Commission where you
21 can get a hearing before an administrative judge.
22 Then you can appeal to the EEOC, Office of Federal

</td></tr>
<tr><td>

**Page 801**

1       Q.  Have you ever appeared as an expert
2  witness before?
3       A.  Yes, I have, both before Bar Counsel
4  committees and in the United States District Court
5  of the District of Columbia.  I've been qualified
6  as an expert witness on employment law,
7  particularly as it involves federal employees.
8       Q.  When you testified in connection with
9  the DC Bar Board on Professional Responsibility
10 matters, were you testifying on behalf of the
11 Office of Bar Counsel?
12      A.  Yes.
13      Q.  Have you ever testified on behalf of a
14 Respondent?
15      A.  Not that I can recall.
16      I don't recall ever being asked.  I
17 don't have any prejudice against doing so.  It's
18 just whoever asked me to be the expert.
19      Q.  In the civil litigation, who were you
20 testifying on behalf of?
21      A.  I've been an expert in several cases in
22 civil litigation.  Only one went to trial.  That

</td><td>

**Page 803**

1  Operations, and then you can go to court.
2       I've handled cases in all the different
3  levels, and I honestly couldn't give you a count
4  of all I've had at all those different levels, but
5  I've had more than 300 total.
6       But I've tried more than 75 cases to
7  judgment in courts over the years.
8       Q.  How many different agencies have you
9  sued on behalf of a client against the federal
10 government?
11      A.  It seems like almost all of them, but I
12 couldn't give you a count.
13      All the major ones.  That's for sure.
14      Q.  And in preparation for filing the cases
15 to the extent they had to go to litigation, did
16 you have to research who the appropriate parties
17 were to sue on behalf of the agency?
18      A.  Yes.
19      MR. SMITH:  At this point I'd like to
20 have Mr. Bennett accepted as an expert witness in
21 this case on the issues of employment law related
22 to the filing of pleadings as they will relate to

</td></tr>
</table>

48  (Pages 800 to 803)

In Re: Larry E. Klayman
June 1, 2018

## Page 804

1  the issues in this case.
2       MR. KLAYMAN: May I voir dire first,
3  sir?
4       CHAIRMAN FITCH: Yes, sir.
5       VOIR DIRE ON BEHALF OF RESPONDENT:
6       BY MR. KLAYMAN:
7   Q.  Mr. Bennett, I take it, because you did
8  not mention Voice of America, that you've never
9  had an employment discrimination case with Voice
10  of America?
11  A.  I have had at least one, possibly more.
12      I didn't mention any specific agencies
13  because I've had cases against every major federal
14  agency in the last 45 years and I honestly can't
15  remember all of the 300 cases.
16      But I'm sure I've had at least one
17  against the Voice of America and I've also had at
18  least one case against Radio Free Europe, which is
19  kind of an affiliated entity.
20  Q.  What were those cases? Can you give me
21  their names?
22  A.  The case against Radio Free Europe was

## Page 805

1  before Judge John Pratt in the United States
2  District Court of the District of Columbia, and
3  I'm pretty sure it was in the late '70s or the
4  early '80s, and I honestly cannot remember the
5  name of the plaintiff.
6      It was a female plaintiff. But I
7  cannot remember her name. I'm sorry.
8   Q.  So that was about 28 years ago?
9   A.  More. Closer to 40.
10  Q.  That was in district court. That was
11  not before VOA in terms of an office of
12  discrimination complaint.
13  A.  Well, it depends on when the client
14  comes to me. If the client comes to me at the
15  very beginning of the process, there's a procedure
16  you have to go through to exhaust administrative
17  remedies: first the client has to go through
18  counseling; then you get a notice of final
19  interview; then you file a formal complaint; then
20  the agency investigates.
21      You can't go to court until the formal
22  complaint is 180 days --

## Page 806

1   Q.  I understand all that. That's not my
2  question.
3       CHAIRMAN FITCH: He's not finished.
4  BY MR. KLAYMAN:
5   Q.  Ok, go on.
6   A.  So I couldn't tell you from that case,
7  40 or so years ago, when I got involved, was it
8  the counseling stage, the formal complaint stage,
9  the investigative stage.
10      I just don't remember. It's too long
11  ago.
12  Q.  You don't ever remember being before
13  the Office of Civil Rights for the Voice of
14  America?
15  A.  I may well have been. I just don't
16  recall.
17  Q.  You don't remember.
18      And within the last ten years you've
19  had no contact with the Voice of America in terms
20  of legal proceedings, correct?
21  A.  I can't recall any case I've had with
22  VOA in the last ten years.

## Page 807

1   Q.  So you don't know the makeup of the
2  people that you have to deal with concerning
3  employment discrimination?
4   A.  I know the offices you have to go to in
5  every federal agency. It does not vary by agency.
6  I don't know the names of the civil rights officer
7  in all several hundred federal agencies.
8   Q.  I didn't ask you that question.
9       MR. KLAYMAN: If I can get an
10  instruction that he respond to my questions.
11      CHAIRMAN FITCH: I think that Mr.
12  Bennett knows to try to respond.
13  BY MR. KLAYMAN:
14  Q.  What I'm saying is you haven't had any
15  contact or proceedings with people at Voice of
16  America in the Office of Civil Rights or otherwise
17  for at least ten years, correct?
18  A.  That is correct.
19  Q.  Now you testified that you've never
20  actually appeared as an expert in a Bar
21  disciplinary matter for a respondent, correct?
22  A.  I've never been asked to appear as an

49 (Pages 804 to 807)

In Re: Larry E. Klayman
June 1, 2018

| Page 808 | Page 810 |
|---|---|

**Page 808**

1  expert in a Bar disciplinary matter for a
2  Respondent.
3      Q.  You make considerable income being the
4  expert for Office of Disciplinary Counsel, don't
5  you?
6      A.  I don't know what you mean by -- I
7  mean, I am being paid by the hour.  Whether it's
8  considerable income or not I suspect is debatable.
9      Q.  Approximately how much are you paid
10  each year, let's say for 2017?  How much were you
11  paid by the Office of Disciplinary Counsel,
12  roughly?
13      A.  I'm handling this case on an hourly fee
14  basis.  I believe the rate is 475 an hour, and
15  I've been paid a few thousand dollars, which I do
16  not consider a considerable income.
17      Q.  I didn't ask you that question.
18      CHAIRMAN FITCH:  It's a different
19  question.
20          What was your total compensation
21  approximately in the year 2017 for testimony as an
22  expert witness in disciplinary cases in the

**Page 809**

1  District of Columbia?
2          THE WITNESS:  I didn't testify in any
3  disciplinary cases in the District of Columbia in
4  2017, to the best of my knowledge.  I worked on
5  this case in 2017, but I didn't testify.
6  BY MR. KLAYMAN:
7      Q.  Regardless of testifying, how much were
8  you paid by the Office of Disciplinary Counsel in
9  2017?
10      A.  I'd have to look at my bills and my
11  file.
12      Q.  An estimate?
13      A.  A few thousand dollars.  Not a
14  considerable sum.
15      Q.  And in 2016?
16      A.  I started the case in 2016 and I would
17  estimate maybe $1,000.
18      Q.  Again, I didn't ask you that question.
19          How much were you paid total, as the
20  chair has suggested?
21      A.  This is the only case I've had with the
22  Office of Disciplinary Counsel in the last three

**Page 810**

1  years.  So my answer, when I say about this case,
2  is everything.
3      Q.  Now, you testified that you handled
4  employment discrimination cases.  You didn't have
5  any employment discrimination cases when you were
6  in the Bureau of Consumer Protection or the
7  Federal Trade Commission, did you?
8      A.  That is incorrect.  I took my first
9  case in 1973 through a program sponsored by the DC
10  Bar.  I handled that case at the administrative
11  level when I was an attorney at the Federal Trade
12  Commission.
13      Q.  You were not acting on behalf of the
14  Federal Trade Commission.
15      A.  Oh, no.
16      Q.  When you were at Stein, Mitchell and
17  Mazinas, what cases did you handle that had
18  employment discrimination, if any?
19      A.  I had my first case and I think I had a
20  second pro bono case.  The first case was against
21  the IRS and the second case was against
22  Smithsonian, and I believe I worked on both of

**Page 811**

1  those while I was with Stein, Mitchell and
2  Mazinas.
3          MR. KLAYMAN:  Your Honor, I'm finished
4  with the voir dire, but I do have objections to
5  portions of Mr. Bennett's testimony that I'd like
6  to raise right now.
7          CHAIRMAN FITCH:  The portions of his
8  forthcoming testimony?
9          MR. KLAYMAN:  Yes, based upon the
10  Disciplinary Counsel's list of witnesses and an
11  explanation of what he's testified to, if I may
12  raise that right now.
13          CHAIRMAN FITCH:  It's an objection to
14  specific portions of his anticipated testimony?
15          MR. KLAYMAN:  That it's irrelevant.
16  It's an issue of relevancy, based upon the way the
17  case is structured.
18          CHAIRMAN FITCH:  I will not hear that
19  right now and he will be admitted as an expert in
20  the field of serving as counsel in employment
21  discrimination cases before federal or other
22  governmental agencies.

50 (Pages 808 to 811)

In Re: Larry E. Klayman
June 1, 2018

Page 812

1    You can raise your objections as
2  specific topics may be encountered.
3    MR. KLAYMAN: Ok.
4    CHAIRMAN FITCH: Thank you.
5    CONTINUED DIRECT EXAMINATION
6    ON BEHALF OF DISCIPLINARY COUNSEL:
7    BY MR. SMITH:
8    Q.  In front of you, Mr. Bennett, is a book
9  of exhibits, and if you'll just look briefly at
10  the first couple pages of Bar Exhibit 4, 5, 6, 7,
11  8, 9, 10, 11, 12, 13, 14, 15, 16, 17.
12    MR. KLAYMAN: Those are your exhibits?
13    MR. SMITH: Yes.
14  BY MR. KLAYMAN:
15    Q.  Have you studied those exhibits prior
16  to today?
17    A.  Yes.
18    Q.  About how much time did it take you to
19  read through all of this stuff?
20    A.  I've looked through them twice, once
21  when I was initially retained and I believe it
22  took me one or two hours, and I looked through

Page 813

1  them a few days ago and it took between one and
2  two hours.
3    Q.  Thank you.
4    I'd like to make a reference to Bar
5  Exhibit Number 4.
6    A.  Yes.
7    Q.  For the record, it is a civil complaint
8  styled "Elham Sataki vs. The Broadcasting Board of
9  Governors," filed in the United States District
10  Court for the District of Columbia, case number
11  1:10-CV-00534 CKK.
12    A.  Yes, I'm familiar with the document.
13    Q.  Are you familiar with that document --
14  alright.
15    On Page 4-2 of the document, you'll see
16  that one of the defendants named is Hillary Rodham
17  Clinton, as Secretary of State, Ex Officio, Member
18  of the Board of Governors.
19    A.  Yes, I see that.
20    Q.  In connection with your preparation of
21  your testimony today, did you look into whether or
22  not it was necessary to name Hillary Rodham

Page 814

1  Clinton as a defendant in this complaint?
2    MR. KLAYMAN: Objection, your Honor.
3  Let me make my objection now.
4    As we have all agreed and realized and
5  acknowledged, based on the Specification of
6  Charges, there is no allegation here of my
7  practicing with either a lack of competence or in
8  a diligent manner.  This is not a case about the
9  legal proceedings that I filed.  And during the
10  testimony earlier in this proceeding with Ms.
11  Sataki, your Honor correctly instructed me at the
12  time that that was not an issue.
13    Now they're trying to, in fact, second
14  guess my legal representation and imply that
15  somehow it was not competent, it was not
16  appropriate.
17    Lawyers do things in different ways,
18  but that's not an issue in this case.  So it's
19  irrelevant and that testimony should not be
20  permitted.
21    CHAIRMAN FITCH: The objection is going
22  to be overruled.

Page 815

1    It is correct that neither zealousness
2  nor competency is at issue here, but his line of
3  examination potentially relates to other
4  Disciplinary Counsel's charges and underlying
5  theories related to those charges.
6    Go ahead.
7    MR. SMITH: I thought I asked a pretty
8  good question.
9    Could you read the question back,
10  please.
11    CHAIRMAN FITCH: The question was
12  whether it was necessary to name Secretary of
13  State Clinton as a defendant in Ms. Sataki's
14  matter.
15    THE WITNESS: No.
16  BY MR. SMITH:
17    Q.  Could you tell the committee why it was
18  not necessary?
19    A.  It involves -- I have to explain a
20  little bit about how the federal employment
21  discrimination system works.
22    The federal employees and applicants

In Re: Larry E. Klayman
June 1, 2018

## Page 816

1  can file complaints of discrimination or
2  retaliation under several statutes.
3      Initially the Civil Rights Act of 1964
4  was the first broad employment discrimination
5  statute, Title VII. That did not cover federal
6  employees. It was amended in 1972 to cover
7  federal employees for discrimination based on
8  race, sex, religion, national origin.
9      There are also other statutes that
10 federal employees can sue under: the
11 Rehabilitation Act, the Age Discrimination and
12 Employment Act and so on. These statutes state
13 right in them who the proper defendant is.
14     The proper defendant is the head of the
15 agency. For example, if Ms. Sataki had been an
16 employee of Main State, the State Department,
17 itself, the only proper defendant would have been
18 Hillary Clinton, if she were the Secretary of
19 State at the time.
20     But Ms. Sataki, as I understand it, was
21 not an employee of Main State. She was an
22 employee of VOA, which is governed by the Board of

## Page 817

1  International Broadcasters. And so, under the
2  statutes, she could only name as a defendant the
3  head of the agency. That's stated in the
4  statutes.
5      Also, when a federal employee exhausts
6  administrative remedies, the agencies have to give
7  them notice of their right to file a civil action,
8  and these notices routinely state, "You must name
9  as defendant the head of your agency by name and
10 title."
11     I've seen that hundreds of times at the
12 agency level, at the EEOC administrative judge
13 level, at the EEOC office of federal operations
14 level, and it's also in EEOC, "other regulations."
15     So it's crystal clear who the proper
16 defendant is in an employment discrimination by a
17 federal employee.
18     Q. By adding Hillary Rodham Clinton's name
19 to the complaint, did it confer any benefit that
20 would assist Ms. Sataki in any way in pursuing her
21 claims?
22     A. No.

## Page 818

1      Q. And if the name had not been added,
2  would it in any way have hurt her ability to
3  prosecute her underlying claim?
4      MR. KLAYMAN: Objection. Calls for
5  speculation.
6      MR. SMITH: Calls for expert testimony.
7      CHAIRMAN FITCH: Overruled.
8      THE WITNESS: It would not have hurt
9  her claim by not naming Hillary Clinton as a
10 defendant.
11     MR. SMITH: I have no further questions
12 of this witness.
13     CHAIRMAN FITCH: I think Mr. Tigar has
14 a question.
15     MR. TIGAR: Mr. Bennett, you've read
16 Exhibit 4?
17     THE WITNESS: Yes.
18     MR. TIGAR: You've read the complaint,
19 Exhibit 4?
20     THE WITNESS: Yes.
21     MR. TIGAR: And you noticed that one of
22 the jurisdictional bases is Section 3131 of Title

## Page 819

1  XXVIII, right?
2      THE WITNESS: There are a lot of
3  jurisdictional bases.
4      MR. TIGAR: Right.
5      THE WITNESS: I can't remember all of
6  them.
7      MR. TIGAR: If you look at the
8  jurisdictional venue allegation as it continues on
9  over to Page 5 --
10     THE WITNESS: I see it.
11     MR. TIGAR: It's about 10 lines down.
12     THE WITNESS: Yeah, I see it.
13     MR. TIGAR: Now, in your experience, is
14 it a reasonable judgment for a lawyer to decide
15 that, in addition to suing an agency, you would
16 bring a Bivens-type action against individual
17 agency employees and add them in?
18     First of all, you know what a Bivens
19 action is?
20     THE WITNESS: Yes, I do, sir.
21     MR. TIGAR: Alright. Would that be a
22 reasonable judgment of a lawyer? Not necessarily

52 (Pages 816 to 819)

In Re: Larry E. Klayman
June 1, 2018

Page 820

1  you.
2      THE WITNESS: Right.
3      MR. TIGAR: But a reasonable judgment,
4  to see if you could kind of heat things up, you
5  know, put on extra pressure?
6      THE WITNESS: There's a lot of case law
7  on that, and the only time you can bring a
8  Bivens-type action is if you have egregious
9  conduct, and by egregious conduct I mean something
10 like breaking into someone's home, a physical
11 assault.
12     There's a law called the Westfall Act
13 that -- I think it was used in this case to move
14 the case from superior court to district court.
15 When you sue federal employees -- first of all,
16 you can't sue them in superior court anyway.
17 Secondly, if you do, the U.S. Attorney's office
18 invokes the Westfall Act and that says, if this
19 all happened within the ordinary scope of duties,
20 it has to be in federal court and there can't be
21 any individual defendants, other than the head of
22 the agency.

Page 821

1      I don't see any Bivens --
2      Now, let's assume for just a moment
3  that Ms. Sataki had been physically assaulted by
4  the supervisor she was complaining of sexual
5  harassment about. Yes, she could have sued him in
6  superior court by himself, under assault and
7  battery and other common law tort claims. But for
8  the federal government you have to deal with the
9  Federal Claims Act.
10     So it's mess.
11     MR. TIGAR: I understand your answer,
12 but the question is: is it completely unreasonable
13 for a lawyer handing a sexual harassment suit, in
14 which unwanted physical touching is an element, as
15 well as retaliation on the other matters in this
16 paragraph, to believe that is reasonable, assuming
17 the client has consented to add claims against
18 individuals?
19     THE WITNESS: For federal employees
20 it's not, because everything is covered by Title
21 VII. You just don't need it.
22     CHAIRMAN FITCH: We may have a little

Page 822

1  difficulty with words.
2      Is it reasonable or unreasonable?
3      THE WITNESS: I would say it's
4  unreasonable.
5      CHAIRMAN FITCH: So the record is
6  clear.
7      THE WITNESS: Yeah, I've never done it
8  and I know lots of other leading plaintiffs and
9  employment lawyers who handle sexual harassment
10 cases.
11     Federal employees, I can't think of any
12 case that I know of where they -- for a federal
13 employee, where they sued the individual.
14     Private sector cases are different, but
15 for federal employees, I can't think of any one
16 where they sued the individual harasser in
17 addition to the Title VII claim.
18     MR. TIGAR: No, I'm not talking about
19 the individual harasser. I'm talking about
20 individuals connected with the decision-making
21 process.
22     THE WITNESS: Oh, I've never seen that

Page 823

1  done. You always sue the head of the agency.
2      MR. TIGAR: Could you do so? And I'm
3  going to stop asking all these questions.
4      Could you do so as a good faith effort
5  to change the law and to bring about
6  responsibility of the board of governors?
7      THE WITNESS: To me that's rather
8  speculative. I can't imagine that being
9  successful.
10     MR. TIGAR: Thank you.
11     CROSS-EXAMINATION ON BEHALF OF RESPONDENT:
12     BY MR. KLAYMAN:
13     Q. Mr. Bennett, you are aware that Hillary
14 Clinton was the --
15     CHAIRMAN FITCH: Well, now wait a
16 minute.
17     "I can't imagine it being successful."
18     That may or may not be an answer to the
19 question that Mr. Tigar asked whether a good faith
20 effort to change the law would include -- I'll put
21 it a little bit differently, naming the Secretary
22 of State in this case.

53 (Pages 820 to 823)

In Re: Larry E. Klayman
June 1, 2018

| Page 824 |
| --- |

1      THE WITNESS: To me it's a million to
2 one shot.
3      Whether that's a good faith effort or
4 not, it's hard to say. I suppose it depends on
5 how much of a gambler you are and how much of a
6 gambler the client is.
7      I've never done it, I can't imagine
8 recommending it to a client, and I've never seen
9 it done.
10      MR. KLAYMAN: Any further questions
11 from the Chair?
12      MR. TIGAR: No, I didn't have anything
13 further. I got the answer.
14 BY MR. KLAYMAN:
15    Q. You are aware that the Secretary of
16 State is a member of the board of governors, and
17 in this case Mrs. Clinton sat on top of that board
18 of governors? She's the number one board of
19 governors member.
20    A. In her official capacity, yes.
21    Q. And you're not aware, you don't have
22 any of the background facts as to what was going

| Page 825 |
| --- |

1 on over at Voice of America in terms of how Ms.
2 Sataki was being treated or other employees were
3 being treated by the agency?
4    A. Well, I've read all of the exhibits,
5 including her -- all the pleadings filed on her
6 behalf, and there's a lot of facts in there about
7 sexual harassment and failure to accommodate, and
8 being sent -- working out of the LA office.
9      So, I'm aware of all of that that's in
10 these exhibits.
11    Q. Let me give you a hypothetical, because
12 you're an expert, at least named as an expert: If
13 the head of an agency, in this case Hillary
14 Clinton, fails to police that agency, fails to
15 take action to correct a serious case of sexual
16 discrimination or retaliation by managers against
17 its employee, and this apparently even goes beyond
18 that particular individual to other broadcasters,
19 shouldn't one be able to file a Bivens action
20 against the head of an agency, in this case Mrs.
21 Clinton, for in fact ratifying that illegal and
22 discriminatory conduct?

| Page 826 |
| --- |

1    A. I would think you'd have to show notice
2 and failure to take action, which I find
3 incredible in this case.
4    Q. Well, you have to concede, don't you,
5 because you haven't had any contact with Voice of
6 America for at least ten years, that you don't
7 know what's going on over there?
8    A. I don't know what's going on in
9 hundreds of federal agencies on a day-to-day
10 basis, but that doesn't preclude me from
11 litigating it.
12    Q. Now in representing the client, you
13 wouldn't be coming to a snap decision or a snap
14 judgment like this before having firsthand
15 knowledge of what was going on at an agency,
16 correct?
17    A. I would investigate the complaint and
18 we would go through the investigative process at
19 the agency that's required for exhaustion of
20 administrative remedies.
21      I would interview every relevant
22 witness I could find for the client and find out

| Page 827 |
| --- |

1 what the facts are and take appropriate action.
2    Q. And the reality is that you never
3 investigated, before you came here to testify,
4 what has been going on at VOA yourself.
5      You have never done that?
6    A. I reviewed all the exhibits. I did not
7 conduct an independent investigation.
8    Q. Right, and the exhibits which I
9 prepared, the pleadings which I filed, are not
10 attacking Mrs. Clinton in a political way or in
11 any sense?
12    A. In all of these hundreds of pages of
13 exhibits, I do not recall any individual attack on
14 Mrs. Clinton.
15    Q. Correct. And it is legitimate, you're
16 aware, to use strategy to try to coerce a
17 settlement through litigation, correct?
18    A. That depends. That's an iffy question.
19      It's legitimate for a lawyer to use
20 facts to represent a client to get the best
21 possible settlement. I'm not comfortable with the
22 word "coerce."

54 (Pages 824 to 827)

In Re: Larry E. Klayman
June 1, 2018

1  Q.  I didn't say "coerce," did I?
2  A.  I think you did.
3  Q.  Well, yeah, "coerce" is fine.
4      It's to convince them that it's in
5  their best interest to settle.
6  A.  Convincing the other side to settle is
7  perfectly fine.
8  Q.  Based on your considerable experience
9  with the government, as you've testified to,
10  you're aware that sometimes, in the course of
11  legal representation, to hold a government
12  official personally accountable can cause that
13  government official to act in a more responsive
14  way towards one's client?
15  A.  First of all, in a typical --
16      CHAIRMAN FITCH:  I didn't get the
17  question part.  I heard everything you said.
18      You are aware, in the course of your
19  various legal activity over all these years, that
20  holding a government official accountable
21  personally can, in effect, serve as a way to get
22  them to do the right thing, because they're

1  personally accountable and government officials
2  generally feel like they're not accountable
3  because they have immunity.
4      You're aware of that?
5      THE WITNESS:  Well, the way you stated
6  the question is really not an accurate statement
7  of the situation.
8      Federal government officials have
9  immunity for things that are done in the course of
10  their official duties as long as they don't do
11  something that's illegal.  If they do something
12  that's illegal, they can be disciplined by the
13  agency, itself, or they could possibly be subject
14  to a separate civil action.
15      I've had cases involving, for example,
16  sex discrimination, where, under the statute, the
17  agency can discipline the employee who is found to
18  be guilty of sex discrimination, or any other
19  illegal discrimination, although that's extremely
20  rare, even in cases that are won.
21      And to say that you can coerce someone,
22  I'm just not comfortable with the word "coerce."

1  BY MR. KLAYMAN:
2  Q.  "Coax," let's use the word "coax."
3      To convince them that it's in their
4  best interest to resolve the matter because that
5  government official can be held personally
6  accountable for violating the Constitutional
7  rights of your client.
8  A.  I would say that's extremely rare, and
9  I cannot recall that ever coming up in a case in
10  any of the 300 or more cases that I've handled.
11  Q.  Are you aware that Judge Ellen Huvell,
12  H-u-v-e-l-l, had such a case concerning Voice of
13  America and ruled that that case could proceed
14  against the board of governors, that it was a
15  viable claim to bring against the board of
16  governors in the context of alleged employment
17  discrimination?
18  A.  I'm not aware of that particular case.
19      I've appeared before Judge Huvell, but
20  I'm not aware of that case.
21  Q.  You didn't bother to research that
22  issue before you came in today?

1  A.  I was not asked to research that issue.
2  Q.  And you don't know whether or not I
3  knew that before I filed the complaint for Ms.
4  Sataki against the board of governors?
5  A.  I didn't see anything in the pleadings
6  that I felt justified naming all these defendants.
7  Q.  But lawyers are entitled to their own
8  strategy.  Not all lawyers do the same thing,
9  based on your experience, correct?
10  A.  Correct.
11  Q.  There are many ways to get to Mecca,
12  correct?
13  A.  I haven't been to Mecca, but there are
14  many ways to try a lawsuit.
15  Q.  My grandfather used to say, "Some folks
16  drive Cadillacs, others drive Lincolns."
17  A.  Right.
18  Q.  We all try to get to the same place.
19  A.  Right.
20  Q.  That's true with lawyers, too, that you
21  can use different strategies and still succeed?
22  A.  Absolutely.  There are many different

55 (Pages 828 to 831)

In Re: Larry E. Klayman
June 1, 2018

Page 832

1  ways that lawyers litigate cases.
2       Q.  Did you vote for Hillary Clinton in the
3  last election?
4       MR. SMITH:  Objection.
5       CHAIRMAN FITCH:  Sustained.
6  BY MR. KLAYMAN:
7       Q.  Now, I turn your attention to Exhibit
8  10 of Respondent's exhibits.
9       CHAIRMAN FITCH:  It's the white
10  notebook.
11      THE WITNESS:  I've got it.
12      MR. SMITH:  Your exhibits or --
13      MR. KLAYMAN:  My exhibits.
14      THE WITNESS:  I've got all these books
15  of exhibits.  I don't have Mr. Klayman's.
16      CHAIRMAN FITCH:  Let me just ask the
17  questions.  Maybe we don't have to go to the
18  actual exhibits.
19      THE WITNESS:  Ok, I see the book.  I've
20  got it up here.  I've got your Exhibit 10.
21  BY MR. KLAYMAN:
22      Q.  You were actually contacted and

Page 833

1  retained by Bar Disciplinary Counsel before I was
2  even notified that was a proceeding that had been
3  filed back in 2010 that was going on.
4       You're aware of that, correct?
5       A.  I was retained in 2016 as I recall.
6  I'm not aware of the other aspects of your
7  situation.
8       MR. KLAYMAN:  I can shorten this
9  testimony, your Honor, by just simply moving into
10  evidence Exhibit 10.
11      I'll ask a few more questions.
12  Respondent's Exhibit 10.
13      MR. SMITH:  There's a lot of stuff in
14  Respondent's Exhibit 10.
15      MR. KLAYMAN:  Yes, it's various tiers
16  pertaining to Mr. Bennett.
17      CHAIRMAN FITCH:  What's the
18  significance on 10, counsel?
19      MR. SMITH:  I have actually quite a bit
20  in here, so I just want to make sure that there's
21  nothing that --
22      (Mr. Smith peruses document.)

Page 834

1  BY MR. KLAYMAN:
2       Q.  Let me turn your attention to a
3  document --
4       MR. SMITH:  No objection.
5       CHAIRMAN FITCH:  Exhibit 10 will then
6  be admitted.  In that case, we will now admit
7  Exhibit 10 in its entirety.
8  BY MR. KLAYMAN:
9       Q.  In this exhibit, Exhibit 10, it's a
10  letter from Bar Disciplinary Counsel to you
11  thanking you for agreeing to serve as an expert in
12  employment law issues in the above-referenced
13  matter.
14      Do you see that?
15      A.  Well, there are quite a few pages in
16  here, so if you could give me --
17      Q.  Take your time.
18      A.  Just tell me where it is.
19      CHAIRMAN FITCH:  Go through Page 1, 2,
20  3, 4, and tell him that it's going to be the fifth
21  page, or eighth page.
22

Page 835

1  BY MR. KLAYMAN:
2       Q.  It's one, two, three, four, five, six,
3  seven, eight, nine -- it's the tenth page in.
4       A.  Ok, I see it, a July 18th, 2016 letter.
5       Is that what you are referring to?
6       Q.  Yes.
7       You did receive that letter on or about
8  that date retaining you?
9       A.  Yes.
10      Q.  Are you aware that I was not contacted
11  that there was in fact a pending proceeding until
12  August 8th of 2016?
13      A.  I really didn't focus on whether you
14  were contacted about anything.  That was not what
15  I was retained for.
16      Q.  Around the time that you were retained
17  in July 18th, 2016, you were sent a draft
18  Specification of Charges by Mr. Smith, correct?
19      A.  Yes.
20      Q.  And in fact, comparing that to the
21  current Specification of Charges, which is the one
22  that's operative in this proceeding, that draft is

56 (Pages 832 to 835)

In Re: Larry E. Klayman
June 1, 2018

| Page 836 | Page 838 |
|---|---|

**Page 836**

1  different, correct?
2  MR. SMITH: I'm going to object at this
3  point. Not only is it beyond the scope of the
4  expert's testimony, you know, for what I asked him
5  here, which was the necessity of naming Hillary
6  Rodham Clinton, now we're getting into essentially
7  what's work product for Disciplinary Counsel, and
8  very far afield of why, you know, Mr. Bennett was
9  called as an expert to testify here today.
10  I see no purpose being served by this
11  other than a waste of time --
12  CHAIRMAN FITCH: I'm going to overrule
13  that objection for two reasons: one, arguably, we
14  may get to evidence in this line of examination
15  that impacts upon the expert's views and
16  observations and conclusions and opinions; and
17  two, it doesn't relate to other -- it probably
18  relates to other matters of delay and the like
19  that Mr. Klayman has raised that this committee
20  has no jurisdiction to resolve, that in at least
21  some aspects of it the committee might be expected
22  to render advice to the board as part of its

**Page 838**

1  A. No.
2  CHAIRMAN FITCH: That's beyond the
3  scope of his expertise.
4  BY MR. KLAYMAN:
5  Q. Based on what you know.
6  Now that is peculiar, is it not, to be
7  sent a draft Specification of Charges before you
8  even gave an opinion as to whether or not in this
9  case Larry Klayman had done anything unethical?
10  CHAIRMAN FITCH: Do not answer. That's
11  beyond the scope of what he's been qualified for.
12  MR. KLAYMAN: If I may ask these
13  questions, your Honor. If your Honor would permit
14  me.
15  BY MR. KLAYMAN:
16  Q. Do you know of a Professor Ronald
17  Rotunda, an ethics expert? There's a book on
18  ethics that he wrote, a famous treatise.
19  A. I don't know that individual.
20  Q. Have you ever appeared in front of
21  Judge Stanley Sporkin?
22  A. Yes.

**Page 837**

1  report.
2  So, even though I have my doubts, I'm
3  going, not just to let Mr. Klayman make a proffer,
4  but to let him explore this a little bit in the
5  rare chance that this expert has some information
6  on that.
7  Go ahead.
8  BY MR. KLAYMAN:
9  Q. So you actually received a draft
10  Specification of Charges from the Office of
11  Disciplinary Counsel and Mr. Smith in and around
12  the time that you were retained?
13  A. Correct.
14  Q. Did you undertake an investigation to
15  see why, before you even rendered an opinion, you
16  had been sent a draft Specification of Charges?
17  A. No.
18  Q. Wouldn't that suggest to you, based on
19  your experience, that Bar Disciplinary Counsel had
20  prejudged the issue of whether I acted ethically
21  or not and was just simply getting you as an
22  expert to try to paper over that prejudgment?

**Page 839**

1  Q. Judge Stanley Sporkin is a man based on
2  your opinion of high --
3  MR. SMITH: Objection. He's not called
4  as a character witness for any of the Respondent's
5  witnesses.
6  CHAIRMAN FITCH: I haven't heard the
7  question.
8  MR. KLAYMAN: Let me ask the question
9  differently.
10  BY MR. KLAYMAN:
11  Q. You're aware that Judge Sporkin has a
12  very good reputation in the legal community?
13  CHAIRMAN FITCH: Do not answer that.
14  It's beyond the scope of your qualification.
15  MR. KLAYMAN: I have no further
16  questions. Thank you.
17  MR. TIGAR: May I ask one or two more?
18  MR. SMITH: Nothing from Disciplinary
19  Counsel. I encourage the committee to ask --
20  MR. TIGAR: Mr. Bennett, have you any
21  familiarity with the supreme court's position in
22  iglar vs. Abbasi, -i-g-l-a r, A-b-b-a-s-i, which

App.0387

In Re: Larry E. Klayman
June 1, 2018

Page 840

1 is a Bivens action in which John Ashcroft was
2 included as a defendant?
3 THE WITNESS: I'm not familiar with
4 that case.
5 MR. TIGAR: Alright, thank you.
6 MR. KLAYMAN: May I ask a follow-up
7 question for that?
8 CHAIRMAN FITCH: Of course.
9 MR. TIGAR: I'm not in charge.
10 CHAIRMAN FITCH: Yes.
11 BY MR. KLAYMAN:
12 Q. Are you aware that when I was running
13 Judicial Watch that I brought a lawsuit against
14 Louis Freeh for breaking into my client, Trulock's
15 apartment, for having his agents do that, in the
16 fourth circuit, sustained his being named as a
17 defendant in that?
18 Are you familiar with that case?
19 A. I'm not familiar with that case.
20 MR. KLAYMAN: No further questions.
21 CHAIRMAN FITCH: Mr. Bennett, thank you
22 for coming down on rather short notice on a Friday

Page 841

1 afternoon. And you are excused.
2 THE WITNESS: Thank you.
3 (Witness is excused.)
4 CHAIRMAN FITCH: I think that, pursuant
5 to discussions about scheduling matters, that,
6 unless somebody tells me differently, we are going
7 to adjourn.
8 Mr. Klayman, another matter?
9 MR. SMITH: I would like to move in all
10 the Disciplinary Counsel's exhibits at this time.
11 CHAIRMAN FITCH: Fair point.
12 Does that make sense to do that now,
13 Mr. Klayman, and then take your points?
14 He wants to move in some exhibits.
15 MR. KLAYMAN: Subject to my
16 objections --
17 CHAIRMAN FITCH: I'm sorry?
18 MR. KLAYMAN: Subject to my objections.
19 CHAIRMAN FITCH: Of course. I propose
20 to do that now and get his case done before taking
21 your points.
22 MR. KLAYMAN: My objections are for the

Page 842

1 record.
2 MR. SMITH: At this point I move in Bar
3 Exhibits A through D and 1 through 22, which have
4 not yet been admitted, and then Bar Exhibits 30
5 through 51 I believe they are.
6 CHAIRMAN FITCH: A through D, 1 through
7 22, and 30 through 51.
8 MR. SMITH: Correct.
9 CHAIRMAN FITCH: Mr. Klayman, you have
10 the right to be heard.
11 MR. KLAYMAN: I'm just going to stand
12 by the objections, your Honor.
13 CHAIRMAN FITCH: Alright.
14 MR. KLAYMAN: And I assume you're going
15 to enter them. I just want them on the record,
16 that's all.
17 CHAIRMAN FITCH: Over Respondent's
18 objections as previously submitted in this
19 proceeding, which are preserved, those exhibits
20 are admitted.
21 MR. SMITH: With that, Disciplinary
22 Counsel rests his case in chief.

Page 843

1 CHAIRMAN FITCH: Thank you.
2 MR. KLAYMAN: Let me give your Honors
3 and Mr. Smith the Motion to Dismiss I filed today.
4 I filed it a short while ago.
5 MR. KLAYMAN: Did the office, the clerk
6 give you all a copy?
7 CHAIRMAN FITCH: If you have a courtesy
8 copy, that would be fine. But if you file it
9 today it will appear in the system tomorrow.
10 MR. KLAYMAN: Right, thank you.
11 All of what is in here may prove to be
12 moot, now that we actually have dates, so I'll be
13 able to ascertain whether the witnesses are
14 available for live testimony in the near future,
15 and we have contacted David Taylor, as you
16 instructed. We were hoping that he would call us
17 back today, but he was off.
18 We are using a service which we've used
19 in many of our cases, it's called Planet Depo, and
20 they're highly sophisticated.
21 CHAIRMAN FITCH: Sure.
22 MR. KLAYMAN: They can take video

In Re: Larry E. Klayman
June 1, 2018

---

Page 844

1  equipment to someone's house and hook it up. They
2  are the best. I find them to be the best.
3      CHAIRMAN FITCH: I note that you have
4  given me a courtesy copy and I assume that it will
5  appear on the website that we use either tomorrow
6  or this afternoon or Monday.
7      Mr. Smith has seven days in which to
8  respond to it -- or is it ten days.
9      MR. SMITH: I believe it's 10. But
10 I'll ask -- if it's going to be moot?
11     Mr. Klayman, is it going to be moot, so
12 I don't --
13     CHAIRMAN FITCH: Yes, the final point
14 is --
15     CHAIRMAN FITCH: I expect counsel to
16 confer early next week as to which parts need to
17 be ruled on. So it appears to refer to two
18 witnesses. It's certainly possible that it won't
19 be necessary to rule on one part and necessary to
20 rule on the other part.
21     Just let Mr. Smith know.
22     MR. KLAYMAN: Yes, I'll let you know.

---

Page 845

1  I'm sorry, your Honor.
2      CHAIRMAN FITCH: Let Mr. Smith know and
3  I'll resolve it as need be.
4      MR. KLAYMAN: Some of those witnesses
5  are lawyers, and we all know that we can be called
6  away on short notice, at the beck and call of
7  judges.
8      CHAIRMAN FITCH: This is true. This is
9  true.
10     There appears to be no further
11 administrative or other matters. We will recess
12 for the day and we will stand in adjournment until
13 9:30 a.m. on Monday June 25th.
14     MR. KLAYMAN: I want to thank the
15 hearing committee for their courtesy and
16 professionalism.
17     CHAIRMAN FITCH: Of course.
18     (Whereupon at 4:14 p.m. the hearing was
19 in recess until Monday, June 25, 2028, at 9:30
20 a.m.)
21
22

---

App.0389

In Re: Larry E. Klayman
June 1, 2018

**A**

**A-b-b-a-s-i** 839:22
**a.m** 616:3 740:3,6
740:14 743:13
789:15 790:2
845:13,20
**Abbasi** 839:22
**Abdy** 705:6
**Abdy's** 705:15
**abilities** 637:2,4
**ability** 636:22 663:2
708:22 818:2
**able** 624:4 626:14
643:6 659:2
690:20 754:10
781:20 825:19
843:13
**above-referenced**
834:12
**abrasive** 642:21
643:1,2
**Absolutely** 724:19
831:22
**abused** 706:6
**abusive** 786:21
787:21
**Academy** 714:10
**accept** 689:17
**acceptable** 792:17
**accepted** 691:16
803:20
**accommodate**
825:7
**accommodation**
638:3
**account** 664:7,8,15
664:16
**accountable** 711:11
828:12,20 829:1,2
830:6
**accuracy** 710:17
**accurate** 703:3,5
829:6
**accuse** 745:16
787:14,17
**accused** 637:7
745:8,11,13
**acknowledge**
665:20
**acknowledged**
814:5
**act** 636:13 648:14
816:3,11,12
820:12,18 821:9
828:13
**acted** 837:20

**acting** 810:13
**action** 630:5 687:21
709:2 817:7
819:16,19 820:8
825:15,19 826:2
827:1 829:14
840:1
**actions** 700:12
755:19
**active** 799:6
**activity** 828:19
**acts** 636:4 737:12
**actual** 832:18
**Ad** 616:3,10
**add** 678:10 819:17
821:17
**added** 818:1
**adding** 817:18
**addition** 620:21
645:16 709:1
776:2 819:15
822:17
**Additional** 726:19
**address** 623:15
629:21 635:5
670:19 792:8,14
792:16
**addressed** 629:18
649:3 651:7
738:16
**adds** 791:19
**adduced** 642:15
725:12
**adequately** 644:21
**adjourn** 841:7
**adjournment**
845:12
**administration**
756:4
**administrative**
802:21 805:16
810:10 817:6,12
826:20 845:11
**admission** 658:11
**admit** 647:15
674:18 834:6
**admitted** 621:22
647:5,13 648:19
649:8,10 650:22
651:3 656:12,14
657:17,19 659:7
659:10 674:14
678:16 768:8,10
768:12,15,18,21
795:22 811:19
834:6 842:4,20

**admonishing** 689:2
**advanced** 708:6
**advances** 635:20
636:3,11
**advice** 666:17
711:16,17 783:19
836:22
**advise** 733:18
**advised** 652:10,22
653:4
**advocate** 645:6
**affair** 637:7
**affidavit** 678:19
**affiliated** 804:19
**affirm** 793:14
**afield** 836:8
**AFL-CIO** 733:15
**afternoon** 750:2,3,8
750:14,15 769:20
769:21 841:1
844:6
**Age** 816:11
**agencies** 803:8
804:12 807:7
811:22 817:6
826:9
**agency** 630:5
802:19 803:17
804:14 805:20
807:5,5 816:15
817:3,9,12 819:15
819:17 820:22
823:1 825:3,13,14
825:20 826:15,19
829:13,17
**agents** 840:15
**ago** 661:6,16 676:5
676:8 689:5
696:15,20 726:7
777:11 805:8
806:7,11 813:1
843:4
**agree** 644:15
652:13 709:19
710:2 716:1
762:12 775:13,17
792:21
**agreed** 688:4 814:4
**agreeing** 834:11
**agrees** 622:15 639:2
792:22
**ahead** 620:9 653:16
660:14 664:2
665:3 668:12
669:4 682:17,19
684:4 686:3

750:12 754:21
768:5 769:14
778:18 782:21
785:19 795:3
815:6 837:7
**al** 735:10
**alias** 735:10
**allegation** 814:6
819:8
**allegations** 637:9
637:13,14
**allege** 636:1
**alleged** 635:19
636:19 638:2
718:3 830:16
**allegedly** 718:3
**alleging** 636:10,15
**allowed** 644:17
721:17
**Allred** 688:1 689:17
690:14,14 748:8
749:1,1 779:12,21
781:1
**alright** 621:9 626:2
640:2 648:10,10
659:22 674:2
675:10 709:12
712:1 717:3 719:6
733:9 740:8 763:5
768:22 769:9,15
776:21 779:11
783:1 813:14
819:21 840:5
842:13
**ambiguous** 785:9
**amended** 816:6
**America** 630:7
652:17 654:17
678:7 693:5 698:4
719:3 745:12,17
752:19 753:2,12
753:20 754:4
755:2,8 756:4,21
757:2,8,15 760:5
761:7 804:8,10,17
806:14,19 807:16
825:1 826:6
830:13
**American** 736:2
796:10
**amicably** 650:14
**amounts** 709:11
**Analysis** 632:4
639:16
**and/or** 705:6
**Andisheh** 746:7

**Andisher** 620:14
**Angeles** 620:15
638:4 652:13
675:19 702:18,22
704:19 718:13
745:22 746:6
**annually** 800:9
**anonymous** 732:7
736:7
**answer** 640:11
656:1,2 659:4
671:7 673:10
681:1,5 715:15
730:14 736:13
744:5,7,21 754:21
761:14,19 770:12
771:11 810:1
821:11 823:18
824:13 838:10
839:13
**answered** 628:5
668:2 711:22
746:2,9 754:19
782:9
**answering** 628:10
653:15
**ANTHONY** 616:11
**anticipated** 811:14
**anybody** 647:22
662:14 730:10
739:3 742:20,21
743:1,3,5,11
785:5
**anyone's** 684:11
**anyway** 710:4
722:15 820:16
**apartment** 629:22
669:20 671:3
673:12 840:15
**apologize** 621:19
634:18 679:16,18
**apparently** 763:18
825:17
**appeal** 695:5
802:22
**APPEALS** 615:1
**appear** 641:21
741:4 784:17
807:22 843:9
844:5
**appearance** 793:4
**APPEARANCES**
616:9 617:1
**appeared** 801:1
807:20 830:19
838:20

**appears** 780:17
  789:15 844:17
  845:10
**applicants** 815:22
**apply** 737:17
**appointed** 691:16
  800:1
**appreciate** 675:3
  749:18 794:20
**approach** 621:10
  621:14 758:14
**appropriate** 675:6
  793:19 803:16
  814:16 827:1
**approximately**
  766:8,9 808:9,21
**area** 746:12 798:2
**arguably** 741:1
  836:13
**argue** 642:12
  691:15
**argument** 646:12
**arguments** 662:13
**Arlene** 702:20
**arranged** 720:4
**arrested** 737:9
**arrives** 792:5
**article** 751:3,11,15
  751:18,22 752:2,5
  752:13,16,21
  753:6,15 757:22
  758:3
**articles** 753:19
  757:5,12 776:2
  800:20
**articulate** 749:5
**ascertain** 843:13
**Ashcroft** 840:1
**asked** 625:10,11
  628:5 640:20,22
  641:6 661:22
  662:20 664:15
  677:14 687:21
  688:13 696:3
  711:22 717:8,11
  720:13,18 721:8
  722:13 738:9
  746:2,9 754:19
  773:21 774:4,22
  780:9,11 782:1,1
  782:8 783:19,19
  789:1,4,6,8,9
  801:16,18 807:22
  815:7 823:19
  831:1 836:4
**asking** 635:2 670:8

695:14 732:11,19
  734:11 738:5
  740:20 766:7
  774:1 785:4,15
  823:3
**aspect** 695:4
**aspects** 741:4 833:6
  836:21
**assault** 820:11
  821:6
**assaulted** 821:3
**asserting** 710:17
**asset** 781:20
**assist** 782:2 817:20
**associate** 797:9
**Association** 800:17
**assume** 821:2
  842:14 844:4
**assuming** 656:22
  658:4 677:12
  680:1 682:6
  821:16
**attached** 621:21
  678:19
**attachment** 623:11
  623:13 631:3
**attachments** 650:8
**attack** 827:13
**attacking** 827:10
**attend** 796:11,13
**attendant** 692:14
**attention** 628:16
  629:3 635:7,14
  646:13 648:13
  659:13 660:2
  661:2 663:17
  676:19 685:20
  686:6 694:14
  697:4 699:8
  701:20,22 707:14
  712:4 729:14
  730:18 735:5
  737:1 739:12
  742:8 750:16
  751:2 763:10
  794:9 832:7 834:2
**attitude** 758:13
**attitudes** 757:8,15
**attorney** 616:16,18
  653:5 654:7,7,8
  741:12 775:19,20
  783:19 795:16,17
  810:11
**Attorney's** 800:7
  820:17
**August** 694:16

697:10 699:9,15
  700:7 702:2 749:9
  784:14 786:1
  835:12
**Austin** 697:15,19
  698:3,15,20
**author** 800:15,19
**authored** 776:4
**autobiography**
  759:6
**available** 777:10
  778:8 800:10
  843:14
**Aviera** 702:20
**Awards** 714:11
**aware** 650:13 662:6
  669:14 670:3,7
  671:8,12 672:1,5
  672:11,20 673:4,7
  680:2,15 685:17
  695:9 696:2,5
  714:16 715:22
  716:3,6 718:12
  719:2 720:11,15
  730:10,12,15
  732:5,10,11,15,18
  734:10 736:6
  756:20 776:5
  823:13 824:15,21
  825:9 827:16
  828:10,18 829:4
  830:11,18,20
  833:4,6 835:10
  839:11 840:12

---

**B**

**B** 643:18 770:21
**B-a-e-h-r** 714:4
**B-a-m-b-o-o-s**
  678:21
**back** 619:3 632:15
  637:21 654:16
  668:21 670:22
  671:22 673:1
  674:11 675:18
  677:11,20 689:10
  693:18 694:8
  710:8,19 711:2
  722:18 727:22
  728:9 743:17
  747:6 757:10
  764:3 775:11
  784:5 788:8 790:6
  792:7 793:7
  797:18 815:9
  833:3 843:17

**backfire** 758:19
**background** 631:6
  632:4 824:22
**backing** 683:9
**bad** 741:12
**Baehr** 714:4,4,20
  718:6 724:13
**balanced** 754:5
  755:2 757:3
**Bamboos** 678:20
**bank** 664:6,15
**Bar** 625:9 657:2,11
  658:4,9 659:18
  668:7 669:8
  676:19 681:10
  683:18 686:9
  690:7 694:14
  697:4 699:8
  701:20 707:3,14
  712:4 728:4,20
  729:14 730:18
  735:5 737:1
  738:14 750:17,19
  758:4 764:20
  765:8,21 766:3,18
  767:2,6 770:19
  779:8 784:12,13
  784:15 786:11
  794:12 795:10,19
  799:6,9,10,22
  800:16,18 801:3,9
  801:11 807:20
  808:1 810:10
  812:10 813:4
  833:1 834:10
  837:19 842:2,4
**based** 641:20
  666:15 701:12
  757:6,13,16 811:9
  811:16 814:5
  816:7 828:8 831:9
  837:18 838:5
  839:1
**bases** 818:22 819:3
**basically** 696:16
  775:22 783:22
  787:2
**basis** 724:22 808:14
  826:10
**Bat** 751:5
**Bates** 771:19 802:1
**battery** 821:7
**Beahr** 715:19 716:4
  716:9
**Bear** 714:7
**bearing** 647:18

**bears** 645:21 646:2
  646:2,3
**beat** 788:13
**beauty** 751:5 758:2
**beck** 845:6
**becoming** 787:13
**began** 784:12
**beginning** 705:13
  705:16 770:17,22
  786:1 805:15
**behalf** 616:6,18
  617:2 620:2 663:6
  665:6 667:16
  708:5 720:19
  750:5 751:12
  757:5,12 762:4,18
  762:19 769:18
  795:7,10 801:10
  801:13,20 802:5
  803:9,17 804:5
  810:13 812:6
  823:11 825:6
**belabor** 656:7
  681:6
**believe** 628:19
  646:6 661:8,11
  662:1 667:9
  697:15 716:11
  724:11 730:2
  743:22 749:9
  761:8,14,14
  777:15 788:19
  797:10,14 800:2
  808:14 810:22
  812:21 821:16
  842:5 844:9
**believed** 650:15
  693:5 757:19
  774:13
**belongs** 736:17
**benefit** 817:19
**benefits** 621:2
  800:2
**Bennett** 618:4
  792:5 793:6,11
  794:5,8,14 795:6
  795:14 797:15,17
  803:20 804:7
  807:12 812:8
  818:15 823:13
  833:16 836:8
  839:20 840:21
**Bennett's** 793:4
  811:5
**best** 624:17 645:7
  645:12 654:8

694:2 728:22
729:8,19 743:21
760:9 775:20
776:1 809:4
827:20 828:5
830:4 844:2,2
**better** 654:13
754:17 769:12
779:18
**beyond** 825:17
836:3 838:2,11
839:14
**bifurcated** 632:5
**big** 634:22 642:9
721:11 755:17
**bills** 809:10
**birth** 763:17
**bit** 648:7 674:7
693:18 815:20
823:21 833:19
837:4
**Bivens** 819:18
821:1 825:19
840:1
**Bivens-type** 819:16
820:8
**blah** 782:19,19,19
782:19,19,19
**blame** 702:14
**blamed** 676:11
**Blanquita** 650:15
650:18
**Blanquita's** 650:9
**bleed** 749:10
**bless** 730:3 753:1,2
**blown** 776:13
**blue** 750:21 770:6
770:17,22 771:7
**board** 615:2,4
616:1 650:18
652:12 658:7
801:9 813:8,18
816:22 823:6
824:16,17,18
830:14,15 831:4
836:22
**bono** 798:8 810:20
**book** 726:3,5,8,11
726:12 727:14
750:21 759:13
770:6,10,17,22
771:7 794:7,13
800:6,16 812:8
832:19 838:17
**books** 832:14
**BOPR** 617:14

**born** 744:11
**Borrazas** 617:13
622:15,16,17
**boss** 624:5
**bother** 696:7
713:15 830:21
**bothers** 713:12,13
**bottom** 665:2
682:10 683:21
699:11
**Boulevard** 705:19
**Box** 649:4
**bra** 636:12
**branch** 687:18
**Brantley** 615:22
616:4
**break** 693:11,19,19
693:20 704:10
709:12 746:14
749:17 769:12
788:7
**breaking** 820:10
840:14
**bribed** 741:16,19
742:4,14
**brief** 659:21 665:6
665:8 673:21
686:2 750:11
763:6 767:19
791:13 792:6
**briefed** 748:13
**briefly** 647:19
692:5 812:9
**briefs** 622:20
**bring** 655:8 733:16
754:2 756:5
819:16 820:7
823:5 830:15
**broad** 816:4
**broadcast** 719:3,11
753:4 756:18
**broadcasted** 718:16
**broadcaster** 637:8
751:6 753:20
755:13 756:11
772:15
**broadcasters** 756:3
757:6,13 759:13
817:1 825:18
**broadcasting**
620:15 651:9
652:11,12 658:6
714:1 720:6
754:11,13 755:7
756:5 813:8
**broadcasts** 721:18

**broke** 702:19
**brother** 712:6,11
712:18,22 713:7
713:10,16 720:4
721:15 726:6
727:20,21 728:8
728:15 729:1
783:14,17 784:4
**brought** 667:16
734:15 794:9
797:16 840:13
**Brown** 796:6
**Build** 800:13
**building** 653:7
662:12,16 663:9
666:18 675:9,11
679:20 683:7
690:15,17 691:5
692:10 695:4
706:13 709:7
737:19 740:2
741:11,11,16
742:4,15 743:1
744:1,19 756:2
761:3 765:9
766:18 768:18
772:20 773:14,19
774:14 775:21
776:5 779:1
781:20 786:15
788:9 798:8 802:1
802:4 803:21
804:1,9,18,22
806:6,21 808:13
809:5,16,21 810:1
810:9,10,19,20,20
810:21 811:17
813:10 814:8,18
820:6,13,14
822:12 823:22
824:17 825:13,15
825:20 826:3
830:9,12,13,18,20
834:6 838:9 840:4
840:18,19 841:20
842:22
**cases** 662:9,9 663:3
666:18 667:6
691:22 695:1
696:3,8,12 708:12
709:7 711:10
734:16 746:6
779:15 798:4,12
798:14,17 801:21
802:11,16,17
803:2,6,14 804:13
804:15,20 808:22

**bunch** 661:17
**bureau** 638:7 651:9
652:11 718:13
720:6 797:6 810:6
**buy** 782:13

---

**C**

**C** 619:1 770:21
**C.S.R** 615:22 616:4
**Cadillacs** 831:16
**Calabasas** 705:15
**California** 747:19
**call** 670:1 671:5
720:13,18 721:8
722:13 725:10
729:4 788:6
843:16 845:6
**called** 667:4 669:20
669:22 671:2,4
673:11 688:13
714:8,14 720:11
722:10,18 729:22
730:8 735:22
751:18 793:9
795:7 797:15,17
799:12 820:12
836:9 839:3
843:19 845:5
**calling** 622:16
696:7 730:10
793:21
**calls** 713:4 722:19
786:14 788:14
818:4,6
**campaign** 636:16
636:20
**candidly** 645:8
**candor** 646:3
**capacity** 824:20
**car** 669:15,21 670:4
671:4,9 672:2,21
673:4 675:17,21

708:8 781:22
782:2,13 783:5,8
783:12,13 791:5
**care** 651:7 658:1
**career** 624:16
627:22 643:11
653:9 654:11
691:4 759:14
798:1,6,13
**Carly** 794:18
**case** 621:11,21
642:6,14 655:10
655:14 662:7,10
662:12,16 663:9
666:18 675:9,11
679:20 683:7
690:15,17 691:5
692:10 695:4
706:13 709:7
737:19 740:2
741:11,11,16
742:4,15 743:1
744:1,19 756:2
761:3 765:9
766:18 768:18
772:20 773:14,19
774:14 775:21
776:5 779:1
781:20 786:15
788:9 798:8 802:1
802:4 803:21
804:1,9,18,22
806:6,21 808:13
809:5,16,21 810:1
810:9,10,19,20,20
810:21 811:17
813:10 814:8,18
820:6,13,14
822:12 823:22
824:17 825:13,15
825:20 826:3
830:9,12,13,18,20
834:6 838:9 840:4
840:18,19 841:20
842:22
**cases** 662:9,9 663:3
666:18 667:6
691:22 695:1
696:3,8,12 708:12
709:7 711:10
734:16 746:6
779:15 798:4,12
798:14,17 801:21
802:11,16,17
803:2,6,14 804:13
804:15,20 808:22

809:3 810:4,5,17
811:21 822:10,14
829:15,20 830:10
832:1 843:19
**cash** 672:21 675:17
**catch** 685:22
**cause** 828:12
**causing** 794:19
**CBN** 713:22 718:10
718:12,16 719:2
719:11,21 720:3,7
720:9,11,18 721:8
721:15,18 722:10
722:16,21 723:1
727:14
**CBN's** 721:20
**CC** 623:16
**cell** 650:9
**Central** 638:7
**certain** 638:20
641:12 644:18
755:19
**certainly** 642:16
672:16 748:22
844:18
**Certificate** 658:10
**cesspool** 677:21
**cetera** 708:9
**chair** 616:12 799:11
800:1 809:20
824:11
**chaired** 799:21
**Chairman** 619:2,10
619:14,19 620:6,9
621:15 622:9,14
622:18 623:2,21
627:9 628:5,11,18
629:1 631:17
632:3,7 638:12,16
639:4,10,13,22
640:10,21 641:1,5
641:10,15 642:1
642:11,22 643:17
644:1,7,11 645:10
646:11 647:2,5,7
647:12 648:4,8,16
648:20 649:8,12
651:2,13,19,21
653:15 656:1,11
656:15,18 657:7
657:16 658:3,13
658:18 659:1,7,10
659:16,19 660:14
661:20 663:12
664:2 665:3 667:1
668:17 670:20

671:13,21 672:7
672:17 673:18
674:2,6,13,17,21
675:8,11 677:8
680:10,22 681:2
681:13,16 682:17
682:19 684:4
685:21 686:3
691:10 692:16
693:9,13,17,21
694:1,8 695:13,19
698:5,9,12 699:6
700:4,22 709:17
709:22 710:14
711:22 713:3
715:8,10,14,17,20
717:3,11 718:2,20
719:4,18 720:14
720:21 721:2
724:21 725:3,5,7
725:12,16 726:10
726:16,19 727:1
728:12,17 730:14
731:13 732:9,19
733:1,7 734:5
736:10,12,19
738:3,7,11 739:10
739:14,17 740:10
740:16,19,22
743:18 744:4,6,14
744:17 746:2,9,14
746:17,20 747:6
747:13 748:17,20
749:13,16,20
750:2,9,18,21
754:20 760:8,18
760:22 761:13,18
762:9,12 763:5,13
764:1,5,14 765:1
765:13 766:7,13
767:13,17 768:3,8
768:12,14,20
769:3,8,10,14,16
770:5,7,9,13,16
770:21 771:5,10
771:14 774:21
775:2 776:19
777:18 778:10,15
778:18 780:19
781:5 782:17,21
784:9,22 785:12
785:17 790:13,16
790:19 791:1,7,14
791:16,22 792:3,7
792:19 793:2,7,12
793:20 794:16

795:3 799:14
804:4 806:3
807:11 808:18
811:7,13,18 812:4
814:21 815:11
818:7,13 821:22
822:5 823:15
828:16 832:5,9,16
833:17 834:5,19
836:12 838:2,10
839:6,13 840:8,10
840:21 841:4,11
841:17,19 842:6,9
842:13,17 843:1,7
843:21 844:3,13
844:15 845:2,8,17
challenges 642:4
chance 635:16
650:16 713:22
719:20 729:3
837:5
change 624:5 754:1
755:9 756:11
757:7,14 758:13
823:5,20
character 839:4
charge 840:9
charged 645:11,14
645:15
charges 642:6,14
770:19,20 771:13
814:6 815:4,5
835:18,21 837:10
837:16 838:7
check 767:13
Chicago 797:3
chief 701:7 842:22
choosing 654:11
Christ 723:20
Christian 714:1,15
723:22 724:5,11
724:18 743:20
744:12
Christian-owned
722:2
Christmas 729:18
circuit 840:16
circulating 678:6
citations 711:16
cited 692:9
civil 629:4 630:8
632:19 633:4,9
640:5 658:5
679:21 680:2,15
680:19 692:6,12
702:16 703:16

709:21 801:19,22
806:13 807:6,16
813:7 816:3 817:7
829:14
civilization 796:10
CKK 813:11
claim 818:3,9
822:17 830:15
claims 632:20
634:16 635:9
640:7,13 641:14
643:19 646:7
677:18 680:18
710:9 711:3 802:8
817:21 821:7,9,17
clarity 631:17
651:13
class 684:16
classless 787:12
Clay 616:20 623:16
CLE 799:1
clear 647:12 654:21
761:20 817:15
822:6
clearly 790:9
clerk 843:5
clerking 797:2
CLEs 799:3
client 689:18
733:19 802:6
803:9 805:13,14
805:17 821:17
824:6,8 826:12,22
827:20 828:14
830:7 840:14
client/attorney
787:22
Clinton 813:17
814:1 815:13
816:18 818:9
823:14 824:17
825:14,21 827:10
827:14 832:2
836:6
Clinton's 817:18
close 669:21 671:3
673:12 722:21
closely 663:6 701:9
701:10
Closer 805:9
closing 630:7
Club 776:9 777:17
clueless 741:12
co-anchor 637:15
co-host 636:16
coax 830:2,2

codes 737:17
coerce 827:16,22
828:1,3 829:21,22
cofounder 799:11
collect 708:17,22
Columbia 615:1
616:6 795:19,21
799:9,10,22
800:14,17 801:5
802:3 805:2 809:1
809:3 813:10
column 729:20
columns 727:4,8
come 623:14 691:16
693:18 725:17
748:9 767:12
777:17 783:20
788:10
comes 708:13 710:8
711:2 805:14,14
comfortable 688:3
773:21 827:21
829:22
coming 712:18
826:13 830:9
840:22
commencing 616:3
comment 643:1
Commission 714:15
797:5 798:10
802:20 810:7,12
810:14
commissions
620:21
commit 737:11
commitments
664:10
committee 616:4,10
619:5 621:18
648:1 674:22
691:1 703:21
773:9 775:16
777:13,21 778:3
780:1 781:15
786:8 787:8
789:19 792:8
794:4,11 799:17
799:20 800:2
815:17 836:19,21
839:19 845:15
committees 801:4
common 700:21
821:7
communicate 662:7
662:14 700:13
738:10 780:5,14

communicating
732:14 756:12
communication
670:12 732:2
735:7 736:6 771:3
771:16,22 780:17
781:9
communists 687:19
Communities
799:13
community 777:22
839:12
company 620:14
720:6 722:2
comparing 835:20
compensation
808:20
competence 814:7
competency 645:15
815:2
competent 814:15
Complainant's
638:2
complaining 821:4
complaint 630:6,6,9
631:5 636:6
646:15 658:5
763:2,11 764:10
764:15 765:12
805:12,19,22
806:8 813:7 814:1
817:19 818:18
826:17 831:3
complaints 637:3
766:22 816:1
completed 791:16
completely 624:15
627:22 656:8
689:11 741:10
821:12
completeness 690:2
complicated 802:4
complimentary
751:14 752:2,5,13
compound 672:6,8
716:20 762:8
Compounds 762:10
computer 691:18
concede 826:4
concern 758:18
774:8,9
concerned 679:2
706:11,18
concerning 667:6
708:18 759:12
807:2 830:12

In Re: Larry E. Klayman
June 1, 2018

concerns 774:12
concluded 767:11
concludes 659:5
conclusions 836:16
conclusively 792:9
concussion 673:8
conditions 722:4
conduct 820:9,9
  825:22 827:7
confer 749:16
  817:19 844:16
conference 776:8
confirm 631:15
conflicting 656:8
confused 704:8
congressman
  682:12,22 683:9
  683:12
connected 822:20
connection 801:8
  813:20
consent 749:19
consented 821:17
consider 639:13
  808:16
considerable 808:3
  808:8,16 809:14
  828:8
consideration 644:4
  675:1
considered 632:1
considering 706:19
conspiracy 737:11
Constitutional
  830:6
consult 625:5
Consumer 797:6
  810:6
contact 733:13,15
  734:14 735:1
  766:3 806:19
  807:15 826:5
contacted 662:19
  662:22 706:8,17
  735:3 766:17
  767:2,3 800:5
  832:22 835:10,14
  843:15
contained 711:16
contains 684:6
context 830:16
continue 623:21
  653:14 654:13
  685:1,3 689:19
  694:10 747:17
continued 617:1

620:1 643:12
  750:4 812:5
continues 819:8
continuing 648:2
  722:15 798:20
continuous 636:20
continuously
  795:19 797:20
contractors 708:11
contradicted
  690:11
control 754:14
controlled 754:15
conversation 676:1
  676:3,10,12
  696:15 760:12
  774:16 775:3,5,11
  779:6,20
conversations
  696:10,11 760:14
  760:15,16 772:19
  773:1,6 778:21
  787:2
convicted 737:10
  737:15,21 738:6
convince 828:4
  830:3
convinced 775:22
Convincing 828:6
copies 621:17
copy 772:6 778:7
  794:17 843:6,8
  844:4
correct 620:16,17
  624:21,22 625:16
  629:19,20 630:1,2
  630:9,10,16,17,19
  630:20 632:22
  633:1,5,6,9,10
  636:7,8,13,14,17
  636:18 637:10,11
  637:17,18,22
  638:1,9 640:5
  646:19,20 648:15
  648:22 652:14,15
  652:21 660:8,9,12
  661:9 663:3,4
  664:21,22 665:14
  665:15 666:21,22
  668:9,13 669:4,12
  669:13,16 670:2
  671:7 673:12,13
  673:16 676:13,17
  676:22 677:1,3
  678:1,7 679:4,5
  679:22 681:19,20

682:6 686:13,14
  687:6 688:6,9
  693:7,8 694:19
  695:10 698:4,22
  699:1,15,22 700:8
  700:9 701:6,9
  702:8 703:9,12
  704:14 705:7,8,15
  707:8,20,21 708:1
  711:6,7,21 712:7
  712:8,9,10,12
  714:1,2,8,9,11
  717:6 718:7,8,10
  718:11,14,17
  720:19 723:15,16
  726:9,9 727:16,20
  730:21 731:8,9,11
  733:6 734:18
  735:2,12,15,18
  736:1,9 738:10,17
  741:17 742:17
  745:6,9,17 746:1
  752:14,20 753:13
  753:21,22 755:10
  755:20 764:12
  765:5,6,9 766:4,5
  766:15,19,20,22
  767:7,8 771:20
  782:15 806:20
  807:17,18,21
  815:1 825:15
  826:16 827:15,17
  831:9,10,12 833:4
  835:18 836:1
  837:13 842:8
corrected 794:9,13
correctly 645:18
  651:14 814:11
correspondence
  765:8,21
corruption 677:21
cosmetic 620:14
cost 653:8,9 708:5
costs 708:10 710:8
  711:1
counsel 619:6,9
  625:10 638:5
  640:1 645:7
  659:18 668:7
  690:8 728:4 735:6
  737:1 747:11
  765:8,22 766:3,10
  767:3,6 769:18
  779:8 792:22
  794:3 795:8,10
  801:3,11 808:4,11

809:8,22 811:20
  812:6 833:1,18
  834:10 836:7
  837:11,19 839:19
  842:22 844:15
Counsel's 669:8
  676:20 681:10
  683:18 686:9
  694:15 697:5
  699:8 701:21
  707:3,14 712:4
  728:20 730:19
  738:14 750:17,20
  758:5 764:4,21
  770:3 811:10
  815:4 841:10
counseling 805:18
  806:8
count 780:22 803:3
  803:12
counterproductive
  697:20
country 706:5
  751:20 754:3
County 737:11
couple 680:7
  696:10 709:16
  812:10
course 641:15
  744:9 828:10,18
  829:9 840:8
  841:19 845:17
court 615:1 616:5
  640:16 668:20,22
  669:2 671:1 672:1
  677:14 692:10
  695:6 708:9
  710:20,21 737:10
  757:11 768:18
  801:4 802:2 803:1
  805:2,10,21
  813:10 820:14,14
  820:16,20 821:6
court' 683:3
court's 839:21
courtesy 772:5
  843:7 844:4
  845:15
courts 795:22 803:7
cousin 633:16
  722:11 730:9
  735:14 737:20
  743:4
cover 631:22 816:5
  816:6
covered 628:7

791:7 821:20
crafted 778:6
crash 669:15 670:4
  671:9 672:2
  675:21 676:15
crashed 669:21
  671:4
create 639:6
credibility 623:6
  642:3,8,9 643:8
  643:16 646:9
credible 680:20
crime 738:6
criminal 692:12
  730:13
criticism 725:20
cross 618:2 767:11
cross-examination
  619:15 620:1
  643:7 648:9
  694:11 750:4
  791:8 823:11
crossed 648:5
crying 790:5
crystal 817:15
Cullum 650:15,18
cumulative 642:4
current 620:18
  835:21
currently 706:7
curriculum 794:4
cut 664:14
cycle 787:20

**D**

D 618:1 619:1
  770:4,8,9,11,21
  771:1,7 842:3,6
D-23 770:8 771:19
d-e-a-l 742:11
d-i-l-l 742:11
daily 636:20 729:20
  776:4
damage 677:17
  710:9 711:3
damages 677:13
Dan 697:15,19
  698:3,15,20
danger 706:12
dash 718:19
date 624:6,11
  625:18 626:11
  663:1 672:20,21
  699:17 707:19,21
  707:22 730:6
  733:16 734:16

758:10 763:16
773:5 777:15
835:8
**dated** 630:3 656:22
657:1 666:3
683:19 712:9
729:16 763:15,17
764:15 771:3,22
780:17 781:9
784:14,15 789:14
**dates** 675:1 735:4
792:21 793:1
843:12
**daughter** 689:6
**David** 800:3 843:15
**day** 620:13 636:10
660:11 666:5
667:10,12,13
675:16,17 676:2
676:15 702:16
703:2 704:14,20
707:8,9,10,11,12
744:21 756:12
774:5 845:12
**day-to-day** 826:9
**days** 777:11 788:14
805:22 813:1
844:7,8
**DC** 615:9 616:2,18
652:18 797:13,20
801:9 810:9
**deadline** 764:19
**deal** 653:12 657:19
683:11 684:13
691:11 726:3,5,8
726:11,12,12,12
727:9 739:6
786:18 787:5
799:3 807:2 821:8
**dealership** 783:14
783:18
**dealing** 701:12
748:8 787:19
**deals** 635:18
**dealt** 645:3 690:22
**Dear** 630:4 651:8
685:5
**debatable** 808:8
**December** 729:16
**decide** 644:21
819:14
**decided** 728:3
**decision** 631:4,19
631:22 632:19
634:16 635:8
640:16 670:4

671:10,15 672:3
672:12,22 675:18
681:7 695:6
703:16 826:13
**decision-making**
822:20
**defend** 644:21,22
690:20 691:8
**defendant** 802:8
814:1 815:13
816:13,14,17
817:2,9,16 818:10
840:2,17
**defendants** 813:16
820:21 831:6
**defense** 798:18
**Definitely** 788:22
**degree** 796:3,15
**delay** 836:18
**Delia** 629:4,11
653:18
**denial** 671:16 674:9
**denied** 638:4
**denomination**
622:19
**Department** 816:16
**depends** 805:13
824:4 827:18
**Depo** 843:19
**Deputy** 638:5
**describe** 774:3
**described** 777:3
**deserve** 700:15
**desire** 705:6
**desk** 769:11
**despite** 722:19
**destroyed** 741:10
745:5
**destroying** 745:8,11
745:13,17
**detail** 644:6,6 684:8
**detailed** 638:3
**details** 721:12,14
**determination**
633:4 679:21
680:16
**determine** 691:18
**diamond** 706:3
**difference** 791:18
**different** 628:6
693:6 717:8
788:17 802:18
803:2,4,8 808:18
814:17 822:14
831:21,22 836:1
**differently** 823:21

839:9 841:6
**difficult** 780:3,4,5
789:22
**difficulties** 693:4
**difficulty** 794:20
822:1
**digest** 748:12,12
**diligence** 690:6
**diligent** 814:8
**dill** 741:14 742:11
**dinner** 705:14
**dire** 793:19,22
804:2,5 811:4
**DIRECT** 618:2
795:10 812:5
**directions** 696:3
**directly** 733:14
**director** 629:4
**disagree** 758:22
**disappointing**
684:14
**disciplinary** 616:18
619:6,8 658:10
692:8 728:20
729:14 735:6
749:5 764:4
769:18 770:3
792:22 795:7
807:21 808:1,4,11
808:22 809:3,8,22
811:10 812:6
815:4 833:1
834:10 836:7
837:11,19 839:18
841:10 842:21
**discipline** 829:17
**disciplined** 829:12
**discovery** 690:18
749:2,6
**discredited** 680:3
**discrepancy** 794:15
**discriminate**
753:10
**discrimination**
631:5 680:17
798:4,14,17
802:11 804:9
805:12 807:3
810:4,5,18 811:21
815:21 816:1,4,7
816:11 817:16
825:16 829:16,18
829:19 830:17
**discriminatory**
825:22
**discuss** 689:22

758:22
**discussed** 625:15
679:20 738:21
739:3,5 758:2,6
759:11 761:8,15
761:15 769:22
770:2
**discusses** 693:3
**discussions** 841:5
**dishonest** 684:7,10
**dishonesty** 640:17
**dismiss** 696:4 843:3
**dismissed** 695:1
696:3,9,13
**Diso** 797:15,17
**disparage** 636:21
**disparaging** 744:2
**dispute** 802:6
**disrespect** 786:22
**disrespected** 787:7
787:10
**distinct** 650:4
672:10
**district** 615:1 616:6
737:10 795:18,21
797:2 799:9,10,22
800:14,17 801:4,5
802:2,2 805:2,2
805:10 809:1,3
813:9,10 820:14
**divided** 632:3
**doable** 627:15
**docket** 615:4 674:9
**doctor** 705:12
715:19,22
**doctorate** 716:3
**document** 622:2,12
629:17 631:19
632:1,8,12 635:13
635:17 639:10
642:20 643:10,18
651:12 660:17
682:8 710:11
725:13 742:7
752:9 781:2,8
786:2 813:12,13
813:15 833:22
834:3
**documents** 631:8,8
631:12 644:8,13
658:13 690:1,6
739:20 748:5
749:2 765:20
767:12 780:21
**doing** 636:4 645:12
650:16 654:6

758:22
**discussed** 625:15

665:9 685:22
764:6 777:22
778:16 785:14
798:7,11 801:17
**dollars** 677:19
808:15 809:13
**Dorsey** 649:17
**double** 760:6
**double-check**
767:10
**double-checking**
768:11
**doubts** 837:2
**dozen** 746:18
**Dr** 702:19 715:19
716:4,9
**draft** 835:17,22
837:9,16 838:7
**drive** 831:16,16
**due** 690:5,21
693:16 696:16
**duly** 795:8
**duties** 820:19
829:10
**DX23** 770:10
**DXD** 770:13

---

**E**

**E** 615:5 616:2
617:10 618:1
619:1,1 747:3,3
**earlier** 654:15
665:8 667:9 691:3
692:9 769:22
785:21 786:13
814:10
**early** 687:22 690:19
746:15 797:14
805:4 844:16
**easier** 794:22
**East** 720:8
**eat** 664:17
**edition** 800:13
**editions** 800:15
**educating** 755:18
**education** 798:21
**EEO** 630:5,9
646:15
**EEOC** 802:22
817:12,13,14
**effect** 753:9 828:21
**effort** 718:9 725:14
778:7 823:4,20
824:3
**efforts** 725:17
**egregious** 820:8,9

In Re:  Larry E. Klayman
June 1, 2018

**eight** 620:16 624:15
  625:1,1 627:21
  676:8 696:20
  726:6 835:3
**Eighteen** 647:5
**eighth** 834:21
**either** 657:8 686:19
  691:1 696:9
  734:15 777:20
  814:7 844:5
**elected** 799:19
**election** 832:3
**electronic** 794:21
**element** 821:14
**elevation** 692:12
**Elham** 618:3
  619:16 623:16
  624:17 629:10
  631:5 658:6,7
  735:8 740:16
  749:22 813:8
**elicit** 710:14
**Ellen** 830:11
**Ellie** 666:10 708:5
  720:2 721:17,22
  722:4,6,17 723:1
  723:2 728:22
  729:18 745:5
**Ellie's** 722:19
**EllieSataki@yah...**
  623:16
**email** 617:8 623:5,9
  623:14,15 625:10
  625:11,14,16,19
  625:21 626:6,7
  650:8 652:4 660:5
  660:18 661:4
  663:8,9,18 664:5
  664:20 665:5
  666:3,11 668:8
  669:5,9 676:21
  678:4,9,19 681:18
  682:10 683:13,17
  684:6,20 685:4,8
  686:12,19 688:15
  688:16 689:4,7,12
  690:15 694:16
  697:9 699:9,14
  702:2 707:6,15
  712:6,17 713:9,11
  713:21 726:4
  727:15 728:8,21
  729:10,12,15
  730:7,20,22 731:6
  732:4 734:1 735:6
  735:11,13 737:2,5

738:15,18,20
  739:12 740:2,5,20
  740:22 741:21
  742:22 743:19
  772:6 781:11,13
  784:14,15 789:14
  790:9
**emailed** 689:10
  727:22 780:7,9
**emails** 661:13,17,18
  662:5,11,16
  666:11 667:4,6,11
  667:15 683:14,19
  684:10 685:15
  689:16 690:16
  696:6 697:1
  699:19 700:7
  702:12 706:22
  708:2 723:2,19
  728:2 738:21
  739:5 741:4
  784:18 786:6,9,13
  788:14
**employed** 620:13
  746:1 796:22
  798:9
**employee** 635:20
  745:2 754:4
  816:16,21,22
  817:5,17 822:13
  825:17 829:17
**employees** 798:16
  801:7 802:17
  815:22 816:6,7,10
  819:17 820:15
  821:19 822:11,15
  825:2
**employer** 626:15,22
  627:1,3,13,15,18
  627:13,15,18
**employers** 779:17
  798:19
**employment** 630:6
  722:4 798:3,3,7
  798:14,17 799:3
  799:17 800:21
  801:6 802:11,20
  803:21 804:9
  807:3 810:4,5,18
  811:20 815:20
  816:4,12 817:16
  822:9 830:16
  834:12
**encountered** 812:2
**encourage** 839:19
**engaged** 636:4
**English** 624:19,20

625:2 686:22
  687:9 711:18
  721:19
**enter** 842:15
**entered** 656:10
  658:2 737:14
**entertaining** 692:15
**entertainment**
  723:4
**enthusiasm** 683:10
**entire** 631:21
**entirely** 771:6
**entirety** 657:17
  659:11 768:15
  834:7
**entitled** 751:4 831:7
**entity** 804:19
**equal** 690:21
  802:20
**equipment** 844:1
**error** 794:8
**especially** 773:16
  773:22 798:4
**ESQUIRE** 616:11
  616:15,20 617:3
  617:10
**essentially** 836:6
**estimate** 802:14
  809:12,17
**et** 708:8 735:10
**ethically** 837:20
**ethics** 838:17,18
**Europe** 804:18,22
**evaluated** 781:19
**evening** 655:12
  669:19 671:1
  729:5 788:6
**event** 632:10 635:2
  686:21 776:11
  779:18
**events** 755:14
**eventually** 766:17
**everybody** 657:13
  688:17 759:17
  773:15,16,17
  776:15
**everybody's** 675:12
  691:17 758:19
**evidence** 639:11
  642:14,18 645:11
  645:18,19 646:22
  649:9 656:14
  658:2 674:5,14,16
  674:20 678:15,17
  690:11 691:9
  725:13 741:11

742:3,13 748:11
  767:21 768:1,7
  778:4 833:10
  836:14
**evidentiary** 643:3
**Ex** 813:17
**exact** 669:1
**exactly** 628:20
  632:15,16 676:7
  761:17 766:12
  772:11 773:4
  775:10 785:6
**examination** 708:10
  710:18 769:17
  770:1 781:22
  791:1 795:10
  812:5 815:3
  836:14
**examine** 791:3,10
**examined** 785:22
  795:9
**example** 777:13
  816:15 829:15
**examples** 787:9
**Excepted** 635:9
**excess** 708:13
**excluding** 708:11
**excuse** 639:18
  763:3,16 777:18
  786:3
**excused** 791:20
  841:1,3
**executive** 721:21
  722:16 745:19
**exhaust** 805:16
**exhausting** 787:18
**exhaustion** 826:19
**exhausts** 817:5
**exhibit** 621:22,22
  622:6,8,11 623:13
  628:16,17,19
  631:10 642:17
  646:13,22 648:13
  649:1,7 650:22
  651:6 655:20
  656:10,10,13
  657:2,18 658:5,9
  660:3 661:3
  663:18 664:20
  666:2 668:7 669:9
  673:17 676:20
  681:10,11,14
  683:19 686:7,8,10
  694:15,15 697:5,6
  697:7 699:9
  701:21 707:4,15

712:5 728:21
  729:15 730:19
  734:4 735:6 737:2
  738:15 750:16,19
  758:5 763:11,15
  763:20,21 764:2,4
  764:9,10,13,16,21
  764:22 765:3,16
  768:1,6,8,19
  770:4,10,19 771:1
  771:7 772:2
  780:17 784:13,15
  789:12 790:21
  794:7,12 812:10
  813:5 818:16,19
  832:7,20 833:10
  833:12,14 834:5,7
  834:9,9
**exhibits** 622:21
  657:11,20 659:14
  659:17 674:8,20
  675:5 750:17,20
  764:4,15 767:21
  779:8 784:12
  785:22 786:11
  794:7 812:9,12,15
  825:4,10 827:6,8
  827:13 832:8,12
  832:13,15,18
  841:10,14 842:3,4
  842:19
**exit** 669:20 671:2
  673:12
**expect** 844:15
**expected** 684:12
  836:21
**expended** 708:5
**expense** 633:3
  641:17 645:3
  677:19
**expenses** 641:19
  708:7,8 709:8
**experience** 701:12
  729:21 755:13,20
  757:7,14,16
  819:13 828:8
  831:9 837:19
**expert** 793:19,21
  801:1,6,18,21
  803:20 807:20
  808:1,4,22 811:19
  818:6 825:12,12
  834:11 836:9
  837:5,22 838:17
**expert's** 836:4,15
**expertise** 838:3

**explain** 625:12
640:19,20,22
641:6 709:18
740:10 783:10
815:19
**explained** 625:17
626:9 627:14
654:4 679:6
713:10,16 723:18
723:20
**explains** 729:20
751:19
**explanation** 641:2,4
811:11
**explore** 837:4
**express** 774:9
**extend** 624:17
**extent** 638:20 658:9
803:15
**extra** 820:5
**extrajudicial** 778:4
**extremely** 664:1
829:19 830:8

**F**

**F** 747:3
**facing** 693:4
**fact** 644:2 662:19
677:10 700:17
705:14,17 718:9
723:1 724:4,9
727:4 730:12
737:21 746:5
748:4 751:14
759:16 814:13
825:21 835:11,20
**fact-finders** 644:12
**facts** 686:19 742:3
742:13 743:17
824:22 825:6
827:1,20
**fails** 825:14,14
**failure** 700:12
825:7 826:2
**fair** 672:18 702:13
710:18 766:13
841:11
**fairly** 645:4 691:1
**faith** 724:8,10
725:20 744:2
823:4,19 824:3
**Falahati** 635:21
636:3,20 637:20
653:7 658:8
**Falahati's** 636:11
**false** 637:1,1,3,4,14

640:8,13 643:20
643:21 684:6
704:3
**falsely** 637:7
**falsified** 686:19
**falsity** 640:17
**familiar** 718:18
813:12,13 840:3
840:18,19
**familiarity** 839:21
**families** 714:13
**family** 714:11
728:11 729:2
730:4
**famous** 838:18
**far** 718:2 777:11
836:8
**Farsi** 636:22 721:19
**fault** 740:1
**favorable** 757:4,12
761:6
**February** 649:16
650:7 703:1
704:19 773:3
796:18 797:4
**federal** 709:20
797:5 798:5,9,13
798:16 801:7
802:11,17,22
803:9 804:13
807:5,7 810:7,11
810:14 811:21
815:20,22 816:5,7
816:10 817:5,13
817:17 820:15,20
821:8,9,19 822:11
822:12,15 826:9
829:8
**fee** 808:13
**feel** 625:12 645:3
668:12 669:3
829:2
**feeling** 742:19
**feelings** 670:9,10
687:22 743:1
**fees** 708:9 709:1
710:8 711:1 800:7
802:6
**felt** 683:8 742:1,2
755:10 787:20
831:6
**female** 805:6
**field** 797:21 811:20
**fifth** 687:10 781:1,3
834:20
**fighting** 677:19

751:6
**figure** 722:17
**file** 802:15 805:19
809:11 816:1
817:7 825:19
843:8
**filed** 621:11 646:15
646:16 648:15
692:9 763:1,18
764:11 765:4,7,11
766:22 770:19
813:9 814:9 825:5
827:9 831:3 833:3
843:3,4
**filing** 708:9 803:14
803:22
**Film** 714:15
**films** 714:11,13
**final** 630:5 631:4,22
635:7 679:21
680:16 703:15
805:18 844:13
**finally** 759:3
**find** 629:7 690:6
696:8 718:7
724:13 749:8
758:20 773:15
780:21 826:2,22
826:22 844:2
**findings** 630:8,12
630:14,19,22
641:20
**fine** 670:17 718:20
721:2,5 739:10
746:17 749:14
771:15 794:16
828:3,7 843:8
**finish** 762:7
**finished** 652:2
655:13 792:1,2
806:3 811:3
**firm** 797:8,14
**firms** 798:18
**first** 657:4 681:21
697:16,18 700:10
701:8 702:1,18
727:5 749:17
757:22 789:5
793:22 795:8
797:1 798:8
799:11 800:13
802:18 804:2
805:17 810:8,19
810:20 812:10
816:4 819:18
820:15 828:15

**firsthand** 826:14
**fit** 794:11
**FITCH** 616:11
619:2,10,14,19
620:6,9 621:15
622:9,14,18 623:2
623:21 627:9
628:5,11,18 629:1
631:17 632:3,7
638:12,16 639:4
639:10,13,22
640:10,21 641:1,5
641:10,15 642:1
642:11,22 643:17
644:1,7,11 645:10
646:11 647:2,5,7
647:12 648:4,8,16
648:20 649:8,12
651:2,13,19,21
653:15 656:1,11
656:15,18 657:7
657:16 658:3,13
658:18 659:1,7,10
659:16,19 660:14
661:20 663:12
664:2 665:3 667:1
668:17 670:20
671:13,21 672:7
672:17 673:18
674:2,6,13,17,21
675:8,11 677:8
680:10,22 681:2
681:13,16 682:17
682:19 684:4
685:21 686:3
691:10 692:16
693:9,13,17,21
694:1,8 695:13,19
698:5,9,12 699:6
700:4,22 709:17
709:22 710:14
711:22 713:3
715:8,10,14,17,20
717:3,11 718:2,20
719:4,18 720:14
720:21 721:2
724:21 725:3,5,7
725:12,16 726:10
726:16,19 727:1
728:12,17 730:14
731:13 732:9,19
733:1,7 734:5
736:10,12,19
738:3,7,11 739:10
739:14,17 740:10
740:16,19,22

743:18 744:4,6,14
744:17 746:2,9,14
746:17,20 747:6
747:13 748:17,20
749:13,16,20
750:2,9,18,21
754:20 760:8,18
760:22 761:13,18
762:9,12 763:5,13
764:1,5,14 765:1
765:13 766:7,13
767:13,17 768:3,8
768:12,14,20
769:3,8,10,14
770:5,7,9,13,16
770:21 771:5,10
771:14 774:21
775:2 776:19
778:10,15,18
780:19 781:5
782:17,21 784:9
784:22 785:12,17
790:13,16,19
791:1,7,14,16,22
792:3,7,19 793:2
793:7,12,20
794:16 795:3
799:14 804:4
806:3 807:11
808:18 811:7,13
811:18 812:4
814:21 815:11
818:7,13 821:22
822:5 823:15
828:16 832:5,9,16
833:17 834:5,19
836:12 838:2,10
839:6,13 840:8,10
840:21 841:4,11
841:17,19 842:6,9
842:13,17 843:1,7
843:21 844:3,13
844:15 845:2,8,17
**five** 636:19 639:18
741:1 769:6
792:12 835:2
**Florida** 617:6
747:19,20
**focus** 835:13
**folks** 831:15
**follow** 631:22
**follow-up** 840:6
**followed** 694:22
695:9 696:2
**following** 697:21
761:1

In Re:  Larry E. Klayman
June 1, 2018

follows 795:9
fondled 636:12
force 717:21
forget 696:18,18
forgot 688:19,20
form 680:6 794:22
formal 692:7
  805:19,21 806:8
former 645:6
  678:20
forth 775:11
forthcoming 811:8
forward 667:14
  683:12 705:4
  711:10 734:11
  747:12 749:6
  766:19
forwarded 666:4
  712:11,13,19
  713:11
forwarding 737:5
found 640:7 680:20
  701:17 702:19
  706:9 776:10
  777:12 783:15
  829:17
foundation 638:15
  639:4,14 764:7
four 636:9 652:18
  766:21 779:11
  835:2
four-year 767:5
fourth 677:6 733:12
  734:1 781:2
  797:16 840:16
frankly 645:3
fraudulent 737:12
Fred 748:12
Frederick 617:3,4
Free 751:6 804:18
  804:22
freedom 648:14
  719:12 751:19
  752:18 753:4,12
  754:3 757:1 758:1
Freedom-Loving
  751:5
Freeh 840:14
frequently 691:20
Friday 615:8
  840:22
friend 684:10,21
  685:3 688:2 720:5
  784:5
friend's 788:5
friends 705:7,9

729:18
friendship 650:15
front 646:1 758:2
  758:11 759:1
  812:8 838:20
fruition 725:18
fsujat@yahoo.com
  617:8
full 624:3
fully 735:9 748:13
  749:4
further 683:6
  748:17 767:6
  769:1 790:11
  791:3 818:11
  824:10,13 839:15
  840:20 845:10
future 653:11
  843:14

G

G 619:1
gambler 824:5,6
gaming 737:12
garage 783:12
Garrison 737:6
general 638:5 640:3
  650:11 702:11
  710:15,16 717:12
  755:16
generally 647:18
  702:10 719:2
  736:16 755:15
  829:2
gentleman 703:1
  704:20
Georgetown 796:14
getting 656:8
  660:17 661:3
  662:13 683:13
  702:14 726:3
  727:13 729:10
  755:18 836:6
  837:21
ghetto 787:11 789:5
girl 723:19 745:1
give 621:10 622:1
  641:3 644:20
  656:15 666:17
  667:5 673:18
  674:3 676:16
  679:14 685:21
  719:12 728:3
  747:18 748:9
  750:9 762:12,14
  768:3 787:8

793:15 794:17
  803:3,12 804:20
  817:6 825:11
  834:16 843:2,6
given 642:3,13
  713:7 755:12
  844:4
gives 650:10 737:18
  747:21
giving 742:10
  774:19 785:15
glass 729:5
global 721:19
Gloria 688:1,2,13
  689:4,17 748:8
  749:1,1 779:12,15
  779:21 780:8,10
go 620:9 632:15
  635:8 636:9
  638:18 639:16
  642:1 653:16
  654:16 659:15
  660:14 664:2
  665:3 673:8
  674:11 676:6
  679:19 682:17,19
  684:4 686:3
  691:18 692:21
  700:17 704:15
  713:17 747:20,20
  748:2,2 750:12
  751:17 753:18
  754:21 768:4,5
  769:14 773:15
  777:22 778:18
  780:20 782:21
  785:19 788:4,8,11
  790:3 795:3 803:1
  803:15 805:16,17
  805:21 806:5
  807:4 815:6
  826:18 832:17
  834:19 837:7
God 724:11 729:19
  730:3 744:21
  753:1,2
goes 642:7 735:17
  751:5 825:17
going 621:9,11,21
  623:4,5 625:6,15
  626:5,9 627:15
  628:22 635:12
  639:8,10 644:2,3
  644:7,9,12 646:6
  652:6,9,12 653:21
  659:13,14 660:2

661:16,19 662:8
  662:15 664:5
  665:2 666:7
  673:22 674:11,17
  674:19 675:5
  678:15 680:5
  681:6 687:10,12
  689:17,22 690:14
  691:14 692:1,3,19
  700:10,20 704:4
  704:12 708:4
  710:6,22 711:10
  713:15 720:1
  722:7,17 723:21
  723:21,22 724:1
  733:9 741:3
  746:11 747:11,16
  749:6 752:19
  753:11,18 754:9
  755:4 758:12,17
  758:20 759:5,12
  759:17 766:19
  767:10 773:13,17
  773:17 774:14
  775:20 777:19
  783:17,18,20
  784:2,8 788:15,16
  802:19 814:21
  823:3 824:22
  826:7,8,15 827:4
  833:3 834:20
  836:2,12 837:3
  841:6 842:11,14
  844:10,11
good 619:4,18,19
  620:4,5 632:6
  636:4 639:7 645:8
  648:8 650:16
  664:9 668:12,22
  669:4 693:15
  701:13 714:13
  718:7 719:8,9
  723:15 729:16
  746:11 750:3,8,14
  750:15 753:11,12
  763:7 769:20,21
  815:8 823:4,19
  824:3 839:12
governed 816:22
government 653:10
  751:4 757:1 758:1
  779:16 798:5
  800:7 803:10
  821:8 828:9,11,13
  828:20 829:1,8
  830:5

governmental
  811:22
governors 650:19
  652:12 658:7
  813:9,18 823:6
  824:16,18,19
  830:14,16 831:4
grabbed 636:12
gracious 643:2
grandfather 831:15
great 644:5,6
  721:17 748:1
greater 684:8 713:9
Greenberg 797:16
  797:17
group 714:7,8,14
guess 622:22
  784:13 814:14
guilty 737:9,14
  829:18
guy 674:6

H

H 616:20
H-u-v-e-l-l 830:12
half 693:10 746:18
  766:2
halfway 740:11
hand 621:16 793:13
handed 630:9
handing 821:13
handle 654:1
  717:12 781:20
  810:17 822:9
handled 645:17
  691:7 798:13,17
  802:18 803:2
  810:3,10 830:10
handling 808:13
handwriting 763:12
hang 706:1 787:11
happen 755:5,19
  758:17
happened 635:1
  773:18 790:4,5
  791:5 820:19
happening 662:20
happens 691:20
happy 659:4 670:5
  671:10 672:3
  741:10
harassed 637:20
  751:6
harasser 638:8
  653:3 822:16,19
harassment 632:21

634:16 636:5
745:2 773:19
774:2,4 779:15
821:5,13 822:9
825:7
**hard** 677:10 824:4
**harmed** 700:13
**hash** 705:5
**hated** 687:16,17
**head** 714:7 816:14
817:3,9 820:21
823:1 825:13,20
**health** 621:4 748:1
**hear** 724:12 729:8
759:8 777:21
784:22 811:18
**heard** 646:4,12
650:4 651:15
656:3,5 828:17
839:6 842:10
**hearing** 615:11
616:1,3,10 619:5
621:18 623:17
624:3 645:22
647:11 654:16
659:5 691:1 747:4
749:8 781:15
786:8 787:8
789:19 792:8,11
794:4 802:21
845:15,18
**hearsay** 776:18
784:7
**heart** 665:18,22
**heat** 820:4
**heavily** 798:11
**held** 830:5
**Hello** 624:2
**help** 629:6 633:11
634:12 669:22
671:4 673:11
676:16 683:10
688:4 698:19
701:1 716:16
717:2,6 718:3,7
745:3,4 756:4
759:17,20,22
774:14 775:21,21
780:11,12 783:5
788:6
**helped** 685:10
687:8 698:18
701:3 711:18
**helpful** 690:8
**helping** 685:15
717:9 729:6

756:11
**hesitancy** 725:21
**high** 839:2
**higher** 695:6
**highly** 843:20
**highway** 676:17
**Hillary** 813:16,22
816:18 817:18
818:9 823:13
825:13 832:2
836:5
**hint** 781:16
**History** 658:10
**Hoc** 616:3,10
**hold** 624:14 627:21
711:11 778:10
791:12 828:11
**holding** 642:17
828:20
**Hollywood** 617:6
716:7 718:7
**home** 650:10
820:10
**homeless** 634:21
**honest** 701:17,18
**honestly** 677:4
720:20,20 802:6
803:3 804:14
805:4
**honesty** 646:2
684:13,15
**Honor** 619:13
623:19 628:21
638:19 641:4
642:8,19 644:10
644:15 646:21
650:21 651:18
656:6 657:20
658:16 660:21
663:11 664:1
665:1 666:8
671:18 677:7
678:14 681:7
682:15 684:2
687:13 689:13,20
693:12 716:1
746:10 748:4
760:21 763:3
764:17 767:9
769:1 782:9,15
784:6,21 791:12
793:18 795:4
811:3 814:2,11
833:9 838:13,13
842:12 845:1
**Honors** 843:2

**hook** 844:1
**hope** 624:10,16
654:13 708:17
729:2
**hoped** 708:17
**hoping** 755:4
843:16
**hour** 693:10 746:21
808:7,14
**hourly** 808:13
**hours** 741:2 812:22
813:2
**house** 705:11,15
716:13,14 748:2
788:5 844:1
**huge** 643:8
**hundred** 677:18
798:16 802:13
807:7
**hundreds** 817:11
826:9 827:12
**hung** 706:19
**hurt** 627:16 818:2,8
**hurting** 786:16
**hurts** 683:6
**husband** 678:20
**Huvell** 830:11,19
**hypothetical** 825:11

**I**

**idea** 683:4
**identified** 623:11
720:8 736:8 748:7
**identify** 629:9
631:14 659:3
727:7
**identity** 706:5
**iffy** 827:18
**III** 616:20
**ill** 686:20
**illegal** 825:21
829:11,12,19
**imagine** 823:8,17
824:7
**immunity** 829:3,9
**impacts** 836:15
**impediment** 725:10
**implied** 683:3
**imply** 814:14
**implying** 683:5
**important** 624:9,13
630:15 633:8
634:2 643:16
646:7,10 665:13
690:10 713:1
748:8 751:20

**imposed** 722:3
**improper** 648:2
672:16,17 711:10
**improperly** 711:9
**inaccurate** 648:17
**inappropriate**
695:18 785:16,18
**inaudible** 729:20
**include** 674:8
823:20
**included** 840:2
**including** 684:11
706:4 708:6
711:16 798:3
800:21 825:5
**income** 721:16
808:3,8,16
**inconceivable** 646:6
**incorrect** 810:8
**incredible** 826:3
**independent** 708:11
827:7
**individual** 637:19
714:3 819:16
820:21 822:13,16
822:19 825:18
827:13 838:19
**individuals** 821:18
822:20
**indulge** 769:5
**indulgence** 746:13
**influence** 754:10,12
755:14
**inform** 735:9
**information** 641:13
644:21 648:14
768:14 791:6
837:5
**informed** 686:20
692:11
**initial** 633:3 737:4
763:2 766:22
**initially** 699:11
794:12 797:15
800:8 812:21
816:3
**inserting** 695:16
**inside** 640:6 678:6
**instruct** 762:18
**instructed** 723:9
760:3 814:11
843:16
**instruction** 807:10
**instructions** 695:1
695:10
**insurance** 621:4

**intend** 657:21 695:5
**intentionally**
686:19
**interact** 787:16
**interest** 684:11
700:13 702:22
704:18 714:8
776:1 828:5 830:4
**interested** 727:16
756:2
**interfere** 789:3
**interfered** 711:13
**Interference** 708:21
**interferes** 711:9
**interfering** 709:6
**International** 651:8
652:11 817:1
**internet** 706:10
**interrupt** 626:10
777:19 780:19
**interrupted** 781:6
**intervened** 720:9
723:3
**interview** 719:21
723:6 805:19
826:21
**interviewed** 640:6
680:18 720:3
722:5
**interviewing**
720:10 723:1
**intimidation** 636:5
**introduce** 645:19
**introduced** 645:18
701:11 705:9
714:5
**investigate** 826:17
**investigated** 827:3
**investigates** 805:20
**investigation** 737:8
737:13 778:1
827:7 837:14
**investigative** 806:9
826:18
**investigator** 706:9
706:17 736:9,18
737:6,18
**Investigator's**
737:4
**invite** 705:5 788:12
**invokes** 820:18
**involved** 653:19
783:8 802:12
806:7
**involves** 801:7
815:19

In Re:  Larry E. Klayman
June 1, 2018

Page 856

**involving** 737:12
  829:15
**Iran** 718:16 719:3
  719:12 720:7
  751:7,20 754:2,17
  755:9 756:12,13
**Iranian** 752:20
**irrelevant** 811:15
  814:19
**IRS** 810:21
**Isabel** 800:3
**issue** 642:9 643:3
  645:16,17 670:19
  691:11 727:13
  792:10 811:16
  814:12,18 815:2
  830:22 831:1
  837:20
**issued** 670:4 671:9
  672:3,22 675:18
**issues** 623:6 644:17
  691:6 705:5
  716:17,18 799:4
  803:21 804:1
  834:12
**It'll** 660:21

—————————

**J**

**J** 617:3,4
**Jamshid** 729:6,8
**Janet** 705:6
**January** 730:20
  735:7,12 737:3,14
  738:17 784:16
  786:3
**Jewish** 743:21
  744:11
**job** 621:3 624:11
  626:10 636:4
  653:8,9,9,10
  654:12 677:20
  713:22 718:7,10
  721:9,16 723:14
  723:15,17 727:13
  754:6 797:1
**jobs** 637:16
**Joel** 618:4 793:6,11
  794:5 795:6,14
**John** 802:1 805:1
  840:1
**Johnson** 629:4,11
  653:18
**joined** 797:4,8
**jointly** 747:9
**Journal** 800:6
**journalist** 756:18

**journals** 800:20
**Joy** 702:17,20
  703:8,11,20,20
  704:1,21 705:1
**judge** 670:4 671:9
  672:2,12,22
  675:17 676:2
  747:22 797:2
  802:1,21 805:1
  817:12 830:11,19
  838:21 839:1,11
**judge's** 695:6
**judges** 845:7
**judgment** 803:7
  819:14,22 820:3
  826:14
**judicial** 658:6,14,19
  658:20,21 840:13
**July** 624:12 681:19
  682:10 683:19
  686:13 747:18
  748:15 749:7,8,12
  780:18 781:9
  835:4,17
**jumbled** 785:3
**June** 615:8 657:1,1
  657:4 666:3 668:8
  669:10 676:21
  771:3,22 773:5,7
  792:12 845:13,19
**jurisdiction** 836:20
**jurisdictional**
  818:22 819:3,8
**Justice** 794:21
**justified** 831:6

—————————

**K**

**Kaiser** 673:8
**karma** 743:22
**Kathleen** 633:20
  655:16,22 682:12
  682:22 683:8
  685:10,14,17
  687:5 697:15
  698:3,16 743:10
**keep** 624:10 625:13
  625:18 626:11
  645:13 677:15
  730:2
**Kevin** 712:6,11
  727:19
**kill** 654:18 655:1
**killed** 676:16
**Kim** 615:22 616:4
**kind** 642:17 690:5
  692:10 749:10

769:6 804:19
  820:4
**kinds** 706:19
**Kinko's** 764:18
**Klayman** 615:5
  617:10 620:3,9,11
  621:8,13,17 622:3
  622:4,7,13 623:1
  623:3,4,7,12,18
  623:22 624:1,15
  626:2,4 627:7,11
  627:22 628:15,18
  628:20 629:2,9,12
  631:18 632:2,6,9
  632:18 638:14,18
  639:6,12,15 640:2
  640:4,19,22 641:3
  641:8,11,16 642:7
  642:19 643:4,15
  643:22 644:5,9,14
  645:21 646:21
  647:4,6,8,10,16
  648:6,10,12,18,22
  649:2,5,6,11,13
  650:4,6,21 651:4
  651:5,14,17,20
  652:1 654:9
  655:19 656:6,13
  657:5,10,18 658:5
  658:11,12,16,20
  659:2,9,12,17
  660:1,16,20 661:1
  662:4 663:10,16
  663:19,22 664:3
  665:1,4 666:7,9
  666:20 667:3
  668:3,5,15,20
  669:7 670:11,14
  670:17,22 671:17
  671:19 672:19
  673:20,22 674:4
  674:11 675:13,14
  677:6,9 678:12,18
  679:8 680:8,14
  681:6,9,17 682:15
  682:18,20,21
  684:1,5 686:1,3,5
  686:9,11 687:12
  687:14 689:13,16
  689:20 691:10,14
  692:17 693:1,10
  693:11,15,20,22
  694:10,12,13
  695:16 696:1
  697:7,8 698:7,11
  698:13 699:5,7

700:5,21 701:4
  704:10,11 707:3,5
  709:12,19 710:2,5
  710:19 711:4
  712:1,3 713:4,6
  715:11 715:11,16
  715:18,21 716:1,2
  716:21 717:1,5,16
  718:5 719:1,6,7
  719:15,19 720:16
  720:17 721:6
  725:1,4,6,9,15,19
  726:1,13 727:3,9
  727:12,17 728:6
  728:14,18,19
  730:17 731:16
  732:17 733:2,7,9
  733:11 734:9
  736:15,20,22
  737:7 738:1,5,8
  738:13 739:11,15
  739:22 740:12
  741:7,9 743:19
  744:8,15,18 746:3
  746:4,10,16,19
  747:14 749:14,18
  750:6,7,13,19
  751:1,5,19 755:6
  757:18 759:10
  760:19,21 761:4
  761:20 762:1,4,10
  762:14,15,18
  763:3,7,9,14,21
  764:6,8,14,17
  765:2,16,19
  766:14 767:9,15
  767:20 768:6,11
  768:13,15,17,22
  770:14 771:1,4
  772:1,3,20 773:6
  773:10 774:10,18
  775:6,14 776:3,8
  776:17 777:16
  778:22 779:11,20
  780:6 781:12,18
  781:22 782:8,14
  783:4,4,8,18
  784:1,6,16,21
  785:2,11,14,22
  786:10,14 788:19
  789:16 790:12,14
  790:17,21 791:4
  791:11,18 792:17
  792:21 793:18
  804:2,6 806:4
  807:9,13 809:6

811:3,9,15 812:3
  812:12,14 814:2
  818:4 823:12
  824:10,14 830:1
  832:6,13,21 833:8
  833:15 834:1,8
  835:1 836:19
  837:3,8 838:4,9
  838:12,15 839:8
  839:10,15 840:6
  840:11,20 841:8
  841:13,15,18,22
  842:9,11,14 843:2
  843:5,10,22
  844:11,22 845:4
  845:14
**Klayman's** 770:1
  777:16 832:15
**knew** 663:5 687:22
  687:22 713:15
  738:2,5 742:18
  744:16 831:3
**know** 621:7 624:2
  624:12 625:1
  627:3 633:8 634:8
  634:10,11 635:16
  643:5,18 645:2,10
  653:13 656:7
  657:10 662:8,12
  669:17 670:10
  675:22 676:18
  683:17 689:19,22
  690:22 691:6,21
  700:20 701:2
  712:19 713:13
  716:5 718:3,21
  722:12 727:6
  730:1 731:4,11,18
  732:1 736:11,16
  737:19 743:20
  745:14 754:12
  756:8 766:11
  770:14 773:4
  775:9 776:7 777:2
  778:6 807:1,4,6
  808:6 819:18
  820:5 822:8,12
  826:7,8 831:2
  836:4,8 838:5,16
  838:19 844:21,22
  845:2,5
**knowledge** 666:16
  777:9 809:4
  826:15
**knows** 654:8 666:12
  670:9 772:15

App.0400

In Re:  Larry E. Klayman
June 1, 2018

Page 857

776:19 785:5
807:12
**Kollar-Kotelly**
672:13
**Kollmer** 649:16
**Kotelly** 670:4 671:9
672:2,22 675:18
676:2

_____
**L**

l-i-a-i-s-o-n-s 637:6
**LA** 654:5 673:1
683:4 695:3
704:13,16 720:6
721:22 825:8
**Labor** 799:17
**lack** 645:13,14
684:14 725:4
785:2 814:7
**laid** 639:5,14
**language** 636:22
**LARKIN** 616:13
**Larry** 615:5 617:10
658:5,10 663:18
664:10 683:12
684:16 685:5
729:9 730:4
740:12 751:5,19
771:4 772:1
777:16 838:9
**late** 805:3
**law** 617:4 796:11
796:13 797:1,21
798:3,7,18 799:3
799:11,18 800:5
800:13,20,21,21
801:6 803:21
820:6,12 821:7
823:5,20 834:12
**lawsuit** 831:14
840:13
**lawyer** 683:7
685:18,18 698:22
699:2 796:19
802:5 819:14,22
821:13 827:19
**lawyers** 711:20
797:13 814:17
822:9 831:7,8,20
832:1 845:5
**LAX** 708:9
**lay** 639:5 764:7
**laying** 638:14
**lead** 748:10
**leading** 716:21
774:18 822:8

**learn** 625:2 735:1
**leave** 661:14 703:12
785:12 789:2
**lecturer** 799:1
**led** 788:19
**left** 628:17 670:1
671:5 673:15
702:21,22 704:19
**legal** 643:3 660:6
665:5,7,8 666:17
667:15,18 687:21
702:3 706:5,9
708:6,11 709:1,2
710:8 711:1,16,16
711:17 733:13,16
734:13 735:2,8
798:21 806:20
814:9,14 828:11
828:19 839:12
**legally** 711:11
**legitimate** 627:3
827:15,19
**let's** 626:11 713:17
717:18 727:7
731:1 746:20
774:21 808:10
821:2 830:2
**letter** 629:3,7,8,10
629:13,18 630:11
631:3,22 635:3
647:21 649:16
650:7 651:6,11
656:22 657:1,4
687:4,13 689:7
691:3 693:2
697:14,14,18
698:2,6,15,17,18
698:19 734:18,20
834:10 835:4,7
**letters** 711:15
**level** 810:11 817:12
817:13,14
**levels** 802:18 803:3
803:4
**Lexis** 800:11
**liaisons** 637:6
**licensed** 795:20
796:1
**lies** 745:18
**life** 624:14,16
627:20,22 630:15
646:8 668:12
669:4 715:5,13
729:21 744:22,22
745:5,9,12,13,17
789:2

**light** 642:20 748:4
767:12
**likewise** 738:12
**limits** 749:5
**Lincolns** 831:16
**line** 815:2 836:14
**lines** 665:2 749:4
819:11
**link** 776:7,11,12
778:8
**list** 635:9 706:4
811:10
**listed** 670:17,18
776:14
**listening** 717:20
**litigate** 832:1
**litigating** 826:11
**litigation** 691:20
708:17 799:20,21
800:21 801:19,22
803:15 827:17
**little** 628:22 648:7
674:7 692:18
693:17 745:1
754:17 769:11
815:20 821:22
823:21 837:4
**live** 641:19 664:17
843:14
**living** 708:7
**located** 737:18
**location** 664:6
**logically** 630:18
**long** 655:22,22,22
676:4 696:15
706:4 710:4
795:17 806:10
829:10
**longer** 693:18
**look** 631:7,10
649:14 651:10
652:19 656:21
682:5 683:21
705:4 713:18
731:2 740:11
777:14 778:3
779:7,13 780:16
789:11 795:1
809:10 812:9
813:21 819:7
**looked** 661:6
812:20,22
**looking** 657:13,14
699:10 763:4
773:5 790:6
**looks** 771:2

**Los** 620:15 638:4
652:13 675:19
702:18,22 704:19
718:13 745:22
746:5
**lose** 741:13 742:4
742:15
**losing** 744:1,20
**lost** 640:14,14
653:9,9,10 655:3
662:11 670:20
733:21 740:1
741:11,13,15,17
742:9
**lot** 645:2 683:14
697:2 699:19
701:5 704:9 819:2
820:6 825:6
833:13
**lots** 822:8
**Louis** 840:14
**love** 729:8
**loving** 758:1
**low-class** 706:1
**loyal** 687:19
**lucid** 687:15
**lunch** 746:11,21
**luncheon** 747:1

_____
**M**

**M** 615:22 616:4
**Madame** 668:20
710:20
**Mahmonir** 729:4,7
**mailed** 743:9
**Main** 816:16,21
**major** 796:9 803:13
804:13
**makeup** 807:1
**making** 680:16
693:16 754:17
763:7
**man** 839:1
**management**
636:21 687:17
799:12 800:22
**manager** 720:9,12
721:20 722:20
723:2,3,4
**managers** 708:18
757:8,15 758:13
825:16
**manner** 814:8
**manufactured**
637:3
**March** 629:7,10

630:3 631:16
632:15 651:15
737:16 773:3
**mark** 622:10
721:21 722:16
**marked** 622:8
770:3 779:8
**MARY** 616:13
**material** 691:9
**Matt** 737:5
**matter** 615:4
621:20 628:6
691:7 747:17
781:17 790:21
794:1 807:21
808:1 815:14
830:4 834:13
841:8
**matters** 619:7,11
625:20 645:1
649:22 667:17
693:6 702:3 708:6
728:11 733:17
734:13 735:2
790:14,20 801:10
821:15 836:18
841:5 845:11
**Mazinas** 810:17
811:2
**McLaren** 797:3
**mean** 622:1 631:1
646:4 658:14
664:9 670:9 676:4
676:8 701:3,8
720:22 724:10
742:9 748:21
755:2 756:21
770:9,10,11
788:17 789:9
808:6,7 820:9
**means** 681:4 700:20
774:4 791:22
**meant** 742:11
**Mecca** 831:11,13
**Medhi** 653:7 658:7
**media** 755:14,17,19
757:6,13
**medication** 790:2
**meet** 714:20,22
715:4 721:22
747:19,20 783:21
**meeting** 702:3
705:4 722:6
**MEGHAN** 617:13
**Mehran** 735:9,14
736:3 737:3,8

In Re:  Larry E. Klayman
June 1, 2018

member 616:14,16
  795:18 799:16,19
  813:17 824:16,19
members 619:5
  794:4
Membership 800:2
memo 631:19
menial 637:16
mental 789:20
mentally 786:17
  787:5
mention 804:8,12
mentioned 747:15
mentor 716:18
merged 797:13
mess 821:10
message 670:1
  671:6 729:18
  753:4
messages 719:12
  786:14 788:14
messing 709:7
met 714:4 716:9
Mezinas 797:9
MICHAEL 616:15
microphone 772:14
Middle 720:8
million 824:1
mind 642:13 648:5
  672:14 692:5
  713:8 722:1
  741:22 743:8
  790:8
mine 688:2 700:14
miniature 714:10
minimum 684:12
minute 640:11
  647:2 671:14
  768:3 823:16
minutes 694:2
  769:6 790:18
  792:15
mission 754:1,5
misspelled 735:19
Mitchell 797:9
  810:16 811:1
mom 729:1 788:5
moment 656:15,19
  673:18 674:3
  742:1 772:11
  784:1 821:2
monarchist 687:18
Monday 792:12
  844:6 845:13,19
money 631:1 664:8
  664:16,17 665:21

677:16
money.' 665:11
monies 664:14
  708:16
month 621:5
months 773:2
  786:13 797:4
moot 843:12 844:10
  844:11
morning 619:4,18
  619:19 620:4,5
  664:8 729:17
  743:8 748:7
Motion 843:3
motions 749:3,4
move 646:21
  655:20 674:1,15
  674:19 675:6,7
  678:14 699:5
  733:10,10 768:1
  772:14 776:17
  778:13 820:13
  841:9,14 842:2
moved 647:7
  767:21 768:7
movers 708:7
Movieguide 714:8
  720:5
moving 641:19
  684:2 767:15
  833:9
Ms.- 654:10
Muslim 723:18,22
  724:8,10
Muslim,' 722:1

—————————
          N
N 618:1 619:1
  747:3,3,3
name 664:6 714:3
  735:17,22 736:2,3
  736:3 737:20
  777:16 793:10
  795:12 805:5,7
  813:22 815:12
  817:2,8,9,18
  818:1
named 813:16
  825:12 840:16
names 680:18
  735:21 804:21
  807:6
naming 818:9
  823:21 831:6
  836:5
national 776:9

777:16 816:8
native 754:3
near 843:14
near-fatal 675:17
necessarily 643:20
  719:17 743:12
  792:9 819:22
necessary 813:22
  815:12,18 844:19
  844:19
necessity 836:5
need 625:13,18
  681:5 689:2
  690:15,15,19,20
  691:7 692:1 693:7
  710:12 736:13
  748:11 752:17
  790:17 821:21
  844:16 845:3
needed 624:8 627:4
needs 691:18
  748:12
negative 696:22
  760:7 761:19
negotiations 708:13
neither 815:1
Nella 705:5,17
Nella's 705:14
Net 776:4
network 620:16
  638:6 673:1
  677:11,17,20
  714:1
Nevada 737:11
never 646:5 648:5
  665:10 671:14
  683:2 685:14
  688:11 709:9
  719:20 722:2,18
  723:4 727:14,15
  743:14 756:15
  759:4,7,11,15,19
  759:20 760:1,3,7
  760:20 762:2,16
  762:20,21 766:3
  787:20 804:8
  807:19,22 822:7
  822:22 824:7,8
  827:2,5
new 690:12 791:5
news 638:6,7 673:1
  677:11,17 754:5
  755:2,3 757:3
newscasting 637:2
  637:4
nice 729:3,4

nicely 648:9 789:6
  789:9
night 655:10
nine 638:11 835:3
non-case 787:3
non-lawyers 711:15
nonstop 774:1
normal 782:18
Notary 616:5
note 674:21 844:3
notebook 764:1
  832:10
noted 794:8
notice 805:18 817:7
  826:1 840:22
  845:6
noticed 818:21
notices 817:8
notified 833:2
notwithstanding
  758:21
November 728:22
  729:11 763:15,17
  763:18 776:12
  777:17
number 624:18
  635:15,18 636:9
  636:19 637:12
  638:11 640:6,15
  646:13 649:9
  650:10 664:6,7,15
  664:20 674:9
  693:6 706:11
  736:17 763:20,22
  764:21,22 765:14
  765:14 768:20
  770:7 774:19
  779:9 784:13
  789:12 802:14,15
  813:5,10 824:18
numbered 771:19
NW 616:2

—————————
          O
O 619:1 747:3,3,3
o'clock 743:7
  746:21
oath 620:7 679:3,11
  688:21
obey 644:16
object 657:8 658:11
  680:6 784:6 836:2
objected 675:5
objecting 681:3
objection 621:6
  625:22 628:4,13

639:22 640:9
  647:1,9 650:2
  651:1 656:20
  657:15 658:8
  659:6,8,11 660:13
  666:19 667:1
  668:14,16 670:8
  678:15 680:21
  689:1 695:11
  700:3,19 704:6
  709:10,18 710:11
  715:8,9,10 716:19
  717:7 724:20
  725:7 727:7 728:5
  728:12,17 737:22
  744:3 768:9
  774:18 776:17
  782:8,16 784:21
  785:1 811:13
  814:2,3,21 818:4
  832:4 834:4
  836:13 839:3
objections 709:15
  811:4 812:1
  841:16,18,22
  842:12,18
objects 681:2
obligated 688:22
obligation 690:5
obligations 735:9
observations
  836:16
observe 619:4
obviously 646:5
  691:4 723:3
  748:11 758:22
occasions 716:10
occupation 795:15
occurred 666:13
OCR 644:18 646:15
OCR-10-11 631:6
October 712:9
  764:12 765:4
  797:11,12
odd 799:2
offered 652:16
  664:13
office 617:4 629:4
  630:8 632:19
  633:4,8 640:5
  659:18 668:7
  679:21 680:2,15
  680:19 682:12
  683:1 697:4
  701:20 702:16
  703:16 730:18

In Re: Larry E. Klayman
June 1, 2018

738:14 800:22
801:11 802:22
805:11 806:13
807:16 808:4,11
809:8,22 817:13
820:17 825:8
837:10 843:5
**officer** 807:6
**offices** 807:4
**official** 824:20
828:12,13,20
829:10 830:5
**officials** 636:21
829:1,8
**Officio** 813:17
**oh** 622:10 682:20
810:15 822:22
**ok** 623:1,22 625:19
627:18 628:14
632:9 639:17
641:10,11 644:14
648:22 657:16
659:19 663:14
664:4 668:4
671:13 674:4,21
675:15 676:19
679:12,16 681:8
688:20 698:12
704:10 705:17
713:4 715:16
719:18 720:21
724:16 725:6,15
727:1,11 728:18
731:12 733:1
734:7,8 735:21
736:20 739:18
740:15 746:3,13
746:14 747:13
752:10,15 762:11
762:14 765:1
766:1,16 768:5,22
771:1 772:10,17
775:13,16 782:10
788:8,20 791:11
806:5 812:3
832:19 835:4
**okay** 656:5
**old** 674:6
**once** 812:20
**one's** 828:14
**ones** 748:6 803:13
**online** 777:10
800:11
**oops** 767:18
**open** 642:13 661:14
662:6,16 667:10

683:15 696:6
706:22 708:2
712:21
**opened** 661:18
699:19 729:13
730:22 786:6
**opening** 661:21
700:6 786:9
**operations** 803:1
817:13
**operative** 835:22
**opinion** 837:15
838:8 839:2
**opinions** 836:16
**opportunity** 631:7
634:5 635:10
646:14 651:10
682:5 719:9,10
802:20
**opposed** 639:2
**oppressed** 756:13
**optimistic** 668:12
669:3
**option** 802:19
**order** 657:12
**ordered** 744:21
**orders** 624:7
**ordinary** 830:20
**organ** 756:22
**organized** 769:7
**origin** 816:8
**original** 763:11
764:10,15
**originally** 747:17
794:6
**outside** 769:11
**overrule** 836:12
**overruled** 660:14
667:2 668:17
695:13,19 700:22
717:4 724:21,21
725:3,5,8 754:20
784:9 814:22
818:7
**owe** 665:11,17,21
**owned** 667:11

**P**

**P** 619:1
**P-o-u-r-g-o-l**
678:21
**p.m** 699:11 747:1,4
793:8 845:18
**package** 629:5
659:20 684:20
739:20

**page** 622:5 623:8
631:4 635:8
639:18 646:17
693:2 702:17
703:15,17 705:2
707:1,2 712:5
739:19 741:5
770:4 780:16
781:8 813:15
819:9 834:19,21
834:21 835:3
**pages** 631:21
639:18 647:13
651:11 652:6
657:8 751:2,17
758:4 812:10
827:12 834:15
**paid** 808:7,9,11,15
809:8,19
**paper** 837:22
**paragraph** 639:1
652:18 677:6
687:11 701:22
702:13 705:3
720:2 733:12
734:1 779:11,13
821:16
**paragraphs** 628:7
781:1
**paraphrase** 638:20
**part** 621:12 626:8
626:12,13 630:8
636:6 638:18
643:8 652:17
658:14 695:2
719:5 724:8,9
729:20 731:15
778:9,13,13
828:17 836:22
844:19,20
**participate** 798:20
**participated** 800:12
**particular** 634:21
635:1,2,3,15
663:9 698:17
758:9 760:17
790:1 797:21
825:18 830:18
**particularly** 727:5
801:7
**parties** 616:7
708:22 709:3
747:8 779:14
792:14 803:16
**partner** 797:16
**parts** 844:16

**party** 741:14
777:20 793:21
**passed** 664:5 794:2
**Paul** 649:16
**pause** 659:21
673:21 686:2
750:11 763:6
767:19 791:13
792:6
**pay** 664:14 710:7
710:22
**payday** 664:4
**paying** 723:15
**peculiar** 838:6
**pending** 663:11
793:3 835:11
**Pennsylvania** 649:4
**people** 633:15
636:3 640:6 679:7
694:2 706:1,2,4
706:19 711:20
744:22 745:12
752:18,20 753:2
753:10 754:2
755:3,18 756:6,13
773:22 784:2
786:22 787:11
807:2,15
**percentage** 677:13
**perfect** 790:8
**perfectly** 641:10
648:8 763:5
782:18 828:7
**performing** 756:10
**peril** 706:12
**period** 669:15
732:6 734:22
746:1 766:10
767:5 786:1
**periods** 687:15
**perk** 742:10
**Permanente** 673:8
**permit** 838:13
**permitted** 709:20
814:20
**Persia** 638:6 673:1
677:11,17
**Persian** 620:15
637:8 687:18
736:3 751:19
752:18 753:2,12
789:5
**Persians** 787:12,12
**person** 665:13
698:21,21 701:13
706:3 716:12

722:10 730:8
731:19 732:7
733:5 734:11,12
736:7,8 738:9
787:15,15,16,18
**personal** 788:20
**personally** 630:16
695:5 828:12,21
829:1 830:5
**persons** 665:18
706:5
**persuaded** 775:17
**pertaining** 833:16
**peruses** 631:12
833:22
**petitioner** 659:18
750:20
**petitioner's** 659:14
661:2 664:19
668:6
**Phoenix** 684:7
**phon** 797:9,15
**phone** 624:18
625:18 673:10
696:11
**photograph** 776:20
**physical** 635:19
638:8 789:20
820:10 821:14
**physically** 786:17
821:3
**picked** 705:11
**picture** 634:22
721:11 776:13,14
776:14
**piece** 690:10 691:9
**pitfalls** 678:4
**place** 641:18 680:17
705:13,18 754:18
831:18
**placed** 637:21
638:7
**plaintiff** 802:7
805:5,6
**plaintiff's** 636:22
**plaintiffs** 822:8
**plane** 708:8
**Planet** 843:19
**planned** 778:22
**play** 699:22 700:2
744:22 754:17
755:8,18 788:11
**plays** 755:17
**plea** 737:14
**pleading** 621:10
692:9

**pleadings** 802:15
803:22 825:5
827:9 831:5
**please** 623:8 626:10
627:5 635:8
639:21 655:8
656:16 664:5
665:7 670:15
673:19 680:12
684:9 685:1
733:14 734:14
754:22 757:10
762:3,4,7,18
780:1 783:11
785:7 789:2,7
793:13 795:12
815:10
**pled** 737:9
**plod** 674:7
**PNN** 687:18
**point** 631:19 638:12
643:18 656:8
662:11 670:6
671:11 672:4,18
683:12 691:12
700:7 716:20
727:18 752:17
764:7 767:22
772:22 786:17
787:4 803:19
836:3 841:11
842:2 844:13
**points** 841:13,21
**police** 825:14
**political** 827:10
**polygraph** 708:10
**poorly** 666:11
683:8
**portions** 666:8
811:5,7,14
**position** 637:15
721:17 839:21
**positions** 692:18
**positive** 756:22
**possible** 721:9
827:21 844:18
**possibly** 804:11
829:13
**poster** 776:20
**posts** 799:19
**potential** 721:18
**potentially** 815:3
**Pourgol** 678:20
**practice** 797:13,22
798:2,2 799:11
800:14

**practicing** 796:19
814:7
**practitioner** 797:19
797:19
**Pratt** 805:1
**pray** 624:10 706:13
717:21
**prayed** 717:17
**praying** 717:14,20
**precise** 785:8
**preclude** 826:10
**prefer** 695:21 778:2
**prefers** 657:20
**prejudged** 837:20
**prejudgment**
837:22
**prejudice** 801:17
**prejudiced** 724:17
**preliminary** 619:7
619:10 794:1
**preparation** 803:14
813:20
**prepared** 649:15,20
665:6 698:16
827:9
**present** 616:6 617:9
694:9 722:6 723:5
778:2 798:11
**presents** 689:20
**preserved** 691:12
842:19
**preserves** 691:17
**preserving** 675:12
**president** 733:15
800:3
**Press** 776:9 777:17
800:6
**pressure** 820:5
**prestigious** 720:5
**presumes** 774:19
**pretty** 684:2 805:3
815:7
**prevented** 700:6
**prevents** 711:9
**preview** 692:18
**previous** 656:9
761:13
**previously** 653:1
654:15 675:4
685:9 705:22
745:22 776:3
842:18
**primarily** 797:22
**primary** 798:2
**principals** 753:3
**prior** 773:7 779:17

812:15
**privacy** 691:17
**private** 736:8,18
737:4,6 789:2
798:1 822:14
**pro** 798:8 810:20
**probably** 693:18
705:20,21 760:13
766:5,8 772:8
773:4 775:21
791:19 836:17
**probe** 644:17
**problem** 689:21
795:2
**procedure** 709:21
805:15
**proceed** 666:18
792:12 830:13
**proceeding** 643:9
657:21 692:6,7,8
692:13 814:10
833:2 835:11,22
842:19
**proceedings** 665:7
667:16 692:11
749:10 806:20
807:15 814:9
**process** 641:22
690:21 693:16
708:10 805:15
822:21 826:18
**processed** 765:9
**produce** 748:10
**produced** 691:19
**producer** 745:19
**product** 836:7
**professional** 615:2
616:1 759:14
801:9
**professionalism**
845:16
**professionally**
630:15
**Professor** 838:16
**proffer** 623:3 837:3
**profound** 729:21
**program** 637:22
810:9
**programs** 723:21
724:1 798:21
799:1
**progress** 763:8
**prominent** 716:7
**promote** 757:1
**promoting** 714:11
**pronoun** 765:14

**propaganda** 756:21
**proper** 816:13,14
816:17 817:15
**properly** 769:7
**propose** 747:15,16
841:19
**prosecute** 818:3
**protect** 735:8
**protection** 690:21
797:6 810:6
**proud** 754:7,8
**prove** 679:20 787:1
787:22 843:11
**proves** 640:16
**provide** 653:10
749:2 754:5 757:3
**provided** 721:16
748:6 794:10
**providing** 755:2,3
**psychological**
716:17
**psychologically**
786:18 787:5
**psychologist** 730:3
**public** 616:5,14
714:8
**publications** 800:4
**publicity** 755:14
758:12 759:2,5,12
759:17,20,22
760:4 761:3,3,6
761:11 762:4,5,17
762:19 770:1,2
772:20 773:11,12
773:16 774:13,16
775:14,18 776:5
778:22
**publicizing** 755:7
**publicly** 636:21
756:17
**publish** 637:1
**published** 800:8,16
800:20
**pulled** 660:11 739:8
**purchase** 783:5
**purchasing** 782:2
**purported** 675:2
720:12
**purporting** 666:17
**purports** 623:6,14
651:15 741:2
**purpose** 741:17
757:2 836:10
**purposes** 632:8
**purps** 741:13 742:9
**pursuant** 841:4

**pursue** 704:13,16
710:9 711:2
715:12 781:17
**pursued** 640:13
**pursuing** 817:20
**put** 625:6,16,19
641:9,16 665:9
675:18 742:1
777:15 794:21,22
820:5 823:20
**puts** 714:10
**putting** 633:2
**puzzle** 799:15

___
**Q**
___
**qualification**
839:14
**qualified** 801:5
838:11
**question** 627:6,9,17
628:12 638:15
639:5,11 640:3,3
640:18 648:16,17
650:2,12 653:16
663:10,13 667:8
668:1,3,19 670:21
671:8 672:6,9,16
678:3 679:9 680:6
680:9,11,13 681:3
681:5 684:15
692:21 695:20
697:17 698:6,10
699:4 702:1
703:19,20,22
710:3 716:20
717:10,12 718:21
719:14 720:14
727:2,10 734:8
736:13 738:3
751:8 754:21
757:9 759:9
760:10,17,20
761:10,21 762:8
762:16 773:17
778:6 781:5
782:22 784:19
785:4,4,5,6,8,10
785:16 788:20
806:2 807:8
808:17,19 809:18
815:8,9,11 818:14
821:12 823:19
827:18 828:17
829:6 839:7,8
840:7
**questioning** 647:21

In Re: Larry E. Klayman
June 1, 2018

Page 861

782:15
questions 623:5
635:11 639:17
652:7 657:22
659:4 672:10,15
674:1 680:7
710:15 769:1
782:5 790:11
807:10 818:11
823:3 824:10
832:17 833:11
838:13 839:16
840:20
quick 649:14
quickly 764:18
quit 624:11
quite 833:19 834:15
quote 641:6 704:18
751:21
quotes 665:10

**R**
r 619:1 622:16
747:3 839:22
R-a-z-z 736:1
race 816:8
Radio 804:18,22
raise 758:18 793:12
811:6,12 812:1
raised 692:12
836:19
rape 774:4
raped 774:5,6
rare 829:20 830:8
837:5
rate 808:14
ratifying 825:21
Razavi 735:10,14
735:19 736:4
737:4,8,14,20
738:16,22 739:7
Razz 735:10,22
Razzazi 722:11
723:9 730:9,12
735:10,18
reach 721:19
read 623:18,19
629:16 630:11,18
630:22 631:13,15
633:12,15,18,20
634:5,6,9 635:12
635:16 639:1,17
639:18,20,21
644:7,10,12 645:8
646:5,8 652:4
660:20 662:9

663:22 665:2,8
666:7 668:21
670:22 671:22
677:7 680:1 681:8
682:6,15 684:1
687:12 700:10
707:11,13,22
708:4 710:19
712:14,16,17
713:2,9,12,14,20
720:1 726:4
729:12 730:7
731:2,17 732:5
733:3 734:20
735:13 736:5
738:20 739:1
757:10 812:19
815:9 818:15,18
825:4
reading 638:13,22
639:3 652:2 705:3
741:8
reads 629:17
632:12 635:13,17
651:12 682:8
742:7 752:9
ready 768:4
Reagan 756:3
real 753:2
reality 643:7 827:2
realization 665:12
realize 664:4
721:18
realized 781:19
814:4
really 633:22
650:16 667:21
700:15,19 704:6
719:8 727:6 748:1
763:7 785:2
786:16 790:3
829:6 835:13
reason 627:4 641:9
641:11 661:8,11
661:22 704:4
725:16 731:22
754:9
reasonable 638:3
819:14,22 820:3
821:16 822:2
reasons 640:15
697:21 756:1
799:14 836:13
rebuttal 791:2,8
recall 695:12
772:19 773:1

775:10 777:12
778:20 779:3
782:3 783:3
801:15,16 806:16
806:21 827:13
830:9 833:5
receipt 778:4
receive 796:2 835:7
received 631:15
634:17 672:12
677:5 678:17
693:3 697:12
707:11,19 735:11
765:7,21,21 772:9
837:9
receiving 632:16
660:10 668:9
669:11 677:2
681:22 686:15
694:18 697:11
699:14,16 702:2,5
702:7,10 707:8
730:5 772:7
786:10,12,13
receptive 637:5
recess 694:3,7
747:2 769:13
792:4 793:3,5
845:11,19
recitation 791:4
recognize 642:8
recollection 630:21
632:11 695:15
721:7 723:8
779:19
recommending
824:8
reconvene 689:21
record 619:3
621:12,20 623:10
631:18 638:22
639:7 641:9,12
647:19 648:19
651:14 654:21
655:19 681:12,15
690:13 694:9
724:22 730:13
738:4 747:7 771:2
771:21 778:9,13
778:14 780:20,21
784:14,17 789:13
792:7 793:8 794:2
795:13 813:7
822:5 842:1,15
recounting 784:7
recoup 709:8

recross 790:12
redirect 769:3,17
791:9
refer 742:8 844:17
reference 698:7,14
764:7 784:12
813:4
references 780:22
referred 631:18
688:1 705:22
779:12 786:10
referring 628:19
671:16 687:4
698:2,10 703:15
706:2,2 740:2
764:9 770:15
781:12 835:5
refers 697:14
reflected 660:7
reflection 647:22
refrain 684:9
refresh 630:21
632:11 723:8,13
779:19
refreshes 721:7
refused 636:11
refute 688:11
regard 632:20
678:5 693:4,6
698:15 702:15
706:9 710:16
738:22 790:15
regarding 637:2
689:7 743:1 780:8
780:8 786:15,16
789:8
Regardless 809:7
regards 737:7
regime 756:12
regrettable 646:1
regulations 817:14
Rehabilitation
816:11
reimbursed 710:10
711:3
rejected 636:2,2
644:19
rejecting 680:16
rejects 643:19
relate 667:15 688:3
690:16 803:22
836:17
related 667:17
708:6 787:3
802:11 803:21
815:5

relates 815:3
836:18
relationship 704:13
704:16 706:10
787:17,21
relationships
787:15 788:21
relegated 637:16
relevance 640:12
715:17
relevancy 811:16
relevant 642:5
689:12 728:3
748:10,11 826:21
relied 641:12
religion 724:11
816:8
remain 620:7
remedies 805:17
817:6 826:20
remember 630:13
632:14,16,17
633:11,17,19,19
633:21 634:7,17
634:18,21,22
635:4 654:19
660:10,17 661:3,5
661:6 662:18
665:14 668:9
669:11 676:7
677:2,4 679:22
681:22 683:13
686:15 688:5,8
694:4,18,20
696:14,17,17,19
696:22 697:11,12
698:18 699:14,16
702:1,5,7,10
705:20 706:16
707:7,9 720:20
721:1,5,10,10,11
721:13 722:12,14
729:10 730:5
735:3,4 751:11,22
758:9 761:12,12
772:7,9 802:7
804:15 805:4,7
806:10,12,17
819:5
remembered 697:2
remind 620:6
802:10
reminding 645:13
removed 637:15
638:6
render 836:22

rendered 837:15
rent 708:7
rented 629:22
repeat 668:18
    680:12
repeated 636:12
    789:8
repetitive 642:4
    646:11
rephrase 626:2
    698:11 710:4
    774:21 785:7
replace 794:12
replaced 636:16
reply 781:14 782:7
replying 781:12
repoed 783:13
report 622:20
    702:16 737:4
    837:1
Reported 615:21
reporter 616:5
    668:20,22 669:2
    671:1 672:1
    710:20,21 757:11
reporting 777:7
represent 688:14
    827:20
representation
    660:6 772:22
    814:14 828:11
represented 688:15
    779:14 798:15
representing
    653:18 655:5
    667:22 776:15
    826:12
reputation 839:12
request 638:3
    648:14 692:19,20
    748:15 761:1
    778:12,15
requested 624:3
required 826:19
reschedule 627:4
research 803:16
    830:21 831:1
resolve 649:21
    653:20 701:6
    784:1 830:4
    836:20 845:3
resolved 746:6
    784:5
respect 644:14,16
    665:12 672:14
    684:14 696:17

725:4 773:10
779:1 781:22
785:3 786:21
799:8
respectfully 748:16
respective 616:7
respond 669:22
    671:5,20 673:14
    684:8 692:4
    727:19 731:19
    774:12 786:7
    807:10,12 844:8
responded 685:4,6
    688:11 727:14
    784:18
respondent 615:6
    617:2,11 619:5,11
    620:2 675:4
    747:11,13 748:22
    750:5 792:18
    794:3 801:14
    804:5 807:21
    808:2 823:11
Respondent's
    621:22 622:8,10
    622:21 628:19
    631:9 650:22
    657:16 686:6,8
    763:10,19 764:21
    770:12 771:10
    832:8 833:12,14
    839:4 842:17
responding 727:17
response 648:21
    682:3
responsibility 615:2
    616:2 801:9 823:6
responsive 828:13
rest 690:21 729:1
restate 627:5
rests 842:22
result 645:8 709:2
    761:6
resulted 637:14
results 702:14
resume 619:15
    747:16 792:11
resumed 747:5
resumes 619:16
    749:22
retained 812:21
    833:1,5 835:15,16
    837:12
retaining 779:21
    835:8
retaliated 729:7

745:2
retaliation 632:21
    680:17 816:2
    821:15 825:16
return 677:16
    746:20
revealed 737:8
review 635:10
    646:14 697:2
    752:8
reviewed 827:6
reviewing 702:15
revisited 699:20
Richard 797:3
right 622:3 628:12
    638:9 658:16
    659:1,15 679:7
    684:22 685:7,10
    691:2 692:4
    709:17 716:14,18
    721:3,4 726:3
    727:20 744:13
    746:12 753:1
    777:21 789:3,6
    793:13,22 811:6
    811:12,19 816:13
    817:7 819:1,4
    820:2 827:8
    828:22 831:17,19
    842:10 843:10
rights 629:5 630:8
    632:20 633:4,9
    640:6 654:4
    675:12 680:2,16
    680:19 702:16
    703:16 735:8
    806:13 807:6,16
    816:3 830:7
Rights' 679:21
ring 706:3
risk 794:19
Rodham 813:16,22
    817:18 836:6
Rohrbacher's
    682:12 683:1
role 689:2 754:17
    755:8,17,18
    756:11,14,20
romantic 637:6
    702:21 703:14
    704:13,16,18
Ronald 838:16
Rotunda 838:17
roughly 808:12
routinely 817:8
routing 664:6

RS18 768:15
RSS 623:1
RSS1 623:13
RSX 622:22
ruined 624:15
    627:22 643:12
    646:7 691:4
rule 690:2 844:19
    844:20
ruled 633:9 676:3
    830:13 844:17
rules 692:13 709:20
rulings 644:15,16
rumors 637:1,4,14
    678:5
run 687:19
running 840:12
runs 714:14 720:5
RX 622:17,18
    659:10
RX-1 622:15
RX24 651:2

_____

S

S 619:1 747:3,3,3
s-y-n-t-a-x 687:1
sad 790:2
sake 647:13
salaries 664:14
salary 620:18
Sam 633:16 655:15
    722:11 723:9
    730:9,12 735:10
    735:10,15,17,19
    735:22 736:2
    737:20 738:22
    743:4
sat 650:18 824:17
Sataki 618:3 619:15
    619:16 620:4,12
    621:13 623:15,17
    624:17,19 629:11
    629:13 630:4
    631:5 632:11
    646:2 651:8 655:9
    658:6,7 675:16
    688:21 690:8
    694:14 696:16
    699:21 733:14
    734:14 735:8
    740:16 745:5,21
    749:22 750:8,14
    750:22 753:10
    763:1 764:5
    769:20 772:5
    789:16 791:14

813:8 814:11
816:15,20 817:20
821:3 825:2 831:4
Sataki's 734:13
    815:13
Sataki@Hotmail....
    712:7
save 660:21
saw 661:9 705:17
    734:7 738:18
    776:10 777:4,7
saying 634:1 665:14
    678:4 683:5 690:3
    703:18 706:16
    709:6,9,11 710:6
    710:21 711:5,8
    713:21 734:10,17
    753:9,14 754:14
    754:15,16 758:16
    765:8 766:9 788:3
    807:14
says 625:18 630:4
    631:3 635:8
    682:11 685:5
    692:19 694:22
    705:3 726:14
    732:12,12,20
    752:21 779:14
    820:18
scared 720:9
    722:15
schedule 624:7
    626:10 627:13,16
    792:20
scheduled 749:9
scheduling 626:15
    689:22 747:9,11
    748:19 792:10
    841:5
school 796:11,13
    797:1
scope 791:3,9
    820:19 836:3
    838:3,11 839:14
searched 777:13
seated 793:20
second 671:21
    672:15 685:21
    693:2 705:2 720:2
    750:9 800:15
    810:20,21 814:13
Secondly 820:17
Secretary 813:17
    815:12 816:18
    823:21 824:15
section 799:12,18

In Re: Larry E. Klayman
June 1, 2018

799:20,21 818:22
**sector** 822:14
**see** 624:5 626:15,19
  627:2 628:1
  629:13 649:18
  653:20 660:3
  661:12 663:20
  664:11 665:9
  666:5,14 675:21
  678:22 682:7,13
  684:17 685:4
  687:2,17 695:7
  697:22 699:12
  703:1,18 704:20
  706:14 707:17
  708:14,19 709:4
  722:8 723:7 733:8
  733:20 740:4,5,7
  740:11 742:5
  743:7 751:3,9
  783:18 813:15,19
  819:10,12 820:4
  821:1 831:5
  832:19 834:14
  835:4 836:10
  837:15
**seed** 745:3
**seeing** 751:22
**seen** 713:18 817:11
  822:22 824:8
**sees** 794:11
**sell** 759:5,13
**Seminars** 800:6
**send** 625:19 667:5
  733:5
**sending** 665:5
  712:22 731:10
  733:4
**sense** 683:8 697:20
  827:11 841:12
**sent** 625:21 626:6
  643:10 647:21
  660:5,6 662:1
  665:8 666:16
  667:13 668:8
  669:9 673:1
  676:21 681:18
  682:11 683:22
  684:20 685:2
  686:12 687:5
  689:7 694:16
  697:9,15,19
  698:19,20 699:10
  707:6,16,21 712:6
  713:11 728:21
  730:20 731:7,14

731:18,22 732:1,3
734:2 735:7 737:2
738:16 739:13
740:3,5 741:8
742:22,22 743:2
772:6 776:12
786:3 789:15
790:9 825:8
835:17 837:16
838:7
**sentence** 627:20
665:16 692:17
697:16,18 700:11
705:4 734:21
**sentenced** 737:15
**separate** 829:14
**September** 707:7
707:16 739:13
740:3,6,9,13
741:9 789:14
797:4
**serious** 669:15
825:15
**serve** 684:11 828:21
834:11
**served** 836:10
**servers** 708:10
**service** 691:15
843:18
**serving** 811:20
**session** 632:6
693:18 748:7
**settle** 650:14 828:5
828:6
**settled** 619:2
**settlement** 708:12
758:15 760:4
827:17,21
**seven** 637:19 726:7
797:3 835:3 844:7
**sex** 816:8 829:16,18
**sexual** 632:21
634:16 635:19
636:2,11 638:8
773:19 774:2,3
779:15 821:4,13
822:9 825:7,15
**sexually** 637:20
**Shamble** 650:9
653:18 662:20,22
663:3,5 696:8,11
697:19 700:17
701:13 733:16
734:15 735:1,4
758:3,7,11 759:1
759:19 760:3,12

760:14,15 761:2,5
761:9,16 762:3,17
762:20,21 772:1
**Shamble's** 700:14
**share** 743:3,5,11
**shared** 743:10
**Shea** 780:9,11,12
781:16
**short** 623:19 638:19
664:1 682:16
684:2 708:5
729:17 746:21
840:22 843:4
845:6
**shorten** 833:8
**shortly** 765:11,22
**shot** 824:2
**show** 725:1,9
742:14 770:2
778:3 826:1
**showed** 757:22
**showing** 632:10
648:7
**shown** 776:3,20
**shows** 683:6
**shut** 786:19
**sic** 741:13,14 742:9
742:11 745:3
**sick** 633:13 634:3
634:19 655:3
**side** 746:15 798:18
828:6
**sides** 642:15
**signed** 646:15,16
**significance** 713:9
833:18
**simply** 643:11
833:9 837:21
**sincere** 701:15
**sir** 662:3 676:18
694:6 696:19
697:1 711:17
713:20 747:12
752:22 793:10
795:15 804:3,4
819:20
**situation** 654:1
701:6 780:15
783:7,8,10 784:5
829:7 833:7
**six** 637:12 639:2
746:17 835:2
**sixth** 781:1
**skilled** 779:16
**skipped** 647:3
**sleazy** 706:1,4

**sleep** 790:3
**small** 666:8
**Smith** 616:20 619:7
619:8 621:6,10,15
622:1 623:10,16
624:2 625:9,15,21
625:22 626:5,9,12
626:14,21 627:1,5
627:8,12,14,17
628:4 629:6,8
638:21 640:9
643:10 647:1,9,22
650:2 651:1
656:17,18,20
657:7,9 658:4
659:6,22 660:7,13
666:4,19 667:5,14
668:14,16 670:8
670:12,13,16
672:6,8 674:8,10
674:15,19 675:3
675:10 678:14,16
679:14 680:5,21
681:11,14 686:8
688:17 689:1
690:4 692:3,16
695:11,14 697:6
700:3,19 704:6,9
707:2 709:10,14
710:11 715:9
716:19 717:7
724:20 727:7
728:5 737:22
739:19 744:3
747:8,10 748:18
748:19,21 754:19
757:9 760:6 762:8
763:19 764:3,20
769:4,5,9,14,15
769:19 770:6,8,11
770:15,18 771:2,9
771:12,18,20,21
772:4,13,18
774:22 775:4
776:21 777:1
778:5,12,16,19
781:4,7 782:11,20
783:1,2 784:10
785:3,10,13,19,20
789:13,18 790:10
792:22 793:9
794:1,17 795:2,3
795:4,11 803:19
812:7,13 815:7,16
818:6,11 832:4,12
833:13,19,22

834:4 835:18
836:2 837:11
839:3,18 841:9
842:2,8,21 843:3
844:7,9,21 845:2
**Smith's** 749:18
**Smithsonian**
810:22
**snap** 826:13,13
**so-called** 721:20
722:20 723:2
**sole** 800:15
**solely** 791:9
**solo** 797:12,18,19
**somebody** 624:21
634:12 666:10
704:17 720:13
731:7 742:10
841:6
**someone's** 820:10
844:1
**sooner** 702:15
**sophisticated**
843:20
**sorry** 628:9,14
634:18 640:21
643:14 647:4,4
655:11 656:4
661:10 663:14,15
668:4 672:7
675:13 676:6
679:10,12,13
681:13 685:7
686:9 688:19
697:17 700:1
704:8 721:13
733:21 734:7
736:14 739:4,9
740:7 745:10,14
746:16 751:8
750:8 760:21
770:5,14 772:13
772:16 778:18
805:7 841:17
845:1
**Soviet** 756:5,6
**speak** 655:20
658:22 690:13
694:5 753:19
**speakers** 776:9
**speaking** 709:15
755:15
**speaks** 643:19
683:7 710:12
733:7
**specific** 737:17

In Re: Larry E. Klayman
June 1, 2018

778:21 779:4,5
790:16,19 804:12
811:14 812:2
**Specification**
770:18,20 771:12
814:5 835:18,21
837:10,16 838:7
**specifics** 644:20
**speculation** 713:5
818:5
**speculative** 823:8
**speed** 747:18 748:1
**spent** 645:2 677:18
**spiritual** 715:12
**spirituality** 715:5,7
**spoken** 747:10
**sponsored** 810:9
**Sporkin** 747:22,22
838:21 839:1,11
**spread** 636:22
637:4
**staff** 617:14 637:2,5
**stage** 806:8,8,9
**stand** 619:17
679:15 694:3
750:1 792:4 793:3
793:6 842:11
845:12
**standing** 717:19
**Stanley** 838:21
839:1
**Stanton** 697:16
698:3,16
**start** 748:13 749:9
773:14 774:1
777:22 800:13
**started** 636:16
653:17 654:6
661:16,19 698:10
773:3 784:2
797:12 798:11
809:16
**starting** 780:4
**starts** 631:6 734:6
**state** 666:6 670:5
671:10 672:3,13
729:17 737:10
741:22 743:8
789:20 790:8
795:12 813:17
815:13 816:12,16
816:16,19,21
817:8 823:22
824:16
**stated** 702:17 817:3
829:5

**statement** 703:3,5
785:21 829:6
**statements** 637:1
684:7
**states** 756:22
779:12 796:1
797:2 801:4 802:2
805:1 813:9
**stationed** 652:13,17
**status** 733:13
734:16 735:1
**statute** 816:5
829:16
**statutes** 816:2,9,12
817:2,4
**stay** 654:12
**staying** 705:12,13
783:14
**steering** 799:17,20
**Stein** 797:8 810:16
811:1
**step** 769:11
**stole** 706:3
**stop** 653:14 823:3
**stopped** 786:9
**stopping** 744:20
**Store** 651:7
**story** 690:12
**Straight** 636:17
637:16,21
**straps** 636:12
**strategies** 831:21
**strategy** 827:16
831:8
**Street** 616:2
**strike** 699:5 776:18
**stronger** 730:3
**struck** 627:10
648:17 699:6
715:20 736:10,12
736:19 738:4,7,11
743:18 763:13
**structured** 811:17
**student** 798:22
**studied** 812:15
**stuff** 683:5 690:1,7
690:20 697:3
701:2 786:16
812:19 833:13
**styled** 813:8
**subject** 623:17
628:6 702:3
729:16 737:3,8,13
740:1 761:9,15
767:11 829:13
841:15,18

**submission** 658:14
**submissions** 658:19
658:21,21
**submit** 665:7 690:3
767:6
**submitted** 794:6
842:18
**subpoena** 690:19
**subsequently**
637:21
**substantial** 725:13
**substantive** 632:20
**succeed** 831:21
**successful** 823:9,17
**successfully** 779:14
**sue** 722:7 784:3,8
803:17 816:10
820:15,16 823:1
**sued** 803:9 821:5
822:13,16
**sufficient** 641:2
**suggest** 631:21
638:21 683:11
837:18
**suggested** 691:11
809:20
**suggesting** 741:15
741:18
**suggestion** 767:16
**suggests** 772:5
**suing** 779:16
819:15
**suit** 821:13
**suits** 699:21 700:2
743:21
**Sujat** 617:3,4
619:12 643:6
747:18
**sum** 809:14
**summon** 753:3
**Sunday** 740:13
789:14
**super** 748:8
**superior** 820:14,16
821:6
**supervisor** 702:17
821:4
**supplement** 764:11
**supplemental** 622:8
622:11 659:14,17
661:3 663:17
664:19 666:2
668:6 669:8
676:20 681:11,14
683:18 686:10
694:15 697:6,7

699:9 701:21
707:4,15 712:5
729:15 730:19
737:2 738:15
779:8 785:22
789:12
**suppose** 749:3
824:4
**supreme** 839:21
**sure** 629:1 642:5,11
643:17 657:10,12
673:20 676:5
677:8 679:17
686:1 691:21
729:7 767:20
769:6 803:13
804:16 805:3
833:20 843:21
**survive** 634:20
**suspect** 808:8
**sustained** 628:8,13
639:22 680:22
681:3,4 700:4
713:3 715:10
725:8 728:13,17
744:4,14,17 832:5
840:16
**swear** 793:14
**sworn** 679:3 795:8
**SX38** 739:14,17
791:2
**SX5** 660:3
**syntax** 686:22
**system** 616:19
749:5 815:21
843:9

_____
**T**
**T** 747:3 772:1
**take** 625:9 629:14
631:7,10 635:10
644:2,3 646:14
649:14 650:12
651:10 654:5,13
656:21 658:1
674:22 682:5
687:21 690:18
693:11,20 703:17
705:11 713:8,18
727:19 731:2
736:16 743:3,6
746:11 752:7
777:14 789:11
790:2 792:15
804:7 812:18
825:15 826:2

827:1 834:17
841:13 843:22
**taken** 616:1 692:18
694:7 725:19
747:2 769:13
793:5
**talk** 626:15,19,21
627:1,12 636:17
637:16,21 655:9
655:12,17 663:3
676:14 722:18
728:10,15 731:1
734:12
**talked** 624:5 626:12
627:14,18 655:15
655:15,21 680:2
682:11,22 704:1
727:21 728:1,8
756:17 759:16
768:18 780:8
**talking** 639:8
653:14 666:15
676:2 681:21
720:7 726:3 727:8
731:6,9 743:12
749:11 765:16,17
822:18,19
**Taylor** 843:15
**Ted** 714:3,4,20
718:6 721:10
724:13
**Tehran** 687:20
**telephone** 676:3
706:11 736:17
**televises** 720:7
**Television** 620:15
714:15 746:7
**tell** 641:21 652:2
687:16 688:22
703:13 704:12
705:1 721:4
733:14 744:9
752:19 755:3
761:2,5,10 762:4
773:9 775:16
780:1 781:15
786:8 788:2
789:19 806:6
815:17 834:18,20
**telling** 630:4 704:2
782:16 784:2
785:11
**tells** 654:7 841:6
**ten** 806:18,22
807:17 826:6
844:8

In Re: Larry E. Klayman
June 1, 2018

**tenth** 835:3
**termination** 645:17
**terms** 763:8 805:11
  806:19 825:1
**testified** 620:13
  654:15,19 660:12
  667:9 685:9 687:6
  745:22 786:5
  795:9 801:8,13
  807:19 810:3
  811:11 828:9
**testify** 653:1 710:13
  711:14 782:18
  794:14 809:2,5
  827:3 836:9
**testifying** 801:10,20
  802:3,5 809:7
**testimony** 646:4
  647:18 648:2
  655:10,13 656:9,9
  670:15 680:4
  694:5 695:17
  758:21 769:22
  782:3,12 783:3
  784:11,20 785:15
  791:2,17 792:3
  793:15 808:21
  811:5,8,14 813:21
  814:10,19 818:6
  833:9 836:4
  843:14
**text** 786:14 788:14
**thank** 619:9 628:20
  629:15 645:22
  651:21 656:2
  657:6 658:12
  659:9 671:17
  674:20 681:16
  682:20 686:4
  693:22 694:12
  740:21 746:13,19
  750:12 753:17
  764:17 768:13
  769:15 781:4
  782:20 790:10
  791:21 795:4
  812:4 813:3
  823:10 839:16
  840:5,21 841:2
  843:1,10 845:14
**thanking** 834:11
**Thanks** 648:11
**Thanksgiving**
  729:2,4
**theme** 753:6
**theoretical** 726:11

**theories** 815:5
**theory** 643:21
**thereto** 692:14
**thing** 640:15 647:11
  650:14 687:13
  689:7 750:10
  828:22 831:8
**things** 625:13
  644:18 656:7
  669:1 701:5
  706:16 714:17
  717:8 723:5
  743:16 744:10
  755:9 767:14
  777:2 788:7,9,17
  795:1 814:17
  820:4 829:9
**think** 619:14 632:5
  651:16 657:7
  662:17 665:19
  667:18 676:4
  678:12 680:10
  689:11 694:10
  700:21 709:22
  710:14 713:1
  716:12 718:2
  747:15 754:2
  760:8,11 761:18
  764:16,20 766:8
  767:10 774:3
  778:6 781:2,21
  785:5,17 787:9
  788:18 792:11,15
  799:13 807:11
  810:19 818:13
  820:13 822:11,15
  826:1 828:2 841:4
**thinking** 790:4,8
**thinks** 690:8
**third** 622:5 629:8
  701:22 702:13
  708:22 709:2
  800:15
**Thomas** 797:17
**thought** 648:6
  655:7 698:9
  768:10 771:6,14
  771:15 773:12
  775:20 779:17
  815:7
**thoughts** 747:9
  748:17
**thousand** 677:18
  808:15 809:13
**threatened** 638:5
  729:22 730:8

731:8 732:2,6,13
  732:21 733:5
  734:12 736:7
  738:10 739:6
**threatening** 722:20
  730:11 732:3
**threats** 731:20
  732:10
**three** 619:4 635:15
  635:18 644:3,11
  690:11 749:17
  760:14 766:2,21
  798:15 802:13
  809:22 835:2
**three-** 767:5
**throw** 744:22
**Thursday** 666:4
**tickets** 708:8
**tied** 745:15
**tiers** 833:15
**Tigar** 616:15
  628:13 649:1,3
  656:2,5 657:3,6
  668:1 691:21
  759:8 771:17,19
  772:13,17 777:18
  782:10 794:19
  818:13,15,18,21
  819:4,7,11,13,21
  820:3 821:11
  822:18 823:2,10
  823:19 824:12
  839:17,20 840:5,9
**Tim** 650:9 653:18
  697:19 700:14,14
  733:16 734:15
  780:9,11,12
  781:16
**time** 619:12 624:3,3
  624:4,7,8 629:14
  631:10 632:13
  633:3,14 634:4,19
  635:1 640:1
  641:16 643:5
  645:2 650:3,12,17
  650:19 655:1,2,6
  655:22 660:21
  661:18 666:10
  667:21 669:12,14
  670:6 671:11
  672:4,18 676:5
  677:3,5,19 682:1
  683:15,16 686:16
  686:17 689:5
  691:12 694:19,21
  696:6,11,15 697:3

697:13 699:2,18
  699:20 700:7
  702:6,8,18 706:21
  706:22 708:3,12
  712:12,15 713:8
  715:13 716:6,11
  718:12 720:2
  723:14 726:22
  732:15 734:22
  738:22 740:7,8
  741:20 742:14,20
  743:15 745:21
  746:11 747:18,22
  748:9,11 749:8
  752:7 757:19
  763:8 767:3 769:2
  773:22 775:3,3,6
  778:17 780:3
  783:15 788:1,1,2
  789:5,9,21,22
  790:1 791:18
  793:19 812:18
  814:12 816:19
  820:7 834:17
  835:16 836:11
  837:12 841:10
**times** 663:2 690:12
  709:16 711:14
  774:15,17,19,22
  775:8,9,10 802:15
  817:11
**tiring** 791:17
**title** 816:5 817:10
  818:22 821:20
  822:17
**today** 623:20 634:8
  634:11 645:5
  691:3 729:22
  785:21 812:16
  813:21 830:22
  836:9 843:3,9,17
**told** 626:5 636:3
  641:6 650:20
  664:9 665:20
  669:17,18 673:3,6
  673:9 675:20
  677:14 678:1
  683:1,1 685:12,14
  702:20 703:8,11
  703:20,21 704:3,5
  704:21 714:12,17
  715:1,3 716:8
  717:18,18 721:20
  723:1 724:4,7
  727:15 744:13
  759:4,11,15,19,21

760:1 766:18
  771:6 773:10
  776:11,14 780:10
  783:16
**tomorrow** 664:8
  843:9 844:5
**top** 622:14 660:7
  686:18 705:3
  712:5 785:4
  824:17
**topics** 800:21 812:2
**tort** 821:7
**total** 803:5 808:20
  809:19
**totalled** 672:21
  673:5
**totally** 695:17 791:2
**touching** 821:14
**tough** 654:1,12
**towed** 783:12
**town** 704:10
**trace** 736:17
**track** 670:20
**Trade** 797:5 798:9
  810:7,11,14
**transcript** 639:7
**transition** 782:18
**transporting** 708:7
**travel** 708:8
**traveled** 721:22
**treated** 665:11
  825:2,3
**treatise** 838:18
**trial** 788:1 797:5
  801:22
**tried** 641:17 642:21
  665:10 716:16
  717:2,6 803:6
**TRO** 671:16 674:9
**true** 628:3 643:11
  644:19 664:13
  675:15 701:15
  714:19 715:1
  742:18 753:3
  755:12 757:4,11
  757:17 788:3
  831:20 845:8,9
**Trulock's** 840:14
**truth** 641:21 688:22
  704:2 752:20
  755:4 793:15,16
  793:16
**truthfully** 721:4
**truthfulness** 646:3
**try** 623:19 626:11
  677:11 679:20

701:5 718:6,10
757:7,14 758:13
758:14 759:5
760:4 761:6
762:13,14 807:12
827:16 831:14,18
837:22
**trying** 634:20
638:19 639:6
640:16 649:21
650:13 653:20
654:1 657:9,12
662:6 668:11
669:3 725:1,9
752:17 755:9
814:13
**turn** 622:5 623:8
628:16 629:3
631:4 635:7,14
646:13 648:13
649:7 650:7
659:13 660:2
661:2 663:17
664:19 666:2
668:6 669:8
673:17 676:19
681:10 683:18
685:20 686:6
687:10 694:14
697:4 699:8
701:20,21 705:2
707:1,14 712:4
728:20 729:14
735:5 737:1
738:14 739:12
750:16 751:2
788:5 832:7 834:2
**turned** 690:7
723:20
**turning** 730:18
763:10 765:3
**TV** 689:6
**Twenty-eight**
656:17
**Twenty-five** 656:11
**twice** 812:20
**two** 621:18 650:4
651:11 652:6
661:6 665:2
672:10,15 689:5
711:14 717:8
735:21 741:4
760:13 773:2
777:11 791:12
797:13 812:22
813:2 835:2

836:13,17 839:17
844:17
**types** 778:21
**typical** 828:15
**typographical**
794:8

---

**U**

**U.S** 800:7 820:17
**ultimately** 710:9
711:2 775:13,17
**unartfully** 778:5
**undercut** 683:7
**undergraduate**
796:2
**underlying** 815:4
818:3
**understand** 626:1
631:20 634:12,15
639:12 641:18
644:1 662:15
667:8,21 731:21
732:20 734:17,19
734:20 752:16
753:7,8 760:10
791:19 793:8
806:1 816:20
821:11
**understanding**
710:15,16 726:11
726:17,20,22
733:4
**understood** 668:15
731:17 758:12
**undertake** 837:14
**unethical** 838:9
**unfortunate** 634:3
780:14
**unfortunately**
632:16 635:3
790:7
**unimportant**
633:22
**union** 700:14 701:7
733:15 756:5,6
**United** 756:22
797:2 801:4 802:1
805:1 813:9
**University** 796:6
**unnecessary** 722:3
**unopened** 661:14
661:18
**unquote** 641:7
**unreasonable**
821:12 822:2,4
**untrue** 742:17

**unwanted** 821:14
**unwarranted**
635:19
**updated** 800:8,10
**UPS** 649:4 651:7
**upset** 676:11
741:20 788:12
790:5
**upstairs** 783:15
**Urgent** 702:4
**urging** 678:9
**use** 624:4 639:8
742:5 758:12
759:1,12,20,22
760:4 761:2,5,11
762:3,5,17,19
827:16,19 830:2
831:21 844:5
**usual** 694:1

---

**V**

**vacation** 624:4,7
**vague** 625:22
765:13 785:8
**Valentine's** 703:2
704:14,20
**valley** 629:22
718:13 746:8
**valuable** 756:10
**Vanessa** 664:7
**variety** 800:20
**various** 641:13
675:1 691:22
828:19 833:15
**vary** 807:5
**Ventura** 705:19
**venue** 819:8
**verbal** 635:19
**version** 794:9,13
**viable** 830:15
**vicinity** 638:8 653:2
**vicious** 787:20
**victim** 699:22 700:2
**video** 777:3,10
843:22
**view** 648:1 683:6
**viewed** 719:9
**viewers** 637:3
**views** 755:8 773:11
836:15
**VII** 816:5 821:21
822:17
**violating** 830:6
**visit** 705:18
**vitae** 794:4
**VOA** 640:7 664:15

687:16,19 695:2
708:18 719:11
741:16 745:2,8,11
754:6,13 776:16
805:11 806:22
816:22 827:4
**voice** 630:6 652:17
654:17 678:7
693:5 698:4 719:3
745:12,16 751:18
752:18,19 753:20
754:4 755:2,8
756:4,20 757:2,8
757:15 760:5
761:7 804:8,9,17
806:13,19 807:15
825:1 826:5
830:12
**voicemail** 673:14
**voir** 793:19,22
804:2,5 811:4
**voluntary** 800:18
**vote** 832:2
**vs** 658:5,6,7 813:8
839:22

---

**W**

**W-o-o-d-l-a-n-d**
721:21
**Wagner** 702:17,20
703:8,11,20,21
704:1,21 705:1
**wait** 640:11 647:2
653:1 671:13
782:14,14,14
823:15
**waiting** 675:4
**walked** 669:19
671:2
**want** 622:5,10,11
631:13,14 639:5
639:17,20 643:5
645:19 647:14,17
647:20 648:3
650:11 652:4,21
653:2 662:8
670:14,16 674:22
683:3 689:8
695:20,21 696:17
696:18 710:3
715:7,12 724:2,3
724:7,9,10 725:19
749:10 752:7
761:20 769:10
773:14 774:2
833:20 842:15

845:14
**wanted** 643:5
644:22 665:11
677:12,22 683:2
690:18 702:15
714:21 715:5
719:11 722:5
723:14,15 724:4
722:12,15,15
755:1 777:13
**wants** 639:5 690:3
694:10 748:22
777:21 792:8
841:14
**war** 751:4 758:1
**WARREN** 616:11
**Washington** 615:9
616:2 652:18
654:17
**Washoe** 737:11
**wasn't** 643:11
698:22 722:11
730:9 767:2
773:20
**waste** 640:1 836:11
**Watch** 658:6
840:13
**watched** 777:5,6
**watching** 689:6
**water** 628:22
**way** 617:5 642:21
647:10 648:1
684:13 691:7,17
709:20 711:11
717:12,19 725:20
742:1,2 748:9
754:1,10 756:22
761:2 776:11
782:15 785:3
811:16 817:20
818:2 827:10
828:14,21 829:5
**ways** 814:17 831:11
831:14 832:1
**we'll** 622:19 655:19
670:18 674:1
691:13 693:17,19
727:9,10 747:19
749:16 769:11
793:3
**we're** 619:2 639:7,8
642:9 644:7,9,12
659:14 675:12
680:10 684:2
689:22 692:1
693:15 727:8

749:11 763:7
764:3 791:22
792:2 793:2 836:6
**we've** 693:9 712:1
718:2 843:18
**website** 794:21
844:5
**week** 636:13 661:16
661:19 667:5,13
697:2 699:20
707:13 712:16
713:20 726:4
729:12 730:7,22
731:2 735:13
736:5 738:18,20
749:11 764:19
792:13 844:16
**weekdays** 792:13
**weeks** 661:6
**weighing** 643:16
**welcome** 749:3
**went** 625:20 642:19
643:9 655:5 691:2
700:15 701:8
702:18 703:17
705:18 716:12,14
739:6 745:22
762:2,16,21 784:5
797:18 798:10
801:22
**weren't** 636:4 655:4
676:15 704:2
711:20 727:15
728:3 732:10
**Westfall** 820:12,18
**Westlaw** 800:11
**whatnot** 692:13
**whichever** 743:21
**white** 764:1 832:9
**wholesome** 714:13
**wide** 721:19
**willing** 653:6
676:14,15
**Windjammer** 617:5
**wine** 729:5
**Winning** 800:6
**wire** 664:7,16
**wise** 778:4
**wish** 620:10 657:22
729:4,19
**wishes** 728:22
729:9
**withdraw** 720:16
727:10
**withholding** 688:17
**witness** 618:2

619:16,18 620:8
621:7 626:1 628:9
628:14 629:17
631:12 632:12,13
635:13,17 639:1
643:13 651:12
653:13,17 655:21
656:4 659:19
660:15 662:3
663:8,14 667:20
668:4,18 669:5
670:18,18 678:10
680:12 681:1
682:8 689:2,4,14
690:14 694:4,6,9
695:17 701:1
704:8 710:12
717:14 719:13
720:22 726:14,18
726:21 730:15
732:14,22 734:7
736:11,14 739:16
739:18 740:15,18
740:21 741:6
742:7 744:5
749:20,22 750:3
752:9 755:1
757:16 760:11
761:17 766:11
772:16 774:20
789:17 791:15,17
791:21 792:2
793:6,9,11,17
795:7 799:16
801:2,6 803:20
808:22 809:2
815:15 818:8,12
818:17,20 819:2,5
819:10,12,20
820:2,6 821:19
822:3,7,22 823:7
824:1 826:22
829:5 832:11,14
832:19 839:4
840:3 841:2,3
**witnesses** 679:7,19
680:3,18,20
741:12 811:10
839:5 843:13
844:18 845:4
**woah** 728:12,12
731:13,13,13
**woke** 790:3,5
**woman** 773:21
**won** 677:13 829:20
**Woodland** 721:21

722:16
**word** 726:6 734:6
742:5 789:5
827:22 829:22
830:2
**wording** 786:20
**words** 676:18 687:8
688:7 711:19
715:6 716:8
723:12 740:12,12
740:17 756:7,8
822:1
**work** 624:2 627:2
654:17 675:19
680:17 695:2
705:18 769:10
776:15 836:7
**worked** 626:16
701:9,10 737:7
744:10 797:6,10
809:4 810:22
**working** 653:22
654:2 663:6
677:10 708:12
722:1 744:20
746:7 755:22
825:8
**workplace** 632:21
637:5
**works** 693:13 694:2
815:21
**world** 751:20 753:5
754:2,10,13,15,16
776:4
**worry** 740:8
**worse** 769:12
**worth** 621:5
**wouldn't** 646:8
661:14 662:8,16
708:2 712:17
713:8 732:15
777:21 786:21
788:5 826:13
837:18
**write** 624:21 625:10
625:11 666:10
685:12,15 686:18
686:21 721:15
742:6 800:6
**writing** 625:4 669:6
688:5,8 711:15
720:3 733:3
800:12
**written** 623:6
666:11 684:10
698:3 763:12

800:4
**wrong** 690:4 771:6
771:8
**wrote** 623:5 625:5
625:14 686:18
687:5,11 688:12
697:16 708:16,21
727:5 734:19
740:17 741:20
742:21 751:12,18
772:11 781:13
838:18

**X**

**X** 615:3,7 618:1
**XXVIII** 819:1

**Y**

**yeah** 641:8 693:15
693:21 696:2
698:7 710:2 769:5
792:2 819:12
822:7 828:3
**year** 714:11 764:11
765:4 796:7,17
808:10,21
**years** 620:16
624:15 625:2
627:21 676:8
689:5,14 696:20
726:7,7 766:2,4
766:15,21 779:15
799:2,18 800:9
803:7 804:14
805:8 806:7,18,22
807:17 810:11
826:6 828:19
**yeses** 650:5
**yesterday** 620:12
628:17 655:12
768:18 781:21
**you,'** 702:21
**YouTube** 776:7
777:3,6,9

**Z**

**Z-i-g-l-a** 839:22
**zealous** 645:6
**zealousness** 645:14
815:1
**Ziglar** 839:22
**zones** 791:19

**0**

**1**

**1** 615:8 622:8,11
623:11,13 763:15
763:22 764:2,4,9
764:21 834:19
842:3,6
**1,000** 809:17
**1,614** 631:2
**1:00** 746:20
**1:10-CV-00534**
813:11
**10** 639:18 651:15
651:15,16 664:20
694:1 769:8
771:22 812:11
819:11 832:8,20
833:10,12,14,18
834:5,7,9 844:9
**10:55** 694:3
**10th** 707:7,16 771:3
773:6,7
**11** 639:18 812:11
**11/2/2010** 764:15
**11:10** 694:9
**11th** 740:3,6,13
741:9 789:14
**12** 639:18 694:1
768:19 812:11
**12:02** 747:1
**12:46** 699:11
**12:57** 747:4,7
**12th** 651:6,17,19
652:10
**13** 635:9,11 639:19
812:11
**14** 666:2 812:11
**14th** 730:20
**15** 790:17 812:11
**1525** 617:5
**15th** 739:13 740:9
780:18
**16** 668:7 735:12
768:1,8 812:11
**16th** 657:1,4 666:3
735:7
**17** 669:9 812:11
**17-BD-063** 615:5
**17th** 776:13 777:17
**18** 628:16,17,19
642:17 646:22
647:9,13 673:17
674:1
**180** 805:22
**18th** 835:4,17
**19** 631:10,21
646:22 648:13
649:1,9,10 676:20

In Re: Larry E. Klayman
June 1, 2018

768:6,10,16
**1964** 816:3
**1968** 796:8
**1970** 763:16
**1972** 795:19 796:18
796:20 797:7
816:6
**1973** 798:8,16
802:12 810:9
**1975** 797:7,8,10
**1976** 797:11,12
798:10,11
**1980** 797:14
**1981** 797:14
**1984** 797:18,20
800:5,8
**19th** 663:19 664:20
699:10,15 700:7
712:9
**1st** 751:21 784:14
786:2

**2**

**2** 834:19
**2:15** 792:5
**20** 646:14 647:7,8,9
647:15 681:10,11
681:14 768:12,16
**2000** 649:4
**2006** 737:15,16
**2010** 649:16 650:8
651:7 652:10
657:1,2,4 660:6
660:18 661:4,9,12
663:19 664:21
666:3 668:8
669:10 676:21
681:19 682:10
683:20 686:13
694:17 697:10
699:10,15 700:7
702:3,19 703:1
704:19 707:7,16
712:9 728:22
729:11,16 751:21
763:17 771:3,22
773:7 776:13
777:17 781:9
784:14 786:2
833:3
**2011** 629:7,10
630:3 631:16
632:15 730:20
735:7,12 737:3
738:17 739:13
740:9,13 741:9

765:4 784:16
786:4 789:14
**2016** 809:15,16
833:5 835:4,12,17
**2017** 808:10,21
809:4,5,9
**2018** 615:8 660:8
666:5
**2028** 845:19
**20th** 763:16
**21** 683:19
**21st** 649:16 786:3
**22** 842:3,7
**22nd** 650:7 657:2
702:3
**23** 686:7,8,10
750:16,19 758:4,5
764:10,13,22
765:3,15,16,17
771:17 779:9
**23-30** 751:17
**23-31** 751:17
**23-33** 751:3,17
**23-34** 751:3
**23-35** 751:3
**23-D** 770:4
**23-I** 771:18
**23rd** 629:7,10
630:3 631:16
632:15 668:8
669:10
**24** 649:7 650:22
666:4 784:13
785:22 786:1,11
**24th** 660:8 764:12
765:4
**25** 651:6 656:10,20
694:15,15 792:12
845:19
**25th** 728:22 729:16
845:13
**26** 681:19 682:10
697:5,6,7 738:17
**26th** 737:3 784:16
786:3
**27** 699:9 737:14
**28** 656:13,21,22
657:2,3,16,17
701:21 805:8
**29** 657:18,22 658:5
658:14 659:10
707:4
**29th** 676:21
**2nd** 694:16 737:10
747:17 748:15
749:7,11 763:17

**3**

**3** 623:8 646:17
780:16 781:8
834:20
**3:20** 793:8
**30** 657:22 658:9
707:15 842:4,7
**30,000** 708:13
**300** 803:5 804:15
830:10
**307-9510** 650:10
**30th** 683:19 781:9
**31** 712:5
**3131** 818:22
**31st** 686:13
**32** 728:21
**33** 729:15
**33019** 617:6
**34** 730:19
**345** 649:4
**35** 735:6 758:4
**36** 737:2
**37** 738:15 784:15
786:1,2,11
**38** 789:12 790:22
**3rd** 763:18

**4**

**4** 635:8 763:20
764:16 812:10
813:5 818:16,19
834:20
**4-2** 813:15
**4:14** 845:18
**40** 702:17 703:15
703:17 799:1
800:9 805:9 806:7
**405** 669:16
**430** 616:2
**45** 804:14
**475** 808:14

**5**

**5** 660:3 812:10
819:9
**5:00** 743:7
**5:28** 740:3,6,14
743:12 789:15
790:1
**50** 794:7,12
**51** 842:5,7
**5th** 697:10

**6**

**6** 812:10
**62,000** 620:20

**620** 618:3
**65,000** 620:19

**7**

**7** 661:3 812:10
**703** 650:9
**70s** 805:3
**75** 803:6
**75,000-a-year**
677:20
**769** 618:3
**795** 618:4

**8**

**8** 812:11
**80s** 805:4
**815-5221** 617:7
**823** 618:4
**8th** 660:6,18 737:16
749:9 835:12

**9**

**9** 639:18 663:18
812:11
**9:30** 616:3 845:13
845:19
**954** 617:7
**9th** 661:4,9,12
662:2



RECEIVED

July 12, 2018

Board on Professional
Responsibility

**Date:** ne 2 , 2018

**Case:** In Re: Larry E. Klayman



Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

In Re:  Larry E. Klayman
June 25, 2018

Page 870

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - X

In the Matter of,              : Board Docket No.

LARRY E. KLAYMAN,              : 17-BD-063

          Respondent.    :    ol I

- - - - - - - - - - - - - - - X

          Monday,   ne 25, 2018

          Washington, DC


          HEARING


Reported by

   Kim M. Brantley, C.S.R.

In Re: Larry E. Klayman
June 25, 2018

| Page 871 |
|---|

1  Hearing, taken at the Board on Professional
2  Responsibility, 430 E Street, NW, Washington, DC,
3  commencing at 9:30 a.m., before the Ad Hoc Hearing
4  Committee, and before Kim M. Brantley, C.S.R., a
5  Court Reporter and Notary Public in and for the
6  District of Columbia, when were present on behalf
7  of the respective parties:
8
9  APPEARANCES:
10  AD HOC HEARING COMMITTEE:
11  WARREN ANTHONY FITCH, ESQUIRE
12  Chair
13  MARY LARKIN
14  Public Member
15  MICHAEL TIGAR, ESQUIRE
16  Attorney Member
17
18  On behalf of the DC Attorney Disciplinary
19  System:
20  H. CLAY SMITH, III, ESQUIRE
21
22

| Page 873 |
|---|

1  I N D E X
2  WITNESSES:       DIRECT:      CROSS:
3  Timothy Shamble   880, 944      936
4  Larry Klayman       947
5  Gloria Allred      1098
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

| Page 872 |
|---|

1  APPEARANCES CONTINUED:
2  On behalf of Respondent:
3  FREDERICK J. SUJAT, ESQUIRE
4  Law Office of Frederick J. Sujat
5  1525 Windjammer Way
6  Hollywood, Florida 33019
7  (954) 815-5221
8  Email: fsujat@yahoo.com
9  ALSO PRESENT:
10  LARRY E. KLAYMAN, ESQUIRE
11  Respondent
12
13
14
15
16
17
18
19
20
21
22

| Page 874 |
|---|

1  P R O C E E D I N G S
2  CHAIRMAN FITCH: Good morning. We have
3  returned here on June 25 from standing in recess
4  since Friday afternoon, June 1st. I note that all
5  counsel and parties are present and that all three
6  members of the hearing committee are present.
7  The court reporter remains under oath.
8  Mr. Smith, preliminary matters, if any?
9  MR. SMITH: Nothing from Disciplinary
10  Counsel, thank you.
11  CHAIRMAN FITCH: Mr. Sujat, Mr.
12  Klayman, preliminary matters, if any?
13  MR. KLAYMAN: I have a few. I filed a
14  supplemental exhibit list.
15  CHAIRMAN FITCH: Get closer to one
16  microphone or the other, please.
17  MR. KLAYMAN: I'm sorry. I filed on
18  Friday a supplemental exhibit list regarding
19  communications to and from Ms. Gloria Allred, who
20  will testify at 4:00 p.m. today, via remote.
21  Arrangements have been made.
22  CHAIRMAN FITCH: Yes.

2 (Pages 871 to 874)

In Re: Larry E. Klayman
June 25, 2018

---

Page 875

1   MR. KLAYMAN: There were also some
2   other documents that I came upon over the weekend
3   which basically came out of the files of Mr. Smith
4   and Bar Disciplinary Counsel. So there's no
5   surprise here, and it also contains, elsewhere in
6   our exhibits, but I made extra copies so we can
7   get to them quickly.
8       Ok, I'd like to give you copies of
9   these. There are very view. May I approach --
10      CHAIRMAN FITCH: Whenever you wish.
11      MR. KLAYMAN: Yes.
12      CHAIRMAN FITCH: I see that you have
13  numbered them and we will take care of that matter
14  a bit later.
15      MR. KLAYMAN: Yes. I'd like to see if
16  we could move into evidence by agreement, as I
17  stipulated during the last hearing with Mr.
18  Smith, all the exhibits. That will move things
19  that we have in our books along much more quickly.
20      CHAIRMAN FITCH: Have we given any
21  thought to that, Mr. Smith, or should we take this
22  up a little bit later?

---

Page 876

1       MR. SMITH: Yes, I'm inclined to not
2   object, but, yeah, let's take it up a little bit
3   later.
4       MR. KLAYMAN: Ok. The other thing is I
5   request, your Honor, because I have something that
6   I have to attend to, if we could take lunch
7   between 1:00 o'clock and 2:30, if I could have an
8   extra half hour or so, maybe, or 40 minutes?
9       CHAIRMAN FITCH: We will do that, and I
10  assure you that my generosity in agreeing to that
11  has absolutely nothing to do with the fact that I
12  was going to suggest the same thing, for a matter
13  that I have.
14      MR. KLAYMAN: Ok, good. We all have
15  matters.
16      I think that that's all that I want to
17  raise at this time.
18      CHAIRMAN FITCH: Ok. As I recall, Mr.
19  Smith did indeed rest his case and I'm assuming
20  that we're prepared to begin the Respondent's
21  case.
22      Do you have a brief estimate of the

---

Page 877

1   order your case may take?
2       MR. KLAYMAN: Yes. Well, today we're
3   going to put on Mr. Shamble first, Tim Shamble,
4   and then I will testify.
5       CHAIRMAN FITCH: Ok.
6       MR. KLAYMAN: And if we can take a
7   short break for Ms. Allred, which will be very
8   brief testimony, and then we could, with of course
9   your permission, resume with me at 4:00.
10      She was available today, so we worked
11  her in on that.
12      CHAIRMAN FITCH: Good.
13      MR. KLAYMAN: She travels a lot.
14      CHAIRMAN FITCH: I think it's likely
15  that we will recess at 4:20, 4:30, 4:45, whenever
16  Ms. Allred's testimony is completed. Unless we
17  have to interrupt your testimony like two or three
18  minutes before some transition point or something.
19      MR. KLAYMAN: Right.
20      CHAIRMAN FITCH: But I'm inclined, if
21  it's not an inconvenience to you, to recess after
22  her testimony. And again that's partially selfish

---

Page 878

1   on my part, because a matter that I have may take
2   a little longer than the lunch hour.
3       MR. KLAYMAN: Well, I don't know how
4   everything is going to go this week, your Honor,
5   but I have a feeling we'll be done before Friday.
6   I think that will probably be the case.
7       CHAIRMAN FITCH: And the other heads up
8   is that there's a possibility that we'll need to
9   be in recess for part of Wednesday. And we don't
10  know yet exactly when that is. So, notice of that
11  could come 6:00 a.m. Wednesday morning, or 8:00
12  a.m. So keep an eye out on your email.
13      MR. KLAYMAN: Is that with regard to
14  this matter or some other matter?
15      CHAIRMAN FITCH: It's another matter
16  that one of us may have. An effort will be made
17  to clarify that.
18      MR. KLAYMAN: Ok. So we're ready to
19  call Mr. Shamble.
20      CHAIRMAN FITCH: I think that's fine.
21      (Tim Shamble on the witness stand.)
22      CHAIRMAN FITCH: Good morning, sir.

---

3 (Pages 875 to 878)

In Re:  Larry E. Klayman
June 25, 2018

| Page 879 |
| --- |

1    THE WITNESS:  Morning.

2    CHAIRMAN FITCH:  Remain standing for

3  just a second.  What is your full name.

4    THE WITNESS:  Timothy E. Shamble.

5    CHAIRMAN FITCH:  Mr. Shamble, do you

6  swear or affirm that the testimony you are about

7  to give will be the truth, the whole truth and

8  nothing but the truth?

9    THE WITNESS:  Yes.

10    CHAIRMAN FITCH:  Please be seated.

11  Make yourself comfortable.

12    Mr. Klayman, you may proceed with your

13  direct examination.

14    MR. KLAYMAN:  I'm just going to put

15  Respondent's Supplemental Exhibit 3 in front of

16  Mr. Shamble now, if I may.  And we'll get to that,

17  so I don't have to interrupt the testimony.

18    CHAIRMAN FITCH:  Mr. Shamble, there are

19  various compilations of exhibits and we'll guide

20  you through those to the extent necessary.  One of

21  the compilations looks something like this, a

22  small one (indicating).

| Page 880 |
| --- |

1    THE WITNESS:  Ok.

2    CHAIRMAN FITCH:  And it has some RS EX

3  1 to 3, whatever, up in the right-hand corner, and

4  I think that, at least right now, Mr. Klayman

5  wants to look at RS Number 3, and then he'll

6  lead you all through those as he may wish.

7    MR. KLAYMAN:  Yeah, that will come up

8  early in the testimony, the three.

9  Whereupon,

10    TIMOTHY SHAMBLE

11  called as a witness on behalf of Respondent, and,

12  after having been first duly sworn, was examined

13  and testified as follows:

14    DIRECT EXAMINATION ON BEHALF OF RESPONDENT:

15    BY MR. KLAYMAN:

16    Q.  Mr. Shamble, how are you today?

17    A.  I'm ok.

18    Q.  Would you please state your name.

19    A.  Timothy Shamble.

20    Q.  How old are you?

21    A.  I'm 61.

22    Q.  I'm 67 almost.

| Page 881 |
| --- |

1    A.  A little younger than you.

2    CHAIRMAN FITCH:  Mr. Klayman keeps

3  rubbing in his age advantage on me.

4  BY MR. KLAYMAN:

5    Q.  Mr. Shamble, run us through your

6  educational background, briefly.

7    A.  I'm a college graduate.  I graduated

8  from IAMA College in Michigan, with a BA in

9  history.

10    Q.  And your employment history?

11    A.  I work for -- well, I started out in

12  radio.  I worked in Pennsylvania, moved to Ocean

13  City, Maryland, I worked in radio there.  Then I

14  moved to the Washington, D.C. area, worked in

15  radio here.  Then I started working for the

16  federal government, Office Keeper of Broadcasting

17  in 1991, and then moved over to the Voice of

18  America in 1996 and have been with the Voice of

19  America ever since.

20    Currently I'm the local union

21  president, AFG Local 1812, and I've been the local

22  president since 2000.

| Page 882 |
| --- |

1    Q.  Year 2000?

2    A.  Yes.

3    Q.  What are your duties and

4  responsibilities as local union president at Voice

5  of America?

6    A.  Represent employees' rights, defend the

7  contract, bargain for employee rights.

8    Q.  You're in fact their representative?

9    A.  Yes.

10    Q.  You have an office at Voice of America?

11    A.  Currently, yes.

12    Q.  Did there come a point in time when you

13  met, in the course of your duties and

14  responsibilities, Ms. Elham Sataki, who goes by

15  the name Ellie?

16    A.  Yes.

17    Q.  When was that?

18    A.  Several years ago, 2009 maybe.  Yes,

19  she came into my office.  She was in distress.

20    Q.  What did she tell you?  What transpired

21  when she came into your office?

22    A.  She said she was -- she had been

4  (Pages 879 to 882)

In Re:  Larry E. Klayman
June 25, 2018

## Page 883

1  sexually harassed and that management was not
2  listening to her.  They were treating her
3  unfairly.
4        She had been removed as a co-host and
5  then relegated to producing TV packages, which she
6  felt was a less important job, and then the person
7  she had accused of harassing her was still hosting
8  TV programs.  She felt that was unfair.
9        Q.  Was that person an individual named
10  Mehdi Falahati?
11       A.  Yeah, that was the co-host.
12       Q.  At the time this happened, was there
13  also a political division, based on your
14  knowledge, inside of the Persia News Network at
15  VOA?
16       A.  Yeah, that service has always been
17  politically divergent.
18       Q.  What were the two factions?  Were there
19  two factions?
20       A.  There's at least two.
21           There's those that support the Shah,
22  and then there's those that seem to support -- I

## Page 884

1  mean, there's accusation, they support the Mughals
2  in Iran.  There's probably even more factions.
3        Q.  What faction did you perceive Ms.
4  Sataki to be in?
5        A.  Who?
6        Q.  Ms. Sataki.  What faction did she seem
7  to be in?
8        A.  Oh, Elham.  She seemed to be with the
9  pro-Shah faction.
10       Q.  Give us your experience in trying to
11  negotiate with Voice of America and your
12  experience in terms of its reputation.
13       A.  They are very hard-edged.  We've won --
14  matter of fact, we've won several cases and they
15  still don't knowledge it.  If fact, we won a case
16  where they have been illegally hiring
17  non-citizens.  We won that arbitration.  They
18  appealed that up to the FRA.  They lost the FRA,
19  then they appealed it to the Court of Appeals, and
20  eventually had to withdraw their appeal, and they
21  still won't abide by that decision.  That's just
22  an example of the type of management they are.

## Page 885

1        CHAIRMAN FITCH:  When you say they are
2  "hard-edged," is that in all the labor
3  negotiations that you're aware of, or just certain
4  categories?
5        THE WITNESS:  Yeah, we just got done
6  negotiating a new contract with them, and they
7  sought concession after concession relief.  We
8  went to impasse on that.  That took about eight
9  years to negotiate that contract.  They went to
10  impasse.  Finally the union -- we signed it.
11  They have refused to sign that contract.  It's
12  been through impasse.  It's been through agency
13  head review.  That proposal went to impasse.
14  That's been decided on, but they still refused to
15  sign that contract.
16  BY MR. KLAYMAN:
17       Q.  I turn your attention to the document
18  that I put in front of you, which is Respondent's
19  Supplemental Exhibit 3.
20       A.  Mm-hmm.
21       Q.  What is that, Mr. Shamble?
22       A.  This is an article by Joe Davidson in

## Page 886

1  the Washington Post where he discusses the
2  Open-Ended (phon) Survey.  It used to be called
3  the Human Capital Survey.  It's now the Employee
4  Feedback Survey, same thing.
5        Q.  What was the date of that article?
6        A.  2009.
7        Q.  Around the time that you first met Ms.
8  Sataki.
9        A.  Right around that time, yeah.
10       Q.  Did you give this article to me at the
11  time?
12       A.  I don't recall, but I probably did.
13       Q.  Right.  And what does it reflect, based
14  on your experience?  What is that article talking
15  about?
16       A.  Well, winners and losers, according to
17  the survey results, and this shows the
18  Broadcasting Board of Governors is at the very
19  bottom.  Employees don't rank them very high.
20       Q.  So it ranks as one of the worst in
21  government?
22       A.  Consistently.  Ever since they have

5 (Pages 883 to 886)

In Re: Larry E. Klayman
June 25, 2018

Page 887

1  been doing this they have been worst or next to
2  worst throughout the federal government.
3      Q.  Now after you met with Ms. Sataki that
4  you just described, what if anything happened?
5      A.  Well, we were in discussions with her
6  regarding which way she wanted to go with her
7  case, whether bringing a grievance or an EEO
8  complaint or exactly how we could address this.
9          We contacted Labor Relations, tried to
10  reach some kind of settlement there.  I discussed
11  with the head of human resource, Donna Grace,
12  whether there was a way to resolve this -- all her
13  complaint really was that she wasn't being treated
14  fairly.  So we sought, is there a way you could
15  include her as a host in that inquiry.   But they
16  just weren't willing to reach some kind of, you
17  know, fair settlement.
18      Q.  Is that consistent with your experience
19  in dealing with them?
20      A.  Oftentimes, yes.
21      Q.  Yes.  And was there a solution that she
22  wanted with regard to being in Los Angeles?

Page 888

1      A.  Yeah, eventually --
2          MR. SMITH:  Objection.  Leading.
3          CHAIRMAN FITCH:  Overruled.
4  BY MR. SMITH:
5      Q.  Did she see a solution?  Did she
6  propose a solution to you?
7      A.  One of the solutions that she had filed
8  was possibly working out of the Los Angeles
9  Bureau, bureau of broadcasting.
10      Q.  Did that have anything to do with the
11  person who harassed her?
12      A.  She -- well, letter complaint was that
13  she didn't want to be near this person, and the
14  agency, what the agency had offered is that they
15  would put her back in Persian service where she
16  would be in close contact with him, or they would
17  move her over to the English Central News room.
18  But that's right across the hall.  And she would
19  run into him.  So she did not want that as a
20  solution.
21          But she could do her work from Los
22  Angeles.  We can do remotes from there.  So that

Page 889

1  would have been the solution that the agency could
2  have done, if they wanted to.
3      Q.  Based on your experience dealing with
4  the Persia News Network and various offices, is
5  there a large Persian population in Los Angeles?
6      A.  Yes.  I think it's probably the largest
7  in the United States.
8      Q.  Was it your experience that in fact Ms.
9  Sataki had done some remotes from other offices?
10  Did she say anything about that?
11      A.  I don't recall her saying that.
12      Q.  Now did there come a point in time that
13  you met me?
14      A.  Yes.
15      Q.  Larry Klayman?
16      A.  Yes.
17      Q.  When was that?
18      A.  She had contacted me and said that she
19  had hired an attorney that she had met, and she
20  brought you in to discuss the case.  So I met you
21  in my office.
22      Q.  And we met with Ms. Sataki present?

Page 890

1      A.  Yes.
2      Q.  Did we have several meetings in that
3  regard with her?
4      A.  Yes.
5      Q.  During the course of those meetings,
6  did we decide on whether we would try to pursue
7  settlement or not first?
8      A.  Yes.  I mean, we always -- our policy
9  in the union is we would rather do settlement than
10  grievance or any other kind of option.  And that
11  was our objective was to somehow come to a
12  settlement.
13      Q.  Did Ms. Sataki agree to do settlement,
14  try settlement first?
15      A.  Yes, absolutely.  Yes.
16      Q.  Did we ultimately undertake to try to
17  settle the case?
18      A.  Yes.
19      Q.  What transpired in that regard?  What
20  did we do?
21      A.  Well, we met with -- with your
22  involvement we met with the Broadcasting Board of

6 (Pages 887 to 890)

In Re: Larry E. Klayman
June 25, 2018

| Page 891 |
| --- |

1  Governors for one thing, and the general counsel.
2      Q.   What was the response of our attempts
3  to settle and their attitude?
4      A.   The agency was very negative.  They
5  just seemed to be determined and stubborn that
6  they weren't going to do anything in regard for
7  Elham.
8      Q.   Was that consistent with your previous
9  experience about them?
10      A.   Yeah, it's pretty typical of them.
11      Q.   What was their response in terms of our
12  settlement negotiations?  What did they offer?
13  Was it what you just said?
14      A.   What they offered was to have her go
15  back and work in the Persian service.  They
16  weren't going to give her an anchor position.  Or
17  she could go to the central newsroom, and she told
18  them that she didn't feel comfortable around this
19  person and she would be in close proximity with
20  him.  But they would not bump.
21      Q.   Did her decision not to go to -- she
22  decided not to go to the Central News Bureau.  Is

| Page 892 |
| --- |

1  that correct?
2      A.   Yes.
3      Q.   Did that hinge on her language in part,
4  based on what she told you?
5      A.   I don't think she was very comfortable
6  working strictly in English, and I think the major
7  part was that she didn't want to be in the
8  proximity of Falahati.
9      Q.   So she was adamant about going to Los
10  Angeles?
11      A.   Yeah, she wanted to -- she thought that
12  was a good solution to work out of Los Angeles.
13      Q.   Did there come a time when she had
14  discussions, you, me and her, about using
15  publicity to try to coax the agency into
16  settlement or a reasonable solution?
17      A.   Yes.
18      Q.   Was she present at the time?
19      A.   Yes.  It was in my office.
20      Q.   Why is publicity helpful based, on your
21  experience, in trying to get a solution with this
22  very difficult agency?

| Page 893 |
| --- |

1      A.   We've done it.  It's something that you
2  can use to pressure managers, if they're
3  intractable, you know, to try to get them to come
4  to some sort of agreement.  We have our own
5  website, so we use it, too.
6      Q.   Is it your experience, based upon being
7  in Washington, that publicity sometimes coaxes
8  people to do the right thing?
9      A.   Sometimes, yes.
10      Q.   And did there come a point in time when
11  you actually went with her and distributed
12  publicity?
13      A.   I remember one time.  The VOA was on
14  the mall here in Washington, some kind of
15  public -- it might have been a recruitment fair or
16  something.  But we had an article and both her and
17  I were distributing it to people in the vicinity,
18  tried to let people know and to let the agency
19  know that, you know, we were going to publicize
20  this.
21      Q.   I'm going to turn your attention to
22  Exhibit 23 of Bar Counsel's exhibits.

| Page 894 |
| --- |

1      MR. KLAYMAN:  And Mr. Sujat, please
2  turn to Page 23-33 for Mr. Shamble, 23-33.
3  BY MR. KLAYMAN:
4      Q.   Ok, great.  Is that the article that
5  you distributed in Ms. Sataki's presence?
6      A.   Yes, I believe it is.  Yes.
7      Q.   It's called: "Government War on a
8  Freedom Loving Beauty.  Exclusive, Larry Klayman
9  Goes to Bat for Harassed Broadcaster Fighting for
10  a Free Iran."
11      That's it?
12      A.   Yes.
13      Q.   And was she there when she gave it out
14  and she approved of that?
15      A.   Yes.  We were both on the mall handing
16  that out.
17      Q.   Now you saw other articles that I have
18  written on her behalf?
19      A.   I have seen other articles, yes.
20      Q.   And I provided them to you, correct?
21      A.   I've seen some, yeah, that you had
22  given me.

7 (Pages 891 to 894)

In Re: Larry E. Klayman
June 25, 2018

| Page 895 |
| --- |

1    Q.  Were they always very positive -- were
2    they positive or negative in how I described her?
3        CHAIRMAN FITCH:  That question is
4    struck.
5    BY MR. KLAYMAN:
6        Q.  How did you perceive those articles?
7        A.  They were always positive towards her.
8        Q.  I'm going to turn your attention to
9    Exhibit 5.
10       MR. KLAYMAN:  And Mr. Sujat, please
11   turn to the affidavits of Mr. Shamble.  Flip those
12   forward, me, in that exhibit.
13       While we're here, your Honor, I'm going
14   to move the article, Respondent's Exhibit 3, into
15   evidence.
16       MR. SMITH:  No objection.
17       CHAIRMAN FITCH:  Admitted.
18       MR. KLAYMAN:  To the extent that I can
19   do it as I'm going, I will, and then we can go
20   back.
21       MR. SUJAT:  Respondent's 5.
22       MR. KLAYMAN:  I want the affidavit of

| Page 896 |
| --- |

1    Timothy Shamble.
2        CHAIRMAN FITCH:  We're looking for
3    Respondent's 5.
4        MR. KLAYMAN:  No, excuse me, it's Bar
5    Counsel's Exhibit 23.
6        MR. SUJAT:  Bar Counsel, ok.
7        THE WITNESS:  That's the one I just
8    looked at.
9        CHAIRMAN FITCH:  I've gotten confused.
10       MR. KLAYMAN:  I'm sorry, I'm confused.
11   Yes, it's Exhibit 5.
12       CHAIRMAN FITCH:  We were just
13   discussing R.S., Respondent's Exhibit 23.  And
14   that was admitted.
15       And now we're looking at --
16       MR. KLAYMAN:  We're looking at
17   Respondent's Exhibit 5.  I'm sorry, it was my
18   fault.
19       Turn to the declarations of Mr.
20   Shamble.
21       THE WITNESS:  Which book is that?
22       MR. SUJAT:  This is Respondent's.

| Page 897 |
| --- |

1        MR. KLAYMAN:  Thank you.
2    BY MR. KLAYMAN:
3        Q.  Mr. Shamble, is this an affidavit, a
4    declaration that you signed on or about February
5    3rd, 2012?
6        A.  Yes.
7        Q.  Is that your signature?
8        A.  Yes.
9        Q.  And you dated it?
10       A.  Yes.
11       Q.  Ok.  Is that declaration true and
12   correct?
13       A.  Yes.
14       Q.  I turn your attention to the first
15   paragraph --
16       CHAIRMAN FITCH:  I'm still writing, I'm
17   behind.
18       KLAYMAN:  We apologize, your Honor.
19       CHAIRMAN FITCH:  No, no, it's not your
20   fault in any way.
21       Is it Respondent's Exhibit 5?
22       MR. KLAYMAN:  Five.  And in there

| Page 898 |
| --- |

1    that's part of my answer to the Specification of
2    Charges, Respondent's Exhibit 5.  It's in book
3    four.
4        MR. TIGAR:  It's the six numbered
5    paragraphs, correct?
6        MR. KLAYMAN:  Right, exactly, Mr.
7    Tigar.
8        CHAIRMAN FITCH:  Our book has gotten
9    out of order.
10       MR. KLAYMAN:  Your Honor, I can help
11   you.
12       CHAIRMAN FITCH:  Unless it's somewhere
13   within five --
14       MR. KLAYMAN:  Yes, it was within five.
15       CHAIRMAN FITCH:  How far along do I go?
16       MR. KLAYMAN:  Let's say about a quarter
17   of an inch of pages maybe; the Declaration of
18   Timothy Shamble.
19       CHAIRMAN FITCH:  Supplemental?
20       MR. KLAYMAN:  Well, there's one before.
21   They're two.  I'm talking about the first one.
22       CHAIRMAN FITCH:  That's dated February

8 (Pages 895 to 898)

In Re: Larry E. Klayman
June 25, 2018

## Page 899

1 3, 2012?
2 MR. KLAYMAN: Yeah, that's it.
3 CHAIRMAN FITCH: Now let me go back and
4 clarify something else.
5 MR. KLAYMAN: Ok.
6 CHAIRMAN FITCH: The exhibit that we
7 were first looking at was a supplemental exhibit
8 of yours.
9 MR. KLAYMAN: Correct. Number three.
10 CHAIRMAN FITCH: Ok. That's R
11 supplemental.
12 So let me state clearly for the record
13 that Respondent's Supplemental Exhibit 3, a copy
14 of a Washington Post article, has been admitted
15 into evidence.
16 BY MR. KLAYMAN:
17 Q. So returning to Respondent's Exhibit 5,
18 your declaration on February 3rd, 2012, is the
19 first paragraph accurate?
20 A. Yes.
21 Q. Second paragraph?
22 A. Yes.

## Page 900

1 Q. The third paragraph? I'm going to read
2 this.
3 MR. KLAYMAN: I'm not going to read the
4 whole thing, your Honor. This is an important
5 paragraph...
6 "I found Mr. Klayman to be very
7 diligent in attempting to zealously represent Ms.
8 Sataki, putting in many hours, and did not to my
9 knowledge compromise any of her rights.
10 "However, communication became very
11 difficult and nearly non-existent with Ms. Sataki,
12 perhaps due to her health condition.
13 "When Mr. Klayman and I would try to
14 contact her, we usually got no response, even for
15 months. During these periods Mr. Klayman
16 attempted to protect Ms. Sataki's rights so that
17 they would not be forfeited.
18 "It is my opinion that Mr. Klayman
19 acted professionally and ethically in trying to
20 protect Ms. Sataki's rights, even when she would
21 not communicate with him."
22 Is that an accurate statement?

## Page 901

1 A. Yes.
2 Q. That's your experience?
3 A. Yes.
4 Q. Paragraph four: "I have given Mr.
5 Klayman's name and contact information to at least
6 one other aggrieved VOA employee when they
7 requested the name of an aggressive attorney. I
8 was impressed by his willingness to doggedly
9 defend Ms. Sataki under difficult circumstances.
10 "The Broadcast Board of Governors, of
11 which VOA is a subcomponent, has been ranked the
12 worst agency in government and it is very
13 difficult to negotiate any settlement with them
14 because of management's attitude and approach to
15 employees."
16 Is that accurate?
17 A. Yes.
18 Q. Is it fair to say based on that that
19 you felt highly of my professional abilities?
20 MR. SMITH: Objection, leading.
21 BY MR. KLAYMAN:
22 Q. Why did you recommend me to another

## Page 902

1 employee?
2 A. Another employee came to me, Ms. Vera
3 Wiley, who wanted an aggressive attorney for her
4 case, and I recommended that she contact you.
5 Q. Were you aware that I was also
6 representing other people, broadcasters in the
7 Persia News Network?
8 A. I was aware, yes.
9 Q. Who were they?
10 A. Manohir (phon) -- I don't know if I
11 pronounced it right, and Mr. Chalangi were two of
12 them.
13 Q. Mahmonir Rahimi?
14 A. That's it.
15 Q. And how do you spell Mr. Chalangi's
16 name?
17 A. And that's his last name. It's
18 C-h-a-r-l-a-n-g-i, I believe.
19 Q. Based on their knowledge, what was
20 their issue, generally speaking? For Mr.
21 Chalangi?
22 A. Chalangi. I think they felt they

App.0422

In Re:  Larry E. Klayman
June 25, 2018

| Page 903 | Page 905 |
|---|---|

**Page 903**

1  weren't being treated fairly because of their

2  political views.

3      Q.  Were there a number of broadcasters at

4  Voice of America, Persia News Network who felt

5  that way?

6      A.  Still do.

7      Q.  Paragraph five: "It did not appear to

8  me that Mr. Klayman was representing Ms. Sataki to

9  promote his interests rather than Ms. Sataki's.

10  He appeared to me to be very dedicated to her

11  interests, and I was aware that public relations

12  avenues were used to try to prod VOA into a

13  settlement."

14      Is that an accurate statement?

15      A.  Yes.

16      CHAIRMAN FITCH:  What do you base that

17  view on?

18      THE WITNESS:  I've had several

19  employees that have hired attorneys, and they have

20  asked for the union to cooperate with them and to,

21  you know, help them with their cases.

22      But, in all honesty, I've never seen

**Page 904**

1  one go as far and as dedicated as Mr. Klayman was

2  towards Ms. Sataki.  I felt like he went above and

3  beyond.

4      MR. KLAYMAN:  I move this affidavit

5  into -- I move Exhibit 5 into evidence.  It's my

6  Answer and Affirmative Defenses.  I move the whole

7  exhibit in, to make it easier.

8      CHAIRMAN FITCH:  Alright, give me a

9  minute.

10      (Brief pause.)

11      CHAIRMAN FITCH:  Mr. Smith, I'm still

12  going through the first part of Respondent's

13  Exhibit 5.

14      MR. KLAYMAN:  Your Honor, this is -- if

15  I can help you, it's already in evidence with Mr.

16  Smith's exhibits.

17      CHAIRMAN FITCH:  Is that right.

18  Alright.  It will be admitted.

19      MR. KLAYMAN:  Yes.  It's just my Answer

20  to the Specification of Charges.  That's all it

21  is.  That's what I filed.

22      CHAIRMAN FITCH:  Well, and then toward

**Page 905**

1  the end there's some additional --

2      MR. KLAYMAN:  Yeah, I attached that and

3  incorporated it by reference.

4      CHAIRMAN FITCH:  Mr. Smith?

5      MR. SMITH:  I have no objection to the

6  admission of the exhibits.

7      CHAIRMAN FITCH:  Thank you.

8  BY MR. KLAYMAN:

9      Q.  I turn your attention to the

10  Supplemental Declaration of Tim Shamble, if you

11  can flip the page.  You identify yourself in the

12  first paragraph, and getting to -- excuse me, the

13  preamble, "My name is Tim Shamble.  I am the

14  president of the American Federation of Government

15  Employees, Local 112, and attest the following

16  information:  Number one, I sat in and was present

17  at at least one meeting with Larry Klayman and

18  Elham Sataki where using public relations such as

19  press articles and news stories to describe and

20  publicize the alleged sexual and workplace

21  harassment of Elham at VOA was discussed.

22      "Indeed, the idea was that public

**Page 906**

1  relations should help push the agency into a

2  settlement, a resolution of Elham's claims,

3  especially since VOA had been consistently ranked

4  one of the worst agencies in the federal

5  government according to the OPM."

6      Is that an accurate statement?

7      A.  Yes.

8      Q.  "Number two:  In this regard, attached

9  is an email between Larry Klayman and Elham and

10  two other broadcasters at VOA, who Larry Klayman

11  was also speaking to help, as they too, along with

12  others in the Persia News Network branch of VOA,

13  believed they were experiencing workplace

14  harassment of various sorts, about an interview of

15  the Los Angeles Times."

16      I turn your attention to an email which

17  is behind your affidavit.  Do you see that?

18      A.  Yes.

19      Q.  Do you recollect getting that email

20  from me on or about June 10th, 2010?

21      A.  Yes.

22      Q.  And that's an email that purports to be

10 (Pages 903 to 906)

In Re:  Larry E. Klayman
June 25, 2018

Page 907

1  sent to -- is dealing with an interview with the
2  LA Times for Ms. Sataki, correct?
3      A.  Yes.
4      Q.  She's copied on that, correct?
5      A.  Yes.
6      Q.  And is that consistent with her having
7  agreed to publicity?
8      A.  Yes.
9      MR. SMITH:  Objection.
10  BY MR. SMITH:
11      Q.  Now, "Number four: Public relations can
12  influence entities such as VOA and congressmen to
13  take positive action as the press can be very
14  influential in this regard.
15          "It was my impression that Elham
16  understood this and approved it."
17          Is that an accurate statement?
18      A.  Yes.
19      Q.  "Five: As a broadcaster and TV anchor,
20  I believe that Elham understood the benefit of
21  public relations.  I am not aware that any public
22  relations about Elham's situation was anything but

Page 908

1  positive and complimentary about her."
2          Is that an accurate statement?
3      A.  Yes.
4      CHAIRMAN FITCH:  What do you base that
5  first sentence on?
6      THE WITNESS:  Broadcaster and anchor,
7  that's speaking of her.  So she was in the
8  business, plus we were in discussions about using
9  public relations.
10      CHAIRMAN FITCH:  Were you or are you
11  aware of any work or other activity by Ms. Sataki
12  in the public relations field, however that may
13  be?
14      THE WITNESS:  Of her in public
15  relations?
16      CHAIRMAN FITCH:  However that may be
17  defined.
18      THE WITNESS:  I was just aware that she
19  was in the media.  She was a broadcaster.
20  BY MR. KLAYMAN:
21      Q.  Following up on that, she was a
22  broadcaster.  Where was she broadcasting?  What

Page 909

1  country was she broadcasting into?
2      A.  The VOA, the Persia News Network
3  broadcasts into Iran.
4      Q.  Based on VOA's mission, is it to
5  broadcast pro-American propaganda into Iran, for
6  lack of a better word?
7      A.  We don't broadcast propaganda.  We
8  represent the United States.
9      Q.  I was trying to go ahead of you.
10      CHAIRMAN FITCH:  Everybody's
11  understanding is that, in this context, the word
12  "propaganda" means information.
13      MR. KLAYMAN:  Yeah.
14      THE WITNESS:  That's a dirty word over
15  at the VOA.
16  BY MR. KLAYMAN:
17      Q.  Right, but the purpose is, and that's
18  why I said it this way, tongue in cheek, is that
19  we're trying to influence thought in Iran,
20  pro-freedom thought?
21      A.  We extol the virtues of our way of
22  government.

Page 910

1      Q.  Now, is that something as a broadcaster
2  that broadcasts into Iran carries some risk?
3      A.  Absolutely.
4      Q.  How is that?
5      A.  Well, to themselves, and, you know, to
6  possible family members that may still be in Iran,
7  yeah, their name and face is out there.
8      Q.  Did Ms. Sataki ever express concerns
9  that she was broadcasting into Iran to you?
10      A.  No, she wanted to.  She wanted to
11  broadcast into Iran.
12      Q.  Did it appear to you that she was not
13  afraid of publicity into Iran?
14      A.  I never heard her complain about that.
15      Q.  In fact, in the lobby of VOA they have
16  rather strict security, correct?
17      A.  Correct.
18      Q.  And is it for that reason, with regard
19  to all the other networks there?
20      A.  I could only speculate on that.  I
21  mean, they have a lot of security there.  We are a
22  target, according to them.

In Re: Larry E. Klayman
June 25, 2018

Page 911

1    Q.  Now, as we were going through, trying
2  to settle initially, did there come a point in
3  time when we learned that we were trying to settle
4  it through a member of the Board of Governors by
5  the name of Blanquita Collum?
6    A.  Yes.  She had told me you contacted
7  her.
8    Q.  Were you aware of my friendship with
9  Blanquita?
10    A.  You informed me you were a friend of
11  hers, yes.
12    Q.  And we went to her after we attempted
13  with the general counsel and others to settle, we
14  thought maybe we could --
15    MR. SMITH:  Objection.
16    CHAIRMAN FITCH:  First of all, what is
17  the individual's name.
18    THE WITNESS:  Blanquita Collum.
19    MR. KLAYMAN:  B-l-a-n-q-u-i-t-a
20  C-o-l-l-u-m.
21  BY MR. KLAYMAN:
22    Q.  How many people were on the Board of

Page 912

1  Governors at that time when we were trying to
2  settle?
3    A.  I don't remember how many there were.
4  I think it was eight.
5    Q.  And the very top person on the Board of
6  Governors, who was that?  Was it the Secretary of
7  State, Mrs. Clinton?
8    A.  The Secretary of State has a seat on
9  the board.  The chairman at that time I think was
10  probably Kenneth Tomlinson.
11    Q.  But the Secretary of State is a member
12  of the Board of Governors at the time?
13    A.  Secretary of State has a seat on the
14  board, yes.
15    Q.  I'll turn your attention and back up,
16  were we successful in lobbying Ms. Collum?
17    A.  I don't know.  I assume not.  But you
18  were lobbying her.
19    Q.  Ok.  Did we also take other actions
20  with regard to congressman and senators to try to
21  intercede?
22    A.  Yeah.  We went up to several I know

Page 913

1  senators' offices.
2    Q.  Who were some of the senators that we
3  went to?
4    A.  I know I --
5    Q.  You and I both went, right?
6    A.  Yeah.  I know I was there for Coburn's
7  office.
8    Q.  Tom Coburn of Oklahoma?
9    A.  Tom Coburn, of Oklahoma.  I'm drawing a
10  blank --
11    Q.  Let me stop you.  He was on the
12  Oversight Committee at VOA?
13    A.  Foreign Affairs.
14    Q.  Did we go to see John McCain?
15    A.  That's one of the offices that was
16  contacted, yes.
17    Q.  During the time that we went up there,
18  did we take some press materials to give them?
19    A.  Yes.
20    Q.  Did Ms. Sataki tell you not to do that?
21    A.  No.
22    Q.  She was aware we were going up there?

Page 914

1    A.  Yeah, I assume, yeah.
2    Q.  Now, were you aware that I had even
3  sought the help from John Boehner, who was
4  incoming Speaker of the House?
5    A.  Yeah, I remember you telling me.  Yeah.
6    Q.  I turn your attention to Respondent's
7  Exhibit 24.
8    MR. KLAYMAN:  You can just leave that
9  there, Fred, and then we're going to do another
10  one.
11  BY MR. KLAYMAN:
12    Q.  Take a look at that, Mr. Shamble.  I'm
13  going to ask you questions.
14    Is this exemplary of some of the
15  matters that I made to try to settle this matter
16  with VOA, this letter?
17    A.  Yes.
18    MR. KLAYMAN:  I'm going to move Exhibit
19  24 into evidence.
20    MR. SMITH:  No objection.
21  BY MR. KLAYMAN:
22    Q.  Take a look at Exhibit 24 and tell me

12 (Pages 911 to 914)

In Re: Larry E. Klayman
June 25, 2018

## Page 915

1  what it is that we were trying to accomplish, just
2  generally speaking.
3      A.  This letter dated February 21st, 2010?
4      Q.  Yes.
5      A.  Well, trying to get a settlement here,
6  trying to get the agency to do the right thing.
7      Q.  Were you aware -- you can take a look
8  at it -- that when Ms. Sataki went out on leave to
9  Los Angeles that she had a nervous breakdown, for
10  lack of a better word, and went to see doctors?
11     A.  I was aware, yes.
12     CHAIRMAN FITCH:  If we have moved from
13  Exhibit 24, I'm prepared to admit it.  He asked
14  that it be admitted and there's no objection.
15     MR. SMITH:  Right.
16     MR. KLAYMAN:  Because it's admitted I'm
17  just going to ask a few brief questions, since
18  it's in the record.
19     CHAIRMAN FITCH:  Oh, I'm sorry, I
20  thought you were finished.
21     MR. KLAYMAN:  No, that's fine.
22

## Page 916

1  BY MR. KLAYMAN:
2      Q.  And the agency, based on your
3  knowledge, you were asking for reasonable medical
4  accommodation?
5      A.  Correct.
6      Q.  Was that granted?
7      A.  No.
8      Q.  Now, was it at that time that the offer
9  to go work in the Central News Division occurred?
10         I'll turn your attention to Exhibit 25,
11  if you can flip the page.
12     A.  Flip the tab?
13     Q.  Yeah, flip the tab.
14     A.  Ok.  May 12, 2010?
15     Q.  Yeah.  You've seen this before, have
16  you not?
17     A.  I don't know.  Let me just look at it.
18         (Witness peruses document.)
19     A.  Yes, I have seen this.
20     Q.  This is where they're offering to put
21  her on the middle eastern desk of the Central News
22  Division in Washington, D.C.?

## Page 917

1      A.  Correct.
2      Q.  Which she then declined?
3      A.  Correct.
4      MR. KLAYMAN:  I'll move Exhibit 325
5  into evidence.
6      CHAIRMAN FITCH:  Admitted.
7  BY MR. KLAYMAN:
8      Q.  I turn your attention to Exhibit 26.
9  You can flip the page, Mr. Shamble.
10     A.  Ok.
11     Q.  You're copied on that, are you not?
12     A.  Yes.
13     Q.  And in there we are presenting
14  information to try to get that reasonable
15  accommodation, that's your understanding,
16  reasonable medical accommodation?
17     A.  Yes.
18     MR. KLAYMAN:  I'll move Exhibit 26 into
19  evidence, your Honor.
20     MR. SMITH:  No objection.
21     CHAIRMAN FITCH:  It's admitted.
22

## Page 918

1  BY MR. SMITH:
2      Q.  What I've just shown you, Exhibits 24,
3  25 and 26, are they exemplary of just some of the
4  efforts I made to resolve this?
5      A.  Yes.
6      Q.  And we made?
7      A.  Yes.
8      Q.  Every step of the way I kept you
9  apprised of what's going on?
10     A.  As far as I know, yeah.
11     Q.  Now, are you also aware that on behalf
12  of Ms. Sataki I filed an Office of Civil Rights
13  complaint for her?
14     A.  Yes.
15     Q.  And tell us what an OCR -- we call it
16  an OCR complaint -- entails, based on your
17  experience.
18     A.  That you file a complaint with the
19  Office of Civil Rights regarding discrimination.
20     Q.  And what kind of discrimination were we
21  claiming?
22     A.  I don't recall offhand.  It's sexual

13 (Pages 915 to 918)

In Re: Larry E. Klayman
June 25, 2018

## Page 919

1 harassment, I would imagine, and retaliation.
2 　Q.　Did there come a time when, you know,
3 you felt that the case needed to move more
4 quickly?
5 　　　Let me back up.  I'll turn your
6 attention to Respondent's Exhibit 17.  I'll make
7 it easier.
8 　A.　Same book?
9 　Q.　Yes.
10 　A.　This is a letter May 3rd?
11 　Q.　Yes.
12 　A.　Ok.  Yes, I remember this it.
13 　Q.　Was there an aspect of this
14 investigation that troubled you, those being
15 conducted by Office of Civil Rights?
16 　　　You can take your time and take a look
17 at that letter.
18 　A.　Ok.  They seemed to be stalling coming
19 to some sort of resolution, and that was blocking
20 any further progress in the case.
21 　Q.　Was there an issue with witnesses and
22 how they were being handled?

## Page 920

1 　A.　Yeah, that there were witnesses that
2 were claiming they were being harassed.
3 　Q.　Were they witnesses on Ms. Sataki's
4 behalf?
5 　A.　Yes.
6 　Q.　And you wrote a letter to the Justice
7 Department?
8 　A.　Correct.
9 　Q.　"Honorable Lanny Breuer, Assistant
10 Attorney General, Criminal Division"?
11 　A.　Correct.
12 　Q.　Of the Justice Department?
13 　A.　Correct.
14 　Q.　What was the purpose of the letter?  To
15 resolve this whole thing?
16 　A.　Yeah, hopefully.  Yes.
17 　Q.　After this letter, turn to a letter
18 dated May 18th, 2010, which is being sent to you.
19 　　　Do you remember receiving that from the
20 Justice Department on or about that date?
21 　A.　Let me just read it.
22 　　　(Witness reads document.)

## Page 921

1 　A.　Yes, I remember.
2 　Q.　Yes, and they're referring you to the
3 FBI if you want to pursue this.  They're basically
4 giving you the back of the hand there?
5 　A.　Yes.
6 　　　MR. KLAYMAN:  I move Exhibit 17 into
7 evidence, your Honor.
8 　　　MR. SMITH:  No objection.
9 　　　BY MR. KLAYMAN:
10 　Q.　Please turn to Exhibit 18.  That's the
11 letter of January 4th, 2011, to Ms. Delia Johnson,
12 Director, Office of Civil Rights.
13 　　　Without having to read the whole thing,
14 what are you trying to say to Ms. Johnson with
15 that letter?
16 　A.　That they need to come to some kind of
17 conclusion.  They need to issue a final decision.
18 　Q.　Why was that?
19 　A.　Because it was stalled.  There was
20 nothing happening.
21 　Q.　Is that consistent with your experience
22 with Voice of America when dealing with employment

## Page 922

1 matters?
2 　A.　Basically happens all the time.
3 　　　We've had an employee that's been on
4 administrative leave for three years now, because
5 they won't resolve the case.
6 　Q.　Turn to the next page, a January 5th,
7 2011 letter from Ms. Delia Johnson to you.
8 　　　What is your understanding that Ms.
9 Johnson was trying to accomplish, by sending that
10 letter from OCR to you?  What was she conveying to
11 you? How did you take it?
12 　A.　It looks like she's saying you can go
13 ahead and proceed, and I imagine she was getting
14 pressure not to issue a final decision.
15 　Q.　I'll turn your attention to the next
16 letter, March 23rd, 2011 from Delia Johnson to Ms.
17 Sataki.  This is the actual finding of OCR,
18 correct, which did not grant relief for Ms.
19 Sataki?
20 　A.　I'm sorry, I didn't hear the last --
21 　Q.　This is the actuality finding, the
22 finding of the Office of Civil Rights, which did

14 (Pages 919 to 922)

In Re: Larry E. Klayman
June 25, 2018

---

Page 923

1  not grant the relief that Ms. Sataki was seeking?
2      A.  Yes, that's true.
3      Q.  And then attaches a report?
4      A.  Correct.
5      Q.  And you have seen this before?
6      A.  I have seen this, yes.
7          MR. KLAYMAN:  Your Honor, I move
8  Exhibit 18 into evidence.
9          MR. SMITH:  No objection.
10         CHAIRMAN FITCH:  It's admitted.
11 BY MR. KLAYMAN:
12     Q.  Now after OCR issues a report, that's
13 not the end of the story, is it?
14     A.  There's appeal rights.
15     Q.  You have rights.  You have time to take
16 an appeal.
17     A.  Correct.
18     Q.  At that point you can go to court with
19 a Title VII action.
20     A.  Correct.
21         CHAIRMAN FITCH:  We're been referring
22 to the Office of Civil Rights here.  Are we

---

Page 924

1  referring to "an" Office of Civil Rights in VOA?
2          THE WITNESS:  Yes.
3          MR. KLAYMAN:  And sometimes I've used
4  the word "EEO actions."  It's the same thing as
5  I'm referring to, your Honor.  It's employment
6  discrimination, administrative proceeding.
7  BY MR. KLAYMAN:
8      Q.  Now, after this issue, did we try to
9  contact -- you and me, try to contact Ms. Sataki
10 to let her know she still had rights that she
11 could pursue in court, as in a Title VII action?
12     A.  Yeah, you had contacted me and said you
13 couldn't reach her, and I had tried to contact
14 her, too.
15     Q.  Unsuccessfully?
16     A.  Unsuccessfully, yes.
17     Q.  So I turn your attention to
18 Respondent's Exhibit 21.  This is an email to Ms.
19 Sataki dated May 12, 2011.
20         Is that an email which you sent to Ms.
21 Sataki?
22     A.  I'm not -- I don't see an email

---

Page 925

1  dated --
2      Q.  Excuse me, it's January 27, 2011.  I'm
3  sorry, I misread the date.
4      A.  Yes.
5      Q.  You sent it to her --
6      A.  Yes.
7      Q.  -- on January 27th, 2011?
8      A.  Correct.
9      Q.  Is that accurate, this email?
10     A.  Yes.
11     Q.  And I had asked you to send that email
12 to her, correct?
13     A.  Yes you did, yeah.
14     Q.  Let me just read it.
15         MR. KLAYMAN:  I'm not reading very
16 much, your Honor, these days --
17         CHAIRMAN FITCH:  That's alright.
18         MR. KLAYMAN:  I'm trying to move it
19 along.
20 BY MR. KLAYMAN:
21     Q.  "Elham, Larry tells me that, since he
22 met the deadline to file for a final decision in

---

Page 926

1  your OCR investigation of sexual harassment and
2  retaliation, and now that 180 days have passed
3  since your complaint was filed last year, you now
4  have the right to sue in federal court for sexual
5  harassment and retaliation.  Therefore, all your
6  rights were protected.  Your chance to address
7  them are just in a different form.
8          "Larry tells me that you are not
9  communicating with him.  He's told me that he
10 would like to discuss this with you, specifically
11 the fact that Judge Kollar-Kotelly would not order
12 that you be allowed to go back to work in Los
13 Angeles, and had ruled that your sexual harassment
14 and retaliation claims could not be pursued before
15 the 180 day period had elapsed.
16         "So there really were no deadlines
17 missed.  He can explain this in more detail than I
18 can but he tells me you won't speak to him.
19         "He also tells me that the part of the
20 case involving your returning to work was appealed
21 to the higher court.  He did this even though you
22 have not communicated with him, in order to

---

In Re:  Larry E. Klayman
June 25, 2018

---

**Page 927**

1   preserve your rights.
2       "If you wish to pursue this, the appeal
3   is still out there but it must be moved forward
4   soon if you want to do so.
5       "I think you really ought to talk to
6   him to get a better picture about this.  Tim."
7       That's accurate, what you wrote?
8       A.  Yes.
9       Q.  Ok.  So, the situation behind us is
10  that neither you nor I could get in touch with
11  her.
12      A.  Yes.
13      Q.  And we didn't want her to lose her
14  rights.
15      A.  Correct.
16      Q.  Now, Ms. Sataki, based on your
17  experience, knew that she could always call you,
18  right?
19      A.  I mean, she had my contact info, yes.
20      Q.  Just to recap testimony, she initially
21  came to me before she even came to you.
22      A.  Correct.

---

**Page 928**

1       MR. KLAYMAN:  Your Honor, I move
2   Exhibit 21 into evidence.
3       MR. SMITH:  No objection.
4       CHAIRMAN FITCH:  Admitted.
5   BY MR. KLAYMAN:
6       Q.  I turn your attention to a letter to
7   Danforth Austin of August 4th, 2010, which is part
8   of that exhibit.  It purports to be copied on you
9   on August 5th, correct?
10      A.  I'm CC'd on this, yes.
11      Q.  Yes, now before this letter was written
12  by Ms. Sataki, you weren't consulted on what she
13  was going to do with Mr. Austin, were you?
14      MR. SMITH:  Objection.
15      CHAIRMAN FITCH:  Why don't you ask
16  that --
17  BY MR. KLAYMAN:
18      Q.  Were you consulted by Ms. Sataki before
19  she sent this?
20      (Witness reads document.)
21      A.  To the best of my recollection, no.
22      Q.  Based on your testimony, you were aware

---

**Page 929**

1   I was having difficulty interacting and
2   communicating with Ms. Sataki?
3       A.  Correct.
4       Q.  Did there come a time when I asked you
5   to give me the name of another lawyer who might be
6   able to help her?
7       A.  Yes.
8       Q.  And did you do that?
9       A.  Yes.
10      Q.  Who was that?
11      A.  The other attorney was Tim Shea.
12      Q.  What's Mr. Shea's background, to the
13  best of your knowledge, with regard to VOA?
14      A.  He had worked with several other
15  employees and he had worked with at least one
16  other employee in the Persia News Network.  So he
17  was familiar with that entity and he was familiar
18  with the agency.
19      Q.  He would be a good person to try to
20  step in?
21      A.  Yeah.  I liked Tim.  I thought he would
22  be good.

---

**Page 930**

1       Q.  Do you continue to have issues to this
2   day with Voice of America?
3       MR. SMITH:  Objection.
4       CHAIRMAN FITCH:  I think that's
5   alright.  Overruled.
6       THE WITNESS:  Should I answer?
7       CHAIRMAN FITCH:  Yes, go ahead.
8       THE WITNESS:  Yes.
9   BY MR. KLAYMAN:
10      Q.  What's going on now, if anything?
11      A.  Well, they're still not abiding by some
12  arbitration cases we won that have been appealed,
13  all the way through the appeals process.
14      And just this weekend I found out that
15  they're removing one of my executive board
16  members.  He was a non-citizen.  He just became a
17  citizen and they determined they were going to
18  cancel his appointment.
19      I can go on and on if you want more.
20      Q.  Yeah, give us some more.
21      A.  Well, we had a case with the Office of
22  Cuban Broadcasting where they conducted an illegal

---

In Re: Larry E. Klayman
June 25, 2018

Page 931

1 rift and we won that in arbitration. They
2 appealed that for several years. These employees
3 were out of work for over five years, and the
4 agency lost the appeal and had to finally bring
5 them back and then provide them back pay.
6      Several of them were over paid, and
7 there's no way that they would have known they
8 were over paid, and yet the agency refused to
9 grant them a waiver of a debt. So we had to file
10 a grievance on that.
11      When I filed the grievance, they filed
12 for unfair labor practice charge against me and
13 they also filed a grievance against me for filing
14 my grievance.
15      But that's the type of action that they
16 do.
17      Q. And you are the president of the union?
18      A. Yes.
19      Q. And you're there --
20      A. President of the local.
21      Q. Local union.
22      A. Yes.

Page 932

1      Q. I'm going to return to exhibit, just
2 briefly, 21, which is in evidence. Turn to the
3 second page where it says -- paragraph two: "I
4 wish to also inform you that I've instructed Larry
5 Klayman to withdraw any and all civil actions that
6 you may have filed in my name."
7      Again, did she ever discuss that with
8 you?
9      A. She did contact me after we had been
10 trying to reach her and saying that she was having
11 second thoughts.
12      Q. But that was well after we tried to
13 contact her?
14      A. Yes.
15      Q. And that was well after January 23rd,
16 2011?
17      A. Yes.
18      The date of that email?
19      Q. Right.
20      A. Yes.
21      Q. I turn your attention to Exhibit 20.
22 This is the actual Office of Civil Rights

Page 933

1 complaint.
2      You've seen that, correct?
3      A. I believe I have seen that.
4      Q. It was filed on Ms. Sataki's behalf by
5 me, signed by her, third page?
6      A. If looks like her signature.
7      CHAIRMAN FITCH: Your Honor, I move
8 this into evidence, Exhibit 20.
9      MR. SMITH: No objection.
10      CHAIRMAN FITCH: Give me just a minute,
11 please.
12      (Brief pause.)
13      CHAIRMAN FITCH: It is admitted, of
14 course.
15      MR. KLAYMAN: I have no further
16 questions, subject to redirect, if any.
17      CHAIRMAN FITCH: Mr. Smith?
18      MR. SMITH: If you will indulge me a
19 few seconds to clear my thoughts.
20      CHAIRMAN FITCH: You want a ten-minute
21 break?
22      MR. SMITH: Yes.

Page 934

1      CHAIRMAN FITCH: We will stand in
2 recess until 10:50 approximately.
3      (Recess taken.)
4      MR. KLAYMAN: Your Honor, I have one
5 last question.
6      CHAIRMAN FITCH: Ok. We are back on
7 the record at 10:50.
8      Mr. Klayman?
9 BY MR. SMITH:
10      Q. Yes, Mr. Shamble, did I ever discuss
11 with you in the presence of Ms. Sataki the judge
12 that we drew in the federal court for her cases
13 against the Board of Governors? And to refresh
14 your recollection, Judge Colleen Kollar-Kotelly.
15      A. I know that you discussed it with me.
16 I don't know if it was in the presence of Elham.
17      Q. What did I say to you?
18      A. That she didn't have a very favorable
19 opinion of you or your politics or the way that
20 you conduct your business.
21      Q. Did I say that she could be a problem
22 in this case?

17 (Pages 931 to 934)

In Re: Larry E. Klayman
June 25, 2018

| Page 935 |
|---|

1    A.  Yeah, you made that clear.
2    Q.  Did I explain anything about her
3  politics as perceived?
4    A.  Something to do with -- well, not --
5  she didn't see eye to eye with you on your
6  politics and something to do with the Clintons, I
7  think.  I think she was some how favorable to
8  them.
9    Q.  Were you aware that I had sued the
10  Clintons a long time ago?
11    A.  You had told me that, yes.
12    Q.  And I think I gave you a copy of my
13  book at one time, didn't I?
14    A.  Yes, you did.
15    CHAIRMAN FITCH:  You're mumbling a
16  little bit, Mr. Klayman.
17  BY MR. SMITH:
18    Q.  I think I gave you a copy of my
19  autobiography?
20    A.  Yes.
21    Q.  And it discusses it in there?
22    A.  Yes.

| Page 936 |
|---|

1    MR. KLAYMAN:  No further questions.
2    CHAIRMAN FITCH:  Mr. Smith, you may
3  cross examine.
4    CROSS-EXAMINATION BY DISCIPLINARY COUNSEL:
5    BY MR. SMITH:
6    Q.  Good morning, Mr. Shamble.
7    A.  Good morning.
8    Q.  We have spoken a few times over the
9  telephone last several years?
10    A.  Ok, yeah, yeah, I remember.
11    Q.  Now --
12    MR. KLAYMAN:  Objection.  That was
13  leading.  Move to strike.
14    MR. SMITH:  I'm cross examining.
15    MR. KLAYMAN:  It was lack of
16  foundation.
17    CHAIRMAN FITCH:  Go ahead, Mr. Smith.
18  BY MR. SMITH:
19    Q.  Now prior to your meeting Mr. Klayman,
20  you spoke with Ms. Sataki about her claim,
21  correct?
22    A.  Yes.

| Page 937 |
|---|

1    Q.  And you sought to assist her with her
2  concerns.
3    A.  Yeah, we were meeting with her to find
4  out what they were and what options she might
5  have, yes.
6    Q.  And at that time she did not mention to
7  you that she was interested in moving to Los
8  Angeles, did she?
9    A.  No.
10    Q.  Thereafter you met with Ms. Sataki and
11  Mr. Klayman.
12    A.  Yes.
13    Q.  And she introduced Mr. Klayman to you
14  as her attorney.
15    A.  Yes.
16    Q.  So the first time that you learned of
17  any Los Angeles solution was after you met with
18  Mr. Klayman, correct?
19    A.  It was after the time that, yeah, she
20  had hired him as her attorney.
21    Q.  Prior to your meeting with Mr. Klayman,
22  Ms. Sataki did not discuss publicizing her case,

| Page 938 |
|---|

1  did she?
2    A.  No.
3    Q.  And there came a time when you met with
4  Ms. Sataki and Mr. Klayman and the subject of
5  publicity was discussed, right?
6    A.  Yes.
7    Q.  You don't really recall the specific
8  details of that meeting, do you?
9    A.  I just remember it was in my office.  I
10  can remember where they were sitting.
11    Q.  Ok.
12    A.  But other than that, no.
13    Q.  Because you don't recall whether any
14  particular media options were discussed at that
15  time, correct?
16    MR. KLAYMAN:  Objection, leading.
17    THE WITNESS:  The discussion involved
18  various options we had in order to address her
19  issues.
20  BY MR. SMITH:
21    Q.  Alright, but you did not discuss any
22  particular forum with respect to that?

18  (Pages 935 to 938)

In Re:  Larry E. Klayman
June 25, 2018

## Page 939

1      MR. KLAYMAN:  Objection, vague and
2  ambiguous.  "Forum."
3      CHAIRMAN FITCH:  By "forum" I think he
4  means, not courthouse.  Media forum.
5      THE WITNESS:  Various options were
6  discussed, whether newspaper, magazine or, you
7  know.
8  BY MR. SMITH:
9      Q.  And you did not discuss with Ms. Sataki
10  her personal views about publicity at that time,
11  did you?
12      A.  I didn't directly.  No, I assume -- she
13  was there, so if she had a problem she would raise
14  objections.
15      Q.  You assumed, but --
16      A.  I didn't ask her specifically if she
17  had a problem with that, no.
18      Q.  Thank you.
19      If you could turn to Respondent's
20  Exhibit 25.  It's in the white book.
21      A.  May 12, 2010 letter?
22      Q.  Yes.

## Page 940

1      A.  Ok.
2      Q.  So I'm assuming that on or about May
3  12th you got a copy of this letter?
4      A.  Probably, yes.
5      Q.  You were aware that Ms. Sataki declined
6  the settlement offer outlined in this letter,
7  correct?
8      A.  Yes.
9      Q.  But you didn't have any personal
10  discussions with her about why she declined the
11  settlement offer, did you?
12      A.  No.
13      Q.  Turn to Respondent's Exhibit Number 5,
14  please.  That would be the two affidavits that you
15  had previously testified to, the affidavits dated
16  February 3rd, 2012, which is identified as the
17  Declaration of Timothy Shamble, and then the
18  Supplemental Declaration of Timothy Shamble dated
19  July 9th, 2017.
20      A.  Yeah.
21      Q.  These affidavits were prepared by
22  someone other than you, correct?

## Page 941

1      A.  I received suggestions from someone
2  else, but I changed them.
3      Q.  Ok.  And the person that made the
4  suggestions, was that Mr. Klayman?
5      A.  Yes.
6      Q.  Turn to Respondent's Exhibit --
7      CHAIRMAN FITCH:  Let me ask, you were
8  asked if this was prepared by somebody else, and
9  you said you received suggestions.
10      Who wrote the first draft.
11      THE WITNESS:  Larry Klayman.
12      MR. TIGAR:  Excuse me, but is that your
13  signature at the bottom of each of the two of
14  them?
15      THE WITNESS:  It is, yes.
16      MR. TIGAR:  You signed them yourself?
17      THE WITNESS:  I did, yes.
18  BY MR. SMITH:
19      Q.  Mr. Klayman drafted both affidavits,
20  both the declaration and then the supplemental
21  declaration?
22      A.  Yeah.  He provided me what he was

## Page 942

1  looking for and I changed what I felt was
2  incorrect or was not to the best of my
3  recollection.
4      Q.  Turn to the Respondent's Exhibit Number
5  21.  Specifically it would be the second page.  It
6  would be the August 4th, 2010 letter from Ms.
7  Sataki to Mr. Austin.
8      A.  Ok.
9      Q.  You said that you recall receiving this
10  letter on or about August 5th, 2010?
11      A.  This is the August 4th letter?
12      Q.  Yes.
13      A.  I don't recall exactly when I received
14  this.
15      Q.  But do you recall receiving it at or
16  about the time that it was dated?
17      A.  Yeah, because it's -- I mean the email
18  is dated August 5th, so I assume that's correct.
19      Q.  Prior to receiving this letter from Ms.
20  Sataki, you were not aware that she was unhappy
21  with Mr. Klayman.
22      Is that correct?

202-347-3700                    Ace-Federal Reporters, Inc.                    866-928-6509

App.0432

In Re:  Larry E. Klayman
June 25, 2018

## Page 943

1     A.  To the best my recollection, I was not
2 aware.
3     Q.  And you were not aware that Mr. Klayman
4 was in love with Ms. Sataki?
5     MR. KLAYMAN:  Objection, your Honor.
6 It goes beyond the scope of direct.
7     CHAIRMAN FITCH:  I think it's fair.  Go
8 ahead.
9     THE WITNESS:  I was not aware of
10 anything like that.
11 BY MR. SMITH:
12     Q.  You were not aware that he was sending
13 her emails expressing his love to her?
14     MR. KLAYMAN:  Objection.  It lacks
15 foundation.
16     CHAIRMAN FITCH:  There's foundation in
17 the record.  Overruled.
18     THE WITNESS:  I have -- I'm not aware
19 of that.
20 BY MR. SMITH:
21     Q.  Are you just learning of that today?
22     A.  I am.

## Page 944

1     MR. SMITH:  Thank you.  I have no
2 further questions.
3     CHAIRMAN FITCH:  And Mr. Klayman has a
4 right to do redirect examination, which he will.
5     REDIRECT EXAMINATION ON BEHALF OF RESPONDENT:
6     BY MR. KLAYMAN:
7     Q.  With regard to the affidavits,
8 everything in there that you signed, the affidavit
9 and the supplemental affidavit, was true, was it
10 not?
11     A.  Yes.
12     Q.  And you've made changes on the drafts
13 that I've given to you.
14     A.  Yes.
15     Q.  And before I sent you the affidavits,
16 we talked about what to put in the affidavits,
17 correct?
18     A.  Yes.
19     Q.  So you stand by everything you said in
20 those affidavits, correct?
21     A.  Yes.
22     Q.  Based upon your experience, there's

## Page 945

1 nothing wrong with someone caring for someone, is
2 there?
3     A.  No.
4     MR. KLAYMAN:  Ok.  No further
5 questions.
6     CHAIRMAN FITCH:  Mr. Shamble, you'll be
7 delighted to know that I think you can be
8 discharged.
9     THE WITNESS:  Thank you.
10     CHAIRMAN FITCH:  And we very much
11 appreciate your time.
12     THE WITNESS:  Thanks.
13     (Witness is excused.)
14     CHAIRMAN FITCH:  Respondent's team,
15 where do we go from here?
16     MR. KLAYMAN:  Me.
17     CHAIRMAN FITCH:  Ok.
18     MR. KLAYMAN:  I'm the next witness.
19     CHAIRMAN FITCH:  May I ask a question
20 of Respondent's team?
21     Do you want to go to 1:00 o'clock,
22 because the obligation --

## Page 946

1     MR. KLAYMAN:  Yes.
2     CHAIRMAN FITCH:  -- involves something
3 around 2:00 o'clock or so, or are you willing to
4 break earlier for an hour and a half.
5     MR. KLAYMAN:  Yeah, I would like to
6 just take the full hour and a half.
7     CHAIRMAN FITCH:  No, we're going to
8 take the full hour and a half, no question of
9 that.  But does it a have to be 1:00 to 2:30, or
10 can it be 12:30 to --
11     MR. KLAYMAN:  It has to be 1:00 to
12 2:30.  Thank you very much for your courtesy.
13     CHAIRMAN FITCH:  Sure.
14     Alright.  I understand that the
15 Respondent's team has called Respondent to
16 testify.
17     Mr. Klayman, raise your right hand,
18 please.  Do you swear or affirm that the testimony
19 you are about to give will be the truth, the whole
20 truth and nothing but the truth?
21     THE WITNESS:  I do.
22     CHAIRMAN FITCH:  You may, of course, be

In Re: Larry E. Klayman
June 25, 2018

---

Page 947

1  seated.
2  Whereupon,
3       LARRY KLAYMAN,
4  called as a witness on behalf of Respondent, and
5  after having been first duly sworn, was examined
6  and testified as follows:
7  DIRECT EXAMINATION ON BEHALF OF RESPONDENT:
8  BY MR. SUJAT:
9      Q.  Good morning, Mr. Chair, and members of
10 the committee, Mr. Klayman.
11     A.  Good morning, Mr. Sujat.
12     Q.  Would you please indicate for the
13 record your full name.
14     A.  Larry Elliot Klayman, E-l-l-i-o-t,
15 Klayman.  I generally don't use the middle name.
16     Q.  Where and when did you receive your
17 undergraduate degrees?
18     A.  Well, I attended, in terms of my
19 education, Harriton High School in Philadelphia,
20 Pennsylvania.  I graduated in 1969.
21     Q.  Mm-hmm.
22     A.  And I then matriculated, as they say,

---

Page 948

1  in Duke University, in Durham, North Carolina.
2      Q.  Mm-hmm.
3      A.  I graduated with a degree in political
4  science and French literature in 1973.  And also I
5  was an honor student.  I wrote a thesis on the
6  events of 1968 in France when the government was
7  almost overthrown.
8      Q.  Now where and when did you receive your
9  law degree?
10     A.  I took a year off between law school
11 and undergraduate school, and I worked for Senator
12 Dick Schweiker from Pennsylvania on Capitol Hill.
13 It was during Watergate, ironically.
14         I also worked on weekends and holidays
15 at Ritz Camera in Georgetown selling cameras.
16         That's my hobby.  I actually liked
17 working in the camera store more than working on
18 Capitol Hill.
19     Q.  Could you maybe explain a little bit
20 more what you did on Capitol Hill?
21     A.  Yes.  I was basically an entry-level
22 person.  So I would assign correspondence to

---

Page 949

1  various parties.
2          If I may just say a little bit -- I
3  don't want to belabor it, although I really loved
4  Senator Schweiker, I think he was a great man at
5  the time -- what struck me is that assigning
6  letters on the same subject, ranging from left to
7  right, in terms of impression, to give the
8  constituents the impression that you agreed with
9  them, I felt that kind of strange.  I think that
10 was the beginnings of Judicial Watch and Freedom
11 Watch years later.
12         But he's a very nice man, a good man,
13 and he was thought of as a liberal republican and
14 ran on the first ticket with Ronald Reagan in 1976
15 against Gerald Ford.
16         So I worked there and I did other odd
17 jobs.
18     Q.  Did that help compel you maybe into
19 working for Washington, DC?
20     A.  Yes.  I really learned to love
21 Washington, D.C., just the challenge of being
22 here.  Not everything that went on, such as

---

Page 950

1  writing six different letters on the same subject.
2      Q.  So what is your occupation right now?
3      A.  My occupation, I'm a lawyer, and, just
4  to give you a little background in that regard as
5  to what kind of lawyer I am, is that I started
6  with a litigation law firm in Miami called
7  Blackwell and Walker, and it was at that time the
8  biggest law firm in Florida, which wasn't that big
9  by today's standards.  It was about 60 people,
10 litigation, and I learned how to try cases.  I was
11 lucky to work with a really excellent trial lawyer
12 named Paul Larkin.
13         After two years my first love was to be
14 in Washington, although I loved Miami, too.  But I
15 was up here on vacation, and in those days you
16 didn't have all this security.  I literally rang
17 the bell at the Justice Department and said "I
18 want to talk to somebody in the Antitrust Division
19 in the Assistant Attorney General's office."  And
20 I was called up.  Antitrust was very popular then.
21 I interviewed with someone named Bill Colton, who
22 was the Chief of staff to the Assistant Attorney

---

21 (Pages 947 to 950)

In Re:  Larry E. Klayman
June 25, 2018

## Page 951

1  General John Shenefield, and they offered me
2  several positions in the Justice Department in the
3  antitrust division and I chose the Consumer
4  Affairs division.
5      Later, when I was in Consumer Affairs,
6  I transferred to the AT T division.  I helped
7  break up the monopoly.
8      I left in 1983.  Because of my
9  international background -- I speak French and
10 Italian and I also speak understandable Spanish.
11 It's not as good as the other two -- I wanted to
12 do something internationally, so I went with an
13 international trade law firm by the name of Busby
14 Reem and Leonard, free trade, and I was with them
15 for about two and a half rears, and I started my
16 own law firm, Law Office of Larry E. Klayman.  I
17 dropped the E and later became Klayman and
18 Associates.
19      In the course of doing that I did all
20 kinds of litigation.  We did international trade,
21 import/export, anti-dumping, countervailing duty.
22      You were with me for a time, Fred, at

## Page 952

1  that law firm.  You worked with me, actually for a
2  long time.  And, you know, we also did some
3  employment matters for people.  We had some cases
4  in that regard.
5      I mean, it was basically general
6  practice with an emphasis on international trade
7  and litigation and corporate law work.
8      Q.  Did you also represent various
9  government agencies in the process?
10     A.  Yes.  Well, we represented a lot of
11 foreign government agencies.  I represented the
12 Italian Trade Commission for the government of
13 Italy.  I represented the Portuguese Trade
14 Commission.  We represented the government of
15 Thailand.  We represented -- I'm trying to think.
16 Interestingly enough, there was the Romanian steel
17 industry at one point.
18     I'm a free trader, I believe in free
19 trade, and that was what Busby Reem and Leonard
20 believed in.
21     So we were generally on the defense
22 side of international trade proceedings, and we

## Page 953

1  represented American importers, the importers of
2  fireworks, for instance, from China.
3      So that was kind of the practice I did,
4  general practice.  I've been very fortunate to
5  practice in a number of different areas in my
6  career, which is now 40 years old.
7      Q.  I was going to ask you, more recently,
8  what type of practice have you had, say in the
9  last ten or fifteen years?
10     CHAIRMAN FITCH:  Just keep going
11 chronologically.
12     THE WITNESS:  Yeah, so I started
13 Klayman and Associates.  First it was the Law
14 Office of Larry E. Klayman, and at some point I
15 had had some experiences about the courts with
16 what I thought were unjust judges that were
17 discriminating against my clients based on their
18 national origin, that they were not getting a fair
19 shake.
20     And there came a point in time when I
21 encountered a judge in California who made various
22 remarks about my client that were very

## Page 954

1  prejudicial, and mocking his Chinese -- his
2  Taiwanese heritage.  The judge was mocking my
3  Jewish heritage and some of the witnesses, and
4  also mocking a gay witness of theirs.  I said to
5  myself after that, "Some day I'm going to start a
6  group to try to, in effect, be a type of Hamburger
7  Helper to the Bar to promote integrity in the
8  legal profession."  Because I had gotten to the
9  point where I didn't think that we were living to
10 the standards that we should live to, and I don't
11 want to take up too much time with the panel --
12     CHAIRMAN FITCH:  Don't worry about that
13 right now.
14     THE WITNESS:  Ok.
15     I'm very proud of what I did, and I'll
16 tell you why.  I actually conceived of the name
17 "Judicial Watch" walking through Georgetown.  I
18 was living in Georgetown.  I was then married, and
19 I was walking in front of the Sports Authority and
20 the name came to me, "Judicial Watch," and that
21 became the name of my organization.  And it was
22 like an alternative Bar association, in a way, to

22 (Pages 951 to 954)

In Re:  Larry E. Klayman
June 25, 2018

## Page 955

1  keep the government honest, try to keep it
2  honest -- today I say less dishonest -- and also
3  to promote ethics in the legal profession and get
4  good judges.  That was it.
5      By the way, I really respect the
6  government and I respect the legal profession.  I
7  believe in it.  I don't believe it's held up to
8  the standards, and we heard Mr. Shamble talk about
9  that.
10     MR. TIGAR:  I'm going to ask a favor of
11 both of you.  Would you keep your voice up.  If
12 you would.
13     THE WITNESS:  I know I'm mumbling.  I'm
14 sorry.
15     So I started Judicial Watch on July
16 29th, 1994.  It became very prominent.  It was
17 nonpartisan.  It had a conservative Libertarian
18 ideology, which is mine.  I'm half conservative,
19 half Libertarian in many ways, and I'm eclectic.
20 Many views of mine are actually liberal.  I don't
21 believe in the death penalty, for instance.  Who
22 was in office at the time?  The Clintons were.

## Page 956

1  And we tried to address some of the scandals that
2  were there, such as China gate.  I played a big
3  roll in triggering the campaign finance scandal.
4  I had sought a FOIA request with regard to
5  overseas trade missions, which I had read an
6  article coming back from Los Angeles one day on
7  the plane: "Clinton cozies up to business in
8  Business Week."
9      An individual by the name of Bernard
10 Schwartz, who was the CEO of Loral Corporation,
11 was bagging that he gave $100,000 to the
12 Clinton/Gore reelection campaign and got a seat on
13 the trade mission to China where the government,
14 under Secretary Ron Brown, helped him do business.
15     And I said to myself, "That's not
16 right."  Because I'm a small law firm.  I can't
17 afford to pay $100,000 to have the government help
18 me do business.  This is from my antitrust
19 background.
20     So I filed this FOIA request and one
21 thing led to the next.  We uncovered a suspected
22 Chinese agent by the name of John Wong.

## Page 957

1  Everything just kind of went crazy.  And at that
2  point I was just an international trade lawyer.  I
3  did this as a hobby, Judicial Watch.
4      So, that's kind of when I came on and
5  people began to know about me and my advocacy.
6  Later there were cases involving Filegate,
7  Chinagate, Travelgate, IRSgate, all kinds of
8  gates.  We all knew about it.  And, you know, I
9  brought cases against the Clinton administration.
10     Then later, when President George W.
11 Bush won, people were surprised, because I always
12 said I was nonpartisan, but a lot of people didn't
13 believe me at that point.  And I brought federal
14 lawsuits against him and Vice President Dick
15 Cheney.  The one against the president himself was
16 over what I perceived to be, through a client,
17 Scott Dolley, the unconstitutional mass
18 surveillance of the American people.
19     And at Freedom Watch -- I'll tell you
20 about that as I get to it -- I brought another
21 case and we prevailed on that, under the -- that
22 is current, under the Obama administration.

## Page 958

1      I also sued Vice President Cheney with
2  regard to what he did at Halliburton, which was to
3  inflate the earnings of Halliburton to create
4  investment through (inaudible).  It was similar to
5  the Enron case.  People couldn't believe I did
6  that either.
7      And then I also sued the vice president
8  and his energy task force for not disclosing who
9  he was meeting with in secret meetings, which were
10 setting energy policy for the United States.
11     So, I've always been nonpartisan.  I
12 brought cases against Tom DeLay for taking
13 gratuities.  I was the first to criticize Newt
14 Gingrich when he got into difficulty when he was
15 Speaker, suggested that he resign as the Speaker.
16     So that's who I am, ok.  And by the
17 year 2003, I saw that Senator Graham in Florida,
18 because Florida is my home state -- adopted home
19 state.  I was born in Philadelphia, having started
20 there with Blackwell and Walker.  But I had a
21 condominium there.  I would go frequently.
22     I was very much involved in the Cuban

23 (Pages 955 to 958)

In Re: Larry E. Klayman
June 25, 2018

Page 959

1  American community at Judicial Watch. I got a
2  judgment against the Cuban government for shooting
3  down the airplanes of Brothers to the Rescue, for
4  Jose Basulto. They were picking up rafters coming
5  out of Cuba.
6      Also I played some role in the Elian
7  case at the end. And I really love Florida,
8  and -- like you do, Fred.
9      So, I decided, when I saw that Senator
10  Graham was retiring, that I would run for the U.S.
11  Senate. I ran as a very independent republican,
12  in other words I ran against the republican party.
13  But I could not overcome the George W. Bush
14  machine which wanted to install HUD Secretary Mel
15  Martinez. So I lost that race.
16      I probably was better off. I think I'm
17  better off from the outside, and after that I
18  started Freedom Watch, and I also continued on in
19  my private practice doing many of the same things
20  I did at Klayman and Associates. So I had a dual
21  practice.
22      But I went through a difficult period,

Page 960

1  and in and around 2008, the finances were bad. I
2  was hurting. And so I developed sympathy for
3  other people that were hurting and were not
4  treated well. And Ms. Sataki was one of them.
5      CHAIRMAN FITCH: Approximately when was
6  Freedom Watch founded?
7      THE WITNESS: It was founded earlier
8  than 2004 when I did not win the primary. It was
9  previously known as the International Center for
10  Economic Justice, and I forget the exact years. I
11  think it was maybe 1996.
12      CHAIRMAN FITCH: Sure.
13      THE WITNESS: And I founded it to
14  promote immigration, interestingly enough, which
15  is a big controversy today, because I thought
16  immigration was good for the United States, and I
17  also did it to promote free trade.
18      Around that time I also was trying to
19  help personally congressman Jack Kemp be elected
20  president, because I really liked him. He brought
21  minorities into the republican party. He believed
22  in free trade. I thought he was a really good

Page 961

1  man. So I was on the executive finance committee.
2      But the international center, after I
3  finished the campaign, I changed its name and I
4  changed its mission. I converted it to Freedom
5  Watch. And we still promote free trade. We still
6  promote legal immigration. And I was never one to
7  go out there bashing immigrants. I'm a
8  second-generation myself. And I really loved the
9  Latino -- "Latin," they'll say in Miami, "Latin"
10  community. They don't say "Latino" --in Miami.
11      So, my Chief of Staff when I ran for
12  the senate, Sandy Cobas, is Cuban American, and
13  she introduced me to a lot of the Cuban community.
14      So the answer to the Chair's question,
15  it was started earlier, but it really -- the
16  International Center for Economic Justice put on a
17  debate in 1996 I believe it was at the Press Club
18  to promote an understanding of immigration, why it
19  was important in the United States, and free trade
20  as well. And I had all the third-party candidates
21  there, the major party candidates. It was
22  televised on C-SPAN.

Page 962

1      Later, Judicial Watch, we did a debate
2  of the presidential candidates in 2000, and,
3  interestingly enough, Vice President Al Gore
4  accepted. But I think he got criticism for that
5  and bowed out at the last minute, because, you
6  know, to be with Larry Klayman on the dais who had
7  sued the administration, I think he -- but he did
8  accept at first, and we had the third-party
9  candidates there, and that also was televised.
10      So this is who I am. I do believe in
11  causes. I do believe in justice. I do believe
12  in, ironically, what the Bar sometimes does.
13  Obviously not with regard to this case.
14      But I tried to be someone who would
15  improve the legal profession in my public interest
16  capacity, make it more honest, and tried to
17  address, particularly federal judges who
18  frequently feel that they're not accountable
19  because of their lifetime tenure and they can
20  basically do whatever they want. I saw that
21  frequently, particularly because I was
22  representing people from the other side of the

In Re: Larry E. Klayman
June 25, 2018

| Page 963 | Page 965 |
|---|---|

**Page 963**

1  street, you know, foreign interests, employers,
2  and I didn't think that was fair, to treat the
3  American interest better than interest generally.
4  BY MR. SUJAT:
5      Q.  Mr. Klayman, have you also worked on
6  employment matters and, you know, represented
7  employees?
8      A.  No, I have, and I had several cases in
9  that regard.  As I said, I was part of a general
10  practice, and that's part of what we did.
11      Q.  Mm-hmm?
12      A.  You know, one of the reasons I took the
13  job at the Consumer Affairs section -- because I
14  was offered to go to the International Antitrust
15  section -- was because Consumer Affairs
16  represented five government agencies. I wanted to
17  learn, not just government litigation, but
18  administrative law in a better way.  And we
19  represented the Federal Trade Commission and the
20  Consumer Products Safety Commission, the Federal
21  Reserve Board, the Department of Agriculture, the
22  National Highway Safety and Transportation

**Page 964**

1  Administration, and this gave me a deep
2  understanding in administrative practice as well
3  as litigation.
4          So, you know, given the fact that you
5  have Office of Civil Rights complaints in
6  administrative cases, I felt I was very well
7  versed in that kind of administrative law.
8      Q.  Mr. Klayman, in what states are you
9  licensed to practice law?
10      A.  I'm licensed in Florida and the
11  District of Columbia.  I've been continuously a
12  member in good standing with those bars, and I'm
13  currently inactive in Pennsylvania.  I didn't take
14  CLE.  I was moving around a lot.  I didn't get --
15  I accidentally checked off that I was an active
16  member rather than an inactive member, so my
17  ability to practice law in Pennsylvania
18  deactivated.  And recently I've taken a number of
19  CLE courses to reactivate it.
20          I have no disciplinary record in
21  Pennsylvania over all these years, and -- so
22  that's Pennsylvania.

**Page 965**

1      Q.  I was going to ask another question on
2  that.
3      A.  Yeah.
4      Q.  And again, I just wanted to ask you,
5  are you now and have you always been in good
6  standing to practice in those states?
7      A.  Yeah -- with that caveat that I didn't
8  take the CLE -- in all three bars.
9      Q.  So what I was going to ask here is,
10  could you explain the disciplinary history in
11  Florida and Pennsylvania.
12          I was going to also refer you to
13  Respondent's Exhibits 23 and 30, respectively.
14          MR. SUJAT:  Which I would like to enter
15  into the record.
16          THE WITNESS:  We'll do one at a time.
17  Now at 23.
18  BY MR. SUJAT:
19      Q.  Yes.
20      A.  This is Petitioner's Exhibit 23.
21      Q.  Respondent's.
22      A.  No, it's Petitioner's Exhibit 23.

**Page 966**

1      Q.  And also have you looked at -- would
2  you take a look at 30.
3      A.  Is that Respondent's --
4      Q.  Respondent's Exhibit 30.
5      A.  You know, Fred, I'm sorry about being
6  informal here.  You were right about Respondent's
7  Exhibit 23.  That's also relevant to this
8  question.
9      Q.  Yes.
10      A.  Which I'll point out, if I may?
11      Q.  Yes, absolutely.
12      A.  Petitioner's Exhibit 23 contains the
13  supplemental complaint of Ms. Sataki that was
14  prepared by either her --
15          MR. SMITH:  Which exhibit are you
16  looking at now?
17          THE WITNESS:  Respondent's.  Let me
18  just key it up, because I can move it along
19  faster.
20          MR. SMITH:  Respondent's 23?
21          THE WITNESS:  Respondent's Exhibit 23
22  is the supplemental complaint of Ms. Sataki.  I'm

25 (Pages 963 to 966)

In Re: Larry E. Klayman
June 25, 2018

Page 967

1  going to get back into her testimony, but it's
2  prepared by Miss Kathleen Staunton.
3       CHAIRMAN FITCH: That's not my
4  Respondent's 23.
5       THE WITNESS: I'm sorry, Petitioner's
6  23. My apologies.
7       CHAIRMAN FITCH: Is that the one you
8  want to discuss?
9       THE WITNESS: Yeah, that's the one --
10      CHAIRMAN FITCH: Now wait a minute, Mr.
11  Klayman. I'm asking Mr. Sujat.
12      Do you want to discuss Respondent's 23
13  or Disciplinary Counsel's 23?
14      MR. SUJAT: Actually I'd like to
15  discuss both of them. Right now we're looking at
16  23 and 30 of Respondent's exhibits.
17      THE WITNESS: Let's start with the
18  petitioner's.
19  BY MR. SUJAT:
20      Q.  You want to start with the
21  petitioner's. It was the amended complaint, I
22  believe. That references --

Page 968

1       A.  Number 23.
2       MS. LARKIN: What are we doing now?
3       CHAIRMAN FITCH: My understanding is
4  that we are now getting ready to talk about --
5       MR. SUJAT: Petitioner's 23.
6       CHAIRMAN FITCH: -- DX23, or
7  Petitioner's 23, as Mr. Klayman sometimes refers
8  to it.
9  BY MR. SUJAT:
10      Q.  So could you explain that?
11      A.  Yeah, I'll link it up and I'll try to
12  move it along.
13      This supplemental complaint was,
14  according to Ms. Sataki's testimony, prepared by
15  Kathleen Staunton and perhaps her cousin, Sam
16  Razavi. It states at paragraph C, "Have you filed
17  a complaint about this matter anywhere else? If
18  yes, give details." "Complaint also filed in
19  Pennsylvania and Florida."
20      I wanted to be able to show that in
21  fact those complaints were summarily dismissed.
22  However, by the time that this case was

Page 969

1  reactivated, six years into the fact, the records
2  of those bars were purged. After five years
3  they're purged, essentially. So I got the
4  disciplinary records from those bars to show that
5  there was none, so that therefore this must have
6  been dismissed, this complaint.
7       That's what you're referring to in
8  Respondent's exhibits.
9       MR. SUJAT: Yes, we want to move those
10  two exhibits, Respondent's exhibits into evidence.
11      CHAIRMAN FITCH: Wait just a minute.
12  Because I think you want me and the other members,
13  at least as one does always as evidence that's
14  going on, to look preliminarily at something else.
15  And what you want us to look preliminarily at is
16  Respondent's Exhibit 23.
17      MR. SUJAT: Preliminarily we're looking
18  at Bar --
19      THE WITNESS: Yeah, and we're looking
20  at Respondent's Exhibit 23.
21      MR. SUJAT: -- Bar 23, and then we're
22  looking at 23, Respondent's.

Page 970

1       THE WITNESS: Well, I can turn then to
2  the Respondent's.
3  BY MR. SUJAT:
4       Q.  And 23 references the Florida Bar.
5       A.  Yes, 23 is my disciplinary record in
6  Florida, and it doesn't make any reference to any
7  action that was taken with regard to Ms. Sataki.
8       Q.  Alright.
9       A.  Therefore confirming that it was
10  dismissed.
11      Q.  Yes.
12      A.  And when Ms. Sataki testified she
13  confirmed that the Exhibit 23 and Bar Counsel was
14  accurate, and I specifically refer to line C, I
15  believe, complaint also filed in Pennsylvania and
16  Florida.
17      I'll turn to 30, as you requested.
18      Q.  Mm-hmm?
19      A.  And this is my disciplinary record in
20  Pennsylvania, and it says there's no record of
21  private or public discipline in Pennsylvania, and
22  that I have no complaints pending as of May 22nd,

26 (Pages 967 to 970)

Page 971

1  2018.
2      So that also confirms that Pennsylvania
3  was dismissed because they don't have the records
4  anymore.
5      And in addition I might add, Mr. Sujat,
6  I had discarded a lot of my records over the six
7  years before I was notified by Bar Counsel that
8  this case was still active. I thought the case
9  had been dismissed, so, my records either were
10 discarded and/or lost. I thought this thing had
11 been resolved, such as Pennsylvania and Florida
12 had done.
13     THE WITNESS: Move these into evidence.
14     MR. SUJAT: Yes.
15     CHAIRMAN FITCH: They are admitted.
16     MR. SMITH: I have a question about --
17 there's some handwriting appears on Page 2 of the
18 Bar Exhibit Number 23 and I'd like some
19 explanation for that handwriting, whether that's
20 something from the Florida Bar or whether someone
21 else wrote that in there.
22     THE WITNESS: Are you talking about

Page 972

1  Respondent's exhibit, or --
2      MR. SMITH: Respondent's Exhibit Number
3  23.
4      THE WITNESS: You said Bar exhibit.
5      MR. SUJAT: I think he's referring to
6  Respondent's exhibit.
7      MR. SMITH: Respondent's Exhibit Number
8  23 on the second page.
9      THE WITNESS: Yeah, that's my
10 handwriting. I was just making reference to the
11 fact that it didn't have anything to do with
12 Sataki.
13     MR. SMITH: No objection.
14     THE WITNESS: Thank you for asking.
15 BY MR. SUJAT:
16     Q. Mr. Klayman, how long have you
17 practiced law in the District of Columbia?
18     A. I became a member in 1982, right before
19 I left the Justice Department. I'm one of the few
20 people in the history of DC that actually took the
21 Bar exam here and didn't just waive in.
22     In those years there was kind of a

Page 973

1  loophole, in Florida, because that was my first
2  Bar, that you had to have lived there six months
3  before you took the bar to waive into DC. And I
4  hadn't lived there six months before, so I
5  actually had to take the DC bar, and I passed.
6      So since 1982. That would make it 36
7  years.
8      Q. So, getting into this case here,
9  approximately when did you meet Ms. Sataki for the
10 first time?
11     A. I met her in the late fall of 2009.
12     Q. Where did you meet her?
13     A. I was at that time, to give you a
14 little context, representing a family whose sons
15 were leaders of the student movement in Iran, the
16 Green Movement. Their names are Akbar and
17 Manouchehr Mohammadi. And, you know, as you'll
18 see in some of the columns that I wrote, not only
19 did I sympathize with them, because they were very
20 brave people -- Akbar was tortured and killed;
21 Manouchehr escaped -- and I was bringing a case
22 for Akbar, initially. Later Manouchehr came into

Page 974

1  the case. So I became very much involved in the
2  Iranian freedom movement. I felt this was
3  something really unique that could change the
4  whole scope of the word. And Iran -- I'm starting
5  to talk a little bit with an Iranian accent, a
6  little sing-songy, which is a nice accent -- I
7  felt that if the regime could change, then we
8  wouldn't have an issue with nuclear weapons and
9  that Iran ultimately could become a friend of
10 Israel, I felt, because they had common interests
11 in the Middle East.
12     So I became very much involved with
13 that and I really sympathized with that family and
14 I brought lawsuits for that family.
15     So insofar as I got to know the Iranian
16 community, I went up to Capitol Hill. There was a
17 freedom match. And standing, doing an interview,
18 was a lady who appeared to be about 40 years old,
19 about that, and I walked up and I said, you know,
20 "I'm Larry Klayman and I see you're doing an
21 interview. I brought a lawsuit for Akbar
22 Mohammadi" -- Akbar's very famous -- and I said,

27 (Pages 971 to 974)

In Re: Larry E. Klayman
June 25, 2018

Page 975

1    "If you ever want to do a story about it, let me
2    know." And it was very brief because she was
3    busy doing her interview. And I gave her my card.
4    And then I walked away.
5         I was with somebody else, probably my
6    client, the Mohammadi family, and she ran after me
7    as I was walking town the path at the Capitol on
8    the side facing the mall, and she says, "Here,
9    take my card." And she had written on that card
10   her personal cell phone number. She said, "Call
11   me," ok. And I called her and I left a message.
12   She didn't get back to me for a while.
13        Eventually she got back to me, and she
14   said, "Larry, I've had some difficulties. It's
15   been a hard time. Sorry, I didn't call you back."
16        And I said to her, "Well, you want to
17   meet? You want to have dinner sometime?" She was
18   attractive. She seemed nice. And I was single.
19        So I invited her to Clyde's Restaurant.
20   And we met there. And I was in the back, I had a
21   table for two. And she came in, and I saw her at
22   the bar, and I came up to her, and she gave me a

Page 976

1    kiss on the cheek, you know, Persian style.
2         Latins are very -- are that way, too.
3    Q.   Could you explain "Persian style"?
4    A.   Well, it's like Latins. You greet
5    somebody by giving somebody a kiss. I think we're
6    really the only people that don't do that in the
7    world.
8    Q.   You're right.
9    A.   On the cheek.
10        And we sat down. And the -- you know,
11   pleasantries, niceties, trying to get to know each
12   other. And it was clear to me, I hadn't really
13   asked her there for a professional reason. I had
14   no desire that I knew of at the time to represent
15   her. I just wanted to get to know her and see
16   what she did and if she might be interested, you
17   know, in doing some stories and that kind of
18   thing.
19        It was no sooner than about five to ten
20   minutes before she broke down in tears and grabbed
21   my hand and said, "Larry, I really have big
22   problems. I've been sexually harassed by my

Page 977

1    co-anchor," she described it, "Mehdi Falahati, and
2    before that I was unfairly criticized for my
3    abilities and I need help."
4         And I said, "Well, I'll try to help
5    you, and you know, I'll do it out of friendship.
6    We're now friends."
7         I mean, I do that. I'm not wealthy. I
8    don't have much. I never made a lot of money, and
9    so it was clear I would do it pro bono for her and
10   try to help her, you know.
11        And we later met and she would tell me
12   what was going on. And we met in a private place.
13   I had actually had an apartment over in Arlington
14   near Pentagon City. We met there, and that's
15   where we actually prepared complaints together.
16   So she was there when the complaints were
17   prepared. She was giving me the information to
18   prepare. We did them together. And it developed
19   into a friendship, a close friendship, and I was
20   going through a hard time.
21        I had difficulty with my former
22   organization, Judicial Watch, that -- there's

Page 978

1    somebody from them sitting back there right now
2    taking notes. How they got there is another
3    story. And I have a malicious defamation judgment
4    against them, over the years, and I don't need to
5    get into that here, but his name was James
6    Peterson. I actually hired him.
7         But I sympathized with her, because I
8    had gone through a hard time in my life. I had
9    gone through a hard time in my personal life. I
10   had gone through a hard time financially. At one
11   point I had so little money I would, you know, go
12   to the Hyatt and get a free apple. I mean, I
13   understood what it was like to hit the skids, you
14   know.
15        So my heart went out to her, and I
16   identified with her. To some extent, and I -- you
17   know, by trying to help her and others that I was
18   helping, I was trying to forget about my own
19   problems that I had. So it became a close
20   friendship.
21        From there, you know, I was introduced
22   to Tim Shamble. She told me she was writing --

28 (Pages 975 to 978)

App.0441

In Re: Larry E. Klayman
June 25, 2018

Page 979

1  that she had met with him over this.  I met Mr.
2  Shamble.  I was very impressed with him.  He's a
3  very honest and good person.  And, you know,
4  that's when we had the meetings that he testified
5  to a few minutes ago, where we discussed trying to
6  settle this thing, to settle the case.  He told me
7  how difficult Voice of America was to work with.
8        He was aware, to some extent, of my
9  background, that I take on difficult causes that
10  other people don't take on, and that he needed a
11  strong lawyer to take VOA on.
12        So we set out -- if I may just do a
13  little narrative here, we can break it up, but I
14  can move it along quickly, if the panel indulges
15  me...
16        We decided to try to set up some
17  meetings with VOA, and we did that, and we got
18  this resistance.  We got this hostility, and I
19  couldn't figure out why we were getting hostility.
20  But later Mr. Shamble explained to me, "That's the
21  way they are."  And we decided we needed to try to
22  coax them into a settlement.  That was the reason

Page 980

1  for the publicity.
2        Because I knew over the years that
3  publicity drives legal cases and other matters in
4  Washington, D.C.  No place in the world is
5  publicity more important to trying -- to move a
6  case.  Not just with agencies, but with judges.  I
7  saw that at Judicial Watch judges would take an
8  interest in the case if they read about it in the
9  newspaper or they saw it on TV.  Everybody wants a
10  sexy case, you know, so to speak, quote unquote.
11        So that was the reason for that.
12        And these people were so difficult that
13  I was basically saying to them, and in fact I told
14  them this in advance, you know, "This is not good.
15  It's not going to be good for VOA.  Let's settle
16  this thing."  And they just dug in their heels.
17        So that was the reason for the
18  publicity.  She agreed to it, Tim agreed to it,
19  and there will be other witness that will testify
20  in this proceeding that she agreed to the
21  publicity, and that to me was the way things could
22  be moved along.  And she accepted that.

Page 981

1        So at that point, when we couldn't
2  settle it, I then fashioned lawsuits, and perhaps
3  you'll show me those lawsuits, Mr. Sujat, that
4  also would try to put pressure on them, because
5  the publicity was not producing exactly what we
6  needed at that time.  And she had wanted me to sue
7  the harasser, Falahati, and two of her managers,
8  Susan Jackson and another one.  Because when she
9  complained to Mr. Shambles, she was -- she told me
10  she was retaliated against.
11        So we filed that lawsuit, and then I
12  did one against the Board of Governors, and you
13  know, they were named.  You know, it was a Bivens
14  case, but it was also a case that was fashioned,
15  later amended under a case called Wagner vs.
16  Taylor, and we also had filed -- we identified
17  that this morning -- an Office of Civil Rights
18  complaint, an administrative complaint.
19        Wagner v. Taylor stands for the
20  proposition that, while a civil rights complaint
21  is ongoing, administratively, that you can go to a
22  federal district court and ask them to preserve

Page 982

1  the status quo, which in this case would be --
2  because this is what she wanted.  She wanted to be
3  in LA.  That's where the Persian community is.
4  That's where her friends were.  She told me she
5  didn't like Washington, D.C.  She was only here
6  because of Voice of America.  And she didn't feel
7  comfortable in that environment in Washington,
8  D.C.  She told me -- in fact it's in her
9  testimony -- "Larry, if I stay here, I'll kill
10  myself.  I'll commit suicide.  And I don't want to
11  be in this presence, and I don't speak English
12  that well."  That was one of the criticisms of her
13  and her Farsi at VOA, and "I won't -- I'll get
14  fired in the Central News Agency, because my
15  English isn't good enough.  So they're setting me
16  up.  And I don't want to be there because of -- I
17  don't want to have to walk past my former
18  co-anchor, Falahati, every morning."
19        And she was very emotional and would
20  break down, and you know, apparently eight years
21  later, it's not changed that much, from what I
22  could see, you know, when she was on the witness

29 (Pages 979 to 982)

In Re:  Larry E. Klayman
June 25, 2018

## Page 983

1  stand, is that she fears people.

2      She has a -- I perceived her to have a

3  fear of men, and I tried to be her close friend

4  and I really started to care about her deeply.  I

5  really did.  And I don't make any apologies for

6  that, and I care about everything that I do

7  deeply.  That's who I am.

8      So we filed these cases and I told her,

9  I advised her when the case was filed, it was

10  first filed and assigned randomly --

11      CHAIRMAN FITCH:  Before we get to the

12  case, I was just taking some notes on something.

13      THE WITNESS:  Sure.

14      CHAIRMAN FITCH:  And you used the term,

15  and we've had it from -- Mr. Shamble?

16      THE WITNESS:  Shamble.

17      CHAIRMAN FITCH:  -- Shamble, as well,

18  "Central News Bureau."  Is that initial caps?

19  That's a formal part of the Persian part of VOA?

20      THE WITNESS:  Yes.

21      CHAIRMAN FITCH:  So it is a formal

22  section.  Alright.

## Page 984

1      THE WITNESS:  It's not part of the

2  Persia News Network.

3      CHAIRMAN FITCH:  That is of course what

4  the record shows.

5      THE WITNESS:  It's a separate part.  It

6  broadcasts to the Middle East in English.  It's

7  mostly to Arabic countries.

8      CHAIRMAN FITCH:  This testimony is

9  important and I want the record to be precise.

10      THE WITNESS:  I yes.  And she -- you

11  know, Persian people, Iranian people, are not

12  Arabic.

13      CHAIRMAN FITCH:  Right.

14      THE WITNESS:  So they don't gravitate

15  to that culture, and they're very proud of being

16  Persian.  So she didn't really want to be there,

17  because she didn't feel that she would influence

18  the world much there and that she couldn't speak

19  English well.  So she felt they were setting her

20  up to fail.  So she was very adamant about going

21  to LA.

22      At this time we were trying to settle

## Page 985

1  things.  I was writing letters, and you saw some

2  of them this morning.  And we were having meetings

3  with Voice of America, general counsel,

4  Kollmer-Dorsey, and others, and we weren't getting

5  anywhere.

6      So I then decided that, before we even

7  filed suit, and even thereafter, we would try to,

8  knowing the way Washington works, get some support

9  on Capitol Hill.  That's when Mr. Shamble and I

10  went up to meet with the Chief of Staff of Senator

11  Tom Coburn.  He had been very critical of Voice of

12  America, about the way it was broadcasting

13  overseas.  It wasn't as pro-American as he wanted.

14  He was critical of, you know, the employment

15  situation and we sought his help.  And I met with

16  his Chief of Staff who I'd known from earlier

17  travails in Washington, and Mr. Shamble was with

18  me.

19      We also went to the office of Senator

20  John McCain and Mr. Shamble was with me.  I had

21  several meetings with them -- we had several

22  meetings with them, at the staff members, and

## Page 986

1  Senator McCain and Mr. Coburn never did much of

2  anything -- didn't do anything for Ms. Sataki.

3  They were preoccupied, I guess, with other issues,

4  which was unfortunate.

5      I then went to Senator Lieberman, asked

6  for his help.  He didn't do anything.  And then I

7  have a friend -- he's going to testify, who I got

8  to know, he's Iranian, he lives in the Washington,

9  D.C. community -- named Keya Dash.  Keya's brother

10  worked for VOA.  It's a prominent family, the Dash

11  family.  People might remember Dash Designers, it

12  was a clothing store?  The family owned that

13  store.  They're now in commercial real estate.

14  And Keya's brother worked for Voice of America in

15  the accounting department.  So I thought maybe we

16  could use that as a way to convince people at

17  Voice of America to help Ms. Sataki.

18      So I wanted Elham to meet Keya.  And we

19  met at Morton's Restaurant and Keya was there.

20  And Keya smoked cigars, so we went in the smoking

21  room -- I don't smoke -- on the side on the

22  patio...

30  (Pages 983 to 986)

In Re: Larry E. Klayman
June 25, 2018

## Page 987

As we're sitting there, I noticed -- and I'm trying to explain to Keya to meet Elham, so he could be of help to her, you know, with the family, and others he might know in the Iranian community -- and sitting across from me is John Boehner. And I said, "Look, there's Congressman Boehner. He's soon going to be Speaker of the House." So I said, "Let's meet Congressman Boehner. Maybe he can be of some help."

So I had met Congressman Boehner, you know, on more than one occasion in the past. He knew who I was from the past. We were on Judicial Watch all the time. And I went up to him, and I said "John" -- you know, in Washington you use someone's first name, and I said, "how you been?"

He said, "I'm fine. How are you, Larry?" And I said, "I want to introduce you to my client, Elham Sataki. She has a problem with Voice of America." And I turned to Elham and I said, "Can you explain to the next Speaker of the House what your problem is." And she did, briefly. He was very friendly. He had a couple

## Page 988

of drinks. He smokes a lot, and he was really warm, and he said, "We'll help you." And he gave us a card of his Chief of Staff, and he says, "You contact them and we'll help you."

When the meeting ended, he gave her a kiss on the cheek. It wasn't anything untoward. And he said "I just wish you well and we'll help you."

So we went up to his office, too, and we asked them for help, and nothing ever transpired there either. I was getting very disillusioned that he wouldn't help somebody like this, you know, who had a need.

And I was also trying to get them to clean up the situation about the division of politics at Voice of America, because you did have these two factions. And one of the reasons that Elham, we thought, was discriminated against and why they didn't give dignity to her claims is because her family was in the government of the Shah, and that's how they wound up in Sweden. They had to flee. The parties that were in

## Page 989

control of VOA were the anti-Shah people. One of them was named Alex Sajedi, S-a-j-e-d-i, and the rumor was that his father was a "mullah," an advisor to Ayatollah Khomeini in Iran. How someone like that could run the Persia News Network, which I jokingly said was supposed to do propaganda into Iran, was difficult to understand.

But there were these factions. And there were 30 VOA broadcasters that complained about the coverage that was being done. And I think, to some extent, the then Obama administration didn't want to offend the Iranians that negotiated with VOA, but it offended the broadcasters because they thought maybe VOA should be used as it was during the days of the Soviet Union and try to bring it down.

So, there was that. And that's what ultimately gave rise to my preparing these complaints with Ms. Sataki, sitting there side-by-side with her, hour upon hour. And if you look at, you know, all the correspondence and the complaints, they're very

## Page 990

detailed. They're very exact. She was feeding me information.

BY MR. SUJAT:
Q. Mr. Klayman, what I'd like to do is I'd like to introduce into evidence these pleadings.
A. Yes.
Q. For instance, two of them I have in mind right now, Exhibit 2, Respondent's Exhibit 2, Sataki vs. Falahati, and Exhibit 3, and exhibit 29, which would deal with Sataki vs. Broadcasting Board of Governors, et. al.

CHAIRMAN FITCH: Give us a minute, because I think those are in different books, am I right?

THE WITNESS: Show me the first one, Mr. Sujat.

BY MR. SUJAT:
Q. Right. Two and three.

MR. TIGAR: Two is in binder one and three is in binder two.

MR. SUJAT: Two, yes, in the book that's one of four.

31 (Pages 987 to 990)

In Re:  Larry E. Klayman
June 25, 2018

## Page 991

1    CHAIRMAN FITCH:  Are you proposing to
2  spend some time on these?  If so, I will take a
3  minute and get a copy.
4    THE WITNESS:  Yes, let's take a minute.
5    MR. SUJAT:  Do you have that?
6    THE WITNESS:  Which exhibit?
7  BY KLAYMAN:
8    Q.  This will be Exhibit 2.  We'll do one
9  at a time.  That will be Exhibit 2, Respondent's
10  exhibit.  It's book one of four.
11    CHAIRMAN FITCH:  Alright, are we going
12  to talk about RX2?
13    MR. SUJAT:  That's correct, your Honor.
14    CHAIRMAN FITCH:  Ok.
15  BY MR. SUJAT:
16    Q.  RX2 is the case of Sataki vs Falahati,
17  and Mr. Klayman --
18    A.  Right, and for the court reporter, it's
19  M-e-d-h-i F-a-l-a-h-a-t-i.
20    A.  I brought this case because we wanted
21  to get a case against the harasser for the
22  harassment.  But it was understood that Mr.

## Page 992

1  Falahati didn't -- I didn't do it for money.  I
2  did it because she wanted me to do it.  And I
3  thought it was the right thing to do, and it was
4  clear that she would never really get a recovery
5  against Mr. Falahati, but this was the right way
6  to proceed, so I did it, and I did it pro bono.
7    And it was also to put pressure on.
8  That was another reason I did it.  Because this
9  was their anchor.  I mean, ironically, and
10  tragically, while they wouldn't give her
11  ultimately -- and we'll get to that -- leave to
12  live in Los Angeles, they later cut her salary
13  off.  I then kept her afloat financially.
14    Falahati was still working there at
15  Voice of America.  Ultimately they put him on
16  administrative leave, after I filed the Office of
17  Civil Rights complaint.  They continued to pay
18  him, but they cut her off, you see?  So that's why
19  I subsidized her at the time -- you'll see the
20  documents later, I paid her what she would have
21  gotten, her salary.
22    Q.  This case here, it was filed, is it

## Page 993

1  true, on March 1st, 2010 in the District Court, DC
2  Superior Court?
3    A.  Correct.  And then it was removed to
4  the federal court.
5    Q.  Could you explain a little bit more
6  about the --
7    A.  The other complaint was removed against
8  the Board of Governors.  You might want to show me
9  that.
10    Q.  Right.
11    A.  And of move this into evidence.
12    MR. SUJAT:  Yes, we're going to
13  introduce that into evidence.  So that is
14  Respondent's 3, Respondent's Exhibit 3.  So it
15  would be the next book.
16    THE WITNESS:  I believe it's Exhibit 2
17  we just identified.
18    MR. SUJAT:  We just introduced Exhibit
19  2, Sataki vs. Falahati.
20    CHAIRMAN FITCH:  And, Mr. Smith, you
21  will no doubt notice that there are some number of
22  pleadings behind tab number two in Respondent's

## Page 994

1  book.
2    Do you object to any of that?
3    MR. SMITH:  I do not.
4    CHAIRMAN FITCH:  The entire body of
5  documents comprising Exhibit 2 is admitted.
6    MR. SUJAT:  Thank you, your Honor.
7  BY KLAYMAN:
8    Q.  And we have Respondent's Exhibit 3.  I
9  believe that would be the second book.
10    MR. TIGAR:  To be clear, Exhibit 3 is a
11  lengthy exhibit and portions of it are in binder
12  two and than portions carry over into binder
13  three.
14    Is that correct?
15    MR. SUJAT:  It starts in two of four,
16  Respondent's Exhibits 2 of 4.
17    CHAIRMAN FITCH:  And, as Mr. Tigar
18  points out, the latter part of Exhibit 3, which is
19  about an inch thick or more, appears at the
20  beginning of Respondent's Part 1 of 4.
21    MR. SUJAT:  Part 3 of 4, right?
22    CHAIRMAN FITCH:  No.  In mine,

In Re: Larry E. Klayman
June 25, 2018

| Page 995 | Page 997 |
|---|---|

**Page 995**

1 something appears at the beginning of part one of
2 four without any title, and I'm kind of
3 assuming -- well, I stand corrected.
4     Am I correct, for the record, that
5 Exhibit 3, the entire Exhibit 3, is found in the
6 Respondent's notebook that's called Part 2 of 4
7 and the Respondent's notebook that's called Part 3
8 of 4?
9     MR. SUJAT: That's correct.
10     MR. SMITH: I have a question.
11     You're correct, in my book there is
12 about an inch, inch-and-a-half thick compendium of
13 documents which precede what is marked as Exhibit
14 1, and I'm curious as to whether or not these
15 documents should be as part of --
16     CHAIRMAN FITCH: And I have that
17 question also.
18     THE WITNESS: Yes, they should be.
19     MR. SMITH: My solution is to put that
20 inch thing of documents which precedes Exhibit 1,
21 which was in book one of four, into book two of
22 four as I would imagine the rest of Bar Exhibit

**Page 996**

1 Number 3.
2     CHAIRMAN FITCH: Let me suggest that
3 counsel will workout this little organizational
4 matter. Then we will make clear for the record,
5 if the Board wants to go through it at some point,
6 where exactly Respondent's Exhibit 3 can be found,
7 ok?
8     We think we know the answer, but you
9 folks are going to confer and we're going to make
10 the record clear.
11     MR. SUJAT: Yes, your Honor.
12     CHAIRMAN FITCH: Ok, we're talking
13 about Respondent's 3. Go ahead, counsel.
14     MR. SUJAT: And this is --
15     THE WITNESS: What book is that in, Mr.
16 Sujat?
17     CHAIRMAN FITCH: Respondent's 3 starts,
18 we are sure, in Part 2 of 4.
19     MR. SUJAT: Right, it starts there.
20     THE WITNESS: So you're going to turn
21 my attention to the Board of Governor's
22 complaints.

**Page 997**

1     CHAIRMAN FITCH: And it starts with a
2 superior court docket sheet, a filing sheet.
3 BY MR. SUJAT:
4     Q. Mr. Klayman, can you explain what
5 brought about this lawsuit?
6     CHAIRMAN FITCH: I have misspoken. I
7 have misspoken.
8     The Exhibit 3 that starts in Part 2 of
9 4 begins with not a superior court information
10 sheet but with a United States District Court
11 information sheet.
12     Go ahead.
13     THE WITNESS: This lawsuit, Mr. Sujat,
14 which is styled 10-CV-00534, is the case that was
15 brought against the Board of Governors. This is
16 the case that I correct previously that named
17 Hillary Clinton as one of the Board of Governors.
18 She sits on top of it, as Mr. Shamble testified,
19 and all the rest of the Board of Governors. And
20 it deals with Ms. Sataki's situation, not with
21 other political considerations. And it was
22 brought to try to coax, by naming in a Bivens

**Page 998**

1 action, which is for Constitutional violations --
2 sexual harassment would be a violation of the
3 Constitution, discrimination based on sex -- plus
4 a First Amendment, and those kinds of things, to
5 put pressure on them to settle.
6     But it also contained a component,
7 because this was also amended as part of this
8 overall exhibit, to include the cause of action
9 for a Wagner vs. Taylor type remedy, which was, as
10 I testified, to have a federal district court,
11 while an administrative EEO or Office of Civil
12 Rights complaint is proceeding, who will preserve
13 the status quo, to make sure that the parties
14 aren't hurt, that the complainant is not hurt, the
15 harassed person or whatever that employee's
16 problem was. And so, in the outset of this
17 litigation, that was my concern, because, number
18 one, I wanted to get a good result for Ms. Sataki.
19 I wanted her to be in Los Angeles. That's where
20 she wanted to be. You know, I cared what happened
21 to her, I cared about her. And there was no
22 pursuit of damages or anything like that. I just

33 (Pages 995 to 998)

In Re: Larry E. Klayman
June 25, 2018

Page 999

1  wanted to get her back to LA.
2      And, you know, one of the things about
3  litigating against the government, if you think
4  you're going to get rich on that, as Mr. Shamble
5  pointed out, if you ever see a judge it will be
6  probably be five, ten years down the line, with
7  all the appeals, maybe even longer.
8      So I never did this for money.  My
9  primary goal, and she agreed, was to get her back
10 to work at the field office on Wilshire Boulevard
11 in the federal building of Voice of America.  They
12 did do broadcasting out of there because, you have
13 over a million Iranians in Los Angeles.  This is
14 the biggest community in the world outside of
15 Tehran, so much so that people call Los Angeles
16 "Tehrangeles."  And there was no reason why she
17 couldn't be there, particularly since she had a
18 situation, and I'll describe that.  But there was
19 a situation that occurred while she was on leave
20 and visiting LA, and that's what this case was
21 about.
22      Now the case initially was randomly

Page 1000

1  assigned to Judge John Roberts, no relationship to
2  John Roberts, Chief Justice.  A different John
3  Roberts in the district court here.  And then for
4  some inexplicable reason it was transferred to
5  Judge Colleen Kollar-Kotelly.  And it was at that
6  time, and Mr. Shamble made reference to that and
7  that I raised the issue with both him and Ms.
8  Sataki, that this was a judge that was very
9  problematic for us.
10     MR. TIGAR:  Could I interrupt briefly.
11 I see the civil cover sheet for double O 543 and
12 it says Judge Huvelle.
13     THE WITNESS:  I think it actually
14 passed through the hands of two judges at the
15 time.  For some reason it kept getting reassigned.
16 That's my recollection.  So it was Huvelle and
17 then it was Roberts and then it was Kotelly.
18     When it went to Kotelly, I said to
19 myself, this is not optimal.  I had difficulty
20 with her in the past over a client where I had
21 sued George W. Bush, I made reference to that,
22 over over-surveillance of him, his name was Scott

Page 1001

1  Dolley.  She dismissed his case.  He claimed he
2  was being surveilled.  The New York Times
3  reporter, Eric Lichtblau, believed he was being
4  surveilled.  He made a comment after 9/11 at the
5  airport, to Southwest, that, when he was asked by
6  a check-in clerk, "Do you have any suggestions for
7  a chairman," he said "Yes.  You can check your
8  cargo holds."  She said, "Why is that?"  He said,
9  "There may be a bomb in there."  It was the wrong
10 thing to say.  He was the IT person in Congress
11 during Christopher Cox.  A very distinguished guy,
12 a young guy.
13     And so that was a problem I had.  She
14 actually dismissed the case based on newspaper
15 articles.  She was also head of the FISA court.
16 And then I had issues with a case I brought with
17 Judicial Watch.  I won't belabor that.  It's in
18 the record and I'll get into it later.
19     I mean, we live in the real world,
20 unfortunately, and people sometimes make decisions
21 on the basis of their own personal predilections.
22 Judges too.  That was the reason for Judicial

Page 1002

1  Watch.  And I had been a strong advocate against
2  the Clinton administration.  She was an appointee.
3  Her husband had defended a Secret Service agent in
4  the White House who had information about
5  Lewinsky.  She had been opposed by every
6  conservative group under the umbrella for the
7  communist organization.  Her reputation was she
8  didn't like conservatives, and both Ms. Sataki and
9  I are conservative.  She's conservative in the
10 Iranian sense and I'm a conservative Libertarian
11 in the American sense.  And I mean, as you can see
12 from later today with Ms. Allred, we're different
13 politically, but I have friends that are not
14 conservative, good friends.
15     But, you know, that was my concern.  I
16 raised it with them, and this is what happened in
17 the case.
18     Now, while this case was proceeding --
19 you'll find these in these exhibits -- is that, to
20 get her back to work in LA, I had to file for a
21 TRO and preliminary injunction.  But before that
22 happened, she had taken leave to go to Los

In Re: Larry E. Klayman
June 25, 2018

## Page 1003

1   Angeles, and while she was in Los Angeles, she had
2   word that she was being denied her reasonable
3   medical accommodation and transfer to LA, and she
4   had a nervous reaction and got very upset, and for
5   that reason I found psychologists and doctors for
6   her, two of which were Dr. Aviera and another one
7   was Dr. Long. Aviera has a PhD in psychology.
8   She specializes in these kinds of matters. And
9   Long was an M.D., a psychiatrist. And there was
10  another one that I got for her that she didn't
11  like that one. I didn't think he was high-powered
12  enough. And I took her there and I paid for the
13  initial visits and everything. A, I felt she
14  needed help psychologically, and also I felt, and
15  she agreed, that we could build a case that she
16  should be in Los Angeles to be able to consult
17  with her physicians. And that was her home.
18  That's where she felt more comfortable. She liked
19  the sun. She liked the Iranian community. She
20  told me she never really felt comfortable here.
21  She just liked the job at VOA.
22          When she was living here -- this became

## Page 1004

1   an issue in the early discussions, as I elicited
2   on her testimony -- she was living here with a
3   coworker named Kevah, K-e-v-a-h, sharing an
4   apartment with him, and that, in conjunction with
5   rumors at that time that she had had this
6   relationship with this owner of NITV named   ia,
7   and that she got into an altercation with   ia's
8   wife, who keyed her car.
9          By the way, the case -- she didn't get
10  a temporary retraining over whether there was a --
11  the documents will show this and they're in the
12  record. It wasn't over whether or not she had an
13  affair with   ia. It was over the fact that   ia's
14  wife had keyed her car. So she got a restraining
15  order on that.
16          And also because I became aware that
17  her former husband had also alleged that she had
18  been adulterous. And I felt that it would be good
19  to get her out of Washington. It wasn't good to
20  be living there with Kevah, another coworker,
21  because we're claiming sexual harassment by a
22  coworker.

## Page 1005

1          Now in that context, one of the
2   criticisms of Ms. Sataki by VOA, her supervisor,
3   Susan Jackson, was not only that her English was
4   not good -- her Farsi was not good. It wasn't a
5   literal Farsi. She moved to Sweden, the record
6   shows, when she was very young. So she never
7   learned to speak Farsi in her own language in her
8   own country.
9          It was also the fact that she was
10  getting help. It was said that she couldn't
11  produce packages on her own, that someone was
12  helping her. That was Kevah that was helping her.
13  And they had a close friendship, as well.
14          So I thought it was a good idea for a
15  number of reasons. I suggested it to her and she
16  said she always wanted to be in LA anyway and she
17  didn't want to ever pass by Falahati again.
18          So that was how that decision was
19  arrived at.
20          So then I moved for a TRO and a
21  preliminary injunction before Judge Kotelly. All
22  these records are in this record as being

## Page 1006

1   admitted. And they speak for themselves. And I
2   made all these arguments. I filed for a TRO and
3   Judge Kotelly said to me, "Why don't we roll this
4   into a preliminary injunction?"
5          I then asked for a hearing, because
6   this is a very fact-intensive analysis. In fact
7   the motion that you will find in here has all
8   kinds of affidavits in it from the psychologist
9   and the psychiatrists that were treating her. It
10  has a polygraph examination that I had her take,
11  it cost me $2,500 out of my own money, to confirm
12  that she was telling the truth. She passed it.
13  There were affidavits from coworkers who had
14  knowledge of the harassment and the politics at
15  VOA, and it's a very thick, very well-documented
16  motion for temporary restraining order and
17  preliminary injunction. I had affidavits from Mr.
18  Shamble. I had affidavits from others, as well.
19          What happened was -- and this is why
20  the issues with Judge Kotelly came to the
21  forefront -- is that, without granting us an
22  evidentiary hearing, or even discovery, Judge

35 (Pages 1003 to 1006)

In Re: Larry E. Klayman
June 25, 2018

## Page 1007

1  Kotelly denied the TRO and motion for preliminary
2  injunction and didn't grant a hearing.
3          Now, you're going to hear testimony
4  from Judge Sporkin. As this was going on, I
5  called Judge Sporkin. He had become a friend of
6  mine. I first appeared in front of him as a young
7  man. It's kind of a funny story, if I may tell
8  it...
9          I had rented office space at 601
10  Pennsylvania Avenue when it was just being built,
11  this area was just being built up, from B.F. Saul,
12  II, who owned Chevy Chase; the richest man in
13  Washington, D.C.; could buy Dan Snyder ten times
14  over. And I had a letter of intent and I was
15  waiting to get the lease. I had forgone -- I was
16  a new lawyer and I rented a little portion on the
17  sixth floor -- ninth floor. Someone from
18  Westminster Real Estate calls me up -- that's
19  owned by B.F. Saul, Chevy Chase -- and said "Mr.
20  Klayman, we rented it to someone else."
21          I said, "Well, you can't do that. I
22  have a letter of intent. Unless I die or

## Page 1008

1  financially I can't qualify, you have to offer it
2  to me first." I had been forbearing on that. So
3  they said, "Sue me if you don't like it." And I
4  was just a young lawyer. I was just in my
5  thirties.
6          I said, "Ok. I'll sue you."
7          I sued them, and it got assigned to
8  Judge Sporkin. This is a funny story and very
9  interesting. It tells you about the kind of judge
10  that I really respect and admire. The first
11  status conference, he says, "Mr. Klayman, what's
12  this case about?" And he has his staff sitting in
13  the jury box and he has his glasses down. And I
14  said, "Your Honor, I have a letter of intent for
15  601 Pennsylvania Avenue and I got the rug pulled
16  out from under me and they rented it to somebody
17  else."
18          Judge Sporkin, says, "You know, Mr.
19  Klayman, the same thing happened to me last week.
20  He said, "I had a hotel room in New York. I got
21  there and they had given it to someone else."
22          He said, "You know what I did?" He

## Page 1009

1  said, "I got a room ten times better." And he
2  said, "How about 1001 Pennsylvania Avenue? I can
3  put you there it's better."
4          And I said "No, I like 601. It's a
5  personal preference."
6          He said, "Ok, if you win, I'll put you
7  in 601."
8          To make a long story short, at the end
9  of the day, he even let me depose B.F. Saul. This
10  is like deposing Howard Hughes. I was a young
11  lawyer. B.F. Saul sat at a table about as far as
12  the court reporter is from me today. And he was
13  instrumental in getting a settlement, and that's
14  how I wound up renting my office space over in
15  501. I let 601 go and I had a settlement and I
16  went to 501.
17          But I had asked Judge Sporkin, I called
18  him years later, I said "Because, your Honor, I
19  admired you" -- I had him in another case. I
20  never talked to him about the cases -- I said,
21  "let's have lunch one day." So I got to know him.
22  So I called him up and I said, "Judge Sporkin" --

## Page 1010

1  I was calling him "Your Honor." He was retired
2  then -- and I explained to him the facts of this
3  case and Wagner V. Taylor, and I said, "What would
4  you do?" This was before Kotelly ruled. And he
5  said, "It's a chip shot, Larry. Obviously I'd put
6  her to work in LA. That's the status quo."
7          But Kotelly didn't. And it pretty much
8  confirmed my impression of how she would react to
9  me and react to Ms. Sataki. And also the fact
10  that she's the type of judge that believes
11  everything the government says. And obviously I
12  don't. And she discounted all of our affidavits
13  and ruled for the government without a hearing.
14          That's the basis of why I wrote a
15  column that said there is no basis in law or fact.
16  Because there really wasn't. Without a hearing,
17  how could you make a ruling? There is no basis to
18  make factual findings or make a ruling like that.
19  I thought it was heartless.
20          And you know, and this will tell you
21  something about me and how I interacted on this
22  case and what I did. I moved for reconsideration.

App.0449

In Re:  Larry E. Klayman
June 25, 2018

## Page 1011

1  Ms. Sataki knew every step of the way what I was
2  doing.  I was meeting with her.  I had previously
3  moved to have the case sent back to Judge Roberts.
4  That didn't succeed.  And I ultimately ruled --
5  moved to disqualify Judge Kotelly.  She knew of
6  that, Ms. Sataki.  Because if I could disqualify
7  her, I could get all of the orders vacated
8  potentially, and, you know, we could get a judge
9  who would give us a hearing.  And Judge Sporkin
10  said, "I would have given you a hearing, Larry, at
11  least a hearing."
12          And consequently there is no basis.
13  And that's just my opinion.  Ok.  I'm entitled to
14  my opinion.  There is no basis in law or fact.
15  The Bar tries to make an issue of that, Bar
16  Disciplinary Counsel.  But lawyers say that all
17  the time, there was no basis for the court to make
18  a ruling.  And there wasn't a hearing.  Because
19  without a hearing and just simply not considering
20  her affidavits and considering the government,
21  particularly when I had a polygraph that she
22  passed and all that medical information, to me was

## Page 1012

1  exemplary of extrajudicial bias and prejudice.
2  There was no other way to explain it in my mind,
3  and there was no basis in law or fact.
4          So that's what happened.
5          Now, the day that that happened -- I'm
6  going to put it all in context and then Mr. Sujat
7  will take me back into certain exhibits -- I was
8  in Los Angeles, and --
9          MR. TIGAR:  The day that all that
10  happened --
11          THE WITNESS:  She ruled against Ms.
12  Sataki.
13          MR. TIGAR:  That day.  Ok.
14          THE WITNESS:  I took it to heart, as my
15  grandmother used to say, Freda Klayman, F-r-e-d-a.
16  It really affected me a lot.  Because, you know, I
17  had been fighting for justice for years at
18  Judicial Watch and then Freedom Watch and in my
19  private practice, and I didn't see how a judge
20  could do that.  I didn't see how a judge could be
21  so heartless.  Certainly Judge Sporkin wouldn't
22  have been.

## Page 1013

1          In the context of everything, I was
2  just down and out; down and out about, you know,
3  situations going on in my personal life, you know,
4  continuously fighting with Judicial Watch.  The
5  directors were very wary of me when I left.  I ran
6  for the Senate and the person who runs it, Mr.
7  Fitton, is not a lawyer, and he always felt very
8  competitive with me.  They tried to harm me in a
9  number of ways.  I got a judgment against them for
10  defamation, later, later I got that.  And I was
11  really down and out about what happened with
12  Sataki, because it really shook my confidence in
13  the legal system, even more than it had been
14  shaken to get me to start Judicial Watch and
15  Freedom Watch.
16          But I went that evening with a friend
17  of mine, an Israeli-American friend of mine, Adam
18  Bar, to a restaurant in LA.  I had only two
19  glasses of wine, right, not much, but I was really
20  down and out.  And I drove home -- I was staying
21  at that time -- because I had just moved to LA
22  with someone I call my surrogate mom, Louise

## Page 1014

1  Benson, who lived in the valley.  And I was
2  driving on the 405, which is the most dangerous
3  highway in the United States, towards Woodland
4  Hills.  It splits at some point on the 101 going
5  into LA.  The other way goes towards Ventura.  I
6  was supposed to go towards Ventura.  And it was
7  raining cats and dogs, and all of a sudden the car
8  in front of me jams on its brakes and I hit that
9  car at about 50 miles an hour.  My glasses fly
10  off.  And I'm basically blind, even with my
11  glasses, and I don't see that well.  And I
12  couldn't see, and it was raining cats and dogs; a
13  five-lane highway.
14          By the grace of God, I got over to the
15  side.  I left the car.  The driver that I hit, he
16  had jammed on his brakes, drove away, for whatever
17  reason.  Maybe he had a criminal record.  I don't
18  know.  And I just walked up the exit, the Haskell
19  exit past where my car was totalled.  It was
20  totalled.  It was a Saab, a used Saab.  And by the
21  grace of God I wasn't hit by a car doing that.
22  But I was looking at a laptop computer and a suit

In Re: Larry E. Klayman
June 25, 2018

Page 1015

1  that I had in the car, and I walked up there to go
2  to my surrogate mom's house at Ventura.
3       When I got off the exit, that was where
4  the apartment -- close to the apartment that I
5  rented for Ms. Sataki. And I called her because I
6  needed some help. I was really shaking. And she
7  didn't answer the call. She conceded the other
8  day she knew I called but didn't answer the call.
9       So I then got a cab, a Yellow Cab and
10  went to my surrogate mom's house.
11       The next morning we went to get the
12  car. We took it, had it towed in to my surrogate
13  mom, Louise. She's one who kind of like adopted
14  me. She's 87 right now. And she helped Judicial
15  Watch when I was running that in the California
16  office.
17       MR. TIGAR: So that my notes are
18  clear --
19       THE WITNESS: Yeah.
20       MR. TIGAR: Do you have a date for this
21  event?
22       THE WITNESS: It was the day Judge

Page 1016

1  Kotelly ruled and I can get that for you. I'll
2  tie it in. I'm trying to get the narrative in so
3  we have it in context and then we will go back.
4       It was the date that Kotelly ruled
5  initially. I think it was in June, but we'll make
6  that precise.
7       CHAIRMAN FITCH: There's an allegation
8  that the issuance of the order denying the TRO
9  occurred on July 1, 2010.
10       THE WITNESS: Ok, 2010. That comports
11  with my memory, and it's in here in the exhibit.
12  So when we brief this I can lay it all out in the
13  chronology for you.
14       And the next day I get up. I have a
15  concussion. I go to Kaiser Permanente where I
16  have insurance. They said I had a concussion. I
17  rented a car through the insurance company, and
18  I'm driving to work the next week. I had rented
19  some office space in LA, going down Ventura
20  Boulevard. It was a sublease. I just had one
21  office. It was on Camden and Wilshire in Beverly
22  Hills. I was trying to do some entertainment work

Page 1017

1  then. That's why the locale was there. I went to
2  LA because I wanted to use Hollywood to try to
3  change people's values and make it more ethical
4  and just.
5       So, I'm driving down Ventura. This
6  tells you about me. Because there's references in
7  the record in one of Ms. Sataki's last emails that
8  talks about me, in a mocking way, being Christian
9  and Jewish. I was born Jewish. And I feel
10  strongly about my heritage.
11       And as I'm driving down the exit at
12  Ventura and I go past Haskell, something happened
13  to me that happened to me ten years earlier in the
14  Catholic church in Georgetown -- Our Mother of
15  Victory I think is the name of the church, when I
16  was staying there with my then wife and my two
17  young kids -- ten years earlier alter boys had
18  come by at Christmas and I heard someone talking
19  to me saying, "Larry, I do exist. Do you accept
20  me?"
21       My grandfather actually believed
22  intellectually in Jewish Christ, even though he

Page 1018

1  was Jewish and he thought of being a rabbi full
2  time. Instead he went into the pork business. I
3  didn't know he ate pork.
4       So I'm driving down and I'm really
5  upset about this injustice, and I'm saying to
6  myself, "Larry" -- in my head, "you're a
7  revolutionary; Jesus was a revolutionary. I mean
8  obviously much more than you are. And he told the
9  high priest to go stick it." I was actually using
10  a nasty word. I don't want to say it on the
11  record. In my head. And he also told the Romans
12  to go stick it.
13       And all of a sudden I got the same
14  feeling from ten years earlier. And I felt maybe
15  I self-induced it. Maybe I was trying to make
16  myself feel better. So I pulled to the side of
17  the road. And it builds for about 30 to 45
18  seconds, and it's this warmth and adulation. And
19  I hear him talking to me and -- not in words, but
20  in thoughts, saying, "Larry, you are a
21  revolutionary and you'll pay a price, too, like I
22  did. Obviously not like I did. I paid the

App.0451

In Re:  Larry E. Klayman
June 25, 2018

## Page 1019

1  ultimate price.  But you're working for me now.
2  Get it all out of your head.  Get all these
3  problems out of your head."
4        And, you know, I was very blessed and
5  fortunate that, you know, he's come to me two
6  times during difficult periods, and it cleared out
7  my entire head.  And to this day a lot of
8  things --
9        Because, you know, I'm in a very
10 contentious area of the law: political interest,
11 Freedom Watch, taking on politicians, powerful
12 people.  I don't let things knock me off my
13 rocker.  I was always feeling kind of vulnerable,
14 even though I took strong actions.  That's why I
15 left and I ran for the Senate.  I felt I wanted a
16 different life.
17        But, I put myself in his hands.  And
18 the reason that I felt that way is because of the
19 strength of the feeling of injustice toward Ms.
20 Sataki, and because I cared about her.  Honestly,
21 I cared about her.
22        So that's what happened in that regard.

## Page 1020

1        And she was very upset.  I talked to
2  her that day.  That had upset me, and she blamed
3  me.  I thought that that was inappropriate.  I
4  understood that she was upset, but she went too
5  far.
6        There is an email that Mr. Sujat is
7  going to show to you accusing me of being bribed,
8  disparaging my faith.  And that's the way she was
9  frequently with me.  That's why some of those
10 emails about respect is that I was really going
11 all out for her.  I believed in her.  I didn't
12 want her to sink.
13        I paid for her moving expenses.  I paid
14 for her car to go to LA.  I paid initially for the
15 psychiatrist.  I got her an apartment.  She had no
16 credit.  I got the apartment she wanted.  She
17 picked it out.  It was a two-bedroom.  I said,
18 "Ok, you can put your family and friends there."
19 I signed the lease for her.
20        I was not in good financial shape
21 myself.  That's why I had to look for apples at
22 the Hyatt around here when I came back to

## Page 1021

1  Washington for a while.
2        And I just thought it was incredibly
3  ungrateful and very self-centered, and I told her,
4  I said, "You didn't lose your rights.  This is
5  just round one.  We still have a motion for a
6  complaint as to permanent injunction, and you were
7  put back to work in LA.  And I said, "And also,
8  you have your Office of Civil Rights and EEO
9  complaint, and you haven't lost any of your
10 rights.  We just lost round one."
11        But she just really blamed me and was
12 very, very nasty and I felt unappreciative.
13        And it was around that time that I had
14 told her -- because also in the context of
15 everything else, she started to ask me for things
16 that, you know, were very, very personal.  Like,
17 "Please go with me to buy a car," and she did want
18 me to buy a car.  You heard the testimony, your
19 Honors.  First she says it was because of her
20 credit that they were repossessing her car, and
21 that was true.  But then she says, "I need to get
22 a cheaper car.  So, can you buy it for me, Larry?

## Page 1022

1  I have no credit.  There will be lower payments
2  and I'll pay you back for the payments."  She did
3  ask me to buy her a car.  And she asked me to help
4  her friend Kevah with a bankruptcy attorney, to
5  find one for him.  I found one for him, and then
6  she berated me over who I found for him.  She said
7  he was worthless.
8        There are two sides to Ms. Sataki:
9  there is one where she presents herself in a very
10 opinionated way as a victim, and then there's one
11 that's frankly vicious.  That's why you see that
12 last email.  I mean, who would write something
13 like that to somebody who put himself out like
14 that, whatever the circumstances, accusing me of
15 bribery.  And then mocking my Christian, Jewish
16 faith, highlighting Jewish faith.
17        And I might say, I always respected her
18 religion.  We'll get into this.
19        I told her actually I thought she
20 lacked confidence.  And you'll see that in all the
21 correspondence that we're going to go through.
22 She did have a lot of talent and I believed in

In Re: Larry E. Klayman
June 25, 2018

---

### Page 1023

1   her. And I used to joke with her, I said, "You
2   could be the Tokyo Rose" -- in the positive sense
3   "at the VOA with Iran. You could be very
4   persuasive over there, that there's lots of other
5   places you could work.
6       "A, VOA doesn't pay that well, and B,
7   you've got all these networks that have" --
8   because Iran was very much in the news. They have
9   Persian hosts. There was one on CNN. Christiane
10  Amanpour is Persian on CNN news, and there's
11  another one, begins with a D. I said, "You can do
12  that."
13      So I tried to take her out of this
14  walling-off that she did for herself and say, "You
15  can get out into the real world."
16      I didn't mean anything by saying
17  "Persian ghetto." Look, there were Jewish ghettos
18  in Poland and there are in Miami Beach and New
19  York City. I didn't mean it in that way. What I
20  meant was, "You have to move out of this
21  environment and profit from the rest of the media.
22  You can do it. You don't need VOA. If you don't

---

### Page 1024

1   succeed, get yourself another job." They cut her
2   off.
3       So, that's why I took her to that Movie
4   Guide, so she could meet people. Movie Guide, the
5   Christian Film and Television Commission, does a
6   miniature Academy Awards for family films and
7   films of faith -- not just Christian and Jewish
8   and Muslim, but all of them, teaching good values.
9   And I sat on the board of directors. The head of
10  it is Ted Baehr, B-a-e-h-r. Instead of giving
11  Oscars they give teddy bears to all the people who
12  win awards. And they have all the studios from LA
13  there, actors. They even gave an award one year
14  to Spiderman because it teaches good values, not
15  just religious films.
16      And I took her there and she was very
17  rude at that event, and that's what caused the
18  thing -- and she described, she already testified
19  on that, but it wasn't true. Yeah, I mean, we had
20  difficulty, but why I did go into the bathroom at
21  the Luxe Hotel. But she's so scared of people,
22  venturing out of her environment.

---

### Page 1025

1   And she wasn't scared of me. That's
2   not correct. In fact she shook when Kathleen
3   Staunton met her. She used to shake all the time.
4       But she treated me in a really lesser
5   way, like I was there to do anything that she
6   wanted and didn't have to show any kind of concern
7   or any kind of an appreciation towards me.
8       In one email she wrote, which,
9   we'll get into that, it was written by somebody
10  else, she says that she does appreciate me and,
11  you know, "thank you for helping me." But mostly
12  it was not -- it was like I was just there to
13  serve her, whether it was buying a car or an
14  apartment or this or that. And I did it because I
15  believed in her and I really did care for her.
16      So, that's what that was about.
17      And we tried to get her to get other
18  employment. Now there was right here, you'll see
19  it on M Street, the Christian Broadcasting
20  Network. I introduced her to Ted Baehr. Ted
21  Baehr is a minister. On July 21st -- I never got
22  baptized. He's actually going to baptize me at

---

### Page 1026

1   his house this year after my birthday. And she
2   said, "Larry, I really don't feel Muslim. I
3   feel -- I don't feel anything." And she said, "I
4   think I might want to learn more about
5   Christianity."
6       And a lot of Iranians do that in that
7   country, and what radical Islam has done in their
8   country -- not Islam, but radical Islam. The
9   mullahs, they call themselves   oroastrians, and
10  there's a big conversion there.
11      So anyway, I introduced her to Ted
12  Baehr and Ted Baehr, you know, mentored her, and
13  it was comforting for her. And Ted helped me try
14  to find her other employment, and that was the CBN
15  matter. And there was a very good chance that
16  she'd get a job there and could be very well paid.
17      Contrary to the Central News Bureau,
18  CBN was broadcasting right out of the valley in
19  Los Angeles, their headquarters are there, right
20  out of Iran, in Farsi, which was her language.
21      So I introduced her to Mark Woodland
22  who was present of CBN Broadcasting, and before

---

40 (Pages 1023 to 1026)

In Re: Larry E. Klayman
June 25, 2018

## Page 1027

1  she could get an interview, apparently -- because
2  the correspondence, whatever was missing, that's
3  why I asked for all of it to be produced, and
4  we'll go through that.
5      Mr. Razavi, Sam, with several different
6  alias names, apparently spoke to Mark Woodland and
7  scared him off and said, "You know she's a Muslim?
8  I don't have a problem with her working for you,
9  but she has certain conditions" -- we'll go
10 through that -- "that have to be met." You don't
11 do that before you get an interview. It was clear
12 that Sam didn't want her to be there, so Woodland
13 got cold feet and backed off.
14     But that was what that was all about.
15 I was trying to --
16     CHAIRMAN FITCH: When was this the
17 summer of?
18     THE WITNESS: Let's find that email.
19     CHAIRMAN FITCH: The summer of 2010.
20     THE WITNESS: Yes.
21     CHAIRMAN FITCH: I want to make sure,
22 about other things, that we have finished with

## Page 1028

1  relevant evidence relating to federal court
2  actions.
3      THE WITNESS: Ok, I did that as an
4  aside.
5      CHAIRMAN FITCH: We're beyond the TRO.
6      THE WITNESS: We didn't really finish
7  with it.
8      CHAIRMAN FITCH: I'd like to wrap up
9  that federal action in the next 16 minutes.
10     THE WITNESS: Ok. Fred, why don't you
11 walk me through it.
12 BY MR. SUJAT:
13     Q. One of the concerns here on the BBG
14 case was -- while we have that open, I think maybe
15 that's the last place we were anyhow with our
16 exhibits -- the defendants were members of the
17 board of governors, or BBG, and then there's also
18 Hillary Clinton.
19     A. Yes, and I included Hillary Clinton
20 because she's the head of the board of governors,
21 and there's nothing in that complaint that attacks
22 her for her politics or being the former First

## Page 1029

1  Lady or anything like that. She was just sued
2  like everybody else, that's all. That was the
3  reason for that, to put pressure on her. She
4  wasn't singled out.
5      But with regard to that, and Mr. Sujat
6  can get into that after the break as we go through
7  the specific pleadings, is that I tried to get
8  those orders vacated by resubmission and by filing
9  a motion for disqualification. Ms. Sataki knew of
10 that. Obviously if Judge Kotelly didn't
11 disqualify herself, and I thought if she had, we
12 could get our ruling vacated and start with
13 someone who would give us a hearing. I asked for
14 a hearing. She wouldn't give us a hearing. I
15 couldn't understand that.
16     But none of the rights were lost.
17 That's the basis of the email that Mr. Shamble
18 wrote to her. "Your rights haven't been lost.
19 This is just round one. So communicate with me or
20 Mr. Klayman."
21     Now, if she had some problem with me,
22 she could always talk to Mr. Shamble. She didn't

## Page 1030

1  do that either, until much later.
2      CHAIRMAN FITCH: I'm glad to hear this
3  evidence a little bit later. I just really want
4  to finish --
5      THE WITNESS: I apologize.
6      CHAIRMAN FITCH: -- with the federal
7  court action --
8      THE WITNESS: Ok.
9      CHAIRMAN FITCH: -- and not come back
10 to it.
11     THE WITNESS: Yes.
12     CHAIRMAN FITCH: Because I think that
13 the court action is related to Disciplinary
14 Counsel's 1.7(b)(4) charge. They have charged you
15 with conflict of interest, and I think one of
16 their theories is that the naming of Secretary
17 Clinton and related actions were not taken
18 entirely in Ms. Sataki's interest.
19     You have explained why you named her
20 and the Bivens basis and other basis for the
21 action and so on.
22     I think, unless Mr. Smith tells me

41 (Pages 1027 to 1030)

In Re: Larry E. Klayman
June 25, 2018

Page 1031

1 differently, that charge is related -- the only
2 relevance of this action, and we've heard you for
3 a while, but I want to make sure, if there's
4 anything else to cover about the federal court
5 action, you may want to testify more --
6 THE WITNESS: Yeah, we'll testify on
7 it --
8 CHAIRMAN FITCH: -- about it in the
9 next 12 minutes.
10 THE WITNESS: Not necessarily. Just
11 that we're continuing on. And you'll see later
12 that, while Ms. Sataki purported to tell me that
13 she had the wrong address on some of the things
14 that she was sending, and she wasn't communicating
15 with Mr. Shamble either, told me to, as the Austin
16 case letter shows, to drop all actions.
17 She was getting advice from non-lawyers
18 that "Maybe if you're nice to them it will help
19 you," apparently.
20 You'll see that she, herself, sent the
21 Notice of Appeal to Judge Kotelly, she herself.
22 And Kotelly has responded --

Page 1032

1 MR. SMITH: Excuse me, if I could be
2 heard.
3 I mean, I understand the committee has
4 given Mr. Klayman a tremendous amount of latitude
5 in allowing him to testify in a narrative manner,
6 but the record is not going to be well-served by
7 an ongoing narrative kind of like that moves from
8 point to point and contains a lot of hearsay, a
9 lot of anecdotal stories. It's more like a
10 fireside chat, you know, on the radio than it is
11 testimony at this point.
12 I would suggest that when we resume,
13 perhaps in the next ten minutes, we allow Mr.
14 Sujat to kind of direct the testimony in this
15 matter and that the answers be kind of within that
16 framework, so that we don't go all around the
17 world as we --
18 CHAIRMAN FITCH: Leaving aside the
19 characterizations, we'll take that up after the
20 break. But we are not going to take up after the
21 break anything more about the filing and theory
22 and reasons, legal and strategic, for the actual

Page 1033

1 federal court action. We could talk later about
2 what, at a later date, August, September, Ms.
3 Sataki did or didn't do.
4 But we are now down to ten minutes on
5 the filing and litigation of the federal court
6 action. I think we've heard enough of that,
7 unless you have more to say, and you've said quite
8 a bit, about the reasons for the proposed
9 disqualification.
10 THE WITNESS: Right.
11 CHAIRMAN FITCH: And we have that.
12 Is there anything else about the
13 federal court action itself?
14 THE WITNESS: Not that I can think of
15 at this time, but I'll think over it over the
16 break if there's something else. I can certainly
17 identify when we come back more specifically the
18 pleadings that are at issue.
19 One thing is when I went back to have
20 Judge Kotelly recuse herself -- and this is part
21 of the exhibit, and we'll identify that, Mr. Sujat
22 will do that -- or be disqualified, I attached a

Page 1034

1 page, it was about 17 pages, single-spaced, of
2 factual errors that I alleged she had made. I had
3 testimony from Ms. Sataki and from others with
4 regard to the affidavits and Judge Kotelly's
5 findings. And to me that was so egregious, the
6 factual errors, that that was one basis that I
7 said there was no basis in law or fact for this
8 finding.
9 Not only that, because we never had a
10 hearing. How do you rule on something like this
11 without giving somebody an evidentiary hearing,
12 after you have already refused to allow her
13 discovery?
14 And I had agreed with Ms. Sataki to
15 roll the TRO into the injunction --
16 CHAIRMAN FITCH: Right.
17 THE WITNESS: -- in good faith thinking
18 that I was getting a hearing. So, that's why I
19 saw there is no basis in law and fact.
20 That's also in fact why I totaled my
21 car that night. It's not funny. But I was so
22 upset. I just couldn't believe that any judge

42 (Pages 1031 to 1034)

In Re: Larry E. Klayman
June 25, 2018

Page 1035

1  would do that.
2      And I've seen a lot in my career and
3  time.
4      CHAIRMAN FITCH:  I think we all have.
5  We have thoroughly examined the
6  litigation in that case through the order of July
7  7 denying the motion to reassign.  And of course
8  the TRO was decided in June.  We are not going to
9  hear any more about that.
10      THE WITNESS:  Understood.
11      CHAIRMAN FITCH:  We will hear, if you
12  wish to bring out, evidence about later steps in
13  the case in October, November and December,
14  because I think Bar Counsel has an accusation
15  against you about the very latter part of trying
16  to resuscitate that case and what was going on.
17      With that said --
18      MR. TIGAR:  Mr. Chairman, is Exhibit 3
19  in evidence?
20      THE WITNESS:  Yes, subject to
21  rejiggering it somewhat to make sure it's in the
22  right folder.  We'll do that over the break I

Page 1036

1  assume.
2      CHAIRMAN FITCH:  I do not show Exhibit
3  3 being in evidence.
4      I assume you move it into evidence, Mr.
5  Sujat.
6      MR. SUJAT:  Yes.
7      MR. SMITH:  To the extent that Bar
8  Exhibit 3 is just the pleadings --
9      MR. TIGAR:  I'm sorry, I'm not hearing
10  your words.
11      MR. SMITH:  To the extent that Bar
12  Exhibit 3 is just the pleadings that comprise that
13  Sataki vs. BBG case, then I would have no
14  objection.
15      CHAIRMAN FITCH:  I will admit Exhibit 3
16  with the understanding that the record needs to be
17  clarified a little bit about where future readings
18  can find all exhibits if they wish.
19      With that notation and reminder, we'll
20  adjourn a few minutes before 1:00 and stand in
21  recess until 2:30.
22      THE WITNESS:  Thank you, your Honor.

Page 1037

1      Appreciate your courtesy.
2      (Whereupon at 12:53 p.m. a luncheon
3  recess was taken.)
4  A F T E R N O O N   S E S S I O N
5      (Whereupon at 2:30 p.m. the hearing
6  resumed.)
7      CHAIRMAN FITCH:  We are back on the
8  record at 2:30.  All requisite persons are present
9  and I believe that Mr. Sujat is going to resume
10  his examination of Mr. Klayman.
11      CONTINUED DIRECT EXAMINATION
12      ON BEHALF OF RESPONDENT:
13      BY MR. SUJAT:
14  Q.  At this point I'd like to refer to
15  certain exhibits related to the termination of the
16  representation or alleged termination of the
17  representation.
18  A.  Ok.
19  Q.  This basically will show the chronology
20  of the letters that went out for notification.
21      So, first I'd like to refer to
22  Respondent's Exhibit Number 21.  It's a letter

Page 1038

1  dated August 4th, 2010, a letter to the Voice of
2  America director, Danforth Austin.  The letter
3  is from Ellie Sataki, and in it she instructs that
4  Larry Klayman has already --
5  A.  Just show me the letter.  Where is it?
6  Q.  Ok.  Again, Respondent's Exhibit 20 --
7      THE WITNESS:  Let me help you.
8      CHAIRMAN FITCH:  What exhibit number,
9  please?
10      MR. SUJAT:  That's Exhibit Number 21,
11  Respondent's Exhibit Number 21.  It's dated August
12  4th, 2010.
13      CHAIRMAN FITCH:  I think we're all
14  reasonably there.  And you may ask your question.
15  BY MR. SUJAT:
16  Q.  Mr. Klayman, can you take a look at the
17  letter.
18  A.  Yes.  This is a letter that purports to
19  be to Mr. Dan Austin of Voice of America and
20  apparently was sent to Mr. Shamble, copied to Mr.
21  Shamble in addition to Mr. Austin, but it was not
22  sent to me.

43 (Pages 1035 to 1038)

In Re: Larry E. Klayman
June 25, 2018

## Page 1039

1  Q. So, it was sent to just Danforth
2  Austin?
3  A. That's what it says, yeah.
4  Q. No other person received a copy from
5  what you know?
6  A. I'm testifying as to myself. I don't
7  know who else received it. I didn't receive it.
8  Q. Thank you.
9  A. From Ms. Sataki.
10  Let me point out, and it's something
11  that will come out later, and it's in the
12  supplemental exhibits --
13  MR. SMITH: Objection.
14  CHAIRMAN FITCH: Let's let counsel ask
15  his next question.
16  THE WITNESS: I'm allowed to explain
17  the letter.
18  CHAIRMAN FITCH: Well, it sounds like
19  you were explaining something else.
20  Counsel, where do you want to take Mr.
21  Klayman? You can jump around. Ask him a
22  question.

## Page 1040

1  BY MR. SUJAT:
2  Q. Yeah, well, I mean, my question here
3  is, when did you become aware of this? Did you
4  ever receive this?
5  A. Yeah, I testified to that.
6  What I wanted to add was that in this
7  letter, even though it wasn't sent to me, she's
8  instructing to get rid of all the civil actions,
9  ok, yet she did file a Notice of Appeal in her
10  case involving the Board of Governors of BBG, and
11  that Notice of Appeal is one of our supplemental
12  exhibits.
13  Q. Right.
14  A. So that's inconsistent.
15  Q. Right. So this inconsistency shown by
16  Respondent's Supplemental Exhibit 4 --
17  MR. SMITH: Objection. I mean, that's
18  a narrative. I think we need a question, not a
19  narrative.
20  THE WITNESS: Just ask me the question.
21
22  BY MR. SUJAT:

## Page 1041

1  Q. Ok, Mr. Klayman, can you take a look at
2  Respondent's Supplemental Exhibit Number 4.
3  A. Can you give me a copy of that, please.
4  Q. Yes.
5  A. This is the Notice of Appeal that I'm
6  referring to, and the way I was able to get a copy
7  of this, this actually came out of Bar Counsel's
8  files, but I had a copy too, because it appeared
9  on the court's docket that, at the same time
10  she's telling Mr. Austin -- or actually before
11  that -- excuse me, later than that, and she's
12  telling Mr. Austin that she wants all cases to be
13  dismissed. She's appealing the action.
14  So this is part and parcel to the
15  problems that I was having during that period in
16  time. That's why I wanted to contact her.
17  Because I was getting communications that didn't
18  appear to come to her. It wasn't in her way of
19  speaking. It wasn't in her English. It was in
20  virtually perfect English, as the letter to Mr.
21  Austin demonstrates. That's why I needed to be
22  able to talk to her, and that's why the first

## Page 1042

1  document in this exhibit, sent by Mr. Shamble, was
2  important, because we were trying to reach her --
3  MR. SMITH: Objection. Not responsive
4  to the question.
5  THE WITNESS: I'm explaining the
6  context of the document.
7  CHAIRMAN FITCH: No, overruled.
8  THE WITNESS: Because I needed to find
9  out, you know, what she really wanted to do. And
10  apparently, whatever advice she was getting, we
11  learned in her testimony, was from non-lawyers, it
12  was contradictory and in my view not in her best
13  interest.
14  BY MR. SUJAT:
15  Q. Mr. Klayman, there were also other
16  letters that were sent regarding termination.
17  A. Just show me the letters.
18  Q. That would be Exhibit 8, Respondent's
19  Exhibit 8. One dated November 15th, 2010,
20  addressed to the Klayman Law Firm at 2000
21  Pennsylvania Avenue, and then another one the same
22  date addressed to Klayman Law Firm, 201

44 (Pages 1039 to 1042)

In Re:  Larry E. Klayman
June 25, 2018

| Page 1043 | Page 1045 |
|---|---|

**Page 1043**

1  Massachusetts Avenue.
2       A.  Right.
3       The first one here is a November 15th,
4  2010, and it says "Termination of Services Case."
5  Now it's written again in perfect English and the
6  address here is incorrect.  So I never got this
7  letter, apparently.  And even if I did, I had to
8  be able to talk to her and communicate with her.
9  Because I knew this was not coming from her.  She
10  doesn't write like that and it didn't make any
11  sense to me.  And out of an abundance of caution,
12  I had to take actions to try to protect her, not
13  just contacting her -- trying to contract her, and
14  that's what she's talking about, a lot of the
15  calls, trying to reach her, but also asking Mr.
16  Shamble to communicate with her to get
17  instructions on what to do.
18       In the meantime, I myself filed a
19  Notice of Appeal, which is part of the documents
20  that were entered into evidence, and I paid for it
21  myself.  I mean, to this day I haven't been
22  remunerated or anything else that I paid for,

**Page 1044**

1  whether it was the apartment, whether it was
2  moving expenses, whether it was this, or anything
3  else.  And I don't seek to be compensated.  I did
4  it out of my heart to do the right thing and to
5  help someone who I thought was in distress and
6  needed help.
7       MR. TIGAR:  Excuse me, when you say
8  that the address is wrong, is that the 2000
9  Pennsylvania address is wrong?
10       THE WITNESS:  Yeah, and that
11  probably -- in some ways that was my fault, ok.
12  Because I thought the address was 2000.  It was
13  basically a mail drop.  I was practicing out of
14  Florida at that time.  So it never got to me.  The
15  real address is 2020 Pennsylvania Avenue.
16       MR. TIGAR:  You had 2000 Pennsylvania
17  at one time?
18       THE WITNESS:  I had it on letterhead at
19  one time and I corrected it.  But I didn't get
20  this, as a result.
21       The next letter that you're referring
22  to is addressed -- it's very similar --

**Page 1045**

1       CHAIRMAN FITCH:  Am I correct that this
2  office building in question is exactly on I Street
3  between 20th and 21st, but it carries a
4  Pennsylvania Avenue because of the --
5       THE WITNESS:  I think it fronts I
6  Street, yeah.  It fronts Pennsylvania, too.  So I
7  use that as an address when I'm in DC.
8       CHAIRMAN FITCH:  Does the entire office
9  building have one address?
10       THE WITNESS:  No.  The address of that
11  office was 2020 -- that drop, UPS, was 2020
12  Pennsylvania Avenue, and I still use that today.
13  But in any event, I didn't get the letter.
14       And even if I did, what I'm saying is I
15  had to get instructions on what to do, because it
16  didn't make any sense, and it's clear it wasn't
17  written by her.  That's why I was trying to send
18  emails.  You'll see later --
19       MS. LARKIN:  Have you ever received any
20  communication to 2000 Pennsylvania?
21       THE WITNESS:  No.  It went to the wrong
22  address.  That's why I had to correct it.

**Page 1046**

1       MS. LARKIN:  You've never received
2  anything?
3       THE WITNESS:  Not that I can recollect,
4  no.
5       And I was moving around a lot on that,
6  but I realized it was the incorrect address and I
7  changed it, ultimately.
8       And this next letter, 2001
9  Massachusetts Avenue, that was not my office
10  address either.  And in any event I didn't get the
11  letter.  But even if I had gotten the letter, I
12  would have not been able to dismiss all the cases
13  unless I was able to talk to her first.
14       That's why you'll see from documents --
15  and that's the more important point -- is that
16  that's why, you know, I sent some emails, and
17  you'll see them later, and they also came up in
18  Office of Disciplinary Counsel's supplemental
19  complaint exhibits, is I was communicating with
20  her trying to say, "What do I do here?"  Because
21  it was clear these communications were coming from
22  other people.  And I thought they may be coming

In Re: Larry E. Klayman
June 25, 2018

## Page 1047

1  from this Sam Razavi or someone who I had done
2  some research and seen that he had been convicted
3  of fraud in Las Vegas, Nevada.
4  CHAIRMAN FITCH: Have you ever had an
5  office on Capitol Hill.
6  THE WITNESS: Capitol Hill? No. I
7  didn't have an office on Capitol Hill.
8  That was an address of an office run by
9  Armstrong Williams where I was working out of, but
10  it wasn't my office.
11  CHAIRMAN FITCH: The 201 --
12  THE WITNESS: Yeah, the problem is that
13  there is no suite number on that, and I'm not
14  registered as a tenant this.
15  This is during the period of time in my
16  life that was very difficult. This is when I was
17  going over to the Hyatt to get an apple. I mean,
18  I was basically on my back, bankrupt, so it wasn't
19  my office. I simply was using that when I was in
20  Washington, D.C. And there was a suite number and
21  the suite number is not on the address here.
22  So, I also did not get that letter, but

## Page 1048

1  again, even if I did, I could not have done what
2  she was asking at that time then forfeit over
3  rights, unless I talked to her, or at least Mr.
4  Shamble talked to her.
5  And she was always free to call Mr.
6  Shamble and ask him what was going on and she
7  didn't do that. You heard the testimony.
8  CHAIRMAN FITCH: What kind of building
9  is 201 Massachusetts Avenue? I just want picture
10  it.
11  THE WITNESS: It's an office building.
12  It's across from Heritage Foundation.
13  CHAIRMAN FITCH: I'm sorry.
14  THE WITNESS: It was across from
15  Heritage Foundation. There's a barbershop in the
16  lobby.
17  CHAIRMAN FITCH: Is it a new office
18  building?
19  THE WITNESS: No, it's an older
20  building.
21  CHAIRMAN FITCH: It's an older
22  building.

## Page 1049

1  THE WITNESS: There are a number of
2  offices there.
3  And I was moving around, so, honestly,
4  I didn't get these letters. But the more
5  important point is, if I did, I have an obligation
6  not to dismiss outs cases and give up her rights
7  without some communication. And that's why I was
8  even asking Mr. Shamble to be in communication
9  with her so I could find out what was going on.
10  BY MR. SUJAT:
11  Q. Mr. Klayman I'd like to, if I could,
12  ask you questions relating to --
13  CHAIRMAN FITCH: When was the first
14  time you saw either of these two letters?
15  THE WITNESS: I'm not sure when I saw
16  them. I mean, they come up in the documentation
17  that was produced by Bar Counsel.
18  There's also "Received, Chambers of
19  Judge Kotelly." So I suspect that around January
20  24th this came to my attention. She probably sent
21  it to me.
22  It says, "January 24th, Chambers of

## Page 1050

1  Judge Kotelly, Received." So that's probably when
2  I learned of it.
3  And she put it on the record that she
4  had put it on Pacer.
5  THE WITNESS: I do observe that on the
6  November 15th, 2010 letter, below that there is
7  the word "received." I can't read -- and that's
8  below that, there appears "January 14th, 2011,"
9  and then that appears, "Angela D." somebody, "a
10  clerk of court," and there's a possibility that
11  below that it says "United States District Court."
12  And as you point out, Mr. Klayman, there is a
13  clear "Received January 24th Judge Kotelly's
14  Chambers."
15  THE WITNESS: I believe she mailed them
16  to me, and we're on the record, as received
17  January 24th, 2011 in chambers, Judge Kotelly.
18  I might add, during that period of
19  time, there was a lot of mail that wasn't getting
20  to me, including mail that Mr. Smith sent to me.
21  He sent something to a post office box in
22  Washington, DC., apparently the supplemental

In Re: Larry E. Klayman
June 25, 2018

---

**Page 1051**

1 complaint at the time, and I never got that.

2      That actually was a fundraising box for

3 Freedom Watch and the mail got forwarded to the

4 cage of the people who open the mail contributions

5 and they didn't forward it back to me. So I never

6 got this request for supplemental comment in that

7 time period. I was moving around a lot. I was in

8 very bad financial shape.

9      It also accounts for the fact that a

10 lot of the documents are missing because a lot of

11 it got lost in the shuffle.

12      CHAIRMAN FITCH: Does the indication

13 Suite 354 in connection with 2000 Pennsylvania

14 Avenue or 2020 Pennsylvania Avenue mean anything

15 to you?

16      THE WITNESS: Yes. That's the correct

17 suite number, you know, it's the box number,

18 everybody calls it a "suite," but again it's at

19 2020, not 2000. That goes to Pennsylvania Avenue

20 and they would have no way of knowing I was on

21 2020 when they got that letter.

22      And I wasn't on any kind of marquis or

---

**Page 1052**

1 board, you know, in the front of the building.

2      CHAIRMAN FITCH: Are you saying that

3 Suite 345 was in fact not a room or set of rooms,

4 but it was in fact a mail drop?

5      THE WITNESS: Correct. And that's the

6 way people refer to it. A lot of people refer to

7 those mail drops as suites.

8      CHAIRMAN FITCH: It's a suite, or the

9 appearance of it.

10      THE WITNESS: It is a portion that it

11 goes into.

12      CHAIRMAN FITCH: Ok.

13      THE WITNESS: It's a portion of the

14 suite that it goes into, the box. It's accurate

15 that it's a suite.

16      But the point I'm making is that 2000

17 Pennsylvania Avenue is a separate building from

18 2020. It's a different part of the building over

19 there.

20      CHAIRMAN FITCH: So there are at least

21 two entrances in this block-long building?

22      THE WITNESS: There's several. I think

---

**Page 1053**

1 there are four entrances, and there's a Devon

2 Grill in front of it, and you have one on the

3 side, one on one side, one on the other side, and

4 two in the front.

5      So if the letter goes to 2000, nobody

6 in 2000 knows where I'm located. That's the

7 problem, you see. So they can't forward it.

8      CHAIRMAN FITCH: The mail drop 354, was

9 that located sort of in the part of the building

10 that had lessors to 2020.

11      THE WITNESS: I frankly don't know.

12 It's located -- it's like retail level

13 when you go in.

14      CHAIRMAN FITCH: Correct.

15      THE WITNESS: Ok, so it wasn't next to

16 lessors other than retail facilities on that.

17      I never really explored the rest of

18 that building. I was just concerned that I needed

19 to get the address changed to 2020, and it

20 explains I wasn't getting a lot of things in that

21 period. It was going to the wrong place.

22      CHAIRMAN FITCH: The record should

---

**Page 1054**

1 show, I suppose out of an abundance of caution,

2 that in evaluating evidence, I will look only at

3 what the evidence in the record is. I'm familiar

4 with that building. I was familiar with that

5 building, a long time along, when Kincaid --

6      THE WITNESS: It's a nice building.

7      CHAIRMAN FITCH: -- whether Kincaid was

8 there. But I have no memory of it.

9      So I will take judicial notice of it

10 and I will not allow my non-familiarity to affect

11 it.

12      THE WITNESS: Here's the other point...

13      Regardless of the address, regardless

14 of the fact that I couldn't accept what was being

15 sent because it clearly wasn't written by her, she

16 could have emailed me then, and she didn't. You

17 know, she has all kinds of texts and emails and

18 all kinds of other things, and I didn't get notice

19 one way or the other, and neither did Mr. Shamble.

20 She could have always gone back to Mr. Shamble.

21 She was on good terms with Mr. Shamble. He tried

22 to help her. She knew, in effect, Mr. Shamble was

---

47 (Pages 1051 to 1054)

In Re: Larry E. Klayman
June 25, 2018

## Page 1055

1  my partner in helping her, and she didn't even get
2  back to him, and he didn't know.   That's why I
3  asked him to try to get ahold of her.
4       CHAIRMAN FITCH:  Mr. Sujat, go ahead.
5  BY MR. SUJAT:
6       Q.  There have been some emails that
7  reference contingency fees.
8       A.  Fred, just show me the document.
9       Q.  And I wanted to bring those to your
10 attention to look at.
11      A.  Yeah.
12      Q.  They would be SX12.  Let me just help
13 you with this.   Exhibit 12?
14 BY MR. SUJAT:
15      Q.  It's Exhibit SX12.
16      CHAIRMAN FITCH:  Mr. Sujat, I at least
17 don't have an RX12 -- oh, it's this group of X's.
18      THE WITNESS:  Supplemental exhibit?
19      CHAIRMAN FITCH:  I'm sorry, go ahead.
20 BY MR. SUJAT:
21      Q.  SX12.
22      A.  Yes.

## Page 1056

1       Q.  Would you take a look at that, please.
2       A.  I will.
3       This is an email from Elham Sataki --
4  from me to Ellie Sataki and it's dated May 31st,
5  2010.
6       Ok, what I want to point out is that I
7  had always done this in a pro bono way.  I was
8  pointing out in this letter that this is the time
9  that I put in.  This was very, very expensive AND
10 that it's unlikely that this will ever be
11 remunerated in any final judgment.
12      As I testified earlier, to get a
13 judgment against the government, you know, we'll
14 all be close to expiring by the time that happens,
15 and that was not what we were trying to do.  We
16 were trying to put her back to work in Los
17 Angeles.
18      But I was getting to the point where I
19 didn't feel that I was being respected, as I said.
20 It was a difficult relationship, and if I
21 continued on, I'm suggesting 50 percent of any
22 recovery of what's fair.  But we never agreed,

## Page 1057

1  either 40 percent or 50 percent, previously.
2       And, you know, it was around this time
3  period that I was trying to get her other counsel,
4  too, because I realized that she was just very
5  difficult to deal with.  I viewed her as, you
6  know, better.  It was getting personal.  She was
7  asking me to buy a car.  I cared for her.  I
8  thought it needed to go on to other lawyers, such
9  as Mr. Shea and Ms. Allred.
10      You, and I refer to this here, and I'm
11 trying to kind of wake her up, you know.  I did
12 really care for the woman, and she does kind of
13 have a diva mentality.  And I was seeing that, and
14 I realized, this is not good to continue on under
15 that circumstances.
16      So it was not that I was demanding 50
17 percent, because I was trying to get out of the
18 case at that point.  I was trying to make a point
19 that I put in a lot of time and expense, and to
20 this day, after the representation ended, for
21 whatever reason, I've never asked her to pay me
22 back.  I've never asked anybody to pay my back.

## Page 1058

1       To the extent that there's
2  communications later on that we can get into, what
3  I was saying was if those people interfered in my
4  relationship, given the fact that I've put in so
5  much time and expense, then, you know, they should
6  have to pay for that.  Because it's all going for
7  an naught.  I tried and I tried.  It's all going
8  in the trash.  I didn't expect her to pay for it.
9  I would never ask her to pay for it.  She didn't
10 have any money to pay anyway.  She had no credit.
11      But I was very much concerned and very
12 much perplexed, and very much at a loss to try to
13 understand why, after we had done all that work,
14 why she would just say "give up."
15      And this is a crucial point, your
16 Honors: it was not in her best interest to drop
17 everything.  It was not in her best interest to
18 fall on her sword.  At any time she was free to
19 get another lawyer, and these people that were
20 helping her -- Kathleen Staunton, is a woman who
21 is educated.  She was the Chief of Staff in the
22 Orange County office for Congressman Rohrabacher.

48  (Pages 1055 to 1058)

App.0461

In Re:  Larry E. Klayman
June 25, 2018

## Page 1059

1  They obviously could have gotten her a lawyer
2  rather than just telling her to drop stuff.  And
3  same for Sam Razavi or anybody else that was
4  giving her what I perceived to be very bad advice.
5      So it's a little bit like the Wizard of
6  Oz and Dorothy --
7      MR. SMITH:  I'm going to object,
8  because this goes beyond the scope of the May 31st
9  letter, which is talking about the 50-percent
10 contingency fees.
11     There is no testimony pertaining about
12 her dropping the case, unless he understood her to
13 have dropped the case on or about May 31st, 2010.
14     CHAIRMAN FITCH:  No, I'm going to
15 overrule that, Mr. Smith.
16     I think that it is potentially and
17 theoretically in the Respondent's team view
18 relevant to and possibly explanatory of the charge
19 that he undertook to represent his client on a
20 contingent-fee basis, et cetera.
21     I may or may not be convinced at the
22 present time of what this stuff means, but it

## Page 1060

1  seems to me it's potentially relevant and they
2  have a right to pursue their theory.
3      THE WITNESS:  So to finish my point is
4  that, it's a little bit like Dorothy in the Wizard
5  of Oz, where the voice says at the end, "Dorothy,
6  you could always come back to Oz.  You don't have
7  to be here," Auntie Em.  She could have always
8  gotten another lawyer.  She wasn't tied to me.
9      But, you know, I was representing her
10 for free.  That's a pretty good deal.  And she
11 knew that I believed in her.  She knew how much I
12 tried for her.
13     But like I said, there were two sides
14 to her personality: one you see, and sometimes the
15 other that was quite aggressive and I viewed it as
16 not respectful.
17     So that's the quandary we were in, and
18 at that time I said that I didn't have any
19 intention of asking her for 50 percent.  I just
20 kind of threw it out there to wake her up.  And
21 that's what that letter's about.
22     CHAIRMAN FITCH:  Next question.

## Page 1061

1  BY MR. SUJAT:
2      Q.  Along the same line here, Mr. Klayman,
3  would you pull out SX19.
4      A.  Ok, this is an email from me to
5  elliesataki@yahoo.com, June 29th, 2010.  The third
6  paragraph is the key to this -- actually the third
7  paragraph and the fourth: "I did not help you for
8  money and it is not my motivation now."  This is
9  really where I was at.  "In fact, working as hard
10 as I have to try to get you back to PNN, Persia
11 News Network, gets me nothing, assuming I ever
12 wanted a percentage of the damages we could have
13 won in court, which I never asked for.  I told you
14 to 'keep it all.'
15     "There is no money in having you return
16 to Persia News Network, PNN.  There is the damage
17 claims, and I've spent several hundred thousand
18 dollars of my own expense trying to get you back
19 to a $75,000 a year job at a network that is a
20 cesspool of corruption.  But that's what you
21 wanted."
22     And then I get into some of the

## Page 1062

1  difficulties with Judge Kotelly and this occurred
2  after she made that ruling denying the preliminary
3  injunction, and I get into, you know, the
4  difficulties with PNN and the rumors that were out
5  there that may have influenced their
6  decision-making.
7      I'm basically, you know, just trying to
8  explain to her that it wasn't my fault.  I did
9  everything I could to try to help her.  I'm not
10 the kind of person that worries about fault, you
11 know.  But because I cared for her.  I wanted her
12 to understand.  And I wanted her to understand
13 that she doesn't owe me any money and never will.
14     I didn't do it for a contingent fee.  I
15 didn't do it for money.  I did it because it's who
16 I am and it's the right thing to do.  I knew she
17 had no money.
18     I knew that, at that point we hadn't
19 gotten into the damage aspect of the case, and
20 that was something as far down the line that in
21 all likelihood she would not see, in the near or
22 immediate future, and I probably would never see.

49 (Pages 1059 to 1062)

## Page 1063

1    We never went to discovery.  We never
2 took depositions.  It didn't go far enough.  And
3 before the relationship could go forward, into the
4 damage aspect of things, where there could in
5 theory be a recovery, the relationship ended.  So
6 there was no need to get into a contingent fee
7 agreement because it just simply wasn't relevant
8 at that point.
9    MR. TIGAR:  In the last paragraph of
10 SX19, it says, "I now agree with your conclusion
11 that it's best that you go back with your family
12 in Sweden."
13    Where had she expressed that
14 conclusion?
15    THE WITNESS:  One of her
16 frustrations -- I was trying to use reverse
17 psychology, even though I'm not a psychologist.
18 She always told me, and it hasn't changed, because
19 you heard it yourself when she testified, she
20 always told people that she was going to commit
21 suicide, that she is going to give up.  It was for
22 affect.  So I was basically saying to her -- I was

## Page 1064

1 challenging her really with some reverse
2 psychology.
3    MR. TIGAR:  When did she say that she
4 had reached that conclusion?  That was the
5 question.
6    THE WITNESS:  In and around the time
7 that Judge Kotelly ruled against us.
8    I mean, she was as dejected as I was.
9 And I might add, your Honor, before this
10 proceeding ever began, the hearing, you received
11 correspondence.  It's in the record.  She said "My
12 life's been ruined.  It is put on hold for eight
13 years."  And obviously you heard the testimony.
14 It wasn't ruined.  She continued on fully employed
15 doing broadcasting with Persian networks in Los
16 Angeles, with cosmetic firms, which is her
17 background.  She's making a good salary.  Her life
18 wasn't ruined.
19    And I can jump ahead a little bit.  In
20 and around the time that Mr. Smith told me that
21 this case was not dismissed, that's when he
22 re-contacted me and said he would respond.  I

## Page 1065

1 think it was shortly before he told me that, I'm
2 sitting in a cafe having lunch with my CHIEF OF
3 STAFF, and this woman comes running over to me,
4 screaming, "This man ruined my life.  This man's a
5 terrible person," in front of my chief of staff.
6 I didn't know who she was, because and I hadn't
7 seen her for a number of years.  First I thought
8 she was my haircutter, and then I realized it was
9 Ellie.
10    So she's screaming and she's just going
11 crazy.  And eventually I don't say anything, and
12 she walks off, and then she comes back again
13 screaming, and tells my chief of staff to contact
14 her, she'll tell her what a very terrible person I
15 am.
16    So she's just not stable, and, you
17 know, eight years later it's not me.  This is her.
18 And I'm very sorry what happened to her.  I wish
19 it would have been different.  But I didn't ruin
20 her life.
21    And she told you that her life was on
22 hold.  It obviously wasn't on hold.  She told you

## Page 1066

1 that her life was ruined.
2    It's kind of like -- and I don't mean
3 this with any lack of respect.  It's a little like
4 Blanch DuBois in A Street Car Named Desire -- and
5 I've always believed in the generosity of
6 strangers.  You can also say no good deed goes
7 unpunished.  And there has to be somebody to
8 blame.  And I understand that, because victims,
9 when they get into this mode -- and I have
10 represented a lot of victims, people that were
11 wounded in battle, sexual harassment victims,
12 other than her, victims that were liaised, you
13 know, by foreign powers -- is that they tend --
14 the world tends to revolve around them and they
15 feel the world owes them.
16    So the reaction is, when you don't get
17 what you want, based on my experience, is to
18 strike out at the person that's easiest to strike
19 out at.  And that was me.  So I've never, ever
20 asked her to be paid back, and to this day I wish
21 her well.  I pray to God that she has a good life,
22 but I'm not the cause of her problems.

In Re: Larry E. Klayman
June 25, 2018

Page 1067

1    CHAIRMAN FITCH: This letter, SX19,
2  that you emailed to her on June 29th, 2010, so
3  this would have been about 27 days after the
4  TRO/PI was denied, correct?
5    THE WITNESS: Right.
6    CHAIRMAN FITCH: If, assuming the date
7  is correct.
8    THE WITNESS: If the date is correct,
9  and we'll go back to it, yeah.
10    CHAIRMAN FITCH: Both you and she were
11  in Los Angeles that whole period of time. Is that
12  correct.
13    THE WITNESS: It's my understanding --
14  I don't know where she was, but I was.
15    CHAIRMAN FITCH: Ok. That was my next
16  question.
17    Did you have communications with her
18  between roughly June 2nd and your unsuccessful
19  attempt to reach her that night after the
20  automobile --
21    THE WITNESS: I'll have to go back and
22  check.

Page 1068

1    CHAIRMAN FITCH: -- and June 29th,
2  2010?
3    THE WITNESS: I don't recollect any
4  communications during that period.
5    CHAIRMAN FITCH: Ok.
6    THE WITNESS: She just kind of shut off
7  and just went off, you know, in effect -- and I
8  don't mean this in a disrespectful kind of way,
9  feeling sorry for herself. That's why the
10  comments, "I'm going to go back to Sweden," she
11  doesn't want to go back to Sweden, and drama. And
12  I was trying -- I was doing reverse psychology
13  there.
14    I really wanted to help her, that she
15  had to get other counseling because things had
16  gotten in a manner that we couldn't communicate
17  with each other. If you can't talk to your
18  client, you can't represent your client.
19    CHAIRMAN FITCH: The June 29
20  letter/email has a subject line and it says
21  "Sweden."
22    Do you have any recollection now -- and

Page 1069

1  Sweden is discussed in the last paragraph, as we
2  see and heard. Do you have any recollection now
3  of why on June 29, or approximately at that time,
4  on or about that time, you sent her a letter about
5  Sweden, or had Sweden on your mind?
6    THE WITNESS: I think that it may have
7  been when I had the conversations with her after
8  Judge Kotelly's ruling that I made that reference.
9    CHAIRMAN FITCH: Say that again.
10    THE WITNESS: I think, I think, I'm
11  trying to recollect, remember this is eight years
12  ago --
13    CHAIRMAN FITCH: Fair enough.
14    THE WITNESS: -- that around the time
15  that I had that conversation with her that we had
16  not won the preliminary injunction. I think she
17  mentioned that, ok, "I'm going to go back to
18  Sweden."
19    We did have a telephone conversation
20  that day. She really ripped into me that day.
21    CHAIRMAN FITCH: I may have the
22  timelines a little bit confused. If the denial of

Page 1070

1  the TRO and the PI came down on approximately June
2  1, 2010 -- when did the automobile accident
3  happen? That night?
4    THE WITNESS: That night.
5    CHAIRMAN FITCH: And had you already
6  contacted her about the adverse decision?
7    THE WITNESS: I talked to her earlier
8  in the day.
9    CHAIRMAN FITCH: You called her earlier
10  in the day.
11    THE WITNESS: Yeah, and that was one of
12  the things that really upset me.
13    CHAIRMAN FITCH: Ok.
14    THE WITNESS: the combination of Judge
15  Kotelly's ruling and your client reading you the
16  riot act --
17    CHAIRMAN FITCH: Ok.
18    THE WITNESS: And vilifying you.
19    CHAIRMAN FITCH: Mr. Sujat.
20  BY MR. SUJAT:
21    Q. Mr. Klayman, on the same line, would
22  you take a look at SX26, please.

51 (Pages 1067 to 1070)

App.0464

In Re:  Larry E. Klayman
June 25, 2018

Page 1071

1   A.  Yes.
2       This is an email that I wrote on or
3   around August 5th.  Apparently the letter to
4   Austin had been forwarded to me.  It wasn't sent
5   to me, and I'm trying to --
6       CHAIRMAN FITCH:  Wait a minute, Mr.
7   Klayman.  I apologize.
8       (Brief pause.)
9       CHAIRMAN FITCH:  You were going to
10  respond to Mr. Sujat's question?
11      THE WITNESS:  Yes.
12      This is an email I sent to Ms. Sataki,
13  apparently on or about August 5th, which was
14  dealing with the Dan Austin letter.  This may have
15  been brought to my attention by Mr. Shamble,
16  because he got the letter.  I didn't.  And that's
17  why the letter says, "The letter which you sent to
18  Dan Austin and Tim Shamble, but not to me, makes
19  no sense and is counterproductive for the
20  following basic reasons."  And I'm telling her
21  that, "Given everything we know about Voice of
22  America, being nice to them, appearing to placate

Page 1072

1   them or rollover for them is not going to get you
2   in all likelihood what you want."  I'm saying,
3   "Being nice to them won't get you anywhere anyway,
4   as Tim has also advised you.  You tried that
5   before, before I agreed to help you, and we tried
6   that when I tried to negotiate an amicable
7   solution when a lawsuit was filed."
8       And then I state, "Second" -- I won't
9   read the whole thing, but this is important.
10  "Second, by giving up all totally in court, this
11  is what you intended, which for the most part
12  eliminated any means for you to have VOA pay any
13  costs.  How then will you pay me back for rent,
14  living expenses, polygraphs and other costs you
15  agreed to?
16      Now, I never asked for this and I
17  wouldn't have taken it.  I made it clear.  There
18  are several things in here that were said, but
19  this is what she said.
20      I said, "If you give up the suit then
21  you are personally responsible for paying these
22  costs, in theory" -- not that I would make her pay

Page 1073

1   them, but in theory, when a client does something
2   like that, lawyers generally ask to be paid.  But
3   I have never asked to be paid, I never wanted to
4   be paid, and, you know, I did it for her.  That's
5   what "in theory" meant.  I think that's an
6   important word.
7       But there are other documents where I
8   clearly say, it's pro bono.  I'm not asking to be
9   paid back.  I don't want to ask to be paid back.
10  "I did it, Ellie, for you."  That's why I said,
11  when Mr. Smith produced this stuff the first day
12  of trial, I said there is a lot of stuff in here
13  that's extremely helpful, that explains where I
14  was at, what I was doing, what I was thinking and
15  what I said.
16      CHAIRMAN FITCH:  Go ahead, Mr. Sujat.
17  I'm not going to interrupt.
18      MR. SUJAT:  No problem.
19  BY MR. SUJAT:
20      Q.  So, staying in the line of financial
21  assistance that you provided Ms. Sataki and also
22  helping her with employment, I would like to refer

Page 1074

1   you to the Bar Exhibit 29.
2       A.  The supplement Exhibit 29?
3       Q.  No, just the regular Exhibit 29 Bar
4   exhibit, from Larry Klayman to Ms. Sataki.
5       A.  Yes, this is an email of November 21st,
6   2011.
7       You know, I felt that she had to get
8   other counsel at this time.  She had to move on.
9   I had gotten her a six-month lease.  I prepaid it
10  with my money.  And it's not that she was being
11  told to leave, but I wanted to give her notice
12  that we were going to likely have to go in
13  different directions, because the relationship had
14  become very difficult and noncommunicative.
15      And I said, "I will take, if you do not
16  want to assume the lease, I will notify the Serano
17  in the morning.  I have prepaid four months plus
18  the security deposit for a total of over $11,000,
19  the equivalent of five months rent.  The security
20  deposits will provide your monthly rent at the
21  Serano until and including September 7, 2010, as
22  of the date when you vacate the apartment.

52 (Pages 1071 to 1074)

In Re: Larry E. Klayman
June 25, 2018

Page 1075

1 However you must keep the apartment neat and clean
2 so they can at least begin to show it. The Serano
3 executives will keep you advised. This one-month
4 period should give you time to find another place
5 to live.
6 "Ellie, I'm not taking this position to
7 coerce you to do anything. You are your own free
8 agent and I respect that. I assume by now that
9 you have reflected and understand why we have to
10 move on in this regard. I'm not retaliating
11 against you. It's just that you cannot expect me
12 to indefinitely support you, like a boyfriend,
13 husband or family.
14 "So now that you do not owe me anything
15 going forward into the future, this should make
16 you feel better.
17 "I will continue to try to help you get
18 a job and if you're ill or there is an emergency,
19 you can always count on me. But like I told you
20 many times, I cannot continue to be where I'm not
21 wanted.
22 And I finally got the message, while it

Page 1076

1 hurts and while I would have given you the shirt
2 off my back, something has to be done, no matter
3 how much I love you and always will."
4 And the reference to love, too, I love
5 a lot of people. I love my dog, Beverly. I love
6 my friends. I did love Ellie. I'm not
7 embarrassed about that. That's one reason I tried
8 so hard for her, because I really did want her to
9 succeed and I really cared.
10 So when we got to the point of
11 separation, you know, that's why I suggested Tim
12 Shea and also, you know, made reference to that in
13 communications with Dr. Aviera that she didn't
14 understand that she needed to get other counsel at
15 that point.
16 Because I saw the potential of this not
17 going good when I could not communicate with her,
18 and when she expected things like me buying a car
19 or helping Kevah and berating me when I didn't get
20 the right lawyer, and it just was getting too
21 personal. And I recognized that.
22 But I didn't ever pursue my personal

Page 1077

1 interest. My interest was to get her what she
2 wanted. My interest was, as a lawyer, to win the
3 case. And to the extent that she was part of this
4 whole Persian movement to try to liberate Iran,
5 that was a good thing. That's why I admired her
6 and admired other people at VOA for tying to
7 that. And I was trying to do that.
8 BY MR. SUJAT:
9 Q. Mr. Klayman, would you look at SX31.
10 It's an email from you to Ms. Sataki dated October
11 24th, 2010.
12 A. Let me just check something Mr. Sujat.
13 Q. SX31?
14 A. If I could ask, Mr. Sujat, just to go
15 back, because it goes with the flow.
16 THE WITNESS: He's not as familiar with
17 this case as I am.
18 If you can, I want to direct your
19 attention to the emails in our exhibit book where
20 I'm talking to Dr. Aviera saying she needs to get
21 another lawyer, in our exhibit book.
22 I can help you with it. It's Exhibit

Page 1078

1 9.
2 MR. TIGAR: Respondent's Exhibit 9?
3 THE WITNESS: Respondent's Exhibit 9.
4 And this is an email May 10th -- May
5 8th, 2010 -- May 10th, 2010 where I'm saying in
6 paragraph three, "It's not healthy for you or me.
7 You will get better legal representation from
8 someone else like Tim Shea who does not have an
9 emotional conflict."
10 So I recognized that there was that
11 personal aspect of things and it was getting too
12 close. So that's why I tried to find somebody
13 else, and Mr. Shamble had given me Tim Shea's name
14 and he seemed like a very competent person.
15 And then in the next email, the next
16 page, "In case you did not see my text this
17 morning, I thought of someone who can take over
18 your legal representation. His name is Tim Shea.
19 Tim Shamble also knows him. And he has had
20 experience for clients before VOA, and PNN, Persia
21 News Network.
22 BY MR. SUJAT:

53 (Pages 1075 to 1078)

In Re: Larry E. Klayman
June 25, 2018

Page 1079

1   Q.  That's SX5 you're referring to --
2       CHAIRMAN FITCH:  I'm sorry, where are
3   we now?
4       THE WITNESS:  This is Respondent's
5   Exhibit 9.
6       CHAIRMAN FITCH:  I'm looking at RX9.
7       THE WITNESS:  Yeah, right.
8       CHAIRMAN FITCH:  What's the date of the
9   email you want me to look at?
10      THE WITNESS:  It's May 8th, 2010.
11  They're two of them.
12      CHAIRMAN FITCH:  And which one -- you
13  have testified about the first one.
14      THE WITNESS:  Yes, and I testified
15  about the second one, too.
16      CHAIRMAN FITCH:  You're on the second
17  one that says, "In case you did not see my text
18  this morning"?
19      THE WITNESS:  Yeah.
20      CHAIRMAN FITCH:  About Tim Shea?
21      THE WITNESS:  This is what I would like
22  everyone to understand, is that I realized it was

Page 1080

1   getting too close and I was trying to give her
2   another lawyer to take over the case.  I know
3   that, you know, there's an issue that was raised
4   by Bar Counsel about conflict.  I felt that, to
5   avoid a conflict, she should get other counsel.
6   That comes out in a number of different
7   communications.
8       Thank you, Mr. Sujat, for indulging me.
9       MR. TIGAR:  What kind of love
10  relationship did you want to have with Ms. Sataki?
11      THE WITNESS:  That's a good question.
12  I never wanted a sexual relationship.
13  I never had a sexual relationship.  I never
14  touched her.  I'm someone who gravitates to
15  somebody and, you know, I did love Ms. Sataki, but
16  it wasn't in any way intended to be a long-term
17  relationship or marriage or anything like that.
18      Because I was going through a difficult
19  period of my life and I sympathized with her and I
20  fell in love with her.  And I did that because I
21  kind of projected to myself, too, the difficulties
22  that I was going through at the time.  And it was

Page 1081

1   a way also of trying to forget about my issues,
2   you know, and trying to help other people.  And I
3   felt bad or her.
4       I had gotten divorced before that.  I
5   felt that I didn't do enough to try to help.
6   Maybe I was responsible in part for the earlier
7   divorce, I didn't give enough attention to my
8   female wife.  So I wanted -- I'm not trying to
9   psychoanalyze myself, but I'm basically trying to
10  say that I tried to help her.  I tried to help out
11  a woman in need.  I believe in women's rights.
12  Ms. Allred's my friend.  You know, we're
13  politically different.
14      So it was a combination of factors.  I
15  said that: "I'm not your boyfriend.  I don't want
16  to be your boyfriend."  That's in the
17  correspondence.
18      MR. TIGAR:  Thank you.
19      THE WITNESS:  And I would add that
20  there were times that I was treated so badly that
21  I reacted to that, and that was because I did
22  care.  Something like Sweden, you know, using

Page 1082

1   reverse psychology.
2   BY MR. SUJAT:
3       Q.  Mr. Klayman, would you open up SX3, ON
4   Pages 2 and 3.  This is an email from Ms. Sataki
5   to you dated 23, April 2010.
6       A.  I don't think I have that exhibit.
7       CHAIRMAN FITCH:  The date of the email
8   again.  April 23, '10.
9       MR. SUJAT:  It's 23 April, 2010.
10      CHAIRMAN FITCH:  Thank you.  Just
11  making sure.
12  BY MR. SUJAT:
13      Q.  So I would ask Mr. Klayman to take a
14  look at it and --
15      A.  Yes.
16      Q.  This would relate to the relationship?
17      A.  Yes.
18      It's an email of April 23rd, 2010 from
19  Elham Sataki to me, Larry Klayman: "Dear Larry, I
20  wish we didn't have this unfortunate problem at
21  this stage in my life."  It's important, so I want
22  to read this part...

In Re: Larry E. Klayman
June 25, 2018

## Page 1083

1      "But, as you know better than anyone
2 else, I'm so tired and anxious that I can't even
3 think about anything else but my case.
4      "I tried so many times to tell you, you
5 are not the problem. As I said before the only
6 unfortunate thing is the timing" -- which is, you
7 know, kind of -- I mean that's kind of intimate of
8 itself, saying something from her point of view.
9      "If you say you love me, then you
10 should be able to put yourself in my shoes for
11 even one minute. Right now I don't have any
12 money, because VOA is not paying me, for whatever
13 reason. I'm not even sure if I have a job any
14 more. I rented a new apartment with no money."
15      Actually I rented the apartment.
16      "I don't think I need to explain to you
17 what I have and what I don't because you know
18 every detail of my life now. You always say I can
19 count on you and lean on you with problems, but
20 sometimes you say some hurtful things like, 'you
21 never let me into your world with your reach'" --
22 she meant rich -- "'Persian friends. What in

## Page 1084

1 God's name were you thinking when you wrote that?
2 Sometimes I feel, not only I can't lean on you,
3 but for if there is an understanding or other
4 reason, you drop me suddenly and I lose all the
5 support."
6      I'm not going to read the whole thing.
7      "I don't and I cannot see anything
8 besides my case. This is not that I don't see
9 your hard work and thoughtfulness, your kindness,
10 and above all your compassion that is in your
11 heart.
12      "Again, thank you for all your help and
13 understanding. Can you please tell me we will win
14 or lose this case. Please don't let anything come
15 between our friendship."
16      This is the way it started and then it
17 just kind of went downhill after that,
18 particularly when we didn't get the result we
19 wanted with Kotelly. She blamed me.
20      She has a -- again, I'm not a
21 psychologist. And I don't mean this with any lack
22 of respect. She has two sides: One side is this,

## Page 1085

1 and the other side is a very aggressive -- it can
2 be a vicious side from time to time. It explains
3 a lot of the interaction.
4 BY MR. SUJAT:
5     Q. Mr. Klayman, could you take a look at
6 SX20 while you have it there, the email from you
7 to Ms. Sataki.
8     A. Yes.
9      This was talking about the interactions
10 with Kathleen Staunton in Congressman
11 Rohrabacher's office, and let me give you the
12 context of that.
13      It said I had known Congressman
14 Rohrabacher. He was active with regard to -- in
15 Iran he sits I believe on the Foreign Relations
16 Committee. He's from Orange County. Ms. Sataki
17 is not from Orange County but I went to him to see
18 if I could get some help.
19      That's the day that I went to get some
20 help. So I took her there and we met with the
21 congressman and we met with Kathleen Staunton.
22 And they said she is the manager of the office, in

## Page 1086

1 effect. And they said they would try to help
2 Ellie. And from that day forward I didn't really
3 have much, if any, contact with Kathleen Staunton.
4      But I did find out -- I mean I did talk
5 to her at some point, and I was trying to find out
6 whether Congressman Rohrabacher was going to do
7 anything. No one else had done anything, and she
8 told me, as recorded in this email, which is now
9 in evidence, that she was told by Ellie Sataki
10 that she never wanted to do anything in court and
11 implied that she did not want to be in LA and that
12 it was all my idea, which is totally false. I
13 mean, you can glean that from her own testimony
14 and Mr. Shambles' testimony.
15      So I'm writing at the bottom, and I'm
16 saying, "Saying and implying stuff like that not
17 only shows further how you view me, but hurts your
18 case. If you undercut your lawyer, it speaks
19 poorly of you.
20      "Indeed I sense that Kathleen and the
21 congressman are now backing off and have less
22 enthusiasm to help you."

55 (Pages 1083 to 1086)

In Re: Larry E. Klayman
June 25, 2018

## Page 1087

1      They were worked under a false
2 pretense, that I had made this all up myself, and
3 that may explain why Kathleen Staunton wrote the
4 Bar complaint, the supplemental complaint. There
5 is another aspect of this which bears on
6 credibility, where I say, that, you know, "Your
7 diamond ring and a litany of past and present
8 persons who abused you who may have one stolen from
9 you," I'm telling her in fact I'm not one of them.
10      But Ms. Sataki had actually told me
11 that the diamond ring had been taken probably by
12 her girlfriend or someone like that. And then she
13 blames the apartment for it, unequivocally. You
14 might remember that. The only explanation is, and
15 she's talking about her diamond ring and breaking
16 in, and Dean Popper, the manager, with her
17 roommate, who was laying naked in bed. She blames
18 me for that. But she told me she thought it was
19 her roommate, her friend, her female friend who
20 had taken it.
21      So, for whatever reason she makes up
22 stories when it suits her. And so she was selling

## Page 1088

1 Kathleen a bill of goods there and I had to try
2 and straighten it out.
3      But it also explains why Kathleen
4 helped her come after me. Because that's
5 obviously not true, based upon Mr. Shambles'
6 testimony and my testimony. You'll hear other
7 testimony.
8      So that's what that's about.
9      Q. Regarding this other side of her, would
10 you take a look at SX38.
11      A. This is an email I sent. Again, I'm
12 trying to get in touch with her. It was sent to
13 her on September 15th, 2011.
14      CHAIRMAN FITCH: What document?
15      THE WITNESS: Supplemental Exhibit 38.
16      CHAIRMAN FITCH: What document are we
17 looking at?
18      MR. SUJAT: SX38.
19      MR. TIGAR: Oh, 38.
20      THE WITNESS: It's September 15th,
21 2011. I'm sending an email to Ms. Sataki. And
22 the subject, "Is it your fault that I lost my

## Page 1089

1 case?" Apparently that's what it was perceived
2 where she was coming from, and it says. "I tried
3 to" --
4      MS. LARKIN: Can you speak up, please.
5      THE WITNESS: Yes, that's where I
6 perceived she was coming from, and why she
7 wouldn't communicate.
8      "I tried to communicate with you, but I
9 got no response. This is the first time I've
10 heard from you, assuming that this email was
11 written by you. It appears you are still
12 experiencing severe emotional issues." I'm
13 referring to the email below.
14      "You had a right of appeal and could
15 probably appeal the lower court's decision. The
16 appeal will not be dismissed finally until October
17 24th, 2011, so if you decide to appeal, you can
18 notify the court that you want to proceed. It
19 would be best if you have another attorney, given
20 your statements below."
21      And this is symptomatic of the way she
22 talked to me frequently.

## Page 1090

1      And she wrote, "Mr. Klayman, are you
2 happy now that you completely destroyed and lost
3 my case; a case with so many evidence and
4 witnesses? Only a very bad and clueless attorney
5 could lose it, or lost it on purps (sic), just
6 because he made a dill" (sic), she meant a deal,
7 "with the other parties." She's accusing me of
8 being bribed.
9      "I don't know if you are Christian or
10 Jewish" -- and then she underlines Jewish, which
11 is kind of curious. And I took it that she was
12 taking a swipe at, you know, the fact that I'm
13 Jewish -- "because whichever suits you best you
14 become one.
15      "But I do believe in karma and what you
16 have done with my case and loosing (sic) it and
17 not stop working on it when I ordered you to, one
18 day you will answer to God, even if you throw your
19 life -- go throw your life and go play with people
20 life.
21      "I am nobody. Just a little girl that
22 was retaliated and harassment by some VOA

56 (Pages 1087 to 1090)

In Re: Larry E. Klayman
June 25, 2018

## Page 1091

1 employee, and you seed (sic) that you can help me.
2 Not only did you not help me, but destroyed my
3 life to nothing."
4      This is consistent with, you know,
5 other things that she said and did, including
6 going up to the president.
7      You can see from this, this is her
8 English, ok. That is why she didn't want to work
9 in the Central News Bureau, because her English
10 is not that good, and it's broadcast in English.
11 That's why I knew when I got these other
12 communications in perfect English that it was not
13 coming from her, and why I needed to communicate
14 with her truly, with fully informed consent, what
15 she wanted to do.
16      Because this is her English. But this
17 is a very aggressive, abrasive, nasty and
18 demeaning letter. And to accuse your lawyer of
19 taking bribes when he did so much to try to help
20 you, that's the other side of Ellie Sataki. So
21 when I talk about respect, that's what I'm talking
22 about.

## Page 1092

1      So I suggested she get another lawyer,
2 too.
3      CHAIRMAN FITCH: This letter is dated
4 September 15, 2011. This is about ten months or
5 more after the period of preceding correspondence
6 that we've seen.
7      Were there communications between you
8 and Sataki in 2011, for example?
9      THE WITNESS: Yeah -- I think that what
10 triggered this was my attempt to communicate with
11 her after the Judge Kotelly ruling, and she's
12 reacting to that. Because I am sending emails; I
13 am sending texts, "Please communicate with me or
14 Mr. Shamble." And she just let's it rip here.
15 And, you know, to the best of my recollection,
16 right now, it was a one-way communication.
17      Again, I didn't understand why, even if
18 she didn't want to talk with me, she didn't talk
19 with Mr. Shamble. And there's also a very
20 important --
21      CHAIRMAN FITCH: Well, let me interrupt
22 or stop you for a minute.

## Page 1093

1      THE WITNESS: Yes, sir.
2      CHAIRMAN FITCH: I haven't done a
3 timeline here by any means, but I don't see any
4 Kotelly rulings in the 2011 period.
5      If you don't know the answer, it's no
6 big deal. You have overnight to figure it out.
7      THE WITNESS: Yes, I'll take a look at
8 it, your Honor.
9      CHAIRMAN FITCH: It seems to be an
10 email that's ten months after many events.
11      THE WITNESS: It may be -- again it's
12 eight years later. Maybe she just bubbled up one
13 day and decided she was going to take a shot at
14 me.
15      CHAIRMAN FITCH: You mean the
16 intervening period or hiatus or something else may
17 have some significance? It may not have some
18 significance.
19      THE WITNESS: It came up recently. It
20 came up recently when I was just trying to get a
21 continuance of a month, "ruined my life, my life's
22 worth nothing."

## Page 1094

1      We know now she's gainfully employed,
2 making a good living.
3      This bubbles up periodically with her,
4 and it started with people like her supervisors
5 and people around her before I even knew, and she
6 thought they were out to get her. And, you know,
7 that's just where she's at, emotionally, that
8 people are out to get her, particularly men.
9      And, you know, I think she probably had
10 bad experiences in the past. I don't want to get
11 into that. I respect her past. But these rumors
12 were out there at Voice of America, and it was
13 something I had to deal with, too.
14      And it was unfortunate, you know, and I
15 can say this, based on my own experience, there
16 are a lot of people who come out of an environment
17 like she grew up in, she told me once that when
18 there was the Iran/Iraq war, when Saddam Hussein
19 was fighting the Ayatollah Khomeini, not Kamenei,
20 that there were bombs coming into Tehran, that she
21 was literally hiding under her bed. That's a very
22 charged atmosphere where you think things are

57 (Pages 1091 to 1094)

In Re: Larry E. Klayman
June 25, 2018

| Page 1095 |
|---|

1  going to happen to you.
2      I'm not a psychologist. I don't know
3  what happened. But, you know, she had a lot of
4  things happen in her life that were not from me
5  and were not caused by me. And she confided in
6  me, and that's one reason why I cared so much,
7  because I saw the whole totality of the person.
8      I thought at the time at Voice of
9  America that this was unfair and unjust, what
10  happened, and my heart went out to her.
11      CHAIRMAN FITCH: Mr. Sujat, you have a
12  choice of stopping now or stopping one minute from
13  now.
14      THE WITNESS: This would be a good
15  point.
16      MR. SUJAT: Let him see if he can wants
17  to adds to the question.
18      CHAIRMAN FITCH: Let him ask his
19  question.
20  BY MR. SUJAT:
21      Q.  This type of attitude, has this
22  continued up to the present?

| Page 1096 |
|---|

1      What I'd like you to do is take a look
2  at this transcript of Ms. Sataki dated May 30th,
3  Page 200, you know, if you can just explain what
4  you see here.
5      MR. SMITH: Objection to the comments
6  upon Ms. Sataki's testimony a few weeks ago.
7      CHAIRMAN FITCH: I think we'll hold
8  that question to think about it, and we will stand
9  in recess for fifteen minutes to set up the remote
10  testimony.
11      THE WITNESS: Thank you.
12      (Recess taken.)
13      (Gloria Allred appearing before the
14  hearing committee via video conference.)
15      CHAIRMAN FITCH: I believe we are back
16  on the record now. All requisite parties are
17  present.
18      We have interrupted Mr. Klayman's
19  examination in order to take evidence from Ms.
20  Gloria Allred.
21      Ms. Allred? Can you hear us?
22      THE WITNESS: Yes.

| Page 1097 |
|---|

1      CHAIRMAN FITCH: I believe you
2  understand, do you not, that this is a
3  disciplinary proceeding before an ad hoc hearing
4  committee of the Board on Professional
5  Responsibility of the District of Columbia Court
6  of Appeals.
7      THE WITNESS: Yes, thank you.
8      CHAIRMAN FITCH: We are prepared to
9  receive your testimony. If you will raise your
10  right hand, I will swear you.
11      Ms. Allred, do you solemnly swear or
12  affirm that the testimony you are about to give
13  will be the truth, the whole truth and nothing but
14  the truth?
15      THE WITNESS: I do.
16      CHAIRMAN FITCH: I think, Ms. Allred,
17  that you can see that there is a hearing committee
18  of three here, and you can also see counsel table
19  and the podium at which Mr. Klayman is standing.
20  He will be examining you.
21      If you are prepared to proceed, I
22  believe we are also.

| Page 1098 |
|---|

1      THE WITNESS: Yes, I am prepared to
2  proceed. Thank you.
3      CHAIRMAN FITCH: Mr. Klayman.
4  Whereupon,
5      GLORIA ALLRED,
6  called as a witness on behalf of Respondent, and,
7  after having been first duly sworn, was examined
8  and testified (via video conference) as follows:
9      DIRECT EXAMINATION ON BEHALF OF RESPONDENT:
10      BY MR. KLAYMAN:
11      Q.  Ms. Allred, how are you today?
12      A.  Just fine. Thank you, sir.
13      Q.  Would you please state your name.
14      A.  I'm attorney Gloria Allred,
15  G-l-o-r-i-a, A-l-l-r-e-d.
16      Q.  I don't mean to get into much of your
17  background, since you're so famous. Would it be
18  fair to say that you're the most famous women's
19  rights lawyer in the history of this country?
20      A.  Well, I think it's fair to say that my
21  law firm, Allred Maroko and Goldberg, has been the
22  leading private women's rights law firm in the

58 (Pages 1095 to 1098)

App.0471

In Re:  Larry E. Klayman
June 25, 2018

## Page 1099

1  United States for 42 years.
2      Q.  And I believe you were roasted by the
3  Friar's Club over the weekend for your efforts and
4  service.
5      A.  That's correct.  That was actually
6  Thursday night.
7      Q.  Ok.
8      A.  For my efforts to make sure that women
9  could be members of the Friar's Club, and it
10  celebrated its 30th anniversary of accepting women
11  as members as a result of my efforts.
12      Q.  And recently, just briefly, I believe
13  you were the subject of a Netflix documentary of
14  your life story.
15      A.  That's true.  It's called Seeing
16  Allred.  It is streaming on Netflix right now and
17  it is essentially a documentary about my 42-year
18  battle for women's rights.
19      Q.  Of course I don't need to ask this, but
20  you are a lawyer?
21      A.  I'm a lawyer and also a partner in the
22  law firm Allred Maroko and Goldberg.

## Page 1100

1      Q.  You're also licensed in the District of
2  Columbia, are you not?
3      A.  Yes, I'm licensed in California, in the
4  District of Columbia and also in New York.
5      Q.  Did there come a time, and I refer your
6  attention Ms. Allred to Respondent's Supplemental
7  Exhibit Number 1, when I sent you an email on or
8  about June 15th, 2010, which stated -- and if you
9  have at that in front of you, because I sent it --
10      A.  I do.
11      Q.  -- to your assistant, Patty.
12      A.  I have it.
13      Q.  It says "Gloria, I would like to
14  discuss your taking this case over.  It's not
15  because I don't believe in the strength of Ellie's
16  claims.  She has very strong claims and the
17  damages are large.
18      "Please call me when you can to
19  discuss.  Ellie can meet with you.  If your firm
20  wishes to meet with her, she is now living in Los
21  Angeles.
22      "Warm regards, Larry."

## Page 1101

1      Do you remember receiving that from me?
2      A.  Yes, we do show that you have sent --
3  that you did send that email to me on Tuesday,
4  June 15th, 2010, at 6:09 p.m.
5      Q.  And since I'm referring to "Ellie," I
6  must have had prior discussions with you about her
7  before I even sent the email, otherwise I wouldn't
8  have used "Ellie."
9      Is that your understanding?
10      A.  You know, I don't recollect whether you
11  had prior discussions with me or not.
12      Q.  Now --
13      A.  But you may have because you didn't
14  give her last name.
15      Q.  Right.
16      So, did there come a point in time when
17  we had a conference call -- Ellie Sataki, me and
18  you -- to discuss whether you would represent her?
19      A.  I believe there was such a call.  I
20  don't recollect what was said on the call or
21  exactly when it took place.
22      Q.  In any event, did you decide to

## Page 1102

1  represent her?
2      A.  No.
3      Let's put it this way: we did not
4  represent her.
5      Q.  Now, there's a subsequent --
6      A.  I don't know whose decision that was,
7  but we did not accept representation of her.  She
8  was never our client.
9      Q.  I turn your attention to a letter which
10  your partner Mike Maroko -- am I pronouncing his
11  name correctly?
12      CHAIRMAN FITCH:  If I may ask you about
13  your last answer, you said "I don't know whose
14  decision it was."  You essentially said, "I do not
15  know whose decision it was not to represent her."
16      Were you --
17      THE WITNESS:  Right, I don't recollect
18  the contents of any telephone call that we have
19  and I wouldn't have any notes on it either.
20      CHAIRMAN FITCH:  Was it a decision of
21  the law firm that -- when you say you don't know
22  who, were you referring just to the law firm, or

59 (Pages 1099 to 1102)

In Re: Larry E. Klayman
June 25, 2018

| Page 1103 | Page 1105 |
|---|---|

**Page 1103**

1 you were you referring to the law firm and Ms.
2 Sataki?
3     THE WITNESS: Well, we only accept
4 cases as a law firm. We don't accept cases
5 individually outside of the law firm.
6     CHAIRMAN FITCH: Ok, sure.
7     THE WITNESS: What I'm saying is, we
8 didn't end up representing her, which I would have
9 no way of knowing what that reason was.
10     But, you know, whether it was a mutual
11 decision, whether it was all three, two, one, it
12 would just be sheer speculation on my part.
13     All I can say is, we didn't end up
14 representing her.
15     CHAIRMAN FITCH: Thank you.
16 BY MR. KLAYMAN:
17     Q. Ms. Allred, this email from me to you
18 occurred over eight years ago, correct?
19     A. This was 2010.
20     Q. Right. And it was over eight years
21 ago?
22     A. That's correct.

**Page 1104**

1     Q. It's a long time, isn't it?
2     A. Yes, and we -- every day and all week,
3 for more than four decades, to represent
4 individuals, and some we can -- some we accept as
5 clients, some we do not accept as clients.
6     I just have no way of finding out the
7 reason that we didn't represent her.
8     Q. I turn your attention to two emails
9 that were produced by Bar Counsel as Exhibit 2,
10 Respondent's Supplemental Exhibit 2.
11     A. Yes.
12     Q. Excuse me, it was produced --
13     I'm looking at it.
14     Q. It was produced by your department?
15     A. Yes.
16     Q. And I'm going to read the bottom email:
17 "Friday, March 23rd, 2012 at 10:05 a.m. to Gloria
18 Allred" --
19     CHAIRMAN FITCH: Mr. Klayman, what
20 volume is this in?
21     MR. KLAYMAN: These are the
22 supplemental exhibits I handed you today.

**Page 1105**

1     CHAIRMAN FITCH: They have the same
2 numbers.
3     MR. KLAYMAN: We can reenter them if
4 necessary.
5     CHAIRMAN FITCH: But I didn't know
6 where the new supplemental exhibits were.
7     MR. KLAYMAN: Right. This is Exhibit
8 2, the second page, Respondent's Supplemental
9 Exhibit 2.
10     CHAIRMAN FITCH: Go ahead.
11 BY MR. KLAYMAN:
12     Q. This purports to be an email of Friday,
13 March 23rd, 2012, sent at 10:05 p.m. to Gloria
14 Allred from Elham Sataki, Subject: Please let me
15 meet you."
16     It's very short. I'll just read it...
17     "Hi, Gloria. My name is Elham Sataki.
18 I'm watching you on CNN now. All my hope
19 regarding my case died, and I'm on medication and
20 go to my therapist every week just so I can stay
21 alive for my mom. And I love my mom, the same way
22 that you (sic) daughter loves you. My mom is a

**Page 1106**

1 strong mom like you. I'm in LA and hope that I
2 can have a meeting with you regarding my Voice of
3 America case.
4     "Larry Klayman was representing me in
5 this case but completely destroyed it. You can
6 Google and YouTube me.
7     "I just want you to know, if there is
8 any hope left, I have emailed women's rights
9 groups, but no answer."
10     You see that?
11     A. Yes, I'm looking at that now. Thank
12 you.
13     Q. Your partner sent this to me last week,
14 correct?
15     A. I don't know when he sent it to you,
16 but I do have it in front of me.
17     Q. And you responded to that email,
18 looking above.
19     A. Yes --
20     Q. -- with, stating to Ms. Sataki, on
21 March 23rd, 2012, at 10:15 p.m.
22     So you responded to her within ten

60 (Pages 1103 to 1106)

In Re: Larry E. Klayman
June 25, 2018

## Page 1107

1  minutes, correct?

2      A.  That's correct.

3      Q.  "I was willing to consider helping you

4  at the beginning of your case, but unfortunately a

5  great deal of time has passed and at this point

6  I'm no longer able to assist you, given my other

7  existing commitments to my clients who have

8  retained me.

9          "I do wish you the best of luck and

10  that you receive justice."

11         That's your email?

12     A.  Yes, that's my email, correct.

13         MR. KLAYMAN:  I have no further

14  questions.  Thank you.

15         CHAIRMAN FITCH:  Mr. Smith?

16         Mr. Smith is the Assistant Disciplinary

17  Counsel, Ms. Allred.

18         Mr. Smith do you have any questions for

19  Ms. Allred?

20         MR. SMITH:  Disciplinary Counsel has no

21  questions of Ms. Allred.

22         CHAIRMAN FITCH:  Well, Ms. Allred, we

## Page 1108

1  didn't take too much of your time in the hearing,

2  but it took time to set things up and arrange your

3  schedule.  It goes without saying that all of us

4  are very appreciative and we wish you the best for

5  the rest of your day.  Thank you.

6          MR. KLAYMAN:  Thank you Gloria.  Thank

7  you very much.

8          THE WITNESS:  Thank you very much.

9          (Video conference has ended and Ms.

10  Allred is excused.)

11         CHAIRMAN FITCH:  Should we stand in

12  recess?

13         MR. KLAYMAN:  Yes, that would be good

14  idea.

15         MR. SMITH:  That's fine with me.

16         Recess for the rest of the day?

17         CHAIRMAN FITCH:  Yes.

18         MR. SMITH:  Absolutely.

19         CHAIRMAN FITCH:  I think, based on

20  prior discussions, that everyone agrees it's time

21  to adjourn, and we will reconvene from our recess

22  at 9:30 a.m. tomorrow morning.

## Page 1109

1          MR. KLAYMAN:  May I raise something?

2          CHAIRMAN FITCH:  The final point, we

3  think part or all of the pleadings being entered

4  is no longer in question, so we will start 9:30

5  Wednesday.

6          MR. KLAYMAN:  And I wanted to point

7  out, because of the availability in schedules that

8  I have Mr. Sporkin, with your permission, coming

9  in the morning.  His testimony will be short, too,

10  Judge Sporkin.

11         CHAIRMAN FITCH:  We'll take it whenever

12  it's best for Judge Sporkin.

13         MR. KLAYMAN:  Yes.

14         CHAIRMAN FITCH:  Will that be 9:30 or a

15  little bit later?

16         MR. KLAYMAN:  It will be a little

17  later.  We will start with my testimony.  He's

18  coming from Chevy Chase.  It won't be a long

19  testimony.

20         CHAIRMAN FITCH:  I'm just concerned for

21  your sake of taking twenty minutes of your

22  testimony and cutting you off.

## Page 1110

1          We stand in recess until 9:30 a.m.

2  tomorrow morning.

3          (Whereupon the hearing stood in recess

4  until Tuesday, June 26, 2018, at 9:30 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

61  (Pages 1107 to 1110)

In Re: Larry E. Klayman
June 25, 2018

## A

**A-l-l-r-e-d** 1098:15
**a.m** 871:3 878:11
  878:12 1104:17
  1108:22 1110:1,4
**abide** 884:21
**abiding** 930:11
**abilities** 901:19
  977:3
**ability** 964:17
**able** 929:6 968:20
  1003:16 1041:6
  1041:22 1043:8
  1046:12,13
  1083:10 1107:6
**abrasive** 1091:17
**absolutely** 876:11
  890:15 910:3
  966:11 1108:18
**abundance** 1043:11
  1054:1
**abused** 1087:8
**Academy** 1024:6
**accent** 974:5,6
**accept** 962:8
  1017:19 1054:14
  1102:7 1103:3,4
  1104:4,5
**accepted** 962:4
  980:22
**accepting** 1099:10
**accident** 1070:2
**accidentally** 964:15
**accommodation**
  916:4 917:15,16
  1003:3
**accomplish** 915:1
  922:9
**accountable** 962:18
**accounting** 986:15
**accounts** 1051:9
**accurate** 899:19
  900:22 901:16
  903:14 906:6
  907:17 908:2
  925:9 927:7
  970:14 1052:14
**accusation** 884:1
  1035:14
**accuse** 1091:18
**accused** 883:7
**accusing** 1020:7
  1022:14 1090:7
**act** 1070:16
**acted** 900:19
**action** 907:13

923:19 924:11
931:15 970:7
998:1,8 1028:9
1030:7,13,21
1031:2,5 1033:1,6
1033:13 1041:13
**actions** 912:19
  924:4 932:5
  1019:14 1028:2
  1030:17 1031:16
  1040:8 1043:12
**active** 964:15 971:8
  1085:14
**activity** 908:11
**actors** 1024:13
**actual** 922:17
  932:22 1032:22
**actuality** 922:21
**ad** 871:3,10 1097:3
**Adam** 1013:17
**adamant** 892:9
  984:20
**add** 971:5 1040:6
  1050:18 1064:9
  1081:19
**addition** 971:5
  1038:21
**additional** 905:1
**address** 887:8
  926:6 938:18
  956:1 962:17
  1031:13 1043:6
  1044:8,9,12,15
  1045:7,9,10,22
  1046:6,10 1047:8
  1047:21 1053:19
  1054:13
**addressed** 1042:20
  1042:22 1044:22
**adds** 1095:17
**adjourn** 1036:20
  1108:21
**administration**
  957:9,22 962:7
  964:1 989:12
  1002:2
**administrative**
  922:4 924:6
  963:18 964:2,6,7
  981:18 992:16
  998:11
**administratively**
  981:21
**admire** 1008:10
**admired** 1009:19
  1077:5,6

**admission** 905:6
**admit** 915:13
  1036:15
**admitted** 895:17
  896:14 899:14
  904:18 915:14,16
  917:6,21 923:10
  928:4 933:13
  971:15 994:5
  1006:1
**adopted** 958:18
  1015:13
**adulation** 1018:18
**adulterous** 1004:18
**advance** 980:14
**advantage** 881:3
**adverse** 1070:6
**advice** 1031:17
  1042:10 1059:4
**advised** 983:9
  1072:4 1075:3
**advisor** 989:4
**advocacy** 957:5
**advocate** 1002:1
**affair** 1004:13
**Affairs** 913:13
  951:4,5 963:13,15
**affect** 1054:10
  1063:22
**affidavit** 895:22
  897:3 904:4
  906:17 944:8,9
**affidavits** 895:11
  940:14,15,21
  941:19 944:7,15
  944:16,20 1006:8
  1006:13,17,18
  1010:12 1011:20
  1034:4
**affirm** 879:6 946:18
  1097:12
**Affirmative** 904:6
**afford** 956:17
**AFG** 881:21
**afloat** 992:13
**afraid** 910:13
**afternoon** 874:4
**age** 881:3
**agencies** 906:4
  952:9,11 963:16
  980:6
**agency** 885:12
  888:14,14 889:1
  891:4 892:15,22
  893:18 901:12
  906:1 915:6 916:2

929:18 931:4,8
982:14
**agent** 956:22
  1002:3 1075:8
**aggressive** 901:7
  902:3 1060:15
  1085:1 1091:17
**aggrieved** 901:6
**ago** 882:18 935:10
  979:5 1069:12
  1096:6 1103:18
  1103:21
**agree** 890:13
  1063:10
**agreed** 907:7 949:8
  980:18,18,20
  999:9 1003:15
  1034:14 1056:22
  1072:5,15
**agreeing** 876:10
**agreement** 875:16
  893:4 1063:7
**agrees** 1108:20
**Agriculture** 963:21
**ahead** 909:9 922:13
  930:7 936:17
  943:8 996:13
  997:12 1055:4,19
  1064:19 1073:16
  1105:10
**ahold** 1055:3
**airplanes** 959:3
**airport** 1001:5
**Akbar** 973:16,20,22
  974:21
**Akbar's** 974:22
**al** 962:3 990:11
**Alex** 989:2
**alias** 1027:6
**alive** 1105:21
**all.'** 1061:14
**allegation** 1016:7
**alleged** 905:20
  1004:17 1034:2
  1037:16
**allow** 1032:13
  1034:12 1054:10
**allowed** 926:12
  1039:16
**allowing** 1032:5
**Allred** 873:5 874:19
  877:7 1002:12
  1057:9 1096:13
  1096:20,21
  1097:11,16
  1098:5,11,14,21

1099:16,22
1100:6 1103:17
1104:18 1105:14
1107:17,19,21,22
1108:10
**Allred's** 877:16
  1081:12
**alright** 904:8,18
  925:17 930:5
  938:21 946:14
  970:8 983:22
  991:11
**alter** 1017:17
**altercation** 1004:7
**alternative** 954:22
**Amanpour** 1023:10
**ambiguous** 939:2
**amended** 967:21
  981:15 998:7
**Amendment** 998:4
**America** 881:18,19
  882:5,10 884:11
  903:4 921:22
  930:2 979:7 982:6
  985:3,12 986:14
  986:17 987:19
  988:16 992:15
  999:11 1038:2,19
  1071:22 1094:12
  1095:9 1106:3
**American** 905:14
  953:1 957:18
  959:1 961:12
  963:3 1002:11
**amicable** 1072:6
**amount** 1032:4
**analysis** 1006:6
**anchor** 891:16
  907:19 908:6
  992:9
**and/or** 971:10
**anecdotal** 1032:9
**Angela** 1050:9
**Angeles** 887:22
  888:8,22 889:5
  892:10,12 906:15
  915:9 926:13
  937:8,17 956:6
  992:12 998:19
  999:13,15 1003:1
  1003:1,16 1012:8
  1026:19 1056:17
  1064:16 1067:11
  1100:21
**anniversary**
  1099:10

App.0475

In Re: Larry E. Klayman
June 25, 2018

**answer** 898:1 904:6
904:19 930:6
961:14 996:8
1015:7,8 1090:18
1093:5 1102:13
1106:9
**answers** 1032:15
**ANTHONY** 871:11
**anti-dumping**
951:21
**anti-Shah** 989:1
**antitrust** 950:18,20
951:3 956:18
963:14
**anxious** 1083:2
**anybody** 1057:22
1059:3
**anymore** 971:4
**anyway** 1005:16
1026:11 1058:10
1072:3
**apartment** 977:13
1004:4 1015:4,4
1020:15,16
1025:14 1044:1
1074:22 1075:1
1083:14,15
1087:13
**apologies** 967:6
983:5
**apologize** 897:18
1030:5 1071:7
**apparently** 982:20
1027:1,6 1031:19
1038:20 1042:10
1043:7 1050:22
1071:3,13 1089:1
**appeal** 884:20
923:14,16 927:2
931:4 1031:21
1040:9,11 1041:5
1043:19 1089:14
1089:15,16,17
**appealed** 884:18,19
926:20 930:12
931:2
**appealing** 1041:13
**appeals** 870:1
884:19 930:13
999:7 1097:6
**appear** 903:7
910:12 1041:18
**appearance** 1052:9
**APPEARANCES**
871:9 872:1
**appeared** 903:10

**appearing** 1071:22
1096:13
**appears** 971:17
994:19 995:1
1050:8,9 1089:11
**apple** 978:12
1047:17
**apples** 1020:21
**appointee** 1002:2
**appointment**
930:18
**appreciate** 945:11
1025:10 1037:1
**appreciation**
1025:7
**appreciative** 1108:4
**apprised** 918:9
**approach** 875:9
901:14
**approved** 894:14
907:16
**approximately**
934:2 960:5 973:9
1069:3 1070:1
**April** 1082:5,8,9,18
**Arabic** 984:7,12
**arbitration** 884:17
930:12 931:1
**area** 881:14
1007:11 1019:10
**areas** 953:5
**arguments** 1006:2
**Arlington** 977:13
**Armstrong** 1047:9
**arrange** 1108:2
**Arrangements**
874:21
**arrived** 1005:19
**article** 885:22 886:5
886:10,14 893:16
894:4 895:14
899:14 956:6
**articles** 894:17,19
895:6 905:19
1001:15
**aside** 1028:4
1032:18
**asked** 903:20
915:13 925:11
929:4 941:8
976:13 986:5
988:10 1001:5
1006:5 1009:17
1022:3 1027:3

**answer** 974:18 1007:6
1041:8
1029:13 1055:3
1057:21,22
1061:13 1066:20
1072:16 1073:3
**asking** 916:3
967:11 972:14
1043:15 1048:2
1049:8 1057:7
1060:19 1073:8
**aspect** 919:13
1062:19 1063:4
1078:11 1087:5
**assign** 948:22
**assigned** 883:10
1000:1 1008:7
**assigning** 949:5
**assist** 937:1 1107:6
**assistance** 1073:21
**assistant** 920:9
950:19,22
1100:11 1107:16
**Associates** 951:18
953:13 959:20
**association** 954:22
**assume** 912:17
914:1 939:12
942:18 1036:1,4
1074:16 1075:8
**assumed** 939:15
**assuming** 876:19
940:2 995:3
1061:11 1067:6
1089:10
**assure** 876:10
**AT   T** 951:6
**ate** 1018:3
**atmosphere**
1094:22
**attached** 905:2
906:8 1033:22
**attaches** 923:3
**attacks** 1028:21
**attempt** 1067:19
1092:10
**attempted** 900:16
911:12
**attempting** 900:7
**attempts** 891:2
**attend** 876:6
**attended** 947:18
**attention** 885:17
893:21 895:8
897:14 905:9
906:16 912:15
914:6 916:10
917:8 919:6

**922**:15 924:17
928:6 932:21
996:21 1049:20
1055:10 1071:15
1077:19 1081:7
1100:6 1102:9
1104:8
**attest** 905:15
**attitude** 891:3
901:14 1095:21
**attorney** 871:16,18
889:19 901:7
902:3 920:10
929:11 937:14,20
950:19,22 1022:4
1089:19 1090:4
1098:14
**attorneys** 903:19
**attractive** 975:18
**August** 928:7,9
942:6,10,11,18
1033:2 1038:1,11
1071:3,13
**Auntie** 1060:7
**Austin** 928:7,13
942:7 1031:15
1038:2,19,21
1039:2 1041:10
1041:12,21
1071:4,14,18
**Authority** 954:19
**autobiography**
935:19
**automobile** 1067:20
1070:2
**availability** 1109:7
**available** 877:10
**Avenue** 1007:10
1008:15 1009:2
1042:21 1043:1
1044:15 1045:4
1045:12 1046:9
1048:9 1051:14
1051:14,19
1052:17
**avenues** 903:12
**Aviera** 1003:6,7
1076:13 1077:20
**avoid** 1080:5
**award** 1024:13
**awards** 1024:6,12
**aware** 885:3 902:5
902:8 903:11
907:21 908:11,18
911:8 913:22
914:2 915:7,11

**918**:11 928:22
935:9 940:5
942:20 943:2,3,9
943:12,18 979:8
1004:16 1040:3
**Ayatollah** 989:4
1094:19

**B**

**B** 1023:6
**B-a-e-h-r** 1024:10
**B-l-a-n-q-u-i-t-a**
911:19
**B.F** 1007:11,19
1009:9,11
**BA** 881:8
**back** 888:15 891:15
895:20 899:3
912:15 919:5
921:4 926:12
931:5,5 934:6
956:6 967:1
975:12,13,15,20
978:1 999:1,9
1002:20 1011:3
1012:7 1016:3
1020:22 1021:7
1022:2 1030:9
1033:17,19
1037:7 1047:18
1051:5 1054:20
1055:2 1056:16
1057:22,22
1060:6 1061:10
1061:18 1063:11
1065:12 1066:20
1067:9,21
1068:10,11
1069:17 1072:13
1073:9,9 1076:2
1077:15 1096:15
**backed** 1027:13
**background** 881:6
929:12 950:4
951:9 956:19
979:9 1064:17
1098:17
**backing** 1086:21
**bad** 960:1 1051:8
1059:4 1081:3
1090:4 1094:10
**badly** 1081:20
**Baehr** 1024:10
1025:20,21
1026:12,12
**bagging** 956:11

In Re: Larry E. Klayman
June 25, 2018

bankrupt 1047:18
bankruptcy 1022:4
baptize 1025:22
baptized 1025:22
bar 875:4 893:22
  896:4,6 954:7,22
  962:12 969:18,21
  970:4,13 971:7,18
  971:20 972:4,21
  973:2,3,5 975:22
  995:22 1011:15
  1011:15 1013:18
  1035:14 1036:7
  1036:11 1041:7
  1049:17 1074:1,3
  1080:4 1087:4
  1104:9
barbershop
  1048:15
bargain 882:7
bars 964:12 965:8
  969:2,4
base 903:16 908:4
based 883:13
  886:13 889:3
  892:4,20 893:6
  901:18 902:19
  909:4 916:2
  918:16 927:16
  928:22 944:22
  953:17 998:3
  1001:14 1066:17
  1088:5 1094:15
  1108:19
bashing 961:7
basic 1071:20
basically 875:3
  921:3 922:2
  948:21 952:5
  962:20 980:13
  1014:10 1037:19
  1044:13 1047:18
  1062:7 1063:22
  1081:9
basis 1001:21
  1010:14,15,17
  1011:12,14,17
  1012:3 1029:17
  1030:20,20
  1034:6,7,19
  1059:20
Basulto 959:4
Bat 894:9
bathroom 1024:20
battle 1066:11
  1099:18

BBG 1028:13,17
  1036:13 1040:10
Beach 1023:18
bears 1024:11
  1087:5
Beauty 894:8
bed 1087:17
  1094:21
began 957:5
  1064:10
beginning 994:20
  995:1 1107:4
beginnings 949:10
begins 997:9
  1023:11
behalf 871:6,18
  872:2 880:11,14
  894:18 918:11
  920:4 933:4 944:5
  947:4,7 1037:12
  1098:6,9
belabor 949:3
  1001:17
believe 894:6
  902:18 907:20
  933:3 952:18
  955:7,7,21 957:13
  958:5 961:17
  962:10,11,11
  967:22 970:15
  993:16 994:9
  1034:22 1037:9
  1050:15 1081:11
  1085:15 1090:15
  1096:15 1097:1
  1097:22 1099:2
  1099:12 1100:15
  1101:19
believed 906:13
  952:20 960:21
  1001:3 1017:21
  1020:11 1022:22
  1025:15 1060:11
  1066:5
believes 1010:10
bell 950:17
benefit 907:20
Benson 1014:1
berated 1022:6
berating 1076:19
Bernard 956:9
best 928:21 929:13
  942:2 943:1
  1042:12 1058:16
  1058:17 1063:11
  1089:19 1090:13

1092:15 1107:9
  1108:4 1109:12
better 909:6 915:10
  927:6 959:16,17
  963:3,18 1009:1,3
  1018:16 1057:6
  1075:16 1078:7
  1083:1
Beverly 1016:21
  1076:5
beyond 904:3 943:6
  1028:5 1059:8
bias 1012:1
big 950:8 956:2
  960:15 976:21
  1026:10 1093:6
biggest 950:8
  999:14
bill 950:21 1088:1
binder 990:19,20
  994:11,12
birthday 1026:1
bit 875:14,22 876:2
  935:16 948:19
  949:2 974:5 993:5
  1030:3 1033:8
  1036:17 1059:5
  1060:4 1064:19
  1069:22 1109:15
Bivens 981:13
  997:22 1030:20
Blackwell 950:7
  958:20
blame 1066:8
blamed 1020:2
  1021:11 1084:19
blames 1087:13,17
Blanch 1066:4
blank 913:10
Blanquita 911:5,9
  911:18
blessed 1019:4
blind 1014:10
block-long 1052:21
blocking 919:19
board 870:2,4
  871:1 886:18
  890:22 901:10
  911:4,22 912:5,9
  912:12,14 930:15
  934:13 963:21
  981:12 990:11
  993:8 996:5,21
  997:15,17,19
  1024:9 1028:17
  1028:20 1040:10

1052:1 1097:4
body 994:4
Boehner 914:3
  987:6,7,9,10
bomb 1001:9
bombs 1094:20
bono 977:9 992:6
  1056:7 1073:8
book 896:21 898:2
  898:8 919:8
  935:13 939:20
  990:21 991:10
  993:15 994:1,9
  995:11,21,21
  996:15 1077:19
  1077:21
books 875:19
  990:13
born 958:19 1017:9
bottom 886:19
  941:13 1086:15
  1104:16
Boulevard 999:10
  1016:20
bowed 962:5
box 1008:13
  1050:21 1051:2
  1051:17 1052:14
boyfriend 1075:12
  1081:15,16
boys 1017:17
brakes 1014:8,16
branch 906:12
Brantley 870:22
  871:4
brave 973:20
break 877:7 933:21
  946:4 951:7
  979:13 982:20
  1029:6 1032:20
  1032:21 1033:16
  1035:22
breakdown 915:9
breaking 1087:15
Breuer 920:9
bribed 1020:7
  1090:8
bribery 1022:15
bribes 1091:19
brief 876:22 877:8
  904:10 915:17
  933:12 975:2
  1016:12 1071:8
briefly 881:6 932:2
  987:22 1000:10
  1099:12

bring 931:4 989:16
  1035:12 1055:9
bringing 887:7
  973:21
broadcast 901:10
  909:5,7 910:11
  1091:10
broadcaster 894:9
  907:19 908:6,19
  908:22 910:1
broadcasters 902:6
  903:3 906:10
  989:9,14
broadcasting
  881:16 886:18
  888:9 890:22
  908:22 909:1
  910:9 930:22
  985:12 990:10
  999:12 1025:19
  1026:18,22
  1064:15
broadcasts 909:3
  910:2 984:6
broke 976:20
brother 986:9,14
Brothers 959:3
brought 889:20
  957:9,13,20
  958:12 960:20
  974:14,21 991:20
  997:5,15,22
  1001:16 1071:15
Brown 956:14
bubbled 1093:12
bubbles 1094:3
build 1003:15
building 999:11
  1045:2,9 1048:8
  1048:11,18,20,22
  1052:1,17,18,21
  1053:9,18 1054:4
  1054:5,6
builds 1018:17
built 1007:10,11
bump 891:20
bureau 888:9,9
  891:22 983:18
  1026:17 1091:9
Busby 951:13
  952:19
Bush 957:11 959:13
  1000:21
business 908:8
  934:20 956:7,8,14
  956:18 1018:2

App.0477

**busy** 975:3
**buy** 1007:13
  1021:17,18,22
  1022:3 1057:7
**buying** 1025:13
  1076:18

___

**C**

**C** 874:1 968:16
  970:14
**C-h-a-r-l-a-n-g-i**
  902:18
**C-o-l-l-u-m** 911:20
**C-SPAN** 961:22
**C.S.R** 870:22 871:4
**cab** 1015:9,9
**cafe** 1065:2
**cage** 1051:4
**California** 953:21
  1015:15 1100:3
**call** 878:19 918:15
  927:17 975:10,15
  999:15 1013:22
  1015:7,8 1026:9
  1048:5 1100:18
  1101:17,19,20
  1102:18
**called** 880:11 886:2
  894:7 946:15
  947:4 950:6,20
  975:11 981:15
  995:6,7 1007:5
  1009:17,22
  1015:5,8 1070:9
  1098:6 1099:15
**calling** 1010:1
**calls** 1007:18
  1043:15 1051:18
**Camden** 1016:21
**camera** 948:15,17
**cameras** 948:15
**campaign** 956:3,12
  961:3
**cancel** 930:18
**candidates** 961:20
  961:21 962:2,9
**capacity** 962:16
**Capital** 886:3
**Capitol** 948:12,18
  948:20 974:16
  975:7 985:9
  1047:5,6,7
**caps** 983:18
**car** 1004:8,14
  1014:7,9,15,19,21
  1015:1,12

1016:17 1020:14
1021:17,18,20,22
1022:3 1025:13
1034:21 1057:7
1066:4 1076:18
**card** 975:3,9,9
  988:3
**care** 875:13 983:4,6
  1025:15 1057:12
  1081:22
**cared** 998:20,21
  1019:20,21
  1057:7 1062:11
  1076:9 1095:6
**career** 953:6 1035:2
**cargo** 1001:8
**caring** 945:1
**Carolina** 948:1
**carries** 910:2
  1045:3
**carry** 994:12
**case** 876:19,21
  877:1 878:6
  884:15 887:7
  889:20 890:17
  902:4 919:3,20
  922:5 926:20
  930:21 934:22
  937:22 957:21
  958:5 959:7
  962:13 968:22
  971:8,8 973:8,21
  974:1 979:6 980:6
  980:8,10 981:14
  981:14,15 982:1
  983:9,12 991:16
  991:20,21 992:22
  997:14,16 999:20
  999:22 1001:1,14
  1001:16 1002:17
  1002:18 1003:15
  1004:9 1008:12
  1009:19 1010:3
  1010:22 1011:3
  1028:14 1031:16
  1035:6,13,16
  1036:13 1040:10
  1043:4 1057:18
  1059:12,13
  1062:19 1064:21
  1077:3,17
  1078:16 1079:17
  1080:2 1083:3
  1084:8,14
  1086:18 1089:1
  1090:3,3,16

1100:14 1105:19
1106:3,5 1107:4
**cases** 884:14 903:21
  930:12 934:12
  950:10 952:3
  957:6,9 958:12
  963:8 964:6 980:3
  983:8 1009:20
  1041:12 1046:12
  1049:6 1103:4,4
**categories** 885:4
**Catholic** 1017:14
**cats** 1014:7,12
**cause** 998:8
  1066:22
**caused** 1024:17
  1095:5
**causes** 962:11 979:9
**caution** 1043:11
  1054:1
**caveat** 965:7
**CBN** 1026:14,18,22
**CC'd** 928:10
**celebrated** 1099:10
**cell** 975:10
**center** 960:9 961:2
  961:16
**central** 888:17
  891:17,22 916:9
  916:21 982:14
  983:18 1026:17
  1091:9
**CEO** 956:10
**certain** 885:3
  1012:7 1027:9
  1037:15
**certainly** 1012:21
  1033:16
**cesspool** 1061:20
**cetera** 1059:20
**Chair** 871:12 947:9
**Chair's** 961:14
**chairman** 874:2,11
  874:15,22 875:10
  875:12,20 876:9
  876:18 877:5,12
  877:14,20 878:7
  878:15,20,22
  879:2,5,10,18
  880:2 881:2 885:1
  888:3 895:3,17
  896:2,9,12 897:16
  897:19 898:8,12
  898:15,19,22
  899:3,6,10 903:16
  904:8,11,17,22

905:4,7 908:4,10
908:16 909:10
911:16 912:9
915:12,19 917:6
917:21 923:10,21
925:17 928:4,15
930:4,7 933:7,10
933:13,17,20
934:1,6 935:15
936:2,17 939:3
941:7 943:7,16
944:3 945:6,10,14
945:17,19 946:2,7
946:13,22 953:10
954:12 960:5,12
967:3,7,10 968:3
968:6 969:11
971:15 983:11,14
983:17,21 984:3,8
984:13 990:12
991:1,11,14
993:20 994:4,17
994:22 995:16
996:2,12,17 997:1
997:6 1001:7
1016:7 1027:16
1027:19,21
1028:5,8 1030:2,6
1030:9,12 1031:8
1032:18 1033:11
1034:16 1035:4
1035:11,18
1036:2,15 1037:7
1038:8,13
1039:14,18
1042:7 1045:1,8
1047:4,11 1048:8
1048:13,17,21
1049:13 1051:12
1052:2,8,12,20
1053:8,14,22
1054:7 1055:4,16
1055:19 1059:14
1060:22 1067:1,6
1067:10,15
1068:1,5,19
1069:9,13,21
1070:5,9,13,17,19
1071:6,9 1073:16
1079:2,6,8,12,16
1079:20 1082:7
1082:10 1088:14
1088:16 1092:3
1092:21 1093:2,9
1093:15 1095:11
1095:18 1096:7

1096:15 1097:1,8
1097:16 1098:3
1102:12,20
1103:6,15
1104:19 1105:1,5
1105:10 1107:15
1107:22 1108:11
1108:17,19
1109:2,11,14,20
**Chalangi** 902:11,21
  902:22
**Chalangi's** 902:15
**challenge** 949:21
**challenging** 1064:1
**chambers** 1049:18
  1049:22 1050:14
  1050:17
**chance** 926:6
  1026:15
**change** 974:3,7
  1017:3
**changed** 941:2
  942:1 961:3,4
  982:21 1046:7
  1053:19 1063:18
**changes** 944:12
**characterizations**
  1032:19
**charge** 931:12
  1030:14 1031:1
  1059:18
**charged** 1030:14
  1094:22
**Charges** 898:2
  904:20
**Chase** 1007:12,19
  1109:18
**chat** 1032:10
**cheaper** 1021:22
**check** 1001:7
  1067:22 1077:12
**check-in** 1001:6
**checked** 964:15
**cheek** 909:18 976:1
  976:9 988:6
**Cheney** 957:15
  958:1
**Chevy** 1007:12,19
  1109:18
**chief** 950:22 961:11
  985:10,16 988:3
  1000:2 1058:21
  1065:2,5,13
**China** 953:2 956:2
  956:13
**Chinagate** 957:7

In Re:  Larry E. Klayman
June 25, 2018

Chinese 954:1 956:22
chip 1010:5
choice 1095:12
chose 951:3
Christ 1017:22
Christian 1017:8 1022:15 1024:5,7 1025:19 1090:9
Christiane 1023:9
Christianity 1026:5
Christmas 1017:18
Christopher 1001:11
chronologically 953:11
chronology 1016:13 1037:19
church 1017:14,15
cigars 986:20
circumstances 901:9 1022:14 1057:15
citizen 930:17
City 881:13 977:14 1023:19
civil 918:12,19 919:15 921:12 922:22 923:22 924:1 932:5,22 964:5 981:17,20 992:17 998:11 1000:11 1021:8 1040:8
claim 936:20
claimed 1001:1
claiming 918:21 920:2 1004:21
claims 906:2 926:14 988:19 1061:17 1100:16,16
clarified 1036:17
clarify 878:17 899:4
CLAY 871:20
CLE 964:14,19 965:8
clean 988:15 1075:1
clear 933:19 935:1 976:12 977:9 992:4 994:10 996:4,10 1015:18 1027:11 1045:16 1046:21 1050:13 1072:17
cleared 1019:6

clearly 899:12 1054:15 1073:8
clerk 1001:6 1050:10
client 953:22 957:16 975:6 987:18 1000:20 1059:19 1068:18 1068:18 1070:15 1073:1 1102:8
clients 953:17 1078:20 1104:5,5 1107:7
Clinton 912:7 956:7 957:9 997:17 1002:2 1028:18 1028:19 1030:17
Clinton/Gore 956:12
Clintons 935:6,10 955:22
close 888:16 891:19 977:19 978:19 983:3 1005:13 1015:4 1056:14 1078:12 1080:1
closer 874:15
clothing 986:12
Club 961:17 1099:3 1099:9
clueless 1090:4
Clyde's 975:19
CNN 1023:9,10 1105:18
co-anchor 977:1 982:18
co-host 883:4,11
coax 892:15 979:22 997:22
coaxes 893:7
Cobas 961:12
Coburn 913:8,9 985:11 986:1
Coburn's 913:6
coerce 1075:7
cold 1027:13
Colleen 934:14 1000:5
college 881:7,8
Collum 911:5,18 912:16
Colton 950:21
Columbia 870:1 871:6 964:11 972:17 1097:5 1100:2,4

column 1010:15
columns 973:18
combination 1070:14 1081:14
come 878:11 880:7 882:12 889:12 890:11 892:13 893:3,10 911:2 919:2 921:16 929:4 1017:18 1019:5 1030:9 1033:17 1039:11 1041:18 1049:16 1060:6 1084:14 1088:4 1094:16 1100:5 1101:16
comes 1065:3,12 1080:6
comfortable 879:11 891:18 892:5 982:7 1003:18,20
comforting 1026:13
coming 919:18 956:6 959:4 1043:9 1046:21 1046:22 1089:2,6 1091:13 1094:20 1109:8,18
commencing 871:3
comment 1001:4 1051:6
comments 1068:10 1096:5
commercial 986:13
Commission 952:12 952:14 963:19,20 1024:5
commit 982:10 1063:20
commitments 1107:7
committee 871:4,10 874:6 913:12 947:10 961:1 1032:3 1085:16 1096:14 1097:4 1097:17
common 974:10
communicate 900:21 1029:19 1043:8,16 1068:16 1076:17 1089:7,8 1091:13 1092:10,13
communicated 926:22

communicating 926:9 929:2 1031:14 1046:19
communication 900:10 1045:20 1049:7,8 1092:16
communications 874:19 1041:17 1046:21 1058:2 1067:17 1068:4 1076:13 1080:7 1091:12 1092:7
communist 1002:7
community 959:1 961:10,13 974:16 982:3 986:9 987:5 999:14 1003:19
company 1016:17
compassion 1084:10
compel 949:18
compendium 995:12
compensated 1044:3
competent 1078:14
competitive 1013:8
compilations 879:19,21
complain 910:14
complainant 998:14
complained 981:9 989:9
complaint 887:8,13 888:12 918:13,16 918:18 926:3 933:1 966:13,22 967:21 968:13,17 968:18 969:6 970:15 981:18,18 981:20 992:17 993:7 998:12 1021:6,9 1028:21 1046:19 1051:1 1087:4,4
complaints 964:5 968:21 970:22 977:15,16 989:19 989:22 996:22
completed 877:16
completely 1090:2 1106:5
complimentary 908:1
component 998:6

comports 1016:10
comprise 1036:12
comprising 994:5
compromise 900:9
computer 1014:22
conceded 1015:7
conceived 954:16
concern 998:17 1002:15 1025:6
concerned 1053:18 1058:11 1109:20
concerns 910:8 937:2 1028:13
concession 885:7,7
conclusion 921:17 1063:10,14 1064:4
concussion 1016:15 1016:16
condition 900:12
conditions 1027:9
condominium 958:21
conduct 934:20
conducted 919:15 930:22
confer 996:9
conference 1008:11 1096:14 1098:8 1101:17 1108:9
confided 1095:5
confidence 1013:12 1022:20
confirm 1006:11
confirmed 970:13 1010:8
confirming 970:9
confirms 971:2
conflict 1030:15 1078:9 1080:4,5
confused 896:9,10 1069:22
Congress 1001:10
congressman 912:20 960:19 987:6,8,10 1058:22 1085:10 1085:13,21 1086:6,21
congressmen 907:12
conjunction 1004:4
connection 1051:13
consent 1091:14
consequently 1011:12

conservative
955:17,18 1002:6
1002:9,9,10,14
conservatives
1002:8
consider 1107:3
considerations
997:21
considering
1011:19,20
consistent 887:18
891:8 907:6
921:21 1091:4
consistently 886:22
906:3
constituents 949:8
Constitution 998:3
Constitutional
998:1
consult 1003:16
consulted 928:12
928:18
Consumer 951:3,5
963:13,15,20
contact 888:16
900:14 901:5
902:4 924:9,9,13
927:19 932:9,13
988:4 1041:16
1065:13 1086:3
contacted 887:9
889:18 911:6
913:16 924:12
1070:6
contacting 1043:13
contained 998:6
contains 875:5
966:12 1032:8
contentious
1019:10
contents 1102:18
context 909:11
973:14 1005:1
1012:6 1013:1
1016:3 1021:14
1042:6 1085:12
contingency 1055:7
1059:10
contingent 1062:14
1063:6
contingent-fee
1059:20
continuance
1093:21
continue 930:1
1057:14 1075:17

1075:20
continued 872:1
959:18 992:17
1037:11 1056:21
1064:14 1095:22
continuing 1031:11
continuously
964:11 1013:4
contract 882:7
885:6,9,11,15
1043:13
contradictory
1042:12
Contrary 1026:17
contributions
1051:4
control 989:1
controversy 960:15
conversation
1069:15,19
conversations
1069:7
conversion 1026:10
converted 961:4
conveying 922:10
convicted 1047:2
convince 986:16
convinced 1059:21
cooperate 903:20
copied 907:4
917:11 928:8
1038:20
copies 875:6,8
copy 899:13 935:12
935:18 940:3
991:3 1039:4
1041:3,6,8
corner 880:3
corporate 952:7
Corporation
956:10
correct 892:1
894:20 897:12
898:5 899:9 907:2
907:4 910:16,17
916:5 917:1,3
920:8,11,13
922:18 923:4,17
923:20 925:8,12
927:15,22 928:9
929:3 933:2
936:21 937:18
938:15 940:7,22
942:18,22 944:17
944:20 991:13
993:3 994:14

995:4,9,11 1025:2
1045:1,22
1051:16 1052:5
1053:14 1067:4,7
1067:8,12 1099:5
1103:18,22
1106:14 1107:1,2
1107:12
corrected 995:3
1044:19
correctly 1102:11
correspondence
948:22 989:22
1022:21 1027:2
1064:11 1081:17
1092:5
corruption 1061:20
cosmetic 1064:16
cost 1006:11
costs 1072:13,14,22
counsel 874:5,10
875:4 891:1 896:6
911:13 936:4
970:13 971:7
985:3 996:3,13
1011:16 1035:14
1039:14,20
1049:17 1057:3
1074:8 1076:14
1080:4,5 1097:18
1104:9 1107:17
1107:20
Counsel's 893:22
896:5 967:13
1030:14 1041:7
1046:18
counseling 1068:15
count 1075:19
1083:19
counterproductive
1071:19
countervailing
951:21
countries 984:7
country 909:1
1005:8 1026:7,8
1098:19
County 1058:22
1085:16,17
couple 987:22
course 877:8
882:13 890:5
933:14 946:22
951:19 984:3
1035:7 1099:19
courses 964:19

court 870:1 871:5
874:7 884:19
923:18 924:11
926:4,21 934:12
981:22 991:18
993:1,2,4 997:2,9
997:10 998:10
1000:3 1001:15
1009:12 1011:17
1028:1 1030:7,13
1031:4 1033:1,5
1033:13 1050:10
1050:11 1061:13
1072:10 1086:10
1089:18 1097:5
court's 1041:9
1089:15
courtesy 946:12
1037:1
courthouse 939:4
courts 953:15
cousin 968:15
cover 1000:11
1031:4
coverage 989:10
coworker 1004:3
1004:20,22
coworkers 1006:13
Cox 1001:11
cozies 956:7
crazy 957:1
1065:11
create 958:3
credibility 1087:6
credit 1020:16
1021:20 1022:1
1058:10
criminal 920:10
1014:17
critical 985:11,14
criticism 962:4
criticisms 982:12
1005:2
criticize 958:13
criticized 977:2
cross 873:2 936:3
936:14
CROSS-EXAMI...
936:4
crucial 1058:15
Cuba 959:5
Cuban 930:22
958:22 959:2
961:12,13
culture 984:15
curious 995:14

1090:11
current 957:22
currently 881:20
882:11 964:13
cut 992:12,18
1024:1
cutting 1109:22

**D**

D 873:1 874:1
1023:11 1050:9
D.C 881:14 916:22
949:21 980:4
982:5,8 986:9
1007:13 1047:20
dais 962:6
damage 1061:16
1062:19 1063:4
damages 998:22
1061:12 1100:17
Dan 1007:13
1038:19 1071:14
1071:18
Danforth 928:7
1038:2 1039:1
dangerous 1014:2
Dash 986:9,10,11
date 886:5 920:20
925:3 932:18
1015:20 1016:4
1033:2 1042:22
1067:6,8 1074:22
1079:8 1082:7
dated 897:9 898:22
915:3 920:18
924:19 925:1
940:15,18 942:16
942:18 1038:1,11
1042:19 1056:4
1077:10 1082:5
1092:3 1096:2
daughter 1105:22
Davidson 885:22
day 926:15 930:2
954:5 956:6
1009:9,21 1012:5
1012:9,13 1015:8
1015:22 1016:14
1019:7 1020:2
1043:21 1057:20
1066:20 1069:20
1069:20 1070:8
1070:10 1073:11
1085:19 1086:2
1090:18 1093:13
1104:2 1108:5,16

In Re: Larry E. Klayman
June 25, 2018

**days** 925:16 926:2
950:15 989:15
1067:3
**DC** 870:9 871:2,18
949:19 972:20
973:3,5 993:1
1045:7 1050:22
**deactivated** 964:18
**deadline** 925:22
**deadlines** 926:16
**deal** 990:10 1057:5
1060:10 1090:6
1093:6 1094:13
1107:5
**dealing** 887:19
889:3 907:1
921:22 1071:14
**deals** 997:20
**Dean** 1087:16
**Dear** 1082:19
**death** 955:21
**debate** 961:17
962:1
**debt** 931:9
**decades** 1104:3
**December** 1035:13
**decide** 890:6
1089:17 1101:22
**decided** 885:14
891:22 959:9
979:16,21 985:6
1035:8 1093:13
**decision** 884:21
891:21 921:17
922:14 925:22
1005:18 1070:6
1089:15 1102:6
1102:14,15,20
1103:11
**decision-making**
1062:6
**decisions** 1001:20
**declaration** 897:4
897:11 898:17
899:18 905:10
940:17,18 941:20
941:21
**declarations** 896:19
**declined** 917:2
940:5,10
**dedicated** 903:10
904:1
**deed** 1066:6
**deep** 964:1
**deeply** 983:4,7
**defamation** 978:3

1013:10
**defend** 882:6 901:9
**defendants** 1028:16
**defended** 1002:3
**defense** 952:21
**Defenses** 904:6
**defined** 908:17
**degree** 948:3,9
**degrees** 947:17
**dejected** 1064:8
**DeLay** 958:12
**Delia** 921:11 922:7
922:16
**delighted** 945:7
**demanding** 1057:16
**demeaning** 1091:18
**demonstrates**
1041:21
**denial** 1069:22
**denied** 1003:2
1007:1 1067:4
**denying** 1016:8
1035:7 1062:2
**department** 920:7
920:12,20 950:17
951:2 963:21
972:19 986:15
1104:14
**depose** 1009:9
**deposing** 1009:10
**deposit** 1074:18
**depositions** 1063:2
**deposits** 1074:20
**describe** 905:19
999:18
**described** 887:4
895:2 977:1
997:16 1024:18
**Designers** 986:11
**desire** 976:14
1066:4
**desk** 916:21
**destroyed** 1090:2
1091:2 1106:5
**detail** 926:17
1083:18
**detailed** 990:1
**details** 938:8
968:18
**determined** 891:5
930:17
**developed** 960:2
977:18
**Devon** 1053:1
**diamond** 1087:7,11
1087:15

**Dick** 948:12 957:14
**die** 1007:22
**died** 1105:19
**different** 926:7
950:1 953:5
990:13 1000:2
1002:12 1019:16
1027:5 1052:18
1065:19 1074:13
1080:6 1081:13
**differently** 1031:1
**difficult** 892:22
900:11 901:9,13
959:22 979:7,9
980:12 989:7
1019:6 1047:16
1056:20 1057:5
1074:14 1080:18
**difficulties** 975:14
1062:1,4 1080:21
**difficulty** 929:1
958:14 977:21
1000:19 1024:20
**dignity** 988:19
**diligent** 900:7
**dill** 1090:6
**dinner** 975:17
**direct** 873:2 879:13
880:14 943:6
947:7 1032:14
1037:11 1077:18
1098:9
**directions** 1074:13
**directly** 939:12
**director** 921:12
1038:2
**directors** 1013:5
1024:9
**dirty** 909:14
**discarded** 971:6,10
**discharged** 945:8
**disciplinary** 871:18
874:9 875:4 936:4
964:20 965:10
967:13 969:4
970:5,19 1011:16
1030:13 1046:18
1097:3 1107:16
1107:20
**discipline** 970:21
**disclosing** 958:8
**discounted** 1010:12
**discovery** 1006:22
1034:13 1063:1
**discriminated**
988:18

**discriminating**
953:17
**discrimination**
918:19,20 924:6
998:3
**discuss** 889:20
926:10 932:7
934:10 937:22
938:21 939:9
967:8,12,15
1100:14,19
1101:18
**discussed** 887:10
905:21 934:15
938:5,14 939:6
979:5 1069:1
**discusses** 886:1
935:21
**discussing** 896:13
**discussion** 938:17
**discussions** 887:5
892:14 908:8
940:10 1004:1
1101:6,11
1108:20
**dishonest** 955:2
**disillusioned**
988:12
**dismiss** 1046:12
1049:6
**dismissed** 968:21
969:6 970:10
971:3,9 1001:1,14
1041:13 1064:21
1089:16
**disparaging** 1020:8
**disqualification**
1029:9 1033:9
**disqualified**
1033:22
**disqualify** 1011:5,6
1029:11
**disrespectful**
1068:8
**distinguished**
1001:11
**distress** 882:19
1044:5
**distributed** 893:11
894:5
**distributing** 893:17
**district** 870:1 871:6
964:11 972:17
981:22 993:1
997:10 998:10
1000:3 1050:11

1097:5 1100:1,4
**diva** 1057:13
**divergent** 883:17
**division** 883:13
916:9,22 920:10
950:18 951:3,4,6
988:15
**divorce** 1081:7
**divorced** 1081:4
**docket** 870:4 997:2
1041:9
**doctors** 915:10
1003:5
**document** 885:17
916:18 920:22
928:20 1042:1,6
1055:8 1088:14
1088:16
**documentary**
1099:13,17
**documentation**
1049:16
**documents** 875:2
992:20 994:5
995:13,15,20
1004:11 1043:19
1046:14 1051:10
1073:7
**dog** 1076:5
**doggedly** 901:8
**dogs** 1014:7,12
**doing** 887:1 951:19
959:19 968:2
974:17,20 975:3
976:17 1011:2
1014:21 1064:15
1068:12 1073:14
**dollars** 1061:18
**Dolley** 957:17
1001:1
**Donna** 887:11
**Dorothy** 1059:6
1060:4,5
**double** 1000:11
**doubt** 993:21
**downhill** 1084:17
**Dr** 1003:6,7
1076:13 1077:20
**draft** 941:10
**drafted** 941:19
**drafts** 944:12
**drama** 1068:11
**drawing** 913:9
**drew** 934:12
**drinks** 988:1
**driver** 1014:15

In Re: Larry E. Klayman
June 25, 2018

drives 980:3
driving 1014:2
  1016:18 1017:5
  1017:11 1018:4
drop 1031:16
  1044:13 1045:11
  1052:4 1053:8
  1058:16 1059:2
  1084:4
dropped 951:12
  1059:13
dropping 1059:12
drops 1052:7
drove 1013:20
  1014:16
dual 959:20
DuBois 1066:4
due 900:12
dug 980:16
Duke 948:1
duly 880:12 947:5
  1098:7
Durham 948:1
duties 882:3,13
duty 951:21
DX23 968:6

_____

E

E 870:5 871:2
  872:10 873:1
  874:1,1 879:4
  951:16,17 953:14
  1037:4,4
E-l-l-i-o-t 947:14
earlier 946:4 960:7
  961:15 985:16
  1017:13,17
  1018:14 1056:12
  1070:7,9 1081:6
early 880:8 1004:1
earnings 958:3
easier 904:7 919:7
easiest 1066:18
East 974:11 984:6
eastern 916:21
eclectic 955:19
Economic 960:10
  961:16
educated 1058:21
education 947:19
educational 881:6
EEO 887:7 924:4
  998:11 1021:8
effect 954:6
  1054:22 1068:7
  1086:1

effort 878:16
efforts 918:4
  1099:3,8,11
egregious 1034:5
eight 885:8 912:4
  982:20 1064:12
  1065:17 1069:11
  1093:12 1103:18
  1103:20
either 958:6 966:14
  971:9 988:11
  1030:1 1031:15
  1046:10 1049:14
  1057:1 1102:19
elapsed 926:15
elected 960:19
Elham 882:14
  884:8 891:7
  905:18,21 906:9
  907:15,20 925:21
  934:16 986:18
  987:2,18,19
  988:18 1056:3
  1082:19 1105:14
  1105:17
Elham's 906:2
  907:22
Elian 959:6
elicited 1004:1
eliminated 1072:12
Ellie 882:15 1038:3
  1056:4 1065:9
  1073:10 1075:6
  1076:6 1086:2,9
  1091:20 1100:19
  1101:5,8,17
Ellie's 1100:15
elliesataki@yaho...
  1061:5
Elliot 947:14
Em 1060:7
email 872:8 878:12
  906:9,16,19,22
  924:18,20,22
  925:9,11 932:18
  942:17 1020:6
  1022:12 1025:8
  1027:18 1029:17
  1056:3 1061:4
  1071:2,12 1074:5
  1077:10 1078:4
  1078:15 1079:9
  1082:4,7,18
  1085:6 1086:8
  1088:11,21
  1089:10,13

1093:10 1100:7
  1101:3,7 1103:17
  1104:16 1105:12
  1106:17 1107:11
  1107:12
emailed 1054:16
  1067:2 1106:8
emails 943:13
  1017:7 1020:10
  1045:18 1046:16
  1054:17 1055:6
  1077:19 1092:12
  1104:8
embarrassed
  1076:7
emergency 1075:18
emotional 982:19
  1078:9 1089:12
emotionally 1094:7
emphasis 972:20
employed 1064:14
  1094:1
employee 882:7
  886:3 901:6 902:1
  902:2 922:3
  929:16 1091:1
employee's 998:15
employees 886:19
  901:15 903:19
  905:15 929:15
  931:2 963:7
employees' 882:6
employers 963:1
employment 881:10
  921:22 924:5
  952:3 963:6
  985:14 1025:18
  1026:14 1073:22
encountered 953:21
ended 988:5
  1057:20 1063:5
  1108:9
energy 958:8,10
English 888:17
  892:6 982:11,15
  984:6,19 1005:3
  1041:19,20
  1043:5 1091:8,9
  1091:10,12,16
Enron 958:5
entails 918:16
enter 965:14
entered 1043:20
  1109:3
entertainment
  1016:22

enthusiasm
  1086:22
entire 994:4 995:5
  1019:7 1045:8
entirely 1030:18
entities 907:12
entitled 1011:13
entity 929:17
entrances 1052:21
  1053:1
entry-level 948:21
environment 982:7
  1023:21 1024:22
  1094:16
equivalent 1074:19
Eric 1001:3
errors 1034:2,6
escaped 973:21
especially 906:3
ESQUIRE 871:11
  871:15,20 872:3
  872:10
essentially 969:3
  1099:17 1102:14
estate 986:13
  1007:18
estimate 876:22
et 990:11 1059:20
ethical 1017:3
ethically 900:19
ethics 955:3
evaluating 1054:2
evening 1013:16
event 1015:21
  1024:17 1045:13
  1046:10 1101:22
events 948:6
  1093:10
eventually 884:20
  888:1 975:13
  1065:11
everybody 980:9
  1029:2 1051:18
Everybody's
  909:10
evidence 875:16
  895:15 899:15
  904:5,15 914:19
  917:5,19 921:7
  923:8 928:2 932:2
  933:8 969:10,13
  971:13 990:5
  993:11,13 1028:1
  1030:3 1035:12
  1035:19 1036:3,4
  1043:20 1054:2,3

1086:9 1090:3
  1096:19
evidentiary
  1006:22 1034:11
EX 880:2
exact 960:10 990:1
exactly 878:10
  887:8 898:6
  942:13 981:5
  996:6 1045:2
  1101:21
exam 972:21
examination 879:13
  880:14 944:4,5
  947:7 1006:10
  1037:10,11
  1096:19 1098:9
examine 936:3
examined 880:12
  947:5 1035:5
  1098:7
examining 936:14
  1097:20
example 884:22
  1092:8
excellent 950:11
Exclusive 894:8
excuse 896:4
  905:12 925:2
  941:12 1032:1
  1041:11 1044:7
  1104:12
excused 945:13
  1108:10
executive 930:15
  961:1
executives 1075:3
exemplary 914:14
  918:3 1012:1
exhibit 874:14,18
  879:15 885:19
  893:22 895:9,12
  895:14 896:5,11
  896:13,17 897:21
  898:2 899:6,7,13
  899:17 904:5,7,13
  914:7,18,22
  915:13 916:10
  917:4,8,18 919:6
  921:6,10 923:8
  924:18 928:2,8
  932:1,21 933:8
  939:20 940:13
  941:6 942:4
  965:20,22 966:4,7
  966:12,15,21

In Re: Larry E. Klayman
June 25, 2018

969:16,20 970:13
971:18 972:1,2,4
972:6,7 990:8,8,9
990:9 991:6,8,9
991:10 993:14,16
993:18 994:5,8,10
994:11,18 995:5,5
995:13,20,22
996:6 997:8 998:8
1016:11 1033:21
1035:18 1036:2,8
1036:12,15
1037:22 1038:6,8
1038:10,11
1040:16 1041:2
1042:1,18,19
1055:13,15,18
1074:1,2,3,4
1077:19,21,22
1078:2,3 1079:5
1082:6 1088:15
1100:7 1104:9,10
1105:7,9
**exhibits** 875:6,18
879:19 893:22
904:16 905:6
918:2 965:13
967:16 969:8,10
969:10 994:16
1002:19 1012:7
1028:16 1036:18
1037:15 1039:12
1040:12 1046:19
1104:22 1105:6
**exist** 1017:19
**existing** 1107:7
**exit** 1014:18,19
1015:3 1017:11
**expect** 1058:8
1075:11
**expected** 1076:18
**expense** 1057:19
1058:5 1061:18
**expenses** 1020:13
1044:2 1072:14
**expensive** 1056:9
**experience** 884:10
884:12 886:14
887:18 889:3,8
891:9 892:21
893:6 901:2
918:17 921:21
927:17 944:22
1066:17 1078:20
1094:15
**experiences** 953:15

1094:10
**experiencing**
906:13 1089:12
**expiring** 1056:14
**explain** 926:11
935:2 948:19
965:10 968:10
976:3 987:2,20
993:5 997:4
1012:2 1039:16
1062:8 1083:16
1087:3 1096:3
**explained** 979:20
1010:2 1030:19
**explaining** 1039:19
1042:5
**explains** 1053:20
1073:13 1085:2
1088:3
**explanation** 971:19
1087:14
**explanatory**
1059:18
**explored** 1053:17
**express** 910:8
**expressed** 1063:13
**expressing** 943:13
**extent** 879:20
895:18 978:16
979:8 989:11
1036:7,11 1058:1
1077:3
**extol** 909:21
**extra** 875:6 876:8
**extrajudicial**
1012:1
**extremely** 1073:13
**eye** 878:12 935:5,5

**F**

**F** 1037:4
**F-a-l-a-h-a-t-i**
991:19
**F-r-e-d-a** 1012:15
**face** 910:7
**facilities** 1053:16
**facing** 975:8
**fact** 876:11 882:8
884:14,15 889:8
910:15 926:11
964:4 968:21
969:1 972:11
980:13 982:8
1004:13 1005:9
1006:6 1010:9,15
1011:14 1012:3

1025:2 1034:7,19
1034:20 1051:9
1052:3,4 1054:14
1058:4 1061:9
1087:9 1090:12
**fact-intensive**
1006:6
**faction** 884:3,6,9
**factions** 883:18,19
884:2 988:17
989:8
**factors** 1081:14
**facts** 1010:2
**factual** 1010:18
1034:2,6
**fail** 984:20
**fair** 887:17 893:15
901:18 943:7
953:18 963:2
1056:22 1069:13
1098:18,20
**fairly** 887:14 903:1
**faith** 1020:8
1022:16,16
1024:7 1034:17
**Falahati** 883:10
892:8 977:1 981:7
982:18 990:9
991:16 992:1,5,14
993:19 1005:17
**fall** 973:11 1058:18
**false** 1086:12
1087:1
**familiar** 929:17,17
1054:3,4 1077:16
**family** 910:6 973:14
974:13,14 975:6
986:10,11,12
987:4 988:20
1020:18 1024:6
1063:11 1075:13
**famous** 974:22
1098:17,18
**far** 898:15 904:1
918:10 1009:11
1020:5 1062:20
1063:2
**Farsi** 982:13 1005:4
1005:5,7 1026:20
**fashioned** 981:2,14
**faster** 966:19
**father** 989:3
**fault** 896:18 897:20
1044:11 1062:8
1062:10 1088:22
**favor** 955:10

**favorable** 934:18
935:7
**FBI** 921:3
**fear** 983:3
**fears** 983:1
**February** 897:4
898:22 899:18
915:3 940:16
**federal** 881:16
887:2 906:4 926:4
934:12 957:13
962:17 963:19,20
981:22 993:4
998:10 999:11
1028:1,9 1030:6
1031:4 1033:1,5
1033:13
**Federation** 905:14
**fee** 1062:14 1063:6
**Feedback** 886:4
**feeding** 990:1
**feel** 891:18 962:18
982:6 984:17
1017:9 1018:16
1026:2,3,3
1056:19 1066:15
1075:16 1084:2
**feeling** 878:5
1018:14 1019:13
1019:19 1068:9
**fees** 1055:7 1059:10
**feet** 1027:13
**fell** 1080:20
**felt** 883:6,8 901:19
902:22 903:4
904:2 919:3 942:1
949:9 964:6 974:2
974:7,10 984:19
1003:13,14,18,20
1004:18 1013:7
1018:14 1019:15
1019:18 1021:12
1074:7 1080:4
1081:3,5
**female** 1081:8
1087:19
**field** 908:12 999:10
**fifteen** 953:9 1096:9
**fighting** 894:9
1012:17 1013:4
1094:19
**figure** 979:19
1093:6
**file** 918:18 925:22
931:9 1002:20
1040:9

**filed** 874:13,17
888:7 904:21
918:12 926:3
931:11,11,13
932:6 933:4
956:20 966:16,18
970:15 981:11,16
983:8,9,10 985:7
992:16,22 1006:2
1043:18 1072:7
**Filegate** 957:6
**files** 875:3 1041:8
**filing** 931:13 997:2
1029:8 1032:21
1033:5
**Film** 1024:5
**films** 1024:6,7,15
**final** 921:17 922:14
925:22 1056:11
1109:2
**finally** 885:10 931:4
1075:22 1089:16
**finance** 956:3 961:1
**finances** 960:1
**financial** 1020:20
1051:8 1073:20
**financially** 978:10
992:13 1008:1
**find** 937:3 1002:19
1006:7 1022:5
1026:14 1027:18
1036:18 1042:8
1049:9 1075:4
1078:12 1086:4,5
**finding** 922:17,21
922:22 1034:8
1104:6
**findings** 1010:18
1034:5
**fine** 878:20 915:21
987:16 1098:12
1108:15
**finish** 1028:6
1030:4 1060:3
**finished** 915:20
961:3 1027:22
**fired** 982:14
**fireside** 1032:10
**fireworks** 953:2
**firm** 950:6,8 951:13
951:16 952:1
956:16 1042:10
1042:22 1098:21
1098:22 1099:22
1100:19 1102:21
1102:22 1103:1,4

1103:5
**firms** 1064:16
**first** 877:3 880:12
886:7 890:7,14
897:14 898:21
899:7,19 904:12
905:12 908:5
911:16 937:16
941:10 947:5
949:14 950:13
953:13 958:13
962:8 973:1,10
983:10 987:15
990:15 998:4
1007:6 1008:2,10
1021:19 1028:22
1037:21 1041:22
1043:3 1046:13
1049:13 1065:7
1073:11 1079:13
1089:9 1098:7
**FISA** 1001:15
**FITCH** 871:11
874:2,11,15,22
875:10,12,20
876:9,18 877:5,12
877:14,20 878:7
878:15,20,22
879:2,5,10,18
880:2 881:2 885:1
888:3 895:3,17
896:2,9,12 897:16
897:19 898:8,12
898:15,19,22
899:3,6,10 903:16
904:8,11,17,22
905:4,7 908:4,10
908:16 909:10
911:16 915:12,19
917:6,21 923:10
923:21 925:17
928:4,15 930:4,7
933:7,10,13,17,20
934:1,6 935:15
936:2,17 939:3
941:7 943:7,16
944:3 945:6,10,14
945:17,19 946:2,7
946:13,22 953:10
954:12 960:5,12
967:3,7,10 968:3
968:6 969:11
971:15 983:11,14
983:17,21 984:3,8
984:13 990:12
991:1,11,14

993:20 994:4,17
994:22 995:16
996:2,12,17 997:1
997:6 1016:7
1027:16,19,21
1028:5,8 1030:2,6
1030:9,12 1031:8
1032:18 1033:11
1034:16 1035:4
1035:11 1036:2
1036:15 1037:7
1038:8,13
1039:14,18
1042:7 1045:1,8
1047:4,11 1048:8
1048:13,17,21
1049:13 1051:12
1052:2,8,12,20
1053:8,14,22
1054:7 1055:4,16
1055:19 1059:14
1060:22 1067:1,6
1067:10,15
1068:1,5,19
1069:9,13,21
1070:5,9,13,17,19
1071:6,9 1073:16
1079:2,6,8,12,16
1079:20 1082:7
1082:10 1088:14
1088:16 1092:3
1092:21 1093:2,9
1093:15 1095:11
1095:18 1096:7
1096:15 1097:1,8
1097:16 1098:3
1102:12,20
1103:6,15
1104:19 1105:1,5
1105:10 1107:15
1107:22 1108:11
1108:17,19
1109:2,11,14,20
**Fitton** 1013:7
**five** 897:22 898:13
898:14 903:7
907:19 931:3
963:16 969:2
976:19 999:6
1074:19
**five-lane** 1014:13
**flee** 988:22
**flip** 895:11 905:11
916:11,12,13
917:9
**floor** 1007:17,17

**Florida** 872:6 950:8
958:17,18 959:7
964:10 965:11
968:19 970:4,6,16
971:11,20 973:1
1044:14
**flow** 1077:15
**fly** 1014:9
**FOIA** 956:4,20
**folder** 1035:22
**folks** 996:9
**following** 905:15
908:21 1071:20
**follows** 880:13
947:6 1098:8
**forbearing** 1008:2
**force** 958:8
**Ford** 949:15
**forefront** 1006:21
**foreign** 913:13
952:11 963:1
1066:13 1085:15
**forfeit** 1048:2
**forfeited** 900:17
**forget** 960:10
978:18 1081:1
**forgone** 1007:15
**form** 926:7
**formal** 983:19,21
**former** 977:21
982:17 1004:17
1028:22
**fortunate** 953:4
1019:5
**forum** 938:22 939:2
939:3,4
**forward** 895:12
927:3 1051:5
1053:7 1063:3
1075:15 1086:2
**forwarded** 1051:3
1071:4
**found** 900:6 930:14
995:5 996:6
1003:5 1022:5,6
**foundation** 936:16
943:15,16
1048:12,15
**founded** 960:6,7,13
**four** 898:3 901:4
907:11 990:22
991:10 994:15
995:2,21,22
1053:1 1074:17
1104:3
**fourth** 1061:7

**FRA** 884:18,18
**framework** 1032:16
**France** 948:6
**frankly** 1022:11
1053:11
**fraud** 1047:3
**Fred** 914:9 951:22
959:8 966:5
1028:10 1055:8
**Freda** 1012:15
**Frederick** 872:3,4
**free** 894:10 951:4
952:18,18 960:17
960:22 961:5,19
978:12 1048:5
1058:18 1060:10
1075:7
**freedom** 894:8
949:10 957:19
959:18 960:6
961:4 974:2,17
1012:18 1013:15
1019:11 1051:3
**French** 948:4 951:9
**frequently** 958:21
962:18,21 1020:9
1089:22
**Friar's** 1099:3,9
**Friday** 874:4,18
878:5 1104:17
1105:12
**friend** 911:10 974:9
983:3 986:7
1007:5 1013:16
1013:17 1022:4
1081:12 1087:19
1087:19
**friendly** 987:22
**friends** 977:6 982:4
1002:13,14
1020:18 1076:6
1083:22
**friendship** 911:8
977:5,19,19
978:20 1005:13
1084:15
**front** 879:15 885:18
954:19 1007:6
1014:8 1052:1
1053:2,4 1065:5
1100:9 1106:16
**fronts** 1045:5,6
**frustrations**
1063:16
**fsujat@yahoo.com**
872:8

**full** 879:3 946:6,8
947:13 1018:1
**fully** 1064:14
1091:14
**fundraising** 1051:2
**funny** 1007:7
1008:8 1034:21
**further** 919:20
933:15 936:1
944:2 945:4
1086:17 1107:13
**future** 1036:17
1062:22 1075:15

**G**

**G** 874:1
**G-l-o-r-i-a** 1098:15
**gainfully** 1094:1
**gate** 956:2
**gates** 957:8
**gay** 954:4
**general** 891:1
911:13 920:10
951:1 952:5 953:4
963:9 985:3
**General's** 950:19
**generally** 902:20
915:2 947:15
952:21 963:3
1073:2
**generosity** 876:10
1066:5
**George** 957:10
959:13 1000:21
**Georgetown** 948:15
954:17,18
1017:14
**Gerald** 949:15
**getting** 905:12
906:19 922:13
953:18 968:4
973:8 979:19
985:4 988:11
1000:15 1005:10
1009:13 1031:17
1034:18 1041:17
1042:10 1050:19
1053:20 1056:18
1057:6 1076:20
1078:11 1080:1
**ghetto** 1023:17
**ghettos** 1023:17
**Gingrich** 958:14
**girl** 1090:21
**girlfriend** 1087:12
**give** 875:8 879:7

In Re: Larry E. Klayman
June 25, 2018

884:10 886:10
891:16 904:8
913:18 929:5
930:20 933:10
946:19 949:7
950:4 968:18
973:13 988:19
990:12 992:10
1011:9 1024:11
1029:13,14
1041:3 1049:6
1058:14 1063:21
1072:20 1074:11
1075:4 1080:1
1081:7 1085:11
1097:12 1101:14
**given** 875:20
894:22 901:4
944:13 964:4
1008:21 1011:10
1032:4 1058:4
1071:21 1076:1
1078:13 1089:19
1107:6
**giving** 921:4 976:5
977:17 1024:10
1034:11 1059:4
1072:10
**glad** 1030:2
**glasses** 1008:13
1013:19 1014:9
1014:11
**glean** 1086:13
**Gloria** 873:5
874:19 1096:13
1096:20 1098:5
1098:14 1100:13
1104:17 1105:13
1105:17 1108:6
**go** 878:4 887:6
891:14,17,21,22
895:19 898:15
899:3 904:1 909:9
913:14 916:9
922:12 923:18
926:12 930:7,19
936:17 943:7
945:15,21 958:21
961:7 963:14
978:11 981:21
996:5,13 997:12
1002:22 1009:15
1014:6 1015:1
1016:3,15
1017:12 1018:9
1018:12 1020:14

1021:17 1022:21
1024:20 1027:4,9
1029:6 1032:16
1053:13 1055:4
1055:19 1057:8
1063:2,3,11
1067:9,21
1068:10,11
1069:17 1073:16
1074:12 1077:14
1090:19,19
1105:10,20
**goal** 999:9
**God** 1014:14,21
1066:21 1090:18
**God's** 1084:1
**goes** 882:14 894:9
943:6 1014:5
1051:19 1052:11
1052:14 1053:5
1059:8 1066:6
1077:15 1108:3
**going** 876:12 877:3
878:4 879:14
891:6,16 892:9
893:19,21 895:8
895:13,19 900:1,3
904:12 911:1
913:22 914:9,13
914:18 915:17
918:9 928:13
930:10,17 932:1
946:7 953:7,10
954:5 955:10
965:1,9,12 967:1
969:14 977:12,20
980:15 984:20
986:7 987:7
991:11 993:12
996:9,9,20 999:4
1007:3,4 1012:6
1013:3 1014:4
1016:19 1020:7
1020:10 1022:21
1025:22 1032:6
1032:20 1035:8
1035:16 1037:9
1047:17 1048:6
1049:9 1053:21
1058:6,7 1059:7
1059:14 1063:20
1063:21 1065:10
1068:10 1069:17
1071:9 1072:1
1073:17 1074:12
1075:15 1076:17

1080:18,22
1084:6 1086:6
1091:6 1093:13
1095:1 1104:16
**Goldberg** 1098:21
1099:22
**good** 874:2 876:14
877:12 878:22
892:12 929:19,22
936:6,7 947:9,11
949:12 951:11
955:4 960:16,22
964:12 965:5
979:3 980:14,15
982:15 998:18
1002:14 1004:18
1004:19 1005:4,4
1005:14 1020:20
1024:8,14
1026:15 1034:17
1054:21 1057:14
1060:10 1064:17
1066:6,21
1076:17 1077:5
1080:11 1091:10
1094:2 1095:14
1108:13
**goods** 1088:1
**Google** 1106:6
**Gore** 962:3
**gotten** 896:9 898:8
954:8 992:21
1046:11 1059:1
1060:8 1062:19
1068:16 1074:9
1081:4
**government** 881:16
886:21 887:2
894:7 901:12
905:14 906:5
909:22 948:6
952:9,11,12,14
955:1,6 956:13,17
959:2 963:16,17
988:20 999:3
1010:11,13
1011:20 1056:13
**Governor's** 996:21
**governors** 886:18
891:1 901:10
911:4 912:1,6,12
934:13 981:12
990:11 993:8
997:15,17,19
1028:17,20
1040:10

**grabbed** 976:20
**grace** 887:11
1014:14,21
**graduate** 881:7
**graduated** 881:7
947:20 948:3
**Graham** 958:17
959:10
**grandfather**
1017:21
**grandmother**
1012:15
**grant** 922:18 923:1
931:9 1007:2
**granted** 916:6
**granting** 1006:21
**gratuities** 958:13
**gravitate** 984:14
**gravitates** 1080:14
**great** 894:4 949:4
1107:5
**Green** 973:16
**greet** 976:4
**grew** 1094:17
**grievance** 887:7
890:10 931:10,11
931:13,14
**Grill** 1053:2
**group** 954:6 1002:6
1055:17
**groups** 1106:9
**guess** 986:3
**guide** 879:19
1024:4,4
**guy** 1001:11,12

--- **H** ---

**H** 871:20
**haircutter** 1065:8
**half** 876:8 946:4,6,8
951:15 955:18,19
**hall** 888:18
**Halliburton** 958:2
958:3
**Hamburger** 954:6
**hand** 921:4 946:17
976:21 1097:10
**handed** 1104:22
**handing** 894:15
**handled** 919:22
**hands** 1000:14
1019:17
**handwriting** 971:17
971:19 972:10
**happen** 1070:3
1095:1,4

**happened** 883:12
887:4 998:20
1002:16,22
1006:19 1008:19
1012:4,5,10
1013:11 1017:12
1017:13 1019:22
1065:18 1095:3
1095:10
**happening** 921:20
**happens** 922:2
1056:14
**happy** 1090:2
**harassed** 883:1
888:11 894:9
920:2 976:22
998:15
**harasser** 981:7
991:21
**harassing** 883:7
**harassment** 905:21
906:14 919:1
926:1,5,13 991:22
998:2 1004:21
1006:14 1066:11
1090:22
**hard** 975:15 977:20
978:8,9,10 1061:9
1076:8 1084:9
**hard-edged** 884:13
885:2
**harm** 1013:8
**Harriton** 947:9
**Haskell** 1014:18
1017:12
**he'll** 880:5
**head** 885:13 887:11
1001:15 1018:6
1018:11 1019:2,3
1019:7 1024:9
1028:20
**headquarters**
1026:19
**heads** 878:7
**health** 900:12
**healthy** 1078:6
**hear** 922:20 1007:3
1018:19 1030:2
1035:9,11 1088:6
1096:21
**heard** 910:14 955:8
1017:18 1021:18
1031:2 1032:2
1033:6 1048:7
1063:19 1064:13
1069:2 1089:10

hearing 870:11
871:1,3,10 874:6
875:17 1006:5,22
1007:2 1010:13
1010:16 1011:9
1011:10,11,18,19
1029:13,14,14
1034:10,11,18
1036:9 1037:5
1064:10 1096:14
1097:3,17 1108:1
1110:3
hearsay 1032:8
heart 978:15
1012:14 1044:4
1084:11 1095:10
heartless 1010:19
1012:21
heels 980:16
held 955:7
help 898:10 903:21
904:15 906:1,11
914:3 929:6
949:18 956:17
960:19 977:3,4,10
978:17 985:15
986:6,17 987:3,9
988:2,4,7,10,12
1003:14 1005:10
1015:6 1022:3
1031:18 1038:7
1044:5,6 1054:22
1055:12 1061:7
1062:9 1068:14
1072:5 1075:17
1077:22 1081:2,5
1081:10,10
1084:12 1085:18
1085:20 1086:1
1086:22 1091:1,2
1091:19
helped 951:6
956:14 1015:14
1026:13 1088:4
Helper 954:7
helpful 892:20
1073:13
helping 978:18
1005:12,12
1025:11 1055:1
1058:20 1073:22
1076:19 1107:3
heritage 954:2,3
1017:10 1048:12
1048:15
Hi 1105:17

hiatus 1093:16
hiding 1094:21
high 886:19 947:19
1018:9
high-powered
1003:11
higher 926:21
highlighting
1022:16
highly 901:19
highway 963:22
1014:3,13
Hill 948:12,18,20
974:16 985:9
1047:5,6,7
Hillary 997:17
1028:18,19
Hills 1014:4
1016:22
hinge 892:3
hired 889:19
903:19 937:20
978:6
hiring 884:16
history 881:9,10
965:10 972:20
1098:19
hit 978:13 1014:8
1014:15,21
hobby 948:16 957:3
hoc 871:3,10
1097:3
hold 1064:12
1065:22,22
1096:7
holds 1001:8
holidays 948:14
Hollywood 872:6
home 958:18,18
1003:17 1013:20
honest 955:1,2
962:16 979:3
honestly 1019:20
1049:3
honesty 903:22
honor 876:5 878:4
895:13 897:18
898:10 900:4
904:14 917:19
921:7 923:7 924:5
925:16 928:1
933:7 934:4 943:5
948:5 991:13
994:6 996:11
1008:14 1009:18

1010:1 1036:22
1064:9 1093:8
Honorable 920:9
Honors 1021:19
1058:16
hope 1105:18
1106:1,8
hopefully 920:16
host 887:15
hostility 979:18,19
hosting 883:7
hosts 1023:9
hotel 1008:20
1024:21
hour 876:8 878:2
946:4,6,8 989:20
989:21 1014:9
hours 900:8
house 914:4 987:8
987:21 1002:4
1015:2,10 1026:1
Howard 1009:10
HUD 959:14
Hughes 1009:10
human 886:3
887:11
hundred 1061:17
hurt 998:14,14
hurtful 1083:20
hurting 960:2,3
hurts 1076:1
1086:17
husband 1002:3
1004:17 1075:13
Hussein 1094:18
Huvelle 1000:12,16
Hyatt 978:12
1020:22 1047:17

_____

**I**

IAMA 881:8
idea 905:22
1005:14 1086:12
1108:14
identified 940:16
978:16 981:16
993:17
identify 905:11
1033:17,21
ideology 955:18
II 1007:12
III 871:20
ill 1075:18
illegal 930:22
illegally 884:16
imagine 919:1

922:13 995:22
immediate 1062:22
immigrants 961:7
immigration 960:14
960:16 961:6,18
impasse 885:8,10
885:12,13
implied 1086:11
implying 1086:16
import/export
951:21
important 883:6
900:4 961:19
980:5 984:9
1042:2 1046:15
1049:5 1072:9
1073:6 1082:21
1092:20
importers 953:1,1
impressed 901:8
979:2
impression 907:15
949:7,8 1010:8
improve 962:15
inactive 964:13,16
inappropriate
1020:3
inaudible 958:4
inch 898:17 994:19
995:12,20
inch-and-a-half
995:12
inclined 876:1
877:20
include 887:15
998:8
included 1028:19
including 1050:20
1074:21 1091:5
incoming 914:4
inconsistency
1040:15
inconsistent
1040:14
inconvenience
877:21
incorporated 905:3
incorrect 942:2
1043:6 1046:6
incredibly 1021:2
indefinitely
1075:12
independent 959:11
indicate 947:12
indicating 879:22
indication 1051:12

individual 883:9
956:9
individual's 911:17
individually 1103:5
individuals 1104:4
indulge 933:18
indulges 979:14
indulging 1080:8
industry 952:17
inexplicable 1000:4
inflate 958:3
influence 907:12
909:19 984:17
influenced 1062:5
influential 907:14
info 927:19
inform 932:4
informal 966:6
information 901:5
905:16 909:12
917:14 977:17
990:2 997:9,11
1002:4 1011:22
informed 911:10
1091:14
initial 983:18
1003:13
initially 911:2
927:20 973:22
999:22 1016:5
1020:14
injunction 1002:21
1005:21 1006:4
1006:17 1007:2
1021:6 1034:15
1062:3 1069:16
injustice 1018:5
1019:19
inquiry 887:15
inside 883:14
insofar 974:15
install 959:14
instance 953:2
955:21 990:7
instructed 932:4
instructing 1040:8
instructions
1043:17 1045:15
instructs 1038:3
instrumental
1009:13
insurance 1016:16
1016:17
integrity 954:7
intellectually
1017:22

In Re:  Larry E. Klayman
June 25, 2018

intended 1072:11
1080:16
intent 1007:14,22
1008:14
intention 1060:19
interacted 1010:21
interacting 929:1
interaction 1085:3
interactions 1085:9
intercede 912:21
interest 962:15
963:3,3 980:8
1019:10 1030:15
1030:18 1042:13
1058:16,17
1077:1,1,2
interested 937:7
976:16
interesting 1008:9
interestingly
952:16 960:14
962:3
interests 903:9,11
963:1 974:10
interfered 1058:3
international 951:9
951:13,20 952:6
952:22 957:2
960:9 961:2,16
963:14
internationally
951:12
interrupt 877:17
879:17 1000:10
1073:17 1092:21
interrupted
1096:18
intervening
1093:16
interview 906:14
907:1 974:17,21
975:3 1027:1,11
interviewed 950:21
intimate 1083:7
intractable 893:3
introduce 987:17
990:5 993:13
introduced 937:13
961:13 978:21
993:18 1025:20
1026:11,21
investigation
919:14 926:1
investment 958:4
invited 975:19
involved 938:17

958:22 974:1,12
involvement 890:22
involves 946:2
involving 926:20
957:6 1040:10
Iran 884:2 894:10
909:3,5,19 910:2
910:6,9,11,13
973:15 974:4,9
989:4,7 1023:3,8
1026:20 1077:4
1085:15
Iran/Iraq 1094:18
Iranian 974:2,5,15
984:11 986:8
987:4 1002:10
1003:19
Iranians 989:12
999:13 1026:6
ironically 948:13
962:12 992:9
IRSgate 957:7
Islam 1026:7,8,8
Israel 974:10
Israeli-American
1013:17
issuance 1016:8
issue 902:20 919:21
921:17 922:14
924:8 974:8
1000:7 1004:1
1011:15 1033:18
1080:3
issues 923:12 930:1
938:19 986:3
1001:16 1006:20
1081:1 1089:12
Italian 951:10
952:12
Italy 952:13
IV 870:6

_____
J
_____
J 872:3,4
Jack 960:19
Jackson 981:8
1005:3
James 978:5
jammed 1014:16
jams 1014:8
January 921:11
922:6 925:2,7
932:15 1049:19
1049:22 1050:8
1050:13,17
Jesus 1018:7

Jewish 954:3
1017:9,9,22
1018:1 1022:15
1022:16 1023:17
1024:7 1090:10
1090:10,13
job 883:6 963:13
1003:21 1024:1
1026:16 1061:19
1075:18 1083:13
jobs 949:17
Joe 885:22
John 913:14 914:3
951:1 956:22
985:20 987:5,14
1000:1,2,2
Johnson 921:11,14
922:7,9,16
joke 1023:1
jokingly 989:6
Jose 959:4
judge 926:11
934:11,14 953:21
954:2 999:5
1000:1,5,8,12
1005:21 1006:3
1006:20,22
1007:4,5 1008:8,9
1008:18 1009:17
1009:22 1010:10
1011:3,5,8,9
1012:19,20,21
1015:22 1029:19
1031:21 1033:20
1034:4,22
1049:19 1050:1
1050:13,17
1062:1 1064:7
1069:8 1070:14
1092:11 1109:10
1109:12
judges 953:16
955:4 962:17
980:6,7 1000:14
1001:22
judgment 959:2
978:3 1013:9
1056:11,13
judicial 949:10
954:17,20 955:15
957:3 959:1 962:1
977:22 980:7
987:12 1001:17
1001:22 1012:18
1013:4,14
1015:14 1054:9

July 940:19 955:15
1016:9 1025:21
1035:6
jump 1039:21
1064:19
June 870:8 874:3,4
906:20 1016:5
1035:8 1061:5
1067:2,18 1068:1
1068:19 1069:3
1070:1 1100:8
1101:4 1110:4
jury 1008:13
justice 920:6,12,20
950:17 951:2
960:10 961:16
962:11 972:19
1000:2 1012:17
1107:10

_____
K
_____
K-e-v-a-h 1004:3
Kaiser 1016:15
Kamenei 1094:19
karma 1090:15
Kathleen 967:2
968:15 1025:2
1058:20 1085:10
1085:21 1086:3
1086:20 1087:3
1088:1,3
keep 878:12 953:10
955:1,1,11
1061:14 1075:1,3
Keeper 881:16
keeps 881:2
Kemp 960:19
Kenneth 912:10
kept 918:8 992:13
1000:15
Kevah 1004:3,20
1005:12 1022:4
1076:19
key 966:18 1061:6
Keya 986:9,18,19
986:20 987:2
Keya's 986:9,14
keyed 1004:8,14
Khomeini 989:4
1094:19
kids 1017:17
kill 882:9
killed 973:20
Kim 870:22 871:4
Kincaid 1054:5,7
kind 887:10,16

890:10 893:14
918:20 921:16
949:9 950:5 953:3
957:1,4 964:7
972:22 976:17
995:2 1007:7
1008:9 1015:13
1019:13 1025:6,7
1032:7,14,15
1048:8 1051:22
1057:11,12
1060:20 1062:10
1066:2 1068:6,8
1080:9,21 1083:7
1083:7 1084:17
1090:11
kindness 1084:9
kinds 951:20 957:7
998:4 1003:8
1006:8 1054:17
1054:18
kiss 976:1,5 988:6
Klayman 870:5
872:10 873:4
874:12,13,17
875:1,11,15 876:4
876:14 877:2,6,13
877:19 878:3,13
878:18 879:12,14
880:4,7,15 881:2
881:4 885:16
889:15 894:1,3,8
895:5,10,18,22
896:4,10,16 897:1
897:2,18,22 898:6
898:10,14,16,20
899:2,5,9,16
900:3,6,13,15,18
901:21 903:8
904:1,4,14,19
905:2,8,17 906:9
906:10 908:20
909:13,16 911:19
911:21 914:8,11
914:18,21 915:16
915:21 916:1
917:4,7,18 921:6
921:9 923:7,11
924:3,7 925:15,18
925:20 928:1,5,17
930:9 932:5
933:15 934:4,8
935:16 936:1,12
936:15,19 937:11
937:13,18,21
938:4,16 939:1

_____
202-347-3700
Ace-Federal Reporters, Inc.
866-928-6509
_____

In Re: Larry E. Klayman
June 25, 2018

941:4,11,19
942:21 943:3,5,14
944:3,6 945:4,16
945:18 946:1,5,11
946:17 947:3,10
947:14,15 951:16
951:17 953:13,14
959:20 962:6
963:5 964:8
967:11 968:7
972:16 974:20
990:4 991:7,17
994:7 997:4
1007:20 1008:11
1008:19 1012:15
1029:20 1032:4
1037:10 1038:4
1038:16 1039:21
1041:1 1042:15
1042:20,22
1049:11 1050:12
1061:2 1070:21
1071:7 1074:4
1077:9 1082:3,13
1082:19 1085:5
1090:1 1097:19
1098:3,10
1103:16 1104:19
1104:21 1105:3,7
1105:11 1106:4
1107:13 1108:6
1108:13 1109:1,6
1109:13,16
**Klayman's** 901:5
1096:18
**knew** 927:17 957:8
976:14 980:2
987:12 1011:1,5
1015:8 1029:9
1043:9 1054:22
1060:11,11
1062:16,18
1091:11 1094:5
**knock** 1019:12
**know** 878:3,10
887:17 893:3,18
893:19,19 902:10
903:21 910:5
912:17,22 913:4,6
916:17 918:10
919:2 924:10
934:15,16 939:7
945:7 952:2
955:13 957:5,8
962:6 963:1,6,12
964:4 966:5

973:17 974:15,19
975:2 976:1,10,11
976:15,17 977:5
977:10 978:11,14
978:17,21 979:3
980:10,14 981:13
981:13 982:20,22
984:11 985:14
986:8 987:3,4,11
987:14 988:13
989:21 996:8
998:20 999:2
1002:15 1008:18
1008:22 1009:21
1010:20 1011:8
1012:16 1013:2,3
1014:18 1018:3
1019:4,5,9
1021:16 1025:11
1026:12 1027:7
1032:10 1039:5,7
1042:9 1046:16
1051:17 1052:1
1053:11 1054:17
1055:2 1056:13
1057:2,6,11
1058:5 1060:9
1062:3,7,11
1065:6,17
1066:13 1067:14
1068:7 1071:21
1073:4 1074:7
1076:11,12
1080:2,3,15
1081:2,12,22
1083:1,7,17
1087:6 1090:9,12
1091:4 1092:15
1093:5 1094:1,6,9
1094:14 1095:2,3
1096:3 1101:10
1102:6,13,15,21
1103:10 1105:5
1106:7,15
**knowing** 985:8
1051:20 1103:9
**knowledge** 883:14
884:15 900:9
902:19 916:3
929:13 1006:14
**known** 931:7 960:9
985:16 1085:13
**knows** 1053:6
1078:19
**Kollar-Kotelly**
926:11 934:14

1000:5
**Kollmer-Dorsey**
985:4
**Kotelly** 1000:17,18
1005:21 1006:3
1006:20 1007:1
1010:4,7 1011:5
1016:1,4 1029:10
1031:21,22
1033:20 1049:19
1050:1,17 1062:1
1064:7 1084:19
1092:11 1093:4
**Kotelly's** 1034:4
1050:13 1069:8
1070:15

_____

**L**

**LA** 907:2 982:3
984:21 999:1,20
1002:20 1003:3
1005:16 1010:6
1013:18,21
1014:5 1016:19
1017:2 1020:14
1021:7 1024:12
1086:11 1106:1
**labor** 885:2 887:9
931:12
**lack** 909:6 915:10
936:15 1066:3
1084:21
**lacked** 1022:20
**lacks** 943:14
**lady** 974:18 1029:1
**language** 892:3
1005:7 1026:20
**Lanny** 920:9
**laptop** 1014:22
**large** 889:5 1100:17
**largest** 889:6
**Larkin** 871:13
950:12 968:2
1045:19 1046:1
1089:4
**Larry** 870:5 872:10
873:4 889:15
894:8 905:17
906:9,10 925:21
926:8 932:4
941:11 947:3,14
951:16 953:14
962:6 974:20
975:14 976:21
982:9 987:17
1010:5 1011:10

1017:19 1018:6
1018:20 1021:22
1026:2 1038:4
1074:4 1082:19
1082:19 1100:22
1106:4
**Las** 1047:3
**late** 973:11
**Latin** 961:9,9
**Latino** 961:9,10
**Latins** 976:2,4
**latitude** 1032:4
**law** 872:4 948:9,10
950:6,8 951:13,16
951:16 952:1,7
953:13 956:16
963:18 964:7,9,17
972:17 1010:15
1011:14 1012:3
1019:10 1034:7
1034:19 1042:20
1042:22 1098:21
1098:22 1099:22
1102:21,22
1103:1,4,5
**lawsuit** 974:21
981:11 997:5,13
1072:7
**lawsuits** 957:14
974:14 981:2,3
**lawyer** 929:5 950:3
950:5,11 957:2
979:11 1007:16
1008:4 1009:11
1013:7 1058:19
1059:1 1060:8
1076:20 1077:2
1077:21 1080:2
1086:18 1091:18
1092:1 1098:19
1099:20,21
**lawyers** 1011:16
1057:8 1073:2
**lay** 1016:12
**laying** 1087:17
**lead** 880:6
**leaders** 973:15
**leading** 888:2
901:20 936:13
938:16 1098:22
**lean** 1083:19
1084:2
**learn** 963:17 1026:4
**learned** 911:3
937:16 949:20
950:10 1005:7

1042:11 1050:2
**learning** 943:21
**lease** 1007:15
1020:19 1074:9
1074:16
**leave** 914:8 915:8
922:4 992:11,16
999:19 1002:22
1074:11
**Leaving** 1032:18
**led** 956:21
**left** 949:6 951:8
972:19 975:11
1013:5 1014:15
1019:15 1106:8
**legal** 954:8 955:3,6
961:6 962:15
980:3 1013:13
1032:22 1078:7
1078:18
**lengthy** 994:11
**Leonard** 951:14
952:19
**lesser** 1025:4
**lessors** 1053:10,16
**let's** 876:2 898:16
967:17 980:15
987:8 991:4
1009:21 1027:18
1039:14 1092:14
1102:3
**letter** 888:12
914:16 915:3
919:10,17 920:6
920:14,17,17
921:11,15 922:7
922:10,16 928:6
928:11 939:21
940:3,6 942:6,10
942:11,19
1007:14,22
1008:14 1031:16
1037:22 1038:1,2
1038:5,17,18
1039:17 1040:7
1041:20 1043:7
1044:21 1045:13
1046:8,11,11
1047:22 1050:6
1051:21 1053:5
1056:8 1059:9
1067:1 1069:4
1071:3,14,16,17
1071:17 1091:18
1092:3 1102:9
**letter's** 1060:21

letter/email
1068:20
letterhead 1044:18
letters 949:6 950:1
985:1 1037:20
1042:16,17
1049:4,14
level 1053:12
Lewinsky 1002:5
liaised 1066:12
liberal 949:13
955:20
liberate 1077:4
Libertarian 955:17
955:19 1002:10
licensed 964:9,10
1100:1,3
Lichtblau 1001:3
Lieberman 986:5
life 978:8,9 1013:3
1019:16 1047:16
1064:17 1065:4
1065:20,21
1066:1,21
1080:19 1082:21
1083:18 1090:19
1090:19,20
1091:3 1093:21
1095:4 1099:14
life's 1064:12
1093:21
lifetime 962:19
liked 929:21 948:16
960:20 1003:18
1003:19,21
likelihood 1062:21
1072:2
line 970:14 999:6
1061:2 1062:20
1068:20 1070:21
1073:20
link 968:11
list 874:14,18
listening 883:2
litany 1087:7
literal 1005:5
literally 950:16
1094:21
literature 948:4
litigating 999:3
litigation 950:6,10
951:20 952:7
963:17 964:3
998:17 1033:5
1035:6
little 875:22 876:2

878:2 881:1
935:16 948:19
949:2 950:4
973:14 974:5,6
978:11 979:13
993:5 996:3
1007:16 1030:3
1036:17 1059:5
1060:4 1064:19
1066:3 1069:22
1090:21 1109:15
1109:16
live 954:10 992:12
1001:19 1075:5
lived 973:2,4
1014:1
lives 986:8
living 954:9,18
1003:22 1004:2
1004:20 1072:14
1094:2 1100:20
lobby 910:15
1048:16
lobbying 912:16,18
local 881:20,21,21
882:4 905:15
931:20,21
locale 1017:1
located 1053:6,9,12
long 935:10 952:2
972:16 1003:7,9
1009:8 1054:5
1104:1 1109:18
long-term 1080:16
longer 878:2 999:7
1107:6 1109:4
look 880:5 914:12
914:22 915:7
916:17 919:16
966:2 969:14,15
987:6 989:21
1020:21 1023:17
1038:16 1041:1
1054:2 1055:10
1056:1 1070:22
1077:9 1079:9
1082:14 1085:5
1088:10 1093:7
1096:1
looked 896:8 966:1
looking 896:2,15,16
899:7 942:1
966:16 967:15
969:17,19,22
1014:22 1079:6
1088:17 1104:13

1106:11,18
looks 879:21 922:12
933:6
loophole 973:1
loosing 1090:16
Loral 956:10
Los 887:22 888:8
888:21 889:5
892:9,12 906:15
915:9 926:12
937:7,17 956:6
992:12 998:19
999:13,15
1002:22 1003:1
1003:16 1012:8
1026:19 1056:16
1064:15 1067:11
1100:20
lose 927:13 1021:4
1084:4,14 1090:5
losers 886:16
loss 1058:12
lost 884:18 931:4
959:15 971:10
1021:9,10
1029:16,18
1051:11 1088:22
1090:2,5
lot 877:13 910:21
952:10 957:12
961:13 964:14
971:6 977:8 988:1
1012:16 1019:7
1022:22 1026:6
1032:8,9 1035:2
1043:14 1046:5
1050:19 1051:7
1051:10,10
1052:6 1053:20
1057:19 1066:10
1073:12 1076:5
1085:3 1094:16
1095:3
lots 1023:4
Louise 1013:22
1015:13
love 943:4,13
949:20 950:13
959:7 1076:3,4,4
1076:5,5,6 1080:9
1080:15,20
1083:9 1105:21
loved 949:3 950:14
961:8
loves 1105:22
Loving 894:8

lower 1022:1
1089:15
luck 1107:9
lucky 950:11
lunch 876:6 878:2
1009:21 1065:2
luncheon 1037:2
Luxe 1024:21

_____
**M**
_____

M 870:22 871:4
1025:19
M-e-d-h-i 991:19
M.D 1003:9
machine 959:14
magazine 939:6
Mahmonir 902:13
mail 1044:13
1050:19,20
1051:3,4 1052:4,7
1053:8
mailed 1050:15
major 892:6 961:21
making 972:10
1052:16 1064:17
1082:11 1094:2
malicious 978:3
mall 893:14 894:15
975:8
man 949:4,12,12
961:1 1007:7,12
1065:4
man's 1065:4
management 883:1
884:22
management's
901:14
manager 1085:22
1087:16
managers 893:2
981:7
manner 1032:5
1068:16
Manohir 902:10
Manouchehr
973:17,21,22
March 922:16
993:1 1104:17
1105:13 1106:21
Mark 1026:21
1027:6
marked 995:13
Maroko 1098:21
1099:22 1102:10
marquis 1051:22
marriage 1080:17

married 954:18
Martinez 959:15
MARY 871:13
Maryland 881:13
mass 957:17
Massachusetts
1043:1 1046:9
1048:9
match 974:17
materials 913:18
matriculated
947:22
matter 870:4
875:13 876:12
878:1,14,14,15
884:14 914:15
968:17 996:4
1026:15 1032:15
1076:2
matters 874:8,12
876:15 914:15
922:1 952:3 963:6
980:3 1003:8
McCain 913:14
985:20 986:1
mean 884:1 890:8
910:21 927:19
942:17 952:5
977:7 978:12
992:9 1001:19
1002:11 1018:7
1022:12 1023:16
1023:19 1024:19
1032:3 1040:2,17
1043:21 1047:17
1049:16 1051:14
1064:8 1066:2
1068:8 1083:7
1084:21 1086:4
1086:13 1093:15
1098:16
means 909:12 939:4
1059:22 1072:12
1093:3
meant 1023:20
1073:5 1083:22
1090:6
media 908:19
938:14 939:4
1023:21
medical 916:3
917:16 1003:3
1011:22
medication 1105:19
meet 973:9,12
975:17 985:10

986:18 987:2,8
1024:4 1100:19
1100:20 1105:15
**meeting** 905:17
936:19 937:3,21
938:8 958:9 988:5
1011:2 1106:2
**meetings** 890:2,5
958:9 979:4,17
985:2,21,22
**Mehdi** 883:10
977:1
**Mel** 959:14
**member** 871:14,16
911:4 912:11
964:12,16,16
972:18
**members** 874:6
910:6 930:16
947:9 969:12
985:22 1028:16
1099:9,11
**memory** 1016:11
1054:8
**men** 983:3 1094:8
**mentality** 1057:13
**mention** 937:6
**mentioned** 1069:17
**mentored** 1026:12
**message** 975:11
1075:22
**met** 882:13 886:7
887:3 889:13,19
889:20,22 890:21
890:22 925:22
937:10,17 938:3
973:11 975:20
977:11,12,14
979:1,1 985:15
986:19 987:10
1025:3 1027:10
1085:20,21
**Miami** 950:6,14
961:9,10 1023:18
**MICHAEL** 871:15
**Michigan** 881:8
**microphone** 874:16
**middle** 916:21
947:15 974:11
984:6
**Mike** 1102:10
**miles** 1014:9
**million** 999:13
**mind** 990:8 1012:2
1069:5
**mine** 955:18,20

994:22 1007:6
1013:17,17
**miniature** 1024:6
**minister** 1025:21
**minorities** 960:21
**minute** 904:9
933:10 962:5
967:10 969:11
990:12 991:3,4
1071:6 1083:11
1092:22 1095:12
**minutes** 876:8
877:18 976:20
979:5 1028:9
1031:9 1032:13
1033:4 1036:20
1096:9 1107:1
1109:21
**misread** 925:3
**missed** 926:17
**missing** 1027:2
1051:10
**mission** 909:4
956:13 961:4
**missions** 956:5
**misspoken** 997:6,7
**Mm-hmm** 885:20
947:21 948:2
963:11 970:18
**mocking** 954:1,2,4
1017:8 1022:15
**mode** 1066:9
**Mohammadi**
973:17 974:22
975:6
**mom** 1013:22
1015:13 1105:21
1105:21,22
1106:1
**mom's** 1015:2,10
**Monday** 870:8
**money** 977:8
978:11 992:1
999:8 1006:11
1058:10 1061:8
1061:15 1062:13
1062:15,17
1074:10 1083:12
1083:14
**monopoly** 951:7
**month** 1093:21
**monthly** 1074:20
**months** 900:15
973:2,4 1074:17
1074:19 1092:4
1093:10

**morning** 874:2
878:11,22 879:1
936:6,7 947:9,11
981:17 982:18
985:2 1015:11
1074:17 1078:17
1079:18 1108:22
1109:9 1110:2
**Morton's** 986:19
**Mother** 1017:14
**motion** 1006:7,16
1007:1 1021:5
1029:9 1035:7
**motivation** 1061:8
**move** 875:16,18
888:17 895:14
904:4,5,6 914:18
917:4,18 919:3
921:6 923:7
925:18 928:1
933:7 936:13
966:18 968:12
969:9 971:13
979:14 980:5
993:11 1023:20
1036:4 1074:8
1075:10
**moved** 881:12,14
881:17 915:12
927:3 980:22
1005:5,20
1010:22 1011:3,5
1013:21
**movement** 973:15
973:16 974:2
1077:4
**moves** 1032:7
**Movie** 1024:3,4
**moving** 937:7
964:14 1020:13
1044:2 1046:5
1049:3 1051:7
**Mughals** 884:1
**mullah** 989:3
**mullahs** 1026:9
**mumbling** 935:15
955:13
**Muslim** 1024:8
1026:2 1027:7
**mutual** 1103:10

_____
**N**
**N** 873:1 874:1
1037:4,4,4
**naked** 1087:17
**name** 879:3 880:18

882:15 901:5,7
902:16,17 905:13
910:7 911:5,17
929:5 932:6
947:13,15 951:13
954:16,20,21
956:9,22 961:3
978:5 987:15
1000:22 1017:15
1078:13,18
1084:1 1098:13
1101:14 1102:11
1105:17
**named** 883:9
950:12,21 981:13
986:9 989:2
997:16 1004:3,6
1030:19 1066:4
**names** 973:16
1027:6
**naming** 997:22
1030:16
**narrative** 979:13
1016:2 1032:5,7
1040:18,19
**nasty** 1018:10
1021:12 1091:17
**national** 953:18
963:22
**naught** 1058:7
**near** 888:13 977:14
1062:21
**nearly** 900:11
**neat** 1075:1
**necessarily** 1031:10
**necessary** 879:20
1105:4
**need** 878:8 921:16
921:17 977:3
978:4 988:13
1021:21 1023:22
1040:18 1063:6
1081:11 1083:16
1099:19
**needed** 919:3
979:10,21 981:6
1003:14 1015:6
1041:21 1042:8
1044:6 1053:18
1057:8 1076:14
1091:13
**needs** 1036:16
1077:20
**negative** 891:4
895:2
**negotiate** 884:11

885:9 901:13
1072:6
**negotiated** 989:13
**negotiating** 885:6
**negotiations** 885:3
891:12
**neither** 927:10
1054:19
**nervous** 915:9
1003:4
**Netflix** 1099:13,16
**network** 883:14
889:4 902:7 903:4
906:12 909:2
929:16 984:2
989:6 1025:20
1061:11,16,19
1078:21
**networks** 910:19
1023:7 1064:15
**Nevada** 1047:3
**never** 903:22
910:14 961:6
977:8 986:1 992:4
999:8 1003:20
1005:6 1009:20
1025:21 1034:9
1043:6 1044:14
1046:1 1051:1,5
1053:17 1056:22
1057:21,22
1058:9 1061:13
1062:13,22
1063:1,1 1066:19
1072:16 1073:3,3
1080:12,13,13
1083:21 1086:10
1102:8
**new** 885:6 1001:2
1007:16 1008:20
1023:18 1048:17
1083:14 1100:4
1105:6
**news** 883:14 888:17
889:4 891:22
902:7 903:4
905:19 906:12
909:2 916:9,21
929:16 982:14
983:18 984:2
989:5 1023:8,10
1026:17 1061:11
1061:16 1078:21
1091:9
**newspaper** 939:6
980:9 1001:14

newsroom 891:17
Newt 958:13
nice 949:12 974:6
  975:18 1031:18
  1054:6 1071:22
  1072:3
niceties 976:11
night 1034:21
  1067:19 1070:3,4
  1099:6
ninth 1007:17
NITV 1004:6
non-citizen 930:16
non-citizens 884:17
non-existent 900:11
non-familiarity
  1054:10
non-lawyers
  1031:17 1042:11
noncommunicative
  1074:14
nonpartisan 955:17
  957:12 958:11
North 948:1
Notary 871:5
notation 1036:19
note 874:4
notebook 995:6,7
notes 978:2 983:12
  1015:17 1102:19
notice 878:10
  993:21 1031:21
  1040:9,11 1041:5
  1043:19 1054:9
  1054:18 1074:11
noticed 987:1
notification
  1037:20
notified 971:7
notify 1074:16
  1089:18
November 1035:13
  1042:19 1043:3
  1050:6 1074:5
nuclear 974:8
number 880:5
  899:9 903:3
  905:16 906:8
  907:11 940:13
  942:4 953:5
  964:18 968:1
  971:18 972:2,7
  975:10 993:21,22
  996:1 998:17
  1005:15 1013:9
  1037:22 1038:8

1038:10,11
1041:2 1047:13
1047:20,21
1049:1 1051:17
1051:17 1065:7
1080:6 1100:7
numbered 875:13
  898:4
numbers 1105:2
NW 871:2

**O**

O 874:1 1000:11
  1037:4,4,4
o'clock 876:7
  945:21 946:3
oath 874:7
Obama 957:22
  989:11
object 876:2 994:2
  1059:7
objection 888:2
  895:16 901:20
  905:5 907:9
  911:15 914:20
  915:14 917:20
  921:8 923:9 928:3
  928:14 930:3
  933:9 936:12
  938:16 939:1
  943:5,14 972:13
  1036:14 1039:13
  1040:17 1042:3
  1096:5
objections 939:14
objective 890:11
obligation 945:22
  1049:5
observe 1050:5
obviously 962:13
  1010:5,11 1018:8
  1018:22 1029:10
  1059:1 1064:13
  1065:22 1088:5
occasion 987:11
occupation 950:2,3
occurred 916:9
  999:19 1016:9
  1062:1 1103:18
Ocean 881:12
OCR 918:15,16
  922:10,17 923:12
  926:1
October 1035:13
  1077:10 1089:16
odd 949:16

offend 989:12
offended 989:13
offer 891:12 916:8
  940:6,11 1008:1
offered 888:14
  891:14 951:1
  963:14
offering 916:20
offhand 918:22
office 872:4 881:16
  882:10,19,21
  889:21 892:19
  913:7 918:12,19
  919:15 921:12
  922:22 923:22
  924:1 930:21
  932:22 938:9
  950:19 951:16
  953:14 955:22
  964:5 981:17
  985:19 988:9
  992:16 998:11
  999:10 1007:9
  1009:14 1015:16
  1016:19,21
  1021:8 1045:2,8
  1045:11 1046:9
  1046:18 1047:5,7
  1047:8,10,19
  1048:11,17
  1050:21 1058:22
  1085:11,22
offices 889:4,9
  913:1,15 1049:2
Oftentimes 887:20
oh 884:8 915:19
  1055:17 1088:19
ok 875:8 876:4,14
  876:18 877:5
  878:18 880:1,17
  894:4 896:6
  897:11 899:5,10
  912:19 916:14
  917:10 919:12,18
  927:9 934:6
  936:10 938:11
  940:1 941:3 942:8
  945:4,17 954:14
  958:16 975:11
  991:14 996:7,12
  1008:6 1009:6
  1011:13 1012:13
  1016:10 1020:18
  1028:3,10 1030:8
  1037:18 1038:6
  1040:9 1041:1

1044:11 1052:12
1053:15 1056:6
1061:4 1067:15
1068:5 1069:17
1070:13,17
1091:8 1099:7
1103:6
Oklahoma 913:8,9
old 880:20 953:6
  974:18
older 1048:19,21
once 1094:17
one-month 1075:3
one-way 1092:16
ongoing 981:21
  1032:7
open 1028:14
  1051:4 1082:3
Open-Ended 886:2
opinion 900:18
  934:19 1011:13
  1011:14
opinionated
  1022:10
OPM 906:5
opposed 1002:5
optimal 1000:19
option 890:10
options 937:4
  938:14,18 939:5
Orange 1058:22
  1085:16,17
order 877:1 889:9
  926:11,22 938:18
  1004:15 1006:16
  1016:8 1035:6
  1096:19
ordered 1090:17
orders 1011:7
  1029:8
organization
  954:21 977:22
  1002:7
organizational
  996:3
origin 953:18
Oscars 1024:11
ought 927:5
outlined 940:6
outset 998:16
outside 959:17
  999:14 1103:5
over-surveillance
  1000:22
overall 998:8
overcome 959:13

overnight 1093:6
overrule 1059:15
overruled 888:3
  930:5 943:17
  1042:7
overseas 956:5
  985:13
Oversight 913:12
overthrown 948:7
owe 1062:13
  1075:14
owes 1066:15
owned 986:12
  1007:12,19
owner 1004:6
Oz 1059:6 1060:5,6

**P**

P 874:1
p.m 874:20 1037:2
  1037:5 1101:4
  1105:13 1106:21
Pacer 1050:4
packages 883:5
  1005:11
page 894:2 905:11
  916:11 917:9
  922:6 932:3 933:5
  942:5 971:17
  972:8 1034:1
  1078:16 1096:3
  1105:8
pages 898:17
  1034:1 1082:4
paid 931:6,8 992:20
  1003:12 1018:22
  1020:13,13,14
  1026:16 1043:20
  1043:22 1066:20
  1073:2,3,4,9,20
panel 954:11
  979:14
paragraph 897:15
  899:19,21 900:1,5
  901:4 903:7
  905:12 932:3
  968:16 1061:6,7
  1063:9 1069:1
  1078:6
paragraphs 898:5
parcel 1041:14
part 878:1,9 892:3
  892:7 898:1
  904:12 926:19
  928:7 963:9,10
  983:19,19 984:1,5

994:18,20,21
995:1,6,7,15
996:18 997:8
998:7 1033:20
1035:15 1041:14
1043:19 1052:18
1053:9 1072:11
1077:3 1081:6
1082:22 1103:12
1109:3
**partially** 877:22
**particular** 938:14
938:22
**particularly** 962:17
962:21 999:17
1011:21 1084:18
1094:8
**parties** 871:7 874:5
949:1 988:22
998:13 1090:7
1096:16
**partner** 1055:1
1099:21 1102:10
1106:13
**party** 959:12
960:21 961:21
**pass** 1005:17
**passed** 926:2 973:5
1000:14 1006:12
1011:22 1107:5
**path** 975:7
**patio** 986:22
**Patty** 1100:11
**Paul** 950:12
**pause** 904:10
933:12 1071:8
**pay** 931:5 956:17
992:17 1018:21
1022:2 1023:6
1057:21,22
1058:6,8,9,10
1072:12,13,22
**paying** 1072:21
1083:12
**payments** 1022:1,2
**penalty** 955:21
**pending** 970:22
**Pennsylvania**
881:12 947:20
948:12 964:13,17
964:21,22 965:11
968:19 970:15,20
970:21 971:2,11
1007:10 1008:15
1009:2 1042:21
1044:9,15,16

1045:4,6,12,20
1051:13,14,19
1052:17
**Pentagon** 977:14
**people** 893:8,17,18
902:6 911:22
950:9 952:3 957:5
957:11,12,18
958:5 960:3
962:22 972:20
973:20 976:6
979:10 980:12
983:1 984:11,11
986:11,16 989:1
999:15 1001:20
1019:12 1024:4
1024:11,21
1046:22 1051:4
1052:6,6 1058:3
1058:19 1063:20
1066:10 1076:5
1077:6 1081:2
1090:19 1094:4,5
1094:8,16
**people's** 1017:3
**perceive** 884:3
895:6
**perceived** 935:3
957:16 983:2
1059:4 1089:1,6
**percent** 1056:21
1057:1,1,17
1060:19
**percentage** 1061:12
**perfect** 1041:20
1043:5 1091:12
**period** 926:15
959:22 1041:15
1047:15 1050:18
1051:7 1053:21
1057:3 1067:11
1068:4 1075:4
1080:19 1092:5
1093:4,16
**periodically** 1094:3
**periods** 900:15
1019:6
**permanent** 1021:6
**Permanente**
1016:15
**permission** 877:9
1109:8
**perplexed** 1058:12
**Persia** 883:14 889:4
902:7 903:4
906:12 909:2

929:16 984:2
989:5 1061:10,16
1078:20
**Persian** 888:15
889:5 891:15
976:1,3 982:3
983:19 984:11,16
1023:9,10,17
1064:15 1077:4
1083:22
**person** 883:6,9
888:11,13 891:19
912:5 929:19
941:3 948:22
979:3 998:15
1001:10 1013:6
1039:4 1062:10
1065:5,14
1066:18 1078:14
1095:7
**personal** 939:10
940:9 975:10
978:9 1001:21
1009:5 1013:3
1021:16 1057:6
1076:21,22
1078:11
**personality** 1060:14
**personally** 960:19
1072:21
**persons** 1037:8
1087:8
**persuasive** 1023:4
**pertaining** 1059:11
**peruses** 916:18
**Peterson** 978:6
**petitioner's** 965:20
965:22 966:12
967:5,18,21 968:5
968:7
**PhD** 1003:7
**Philadelphia**
947:19 958:19
**phon** 886:2 902:10
**phone** 975:10
**physicians** 1003:17
**PI** 1070:1
**picked** 1020:17
**picking** 959:4
**picture** 927:6
1048:9
**placate** 1071:22
**place** 977:12 980:4
1028:15 1053:21
1075:4 1101:21
**places** 1023:5

plane 956:7
**play** 1090:19
**played** 956:2 959:6
**pleadings** 990:5
993:22 1029:7
1033:18 1036:8
1036:12 1109:3
**pleasantries** 976:11
**please** 874:16
879:10 880:18
894:1 895:10
921:10 933:11
940:14 946:18
947:12 1021:17
1038:9 1041:3
1056:1 1070:22
1084:13,14
1089:4 1092:13
1098:13 1100:18
1105:14
**plus** 908:8 998:3
1074:17
**PNN** 1061:10,16
1062:4 1078:20
**podium** 1017:19
**point** 877:18 882:12
889:12 893:10
911:2 923:18
952:17 953:14,20
954:9 957:2,13
966:10 978:11
981:1 996:5
1014:4 1032:8,8
1032:11 1037:14
1039:10 1046:15
1049:5 1050:12
1052:16 1054:12
1056:6,18
1057:18,18
1058:15 1060:3
1062:18 1063:8
1076:10,15
1083:8 1086:5
1095:15 1101:16
1107:5 1109:2,6
**pointed** 999:5
**pointing** 1056:8
**points** 994:18
**Poland** 1023:18
**policy** 890:8 958:10
**political** 883:13
903:2 948:3
997:21 1019:10
**politically** 883:17
1002:13 1081:13
**politicians** 1019:11

**politics** 934:19
935:3,6 988:16
1006:14 1028:22
**polygraph** 1006:10
1011:21
**polygraphs** 1072:14
**poorly** 1086:19
**Popper** 1087:16
**popular** 950:20
**population** 889:5
**pork** 1018:2,3
**portion** 1007:16
1052:10,13
**portions** 994:11,12
**Portuguese** 952:13
**position** 891:16
1075:6
**positions** 951:2
**positive** 895:1,2,7
907:13 908:1
1023:2
**possibility** 878:8
1050:10
**possible** 910:6
**possibly** 888:8
1059:18
**post** 886:1 899:14
1050:21
**potential** 1076:16
**potentially** 1011:8
1059:16 1060:1
**powerful** 1019:11
**powers** 1066:13
**practice** 931:12
952:6 953:3,4,5,8
959:19,21 963:10
964:2,9,17 965:6
1012:19
**practiced** 972:17
**practicing** 1044:13
**pray** 1066:21
**preamble** 905:13
**precede** 995:13
**precedes** 995:20
**preceding** 1092:5
**precise** 984:9
1016:6
**predilections**
1001:21
**preference** 1009:5
**prejudice** 1012:1
**prejudicial** 954:1
**preliminarily**
969:14,15,17
**preliminary** 874:8
874:12 1002:21

1005:21 1006:4
1006:17 1007:1
1062:2 1069:16
**preoccupied** 986:3
**prepaid** 1074:9,17
**prepare** 977:18
**prepared** 876:20
915:13 940:21
941:8 966:14
967:2 968:14
977:15,17 1097:8
1097:21 1098:1
**preparing** 989:19
**presence** 894:5
934:11,16 982:11
**present** 871:6 872:9
874:5,6 889:22
892:18 905:16
1026:22 1037:8
1059:22 1087:7
1095:22 1096:17
**presenting** 917:13
**presents** 1022:9
**preserve** 927:1
981:22 998:12
**president** 881:21,22
882:4 905:14
931:17,20 957:10
957:14,15 958:1,7
960:20 962:3
1091:6
**presidential** 962:2
**press** 905:19 907:13
913:18 961:17
**pressure** 893:2
922:14 981:4
992:7 998:5
1029:3
**pretense** 1087:2
**pretty** 891:10
1010:7 1060:10
**prevailed** 957:21
**previous** 891:8
**previously** 940:15
960:9 997:16
1011:2 1057:1
**price** 1018:21
1019:1
**priest** 1018:9
**primary** 960:8
999:9
**prior** 936:19 937:21
942:19 1101:6,11
1108:20
**private** 959:19
970:21 977:12

1012:19 1098:22
**pro** 977:9 992:6
1056:7 1073:8
**pro-American**
909:5 985:13
**pro-freedom**
909:20
**pro-Shah** 884:9
**probably** 878:6
884:2 886:12
889:6 912:10
940:4 959:16
975:5 999:6
1044:11 1049:20
1050:1 1062:22
1087:11 1089:15
1094:9
**problem** 934:21
939:13,17 987:18
987:21 998:16
1001:13 1027:8
1029:21 1047:12
1053:7 1073:18
1082:20 1083:5
**problematic** 1000:9
**problems** 976:22
978:19 1019:3
1041:15 1066:22
1083:19
**proceed** 879:12
922:13 992:6
1089:18 1097:21
1098:2
**proceeding** 924:6
980:20 998:12
1002:18 1064:10
1097:3
**proceedings** 952:22
**process** 930:13
952:9
**prod** 903:12
**produce** 1005:11
**produced** 1027:3
1049:17 1073:11
1104:9,12,14
**producing** 883:5
981:5
**Products** 963:20
**profession** 954:8
955:3,6 962:15
**professional** 870:2
871:1 901:19
976:13 1097:4
**professionally**
900:19
**profit** 1023:21

**programs** 883:8
**progress** 919:20
**projected** 1080:21
**prominent** 955:16
986:10
**promote** 903:9
954:7 955:3
960:14,17 961:5,6
961:18
**pronounced** 902:11
**pronouncing**
1102:10
**propaganda** 909:5
909:7,12 989:7
**proposal** 885:13
**propose** 888:6
**proposed** 1033:8
**proposing** 991:1
**proposition** 981:20
**protect** 900:16,20
1043:12
**protected** 926:6
**proud** 954:15
984:15
**provide** 931:5
1074:20
**provided** 894:20
941:22 1073:21
**proximity** 891:19
892:8
**psychiatrist** 1003:9
1020:15
**psychiatrists**
1006:9
**psychoanalyze**
1081:9
**psychologically**
1003:14
**psychologist** 1006:8
1063:17 1084:21
1095:2
**psychologists**
1003:5
**psychology** 1003:7
1063:17 1064:2
1068:12 1082:1
**public** 871:5,14
893:15 903:11
905:18,22 907:11
907:21,21 908:9
908:12,14 962:15
970:21
**publicity** 892:15,20
893:7,12 907:7
910:13 938:5
939:10 980:1,3,5

980:18,21 981:5
**publicize** 893:19
905:20
**publicizing** 937:22
**pull** 1061:3
**pulled** 1008:15
1018:16
**purged** 969:2,3
**purported** 1031:12
**purports** 906:22
928:8 1038:18
1105:12
**purpose** 909:17
920:14
**purps** 1090:5
**pursue** 890:6 921:3
924:11 927:2
1060:2 1076:22
**pursued** 926:14
**pursuit** 998:22
**push** 906:1
**put** 877:3 879:14
885:18 888:15
916:20 944:16
961:16 981:4
992:7,15 995:19
998:5 1009:3,6
1010:5 1012:6
1019:17 1020:18
1021:7 1022:13
1029:3 1050:3,4
1056:9,16
1057:19 1058:4
1064:12 1083:10
1102:3
**putting** 900:8

**Q**

**qualify** 1008:1
**quandary** 1060:17
**quarter** 898:16
**question** 895:3
934:5 945:19
946:8 961:14
965:1 966:8
971:16 995:10,17
1038:14 1039:15
1039:22 1040:2
1040:18,20
1042:4 1045:2
1060:22 1064:5
1067:16 1071:10
1080:11 1095:17
1095:19 1096:8
1109:4
**questions** 914:13

915:17 933:16
936:1 944:2 945:5
1049:12 1107:14
1107:18,21
**quickly** 875:7,19
919:4 979:14
**quite** 1033:7
1060:15
**quo** 982:1 998:13
1010:6
**quote** 980:10

**R**

**R** 874:1 899:10
1037:4
**R.S** 896:13
**rabbi** 1018:1
**race** 959:15
**radical** 1026:7,8
**radio** 881:12,13,15
1032:10
**rafters** 959:4
**Rahimi** 902:13
**raining** 1014:7,12
**raise** 876:17 939:13
946:17 1097:9
1109:1
**raised** 1000:7
1002:16 1080:3
**ran** 949:14 959:11
959:12 961:11
975:6 1013:5
1019:15
**randomly** 983:10
999:22
**rang** 950:16
**ranging** 949:6
**rank** 886:19
**ranked** 901:11
906:3
**ranks** 886:20
**Razavi** 968:16
1027:5 1047:1
1059:3
**re-contacted**
1064:22
**reach** 887:10,16
924:13 932:10
1042:2 1043:15
1067:19
**reach'** 1083:21
**reached** 1064:4
**react** 1010:8,9
**reacted** 1081:21
**reacting** 1092:12
**reaction** 1003:4

1066:16
**reactivate** 964:19
**reactivated** 969:1
**read** 900:1,3 920:21
  921:13 925:14
  956:5 980:8
  1050:7 1072:9
  1082:22 1084:6
  1104:16 1105:16
**reading** 925:15
  1070:15
**readings** 1036:17
**reads** 920:22
  928:20
**ready** 878:18 968:4
**Reagan** 949:14
**real** 986:13 1001:19
  1007:18 1023:15
  1044:15
**realized** 1046:6
  1057:4,14 1065:8
  1079:22
**really** 887:13
  926:16 927:5
  938:7 949:3,20
  950:11 955:5
  959:7 960:20,22
  961:8,15 974:3,13
  976:6,12,21 983:4
  983:5 984:16
  988:1 992:4
  1003:20 1008:10
  1010:16 1012:16
  1013:11,12,19
  1015:6 1018:4
  1020:10 1021:11
  1025:4,15 1026:2
  1028:6 1030:3
  1042:9 1053:17
  1057:12 1061:9
  1064:1 1068:14
  1069:20 1070:12
  1076:8,9 1086:2
**rears** 951:15
**reason** 910:18
  976:13 979:22
  980:11,17 992:8
  999:16 1000:4,15
  1001:22 1003:5
  1014:17 1019:18
  1029:3 1057:21
  1076:7 1083:13
  1084:4 1087:21
  1095:6 1103:9
  1104:7
**reasonable** 892:16

916:3 917:14,16
  1003:2
**reasonably** 1038:14
**reasons** 963:12
  988:17 1005:15
  1032:22 1033:8
  1071:20
**reassign** 1035:7
**reassigned** 1000:15
**recall** 876:18
  886:12 889:11
  918:22 938:7,13
  942:9,13,15
**recap** 927:20
**receive** 947:16
  948:8 1039:7
  1040:4 1097:9
  1107:10
**received** 941:1,9
  942:13 1039:4,7
  1045:19 1046:1
  1049:18 1050:1,7
  1050:13,16
  1064:10
**receiving** 920:19
  942:9,15,19
  1101:1
**recess** 874:3 877:15
  877:21 878:9
  934:2,3 1036:21
  1037:3 1096:9,12
  1108:12,16,21
  1110:1,3
**recognized** 1076:21
  1078:10
**recollect** 906:19
  1046:3 1068:3
  1069:11 1101:10
  1101:20 1102:17
**recollection** 928:21
  934:14 942:3
  943:1 1000:16
  1068:22 1069:2
  1092:15
**recommend** 901:22
**recommended**
  902:4
**reconsideration**
  1010:22
**reconvene** 1108:21
**record** 899:12
  915:18 934:7
  943:17 947:13
  964:20 965:15
  970:5,19,20 984:4
  984:9 995:4 996:4

996:10 1001:18
  1004:12 1005:5
  1005:22 1014:17
  1017:7 1018:11
  1032:6 1036:16
  1037:8 1050:3,16
  1053:22 1054:3
  1064:11 1096:16
**recorded** 1086:8
**records** 969:1,4
  971:3,6,9 1005:22
**recovery** 992:4
  1056:22 1063:5
**recruitment** 893:15
**recuse** 1033:20
**redirect** 933:16
  944:4,5
**reelection** 956:12
**Reem** 951:14
  952:19
**reenter** 1105:3
**refer** 965:12 970:14
  1037:14,21
  1052:6,6 1057:10
  1073:22 1100:5
**reference** 905:3
  970:6 972:10
  1000:6,21 1055:7
  1069:8 1076:4,12
**references** 967:22
  970:4 1017:6
**referring** 921:2
  923:21 924:1,5
  969:7 972:5
  1041:6 1044:21
  1079:1 1089:13
  1101:5 1102:22
  1103:1
**refers** 968:7
**reflect** 886:13
**reflected** 1075:9
**refresh** 934:13
**refused** 885:11,14
  931:8 1034:12
**regard** 878:13
  887:22 890:3,19
  891:6 906:8
  907:14 910:18
  912:20 929:13
  944:7 950:4 952:4
  956:4 958:2
  962:13 963:9
  970:7 1019:22
  1029:5 1034:4
  1075:10 1085:14
**regarding** 874:18

887:6 918:19
  1042:16 1088:9
  1105:19 1106:2
**regardless** 1054:13
  1054:13
**regards** 1100:22
**regime** 974:7
**registered** 1047:14
**regular** 1074:3
**rejiggering** 1035:21
**relate** 1082:16
**related** 1030:13,17
  1031:1 1037:15
**relating** 1028:1
  1049:12
**relations** 887:9
  903:11 905:18
  906:1 907:11,21
  907:22 908:9,12
  908:15 1085:15
**relationship** 1000:1
  1004:6 1056:20
  1058:4 1063:3,5
  1074:13 1080:10
  1080:12,13,17
  1082:16
**relegated** 883:5
**relevance** 1031:2
**relevant** 966:7
  1028:1 1059:18
  1060:1 1063:7
**relief** 885:7 922:18
  923:1
**religion** 1022:18
**religious** 1024:15
**Remain** 879:2
**remains** 874:7
**remarks** 953:22
**remedy** 998:9
**remember** 893:13
  912:3 914:5
  919:12 920:19
  921:1 936:10
  938:9,10 986:11
  1069:11 1087:14
  1101:1
**reminder** 1036:19
**remote** 874:20
  1096:9
**remotes** 888:22
  889:9
**removed** 883:4
  993:3,7
**removing** 930:15
**remunerated**
  1043:22 1056:11

**rent** 1072:13
  1074:19,20
**rented** 1007:9,16
  1007:20 1008:16
  1015:5 1016:17
  1016:18 1083:14
  1083:15
**renting** 1009:14
**report** 923:3,12
**Reported** 870:21
**reporter** 871:5
  874:7 991:18
  1001:3 1009:12
**repossessing**
  1021:20
**represent** 882:6
  900:7 909:8 952:8
  976:14 1059:19
  1068:18 1101:18
  1102:1,4,15
  1104:3,7
**representation**
  1037:16,17
  1057:20 1078:7
  1078:18 1102:7
**representative**
  882:8
**represented** 952:10
  952:11,13,14,15
  953:1 963:6,16,19
  1066:10
**representing** 902:6
  903:8 962:22
  973:14 1060:9
  1103:8,14 1106:4
**republican** 949:13
  959:11,12 960:21
**reputation** 884:12
  1002:7
**request** 876:5 956:4
  956:20 1051:6
**requested** 951:7
  970:17
**requisite** 1037:8
  1096:16
**Rescue** 959:3
**research** 1047:2
**Reserve** 963:21
**resign** 958:15
**resistance** 979:18
**resolution** 906:2
  919:19
**resolve** 887:12
  918:4 920:15
  922:5
**resolved** 971:11

In Re: Larry E. Klayman
June 25, 2018

resource 887:11
respect 938:22
  955:5,6 1008:10
  1020:10 1066:3
  1075:8 1084:22
  1091:21 1094:11
respected 1022:17
  1056:19
respectful 1060:16
respective 871:7
respectively 965:13
respond 1064:22
  1071:10
responded 1031:22
  1106:17,22
Respondent 870:6
  872:2,11 880:11
  880:14 944:5
  946:15 947:4,7
  1037:12 1098:6,9
Respondent's
  876:20 879:15
  885:18 895:14,21
  896:3,13,17,22
  897:21 898:2
  899:13,17 904:12
  914:6 919:6
  924:18 939:19
  940:13 941:6
  942:4 945:14,20
  946:15 965:13,21
  966:3,4,6,17,20
  966:21 967:4,12
  967:16 969:8,10
  969:16,20,22
  970:2 972:1,2,6,7
  990:8 991:9
  993:14,14,22
  994:8,16,20 995:6
  995:7 996:6,13,17
  1037:22 1038:6
  1038:11 1040:16
  1041:2 1042:18
  1059:17 1078:2,3
  1079:4 1100:6
  1104:10 1105:8
response 891:2,11
  900:14 1089:9
responsibilities
  882:4,14
Responsibility
  870:2 871:2
  1097:5
responsible
  1072:21 1081:6
responsive 1042:3

rest 876:19 995:22
  997:19 1023:21
  1053:17 1108:5
  1108:16
restaurant 975:19
  986:19 1013:18
restraining 1004:14
  1006:16
resubmission
  1029:8
result 998:18
  1044:20 1084:18
  1099:11
results 886:17
resume 877:9
  1032:12 1037:9
resumed 1037:6
resuscitate 1035:16
retail 1053:12,16
retained 1107:8
retaliated 981:10
  1090:22
retaliating 1075:10
retaliation 919:1
  926:2,5,14
retired 1010:1
retiring 959:10
retraining 1004:10
return 932:1
  1061:15
returned 874:3
returning 899:17
  926:20
reverse 1063:16
  1064:1 1068:12
  1082:1
review 885:13
revolutionary
  1018:7,7,21
revolve 1066:14
rich 999:4 1083:22
richest 1007:12
rid 1040:8
rift 931:1
right 877:19 880:4
  886:9,13 888:18
  893:8 898:6
  902:11 904:17
  909:17 913:5
  915:6,15 926:4
  927:18 932:19
  938:5 944:4
  946:17 949:7
  950:2 954:13
  956:16 966:6
  967:15 972:18

976:8 978:1
  984:13 990:8,14
  990:18 991:18
  992:3,5 993:10
  994:21 996:19
  1013:19 1015:14
  1025:18 1026:18
  1026:19 1033:10
  1034:16 1035:22
  1040:13,15
  1043:2 1044:4
  1060:2 1062:16
  1067:5 1076:20
  1079:7 1083:11
  1089:14 1092:16
  1097:10 1099:16
  1101:15 1102:17
  1103:20 1105:7
right-hand 880:3
rights 882:6,7
  900:9,16,20
  918:12,19 919:15
  921:12 922:22
  923:14,15,22
  924:1,10 926:6
  927:1,14 932:22
  964:5 981:17,20
  992:17 998:12
  1021:4,8,10
  1029:16,18
  1048:3 1049:6
  1081:11 1098:19
  1098:22 1099:18
  1106:8
ring 1087:7,11,15
riot 1070:16
rip 1092:14
ripped 1069:20
rise 989:18
risk 910:2
Ritz 948:15
road 1018:17
roasted 1099:2
Roberts 1000:1,2,3
  1000:17 1011:3
rocker 1019:13
Rohrabacher
  1058:22 1085:14
  1086:6
Rohrabacher's
  1085:11
role 959:6
roll 956:3 1006:3
  1034:15
rollover 1072:1
Romanian 952:16

Romans 1018:11
Ron 956:14
Ronald 949:14
room 888:17
  986:21 1008:20
  1009:1 1052:3
roommate 1087:17
  1087:19
rooms 1052:3
Rose 1023:2
roughly 1067:18
round 1021:5,10
  1029:19
RS 880:2,5
rubbing 881:3
rude 1024:17
rug 1008:15
ruin 1065:19
ruined 1064:12,14
  1064:18 1065:4
  1066:1 1093:21
rule 1034:10
ruled 926:13
  1010:4,13 1011:4
  1012:11 1016:1,4
  1064:7
ruling 1010:17,18
  1011:18 1029:12
  1062:2 1069:8
  1070:15 1092:11
rulings 1093:4
rumor 989:3
rumors 1004:5
  1062:4 1094:11
run 881:5 888:19
  959:10 989:5
  1047:8
running 1015:15
  1065:3
runs 1013:6
RX12 1055:17
RX2 991:12,16
RX9 1079:6

_____
        S
_____
S 874:1 1037:4,4,4
S-a-j-e-d-i 989:2
Saab 1014:20,20
Saddam 1094:18
Safety 963:20,22
Sajedi 989:2
sake 1109:21
salary 992:12,21
  1064:17
Sam 968:15 1027:5
  1027:12 1047:1

1059:3
Sandy 961:12
sat 905:16 976:10
  1009:11 1024:9
Sataki 882:14 884:4
  884:6 886:8 887:3
  889:9,22 890:13
  900:8,11 901:9
  903:8 904:2
  905:18 907:2
  908:11 910:8
  913:20 915:8
  918:12 922:17,19
  923:1 924:9,19,21
  927:16 928:12,18
  929:2 934:11
  936:20 937:10,22
  938:4 939:9 940:5
  942:7,20 943:4
  960:4 966:13,22
  970:7,12 972:12
  973:9 986:2,17
  987:18 989:19
  990:9,10 991:16
  993:19 998:18
  1000:8 1002:8
  1005:2 1010:9
  1011:1,6 1012:12
  1013:12 1015:5
  1019:20 1022:8
  1029:9 1031:12
  1033:3 1034:3,14
  1036:13 1038:3
  1039:9 1056:3,4
  1071:12 1073:21
  1074:4 1077:10
  1080:10,15
  1082:4,19 1085:7
  1085:16 1086:9
  1087:10 1088:21
  1091:20 1092:8
  1096:2 1101:17
  1103:2 1105:14
  1105:17 1106:20
Sataki's 894:5
  900:16,20 903:9
  920:3 933:4
  968:14 997:20
  1017:7 1030:18
  1096:6
Saul 1007:11,19
  1009:9,11
saw 894:17 958:17
  959:9 962:20
  975:21 980:7,9
  985:1 1034:19

1049:14,15
1076:16 1095:7
**saying** 889:11
922:12 932:10
980:13 1017:19
1018:5,20
1023:16 1045:14
1052:2 1058:3
1063:22 1072:2
1077:20 1078:5
1083:8 1086:16
1086:16 1103:7
1108:3
**says** 932:3 970:20
975:8 988:3
1000:12 1008:11
1008:18 1010:11
1021:19,21
1025:10 1039:3
1043:4 1049:22
1050:11 1060:5
1063:10 1068:20
1071:17 1079:17
1089:2 1100:13
**scandal** 956:3
**scandals** 956:1
**scared** 1024:21
1025:1 1027:7
**schedule** 1108:3
**schedules** 1109:7
**school** 947:19
948:10,11
**Schwartz** 956:10
**Schweiker** 948:12
949:4
**science** 948:4
**scope** 943:6 974:4
1059:8
**Scott** 957:17
1000:22
**screaming** 1065:4
1065:10,13
**seat** 912:8,13
956:12
**seated** 879:10 947:1
**second** 879:3
899:21 932:3,11
942:5 972:8 994:9
1072:8,10
1079:15,16
1105:8
**second-generation**
961:8
**seconds** 933:19
1018:18
**secret** 958:9 1002:3

**Secretary** 912:6,8
912:11,13 956:14
959:14 1030:16
**section** 963:13,15
983:22
**security** 910:16,21
950:16 1074:18
1074:19
**see** 875:12,15 888:5
906:17 913:14
915:10 924:22
935:5 973:18
974:20 976:15
982:22 992:18,19
999:5 1000:11
1002:11 1012:19
1012:20 1014:11
1014:12 1022:11
1022:20 1025:18
1031:11,20
1045:18 1046:14
1046:17 1053:7
1060:14 1062:21
1062:22 1069:2
1078:16 1079:17
1084:7,8 1085:17
1091:7 1093:3
1095:16 1096:4
1097:17,18
1106:10
**seed** 1091:1
**seeing** 1057:13
1099:15
**seek** 1044:3
**seeking** 923:1
**seen** 894:19,21
903:22 916:15,19
923:5,6 933:2,3
1035:2 1047:2
1065:7 1092:6
**self-centered**
1021:3
**self-induced**
1018:15
**selfish** 877:22
**selling** 948:15
1087:22
**senate** 959:11
961:12 1013:6
1019:15
**Senator** 948:11
949:4 958:17
959:9 985:10,19
986:1,5
**senators** 912:20
913:2

**senators'** 913:1
**send** 925:11
1045:17 1101:3
**sending** 912:9
943:12 1031:14
1088:21 1092:12
1092:13
**sense** 1002:10,11
1023:2 1043:11
1045:16 1071:19
1086:20
**sent** 907:1 920:18
924:20 925:5
928:19 944:15
1011:3 1031:20
1038:20,22
1039:1 1040:7
1042:1,16
1046:16 1049:20
1050:20,21
1054:15 1069:4
1071:4,12,17
1088:11,12
1100:7,9 1101:2,7
1105:13 1106:13
1106:15
**sentence** 908:5
**separate** 984:5
1052:17
**separation** 1076:11
**September** 1033:2
1074:21 1088:13
1088:20 1092:4
**Serano** 1074:16,21
1075:2
**serve** 1025:13
**service** 883:16
888:15 891:15
1002:3 1099:4
**Services** 1043:4
**set** 979:12,16
1052:3 1096:9
1108:2
**setting** 958:10
982:15 984:19
**settle** 890:17 891:3
911:2,3,13 912:2
914:15 979:6,6
980:15 981:2
984:22 998:5
**settlement** 887:10
887:17 890:7,9,12
890:13,14 891:12
892:16 901:13
903:13 906:2
915:5 940:6,11

979:22 1009:13
1009:15
**severe** 1089:12
**sex** 998:3
**sexual** 905:20
918:22 926:1,4,13
998:2 1004:21
1066:11 1080:12
1080:13
**sexually** 883:1
976:22
**sexy** 980:10
**Shah** 883:21 988:21
**shake** 953:19
1025:3
**shaken** 1013:14
**shaking** 1015:6
**Shamble** 873:3
877:3,3 878:19,21
879:4,5,16,18
880:10,16,19
881:5 885:21
894:2 895:11
896:1,20 897:3
898:18 905:10,13
914:12 917:9
934:10 936:6
940:17,18 945:6
955:8 978:22
979:2,20 983:15
983:16,17 985:9
985:17,20 997:18
999:4 1000:6
1006:18 1029:17
1029:22 1031:15
1038:20,21
1042:1 1043:16
1048:4,6 1049:8
1054:19,20,21,22
1071:15,18
1078:13,19
1092:14,19
**Shambles** 981:9
**Shambles'** 1086:14
1088:5
**shape** 1020:20
1051:8
**sharing** 1004:3
**she'd** 1026:16
**she'll** 1065:14
**Shea** 929:11 1057:9
1076:12 1078:8
1078:18 1079:20
**Shea's** 929:12
1078:13
**sheer** 1103:12

**sheet** 997:2,2,10,11
1000:11
**Shenefield** 951:1
**shirt** 1076:1
**shoes** 1083:10
**shook** 1013:12
1025:2
**shooting** 959:2
**short** 877:7 1009:8
1105:16 1109:9
**shortly** 1065:1
**shot** 1010:5
1093:13
**show** 968:20 969:4
981:3 990:15
993:8 1004:11
1020:7 1025:6
1036:2 1037:19
1038:5 1042:17
1054:1 1055:8
1075:2 1101:2
**shown** 918:2
1040:15
**shows** 886:17 984:4
1005:6 1031:16
1086:17
**shuffle** 1051:11
**shut** 1068:6
**sic** 1090:5,6,16
1091:1 1105:22
**side** 952:22 962:22
975:8 986:21
1014:15 1018:16
1053:3,3,3
1084:22 1085:1,2
1088:9 1091:20
**side-by-side** 989:20
**sides** 1022:8
1060:13 1084:22
**sign** 885:11,15
**signature** 897:7
933:6 941:13
**signed** 885:10 897:4
933:5 941:16
944:8 1020:19
**significance**
1093:17,18
**similar** 958:4
1044:22
**simply** 1011:19
1047:19 1063:7
**sing-songy** 974:6
**single** 975:18
**single-spaced**
1034:1
**singled** 1029:4

In Re: Larry E. Klayman
June 25, 2018

sink 1020:12
sir 878:22 1093:1
    1098:12
sits 997:18 1085:15
sitting 938:10 978:1
    987:1,5 989:20
    1008:12 1065:2
situation 907:22
    927:9 985:15
    988:15 997:20
    999:18,19
situations 1013:3
six 898:4 950:1
    969:1 971:6 973:2
    973:4
six-month 1074:9
sixth 1007:17
skids 978:13
small 879:22
    956:16
Smith 871:20 874:8
    874:9 875:3,18,21
    876:1,19 888:2,4
    895:16 901:20
    904:11 905:4,5
    907:9,10 911:15
    914:20 915:15
    917:20 918:1
    921:8 923:9 928:3
    928:14 930:3
    933:9,17,18,22
    934:9 935:17
    936:2,5,14,17,18
    938:20 939:8
    941:18 943:11,20
    944:1 966:15,20
    971:16 972:2,7,13
    993:20 994:3
    995:10,19
    1030:22 1032:1
    1036:7,11
    1039:13 1040:17
    1042:3 1050:20
    1059:7,15
    1064:20 1073:11
    1096:5 1107:15
    1107:16,18,20
    1108:15,18
Smith's 904:16
smoke 986:21
smoked 986:20
smokes 988:1
smoking 986:20
Snyder 1007:13
solemnly 1097:11
solution 887:21

888:5,6,20 889:1
    892:12,16,21
    937:17 995:19
    1072:7
solutions 888:7
somebody 941:8
    950:18 975:5
    976:5,5 978:1
    988:12 1008:16
    1022:13 1025:9
    1034:11 1050:9
    1066:7 1078:12
    1080:15
someone's 987:15
somewhat 1035:21
sons 973:14
soon 927:4 987:7
sooner 976:19
sorry 874:17
    896:10,17 915:19
    922:20 925:3
    955:14 966:5
    967:5 975:15
    1036:9 1048:13
    1055:19 1065:18
    1068:9 1079:2
sort 893:4 919:19
    1053:9
sorts 906:14
sought 885:7
    887:14 914:3
    937:1 956:4
    985:15
sounds 1039:18
Southwest 1001:5
Soviet 989:15
space 1007:9
    1009:14 1016:19
Spanish 951:10
speak 926:18 951:9
    951:10 980:10
    982:11 984:18
    1005:7 1006:1
    1089:4
Speaker 914:4
    958:15,15 987:7
    987:20
speaking 902:20
    906:11 908:7
    915:2 1041:19
speaks 1086:18
specializes 1003:8
specific 938:7
    1029:7
specifically 926:10
    939:16 942:5

970:14 1033:17
Specification 898:1
    904:20
speculate 910:20
speculation
    1103:12
spell 902:15
spend 991:2
spent 1061:17
Spiderman 1024:14
splits 1014:4
spoke 936:20
    1027:6
spoken 936:8
Sporkin 1007:4,5
    1008:8,18
    1009:17,22
    1011:9 1012:21
    1109:8,10,12
Sports 954:19
stable 1065:16
staff 950:22 961:11
    985:10,16,22
    988:3 1008:12
    1058:21 1065:3,5
    1065:13
stage 1082:21
stalled 921:9
stalling 919:18
stand 878:21 934:1
    944:19 983:1
    995:3 1036:20
    1096:8 1108:11
    1110:1
standards 950:9
    954:10 955:8
standing 874:3
    879:2 964:12
    965:6 974:17
    1097:19
stands 981:19
start 954:5 967:17
    967:20 1013:14
    1029:12 1109:4
    1109:17
started 881:11,15
    950:5 951:15
    953:12 955:15
    958:19 959:18
    961:15 983:4
    1021:15 1084:16
    1094:4
starting 974:4
starts 994:15
    996:17,19 997:1,8
state 880:18 899:12

912:7,8,11,13
    958:18,19 1072:8
    1098:13
stated 1100:8
statement 900:22
    903:14 906:6
    907:17 908:2
statements 1089:20
states 889:7 909:8
    958:10 960:16
    961:19 964:8
    965:6 968:16
    997:10 1014:3
    1050:11 1099:1
stating 1106:20
status 982:1 998:13
    1008:11 1010:6
Staunton 967:2
    968:15 1025:3
    1058:20 1085:10
    1085:21 1086:3
    1087:3
stay 982:9 1105:20
staying 1013:20
    1017:16 1073:20
steel 952:16
step 918:8 929:20
    1011:1
steps 1035:12
stick 1018:9,12
stipulated 875:17
stolen 1087:8
stood 1110:3
stop 913:11
    1090:17 1092:22
stopping 1095:12
    1095:12
store 948:17 986:12
    986:13
stories 905:19
    976:17 1032:9
    1087:22
story 923:13 975:1
    978:3 1007:7
    1008:8 1009:8
    1099:14
straighten 1088:2
strange 949:9
strangers 1066:6
strategic 1032:22
streaming 1099:16
street 871:2 963:1
    1025:19 1045:2,6
    1066:4
strength 1019:19
    1100:15

strict 910:16
strictly 892:6
strike 936:13
    1066:18,18
strong 979:11
    1002:1 1019:14
    1100:16 1106:1
strongly 1017:10
struck 895:4 949:5
stubborn 891:5
student 948:5
    973:15
studios 1024:12
stuff 1059:2,22
    1073:11,12
    1086:16
style 976:1,3
styled 997:14
subcomponent
    901:11
subject 933:16
    938:4 949:6 950:1
    1035:20 1068:20
    1088:22 1099:13
    1105:14
sublease 1016:20
subsequent 1102:5
subsidized 992:19
succeed 1011:4
    1024:1 1076:9
successful 912:16
sudden 1014:7
    1018:13
suddenly 1084:4
sue 926:4 981:6
    1008:3,6
sued 935:9 958:1,7
    962:7 1000:21
    1008:7 1029:1
suggest 876:12
    996:2 1032:12
suggested 958:15
    1005:15 1076:11
    1092:1
suggesting 1056:21
suggestions 941:1,4
    941:9 1001:6
suicide 982:10
    1063:21
suit 985:7 1014:22
    1072:20
suite 1047:13,20,21
    1051:13,17,18
    1052:3,8,14,15
suites 1052:7
suits 1087:22

In Re: Larry E. Klayman
June 25, 2018

1090:13
**Sujat** 872:3,4
  874:11 894:1
  895:10,21 896:6
  896:22 947:8,11
  963:4 965:14,18
  967:11,14,19
  968:5,9 969:9,17
  969:21 970:3
  971:5,14 972:5,15
  981:3 990:3,16,17
  990:21 991:5,13
  991:15 993:12,18
  994:6,15,21 995:9
  996:11,14,16,19
  997:3,13 1012:6
  1020:6 1028:12
  1029:5 1032:14
  1033:21 1036:5,6
  1037:9,13
  1038:10,15
  1040:1,22
  1042:14 1049:10
  1055:4,5,14,16,20
  1061:1 1070:19
  1070:20 1073:16
  1073:18,19
  1077:8,12,14
  1078:22 1080:8
  1082:2,9,12
  1085:4 1088:18
  1095:11,16,20
**Sujat's** 1071:10
**summarily** 968:21
**summer** 1027:17,19
**sun** 1003:19
**superior** 993:2
  997:2,9
**supervisor** 1005:2
**supervisors** 1094:4
**supplement** 1074:2
**supplemental**
  874:14,18 879:15
  885:19 898:19
  899:7,11,13
  905:10 940:18
  941:20 944:9
  966:13,22 968:13
  1039:12 1040:11
  1040:16 1041:2
  1046:18 1050:22
  1051:6 1055:18
  1087:4 1088:15
  1100:6 1104:10
  1104:22 1105:6,8
**support** 883:21,22

884:1 985:8
  1075:12 1084:5
**suppose** 1054:1
**supposed** 989:6
  1014:6
**sure** 946:13 960:12
  983:13 996:18
  998:13 1027:21
  1031:3 1035:21
  1049:15 1082:11
  1083:13 1099:8
  1103:6
**surprise** 875:5
**surprised** 957:11
**surrogate** 1013:22
  1015:2,10,12
**surveillance** 957:18
**surveilled** 1001:2,4
**survey** 886:2,3,4,17
**Susan** 981:8 1005:3
**suspect** 1049:19
**suspected** 956:21
**swear** 879:6 946:18
  1097:10,11
**Sweden** 988:11
  1005:5 1063:12
  1068:10,11,21
  1069:1,5,5,18
  1081:22
**swipe** 1090:12
**sword** 1058:18
**sworn** 880:12 947:5
**SX12** 1055:12,15
  1055:21
**SX19** 1061:3
  1063:10 1067:1
**SX20** 1085:6
**SX26** 1070:22
**SX3** 1082:3
**SX31** 1077:9,13
**SX38** 1088:10,18
**SX5** 1079:1
**sympathize** 973:19
**sympathized**
  974:13 978:7
  1080:19
**sympathy** 960:2
**symptomatic**
  1089:21
**system** 871:19
  1013:13

_____

**T**

**T** 1037:4
**tab** 916:12,13

993:22
**table** 975:21
  1009:11 1097:18
**Taiwanese** 954:2
**take** 875:13,21
  876:2,6 877:1,6
  878:1 907:13
  912:19 913:18
  914:12,22 915:7
  919:16,16 922:11
  923:15 946:6,8
  954:11 964:13
  965:8 966:2 973:5
  975:9 979:9,10,11
  980:7 991:2,4
  1006:10 1012:7
  1023:13 1032:19
  1032:20 1038:16
  1039:20 1041:1
  1043:12 1054:9
  1056:1 1070:22
  1074:15 1078:17
  1080:2 1082:13
  1085:5 1088:10
  1093:7,13 1096:1
  1096:19 1108:1
  1109:11
**taken** 871:1 934:3
  964:18 970:7
  1002:22 1030:17
  1037:3 1072:17
  1087:11,20
  1096:12
**talent** 1022:22
**talk** 927:5 950:18
  955:8 968:4 974:5
  991:12 1029:22
  1033:1 1041:22
  1043:8 1046:13
  1068:17 1086:4
  1091:21 1092:18
  1092:18
**talked** 944:16
  1009:20 1020:1
  1048:3,4 1070:7
  1089:22
**talking** 886:14
  898:21 971:22
  996:12 1017:18
  1018:19 1043:14
  1059:9 1077:20
  1085:9 1087:15
  1091:21
**talks** 1017:8
**target** 910:22
**task** 958:8

**Taylor** 981:16,19
  998:9 1010:3
**teaches** 1024:14
**teaching** 1024:8
**team** 945:14,20
  946:15 1059:17
**tears** 976:20
**Ted** 1024:10
  1025:20,20
  1026:11,12,13
**teddy** 1024:11
**Tehran** 999:15
  1094:20
**Tehrangeles** 999:16
**telephone** 936:9
  1069:19 1102:18
**televised** 961:22
  962:9
**Television** 1024:5
**tell** 882:20 913:20
  914:22 918:15
  954:16 957:19
  977:11 1007:7
  1010:20 1031:12
  1065:14 1083:4
  1084:13
**telling** 914:5
  1006:12 1041:10
  1041:12 1059:2
  1071:20 1087:9
**tells** 925:21 926:8
  926:18,19 1008:9
  1017:6 1030:22
  1065:13
**temporary** 1004:10
  1006:16
**ten** 953:9 976:19
  999:6 1007:13
  1009:1 1017:13
  1017:17 1018:14
  1032:13 1033:4
  1092:4 1093:10
  1106:22
**ten-minute** 933:20
**tenant** 1047:14
**tend** 1066:13
**tends** 1066:14
**tenure** 962:19
**term** 983:14
**termination**
  1037:15,16
  1042:16 1043:4
**terms** 884:12
  891:11 947:18
  949:7 1054:21
**terrible** 1065:5,14

**testified** 880:13
  940:15 947:6
  970:12 979:4
  997:18 998:10
  1024:18 1040:5
  1056:12 1063:19
  1079:13,14
  1098:8
**testify** 874:20 877:4
  946:16 980:19
  986:7 1031:5,6
  1032:5
**testifying** 1039:6
**testimony** 877:8,16
  877:17,22 879:6
  879:17 880:8
  927:20 928:22
  946:18 967:1
  968:14 982:9
  984:8 1004:2
  1007:3 1021:18
  1032:11,14
  1034:3 1042:11
  1048:7 1059:11
  1064:13 1086:13
  1086:14 1088:6,6
  1088:7 1096:6,10
  1097:9,12 1109:9
  1109:17,19,22
**text** 1078:16
  1079:17
**texts** 1054:17
  1092:13
**Thailand** 952:15
**thank** 874:10 897:1
  905:7 939:18
  944:1 945:9
  946:12 972:14
  994:6 1025:11
  1036:22 1039:8
  1080:8 1081:18
  1082:10 1084:12
  1096:11 1097:7
  1098:2,12
  1103:15 1106:11
  1107:14 1108:5,6
  1108:6,8
**Thanks** 945:12
**theirs** 954:4
**theoretically**
  1059:17
**theories** 1030:16
**theory** 1032:21
  1060:2 1063:5
  1072:22 1073:1,5
**therapist** 1105:20

In Re: Larry E. Klayman
June 25, 2018

thesis 948:5
thick 994:19 995:12
  1006:15
thing 876:4,12
  886:4 891:1 893:8
  900:4 915:6
  920:15 921:13
  924:4 956:21
  971:10 976:18
  979:6 980:16
  992:3 995:20
  1001:10 1008:19
  1024:18 1033:19
  1044:4 1062:16
  1072:9 1077:5
  1083:6 1084:6
things 875:18
  959:19 980:21
  985:1 998:4 999:2
  1019:8,12
  1021:15 1027:22
  1031:13 1053:20
  1054:18 1063:4
  1068:15 1070:12
  1072:18 1076:18
  1078:11 1083:20
  1091:5 1094:22
  1095:4 1108:2
think 876:16
  877:14 878:6,20
  880:4 889:6 892:5
  892:6 902:22
  912:4,9 927:5
  930:4 935:7,7,12
  935:18 939:3
  943:7 945:7 949:4
  949:9 952:15
  954:9 959:16
  960:11 962:4,7
  963:2 969:12
  972:5 976:5
  989:11 990:13
  996:8 999:3
  1000:13 1003:11
  1016:5 1017:15
  1026:4 1028:14
  1030:12,15,22
  1033:6,14,15
  1035:4,14
  1038:13 1040:18
  1045:5 1052:22
  1059:16 1065:1
  1069:6,10,10,16
  1073:5 1082:6
  1083:3,16 1092:9
  1094:9,22 1096:7

1096:8 1097:16
1098:20 1108:19
  1109:3
thinking 1034:17
  1073:14 1084:1
third 900:1 933:5
  1061:5,6
third-party 961:20
  962:8
thirties 1008:5
thoroughly 1035:5
thought 875:21
  892:11 909:19,20
  911:14 915:20
  929:21 949:13
  953:16 960:15,22
  971:8,10 986:15
  988:18 989:14
  992:3 1005:14
  1010:19 1018:1
  1020:3 1021:2
  1022:19 1029:11
  1044:5,12
  1046:22 1057:8
  1065:7 1078:17
  1087:18 1094:6
  1095:8
thoughtfulness
  1084:9
thoughts 932:11
  933:19 1018:20
thousand 1061:17
three 874:5 877:17
  880:8 899:9 922:4
  965:8 990:18,20
  994:13 1078:6
  1097:18 1103:11
threw 1060:20
throw 1090:18,19
Thursday 1099:6
ticket 949:14
tie 1016:2
tied 1060:8
Tigar 871:15 898:4
  898:7 941:12,16
  955:10 990:19
  994:10,17
  1000:10 1012:9
  1012:13 1015:17
  1015:20 1035:18
  1036:9 1044:7,16
  1063:9 1064:3
  1078:2 1080:9
  1081:18 1088:19
Tim 877:3 878:21
  905:10,13 927:6

929:11,21 978:22
980:18 1071:18
1072:4 1076:11
1078:8,13,18,19
1079:20
time 876:17 882:12
  883:12 886:7,9,11
  889:12 892:13,18
  893:10,13 911:3
  912:1,9,12 913:17
  916:8 919:2,16
  922:2 923:15
  929:4 935:10,13
  937:6,16,19 938:3
  938:15 939:10
  942:16 945:11
  949:5 950:7
  951:22 952:2
  953:20 954:11
  955:22 960:18
  965:16 968:22
  973:10,13 975:15
  976:14 977:20
  978:8,9,10 981:6
  984:22 987:13
  991:2,9 992:19
  1000:6,15 1004:5
  1011:17 1013:21
  1018:2 1021:13
  1025:3 1033:15
  1035:3 1041:9,16
  1044:14,17,19
  1047:15 1048:2
  1049:14 1050:19
  1051:1,7 1054:5
  1056:8,14 1057:2
  1057:19 1058:5
  1058:18 1059:22
  1060:18 1064:6
  1064:20 1067:11
  1069:3,4,14
  1074:8 1075:4
  1080:22 1085:2,2
  1089:9 1095:8
  1100:5 1101:16
  1104:1 1107:5
  1108:1,2,20
timeline 1093:3
timelines 1069:22
times 906:15 907:2
  936:8 1001:2
  1007:13 1009:1
  1019:6 1075:20
  1081:20 1083:4
timing 1083:6
Timothy 873:3

879:4 880:10,19
896:1 898:18
940:17,18
tired 1083:2
title 923:19 924:11
  995:2
today 874:20 877:2
  877:10 880:16
  943:21 955:2
  960:15 1002:12
  1009:12 1045:12
  1098:11 1104:22
today's 950:9
Tokyo 1023:2
told 891:17 892:4
  911:6 926:9
  935:11 978:22
  979:6 980:13
  981:9 982:4,8
  983:8 1003:20
  1018:8,11 1021:3
  1021:14 1022:19
  1031:15 1061:13
  1063:18,20
  1064:20 1065:1
  1065:21,22
  1074:11 1075:19
  1086:8,9 1087:10
  1087:18 1094:17
Tom 913:8,9 958:12
  985:11
Tomlinson 912:10
tomorrow 1108:22
  1110:2
tongue 909:18
top 912:5 997:18
tortured 973:20
total 1074:18
totaled 1034:20
totality 1095:7
totalled 1014:19,20
totally 1072:10
  1086:12
touch 927:10
  1088:12
touched 1080:14
towed 1015:12
town 975:7
trade 951:13,14,20
  952:6,12,13,19,22
  956:5,13 957:2
  960:17,22 961:5
  961:19 963:19
trader 952:18
tragically 992:10
transcript 1096:2

transfer 1003:3
transferred 951:6
  1000:4
transition 877:18
transpired 882:20
  890:19 988:11
Transportation
  963:22
trash 1058:8
travails 985:17
Travelgate 957:7
travels 877:13
treat 963:2
treated 887:13
  903:1 960:4
  1025:4 1081:20
treating 883:2
  1006:9
tremendous 1032:4
trial 950:11
  1073:12
tried 887:9 893:18
  924:13 932:12
  956:1 962:14,16
  983:3 1013:8
  1023:13 1025:17
  1029:7 1054:21
  1058:7,7 1060:12
  1072:4,5,6 1076:7
  1078:12 1081:10
  1081:10 1083:4
  1089:2,8
tries 1011:15
triggered 1092:10
triggering 956:3
TRO 1002:21
  1005:20 1006:2
  1007:1 1016:8
  1028:5 1034:15
  1035:8 1070:1
TRO/PI 1067:4
troubled 919:14
true 897:11 923:2
  944:9 993:1
  1021:21 1024:19
  1088:5 1099:15
truly 1091:14
truth 879:7,7,8
  946:19,20,20
  1006:12 1097:13
  1097:13,14
try 890:6,14,16
  892:15 893:3
  900:13 903:12
  912:20 914:15
  917:14 924:8,9

In Re: Larry E. Klayman
June 25, 2018

929:19 950:10
954:6 955:1
968:11 977:4,10
979:16,21 981:4
985:7 989:16
997:22 1017:2
1026:13 1043:12
1055:3 1058:12
1061:10 1062:9
1075:17 1077:4
1081:5 1086:1
1088:1 1091:19
**trying** 884:10
892:21 900:19
909:9,19 911:1,3
912:1 915:1,5,6
921:14 922:9
925:18 932:10
952:15 960:18
976:11 978:17,18
979:5 980:5
984:22 987:2
988:14 1016:2,22
1018:15 1027:15
1035:15 1042:2
1043:13,15
1045:17 1046:20
1056:15,16
1057:3,11,17,18
1061:18 1062:7
1063:16 1068:12
1069:11 1071:5
1077:7 1080:1
1081:1,2,8,9
1086:5 1088:12
1093:20
**Tuesday** 1101:3
1110:4
**turn** 885:17 893:21
894:2 895:8,11
896:19 897:14
905:9 906:16
912:15 914:6
916:10 917:8
919:5 920:17
921:10 922:6,15
924:17 928:6
932:2,21 939:19
940:13 941:6
942:4 970:1,17
996:20 1102:9
1104:8
**turned** 987:19
**TV** 883:5,8 907:19
980:9
**twenty** 1109:21

**two** 877:17 883:18
883:19,20 898:21
902:11 906:8,10
932:3 940:14
941:13 950:13
951:11,15 969:10
975:21 981:7
988:17 990:7,18
990:19,20,21
993:22 994:12,15
995:21 1000:14
1003:6 1013:18
1017:16 1019:5
1022:8 1049:14
1052:21 1053:4
1060:13 1079:11
1084:22 1103:11
1104:8
**two-bedroom**
1020:17
**tying** 1077:6
**type** 884:22 931:15
953:8 954:6 998:9
1010:10 1095:21
**typical** 891:10

--- U ---

**U.S** 959:10
**ultimate** 1019:1
**ultimately** 890:16
974:9 989:18
992:11,15 1011:4
1046:7
**umbrella** 1002:6
**unappreciative**
1021:12
**unconstitutional**
957:17
**uncovered** 956:21
**undercut** 1086:18
**undergraduate**
947:17 948:11
**underlines** 1090:10
**understand** 946:14
989:7 1029:15
1032:3 1058:13
1062:12,12
1066:8 1075:9
1076:14 1079:22
1092:17 1097:2
**understandable**
951:10
**understanding**
909:11 917:15
922:8 961:18
964:2 968:3

1036:16 1067:13
1084:3,13 1101:9
**understood** 907:16
907:20 978:13
991:22 1020:4
1035:10 1059:12
**undertake** 890:16
**undertook** 1059:19
**unequivocally**
1087:13
**unfair** 883:8 931:12
1095:9
**unfairly** 883:3
977:2
**unfortunate** 986:4
1082:20 1083:6
1094:14
**unfortunately**
1001:20 1107:4
**ungrateful** 1021:3
**unhappy** 942:20
**union** 881:20 882:4
885:10 890:9
903:20 931:17,21
989:16
**unique** 974:3
**United** 889:7 908:8
958:10 960:16
961:19 997:10
1014:3 1050:11
1099:1
**University** 948:1
**unjust** 953:16
1095:9
**unpunished** 1066:7
**unquote** 980:10
**unsuccessful**
1067:18
**Unsuccessfully**
924:15,16
**untoward** 988:6
**UPS** 1045:11
**upset** 1003:4
1018:5 1020:1,2,4
1034:22 1070:12
**use** 893:2,5 947:15
986:16 987:14
1017:2 1045:7,12
1063:16
**usually** 900:14

--- V ---

**v** 981:19 1010:3
**vacate** 1074:22
**vacated** 1011:7
1029:8,12

**vacation** 950:15
**vague** 939:1
**valley** 1014:1
1026:18
**values** 1017:3
1024:8,14
**various** 879:19
889:4 906:14
938:18 939:5
949:1 952:8
953:21
**Vegas** 1047:3
**Ventura** 1014:5,6
1015:2 1016:19
1017:5,12
**venturing** 1024:22
**Vera** 902:2
**versed** 964:7
**vice** 957:14 958:1,7
962:3
**vicinity** 893:17
**vicious** 1022:11
1085:2
**victim** 1022:10
**victims** 1066:8,10
1066:11,12
**Victory** 1017:15
**video** 1096:14
1098:8 1108:9
**view** 875:9 903:17
1042:12 1059:17
1083:8 1086:17
**viewed** 1057:5
1060:15
**views** 903:2 939:10
955:20
**VII** 923:19 924:11
**vilifying** 1070:18
**violation** 998:2
**violations** 998:1
**virtually** 1041:20
**virtues** 909:21
**visiting** 999:20
**visits** 1003:13
**VOA** 883:15 893:13
901:6,11 903:12
905:21 906:3,10
906:12 907:12
909:2,15 910:15
913:12 914:16
924:1 929:13
979:11,17 980:15
982:13 983:19
986:10 989:1,9,13
989:14 1003:21
1005:2 1006:15

1023:3,6,22
1072:12 1077:6
1078:20 1083:12
1090:22
**VOA's** 909:4
**voice** 881:17,18
882:4,10 884:11
903:4 921:22
930:2 955:11
979:7 982:6 985:3
985:11 986:14,17
987:19 988:16
992:15 999:11
1038:1,19 1060:5
1071:21 1094:12
1095:8 1106:2
**Vol** 870:6
**volume** 1104:20
**vs** 981:15 990:9,10
991:16 993:19
998:9 1036:13
**vulnerable** 1019:13

--- W ---

**W** 957:10 959:13
1000:21
**Wagner** 981:15,19
998:9 1010:3
**wait** 967:10 969:11
1071:6
**waiting** 1007:15
**waive** 972:21 973:3
**waiver** 931:9
**wake** 1057:11
1060:20
**walk** 982:17
1028:11
**walked** 974:19
975:4 1014:18
1015:1
**Walker** 950:7
958:20
**walking** 954:17,19
975:7
**walks** 1065:12
**walling-off** 1023:14
**want** 876:16 888:13
888:19 892:7
895:22 921:3
927:4,13 930:19
933:20 945:21
949:3 950:18
954:11 962:20
967:8,12,20 969:9
969:12,15 975:1
975:16,17 982:10

App.0500

In Re: Larry E. Klayman
June 25, 2018

982:16,17 984:9
984:16 987:17
989:12 993:8
1005:17 1018:10
1020:12 1021:17
1026:4 1027:12
1027:21 1030:3
1031:3,5 1039:20
1048:9 1056:6
1066:17 1068:11
1072:2 1073:9
1074:16 1076:8
1077:18 1079:9
1080:10 1081:15
1082:21 1086:11
1089:18 1091:8
1092:18 1094:10
1106:7
**wanted** 887:6,22
889:2 892:11
902:3 910:10,10
951:11 959:14
963:16 965:4
968:20 976:15
981:6 982:2,2
985:13 986:18
991:20 992:2
998:18,19,20
999:1 1005:16
1017:2 1019:15
1020:16 1025:6
1040:6 1041:16
1042:9 1055:9
1061:12,21
1062:11,12
1068:14 1073:3
1074:11 1075:21
1077:2 1080:12
1081:8 1084:19
1086:10 1091:15
1109:6
**wants** 880:5 980:9
996:5 1041:12
1095:16
**war** 894:7 1094:18
**warm** 988:2
1100:22
**warmth** 1018:18
**WARREN** 871:11
**wary** 1013:5
**Washington** 870:9
871:2 881:14
886:1 893:7,14
899:14 916:22
949:19,21 950:14
980:4 982:5,7

985:8,17 986:8
987:14 1004:19
1007:13 1021:1
1047:20 1050:22
**wasn't** 887:13
950:8 985:13
988:6 1004:12,19
1005:4 1010:16
1011:18 1014:21
1024:19 1025:1
1029:4 1031:14
1040:7 1041:18
1041:19 1045:16
1047:10,18
1050:19 1051:22
1053:15,20
1054:15 1060:8
1062:8 1063:7
1064:14,18
1065:22 1071:4
1080:16
**Watch** 949:10,11
954:17,20 955:15
957:3,19 959:1,18
960:6 961:5 962:1
977:22 980:7
987:13 1001:17
1002:1 1012:18
1012:18 1013:4
1013:14,15
1015:15 1019:11
1051:3
**watching** 1105:18
**Watergate** 948:13
**way** 872:5 887:6,12
887:14 897:20
903:5 909:18,21
918:8 930:13
931:7 934:19
954:22 955:5
963:18 976:2
979:21 980:21
985:8,12 986:16
992:5 1004:9
1011:1 1012:2
1014:5 1017:8
1019:18 1020:8
1022:10 1023:19
1025:5 1041:6,18
1051:20 1052:6
1054:19 1056:7
1068:8 1080:16
1081:1 1084:16
1089:21 1102:3
1103:9 1104:6
1105:21

**ways** 955:19 1013:9
1044:11
**we'll** 878:5,8
879:16,19 965:16
988:2,4,7 991:8
992:11 1016:5
1022:18 1025:9
1027:4,9 1031:6
1032:19 1033:21
1035:22 1036:19
1056:13 1067:9
1096:7 1109:11
**we're** 876:20 877:2
878:18 895:13
896:2,15,16
909:19 914:9
923:21 946:7
967:15 969:17,19
969:21 976:5
977:6 987:1
993:12 996:9,12
1002:12 1004:21
1022:21 1028:5
1031:11 1038:13
1050:16 1081:12
**we've** 884:13,14
893:1 922:3
983:15 1031:2
1033:6 1092:6
**wealthy** 977:7
**weapons** 974:8
**website** 893:5
**Wednesday** 878:9
878:11 1109:5
**week** 878:4 956:8
1008:19 1016:18
1104:2 1105:20
1106:13
**weekend** 875:2
930:14 1099:3
**weekends** 948:14
**weeks** 1096:6
**well-documented**
1006:15
**well-served** 1032:6
**went** 885:8,9,13
893:11 904:2
911:12 912:22
913:3,5,17 915:8
915:10 949:22
951:12 957:1
959:22 974:16
978:15 985:10,19
986:5,20 987:13
988:9 1000:18
1009:16 1013:16

1015:10,11
1017:1 1018:2
1020:4 1033:19
1037:20 1045:21
1063:1 1068:7
1084:17 1085:17
1085:19 1095:10
**weren't** 887:16
891:6,16 903:1
928:12 985:4
**Westminster**
1007:18
**whichever** 1090:13
**white** 939:20
1002:4
**wife** 1004:8,14
1017:16 1081:8
**Wiley** 902:3
**Williams** 1047:9
**willing** 887:16
946:3 1107:3
**willingness** 901:8
**Wilshire** 999:10
1016:21
**win** 960:8 1009:6
1024:12 1077:2
1084:13
**Windjammer** 872:5
**wine** 1013:19
**winners** 886:16
**wish** 875:10 880:6
927:2 932:4 988:7
1035:12 1036:18
1065:18 1066:20
1082:20 1107:9
1108:4
**wishes** 1100:20
**withdraw** 884:20
932:5
**witness** 878:21
879:1,4,9 880:1
880:11 885:5
896:7,21 903:18
908:6,14,18
909:14 911:18
916:18 920:22
924:2 928:20
930:6,8 938:17
939:5 941:11,15
941:17 943:9,18
945:9,12,13,18
946:21 947:4
953:12 954:4,14
955:13 960:7,13
965:16 966:17,21
967:5,9,17 969:19

970:1 971:13,22
972:4,9,14 980:19
982:22 983:13,16
983:20 984:1,5,10
984:14 990:15
991:4,6 993:16
995:18 996:15,20
997:13 1000:13
1012:11,14
1015:19,22
1016:10 1027:18
1027:20 1028:3,6
1028:10 1030:5,8
1030:11 1031:6
1031:10 1033:10
1033:14 1034:17
1035:10,20
1036:22 1038:7
1039:16 1040:20
1042:5,8 1044:10
1044:18 1045:5
1045:10,21
1046:3 1047:6,12
1048:11,14,19
1049:1,15 1050:5
1050:15 1051:16
1052:5,10,13,22
1053:11,15
1054:6,12
1055:18 1060:3
1063:15 1064:6
1067:5,8,13,21
1068:3,6 1069:6
1069:10,14
1070:4,7,11,14,18
1071:11 1077:16
1078:3 1079:4,7
1079:10,14,19,21
1080:11 1081:19
1088:15,20
1089:5 1092:9
1093:1,7,11,19
1095:14 1096:11
1096:22 1097:7
1097:15 1098:1,6
1102:17 1103:3,7
1108:8
**witnesses** 873:2
919:21 920:1,3
954:3 1090:4
**Wizard** 1059:5
1060:4
**woman** 1057:12
1058:20 1065:3
1081:11
**women** 1099:8,10

In Re: Larry E. Klayman
June 25, 2018

**women's** 1081:11
1098:18,22
1099:18 1106:8
**won** 884:13,14,15
884:17 930:12
931:1 957:11
1061:13 1069:16
**Wong** 956:22
**Woodland** 1014:3
1026:21 1027:6
1027:12
**word** 909:6,11,14
915:10 924:4
974:4 1003:2
1018:10 1050:7
1073:6
**words** 959:12
1018:19 1036:10
**work** 881:11 888:21
891:15 892:12
908:11 916:9
926:12,20 931:3
950:11 952:7
979:7 999:10
1002:20 1010:6
1016:18,22
1021:7 1023:5
1056:16 1058:13
1084:9 1091:8
**worked** 877:10
881:12,13,14
929:14,15 948:11
948:14 949:16
952:1 963:5
986:10,14 1087:1
**working** 881:15
888:8 892:6
948:17,17 949:19
992:14 1019:1
1027:8 1047:9
1061:9 1090:17
**workout** 996:3
**workplace** 905:20
906:13
**works** 985:8
**world** 976:7 980:4
984:18 999:14
1001:19 1023:15
1032:17 1066:14
1066:15 1083:21
**worries** 1062:10
**worry** 954:12
**worst** 886:20 887:1
887:2 901:12
906:4
**worth** 1093:22

**worthless** 1022:7
**wouldn't** 974:8
988:12 992:10
1012:21 1029:14
1072:17 1089:7
1101:7 1102:19
**wound** 988:21
1009:14
**wounded** 1066:11
**wrap** 1028:8
**write** 1022:12
1043:10
**writing** 897:16
950:1 978:22
985:1 1086:15
**written** 894:18
928:11 975:9
1025:9 1043:5
1045:17 1054:15
1089:11
**wrong** 945:1 1001:9
1031:13 1044:8,9
1045:21 1053:21
**wrote** 920:6 927:7
941:10 948:5
971:21 973:18
1010:14 1025:8
1029:18 1071:2
1084:1 1087:3
1090:1

**X**

**X** 870:3,7 873:1
**X's** 1055:17

**Y**

**yeah** 876:2 880:7
883:11,16 885:5
886:9 888:1
891:10 892:11
894:21 899:2
905:2 909:13
910:7 912:22
913:6 914:1,1,5,5
916:13,15 918:10
920:1,16 924:12
925:13 929:21
930:20 935:1
936:10,10 937:3
937:19 940:20
941:22 942:17
946:5 953:12
965:3,7 967:9
968:11 969:19
972:9 1015:19
1024:19 1031:6

1039:3 1040:2,5
1044:10 1045:6
1047:12 1055:11
1067:9 1070:11
1079:7,19 1092:9
**year** 882:1 926:3
948:10 958:17
1024:13 1026:1
1061:19
**years** 882:18 885:9
922:4 931:2,3
936:9 949:11
950:13 953:6,9
960:10 964:21
969:1,2 971:7
972:22 973:7
974:18 978:4
980:2 982:20
999:6 1009:18
1012:17 1017:13
1017:17 1018:14
1064:13 1065:7
1065:17 1069:11
1093:12 1099:1
1103:18,20
**Yellow** 1015:9
**York** 1001:2
1008:20 1023:19
1100:4
**young** 1001:12
1005:6 1007:6
1008:4 1009:10
1017:17
**younger** 881:1
**YouTube** 1106:6

**Z**

**zealously** 900:7
**Zia** 1004:6,13
**Zia's** 1004:7,13
**Zoroastrians**
1026:9

**0**

**1**

**1** 880:3 994:20
995:14,20 1016:9
1070:2 1100:7
**1.7(b)(4)** 1030:14
**1:00** 876:7 945:21
946:9,11 1036:20
**10** 1082:8
**10-CV-00534**
997:14
**10:05** 1104:17

1105:13
**10:15** 1106:21
**10:50** 934:2,7
**100,000** 956:11,17
**1001** 1009:2
**101** 1014:4
**1098** 873:5
**10th** 906:20 1078:4
1078:5
**11,000** 1074:18
**112** 905:15
**12** 916:14 924:19
939:21 1031:9
1055:13
**12:30** 946:10
**12:53** 1037:2
**12th** 940:3
**14th** 1050:8
**15** 1092:4
**1525** 872:5
**15th** 1042:19
1043:3 1050:6
1088:13,20
1100:8 1101:4
**16** 1028:9
**17** 919:6 921:6
1034:1
**17-BD-063** 870:5
**18** 921:10 923:8
**180** 926:2,15
**1812** 881:21
**18th** 920:18
**1968** 948:6
**1969** 947:20
**1973** 948:4
**1976** 949:14
**1982** 972:18 973:6
**1983** 951:8
**1991** 881:17
**1994** 955:16
**1996** 881:18 960:11
961:17
**1st** 874:4 993:1

**2**

**2** 971:17 990:8,8
991:8,9 993:16,19
994:5,16 995:6
996:18 997:8
1082:4 1104:9,10
1105:8,9
**2,500** 1006:11
**2:00** 946:3
**2:30** 876:7 946:9,12
1036:21 1037:5,8
**20** 932:21 933:8

1038:6
**200** 1096:3
**2000** 881:22 882:1
962:2 1042:20
1044:8,12,16
1045:20 1051:13
1051:19 1052:16
1053:5,6
**2001** 1046:8
**2003** 958:17
**2004** 960:8
**2008** 960:1
**2009** 882:18 886:6
973:11
**201** 1042:22
1047:11 1048:9
**2010** 906:20 915:3
916:14 920:18
928:7 939:21
942:6,10 993:1
1016:9,10
1027:19 1038:1
1038:12 1042:19
1043:4 1050:6
1056:5 1059:13
1061:5 1067:2
1068:2 1070:2
1074:21 1077:11
1078:5,5 1079:10
1082:5,9,18
1100:8 1101:4
1103:19
**2011** 921:11 922:7
922:16 924:19
925:2,7 932:16
1050:8,17 1074:6
1088:13,21
1089:17 1092:4,8
1093:4
**2012** 897:5 899:1
899:18 940:16
1104:17 1105:13
1106:21
**2017** 940:19
**2018** 870:8 971:1
1110:4
**2020** 1044:15
1045:11,11
1051:14,19,21
1052:18 1053:10
1053:19
**20th** 1045:3
**21** 924:18 928:2
932:2 942:5
1037:22 1038:10
1038:11

In Re:  Larry E. Klayman
June 25, 2018

Page 1139

**21st** 915:3 1025:21
1045:3 1074:5
**22nd** 970:22
**23** 893:22 896:5,13
965:13,17,20,22
966:7,12,20,21
967:4,6,12,13,16
968:1,5,7 969:16
969:20,21,22
970:4,5,13 971:18
972:3,8 1082:5,8
1082:9
**23-33** 894:2,2
**23rd** 922:16 932:15
1082:18 1104:17
1105:13 1106:21
**24** 914:7,19,22
915:13 918:2
**24th** 1049:20,22
1050:13,17
1077:11 1089:17
**25** 870:8 874:3
916:10 918:3
939:20
**26** 917:8,18 918:3
1110:4
**27** 925:2 1067:3
**27th** 925:7
**29** 990:10 1068:19
1069:3 1074:1,2,3
**29th** 955:16 1061:5
1067:2 1068:1
**2nd** 1067:18

**3**

**3** 879:15 880:3,5
885:19 895:14
899:1,13 990:9
993:14,14 994:8
994:10,18,21
995:5,5,7 996:1,6
996:13,17 997:8
1035:18 1036:3,8
1036:12,15
1082:4
**30** 965:13 966:2,4
967:16 970:17
989:9 1018:17
**30th** 1096:2
1099:10
**31st** 1056:4 1059:8
1059:13
**325** 917:4
**33019** 872:6
**345** 1052:3
**354** 1051:13 1053:8

**36** 973:6
**38** 1088:15,19
**3rd** 897:5 899:18
919:10 940:16

**4**

**4** 994:16,20,21
995:6,8 996:18
997:9 1040:16
1041:2
**4:00** 874:20 877:9
**4:20** 877:15
**4:30** 877:15
**4:45** 877:15
**40** 876:8 953:6
974:18 1057:1
**405** 1014:2
**42** 1099:1
**42-year** 1099:17
**430** 871:2
**45** 1018:17
**4th** 921:11 928:7
942:6,11 1038:1
1038:12

**5**

**5** 895:9,21 896:3,11
896:17 897:21
898:2 899:17
904:5,13 940:13
**50** 1014:9 1056:21
1057:1,16
1060:19
**50-percent** 1059:9
**501** 1009:15,16
**543** 1000:11
**5th** 922:6 928:9
942:10,18 1071:3
1071:13

**6**

**6:00** 878:11
**6:09** 1101:4
**60** 950:9
**601** 1007:9 1008:15
1009:4,7,15
**61** 880:21
**67** 880:22

**7**

**7** 1035:7 1074:21
**75,000** 1061:19

**8**

**8** 1042:18,19
**8:00** 878:11

**815-5221** 872:7
**87** 1015:14
**880** 873:3
**8th** 1078:5 1079:10

**9**

**9** 1078:1,2,3 1079:5
**9/11** 1001:4
**9:30** 871:3 1108:22
1109:4,14 1110:1
1110:4
**936** 873:3
**944** 873:3
**947** 873:4
**954** 872:7
**9th** 940:19

App.0503



RECEIVED

July 13, 2018

Board on Professional
Responsibility

**Date:**    ne 26, 2018

**Case:** In Re:  Larry E. Klayman



ACE·FEDERAL

Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

In Re:  Larry E. Klayman
June 26, 2018

Page 1141

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - X

In the Matter of,                 : Board Docket No.

LARRY E. KLAYMAN,                 : 17-BD-063

                 Respondent.    :   ol

- - - - - - - - - - - - - - - X

                 T esday,   ne 26, 2018

                 Washington, DC


                 HEARING




Reported by

   Kim M. Brantley, C.S.R.

In Re:  Larry E. Klayman
June 26, 2018

## Page 1142

1  Hearing, taken at the Board on Professional
2  Responsibility, 430 E Street, NW, Washington, DC,
3  commencing at 9:29 a.m., before the Ad Hoc Hearing
4  Committee, and before Kim M. Brantley, C.S.R., a
5  Court Reporter and Notary Public in and for the
6  District of Columbia, when were present on behalf
7  of the respective parties:
8
9  APPEARANCES:
10  AD HOC HEARING COMMITTEE:
11  WARREN ANTHONY FITCH, ESQUIRE
12  Chair
13  MARY LARKIN
14  Public Member
15  MICHAEL TIGAR, ESQUIRE
16  Attorney Member
17
18  On behalf of the DC Attorney Disciplinary
19  System:
20  H. CLAY SMITH, III, ESQUIRE
21
22

## Page 1143

1  APPEARANCES CONTINUED:
2  On behalf of Respondent:
3  FREDERICK J. SUJAT, ESQUIRE
4  Law Office of Frederick J. Sujat
5  1525 Windjammer Way
6  Hollywood, Florida 33019
7  (954) 815-5221
8  Email: fsujat@yahoo.com
9  ALSO PRESENT:
10  LARRY E. KLAYMAN, ESQUIRE
11  Respondent
12
13
14
15
16
17
18
19
20
21
22

## Page 1144

1  I N D E X
2  WITNESSES:        DIRECT:      CROSS:
3  Larry Klayman    1147, 1180    1267
4  Judge Sporkin       1171       1175
5  Keya Dashtara (Dash) 1340, 1376    1363
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

## Page 1145

1  P R O C E E D I N G S
2  CHAIRMAN FITCH:  Good morning,
3  everyone.  We are back on the record.  All
4  requisite persons are present.
5  Mr. Smith, any preliminary matters?
6  MR. SMITH:  No preliminary matters from
7  Disciplinary Counsel.
8  CHAIRMAN FITCH:  Mr. Sujat or Mr.
9  Klayman, any preliminary matters?
10  MR. KLAYMAN:  Yes.
11  With respect to the witnesses, I've had
12  to schedule them when I can get them, and they're
13  coming from a distance.  I thank you for
14  accommodating Judge Sporkin this morning.  The
15  testimony won't be long.
16  But also, Keya Dash, another one of the
17  witness, I'm hoping to put him on today around
18  4:00 o'clock.
19  CHAIRMAN FITCH:  Why don't you spell
20  that name for the court reporter.
21  MR. KLAYMAN:  K-e-y-a, Dash, D-a-s-h.
22  We have an affidavit from him in

2  (Pages 1142 to 1145)

In Re: Larry E. Klayman
June 26, 2018

## Page 1146

1  Respondent's Exhibit 5, I believe it is, and in
2  speaking with him yesterday, he found some emails
3  that he had written to me and me to him, and also
4  an email from Ms. Sataki, who had been in contact
5  with him.
6      I would like to have this made
7  Respondent's Supplemental Exhibit 7. I wanted to
8  give it to Mr. Smith well in advance of the
9  testimony and give it to you, ok.
10     CHAIRMAN FITCH: That will be fine.
11     For the record, the Respondent's team
12 has tendered to the hearing committee members and
13 to Mr. Smith a set of documents that appear to
14 consist of nine pages. They are stapled together
15 and they are denominated as RSUP7.
16     We will address these documents to the
17 extent necessary in due course.
18     I think we're ready to --
19     MR. KLAYMAN: Yes, I'll take the
20 witness stand.
21     CHAIRMAN FITCH: -- to resume the
22 Respondent's testimony.

## Page 1147

1      Mr. Sujat, you may proceed.
2      (Larry Klayman resumes the witness
3  stand.)
4      MR. SUJAT: Thank you, your Honor.
5      Your Honor, and members of the
6  committee, I'd like to begin with the pleadings in
7  the two cases involved here, the Sataki
8  litigation, Sataki vs. Falahati, and then also the
9  Sataki vs. The Broadcasting Board of Governors.
10 And I'd like to go through the pleadings and have
11 Mr. Klayman identify the pleadings on the record.
12 I'd like to start with the superior court
13 complaint that was filed on March 1st of 2010.
14 It's in Respondent's Exhibit 2.
15     CHAIRMAN FITCH: Let me ask you to make
16 a proffer of why that needs to be done to any
17 substantial extent? I mean, I emphasize again,
18 Mr. Klayman has not been charged with lack of
19 zealousness or lack of competency.
20     MR. KLAYMAN: Your Honor, he's just
21 going to go through the timeline, because you
22 requested about the timeline yesterday, how it

## Page 1148

1  lines up. It will be brief. I'm not really going
2  to get into the documentation.
3      CHAIRMAN FITCH: Well, let's give it a
4  try.
5      CONTINUED DIRECT EXAMINATION
6      ON BEHALF OF RESPONDENT:
7      BY MR. SUJAT:
8      Q. Ok, so please look at Respondent's
9  Exhibit Number 2.
10     A. Yes.
11     Q. Respondent's 2.
12     A. I've got it.
13     Q. Would you please --
14     A. Yes, this is a complaint which I filed.
15 It's in that -- there's a document on top of it.
16 Excuse me.
17     First is a letter that I wrote to Mr.
18 Smith dealing with this particular matter. I
19 don't need to get into that. But behind it on
20 Exhibit 3, this is Exhibit 3 --
21     CHAIRMAN FITCH: Are we talking about
22 Exhibit 2 and 3, or are we talking about

## Page 1149

1  supplementals?
2      THE WITNESS: We're talking about
3  Respondent's Exhibit 3.
4  BY MR. SUJAT:
5      Q. Respondent's Exhibit Number 2 --
6      A. Ok, well let's go through the exhibits
7  of Bar Counsel.
8      CHAIRMAN FITCH: Alright.
9      THE WITNESS: Or I can go to
10 Respondent's Exhibit 2. That's fine.
11     CHAIRMAN FITCH: I just want you to
12 tell me where we are, because, in my book, the
13 first thing behind a tab that has a number two on
14 it is a removal notice.
15     MR. TIGAR: Yes, that's what I have
16 also.
17     MR. SUJAT: That's right, and the
18 superior court complaint is 40 pages in.
19     MR. TIGAR: Forty pages in?
20     MR. SUJAT: Into it, right.
21     CHAIRMAN FITCH: I see it. Ask a
22 question.

3 (Pages 1146 to 1149)

In Re: Larry E. Klayman
June 26, 2018

Page 1150

1  THE WITNESS: Yes, I have it, and thank
2  you. And I will identify it by the book it's in,
3  Respondent's exhibits, when we go to Respondent's
4  exhibits. So it's in book two, Exhibit 2 -- it's
5  book one, Exhibit 2. Book one, Exhibit 2.
6  Yes, this is a complaint that I filed
7  with regard to the alleged harasser, Mehdi
8  Falahati. I filed it with regard to Ms. Sataki's
9  instructions, to bring an action.
10  Just to be brief, I testified yesterday
11  I didn't believe that she would ever see any money
12  out of this because he doesn't really have any
13  money I was told by her and by others. But there
14  was the complaint, ok, and it was removed -- as
15  you can see later on Notice of Removal of Civil
16  Action to Federal Court, on April 19th, 2010.
17  That's also part of that exhibit.
18  There's also another notice of removal
19  with regard to that case for some reason and I
20  don't recollect why the defendants did it twice.
21  I think because there was more than one defendant,
22  even though the caption shows Mehdi Falahati.

Page 1151

1  There's also a notice of removal on
2  March 26th, 2010.
3  By the way, I misspoke. The prior one
4  is March 19th, 2010, and there's another notice of
5  removal in that exhibit for March 26, 2010.
6  That's when it was filed.
7  So this case was removed to the federal
8  court here in Washington, D.C.
9  You want to move this into evidence,
10  Fred?
11  MR. SUJAT: Yes.
12  We'd like to move the Respondent's
13  Exhibit Number 2 in totality into evidence.
14  MR. SMITH: No objection.
15  CHAIRMAN FITCH: Mr. Smith?
16  MR. SMITH: No objection.
17  CHAIRMAN FITCH: It is admitted.
18  THE WITNESS: And I testified about
19  this yesterday.
20  CHAIRMAN FITCH: Yes.
21  THE WITNESS: So I won't be
22  duplicative.

Page 1152

1  MR. SUJAT: So then we can move right
2  along here to this U.S. District Court case, and
3  the pleading would be the Motion for a Temporary
4  Restraining Order, Bar Exhibit D6.
5  THE WITNESS: Yes, this has already
6  been admitted into evidence, as I have stipulated
7  with Mr. Smith. This is with relationship to the
8  case that I brought against the board of governors
9  and their individual governors, and it is the
10  original motion that was filed for temporary
11  restraining order and preliminary injunction on
12  May 24th, 2010. That's what it shows at the top
13  of the Pacer marking. It was assigned to Judge
14  Colleen Kollar-Kotelly, and I've testified about
15  that yesterday.
16  BY MR. SUJAT:
17  Q. Mr. Klayman, I refer you to the order.
18  This would be the Bar Exhibit D-7.
19  A. Yes, thank you, Mr. Sujat.
20  Q. It would be seven.
21  MR. SMITH: Bar Counsel's 7.
22  MR. SUJAT: Bar 7, ok.

Page 1153

1  BY MR. SUJAT:
2  Q. It's an order dated June 1st, 2010.
3  A. This is the order denying the motion
4  for temporary restraining order along with a
5  memorandum opinion. The order and the memorandum
6  opinion are June 1st, 2010.
7  This was my first attempt to have Judge
8  Kotelly rule in Ms. Sataki's favor, and I didn't
9  give up. I proceeded on and wanted to have the
10  preliminary injunction aspect of that motion
11  decided. So this was just for the temporary
12  restraining order.
13  This has already been admitted into
14  evidence as well by stipulation.
15  Q. And then Bar Exhibit 9, Motion For
16  Reconsideration Order Denying Motion for the TRO.
17  A. Yes.
18  As you can see, I was persistent and
19  this is a motion I filed to have the judge
20  reconsider her ruling. And the document speaks
21  for itself. It's been admitted into evidence.
22  I felt that based on my review and my

In Re: Larry E. Klayman
June 26, 2018

Page 1154

1 experience that the judge had made manifest errors
2 of law and fact, and I was pointing it out to her
3 that we had substantial evidence for the TRO, in
4 addition to Dr. Aviera's reports and a polygraph
5 examination and other affidavits and other
6 evidence. And at that point, I felt that we
7 should have gotten a TRO based just upon the
8 affidavits.
9       Now, when we went to a preliminary
10 injunction, we wanted to have an evidentiary
11 hearing, because that obviously is much more
12 substantial than a TRO that would only last, you
13 know, for days. But Ms. Sataki was in such bad
14 emotional state that I thought I had to file the
15 TRO to try to get her some relief, some peace of
16 mind that she would be in Los Angeles, ultimately,
17 to be able to see her doctors and be with her
18 friends and family.
19       Exhibit 9 is also already in evidence.
20       Q. Mr. Klayman, I refer you to Bar Exhibit
21 12, Denial of Motion For Reconsideration.
22       CHAIRMAN FITCH: Give me one second,

Page 1155

1 please, Mr. Sujat.
2       (Brief pause.)
3       CHAIRMAN FITCH: Thank you. We're
4 moving to DX12.
5       THE WITNESS: Mr. Sujat, let me talk
6 about 10, that's important.
7       This is Bar Exhibit 10. This is a
8 motion, plaintiff Elham Sataki's motion and
9 memorandum to Chief Judge and/or Judge
10 Kollar-Kotelly to reassign and remand the case by
11 consent or otherwise to prior trial judge, Richard
12 W. Roberts, or in the alternative to assign Sataki
13 cases to another trial judge through random
14 assignment system. It was filed on or about June
15 9th, 2010. That's what it says on Pacer markings
16 on top.
17       In this I'm trying to politely ask
18 Judge Kotelly, without trying to be provocative --
19 because as I said yesterday, I had prior issues
20 with her in other cases up to this point -- to
21 send the case back to Judge Roberts, that she had
22 the potential for a conflict here, given certain

Page 1156

1 things that had happened in prior litigation
2 between me and other defendants and her sitting as
3 the trial judge, and I asked -- if she wouldn't do
4 it, I asked if Joyce Lambert, who had been the
5 chief judge at the time, could reassign it under
6 the court rules.
7       This proved to be unsuccessful. It
8 wasn't reassigned.
9       But it's Exhibit 10. It's already in
10 evidence.
11       And then there's Exhibit 11, plaintiff
12 Elham Sataki's Supplemental Memorandum --
13       CHAIRMAN FITCH: With respect to DX10
14 filed on 6/9/10, this was filed expeditiously
15 eight days after the opinion and order.
16       Were you still in communication with
17 Ms. Sataki during that week, that eight-day
18 period.
19       THE WITNESS: I don't recollect whether
20 I was or wasn't.
21       As I testified yesterday, I was trying
22 to get in contact with her and I was getting

Page 1157

1 instructions from people who clearly were not her,
2 written in other English, and I was trying to
3 confirm that. So I was trying to protect her
4 interests in the interim.
5       Having seen the ruling of Judge Kotelly
6 at that point, I thought it would be worth a try
7 to get this to another jump to move on with regard
8 to the preliminary injunction aspect of it.
9       So I was protecting her interests at
10 that time, and as Mr. Shamble also testified, you
11 know, we couldn't get in touch with her. So I
12 couldn't let her rights be lost.
13       Then there's Exhibit 11. This is a
14 supplemental memorandum exhibit in support of the
15 motion for preliminary injunction. It's quite
16 extensive. The document which is in Bar Counsel's
17 exhibit book doesn't have all of the attachments
18 in it. But literally it was that thick, it was
19 about three inches thick with affidavits and
20 everything else.
21       At that point, as I testified yesterday
22 briefly, Judge Kotelly had had a status

5  (Pages 1154 to 1157)

App.0509

In Re: Larry E. Klayman
June 26, 2018

## Page 1158

1 conference, and I asked her for a preliminary
2 injunction hearing, and prior to that discovery.
3 She would not grant it. But it's in the context
4 of this supplemental memorandum in support of the
5 motion for preliminary injunction that I asked for
6 that hearing and asked for prior discovery.
7 Because, if she didn't accept the affidavits up
8 front, of all the people that I had submitted, I
9 felt that we needed to put people on the witness
10 stand so she could judge demeanor, take a look at
11 the demeanor of the government witnesses and look
12 at the demeanor of our witness, which was very
13 important, and also the need for
14 cross-examination. Because at that point I
15 believed that the government witnesses who had
16 submitted affidavits were not telling the truth.
17        I believed in Ms. Sataki and her case.
18        So that's what Exhibit 11 is about.
19 It's already in evidence.
20 BY MR. SUJAT:
21    Q.  Mr. Klayman, could you also take a look
22 at Bar exhibit 12, the next tab.

## Page 1159

1        CHAIRMAN FITCH:  Twelve.
2        MR. SUJAT:  Twelve, yes, the next tab.
3        THE WITNESS:  Yes, this is the
4 memorandum opinion of Judge Kotelly that she
5 wrote.  It was filed on July 7th, 2010, and it's
6 denying the motion for temporary restraining
7 order.  She's elaborating, because I went back and
8 asked for reconsideration, and basically on the
9 same grounds as before she accepted everything
10 that the government said and discounted, to the
11 extreme, didn't accept anything that Ms. Sataki
12 and our witnesses had said.
13        And I was pointing out in the pleadings
14 the case of Wagner vs. Taylor, which says that the
15 federal court has the right to preserve the status
16 quo while the Office of Civil Rights proceeding is
17 going forward.
18        So that's her memorandum opinion, and
19 that's already in evidence.
20        MR. TIGAR:  Just to clarify.
21        THE WITNESS:  Yes.
22        MR. TIGAR:  Mr. Klayman, you were in

## Page 1160

1 Los Angeles on the 1st of June.  Is that right?
2 You had the car accident that day.
3        THE WITNESS:  In and around that time
4 period, yeah.
5        MR. TIGAR:  So where were you as you
6 were filing these things eight days later?  Do you
7 remember whether you were in DC or in LA?
8        THE WITNESS:  I don't remember exactly,
9 because I don't have records.  I lost them all,
10 or -- I probably was in LA and we were filing
11 documents electronically under the Pacer system.
12        I actually had an associate working
13 with me, a Persian-American, and he was assisting
14 me with this, who had actually met with Ms. Sataki
15 as well.
16        MR. TIGAR:  I'm sorry?
17        THE WITNESS:  He had actually met with
18 Ms. Sataki as well.
19        In other words, he was participating in
20 this case with me.
21        MR. TIGAR:  What is his name?
22        THE WITNESS:  David Purati (phon).

## Page 1161

1        MR. TIGAR:  Did he meet with her during
2 this period of time between the 1st of June and
3 the 8th?
4        THE WITNESS:  No, no.  He was working
5 under my umbrella and helping me work things out.
6        CHAIRMAN FITCH:  Go ahead, Mr. Sujat.
7        THE WITNESS:  Yes, and I would like to
8 add here, one of the things that came up yesterday
9 was where Ms. Sataki's purported termination
10 notices were sent on November 15th, and they're
11 of course sent to incorrect addresses, for
12 whatever reason, but she knew that I was in Los
13 Angeles then.  She knew where my office was.  It
14 was at 9701 Wilshire Boulevard.  She could have
15 certainly sent it there, and she knew that I
16 wasn't in Washington.
17        And she in fact, you know, met with me
18 there and the small staff that I had during
19 various periods of time.
20        So I think that's an important point,
21 is that --
22        CHAIRMAN FITCH:  In that regard, what

6 (Pages 1158 to 1161)

Page 1162

1    particular document or communication are you
2    referring to?
3         THE WITNESS:  Just general, the
4    November 15th alleged letters terminating me.
5         CHAIRMAN FITCH:  Ok.
6         THE WITNESS:  Ok?
7         CHAIRMAN FITCH:  Right now we're in
8    June.
9         THE WITNESS:  Yeah, I'm just pointing
10   that out because we were talking about where I was
11   in location.  And she knew I was in my office at
12   9701 Wilshire.  It's at the corner of Wilshire and
13   Camden in Beverly Hills.
14        I was doing some entertainment stuff.
15   That's why I had a small office that I had sublet
16   from somebody, one office from an accountant in
17   that building.
18        CHAIRMAN FITCH:  Mr. Sujat?
19   BY MR. SUJAT:
20   Q.  Mr. Klayman, I refer you to Bar Exhibit
21   13.
22   A.  Correct.

Page 1163

1         This is a motion for disqualification,
2    which I fired with regard to Judge Kotelly on July
3    26th, 2010.  That's what the Pacer notice shows.
4    And what's really important about this document,
5    your Honors, is that it sets forth at the back, on
6    pages Bar Counsel Exhibit 13 -- it's Exhibit 13,
7    but the page is 13-25 through and including 13-38,
8    all of what I had determined to be the factual
9    errors of Judge Kotelly's ruling.  And that's the
10   basis upon which I had stated in an article that
11   she had no basis in fact and in law to have denied
12   the preliminary injunction motion and the TRO.
13   And on the left I say, if you go to Judge
14   Kotelly's facts, which she determined and what I
15   viewed to be the actual facts of the case, so I
16   detailed it in great -- with great detail, so to
17   speak.  Because I wanted her to reconsider,
18   showing her that she had significantly erred.
19        And I believed honestly -- and you'll
20   see, I have a judge coming here to testify for me,
21   I have good relationships with many judge -- but I
22   believed honestly that Judge Kotelly did not rule

Page 1164

1    honestly here, and that she tried to create facts
2    to arrive at the conclusion that she wanted
3    because she doesn't like me and doesn't like Ms.
4    Sataki, in part based on my activism, which was
5    against the person who appointed her and others,
6    and, you know, other factors.
7         She has a reputation of not liking
8    conservatives.  There have been many cases where
9    she has ruled with other conservative entities
10   where she's ruled against them or been very, very
11   difficult.
12        Interestingly enough, in this motion I
13   point out that her standard for granting a
14   preliminary injunction was different for Sataki
15   than for other interests.  She raised the
16   threshold of the Bar which she had to get over for
17   preliminary injunction.  But most important, she
18   didn't ever give us a hearing.  I don't understand
19   why you would not give a hearing to a woman who
20   had alleged that she was being destroyed, both
21   legally and emotionally.  It just was beyond my
22   imagination.

Page 1165

1         But also with regard to my having
2    written that there was no basis of law and fact,
3    I'm entitled to my opinion on that.  And lawyers
4    frequently do that in the context of a case, is
5    that, you know, when they speak about them
6    publicly, they do comment, and we know that what a
7    lawyer says outside of the courtroom, in the
8    context of the case, is entitled to First
9    Amendment protections as well and privilege.
10        That's what lawyers do, and we've seen
11   a lot of that lately, in particular, on both sides
12   of the political spectrum.
13        CHAIRMAN FITCH:  This filing on July
14   26th, 2010, do you recall whether you had any
15   discussions with Ms. Sataki --
16        THE WITNESS:  Yes, I had --
17        CHAIRMAN FITCH:  -- about filing --
18        THE WITNESS:  I had --
19        CHAIRMAN FITCH:  -- this motion?
20        THE WITNESS:  I'm sorry, your Honor.  I
21   didn't mean to interrupt you.
22        I had prior discussions with her about

7 (Pages 1162 to 1165)

In Re:  Larry E. Klayman
June 26, 2018

## Page 1166

1    Judge Kotelly and the need of her potentially
2    having to disqualify herself.  She knew about the
3    motion for reassignment.  She knew that ultimately
4    I would have to ask the judge, if necessary, to
5    disqualify herself.
6         Mr. Shamble testified yesterday that --
7         CHAIRMAN FITCH:  Stop.  Stop right
8    there.
9         THE WITNESS:  Yeah.
10        CHAIRMAN FITCH:  What is the basis for
11   your saying that Ms. Sataki knew about the motion
12   to disqualify?
13        THE WITNESS:  She knew that ultimately
14   I may have to file a motion to disqualify her.
15        CHAIRMAN FITCH:  What's the basis of
16   that comment?
17        THE WITNESS:  The conversations that we
18   had, which Mr. Shamble also testified to in some
19   manner yesterday that I raised up front, the
20   difficulty being before this judge, and my prior
21   experience with her in other case, and the fact
22   that she disliked me and generally dislikes people

## Page 1167

1    that she perceives to be conservative.
2         CHAIRMAN FITCH:  Do you have any
3    recollection of whether, in the approximately
4    seven days before July 26th, 2010, you had any
5    conferences or communications with Ms. Sataki --
6         THE WITNESS:  I don't have any
7    recollection about that.
8         CHAIRMAN FITCH:  -- about filing for
9    the motion to disqualify.
10        THE WITNESS:  I don't have any
11   recollection of that.
12        Again, I'm trying to protect her
13   interests.  If I succeeded in getting Judge
14   Kollar-Kotelly to recuse herself -- and this is an
15   interesting issue in the law -- is that a judge is
16   supposed to take himself or herself off the case
17   immediately when there is a 144 motion with an
18   affidavit filed.  But she doesn't do that, and
19   many other judges don't do that, to be candid.
20   They rule on it themselves.  That's kind of like
21   asking someone to say that you've been
22   disqualified.

## Page 1168

1    But if I had succeeded and I had to do
2    it for purposes of appeal, to have a record, if I
3    succeeded, then ultimately I could have the prior
4    orders vacated and get a preliminary injunction
5    hearing.  So I was protecting her interests.
6         And again it was very difficult to
7    communicate with her and, as you can see from some
8    of my testimony in his documents, she was all over
9    the place in what she wanted to do, based upon
10   advice she was getting from non-lawyers.
11        At one point, yesterday, you know, she
12   claims to have --
13        Here's Judge Sporkin.  Hold on.
14        CHAIRMAN FITCH:  Go ahead.
15        (Mr. Klayman communicates on his cell
16   phone off the record.)
17        THE WITNESS:  So, to finish my
18   response, I had to do this to protect her
19   interests.
20        And she was all over the place.  At one
21   point, you know, she's telling Dan Austin, "I want
22   to dismiss all cases," and then she's telling

## Page 1169

1    Kathleen Staunton, "Well, I never wanted to go to
2    LA.  Larry Klayman made that up."  Well, we know
3    that's not the case from various documentation and
4    testimony.
5         And then she's filing a notice of
6    appeal of Kotelly's ruling.
7         So, with all of that uncertainty and
8    all of the prevarication -- and I asked your
9    Honors also to look at this issue in context of
10   her credibility.
11        Also with regard to the publicity,
12   which clearly you're going to hear a lot of
13   testimony that she agreed to the publicity.  But
14   she came in here and testified under oath that she
15   didn't.
16        I had to protect her interest.  And
17   quite apart from any, you know, aspect of how I
18   felt about Ms. Sataki, I believed in her interests
19   and believed in her.  I would have to do that as a
20   lawyer for any client.  I can't let those rights
21   go into the tank, until we can sort out who is
22   involved here and what she wants to do.

8 (Pages 1166 to 1169)

In Re:  Larry E. Klayman
June 26, 2018

## Page 1170

1  So, that was it.  But she knew that we
2  would ultimately perhaps have to move to
3  disqualify Judge Kotelly.  And I was hoping that
4  would not be the case, particularly since I
5  thought, much like with Ms. Allred, that women can
6  appreciate even better than men what it's like to
7  be sexually harassed.  And I thought maybe she
8  might have some empathy and rule in our favor,
9  even though I was very skeptical, given her past
10  experience with me in other cases.
11  CHAIRMAN FITCH:  At this point, we will
12  take a brief recess in order to interrupt the
13  Respondent's testimony, at his request, in order
14  to accommodate the scheduling and other needs of
15  another witness in Respondent's case.
16  (Recess taken.)
17  (Judge Sporkin present in the hearing
18  room.)
19  CHAIRMAN FITCH:  This seems a little
20  silly, your Honor, but I need to swear you.
21  THE WITNESS:  I'll swear.
22  CHAIRMAN FITCH:  Do you solemnly swear

## Page 1171

1  or affirm that the testimony you're about to give
2  will be the truth, the whole truth and nothing but
3  the truth?
4  THE WITNESS:  I swear.
5  Whereupon,
6  STANLEY SPORKIN
7  called as a witness on behalf of Respondent, and
8  after having been first duly sworn, was examined
9  and testified as follows:
10  DIRECT EXAMINATION ON BEHALF OF THE RESPONDENT:
11  BY MR. KLAYMAN:
12  Q.  Please state your name, your Honor.
13  A.  Stanley Sporkin.
14  Q.  Can you run us through briefly your
15  educational background?
16  A.  Well, I went through college at Penn
17  State University.  I went to law school at Yale.
18  I'm a lawyer, a member of the Bar.  I'm a CPA.
19  Anything else?
20  Q.  No, I think that does it.
21  And we had some cases together early on
22  when we were younger, right?

## Page 1172

1  A.  Yes, we have.
2  Q.  I told a little story yesterday about
3  one of them with B.F. Saul.
4  A.  Yeah.
5  Q.  And your sense of humor.  You remember
6  that?
7  A.  Yeah.
8  Q.  In the time that I appeared before you,
9  did you find me to be an honest and ethical
10  lawyer?
11  THE WITNESS:  He has an objection?
12  MR. SMITH:  No, no objection.
13  THE WITNESS:  Alright.
14  Yes, I found you to be an ethical
15  lawyer and a good lawyer.
16  BY MR. KLAYMAN:
17  Q.  And of good character?
18  A.  I have no reason to doubt your
19  character.
20  Q.  And we've known each other over the
21  years since then.  After we stopped having cases
22  together, we got to know each other.

## Page 1173

1  A.  Yeah.
2  Q.  There came a point in time when I
3  called you about one of my clients, Elham Sataki,
4  a woman who alleged she had been sexually harassed
5  at the Voice of America, a government agency.  And
6  I went through facts with you about her harassment
7  and also I discussed the case of Wagner vs.
8  Taylor, putting her back to work in Los Angeles to
9  preserve the status quo while her administrative
10  sexual discrimination claim went through.
11  What did you tell me at that time about
12  what you would do if you were sitting on the bench
13  about that case?
14  A.  This was all nonformal, right.
15  Q.  Right.
16  A.  I was not representing this woman.
17  Q.  No, I just asked you.  You were a
18  retired judge.  And I said "What would you do,
19  your Honor?"
20  A.  And you had suggested what you had told
21  her and you mentioned to me what that was and I
22  said I saw that that seemed to be reasonable.

9  (Pages 1170 to 1173)

In Re: Larry E. Klayman
June 26, 2018

## Page 1174

1    Q. And we discussed whether you would have
2  given her a preliminary injunction hearing before
3  making a ruling, an actual evidentiary hearing.
4    A. Yeah.
5    Q. And what did you tell me?
6    A. What's that?
7    Q. I asked whether you would have given
8  her a preliminary injunction hearing --
9    A. Yeah.
10    Q. -- before making a ruling, with
11  evidence. And what did --
12    A. Well, you asked what the process would
13  have been.
14    Q. Yeah.
15    A. And I agreed that you have to have a
16  hearing before you can get an injunction.
17    Q. And that would be fair for all parties?
18    A. What's that?
19    Q. That would be the fairest thing for all
20  parties, to have an evidentiary hearing.
21    A. Right.
22    MR. KLAYMAN: I have no further

## Page 1175

1  questions.
2    CHAIRMAN FITCH: Let me catch up here
3  in my notes.
4    (Brief pause.)
5    CHAIRMAN FITCH: And Mr. Smith, do you
6  have any questions?
7    MR. SMITH: Just a few.
8    CROSS-EXAMINATION BY DISCIPLINARY COUNSEL:
9    BY MR. SMITH:
10    Q. Good morning, your Honor.
11    A. Good morning.
12    Q. I take it that you have not read the
13  orders of the district court in the Elham Sataki
14  case denying the requests for injunctive relief.
15    A. No, I have not read it.
16    MR. SMITH: I have no further
17  questions.
18    MR. KLAYMAN: One further question.
19    CHAIRMAN FITCH: Redirect, Mr. Klayman?
20    MR. KLAYMAN: Yeah.
21
22

## Page 1176

1    REDIRECT EXAMINATION ON BEHALF OF THE RESPONDENT:
2    BY MR. KLAYMAN:
3    Q. During our conversation I gave you
4  facts that she had been sexually harassed, that
5  there was an office of Persia News Network, Voice
6  of America, in Los Angeles, that she needed
7  medical help from her doctors there.
8    You remember that?
9    A. If you say you told me, you told me.
10    Q. Yeah. This was eight years ago,
11  correct?
12    A. It was a number of years ago, yes.
13    Q. And you would have put her back to work
14  in Los Angeles, at least in the interim during
15  this whole thing?
16    A. Well, I mean, I would have wanted to
17  hear all the facts, but that certainly was one
18  option.
19    Q. And you would have had an evidentiary
20  hearing?
21    A. Well, if we needed one, yeah.
22    Q. And that's the fairest thing to do?

## Page 1177

1    MR. SMITH: Objection, that goes beyond
2  the scope of my cross-examination.
3    CHAIRMAN FITCH: Sustained.
4    MR. KLAYMAN: Ok, no further questions.
5    CHAIRMAN FITCH: Thank you, judge. I
6  very much appreciate your accommodation for this
7  proceeding.
8    THE WITNESS: Well, thanks.
9    CHAIRMAN FITCH: It was a great honor
10  to have seen you.
11    We will stand in recess for a few
12  minutes.
13    (Witness Stanley Sporkin is excused.)
14    (Recess taken.)
15    (Mr. Klayman on the witness stand.)
16    CHAIRMAN FITCH: Mr. Sujat, we left off
17  with discussion of the motion to disqualify --
18    MR. SUJAT: That's correct.
19    CHAIRMAN FITCH: Of 7/26/10, and that
20  gets us back up to where we ended up yesterday,
21  having in my view completed testimony about
22  pre-August matters. We also have allowed

10  (Pages 1174 to 1177)

In Re:  Larry E. Klayman
June 26, 2018

Page 1178

1   testimony about the August 10, I believe, letter.
2   It seems to have been thoroughly examined.
3           You may proceed from there with your
4   questions.
5           MR. SUJAT:  Thank you, your Honor.
6           MR. KLAYMAN:  And your Honor --
7           MR. TIGAR:  I'd like it put one
8   question if I may.
9           You filed the section under United
10  States Code Section 144 which requires that the
11  affidavit be the affidavit of a party, but you
12  didn't file an affidavit of a party.
13          Why was that.
14          THE WITNESS:  Because of the fact that
15  I thought most of the prejudice was coming
16  vis- -vis me.  It's unclear --
17          There are case cases.  I've done
18  research on this.  In my life -- not like your
19  professional life, Mr. Tigar and your very
20  distinguished career, but, you know, sometimes you
21  go up against judges that are biased or whatever.
22  There are cases you can impute to the court on the

Page 1179

1   client, and that's why I filed the affidavit
2   myself.
3           And also, at that point it was very
4   difficult to communicate with her and get her to
5   communicate with me.
6           MR. TIGAR:  Do you recall reaching out
7   to her and asking her if she would make such an
8   affidavit?
9           THE WITNESS:  Yes.  I was calling out
10  generally because I needed to get instructions
11  from her by talking to her, not getting letters
12  secondhand.
13          Well, actually at that point we didn't
14  get anything.  We didn't have any communication.
15  I was trying to reach her the whole time, and she
16  just kind of went into hiding.
17          But there are cases that say prejudice
18  to the lawyer can be imputed to the client.
19          It's an interesting sideline here,
20  something I want to work on in the future in my
21  public interest capacity.  In some states, for
22  instance, like California, when you draw a judge,

Page 1180

1   you get one peremptory challenge of the judge, and
2   you can get another judge.  And if you look at the
3   legislative history of 144, there are aspects of
4   this being like a peremptory challenge.  You
5   should be at least allowed, if you can show, you
6   know, bias and prejudice in some way, to get
7   another judge on your case.  I think the federal
8   system needs to be amended in this regard.  Maybe
9   the Bar can work on that, and also the fact that
10  judges shouldn't be sitting on their own
11  disqualification motions.  It should go to another
12  judge in the courthouse.
13          CONTINUED DIRECT EXAMINATION
14          ON BEHALF OF RESPONDENT:
15          BY MR. SUJAT:
16      Q.  Mr. Klayman, we were just on the Bar
17  Exhibit 13 and I was going to refer you here now
18  to 14, Exhibit 14.
19      A.  Yes.
20      Q.  It's the memorandum opinion, October
21  13, 2010.
22      A.  Yes.

Page 1181

1           This is the memorandum opinion of
2   October 13, 2010, of Judge Kotelly denying the
3   motion for disqualification.
4           And I might add to Mr. Tigar's
5   question, and I not only moved, if you look at the
6   papers under 144, but I moved under 28 U.S.C. 145,
7   as well, which is actually a lower threshold, but
8   it's not an automatic disqualification as 144
9   should be if the affidavit is sufficient under
10  144.
11          So I moved under both bases.
12          I guess we can turn to 15, Mr. Sujat.
13      Q.  Yes, please.  That's the memorandum
14  opinion of October 22nd, 2010.
15      A.  Yes.
16          This was a motion to dismiss that had
17  been filed by the defendants, and that's her order
18  on October 22nd, 2010.
19          And then Exhibit 16 is a motion to
20  reconsider court's dismissal, order of October
21  22nd, 2010, and to correct manifest intentional
22  errors.  The action should not have been

11 (Pages 1178 to 1181)

In Re: Larry E. Klayman
June 26, 2018

## Page 1182

1 dismissed. There was a preliminary injunction
2 claim in the complaint for Judge Kotelly to
3 dismiss it short of letting us go to a permanent
4 injunction was error.
5      She also characterized my complaint as
6 simply a Bivens claim, you know, claiming for
7 Constitutional violations, and the complaint was
8 more than that. It had other counts in it, which
9 she should not have dismissed, and in particular
10 we had the amendment with regard to Wagner vs.
11 Taylor for status quo, and that dealt with the
12 permanent injunction.
13      So she just, for lack of a better word,
14 no lack of respect, threw the baby out with the
15 bath water, and I asked her for her
16 reconsideration.
17      It was another example of what I
18 perceived to be her extrajudicial bias against my
19 client, and me.
20      Q. So would you also look at Bar Exhibit
21 16.
22      A. What is the number?

## Page 1183

1      Q. It's tab 16 --
2      A. Yes, I just talked about this.
3      Q. Ok, then I'm sorry, 21.
4      CHAIRMAN FITCH: I'm sorry, what
5 number?
6      MR. SUJAT: The order on Exhibit 21.
7      CHAIRMAN FITCH: Twenty-one, ok.
8      MR. SUJAT: December 21st, 2010, Bar
9 exhibits.
10      THE WITNESS: The interim exhibit is
11 already in evidence, so I don't need to take up
12 the hearing committee's time on that. They speak
13 for themselves.
14 BY MR. SUJAT:
15      Q. Also I was going to reference a Notice
16 of Appeal. That's Exhibit 22.
17      A. Ok, let's take it one at a time.
18      With regard to Exhibit 21, which is in
19 evidence, that is the opinion denying the motion
20 for reconsideration of Judge Kotelly -- made
21 before Judge Kotelly. And again, to encapsulate
22 what I was saying is, your Honor, you have to let

## Page 1184

1 the case go forward, and there are other counts.
2 The Wagner v. Taylor case we're seeking permanent
3 injunction. So you can't just throw the case out
4 now, which never had an evidentiary hearing. We
5 never had an evidentiary hearing, so how can you
6 dismiss a case before you take evidence and allow
7 for cross-examination, much less she didn't allow
8 for discovery, which I view as very biased and
9 prejudiced in that, in the ordinary course of
10 things, a judge would certainly have granted -- in
11 this circumstance, where a woman alleged that she
12 was virtually on the verge of a nervous breakdown
13 and suicide, to give her a hearing? It's the
14 least you could do.
15      So, anyway, I filed a notice of appeal
16 on or about the 22nd of -- excuse me, January
17 1st -- excuse me, January 19th, 2011. Again, I
18 couldn't be in contact with Ms. Kotelly (sic). I
19 paid for the filing fee myself. I've never
20 recuperated. I've never asked for it.
21      Then later, as we identified yesterday,
22 Ms. Kotelly (sic) herself, Mr. Sujat will find

## Page 1185

1 that notice of appeal --
2      CHAIRMAN FITCH: I think you mean Ms.
3 Sataki. The word "Kotelly" came out of your
4 mouth.
5      THE WITNESS: Oh. I'm a little tired.
6      CHAIRMAN FITCH: Yes, I know.
7      THE WITNESS: I filed a NOTICE OF
8 APPEAL. I paid for it myself. I never asked to
9 be reimbursed. I couldn't get in touch with her.
10      And then, I testified yesterday, Mr.
11 Sujat, if you can find that exhibit in our
12 supplemental exhibits, the notice of appeal to Ms.
13 Sataki.
14      MR. SUJAT: I know what you're talking
15 about. That would be exhibit -- let me give the
16 whole citation here, Respondent's Supplemental
17 Exhibit 4.
18      THE WITNESS: Can I see that.
19      (Brief pause.)
20      THE WITNESS: Thank you.
21      This is the notice of appeal which Ms.
22 Sataki filed on her own. She hadn't called me

12 (Pages 1182 to 1185)

In Re: Larry E. Klayman
June 26, 2018

## Page 1186

1  about it. She hadn't called Mr. Shamble, from his
2  testimony. And there's a notation here from Judge
3  Kotelly, in her handwriting: "Let this be filed:
4  Judge Collar, C-o-l-l-a-r- C-o-t-e-l-l-y," January
5  27th, 2011.
6      So, there is an important point here in
7  that she claims she instructed people to do
8  nothing, drop all cases with Dan Austin in early
9  August, but that she herself was now appealing the
10 case that had been dismissed by Judge Kotelly.
11 It's totally inconsistent with testimony that she
12 gave with regard to Kathleen Staunton and
13 testimony that she got from me through documents
14 dealing with what Kathleen Staunton was told by
15 Ms. Sataki, that she didn't want to go back to LA,
16 that it was all my idea.
17      There's nothing here that makes sense
18 and it's clear on the record. Ms. Sataki's
19 testimony was inconsistent and untruthful.
20      MR. SMITH: Move to strike. This is
21 all editorial, not testimony.
22      CHAIRMAN FITCH: That's struck.

## Page 1187

1      Let me ask counsel, on this document
2  RSUPX4, which is a notice of appeal signed by
3  Elham Sataki, and part of the notice says, "This
4  14th day of January, 2011," and then --
5      THE WITNESS: Can I see it, Mr. Sujat?
6      CHAIRMAN FITCH: And then it says
7  "Received, mailroom, January 20th, 2011."
8      At the top, Mr. Sujat, can you tell
9  what date is being indicated in the court's
10 standard line, at the top of this document?
11      MR. SUJAT: I might need a magnifying
12 glass.
13      THE WITNESS: I think I can, your
14 Honor.
15      CHAIRMAN FITCH: It's printed over.
16      THE WITNESS: Yeah, it looks to me like
17 it says January 31st, 2011.
18      CHAIRMAN FITCH: Thirty-one was my best
19 guess.
20      THE WITNESS: Yes.
21      CHAIRMAN FITCH: I note for the record
22 that it is difficult to ascertain.

## Page 1188

1      Was this a timely notice of appeal?
2      THE WITNESS: No, I don't believe it
3  was. She missed the deadline, and that's why I
4  had to file it by the deadline, didn't want her to
5  lose her rights.
6      But it will tell you that she wanted to
7  appeal it, despite what she testified to. And I
8  couldn't communicate with her and neither could
9  Mr. Shamble.
10      MR. SMITH: Move to strike.
11      CHAIRMAN FITCH: I think that motion to
12 strike is denied. I think it's reasonable in the
13 scope of what was asked.
14      Just remind me, had you filed a notice
15 of appeal from anything at this point?
16      THE WITNESS: Yes, that's Exhibit 22.
17      CHAIRMAN FITCH: Twenty what?
18      THE WITNESS: Twenty-two. It was filed
19 timely.
20      CHAIRMAN FITCH: Oh, that's right, this
21 is from December.
22      THE WITNESS: Right.

## Page 1189

1      CHAIRMAN FITCH: Go ahead, Mr. Sujat.
2      MR. SUJAT: That's all I have right now
3  on this.
4      THE WITNESS: No, we're going on to
5  other testimony.
6      MR. SUJAT: That's all with the
7  pleadings.
8      CHAIRMAN FITCH: Give me a chance to
9  wrap up my work here.
10      (Brief pause.)
11      CHAIRMAN FITCH: Returning to your
12 Exhibit RSUPX4...
13      THE WITNESS: Can I see it, Mr. Sujat?
14      CHAIRMAN FITCH: You agree that, with
15 respect to the statement, typewritten statement,
16 "This 14th day of January, 2011," if filed on that
17 day, it would have been timely.
18      THE WITNESS: Yes, but however this was
19 sent -- you actually raised a good point, which I
20 forgot to testify to.
21      It's signed "Elham Sataki, pro per."
22 She would have no way of knowing "pro per." She

App.0517

In Re:  Larry E. Klayman
June 26, 2018

## Page 1190

1  wouldn't even know "pro se," because she doesn't
2  have a legal background.  But pro per is the term
3  that's used in California for pro se.
4      CHAIRMAN FITCH:  Mm-hmm.
5      THE WITNESS:  So I'm only supposing
6  here that this was mailed in to the courthouse and
7  it took a while to get to Judge Kotelly and then a
8  while to file it.
9      But whoever was advising her -- and it
10  was likely Ms. Staunton and/or her cousin, Sam
11  Razavi -- obviously they were not giving her good
12  advice.
13      MR. TIGAR:  Mr. Klayman, is VOA or the
14  Broadcasting Board of Governors an agency of the
15  United States?
16      THE WITNESS:  Yes.
17      MR. TIGAR:  So that if they're a party
18  to the proceeding, you have 60 days to appeal,
19  correct?
20      THE WITNESS:  I believe they do.
21      CHAIRMAN FITCH:  Oh, ok.
22      THE WITNESS:  They do, but I don't

## Page 1191

1  believe the private plaintiff has 60 days to
2  appeal.  I may be wrong on the government, too.
3      MR. TIGAR:  I'm reading, just so that
4  we're clear, from 4(a)1B of "The notice of appeal
5  may be filed by any party within 60 days if one of
6  the parties is a United States agency."
7      THE WITNESS:  That's a good point, Mr.
8  Tigar.  It shows you that I don't know everything.
9      I did remember that -- actually I was a
10  Justice Department lawyer, so I should have known
11  that.
12      It does raise an important point.  If
13  that's the case -- I have no reason to doubt what
14  you read -- then she had time to pursue the
15  appeal, and she could have done that with whoever
16  was helping her, pro per, pro se, or gotten her
17  another lawyer.
18      But obviously she abandoned the claim.
19      MR. TIGAR:  If I can follow up on that.
20      THE WITNESS:  Yeah.
21      MR. TIGAR:  Later on in October of
22  2011, you wrote a letter to Ms. Sataki, an

## Page 1192

1  email -- and I can't right now lay my hands on
2  it -- in which you tell her that she has the 24th
3  of October to do something.
4      Do you recall that?
5      THE WITNESS:  I believe, without
6  looking at it, that was with regard to filing a
7  Title VII action.
8      MR. TIGAR:  I tried to count on my
9  fingers how many months it was since the final
10  action of the ODC, or the OCR.
11      THE WITNESS:  Yeah.
12      MR. TIGAR:  Would you and Mr. Sujat
13  refresh my recollection by finding that document
14  and then I could -- we'll talk about it.
15      THE WITNESS:  Well.  May I do that in
16  the course of my testimony.  During a break we'll
17  find it.
18      MR. TIGAR:  Of course, during a break.
19      What was the date of that?
20      MR. SUJAT:  October 22nd.  I'm not sure
21  of the year.
22      THE WITNESS:  We'll discuss it at

## Page 1193

1  lunch.  I was constantly aware.  That's why I
2  wanted to contact her.  She still had rights
3  beyond this case.
4      MR. TIGAR:  I don't want to take time
5  up with it now.
6      THE WITNESS:  Sure.
7      You can proceed, Mr. Sujat.
8  BY MR. SUJAT:
9      Q.  So this next area will be some emails.
10  And Mr. Klayman, I'd like you to look at SX3?
11      A.  I need the book.
12      Q.  Ok, Mr. Klayman, I draw your attention
13  to Bar Supplemental Exhibit 3 and the first page.
14      A.  Yes.
15      Q.  And the first sentence.
16      CHAIRMAN FITCH:  Wait a minute.  I
17  don't think the Bar has a supplemental exhibit,
18  does it?
19      THE WITNESS:  Yes.  That was what they
20  presented the day of trial, a lot of
21  correspondence.
22      CHAIRMAN FITCH:  He said the Bar.  It's

14  (Pages 1190 to 1193)

In Re: Larry E. Klayman
June 26, 2018

## Page 1194

1  not Bar.
2      THE WITNESS: It is the Bar. It was
3  that package that Mr. Smith provided the first day
4  of trial.
5      CHAIRMAN FITCH: Ok. I apologize, my
6  error.
7      THE WITNESS: Yes, this is an email
8  that I wrote to Ms. Sataki on April 23rd, 2010,
9  and it says, "You do not have to worry about
10  money. I honor my commitments in all respects.
11  Your apartment is prepaid for six months and I
12  will pay any expense that must be paid as I
13  prepare to go to the judge with full ammunition,"
14  meaning, you know, take strong action legally.
15      "I'm not trying to bribe you," blah,
16  blah, blah. "I would be hurting myself if I let
17  this happen."
18      So this is an example of how I was
19  never seeking to be paid back for these expenses.
20  I say doing this pro bono.
21  BY MR. SUJAT:
22      Q. Mr. Klayman, I refer you to SX5 in the

## Page 1195

1  same book.
2      MR. TIGAR: Excuse me, before you go to
3  that, would you look again at SX3, and the
4  paragraph that begins, "I am human," and you can
5  read that.
6      What were you trying to convey here
7  about your feelings about your client?
8      THE WITNESS: That I had really strong
9  feelings, believed in her and loved her. And I
10  don't think there's any crime in loving someone
11  and working really hard for them. And it
12  certainly is not a slap at anybody. It's a
13  compliment.
14      So that's what I was trying to convey.
15  I'm human. Things happen in life that you don't
16  expect, and when they do, you have to deal with
17  them.
18      But in this case it actually made me
19  work harder for her. And as Mr. Shamble
20  confirmed, and also when I thought that the
21  relationship was over the top, when she asked me
22  to buy the car and things like that, and got mad

## Page 1196

1  at me over trying to help her friend Kaveh, and
2  other issues, then I said, "You know, you've got
3  another lawyer," and I testified that.
4      I might add, in the course of -- I'm
5  not equating this to me, but in a famous case
6  involving William Kennedy Smith, I believe that my
7  friend, Roy Black in Miami, the criminal lawyer,
8  afterwards fell in love with a juror and married
9  her.
10      You know, people are human. It doesn't
11  mean he did anything wrong. He didn't. But
12  that's people decide to love people. You can't
13  really say why that happens. That's a miracle,
14  you know.
15      CHAIRMAN FITCH: Mr. Sujat, continue,
16  please.
17  BY MR. SUJAT:
18      Q. Mr. Klayman, I refer you to SX5, the
19  same book.
20      A. Yes.
21      This is an email that I sent on or
22  about May 8th, 2010 to Ms. Sataki: "Ellie, in case

## Page 1197

1  you do not see my text this morning, I thought of
2  someone who can take over your legal
3  representation. His name is Tim Shea. Tim
4  Shamble also knows him and he has experience with
5  clients before VOA. I will ask him to call you on
6  Monday.
7      "Until all is resolved I will sent you
8  a check every two weeks the equivalent of your
9  paycheck. Your rent is paid for six months, and
10  if you need help I will pay beyond that.
11      "I wish you, your family and Kaveh" --
12  that's her friend that she had lived with in DC.
13  She asked me to help, and I helped Kaveh. "The
14  best -- this is in your best interest."
15      THE WITNESS: So that's what I'm
16  saying, Mr. Tigar, you know, is that I felt we
17  needed to get somebody else in there to represent
18  her, for everyone's interest.
19      CHAIRMAN FITCH: Go ahead. Keep going.
20      THE WITNESS: And it also underscores
21  again that I wasn't going to let her sink. I was
22  taking money out of my own pocket, which

15 (Pages 1194 to 1197)

In Re: Larry E. Klayman
June 26, 2018

## Page 1198

1 ultimately later caused me a lot of financial
2 issues personally, and I've never asked to be paid
3 back.
4
5 BY MR. SUJAT:
6    Q.  Mr. Klayman, I refer to you Exhibit
7 SX10.
8    A.  Yes.
9        That's an email I sent on May 19th,
10 2010, to Ms. Sataki.  It stated here, "I'm working
11 on your case tonight with Vanessa and Alice, so
12 I'm still in the office."  They were helping me
13 legally as assistants.  "I told you that we had to
14 wait until your convalescence was over since VOA
15 and I would reevaluate your request to be in LA at
16 that time.  I told you I would reimburse your pay
17 so you would not sink during this period if we did
18 not get VOA to reverse its position."
19        This shows two things: One, that I was
20 not going to let her thing, and I was not going to
21 ever ask her to pay the expenses.  It's part of
22 the whole continuing to tell her that.  It also

## Page 1199

1 deals with the fact that she knew I was in LA.
2 That's where I was, and she met in the office from
3 time to time with Vanessa and with Alice, and me.
4        So she certainly knew where to find me
5 if she wanted to.
6    Q.  Mr. Klayman I refer you now to a
7 different book.  This would be Bar Exhibit 23 and
8 SUP Exhibit 2.
9    A.  Yes.
10        CHAIRMAN FITCH:  Which book are we in?
11        MR. SUJAT:  This would be the Bar
12 exhibit, the blue book.
13        CHAIRMAN FITCH:  Go ahead.  What
14 exhibit number?
15        MR. SUJAT:  And I refer you to Exhibit
16 2 and 23.
17        THE WITNESS:  You mean the page number
18 two?
19        MR. SUJAT:  Well, it's 23-11.
20        CHAIRMAN FITCH:  I'm sorry, are we on
21 Exhibit 23 in the Bar's exhibits?
22        MR. SUJAT:  Correct, your Honor.

## Page 1200

1        CHAIRMAN FITCH:  So it's not two.
2        MR. TIGAR:  Are we at Page 12 of that
3 exhibit?
4        MR. SUJAT:  Yes, your Honor, 23-12.
5 Now I'm referring to an article that was posted
6 December 25th, 2010.
7        THE WITNESS:  Yes.
8        With regard to this article -- and what
9 I wanted to point out is that this article was
10 written on December 25th and, like all the other
11 articles, was extremely complimentary of Ms.
12 Sataki.  It didn't reveal any confidential
13 information that was already out there -- that was
14 not already out there that she had a approved.
15        We had testimony yesterday from Mr.
16 Shamble that they went up actually with the first
17 article I had written to try to get media
18 attention to try to coerce or coax, I should say,
19 Voice of America into a settlement.
20        But what's important here, the date,
21 December 25th, this was I think the last article
22 that I had written.  It's part of the articles

## Page 1201

1 entered into evidence and it was written before --
2 I still could not get in touch with Ms. Sataki,
3 and again I was getting things from her which
4 clearly did not come from her.  We found out
5 during her testimony that Kathleen Staunton and
6 her cousin were behind things.  And that's why
7 when January 23rd Mr. Shamble calls her -- or
8 sends her an email and says -- and we went through
9 that testimony, I won't belabor it, "Please
10 contact us.  We need to know what to do," contact
11 Mr. Klayman, but she could have also contacted
12 him.
13        So it was still in that period of
14 Never-never Land, so to speak, where I didn't feel
15 I had been terminated, because I was getting stuff
16 from other people and it was so contradictory that
17 I needed to talk to her.
18        But I was still trying to advance her
19 interests, and this is extremely complimentary of
20 her.  There's nothing confidential.
21        Now, there is a statement in the
22 Specification of Charges.  It speaks for itself,

16 (Pages 1198 to 1201)

In Re: Larry E. Klayman
June 26, 2018

## Page 1202

1   that somehow I was promoting myself with my book.
2       Well, WorldNetDaily had bought about
3   200 copies of my book. So they were inserting
4   this into my columns, trying to sell the books
5   themselves. I wasn't tying to sell the book for
6   my columns. It was WorldNetDaily who bought the
7   books and inserted them.
8       When I sold them the books, I didn't
9   know what they were going to put in there. They
10  put in advertisements. That's how they pay for
11  their website. But it's not me soliciting for to
12  buy my book there, so that's important.
13      CHAIRMAN FITCH: Which portion or
14  paragraph of this article are you referring to?
15      THE WITNESS: Yeah, maybe I'm talking
16  about another article, actually.
17      CHAIRMAN FITCH: Alright.
18      MR. SUJAT: Yeah, it wasn't in this
19  article, but in the later article, and some of
20  them, the Republican Establishment and Revolution,
21  "Larry Klayman Sees GOP Kingpin Still in Control
22  Despite Tea Party Victories." So, it not only

## Page 1203

1   shows that I'm nonpartisan and very critical of my
2   own technically registered party, the republican
3   party, they way they act sometimes. I'm
4   nonpartisan.
5       In this one you'll see going down, it
6   says "Get Larry Klayman's "Fascinating Encounters
7   With the Powers That Be: Whores - How I Came to
8   Fight the Establishment.'"
9       So that was WorldNetDaily advertising
10  it, not me.
11      MR. TIGAR: At the time you wrote this,
12  did you still have a belief that Ms. Sataki had
13  meritorious claims of sexual harassment and the
14  related claims?
15      THE WITNESS: Yes. Yes, and, you know,
16  up to today, you know, in hearing her testimony,
17  and I don't mean again to be provocative, but to
18  editorialize, but to hear how untruthful it was,
19  in my opinion, and I now question, as of today,
20  the voracity of her claims of sexual harassment.
21      CHAIRMAN FITCH: Mr. Sujat, go ahead.
22  BY MR. SUJAT:

## Page 1204

1       Q.  Next article is dated September 30th,
2   2011.
3       A.  Yes, this is -- I can say this --
4       CHAIRMAN FITCH: What exhibit number is
5   this?
6       MR. SUJAT: This is still 23.
7       MR. TIGAR: What page number?
8       MR. SUJAT: It's the next one, 23-14.
9       THE WITNESS: Yes, I just testified to
10  that. That's it. So I have no further testimony
11  on that.
12      CHAIRMAN FITCH: Ok, next.
13  BY MR. SUJAT:
14      Q.  And then the next one, 23-16.
15      A.  Yes.
16      That's THE October 14th article. Again
17  I make passing reference to the situation at Voice
18  of America. Again it's very complimentary of Ms.
19  Sataki. There's nothing that's confidential. And
20  I was not trying to sell my book there.
21  WorldNetDaily was trying to sell books that they
22  had purchased and owned.

## Page 1205

1       And I'm not promoting my self-interest
2   in any of these articles. I'm promoting the
3   interests of Ms. Sataki and what I believe in in
4   terms of freedom in Iran, and she believed in
5   that, too, and so did the other broadcasters at
6   BOA that I represented, and continued to represent
7   at that time.
8   BY MR. SUJAT:
9       Q.  Mr. Klayman, I next refer you to an
10  article, same day, October 14th, 2011, and it's on
11  Page 23-19.
12      A.  This was posted October 1st, 2010.
13      Q.  Posted October 1st, 2010.
14      A.  That's correct.
15      So essentially it's the same testimony
16  as before, that everything I said was
17  complimentary to Ms. Sataki, not confidential. I
18  was trying to promote her interest, still trying
19  to bring about the possibility of a settlement. I
20  never kept -- I never stopped trying, because I
21  believed so much that this was the right thing to
22  do. People really paid attention and cared. But

17 (Pages 1202 to 1205)

In Re: Larry E. Klayman
June 26, 2018

## Page 1206

1 in this town sometimes that doesn't happen in
2 particular. Or in other towns, but here there
3 seems to be sometimes politics that enter into
4 things, from my experience in 40 years. But
5 that's what it was about.
6      In this particular article there's no
7 reference to my autobiography.
8      Q.  I refer you to the next article, posted
9 July 2nd, 2010. It's on Page 23-22.
10      A.  Yes. This is called "The Ultimate
11 Freedom Fighter: Larry Klayman Chronicles His
12 Transformation into Jewish Follower of Christ."
13 This gets into the testimony previously. I won't
14 repeat it, belabor it. I'm very proud, very happy
15 that I've had two experiences where he came to me
16 and spoke to me, and I'm saying that there is
17 something that influenced a lot of what I do and
18 how I'm able to take on powerful forces and not
19 worry about what can happen to me, because I
20 believe he is with me. He said he was. And I
21 believe that, obviously, coming from the Son of
22 God.

## Page 1207

1      And this -- I might say I'm not the
2 only person in world history that he's ever come
3 to and talked to directly. With regard to my
4 Jewish background, God obviously had a pretty good
5 line of communication with Moses.
6      And then again the book is being sold
7 by WorldNetDaily on the site, not me.
8      Q.  Mr. Klayman, I now refer you to the
9 article posted June 11th, 2010 is the next one.
10      A.  Yes.
11      Q.  It's Exhibit 23-25.
12      A.  That's posted June 11th, 2010, and
13 that's my article about "Cockroaches and Judges."
14      There was no disrespect to the many
15 fine people that are on the judiciary, whom many
16 of them are my friends at this point, including
17 Judge Royce Lamberth, who I had many cases with,
18 and Judge Sanders Sauls in Tallahassee, who is
19 retired, and people like that. But I tried to
20 bring humor to it. I made a joke.
21      Actually I've done standup comedy
22 before in my life. I don't know if anybody found

## Page 1208

1 me funny. That's probably why I'm a lawyer.
2      This is what I was talking about and I
3 was talking about the injustice here that had
4 occurred.
5      So that's what this article is about.
6      Again, I'm not selling my book. It's
7 WorldNetDaily selling the books that they owned.
8      And again I make reference to Judge
9 Sporkin in 23-16. There are very few Judge
10 Sporkins alive on the bench these days, and I get
11 into the politics that give rise to judges being
12 appointed and confirmed. And I, myself, just to
13 say, it just didn't arise here, but I actually
14 recommended different ways to choose judges. It's
15 that I think that our founding fathers were
16 extremely intelligent, enlightened by God, but
17 they didn't get everything right. They weren't
18 God. And I think it was just a mistake, just to
19 be short, to give them life tenure and not have
20 them accountable for anything that they do.
21      Because, as we know, either -- your
22 only resource is to file a motion for

## Page 1209

1 disqualification or a complaint with the Judicial
2 Council. And the Judicial Council is composed of
3 judges who are in the same courthouse, or friends
4 of the judge at issue, are not going to recommend
5 any kind of remedial action with regard to their
6 colleague. I've never seen it happen.
7      And I also tried that with Kotelly,
8 too. I wanted her colleagues to correct this,
9 using that mechanism.
10      So, just to be brief, I recommended
11 that we have independent panels that recommend
12 judges, that they serve two full terms of five
13 years each, renewable for good behavior.
14      MR. TIGAR:  I want to make clear that,
15 at least as far as I'm concerned, that the way the
16 federal judges are selected and confirmed really
17 has nothing to do with the issues in this case --
18      THE WITNESS:  I agree.
19      MR. TIGAR:  -- and our respective views
20 don't matter.
21      THE WITNESS:  Ok, but --
22      MR. TIGAR:  My son is a United States

18 (Pages 1206 to 1209)

In Re: Larry E. Klayman
June 26, 2018

## Page 1210

1  judge who was chosen through this process, and I
2  want to make clear that --
3      THE WITNESS:  Yeah --
4      MR. TIGAR:  -- that didn't have any
5  impact on what's going on.
6      THE WITNESS:  I'm sure he's a fine
7  judge.
8      Yes, and there are many fine judges who
9  were selected through that process.  But there
10 were other judges who were selected based on
11 politics.
12     It's no reflection on your son.
13     MR. TIGAR:  No, I didn't take it to
14 mean that.  I just wanted to make it clear that
15 that has nothing to do with the burden here.
16     THE WITNESS:  I'm sorry if I made it an
17 issue.
18     But there are many fine judges.  Judge
19 Lamberth is one and Sullivan is another.  He came
20 through that process.  Judge Sporkin, he's
21 another.
22     But I do believe we need a system, and

## Page 1211

1  I'll be brief, that he takes the politics out.
2      CHAIRMAN FITCH:  Now that Mr. Klayman
3  has completed that answer, that answer is struck.
4      THE WITNESS:  Ok.
5      CHAIRMAN FITCH:  I think that we are
6  not going to finish the rest of the articles -- I
7  think we're going to finish them fairly quickly,
8  but if you don't mind, it's been a long time, and
9  we'll take a 12-, 15-minute break here at 11:29,
10 and then we will go to roughly 1:00 p.m., if
11 that's alright with everybody.
12     We stand in recess.
13     THE WITNESS:  Thank you.
14     (Recess taken.)
15     CHAIRMAN FITCH:  We are returning to
16 the record from our 11:29 break here at 11:46, and
17 I think Mr. Sujat is ready to resume his
18 examination, if I'm not mistaken.
19     MR. SUJAT:  Yes, thank you, your Honor.
20 BY MR. SUJAT:
21     Q.  Mr. Klayman, I refer you to the --
22     A.  Mr. Sujat, let's finish the articles,

## Page 1212

1  first.
2      Q.  Yes, that's what I'm going to do.
3      A.  And where were we?
4      Q.  I believe we finished up the one that
5  was called -- or the one that's dated --
6      CHAIRMAN FITCH:  We last had testimony
7  on DS-25.
8      MR. SUJAT:  Yes, 23-25.
9      THE WITNESS:  And let me add to that,
10 and with regard to Mr. Tigar's observations, that
11 I actually believed judges are our most important
12 public servants, and I've written about them a
13 lot.  That's no pandering.  And they protect us
14 from the tyranny of the other two branches of
15 government.  I'm not one of those conservatives
16 that believes that judges are inferior to the
17 other two branches of government.  In fact I think
18 they're more important.
19     CHAIRMAN FITCH:  Are we ready to go to
20 DSX27?
21     MR. SUJAT:  Yes.
22     CHAIRMAN FITCH:  DSX23-27.  What's your

## Page 1213

1  question?
2      MR. SUJAT:  Yes.
3      THE WITNESS:  You asked me about the
4  next article.  It's May 28th, 2010, and it's "Man
5  the Barricades."
6      I want to point out with WorldNetDaily,
7  I'm not an owner of WorldNetDaily.  I don't
8  benefit from them selling my books in anyway.
9  They keep the proceeds.
10     This is another article that I wrote:
11 Truthful, complimentary of Ms. Sataki; nothing
12 confidential.
13     And then turning to the next article,
14 "A Voice for Persian Freedom," this was one of the
15 first articles, May 21st, 2010.  That's at 23-30.
16     23-32, same testimony as the prior
17 testimony about regard to the columns that I
18 wrote, articles, whatever you want to call them.
19     And then we have May 14th, 2010, "The
20 Government War on a Freedom-Loving Beauty: Larry
21 Klayman Goes to Bat for Harassed Broadcaster
22 Fighting for a Free Iran;" extremely

19 (Pages 1210 to 1213)

In Re:  Larry E. Klayman
June 26, 2018

## Page 1214

1 complimentary.
2         Ms. Sataki knew of this and the other
3 articles which I sent to her.  This is the one
4 where Mr. Shamble, along with Ms. Sataki, took to
5 an event to promote her case and to try to coax
6 the government into a favorable settlement.
7         Same testimony as the prior testimony
8 with regard to the columns and the articles.
9         Then there's one written by someone, a
10 reporter at WorldNetDaily, Rob Unruh, May 11,
11 2010: "Lawyer Accuses VOA Manager of Pro-Iranian
12 Bias.  Claims Emerging Lawsuit Over Six
13 Discrimination Allegations.
14         Again, this is what Ms. Sataki wanted
15 to alleviate, along with her other broadcasters.
16 This is what they were there for, and they were
17 broadcasting into Iran, which, you know, created
18 some risk for them.  So it really didn't hinge on
19 the publicity with regard to her trying to get a
20 settlement in her case.
21         And I might also add, this was
22 testimony by her.  This is important --

## Page 1215

1         CHAIRMAN FITCH:  Well, wait a minute.
2         THE WITNESS:  Sorry, I'm going too
3 fast?
4         CHAIRMAN FITCH:  Yes, you are.
5         A moment ago, did you testify that you
6 do not receive any remuneration from the sale by
7 this publisher of books that you have written?
8         THE WITNESS:  Correct.
9         CHAIRMAN FITCH:  And did you receive
10 any remuneration associated with these articles?
11         THE WITNESS:  At one point I did.
12         CHAIRMAN FITCH:  Any tangible
13 remuneration.
14         THE WITNESS:  Intangible?
15         CHAIRMAN FITCH:  Tangible, like money.
16         THE WITNESS:  Yes, at one point I did.
17 I don't believe I was during this period of time.
18 Later, I had an agreement when I represented
19 WorldNetDaily in a lawsuit that one way they could
20 compensate me was to pay me $100 per article, but
21 that occurred after this article was written.
22         CHAIRMAN FITCH:  Was that related to

## Page 1216

1 Ms. Sataki's case?
2         THE WITNESS:  No.
3         What happened was, Esquire Magazine had
4 allegedly defamed the publisher of WorldNetDaily,
5 Joseph Farah, and a writer called Joseph Corsi,
6 and --
7         CHAIRMAN FITCH:  But that was after --
8         THE WITNESS:  That was afterwards, yes.
9         CHAIRMAN FITCH:  Alright.  So is it
10 correct that you received no remuneration for or
11 in association or connection with this group of
12 articles?
13         THE WITNESS:  That is correct.
14         CHAIRMAN FITCH:  And is it true that,
15 at least during this period of time that's
16 relevant to this case, that you received no
17 remuneration from this publisher for books by you
18 that they published?
19         THE WITNESS:  Correct.  Correct, that
20 Larry Klayman did not.
21         CHAIRMAN FITCH:  Ok.  Mr. Sujat.
22 BY MR. SUJAT:

## Page 1217

1         Q.  Yes, next article is posted May 11th I
2 think.
3         CHAIRMAN FITCH:  What page is it on?
4         MR. SUJAT:  23-36.
5         THE WITNESS:  Yes, I just identified
6 that.
7         CHAIRMAN FITCH:  Wait a minute.  Don't
8 interrupt him.  I can't hear him.
9         Twenty-three dash what?
10         MR. SUJAT:  Thirty-six, 23-36.
11         CHAIRMAN FITCH:  I have Mr. Klayman's
12 testimony in that connection.
13         THE WITNESS:  The next article then in
14 this exhibit --
15         CHAIRMAN FITCH:  Well, actually I want
16 some more testimony about that article.
17         Did you arrange with Mr. Unruh, the
18 author of the article, or prompt Mr. Unruh to
19 write this article?
20         THE WITNESS:  Yes, I talked to him
21 about it and I thought it would be helpful, to try
22 to settle Ms. Sataki's case.

App.0524

In Re:  Larry E. Klayman
June 26, 2018

## Page 1218

1    CHAIRMAN FITCH:  Mr. Sujat.

2

3    BY MR. SUJAT:

4    Q.  Mr. Klayman, I refer you to the article

5    posted with the date April 30, 2010.

6    A.  Correct, that's "How to Free the

7    Iranian People" --

8    CHAIRMAN FITCH:  I have to interrupt

9    you.  For the record, this appears at DSX23-41.

10    MR. SUJAT:  Mm-hmm.

11    CHAIRMAN FITCH:  Go ahead.

12    THE WITNESS:  It's titled "How to Free

13    the Iranian People."

14    I really admire the Iranian people.  I

15    think that's pretty clear in everything I write.

16    And I have many, many friends in the community,

17    other than clients.  And this was trying, again,

18    to advance the cause of Ms. Sataki who believed in

19    American -- in freedom and really held herself out

20    for that.

21    I was going to add something that I

22    forgot to testify to yesterday, that, when she

## Page 1219

1    said that she had been threatened and that they

2    had posted her picture on websites with

3    pornographic images, not only did I take her to

4    the FBI on that -- that was the reference to the

5    FBI.  I didn't use the FBI to investigate her or

6    any of her family or friends.

7    She believed -- she told me that she

8    believed it was coming from the harasser,

9    Falahati, and the manager Sajadi, Ali Sajadi.  And

10    Sajadi, as she had advised me and other

11    broadcasters had advised me, his father lived in

12    Tehran and was advisor to the supreme leader, the

13    Ayatollah Khomeini, and consequently that

14    activity -- that's why I asked the FBI to

15    investigate -- would have occurred regardless of

16    any publicity that was trying to further her case

17    and get a settlement, because they knew of her

18    claims against them, both in terms of the internal

19    complaints that had been filed initially by her

20    with the Office of Human Resources, and then with

21    OCR, Office of Civil Rights, and then in court.

22    So, if they were going to retaliate,

## Page 1220

1    they already knew about that.  And she firmly

2    believed -- she told me that it was Falahati and

3    Sajadi that were behind that.  This was the way to

4    try to intimidate her to get her to back off her

5    claims.

6    CHAIRMAN FITCH:  And I note, Mr.

7    Klayman, that there is a group of articles from --

8    that the articles as they are put into

9    Disciplinary Counsel's exhibit book are in reverse

10    chronological order.

11    So now that we have reached the end of

12    those articles at DSX23-41, there are five

13    articles between April 30 and May 28.  And then

14    there's another one just a few days later on June

15    11th.  So that's six articles in a month and 11

16    days.

17    Why was there that flurry?

18    THE WITNESS:  Well, because I write a

19    column every week, every Friday.

20    CHAIRMAN FITCH:  Well, that's fine, but

21    why was that there at that point?

22    THE WITNESS:  Oh, because I'm still

## Page 1221

1    trying to settle this thing.  I'm trying to get

2    them to agree to give her what she wanted, and

3    we're trying also --

4    CHAIRMAN FITCH:  Was this period that I

5    just referred to sort of the height of the active

6    settlement, including engagement with the other

7    side?

8    THE WITNESS:  Yeah, they continued

9    on --

10    CHAIRMAN FITCH:  Ok.

11    THE WITNESS:  They continued on.  Mr.

12    Shamble continued to attempt that.

13    And if you look at Exhibit 21 --

14    CHAIRMAN FITCH:  Well, I'm not ready to

15    look at that.

16    THE WITNESS:  Ok.

17    CHAIRMAN FITCH:  And then there are

18    articles a month later on 7/2 and then three

19    months later, 10/1, and 10/15, and in between that

20    there was one on nine, nine as in September, 30.

21    What was the reason for the more

22    intermittent articles in that time?

21 (Pages 1218 to 1221)

In Re: Larry E. Klayman
June 26, 2018

Page 1222

1       THE WITNESS: As I just testified, that
2   we were still pursuing this.
3       And what I was going to refer to that I
4   hadn't testified to was Exhibit 21 of Bar
5   Counsel's exhibits, and that's not supplementary,
6   but the actual one. The order, the final order of
7   Judge Kotelly came down with regard to all of
8   these matters on December 21st, 2010. So these
9   all, except for that one article about Christmas,
10  written before that time period. This was still
11  ongoing into the courts.
12      And I was also hoping, not just to
13  influence Voice of America, but also to
14  influence -- because publicity does drive judges,
15  unfortunately, and they're good judges, such as
16  Mr. Tigar's son, and Mr. Sporkin and Judge
17  Lamberth and others, and Judge Sullivan who was
18  Clinton appointee, I have a great deal of respect
19  for -- they read the press. And that's the
20  reality of life. Everybody reads the press these
21  days and their decision-making can be influenced
22  by what's out there in the media.

Page 1223

1       That's why we see a lot now with regard
2   to the investigations of Robert Muller on both
3   sides. And also, you know, the prosecutions of
4   Paul Manafort and others, on both sides.
5       So that's what I was doing. I had a
6   dual purpose, and I do write a column every
7   Friday, and I also write for News Max. I have a
8   blog on News Max. That's recently. That wasn't
9   during this period, at all. That was much later.
10      So I'm a writer. I love writing.
11      CHAIRMAN FITCH: Mr. Sujat, have we
12  finished the articles?
13      MR. SUJAT: I believe so.
14      THE WITNESS: Yes. I want to add one
15  other thing, though. I want to go back to Exhibit
16  21 of the judge's order, last order.
17      And I believe I'm correct with regard
18  to my prior testimony, but I started thinking
19  about this, because this case is eight years old,
20  and memories fade, that this may have been the
21  trigger point when I crashed my car, after that
22  final order came out on December 21st, 2010.

Page 1224

1       So I just wanted to point that out.
2   I'm not 100 percent sure that the earlier order on
3   June 1st was the day I had the auto accident. I
4   just wanted to say that.
5       But I was very upset both times, and I
6   felt badly for Ms. Sataki, and I felt badly,
7   frankly, for the American justice system.
8       CHAIRMAN FITCH: Where are we going
9   from here, Mr. Sujat?
10      MR. SUJAT: I have some other things
11  I'd like Mr. Klayman to look at.
12  BY MR. SUJAT:
13      Q. I refer you to the transcript of Ms.
14  Sataki dated May 31st, 2018, on Page 332, lines
15  five through nine.
16      MR. SMITH: I'd like a proffer about
17  where we're going about what the live testimony is
18  going it be, about the prior testimony of Ms.
19  Sataki.
20      CHAIRMAN FITCH: Start over again,
21  there, Mr. Sujat, for the slow guy here.
22      MR. SUJAT: I would like to refer Mr.

Page 1225

1   Klayman to the transcript where Ms. Sataki makes
2   some statements on Page 332. I think it's very
3   relevant to his case, and it, you know, shows a
4   pattern.
5       CHAIRMAN FITCH: Well, you can save
6   your argument.
7       MR. SUJAT: Yes.
8       CHAIRMAN FITCH: I think asking Mr.
9   Klayman about facts asserted by Ms. Sataki is
10  perfectly legitimate.
11      MR. SMITH: I do, too, but I don't
12  think that they need to refer to the transcript.
13  If they have specific questions from specific
14  subject matters --
15      CHAIRMAN FITCH: No, no. It's not
16  uncommon to use a transcript to ask the witness so
17  and so, so and so.
18      So let's see where we go.
19  BY MR. SUJAT:
20      Q. I would like to know, Mr. Klayman, what
21  you think about that. I'd like you to read that.
22      MR. SMITH: Objection, that's a vague

In Re: Larry E. Klayman
June 26, 2018

## Page 1226

1  question, what he thinks about that.
2      CHAIRMAN FITCH: Ok, Mr. Smith, I'm
3  with you. That question is struck.
4      What page of the transcript?
5      MR. SUJAT: It's on Page 332.
6      CHAIRMAN FITCH: Do you have a copy of
7  the transcript.
8      MR. SUJAT: That's the only one I have.
9      CHAIRMAN FITCH: Walk over there,
10  please, take the transcript, and read into the
11  record what you wish to ask Mr. Klayman about, so
12  that we all know.
13      CHAIRMAN FITCH: Someone needs to tell
14  me what page and what lines I'm going to hear.
15      THE WITNESS: Page 332.
16      CHAIRMAN FITCH: And what lines am I
17  going to hear?
18      THE WITNESS: Lines five to nine.
19      CHAIRMAN FITCH: Ok. And this is Ms.
20  Sataki's testimony, correct?
21      THE WITNESS: Yes.
22      MR. SUJAT: Correct.

## Page 1227

1      CHAIRMAN FITCH: What does that
2  testimony say?
3      THE WITNESS: It's dealing with and
4  I'll just characterize it --
5      CHAIRMAN FITCH: No, no, read me the
6  testimony.
7      THE WITNESS: "I was sobbing to every
8  person" --
9      CHAIRMAN FITCH: I can't hear you. I'm
10  seventy-five years old.
11      THE WITNESS: I'm sorry. I'm only
12  seven behind you. Your eyes may be better than
13  mine.
14      CHAIRMAN FITCH: Read it clearly, Mr.
15  Klayman.
16      THE WITNESS: "I was sobbing to every
17  person I was talking at the time, because I was
18  going through a deep depression and every time I
19  talk about that, I would cry. That's just how it
20  was, not only with you, but with everybody."
21      CHAIRMAN FITCH: Do you recall what
22  time period she was referring to in that testimony

## Page 1228

1  when she said, "that time"?
2      THE WITNESS: What I believe is it was
3  from the very inception, from the date I met her
4  and had dinner with her at Clyde's Restaurant.
5  That was my experience, that she would just break
6  down in tears, before anything happened, you know,
7  she testified to with regard to our legal and
8  otherwise friendship, relationship.
9      CHAIRMAN FITCH: And what is your
10  question about that testimony?
11  BY MR. SUJAT:
12      Q. Well, my question is, is that your
13  experience of what, you know --
14      A. Yes. As I just testified to, this
15  condition had nothing to do with me. I mean, it
16  was existent the very first day I met her.
17      And, you know, it shows that I'm not
18  a -- I'm not a psychologist, and no disrespect,
19  that she wasn't terribly stable.
20      Q. In that regard I also refer to
21  Respondent's Exhibit 30, Supplemental Exhibits 1
22  and 2. Those are the emails relating to Ms.

## Page 1229

1  Allred.
2      A. Can you show me those, please. Yes, we
3  went through this yesterday with Ms. Allred.
4      MR. SMITH: What exhibits are we
5  looking at?
6      THE WITNESS: Respondent's Exhibit 2.
7  It's the email --
8      CHAIRMAN FITCH: Wait a minute. Are we
9  in the white book?
10      MR. SUJAT: These are supplemental to
11  the white book, yes.
12      THE WITNESS: Your Honor, those are not
13  our exhibits. We can put them in a binder for you
14  tonight, to make it easier for you.
15      CHAIRMAN FITCH: Thank you.
16      Alright, this document has, at the top
17  of it, the denomination RSEX.2.
18      MR. SUJAT: Right.
19      CHAIRMAN FITCH: Ok. And what do you
20  want me to look at.
21      THE WITNESS: And as we identified with
22  Ms. Sataki, at the bottom, the email that was sent

23 (Pages 1226 to 1229)

In Re: Larry E. Klayman
June 26, 2018

## Page 1230

1 to Ms. Allred, who she identified, for Ms. Sataki,
2 on March 23rd, 2012, at 10:05 in the evening,
3 "Subject: Please let me meet you." This earlier
4 testimony is about her instability and dramatizing
5 her situation is also seen in this email.
6          And, for instance, "All my hope
7 regarding my case died and I'm on medication and
8 go to my therapist every week, just so I can stay
9 alive. And my mom -- and I love my mom the same
10 way your dotter" -- (sic), d-o-t-t-e-r, I think
11 she means daughter -- "loves you." This kind of
12 drama and --
13          I mean, this is a long time after I
14 stopped representing her. And this was Ms.
15 Sataki. It wasn't my doing that she's this way.
16 And she apparently likes -- you know, tries to
17 bring people in to help her and into her fold by
18 being the victim and telling them that she's going
19 to kill herself or she's going to die, or
20 whatever. And that even came out -- that approach
21 came out recently with correspondence which was
22 submitted by Bar Counsel when I was trying to get

## Page 1231

1 a 30-day continuance rescheduling, the drama, the
2 overstatement, trying to play on people's
3 sympathies.
4          You know, I was lured in. I was lured
5 in. I believed in her case and I believed in her
6 case. And I did everything I could, and I still
7 wish her the best, despite everything.
8          CHAIRMAN FITCH: I had noted also the
9 March 23, 2012 date of this email.
10          Am I correct that your examination of
11 Ms. Allred yesterday pertained to contacts with
12 Ms. Allred in 2010?
13          THE WITNESS: Correct.
14          CHAIRMAN FITCH: Ok.
15          THE WITNESS: That's correct.
16          CHAIRMAN FITCH: And with respect to
17 this March 23, 2012 email, were you aware of this
18 communication --
19          THE WITNESS: I was not.
20          CHAIRMAN FITCH: -- from Sataki to
21 Allred? Were you aware in 2012 of this email?
22          THE WITNESS: I was not. And

## Page 1232

1 apparently, lack of a better word, it was bang,
2 bang. There was a communication at 10:05 p.m.,
3 and Ms. Allred responded on March 23rd, same day,
4 ten minutes later. I never found out about it. I
5 just learned of it recently.
6          CHAIRMAN FITCH: Go ahead, Mr. Sujat.
7 BY MR. SUJAT:
8     Q.  Mr. Klayman, I'm going to refer you to
9 the transcript for Ms. Sataki, and this is May
10 30th, 2018, Page 200.
11          Would you please read this and
12 explain --
13          CHAIRMAN FITCH: What lines?
14          MR. SUJAT: These would be lines one
15 through five.
16          THE WITNESS: Mr. Sujat, if you can
17 please show me that, because I don't have that. I
18 have May 31st, 2018.
19          CHAIRMAN FITCH: Question and answer,
20 please.
21          MR. SMITH: For the benefit of us who
22 don't have the transcript, if you could read the

## Page 1233

1 testimony into the record.
2          THE WITNESS: Yes, I will.
3          This is part of a question that was
4 asked by Mr. Smith on Page 199, the preceding
5 page, "Under what circumstances was it that you
6 got around to sending me that package of emails
7 that you recently sent to me?"
8          These are his supplemental exhibits.
9          And as part of that answer, which is
10 quite a long answer, she says, "I wanted" -- she's
11 characterizing the situation --
12          MR. SMITH: Well, objection. Either
13 read it into the record or you're going to do --
14          CHAIRMAN FITCH: I want it read in the
15 record, word for word.
16          THE WITNESS: Alright. The answer is,
17 "As you can see, this whole thing happened eight
18 years ago, and when I was finally rescued from Mr.
19 Klayman, I at that point was homeless, had no job,
20 and I slept in my car two nights later on. So my
21 focus during the last eight years was to recover
22 economically and get a job, and the only way that

In Re: Larry E. Klayman
June 26, 2018

## Page 1234

1  I could survive and my doctors to help me not to
2  take so much medication, in a way maybe I think I
3  just brushed everything under the rug and put
4  everything aside so I can survive, because
5  otherwise there was a time that I was -- I wanted
6  to take my life, and that's how I wanted to have
7  revenge against Mr. Falahati and Mr. Klayman,
8  because I felt that those two, and -- and I had a
9  will, and I had all the evidence and the papers
10  there, and once I died, people are going to come
11  and see what they did to me, because I didn't have
12  the strength to do it and go through everything,
13  and I didn't for the past eight years."
14      CHAIRMAN FITCH: Ok, now tell me what
15  lines you read from Page 200. You've read more
16  than one to five.
17      THE WITNESS: I've read lines from Page
18  199, line one, through and including lines five on
19  200, Page 200.
20      And your Honors, that's consistent with
21  Ms. Sataki in that she's always trying to explain
22  what she does -- from my experience, and what I've

## Page 1235

1  heard -- is she's the ultimate victim, and that
2  was the way she explained not looking at documents
3  earlier to you.
4      It's clear that what she wanted was to
5  have revenge against Mr. Falahati and Mr. Klayman,
6  and this Bar Counsel proceeding, in all respect,
7  is not here to mete out revenge.
8  BY MR. SUJAT:
9      Q. Mr. Klayman, I refer you to Exhibit D1,
10  Bar Exhibit D1, or Bar 1.
11      A. Ok.
12      Q. Mr. Klayman, would you please --
13      A. Yes, this is Respondent's Answer and
14  Affirmative Defenses to Specification of Charges,
15  which denies the allegations of the Specification
16  of Charges and attaches and incorporates by
17  reference --
18      CHAIRMAN FITCH: Alright, once again,
19  my DX1 is the initial inquiry. It's a letter from
20  Sataki.
21      THE WITNESS: Oh.
22      MR. SUJAT: This is not SX. This is D.

## Page 1236

1      THE WITNESS: Yes, it's the original
2  blue exhibit book.
3      MR. TIGAR: Oh, it's exhibit number D
4  as in dog.
5      MR. SMITH: No, I think they're
6  referring to a different Exhibit 1. I could being
7  wrong.
8      CHAIRMAN FITCH: In your book, Mr.
9  Smith, there's A, B, C, D?
10      MR. SMITH: Right.
11      CHAIRMAN FITCH: And D is denominated
12  Respondent's Answer and Affirmative Defense to
13  Specification of Charges.
14      MR. SMITH: Correct.
15      CHAIRMAN FITCH: I think that's what
16  we're talking about.
17      MR. SUJAT: No, it's the tab number one
18  right after that.
19      CHAIRMAN FITCH: Behind the tab that
20  says one?
21      MR. SUJAT: Correct, your Honor.
22      CHAIRMAN FITCH: Ok. In my book,

## Page 1237

1  page --
2      MR. SUJAT: It would be Page 1.1 and
3  1.2, or 1-1 and 1-2.
4      CHAIRMAN FITCH: Alright. Those are
5  documents created by Sataki.
6      What's your question?
7  BY MR. SUJAT:
8      Q. And my question is, Mr. Klayman, what
9  is the complaint at that time?
10      A. I'm sorry, I may still be -- oh, here
11  it is. It's Exhibit 1 -- it's Exhibit 1 you're
12  looking at?
13      Q. Yes.
14      A. Yes, well, the complaint speaks for
15  itself, but I do remember hearing Ms. Sataki's
16  testimony that she couldn't tell us exactly who
17  wrote it. She didn't know whose handwriting it
18  was.
19      And this is what, for many years, I
20  thought was her entire complaint until I was
21  notified by Mr. Smith of Bar Counsel's office that
22  in fact there had been a supplemental filing.

In Re: Larry E. Klayman
June 26, 2018

## Page 1238

1 This is what I thought was out there at that time
2 with the DC Bar. Because this did not refer to
3 sending -- this particular one -- onto any other
4 Bar. The later one does. It says they're also
5 filing it with Florida and Pennsylvania.
6     Q. Mr. Klayman, you're referring to
7 Exhibit 23?
8     A. Yes. Number one.
9     So that's my testimony.
10     CHAIRMAN FITCH: Mr. Smith, I'm
11 allowing this question and answer because, even
12 though it addresses an issue that is beyond the
13 jurisdiction of this committee, he has a right, at
14 least to some extent, to make the record.
15     MR. SMITH: And I have not proposed an
16 objection.
17     CHAIRMAN FITCH: And you have not
18 objected. That's right.
19     Go ahead.
20 BY MR. SUJAT:
21     Q. Mr. Klayman, I refer you to Bar Exhibit
22 Number 43.

## Page 1239

1     A. I'm there.
2     Q. Ok. And what does this letter from Mr.
3 Smith to you state about what is being considered
4 in the charges?
5     A. Well, the first email of December 12th,
6 2016 talks about -- let me put this in context,
7 ok, and I can speed the testimony along, and then
8 we'll look at the exhibits -- that I was notified
9 I believe shortly after the time when Ms. Sataki
10 came running over to that cafe where I was sitting
11 with my chief of staff, you know, screaming,
12 saying that I had ruined her life and I was the
13 worse person that ever lived, and asking my chief
14 of staff to contact her.
15     I believe I was notified by Mr. Smith
16 after that, and that there was -- they were
17 proceeding on this complaint.
18     On the supplemental complaint it asked
19 to give a response to the supplemental complaint,
20 the second complaint that had been filed that was
21 prepared by Kathleen Staunton and Ms. Sataki's
22 cousin, apparently. And I then asked Mr. Smith to

## Page 1240

1 send me what was in his file, documents, because
2 my documents had been lost or discarded after all
3 these years, six years. A lawyer doesn't
4 generally keep documents for six years if they
5 don't need to, and I didn't think there had been a
6 complaint pending in DC because Florida and
7 Pennsylvania had dismissed it. And I thought DC
8 had, too, honestly, I thought they had.
9     So, when Mr. Smith sent me some of the
10 documentation, he apparently inadvertently sent me
11 the draft Specification of Charges that had been
12 already prepared before I had been re-contacted, a
13 draft. Also he sent me documents -- and we'll
14 identify them, they're part of our exhibits, part
15 of Respondent's exhibits -- where he had retained
16 the expert who testified at the end of the first
17 session that we had here, Joel Bennett.
18     That raised alarm bells with me,
19 because, after six or seven years of not knowing
20 what was going on over there, without my even
21 being told, they apparently had prejudged the
22 issue and had already gone ahead and prepared a

## Page 1241

1 Specification of Charges before I even had a
2 chance to respond to the supplemental complaint,
3 and they even hired an expert. So at that point,
4 you know, I communicated with Mr. Smith and I
5 said, "I'd like to come in and talk to you about
6 this." And I did. I talked to him, and I said,
7 "What is this really about?" It was in Bar
8 Counsel's office. And he said, "Well, really, Mr.
9 Klayman, the only issue is whether you zealously
10 and competently represented the client." They
11 thought I had abandoned Ms. Sataki, and I said
12 that's not the case. All of her rights were still
13 there. I couldn't get in touch with her.
14     And she still had, not just the
15 permanent injunction aspect of Wagner v. Taylor,
16 but she also had her civil rights complaint, OCR
17 complaint that could have been brought to court.
18     So then I submitted documentation --
19 you know, we'll go through that -- to Mr. Smith
20 and Bar Counsel, showing that, and I thought that
21 resolved the issue. And then one day I get a call
22 from Mr. Smith. I believe it was right before the

In Re:  Larry E. Klayman
June 26, 2018

## Page 1242

1  July 4th weekend.  I don't remember the exact
2  date.  We have documentation.
3      CHAIRMAN FITCH:  Of what year?
4      MR. TIGAR:  Of what year?
5      THE WITNESS:  Of 2017.
6      And he's telling me, "We're about ready
7  to start this case.  Is there anything else that
8  you want to provide?"
9      He gave me the impression that he
10  wasn't really in charge of this case himself, he
11  always gave me that impression, that basically the
12  decisions were being made by Elizabeth Herman,
13  Deputy Bar Counsel and higher ups.
14      He's always said to me -- I will say I
15  have issues with Mr. Smith in the way this case
16  was brought, but he's always been a gentleman to
17  me.  But he's always told me, "It's out of my
18  hands, Larry.  It's the higher ups."
19      He's shaking his head, but I actually
20  have absolute proof of that.
21      So I said, "I'd like to meet with you
22  and Ms. Herman," and I said, "before you start

## Page 1243

1  this thing.  What's it about now?"  And he said,
2  "Well, it's the publicity."
3      MR. TIGAR:  What was the last words?
4      THE WITNESS:  Publicity.
5      So I took it that they were moving the
6  goalpost back.  They wanted some reason to proceed
7  against me, and, since the first one didn't
8  succeed, because it was clear I hadn't abandoned
9  the client, I represented her zealously, and
10  that's why it was taken out of this Specification
11  of Charges, while it was in the earlier one, they
12  didn't prepare even after they got a response from
13  me, after six years, with the supplemental
14  complaint.  I said, "I need to meet with you."
15      So I met with Mr. Smith and Ms. Herman,
16  and I said, "With regard to the publicity, I'll
17  get you an affidavit from Tim Shamble, and you,
18  Mr. Smith, feel free to contact him, because this
19  was approved and he was a witness to that.  But
20  please hold off on filing a complaint until I give
21  it to you."
22      Now during this meeting, I sensed this

## Page 1244

1  hostility from Ms. Herman.  And I'd never met her
2  before.  I couldn't understand it.  And I said to
3  her, "Have you met with Ms. Sataki?  Ms. Sataki
4  can be very" -- she likes to portray herself as
5  this victim that wants to kill herself.  So I
6  asked that question, and the response from Ms.
7  Herman was, "None of your business."
8      Then I asked, "Are you aware that
9  Florida and Pennsylvania dismissed this case years
10  ago?"
11      And she said, "I could care less."
12      Then I said, "Well, I want you to" --
13  she made a comment to me.  I said, "What's the
14  problem here?"  And she said something to the
15  effect, "I don't like the way you practice law."
16      And I said, "The issue here is not
17  whether you like the way I practice law.  It's
18  whether I violated the Code of Professional
19  Responsibility.  So give me the opportunity to
20  make a supplemental submission with regard to Mr.
21  Shamble and others" -- and that's when Keya Dash's
22  affidavit was submitted as well -- "before you

## Page 1245

1  start the case.
2      "Because this is very costly.  It's
3  very upsetting.  You know, you're dealing here
4  with a very emotional issue.  I'm recently
5  married, you know, and there are a lot of issues
6  here."
7      I then went back and begrudgingly I
8  asked for, I think it was ten days is my estimate,
9  and she didn't really want to give it to me.  And
10  as I was walking out, Mr. Smith said to me,
11  "Larry, I'll get it for you, ok?"
12      And I said, "Thank you, Clay."
13      And I decided, rather than submitting
14  it to Ms. Herman, because I saw this hostility,
15  and Mr. Smith, that I would send a letter to the
16  Bar Counsel, the new Bar Disciplinary Counsel,
17  Hamilton Fox, thinking that Ms. Herman, who
18  appeared to be in charge of this -- that's what I
19  was led to believe, and also she came to the
20  meeting -- that maybe he might be able to exercise
21  some judgment here and not proceed with a
22  non-meritorious complaint which was now seven

In Re: Larry E. Klayman
June 26, 2018

## Page 1246

1  years old, which any other Bar in this country
2  would have dismissed by then, based on my research
3  and Professor Rotunda's research. If not that,
4  based on laches. There are some bars, as you can
5  see from Professor Rotunda's opinion, that
6  actually put in rules, and then there's case
7  law -- Florida is one of them -- that you just
8  can't proceed against a lawyer after eight years.
9  It's not due process. It's not even a protection.
10  It's not a right. It's just general. It's
11  fairness.
12      So I wrote this letter to Bar Counsel,
13  Hamilton Fox. It's part of my -- attached to the
14  Answer to the Specification of Charges, which is
15  admitted into evidence in both Bar Counsel's books
16  and our book of exhibits.
17      I turn your attention to it in Bar
18  Counsel's book. It appears at Section D in the
19  beginning. It's been moved into evidence.
20      That's where I attached the letter I
21  had written to Mr. Fox and the supporting
22  documentation, the affidavits of Mr. Shamble, the

## Page 1247

1  affidavit of Mr. Keya Dash, the opinion that I had
2  previously submitted to Mr. Smith and Ronald
3  Rotunda, who regrettably is deceased, and other
4  materials dealing with the fact that Florida and
5  Pennsylvania never had a disciplinary record for
6  me regarding this, and therefore it's clear they
7  dismissed this case.
8      So I sent it to Mr. Fox hoping that he
9  would take control. Because I sensed that maybe
10  Ms. Herman didn't like me. I had done a little
11  research, and you know, we're entitled to donate
12  campaign contributions to whomever we want. She
13  gave contributions to President Obama, and I had
14  sued President Obama, as I had other presidents.
15  And I also thought maybe I was getting wrapped up
16  into this whole "Me Too" thing, you know, that
17  somehow, I was a man, and this was a way to try to
18  make a point with a high-profile lawyer who had
19  taken positions which were not consistent with her
20  politics.
21      In that regard, I was also aware that a
22  complaint had been filed by David Kendall, from

## Page 1248

1  Mr. Tigar's prior firm, Williams and Connolly, by
2  some lawyer named Ty Clevenger, and he had written
3  an article. And it was dismissed summarily, at
4  the last minute according to Mr. Kendall, by the
5  way who has always been polite towards me, and
6  I've been in many cases with him over the
7  Clintons, that she had destroyed documentation of
8  the 33,000 so-called missing emails.
9      MR. SMITH: Objection.
10      At some point is there going to be some
11  focus or --
12      THE WITNESS: I'm going to get back to
13  that.
14      MR. SMITH: He's dovetailing into
15  stories and things that have nothing to do with
16  this case.
17      THE WITNESS: Well, it does.
18      CHAIRMAN FITCH: He has argument that
19  there's a context and that that context is
20  important. The Board may or may not agree with
21  that argument, but I think I'm required to let him
22  at least get it out.

## Page 1249

1      Even though we have no jurisdiction in
2  this matter, I do have the right and obligation to
3  administratively manage this matter. So I'm
4  taking into consideration those time
5  considerations.
6      But you may continue, Mr. Klayman.
7      THE WITNESS: Yes, sir.
8      CHAIRMAN FITCH: We are not going to
9  have any of these materials read into the record.
10  They speak for themselves.
11      THE WITNESS: Well, I'll just identify
12  them after I give this summary.
13      So therefore I felt like I had to go to
14  Mr. Fox to see whether he would exercise
15  independent judgment here.
16      So I wrote him the letter which is
17  attached to Exhibit D of Respondent's exhibit book
18  and also in our exhibits. I think it's one -- or
19  five rather --
20      MR. SUJAT: 5R.
21      THE WITNESS: Five, yeah, which is in
22  evidence, and I said, "I'd like to meet with you

App.0532

In Re: Larry E. Klayman
June 26, 2018

## Page 1250

1  and hear the facts, and attach them to an answer."
2  I never got a response. And the next
3  thing I knew I was notified by Mr. Smith that this
4  proceeding had been commenced. I never had an
5  opportunity to meet with Bar Counsel.
6  Now I have spoken with other
7  practitioners about this, someone by the name of
8  George Clark, as a matter of fact. He was a
9  friend of Mr. Rotunda. He practices here and he
10  does a lot of ethics proceedings before this
11  Board. And I said to him, "Why do you think I
12  couldn't meet with Mr. Fox?"
13  He says, "Well, you know, it is policy
14  in the office that you at least get a meeting
15  before they start something."
16  I never got it. I never got a
17  response.
18  So after I was notified by Mr. Smith
19  that this matter had started, ultimately I came in
20  to accept service of process of the Specification
21  of Charges. But I requested the opportunity to
22  meet with Mr. Fox finally, thinking that maybe

## Page 1251

1  this Specification of Charges would be withdrawn.
2  I had a meeting. Rather than having
3  Mr. Fox there, I had Mr. Smith there and Ms.
4  Herman again. During that meeting, I reiterated
5  that it looked like to me that the goalposts were
6  being moved, that they just wanted to bring a case
7  against me, after all this time, and, based on my
8  advocacy and my politics -- not really Mr. Smith,
9  but Ms. Herman and others in the office -- and
10  that this was totally unfair and I would like to
11  meet with Mr. Smith.
12  During that meeting it was reiterated
13  by -- I said to Ms. Herman, I said, "You don't
14  like the way I practice law, right?"
15  "Yeah."
16  I said, "Well, obviously you know
17  that's not the issue here. I am a particular type
18  of lawyer. I'm a public advocate here."
19  And Mr. Smith said to me kindly, "I'll
20  try to arrange a meeting with Mr. Fox."
21  Ultimately we arranged for a meeting,
22  and Mr. Fox said to me, "I can't meet unless you

## Page 1252

1  sign a waiver, because I have a conflict of
2  interest, potentially, myself."
3  I said "What's that?"
4  And he said, "I actually represented a
5  partner in my law firm, Sutherland, Asbill and
6  Brennan, on a case you had filed against Judicial
7  Watch for breach of your severance agreement when
8  you left Judicial Watch to run for the U.S.
9  Senate. I represented Mr. Beller at a
10  deposition," and then I remembered that in fact
11  that was the case. In fact his name was appearing
12  as copied on court pleadings in that case, you
13  know, off Pacer. He was getting copies through
14  the electronic filing system, Hamilton Fox.
15  So I said, "I'll sign a waiver."
16  And I believe he knew of this and
17  participated before I was asked to sign the
18  waiver, and I believe that he most likely does
19  have a conflict of interest here, but. I wanted
20  to be able to meet him, because I had never met
21  him, and I was hoping that fairness and justice
22  would prevail.

## Page 1253

1  And I told him what went on and that
2  Pennsylvania and Florida had dismissed the matter
3  and that it was eight years old. And at that
4  point Professor Rotunda was still alive before he
5  had an unexpected death. He talked with Rotunda,
6  read the opinion, and he said he would go back and
7  look at it.
8  And after, I got the impression that
9  Mr. Smith wanted it dismissed, too. He made a
10  statement, he says, "You know, I got to do a lot
11  of preparation, because this hearings's coming
12  up." It's kind of like saying, you know, spare me
13  from having to work on this case.
14  But very shortly later I got a letter
15  back, very terse, "We're not going to do this.
16  We've looked at the evidence and we think it
17  warrants going forward." But it was a very, very
18  tough and a very abrupt letter, which I didn't
19  expect, because, you know, I'd had what I thought
20  was a cordial meeting. At that point I came to
21  the conclusion again, he's not in control. He's
22  the new Bar Counsel, and he's going along with

29 (Pages 1250 to 1253)

In Re: Larry E. Klayman
June 26, 2018

## Page 1254

1  what Ms. Herman wants to do and others in the
2  office. I think that's natural when you're new,
3  to defer it to people who are working under you.
4      But nevertheless, he's part of this
5  decision to go forward, so I asked him to look
6  into it this and stop him.
7      To get to this summary, to identify
8  some of the communications, I had also noted, I
9  asked Mr. Sujat to show me that, that I was aware
10  of a document that had been produced which early
11  on said to Ms. Sataki -- it was part of our
12  supplemental exhibit. I think it's six --
13      MR. SUJAT: It's 10.
14      THE WITNESS: No, not 10. It was
15  provided yesterday --
16      CHAIRMAN FITCH: Keep going.
17      THE WITNESS: Well --
18      CHAIRMAN FITCH: Keep going. We're
19  going to take care of any documents in a minute or
20  so.
21      MR. SUJAT: Ok.
22      THE WITNESS: It was a document that

## Page 1255

1  was sent when the complaint was received by Ms.
2  Sataki, back in 2010, when Bar Counsel received
3  it. It says that, you know, "Attorney's going to
4  make a response" -- I did respond to the initial
5  complaint, "and if we don't hear from you, the
6  gist of it is that we assume you're not going to
7  proceed with this matter, that you've abandoned
8  the matter." And they never got anything from
9  her.
10      And then I learned from the
11  documentation that was produced, and Mr. Sujat
12  will identify that, so I can look at it, that in
13  2014, not hearing from Ms. Sataki for all that
14  time, they contacted her -- or tried to contact
15  her in 2009, and there are emails to that effect,
16  to resurrect this case. And that in fact, even
17  after they tried that it appears they couldn't get
18  ahold of her, and she didn't surface until 2016.
19  And if she had surfaced earlier, she would have
20  found all those letters that she says she found at
21  the last minute at the last hearing.
22      So that's the story, and I'll identify

## Page 1256

1  the emails. But I feel that this is very unfair
2  and it has denied me due process.
3      During this time period a lot of
4  documents have been lost, memories have faded.
5  Witnesses, some of them, I've got witness, but
6  some I don't know where they are. There's a lot
7  of witnesses on my behalf. And I had hoped that
8  Bar Counsel, Mr. Fox, would have exercised his
9  authority, but he didn't.
10      I believe that the person behind this
11  primarily is Ms. Herman, who didn't like me for my
12  politics, and perhaps for my gender, you know, in
13  this whole atmosphere we live in today.
14      That's why I brought in Ms. Allred. I
15  told her, "Look, one of my very good friends is
16  Ms. Allred. I believe in women's rights. That's
17  why I represented Ms. Sataki. I represented
18  others. I felt strongly about" -- I don't think
19  Gloria Allred would consider me a friend if I felt
20  otherwise. I have gotten to know her very well in
21  the last nine years. I invited her when I went to
22  LA -- I wanted to meet her -- to lunch. I said,

## Page 1257

1  "You know, we've been on TV together over certain
2  issues and I'd like to say hello." We've become
3  very good friends.
4      Her politics are different than mine.
5  One thing we have in common is we believe in
6  women's rights and to be treated with dignity and
7  fairly, by men or anybody else.
8      So this whole thing is costing me a lot
9  of emotional distress. It's costing me a lot of
10  time and expense. It's created issues in terms of
11  the distress and that kind of thing, and it should
12  never have been brought.
13      And I believe that it is strategic. As
14  I've set forth in certain pleadings, Judicial
15  Watch has filed a complaint against me too, and
16  they're trying to pile on.
17      I mean, you saw Judicial Watch's person
18  sitting here. How did he know of this? This
19  isn't that public. I think that probably Ms.
20  Herman or somebody told them about it and they
21  came to see what they could get to use against me
22  sometime in the future.

30 (Pages 1254 to 1257)

App.0534

In Re: Larry E. Klayman
June 26, 2018

## Page 1258

1  Because we've had problems since I
2  left, and I have a judgment for defamation against
3  Judicial Watch in the Southern District of
4  Florida, which included punitive damages.
5  So, that's the story here. And Mr.
6  Sujat can show me the documents.
7  First, I ask that you can show me from
8  the first supplemental exhibits, ours, where
9  they're saying "Ms. Sataki, if we don't hear from
10  you"...
11  CHAIRMAN FITCH: Let me --
12  BY MR. SUJAT:
13  Q. That's right. That is Respondent's
14  Supplemental Exhibit Number 5.
15  CHAIRMAN FITCH: Let me --
16  BY MR. SUJAT:
17  Q. It's a letter dated July 15th, 2011.
18  CHAIRMAN FITCH: Let me interject here.
19  If this committee does a report, that
20  report will include a subsection that informs the
21  Board of any prejudicial delay that we find, or
22  don't find, and why we recommend to the Board a

## Page 1259

1  finding of no prejudicial delay or prejudicial
2  delay. Otherwise, as I've pointed out earlier, we
3  have no jurisdiction over the points you've raised
4  over the past segment. But you have a right to
5  raise them. There's no point about that.
6  We're going to break now. It's a
7  little bit before 1:00, and, after we return, you
8  will be allowed to read into the record any and
9  every exhibit number that you want and intend to
10  bring to the attention of the Board in connection
11  with points that Mr. Klayman has just made.
12  We are not going to hear summaries of
13  those documents, descriptions of those documents,
14  wording of those documents or anything else about
15  those documents. It's a waste of your time to
16  have us listen to that, because we can't do
17  anything about it. But you will be able to make
18  whatever arguments you want to to the Board at the
19  appropriate time.
20  The other thing I will expect after
21  lunch is a proffer as to what other evidence you
22  think is needed in this matter. You have

## Page 1260

1  thoroughly covered each and every count in the
2  four-count Specification of Charges. One count
3  relates to one of the actions. You've been
4  through that. One count relates to the other
5  action. You've been through that. The fourth
6  count relates to publicity and articles. You've
7  been through that. And the first count relates to
8  the fee issue. You've been through that.
9  I need to be convinced by a specific
10  proffer of what other nonrepetitive evidence you
11  have after several hours of evidentiary
12  presentation, not to mention cross-examination.
13  We will stand in recess until 2:00
14  o'clock.
15  MR. KLAYMAN: Thank you, your Honor.
16  MR. SUJAT: Thank you, your Honor.
17  CHAIRMAN FITCH: In recess until 2:00
18  o'clock.
19  (Whereupon at 12:46 p.m. a luncheon
20  recess was taken.)
21
22

## Page 1261

1  A F T E R N O O N   S E S S I O N
2  CHAIRMAN FITCH: I think that we are
3  back on the record and all of the participants are
4  present.
5  Does someone from the Respondent's team
6  wish to read into the record the list of exhibits
7  that you wish to bring to the Board's attention
8  with respect to the last subject matter of
9  testimony?
10  MR. KLAYMAN: We're prepared to do
11  that, your Honor.
12  May I raise a scheduling issue here for
13  a minute?
14  CHAIRMAN FITCH: Sure.
15  THE WITNESS: Is that Mr. Keya Dash,
16  I'm sending an Uber for him -- his car broke
17  down -- so he can be here no later than 4:00
18  o'clock, to allow for cross-examination of myself.
19  He's not available tomorrow and I do
20  believe that we'll wrap up tomorrow. I don't
21  know, you know, what else may ensue, but we're
22  going to wrap up our case tomorrow morning.

App.0535

In Re: Larry E. Klayman
June 26, 2018

Page 1262

1    CHAIRMAN FITCH: Well, we'll discuss
2  that.
3    Why don't you give us that list right
4  at the beginning of the afternoon session.
5    THE WITNESS: Ok, thank you.
6    CHAIRMAN FITCH: So it will be readily
7  available for the Board.
8    THE WITNESS: I just want to say one
9  other thing. I will need to take a little break
10  around 2:30 to order the Uber for him on my cell
11  phone. It will take me about thirty seconds.
12    CHAIRMAN FITCH: Ok.
13    Mr. Sujat?
14    MR. SUJAT: Yes, Mr. Chair. We would
15  like to introduce into the record the Respondent
16  Exhibits 1 through 30, which would include all of
17  the exhibit books one through four, and also the
18  Respondent's supplemental exhibits, which should
19  be one through seven.
20    CHAIRMAN FITCH: Disciplinary Counsel?
21  Take your time.
22    MR. SMITH: Disciplinary Counsel

Page 1263

1  doesn't have any objection to 1 through 30 or
2  Respondent's Supplemental Exhibits 1 through 6.
3    However, given the lateness of the -- I
4  know we've been doing last-minute production
5  ourselves, but given the production of Mr. Dash's
6  documents today, perhaps we could get just some
7  proffer or get a factual basis regarding Mr. Dash
8  about the circumstances under which those emails
9  were called up today.
10    CHAIRMAN FITCH: We're taking things
11  one at a time.
12    Respondent's Exhibits 1 through 30 are
13  admitted and Respondent's Supplemental Exhibits 1
14  through 6 are admitted.
15    MR. SUJAT: It's one through seven.
16    THE WITNESS: Yes, but we're holding
17  seven in abeyance until --
18    MR. SUJAT: Ok, sure.
19    THE WITNESS: -- Mr. Dash testifies.
20    MR. SUJAT: No, I just want to make a
21  record that that's what we're asking for.
22    CHAIRMAN FITCH: No, you're on record

Page 1264

1  as having moved it in.
2    MR. SUJAT: Thank you.
3    CHAIRMAN FITCH: But we'll hold it in
4  abeyance until we hear testimony.
5    Now is this a list of documents you
6  want to bring to the Board's attention relating to
7  the --
8    MR. SUJAT: Yes.
9    CHAIRMAN FITCH: Read it into the
10  record, just like I asked you to.
11    MR. SUJAT: Ok, so the ones that we
12  would enter into the record would be Exhibit 5,
13  which includes letters, basically different
14  communications between Mr. Klayman and Mr. Smith.
15    CHAIRMAN FITCH: And when you say five,
16  what do you mean?
17    MR. SUJAT: Respondent's Exhibit Number
18  5 that we have presented to --
19    CHAIRMAN FITCH: I thought that we had
20  admitted 1 through 30.
21    Oh, but you want to make a specific
22  list. Go ahead.

Page 1265

1    MR. SUJAT: So the ones that deal with
2  the Bar Counsel communications.
3    CHAIRMAN FITCH: Which deal in any way
4  in your view with the subject matter of what Mr.
5  Klayman testified to before the lunch break.
6    MR. SUJAT: Before the lunch break, ok.
7    Alright, so that would be Respondent's
8  Exhibit 5, and it would be Respondent's Exhibit
9  10, Respondent's Exhibit 14, Respondent's Exhibit
10  15, Respondent's Exhibit 24, Respondent's Exhibit
11  27.
12    And with respect to the supplemental
13  respondent's exhibits --
14    MS. LARKIN: Has 23 already been
15  entered in?
16    CHAIRMAN FITCH: It's already been
17  admitted.
18    MR. SUJAT: Twenty-three has previously
19  been entered in.
20    MS. LARKIN: Ok.
21    MR. SUJAT: That was the good standing
22  in Florida history.

32 (Pages 1262 to 1265)

In Re: Larry E. Klayman
June 26, 2018

Page 1266

1   MS. LARKIN: Ok.
2   MR. SUJAT: Florida Bar history.
3   CHAIRMAN FITCH: Any others?
4   MR. SUJAT: Then we have this one here,
5   the supplemental -- number six.
6   CHAIRMAN FITCH: Ok. I think that will
7   be helpful. If this gets to the Board stage, that
8   would be helpful to the Board, and I'm sure that,
9   if you happened to have overlooked one or two, the
10  Board I predict will --
11  MR. SUJAT: It's possible there might
12  be some in the Bar's books.
13  CHAIRMAN FITCH: I just thought having
14  this list, if it gets to the Board stage, might be
15  useful to someone on the Board who might have some
16  responsibility for helping the entire Board to
17  deal with the issues, if it gets that far.
18  Do you have cross-examination, Mr.
19  Smith?
20  MR. SMITH: I do. Were you --
21  CHAIRMAN FITCH: Ok.
22  MR. SMITH: Give me a few seconds. I

Page 1267

1   thought we were going to have a few more items.
2   CHAIRMAN FITCH: Ok.
3   (Brief pause.)
4   CROSS-EXAMINATION BY DISCIPLINARY COUNSEL:
5   BY MR. SMITH:
6   Q. Good afternoon, Mr. Klayman.
7   A. Good afternoon, Mr. Smith.
8   Q. I believe I saw in the supplemental
9   exhibit that has not yet been admitted that you
10  sued your own mother.
11  A. I sued to get -- well, I object on
12  relevancy.
13  CHAIRMAN FITCH: What is the relevance
14  of that?
15  MR. SMITH: Character.
16  CHAIRMAN FITCH: What's the relevance
17  as to character to these charges?
18  MR. SMITH: Credibility.
19  CHAIRMAN FITCH: I don't see how that
20  goes to credibility.
21  Sustained.
22  MR. SMITH: Ok.

Page 1268

1   BY MR. SMITH:
2   Q. Beginning in about May, 2010, you
3   suggested to Ms. Sataki, that, because of your
4   love for her, she should consider getting other
5   counsel, correct?
6   A. That's not correct, in large part.
7   The reason was not just because there
8   was a personal feeling there, but because I
9   couldn't communicate with her. She became very
10  difficult and very belligerent and disrespectful,
11  and generally, as I testified to at great extent,
12  I felt that it was better that she got other
13  counsel.
14  She blamed me for things that were
15  going on in the case, and I was trying to do my
16  best, and I was paying expenses, I was paying for
17  apartment. I was being asked to buy cars. I was
18  being asked to help her friend Kaveh, which she
19  wasn't happy with when I tried to do that.
20  So there are a lot of factors involved.
21  Q. So let's take a look at Supplemental
22  Exhibit 6.

Page 1269

1   A. I got it.
2   Q. So your first sentence in Supplemental
3   Exhibit 6 is, "When someone loves you as much as I
4   do"... correct? The first sentence there.
5   A. Yes, yes. I mean it says what it says.
6   Q. Then you go on to say, "It's not help
7   for me. You'll get better representation from
8   someone like Tim Shea who does not have an
9   emotional conflict and can keep his mind clear,"
10  correct?
11  A. It says what it says.
12  Q. But there's nothing in there about her
13  not communicating about her?
14  A. Well, there are other documents to --
15  Q. There is nothing in this document that
16  says there is --
17  A. You don't need to raise your voice with
18  me, Mr. Smith.
19  Q. You're right, you're correct.
20  There are no other reasons in this
21  letter that suggests that you --
22  A. I don't know. It says what it says.

33 (Pages 1266 to 1269)

In Re: Larry E. Klayman
June 26, 2018

Page 1270

1    What I was building into that was,
2  there's emotional conflict because she's reacting
3  to me in a way that is not respectful and doesn't
4  understand how I'm trying to help her.
5    So, yes, it's in there, but I also say
6  in there that I love letter, and I felt --
7    And that's why I don't understand why
8  we're here, in part, because I said, "We should
9  get another lawyer," here.  And she didn't.  She
10 was always free to do that.
11   Q.  So you mentioned to her several times
12 that she should get another lawyer, right, after
13 this May --
14   A.  Yeah, I did suggest it several times.
15 Yes.
16   Q.  And then on July 30th, 2010, she sent
17 you a letter directing you to withdraw from all
18 lawsuits, correct?
19   A.  Where is that?
20   Q.  Bar Exhibit Number 27.
21   A.  Supplemental 27?
22   Q.  No, Bar Exhibit 27.

Page 1271

1    A.  Ok.  I'm reading it.
2    Q.  Paragraph three.
3    A.  Yeah, I would like to see it all in
4  context, if I may, please.
5    (Witness reads document.)
6    A.  Ok.  Thank you.
7    Q.  So she asked you on this date to
8  withdraw all lawsuits you had on her behalf and
9  only file the harassment case against Mr.
10 Falahati, the main harasser, and only Ali Sajadi
11 and Susan Jackson, correct?
12   A.  In the context of my testimony, that's
13 not correct, because I didn't know who this letter
14 was coming from.  It's in perfect English.
15   You can see, you know, her English in
16 the last email of your supplemental exhibit, and
17 it doesn't match up here.  And I thought this was
18 coming from someone else.  And it was inconsistent
19 with other things I understood she wanted me to
20 do.
21   So it looked like someone had gotten
22 control of her, and of course now we found out

Page 1272

1  was her cousin, Sam Razavi, and/or Kathleen
2  Staunton.
3    So I couldn't take actions not having
4  spoken with her, and that's why I was trying to
5  get ahold of her, and that's why I ultimately
6  asked Mr. Shamble to try to get ahold of her.
7    Q.  But didn't you just testify that you
8  suggested to her earlier that she get other
9  counsel?
10   A.  Yes, but she didn't apparently advise
11 me whether she got it or not?
12   Q.  Did she have to advise you of that?
13   A.  Yeah, that's what you have to do when
14 you get other counsel?
15   Q.  What rule requires that?  What rule
16 requires that?
17   A.  I object to the question.  It's not
18 that there has to be a rule.  That's protocol with
19 dealing with your lawyer.  You have respect for
20 your lawyer and you tell your lawyer what the
21 situation is, and you should talk to him and tell
22 him what you want to do.

Page 1273

1    And of course later we have an exhibit
2  that comes up that she actually files an appeal.
3    So she didn't want to do these things
4  in fact showing that this is inconsistent with
5  what I had been told and it was inconsistent with
6  her own desires.
7    So this thing was a total mess, and I
8  needed to talk to her, and I represented her
9  interests by trying to protect them.
10   Q.  Let's take a look at Supplemental
11 Exhibit Number 25, please.  Please take your time
12 and read that.
13   (Witness reads document.)
14   Q.  The first sentence, and this is a
15 letter dated August 2nd, 2010, from Larry Klayman
16 to Ellie Sataki, correct?
17   A.  Right.
18   Q.  And the first sentence, "I have
19 followed your instructions and dismissed all of
20 the cases against VOA, except the part about
21 having you work in L.A."
22   A.  What are we reading here?  I thought it

In Re: Larry E. Klayman
June 26, 2018

Page 1274

1  was Exhibit 25.
2      Q.  It is Exhibit 25.  I'm looking at a
3  letter, Supplemental Exhibit 25.
4      A.  Oh, I didn't know it was supplemental.
5  I see it.  Let me read the whole thing.
6      Q.  I'm sorry?
7      A.  Let me read the whole thing, if I may.
8      Q.  Sure.
9      A.  I mean, you're reacting in this way.
10     Q.  Certainly.
11        (Witness reads document.)
12     A.  Ok.
13     Q.  So this letter, or this email
14  correspondence, you told her that you have
15  followed her instructions and dismissed all the
16  cases against VOA, except the part about having
17  her work in LA.
18     A.  That's right and that's what I told
19  her, and I told her earlier that we could continue
20  on with a permanent injunction hearing, and that's
21  why I was trying to get ahold of her.  That's why
22  there were pleadings in fact that you submitted in

Page 1275

1  your other pleadings to Judge Kotelly saying --
2      Q.  That wasn't consistent with her
3  instructions.  On you --
4      A.  I didn't finish my response, Mr. Smith.
5      Q.  You have gone beyond the scope of my
6  question.  I asked you a yes or no question and
7  you have been editorializing?
8      A.  I'm not editorializing.  I'm giving you
9  an answer to my question.
10        THE WITNESS:  Your Honor, would you
11  instruct him to allow me to finish my answer.
12  I'll be brief.  I just want to be able to finish
13  the answer.
14        CHAIRMAN FITCH:  Go ahead, Mr. Klayman.
15        THE WITNESS:  Yes.
16        I advised Judge Kotelly that we wanted
17  to continue on.  It's in the pleadings that are
18  part of your exhibits as well as mine, in that she
19  had dismissed the entire case herself against the
20  board of governors, and I went back on
21  reconsideration on that.
22        She denied that and I asked her to

Page 1276

1  reconsider the dismissal.  I was in fact pursuing
2  the permanent injunction claims, and I told her to
3  continue with that, and that's what the appeal was
4  about.
5        So, those claims were not dismissed as
6  far as LA was concerned, and that's what I was
7  proceeding on.  But the rest of the case, at least
8  in terms of the lower court level was gone, thanks
9  to Judge Kotelly.
10  BY MR. SMITH:
11     Q.  The document spokes for itself, but
12  this was inconsistent with what Ms. Sataki asked
13  you to do in her July 30th, 2010 email to you
14  where she instructed you to dismiss all cases.
15     A.  The documents do speak for themselves,
16  but you're not characterizing them correctly, Mr.
17  Smith.
18     Q.  And then you say --
19     A.  Wait a minute, can I finish?
20     Q.  No.
21        CHAIRMAN FITCH:  Yes, he can.
22        MR. SMITH:  Jesus Christ.

Page 1277

1        CHAIRMAN FITCH:  Go ahead, Mr. Klayman.
2        THE WITNESS:  Your Honor, I want this
3  to proceed in a way that's respectful to each
4  other.
5        Now -- I kind of lose my train of
6  thought when he says stuff like "Jesus Christ."
7        Now -- what was your question?  Please
8  give me your question again.
9  BY MR. SMITH:
10     Q.  The question was, your actions after
11  July 30th, 2010, instructions for you to dismiss
12  the case, this response about your continuing the
13  case about the work in LA, which was inconsistent
14  with her instruction for you to dismiss the
15  cases --
16     A.  Yeah, but I don't believe that the
17  instructions were coming from her.  That's the
18  thing, ok?  So I didn't do anything that
19  prejudiced her rights.  I was protecting her
20  rights.  And, you know, that's what lawyers are
21  supposed to do, particularly if they're unclear in
22  terms of who is communicating with them.

35 (Pages 1274 to 1277)

In Re:  Larry E. Klayman
June 26, 2018

## Page 1278

1  All I wanted to do was talk to her.
2  She knew where I was.  I was in Los Angeles, and I
3  wasn't getting instructions from her.  This is not
4  her handwriting that I was getting.  It was
5  somebody else's.  It's in perfect English.
6    Q.  And so you never spoke with Ms. Sataki
7  again after that July 30th, 2010 email either, did
8  you?
9    A.  My recollection is I didn't have a
10  communication after that.
11    But, you know, it was eight years, Mr.
12  Smith, and if this thing had been brought sooner
13  and it hadn't sat in your files for eight years,
14  we'd probably have better recollection.
15    Q.  In your August 2nd, 2010 email
16  correspondence, you go on to tell Ms. Sataki,
17  "This aspect of the case is not against anyone
18  personal and I intend to appeal the judge's
19  decision to the higher court."
20    A.  Where are you reading from?
21    Q.  The second sentence in the first
22  paragraph.

## Page 1279

1    A.  Of the same exhibit?
2    Q.  Yes, SX25.
3    A.  Yes.  I'm trying to advise her as best
4  I can that this is what I intend to do.
5    Q.  But this is inconsistent with what she
6  had asked you to do in her letter discharging you
7  correct?
8    A.  But again, I don't want to have to take
9  up everybody's time repeating my testimony,
10  because it's got to be at least ten to twelve
11  times.
12    Q.  Is that inconsistent?
13    A.  It's not inconsistent based on my
14  testimony of what the situation was at the time.
15  No, it's not inconsistent at all.
16    Q.  Is it inconsistent with what Ms. Sataki
17  asked you to do?
18    A.  Ms. Sataki did not send that letter, or
19  write it.  So I needed to be able to talk to her
20  and I needed to be able to protect her rights.
21    Q.  By the way --
22    A.  I suspect, Mr. Smith, that if I had let

## Page 1280

1  all of her rights go down the drain, that, as you
2  previously wrote in the Specification of Charges
3  in draft, before you even re-contacted me after
4  six years, we may have a different case here.
5    MR. SMITH:  Move to strike as
6  nonresponsive.
7    CHAIRMAN FITCH:  I agree.
8    I do want to ask you, Mr. Klayman --
9    THE WITNESS:  Yes.
10    CHAIRMAN FITCH:  -- her email came to
11  you on Friday, July 30, correct?  At least that's
12  what it shows on --
13    THE WITNESS:  Which one are we
14  referring to?
15    CHAIRMAN FITCH:  D27.
16    THE WITNESS:  D27 as in David?
17    MR. SMITH:  DX27.
18    CHAIRMAN FITCH:  -- no, DX27.
19    THE WITNESS:  I have DX27 as --
20    CHAIRMAN FITCH:  It came from her to
21  you on Friday, July 30, right?
22    THE WITNESS:  Yeah, I don't see that.

## Page 1281

1  I'm going to 27 right now.
2    CHAIRMAN FITCH:  It's the email,
3  DX27-1.  You had it in front of you a minute ago.
4    THE WITNESS:  Is this a supplemental
5  exhibit?
6    CHAIRMAN FITCH:  No.  I said DX27-1.
7    THE WITNESS:  Ok, I'm sorry.
8    Yes, and I --
9    CHAIRMAN FITCH:  Alright.
10    THE WITNESS:  Ok.
11    CHAIRMAN FITCH:  My next question, look
12  at SX25.  It purports to have been sent on Monday,
13  August 2, 2010, correct, SX25?
14    THE WITNESS:  I'm looking at SX25?
15    CHAIRMAN FITCH:  Ok.
16    THE WITNESS:  Wait a minute.  Let me
17  turn to it.
18    That's the email that I wrote to her.
19    CHAIRMAN FITCH:  That's correct.
20    THE WITNESS:  Ok.
21    CHAIRMAN FITCH:  And it's dated August
22  2, 2010, correct.

36 (Pages 1278 to 1281)

In Re: Larry E. Klayman
June 26, 2018

1    THE WITNESS: Correct.
2    CHAIRMAN FITCH: Which is a Monday.
3    THE WITNESS: I don't know whether it's
4  a Monday -- oh, yes, it says Monday.
5    CHAIRMAN FITCH: Right.
6    So you received her email Friday, and
7  you responded after the weekend on Monday,
8  correct?
9    THE WITNESS: Yes.
10   CHAIRMAN FITCH: Do you have any
11 recollection of whether there were any other
12 communications with her in that period of time?
13   THE WITNESS: I don't have any
14 recollections.
15   CHAIRMAN FITCH: Ok, my next question
16 is to ask you --
17   THE WITNESS: There might have been.
18   CHAIRMAN FITCH: Well, "might have
19 been" --
20   THE WITNESS: I don't think so.
21   CHAIRMAN FITCH: My next question is to
22 ask you to carefully read the DX27 from Sataki,

1  and carefully read the SX25 from you to Ms.
2  Sataki, and tell me if there is any difference
3  between what she or someone requested in that
4  letter and what you say you were going to do.
5    And Mr. Smith can make the same
6  analysis and then, if he disagrees with your
7  answer, he can pursue that.
8    THE WITNESS: Yeah, let me just say
9  with --
10   CHAIRMAN FITCH: You could not possibly
11 have read those two emails.
12   THE WITNESS: I was going to first
13 address the --
14   CHAIRMAN FITCH: I want you to do what
15 I asked you to do. I want you to carefully read
16 the two emails.
17   (Witness reads documents.)
18   THE WITNESS: Ok, I've got it, your
19 Honor.
20   CHAIRMAN FITCH: Is there a difference
21 between what was asked and what was done?
22   THE WITNESS: Based on what I've

1  testified to, it's not my view that there is a
2  difference.
3    If I may explain...
4    CHAIRMAN FITCH: Go ahead.
5    THE WITNESS: Is that I did continue on
6  it. You know, I allowed, subject to appeal
7  Kotelly's -- I had no control over dismissals.
8  Yes, they were dismissed and I didn't pursue
9  anything further in front of Kotelly planning to
10 take an appeal.
11   With regard to Mr. Falahati, I had
12 filed a lawsuit against Mr. Falahati. I don't
13 remember at that time whether that lawsuit was
14 active or not, but I had filed a lawsuit against
15 Mr. Falahati for her. So that's consistent.
16   And in addition, I said at the end, in
17 the middle paragraph there, on SX25, that "I'm
18 still trying to settle this case." This is what I
19 was saying this morning. I never gave up trying
20 to do that. And I asked Mr. Shamble to seek a
21 reasonable accommodation with VOA to try to get
22 Ms. Sataki what she wanted, which was to go back

1  to work in LA and be outside of the presence of
2  the harasser.
3    And then at the end I say I will
4  continue -- this is important, it's the bottom of
5  the page, Page 1 -- SX25, "I continue to protect
6  your interests and continue to pray for your
7  wellbeing."
8    So I was telling her, look, I've got to
9  take actions here to do that.
10   And I also asked her to contact me
11 again in the paragraph before that, "I also
12 offered to meet with you but you did not reply."
13   So this is all consistent with what
14 I've testified to.
15   CHAIRMAN FITCH: Mr. Smith, you want to
16 follow up with some questions?
17   MR. SMITH: Well, I'll go back to Bar
18 Exhibit Number 27 --
19   THE WITNESS: Your Honor, I have to
20 order that -- if we may, I can order that Uber for
21 Mr. Dash. It will just take me thirty seconds.
22   CHAIRMAN FITCH: Go ahead. We stand in

App.0541

In Re:  Larry E. Klayman
June 26, 2018

Page 1286

1    recess for a moment.
2         THE WITNESS:  Ok.
3         (Recess taken.)
4    BY MR. SMITH:
5         Q.  Mr. Klayman, please take a look at
6    Supplemental Exhibit Number 26.
7         A.  Ok.
8         Q.  For the record, this is an email dated
9    August 5th, 2010 from Larry Klayman to Ellie
10   Sataki.
11        A.  Correct.
12        Q.  Have you had a chance to read that
13   email?
14        A.  I testified at length about it
15   yesterday.  I'll look at it again.
16        (Witness reads document.)
17        A.  Ok.
18        Q.  So in this letter you acknowledge
19   having read the letter that Ms. Sataki wrote to
20   Dan Austin dated August 4th, 2010, correct?
21        A.  Yes.  I got it, I believe, from Mr.
22   Shamble.  He sent it to me.

Page 1287

1         Q.  In that letter Ms. Sataki, as you will
2    recall, told Mr. Austin she was directing you to
3    dismiss all actions against the agency, correct?
4         A.  Again, I didn't know that it came from
5    her, and she didn't send it to me.  Why wouldn't
6    she send it to me?  Why would she send it to
7    Austin?
8         Q.  That was not the question that I asked
9    you.
10        A.  Yeah, well, I didn't know that it was
11   her letter that she wrote.  It was written again
12   in perfect English.
13        Q.  But the letter directed to you -- told
14   Mr. Austin that she had directed you to dismiss
15   all actions against the agency, correct?
16        A.  Can you me show the Austin letter.
17        Q.  Yeah, that would be Bar Exhibit Number
18   28.
19        A.  Ok.
20        Q.  Last sentence, second page.
21        (Witness reads document.)
22        A.  Well, if I may add, to the best of my

Page 1288

1    recollection -- number one, I stand by my
2    testimony of yesterday in terms of how I could not
3    conceive that this came from her, and secondly, I
4    was not copied on this.  She knew where to find
5    me.  She could have emailed it.  And three, I had
6    never been advised, as of that time, that I no
7    longer represented her.  That's the best of my
8    knowledge here.
9         So this came as a great surprise to me,
10   and she said that, you know -- she's telling him
11   that she told me not to represent her anymore, and
12   I hadn't gotten any instruction to that effect, so
13   obviously I had to protect her interest.
14        Q.  That was totally nonresponsive to my
15   question.
16        A.  It was totally responsive to your
17   question, because it's --
18        CHAIRMAN FITCH:  Repeat your question
19   for me again.
20        MR. SMITH:  The question was whether or
21   not he understood the letter that Ms. Sataki wrote
22   to Dan Austin to direct him to withdraw all legal

Page 1289

1    actions that she had pending against the VOA.
2         THE WITNESS:  Yes, and I told you that
3    I could not do that because it looked to me like
4    this letter -- even though I never got it, and I
5    got it apparently by Mr. Shamble -- it was not
6    written by her.
7         I had been, in and around this time
8    period, threatened by somebody on her behalf.  I
9    didn't know who if anyone was behind what was
10   going on, and it looked to me like it was such
11   nonsensical request that, just as a matter of
12   logic, I couldn't do that.
13        In fact what's being said here is get
14   rid of everything, and I just hope -- I believe in
15   the innocence of strangers that they're going to
16   help me.  And we know that that wasn't the case.
17        She was advised by Mr. Shamble,
18   repeatedly, "This is a difficult agency.  You have
19   to fight to get what you want, and you don't
20   unilaterally surrender," and this thing made no
21   sense.  It made no sense.
22        CHAIRMAN FITCH:  I think that when Mr.

38 (Pages 1286 to 1289)

In Re: Larry E. Klayman
June 26, 2018

| Page 1290 |
| --- |

1    Klayman has twice said "I couldn't do that," I
2    think that's the answer "yes" to your question.
3        MR. SMITH: Ok.
4        CHAIRMAN FITCH: If I understood, which
5    I think is the answer you were seeking.
6        MR. SMITH: That is what I was seeking
7    and that is not what I heard.
8        But if that's how the committee
9    receives his testimony --
10       CHAIRMAN FITCH: Well, I'm hearing
11   "yes."
12       MR. SMITH: Well, if that's how the
13   committee receives his testimony --
14       CHAIRMAN FITCH: And I agree that was a
15   rambling answer.
16       MR. SMITH: That's the bottom line.
17       CHAIRMAN FITCH: The record shows that.
18       THE WITNESS: And if I may add to my
19   answer, I could not do that as a matter of
20   professional responsibility.
21       CHAIRMAN FITCH: I strike that --
22       THE WITNESS: Ok.

| Page 1291 |
| --- |

1        CHAIRMAN FITCH: -- as nonresponsive to
2    that question.
3        THE WITNESS: I understand. We can
4    strike it, your Honor. I just want to put it on
5    the record, in all due respect.
6        CHAIRMAN FITCH: I don't need to be
7    instructed as to these matters, Mr. Witness.
8        THE WITNESS: I'm not trying to be
9    disrespectful, your Honor. I'm just trying to put
10   something on the record.
11       CHAIRMAN FITCH: You're doing a good
12   imitation with comments like that.
13       Go ahead, Mr. Smith.
14   BY MR. SMITH:
15       Q.  Let's take a look at Supplemental
16   Exhibit Number 27.
17       THE WITNESS: By the way, I wasn't
18   trying to criticize you. I was just --
19       CHAIRMAN FITCH: Mr. Smith -- Mr. Smith
20   has already asked you a question.
21       THE WITNESS: That's fine. It was not
22   with regard to you, your Honor.

| Page 1292 |
| --- |

1        CHAIRMAN FITCH: Mr. Smith is ready to
2    ask you a question.
3        THE WITNESS: Ok.
4    BY MR. SMITH:
5        Q.  Please look at Supplemental Exhibit
6    Number 27. Let me know when you've had a chance
7    to finish reading that document.
8        For the record it is email
9    correspondence dated August 19th, 2010 from Larry
10   Klayman to Ellie Sataki.
11       A.  Did I just read this before?
12       Q.  No.
13       A.  Twenty-seven?
14       Q.  No.
15       CHAIRMAN FITCH: We understood it to be
16   SX27.
17       THE WITNESS: Oh, ok, it's the
18   supplemental one. I'll read it, hold on.
19       (Witness reads document.)
20       THE WITNESS: Ok.
21       CHAIRMAN FITCH: The question...
22   BY MR. SMITH:

| Page 1293 |
| --- |

1        Q.  By August 19th, 2010, you understood
2    that you had been dumped by your client, correct?
3        A.  I didn't understand that, because I had
4    never been informed by her through a communication
5    that was in her way of writing, or I hadn't been
6    communicated with, and neither had Mr. Shamble.
7        Q.  So the first sentence --
8        A.  So I didn't --
9        Q.  -- where you add --
10       A.  I didn't receive it.
11       Q.  "PS, please be careful not to harm my
12   reputation or Tim further. Tim told me that
13   Parashir (phon), his assistant, had heard inside
14   VOA that I was dumped. Obviously you or persons
15   close to you spread this rumor and VOA's
16   management is using this. Again, obviously you or
17   persons close to you spread this rumor."
18       A.  You see, that can happen -- I'm
19   challenging her on this, because I want her to
20   communicate with me, ok. I was using a little bit
21   of psychology.
22       But that could have come from Falahati

In Re: Larry E. Klayman
June 26, 2018

Page 1294

1  or Sajadi or other people inside of the agency who
2  were trying to create discord between Ms. Sataki
3  and I.
4      I had no confirmation that I was
5  dumped. This was a rumor inside VOA. But I'm
6  challenging her to get back to me directly or get
7  back to Mr. Shamble directly.
8      Q.  But again you didn't speak to Ms.
9  Sataki after her email of July 30th, 2010 telling
10  you to withdraw all lawsuits against VOA, correct?
11      A.  I certainly, Mr. Smith, tried to, on a
12  number of occasions -- through making calls,
13  emails, texts -- I tied to get a line of
14  communication.
15      And at one point I went to Mr. Shamble,
16  because he hadn't heard anything either, and I
17  said, "Can you please try to email her so we can
18  find out what's going on," and she didn't even
19  respond to him.
20      Q.  So the answer to my question is Ms.
21  Sataki did not speak with you again after July
22  30th, 2010, correct?

Page 1295

1      A.  I don't believe she was speaking to me
2  on July, July 31. I don't believe she was. So
3  that's a loaded question.
4      CHAIRMAN FITCH:  No, it's not. It's a
5  fair question.
6      Go ahead.
7  BY MR. SMITH:
8      Q.  We can explore that. Because there
9  were a number of email exchanges between you and
10  Ms. Sataki throughout July.
11      Would you like to take a look at those
12  now?
13      THE WITNESS:  Move to strike, your
14  Honor. That's editorializing.
15      MR. SMITH:  We'll get back to that.
16      THE WITNESS:  Move to strike those
17  comments.
18      CHAIRMAN FITCH:  It's stricken. It's
19  not in evidence.
20  BY MR. SMITH:
21      Q.  You testified that when you met Ms.
22  Sataki she was experiencing some mental

Page 1296

1  instabilities?
2      A.  What I said was I didn't believe them
3  at the time to be instabilities. In retrospect, I
4  do, because they have continued to today, by her
5  own admissions and emails that she's written.
6      My heart went out to her because she
7  took my hand and started crying and told me her
8  story. So I didn't realize that there was a --
9  there was potentially a psychological disorder
10  there.
11      But in retrospect, I've come to believe
12  that.
13      Q.  When did you first come to understand
14  that she was in need of psychiatric assistance?
15      A.  When she asked me for that, when she --
16  well, when she had that very emotional and had a
17  breakdown in Los Angeles, when she was there on
18  leave to --
19      Q.  Do you remember when that was?
20      A.  Wait a minute. Let me finish.
21      When we learned that they weren't going
22  to put her back to work in LA, the first time we

Page 1297

1  got that response, and they weren't going to grant
2  a reasonable medical accommodation -- and they
3  also, it's in the record, said, "If you don't come
4  back to work at a certain point in Washington at
5  VOA there, we'll consider you AWOL and terminate
6  you."
7      So she had a breakdown.
8      And that's when I asked a friend of
9  mine, who is a doctor, who is Persian, named Ben
10  Kasanji (phon), did he know a psychiatrist. And
11  Ben is a very sweet person, a good guy, and he
12  recommended one to me. And that one wasn't
13  acceptable to her. He didn't seem high-powered
14  enough.
15      So then I asked a friend of mine who
16  had been going through psychological counseling,
17  who she might recommend. I called that doctor and
18  then she referred me to Dr. Aviera. And then
19  later on I got Ms. Sataki Dr. Long, who is a
20  psychiatrist; not just to help Ms. Sataki, but to
21  buttress her case to get her a reasonable medical
22  accommodation.

40 (Pages 1294 to 1297)

App.0544

In Re: Larry E. Klayman
June 26, 2018

Page 1298

1    Q.  This was about in February or March of
2  2010?
3    A.  You'll have to key me in on the
4  documents.
5    Q.  Well, I guess if you look at the
6  exhibits that you filed in the lawsuit, you might
7  see a date.
8    MR. TIGAR:  While counsel is looking
9  for that, Mr. Klayman, did you believe that first
10  night, when you met at Clyde's Restaurant in
11  Georgetown, that Ms. Sataki was vulnerable?  Did
12  you see her as a vulnerable person?
13    THE WITNESS:  Not to me.  I saw her as
14  vulnerable towards what happened to her.  I didn't
15  think that she was vulnerable generally at that
16  time.
17    MR. TIGAR:  So you felt that she was
18  vulnerable in the sense that she was going through
19  a very difficult situation in her work place.
20    THE WITNESS:  That she was traumatized
21  by what she claimed was Mr. Falahati's behavior.
22    But I believed that she was a strong

Page 1299

1  person at that time, because I had seen her out on
2  the mall doing interviews when I met her.
3    Her type of work, to broadcast into
4  Iran a pro-American message to the radical regime
5  like that, is really putting herself on the line.
6  You've got to be fearless to do that.
7    So I didn't believe that she was
8  vulnerable in general?
9    MR. TIGAR:  Did you notice at that time
10  that she had difficulty expressing herself in
11  English?
12    THE WITNESS:  Not -- yeah, she had
13  difficulty expressing herself in English in the
14  sense that she could write something that was in
15  good English, but she could express herself
16  verbally, ok.  She could express herself verbally
17  well enough that I could understand.  We heard her
18  on the witness stand in that regard.
19    But in determines of written
20  communications, she couldn't write English very
21  well, you know, as we've seen in various exhibits.
22    And in addition, her English, when she

Page 1300

1  spoke, wasn't perfect.  There were a lot of
2  grammatical errors.
3    MR. TIGAR:  So can you put a time on
4  your realization that her ability to express
5  herself in written English was questionable or not
6  perfect.
7    THE WITNESS:  Well, she told me that.
8  And she told me that that was a criticism of Susan
9  Jackson, one of her supervisors, in terms of her
10  work and why she wasn't going to be transferred to
11  LA.
12    And I also was aware of that, because
13  when she turned down an opportunity to work in the
14  Central News Bureau, which was in English, she
15  said, "I can't do it in English.  They're setting
16  up.  I'm going to be fired."
17    MR. TIGAR:  You began to be aware of
18  this as early as that evening at Clyde's when she
19  was talking about her situation?
20    THE WITNESS:  I was aware at that time
21  that her English wasn't perfect, but she was able
22  to convey her thoughts to me.

Page 1301

1    And I might add, I have a lot of -- and
2  Mr. Sujat knows this -- I started off, after I did
3  litigation, in Miami.  I was an international
4  trade lawyer for many years, and I still am.  And
5  so I understand -- I can piece things together,
6  and I understand when foreigners talk to me,
7  because I represented a lot of them.
8    But when I get a letter that's
9  obviously written by somebody else and didn't make
10  sense, I have to pull back and say, "Hey, I can't
11  throw the baby out with the bath water at that
12  point.  I have to protect her interests."
13    MR. TIGAR:  Go ahead, Mr. Smith.
14  BY MR. SMITH:
15    Q.  If you could take a look at Bar Exhibit
16  4, at Page 4-34 --
17    CHAIRMAN FITCH:  Mr. Smith, may I
18  interject?
19    Are you going to come back in SX27 in
20  one context or another?  If not, I'm going to go
21  ahead and ask a question about SX27.  That's the
22  August 19, the two August 19 emails.

41 (Pages 1298 to 1301)

In Re:  Larry E. Klayman
June 26, 2018

## Page 1302

1  MR. SMITH:  No, I was not going to.
2  CHAIRMAN FITCH:  Ok, let me ask
3  something.
4  MR. SMITH:  Go right ahead.
5  CHAIRMAN FITCH:  Look at SX27, please,
6  Mr. Klayman.
7  THE WITNESS:  I have it, your Honor.
8  CHAIRMAN FITCH:  And look at the first
9  email in time, the 12:46 p.m., email.  It's the
10  one at the bottom of the page.
11  You see where that is?
12  THE WITNESS:  The one at the top of the
13  page?
14  CHAIRMAN FITCH:  No, the bottom of the
15  page.
16  THE WITNESS:  Where it says "
17  Ellie"?
18  CHAIRMAN FITCH:  Yes.
19  Do you see in the fourth paragraph, in
20  the last sentence of the last paragraph on that
21  page, "In addition I deserve to have costs and
22  expenses reimbursed at a minimum, notwithstanding

## Page 1303

1  the hundreds of thousands of dollars in time I put
2  in."
3  THE WITNESS:  Right.
4  CHAIRMAN FITCH:  Can you provide any
5  explanation for how a reader of that would know
6  that you were not seeking costs and expenses,
7  especially since in other such instances, at least
8  one other such instance, you had written in
9  theory.
10  THE WITNESS:  Well, the reason that was
11  written that way is because I was trying to show
12  her just generally that I put in a lot of time and
13  expense on her behalf.
14  If someone was going to come in and
15  interfere with it, what I was trying to say is --
16  maybe I was inarticulate on that, that.  If they
17  were going to interfere in what I was doing, then
18  they should have to pay me.  Not her, not her.
19  Because, to throw everything away,
20  after I put in so much of my heart and soul, and
21  whatever legal ability I had -- and Mr. Shamble
22  testified to my efforts -- to have someone come in

## Page 1304

1  who I couldn't even find out who they were, and
2  completely deep six everything that I did,
3  obviously they should be responsible.
4  That's what I was trying to say , not
5  that she should have to pay me.  That's why
6  repeatedly I said, "You don't owe me anything."
7  I'm a lawyer and I know if I write
8  something like that, if I ever had to try to
9  collect -- which I wouldn't do with her, which I
10  have done with some other clients in the past --
11  that that would completely negate my ability to
12  collect, writing something like that.
13  So, I wasn't intending to have her pay.
14  But I was trying to tell her that, hey, you know,
15  whoever is behind this, they're throwing
16  everything for you and for me away, and I have put
17  in a lot of time and expense and I believe in your
18  case and I took it, and it's not right to have
19  someone who doesn't even know what the case is all
20  about, you know, cut the legs out from under you
21  and cut them out from under me.
22  CHAIRMAN FITCH:  What would you point

## Page 1305

1  to in that sentence that would tell me or Ms.
2  Sataki that you meant in that sentence to say that
3  some third person should pay costs and expenses?
4  THE WITNESS:  Well, I didn't say she
5  had to pay me.  And again there are other emails
6  that say "You don't have to owe me anything ever,
7  that I'm doing this pro bono."
8  So what I was saying in the context of
9  other communications that I was sending her, that,
10  if there are people out there interfering with my
11  representation and what I've invested and what I
12  believe in, and I believe in you, then they should
13  reimburse me, if you just want to throw everything
14  away.  And that's what I was trying to convey.
15  So that's my answer.
16  CHAIRMAN FITCH:  Ok, alright.
17  You've told me the context, and you
18  have told me what you're trying to convey.
19  THE WITNESS:  Yeah.
20  CHAIRMAN FITCH:  And that's perfectly
21  alright.
22  But I asked you, what is there in the

42 (Pages 1302 to 1305)

In Re: Larry E. Klayman
June 26, 2018

## Page 1306

1 wording of that sentence that would suggest to a
2 reader that you were talking about other people
3 paying costs and expenses?
4 THE WITNESS: In the context of
5 everything else --
6 CHAIRMAN FITCH: I didn't ask you that.
7 You told me about the context; perfectly
8 reasonable testimony.
9 What is there in that sentence, what
10 words that suggest that you were suggesting that
11 others would pay.
12 THE WITNESS: It's the omission of
13 words. I didn't say "you have to pay me."
14 CHAIRMAN FITCH: Ok. Thank you, Mr.
15 Klayman.
16 THE WITNESS: Sure.
17 BY MR. SMITH:
18 Q. Alright, I think the last question I
19 asked you is when you first became aware of Ms.
20 Sataki's need for mental health assistance, and I
21 have endeavored to find a document that would
22 perhaps jog your recollection.

## Page 1307

1 So I'll ask you about Disciplinary
2 Counsel Exhibit Number 4, at Page 4-34.
3 A. I just responded to you that it became
4 apparent to me, when I saw her have --
5 Q. Would you please look at Bar Exhibit
6 Number 4-34, please.
7 A. Sure.
8 MR. TIGAR: I'm sorry, Bar exhibit
9 number?
10 MR. SMITH: Disciplinary Counsel
11 Exhibit 4, and it is a letter written by Arlene
12 Aviera dated March 14th, 2010.
13 THE WITNESS: I'll do that. Can I just
14 consult with Mr. Sujat just quickly --
15 CHAIRMAN FITCH: No.
16 THE WITNESS: No, ok. Not on
17 testimony.
18 CHAIRMAN FITCH: Thank you.
19 I note for your information, Mr.
20 Klayman, that there's a preceding letter from Ms.
21 Aviera also.
22 He's asked you about the March 15th

## Page 1308

1 letter.
2 MR. SMITH: Thank you.
3 I note for the record that is Page
4 4-33, and it is a letter from Dr. Aviera dated
5 February 24th, 2010.
6 THE WITNESS: Correct.
7 BY MR. SMITH:
8 Q. So does that refresh your recollection
9 on when you first began to understand that Ms.
10 Sataki was having issues for which she required
11 some clinical psychology?
12 A. Yes. And that's consistent with what I
13 testified to that I took her to see Dr. Aviera,
14 paid for it initially myself, as well as the other
15 doctors, and I took her to see Dr. Aviera, not
16 just so she could have a psychological evaluation,
17 but also to be able to make a record that I could
18 give to VOA to convince them to put her back to
19 work in Los Angeles as a reasonable medical
20 accommodation.
21 So this document was written by Dr.
22 Aviera for purposes of litigation, and I asked her

## Page 1309

1 to do that.
2 She wouldn't ordinarily write this kind
3 of a thing, you know, for her notebook. And
4 that's why in fact I requested, you know, in
5 discovery, to get her file, because this was
6 something that was for litigation purposes.
7 MR. SMITH: I move to strike that
8 testimony as unresponsive.
9 CHAIRMAN FITCH: Yeah, that's struck.
10 Ask your question again.
11 MR. SMITH: I think he answered with
12 respect that it refreshed his recollection about
13 this document.
14 THE WITNESS: Yeah.
15 BY MR. SMITH:
16 Q. Now the reason Ms. Sataki was in need
17 of this psychiatric or psychological assistance
18 was because she was suffering from the
19 aftereffects of being sexually harassed on the job
20 by Mr. Falahati, correct?
21 A. It wasn't the only reason, as I
22 testified to.

43 (Pages 1306 to 1309)

In Re:  Larry E. Klayman
June 26, 2018

Page 1310

1    Q.  Was that one of the reasons?
2    A.  That was one of the stated reasons by
3  Dr. Arlene Aviera.
4       Ok, the thing speaks for itself.
5       But it was also because she had been
6  unfairly criticized, she claimed, for her work by
7  Susan Jackson and that, you know, she got her job
8  because of her looks, that, you know, she had
9  other people doing packages for her, which was
10  Kaveh, that she couldn't communicate well in
11  Farsi, that her Farsi was no good.
12       She developed a bleeding ulcer, and
13  that -- that's what she claimed.
14       So there were other factors there,
15  other than the alleged sexual harassment.
16    Q.  Now Ms. Sataki had told you that she
17  did not want people to know about her legal
18  problems, right?
19    A.  She never said that, no.  In fact -- I
20  mean, you'll hear testimony to the contrary later
21  on in my case -- but that she never said that, and
22  that's false.  That was completely false.

Page 1311

1    Q.  That was false, and -- completely
2  false?
3    A.  Completely false.
4    Q.  She never said that?
5    A.  That's what I just said.
6    Q.  Let me ask you to look at Bar Exhibit
7  Number 24, please.
8       MR. SMITH:  For the record it is a
9  letter which has a date on it -- it looks like a
10  facsimile dated April 7th, 2010, and it is
11  addressed to Arlene -- I would imagine it's
12  Aviera, and it is sent to her by Mr. Klayman.  And
13  it is a letter.
14  BY MR. SMITH:
15    Q.  Alright, looking at the very last two
16  lines under the heading number one on Page 24-1,
17  the last sentence there where you are telling Dr.
18  Aviera, "I found this very peculiar at the time as
19  she did not want to otherwise let people know
20  about her legal problems."
21    A.  Where is that?
22    Q.  You see that?

Page 1312

1    A.  Where is that?
2    Q.  Bar Exhibit Number 24, the very bottom
3  of the page.
4       (Witness reads document.)
5    A.  That was in the beginning.  That was in
6  the very beginning.  But it changed, as she
7  testified to.  I advised her, and so did Tim, that
8  the publicity could help her get a settlement.
9    Q.  But you just said it was false that she
10  never spoke to you about her desire to keep her
11  legal problems quiet?
12    A.  Maybe I didn't hear your question
13  properly.  I thought your question was saying that
14  she always wanted to keep it quiet.  That's the
15  way I took it.
16       But it wasn't true, and you'll hear --
17  you heard testimony and you'll hear more testimony
18  about this.
19    Q.  At some point you understood, though.
20  At some point you understood she had some issues
21  with respect to publicity about her case, correct?
22    A.  Right up front, in the first week or so

Page 1313

1  we tried to settle it quietly, yes.  But then it
2  changed, the situation changed, and we had to put
3  pressure on both, in terms of legal actions and in
4  terms of positive public relations, to try to get
5  the agency to do the right thing.
6    Q.  Did you put pressure on her to go
7  public with the case?
8    A.  No, I never put any pressure on her.  I
9  cared for the girl, you know.  Why would I put
10  pressure on her?  This wasn't about me.  It was
11  about her.
12    Q.  It's a rhetorical question.
13       Let me ask you to look at Bar Exhibit
14  Number 23, and I'll ask you to flip to the
15  compendium of WorldNetDaily articles that begin on
16  23-12 and on through 23-36 -- 23-41 actually.
17       CHAIRMAN FITCH:  I have a question
18  about the previous exhibit, 24, please, in the
19  last sentence that Mr. Smith asked about...
20       That last sentence in those printed
21  words --
22       THE WITNESS:  Which exhibit is this?  I

44  (Pages 1310 to 1313)

In Re:  Larry E. Klayman
June 26, 2018

## Page 1314

1    just flipped it, your Honor.

2        CHAIRMAN FITCH:  Twenty-four.  The last

3    sentence that he just asked you about.

4        THE WITNESS:  Yes.

5        CHAIRMAN FITCH:  "I found this very

6    peculiar at the time as it/she, did not want to

7    otherwise let people know about her legal

8    problems."

9        Now that sentence as written makes no

10   sense, as "it/she," did not want blah, blah, blah.

11       Tell me whether it is a typo.

12       THE WITNESS:  Yeah, it's a typo.

13       CHAIRMAN FITCH:  What is it your

14   testimony that that was meant to be?

15       THE WITNESS:  Well, it shouldn't be in

16   there, ok.

17       As I just testified to, in the very

18   beginning she was reticent, and then we explained

19   to her, Mr. Shamble and I --

20       CHAIRMAN FITCH:  Ok, so is your

21   testimony that the mistake was including to the

22   word i-t, "it," and that this sentence should

## Page 1315

1    read, "as she did not want to otherwise let people

2    know"?

3        THE WITNESS:  Let me take a look at the

4    whole sentence.  I didn't read it.

5        (Witness reads document.)

6        THE WITNESS:  I think -- yeah, I think

7    "it" is superfluous there.

8        I stand by my testimony that in the

9    beginning she was reticent.  But I explained to

10   her that legal proceeding is public and you can't

11   keep it away from public domains and public files

12   when it was dealing with an agency.  And, you

13   know, she understood that she would have to accept

14   that this was public.

15       And then of course we advised her that

16   publicity could help her case and get her a

17   settlement.

18       So things changed.  This was in the

19   very beginning.

20       CHAIRMAN FITCH:  It's a bit after 3:00.

21   Do we need to do anything about this witness and

22   his Uber trip?

## Page 1316

1        THE WITNESS:  Oh, no, he should be on

2    his way.

3        CHAIRMAN FITCH:  I thought you wanted

4    to do something?

5        THE WITNESS:  I did, I called him and

6    told him I sent an Uber to his house.

7        CHAIRMAN FITCH:  I thought there was a

8    later point you wanted --

9        MR. TIGAR:  May I ask a question about

10   that paragraph.

11       THE WITNESS:  I asked him to call me

12   when he gets here.

13       CHAIRMAN FITCH:  Ok, then we're all

14   set.

15       THE WITNESS:  Let me just remind him of

16   that.

17       CHAIRMAN FITCH:  Mr. Tigar has a

18   question.

19       MR. TIGAR:  I'll wait until after he's

20   done with that.

21       THE WITNESS:  Thank you for reminding

22   me.

## Page 1317

1        (Brief pause.)

2        THE WITNESS:  Ok, thank you.

3        MR. TIGAR:  One question:  You said

4    "During our first trip to LA together"; that's the

5    beginning of numbered paragraph number one.

6        THE WITNESS:  Same exhibit?

7        MR. TIGAR:  Page-24-1.

8        THE WITNESS:  Right.

9        MR. TIGAR:  Numbered paragraph at the

10   bottom of the page.

11       THE WITNESS:  Yes, I see that.

12       MR. TIGAR:  When was that trip.  Do you

13   recall?

14       THE WITNESS:  This -- I went out to LA

15   at the same time.  We took separate planes and

16   all.  But I went out to LA at the same time when

17   she was taking leave, and, you know, she had that

18   nervous reaction to not --

19       MR. TIGAR:  When approximately?

20       THE WITNESS:  That was right in the

21   beginning.  Yeah, in early -- it was in January or

22   February.

45 (Pages 1314 to 1317)

In Re: Larry E. Klayman
June 26, 2018

## Page 1318

1  CHAIRMAN FITCH:  Ok.
2  Go ahead, Mr. Smith.
3  THE WITNESS:  It was in January.
4  CHAIRMAN FITCH:  Ok.
5  Go ahead, Mr. Smith.
6  BY MR. SMITH:
7  Q.  So you are familiar with the compendium
8  of articles that appeared in WorldNetDaily,
9  correct?
10  A.  Correct.
11  Q.  And you've testified that some of the
12  references in these articles to your book, "Larry
13  Klayman's Fascinating Encounter with the Battle
14  With the Powers That Be, Whores: Why and How I
15  Came to Fight the Establishment," was something
16  that was inserted into these articles by the
17  publisher?
18  A.  Correct.  Many of them, yeah.
19  Q.  But you knew that these
20  cross-references to your book were going to be in
21  these articles, right?
22  A.  I actually didn't know that.  I never

## Page 1319

1  actually paid made much attention.
2  I saw that they were doing that, but
3  they had purchased books and they wanted to sell
4  them, and I had no problem with them trying to
5  sell them.  But I didn't get any proceeds from
6  them.
7  Q.  If you look at 23 --
8  A.  Larry Klayman didn't get any proceeds
9  from them.
10  Q.  If you look at 23-14.
11  A.  Yes.
12  Q.  And towards the bottom of the page,
13  right within the last paragraph, there's a little
14  insert there, "Get Larry Klayman's Fascinating
15  Encounter With His Battle With the Powers That
16  Be," is that an example of what you're saying was
17  kind of like an insert by the --
18  A.  Yes, that's inserted by the publisher
19  of WorldNetDaily.
20  Q.  And it seems to be disconnected in the
21  overall body of work that you have there?
22  A.  Right.

## Page 1320

1  Q.  Let's take a look at Bar Exhibit Number
2  23 at 12, 23-12, and in the second paragraph, last
3  sentence of the second paragraph, it says -- well,
4  let's start -- the next to last sentence, about
5  four lines from the bottom, "I was in a very sad
6  and angry mood" --
7  A.  Wait, 23-12?  I don't see that.
8  Q.  23-12.  It's like the second paragraph,
9  four lines from the bottom.  It's the very
10  beginning of the sentence, "I was in a very sad
11  and angry mood."
12  A.  Oh, the reason I'm confused, it's five
13  lines from the bottom.  It's five lines from the
14  bottom.
15  Q.  Are we on the same page now?
16  A.  Yeah, and it's five lines, just to
17  identify further.
18  Q.  "I was in a very sad and angry mood,
19  and I also thought about my life as a
20  revolutionary, which has not been easy.
21  "As I discuss in my recent book,
22  "Whores: Why and How I Came to Fight the

## Page 1321

1  Establishment," I have paid a personal price for
2  my dissenting style."
3  That's not an insert from the
4  publisher, is it?
5  A.  No.  And I frequently refer to my book.
6  I'm proud of my book.  It's my auto autobiography.
7  And I wasn't selling my book.  I said that in
8  there.  I was confirming that this has been my
9  view of life.  And I frequently talk about today
10  what I wrote in that book.
11  Because that was my life story up to
12  that point in time.  I wrote it 2004 after my
13  Senate campaign and it was actually published in
14  2009.
15  Q.  Alright, I think we have discussed
16  already that certainly after August 5th, 2010, you
17  understood that Ms. Sataki, or someone working
18  with her, had sent you correspondence telling you
19  to withdraw the cases that you had filed on her
20  behalf, correct?
21  A.  I think -- I'm happy to answer again,
22  but I've asked and answered this many, many

46  (Pages 1318 to 1321)

In Re: Larry E. Klayman
June 26, 2018

## Page 1322

1    times...
2        I didn't believe that it came from her
3    and I had to get confirmation as to what she
4    wanted to do.
5        I'm not going to repeat all my
6    testimony.
7        Q.  But on or about August 5th you
8    understood that that letter written by someone had
9    come with those instructions, correct?
10       A.  I didn't see that it was written by
11   her.  I thought it was written by others.  I got
12   it secondhand.  So that called into question the
13   authenticity and also the content.
14       CHAIRMAN FITCH:  Wait, wait, wait.  I'm
15   going to strike that answer and I want a correct
16   answer to your question.
17       THE WITNESS:  What was the question?
18       MR. SMITH:  Could you please read the
19   question back.
20       THE COURT REPORTER:  "I think we have
21   discussed already that certainly after August 5th,
22   2010, you understood that Ms. Sataki, or someone

## Page 1323

1    working with her, had sent you correspondence
2    telling you to withdraw the cases that you had
3    filed on her behalf, correct?"
4        THE WITNESS:  The answer is no, because
5    it wasn't sent to me.
6    BY MR. SMITH:
7        Q.  Certainly after the --
8        CHAIRMAN FITCH:  Are you satisfied with
9    that --
10       MR. SMITH:  Well, if that's his
11   answer... You all will judge his credibility with
12   respect to that.
13       THE WITNESS:  Your Honor, I think those
14   editorial comments are just not right.
15       CHAIRMAN FITCH:  No, I asked him, and
16   he shot right back.  I can take it.
17       THE WITNESS:  Alright.
18       CHAIRMAN FITCH:  I prefer you answer
19   that question yes or no.
20       THE WITNESS:  Well, I did.  I answered
21   it the way it was posed.  Yes.
22       CHAIRMAN FITCH:  You did, and he's

## Page 1324

1    satisfied.
2        But go ahead, Mr. Smith.
3    BY MR. SMITH:
4        Q.  And you'll also remember that you had
5    no further direct communications with Ms. Sataki
6    after the July 30th, 2010 letter to you that was
7    addressed by her?
8        A.  Where is that letter?
9        Q.  That is the Bar Exhibit 27.
10       CHAIRMAN FITCH:  Keep in mind, whenever
11   it's a good time for you to break.
12       MR. SMITH:  Well, let's do it right
13   now.
14       (Recess taken.)
15   BY MR. SMITH:
16       Q.  So I believe the last question on the
17   table was, you did not have any further direct
18   communications with Ms. Sataki after the July
19   30th, 2010 correspondence that was sent to you by
20   her or someone working for her.
21       A.  Ok, the reason that that question is
22   difficult to answer is because it's loaded.  It

## Page 1325

1    says that I was communicating with "her."  She
2    communicated with me in that letter.  I don't
3    believe that that was a communication from her.  I
4    don't.
5        Q.  Did you --
6        CHAIRMAN FITCH:  That answer, with it's
7    characterization of "a loaded question," is
8    struck.
9        THE WITNESS:  Alright, I'll take out
10   the "loaded question" part.
11       It's that the --
12       MR. SMITH:  I'll withdraw that
13   question.
14   BY MR. SMITH:
15       Q.  Ms. Sataki did not contact you again
16   after July 30th, 2010, correct?
17       A.  I don't recollect any.  But it's so
18   long ago, Mr. Smith, I don't recollect any.
19       Q.  Well, there's no communications in the
20   record between you and Ms. Sataki communicating
21   directly with you again until September 15th,
22   2011.

47  (Pages 1322 to 1325)

In Re:  Larry E. Klayman
June 26, 2018

## Page 1326

1   A.  Well, again you're presuming that it
2   came from her.
3       Where is the September 15th that you're
4   referring to?
5   Q.  Supplementary Exhibit 38.
6   A.  Ok.
7   Q.  Notwithstanding the fact --
8   CHAIRMAN FITCH:  Now, wait a minute.  I
9   haven't heard a question about that exhibit, where
10  the number is.
11      You want to ask a question about that?
12  MR. SMITH:  Well, I thought I had, that
13  there had been no communication between July 30th,
14  2010, direct communication from Ms. Sataki to Mr.
15  Klayman from July 30th, 2010 to September of '11.
16  CHAIRMAN FITCH:  Well, you had asked a
17  question about anything after July 30, and he said
18  no -- he said "don't recall it."  And now you're
19  asking a similar question, but a lightly more
20  specific question, any after July 30 until
21  September 15, 2011; perfectly good question.
22      Do you know of any?

## Page 1327

1       THE WITNESS:  I don't recollect any,
2   no.
3       CHAIRMAN FITCH:  Ok, there's the
4   answer.
5       THE WITNESS:  And in fact, my email
6   there, your Honor, says "This is the first time
7   I've heard from you and it appears this email is
8   written by you and you're still experiencing some
9   emotional issues."
10      The reason why I knew this one did come
11  from her is because it's in her broken English.
12  BY MR. SMITH:
13  Q.  So, despite the fact that you had
14  received this communication asking you to stop
15  representing her in those cases, you continued to
16  seek publicity in order to pressure the government
17  to settle cases that she no longer wanted you to
18  handle?
19      CHAIRMAN FITCH:  Objection.  That's too
20  argumentative, even for cross.
21  MR. SMITH:  Alright.
22      THE WITNESS:  I object, also, because

## Page 1328

1   it's compound.
2       CHAIRMAN FITCH:  Well, you don't have
3   to answer.
4   BY MR. SMITH:
5   Q.  On October 1st, 2010, you published
6   another article in WorldNetDaily, 23-19, Bar
7   Exhibit 23, Page 19.
8   A.  Let me turn to it, thanks.  Ok I see
9   it.
10  Q.  In this article you discuss Ms.
11  Sataki's legal case, correct?
12  A.  Let me look at it.  I turned to it.
13  Now I want to read it.
14      (Witness reads document.)
15  A.  I don't make specific reference --
16  well, let me strike that.
17      In effect I am -- let me just try to be
18  precise.
19      I'm talking about the situation with
20  Mehdi Falahati and Ali Sajadi and what was going
21  on at Voice of America.
22  Q.  And in this article --

## Page 1329

1   A.  Yeah, and I'm just talking about it in
2   that context of what's going on.  Yeah.
3   Q.  And in this article you also disclose
4   that Ms. Sataki had a severe depression and a
5   nervous breakdown, don't you?
6   A.  That had been disclosed in other
7   articles and also in other publicity --
8   Q.  But you disclosed it in this article,
9   too, right?
10  A.  Yeah, that's what it says.
11  Q.  Thank you.
12  A.  But it had been out there before --
13  Q.  Thank you.
14  A.  -- in stuff that I wrote with her
15  permission, yeah.
16      There's no shame in that.
17  Q.  And then on October 15th, 2010, you
18  wrote another article in WorldNetDaily.  That
19  would be Exhibit 23-16.
20  A.  Is that the article posted on October
21  15th, 2010?
22  Q.  Excuse me, yes, 2010: "Evil Ground

48  (Pages 1326 to 1329)

In Re:  Larry E. Klayman
June 26, 2018

Page 1330

1  ero" --
2      A.  Yes.
3      Q.  And in this article you mention Ms.
4  Sataki.
5      CHAIRMAN FITCH:  For all of our sake,
6  point out where you mean, Mr. Smith, please.
7      MR. SMITH:  I'm sorry?
8      CHAIRMAN FITCH:  For everybody's sake,
9  point out where.
10     MR. SMITH:  Oh, on Page 2 --
11     CHAIRMAN FITCH:  23-17?
12     MR. SMITH:  Yes, 23-17, which is three
13 lines from the bottom.
14     THE WITNESS:  Fifteen?
15     MR. SMITH:  23-17.
16     THE WITNESS:  23-17, ok.
17     CHAIRMAN FITCH:  I actually don't see
18 it, Mr. Smith.  Oh, wait a minute.
19     You were referring to the first
20 paragraph on 23-17?
21     MR. SMITH:  Yes.
22     CHAIRMAN FITCH:  What is your question?

Page 1331

1      MR. SMITH:  That this article mentions
2  Ms. Sataki.  I was trying to assist the witness
3  in --
4      THE WITNESS:  Yeah, I mean the article
5  speaks for itself.
6  BY MR. SMITH:
7      Q.  Let me ask you to look at Bar Exhibit
8  23 again.  This is 23-14, and for the record it is
9  an article posted October 29th, 2010, in
10 WorldNetDaily.
11     MR. TIGAR:  I'm sorry, counsel, what
12 page is that?
13     MR. SMITH:  23-14 is the beginning of
14 that article.
15     MR. TIGAR:  Is that the article that
16 says posted, October 29th?
17     MR. SMITH:  Yes.
18     CHAIRMAN FITCH:  Where do you want Mr.
19 Klayman to look?
20 BY MR. SMITH:
21     Q.  If you could look at Page 23-15, the
22 second paragraph and the beginning of the third

Page 1332

1  paragraph.
2      CHAIRMAN FITCH:  And your question is?
3      MR. SMITH:  Well, after he's had a
4  chance to read it, I'll ask him.
5      (Witness reads document.)
6      CHAIRMAN FITCH:  Fair enough.
7      THE WITNESS:  Is there a question?
8  BY MR. SMITH:
9      Q.  Yes.  Have you read it?
10     A.  I skimmed it quickly.  I mean, it
11 speaks for itself.
12     Q.  Once again you discuss Ms. Sataki's
13 case in this article, correct?
14     A.  I'm just looking at that.
15         The facts that relate to that case,
16 yes.
17     Q.  And you talk about how you met with
18 congressmen trying to assist Ms. Sataki with
19 her --
20     A.  Yeah.  The document speaks for itself.
21         You know, and I was still trying to get
22 settlement for her at that time.

Page 1333

1      MR. TIGAR:  Excuse me, was that at
2  Morton's or Clyde's?
3      THE WITNESS:  Well I met her in
4  Morton's, ok, but I actually later met with her
5  and Mr. Keya Dash, who is going to be here
6  momentarily, at Morton's.  And we met, I testified
7  at the beginning on the patio where you can smoke,
8  because Keya smokes cigars, and that's where I met
9  Boehner.
10     MR. TIGAR:  At what restaurant was it
11 did Mr. Boehner kiss and offer to help?  Morton's
12 or Clyde's?
13     THE WITNESS:  Morton's, on Connecticut
14 Avenue.
15     CHAIRMAN FITCH:  For the sake of the
16 record, as an aide to myself, as I review the
17 record, since Mr. Klayman said "the article speaks
18 for itself," there are specific references to
19 "Elham Sataki" and "Sataki" and "Elham."
20     Next question, Mr. Smith.
21
22 BY MR. SMITH:

49 (Pages 1330 to 1333)

In Re: Larry E. Klayman
June 26, 2018

## Page 1334

1  Q.  Moving on, during your testimony
2  yesterday, when you were discussing the issue of
3  love -- now you can direct me if I'm wrong -- but
4  I thought that you compared the love that you had
5  for Ms. Sataki as the love that you had for your
6  doing Beverly.
7  A.  No, I didn't do that.  That's very
8  unfair.
9  Q.  Ok.
10  A.  What I'm saying is that there are lots
11  of things in life that I love, ok, and I don't
12  equate a human being such as Ms. Sataki with a
13  dog, even though I love my dog a whole lot.
14  Her name is Beverly.  She's a
15  Labradoodle.
16  Q.  When did you fall in love with Ms.
17  Sataki?
18  A.  I can't say the exact time.  It
19  happens -- you know, it happens over time, that
20  you start to care for somebody deeply.  And that's
21  the way I would more accurately describe it during
22  the time I wasn't involved in the way I was being

## Page 1335

1  treated.  Because it was a deep friendship, I
2  thought, and I was being treated badly.
3  And yes, I did love Ms. Sataki.  I did.
4  And I'm not making any apologies for that.  I
5  don't see that in any way, from my
6  perspective and the perspective of any Bar rules.
7  I didn't engage in any sexual contact with her.  I
8  didn't ask for any.  But to love somebody, you
9  can't control that in real life.
10  Q.  But Ms. Sataki never told you that she
11  loved you, did she?
12  A.  There was one email -- she never said
13  that directly.  She said, wait 'till this thing is
14  over, and in effect then we'll see.  There was one
15  email to that effect during her testimony, just
16  wait till this thing is over.
17  Q.  Well what she was suggesting --
18  I don't know what she was suggesting, but it was
19  suggestive.  I leave it to her to decide what she
20  meant by that.
21  I do know this, if I may answer this
22  question, is that, in retrospect, I see Ms. Sataki

## Page 1336

1  as very manipulative, that she wanted to get
2  something from me, and she got a lot from me, and
3  when she didn't get what she wanted at the end,
4  she had to blame somebody, and she blamed me.
5  It was not my fault that she didn't get
6  what she wanted because she abandoned all of her
7  cases, except for that notice of appeal.  I mean,
8  we still probably could have gotten a result in
9  one manner, shape or form.  It's not fair to blame
10  me.
11  Q.  So you'll agree with me that you did
12  have romantic intentions with Ms. Sataki, right?
13  A.  No, I will not agree with that.
14  In fact it's clear in the various
15  correspondence that I said, "I'm not your
16  boyfriend."  I said that.  Did I love her?  Yeah.
17  "But I'm not your boyfriend," and I never, ever
18  tried to get her to be my girlfriend.
19  But there was a very close friendship,
20  and I thought there was affection between us.  And
21  sometimes I couldn't understand why I was being
22  insulted, like I was in Exhibit 38, accused of

## Page 1337

1  taking bribes and things like that, and it was
2  upsetting.
3  Q.  Well, let's go through some of the
4  emails and some of the things you said directly to
5  Ms. Sataki or her psychologist about your feelings
6  of love for her.
7  Alright, let's take a look at Bar
8  Exhibit Number 25.
9  A.  Didn't we talk about that before?
10  Q.  I haven't had a chance to talk to you
11  about it, not in the context we're about to.
12  (Witness reads document.)
13  THE WITNESS:  Ok, I just got a call
14  from Mr. Dash.  Let me call back.
15  Can I go down and get him, your Honor?
16  CHAIRMAN FITCH:  I think we'll
17  interrupt your testimony now.  You should bring
18  Mr. Dash up, and we'll get his testimony.
19  THE WITNESS:  You want to take his
20  testimony now?
21  CHAIRMAN FITCH:  Right now.  If he's
22  downstairs, bring him up right now and we'll go

50 (Pages 1334 to 1337)

In Re: Larry E. Klayman
June 26, 2018

| Page 1338 | Page 1340 |
|---|---|

**Page 1338**

1  from there.

2      THE WITNESS:  Thank you.  I will.

3      CHAIRMAN FITCH:  We are taking a break

4  for a few minutes to facilitate the testimony of

5  another witness and to accommodate the schedule.

6      (Recess taken.)

7      (Attorney for Respondent, Mr. Sujat,

8  present in the court.  Respondent, Larry Klayman,

9  not present.)

10     CHAIRMAN FITCH:  I'm inclined, Mr.

11 Smith, to recess after this witness' testimony.

12 Does that screw you up at all?

13     MR. SMITH:  Not at all.  I think that

14 would be perfectly fine.

15     CHAIRMAN FITCH:  Thank you.  We can go

16 off the record.

17     (Recess taken.)

18     (Keya Dash on the witness stand.)

19     CHAIRMAN FITCH:  I believe, sir, you

20 are Mr. Dash?

21     THE WITNESS:  Yes, sir.

22     CHAIRMAN FITCH:  Why don't you approach

**Page 1339**

1  the witness stand.  We appreciate your

2  accommodating this this afternoon.

3      THE WITNESS:  No problem.

4      CHAIRMAN FITCH:  Wait right there just

5  a minute, please.  What is your full name?

6      THE WITNESS:  My name is Keya Dashtara,

7  D-a-s-h-t-a-r-a.  First name K-e-y-a.

8      CHAIRMAN FITCH:  If you would raise

9  your right hand, please, sir.

10     Do you swear or affirm that the

11 testimony you are about to give will be the truth,

12 the whole truth and nothing but the truth?

13     THE WITNESS:  Yes.

14     CHAIRMAN FITCH:  Please be seated, and

15 Mr. Klayman will ask you questions.

16     MR. KLAYMAN:  May I ask, your Honor, I

17 thought that I had another copy of Exhibit 7.  I

18 made copies, I gave one to Mr. Smith and I'm

19 wondering if I could borrow one of your copies for

20 Mr. Dash.

21     CHAIRMAN FITCH:  Sure.

22     MR. KLAYMAN:  Thank you.

**Page 1340**

1  Whereupon,

2      KEYA DASHTARA

3  called as a witness on behalf of Respondent, and

4  after having been first duly sworn, was examined

5  and testified as follows:

6      DIRECT EXAMINATION ON BEHALF OF RESPONDENT:

7      BY MR. KLAYMAN:

8      Q.  Mr. Dash, would you please state your

9  full name.

10     A.  My name is Keya Dashtara.

11     Q.  Tell us a little bit about your

12 background and your family.

13     A.  My dad came here in the '60s; my mother

14 in the '70's.  I was a businessman all my life,

15 since adulthood.  I suppose -- right after high

16 school I went straight into business anyhow.

17     Q.  Right?

18     A.  And for the past twenty years, I've

19 been a business owner.  I've owned many different

20 companies from retail to consulting, a full

21 plethora.

22     Q.  Approximately when did I meet you and

**Page 1341**

1  your family?

2      A.  At least a decade ago, a very long time

3  ago.  You were very close friends with my father,

4  in fact.

5      Q.  Your father, actually, he's the one

6  that founded Dash Clothing Designers?

7      A.  This is true.  In the '70's he founded

8  a chain of retail clothing stores called Dash's

9  Designers.  They were based in the metropolitan

10 area, six locations.  They were quite big at the

11 time.

12     Q.  How did we meet?  Do you know?

13     A.  Yes.  You and I met through a mutual

14 friend named Richard Miniter.

15     Q.  What was his position at the time, or

16 had he just leave?

17     A.  He had just left the Washington Times.

18 He's a journalist and an author.

19     Q.  Ok.  And we used to get together at his

20 house?

21     A.  Yes.

22     Q.  And we became good friends?

51 (Pages 1338 to 1341)

In Re:  Larry E. Klayman
June 26, 2018

Page 1342

1    A.  Yes, sir.

2    Q.  Your brother, he had, at the time that

3 I met you, been working for Voice of America?

4    A.  That's right.  He was working for the

5 Broadcasting Board of Governors that oversees

6 Voice of America.

7    Q.  Would it be fair to say that your

8 family is a very prominent Persian family in the

9 Washington, D.C. area?

10    A.  Yes.

11    Q.  Did there come a time when I asked you

12 for help for Ms. Sataki?

13    A.  Yes, you did.  You asked me to

14 intervene with a friend I had on the broadcasting

15 board whose name was Blanquita Cullum.  My brother

16 worked in the CFO's office for the Broadcasting

17 Board of Governors and Blanquita was one of the

18 governors.

19    You had asked me to personally make the

20 case to Blanquita as a friend to her.

21    Q.  We're going to get back to that, but

22 for now I turn your attention -- and I will open

Page 1343

1 it up for you, to make it easier -- to Exhibit D

2 of Bar Counsel's exhibits, Exhibit D in front.

3 And it's also Exhibit 5 to Respondent's exhibits.

4    A.  I think they're not labeled the same

5 way here.

6    CHAIRMAN FITCH:  D24 is the affidavit?

7    MR. KLAYMAN:  Exactly, your Honor.

8    CHAIRMAN FITCH:  The declaration.

9 BY MR. KLAYMAN:

10    Q.  Take your time and review that, Mr.

11 Dash.

12    A.  Yes.

13    Q.  Is this affidavit that you signed under

14 oath accurate?

15    A.  Yes, it is true and correct.  Yes.

16    Q.  You signed it on December 20th, 2016.

17    A.  That's right.

18    Q.  I turn your attention to paragraph six,

19 initially, where you state, "Given what I know

20 about VOA and the Persia News Network, the use of

21 publicity to try to coax the managers into a

22 settlement of Ms. Sataki's claims was a prudent

Page 1344

1 strategy, and I'm aware, from having been in Ms.

2 Sataki's presence, that her case was discussed and

3 she approved it."

4    Is that right?

5    A.  Yes.

6    CHAIRMAN FITCH:  If I may interject,

7 "Given what I know about VOA and the Persia News

8 Network and use of publicity to try to coax the

9 managers into a settlement of Ms. Sataki's claim

10 was a prudent strategy," that is opinion testimony

11 and it is not going to be omitted.

12 BY MR. KLAYMAN:

13    Q.  Based on your knowledge of VOA -- I'll

14 ask it a different way -- and your brother having

15 worked there, do you know this to be a very

16 difficult agency to deal with?

17    A.  Yes, particularly very bureaucratic,

18 cavernous.

19    Q.  Did there come a point in time when you

20 met Ms. Sataki?

21    A.  Yes, I did meet her.

22    Q.  When was that?

Page 1345

1    A.  Around February of 2010 I believe is

2 when we met.  We first met at Morton's Restaurant.

3    Q.  I had asked you to come to meet her?

4    A.  That's right.

5    Q.  Yes.  And I was trying to get your help

6 at that time?

7    A.  That's right.

8    Q.  Did we sit in a particular part of

9 Morton's that you like to sit in?

10    A.  Yes.  We sat on the enclosed patio,

11 which is where I usually like to sit because you

12 can smoke there.

13    Q.  Smoke cigars?

14    A.  That's right.

15    CHAIRMAN FITCH:  Is this the Morton's

16 in Georgetown?

17    THE WITNESS:  No, the one on Wisconsin

18 Avenue, on the patio that overlooks Connecticut.

19 BY MR. KLAYMAN:

20    Q.  And you were sitting there -- I'm

21 trying to speed it along -- with me and Ms.

22 Sataki?

52  (Pages 1342 to 1345)

In Re: Larry E. Klayman
June 26, 2018

---

Page 1346

1    A.  That's right.
2    Q.  Did there come a point in time when we
3  noticed John Boehner?
4    A.  Yes.
5    Q.  Also smoking?
6    A.  Yes.  He was smoking cigars and he was
7  sitting a table over from us.
8    Q.  He was drinking a bit, too?
9    A.  A little more than a bit, but yes.
10   Q.  I then said -- you were there in my
11 presence -- didn't I say to Ms. Sataki, "Let's
12 didn't meet" --
13       CHAIRMAN FITCH:  That's a leading
14 question.
15 BY MR. KLAYMAN:
16   Q.  What did I say to Ms. Sataki about Mr.
17 Boehner?
18   A.  "Let's go talk to Mr. Boehner."
19   Q.  With regard to helping her?
20   A.  That's right.  To plead her case to him
21 and enlist his support.
22   Q.  What did you observe at that point?

---

Page 1347

1  Did we then go over and I introduced Ms. Sataki?
2    A.  I observed a couple of things: that you
3  knew him, that you were friendly with him, that he
4  heard the case.  He seemed very interested in it.
5  In fact he seemed to side with her.  And that it
6  was a good interaction.
7    Q.  Were you aware as to whether or not I
8  then sought his help?
9    A.  Excuse me?
10   Q.  Are you aware whether or not we sought
11 his help to resolve a situation with her at Voice
12 of America after that?
13   A.  Yes, I am aware that that was the
14 entire purpose.
15   Q.  Did there come another point in time
16 when you met Ms. Sataki?
17   A.  Yes.  There was another occasion that I
18 met her with you at a French restaurant.
19   Q.  In Virginia?
20   A.  In Virginia.
21   Q.  During the two encounters that you had
22 with her, did she explain to you her situation

---

Page 1348

1  with VOA and ask you for help?
2    A.  Yes.  She told me in depth her issues
3  and she sought my assistance in talking to
4  Blanquita Cullum, in particular, Richard Miniter,
5  also, who is a journalist friend, and others whom
6  I might know.
7    Q.  At that time that I introduced you to
8  Ms. Sataki, did you have any reservations about
9  helping her?
10   A.  Yes.  In the beginning I had quite a
11 few reservations, based on her reputation.
12   Q.  What did you understand that reputation
13 to be?
14   A.  Well, her reputation was something of
15 an opportunist who advances herself, and when she
16 reaches the point of no return, alleges sexual
17 discrimination, sexual harassment.  This was
18 something I had told you at the time.
19   Q.  How did you come to that conclusion?
20 How did you come to that understanding?
21   A.  She used to work at a TV station in Los
22 Angeles before working at the Voice of America.

---

Page 1349

1  The TV station I believe was called NITV, which is
2  National Iranian Television, and there was a
3  gentleman who owned it names Mr.  ia,  -i-a,
4  Attaby, A-t-t-a-b-y, and Mr. Attaby was a happily
5  married man, until he met her, at which point he
6  was divorced.  Afterwards he was divorced, because
7  of allegations of an affair and promiscuity on her
8  part.
9    Q.  Is the Persian community a close-knit?
10   A.  Yes, it was very close-knit.
11   Q.  So those were the kinds of things that
12 one learns about families in Washington, D.C.?
13   A.  Yes, sir.
14       MR. SMITH:  Objection, leading.
15 BY MR. KLAYMAN:
16   Q.  After you met her, did you decide to
17 help her, even with those reservations?
18   A.  So I had those reservations and I had
19 reservations, also about the fact that my brother
20 worked there and it might not be prudent.
21       So, after meeting with her the second
22 time, I was convinced to help her.

---

53  (Pages 1346 to 1349)

In Re:  Larry E. Klayman
June 26, 2018

## Page 1350

1    Q.   Was it my urging that played a role in
2   doing that?
3    A.   For the most part, yes.
4    Q.   What if anything did you do after that
5   to try had to help her, with regard to Blanquita
6   Cullum?
7         Who is Blanquita Cullum, specifically?
8    A.   Blanquita Cullum was a governor of the
9   Board of Broadcasting Governors.  She's a radio
10  host.  She's a media personality.  Very well
11  known, especially known within the Latin
12  community.  But particularly she has a reputation
13  on freedom movements in South America and Iran.
14  These are areas of concern for her.
15   Q.   Did you understand her to be a member
16  of the board of governors at VOA?
17   A.   Yes.
18   Q.   How did you know of that?
19   A.   How did I come to know that she
20  works --
21   Q.   Yeah, that she was on the board of
22  governors.

## Page 1351

1    A.   She was appointed -- I know this
2   because my brother was employed by her.
3    Q.   Did you ultimately decide to approach
4   Blanquita Cullum to try to help Ms. Sataki?
5    A.   Yes, I did approach Ms. Cullum to help
6   Ms. Sataki.
7    Q.   I'm going to show you what has been
8   marked as Respondent's Exhibit 7.
9         MR. KLAYMAN:  It's not in evidence.
10        THE WITNESS:  Yes.
11        CHAIRMAN FITCH:  Am I correct in
12  understanding you mean to say it's Supplemental
13  Exhibit 7?
14        MR. KLAYMAN:  Yes, Respondent's
15  Supplemental Exhibit 7.
16  BY MR. KLAYMAN:
17   Q.   Now, take an opportunity to look at the
18  dockets and the exhibits.  They purport to be
19  emails by and between you and me, and also there's
20  an email from Ms. Sataki to you.
21        (Witness reads documents.)
22        CHAIRMAN FITCH:  While the witness is

## Page 1352

1   reviewing those emails in general, before he's
2   asked a specific question, the testimony about
3   Sataki's reputation is not admitted as repetition
4   testimony.
5         It is admitted as relevant to other
6   issues in the case such as actions that you've
7   testified to that you took and so on.
8         Have you had a chance to look at those?
9         THE WITNESS:  Excuse me?
10        CHAIRMAN FITCH:  Have you had a chance
11  to take a look at those?
12        THE WITNESS:  Yes, sir.
13        CHAIRMAN FITCH:  Go ahead.
14  BY MR. KLAYMAN:
15   Q.   You emailed these last night, correct?
16   A.   Yes, sir.
17   Q.   And I didn't know that you had them.
18  We discussed that, correct?
19   A.   That's true.
20   Q.   Look at the first page where it says,
21  June 25th, 2018, from Keya Dash to Larry Klayman,
22  "Larry, here's an email where I told you I

## Page 1353

1   couldn't intervene with BQ because of the fact
2   that my brother worked there.  He later did speak
3   to her, and she passed it off as being in the
4   hands of the lawyers and consequently claimed she
5   couldn't speak about it.  Keya."
6         Do you remember that email that I sent
7   you?
8    A.   That's right.
9    Q.   And then I wrote back to you --
10        CHAIRMAN FITCH:  Who is "her"?
11  BY MR. KLAYMAN:
12   Q.   Who is the "her" we're talking about?
13   A.   We're speaking about Ms. Sataki.
14   Q.   And I had written to you earlier.  It's
15  below, the email of 2010.  You see that, an email?
16        "Keya, this matter only involves having
17  the woman taken out of the DC office and put in
18  LA.  I don't want to have to sue.  So if someone
19  could get beyond the political nonsense, this
20  would be in the best interest of all.
21        "BQ, Blanquita Cullum, is very
22  political, and at this point it's someone neutral

54  (Pages 1350 to 1353)

In Re: Larry E. Klayman
June 26, 2018

## Page 1354

1  to show here that a woman's life is at stake.
2       "Washington is a very cruel and cold
3  place. BQ Blanquita Cullum, thinks only of
4  herself, by doing this I wanted to avoid
5  consequences for her. I wanted to avoid this."
6       CHAIRMAN FITCH: Sir, going back to the
7  area I just asked you about, when you wrote to Mr.
8  Klayman, "I later did speak to her and she passed
9  that off as being in the hands of all the
10 lawyers," now is "her" Ms. Sataki or is that BQ?
11      THE WITNESS: Oh, that "her" is BQ.
12      CHAIRMAN FITCH: Ok.
13      Go ahead, Mr. Klayman.
14 BY MR. KLAYMAN:
15      Q.  And you aware that I considered myself
16 to be a friend of BQ, too?
17      A.  Yes.
18      Q.  Did I ever tell you that I was on a
19 radio show a lot with her?
20      A.  I wouldn't know.
21      CHAIRMAN FITCH: Irrelevant, struck.
22 BY MR. KLAYMAN:

## Page 1355

1       Q.  Ok. Then I'm going to turn your
2  attention to the next page in the emails, an email
3  from Larry Klayman to you on February 22nd, which
4  states, "Keya, what happened with BQ? Thanks,
5  Larry."
6       Do you remember receiving that?
7       A.  Yes.
8       Q.  I'll turn your attention, flipping the
9  page, to an email from you to me, on Monday, June
10 25th, 2018, where you're writing to me saying, "In
11 reviewing my files, I have this email below that
12 you forwarded to me. In order that I speak to
13 Blanquita, you copied journalist Richard Miniter,"
14 M-i-n-i-t-e-r, "regarding an email and Mitch
15 Baxter."
16      Do you see that?
17      A.  Yes, I do.
18      Q.  And Mitch Baxter, he was a friend of
19 ours, too?
20      A.  That's right.
21      Q.  And he was also trying to help.
22      Ok, so, then I wrote, this is an email

## Page 1356

1  the 2nd of March from me to you, "Keya, I'm losing
2  respect for Blanquita. If she thinks I won't sue
3  her if necessary, then she does not know me very
4  well. There is a human life involved here, and I
5  will not hold back. I hope you're well enough in
6  the next day. Best Larry."
7       You remember receiving that?
8       A.  Yes.
9       Q.  And then there's, on the next page
10 there's an email that I sent to Blanquita, "Please
11 take steps to resolve this. I'm the guy who sued
12 his own mother and if you think this will just go
13 away, you don't know me very well. While you are
14 a board of governors" --
15      CHAIRMAN FITCH: I can read the whole
16 thing.
17      MR. KLAYMAN: Ok, that's fine.
18 BY MR. KLAYMAN:
19      Q.  So you remember receiving this from me,
20 correct, Keya.
21      A.  Yes.
22      Q.  Then there's an email below and that I

## Page 1357

1  forwarded to you which --
2       CHAIRMAN FITCH: Let me ask you, sir,
3  in that email Mr. Klayman -- this the March 2nd
4  email -- Mr. Klayman wrote do you see in the final
5  paragraph, "Any additional delay by the board or
6  agency will put her over the edge. Her doctor
7  already documented her suicidal state."
8       Do you see where Mr. Klayman says that
9  to you?
10      (Witness nods head in the affirmative.)
11      CHAIRMAN FITCH: Had you made any
12 observations of Ms. Sataki or the board at this
13 point in time, the January, February, very early
14 March 2010 point in time?
15      THE WITNESS: I had observed that she
16 was very distraught, very nervous, easily
17 agitated, very concerned.
18      CHAIRMAN FITCH: I apologize for
19 interrupting. Go ahead.
20      MR. KLAYMAN: That's ok.
21
22 BY MR. KLAYMAN:

App.0559

In Re: Larry E. Klayman
June 26, 2018

## Page 1358

1    Q.   And again this was early on.  This was
2  back in February of 2010?
3    A.   That's right.
4    Q.   Then I write, at the bottom of the page
5  from the email, Tuesday, March 2nd, 2010, from me
6  to BQview (phon).  That's the email of Blanquita
7  Cullum, correct?
8    A.   Yes, I see that.
9    Q.   I sent that to you.
10        I said, "Blanquita, please take steps
11  to resolve this."  I'm not going to repeat the
12  email -- "remember, I'm the guy who sued my own
13  mother."  My stepfather took my grandmother's
14  money.  My grandmother had dementia and
15  Alzheimer's.
16        CHAIRMAN FITCH:  Did you receive this
17  email?
18        THE WITNESS:  Yes, sir, I did.
19  BY MR. KLAYMAN:
20    Q.   And I say to her at the end, "As a
21  board of governor you have the ability to have
22  this resolved."

## Page 1359

1    A.   Mm-hmm.
2    Q.   And then, on the next page, there's an
3  email that Ms. Sataki sent to you on February
4  21st, 2010: "This is Ellie Sataki.  Thanks for the
5  push with Blanquita."
6        You see that?
7    A.   Yes.
8    Q.   And you got that from Ms. Sataki,
9  herself?
10    A.   That's right.
11    Q.   And then above that you're sending me
12  that email that you got from her.
13    A.   That's right.  I was forwarding it back
14  to you.
15    Q.   Yeah, so that she thanked me.
16        And then the next email is attached.
17  Apparently I gave you that so you could watch her
18  videos.  I got you that so you could watch her
19  videos of her appearances on TV, a glimpse.
20    A.   Yes.  I was already aware, but I did
21  watch those videos as well.
22    Q.   Correct.

## Page 1360

1        And then the next one is an email from
2  you to me of June 25th, 2018: "Larry, below is
3  another email.  Tim Shamble at Voice of America
4  wrote an email to Tim Shambles" -- he probably
5  meant VOA -- "supportive of Elham Sataki.  He
6  forwarded that email to you and also then appealed
7  to you, so I could send it to my best friend,
8  Richard Miniter.  (Inaudible)
9        "I'll bring the book if I can find it,
10  Keya."
11        I was trying to get Mr. Miniter to
12  write a positive article, too, for settlement,
13  correct?
14    A.   That's right.
15    Q.   And then there's an email, the next
16  email from Tim Shamble to Elham Sataki, which I
17  apparently forwarded to you, and it's Mr. Shamble
18  again appealing to Paul Kollmer-Dorsey,
19  K-o-l-l-m-e-r dash D-o-r-s-e-y, the general
20  counsel of Voice of America trying to settle this
21  matter."
22        Take a look at that.

## Page 1361

1        (Witness reads document.)
2        CHAIRMAN FITCH:  For the record, this
3  purports would be a February 26, 2010 email
4  dispatched at 10:29:36.
5        MR. KLAYMAN:  Correct.  It says
6  original message below, February 10, two days --
7  three days --
8        THE WITNESS:  Oh, I see the one, yes.
9  BY MR. KLAYMAN:
10    Q.   So did you take that to understand that
11  Mr. Shamble was trying to get a settlement from
12  VOA?
13    A.   That's correct.
14    Q.   So, Mr. Dash, you used your personal
15  efforts and the prestige of your family in the
16  Persian community to try to help Ms. Sataki?
17    A.   Yes.  I believe she knew I was
18  reluctant to help in the beginning and she tried
19  to have me coax them, and I did.  I did speak to
20  her.
21    Q.   What was your observation, in looking
22  that I was trying to help her, in terms of my

In Re: Larry E. Klayman
June 26, 2018

| Page 1362 | Page 1364 |
|---|---|

**Page 1362**

1  efforts to help her?
2      A.  You were very -- let me preface it.
3          You've always been very concerned with
4  your own affairs, and you've always been very
5  passionate about the Iranian freedom movement.
6  And so you've always been known to support the
7  Iranian community, and I took it as just another
8  example of that.
9      Q.  Did I work very hard for her?
10     A.  Yes, absolutely.
11     Q.  And I used my own personal --
12         MR. SMITH:  Objection.
13         CHAIRMAN FITCH:  Sustained.
14         MR. KLAYMAN:  Ok.  No further guess.
15         I move Respondent's Supplemental
16  Exhibit 7 into evidence.
17         MR. KLAYMAN:  No objection.
18         CHAIRMAN FITCH:  Ok.
19         Mr. Smith.
20
21
22

**Page 1364**

1  or longer?
2      A.  The same amount of time.
3      Q.  How did you come to meet him?
4      A.  I met him through a mutual friend
5  called Richard Miniter.
6      Q.  Do you often dine with him?
7      A.  With Mr. Klayman?
8      Q.  Yes.
9      A.  I don't know that I dine particularly
10 much with him, no.
11     Q.  Did you hang out with him much?
12     A.  Yes, we've hung out a lot, sure.
13     Q.  What do you do when you're hanging out
14 with Mr. Klayman?
15     A.  Mostly just talk, current events.
16     Q.  Do you hang out at bars?
17         MR. KLAYMAN:  Objection, relevance.
18         MR. SMITH:  I'm trying to figure out
19 how they're depends, the nature the friendship.
20         This is like discovery for me.
21         CHAIRMAN FITCH:  I allowed his
22 question; I'm waiting for his answer now.

**Page 1363**

1      CROSS-EXAMINATION BY DISCIPLINARY COUNSEL:
2          BY MR. SMITH:
3      Q.  Good afternoon, Mr. Dash.
4      A.  Good afternoon, sir.
5      Q.  In your affidavit -- and I don't know
6  if you still have it in front of you.  I don't
7  know whether you were looking --
8      A.  I have it here.
9          MR. KLAYMAN:  Let me help him.
10         MR. SMITH:  He's got it, ok.
11 BY MR. KLAYMAN:
12     Q.  Paragraph five you said you've known
13 Mr. Klayman for several years and knew him as a
14 friend and consulted with him on matters in the
15 past.
16     A.  Yes.
17     Q.  How long have you known him?
18     A.  At least ten years.
19     Q.  At least ten years.  And you say your
20 parents have know him as well?
21     A.  Yes.
22     Q.  They know him the same amount of time

**Page 1365**

1      THE WITNESS:  Excuse me?
2      Can you repeat the question?
3  BY MR. KLAYMAN:
4      Q.  Yeah, do you hang out with him at bars,
5  for example?
6      A.  Not particularly.
7      Q.  Where do you hang out with him?
8      A.  At that time often at Mr. Miniter's
9  house, as an example, or at my own house.
10     Q.  Now, this declaration, it was prepared
11 by Mr. Klayman, correct?  You didn't write this
12 yourself, did you?
13     A.  To be honest, I don't remember how it
14 was prepared.
15     Q.  You don't remember how it was prepared?
16     A.  I might have added to it.
17     Q.  You might have added to it.
18     A.  Yeah.
19     Q.  But you didn't write the whole thing,
20 yourself?
21     A.  I could have.  Yeah, it's not very
22 long.

In Re: Larry E. Klayman
June 26, 2018

Page 1366

1    Q.   Alright.
2         Have you ever been to law school?
3    A.   No, sir.
4    Q.   No, ok.
5         So Mr. Klayman told you about the --
6         MR. TIGAR:  Excuse me just a minute.
7         I didn't understand your last answer.
8    Who did the first draft of the declaration?
9         THE WITNESS:  I don't remember.  But
10   it's very straightforward and it's very short.
11   But it's conceivable that I did write this because
12   I do write this way, too.
13        MR. TIGAR:  But you don't remember one
14   way or the other?
15        THE WITNESS:  I don't remember who
16   wrote it in its initial stage, because this was
17   2015.  It was a few years ago.
18   BY MR. SMITH:
19   Q.   Do you know why you wrote this?
20   A.   I wrote it in order to memorialize my
21   account, which is in the document.
22   Q.   Did Mr. Klayman ask you to write this?

Page 1367

1    A.   Yes, Mr. Klayman asked.
2    Q.   Did he tell you why he wanted you to
3    write this for him?
4    A.   I told me that there was a conflict
5    with Ms. Sataki and he wanted me to write about
6    what I remember about the issues that are in the
7    document.
8    Q.   Did you read any materials that May
9    have served as the basis for the complaint that
10   was going --
11   A.   Are you asking if I read the complaint?
12   Q.   Yes.
13   A.   I have not read the complaint.
14   Q.   But you understood that you were
15   supposed to be helping him respond to something?
16   A.   He asked me about my knowledge of
17   certain things and I put it in the document.
18   Q.   Did he ask you whether or not he had a
19   romantic relationship with Ms. Sataki?
20   A.   Are you asking if I asked him this?
21   Q.   No, did he ask you to put your
22   recollections down about any romantic relationship

Page 1368

1    he may have had with Ms. Sataki?
2    A.   I don't understand that question.
3    Q.   Look at paragraph five again and, when
4    you've read the entire paragraph, let me know.
5         (Witness reads document.)
6    A.   Yes, I've read it.
7    Q.   And there's a sentence that says, "With
8    regard to Ms. Sataki, I was present with Larry and
9    Ms. Sataki to discuss her case on more than one
10   occasion.  I observed that he always treated her
11   with respect and was not in any way involved in a
12   romantic relationship with her and nor did he seek
13   one."
14   A.   Yes.
15   Q.   Why did you write that?
16   A.   He told me that one of the allegations
17   was that there was a romantic relationship.
18        I haven't read the complaint, but
19   that's what he told me.
20   Q.   But that was one of the allegations,
21   and he wanted you to --
22   A.   My understanding, yes.

Page 1369

1    Q.   He wanted you to talk about what your
2    recollection was about his involvement with her
3    regarding sexuality, right?
4    A.   Yes.
5    Q.   Now during your testimony earlier
6    today, you talked about Ms. Sataki's reputation --
7    A.   Mm-hmm.
8    Q.   And that she doesn't necessarily have a
9    great reputation in the Persian community.
10        You didn't think that was something
11   important to put in the declaration in order to
12   help your friend deal with an allegation about him
13   being in a romantic relationship with her?
14        MR. KLAYMAN:  Compound question.
15        THE WITNESS:  Well, I think you're
16   asking if something was left out?
17        CHAIRMAN FITCH:  Sir, there's an
18   objection.
19   BY MR. SMITH:
20   Q.   That's exactly what I'm asking.
21        CHAIRMAN FITCH:  I'm thinking about
22   this, and it's always a slow process.

58 (Pages 1366 to 1369)

In Re: Larry E. Klayman
June 26, 2018

## Page 1370

1       If you want to ask that question, Mr.
2 Smith, I'm going to have to consider whether you
3 have opened a door and that therefore I have to
4 admit Mr. Dash's prior testimony about reputation
5 for the purpose of reputation.
6       You can ask that question in a few more
7 minutes, or you can withdraw the question.
8       MR. SMITH:  No, I will ask that
9 question.
10       CHAIRMAN FITCH:  Ok.
11       MR. SMITH:  The testimony is already in
12 the record, so it will be received for how it's
13 going to be received.
14       CHAIRMAN FITCH:  Ok.
15       THE WITNESS:  Are you asking me why
16 something is not in the document?
17 BY MR. SMITH:
18   Q.  Yeah.
19   A.  The subject of the document is Larry,
20 and so, I think, in my own thought process, I
21 wouldn't have put it, if that makes sense to you.
22 It's centered around Larry.

## Page 1371

1   Q.  It doesn't matter whether it makes
2 sense to me, sir.
3       CHAIRMAN FITCH:  Please.
4       MR. SMITH:  Alright.
5 BY MR. SMITH:
6   Q.  So, at the time that you wrote this
7 document, you said that you were not aware that he
8 was involved in a romantic relationship with Ms.
9 Sataki, nor did he seek one.
10       CHAIRMAN FITCH:  No, your question was
11 somewhat different from --
12       MR. SMITH:  No, I'm actually repeating
13 what was in his affidavit.
14 BY MR. KLAYMAN:
15   Q.  My question was, in your affidavit you
16 state that "Mr. Klayman was not in any way
17 involved in a romantic relationship with her,"
18 meaning Ms. Sataki.
19       CHAIRMAN FITCH:  Ok.
20 BY MR. SMITH:
21   Q.  "Nor did he seek one."
22   A.  Yes.

## Page 1372

1       CHAIRMAN FITCH:  That's a fair
2 question.
3 BY MR. SMITH:
4   Q.  Would you be surprised if I told you
5 that Mr. Klayman was sending emails to --
6       MR. KLAYMAN:  Objection.
7 BY MR. SMITH:
8   Q.  -- Ms. Sataki expressing his love --
9       MR. KLAYMAN:  Objection.
10 BY MR. SMITH:
11   Q.  -- his love for her?
12       CHAIRMAN FITCH:  I'll hear the
13 objection.  What is it?  Tell me your objection.
14       MR. KLAYMAN:  He's editorializing.
15 It's nothing he has knowledge of, based on his
16 testimony.
17       MR. SMITH:  He's also testified about
18 his character.
19       CHAIRMAN FITCH:  I think that that is
20 probably a fair question on cross-examination and
21 the objection is overruled.
22

## Page 1373

1 BY MR. SMITH:
2   Q.  So would you be surprised if I told
3 that you Mr. Klayman was sending -- exchanging
4 emails with Ms. Sataki wherein he expressed his
5 love for her?
6       MR. KLAYMAN:  Objection.
7       THE WITNESS:  I don't know about it.  I
8 don't know about it.
9 BY MR. SMITH:
10   Q.  Would you be surprised if that was the
11 case?
12   A.  I'd be surprised.
13   Q.  Because, as far as you knew, he didn't
14 have any romantic -- he did not concede a romantic
15 relationship with her?
16   A.  That's correct.
17   Q.  Let me show you what's been marked
18 Supplemental Exhibit Number 3.  I don't know if
19 you have in front of you.
20       MR. KLAYMAN:  Exhibit 3 in the --
21       MR. SMITH:  Supplemental Exhibit 3,
22 Disciplinary Counsel's Supplemental Exhibit 3.

In Re: Larry E. Klayman
June 26, 2018

## Page 1374

1  THE WITNESS: Yes.
2  BY MR. SMITH:
3  Q. Mr. Klayman never told you about these
4  feelings that he may have been having for Ms.
5  Sataki?
6  A. I've only taken a cursory look at this,
7  but I'm not sure that this says what you say it's
8  saying.
9  Q. Look at the second paragraph from the
10  bottom.
11  A. Ok.
12  MR. SMITH: For the record, this is a
13  letter from Elham Sataki -- April 23rd, 2010, and
14  it's written by Larry Klayman.
15  BY MR. SMITH:
16  Q. And it says, "I am human, you are, and
17  this is to for the only woman that I have ever
18  really loved. You know, when I walk down Beverly
19  Hills, I see an attractive woman, my thoughts
20  immediately flip to you. I see no one else. This
21  has never happened like this with me before."
22  Mr. Klayman never expressed those kinds

## Page 1375

1  of emotions that he had for Ms. Sataki to you?
2  A. The fact is I can only go based on what
3  I've seen and what I know.
4  Q. Ok.
5  A. And what I have seen and therefore what
6  I know is that his interactions were perfectly
7  professional and he was a very zealous advocate.
8  He was very passionate certainly about
9  the case, but he was a very zealous advocate and
10  that's what I knew him about.
11  Q. In your affidavit which was dated
12  September 20th, 2016, about six years after this
13  email went out, you had no idea that this kind of
14  email correspondence was going on between Mr.
15  Klayman and Ms. Sataki, correct?
16  A. I did not see this email before.
17  Q. Yeah, and you had no idea of what his
18  emotions may or may not have been towards Ms.
19  Sataki, correct?
20  A. Mr. Klayman and I are friends, and I
21  think I would have come to know if there was some
22  sort of over-romantic desire on his behalf. I

## Page 1376

1  would have known about that. He never expressed
2  it to me.
3  MR. SMITH: I have no further
4  questions.
5  CHAIRMAN FITCH: Redirect, Mr. Klayman?
6  MR. KLAYMAN: Yes, just one question.
7  REDIRECT EXAMINATION ON BEHALF OF RESPONDENT:
8  BY MR. KLAYMAN:
9  Q. Looking at the affidavit, is that
10  accurate, what you wrote there?
11  A. Yes. This is all accurate.
12  Q. And you signed it under oath?
13  A. I signed it under oath.
14  And also I've been thinking about this
15  while I've been testifying on other things. I
16  think I showed this to an attorney, as well, my
17  own attorney, as well. And it could be that he
18  originated it.
19  MR. KLAYMAN: Ok, I have no further
20  questions.
21  THE WITNESS: Sure.
22  CHAIRMAN FITCH: Thank you, sir, for

## Page 1377

1  coming down to be a witness at these proceedings.
2  It has been helpful to our process, to say the
3  least, and we all very much appreciate it.
4  THE WITNESS: Thank you.
5  CHAIRMAN FITCH: You are excused. Have
6  a pleasant evening.
7  (Witness is excused.)
8  MR. KLAYMAN: Let me just see him
9  downstairs. I'll just be a minute.
10  CHAIRMAN FITCH: A minute.
11  MR. KLAYMAN: A minute.
12  (Brief pause.)
13  (Mr. Sujat, counsel for the Respondent,
14  is present before the hearing committee. Mr.
15  Klayman is not present.)
16  CHAIRMAN FITCH: We are ready to start.
17  Do you have any more testimony to
18  present in your case?
19  MR. SUJAT: No, I don't have anything
20  further.
21  CHAIRMAN FITCH: So you're prepared to
22  rest?

App.0564

In Re:  Larry E. Klayman
June 26, 2018

## Page 1378

1  MR. SUJAT:  I am.

2  CHAIRMAN FITCH:  The Respondent has

3  rested his case.

4  MR. SMITH:  I still have some

5  cross-examination that I'm going to resume

6  tomorrow.

7  CHAIRMAN FITCH:  That is a fair point.

8  That is a fair point.

9  Mr. Smith has further cross-examination

10  of Mr. Klayman and we will take that tomorrow

11  morning.

12  Do you have any rebuttal case?

13  MR. SMITH:  No.

14  (Mr. Klayman present before the hearing

15  committee.)

16  CHAIRMAN FITCH:  We will have closing

17  arguments at approximately 11:00 a.m. tomorrow

18  morning.  Closing arguments will be approximately

19  half an hour each, with some flexibility.

20  I will expect Mr. Smith to be prepared

21  to specify for me -- he can say whatever he wants

22  to in his closing argument, but to specify for me

## Page 1379

1  with respect to each of the four counts what the

2  theory is and what the -- in general what the

3  evidence is with respect to each of the charges in

4  each of the counts.

5  Do you have anything further, Mr.

6  Klayman?

7  MR. KLAYMAN:  Yes, your Honor.  I

8  suppose after that we'll be doing a post-hearing

9  brief.

10  CHAIRMAN FITCH:  If, "if" we make a

11  finding tentatively of the possibility of some

12  finding of violation, then we'll discuss a

13  briefing schedule.

14  If we don't reach a tentative

15  conclusion that there is even one violation, then

16  I don't know quite what happens.

17  MR. SMITH:  I think what happens if

18  there is no violation, there's been no aggravation

19  or mitigation --

20  MR. KLAYMAN:  Well, what I was going to

21  request is, before you make that finding, one way

22  or the other, whether it was a tentative ruling,

## Page 1380

1  then we do a post-hearing brief.

2  CHAIRMAN FITCH:  Read the rules.  The

3  rules don't allow me to do that.

4  MR. KLAYMAN:  Ok.

5  CHAIRMAN FITCH:  I don't say I agree

6  with the rules, but those are the rules.

7  MR. KLAYMAN:  It would make your life

8  easier, but...

9  CHAIRMAN FITCH:  I think I'll have to

10  disagree with you.

11  MR. SMITH:  Will we be meeting tomorrow

12  at 9:30 tomorrow morning for the

13  cross-examination?  We have to leave time for the

14  oral arguments --

15  CHAIRMAN FITCH:  Well, I hope that your

16  cross-examination will --

17  MR. KLAYMAN:  I wanted to say one other

18  thing.

19  CHAIRMAN FITCH:  Well, wait a minute --

20  MR. SMITH:  There's still one witness

21  that's going to be here tomorrow, Ashley Klayman,

22  so I want to present her.

## Page 1381

1  CHAIRMAN FITCH:  Who?

2  MR. KLAYMAN:  Ashley Klayman.

3  CHAIRMAN FITCH:  Who is she?

4  MR. KLAYMAN:  She's my sister.  She's a

5  lawyer and she was privy to discussions with Ms.

6  Sataki.  She is on the witness list.

7  CHAIRMAN FITCH:  And she'll be here.

8  How long is your cross-examination

9  going to be?

10  MR. SMITH:  It depends on the

11  Respondent's answers.

12  CHAIRMAN FITCH:  But you're not going

13  to be here roughly two days.  I don't see any

14  reason for the cross-examination to go more than

15  an hour and a half, Mr. Smith.

16  MR. SMITH:  And I would not either, but

17  it depends on the cooperation of the witness.

18  CHAIRMAN FITCH:  I would like to ask

19  you to accommodate Mr. Klayman and have Ms.

20  Klayman be available at around 11:00 a.m.

21  Is that alright.

22  MR. KLAYMAN:  That's fine.

61 (Pages 1378 to 1381)

In Re: Larry E. Klayman
June 26, 2018

Page 1382

1    CHAIRMAN FITCH: And I anticipate we
2  will have closing argument after lunch.
3    MR. KLAYMAN: That works.
4    CHAIRMAN FITCH: We stand in recess.
5    (Whereupon at 4:35 p.m. the hearing was
6  in recess until Friday, June 27th, 2018, at 9:30
7  a.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

62  (Page 1382)

App.0566

In Re: Larry E. Klayman
June 26, 2018

**A**

**A-t-t-a-b-y** 1349:4
**a.m** 1142:3 1378:17
  1381:20 1382:7
**abandoned** 1191:18
  1241:11 1243:8
  1255:7 1336:6
**abeyance** 1263:17
  1264:4
**ability** 1300:4
  1303:21 1304:11
  1358:21
**able** 1154:17
  1206:18 1245:20
  1252:20 1259:17
  1275:12 1279:19
  1279:20 1300:21
  1308:17
**abrupt** 1253:18
**absolute** 1242:20
**absolutely** 1362:10
**accept** 1158:7
  1159:11 1250:20
  1315:13
**acceptable** 1297:13
**accepted** 1159:9
**accident** 1160:2
  1224:3
**accommodate**
  1170:14 1338:5
  1381:19
**accommodating**
  1145:14 1339:2
**accommodation**
  1177:6 1284:21
  1297:2,22
  1308:20
**account** 1366:21
**accountable**
  1208:20
**accountant** 1162:16
**accurate** 1343:14
  1376:10,11
**accurately** 1334:21
**accused** 1336:22
**Accuses** 1214:11
**acknowledge**
  1286:18
**act** 1203:3
**action** 1150:9,16
  1181:22 1192:7
  1192:10 1194:14
  1209:5 1260:5
**actions** 1260:3
  1272:3 1277:10
  1285:9 1287:3,15

1289:1 1313:3
  1352:6
**active** 1221:5
  1284:14
**activism** 1164:4
**activity** 1219:14
**actual** 1163:15
  1174:3 1222:6
**Ad** 1142:3,10
**add** 1161:8 1181:4
  1196:4 1212:9
  1214:21 1218:21
  1223:14 1287:22
  1290:18 1293:9
  1301:1
**added** 1365:16,17
**addition** 1154:4
  1284:16 1299:22
  1302:21
**additional** 1357:5
**address** 1146:16
  1283:13
**addressed** 1311:11
  1324:7
**addresses** 1161:11
  1238:12
**administrative**
  1173:9
**administratively**
  1249:3
**admire** 1218:14
**admissions** 1296:5
**admit** 1370:4
**admitted** 1151:17
  1152:6 1153:13
  1153:21 1246:15
  1263:13,14
  1264:20 1265:17
  1267:9 1352:3,5
**adulthood** 1340:15
**advance** 1146:8
  1201:18 1218:18
**advances** 1348:15
**advertisements**
  1202:10
**advertising** 1203:9
**advice** 1168:10
  1190:12
**advise** 1272:10,12
  1279:3
**advised** 1219:10,11
  1275:16 1288:6
  1289:17 1312:7
  1315:15
**advising** 1190:9
**advisor** 1219:12

**advocacy** 1251:8
**advocate** 1251:18
  1375:7,9
**affair** 1349:7
**affairs** 1362:4
**affection** 1336:20
**affidavit** 1145:22
  1167:18 1178:11
  1178:11,12
  1179:1,8 1181:9
  1243:17 1244:22
  1247:1 1343:6,13
  1363:5 1371:13
  1371:15 1375:11
  1376:9
**affidavits** 1154:5,8
  1157:19 1158:7
  1158:16 1246:22
**affirm** 1171:1
  1339:10
**affirmative** 1235:14
  1236:12 1357:10
**aftereffects**
  1309:19
**afternoon** 1262:4
  1267:6,7 1339:2
  1363:3,4
**agency** 1173:5
  1190:14 1191:6
  1287:3,15
  1289:18 1294:1
  1313:5 1315:12
  1344:16 1357:6
**aggravation**
  1379:18
**agitated** 1357:17
**ago** 1176:10,12
  1215:5 1233:18
  1244:10 1281:3
  1325:18 1341:2,3
  1366:17
**agree** 1189:14
  1209:18 1221:2
  1248:20 1280:7
  1290:14 1336:11
  1336:13 1380:5
**agreed** 1169:13
  1174:15
**agreement** 1215:18
  1252:7
**ahead** 1161:6
  1168:14 1189:1
  1197:19 1199:13
  1203:21 1218:11
  1232:6 1238:19
  1240:22 1264:22

1275:14 1277:1
  1284:4 1285:22
  1291:13 1295:6
  1301:13,21
  1302:4 1318:2,5
  1324:2 1352:13
  1354:13 1357:19
**ahold** 1255:18
  1272:5,6 1274:21
**aide** 1333:16
**alarm** 1240:18
**Ali** 1219:9 1271:10
  1328:20
**Alice** 1198:11
  1199:3
**alive** 1208:10
  1230:9 1253:4
**allegation** 1369:12
**allegations** 1214:13
  1235:15 1349:7
  1368:16,20
**alleged** 1150:7
  1162:4 1164:20
  1173:4 1184:11
  1310:15
**allegedly** 1216:4
**alleges** 1348:16
**alleviate** 1214:15
**allow** 1184:6,7
  1261:18 1275:11
  1380:3
**allowed** 1177:22
  1180:5 1259:8
  1284:6 1364:21
**allowing** 1238:11
**Allred** 1170:5
  1229:1,3 1230:1
  1231:11,12,21
  1232:3 1256:14
  1256:16,19
**alright** 1149:8
  1172:13 1202:17
  1211:11 1216:9
  1229:16 1233:16
  1235:18 1237:4
  1265:7 1281:9
  1305:16,21
  1306:18 1311:15
  1321:15 1323:17
  1325:9 1327:21
  1337:7 1366:1
  1371:4 1381:21
**alternative** 1155:12
**Alzheimer's**
  1358:15
**amended** 1180:8

**amendment** 1165:9
  1182:10
**America** 1173:5
  1176:6 1200:19
  1204:18 1222:13
  1328:21 1342:3,6
  1347:12 1348:22
  1350:13 1360:3
  1360:20
**American** 1218:19
  1224:7
**ammunition**
  1194:13
**amount** 1363:22
  1364:2
**analysis** 1283:6
**and/or** 1155:9
  1190:10 1272:1
**Angeles** 1154:16
  1160:1 1161:13
  1173:8 1176:6,14
  1278:2 1296:17
  1308:19 1348:22
**angry** 1320:6,11,18
**answer** 1211:3,3
  1232:19 1233:9
  1233:10,16
  1235:13 1236:12
  1238:11 1246:14
  1250:1 1275:9,11
  1275:13 1283:7
  1290:2,5,15,19
  1294:20 1305:15
  1321:21 1322:15
  1322:16 1323:4
  1323:11,18
  1324:22 1325:6
  1327:4 1328:3
  1335:21 1364:22
  1366:7
**answered** 1309:11
  1321:22 1323:20
**answers** 1381:11
**ANTHONY**
  1142:11
**anticipate** 1382:1
**anybody** 1195:12
  1207:22 1257:7
**anymore** 1288:11
**anyway** 1184:15
  1213:8
**apart** 1169:17
**apartment** 1194:11
  1268:17
**apologies** 1335:4
**apologize** 1194:5

1357:18
**apparent** 1307:4
**apparently** 1230:16
  1232:1 1239:22
  1240:10,21
  1272:10 1289:5
  1359:17 1360:17
**appeal** 1168:2
  1169:6 1183:16
  1184:15 1185:1,8
  1185:12,21
  1187:2 1188:1,7
  1188:15 1190:18
  1191:2,4,15
  1273:2 1276:3
  1278:18 1284:6
  1284:10 1336:7
**appealed** 1360:6
**appealing** 1186:9
  1360:18
**APPEALS** 1141:1
**appear** 1146:13
**appearances**
  1142:9 1143:1
  1359:19
**appeared** 1172:8
  1245:18 1318:8
**appearing** 1252:11
**appears** 1218:9
  1246:18 1255:17
  1327:7
**appointed** 1164:5
  1208:12 1351:1
**appointee** 1222:18
**appreciate** 1170:6
  1177:6 1339:1
  1377:3
**approach** 1230:20
  1338:22 1351:3,5
**appropriate**
  1259:19
**approved** 1200:14
  1243:19 1344:3
**approximately**
  1167:3 1317:19
  1340:22 1378:17
  1378:18
**April** 1150:16
  1194:8 1218:5
  1220:13 1311:10
  1374:13
**area** 1193:9
  1341:10 1342:9
  1354:7
**areas** 1350:14
**argument** 1225:6

1248:18,21
1378:22 1382:2
**argumentative**
  1327:20
**arguments** 1259:18
  1378:17,18
  1380:14
**Arlene** 1307:11
  1310:3 1311:11
**arrange** 1217:17
  1251:20
**arranged** 1251:21
**arrive** 1164:2
**article** 1163:10
  1200:5,8,9,17,21
  1202:14,16,19,19
  1204:1,16
  1205:10 1206:6,8
  1207:9,13 1208:5
  1213:4,10,13
  1215:20,21
  1217:1,13,16,18
  1217:19 1218:4
  1222:9 1248:3
  1328:6,10,22
  1329:3,8,18,20
  1330:3 1331:1,4,9
  1331:14,15
  1332:13 1333:17
  1360:12
**articles** 1200:11,22
  1205:2 1211:6,22
  1213:15,18
  1214:3,8 1215:10
  1216:12 1220:7,8
  1220:12,13,15
  1221:18,22
  1223:12 1260:6
  1313:15 1318:8
  1318:12,16,21
  1329:7
**Asbill** 1252:5
**ascertain** 1187:22
**Ashley** 1380:21
  1381:2
**aside** 1234:4
**asked** 1156:3,4
  1158:1,5,6 1159:8
  1169:8 1173:17
  1174:7,12
  1182:15 1184:20
  1185:8 1188:13
  1195:21 1197:13
  1198:2 1213:3
  1219:14 1233:4
  1239:18,22

1244:6,8 1245:8
1252:17 1254:5,9
1264:10 1268:17
1268:18 1271:7
1272:6 1275:6,22
1276:12 1279:6
1279:17 1283:15
1283:21 1284:20
1285:10 1287:8
1291:20 1296:15
1297:8,15
1305:22 1306:19
1307:22 1308:22
1313:19 1314:3
1316:11 1321:22
1323:15 1326:16
1342:11,13,19
1345:3 1352:2
1354:7 1367:1,16
1367:20
**asking** 1167:21
  1179:7 1225:8
  1239:13 1263:21
  1326:19 1327:14
  1367:11,20
  1369:16,20
  1370:15
**aspect** 1153:10
  1157:8 1169:17
  1241:15 1278:17
**aspects** 1180:3
**asserted** 1225:9
**assign** 1155:12
**assigned** 1152:13
**assignment** 1155:14
**assist** 1331:2
  1332:18
**assistance** 1296:14
  1306:20 1309:17
  1348:3
**assistant** 1293:13
**assistants** 1198:13
**assisting** 1160:13
**associate** 1160:12
**associated** 1215:10
**association** 1216:11
**assume** 1255:6
**atmosphere**
  1256:13
**Attaby** 1349:4,4
**attach** 1250:1
**attached** 1246:13
  1246:20 1249:17
  1359:16
**attaches** 1235:16
**attachments**

1157:17
**attempt** 1153:7
  1221:12
**attention** 1193:12
  1200:18 1205:22
  1246:17 1259:10
  1261:7 1264:6
  1319:1 1342:22
  1343:18 1355:2,8
**attorney** 1142:16
  1142:18 1338:7
  1376:16,17
**Attorney's** 1255:3
**attractive** 1374:19
**August** 1178:1
  1186:9 1273:15
  1278:15 1281:13
  1281:21 1286:9
  1286:20 1292:9
  1293:1 1301:22
  1301:22 1321:16
  1322:7,21
**Austin** 1168:21
  1186:8 1286:20
  1287:2,7,14,16
  1288:22
**authenticity**
  1322:13
**author** 1217:18
  1341:18
**authority** 1256:9
**auto** 1224:3 1321:6
**autobiography**
  1206:7 1321:6
**automatic** 1181:8
**available** 1261:19
  1262:7 1381:20
**Avenue** 1333:14
  1345:18
**Aviera** 1297:18
  1307:12,21
  1308:4,13,15,22
  1310:3 1311:12
  1311:18
**Aviera's** 1154:4
**avoid** 1354:4,5
**aware** 1193:1
  1231:17,21
  1244:8 1247:21
  1254:9 1300:12
  1300:17,20
  1306:19 1344:1
  1347:7,10,13
  1354:15 1359:20
  1371:7
**AWOL** 1297:5

**Ayatollah** 1219:13

**B**

**B** 1236:9
**B.F** 1172:3
**baby** 1182:14
  1301:11
**back** 1145:3
  1155:21 1159:7
  1163:5 1173:8
  1176:13 1177:20
  1186:15 1194:19
  1198:3 1220:4
  1223:15 1243:6
  1245:7 1248:12
  1253:6,15 1255:2
  1261:3 1275:20
  1284:22 1285:17
  1294:6,7 1295:15
  1296:22 1297:4
  1301:10,19
  1308:18 1322:19
  1323:16 1337:14
  1342:21 1353:9
  1354:6 1356:5
  1358:2 1359:13
**background**
  1171:15 1190:2
  1207:4 1340:12
**bad** 1154:13
**badly** 1224:6,6
  1335:2
**bang** 1232:1,2
**Bar** 1149:7 1152:4
  1152:18,21,22
  1153:15 1154:20
  1155:7 1157:16
  1158:22 1162:20
  1163:6 1164:16
  1171:18 1180:9
  1180:16 1182:20
  1183:8 1193:13
  1193:17,22
  1194:1,2 1199:7
  1199:11 1222:4
  1230:22 1235:6
  1235:10,10
  1237:21 1238:2,4
  1238:21 1241:7
  1241:20 1242:13
  1245:16,16
  1246:1,12,15,17
  1250:5 1253:22
  1255:2 1256:8
  1265:2 1266:2
  1270:20,22

1285:17 1287:17
1301:15 1307:5,8
1311:6 1312:2
1313:13 1320:1
1324:9 1328:6
1331:7 1335:6
1337:7 1343:2
**Bar's** 1199:21
1266:12
**Barricades** 1213:5
**bars** 1246:4
1364:16 1365:4
**based** 1153:22
1154:7 1164:4
1168:9 1210:10
1246:2,4 1251:7
1279:13 1283:22
1341:9 1344:13
1348:11 1372:15
1375:2
**bases** 1181:11
**basically** 1159:8
1242:11 1264:13
**basis** 1163:10,11
1165:2 1166:10
1166:15 1263:7
1367:9
**Bat** 1213:21
**bath** 1182:15
1301:11
**Battle** 1318:13
1319:15
**Baxter** 1355:15,18
**Beauty** 1213:20
**began** 1300:17
1308:9
**beginning** 1246:19
1262:4 1268:2
1312:5,6 1314:18
1315:9,19 1317:5
1317:21 1320:10
1331:13,22
1333:7 1348:10
1361:18
**begins** 1195:4
**begrudgingly**
1245:7
**behalf** 1142:6,18
1143:2 1148:6
1171:7,10 1176:1
1180:14 1256:7
1271:8 1289:8
1303:13 1321:20
1323:3 1340:3,6
1375:22 1376:7
**behavior** 1209:13

1298:21
**belabor** 1201:9
1206:14
**belief** 1203:12
**believe** 1146:1
1150:11 1178:1
1188:2 1190:20
1191:1 1192:5
1196:6 1205:3
1206:20,21
1210:22 1212:4
1215:17 1223:13
1223:17 1228:2
1239:9,15
1241:22 1245:19
1252:16,18
1256:10,16
1257:5,13
1261:20 1267:8
1277:16 1286:21
1289:14 1295:1,2
1296:2,11 1298:9
1299:7 1304:17
1305:12,12
1322:2 1324:16
1325:3 1338:19
1345:1 1349:1
1361:17
**believed** 1158:15,17
1163:19,22
1169:18,19
1195:9 1205:4,21
1212:11 1218:18
1219:7,8 1220:2
1231:5,5 1298:22
**believes** 1212:16
**Beller** 1252:9
**belligerent** 1268:10
**bells** 1240:18
**Ben** 1297:9,11
**bench** 1173:12
1208:10
**benefit** 1213:8
1232:21
**Bennett** 1240:17
**best** 1187:18
1197:14,14
1231:7 1268:16
1279:3 1287:22
1288:7 1353:20
1356:6 1360:7
**better** 1170:6
1182:13 1227:12
1232:1 1268:12
1269:7 1278:14
**Beverly** 1162:13

1334:6,14
1374:18
**beyond** 1164:21
1177:1 1193:3
1197:10 1238:12
1275:5 1353:19
**bias** 1180:6 1182:18
1214:12
**biased** 1178:21
1184:8
**big** 1341:10
**binder** 1229:13
**bit** 1259:7 1293:20
1315:20 1340:11
1346:8,9
**Bivens** 1182:6
**Black** 1196:7
**blah** 1194:15,16,16
1314:10,10,10
**blame** 1336:4,9
**blamed** 1268:14
1336:4
**Blanquita** 1342:15
1342:17,20
1348:4 1350:5,7,8
1351:4 1353:21
1354:3 1355:13
1356:2,10 1358:6
1358:10 1359:5
**bleeding** 1310:12
**blog** 1223:8
**blue** 1199:12
1236:2
**BOA** 1205:6
**board** 1141:2,4
1142:1 1147:9
1152:8 1190:14
1248:20 1250:11
1258:21,22
1259:10,18
1262:7 1266:7,8
1266:10,14,15,16
1275:20 1342:5
1342:15,17
1350:9,16,21
1356:14 1357:5
1357:12 1358:21
**Board's** 1261:7
1264:6
**body** 1319:21
**Boehner** 1333:9,11
1346:3,17,18
**bono** 1194:20
1305:7
**book** 1149:12
1150:2,4,5,5

1157:17 1193:11
1195:1 1196:19
1199:7,10,12
1202:1,3,5,12
1204:20 1207:6
1208:6 1220:9
1229:9,11 1236:2
1236:8,22
1246:16,18
1249:17 1318:12
1318:20 1320:21
1321:5,6,7,10
1360:9
**books** 1202:4,7,8
1204:21 1208:7
1213:8 1215:7
1216:17 1246:15
1262:17 1266:12
1319:3
**borrow** 1339:19
**bottom** 1229:22
1285:4 1290:16
1302:10,14
1312:2 1317:10
1319:12 1320:5,9
1320:13,14
1330:13 1358:4
1374:10
**bought** 1202:2,6
**Boulevard** 1161:14
**boyfriend** 1336:16
1336:17
**BQ** 1353:1,21
1354:3,10,11,16
1355:4
**BQview** 1358:6
**branches** 1212:14
1212:17
**Brantley** 1141:22
1142:4
**breach** 1252:7
**break** 1192:16,18
1211:9,16 1228:5
1259:6 1262:9
1265:5,6 1324:11
1338:3
**breakdown**
1184:12 1296:17
1297:7 1329:5
**Brennan** 1252:6
**bribe** 1194:15
**bribes** 1337:1
**brief** 1148:1
1150:10 1155:2
1170:12 1175:4
1185:19 1189:10

1209:10 1211:1
1267:3 1275:12
1317:1 1377:12
1379:9 1380:1
**briefing** 1379:13
**briefly** 1157:22
1171:14
**bring** 1150:9
1205:19 1207:20
1230:17 1251:6
1259:10 1261:7
1264:6 1337:17
1337:22 1360:9
**broadcast** 1299:3
**Broadcaster**
1213:21
**broadcasters**
1205:5 1214:15
1219:11
**broadcasting**
1147:9 1190:14
1214:17 1342:5
1342:14,16
1350:9
**broke** 1261:16
**broken** 1327:11
**brother** 1342:2,15
1344:14 1349:19
1351:2 1353:2
**brought** 1152:8
1241:17 1242:16
1256:14 1257:12
1278:12
**brushed** 1234:3
**building** 1162:17
1270:1
**burden** 1210:15
**Bureau** 1300:14
**bureaucratic**
1344:17
**business** 1244:7
1340:16,19
**businessman**
1340:14
**buttress** 1297:21
**buy** 1195:22
1202:12 1268:17

---
**C**
---
**C** 1145:1 1236:9
**C-o-l-l-a-r-** 1186:4
**C-o-t-e-l-l-y** 1186:4
**C.S.R** 1141:22
1142:4
**cafe** 1239:10
**California** 1179:22

1190:3
**call** 1197:5 1213:18
  1241:21 1316:11
  1337:13,14
**called** 1171:7
  1173:3 1185:22
  1186:1 1206:10
  1212:5 1216:5
  1263:9 1297:17
  1316:5 1322:12
  1340:3 1341:8
  1349:1 1364:5
**calling** 1179:9
**calls** 1201:7
  1294:12
**Camden** 1162:13
**campaign** 1247:12
  1321:13
**candid** 1167:19
**capacity** 1179:21
**caption** 1150:22
**car** 1160:2 1195:22
  1223:21 1233:20
  1261:16
**care** 1244:11
  1254:19 1334:20
**cared** 1205:22
  1313:9
**career** 1178:20
**careful** 1293:11
**carefully** 1282:22
  1283:1,15
**cars** 1268:17
**case** 1150:19
  1151:7 1152:2,8
  1155:10,21
  1158:17 1159:14
  1160:20 1163:15
  1165:4,8 1166:21
  1167:16 1169:3
  1170:4,15 1173:7
  1173:13 1175:14
  1178:17 1180:7
  1184:1,2,3,6
  1186:10 1191:13
  1193:3 1195:18
  1196:5,22
  1198:11 1209:17
  1214:5,20 1216:1
  1216:16 1217:22
  1219:16 1223:19
  1225:3 1230:7
  1231:5,6 1241:12
  1242:7,10,15
  1244:9 1245:1
  1246:6 1247:7

1248:16 1251:6
1252:6,11,12
1253:13 1255:16
1261:22 1268:15
1271:9 1275:19
1276:7 1277:12
1277:13 1278:17
1280:4 1284:18
1289:16 1297:21
1304:18,19
1310:21 1312:21
1313:7 1315:16
1328:11 1332:13
1332:15 1342:20
1344:2 1346:20
1347:4 1352:6
1368:9 1373:11
1375:9 1377:18
1378:3,12
**cases** 1147:7
  1155:13,20
  1164:8 1168:22
  1170:10 1171:21
  1172:21 1178:17
  1178:22 1179:17
  1186:8 1207:17
  1248:6 1273:20
  1274:16 1276:14
  1277:15 1321:19
  1323:2 1327:15
  1327:17 1336:7
**catch** 1175:2
**cause** 1218:18
**caused** 1198:1
**cavernous** 1344:18
**cell** 1168:15
  1262:10
**centered** 1370:22
**Central** 1300:14
**certain** 1155:22
  1257:1,14 1297:4
  1367:17
**certainly** 1161:15
  1176:17 1184:10
  1195:12 1199:4
  1274:10 1294:11
  1321:16 1322:21
  1323:7 1375:8
**CFO's** 1342:16
**chain** 1341:8
**Chair** 1142:12
**CHAIRMAN**
  1145:2,8,19
  1146:10,21
  1147:15 1148:3

1148:21 1149:8
1149:11,21
1151:15,17,20
1154:22 1155:3
1156:13 1159:1
1161:6,22 1162:5
1162:7,18
1165:13,17,19
1166:7,10,15
1167:2,8 1168:14
1170:11,19,22
1175:2,5,19
1177:3,5,9,16,19
1183:4,7 1185:2,6
1186:22 1187:6
1187:15,18,21
1188:11,17,20
1189:1,8,11,14
1190:4,21
1193:16,22
1194:5 1196:15
1197:19 1199:10
1199:13,20
1200:1 1202:13
1202:17 1203:21
1204:4,12 1211:2
1211:5,15 1212:6
1212:19,22
1215:1,4,9,12,15
1215:22 1216:7,9
1216:14,21
1217:3,7,11,15
1218:1,8,11
1220:6,20 1221:4
1221:10,14,17
1223:11 1224:8
1224:20 1225:5,8
1225:15 1226:2,6
1226:9,13,16,19
1227:1,5,9,14,21
1228:9 1229:8,15
1229:19 1231:8
1231:14,16,20
1232:6,13,19
1233:14 1234:14
1235:18 1236:8
1236:11,15,19,22
1237:4 1238:10
1238:17 1242:3
1248:18 1249:8
1254:16,18
1258:11,15,18
1260:17 1261:2
1261:14 1262:1,6
1262:12,20
1263:10,22

1264:3,9,15,19
1265:3,16 1266:3
1266:6,13,21
1267:2,13,16,19
1275:14 1276:21
1277:1 1280:7,10
1280:15,18,20
1281:2,6,9,11,15
1281:19,21
1282:2,5,10,15,18
1282:21 1283:10
1283:14,20
1284:4 1285:15
1285:22 1288:18
1289:22 1290:4
1290:10,14,17,21
1291:1,6,11,19
1292:1,15,21
1295:4,18
1301:17 1302:2,5
1302:8,14,18
1303:4 1304:22
1305:16,20
1306:6,14
1307:15,18
1309:9 1313:17
1314:2,5,13,20
1315:20 1316:3,7
1316:13,17
1318:1,4 1322:14
1323:8,15,18,22
1324:10 1325:6
1326:8,16 1327:3
1327:19 1328:2
1330:5,8,11,17,22
1331:18 1332:2,6
1333:15 1337:16
1337:21 1338:3
1338:10,15,19,22
1339:4,8,14,21
1343:6,8 1344:6
1345:15 1346:13
1351:11,22
1352:10,13
1353:10 1354:6
1354:12,21
1356:15 1357:2
1357:11,18
1358:16 1361:2
1362:13,18
1364:21 1369:17
1369:21 1370:10
1370:14 1371:3
1371:10,19
1372:1,12,19
1376:5,22 1377:5

1377:10,16,21
1378:2,7,16
1379:10 1380:2,5
1380:9,15,19
1381:1,3,7,12,18
1382:1,4
**challenge** 1180:1,4
**challenging**
  1293:19 1294:6
**chance** 1189:8
  1241:2 1286:12
  1292:6 1332:4
  1337:10 1352:8
  1352:10
**changed** 1312:6
  1313:2,2 1315:18
**character** 1172:17
  1172:19 1267:15
  1267:17 1372:18
**characterization**
  1325:7
**characterize** 1227:4
**characterized**
  1182:5
**characterizing**
  1233:11 1276:16
**charge** 1242:10
  1245:18
**charged** 1147:18
**charges** 1201:22
  1235:14,16
  1236:13 1239:4
  1240:11 1241:1
  1243:11 1246:14
  1250:21 1251:1
  1260:2 1267:17
  1280:2 1379:3
**check** 1197:8
**chief** 1155:9 1156:5
  1239:11,13
**choose** 1208:14
**chosen** 1210:1
**Christ** 1206:12
  1276:22 1277:6
**Christmas** 1222:9
**Chronicles** 1206:11
**chronological**
  1220:10
**cigars** 1333:8
  1345:13 1346:6
**circumstance**
  1184:11
**circumstances**
  1233:5 1263:8
**citation** 1185:16
**civil** 1150:15

1159:16 1219:21
1241:16
**claim** 1173:10
1182:2,6 1191:18
1344:9
**claimed** 1298:21
1310:6,13 1353:4
**claiming** 1182:6
**claims** 1168:12
1186:7 1203:13
1203:14,20
1214:12 1219:18
1220:5 1276:2,5
1343:22
**clarify** 1159:20
**Clark** 1250:8
**Clay** 1142:20
1245:12
**clear** 1186:18
1191:4 1209:14
1210:2,14
1218:15 1235:4
1243:8 1247:6
1269:9 1336:14
**clearly** 1157:1
1169:12 1201:4
1227:14
**Clevenger** 1248:2
**client** 1169:20
1179:1,18
1182:19 1195:7
1241:10 1243:9
1293:2
**clients** 1173:3
1197:5 1218:17
1304:10
**clinical** 1308:11
**Clinton** 1222:18
**Clintons** 1248:7
**close** 1293:15,17
1336:19 1341:3
**close-knit** 1349:9
1349:10
**closing** 1378:16,18
1378:22 1382:2
**clothing** 1341:6,8
**Clyde's** 1228:4
1298:10 1300:18
1333:2,12
**coax** 1200:18
1214:5 1343:21
1344:8 1361:19
**Cockroaches**
1207:13
**Code** 1178:10
1244:18

**coerce** 1200:18
**cold** 1354:2
**Collar** 1186:4
**colleague** 1209:6
**colleagues** 1209:8
**collect** 1304:9,12
**Colleen** 1152:14
**college** 1171:16
**Columbia** 1141:1
1142:6
**column** 1220:19
1223:6
**columns** 1202:4,6
1213:17 1214:8
**come** 1201:4 1207:2
1234:10 1241:5
1293:22 1296:11
1296:13 1297:3
1301:19 1303:14
1303:22 1322:9
1327:10 1342:11
1344:19 1345:3
1346:2 1347:15
1348:19,20
1350:19 1364:3
1375:21
**comedy** 1207:21
**comes** 1273:2
**coming** 1145:13
1163:20 1178:15
1206:21 1219:8
1253:11 1271:14
1271:18 1277:17
1377:1
**commenced** 1250:4
**commencing**
1142:3
**comment** 1165:6
1166:16 1244:13
**comments** 1291:12
1295:17 1323:14
**commitments**
1194:10
**committee** 1142:4
1142:10 1146:12
1147:6 1238:13
1258:19 1290:8
1290:13 1377:14
1378:15
**committee's**
1183:12
**common** 1257:5
**communicate**
1168:7 1179:4,5
1188:8 1268:9
1293:20 1310:10

**communicated**
1241:4 1293:6
1325:2
**communicates**
1168:15
**communicating**
1269:13 1277:22
1325:1,20
**communication**
1156:16 1162:1
1179:14 1207:5
1231:18 1232:2
1278:10 1293:4
1294:14 1325:3
1326:13,14
1327:14
**communications**
1167:5 1254:8
1264:14 1265:2
1282:12 1299:20
1305:9 1324:5,18
1325:19
**community** 1218:16
1349:9 1350:12
1361:16 1362:7
1369:9
**companies** 1340:20
**compared** 1334:4
**compendium**
1313:15 1318:7
**compensate**
1215:20
**competency**
1147:19
**competently**
1241:10
**complaint** 1147:13
1148:14 1149:18
1150:6,14 1182:2
1182:5,7 1209:1
1237:9,14,20
1239:17,18,19,20
1240:6 1241:2,16
1241:17 1243:14
1243:20 1245:22
1247:22 1255:1,5
1257:15 1367:9
1367:11,13
1368:18
**complaints** 1219:19
**completed** 1177:21
1211:3
**completely** 1304:2
1304:11 1310:22
1311:1,3
**compliment**

1195:13
**complimentary**
1200:11 1201:19
1204:18 1205:17
1213:11 1214:1
**composed** 1209:2
**compound** 1328:1
1369:14
**concede** 1373:14
**conceivable**
1366:11
**conceive** 1288:3
**concern** 1350:14
**concerned** 1209:15
1276:6 1357:17
1362:3
**conclusion** 1164:2
1253:21 1348:19
1379:15
**condition** 1228:15
**conference** 1158:1
**conferences** 1167:5
**confidential**
1200:12 1201:20
1204:19 1205:17
1213:12
**confirm** 1157:3
**confirmation**
1294:4 1322:3
**confirmed** 1195:20
1208:12 1209:16
**confirming** 1321:8
**conflict** 1155:22
1252:1,19 1269:9
1270:2 1367:4
**confused** 1320:12
**congressmen**
1332:18
**Connecticut**
1333:13 1345:18
**connection** 1216:11
1217:12 1259:10
**Connolly** 1248:1
**consent** 1155:11
**consequences**
1354:5
**consequently**
1219:13 1353:4
**conservative**
1164:9 1167:1
**conservatives**
1164:8 1212:15
**consider** 1256:19
1268:4 1297:5
1370:2
**consideration**

1249:4
**considerations**
1249:5
**considered** 1239:3
1354:15
**consist** 1146:14
**consistent** 1234:20
1247:19 1275:2
1284:15 1285:13
1308:12
**constantly** 1193:1
**Constitutional**
1182:7
**consult** 1307:14
**consulted** 1363:14
**consulting** 1340:20
**contact** 1146:4
1156:22 1184:18
1193:2 1201:10
1201:10 1239:14
1243:18 1255:14
1285:10 1325:15
1335:7
**contacted** 1201:11
1255:14
**contacts** 1231:11
**content** 1322:13
**context** 1158:3
1165:4,8 1169:9
1239:6 1248:19
1248:19 1271:4
1271:12 1301:20
1305:8,17 1306:4
1306:7 1329:2
1337:11
**continuance** 1231:1
**continue** 1196:15
1249:6 1274:19
1275:17 1276:3
1284:5 1285:4,5,6
**continued** 1143:1
1148:5 1180:13
1205:6 1221:8,11
1221:12 1296:4
1327:15
**continuing** 1198:22
1277:12
**contradictory**
1201:16
**contrary** 1310:20
**contributions**
1247:12,13
**control** 1202:21
1247:9 1253:21
1271:22 1284:7
1335:9

In Re: Larry E. Klayman
June 26, 2018

**convalescence**
  1198:14
**conversation**
  1176:3
**conversations**
  1166:17
**convey** 1195:6,14
  1300:22 1305:14
  1305:18
**convince** 1308:18
**convinced** 1260:9
  1349:22
**cooperation**
  1381:17
**copied** 1252:12
  1288:4 1355:13
**copies** 1202:3
  1252:13 1339:18
  1339:19
**copy** 1226:6
  1339:17
**cordial** 1253:20
**corner** 1162:12
**correct** 1162:22
  1176:11 1177:18
  1181:21 1190:19
  1199:22 1205:14
  1209:8 1215:8
  1216:10,13,19,19
  1218:6 1223:17
  1226:20,22
  1231:10,13,15
  1236:14,21
  1268:5,6 1269:4
  1269:10,19
  1270:18 1271:11
  1271:13 1273:16
  1279:7 1280:11
  1281:13,19,22
  1282:1,8 1286:11
  1286:20 1287:3
  1287:15 1293:2
  1294:10,22
  1308:6 1309:20
  1312:21 1318:9
  1318:10,18
  1321:20 1322:9
  1322:15 1323:3
  1325:16 1328:11
  1332:13 1343:15
  1351:11 1352:15
  1352:18 1356:20
  1358:7 1359:22
  1360:13 1361:5
  1361:13 1365:11
  1373:16 1375:15

1375:19
**correctly** 1276:16
**correspondence**
  1193:21 1230:21
  1274:14 1278:16
  1292:9 1321:18
  1323:1 1324:19
  1336:15 1375:14
**Corsi** 1216:5
**costing** 1257:8,9
**costly** 1245:2
**costs** 1302:21
  1303:6 1305:3
  1306:3
**Council** 1209:2,2
**counsel** 1145:7
  1149:7 1163:6
  1175:8 1187:1
  1230:22 1235:6
  1241:20 1242:13
  1245:16,16
  1246:12 1250:5
  1253:22 1255:2
  1256:8 1262:20
  1262:22 1265:2
  1267:4 1268:5,13
  1272:9,14 1298:8
  1307:2,10
  1331:11 1360:20
  1363:1 1377:13
**Counsel's** 1152:21
  1157:16 1220:9
  1222:5 1237:21
  1241:8 1246:15
  1246:18 1343:2
  1373:22
**counseling** 1297:16
**count** 1192:8
  1260:1,2,4,6,7
**country** 1246:1
**counts** 1182:8
  1184:1 1379:1,4
**couple** 1347:2
**course** 1146:17
  1161:11 1184:9
  1192:16,18
  1196:4 1271:22
  1273:1 1315:15
**court** 1141:1
  1142:5 1145:20
  1147:12 1149:18
  1150:16 1151:8
  1152:2 1156:6
  1159:15 1175:13
  1178:22 1219:21
  1241:17 1252:12

1276:8 1278:19
  1322:20 1338:8
**court's** 1181:20
  1187:9
**courthouse** 1180:12
  1190:6 1209:3
**courtroom** 1165:7
**courts** 1222:11
**cousin** 1190:10
  1201:6 1239:22
  1272:1
**covered** 1260:1
**CPA** 1171:18
**crashed** 1223:21
**create** 1164:1
  1294:2
**created** 1214:17
  1257:10
**credibility** 1169:10
  1267:18,20
  1323:11
**crime** 1195:10
**criminal** 1196:7
**critical** 1203:1
**criticism** 1300:8
**criticize** 1291:18
**criticized** 1310:6
**cross** 1144:2
  1327:20
**cross-examination**
  1158:14 1175:8
  1177:2 1184:7
  1260:12 1261:18
  1266:18 1267:4
  1363:1 1372:20
  1378:5,9 1380:13
  1380:16 1381:8
  1381:14
**cross-references**
  1318:20
**cruel** 1354:2
**cry** 1227:19
**crying** 1296:7
**Cullum** 1342:15
  1348:4 1350:6,7,8
  1351:4,5 1353:21
  1354:3 1358:7
**current** 1364:15
**cursory** 1374:6
**cut** 1304:20,21

―――――――――――――
       **D**
―――――――――――――
**D** 1144:1 1145:1
  1235:22 1236:3,9
  1236:11 1246:18
  1249:17 1343:1,2

**D-7** 1152:18
**D-a-s-h** 1145:21
**D-a-s-h-t-a-r-a**
  1339:7
**D-o-r-s-e-y** 1360:19
**d-o-t-t-e-r** 1230:10
**D.C** 1151:8 1342:9
  1349:12
**D1** 1235:9,10
**D24** 1343:6
**D27** 1280:15,16
**D6** 1152:4
**dad** 1340:13
**damages** 1258:4
**Dan** 1168:21
  1186:8 1286:20
  1288:22
**dash** 1144:5
  1145:16,21
  1217:9 1247:1
  1261:15 1263:7
  1263:19 1285:21
  1333:5 1337:14
  1337:18 1338:18
  1338:20 1339:20
  1340:8 1341:6
  1343:11 1352:21
  1360:19 1361:14
  1363:3
**Dash's** 1244:21
  1263:5 1341:8
  1370:4
**Dashtara** 1144:5
  1339:6 1340:2,10
**date** 1187:9
  1192:19 1200:20
  1218:5 1228:3
  1231:9 1242:2
  1271:7 1298:7
  1311:9
**dated** 1153:2
  1204:1 1212:5
  1224:14 1258:17
  1273:15 1281:21
  1286:8,20 1292:9
  1307:12 1308:4
  1311:10 1375:19
**daughter** 1230:11
**David** 1160:22
  1247:22 1280:16
**day** 1160:2 1187:4
  1189:16,17
  1193:20 1194:3
  1205:10 1224:3
  1228:16 1232:3
  1241:21 1356:6

**days** 1154:13
  1156:15 1160:6
  1167:4 1190:18
  1191:1,5 1208:10
  1220:14,16
  1222:21 1245:8
  1361:6,7 1381:13
**DC** 1141:9 1142:2
  1142:18 1160:7
  1197:12 1238:2
  1240:6,7 1353:17
**deadline** 1188:3,4
**deal** 1195:16
  1222:18 1265:1,3
  1266:17 1344:16
  1369:12
**dealing** 1148:18
  1186:14 1227:3
  1245:3 1247:4
  1272:19 1315:12
**deals** 1199:1
**dealt** 1182:11
**death** 1253:5
**decade** 1341:2
**deceased** 1247:3
**December** 1183:8
  1188:21 1200:6
  1200:10,21
  1222:8 1223:22
  1239:5 1343:16
**decide** 1196:12
  1335:19 1349:16
  1351:3
**decided** 1153:11
  1245:13
**decision** 1254:5
  1278:19
**decision-making**
  1222:21
**decisions** 1242:12
**declaration** 1343:8
  1365:10 1366:8
  1369:11
**deep** 1227:18
  1304:2 1335:1
**deeply** 1334:20
**defamation** 1258:2
**defamed** 1216:4
**defendant** 1150:21
**defendants** 1150:20
  1156:2 1181:17
**Defense** 1236:12
**Defenses** 1235:14
**defer** 1254:3
**delay** 1258:21
  1259:1,2 1357:5

demeanor 1158:10
1158:11,12
dementia 1358:14
Denial 1154:21
denied 1163:11
1188:12 1256:2
1275:22
denies 1235:15
denominated
1146:15 1236:11
denomination
1229:17
denying 1153:3,16
1159:6 1175:14
1181:2 1183:19
Department
1191:10
depends 1364:19
1381:10,17
deposition 1252:10
depression 1227:18
1329:4
depth 1348:2
Deputy 1242:13
describe 1334:21
descriptions
1259:13
deserve 1302:21
Designers 1341:6,9
desire 1312:10
1375:22
desires 1273:6
despite 1188:7
1202:22 1231:7
1327:13
destroyed 1164:20
1248:7
detail 1163:16
detailed 1163:16
determined 1163:8
1163:14
determines 1299:19
developed 1310:12
die 1230:19
died 1230:7
1234:10
difference 1283:2
1283:20 1284:2
different 1164:14
1199:7 1208:14
1236:6 1257:4
1264:13 1280:4
1340:19 1344:14
1371:11
difficult 1164:11
1168:6 1179:4

1187:22 1268:10
1289:18 1298:19
1324:22 1344:16
difficulty 1166:20
1299:10,13
dignity 1257:6
dine 1364:6,9
dinner 1228:4
direct 1144:2
1148:5 1171:10
1180:13 1288:22
1324:5,17
1326:14 1334:3
1340:6
directed 1287:13,14
directing 1270:17
1287:2
directly 1207:3
1294:6,7 1325:21
1335:13 1337:4
disagree 1380:10
disagrees 1283:6
discarded 1240:2
discharging 1279:6
disciplinary
1142:18 1145:7
1175:8 1220:9
1245:16 1247:5
1262:20,22
1267:4 1307:1,10
1363:1 1373:22
disclose 1329:3
disclosed 1329:6,8
disconnected
1319:20
discord 1294:2
discounted 1159:10
discovery 1158:2,6
1184:8 1309:5
1364:20
discrimination
1173:10 1214:13
1348:17
discuss 1192:22
1262:1 1320:21
1328:10 1332:12
1368:9 1379:12
discussed 1173:7
1174:1 1321:15
1322:21 1344:2
1352:18
discussing 1334:2
discussion 1177:17
discussions 1165:15
1165:22 1381:15
disliked 1166:22

dislikes 1166:22
dismiss 1168:22
1181:16 1182:3
1184:6 1276:14
1277:11,14
1287:3,14
dismissal 1181:20
1276:1
dismissals 1284:7
dismissed 1182:1,9
1186:10 1240:7
1244:9 1246:2
1247:7 1248:3
1253:2,9 1273:19
1274:15 1275:19
1276:5 1284:8
disorder 1296:9
dispatched 1361:4
disqualification
1163:1 1180:11
1181:3,8 1209:1
disqualified
1167:22
disqualify 1166:2,5
1166:12,14
1167:9 1170:3
1177:17
disrespect 1207:14
1228:18
disrespectful
1268:10 1291:9
dissenting 1321:2
distance 1145:13
distinguished
1178:20
distraught 1357:16
distress 1257:9,11
district 1141:1
1142:6 1152:2
1175:13 1258:3
divorced 1349:6,6
Docket 1141:4
dockets 1351:18
doctor 1297:9,17
1357:6
doctors 1154:17
1176:7 1234:1
1308:15
document 1148:15
1153:20 1157:16
1162:1 1163:4
1187:1,10
1192:13 1229:16
1254:10,22
1269:15 1271:5
1273:13 1274:11

1276:11 1286:16
1287:21 1292:7
1292:19 1306:21
1308:21 1309:13
1312:4 1315:5
1328:14 1332:5
1332:20 1337:12
1361:1 1366:21
1367:7,17 1368:5
1370:16,19
1371:7
documentation
1148:2 1169:3
1240:10 1241:18
1242:2 1246:22
1248:7 1255:11
documented 1357:7
documents 1146:13
1146:16 1160:11
1168:8 1186:13
1235:2 1237:5
1240:1,2,4,13
1254:19 1256:4
1258:6 1259:13
1259:13,14,15
1263:6 1264:5
1269:14 1276:15
1283:17 1298:4
1351:21
dog 1236:4 1334:13
1334:13
doing 1162:14
1194:20 1223:5
1230:15 1263:4
1291:11 1299:2
1303:17 1305:7
1310:9 1319:2
1334:6 1350:2
1354:4 1379:8
dollars 1303:1
domains 1315:11
donate 1247:11
door 1370:3
dotter 1230:10
doubt 1172:18
1191:13
dovetailing 1248:14
downstairs 1337:22
1377:9
Dr 1154:4 1297:18
1297:19 1308:4
1308:13,15,21
1310:3 1311:17
draft 1240:11,13
1280:3 1366:8
drain 1280:1

drama 1230:12
1231:1
dramatizing 1230:4
draw 1179:22
1193:12
drinking 1346:8
drive 1222:14
drop 1186:8
DS-25 1212:7
DSX23-27 1212:22
DSX23-41 1218:9
1220:12
DSX27 1212:20
dual 1223:6
due 1146:17 1246:9
1256:2 1291:5
duly 1171:8 1340:4
dumped 1293:2,14
1294:5
duplicative 1151:22
DX1 1235:19
DX10 1156:13
DX12 1155:4
DX27 1280:17,18
1280:19 1282:22
DX27-1 1281:3,6

─────── E ───────

E 1141:5 1142:2
1143:10 1144:1
1145:1,1 1261:1,1
earlier 1224:2
1230:3 1235:3
1243:11 1255:19
1259:2 1272:8
1274:19 1353:14
1369:5
early 1171:21
1186:8 1254:10
1300:18 1317:21
1357:13 1358:1
easier 1229:14
1343:1 1380:8
easily 1357:16
easy 1320:20
economically
1233:22
edge 1357:6
editorial 1186:21
1323:14
editorialize 1203:18
editorializing
1275:7,8 1295:14
1372:14
educational
1171:15

effect 1244:15
    1255:15 1288:12
    1328:17 1335:14
    1335:15
efforts 1303:22
    1361:15 1362:1
eight 1156:15
    1160:6 1176:10
    1223:19 1233:17
    1233:21 1234:13
    1246:8 1253:3
    1278:11,13
eight-day 1156:17
either 1208:21
    1233:12 1278:7
    1294:16 1381:16
elaborating 1159:7
electronic 1252:14
electronically
    1160:11
Elham 1155:8
    1156:12 1173:3
    1175:13 1187:3
    1189:21 1333:19
    1333:19 1360:5
    1360:16 1374:13
Elizabeth 1242:12
Ellie 1196:22
    1273:16 1286:9
    1292:10 1302:17
    1359:4
else's 1278:5
email 1143:8
    1146:4 1192:1
    1194:7 1196:21
    1198:9 1201:8
    1229:7,22 1230:5
    1231:9,17,21
    1239:5 1271:16
    1274:13 1276:13
    1278:7,15
    1280:10 1281:2
    1281:18 1282:6
    1286:8,13 1292:8
    1294:9,17 1295:9
    1302:9,9 1327:5,7
    1335:12,15
    1351:20 1352:22
    1353:6,15,15
    1355:2,9,11,14,22
    1356:10,22
    1357:3,4 1358:5,6
    1358:12,17
    1359:3,12,16
    1360:1,3,4,6,15
    1360:16 1361:3

emailed 1288:5
    1352:15
emails 1146:2
    1193:9 1228:22
    1233:6 1248:8
    1255:15 1256:1
    1263:8 1283:11
    1283:16 1294:13
    1296:5 1301:22
    1305:5 1337:4
    1351:19 1352:1
    1355:2 1372:5
    1373:4
Emerging 1214:12
emotional 1154:14
    1245:4 1257:9
    1269:9 1270:2
    1296:16 1327:9
emotionally
    1164:21
emotions 1375:1,18
empathy 1170:8
emphasize 1147:17
employed 1351:2
encapsulate
    1183:21
enclosed 1345:10
Encounter 1318:13
    1319:15
encounters 1203:6
    1347:21
endeavored
    1306:21
ended 1177:20
engage 1335:7
engagement 1221:6
English 1157:2
    1271:14,15
    1278:5 1287:12
    1299:11,13,15,20
    1299:22 1300:5
    1300:14,15,21
    1327:11
enlightened
    1208:16
enlist 1346:21
ensue 1261:21
enter 1206:3
    1264:12
entered 1201:1
    1265:15,19
entertainment
    1162:14
entire 1237:20
    1266:16 1275:19

1347:14 1368:4
entities 1164:9
entitled 1165:3,8
    1247:11
equate 1334:12
equating 1196:5
equivalent 1197:8
erred 1163:18
error 1182:4
    1194:6
errors 1154:1
    1163:9 1181:22
    1300:2
especially 1303:7
    1350:11
Esquire 1142:11,15
    1142:20 1143:3
    1143:10 1216:3
essentially 1205:15
Establishment
    1202:20 1318:15
    1321:1
Establishment.'
    1203:8
estimate 1245:8
ethical 1172:9,14
ethics 1250:10
evaluation 1308:16
evening 1230:2
    1300:18 1377:6
event 1214:5
events 1364:15
everybody 1211:11
    1222:20 1227:20
everybody's 1279:9
    1330:8
everyone's 1197:18
evidence 1151:9,13
    1152:6 1153:14
    1153:21 1154:3,6
    1154:19 1156:10
    1158:19 1159:19
    1174:11 1183:11
    1183:19 1184:6
    1201:1 1234:9
    1246:15,19
    1249:22 1253:16
    1259:21 1260:10
    1295:19 1351:9
    1362:16 1379:3
evidentiary
    1154:10 1174:3
    1174:20 1176:19
    1184:4,5 1260:11
Evil 1329:22
exact 1242:1

1334:18
exactly 1160:8
    1237:16 1343:7
    1369:20
examination 1148:5
    1154:5 1171:10
    1176:1 1180:13
    1211:18 1231:10
    1340:6 1376:7
examined 1171:8
    1178:2 1340:4
example 1182:17
    1194:18 1319:16
    1362:8 1365:5,9
exchanges 1295:9
exchanging 1373:3
excuse 1148:16
    1184:16,17
    1195:2 1329:22
    1333:1 1347:9
    1352:9 1365:1
    1366:6
excused 1177:13
    1377:5,7
executed 1237:5
exercise 1245:20
    1249:14
exercised 1256:8
exhibit 1146:1,7
    1147:14 1148:9
    1148:20,20,22
    1149:3,5,10
    1150:4,5,5,17
    1151:5,13 1152:4
    1152:18 1153:15
    1154:19,20
    1155:7 1156:9,11
    1157:13,14,17
    1158:18,22
    1162:20 1163:6,6
    1180:17,18
    1181:19 1182:20
    1183:6,10,16,18
    1185:11,15,17
    1188:16 1189:12
    1193:13,17
    1198:6 1199:7,8
    1199:12,14,15,21
    1200:3 1204:4
    1207:11 1217:14
    1220:9 1221:13
    1222:4 1223:15
    1228:21 1229:6
    1235:9,10 1236:2
    1236:3,6 1237:11
    1237:11 1238:7

1238:21 1249:17
    1249:17 1254:12
    1258:14 1259:9
    1262:17 1264:12
    1264:17 1265:8,8
    1265:9,9,10,10
    1267:9 1268:22
    1269:3 1270:20
    1270:22 1271:16
    1273:1,11 1274:1
    1274:2,3 1279:1
    1281:5 1285:18
    1286:6 1287:17
    1291:16 1292:5
    1301:15 1307:2,5
    1307:8,11 1311:6
    1312:2 1313:13
    1313:18,22
    1317:6 1320:1
    1324:9 1326:5,9
    1328:7 1329:19
    1331:7 1336:22
    1337:8 1339:17
    1343:1,2,3 1351:8
    1351:13,15
    1362:16 1373:18
    1373:20,21,22
exhibits 1149:6
    1150:3,4 1183:9
    1185:12 1199:21
    1222:5 1228:21
    1229:4,13 1233:8
    1239:8 1240:14
    1240:15 1246:16
    1249:18 1258:8
    1261:6 1262:16
    1262:18 1263:2
    1263:12,13
    1265:13 1275:18
    1298:6 1299:21
    1343:2,3 1351:18
existent 1228:16
expect 1195:16
    1253:19 1259:20
    1378:20
expeditiously
    1156:14
expense 1194:12
    1257:10 1303:13
    1304:17
expenses 1194:19
    1198:21 1268:16
    1302:22 1303:6
    1305:3 1306:3
experience 1154:1
    1166:21 1170:10

1197:4 1206:4
1228:5,13
1234:22
**experiences**
1206:15
**experiencing**
1295:22 1327:8
**expert** 1240:16
1241:3
**explain** 1232:12
1234:21 1284:3
1347:22
**explained** 1235:2
1314:18 1315:9
**explanation** 1303:5
**explore** 1295:8
**express** 1299:15,16
1300:4
**expressed** 1373:4
1374:22 1376:1
**expressing** 1299:10
1299:13 1372:8
**extensive** 1157:16
**extent** 1146:17
1147:17 1238:14
1268:11
**extrajudicial**
1182:18
**extreme** 1159:11
**extremely** 1200:11
1201:19 1208:16
1213:22
**eyes** 1227:12

**F**

**F** 1261:1
**facilitate** 1338:4
**facsimile** 1311:10
**fact** 1154:2 1161:17
1163:11 1165:2
1166:21 1178:14
1180:9 1199:1
1212:17 1237:22
1247:4 1250:8
1252:10,11
1255:16 1273:4
1274:22 1276:1
1289:13 1309:4
1310:19 1326:7
1327:5,13
1336:14 1341:4
1347:5 1349:19
1353:1 1375:2
**factors** 1164:6
1268:20 1310:14
**facts** 1163:14,15

1164:1 1173:6
1176:4,17 1225:9
1250:1 1332:15
**factual** 1163:8
1263:7
**fade** 1223:20
**faded** 1256:4
**fair** 1174:17 1295:5
1332:6 1336:9
1342:7 1372:1,20
1378:7,8
**fairest** 1174:19
1176:22
**fairly** 1211:7
1257:7
**fairness** 1246:11
1252:21
**Falahati** 1147:8
1150:8,22 1219:9
1220:2 1234:7
1235:5 1271:10
1284:11,12,15
1293:22 1309:20
1328:20
**Falahati's** 1298:21
**fall** 1334:16
**false** 1310:22,22
1311:1,2,3 1312:9
**familiar** 1318:7
**families** 1349:12
**family** 1154:18
1197:11 1219:6
1340:12 1341:1
1342:8,8 1361:15
**famous** 1196:5
**far** 1209:15
1266:17 1276:6
1373:13
**Farah** 1216:5
**Farsi** 1310:11,11
**Fascinating** 1203:6
1318:13 1319:14
**fast** 1215:3
**father** 1219:11
1341:3,5
**fathers** 1208:15
**fault** 1336:5
**favor** 1153:8
1170:8
**favorable** 1214:6
**FBI** 1219:4,5,5,14
**fearless** 1299:6
**February** 1298:1
1308:5 1317:22
1345:1 1355:3
1357:13 1358:2

1359:3 1361:3,6
**federal** 1150:16
1151:7 1159:15
1180:7 1209:16
**fee** 1184:19 1260:8
**feel** 1201:14
1243:18 1256:1
**feeling** 1268:8
**feelings** 1195:7,9
1337:5 1374:4
**fell** 1196:8
**felt** 1153:22 1154:6
1158:9 1169:18
1197:16 1224:6,6
1234:8 1249:13
1256:18,19
1268:12 1270:6
1298:17
**Fifteen** 1330:14
**fight** 1203:8
1289:19 1318:15
1320:22
**Fighter** 1206:11
**Fighting** 1213:22
**figure** 1364:18
**file** 1154:14
1166:14 1178:12
1188:4 1190:8
1208:22 1240:1
1271:9 1309:5
**filed** 1147:13
1148:14 1150:6,8
1151:6 1152:10
1153:19 1155:14
1156:14,14
1159:5 1167:18
1178:9 1179:1
1181:17 1184:15
1185:7,22 1186:3
1188:14,18
1189:16 1191:5
1219:19 1239:20
1247:22 1252:6
1257:15 1284:12
1284:14 1298:6
1321:19 1323:3
**files** 1273:2 1278:13
1315:11 1355:11
**filing** 1160:6,10
1165:13,17
1167:8 1169:5
1184:19 1192:6
1237:22 1238:5
1243:20 1252:14
**final** 1192:9 1222:6
1223:22 1357:4

**finally** 1233:18
1250:22
**financial** 1198:1
**find** 1172:9 1184:22
1185:11 1192:17
1199:4 1258:21
1258:22 1288:4
1294:18 1304:1
1306:21 1360:9
**finding** 1192:13
1259:1 1379:11
1379:12,21
**fine** 1146:10
1149:10 1207:15
1210:6,8,18
1220:20 1291:21
1338:14 1356:17
1381:22
**fingers** 1192:9
**finish** 1168:17
1211:6,7,22
1275:4,11,12
1276:19 1292:7
1296:20
**finished** 1212:4
1223:12
**fired** 1163:2
1300:16
**firm** 1248:1 1252:5
**firmly** 1220:1
**first** 1148:17
1149:13 1153:7
1165:8 1171:8
1193:13,15
1194:3 1200:16
1212:1 1213:15
1228:16 1239:5
1240:16 1243:7
1258:7,8 1260:7
1269:2,4 1273:14
1273:18 1278:21
1283:12 1293:7
1296:13,22
1298:9 1302:8
1306:19 1308:9
1312:22 1317:4
1327:6 1330:19
1339:7 1340:4
1345:2 1352:20
1366:8
**FITCH** 1142:11
1145:2,8,19
1146:10,21
1147:15 1148:3
1148:21 1149:8
1149:11,21

1151:15,17,20
1154:22 1155:3
1156:13 1159:1
1161:6,22 1162:5
1162:7,18
1165:13,17,19
1166:7,10,15
1167:2,8 1168:14
1170:11,19,22
1175:2,5,19
1177:3,5,9,16,19
1183:4,7 1185:2,6
1186:22 1187:6
1187:15,18,21
1188:11,17,20
1189:1,8,11,14
1190:4,21
1193:16,22
1194:5 1196:15
1197:19 1199:10
1199:13,20
1200:1 1202:13
1202:17 1203:21
1204:4,12 1211:2
1211:5,15 1212:6
1212:19,22
1215:1,4,9,12,15
1215:22 1216:7,9
1216:14,21
1217:3,7,11,15
1218:1,8,11
1220:6,20 1221:4
1221:10,14,17
1223:11 1224:8
1224:20 1225:5,8
1225:15 1226:2,6
1226:9,13,16,19
1227:1,5,9,14,21
1228:9 1229:8,15
1229:19 1231:8
1231:14,16,20
1232:6,13,19
1233:14 1234:14
1235:18 1236:8
1236:11,15,19,22
1237:4 1238:10
1238:17 1242:3
1248:18 1249:8
1254:16,18
1258:11,15,18
1260:17 1261:2
1261:14 1262:1,6
1262:12,20
1263:10,22
1264:3,9,15,19
1265:3,16 1266:3

In Re: Larry E. Klayman
June 26, 2018

1266:6,13,21
1267:2,13,16,19
1275:14 1276:21
1277:1 1280:7,10
1280:15,18,20
1281:2,6,9,11,15
1281:19,21
1282:2,5,10,15,18
1282:21 1283:10
1283:14,20
1284:4 1285:15
1285:22 1288:18
1289:22 1290:4
1290:10,14,17,21
1291:1,6,11,19
1292:1,15,21
1295:4,18
1301:17 1302:2,5
1302:8,14,18
1303:4 1304:22
1305:16,20
1306:6,14
1307:15,18
1309:9 1313:17
1314:2,5,13,20
1315:20 1316:3,7
1316:13,17
1318:1,4 1322:14
1323:8,15,18,22
1324:10 1325:6
1326:8,16 1327:3
1327:19 1328:2
1330:5,8,11,17,22
1331:18 1332:2,6
1333:15 1337:16
1337:21 1338:3
1338:10,15,19,22
1339:4,8,14,21
1343:6,8 1344:6
1345:15 1346:13
1351:11,22
1352:10,13
1353:10 1354:6
1354:12,21
1356:15 1357:2
1357:11,18
1358:16 1361:2
1362:13,18
1364:21 1369:17
1369:21 1370:10
1370:14 1371:3
1371:10,19
1372:1,12,19
1376:5,22 1377:5
1377:10,16,21
1378:2,7,16

1379:10 1380:2,5
1380:9,15,19
1381:1,3,7,12,18
1382:1,4
**five** 1209:12
1220:12 1224:15
1226:18 1232:15
1234:16,18
1249:19,21
1264:15 1320:12
1320:13,16
1363:12 1368:3
**flexibility** 1378:19
**flip** 1313:14
1374:20
**flipped** 1314:1
**flipping** 1355:8
**Florida** 1143:6
1238:5 1240:6
1244:9 1246:7
1247:4 1253:2
1258:4 1265:22
1266:2
**flurry** 1220:17
**focus** 1233:21
1248:11
**fold** 1230:17
**follow** 1191:19
1285:16
**followed** 1273:19
1274:15
**Follower** 1206:12
**follows** 1171:9
1340:5
**forces** 1206:18
**foreigners** 1301:6
**forgot** 1189:20
1218:22
**form** 1336:9
**forth** 1163:5
1257:14
**Forty** 1149:19
**forward** 1159:17
1184:1 1253:17
1254:5
**forwarded** 1355:12
1357:1 1360:6,17
**forwarding**
1359:13
**found** 1146:2
1172:14 1201:4
1207:22 1232:4
1255:20,20
1271:22 1311:18
1314:5
**founded** 1341:6,7

**founding** 1208:15
**four** 1262:17
1320:5,9 1379:1
**four-count** 1260:2
**fourth** 1260:5
1302:19
**Fox** 1245:17
1246:13,21
1247:8 1249:14
1250:12,22
1251:3,20,22
1252:14 1256:8
**frankly** 1224:7
**Fred** 1151:10
**Frederick** 1143:3,4
**free** 1213:22 1218:6
1218:12 1243:18
1270:10
**freedom** 1205:4
1206:11 1213:14
1218:19 1350:13
1362:5
**Freedom-Loving**
1213:20
**French** 1347:18
**frequently** 1165:4
1321:5,9
**Friday** 1220:19
1223:7 1280:11
1280:21 1282:6
1382:6
**friend** 1196:1,7
1197:12 1250:9
1256:19 1268:18
1297:8,15
1341:14 1342:14
1342:20 1348:5
1354:16 1355:18
1360:7 1363:14
1364:4 1369:12
**friendly** 1347:3
**friends** 1154:18
1207:16 1209:3
1218:16 1219:6
1256:15 1257:3
1341:3,22
1375:20
**friendship** 1228:8
1335:1 1336:19
1364:19
**front** 1158:8
1166:19 1281:3
1284:9 1312:22
1343:2 1363:6
1373:19
**fsujat@yahoo.com**

1143:8
**full** 1194:13
1209:12 1339:5
1340:9,20
**funny** 1208:1
**further** 1174:22
1175:16,18
1177:4 1204:10
1219:16 1284:9
1293:12 1320:17
1324:5,17
1362:14 1376:3
1376:19 1377:20
1378:9 1379:5
**future** 1179:20
1257:22

---

**G**

**G** 1145:1
**gender** 1256:12
**general** 1162:3
1246:10 1299:8
1352:1 1360:19
1379:2
**generally** 1166:22
1179:10 1240:4
1268:11 1298:15
1303:12
**gentleman** 1242:16
1349:3
**George** 1250:8
**Georgetown**
1298:11 1345:16
**getting** 1156:22
1167:13 1168:10
1179:11 1201:3
1201:15 1247:15
1252:13 1268:4
1278:3,4
**girl** 1313:9
**girlfriend** 1336:18
**gist** 1255:6
**give** 1146:8,9
1148:3 1153:9
1154:22 1164:18
1164:19 1171:1
1184:13 1185:15
1189:8 1208:11
1208:19 1221:2
1239:19 1243:20
1244:19 1245:9
1249:12 1262:3
1266:22 1277:8
1308:18 1339:11
**given** 1155:22
1170:9 1174:2,7

1263:3,5 1343:19
1344:7
**giving** 1190:11
1275:8
**glass** 1187:12
**glimpse** 1359:19
**Gloria** 1256:19
**go** 1147:10,21
1149:6,9 1150:3
1161:6 1163:13
1168:14 1169:1
1169:21 1178:21
1180:11 1182:3
1184:1 1186:15
1189:1 1194:13
1195:2 1197:19
1199:13 1203:21
1211:10 1212:19
1218:11 1223:15
1225:18 1230:8
1232:6 1234:12
1238:19 1241:19
1249:13 1253:6
1254:5 1264:22
1269:6 1275:14
1277:1 1278:16
1280:1 1284:4,22
1285:17,22
1291:13 1295:6
1301:13,20
1302:4 1313:6
1318:2,5 1324:2
1337:3,15,22
1338:15 1346:18
1347:1 1352:13
1354:13 1356:12
1357:19 1375:2
1381:14
**goalpost** 1243:6
**goalposts** 1251:5
**God** 1206:22
1207:4 1208:16
1208:18
**goes** 1177:1
1213:21 1267:20
**going** 1147:21
1148:1 1159:17
1169:12 1180:17
1183:15 1189:4
1197:19,21
1198:20,20
1202:9 1203:5
1209:4 1210:5
1211:6,7 1212:2
1215:2 1218:21
1219:22 1222:3

In Re: Larry E. Klayman
June 26, 2018

1224:8,17,18
1226:14,17
1227:18 1230:18
1230:19 1232:8
1233:13 1234:10
1240:20 1248:10
1248:12 1249:8
1253:15,17,22
1254:16,18,19
1255:3,6 1259:6
1259:12 1261:22
1267:1 1268:15
1281:1 1283:4,12
1289:10,15
1294:18 1296:21
1297:1,16
1298:18 1300:10
1300:16 1301:19
1301:20 1302:1
1303:14,17
1318:20 1322:5
1322:15 1328:20
1329:2 1333:5
1342:21 1344:11
1351:7 1354:6
1355:1 1358:11
1367:10 1370:2
1370:13 1375:14
1378:5 1379:20
1380:21 1381:9
1381:12
**good** 1145:2
1163:21 1172:15
1172:17 1175:10
1175:11 1189:19
1190:11 1191:7
1207:4 1209:13
1222:15 1256:15
1257:3 1265:21
1267:6,7 1291:11
1297:11 1299:15
1310:11 1324:11
1326:21 1341:22
1347:6 1363:3,4
**GOP** 1202:21
**gotten** 1154:7
1191:16 1256:20
1271:21 1288:12
1336:8
**government**
1158:11,15
1159:10 1173:5
1191:2 1212:15
1212:17 1213:20
1214:6 1327:16
**governor** 1350:8

1358:21
**governors** 1147:9
1152:8,9 1190:14
1275:20 1342:5
1342:17,18
1350:9,16,22
1356:14
**grammatical**
1300:2
**grandmother**
1358:14
**grandmother's**
1358:13
**grant** 1158:3
1297:1
**granted** 1184:10
**granting** 1164:13
**great** 1163:16,16
1177:9 1222:18
1268:11 1288:9
1369:9
**Ground** 1329:22
**grounds** 1159:9
**group** 1216:11
1220:7
**guess** 1181:12
1187:19 1298:5
1362:14
**guy** 1224:21
1297:11 1356:11
1358:12

_____
**H**

**H** 1142:20
**half** 1378:19
1381:15
**Hamilton** 1245:17
1246:13 1252:14
**hand** 1296:7 1339:9
**handle** 1327:18
**hands** 1242:18
1353:4 1354:9
**handwriting** 1186:3
1237:17 1278:4
**hang** 1364:11,16
1365:4,7
**hanging** 1364:13
**happen** 1194:17
1195:15 1206:1
1206:19 1209:6
1293:18
**happened** 1156:1
1216:3 1228:6
1233:17 1266:9
1298:14 1355:4
1374:21

**happens** 1196:13
1334:19,19
1379:16,17
**happily** 1349:4
**happy** 1206:14
1268:19 1321:21
**harassed** 1170:7
1173:4 1176:4
1213:21 1309:19
**harasser** 1150:7
1219:8 1271:10
1285:2
**harassment** 1173:6
1203:13,20
1271:9 1310:15
1348:17
**hard** 1195:11
1362:9
**harder** 1195:19
**harm** 1293:11
**head** 1242:19
1357:10
**heading** 1311:16
**health** 1306:20
**hear** 1169:12
1176:17 1203:18
1217:8 1226:14
1226:17 1227:9
1250:1 1255:5
1258:9 1259:12
1264:4 1310:20
1312:12,16,17
1372:12
**heard** 1235:1
1290:7 1293:13
1294:16 1299:17
1312:17 1326:9
1327:7 1347:4
**hearing** 1141:11
1142:1,3,10
1146:12 1154:11
1158:2,6 1164:18
1164:19 1168:5
1170:17 1174:2,3
1174:8,16,20
1176:20 1183:12
1184:4,5,13
1203:16 1237:15
1255:13,21
1274:20 1290:10
1377:14 1378:14
1382:5
**hearings's** 1253:11
**heart** 1296:6
1303:20
**height** 1221:5

**held** 1218:19
**hello** 1257:2
**help** 1176:7 1196:1
1197:10,13
1230:17 1234:1
1268:18 1269:6
1270:4 1289:16
1297:20 1312:8
1315:16 1333:11
1342:12 1345:5
1347:8,11 1348:1
1349:17,22
1350:5 1351:4,5
1355:21 1361:16
1361:18,22
1362:1 1363:9
1369:12
**helped** 1197:13
**helpful** 1217:21
1266:7,8 1377:2
**helping** 1161:5
1191:16 1198:12
1266:16 1346:19
1348:9 1367:15
**Herman** 1242:12
1242:22 1243:15
1244:1,7 1245:14
1245:17 1247:10
1251:4,9,13
1254:1 1256:11
1257:20
**hey** 1301:10
1304:14
**hiding** 1179:16
**high** 1340:15
**high-powered**
1297:13
**high-profile**
1247:18
**higher** 1242:13,18
1278:19
**Hills** 1162:13
1374:19
**hinge** 1214:18
**hired** 1241:3
**history** 1180:3
1207:2 1265:22
1266:2
**Hoc** 1142:3,10
**hold** 1168:13
1243:20 1264:3
1292:18 1356:5
**holding** 1263:16
**Hollywood** 1143:6
**homeless** 1233:19
**honest** 1172:9

1365:13
**honestly** 1163:19
1163:22 1164:1
1240:8
**honor** 1147:4,5,20
1165:20 1170:20
1171:12 1173:19
1175:10 1177:9
1178:5,6 1183:22
1187:14 1194:10
1199:22 1200:4
1211:19 1229:12
1236:21 1260:15
1260:16 1261:11
1275:10 1277:2
1283:19 1285:19
1291:4,9,22
1295:14 1302:7
1314:1 1323:13
1327:6 1337:15
1339:16 1343:7
1379:7
**Honors** 1163:5
1169:9 1234:20
**hope** 1230:6
1289:14 1356:5
1380:15
**hoped** 1256:7
**hoping** 1145:17
1170:3 1222:12
1247:8 1252:21
**host** 1350:10
**hostility** 1244:1
1245:14
**hour** 1378:19
1381:15
**hours** 1260:11
**house** 1316:6
1341:20 1365:9,9
**human** 1195:4,15
1196:10 1219:20
1334:12 1356:4
1374:16
**humor** 1172:5
1207:20
**hundreds** 1303:1
**hung** 1364:12
**hurting** 1194:16

_____
**I**

**i-t** 1314:22
**idea** 1186:16
1375:13,17
**identified** 1184:21
1217:5 1229:21
1230:1

**identify** 1147:11
1150:2 1240:14
1249:11 1254:7
1255:12,22
1320:17
**III** 1142:20
**images** 1219:3
**imagination**
1164:22
**imagine** 1311:11
**imitation** 1291:12
**immediately**
1167:17 1374:20
**impact** 1210:5
**important** 1155:6
1158:13 1161:20
1163:4 1164:17
1186:6 1191:12
1200:20 1202:12
1212:11,18
1214:22 1248:20
1285:4 1369:11
**impression** 1242:9
1242:11 1253:8
**impute** 1178:22
**imputed** 1179:18
**inadvertently**
1240:10
**inarticulate**
1303:16
**Inaudible** 1360:8
**inception** 1228:3
**inches** 1157:19
**inclined** 1338:10
**include** 1258:20
1262:16
**included** 1258:4
**includes** 1264:13
**including** 1163:7
1207:16 1221:6
1234:18 1314:21
**inconsistent**
1186:11,19
1271:18 1273:4,5
1276:12 1277:13
1279:5,12,13,15
1279:16
**incorporates**
1235:16
**incorrect** 1161:11
**independent**
1209:11 1249:15
**indicated** 1187:9
**individual** 1152:9
**inferior** 1212:16
**influence** 1222:13

1222:14
**influenced** 1206:17
1222:21
**information**
1200:13 1307:19
**informed** 1293:4
**informs** 1258:20
**initial** 1235:19
1255:4 1366:16
**initially** 1219:19
1308:14 1343:19
**injunction** 1152:11
1153:10 1154:10
1157:8,15 1158:2
1158:5 1163:12
1164:14,17
1168:4 1174:2,8
1174:16 1182:1,4
1182:12 1184:3
1241:15 1274:20
1276:2
**injunctive** 1175:14
**injustice** 1208:3
**innocence** 1289:15
**inquiry** 1235:19
**insert** 1319:14,17
1321:3
**inserted** 1202:7
1318:16 1319:18
**inserting** 1202:3
**inside** 1293:13
1294:1,5
**instabilities** 1296:1
1296:3
**instability** 1230:4
**instance** 1179:22
1230:6 1303:8
**instances** 1303:7
**instruct** 1275:11
**instructed** 1186:7
1276:14 1291:7
**instruction** 1277:14
1288:12
**instructions** 1150:9
1157:1 1179:10
1273:19 1274:15
1275:3 1277:11
1277:17 1278:3
1322:9
**insulted** 1336:22
**Intangible** 1215:14
**intelligent** 1208:16
**intend** 1259:9
1278:18 1279:4
**intending** 1304:13
**intentional** 1181:21

**intentions** 1336:12
**interaction** 1347:6
**interactions** 1375:6
**interest** 1169:16
1179:21 1197:14
1197:18 1205:18
1252:2,19
1288:13 1353:20
**interested** 1347:4
**interesting** 1167:15
1179:19
**Interestingly**
1164:12
**interests** 1157:4,9
1164:15 1167:13
1168:5,19
1169:18 1201:19
1205:3 1273:9
1285:6 1301:12
**interfere** 1303:15
1303:17
**interfering** 1305:10
**interim** 1157:4
1176:14 1183:10
**interject** 1258:18
1301:18 1344:6
**intermittent**
1221:22
**internal** 1219:18
**international**
1301:3
**interrupt** 1165:21
1170:12 1217:8
1218:8 1337:17
**interrupting**
1357:19
**intervene** 1342:14
1353:1
**interviews** 1299:2
**intimidate** 1220:4
**introduce** 1262:15
**introduced** 1347:1
1348:7
**invested** 1305:11
**investigate** 1219:5
1219:15
**investigations**
1223:2
**invited** 1256:21
**involved** 1147:7
1169:22 1268:20
1334:22 1356:4
1368:11 1371:8
1371:17
**involvement** 1369:2
**involves** 1353:16

**involving** 1196:6
**Iran** 1205:4
1213:22 1214:17
1299:4 1350:13
**Iranian** 1218:7,13
1218:14 1349:2
1362:5,7
**Irrelevant** 1354:21
**issue** 1167:15
1169:9 1209:4
1210:17 1238:12
1240:22 1241:9
1241:21 1244:16
1245:4 1251:17
1260:8 1261:12
1334:2
**issues** 1155:19
1196:2 1198:2
1209:17 1242:15
1245:5 1257:2,10
1266:17 1308:10
1312:20 1327:9
1348:2 1352:6
1367:6
**it/she** 1314:6,10
**items** 1267:1

---

**J**

**J** 1143:3,4
**Jackson** 1271:11
1300:9 1310:7
**January** 1184:16
1184:17 1186:4
1187:4,7,17
1189:16 1201:7
1317:21 1318:3
1357:13
**Jesus** 1276:22
1277:6
**Jewish** 1206:12
1207:4
**job** 1233:19,22
1309:19 1310:7
**Joel** 1240:17
**jog** 1306:22
**John** 1346:3
**joke** 1207:20
**Joseph** 1216:5,5
**journalist** 1341:18
1348:5 1355:13
**Joyce** 1156:4
**judge** 1144:4
1145:14 1152:13
1153:7,19 1154:1
1155:9,9,11,13,18
1155:21 1156:3,5

1157:5,22
1158:10 1159:4
1163:2,9,13,20,21
1163:22 1166:1,4
1166:20 1167:13
1167:15 1168:13
1170:3,17
1173:18 1177:5
1179:22 1180:1,2
1180:7,12 1181:2
1182:2 1183:20
1183:21 1184:10
1186:2,4,10
1190:7 1194:13
1207:17,18
1208:8,9 1209:4
1210:1,7,18,20
1222:7,16,17
1275:1,16 1276:9
1323:11
**judge's** 1223:16
1278:18
**judges** 1167:19
1178:21 1180:10
1207:13 1208:11
1208:14 1209:3
1209:12,16
1210:8,10,18
1212:11,16
1222:14,15
**judgment** 1245:21
1249:15 1258:2
**Judicial** 1209:1,2
1252:6,8 1257:14
1257:17 1258:3
**judiciary** 1207:15
**July** 1159:5 1163:2
1165:13 1167:4
1206:9 1242:1
1258:17 1270:16
1276:13 1277:11
1278:7 1280:11
1280:21 1294:9
1294:21 1295:2,2
1295:10 1324:6
1324:18 1325:16
1324:18 1325:16
1324,15,15,17,20
**jump** 1157:7
**June** 1141:8 1153:2
1153:6 1155:14
1160:1 1161:2
1162:8 1207:9,12
1220:14 1224:3
1352:21 1355:9
1360:2 1382:6
**jurisdiction**

1238:13 1249:1
1259:3
**juror** 1196:8
**justice** 1191:10
1224:7 1252:21

**K**

**K-e-y-a** 1145:21
1339:7
**K-o-l-l-m-e-r**
1360:19
**Kasanji** 1297:10
**Kathleen** 1169:1
1186:12,14
1201:5 1239:21
1272:1
**Kaveh** 1196:1
1197:11,13
1268:18 1310:10
**keep** 1197:19
1213:9 1240:4
1254:16,18
1269:9 1312:10
1312:14 1315:11
1324:10
**Kendall** 1247:22
1248:4
**Kennedy** 1196:6
**kept** 1205:20
**key** 1298:3
**Keya** 1144:5
1145:16 1244:21
1247:1 1261:15
1333:5,8 1338:18
1339:6 1340:2,10
1352:21 1353:5
1353:16 1355:4
1356:1,20
1360:10
**Khomeini** 1219:13
**kill** 1230:19 1244:5
**Kim** 1141:22
1142:4
**kind** 1167:20
1179:16 1209:5
1230:11 1253:12
1257:11 1277:5
1309:2 1319:17
1375:13
**kindly** 1251:19
**kinds** 1349:11
1374:22
**Kingpin** 1202:21
**kiss** 1333:11
**Klayman** 1141:5
1143:10 1144:3

1145:9,10,21
1146:19 1147:2
1147:11,18,20
1152:17 1154:20
1158:21 1159:22
1162:20 1168:15
1169:2 1171:11
1172:16 1174:22
1175:18,19,20
1176:2 1177:4,15
1178:6 1180:16
1190:13 1193:10
1193:12 1194:22
1196:18 1198:6
1199:6 1201:11
1202:21 1205:9
1206:11 1207:8
1211:2,21
1213:21 1216:20
1218:4 1220:7
1224:11 1225:1,9
1225:20 1226:11
1227:15 1232:8
1233:19 1234:7
1235:5,9,12
1237:8 1238:6,21
1241:9 1249:6
1259:11 1260:15
1261:10 1264:14
1265:5 1267:6
1273:15 1275:14
1277:1 1280:8
1286:5,9 1290:1
1292:10 1298:9
1302:6 1306:15
1307:20 1311:12
1319:8 1326:15
1331:19 1333:17
1338:8 1339:15
1339:16,22
1340:7 1343:7,9
1344:12 1345:19
1346:15 1349:15
1351:9,14,16
1352:14,21
1353:11 1354:8
1354:13,14,22
1355:3 1356:17
1356:18 1357:3,4
1357:8,20,22
1358:19 1361:5,9
1362:14,17
1363:9,11,13
1364:7,14,17
1365:3,11 1366:5
1366:22 1367:1

1369:14 1371:14
1371:16 1372:5,6
1372:9,14 1373:3
1373:6,20 1374:3
1374:14,22
1375:15,20
1376:5,6,8,19
1377:8,11,15
1378:10,14
1379:6,7,20
1380:4,7,17,21
1381:2,2,4,19,20
1381:22 1382:3
**Klayman's** 1203:6
1217:11 1318:13
1319:14
**knew** 1161:12,13
1161:15 1162:11
1166:2,3,11,13
1170:1 1199:1,4
1214:2 1219:17
1220:1 1250:3
1252:16 1278:2
1288:4 1318:19
1327:10 1347:3
1361:17 1363:13
1373:13 1375:10
**know** 1154:13
1157:11 1161:17
1164:6 1165:5,6
1168:11,21
1169:2,17
1172:22 1178:20
1180:6 1182:6
1185:6,14 1190:1
1191:8 1194:14
1196:2,10,14
1197:16 1201:10
1202:9 1203:15
1203:16 1207:22
1208:21 1214:17
1223:3 1225:3,20
1226:12 1228:6
1228:13,17
1230:16 1231:4
1237:17 1239:11
1241:4,19 1245:3
1245:5 1247:11
1247:16 1250:13
1251:16 1252:13
1253:10,12,19
1255:3 1256:6,12
1256:20 1257:1
1257:18 1261:21
1261:21 1263:4
1269:22 1271:13

1271:15 1274:4
1277:20 1278:11
1282:3 1284:6
1287:4,10
1288:10 1289:9
1289:16 1292:6
1297:10 1299:21
1303:5 1304:7,14
1304:19,20
1309:3,4 1310:7,8
1310:17 1311:19
1313:9 1314:7
1315:2,13
1317:17 1318:22
1326:22 1332:21
1334:19 1335:18
1335:21 1341:12
1343:19 1344:7
1344:15 1348:6
1350:18,19
1351:1 1352:17
1354:20 1356:3
1356:13 1363:5,7
1363:20,22
1364:9 1366:19
1368:4 1373:7,8
1373:18 1374:18
1375:3,6,21
1379:16
**knowing** 1189:22
1240:19
**knowledge** 1288:8
1344:13 1367:16
1372:15
**known** 1172:20
1191:10 1350:11
1350:11 1362:6
1363:12,17
1376:1
**knows** 1197:4
1301:2
**Kollar-Kotelly**
1152:14 1155:10
1167:14
**Kollmer-Dorsey**
1360:18
**Kotelly** 1153:8
1155:18 1157:5
1157:22 1159:4
1163:2,22 1166:1
1170:3 1181:2
1182:2 1183:20
1183:21 1184:18
1184:22 1185:3
1186:3,10 1190:7
1209:7 1222:7

1275:1,16 1276:9
1284:9
**Kotelly's** 1163:9,14
1169:6 1284:7

**L**

**LA** 1160:7,10
1169:2 1186:15
1198:15 1199:1
1256:22 1273:21
1274:17 1276:6
1277:13 1285:1
1296:22 1300:11
1317:4,14,16
1353:18
**labeled** 1343:4
**Labradoodle**
1334:15
**laches** 1246:4
**lack** 1147:18,19
1182:13,14
1232:1
**Lambert** 1156:4
**Lamberth** 1207:17
1210:19 1222:17
**Land** 1201:14
**lands** 1192:1
**large** 1268:6
**LARKIN** 1142:13
1265:14,20
1266:1
**Larry** 1141:5
1143:10 1144:3
1147:2 1169:2
1202:21 1203:6
1206:11 1213:20
1216:20 1242:18
1245:11 1273:15
1286:9 1292:9
1318:12 1319:8
1319:14 1338:8
1352:21,22
1355:3,5 1356:6
1360:2 1368:8
1370:19,22
1374:14
**last-minute** 1263:4
**lately** 1165:11
**lateness** 1263:3
**Latin** 1350:11
**law** 1143:4 1154:2
1163:11 1165:22
1167:15 1171:17
1244:15,17
1246:7 1251:14
1252:5 1366:2

lawsuit 1214:12
 1215:19 1284:12
 1284:13,14
 1298:6
lawsuits 1270:18
 1271:8 1294:10
lawyer 1165:7
 1169:20 1171:18
 1172:10,15,15
 1179:18 1191:10
 1191:17 1196:3,7
 1208:1 1214:11
 1240:3 1246:8
 1247:18 1248:2
 1251:18 1270:9
 1270:12 1272:19
 1272:20,20
 1301:4 1304:7
 1381:5
lawyers 1165:3,10
 1277:20 1353:4
 1354:10
lay 1192:1
leader 1219:12
leading 1346:13
 1349:14
learned 1232:5
 1255:10 1296:21
learns 1349:12
leave 1296:18
 1317:17 1335:19
 1341:16 1380:13
led 1245:19
left 1163:13
 1177:16 1252:8
 1258:2 1341:17
 1369:16
legal 1190:2 1197:2
 1228:7 1288:22
 1303:21 1310:17
 1311:20 1312:11
 1313:3 1314:7
 1315:10 1328:11
legally 1164:21
 1194:14 1198:13
legislative 1180:3
legitimate 1225:10
legs 1304:20
length 1286:14
let's 1148:3 1149:6
 1183:17 1211:22
 1225:18 1268:21
 1273:10 1291:15
 1320:1,4 1324:12
 1337:3,7 1346:11
 1346:18

letter 1148:17
 1178:1 1191:22
 1235:19 1239:2
 1245:15 1246:12
 1246:20 1249:16
 1253:14,18
 1258:17 1269:21
 1270:6,17
 1271:13 1273:15
 1274:3,13 1279:6
 1279:18 1283:4
 1286:18,19
 1287:1,11,13,16
 1288:21 1289:4
 1301:8 1307:11
 1307:20 1308:1,4
 1311:9,13 1322:8
 1324:6,8 1325:2
 1374:13
letters 1162:4
 1179:11 1255:20
 1264:13
letting 1182:3
level 1276:8
life 1178:18,19
 1195:15 1207:22
 1208:19 1222:20
 1234:6 1239:12
 1320:19 1321:9
 1321:11 1334:11
 1335:9 1340:14
 1354:1 1356:4
 1380:7
lightly 1326:19
likes 1230:16
 1244:4
liking 1164:7
line 1187:10 1207:5
 1234:18 1290:16
 1294:13 1299:5
lines 1148:1
 1224:14 1226:14
 1226:16,18
 1232:13,14
 1234:15,17,18
 1311:16 1320:5,9
 1320:13,13,16
 1330:13
list 1261:6 1262:3
 1264:5,22
 1266:14 1381:6
listen 1259:16
literally 1157:18
litigation 1147:8
 1156:1 1301:3
 1308:22 1309:6

little 1170:19
 1172:2 1185:5
 1247:10 1259:7
 1262:9 1293:20
 1319:13 1340:11
 1346:9
live 1224:17
 1256:13
lived 1197:12
 1219:11 1239:13
loaded 1295:3
 1324:22 1325:7
 1325:10
location 1162:11
locations 1341:10
logic 1289:12
long 1145:15
 1211:8 1230:13
 1233:10 1297:19
 1325:18 1341:2
 1363:17 1365:22
 1381:8
longer 1288:7
 1327:17 1364:1
look 1148:8
 1158:10,11,21
 1169:9 1180:2
 1181:5 1182:20
 1193:10 1195:3
 1221:13,15
 1224:11 1229:20
 1239:8 1253:7
 1254:5 1255:12
 1256:15 1268:21
 1273:10 1281:11
 1285:8 1286:5,15
 1291:15 1292:5
 1295:11 1298:5
 1301:15 1302:5,8
 1307:5 1311:6
 1313:13 1315:3
 1319:7,10 1320:1
 1328:12 1331:7
 1331:19,21
 1337:7 1351:17
 1352:8,11,20
 1360:22 1368:3
 1374:6,9
looked 1251:5
 1253:16 1271:21
 1289:3,10
looking 1192:6
 1229:5 1235:2
 1237:12 1274:2
 1281:14 1298:8
 1311:15 1332:14

1361:21 1363:7
 1376:9
looks 1187:16
 1310:8 1311:9
Los 1154:16 1160:1
 1161:12 1173:8
 1176:6,14 1278:2
 1296:17 1308:19
 1348:21
lose 1188:5 1277:5
losing 1356:1
lost 1157:12 1160:9
 1240:2 1256:4
lot 1165:11 1169:12
 1193:20 1198:1
 1206:17 1212:13
 1223:1 1245:5
 1250:10 1253:10
 1256:3,6 1257:8,9
 1268:20 1300:1
 1301:1,7 1303:12
 1304:17 1334:13
 1336:2 1354:19
 1364:12
lots 1334:10
love 1196:8,12
 1223:10 1230:9
 1268:4 1270:6
 1334:3,4,5,11,13
 1334:16 1335:3,8
 1336:10 1337:6
 1372:8,11 1373:5
loved 1195:9
 1335:11 1374:18
loves 1230:11
 1269:3
loving 1195:10
lower 1181:7
 1276:8
lunch 1193:1
 1256:22 1259:21
 1265:5,6 1382:2
luncheon 1260:19
lured 1231:4,4

——— M ———
M 1141:22 1142:4
M-i-n-i-t-e-r
 1355:14
mad 1195:22
Magazine 1216:3
magnifying
 1187:11
mailed 1190:6
mailroom 1187:7
main 1271:10

making 1174:3,10
 1294:12 1335:4
mall 1299:2
man 1213:4
 1247:17 1349:5
Manafort 1223:4
manage 1249:3
management
 1293:16
manager 1214:11
 1219:9
managers 1343:21
 1344:9
manifest 1154:1
 1181:21
manipulative
 1336:1
manner 1166:19
 1336:9
March 1147:13
 1151:2,4,5 1230:2
 1231:9,17 1232:3
 1298:1 1307:12
 1307:22 1356:1
 1357:3,14 1358:5
marked 1351:8
 1373:17
marking 1152:13
markings 1155:15
married 1196:8
 1245:5 1349:5
MARY 1142:13
match 1271:17
materials 1247:4
 1249:9 1367:8
matter 1141:4
 1148:18 1209:20
 1249:2,3 1250:8
 1250:19 1253:2
 1255:7,8 1259:22
 1261:8 1265:4
 1289:11 1290:19
 1353:16 1360:21
 1371:1
matters 1145:5,6,9
 1177:22 1222:8
 1225:14 1291:7
 1363:14
Max 1223:7,8
mean 1147:17
 1165:21 1176:16
 1185:2 1196:11
 1199:17 1203:17
 1210:14 1228:15
 1230:13 1257:17
 1264:16 1269:5

In Re: Larry E. Klayman
June 26, 2018

1274:9 1310:20
1330:6 1331:4
1332:10 1336:7
1351:12
**meaning** 1194:10
1371:18
**means** 1230:11
**meant** 1305:2
1314:14 1335:20
1360:5
**mechanism** 1209:9
**media** 1200:17
1222:22 1350:10
**medical** 1176:7
1297:2,21
1308:19
**medication** 1230:7
1234:2
**meet** 1161:1 1230:3
1242:21 1243:14
1249:22 1250:5
1250:12,22
1251:11,22
1252:20 1256:22
1285:12 1340:22
1341:12 1344:21
1345:3 1346:12
1364:3
**meeting** 1243:22
1245:20 1250:14
1251:2,4,12,20,21
1253:20 1349:21
1380:11
**Mehdi** 1150:7,22
1328:20
**member** 1142:14,16
1171:18 1350:15
**members** 1146:12
1147:5
**memorandum**
1153:5,5 1155:9
1156:12 1157:14
1158:4 1159:4,18
1180:20 1181:1
1181:13
**memorialize**
1366:20
**memories** 1223:20
1256:4
**men** 1170:6 1257:7
**mental** 1295:22
1306:20
**mention** 1260:12
1330:3
**mentioned** 1173:21
1270:11

**mentions** 1331:1
**meritorious**
1203:13
**mess** 1273:7
**message** 1299:4
1361:6
**met** 1160:14,17
1161:17 1199:2
1228:3,16
1243:15 1244:1,3
1252:20 1295:21
1298:10 1299:2
1332:17 1333:3,4
1333:6,8 1341:13
1342:3 1344:20
1345:2,2 1347:16
1347:18 1349:5
1349:16 1364:4
**mete** 1235:7
**metropolitan**
1341:9
**Miami** 1196:7
1301:3
**MICHAEL**
1142:15
**middle** 1284:17
**mind** 1154:16
1211:8 1269:9
1324:10
**mine** 1227:13
1257:4 1275:18
1297:9,15
**minimum** 1302:22
**Miniter** 1341:14
1348:4 1355:13
1360:8,11 1364:5
**Miniter's** 1365:8
**minute** 1193:16
1215:1 1217:7
1229:8 1248:4
1254:19 1255:21
1261:13 1276:19
1281:3,16
1296:20 1326:8
1330:18 1339:5
1366:6 1377:9,10
1377:11 1380:19
**minutes** 1177:12
1232:4 1338:4
1370:7
**miracle** 1196:13
**missed** 1188:3
**missing** 1248:8
**misspoke** 1151:3
**mistake** 1208:18
1314:21

**mistaken** 1211:18
**Mitch** 1355:14,18
**mitigation** 1379:19
**Mm-hmm** 1190:4
1218:10 1359:1
1369:7
**mom** 1230:9,9
**moment** 1215:5
1286:1
**momentarily**
1333:6
**Monday** 1197:6
1281:12 1282:2,4
1282:4,7 1355:9
**money** 1150:11,13
1194:10 1197:22
1215:15 1358:14
**month** 1220:15
1221:18
**months** 1192:9
1194:11 1197:9
1221:19
**mood** 1320:6,11,18
**morning** 1145:2,14
1175:10,11
1197:1 1261:22
1284:19 1378:11
1378:18 1380:12
**Morton's** 1333:2,4
1333:6,11,13
1345:2,9,15
**Moses** 1207:5
**mother** 1267:10
1340:13 1356:12
1358:13
**motion** 1152:3,10
1153:3,10,15,16
1153:19 1154:21
1155:8,8 1157:15
1158:5 1159:6
1163:1,12
1164:12 1165:19
1166:3,11,14
1167:9,17
1177:17 1181:3
1181:16,19
1183:19 1188:11
1208:22
**motions** 1180:11
**mouth** 1185:4
**move** 1151:9,12
1152:1 1157:7
1170:2 1186:20
1188:10 1280:5
1295:13,16
1309:7 1362:15

**moved** 1181:5,6,11
1246:19 1251:6
1264:1
**movement** 1362:5
**movements** 1350:13
**moving** 1155:4
1243:5 1334:1
**Muller** 1223:2
**mutual** 1341:13
1364:4

———————
**N**
———————
**N** 1144:1 1145:1
1261:1,1,1
**name** 1145:20
1160:21 1171:12
1197:3 1250:7
1252:11 1334:14
1339:5,6,7 1340:9
1340:10 1342:15
**named** 1248:2
1297:9 1341:14
**names** 1349:3
**National** 1349:2
**natural** 1254:2
**nature** 1364:19
**necessarily** 1369:8
**necessary** 1146:17
1166:4 1356:3
**need** 1148:19
1158:13 1166:1
1170:20 1183:11
1187:11 1193:11
1197:10 1201:10
1210:22 1225:12
1240:5 1243:14
1260:9 1262:9
1269:17 1291:6
1296:14 1306:20
1309:16 1315:21
**needed** 1158:9
1176:6,21
1179:10 1197:17
1201:17 1259:22
1273:8 1279:19
1279:20
**needs** 1147:16
1170:14 1180:8
1226:13
**negate** 1304:11
**neither** 1188:8
1293:6
**nervous** 1184:12
1317:18 1329:5
1357:16
**Network** 1176:5

1343:20 1344:8
**neutral** 1353:22
**never** 1169:1
1184:4,5,19,20
1185:8 1194:19
1198:2 1205:20
1205:20 1209:6
1232:4 1244:1
1247:5 1250:2,4
1250:16,16
1252:20 1255:8
1257:12 1278:6
1284:19 1288:6
1289:4 1293:4
1310:19,21
1311:4 1312:10
1313:8 1318:22
1335:10,12
1336:17 1374:3
1374:21,22
1376:1
**Never-never**
1201:14
**nevertheless** 1254:4
**new** 1245:16
1253:22 1254:2
**News** 1176:5
1223:7,8 1300:14
1343:20 1344:7
**night** 1298:10
1352:15
**nights** 1233:20
**nine** 1146:14
1221:20,20
1224:15 1226:18
1256:21
**NITV** 1349:1
**nods** 1357:10
**non-lawyers**
1168:10
**non-meritorious**
1245:22
**nonformal** 1173:14
**nonpartisan** 1203:1
1203:4
**nonrepetitive**
1260:10
**nonresponsive**
1280:6 1288:14
1291:1
**nonsense** 1353:19
**nonsensical**
1289:11
**Notary** 1142:5
**notation** 1186:2
**note** 1187:21

In Re: Larry E. Klayman
June 26, 2018

1220:6 1307:19
1308:3
**notebook** 1309:3
**noted** 1231:8
1254:8
**notes** 1175:3
**notice** 1149:14
1150:15,18
1151:1,4 1163:3
1169:5 1183:15
1184:15 1185:1,7
1185:12,21
1187:2,3 1188:1
1188:14 1191:4
1299:9 1336:7
**noticed** 1346:3
**notices** 1161:10
**notified** 1237:21
1239:8,15 1250:3
1250:18
**notwithstanding**
1302:22 1326:7
**November** 1161:10
1162:4
**number** 1148:9
1149:5,13
1151:13 1176:12
1182:22 1183:5
1199:14,17
1204:4,7 1236:3
1236:17 1238:8
1238:22 1258:14
1259:9 1264:17
1266:5 1270:20
1273:11 1285:18
1286:6 1287:17
1288:1 1291:16
1292:6 1294:12
1295:9 1307:2,6,9
1311:7,16 1312:2
1313:14 1317:5
1320:1 1326:10
1337:8 1373:18
**numbered** 1317:5,9
**NW** 1142:2

**O**

**O** 1145:1 1261:1,1
1261:1
**o'clock** 1145:18
1260:14,18
1261:18
**oath** 1169:14
1343:14 1376:12
1376:13
**Obama** 1247:13,14

**object** 1267:11
1272:17 1327:22
**objected** 1238:18
**objection** 1151:14
1151:16 1172:11
1172:12 1177:1
1225:22 1233:12
1238:16 1248:9
1263:1 1327:19
1349:14 1362:12
1362:17 1364:17
1369:18 1372:6,9
1372:13,13,21
1373:6
**obligation** 1249:2
**observation**
1361:21
**observations**
1212:10 1357:12
**observe** 1346:22
**observed** 1347:2
1357:15 1368:10
**obviously** 1154:11
1190:11 1191:18
1206:21 1207:4
1251:16 1288:13
1293:14,16
1301:9 1304:3
**occasion** 1347:17
1368:10
**occasions** 1294:12
**occurred** 1208:4
1215:21 1219:15
**OCR** 1192:10
1219:21 1241:16
**October** 1180:20
1181:2,14,18,20
1191:21 1192:3
1192:20 1204:16
1205:10,12,13
1328:5 1329:17
1329:20 1331:9
1331:16
**ODC** 1192:10
**offer** 1333:11
**offered** 1285:12
**office** 1143:4
1159:16 1161:13
1162:11,15,16
1176:5 1198:12
1199:2 1219:20
1219:21 1237:21
1241:8 1250:14
1251:9 1254:2
1342:16 1353:17
**oh** 1185:5 1188:20

1190:21 1220:22
1235:21 1236:3
1237:10 1264:21
1274:4 1282:4
1292:17 1316:1
1320:12 1330:10
1330:18 1354:11
1361:8
**ok** 1146:9 1148:8
1149:6 1150:14
1152:22 1162:5,6
1177:4 1183:3,7
1183:17 1190:21
1193:12 1194:5
1204:12 1209:21
1211:4 1216:21
1221:10,16
1226:2,19
1229:19 1231:14
1234:14 1235:11
1236:22 1239:2,7
1245:11 1254:21
1262:5,12
1263:18 1264:11
1265:6,20 1266:1
1266:6,21 1267:2
1267:22 1271:1,6
1274:12 1277:18
1281:7,10,15,20
1282:15 1283:18
1286:2,7,17
1287:19 1290:3
1290:22 1292:3
1292:17,20
1293:20 1299:16
1302:2 1305:16
1306:14 1307:16
1310:4 1314:16
1314:20 1316:13
1317:2 1318:1,4
1324:21 1326:6
1327:3 1328:8
1330:16 1333:4
1334:9,11
1337:13 1341:19
1354:12 1355:1
1355:22 1356:17
1357:20 1362:14
1362:18 1363:10
1366:4 1370:10
1370:14 1371:19
1374:11 1375:4
1376:19 1380:4
**old** 1223:19
1227:10 1246:1
1253:3

**omission** 1306:12
**omitted** 1344:11
**once** 1234:10
1235:18 1332:12
**ones** 1264:11
1265:1
**ongoing** 1222:11
**open** 1342:22
**opened** 1370:3
**opinion** 1153:5,6
1156:15 1159:4
1159:18 1165:3
1180:20 1181:1
1181:14 1183:19
1203:19 1246:5
1247:1 1253:6
1344:10
**opportunist**
1348:15
**opportunity**
1244:19 1250:5
1250:21 1300:13
1351:17
**option** 1176:18
**oral** 1380:14
**order** 1152:4,11,17
1153:2,3,4,5,12
1153:16 1156:15
1159:7 1170:12
1170:13 1181:17
1181:20 1183:6
1220:10 1222:6,6
1223:16,16,22
1224:2 1262:10
1285:20,20
1327:16 1355:12
1366:20 1369:11
**orders** 1168:4
1175:13
**ordinarily** 1309:2
**ordinary** 1183:4
**original** 1152:10
1236:1 1361:6
**originated** 1376:18
**outside** 1165:7
1285:1
**over-romantic**
1375:22
**overall** 1319:21
**overlooked** 1266:9
**overlooks** 1345:18
**overruled** 1372:21
**oversees** 1342:5
**overstatement**
1231:2
**owe** 1304:6 1305:6

**owned** 1204:22
1208:7 1340:19
1349:3
**owner** 1213:7
1340:19

**P**

**P** 1145:1
**p.m** 1211:10 1232:2
1260:19 1302:9
1382:5
**Pacer** 1152:13
1155:15 1160:11
1163:3 1252:13
**package** 1194:3
1233:6
**packages** 1310:9
**page** 1163:7
1193:13 1199:17
1200:2 1204:7
1205:11 1206:9
1217:3 1224:14
1225:2 1226:4,5
1226:14,15
1232:10 1233:4,5
1234:15,17,19
1237:1,2 1285:5,5
1287:20 1301:16
1302:10,13,15,21
1307:2 1308:3
1311:16 1312:3
1317:10 1319:12
1320:15 1328:7
1330:10 1331:12
1331:21 1352:20
1355:2,9 1356:9
1358:4 1359:2
**Page-24-1** 1317:7
**pages** 1146:14
1149:18,19
1163:6
**paid** 1184:19
1185:8 1194:12
1194:19 1197:9
1198:2 1205:22
1308:14 1319:1
1321:1
**pandering** 1212:13
**panels** 1209:11
**papers** 1181:6
1234:9
**paragraph** 1195:4
1202:14 1271:2
1278:22 1284:17
1285:11 1302:19
1302:20 1316:10

In Re:  Larry E. Klayman
June 26, 2018

1317:5,9 1319:13
1320:2,3,8
1330:20 1331:22
1332:1 1343:18
1357:5 1363:12
1368:3,4 1374:9
**Parashir** 1293:13
**parents** 1363:20
**part** 1150:17
1164:4 1187:3
1198:21 1200:22
1233:3,9 1240:14
1240:14 1246:13
1254:4,11 1268:6
1270:8 1273:20
1274:16 1275:18
1325:10 1345:8
1349:8 1350:3
**participants** 1261:3
**participated**
1252:17
**participating**
1160:19
**particular** 1148:18
1162:1 1165:11
1182:9 1206:2,6
1238:3 1251:17
1345:8 1348:4
**particularly** 1170:4
1277:21 1344:17
1350:12 1364:9
1365:6
**parties** 1142:7
1174:17,20
1191:6
**partner** 1252:5
**party** 1178:11,12
1190:17 1191:5
1202:22 1203:2,3
**passed** 1353:3
1354:8
**passing** 1204:17
**passionate** 1362:5
1375:8
**patio** 1333:7
1345:10,18
**pattern** 1225:4
**Paul** 1223:4
1360:18
**pause** 1155:2
1175:4 1185:19
1189:10 1267:3
1317:1 1377:12
**pay** 1194:12
1197:10 1198:16
1198:21 1202:10

1215:20 1303:18
1304:5,13 1305:3
1305:5 1306:11
1306:13
**paycheck** 1197:9
**paying** 1268:16,16
1306:3
**peace** 1154:15
**peculiar** 1311:18
1314:6
**pending** 1240:6
1289:1
**Penn** 1171:16
**Pennsylvania**
1238:5 1240:7
1244:9 1247:5
1253:2
**people** 1157:1
1158:8,9 1166:22
1186:7 1196:10
1196:12,12
1201:16 1205:22
1207:15,19
1218:7,13,14
1230:17 1234:10
1254:3 1294:1
1305:10 1306:2
1310:9,17
1311:19 1314:7
1315:1
**people's** 1231:2
**perceived** 1182:18
**perceives** 1167:1
**percent** 1224:2
**peremptory** 1180:1
1180:4
**perfect** 1271:14
1278:5 1287:12
1300:1,6,21
**perfectly** 1225:10
1305:20 1306:7
1326:21 1338:14
1375:6
**period** 1156:18
1160:4 1161:2
1198:17 1201:13
1215:17 1216:15
1221:4 1222:10
1223:9 1227:22
1256:3 1282:12
1289:8
**periods** 1161:19
**permanent** 1182:3
1182:12 1184:2
1241:15 1274:20
1276:2

**permission** 1329:15
**Persia** 1176:5
1343:20 1344:7
**Persian** 1213:14
1297:9 1342:8
1349:9 1361:16
1369:9
**Persian-American**
1160:13
**persistent** 1153:18
**person** 1164:5
1207:2 1227:8,17
1239:13 1256:10
1257:17 1297:11
1298:12 1299:1
1305:3
**personal** 1268:8
1278:18 1321:1
1361:14 1362:11
**personality** 1350:10
**personally** 1198:2
1342:19
**persons** 1145:4
1293:14,17
**perspective** 1335:6
1335:6
**pertained** 1231:11
**phon** 1160:22
1293:13 1297:10
1358:6
**phone** 1168:16
1262:11
**picture** 1219:2
**piece** 1301:5
**pile** 1257:16
**place** 1168:9,20
1298:19 1354:3
**plaintiff** 1155:8
1156:11 1191:11
**planes** 1317:15
**planning** 1284:9
**play** 1231:2
**played** 1350:1
**plead** 1346:20
**pleading** 1152:3
**pleadings** 1147:6
1147:10,11
1159:13 1189:7
1252:12 1257:14
1274:22 1275:1
1275:17
**pleasant** 1377:6
**please** 1148:8,13
1155:1 1171:12
1181:13 1196:16
1201:9 1226:10

1229:2 1230:3
1232:11,17,20
1235:12 1243:20
1271:4 1273:11
1273:11 1277:7
1286:5 1292:5
1293:11 1294:17
1302:5 1307:5,6
1311:7 1313:18
1322:18 1330:6
1339:5,9,14
1340:8 1356:10
1358:10 1371:3
**plethora** 1340:21
**pocket** 1197:22
**point** 1154:6
1155:20 1157:6
1157:21 1158:14
1161:20 1164:13
1168:11,21
1170:11 1173:2
1179:3,13 1186:6
1188:15 1189:19
1191:7,12 1200:9
1207:16 1213:6
1215:11,16
1220:21 1223:21
1224:1 1233:19
1241:3 1247:18
1248:10 1253:4
1253:20 1259:5
1294:15 1297:4
1301:12 1304:22
1312:19,20
1316:8 1321:12
1330:6,9 1344:19
1346:2,22
1347:15 1348:16
1349:5 1353:22
1357:13,14
1378:7,8
**pointed** 1259:2
**pointing** 1154:2
1159:13 1162:9
**points** 1259:3,11
**policy** 1250:13
**polite** 1248:5
**politely** 1155:17
**political** 1165:12
1353:19,22
**politics** 1206:3
1208:11 1210:11
1211:1 1247:20
1251:8 1256:12
1257:4
**polygraph** 1154:4

**pornographic**
1219:3
**portion** 1202:13
**portray** 1244:4
**posed** 1323:21
**position** 1198:18
1341:15
**positions** 1247:19
**positive** 1313:4
1360:12
**possibility** 1205:19
1379:11
**possible** 1266:11
**possibly** 1283:10
**post-hearing**
1379:8 1380:1
**posted** 1200:5
1205:12,13
1206:8 1207:9,12
1217:1 1218:5
1219:2 1329:20
1331:9,16
**potential** 1155:22
**potentially** 1166:1
1252:2 1296:9
**powerful** 1206:18
**Powers** 1203:7
1318:14 1319:15
**practice** 1244:15,17
1251:14
**practices** 1250:9
**practitioners**
1250:7
**pray** 1285:6
**pre-August**
1177:22
**preceding** 1233:4
1307:20
**precise** 1328:18
**predict** 1266:10
**preface** 1362:2
**prefer** 1323:18
**prejudged** 1240:21
**prejudice** 1178:15
1179:17 1180:6
**prejudiced** 1184:9
1277:19
**prejudicial** 1258:21
1259:1,1
**preliminary** 1145:5
1145:6,9 1152:11
1153:10 1154:9
1157:8,15 1158:1
1158:5 1163:12
1164:14,17
1168:4 1174:2,8

1182:1
prepaid 1194:11
preparation
1253:11
prepare 1194:13
1243:12
prepared 1239:21
1240:12,22
1261:10 1365:10
1365:14,15
1377:21 1378:20
presence 1285:1
1344:2 1346:11
present 1142:6
1143:9 1145:4
1170:17 1261:4
1338:8,9 1368:8
1377:14,15,18
1378:14 1380:22
presentation
1260:12
presented 1193:20
1264:18
preserve 1159:15
1173:9
President 1247:13
1247:14
presidents 1247:14
press 1222:19,20
pressure 1313:3,6,8
1313:10 1327:16
prestige 1361:15
presuming 1326:1
pretty 1207:4
1218:15
prevail 1252:22
prevarication
1169:8
previous 1313:18
previously 1206:13
1247:2 1265:18
1280:2
price 1321:1
primarily 1256:11
printed 1187:15
1313:20
prior 1151:3
1155:11,19
1156:1 1158:2,6
1165:22 1166:20
1168:3 1213:16
1214:7 1223:18
1224:18 1248:1
1370:4
private 1191:1
privilege 1165:9

privy 1381:5
pro 1189:21,22
1190:1,2,3
1191:16,16
1194:20 1305:7
pro-American
1299:4
Pro-Iranian
1214:11
probably 1160:10
1208:1 1257:19
1278:14 1336:8
1360:4 1372:20
problem 1244:14
1319:4 1339:3
problems 1258:1
1310:18 1311:20
1312:11 1314:8
proceed 1147:1
1178:3 1193:7
1243:6 1245:21
1246:8 1255:7
1277:3
proceeded 1153:9
proceeding 1159:16
1177:7 1190:18
1235:6 1239:17
1250:4 1276:7
1315:10
proceedings
1250:10 1377:1
proceeds 1213:9
1319:5,8
process 1174:12
1210:1,9,20
1246:9 1250:20
1256:2 1369:22
1370:20 1377:2
produced 1254:10
1255:11
production 1263:4
1263:5
professional 1141:2
1142:1 1178:19
1244:18 1290:20
1375:7
Professor 1246:3,5
1253:4
proffer 1147:16
1224:16 1259:21
1260:10 1263:7
prominent 1342:8
promiscuity 1349:7
promote 1205:18
1214:5
promoting 1202:1

1205:1,2
prompt 1217:18
proof 1242:20
properly 1312:13
proposed 1238:15
prosecutions
1223:3
protect 1157:3
1167:12 1168:10
1169:16 1212:13
1273:9 1279:20
1285:5 1288:13
1301:12
protecting 1157:9
1168:5 1277:19
protection 1246:9
protections 1165:9
protocol 1272:18
proud 1206:14
1321:6
proved 1156:7
provide 1242:8
1303:4
provided 1194:3
1254:15
provocative
1155:18 1203:17
prudent 1343:22
1344:10 1349:20
PS 1293:11
psychiatric 1296:14
1309:17
psychiatrist
1297:10,20
psychological
1296:9 1297:16
1308:16 1309:17
psychologist
1228:18 1337:5
psychology 1293:21
1308:11
public 1142:5,14
1179:21 1212:12
1251:18 1257:19
1313:4,7 1315:10
1315:11,11,14
publicity 1169:11
1169:13 1214:19
1219:16 1222:14
1243:2,4,16
1260:6 1312:8,21
1315:16 1327:16
1329:7 1343:21
1344:8
publicly 1165:6
published 1216:18

1321:13 1328:5
publisher 1215:7
1216:4,17
1318:17 1319:18
1321:4
pull 1301:10
punitive 1258:4
Purati 1160:22
purchased 1204:22
1319:3
purport 1351:18
purported 1161:9
purports 1281:12
1361:3
purpose 1223:6
1347:14 1370:5
purposes 1168:2
1308:22 1309:6
pursue 1191:14
1283:7 1284:8
pursuing 1222:2
1276:1
push 1359:5
put 1145:17 1158:9
1176:13 1178:7
1202:9,10 1220:8
1229:13 1234:3
1239:6 1246:6
1291:4,9 1296:22
1300:3 1303:1,12
1303:20 1304:16
1308:18 1313:2,6
1313:8,9 1353:17
1357:6 1367:17
1367:21 1369:11
1370:21
putting 1173:8
1299:5

Q

question 1149:22
1175:18 1178:8
1181:5 1203:19
1213:1 1226:1,3
1228:10,12
1232:19 1233:3
1237:6,8 1238:11
1244:6 1272:17
1275:6,6,9 1277:7
1277:8,10
1281:11 1282:15
1282:21 1287:8
1288:15,17,18,20
1290:2 1291:2,20
1292:2,21
1294:20 1295:3,5

1301:21 1306:18
1309:10 1312:12
1312:13 1313:12
1313:17 1316:9
1316:18 1317:3
1322:12,16,17,19
1323:19 1324:16
1324:21 1325:7
1325:10,13
1326:9,11,17,19
1326:20,21
1330:22 1332:2,7
1333:20 1335:22
1346:14 1352:2
1364:22 1365:2
1368:2 1369:14
1370:1,6,7,9
1371:10,15
1372:2,20 1376:6
questionable
1300:5
questions 1175:1,6
1175:17 1177:4
1178:4 1225:13
1285:16 1339:15
1376:4,20
quickly 1211:7
1307:14 1332:10
quiet 1312:11,14
quietly 1313:1
quite 1157:15
1169:17 1233:10
1341:10 1348:10
1379:16
quo 1159:16 1173:9
1182:11

R

R 1145:1 1261:1
radical 1299:4
radio 1350:9
1354:19
raise 1191:12
1259:5 1261:12
1269:17 1339:8
raised 1164:15
1166:19 1189:19
1240:18 1259:3
rambling 1290:15
random 1155:13
Razavi 1190:11
1272:1
re-contacted
1240:12 1280:3
reach 1179:15
1379:14

In Re: Larry E. Klayman
June 26, 2018

**reached** 1220:11
**reaches** 1348:16
**reaching** 1179:6
**reacting** 1270:2
1274:9
**reaction** 1317:18
**read** 1175:12,15
1191:14 1195:5
1222:19 1225:21
1226:10 1227:5
1227:14 1232:11
1232:22 1233:13
1233:14 1234:15
1234:15,17
1249:9 1253:6
1259:8 1261:6
1264:9 1273:12
1274:5,7 1282:22
1283:1,11,15
1286:12,19
1292:11,18
1315:1,4 1322:18
1328:13 1332:4,9
1356:15 1367:8
1367:11,13
1368:4,6,18
1380:2
**reader** 1303:5
1306:2
**readily** 1262:6
**reading** 1191:3
1271:1 1273:22
1278:20 1292:7
**reads** 1222:20
1271:5 1273:13
1274:11 1283:17
1286:16 1287:21
1292:19 1312:4
1315:5 1328:14
1332:5 1337:12
1351:21 1361:1
1368:5
**ready** 1146:18
1211:17 1212:19
1221:14 1242:6
1292:1 1377:16
**real** 1335:9
**reality** 1222:20
**realization** 1300:4
**realize** 1296:8
**really** 1148:1
1150:12 1163:4
1195:8,11
1196:13 1205:22
1209:16 1214:18
1218:14,19

1241:7,8 1242:10
1245:9 1251:8
1299:5 1374:18
**reason** 1150:19
1161:12 1172:18
1191:13 1221:21
1243:6 1268:7
1303:10 1309:16
1309:21 1320:12
1324:21 1327:10
1381:14
**reasonable** 1173:22
1188:12 1284:21
1297:2,21 1306:8
1308:19
**reasons** 1269:20
1310:1,2
**reassign** 1155:10
1156:5
**reassigned** 1156:8
**reassignment**
1166:3
**rebuttal** 1378:12
**recall** 1165:14
1179:6 1192:4
1227:21 1287:2
1317:13 1326:18
**receive** 1215:6,9
1293:10 1358:16
**received** 1187:7
1216:10,16
1255:1,2 1282:6
1327:14 1370:12
1370:13
**receives** 1290:9,13
**receiving** 1355:6
1356:7,19
**recess** 1170:12,16
1177:11,14
1211:12,14
1260:13,17,20
1286:1,3 1324:14
1338:6,11,17
1382:4,6
**recollect** 1150:20
1156:19 1325:17
1325:18 1327:1
**recollection** 1167:3
1167:7,11
1192:13 1278:9
1278:14 1282:11
1288:1 1306:22
1308:8 1309:12
1369:2
**recollections**
1282:14 1367:22

**recommend** 1209:4
1209:11 1258:22
1297:17
**recommended**
1208:14 1209:10
1297:12
**reconsider** 1153:20
1163:17 1181:20
1276:1
**reconsideration**
1153:16 1154:21
1159:8 1182:16
1183:20 1275:21
**record** 1145:3
1146:11 1147:11
1168:2,16
1186:18 1187:21
1211:16 1218:9
1226:11 1233:1
1233:13,15
1238:14 1247:5
1249:9 1259:8
1261:3,6 1262:15
1263:21,22
1264:10,12
1286:8 1290:17
1291:5,10 1292:8
1297:3 1308:3,17
1311:8 1325:20
1331:8 1333:16
1333:17 1338:16
1361:2 1370:12
1374:12
**records** 1160:9
**recover** 1233:21
**recuperated**
1184:20
**recuse** 1167:14
**Redirect** 1175:19
1176:1 1376:5,7
**reevaluate** 1198:15
**refer** 1152:17
1154:20 1162:20
1180:17 1194:22
1196:18 1198:6
1199:6,15 1205:9
1206:8 1207:8
1211:21 1218:4
1222:3 1224:13
1224:22 1225:12
1228:20 1232:8
1235:9 1238:2,21
1321:5
**reference** 1183:15
1204:17 1206:7
1208:8 1219:4

1235:17 1328:15
**references** 1318:12
1333:18
**referred** 1221:5
1297:18
**referring** 1162:2
1200:5 1202:14
1227:22 1236:6
1238:6 1280:14
1326:4 1330:19
**reflection** 1210:12
**refresh** 1192:13
1308:8
**refreshed** 1309:12
**regard** 1150:7,8,19
1157:7 1161:22
1163:2 1165:1
1169:11 1180:8
1182:10 1183:18
1186:12 1192:6
1200:8 1207:3
1209:5 1212:10
1213:17 1214:8
1214:19 1222:7
1223:1,17 1228:7
1228:20 1243:16
1244:20 1247:21
1284:11 1291:22
1299:18 1346:19
1350:5 1368:8
**regarding** 1230:7
1247:6 1263:7
1355:14 1369:3
**regardless** 1219:15
**regime** 1299:4
**registered** 1203:2
**regrettably** 1247:3
**reimburse** 1198:16
1305:13
**reimbursed** 1185:9
1302:22
**reiterated** 1251:4
1251:12
**relate** 1332:15
**related** 1203:14
1215:22
**relates** 1260:3,4,6,7
**relating** 1228:22
1264:6
**relations** 1313:4
**relationship** 1152:7
1195:21 1228:8
1367:19,22
1368:12,17
1369:13 1371:8
1371:17 1373:15

**relationships**
1163:21
**relevance** 1267:13
1267:16 1364:17
**relevancy** 1267:12
**relevant** 1216:16
1225:3 1352:5
**relief** 1154:15
1175:14
**reluctant** 1361:18
**remand** 1155:10
**remedial** 1209:5
**remember** 1160:7,8
1172:5 1176:8
1191:9 1237:15
1242:1 1284:13
1296:19 1324:4
1353:6 1355:6
1356:7,19
1358:12 1365:13
1365:15 1366:9
1366:13,15
1367:6
**remembered**
1252:10
**remind** 1188:14
1316:15
**reminding** 1316:21
**removal** 1149:14
1150:15,18
1151:1,5
**removed** 1150:14
1151:7
**remuneration**
1215:6,10,13
1216:10,17
**renewable** 1209:13
**rent** 1197:9
**repeat** 1206:14
1288:18 1322:5
1358:11 1365:2
**repeatedly** 1289:18
1304:6
**repeating** 1279:9
1371:12
**repetition** 1352:3
**reply** 1285:12
**report** 1258:19,20
**Reported** 1141:21
**reporter** 1142:5
1145:20 1214:10
1322:20
**reports** 1154:4
**represent** 1197:17
1205:6 1288:11
**representation**

1197:3 1269:7
1305:11
**represented** 1205:6
1215:18 1241:10
1243:9 1252:4,9
1256:17,17
1273:8 1288:7
1301:7
**representing**
1173:16 1230:14
1327:15
**republican** 1202:20
1203:2
**reputation** 1164:7
1293:12 1348:11
1348:12,14
1350:12 1352:3
1369:6,9 1370:4,5
**request** 1170:13
1198:15 1289:11
1379:21
**requested** 1147:22
1250:21 1283:3
1309:4
**requests** 1175:14
**required** 1248:21
1308:10
**requires** 1178:10
1272:15,16
**requisite** 1145:4
**rescheduling**
1231:1
**rescued** 1233:18
**research** 1178:18
1246:2,3 1247:11
**reservations** 1348:8
1348:11 1349:17
1349:18,19
**resolve** 1347:11
1356:11 1358:11
**resolved** 1197:7
1241:21 1358:22
**resource** 1208:22
**Resources** 1219:20
**respect** 1145:11
1156:13 1182:14
1189:15 1222:18
1231:16 1235:6
1261:8 1265:12
1272:19 1291:5
1309:12 1312:21
1323:12 1356:2
1368:11 1379:1,3
**respectful** 1270:3
1277:3
**respective** 1142:7

1209:19
**respects** 1194:10
**respond** 1241:2
1255:4 1294:19
1367:15
**responded** 1232:3
1282:7 1307:3
**Respondent** 1141:6
1143:2,11 1148:6
1171:7,10 1176:1
1180:14 1262:15
1338:7,8 1340:3,6
1376:7 1377:13
1378:2
**respondent's**
1146:1,7,11,22
1147:14 1148:8
1148:11 1149:3,5
1149:10 1150:3,3
1151:12 1170:13
1170:15 1185:16
1228:21 1229:6
1235:13 1236:12
1240:15 1249:17
1258:13 1261:5
1262:18 1263:2
1263:12,13
1264:17 1265:7,8
1265:9,9,10,10,13
1343:3 1351:8,14
1362:15 1381:11
**response** 1168:18
1239:19 1243:12
1244:6 1250:2,17
1255:4 1275:4
1277:12 1297:1
**responsibility**
1141:2 1142:2
1244:19 1266:16
1290:20
**responsible** 1304:3
**responsive** 1288:16
**rest** 1211:6 1276:7
1377:22
**restaurant** 1228:4
1298:10 1333:10
1345:2 1347:18
**rested** 1378:3
**restraining** 1152:4
1152:11 1153:4
1153:12 1159:6
**result** 1336:8
**resume** 1146:21
1211:17 1378:5
**resumes** 1147:2
**resurrect** 1255:16

**retail** 1340:20
1341:8
**retained** 1240:15
**retaliate** 1219:22
**reticent** 1314:18
1315:9
**retired** 1173:18
1207:19
**retrospect** 1296:3
1296:11 1335:22
**return** 1259:7
1348:16
**returning** 1189:11
1211:15
**reveal** 1200:12
**revenge** 1234:7
1235:5,7
**reverse** 1198:18
1220:9
**review** 1153:22
1333:16 1343:10
**reviewing** 1352:1
1355:11
**Revolution** 1202:20
**revolutionary**
1320:20
**rhetorical** 1313:12
**Richard** 1155:11
1341:14 1348:4
1355:13 1360:8
1364:5
**rid** 1289:14
**right** 1149:17,20
1152:1 1159:15
1160:1 1162:7
1166:7 1171:22
1173:14,15
1174:21 1188:20
1188:22 1189:2
1192:1 1205:21
1208:17 1229:18
1236:10,18
1238:13,18
1241:22 1246:10
1249:2 1251:14
1258:13 1259:4
1262:3 1269:19
1270:12 1273:17
1274:18 1280:21
1281:1 1282:5
1302:4 1303:3
1304:18 1310:18
1312:22 1313:5
1317:8,20
1318:21 1319:13
1319:22 1323:14

1323:16 1324:12
1329:9 1336:12
1337:21,22
1339:4,9 1340:15
1340:17 1342:4
1343:17 1344:4
1345:4,7,14
1346:1,20 1353:8
1355:20 1358:3
1359:10,13
1360:14 1369:3
**rights** 1157:12
1159:16 1169:20
1188:5 1193:2
1219:21 1241:12
1241:16 1256:16
1257:6 1277:19
1277:20 1279:20
1280:1
**rise** 1208:11
**risk** 1214:18
**Rob** 1214:10
**Robert** 1223:2
**Roberts** 1155:12,21
**role** 1350:1
**romantic** 1336:12
1367:19,22
1368:12,17
1369:13 1371:8
1371:17 1373:14
1373:14
**Ronald** 1247:2
**room** 1170:18
**Rotunda** 1247:3
1250:9 1253:4,5
**Rotunda's** 1246:3,5
**roughly** 1211:10
1381:13
**Roy** 1196:7
**Royce** 1207:17
**RSEX.2** 1229:17
**RSUP7** 1146:15
**RSUPX4** 1187:2
1189:12
**rug** 1234:3
**ruined** 1239:12
**rule** 1153:8 1163:22
1167:20 1170:8
1272:15,15,18
**ruled** 1164:9,10
**rules** 1156:6 1246:6
1335:6 1380:2,3,6
1380:6
**ruling** 1153:20
1157:5 1163:9
1169:6 1174:3,10

1379:22
**rumor** 1293:15,17
1294:5
**run** 1171:14 1252:8
**running** 1239:10

---

**S**

**S** 1145:1 1261:1,1,1
**sad** 1320:5,10,18
**Sajadi** 1219:9,9,10
1220:3 1271:10
1294:1 1328:20
**sake** 1330:5,8
1333:15
**sale** 1215:6
**Sam** 1190:10
1272:1
**Sanders** 1207:18
**sat** 1278:13 1345:10
**Sataki** 1146:4
1147:7,8,9
1154:13 1155:12
1156:17 1158:17
1159:11 1160:14
1160:18 1164:4
1164:14 1165:15
1166:11 1167:5
1169:18 1173:3
1175:13 1185:3
1185:13,22
1186:15 1187:3
1189:21 1191:22
1194:8 1196:22
1198:10 1200:12
1201:2 1203:12
1204:19 1205:3
1205:17 1213:11
1214:2,4,14
1218:18 1224:6
1224:14,19
1225:1,9 1229:22
1230:1,15
1231:20 1232:9
1234:21 1235:20
1237:5 1239:9
1241:11 1244:3,3
1254:11 1255:2
1255:13 1256:17
1258:9 1268:3
1273:16 1276:12
1278:6,16
1279:16,18
1282:22 1283:2
1284:22 1286:10
1286:19 1287:1
1288:21 1292:10

1295:10,22
1297:19,20
1298:11 1305:2
1308:10 1309:16
1310:16 1321:17
1322:22 1324:5
1324:18 1325:15
1325:20 1326:14
1329:4 1330:4
1331:2 1332:18
1333:19,19
1334:5,12,17
1335:3,10,22
1336:12 1337:5
1342:12 1344:20
1345:22 1346:11
1346:16 1347:1
1347:16 1348:8
1351:4,6,20
1353:13 1354:10
1357:12 1359:3,4
1359:8 1360:5,16
1361:16 1367:5
1367:19 1368:1,8
1368:9 1371:9,18
1372:8 1373:4
1374:5,13 1375:1
1375:15,19
1381:6
**Sataki's** 1150:8
1153:8 1155:8
1156:12 1161:9
1186:18 1216:1
1217:22 1226:20
1237:15 1239:21
1306:20 1328:11
1332:12 1343:22
1344:2,9 1352:3
1369:6
**satisfied** 1323:8
1324:1
**Saul** 1172:3
**Sauls** 1207:18
**save** 1225:5
**saw** 1173:22
1245:14 1257:17
1267:8 1298:13
1307:4 1319:2
**saying** 1166:11
1183:22 1197:16
1206:16 1239:12
1253:12 1258:9
1275:1 1284:19
1305:8 1312:13
1319:16 1334:10
1355:10 1374:8

**says** 1155:15
1159:14 1165:7
1187:3,6,17
1194:9 1201:8
1203:6 1233:10
1236:20 1238:4
1250:13 1253:10
1255:3,20 1269:5
1269:5,11,11,16
1269:22,22
1277:6 1282:4
1302:16 1323:8
1325:1 1327:6
1329:10 1331:16
1352:20 1357:8
1361:5 1368:7
1374:7,16
**schedule** 1145:12
1338:5 1379:13
**scheduling** 1170:14
1261:12
**school** 1171:17
1340:16 1366:2
**scope** 1177:2
1188:13 1275:5
**screaming** 1239:11
**screw** 1338:12
**se** 1190:1,3 1191:16
**seated** 1339:14
**second** 1154:22
1239:20 1278:21
1287:20 1320:2,3
1320:8 1331:22
1349:21 1374:9
**secondhand**
1179:12 1322:12
**secondly** 1288:3
**seconds** 1262:11
1266:22 1285:21
**section** 1178:9,10
1246:18
**see** 1149:21
1150:11,15
1153:18 1154:17
1163:20 1168:7
1185:18 1187:5
1189:13 1197:1
1203:5 1223:1
1225:18 1233:17
1234:11 1246:5
1249:14 1257:21
1267:19 1271:3
1271:15 1274:5
1280:22 1293:18
1298:7,12
1302:11,19

1308:13,15
1311:22 1317:11
1320:7 1322:10
1328:8 1330:17
1335:5,14,22
1353:15 1355:16
1357:4,8 1358:8
1359:6 1361:8
1374:19,20
1375:16 1377:8
1381:13
**seek** 1284:20
1327:16 1368:12
1371:9,21
**seeking** 1184:2
1194:19 1290:5,6
1303:6
**seen** 1157:5
1165:10 1177:10
1209:6 1230:5
1299:1,21 1375:3
1375:5
**Sees** 1202:21
**segment** 1259:4
**selected** 1209:16
1210:9,10
**self-interest** 1205:1
**sell** 1202:4,5
1204:20,21
1319:3,5
**selling** 1208:6,7
1213:8 1321:7
**Senate** 1252:9
1321:13
**send** 1155:21
1240:1 1245:15
1279:18 1287:5,6
1287:6 1360:7
**sending** 1233:6
1238:3 1261:16
1305:9 1359:11
1372:5 1373:3
**sends** 1201:8
**sense** 1172:5
1186:17 1289:21
1289:21 1298:18
1299:14 1301:10
1314:10 1370:21
1371:2
**sensed** 1243:22
1247:9
**sent** 1161:10,11,15
1189:19 1196:21
1197:7 1198:9
1214:3 1229:22
1233:7 1240:9,10

1240:13 1247:8
1255:1 1270:16
1281:12 1286:22
1311:12 1316:6
1321:18 1323:1,5
1324:19 1353:6
1356:10 1358:9
1359:3
**sentence** 1193:15
1269:2,4 1273:14
1273:18 1278:21
1287:20 1293:7
1302:20 1305:1,2
1306:1,9 1311:17
1313:19,20
1314:3,9,22
1315:4 1320:3,4
1320:10 1368:7
**separate** 1317:15
**September** 1204:1
1221:20 1325:21
1326:3,15,21
1375:12
**servants** 1212:12
**serve** 1209:12
**served** 1367:9
**service** 1250:20
**session** 1240:17
1262:4
**set** 1146:13 1257:14
1316:14
**sets** 1163:5
**setting** 1300:15
**settle** 1217:22
1221:1 1284:18
1313:1 1327:17
1360:20
**settlement** 1200:19
1205:19 1214:6
1214:20 1219:17
1221:6 1312:8
1315:17 1332:22
1343:22 1344:9
1360:12 1361:11
**seven** 1152:20
1167:4 1227:12
1240:19 1245:22
1262:19 1263:15
1263:17
**seventy-five**
1227:10
**severance** 1252:7
**severe** 1329:4
**sexual** 1173:10
1203:13,20
1310:15 1335:7

1348:16,17
**sexuality** 1369:3
**sexually** 1170:7
1173:4 1176:4
1309:19
**shaking** 1242:19
**Shamble** 1157:10
1166:6,18 1186:1
1188:9 1195:19
1197:4 1200:16
1201:7 1214:4
1221:12 1243:17
1244:21 1246:22
1272:6 1284:20
1286:22 1289:5
1289:17 1293:6
1294:7,15
1303:21 1314:19
1360:3,16,17
1361:11
**Shambles** 1360:4
**shame** 1329:16
**shape** 1336:9
**she'll** 1381:7
**Shea** 1197:3 1269:8
**short** 1182:3
1208:19 1366:10
**shortly** 1329:9
1253:14
**shot** 1323:16
**show** 1180:5 1229:2
1232:17 1254:9
1258:6,7 1287:16
1303:11 1351:7
1354:1,19
1373:17
**showed** 1376:16
**showing** 1163:18
1241:20 1273:4
**shows** 1150:22
1152:12 1163:3
1191:8 1198:19
1203:1 1225:3
1228:17 1280:12
1290:17
**sic** 1184:18,22
1230:10
**side** 1221:7 1347:5
**sideline** 1179:19
**sides** 1165:11
1223:3,4
**sign** 1252:1,15,17
**signed** 1187:2
1189:21 1343:13
1343:16 1376:12
1376:13

In Re: Larry E. Klayman
June 26, 2018

**significantly**
1163:18
**silly** 1170:20
**similar** 1326:19
**simply** 1182:6
**sink** 1197:21
1198:17
**sir** 1249:7 1338:19
1338:21 1339:9
1342:1 1349:13
1352:12,16
1354:6 1357:2
1358:18 1363:4
1366:3 1369:17
1371:2 1376:22
**sister** 1381:4
**sit** 1345:8,9,11
**site** 1207:7
**sitting** 1156:2
1173:12 1180:10
1239:10 1257:18
1345:20 1346:7
**situation** 1204:17
1230:5 1233:11
1272:21 1279:14
1298:19 1300:19
1313:2 1328:19
1347:11,22
**six** 1194:11 1197:9
1214:12 1220:15
1240:3,4,19
1243:13 1254:12
1266:5 1280:4
1304:2 1341:10
1343:18 1375:12
**skeptical** 1170:9
**skimmed** 1332:10
**slap** 1195:12
**slept** 1233:20
**slow** 1224:21
1369:22
**small** 1161:18
1162:15
**Smith** 1142:20
1145:5,6 1146:8
1146:13 1148:18
1151:14,15,16
1152:7,21
1172:12 1175:5,7
1175:9,16 1177:1
1186:20 1188:10
1194:3 1196:6
1224:16 1225:11
1225:22 1226:2
1229:4 1232:21
1233:4,12 1236:5

1236:9,10,14
1237:21 1238:10
1238:15 1239:3
1239:15,22
1240:9 1241:4,19
1241:22 1242:15
1243:15,18
1245:10,15
1247:2 1248:9,14
1250:3,18 1251:3
1251:8,11,19
1253:9 1262:22
1264:14 1266:19
1266:20,22
1267:5,7,15,18,22
1268:1 1269:18
1275:4 1276:10
1276:17,22
1277:9 1278:12
1279:22 1280:5
1280:17 1283:5
1285:15,17
1286:4 1288:20
1290:3,6,12,16
1291:13,14,19,19
1292:1,4,22
1294:11 1295:7
1295:15,20
1301:13,14,17
1302:1,4 1306:17
1307:10 1308:2,7
1309:7,11,15
1311:8,14
1313:19 1318:2,5
1318:6 1322:18
1323:6,10 1324:2
1324:3,12,15
1325:12,14,18
1326:12 1327:12
1327:21 1328:4
1330:6,7,10,12,15
1330:18,21
1331:1,6,13,17,20
1332:3,8 1333:20
1333:22 1338:11
1338:13 1339:18
1349:14 1362:12
1362:19 1363:2
1363:10 1364:18
1366:18 1369:19
1370:2,8,11,17
1371:4,5,12,20
1372:3,7,10,17
1373:1,9,21
1374:2,12,15
1376:3 1378:4,9

1378:13,20
1379:17 1380:11
1380:20 1381:10
1381:15,16
**smoke** 1333:7
1345:12,13
**smokes** 1333:8
**smoking** 1346:5,6
**so-called** 1248:8
**sobbing** 1227:7,16
**sold** 1202:8 1207:6
**solemnly** 1170:22
**soliciting** 1202:11
**somebody** 1162:16
1197:17 1257:20
1278:5 1289:8
1301:9 1334:20
1335:8 1336:4
**somewhat** 1371:11
**son** 1206:21
1209:22 1210:12
1222:16
**sooner** 1278:12
**sorry** 1160:16
1165:20 1183:3,4
1199:20 1210:16
1215:2 1227:11
1237:10 1274:6
1281:7 1307:8
1330:7 1331:11
**sort** 1169:21 1221:5
1375:22
**sought** 1347:8,10
1348:3
**soul** 1303:20
**South** 1350:13
**Southern** 1258:3
**spare** 1253:12
**speak** 1163:17
1165:5 1183:12
1201:14 1249:10
1276:15 1294:8
1294:21 1353:2,5
1354:8 1355:12
1361:19
**speaking** 1146:2
1295:1 1353:13
**speaks** 1153:20
1201:22 1237:14
1310:4 1331:5
1332:11,20
1333:17
**specific** 1225:13,13
1260:9 1264:21
1326:20 1328:15
1333:18 1352:2

**specifically** 1350:7
**Specification**
1201:22 1235:14
1235:15 1236:13
1240:11 1241:1
1243:10 1246:14
1250:20 1251:1
1260:2 1280:2
**specify** 1378:21,22
**spectrum** 1165:12
**speed** 1239:7
1345:21
**spell** 1145:19
**spoke** 1206:16
1278:6 1300:1
1312:10
**spoken** 1250:6
1272:4
**spokes** 1276:11
**Sporkin** 1144:4
1145:14 1168:13
1170:17 1171:6
1171:13 1177:13
1208:9 1210:20
1222:16
**Sporkins** 1208:10
**spread** 1293:15,17
**stable** 1228:19
**staff** 1161:18
1239:11,14
**stage** 1266:7,14
1366:16
**stake** 1354:1
**stand** 1146:20
1147:3 1158:10
1177:11,15
1211:12 1260:13
1285:22 1288:1
1299:18 1315:8
1338:18 1339:1
1382:4
**standard** 1164:13
1187:10
**standing** 1265:21
**standup** 1207:21
**Stanley** 1171:6,13
1177:13
**stapled** 1146:14
**start** 1147:12
1224:20 1242:7
1242:22 1245:1
1250:15 1320:4
1334:20 1377:16
**started** 1223:18
1250:19 1296:7
1301:2

**state** 1154:14
1171:12,17
1239:3 1340:8
1343:19 1357:7
1371:16
**stated** 1163:10
1198:10 1310:2
**statement** 1189:15
1189:15 1201:21
1253:10
**statements** 1225:2
**states** 1178:10
1179:21 1190:15
1191:6 1209:22
1355:4
**station** 1348:21
1349:1
**status** 1157:22
1159:15 1173:9
1182:11
**Staunton** 1169:1
1186:12,14
1190:10 1201:5
1239:21 1272:2
**stay** 1230:8
**stepfather** 1358:13
**steps** 1356:11
1358:10
**stipulated** 1152:6
**stipulation** 1153:14
**stop** 1166:7,7
1254:6 1327:14
**stopped** 1172:21
1205:20 1230:14
**stores** 1341:8
**stories** 1248:15
**story** 1172:2
1255:22 1258:5
1296:8 1321:11
**straight** 1340:16
**straightforward**
1366:10
**strangers** 1289:15
**strategic** 1257:13
**strategy** 1344:1,10
**Street** 1142:2
**strength** 1234:12
**stricken** 1295:18
**strike** 1186:20
1188:10,12
1280:5 1290:21
1291:4 1295:13
1295:16 1309:7
1322:15 1328:16
**strong** 1194:14
1195:8 1298:22

**strongly** 1256:18
**struck** 1186:22
   1211:3 1226:3
   1309:9 1325:8
   1354:21
**stuff** 1162:14
   1201:15 1277:6
   1329:14
**style** 1321:2
**subject** 1225:14
   1230:3 1261:8
   1265:4 1284:6
   1370:19
**sublet** 1162:15
**submission** 1244:20
**submitted** 1158:8
   1158:16 1230:22
   1241:18 1244:22
   1247:2 1274:22
**submitting** 1245:13
**subsection** 1258:20
**substantial** 1147:17
   1154:3,12
**succeed** 1243:8
**succeeded** 1167:13
   1168:1,3
**sue** 1353:18 1356:2
**sued** 1247:14
   1267:10,11
   1356:11 1358:12
**suffering** 1309:18
**sufficient** 1181:9
**suggest** 1270:14
   1306:1,10
**suggested** 1173:20
   1268:3 1272:8
**suggesting** 1306:10
   1335:17,18
**suggestive** 1335:19
**suggests** 1269:21
**suicidal** 1357:7
**suicide** 1184:13
**Sujat** 1143:3,4
   1145:8 1147:1,4
   1148:7 1149:4,17
   1149:20 1151:11
   1152:1,16,19,22
   1153:1 1155:1,5
   1158:20 1159:2
   1161:6 1162:18
   1162:19 1177:16
   1177:18 1178:5
   1180:15 1181:12
   1183:6,8,14
   1184:22 1185:11
   1185:14 1187:5,8

1187:11 1189:1,2
1189:6,13
1192:12,20
1193:7,8 1194:21
1196:15,17
1198:5 1199:11
1199:15,19,22
1200:4 1202:18
1203:21,22
1204:6,8,13
1205:8 1211:17
1211:19,20,22
1212:8,21 1213:2
1216:21,22
1217:4,10 1218:1
1218:3,10
1223:11,13
1224:9,10,12,21
1224:22 1225:7
1225:19 1226:5,8
1226:22 1228:11
1229:10,18
1232:6,7,14,16
1235:8,22
1236:17,21
1237:2,7 1238:20
1249:20 1254:9
1254:13,21
1255:11 1258:6
1258:12,16
1260:16 1262:13
1262:14 1263:15
1263:18,20
1264:2,8,11,17
1265:1,6,18,21
1266:2,4,11
1301:2 1307:14
1338:7 1377:13
1377:19 1378:1
**Sullivan** 1210:19
   1222:17
**summaries** 1259:12
**summarily** 1248:3
**summary** 1249:12
   1254:7
**SUP** 1199:8
**superfluous** 1315:7
**superior** 1147:12
   1149:18
**supervisors** 1300:9
**supplemental**
   1146:7 1156:12
   1157:14 1158:4
   1185:12,16
   1193:13,17
   1228:21 1229:10

1233:8 1237:22
1239:18,19
1241:2 1243:13
1244:20 1254:12
1258:8,14
1262:18 1263:2
1263:13 1265:12
1266:5 1267:8
1268:21 1269:2
1270:21 1271:16
1273:10 1274:3,4
1281:4 1286:6
1291:15 1292:5
1292:18 1351:12
1351:15 1362:15
1373:18,21,22
**supplementals**
   1149:1
**supplementary**
   1222:5 1326:5
**support** 1157:14
   1158:4 1346:21
   1362:6
**supporting** 1246:21
**supportive** 1360:5
**suppose** 1340:15
   1379:8
**supposed** 1167:16
   1277:21 1367:15
**supposing** 1190:5
**supreme** 1219:12
**sure** 1192:20
   1193:6 1210:16
   1224:2 1261:14
   1263:18 1266:8
   1274:8 1306:16
   1307:7 1339:21
   1364:12 1374:7
   1376:21
**surface** 1255:18
**surfaced** 1255:19
**surprise** 1288:9
**surprised** 1372:4
   1373:2,10,12
**surrender** 1289:20
**survive** 1234:1,4
**Susan** 1271:11
   1300:8 1310:7
**suspect** 1279:22
**Sustained** 1177:3
   1267:21 1362:13
**Sutherland** 1252:5
**swear** 1170:20,21
   1170:22 1171:4
   1339:10
**sweet** 1297:11

**sworn** 1171:8
   1340:4
**SX** 1235:22
**SX10** 1198:7
**SX25** 1279:2
   1281:12,13,14
   1283:1 1284:17
   1285:5
**SX27** 1292:16
   1301:19,21
   1302:5
**SX3** 1193:10
   1195:3
**SX5** 1194:22
   1196:18
**sympathies** 1231:3
**system** 1142:19
   1155:14 1160:11
   1180:8 1210:22
   1224:7 1252:14

        **T**

**T** 1261:1
**tab** 1149:13
   1158:22 1159:2
   1183:1 1236:17
   1236:19
**table** 1324:17
   1346:7
**take** 1146:19
   1158:10,21
   1167:16 1170:12
   1175:12 1183:11
   1183:17 1184:6
   1193:4 1194:14
   1197:2 1206:18
   1210:13 1211:9
   1219:3 1226:10
   1234:2,6 1247:9
   1254:19 1262:9
   1262:11,21
   1268:21 1272:3
   1273:10,11
   1279:8 1284:10
   1285:9,21 1286:5
   1291:15 1295:11
   1301:15 1315:3
   1320:1 1323:16
   1325:9 1337:7,19
   1343:10 1351:17
   1352:11 1356:11
   1358:10 1360:22
   1361:10 1378:10
**taken** 1142:1
   1170:16 1177:14
   1211:14 1243:10

1247:19 1260:20
1286:3 1324:14
1338:6,17
1353:17 1374:6
**takes** 1211:1
**talk** 1155:5 1192:14
1201:17 1227:19
1241:5 1272:21
1273:8 1278:1
1279:19 1301:6
1321:9 1332:17
1337:9,10
1346:18 1364:15
1369:1
**talked** 1183:2
1207:3 1217:20
1241:6 1253:5
1369:6
**talking** 1148:21,22
1149:2 1162:10
1179:11 1185:14
1202:15 1208:2,3
1227:17 1236:16
1300:19 1306:2
1328:19 1329:1
1348:3 1353:12
**talks** 1239:6
**Tallahassee**
1207:18
**tangible** 1215:12,15
**tank** 1169:21
**Taylor** 1159:14
1173:8 1182:21
1184:2 1241:15
**Tea** 1202:22
**team** 1146:11
1261:5
**tears** 1228:6
**technically** 1203:2
**Tehran** 1219:12
**Television** 1349:2
**tell** 1149:12
1173:11 1174:5
1187:8 1188:6
1192:2 1198:22
1226:13 1234:14
1237:16 1272:20
1272:21 1278:16
1283:2 1304:14
1305:1 1314:11
1340:11 1354:18
1367:2 1372:13
**telling** 1158:16
1168:21,22
1230:18 1242:6
1285:8 1288:10

In Re: Larry E. Klayman
June 26, 2018

1294:9 1311:17
1321:18 1323:2
**temporary** 1152:3
1152:10 1153:4
1153:11 1159:6
**ten** 1232:4 1245:8
1279:10 1363:18
1363:19
**tendered** 1146:12
**tentative** 1379:14
1379:22
**tentatively** 1379:11
**tenure** 1208:19
**term** 1190:2
**terminate** 1297:5
**terminated** 1201:15
**terminating** 1162:4
**termination** 1161:9
**terms** 1205:4
1209:12 1219:18
1257:10 1276:8
1277:22 1288:2
1300:9 1313:3,4
1361:22
**terribly** 1228:19
**terse** 1253:15
**testified** 1150:10
1151:18 1152:14
1156:21 1157:10
1157:21 1166:6
1166:18 1169:14
1171:9 1185:10
1188:7 1196:3
1204:9 1222:1,4
1228:7,14
1240:16 1265:5
1268:11 1284:1
1285:14 1286:14
1295:21 1303:22
1308:13 1309:22
1312:7 1314:17
1318:11 1333:6
1340:5 1352:7
1372:17
**testifies** 1263:19
**testify** 1163:20
1189:20 1215:5
1218:22 1272:7
**testifying** 1376:15
**testimony** 1145:15
1146:9,22 1168:8
1169:4,13
1170:13 1171:1
1177:21 1178:1
1186:2,11,13,19
1186:21 1189:5

1192:16 1200:15
1201:5,9 1203:16
1204:10 1205:15
1206:13 1212:6
1213:16,17
1214:7,7,22
1217:12,16
1223:18 1224:17
1224:18 1226:20
1227:2,6,22
1228:10 1230:4
1233:1 1237:16
1238:9 1239:7
1261:9 1264:4
1271:12 1279:9
1279:14 1288:2
1290:9,13 1306:8
1307:17 1309:8
1310:20 1312:17
1312:17 1314:14
1314:21 1315:8
1322:6 1334:1
1335:15 1337:17
1337:18,20
1338:4,11
1339:11 1344:10
1352:2,4 1369:5
1370:4,11
1372:16 1377:17
**text** 1197:1
**texts** 1294:13
**thank** 1145:13
1147:4 1150:1
1152:19 1155:3
1177:5 1178:5
1185:20 1211:13
1211:19 1229:15
1245:12 1260:15
1260:16 1262:5
1264:2 1271:6
1306:14 1307:18
1308:2 1316:21
1317:2 1329:11
1329:13 1338:2
1338:15 1339:22
1376:22 1377:4
**thanked** 1359:15
**thanks** 1177:8
1276:8 1328:8
1355:4 1359:4
**theory** 1303:9
1379:2
**therapist** 1230:8
**thick** 1157:18,19
**thing** 1149:13
1174:19 1176:15

1176:22 1198:20
1205:21 1221:1
1223:15 1233:17
1243:1 1247:16
1250:3 1257:5,8
1257:11 1259:20
1262:9 1273:7
1274:5,7 1277:18
1278:12 1289:20
1309:3 1310:4
1313:5 1335:13
1335:16 1356:16
1365:19 1380:18
**things** 1156:1
1160:6 1161:5,8
1184:10 1195:15
1195:22 1198:19
1201:3,6 1206:4
1224:10 1248:15
1263:10 1268:14
1271:19 1273:3
1301:5 1315:18
1334:11 1337:1,4
1347:2 1349:11
1367:17 1376:15
**think** 1146:18
1150:21 1161:20
1171:20 1180:7
1185:2 1187:13
1188:11,12
1193:17 1195:10
1200:21 1208:15
1208:18 1211:5,7
1211:17 1212:17
1217:2 1218:15
1225:2,8,12,21
1230:10 1234:2
1236:5,15 1240:5
1245:8 1248:21
1249:18 1250:11
1253:16 1254:2
1254:12 1256:18
1257:19 1259:22
1261:2 1266:6
1282:20 1289:22
1290:2,5 1298:15
1306:18 1309:11
1315:6,6 1321:15
1321:21 1322:20
1323:13 1335:17
1337:16 1338:13
1343:4 1356:12
1369:10,15
1370:20 1372:19
1375:21 1376:16
1379:17 1380:9

**thinking** 1223:18
1245:17 1250:22
1369:21 1376:14
**thinks** 1226:1
1354:3 1356:2
**third** 1305:3
1331:22
**thirty** 1262:11
1285:21
**Thirty-one** 1187:18
**Thirty-six** 1217:10
**thoroughly** 1178:2
1260:1
**thought** 1154:14
1157:6 1170:5,7
1178:15 1195:20
1197:1 1217:21
1237:20 1238:1
1240:7,8 1241:11
1241:20 1247:15
1253:19 1264:19
1266:13 1267:1
1271:17 1273:22
1277:6 1312:13
1316:3,7 1320:19
1322:11 1326:12
1334:4 1335:2
1336:20 1339:17
1370:20
**thoughts** 1300:22
1374:19
**thousands** 1303:1
**threatened** 1219:1
1289:8
**three** 1157:19
1221:18 1271:2
1288:5 1330:12
1361:7
**threshold** 1164:16
1181:7
**threw** 1182:14
**throw** 1184:3
1301:11 1303:19
1305:13
**throwing** 1304:15
**tied** 1294:13
**Tigar** 1142:15
1149:15,19
1159:20,22
1160:5,16,21
1161:1 1178:7,19
1179:6 1190:13
1190:17 1191:3,8
1191:19,21
1192:8,12,18
1193:4 1195:2

1197:16 1200:2
1203:11 1204:7
1209:14,19,22
1210:4,13 1236:3
1242:4 1243:3
1298:8,17 1299:9
1300:3,17
1301:13 1307:8
1316:9,17,19
1317:3,7,9,12,19
1331:11,15
1333:1,10 1366:6
1366:13
**Tigar's** 1181:4
1212:10 1222:16
1248:1
**till** 1335:13,16
**Tim** 1197:3,3
1243:17 1269:8
1293:12,12
1312:7 1360:3,4
1360:16
**time** 1156:5
1157:10 1160:3
1161:2,9 1172:8
1173:2,11
1179:15 1183:12
1183:17 1191:14
1193:4 1198:16
1199:3,3 1203:11
1205:7 1211:8
1215:17 1216:15
1221:22 1222:10
1227:17,18,22
1228:1 1230:13
1234:5 1237:9
1238:1 1239:9
1249:4 1251:7
1255:14 1256:3
1257:10 1259:15
1259:19 1262:21
1263:11 1273:11
1279:9,14
1282:12 1284:13
1288:6 1289:7
1296:3,22
1298:16 1299:1,9
1300:3,20 1302:9
1303:1,12
1304:17 1311:18
1314:6 1317:15
1317:16 1321:12
1324:11 1327:6
1332:22 1334:18
1334:19,22
1341:2,11,15

1342:2,11
1343:10 1344:19
1345:6 1346:2
1347:15 1348:7
1348:18 1349:22
1357:13,14
1363:22 1364:2
1365:8 1371:6
1380:13
**timeline** 1147:21,22
**timely** 1188:1,19
1189:17
**times** 1224:5
1270:11,14
1279:11 1322:1
1341:17
**tired** 1185:5
**Title** 1192:7
**titled** 1218:12
**today** 1145:17
1203:16,19
1256:13 1263:6,9
1296:4 1321:9
1369:6
**told** 1150:13 1172:2
1173:20 1176:9,9
1186:14 1198:13
1198:16 1219:7
1220:2 1240:21
1242:17 1253:1
1256:15 1257:20
1273:5 1274:14
1274:18,19
1276:2 1287:2,13
1288:11 1289:2
1293:12 1296:7
1300:7,8 1305:17
1305:18 1306:7
1310:16 1316:6
1335:10 1348:2
1348:18 1352:22
1366:5 1367:4
1368:16,19
1372:4 1373:2
1374:3
**tomorrow** 1261:19
1261:20,22
1378:6,10,17
1380:11,12,21
**tonight** 1198:11
1229:14
**top** 1148:15
1152:12 1155:16
1187:8,10
1195:21 1229:16
1302:12

**total** 1273:7
**totality** 1151:13
**totally** 1186:11
1251:10 1288:14
1288:16
**touch** 1157:11
1185:9 1201:2
1241:13
**tough** 1253:18
**town** 1206:1
**towns** 1206:2
**trade** 1301:4
**train** 1277:5
**transcript** 1224:13
1225:1,12,16
1226:4,7,10
1232:9,22
**transferred**
1300:10
**Transformation**
1206:12
**traumatized**
1298:20
**treated** 1257:6
1335:1,2 1368:10
**trial** 1155:11,13
1156:3 1193:20
1194:4
**tried** 1164:1 1192:8
1207:19 1209:7
1255:14,17
1268:19 1294:11
1313:1 1336:18
1361:18
**tries** 1230:16
**trigger** 1223:21
**trip** 1315:22 1317:4
1317:12
**TRO** 1153:16
1154:3,7,12,15
1163:12
**true** 1216:14
1312:16 1341:7
1343:15 1352:19
**truth** 1158:16
1171:2,2,3
1339:11,12,12
**Truthful** 1213:11
**try** 1148:4 1154:15
1157:6 1200:17
1200:18 1214:5
1217:21 1220:4
1247:17 1251:20
1272:6 1284:21
1294:17 1304:8
1313:4 1328:17

1343:21 1344:8
1350:5 1351:4
1361:16
**trying** 1155:17,18
1156:21 1157:2,3
1167:12 1179:15
1194:15 1195:6
1195:14 1196:1
1201:18 1202:4
1204:20,21
1205:18,18,20
1214:19 1218:17
1219:16 1221:1,1
1221:3 1230:22
1231:2 1234:21
1257:16 1268:15
1270:4 1272:4
1273:9 1274:21
1279:3 1284:18
1284:19 1291:8,9
1291:18 1294:2
1303:11,15
1304:4,14
1305:14,18
1319:4 1331:2
1332:18,21
1345:5,21
1355:21 1360:11
1360:20 1361:11
1361:22 1364:18
**Tuesday** 1141:8
1358:5
**turn** 1181:12
1246:17 1281:17
1328:8 1342:22
1343:18 1351:5,8
**turned** 1300:13
1328:12
**turning** 1213:13
**TV** 1257:1 1348:21
1349:1 1359:19
**twelve** 1159:1,2
1279:10
**twenty** 1188:17
1340:18
**Twenty-four**
1314:2
**Twenty-one** 1183:7
**Twenty-seven**
1292:13
**Twenty-three**
1217:9 1265:18
**Twenty-two**
1188:18
**twice** 1150:20
1290:1

**two** 1147:7 1149:13
1150:4 1197:8
1198:19 1199:18
1200:1 1206:15
1209:12 1212:14
1212:17 1233:20
1234:8 1266:9
1283:11,16
1301:22 1311:15
1347:21 1361:6
1381:13
**Ty** 1248:2
**tying** 1202:5
**type** 1251:17
1299:3
**typewritten**
1189:15
**typo** 1314:11,12
**tyranny** 1212:14

_____
**U**
_____
**U.S** 1152:2 1252:8
**U.S.C** 1181:6
**Uber** 1261:16
1262:10 1285:20
1315:22 1316:6
**ulcer** 1310:12
**ultimate** 1206:10
1235:1
**ultimately** 1154:16
1166:3,13 1168:3
1170:2 1198:1
1250:19 1251:21
1272:5 1351:3
**umbrella** 1161:5
**uncertainty** 1169:7
**unclear** 1178:16
1277:21
**uncommon** 1225:16
**underscores**
1197:20
**understand**
1164:18 1244:2
1270:4,7 1291:3
1293:3 1296:13
1299:17 1301:5,6
1308:9 1336:21
1348:12 1350:15
1361:10 1366:7
1368:2
**understanding**
1348:20 1351:12
1368:22
**understood**
1271:19 1288:21
1290:4 1292:15

1293:1 1312:19
1312:20 1315:13
1321:17 1322:8
1322:22 1367:14
**unexpected** 1253:5
**unfair** 1251:10
1256:1 1334:8
**unfairly** 1310:6
**unfortunately**
1222:15
**unilaterally**
1289:20
**United** 1178:9
1190:15 1191:6
1209:22
**University** 1171:17
**unresponsive**
1309:8
**Unruh** 1214:10
1217:17,18
**unsuccessful**
1156:7
**untruthful** 1186:19
1203:18
**ups** 1242:13,18
**upset** 1224:5
**upsetting** 1245:3
1337:2
**urging** 1350:1
**use** 1219:5 1225:16
1257:21 1343:20
1344:8
**useful** 1266:15
**usually** 1345:11

_____
**V**
_____
**v** 1141:6 1184:2
1241:15
**vacated** 1168:4
**vague** 1225:22
**Vanessa** 1198:11
1199:3
**various** 1161:19
1169:3 1299:21
1336:14
**verbally** 1299:16,16
**verge** 1184:12
**victim** 1230:18
1235:1 1244:5
**Victories** 1202:22
**videos** 1359:18,19
1359:21
**view** 1177:21
1184:8 1265:4
1284:1 1321:9
**viewed** 1163:15

In Re: Larry E. Klayman
June 26, 2018

views 1209:19
VII 1192:7
violated 1244:18
violation 1379:12
  1379:15,18
violations 1182:7
Virginia 1347:19
  1347:20
virtually 1184:12
vis- -vis 1178:16
VOA 1190:13
  1197:5 1198:14
  1198:18 1214:11
  1273:20 1274:16
  1284:21 1289:1
  1293:14 1294:5
  1294:10 1297:5
  1308:18 1343:20
  1344:7,13 1348:1
  1350:16 1360:5
  1361:12
VOA's 1293:15
voice 1173:5 1176:5
  1200:19 1204:17
  1213:14 1222:13
  1269:17 1328:21
  1342:3,6 1347:11
  1348:22 1360:3
  1360:20
Vol 1141:6
voracity 1203:20
vs 1147:8,9 1159:14
  1173:7 1182:10
vulnerable 1298:11
  1298:12,14,15,18
  1299:8

_____
          W
_____
W 1155:12
Wagner 1159:14
  1173:7 1182:10
  1184:2 1241:15
wait 1193:16
  1198:14 1215:1
  1217:7 1229:8
  1276:19 1281:16
  1296:20 1316:19
  1320:7 1322:14
  1322:14,14
  1326:8 1330:18
  1335:13,16
  1339:4 1380:19
waiting 1364:22
waiver 1252:1,15
  1252:18
walk 1226:9

1374:18
walking 1245:10
want 1149:11
  1151:9 1168:21
  1179:20 1186:15
  1188:4 1193:4
  1209:14 1210:2
  1213:6,18
  1217:15 1223:14
  1223:15 1229:20
  1233:14 1242:8
  1244:12 1245:9
  1247:12 1259:9
  1259:18 1262:8
  1263:20 1264:6
  1264:21 1272:22
  1273:3 1275:12
  1277:2 1279:8
  1280:8 1283:14
  1283:15 1285:15
  1289:19 1291:4
  1293:19 1305:13
  1310:17 1311:19
  1314:6,10 1315:1
  1322:15 1326:11
  1328:13 1331:18
  1337:19 1353:18
  1370:1 1380:22
wanted 1146:7
  1153:9 1154:10
  1163:17 1164:2
  1168:9 1169:1
  1176:16 1188:6
  1193:2 1199:5
  1200:9 1209:8
  1210:14 1214:14
  1221:2 1224:1,4
  1233:10 1234:5,6
  1235:4 1243:6
  1251:6 1252:19
  1253:9 1256:22
  1271:19 1275:16
  1278:1 1284:22
  1312:14 1316:3,8
  1319:3 1322:4
  1327:17 1336:1,3
  1336:6 1354:4,5
  1367:2,5 1368:21
  1369:1 1380:17
wants 1169:22
  1244:5 1254:1
  1378:21
War 1213:20
warrants 1253:17
WARREN 1142:11
Washington 1141:9

1142:2 1151:8
1161:16 1297:4
1341:17 1342:9
1349:12 1354:2
wasn't 1156:8,20
  1161:16 1197:21
  1202:5,18 1223:8
  1228:19 1230:15
  1242:10 1268:19
  1275:2 1278:3
  1289:16 1291:17
  1297:12 1300:1
  1300:10,21
  1304:13 1309:21
  1312:16 1313:10
  1321:7 1323:5
  1334:22
waste 1259:15
watch 1252:7,8
  1257:15 1258:3
  1359:17,18,21
Watch's 1257:17
water 1182:15
  1301:11
way 1143:5 1151:3
  1180:6 1189:22
  1203:3 1209:15
  1215:19 1220:3
  1230:10,15
  1233:22 1234:2
  1235:2 1242:15
  1244:15,17
  1247:17 1248:5
  1251:14 1265:3
  1270:3 1274:9
  1277:3 1279:21
  1291:17 1293:5
  1303:11 1312:15
  1316:2 1323:21
  1334:21,22
  1335:5 1343:5
  1344:14 1366:12
  1366:14 1368:11
  1371:16 1379:21
ways 1208:14
we'll 1192:14,16,22
  1211:9 1239:8
  1240:13 1241:19
  1261:20 1262:1
  1264:3 1295:15
  1297:5 1335:14
  1337:16,18,22
  1379:8,12
we're 1146:18
  1149:2 1155:3
  1162:7 1184:2

1189:4 1191:4
1211:7 1221:3
1224:17 1236:16
1242:6 1247:11
1253:15 1254:18
1259:6 1261:10
1261:21 1263:10
1263:16,21
1270:8 1316:13
1337:11 1342:21
1353:12,13
we've 1165:10
  1172:20 1253:16
  1257:1,2 1258:1
  1263:4 1299:21
  1364:12
website 1202:11
websites 1219:2
week 1156:17
  1220:19 1230:8
  1312:22
weekend 1242:1
  1282:7
weeks 1197:8
wellbeing 1285:7
went 1154:9 1159:7
  1171:16,17
  1173:6,10
  1179:16 1200:16
  1201:8 1229:3
  1245:7 1253:1
  1256:21 1275:20
  1294:15 1296:6
  1317:14,16
  1340:16 1375:13
weren't 1208:17
  1296:21 1297:1
white 1229:9,11
Whores 1203:7
  1318:14 1320:22
William 1196:6
Williams 1248:1
Wilshire 1161:14
  1162:12,12
Windjammer
  1143:5
Wisconsin 1345:17
wish 1197:11
  1226:11 1231:7
  1261:6,7
withdraw 1270:17
  1271:8 1288:22
  1294:10 1321:19
  1323:2 1325:12
  1370:7
withdrawn 1251:1

witness 1145:17
1146:20 1147:2
1149:2,9 1150:1
1151:18,21
1152:5 1155:5
1156:19 1158:9
1158:12 1159:3
1159:21 1160:3,8
1160:17,22
1161:4,7 1162:3,6
1162:9 1165:16
1165:18,20
1166:9,13,17
1167:6,10
1168:17 1170:15
1170:21 1171:4,7
1172:11,13
1177:8,13,15
1178:14 1179:9
1183:10 1185:5,7
1185:18,20
1187:5,13,16,20
1188:2,16,18,22
1189:4,13,18
1190:5,16,20,22
1191:7,20 1192:5
1192:11,15,22
1193:6,19 1194:2
1194:7 1195:8
1197:15,20
1199:17 1200:7
1202:15 1203:15
1204:9 1209:18
1209:21 1210:3,6
1210:16 1211:4
1211:13 1212:9
1213:3 1215:2,8
1215:11,14,16
1216:2,8,13,19
1217:5,13,20
1218:12 1220:18
1220:22 1221:8
1221:11,16
1222:1 1223:14
1225:16 1226:15
1226:18,21
1227:3,7,11,16
1228:2 1229:6,12
1229:21 1231:13
1231:15,19,22
1232:16 1233:2
1233:16 1234:17
1235:21 1236:1
1242:5 1243:4,19
1248:12,17
1249:7,11,21

In Re: Larry E. Klayman
June 26, 2018

1254:14,17,22
1256:5 1261:15
1262:5,8 1263:16
1263:19 1271:5
1273:13 1274:11
1275:10,15
1277:2 1280:9,13
1280:16,19,22
1281:4,7,10,14,16
1281:20 1282:1,3
1282:9,13,17,20
1283:8,12,17,18
1283:22 1284:5
1285:19 1286:2
1286:16 1287:21
1289:2 1290:18
1290:22 1291:3,7
1291:8,17,21
1292:3,17,19,20
1295:13,16
1298:13,20
1299:12,18
1300:7,20 1302:7
1302:12,16
1303:3,10 1305:4
1305:19 1306:4
1306:12,16
1307:13,16
1308:6 1309:14
1312:4 1313:22
1314:4,12,15
1315:3,5,6,21
1316:1,5,11,15,21
1317:2,6,8,11,14
1317:20 1318:3
1322:17 1323:4
1323:13,17,20
1325:9 1327:1,5
1327:22 1328:14
1330:14,16
1331:2,4 1332:5,7
1333:3,13
1337:12,13,19
1338:2,5,18,21
1339:1,3,6,13
1340:3 1345:17
1351:10,21,22
1352:9,12
1354:11 1357:10
1357:15 1358:18
1361:1,8 1365:1
1366:9,15 1368:5
1369:15 1370:15
1373:7 1374:1
1376:21 1377:1,4
1377:7 1380:20

1381:6,17
**witness'** 1338:11
**witnesses** 1144:2
1145:11 1158:11
1158:15 1159:12
1256:5,7
**woman** 1164:19
1173:4,16
1184:11 1353:17
1374:17,19
**woman's** 1354:1
**women** 1170:5
**women's** 1256:16
1257:6
**wondering** 1339:19
**word** 1182:13
1185:3 1232:1
1233:15,15
1314:22
**wording** 1259:14
1306:1
**words** 1160:19
1243:3 1306:10
1306:13 1313:21
**work** 1161:5 1173:8
1176:13 1179:20
1180:9 1189:9
1195:19 1253:13
1273:21 1274:17
1277:13 1285:1
1296:22 1297:4
1298:19 1299:3
1300:10,13
1308:19 1310:6
1319:21 1348:21
1362:9
**worked** 1342:16
1344:15 1349:20
1353:2
**working** 1160:12
1161:4 1195:11
1198:10 1254:3
1321:17 1323:1
1324:20 1342:3,4
1348:22
**works** 1350:20
1382:3
**world** 1207:2
**WorldNetDaily**
1202:2,6 1203:9
1204:21 1207:7
1208:7 1213:6,7
1214:10 1215:19
1216:4 1313:15
1318:8 1319:19
1328:6 1329:18

1331:10
**worry** 1194:9
1206:19
**worse** 1239:13
**worth** 1157:6
**wouldn't** 1156:3
1190:1 1287:5
1304:9 1309:2
1354:20 1370:21
**wrap** 1189:9
1261:20,22
**wrapped** 1247:15
**write** 1217:19
1218:15 1220:18
1223:6,7 1279:19
1299:14,20
1304:7 1309:2
1358:4 1360:12
1365:11,19
1366:11,12,22
1367:3,5 1368:15
**writer** 1216:5
1223:10
**writing** 1223:10
1293:5 1304:12
1355:10
**written** 1146:3
1157:2 1165:2
1200:10,17,22
1201:1 1212:12
1214:9 1215:7,21
1222:10 1246:21
1248:2 1287:11
1289:6 1296:5
1299:19 1300:5
1301:9 1303:8,11
1307:11 1308:21
1314:9 1322:8,10
1322:11 1327:8
1353:14 1374:14
**wrong** 1191:2
1196:11 1236:7
1334:3
**wrote** 1148:17
1159:5 1191:22
1194:8 1203:11
1213:10,18
1237:17 1246:12
1249:16 1280:2
1281:18 1286:19
1287:11 1288:21
1321:10,12
1329:14,18
1353:9 1354:7
1355:22 1357:4
1360:4 1366:16

1366:19,20
1371:6 1376:10

_____
**X**
_____
**X** 1141:3,7 1144:1

_____
**Y**
_____
**Yale** 1171:17
**yeah** 1160:4 1162:9
1166:9 1172:4,7
1173:1 1174:4,9
1174:14 1175:20
1176:10,21
1187:16 1191:20
1192:11 1202:15
1202:18 1210:3
1221:8 1249:21
1251:15 1270:14
1271:3 1272:13
1277:16 1280:22
1283:8 1287:10
1287:17 1299:12
1305:19 1309:9
1309:14 1314:12
1315:6 1317:21
1318:18 1320:16
1329:1,2,10,15
1331:4 1332:20
1336:16 1350:21
1359:15 1365:4
1365:18,21
1370:18 1375:17
**year** 1192:21
1242:3,4
**years** 1172:21
1176:10,12
1206:4 1209:13
1223:19 1227:10
1233:18,21
1234:13 1237:19
1240:3,3,4,19
1243:13 1244:9
1246:1,8 1253:3
1256:21 1278:11
1278:13 1280:4
1301:4 1340:18
1363:13,18,19
1366:17 1375:12
**yesterday** 1146:2
1147:22 1150:10
1151:19 1152:15
1155:19 1156:21
1157:21 1161:8
1166:6,19
1168:11 1172:2
1177:20 1184:21

1185:10 1200:15
1218:22 1229:3
1231:11 1254:15
1286:15 1288:2
1334:2
**younger** 1171:22

_____
**Z**
_____
**Z-i-a** 1349:3
**zealous** 1375:7,9
**zealously** 1241:9
1243:9
**zealousness**
1147:19
**Zero** 1330:1
**Zia** 1349:3

_____
**0**
_____

_____
**1**
_____
**1** 1228:21 1235:10
1236:6 1237:11
1237:11 1262:16
1263:1,2,12,13
1264:20 1285:5
**1-1** 1237:3
**1-2** 1237:3
**1.1** 1237:2
**1.2** 1237:3
**1:00** 1211:10
1259:7
**10** 1155:6,7 1156:9
1178:1 1254:13
1254:14 1265:9
1361:6
**10/1** 1221:19
**10/15** 1221:19
**10:05** 1230:2
1232:2
**10:29:36** 1361:4
**100** 1215:20 1224:2
**11** 1156:11 1157:13
1158:18 1214:10
1220:15 1326:15
**11:00** 1378:17
1381:20
**11:29** 1211:9,16
**11:46** 1211:16
**1147** 1144:3
**1171** 1144:4
**1175** 1144:4
**1180** 1144:3
**11th** 1207:9,12
1217:1 1220:15
**12** 1154:21 1158:22
1200:2 1320:2

In Re: Larry E. Klayman
June 26, 2018

Page 1410

| | | | | |
|---|---|---|---|---|
| **12-** 1211:9 | 1330:10 | **2017** 1242:5 | **25th** 1200:6,10,21 | **4:00** 1145:18 |
| **12:46** 1260:19 | **2:00** 1260:13,17 | **2018** 1141:8 | 1352:21 1355:10 | 1261:17 |
| 1302:9 | 1302:9 | 1224:14 1232:10 | 1360:2 | **4:35** 1382:5 |
| **1267** 1144:3 | **2:30** 1262:10 | 1232:18 1352:21 | **26** 1141:8 1151:5 | **40** 1149:18 1206:4 |
| **12th** 1239:5 | **200** 1202:3 1232:10 | 1355:10 1360:2 | 1286:6 1361:3 | **43** 1238:22 |
| **13** 1162:21 1163:6 | 1234:15,19,19 | 1382:6 | **26th** 1151:2 1163:3 | **430** 1142:2 |
| 1163:6 1180:17 | **2004** 1321:12 | **2004** 1321:12 | 1165:14 1167:4 | **4th** 1242:1 1286:20 |
| 1180:21 1181:2 | **2009** 1255:15 | **2009** 1255:15 | **27** 1265:11 1270:20 | |
| **13-25** 1163:7 | 1321:14 | 1321:14 | 1270:21,22 | **5** |
| **13-38** 1163:7 | **2010** 1147:13 | **20th** 1187:7 | 1281:1 1285:18 | **5** 1146:1 1258:14 |
| **1340** 1144:5 | 1150:16 1151:2,4 | 1343:16 1375:12 | 1291:16 1292:6 | 1264:12,18 |
| **1363** 1144:5 | 1151:5 1152:12 | **21** 1183:3,6,18 | 1324:9 | 1265:8 1343:3 |
| **1376** 1144:5 | 1153:2,6 1155:15 | 1221:13 1222:4 | **27th** 1186:5 1382:6 | **5R** 1249:20 |
| **14** 1180:18,18 | 1159:5 1163:3 | 1223:16 | **28** 1181:6 1220:13 | **5th** 1286:9 1321:16 |
| 1265:9 | 1165:14 1167:4 | **21st** 1183:8 1213:15 | 1287:18 | 1322:7,21 |
| **144** 1167:17 | 1180:21 1181:2 | 1222:8 1223:22 | **28th** 1213:4 | |
| 1178:10 1180:3 | 1181:14,18,21 | 1359:4 | **29th** 1331:9,16 | **6** |
| 1181:6,8,10 | 1183:8 1194:8 | **22** 1183:16 1188:16 | **2nd** 1206:9 1273:15 | **6** 1263:2,14 |
| **145** 1181:6 | 1196:22 1198:10 | **22nd** 1181:14,18,21 | 1278:15 1356:21 | 1268:22 1269:3 |
| **14th** 1187:4 | 1200:6 1205:12 | 1184:16 1192:20 | 1357:3 1358:5 | **6/9/10** 1156:14 |
| 1189:16 1204:16 | 1205:13 1206:9 | 1355:3 | | **60** 1190:18 1191:1 |
| 1205:10 1213:19 | 1207:9,12 1213:4 | **23** 1199:7,16,21 | **3** | 1191:5 |
| 1307:12 | 1213:15,19 | 1204:6 1231:9,17 | **3** 1148:20,20,22 | **60s** 1340:13 |
| **15** 1181:12 1265:10 | 1214:11 1218:5 | 1238:7 1265:14 | 1149:3 1193:13 | |
| 1326:21 | 1222:8 1223:22 | 1313:14 1319:7 | 1373:18,20,21,22 | **7** |
| **15-minute** 1211:9 | 1231:12 1255:2 | 1320:2 1328:7 | **3:00** 1315:20 | **7** 1146:7 1152:21 |
| **1525** 1143:5 | 1268:2 1270:16 | 1331:8 | **30** 1218:5 1220:13 | 1152:22 1339:17 |
| **15th** 1161:10 | 1273:15 1276:13 | **23-11** 1199:19 | 1221:20 1228:21 | 1351:8,13,15 |
| 1162:4 1258:17 | 1277:11 1278:7 | **23-12** 1200:4 | 1262:16 1263:1 | 1362:16 |
| 1307:22 1325:21 | 1278:15 1281:13 | 1313:16 1320:2,7 | 1263:12 1264:20 | **7/2** 1221:18 |
| 1326:3 1329:17 | 1281:22 1286:9 | 1328:8 | 1280:11,21 | **7/26/10** 1177:19 |
| 1329:21 | 1286:20 1292:9 | **23-14** 1204:8 | 1326:17,20 | **70's** 1340:14 1341:7 |
| **16** 1181:19 1182:21 | 1293:1 1294:9,22 | 1319:10 1331:8 | **30-day** 1231:1 | **7th** 1159:5 1311:10 |
| 1183:1 | 1298:2 1307:12 | 1331:13 | **30th** 1204:1 | |
| **17-BD-063** 1141:5 | 1308:5 1311:10 | **23-15** 1331:21 | 1232:10 1270:16 | **8** |
| **19** 1301:22,22 | 1321:16 1322:22 | **23-16** 1204:14 | 1276:13 1277:11 | **815-5221** 1143:7 |
| 1328:7 | 1324:6,19 | 1208:9 1329:19 | 1278:7 1294:9,22 | **8th** 1161:3 1196:22 |
| **199** 1233:4 1234:18 | 1325:16 1326:14 | **23-17** 1330:11,12 | 1324:6,19 | |
| **19th** 1150:16 | 1326:15 1328:5 | 1330:15,16,20 | 1325:16 1326:13 | **9** |
| 1151:4 1184:17 | 1329:17,21,22 | **23-19** 1205:11 | 1326:15 | **9** 1153:15 1154:19 |
| 1198:9 1292:9 | 1331:9 1345:1 | 1328:6 | **31** 1295:2 | **9:29** 1142:3 |
| 1293:1 | 1353:15 1357:14 | **23-22** 1206:9 | **31st** 1187:17 | **9:30** 1380:12 |
| **1st** 1147:13 1153:2 | 1358:2,5 1359:4 | **23-25** 1207:11 | 1224:14 1232:18 | 1382:6 |
| 1153:6 1160:1 | 1361:3 1374:13 | 1212:8 | **33,000** 1248:8 | **954** 1143:7 |
| 1161:2 1184:17 | **2011** 1184:17 | **23-30** 1213:15 | **33019** 1143:6 | **9701** 1161:14 |
| 1205:12,13 | 1186:5 1187:4,7 | **23-32** 1213:16 | **332** 1224:14 1225:2 | 1162:12 |
| 1224:3 1328:5 | 1187:17 1189:16 | **23-36** 1217:4,10 | 1226:5,15 | **9th** 1155:15 |
| | 1191:22 1204:2 | 1313:16 | **38** 1326:5 1336:22 | |
| **2** | 1205:10 1258:17 | **23-41** 1313:16 | | |
| **2** 1147:14 1148:9 | 1325:22 1326:21 | **23rd** 1194:8 1201:7 | **4** | |
| 1148:11,22 | **2012** 1230:2 1231:9 | 1230:2 1232:3 | **4** 1185:17 1301:16 | |
| 1149:5,10 1150:4 | 1231:17,21 | 1374:13 | 1307:2,11 | |
| 1150:5,5 1151:13 | **2014** 1255:13 | **24** 1265:10 1311:7 | **4-33** 1308:4 | |
| 1199:8,16 | **2015** 1366:17 | 1312:2 1313:18 | **4-34** 1301:16 | |
| 1228:22 1229:6 | **2016** 1239:6 | **24-1** 1311:16 | 1307:2,6 | |
| 1281:13,22 | 1255:18 1343:16 | **24th** 1152:12 | **4(a)1B** 1191:4 | |
| | 1375:12 | 1192:2 1308:5 | | |
| | | **25** 1273:11 1274:1 | | |
| | | 1274:2,3 1337:8 | | |

App.0594



RECEIVED

July 19, 2018

Board on Professional
Responsibility

**Date:** June 27, 2018

**Case:** In Re:  Larry Klayman



Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

Page 1412

DISTRICT OF COLUMBIA COURT OF APPEALS

BOARD ON PROFESSIONAL RESPONSIBILITY

- - - - - - - - - - - - - - - - X

In the Matter of,               : Board Docket No.

LARRY E. KLAYMAN,               : 17-BD-063

            Respondent.    :  Vol VI

- - - - - - - - - - - - - - - - X

           Wednesday, June 27, 2018

           Washington, DC


      HEARING


Reported by

    Kim M. Brantley, C.S.R.

In Re: Larry Klayman
June 27, 2018

| Page 1413 | |
|---|---|

1  Hearing, taken at the Board on Professional
2  Responsibility, 430 E Street, NW, Washington, DC,
3  commencing at 9:32 a.m., before the Ad Hoc Hearing
4  Committee, and before Kim M. Brantley, C.S.R., a
5  Court Reporter and Notary Public in and for the
6  District of Columbia, when were present on behalf
7  of the respective parties:
8
9  APPEARANCES:
10  AD HOC HEARING COMMITTEE:
11  WARREN ANTHONY FITCH, ESQUIRE
12  Chair
13  MARY LARKIN
14  Public Member
15  MICHAEL TIGAR, ESQUIRE
16  Attorney Member
17
18  On behalf of the DC Attorney Disciplinary
19  System:
20  H. CLAY SMITH, III, ESQUIRE
21
22

| Page 1415 | |
|---|---|

1      I N D E X
2  WITNESSES:    DIRECT:   CROSS:
3  Larry Klayman    1532    1422
4  Joshua Ashley Klayman    1521
5
6  CLOSING ARGUMENTS:    PAGE:
7  By Mr. Smith    1547
8  By Mr. Klayman    1569
9
10
11
12
13
14
15
16
17
18
19
20
21
22

| Page 1414 | |
|---|---|

1  APPEARANCES CONTINUED:
2  On behalf of Respondent:
3  FREDERICK J. SUJAT, ESQUIRE
4  Law Office of Frederick J. Sujat
5  1525 Windjammer Way
6  Hollywood, Florida 33019
7  (954) 815-5221
8  Email: fsujat@yahoo.com
9  ALSO PRESENT:
10  LARRY E. KLAYMAN, ESQUIRE
11  Respondent
12  and
13  MEGHAN BORRAZAS,
14  BOPR Staff
15
16
17
18
19
20
21
22

| Page 1416 | |
|---|---|

1      P R O C E E D I N G S
2  CHAIRMAN FITCH: Good morning. We are
3  now back on the record at 9:32 and ready to resume
4  Mr. Smith's cross-examination of Mr. Klayman.
5  First, any preliminary matters, Mr.
6  Smith?
7  MR. SMITH: Yes.
8  There was one document that I was going
9  to introduce during our case, and it is a letter
10  dated January 14th, 2011. It is the letter that
11  opened our investigation in this matter and the
12  cover letter, along with the ethical complaint,
13  which was not included.
14  So, I'm actually going to just ask this
15  to be -- I'm giving a copy to Respondent and his
16  counsel.
17  CHAIRMAN FITCH: Does this document
18  relate to the testimony by Respondent Klayman as
19  to the circumstances that are beyond the
20  jurisdiction of this committee?
21  MR. SMITH: It does not.
22  CHAIRMAN FITCH: What does it relate

In Re:  Larry Klayman
June 27, 2018

---

## Page 1417

1  to?

2  MR. SMITH:  This actually should have

3  been a part of Bar Exhibit Number 1.  It is a

4  letter that we sent to Mr. Klayman in January of

5  2011 opening the investigation.

6  What we have as Exhibit 1 is just a

7  copy of the ethical complaint.  But for purposes

8  of knowing exactly when we first --

9  CHAIRMAN FITCH:  I thought this was

10  already in your exhibits.

11  MR. SMITH:  Not the cover letter.  The

12  complaint itself is, it's Bar Exhibit 1, but the

13  cover letter was not.

14  CHAIRMAN FITCH:  Ok.

15  MR. SMITH:  And I would ask that this

16  document be received as Disciplinary Counsel

17  Exhibit 52.

18  CHAIRMAN FITCH:  Respondent?

19  MR. KLAYMAN:  No objection.

20  CHAIRMAN FITCH:  We are writing 52

21  underneath the words Disciplinary Counsel Exhibit.

22  Did you give one to Ms. Borrazas?

---

## Page 1418

1  MR. SMITH:  I certainly will.

2  CHAIRMAN FITCH:  Alright then.

3  I think we're set.  Anything else?

4  MR. KLAYMAN:  Your Honor, just that --

5  CHAIRMAN FITCH:  Wait a minute.

6  Anything else, Mr. Smith?

7  MR. SMITH:  Nothing else from

8  Disciplinary Counsel.

9  CHAIRMAN FITCH:  Mr. Klayman?

10  MR. KLAYMAN:  Just that Ms. Klayman is

11  on the way here from New York City.  She will be

12  here at the estimated time of 11:00 a.m.  And if I

13  may go down when she arrives here, I will go down

14  and bring her up.

15  CHAIRMAN FITCH:  Is she training or

16  planing?

17  MR. KLAYMAN:  She is coming by train.

18  I just need to go down and get her.  She doesn't

19  know this courthouse.

20  CHAIRMAN FITCH:  No, given this

21  construction...

22  Why don't you resume the stand and you

---

## Page 1419

1  and Mr. Sujat can keep track of when you should --

2  is she going to call you?

3  MR. KLAYMAN:  Yes, she's going to call

4  me.

5  CHAIRMAN FITCH:  Ok.

6  MR. KLAYMAN:  I'll leave my cell phone

7  on silent.

8  CHAIRMAN FITCH:  So, Mr. Smith, just

9  for your information, if you happen to go that

10  long, your cross-examination, in terms of your

11  organization and so on, keep in mind that there's

12  a definite likelihood of a break in your

13  examination.

14  MR. SMITH:  Alright.

15  CHAIRMAN FITCH:  Shortly before 11:00

16  a.m., apparently.

17  MR. SMITH:  Alright, thank you.

18  CHAIRMAN FITCH:  Mr. Klayman, resume

19  the stand.

20  (Mr. Klayman resumes the stand.)

21  CHAIRMAN FITCH:  Go ahead, Mr. Smith.

22  Mr. Klayman remains under oath.

---

## Page 1420

1  MR. TIGAR:  Before you start, I have in

2  front of me Disciplinary Counsel Exhibit 52, which

3  has just been admitted, and Mr. Klayman, it was

4  addressed to Post Office Box 2788, Washington,

5  D.C., 200013.

6  Now that's a new one?

7  THE WITNESS:  It is, yeah.

8  MR. TIGAR:  So can you tell me about

9  that?

10

11  THE WITNESS:  Yeah, at that time in my

12  life I didn't have a virtual office at 2020

13  Pennsylvania Avenue.  There was a post office box,

14  and I believe that post office box was for my

15  group, Freedom Watch, so it was sent there, and

16  for myself -- actually it was for myself, and I

17  had used that, I believe, as the address with the

18  Bar, and then I changed the address later with the

19  Bar registration as to where I was located.

20  MR. TIGAR:  Thank you.

21  CHAIRMAN FITCH:  During what period of

22  time did you have that as your post office

---

3 (Pages 1417 to 1420)

App.0598

In Re: Larry Klayman
June 27, 2018

## Page 1421

1   address? I mean the letter is dated the 11th.
2       THE WITNESS: Yes, I don't remember the
3   exact timeframe, but I'm not disputing --
4       CHAIRMAN FITCH: Yeah, I know.
5       THE WITNESS: -- that I got that.
6       CHAIRMAN FITCH: No, I know.
7       THE WITNESS: Yeah.
8       CHAIRMAN FITCH: This is January 2011.
9   At that point in time had you had the post office
10   box for a week, a year?
11       THE WITNESS: I think I did. Well, I
12   had it before. Yeah, I was using it before.
13       CHAIRMAN FITCH: For how long before?
14   Approximately how long before January?
15       THE WITNESS: I don't recollect, you
16   know. This has been eight years, this case. It's
17   hard to remember exactly.
18       But I may have had both addresses at
19   the time, and it's probable that I did.
20       But I'm just speculating now. This
21   goes back eight years. I don't really remember
22   specifically when I took the box out.

## Page 1422

1       But I was moving around a lot, and I
2   was in Florida, which is my home state, and I was
3   here, I was in California, I was in another
4   states. So I needed a post office box to send
5   things to, and then I felt that I needed an
6   address, you know, a street address, so that's
7   when I took out the virtual office on 2020
8   Pennsylvania Avenue.
9       But I don't remember the exact dates,
10   your Honor.
11       CHAIRMAN FITCH: Go ahead, Mr. Smith.
12       MR. SMITH: Thank you.
13       CONTINUED CROSS-EXAMINATION
14       BY DISCIPLINARY COUNSEL:
15       BY MR. SMITH:
16     Q. Mr. Klayman, I will ask you to look at
17   Bar Exhibit Number 51. For the record, it is a
18   letter dated December 19, 2016 from Mr. Klayman to
19   the Office of Bar Counsel.
20     A. Is this the new exhibit?
21     Q. No. Fifty-one is the --
22     A. I don't have 51 in the book.

## Page 1423

1       CHAIRMAN FITCH: The blue book.
2       THE WITNESS: In the blue book I only
3   have up to 50.
4   BY MR. SMITH:
5     Q. It's not in that blue book?
6     A. No. I've never seen 51. This was the
7   book that was sent to me by you.
8       MR. SMITH: Fifty-one was the exhibit
9   that we added at the beginning of the hearing.
10       Do you have another copy of your --
11       MR. SUJAT: Let me see. This is my
12   copy.
13       CHAIRMAN FITCH: Now wait a minute.
14   Fifty-one -- oh, he has it.
15       MR. SUJAT: Yes.
16       CHAIRMAN FITCH: Ok. Mr. Sujat has
17   taken it from the Respondent's file and provided
18   it to Mr. Klayman.
19       Go ahead.
20       THE WITNESS: Wait a second. Is this
21   our exhibit or your exhibit?
22       CHAIRMAN FITCH: It's Disciplinary

## Page 1424

1   Counsel's Exhibit 51.
2       MR. SMITH: Our Exhibit 51.
3   BY MR. SMITH:
4     Q. It's the letter you wrote to
5   Disciplinary Counsel on December 19th, 2016.
6     A. Ok, you also have that in your Exhibit
7   D, which is in evidence, which is part of -- it
8   was attached to my Answer and Affirmative Defenses
9   to the Specification of Charges.
10     Q. Ok.
11     A. So it's there, as well.
12     Q. Ok. Thanks.
13       CHAIRMAN FITCH: Go ahead.
14   BY MR. SMITH:
15     Q. Have you had a chance to read that, or
16   do you want some more time to read it?
17     A. I'll read it.
18     Q. I'd like to take your attention to --
19       MR. SUJAT: Excuse me, Mr. Chair, I
20   have one question if I could.
21       CHAIRMAN FITCH: Sure.
22       MR. SUJAT: I was looking at these

4 (Pages 1421 to 1424)

App.0599

In Re: Larry Klayman
June 27, 2018

## Page 1425

1  exhibits here. I do see that Exhibit 51 in the
2  binder that you sent me to Florida, remember I
3  asked for a copy that you sent, so I see here, and
4  I'm looking in probably what you had given Mr.
5  Klayman previously to look at, and this is all he
6  has right now.
7        I don't see 51 and I don't see it in
8  the index in the front -- if you look at the front
9  cover.
10       MR. SMITH: We amended it the first
11  day. We amended that the first day.
12       MR. SUJAT: Oh, I see, ok.
13       MR. SMITH: And, as Mr. Klayman pointed
14  out, there's a copy in Bar Exhibit D.
15       MR. SUJAT: Right.
16       MR. SMITH: Which is his answer to the
17  Specification of Charges.
18       MR. TIGAR: I'm having trouble finding
19  51. Would you mind referring to it as part of D,
20  using the D reference.
21       MR. SMITH: Ok. Yep, absolutely.
22       MR. TIGAR: If that's the case, does it

## Page 1426

1  begin at D26? Mr. Sujat is nodding yes.
2        MR. SUJAT: I've been having the same
3  problem, your Honor.
4        MR. SMITH: Yes, it begins at D26.
5        MR. TIGAR: If you wouldn't mind using
6  that for your basis of examination, that would be
7  more feasible.
8        CHAIRMAN FITCH: Well, now I'm
9  confused. My D26 has nothing to do -- oh, DXD
10  is what --
11       THE WITNESS: Actually, your Honor, I
12  have no problem. I liked 51 in the record. I
13  think that's good. I didn't realize it was
14  part --
15       CHAIRMAN FITCH: Anyhow, we all have
16  the same document.
17       THE WITNESS: Yeah, two different
18  numbers.
19       CHAIRMAN FITCH: DXD and DX51.
20  Question.
21       THE WITNESS: Just one note, I think
22  there may be some things in 51 attachments that

## Page 1427

1  were not in Exhibit D of Bar Counsel that's in the
2  book.
3        CHAIRMAN FITCH: Question.
4        THE WITNESS: I agree to have this in
5  the record as 51.
6        MR. SMITH: So, if we are looking at
7  either Exhibit D, I will ask those who are looking
8  at Exhibit D to look at Page D28. For those of us
9  who have Bar Exhibit 51, please look at Page 51-3.
10       And I would ask you to look at footnote
11  12 --
12  BY MR. SMITH:
13    Q. Let me refer you to this. This was
14  your response to Disciplinary Counsel's inquiry
15  into Ms. Sataki's supplemental complaint, correct?
16    A. Correct.
17       There had been an earlier response at
18  the time that you identified that the initial
19  complaint, which was in handwriting, was sent to
20  my post office box, apparently. There had been an
21  initial response.
22       But this is in response to the

## Page 1428

1  supplemental complaint after I was notified, after
2  six years, that this matter was still pending,
3  having believed that it had been dismissed, much
4  earlier.
5    Q. Alright, would you take a look at
6  footnote one, please. Let me know when you finish
7  reading that.
8    A. I don't see a footnote --
9    Q. Footnote one on the third page of the
10  letter.
11   A. Oh, ok.
12      (Witness reads document.)
13   A. Yes.
14   Q. Now I take it that this footnote was in
15  response to the allegation in Ms. Sataki's
16  complaint that you wanted a romantic relationship
17  with her, correct?
18   A. I don't believe there was an allegation
19  in her complaint that I wanted a romantic
20  relationship. I think that's something that y'all
21  came up with.
22   Q. Ok, then this --

5 (Pages 1425 to 1428)

In Re: Larry Klayman
June 27, 2018

Page 1429

1    A.  She never alleged that in either of her
2   complaints.
3    Q.  So in response to the draft complaint,
4   with respect to whether or not there was a
5   romantic relationship, this was your response to
6   that, correct?
7    A.  No.  I don't know what you're talking
8   about "draft complaint."
9    CHAIRMAN FITCH:  Well, let me cut
10  through it.
11    Mr. Klayman, in footnote number one --
12    THE WITNESS:  Right.
13    CHAIRMAN FITCH:  It appears that you
14  wrote, I quote, "I notice the draft complaint you
15  sent me makes the surprising claim that I
16  announced to Ms. Sataki that I wanted a romantic
17  relationship with her and that she declined my
18  entreaties."
19    THE WITNESS:  Right.
20    CHAIRMAN FITCH:  "Let me make this
21  clear:  That is false."
22    THE WITNESS:  Ok.

Page 1430

1    CHAIRMAN FITCH:  And then there are
2   about ten more lines in that footnote.
3    THE WITNESS:  Right.
4    CHAIRMAN FITCH:  Mr. Smith is asking
5   you some question about that.
6    Go ahead, Mr. Smith.
7    THE WITNESS:  Right, I guess I was
8   confused, because I had --
9    CHAIRMAN FITCH:  Ok, he wants to ask
10  you a question.
11    THE WITNESS:  Yeah, that's fine.
12    CHAIRMAN FITCH:  Go ahead, Mr. Smith.
13  BY MR. SMITH:
14    Q.  And as part of your response to that
15  allegation, you said, "Let me make this clear:
16  That is false," correct?
17    A.  Correct.
18    Q.  And you said you did not pursue her,
19  correct?
20    A.  That's correct.
21    Q.  You said you never kissed her on the
22  lips.

Page 1431

1    A.  That's correct.
2    Q.  And you said, "Perhaps she is imagining
3   these things," right?  "Perhaps she imagines that
4   people are sexually coming on to her when they are
5   not".
6    A.  Correct, because I was confused when
7   you first asked me about the draft complaint.
8   This was the Specification of Charges that I was
9   referring to that had been prepared before you
10  even notified me that you were resurrecting this
11  case, and that you inadvertently sent that to me
12  when I asked you to send me some of the
13  documentation that was in the file when I found
14  out that this matter had been resurrected from the
15  dead.  Or I thought it was the dead, because
16  Florida and Pennsylvania had dismissed it.
17    So, yes.  I mean, that's what I said,
18  and I stand by it.
19    Q.  And you also suggested that "Perhaps
20  she is just lying," correct?
21    A.  Yes, because over time I came to
22  believe that she had not even told me the truth

Page 1432

1   about the original harassment, and you heard the
2   testimony of Mr. Dash yesterday in terms of, you
3   know, what he perceived to be her way of doing
4   things.
5    He actually testified as to reputation,
6   but the reputation part was ruled not part of this
7   testimony --
8    CHAIRMAN FITCH:  Next question.
9   BY MR. SMITH:
10    Q.  She took a lie detector test in
11  connection with the litigation, didn't she?
12    A.  She did.  In fact I paid for it.
13    Q.  And she passed that lie detector test,
14  didn't she?
15    A.  She did.  Polygraph tests are not a
16  hundred percent accurate.  I mean they're not used
17  in court --
18    Q.  You were prepared to use that evidence
19  in support of her claim that she was telling the
20  truth about her sexual harassment.
21    Am I correct?
22    A.  Correct, because I'm zealously

6  (Pages 1429 to 1432)

In Re: Larry Klayman
June 27, 2018

Page 1433

¹ representing her within the bounds and ethics of
² the law, and I'm going to use everything I can to
³ try to get my client a good result.
⁴     Q.  Let me ask you to look at Bar Exhibit
⁵ Number 24, please.
⁶     A.  Bar Exhibit 24?
⁷     Q.  Yeah, Bar Exhibit 24.
⁸     A.  By the way, I'm not saying she wasn't
⁹ sexually harassed by Falahati or mental.  What I'm
¹⁰ saying is, listening to her testimony, how
¹¹ contradictory in many aspects how untruthful it
¹² was, I have to question it now.
¹³         And the Office of Civil Rights found in
¹⁴ interviewing a lot of witness, and that's in the
¹⁵ record, their findings, that she was not truthful
¹⁶ about it.  That was their conclusion.
¹⁷     Q.  Have you had a chance to look at Bar
¹⁸ Exhibit Number 24.
¹⁹     A.  I'm doing it, yes.  Thank you.
²⁰         (Witness reads document.)
²¹     A.  Ok.
²²     Q.  Dr. Aviera was the psychologist that

Page 1434

¹ you had retained for Ms. Sataki to see for, among
² other things, the issues that she was dealing with
³ because of her sexual harassment at PNN, correct?
⁴     A.  Well, she had retained Dr. Aviera, of
⁵ course, but I put her in contact with Dr. Aviera
⁶ and paid for her coverage.
⁷     Q.  And that was in part to help her with
⁸ her issues that she dealt with because of her
⁹ sexual harassment at the PNN, correct?
¹⁰     A.  Right.
¹¹     Q.  In this letter to Dr. Aviera, is it
¹² fair to say that you are complaining to her about
¹³ your inability to foster a better personal
¹⁴ relationship with Ms. Sataki?
¹⁵     A.  That's not what I'm complaining about.
¹⁶         I'm complaining about a lack of
¹⁷ respect, is that we were I thought very close
¹⁸ friends.  I thought we cared about each other, and
¹⁹ she treated me badly as if I didn't even exist.
²⁰         That's what I'm saying, is that, you
²¹ know, I just wanted to be treated like her other
²² friends and have some courtesy.

Page 1435

¹         And we've seen, for instance, Exhibit
² 38, your Exhibit 38, the other side of Elham
³ Sataki, and that was exhibited several times
⁴ throughout the time I was trying to represent her,
⁵ zealously, and within the bounds of law.
⁶     Q.  Take a at Supplemental Exhibit Number
⁷ 1, please.  For the record, this is an email dated
⁸ April 9th, 2010 from Mr. Klayman to Mr. Sataki.
⁹     MR. TIGAR:  Mr. Smith, before you go to
¹⁰ that...
¹¹         Mr. Klayman, at the bottom paragraph of
¹² this Exhibit 24 that you were just looking at --
¹³     THE WITNESS:  Right.
¹⁴     MR. TIGAR:  It says, "Because I do care
¹⁵ so much about Ellie, I, too, have trouble seeing
¹⁶ the proverbial forest from the trees."
¹⁷         What did you mean?
¹⁸     THE WITNESS:  I meant it reached the
¹⁹ point, your Honor, when she was asking me to buy
²⁰ her a car.  And obviously my heart went out to
²¹ her.  She had no credit.  And she asked me for
²² other things, like helping Kaveh, her friend, that

Page 1436

¹ obviously that affected me.
²         Because I couldn't understand why
³ someone who was trying to do so much for her was
⁴ being berated for trying to help her, or being
⁵ asked to do things that were beyond the scope of
⁶ legal representation.
⁷         So at that point, that's what I felt,
⁸ and I felt that we needed to find another lawyer
⁹ here, that this wasn't working.
¹⁰     MR. TIGAR:  Thank you.
¹¹     MS. LARKIN:  I have another question
¹² also.
¹³         On the same document, paragraph one,
¹⁴ where it says, "That's why I've done what I have.
¹⁵ I've not helped her for money.  I love Ellie."
¹⁶     THE WITNESS:  Yes, and -- I'm sorry.
¹⁷     MS. LARKIN:  Go on.
¹⁸     THE WITNESS:  And that confirms that I
¹⁹ didn't do it for money, and I was doing it pro
²⁰ bono, and I never expected to be paid anything,
²¹ and that's the case many, many years later.
²²         Because I loved Ellie.  I love many

7 (Pages 1433 to 1436)

In Re: Larry Klayman
June 27, 2018

## Page 1437

1     people. Love is love. There's nothing wrong with
2     that, and it actually made me work harder, because
3     I felt that, you know, there was a need to help
4     her.
5         So the fact that you love somebody is
6     not negative. It's positive.
7     BY MR. SMITH:
8     Q. Bar Supplemental Exhibit Number 1.
9     A. Exhibit Number 1?
10    Q. Supplemental Exhibit Number 1.
11    A. I don't think I have that. I'll have
12    to get it.
13        (Brief pause.)
14    A. Ok.
15    Q. In this letter you are listing seven
16    things that you believed at the time constitute
17    what it meant to be a friend?
18    A. That's what I'm trying to do, yeah.
19    Q. And you're telling her that you want to
20    be her companion?
21    A. Where do I say that? I don't see that.
22    Q. "Friendship, companionship."

## Page 1438

1        Did you want to spend time with her?
2    A. Where is what you just said?
3    Q. It's not there.
4    A. Ok, then that's not --
5    Q. I'm paraphrasing?
6    THE WITNESS: I object to that, your
7    Honor. It's editorializing and prejudicial, those
8    kind of remarks, Mr. Smith.
9    BY MR. SMITH:
10    Q. You tell her in this letter that you
11    want to "spend more time with her," "have more fun
12    with her." The letter says what it says. I stand
13    A. The letter says what it says. I stand
14    by the letter and it says what it says, and you're
15    mischaracterizing it.
16    Q. And would Ms. Sataki be lying if she
17    thought that this was some sort of pursuit of her?
18    Would she get mad at that?
19    A. That's speculation. I don't know what
20    was in her mind then.
21        I was trying to say we were friends, we
22    were close friends, and this is what I thought

## Page 1439

1     being a friend was, and I was not being respected
2    in terms of being even a friend, when I was going
3    all out for her and working as hard as I could, as
4    Mr. Shamble testified to, spending my own money to
5    try to get her health care and do other things, to
6    get her an apartment, this and that.
7        You know, I cared about her as a close
8    friend, and yes, I felt love towards Ms. Sataki,
9    and I feel love to other people, too, you know, in
10    my life.
11    Q. Let's take a look at Supplementary
12    Exhibit Number 2.
13    MR. TIGAR: Mr. Smith, before we do
14    that...
15        There's a mention in this exhibit you
16    just looked at about a documentary in Turkey.
17        Was there a plan that Ms. Sataki was
18    going to go to Turkey to produce or participate in
19    a documentary?
20    THE WITNESS: That's a good question.
21    That was her idea, not mine. I have no contacts
22    in Turkey.

## Page 1440

1     MR. TIGAR: You had heard that that was
2    out there.
3    THE WITNESS: Right, and she wanted to
4    do that.
5    MR. TIGAR: And you wanted to go with
6    her to Turkey?
7    THE WITNESS: Well, to control what the
8    documentary said, so that it was favorable. Yes.
9        I mean, if she is going to do a
10    documentary to be used as evidence in her case, I
11    need to know how it's being structured.
12        And a lot of times people in the media
13    are not very sympathetic. You all know that on
14    both sides of the political spectrum. And I
15    myself have been subject to that from time to
16    time, and you probably have too, your Honor.
17        So you want to make sure it's done
18    right. And Turkey is a place, it's a very murky
19    place in terms of who is in charge of it.
20    MR. TIGAR: I just wanted to know.
21    THE WITNESS: Yeah, you don't know if
22    somebody is going to be favorable to her because

8 (Pages 1437 to 1440)

In Re: Larry Klayman
June 27, 2018

## Page 1441

1 she was pro-Shah or favorable to her because of
2 other reasons.
3     CHAIRMAN FITCH: And I have a question,
4 and this is an April 9, 2010 email, or purports to
5 be that. It was sent by Ms. Sataki a few years
6 later, May 24, 2018, and in that 2018 email it
7 says "Subject: Forward: Friendship and what it
8 means to me."
9     Does that indicate that, even though
10 there's no subject matter set forth in the part of
11 this page that includes the 4/9/2010 email, that
12 your original email to her said "Friendship and
13 what it means to me"?
14     THE WITNESS: Yeah. I mean, that's
15 what I was trying to convey, is that we were
16 friends. We were close friends, and I wasn't
17 being treated even like a friend.
18     As I said, you know, other people were
19 treated much better than me, and I was doing the
20 work.
21     CHAIRMAN FITCH: So is it your belief
22 that in your email, your subject matter, even

## Page 1442

1 though it doesn't appear, right, as part of your
2 email --
3     THE WITNESS: Right.
4     CHAIRMAN FITCH: -- is it true that in
5 your email there was a part that said that subject
6 matter and what it means?
7     THE WITNESS: I think that's part of
8 the case.
9     CHAIRMAN FITCH: Yeah.
10     THE WITNESS: And I think that confirms
11 what I thought we were as friends and I wanted to
12 have that to represent her, because I represented
13 friends before.
14     CHAIRMAN FITCH: Go ahead, Mr. Smith.
15 BY MR. SMITH:
16     Q. Did you have a chance to look at
17 Supplemental Exhibit Number 2?
18     (Witness reads document.)
19     A. Yes.
20     Q. And in the first sentence, you're
21 asking her to look at the email that you sent to
22 Dr. Aviera.

## Page 1443

1     Would that be what we looked at before,
2 the April 7th, 2010 email to Dr. Aviera?
3     A. I don't know and at this time, eight
4 years later, I'm not sure.
5     Q. In this letter, paragraph three, is it
6 fair to say that you are complaining that she
7 tells you that "You'll never be my boyfriend?"
8     A. What I'm saying is it's unnecessary to
9 say that, because I didn't consider myself to be
10 her boyfriend, and I made that clear to Dr. Aviera
11 and to others. That, you know, it really was
12 irrelevant.
13     And Mr. Tigar raised an important
14 point, which actually I had forgotten about, is
15 that she was the one that wanted to go to Turkey
16 to do a documentary, and for her to then testify
17 untruthfully that she wanted to keep everything
18 quiet.
19     I mean, my God, to go to Turkey where
20 there are some very radical people that are
21 pro-regime, in Iran, and to do a documentary...
22 talk about risk, and that's why I wanted to go. I

## Page 1444

1 was concerned about her safety. I was concerned
2 about what might be said, how it might be twisted
3 by the people in the Turkish media that would harm
4 our case.
5     Q. And later on in this letter you say to
6 Ms. Sataki, "I am very sad because I really do
7 love you, Ellie," correct?
8     A. Yes. And that's true, I was sad,
9 because, when you love somebody, you expect to get
10 at least common courtesy coming back and not to be
11 berated for how you're going all out for them.
12     You saw in Exhibit 38 where I was
13 accused of taking bribes to take a dive on her
14 case.
15     Q. Let's look at Bar Supplemental Exhibit
16 Number 3, please.
17     A. Yes.
18     Q. In the penultimate paragraph on that
19 page, you say, "I am human, you are, and this is
20 about the fact that you're the only woman I've
21 every really loved. You know, when I walk down
22 the street in Beverly Hills and I see an

9 (Pages 1441 to 1444)

In Re: Larry Klayman
June 27, 2018

## Page 1445

1　attractive woman, my thoughts immediately flip to
2　you. I see no one else. This has never happened
3　like this with me before."
4　　Those are your words, right?
5　　A. They're my words, and see, here's what
6　I don't understand, Mr. Smith, in the context of
7　that, why you're trying to make loving someone
8　into something that's dirty, in effect, and I take
9　that --
10　　CHAIRMAN FITCH: That's nonresponsive
11　and it's struck.
12　　MR. KLAYMAN: You know, and I've never
13　said that I didn't love her, and you know that's
14　why I worked so hard. But I never said I wanted
15　to be her boyfriend, I didn't.
16　BY MR. SMITH:
17　　Q. And later on in the letter you say,
18　last sentence, "My loving you has given me true
19　meaning in my life."
20　　A. And I testified -- yes, I testified to
21　this earlier that I was going through a very
22　difficult time in my life, and I saw, when she

## Page 1446

1　grabbed my hand and started trying at Clyde's
2　restaurant, that I could help somebody.
3　　And to some extent, if I can be a
4　psychologist on my own behalf, is that I was kind
5　of taking my problems away by trying to help
6　somebody else. I was kind of sublimating the way
7　I felt, and it made me feel good to help her.
8　　And that's why I also say, "I'm not
9　trying to bribe you. I simply love you. I'm not
10　saying you're owing me anything here. I'm doing
11　this because, A, I'm a professional lawyer who
12　believes in you and your case, and B, I care about
13　you."
14　　And see, that's what's positive, is
15　that when you care about somebody, you're going to
16　try harder.
17　　And Mr. Shamble, boy, he said he never
18　saw a lawyer that worked as hard as I did, he
19　testified, and he recommended me to other clients
20　at Voice of America because of that.
21　　And I had other clients come to me at
22　Voice of America, other broadcasters who claimed

## Page 1447

1　that they too were being discriminated against.
2　　Q. On Page 2 and 3 of the exhibit, we have
3　Ms. Sataki's reply to your letter. Have you had a
4　chance to look at that?
5　　A. Well, you know --
6　　Q. It begins with the sentence, "I wish we
7　didn't have this unfortunate problem?"
8　　A. I don't know that it's a reply. Look
9　at the -- maybe I'm reading this thing wrong. I
10　sent mine at 11:13 a.m., and hers seem to be at
11　10:42, before I sent mine.
12　　CHAIRMAN FITCH: Or hers seems to be
13　7:00 p.m. Pacific time, Pacific daylight time.
14　　THE WITNESS: Ok, well, mine may have
15　been Pacific time, too. I guess my account didn't
16　do what hers did in terms of setting the time.
17　　This may have been sent before I sent
18　mine.
19　　I don't know. It's eight years down
20　the line.
21　　CHAIRMAN FITCH: What does the subject
22　matter say.

## Page 1448

1　　THE WITNESS: It says -- I don't think
2　there is a subject matter, unless I'm missing
3　something -- oh, "Respond to your letter".
4　　CHAIRMAN FITCH: Go ahead, Mr. Smith.
5　BY MR. SMITH:
6　　Q. Now, if you look at the last two
7　sentences of her letter --
8　　A. Let me read the whole letter.
9　　Q. Ok.
10　　(Witness reads document.)
11　　Q. Reading the letter in a whole, you will
12　agree with me that she's asking you to stop
13　pursuing her with this relationship and to
14　concentrate on her case, correct?
15　　A. That's not what she's saying, Mr.
16　Smith, and I take offense to that, because you're
17　characterizing things that aren't in the letter.
18　It's not right.
19　　Q. Ok. So you don't agree with me?
20　　A. No, I don't agree with you.
21　　Q. Ok. Please take a look at Supplemental
22　Exhibit Number 4 --

10 (Pages 1445 to 1448)

In Re: Larry Klayman
June 27, 2018

## Page 1449

1    A.  Let me tell you why I don't agree with
2  you.
3    Q.  I didn't ask you that.  You'll have a
4  chance on redirect I would imagine.
5    CHAIRMAN FITCH:  I think he may explain
6  his answer.
7    THE WITNESS:  Yes.  Is that clearly I'm
8  saying -- I'm saying "You always said I could
9  count on you as a friend."  So it was clear, that
10  was the relationship in terms of friendship, in
11  addition to professional, and I can lean on you as
12  a friend.
13    And then it says, in the next page,
14  "Let me be clear one more time, right now I don't
15  and cannot see anything besides my case.  That
16  doesn't mean I don't see your kindness, your hard
17  work -- your thoughtfulness and hard work..."
18  (inaudible).
19    So she recognized at that moment at
20  least that, yes, I was putting myself all out for
21  her.  And she's apologizing and she's talking
22  about timing, you know.

## Page 1450

1    She's in a bad way right now, and I
2  understood that, but there was also another side
3  of her, and that was the side that I've already
4  testified to, is that this was one of the few
5  times that she actually acknowledged my hard work
6  and the fact that I cared about her.  But the rest
7  of the time it was berating me and putting me down
8  and things like that.
9    So, I'm glad that you brought that to
10  your attention, but the letter doesn't say what
11  she said.
12  BY MR. SMITH:
13    Q.  So the last couple of sentences at the
14  bottom of Page 3, it says, "All I'm asking to
15  concentrate on the case now, so I have peace of
16  mind on our future projects.  Thank you so much
17  for your help and understanding, my friend.
18  Please don't let anything else come between our
19  friendship."
20    A.  Thank you for reading that.
21  "Friendships."  She acknowledges friendships.
22    At the same time she is saying

## Page 1451

1  "concentrate on the case," she is saying "I don't
2  have a place to live," she's saying, "Go get me a
3  cheaper car.  I have no credit.  And then she is
4  saying, "Go help my friend, Kaveh," and then
5  berating me for.
6    Q.  I don't see that anywhere in the
7  record.
8    CHAIRMAN FITCH:  I think that's
9  nonresponsive.
10    THE WITNESS:  But she does acknowledge
11  friendships.
12  BY MR. SMITH:
13    Q.  Please look at supplemental Exhibit
14  Number 4.
15    A.  Let me read it.
16    (Witness reads document.)
17    A.  Ok.
18    Q.  Is it fair to say this letter reflects
19  you again complaining about the lack of a personal
20  relationship that she is willing to have with you?
21    A.  That's not at all -- please stop
22  mischaracterizing --

## Page 1452

1    CHAIRMAN FITCH:  He has a right to ask
2  that question.
3    THE WITNESS:  Ok, then the answer is
4  no.
5    CHAIRMAN FITCH:  You have a right to
6  say, "that's not correct."
7    THE WITNESS:  The answer is no, and in
8  fact, I said, except for my role as a lawyer, I'm
9  a low priority.
10    I just wanted to be treated as a
11  friend, as a close friend, as someone who cared
12  about her.
13    That's what this is all about.
14  BY MR. SMITH:
15    Q.  You also said, "Given all that I know
16  and feel, you do not want, however, to call me in
17  front of the rich Persian family for fear they
18  might think we have a personal relationship and
19  are boyfriend and girlfriend."
20    A.  That's correct.  And she was saying we
21  had a friendship.  And I was saying every aspect
22  of what I did was like I had no importance at all,

11 (Pages 1449 to 1452)

In Re: Larry Klayman
June 27, 2018

## Page 1453

1  except for that, you know, one acknowledgment in
2  that email, which appears to be written by
3  somebody else in the prior exhibit. She can't
4  write that. She's not capable of writing in that
5  English.
6      Q. Mr. Klayman, would you look at Bar
7  Exhibit 25, back in the blue book.
8      A. Let me read that.
9      (Witness reads document.)
10     Q. For the record, this is a letter dated
11 May 9th, 2010, written by Mr. Klayman to Dr.
12 Arlene Aviera.
13     A. Ok.
14     Q. Have you had a chance to read that?
15     A. I read it.
16     Q. Now in your letter, the second
17 paragraph, you say, "I want to ask you this
18 question:" -- this is Dr. Aviera -- "as to what I
19 have to do under the sad circumstances. Ellie has
20 never found someone who truly loves her and meets
21 her expectations of someone she wants to be with.
22 But suppose someone comes along who falls in love

## Page 1454

1  with her and deeply loves her, and, more
2  importantly, wants to care for her because of who
3  she is as a person as opposed to just because she
4  is beautiful, and suppose it's not the right time
5  for a relationship, so the conventional
6  psychological wisdom goes"...
7      Is that person you that she's talking
8  about?
9      A. Where? In the last sentence?
10     Q. In this entire --
11     A. Yeah, and it's recognizing it's not the
12 right time to have any kind of relationship with
13 her. It's romantic. I recognize that.
14     And if you go down in the paragraph
15 four, I say I just want to be treated like a
16 roommate, Kaveh, to be treated like Kaveh, to have
17 some understanding that I'm doing something for
18 her above, and beyond the call of duty.
19     So I'm glad you read that, Mr. Smith.
20     Q. And you go on later, a few paragraphs
21 down that begins with, "I'm sure you realize that
22 no man, particularly this one who wears his heart

## Page 1455

1  on his sleeve, is super human. How long can
2  anyone go along trying to be selfless without
3  getting anything back, but instead being hit over
4  the head constantly with the proverbial pot or
5  kettle?"
6      A. I'm glad you asked me that, too,
7  because it's consistent with what I've said.
8      Somebody that is doing as much as I
9  did, that cares about her, deserves some respect,
10 like Kaveh got, and understanding that that
11 person's there for you.
12     You can't be a whipping boy and
13 represent somebody in a case like this, because
14 this is an emotional case for her, and it's
15 emotional for me, and I was telling Dr. Aviera
16 that basically she needs to get another lawyer,
17 and that comes up in and around this time period.
18     So, I can't function when someone has
19 absolutely little to no appreciation for what I'm
20 doing for free.
21     Q. On the next page, you say in the second
22 paragraph, "So I come along, fall in love with

## Page 1456

1  Ellie, and I am there to help lift her up because
2  I love her. I tell her that I love her so that
3  she does not think I am there to get something
4  from her. Is it ok, then, for Ellie to feel that
5  it's okay for her to feel something too?
6      "True love. Is that a term that has
7  many meanings across the emotional spectrum does
8  not come along at the right time. It happens when
9  you least expect it and it cannot be controlled
10 clinically. And should not love factor into
11 Ellie's well-being and rehabilitation? Love is
12 the strongest medicine, I believe."
13     Those are your words?
14     A. Correct.
15     But in the context of this letter and
16 everything else what I was trying to say is that,
17 yes, things happen in life. You do love people.
18 You fall in love with people. That's not
19 something which is to be disparaged. It's not
20 negative. It's a positive. That's what this
21 world is all about.
22     And to get, as I'm saying here, just

12 (Pages 1453 to 1456)

In Re: Larry Klayman
June 27, 2018

---

**Page 1457**

1 some minimal recognition of that, to be treated
2 like everybody else that's her friend -- and she
3 acknowledges the friendship -- we've just gone
4 through that -- that's what I'm asking for.
5 And it got to a point, where, at the
6 same time that I was getting no recognition, she
7 was asking me to do a lot of things which had
8 nothing to do with my role as a lawyer or even as
9 a friend. Because you don't ask somebody to go
10 out and buy you a car. You don't ask them to do
11 things for you because you have no credit.
12 I did it because it was in my heart to
13 do it and I didn't expect anything back from her.
14 Q. In the next paragraph you say, "I do
15 not believe that I met her by accident. Maybe I'm
16 overly romantic, or too religious, but I feel that
17 I was meant to help Ellie, and then I fell in love
18 with her, totally."
19 A. Yes, I am a romantic in thought.
20 That's why I do what I do. That's why I founded
21 Judicial Watch. That's why I ran for the Senate.
22 That's why I started Freedom Watch, because

---

**Page 1458**

1 everything I do comes from my heart. If it's not
2 there, I don't do it, and that's what I mean by
3 romantic, and also religious.
4 Because, I've testified at length about
5 my spiritual believes, and I believe that God uses
6 you and puts you in a place where you can help
7 people. I believe that what I'm doing now at
8 Freedom Watch is with the grace of God. I don't
9 do everything right all the time. Sometimes I
10 make mistakes. Sometimes I don't see things as
11 clearly as God may want me to see it. But I feel
12 that I'm trying to do things that he wants me to
13 do, and I pray every day that I'm trying to
14 fulfill his will.
15 That's what I meant.
16 Q. You would agree that Ms. Sataki may
17 have a different view of all these professations
18 of love?
19 A. I think that her view is ex post facto,
20 after the fact, and I think she's reactive and
21 wants to blame somebody because her life didn't
22 turn out exactly the way she wanted.

---

**Page 1459**

1 But we heard testimony that she wasn't
2 unemployed, that she had good jobs after this. I
3 tried to get her even better jobs. Sam Razavi,
4 her cousin, intervened. She could have had a
5 really great job with CBN. And you have to blame
6 somebody.
7 So what she testifies here, what she
8 said three weeks ago, what she wanted was revenge.
9 Well, that's not the purpose of a Bar proceeding
10 and, if she's unhappy with her life, that's not my
11 fault.
12 CHAIRMAN FITCH: I think that's
13 marginally responsive to the question, arguably.
14 Let me rephrase 34 Smith's question.
15 THE WITNESS: Ok.
16 CHAIRMAN FITCH: Did you have any basis
17 at the time for --
18 And then what did you say, Mr. Smith?
19 What was your original question?
20 -- or understanding? Did you have any
21 knowledge or basis at the time for knowing what
22 her reaction was to this letter?

---

**Page 1460**

1 Was that your question?
2 MR. SMITH: That's the gist of the
3 question, yes.
4 THE WITNESS: To the extent that she --
5 CHAIRMAN FITCH: You can answer, "I
6 don't, that would be speculation," or do you have
7 some basis for understanding, for knowing what her
8 reaction was at the time to this series of
9 letters?
10 THE WITNESS: My reaction and
11 understanding was that Ms. Sataki, as happens
12 frequently with victims -- I've represented
13 victims before in sexual harassment cases in the
14 military and elsewhere -- they become very
15 self-centered, and the world revolves around them.
16 Everybody's to give them something. And I didn't
17 view that negatively towards her, but I tried to
18 understand that.
19 And I am a woman's advocate, so, you
20 know, Ms. Allred is my close friend.
21 So I tried to understand that. So I
22 tried to understand people that they're in a

---

13 (Pages 1457 to 1460)

In Re:  Larry Klayman
June 27, 2018

| Page 1461 | Page 1463 |
|---|---|
| 1   difficult situation, and I'm not judgemental, but | 1   another instance, if your Honor would indulge me? |
| 2   I did just simply want to be treated with respect, | 2       CHAIRMAN FITCH:  Go ahead. |
| 3   and let me -- | 3       THE WITNESS:  I represented Cliven |
| 4       CHAIRMAN FITCH:  No, no, no. | 4   Bundy in his criminal trial in Las Vegas, Nevada. |
| 5       What if any information did you have at | 5   We got a good result in the end in a number of |
| 6   the time for knowing what her reaction was to this | 6   different capacities. |
| 7   series of letters? | 7       The first time I met him, he was under |
| 8       If you have none, just say "I have | 8   a lot of pressure.  He was being criticized for |
| 9   none."  If you have some basis that you can | 9   something he said to the New York Times, which he |
| 10   identify, tell me. | 10   didn't mean.  And I was being introduced to him |
| 11       Now you said that you have this general | 11   right after the federal government had left his |
| 12   experience with some clients falling into a victim | 12   property, and I walked in and I said, "Mr. Bundy, |
| 13   syndrome.  I think that's responsive. | 13   I think that the comment that you made in the New |
| 14       Any other basis at this time for | 14   York Times, you've got to get out and clarify, |
| 15   understanding -- | 15   ok?"  And he did, but his reaction was, "I don't |
| 16       THE WITNESS:  Well -- | 16   need to hear from no lawyers." |
| 17       CHAIRMAN FITCH:  I know I speak solely. | 17       Now, he didn't know me, but I |
| 18   I try to find the right word. | 18   understood he was under a lot of stress, and we |
| 19       THE WITNESS:  You speak very well. | 19   have since become extremely close friends -- |
| 20       CHAIRMAN FITCH:  Bear with me. | 20       CHAIRMAN FITCH:  Did you understand -- |
| 21       THE WITNESS:  I will. | 21   is the point of that comment or that observation, |
| 22       CHAIRMAN FITCH:  Any other basis at | 22   is the point of that that you understood that she, |

| Page 1462 | Page 1464 |
|---|---|
| 1   that time for knowing what her reactions to these | 1   that Ms. Sataki, was under a lot of stress at that |
| 2   letters were? | 2   point? |
| 3       THE WITNESS:  I would say, you know, at | 3       THE WITNESS:  I understood that she was |
| 4   the same time -- yes, to be honest, because I've | 4   under a lot of -- yeah, that she was under a lot |
| 5   been honest with you throughout this, yes, and I | 5   of stress in terms of what was being done to her. |
| 6   always try to be honest, and I realize I'm under | 6   She thought that VOA was trying to destroy her and |
| 7   oath, and I respect the legal profession and | 7   I was trying to be her night in shining armor, so |
| 8   judges and others -- is that I knew she wanted -- | 8   to speak, to take her out of that, so I just |
| 9   and that's what I meant by my response, because I | 9   wanted minimum respect -- |
| 10   didn't mean to take a shot at her.  I really | 10       CHAIRMAN FITCH:  I didn't ask you what |
| 11   didn't.  It was the contrary. | 11   you wanted. |
| 12       What I was saying is, to me it was | 12       THE WITNESS:  Ok, that's my |
| 13   understandable that she might say, "We will just | 13   understanding. |
| 14   focus on my case," but at the same time she was | 14       CHAIRMAN FITCH:  I asked you what you |
| 15   claiming that I was her friend, and friend should | 15   understood, and you said you understood that she |
| 16   be treated like your other friends. | 16   was under a lot of stress at the time. |
| 17       So that's what I understood all this to | 17       THE WITNESS:  That's with regard to |
| 18   be. | 18   Voice of America, not from me. |
| 19       And I discount a lot when people are | 19       Because you see -- |
| 20   under that degree of, when they're in that kind of | 20       CHAIRMAN FITCH:  No, I understand. |
| 21   a situation. | 21       THE WITNESS:  -- eight years later that |
| 22       If I can give you one example of | 22   she is still under stress and I had nothing to do |

14 (Pages 1461 to 1464)

App.0609

In Re: Larry Klayman
June 27, 2018

## Page 1465

1 with that.
2          MR. TIGAR:  Mr. Smith, in your
3 examination as it goes on, are you going to
4 inquire about Supplemental Exhibit 8 and
5 Supplemental Exhibit 15?
6          MR. SMITH:  Yes.
7          MR. TIGAR:  Well, in that case, they're
8 related to what just went on and I'll wait for the
9 examination.
10          MR. SMITH:  Ok.
11          CHAIRMAN FITCH:  Go ahead, Mr. Smith.
12          MR. SMITH:  Thank you.
13 BY MR. SMITH:
14     Q.   Would you take a look at Supplemental
15 Exhibit 7, please.  For the record it is an email
16 dated Sunday, May 9th, 2010.  Subject, "Letter to
17 Dr. Aviera," from Larry Klayman to Ellie Sataki.
18          MR. TIGAR:  I'm sorry, what exhibit is
19 that?
20          CHAIRMAN FITCH:  Supplemental.
21          MR. SMITH:  Supplemental Exhibit 7.
22          CHAIRMAN FITCH:  SX7.

## Page 1466

1 BY MR. SMITH:
2     Q.   By this email are you sending a copy of
3 your letter to Dr. Aviera to Ms. Sataki, your May
4 9th letter that we just talked about to Ms.
5 Sataki?
6     A.   Perhaps.  I'm not absolutely sure at
7 this point, eight years later.  But perhaps.
8     Q.   And in the end you again begin to tell
9 her that you love her?  Ms. Sataki?
10     A.   Yes, I've told her that before.  "I
11 care about you.  I love you.  I want the best for
12 you."
13          And I say, "It's painful for me,
14 because at this point I'm going to have to move on
15 and I'm recommending to you other lawyers to
16 represent you."
17          That's what I'm saying.
18     Q.   This is what we talked about
19 yesterday --
20     A.   Then we had communication problems, and
21 my, you know, letting everything not go down the
22 drain.

## Page 1467

1     Q.   Alright, so can you take a look at
2 Supplemental Exhibit Number 8, please.
3          For the record it is an email dated May
4 18th, 2010, Larry Klayman to Ellie Sataki.
5          (Witness reads document.)
6     A.   Yes.
7     Q.   The sentence here, "By the way, the
8 Luxe Hotel, Hotel Luxe, renamed the women's
9 restroom in my honor.  It's now called the Klayman
10 Room.  I could now use it for client meetings."
11          Is that a joke?
12     A.   That was a joke, yes.
13     Q.   Is that a joke because you had chased
14 Ms. Sataki into the women's room?
15     A.   No, it's because she had ran into the
16 women's room.  I never went into the women's room.
17 I was trying to see that she was alright.
18          And you know, she was very emotional.
19 She's been emotional before, and she's been
20 emotional here, and she was emotional with others.
21 And I was concerned about her.
22          But I didn't go into the women's room.

## Page 1468

1 That was just a joke.
2          MR. SMITH:  Mr. Tigar, you had some
3 questions about this exhibit?
4          Excuse me, Mr. Tigar, you said you had
5 some questions about this exhibit?
6          MR. TIGAR:  This letter apparently
7 relates to testimony that we have heard about an
8 evening in which she got out of the car in Beverly
9 Hills and went into the hotel.
10          THE WITNESS:  That's correct.
11          MR. TIGAR:  And you no doubt remember
12 the testimony.
13          THE WITNESS:  I do.
14          MR. TIGAR:  What happened?
15          THE WITNESS:  What happened was we were
16 at this MovieGuide event.  I took her there to try
17 to meet people.  That's Ted Baehr's event, I
18 testified, MovieGuide.  It's like the Academy
19 Awards.  I spent -- and money's not an issue with
20 me, but I spent a lot of money to take her there.
21 It cost $1,000 a ticket.  Ted Baehr discounts it
22 for me because I'm on the board.

15 (Pages 1465 to 1468)

In Re:  Larry Klayman
June 27, 2018

**Page 1469**

1  But she was so disrespectful to me
2  there, not even acknowledging my presence and
3  looking the other way, and we're trying to talk to
4  people, I'm trying to introduce her to people,
5  that, yes, I was upset.
6  And then she got upset, as I was
7  driving her home and, you know, got out of the car
8  and went into the restroom --
9  MR. TIGAR:  Is it fair to say, then,
10  the two of you had an argument.
11  THE WITNESS:  Yeah.
12  CHAIRMAN FITCH:  Go ahead, Mr. Smith.
13  MR. SMITH:  Thank you.
14  THE WITNESS:  And these kinds of
15  things, to answer your other question, Mr. Tigar,
16  is that I realized why I had to move on.  That's
17  why I referred her to Ms. Allred and Mr. Shea.
18  She was always free to get another
19  lawyer.  And she had people helping her, Kathleen
20  Staunton and her cousin.  They could have found
21  another lawyer.
22  BY MR. SMITH:

**Page 1470**

1  Q.  Please take a look at Supplemental
2  Exhibit Number 13.
3  CHAIRMAN FITCH:  DX or SX.
4  MR. SMITH:  SX, thank you.  SX13.
5  THE WITNESS:  Let me read it.
6  MR. SMITH:  For the record, it is an
7  email dated June 1st, 2019 from Mr. Klayman to Ms.
8  Sataki.
9  THE WITNESS:  Ok.
10  BY MR. SMITH:
11  Q.  And you're complaining that she won't
12  allow you to come visit her at her apartment when
13  she's, are you not?
14  A.  I'm not complaining about that.  I'm
15  saying not to -- again to respect me because
16  that's not right.
17  I didn't have keys to her apartment.  I
18  never took keys to her apartment.  I didn't expect
19  anything in return.
20  It's all in this context of respect and
21  not making you feel like you're a leper, in
22  effect.  So this is what I'm trying to say.

**Page 1471**

1  And then --
2  Q.  You're complaining that she won't allow
3  you to come visit her while she's alone at her
4  apartment?
5  A.  No.
6  Read that portion to me, ok.  What are
7  you talking about --
8  Q.  The last sentence of the first
9  paragraph, "And, you make it clear of late
10  that I cannot even enter the apartment when you
11  are alone there.  I am not welcome."
12  A.  Yes, but I never, ever asked to go into
13  that apartment with her.  That's why I didn't have
14  the keys.
15  But the fact that, you know, other
16  people could go there, but I couldn't go there...
17  You know, she had her brother who I had
18  met, she had her mom, who I had met, she had her
19  friends that were living there.  She testified to
20  that.  The apartment person tried to break in, the
21  manager, Mr. Hopper, while her roommate was naked;
22  that other people had been in the apartment, she

**Page 1472**

1  told me, that stole her diamond ring.
2  So I couldn't understand, you know, why
3  I was being treated differently.
4  That's what it was all about.  That's
5  what all this was about, was I just wanted to be
6  treated with respect.
7  Q.  But you did understand.
8  The last sentence says "Larry, you did,
9  and you had no problem with this until you started
10  seeing someone else.  Larry?"
11  So you did have understanding?
12  A.  I'm trying to figure out what it's
13  about.  I've told her, "I'm not your boyfriend.
14  I'm not a threat to you, or anybody else."  That's
15  what I told her.
16  Later I got calls from someone else
17  threatening me.
18  Q.  Let's take a look at Supplemental
19  Exhibit Number 14.  For the record, this is an
20  email from Larry Klayman to Ellie Sataki dated
21  June 16th, 2010, subject: "One more time."
22  (Witness reads document.)

16 (Pages 1469 to 1472)

In Re: Larry Klayman
June 27, 2018

## Page 1473

1    A.  Ok, I read it.
2    Q.  It's fair to say that you're getting
3  more and more frustrated with the lack of
4  relationship you've been able to foster with her
5  by this time, isn't it?
6    A.  That's unfair to say.  In fact, it's
7  unfair to say.
8        The key here is the second page, and
9  that's why I was upset, the third paragraph -- ok,
10  I had, as I testified to, and as Ms. Sataki
11  testified to, gotten emails --
12    CHAIRMAN FITCH:  Let him -- the second
13  page may be of --
14    THE WITNESS:  Ok.
15    CHAIRMAN FITCH:  No, I stand corrected.
16  Go ahead.
17    THE WITNESS:  Ok, I had gotten into a
18  near-fatal auto accident, which resulted in my
19  totaling my car on the 405, where it splits to Los
20  Angeles and Ventura, the most dangerous
21  intersection in the country, it's been ranked.
22  And I came up the Haskell exit, which was close to

## Page 1474

1  there, and I then learned the next day I had a
2  concussion.  But I was really dizzy and feeling
3  like I might faint.  And I called her because her
4  apartment was right near the Haskell exit to ask
5  her for help.
6        I didn't have a car.  She did.  And,
7  you know, she could help me.  Now she admits that
8  I called her and she didn't answer the phone.  I
9  left a message that I was in a serious accident
10  and she didn't even respond.  And that's exactly
11  what I'm talking about, is that if your friends,
12  and your friend, you know, had gotten into a
13  serious accident, you at least answer the phone.
14        So this is what got me upset there.
15  BY MR. SMITH:
16    Q.  Well, staying on Page 2, you say, "Good
17  luck burying yourself in the Persian ghetto."
18        And then Ms. Sataki testified that she
19  was offended by this.
20        You'll agree this was insulting, right?
21    A.  No, it wasn't insulting.
22        What I was saying to her was -- number

## Page 1475

1  one, everybody knows -- and Mr. Dash testified to
2  this, he's Persian -- he knows my reputation in
3  the Persian community.  I really love the Persian
4  people.  I love what they're trying to do.  I have
5  many Persian friends.
6        One of my best friends in LA, Benjamin
7  Kasanji, is Persian, and in fact he helped her in
8  the beginning to find the initial psychologist.
9        So I'm saying this, you know, "You have
10  to get out of that world.  Don't wear yourself
11  out.  You have so much potential."  And I was
12  trying to get her that potential, and she slammed
13  that in my face, too.
14        Somebody called Mark Woodland of CBN
15  and said, you know --
16    Q.  That's nonresponsive.
17    A.  Alright, that's fine.
18        That's what it's about.  It's not --
19  there's a Jewish ghetto, and I'm a
20  Jewish-Christian.  There's a Polish ghetto.  It's
21  not a negative phrase.  It's that when people wall
22  themselves in one place and don't want to come out

## Page 1476

1  and don't want to assimilate, it hurts them.
2    Q.  Well, let's look at Page 1 of the
3  letter, and if you skip down to the third
4  paragraph.  There you say, "It appears that you're
5  defining the term 'Persian ghetto'.  As for use of
6  the term 'Persian ghetto,' that's accurate, and
7  you should take no offense.  You've been with six
8  or more Persian guys, all of whom have abused you,
9  stole from you and harmed you."
10    A.  What I'm saying --
11    Q.  Is that something that she should not
12  have been insulted about?
13    A.  It's not -- it's something she had to
14  deal with because of what we were going through
15  with the case, because there were allegations and
16  apparently more than rumors, because we heard from
17  Mr. Dash from NITV and Zia Attaby.  We were
18  dealing with that.
19        What I'm saying is "I'm not abusing you
20  as a friend.  I'm not abusing you as somebody that
21  cares for you.  I'm not abusing you as somebody
22  who loves you.  But other people have and you're

17 (Pages 1473 to 1476)

App.0612

In Re: Larry Klayman
June 27, 2018

## Page 1477

1 projecting that onto me. It's not fair."
2          That's what I'm saying.
3      Q. Let's take a look --
4      A. And then I say, "I recognize that Kaveh
5 is a very good person," and those are the kinds of
6 people she should hang with, Kaveh.
7      Q. You're telling her who she should be
8 friends with and who she shouldn't be friends
9 with?
10      A. I'm suggesting she should not be
11 friends with people who have abused her.
12          And here's what I don't understand, and
13 let me answer it from my perspective, I've had
14 many clients that have given me personal advice.
15 I've had many clients that I've given personal
16 advice, because we've become very close, right,
17 and that's the nature of even professional
18 relationships, that you want to try to help that
19 person, and if you can, you know, make a
20 suggestion, there's nothing wrong with it. And
21 this is obviously not something which should be
22 involved in a Bar proceeding, that I'm giving her

## Page 1478

1 some advice to hang around with better people.
2 That's what I don't understand here, particularly
3 when it affects her case, because she's being
4 accused of sleeping around. She's being accused
5 of living with her roommate.
6          MR. SMITH: Objection, move to strike.
7 Now he's telling me what his case is --
8          CHAIRMAN FITCH: I know it's close, but
9 you have suggested a certain characterization of
10 some of the statements in there, and, although
11 he's rambling, I think it's arguably responsive.
12          Go ahead, Mr. Klayman, if you wish.
13          THE WITNESS: Yes, so I'm basically
14 saying "This is not good for you. It's not good
15 for your case, in effect. Be around people like
16 Kaveh. He's a fine person."
17 BY MR. SMITH:
18      Q. Can you take a look at Supplementary
19 Exhibit Number 15, please.
20      A. Let me add one other thing...
21          She also accused one of her friends as
22 having --

## Page 1479

1          CHAIRMAN FITCH: Move to strike,
2 nonresponsive.
3          THE WITNESS: No, no, I am putting it
4 in context.
5          CHAIRMAN FITCH: I fail to see the
6 context. Sustained.
7          THE WITNESS: Ok.
8          CHAIRMAN FITCH: SX15?
9          MR. SMITH: Fifteen, yes. For the
10 record it is an email dated June 21st, 2010, from
11 Mr. Klayman to Ms. Sataki.
12          (Witness reads document.)
13          THE WITNESS: I see it.
14 BY MR. SMITH:
15      Q. You wrote this email to Ms. Sataki?
16      A. Yes.
17      Q. At the end it says "anonymous"?
18      A. Anonymous, yeah -- this was tongue in
19 cheek, and I was tying to say, in a nice way,
20 that, as I said, "I regret to inform you that Mr.
21 Klayman died last week." It's joking to try to
22 make a point. Sometimes humor, even black humor,

## Page 1480

1 can make a point. "And as he was on his way off
2 to heaven -- hopefully he won't be going south --
3 but he told me to tell you this: And what I'm
4 saying is I cared about you, Ms. Sataki. And
5 don't feel sorry for yourself. You've got a lot
6 of promise and you have a life ahead of you, and
7 I'm trying to help you by getting you another
8 job," but CNN -- I mean not CNN, but PNN is not
9 that great a place. It's the worst agency in
10 government and they treat people badly, and "your
11 salary is not that good. So I tried to help you.
12 And with a little bit of coaching," as I say in
13 the second page, "major English-speaking
14 television networks like CNN, BBC, ABC, CBS, NBC
15 and Fox could hire you. But you have to be
16 positive and look to the future and have faith in
17 God and yourself.
18          "That's why I wanted to take you to
19 events where you could meet people and help
20 yourself." That's the MovieGuide and other and
21 things.
22          And I'm saying "I died. You took the

18 (Pages 1477 to 1480)

| Page 1481 | Page 1483 |
|---|---|
| 1 life out of me because you weren't appreciative of | 1 "Hopefully he won't be going south." That's me. |
| 2 what I was trying to do for you and you weren't | 2 It's self-deprecating towards me. |
| 3 respectful," and that's why in and around this | 3     "South" means h-e-l-l. |
| 4 time period I'm saying, you know, "You've got to | 4     MS. LARKIN: I know what south means. |
| 5 move on and get another lawyer." | 5 Thank you. |
| 6     Q. And you did again express your love for | 6     CHAIRMAN FITCH: Mr. Smith. |
| 7 her? | 7     THE WITNESS: By the way, humor can be |
| 8     A. Yes, that's not in dispute. | 8 very, very strong. Like I said, I've done |
| 9     Q. And with tears in your eyes, you closed | 9 stand-up comedy before. |
| 10 your eyes and passed away. | 10     CHAIRMAN FITCH: Mr. Smith. |
| 11     You thought this was funny? | 11     THE WITNESS: Makes a point. |
| 12     A. I'm trying to say that I've got to -- | 12     CHAIRMAN FITCH: Mr. Smith. |
| 13 you know, I've got to -- we both need to move on. | 13 BY MR. SMITH: |
| 14     CHAIRMAN FITCH: Mr. Tigar, did you | 14     Q. Please take a look at Supplemental |
| 15 have some questions about this exhibit? | 15 Exhibit Number 16. For the record, it is a -- |
| 16     MR. TIGAR: Mr. Klayman, in your law | 16     A. Which number? |
| 17 practice, had you ever before this time told a | 17     Q. Sixteen. It is a letter or email dated |
| 18 client with whom you were having this | 18 June 23rd, 2010 from Mr. Klayman to Ms. Sataki, |
| 19 understanding that you had died? | 19 and there's also at the bottom of the page a |
| 20     THE WITNESS: No. | 20 response from Ms. Sataki to Mr. Klayman. |
| 21     I was trying to make a point, because | 21     A. Ok. |
| 22 she was always saying, "I'm going to kill myself," | 22     Q. I'll ask you, was this something that |

| Page 1482 | Page 1484 |
|---|---|
| 1 so it was kind of playing off that. "Things | 1 you wrote after your accident? |
| 2 aren't that bad." That's what I was saying to | 2     You were inspired by your accident to |
| 3 her. "You have a bright future." | 3 write those "words of inspiration"? |
| 4     MR. TIGAR: This was in a response then | 4     A. No, I was trying to give her a pep |
| 5 to her saying that she was suicidal? | 5 talk, that she has a lot of potential and that I |
| 6     THE WITNESS: In effect, it was the | 6 see a lot in her, and she should realize that. |
| 7 same theme. But I was trying to get the point | 7     Q. In the next paragraph, you start off by |
| 8 across in a humorous way. That's what I was | 8 "Dear" -- not Ellie, not Ms. Sataki, but -- "Dear, |
| 9 trying to do; that she should go out and make a | 9 why do you think I am with you and come back even |
| 10 great life for herself. | 10 when you push me away? I am not a masochist and I |
| 11     I was willing to help her with that, | 11 have pride. When I have time to think and |
| 12 and I tried my best, and, you know, she just | 12 reflect, I understand how you are feeling, and I |
| 13 walled herself in pity, and that's not good, | 13 do feel your pain, but I am not here because I |
| 14 because I believe -- | 14 feel sorry for you. It's not charity. It's |
| 15     CHAIRMAN FITCH: Another question. | 15 because you touched me with yourself, because you |
| 16     THE WITNESS: I believe she had a great | 16 were special in general and to me." |
| 17 potential. | 17     A. Well, I'm trying to show her that she |
| 18     CHAIRMAN FITCH: Another question. | 18 was. I call other people "dear," who weren't my |
| 19     MS. LARKIN: Just a question: What in | 19 wife or, prior to that, girlfriend. |
| 20 the letter would let Ms. Sataki know that you were | 20     Also, you see I write here "Ellie |
| 21 joking? | 21 John," and it's a Persian way of saying dear, in |
| 22     THE WITNESS: The fact that I said, | 22 effect. It's kind of a familiar, warm way of |

19 (Pages 1481 to 1484)

In Re:  Larry Klayman
June 27, 2018

|  | Page 1485 |
|---|---|

1    addressing somebody.  So I was trying to show that
2    in fact I did love her and I wanted something
3    better for her.
4          But again I had to move on, you know,
5    and I just wanted her to know that she didn't owe
6    me anything.  I wished her the best.  I still wish
7    her the best, and that's what I was trying to
8    convey.
9        Q.  Look at Supplementary Exhibit Number
10   18.
11         THE WITNESS:  At some point, your
12   Honor, my sister may be here.  I'd like to step
13   out and give her a call, because I don't see
14   anything coming on my cell phone.
15         CHAIRMAN FITCH:  In a few minutes.
16         THE WITNESS:  Take 30 minutes.
17         CHAIRMAN FITCH:  How much more do you
18   have in this segment of your examination, Mr.
19   Smith?
20         MR. SMITH:  Just a few more questions.
21   About two to four exhibits.
22         CHAIRMAN FITCH:  Let's keep going.

|  | Page 1487 |
|---|---|

1    let me read it.  Ok.
2          CHAIRMAN FITCH:  He has a question
3    pending, which is as follows:  Is it fair to say
4    that in this email you're complaining to Ms.
5    Sataki about the lack of a relationship?
6          MR. KLAYMAN:  No, absolutely not.
7    Absolutely not.
8          What I'm saying is I want to be
9    respected, and Persians, by the way, and I know
10   the community very well, are very respectful
11   people, and I'm saying --
12         CHAIRMAN FITCH:  That's not responsive.
13         THE WITNESS:  Yeah, ok, let me --
14   "Just treat me like you're treating
15   other people and don't treat me like I'm a leper,
16   ok." "Because I'm truly trying to help you and
17   trying to do things," and it's coming -- you know,
18   "you're treating me really badly."
19         And I've testified to this several
20   times.
21         CHAIRMAN FITCH:  Yes, you have.
22         Next question.

|  | Page 1486 |
|---|---|

1    Keep going, and take your time.
2          THE WITNESS:  Let me just send a quick
3    text.  Hopefully she will get it.
4          CHAIRMAN FITCH:  I said that Mr. Smith
5    is proceeding.
6          THE WITNESS:  No, I wasn't going to
7    stop anything.
8          CHAIRMAN FITCH:  You're not going to
9    sit there on the cell phone when you're a witness.
10         THE WITNESS:  Ok.
11         CHAIRMAN FITCH:  Go ahead, Mr. Smith.
12   BY MR. SMITH:
13       Q.  Please take a look at Supplementary
14   Exhibit 18.
15       A.  Ok.
16       Q.  Is it fair to say that, once again,
17   you're complaining to Ms. Sataki about the lack of
18   a relationship that you've been able to establish
19   with her?
20       A.  Let me read this.
21         (Witness reads document.)
22       A.  That's not what I was doing, no.  But

|  | Page 1488 |
|---|---|

1    BY MR. SMITH:
2        Q.  And it seems like she's been treating
3    you this way for quite some time?  Isn't that
4    correct?
5        A.  Well, and that's what I said, I
6    swallowed it, but it got to the point where I
7    couldn't any more.
8          You don't treat somebody like that and
9    then ask them to buy you a car.
10       Q.  Let's look at the last paragraph of
11   this letter, Page 2: "Discuss this with Arlene."
12         You're suggesting that she discuss her
13   attitude towards you with her
14   psychiatrist/psychologist that she retained to
15   help her with the sexual harassment at the job?
16       A.  Well, I was always hoping that Arlene,
17   who I got to know, would council her and deal with
18   some of the issues that we had gone through
19   before, which to me would have been very helpful
20   to Ellie.
21         I mean, for instance --
22       Q.  So, you wanted Dr. Aviera to intervene

20  (Pages 1485 to 1488)

In Re: Larry Klayman
June 27, 2018

## Page 1489

1  in the relationship between you and Ms. Sataki?
2      A.  Can I finish my answer, please?
3      Q.  I'll ask it again.
4          Go ahead, but I'll ask it again --
5      A.  You interrupted me.
6      THE WITNESS:  Can I answer, your Honor?
7      CHAIRMAN FITCH:  Go ahead.
8      THE WITNESS:  Yeah, what I'm saying is,
9  "Ellie, you have a lot of potential here, and you
10  know, you're not treating me well," and, you know,
11  there's a psychological aspect of that, and it's
12  not right, and I was hoping that Arlene could help
13  her with that.
14  BY MR. SMITH:
15      Q.  So you wanted the psychologist to help
16  with your relationship with Ms. Sataki?
17      A.  No.  No, because I felt that it
18  permeated everything she did.  For instance, not
19  getting out of the cocoon that she put herself in.
20  And that was not helpful to her in terms of
21  advancing her own career and the personal aspects
22  of her being.

## Page 1490

1      Q.  And then you conclude this letter with,
2  "Thank God I love you or I would have been gone
3  long ago.  Being around you requires me to always
4  swallow my pride and self respect."
5      A.  Right, that's exactly correct.
6      Q.  "I will not and do not do this with
7  anyone else."
8      A.  That's correct.
9          You know, because I cared about her
10  deeply, you know.  I took the lack of respect and
11  the verbal abuse and other things for a very long
12  time.
13          But the straw that broke the camel's
14  back, in terms of my realizing I had to move on,
15  was when whether you're treated that way and
16  someone asks you to buy them a car.
17          Where the -- that's -- that's
18  unbelievable.
19      Q.  Take a look at Supplementary Exhibit
20  Number 19.  For the record this is a letter dated
21  June 29th, 2010, from Mr. Klayman to Ms. Sataki.
22      A.  Ok.

## Page 1491

1      (Witness reads document.)
2      Q.  In this letter you describe all of the
3  potential problems with her case, correct?
4      A.  Some of them, yeah.
5      Q.  And you note that the defense will try
6  to prove that she is promiscuous, and you go into
7  detail, all of the evidence that the defendants
8  have dug up, correct?
9      A.  The letter speaks for itself.
10          As I testified I think at length that
11  was a concern in representing her.  It's a concern
12  of anyone representing an alleged sexual
13  harassment victim.
14          So, yes, that was a concern.  That's
15  one of the reasons why I thought it would be good
16  not to live with Kaveh, even though he's a very
17  fine person and to, as she wanted to do from day
18  one, be in LA working for PNN in their field
19  office there.
20      Q.  And your last sentence, "With your
21  approach and attitude you're unlikely to succeed
22  professionally in this country.  I wish you the

## Page 1492

1  best.  Larry."
2      Correct?
3      A.  Where is that?
4      Q.  Page 2, the last sentence.
5      CHAIRMAN FITCH:  Well, we see what it
6  says, Mr. Smith.  Do you have --
7      THE WITNESS:  I also --
8      CHAIRMAN FITCH:  Wait a minute, he
9  hasn't asked you a question.
10  BY MR. SMITH:
11      Q.  You didn't profess your love in this
12  letter, did you?
13      A.  The letter speaks for itself.
14          I'm talking about a difficult Judge
15  Kotelly.  I'm talking about difficulties that we
16  may have had to face in the case.  I'm talking
17  about trying to get her life going in a positive
18  direction, so, you know, she could have a better
19  future.
20          That's what I'm doing.
21      CHAIRMAN FITCH:  Well, Mr. Klayman --
22  wait a minute.

21 (Pages 1489 to 1492)

In Re: Larry Klayman
June 27, 2018

## Page 1493

1      Mr. Klayman, you said, the first
2  sentence of your answer, the letter speaks for
3  itself, and that's fine.
4      THE WITNESS: Ok.
5      CHAIRMAN FITCH: But now you went on
6  and, notwithstanding it speaks for itself, you
7  should answer his question.
8      THE WITNESS: Ok.
9      CHAIRMAN FITCH: You don't say in this
10  letter that you love her, do you?
11      THE WITNESS: Correct.
12      CHAIRMAN FITCH: Go ahead, Mr. Smith.
13  BY MR. SMITH:
14      Q.  Is it fair to say that you now
15  understood that Ms. Sataki was not going to return
16  your love?
17      A.  No, not at all.  It's an incorrect
18  characterization.
19      Q.  You still believed that Ms. Sataki
20  might somehow fall in love with you?  Is that
21  fair?
22      A.  That was not my intent or approach.  My

## Page 1494

1  approach was that I cared for her and that I
2  wasn't getting the respect and the interaction
3  that would be normal in even a friendship.
4      Q.  Look at Supplementary Exhibit Number
5  20, please.
6      CHAIRMAN FITCH: SX20, correct?
7      MR. SMITH: SX20, yes.
8      CHAIRMAN FITCH: Are we pretty much
9  toward the end?
10      MR. SMITH: Yes, of this aspect of the
11  examination.
12      CHAIRMAN FITCH: Yeah, ok.
13      THE WITNESS: May I ask, just for
14  purposes of scheduling, your Honor, with my sister
15  who came from New York --
16      CHAIRMAN FITCH: Now that it's 11:00,
17  Mr. Smith, I'm getting a little worried, how much
18  more do you have?
19      MR. SMITH: Not much more.  I'm about
20  to wrap up.  It depends on the answers that I get.
21      CHAIRMAN FITCH: I'm going to have to
22  break in about two or three minutes.

## Page 1495

1      MR. SMITH: Alright.
2  BY MR. SMITH:
3      Q.  Take a look at Exhibit 20,
4  Supplementary Exhibit 20.
5      A.  Yeah, let me read it.
6      (Witness reads document.)
7      MR. SMITH: These are two
8  correspondence, both dated July 26th, 2010, and
9  both from Mr. Klayman to Ms. Sataki.
10      THE WITNESS: Ok, I got it.
11  BY MR. SMITH:
12      Q.  Alright.  In these two letters, you
13  became aware that Ms. Sataki had been talking with
14  Kathleen Staunton from Congressman Rohrabacher's
15  office, correct?
16      A.  Correct.  I called Kathleen, Kathleen
17  Staunton, and I said, "Is Congressman Rohrabacher
18  going to do anything to help Ms. Sataki," because
19  I had gone up there to ask for his help.
20      Q.  And based upon your conversation with
21  Ms. Staunton, Kathleen, you were inspired to write
22  a letter to Ms. Sataki indicating that she "needed

## Page 1496

1  to improve in the areas of honesty, class and
2  knowing who your friends are"?
3      A.  No, that wasn't the purpose of my
4  letter.
5      The primary purpose is that, as it
6  states here, which you overlooked, is that the
7  email, very short, July 26th, 2010, 3:23 p.m.,
8  Larry Klayman, "Talked with Kathleen about" --
9      CHAIRMAN FITCH: He didn't ask you
10  about this email?
11      THE WITNESS: Ok, but that was the
12  purpose.  It was a reaction to that, telling her
13  things that were patently untrue; that she didn't
14  want to go to LA, never wanted to file a court
15  case.  That was false.
16      I was concerned about that because that
17  was perhaps the reason that Congressman
18  Rohrabacher didn't try to help her, and it was
19  probably the reason that Kathleen Staunton later
20  came after me, thinking that somehow I had done
21  things that she didn't want.
22      This is so false.  And I'm glad that

22  (Pages 1493 to 1496)

App.0617

In Re: Larry Klayman
June 27, 2018

| Page 1497 | Page 1499 |
|---|---|

**Page 1497**

1 you brought this letter in front of the
2 committee --
3 BY MR. SMITH:
4    Q. Well, can you answer my question, so
5 then you can deal with whatever else it is you
6 want to deal with?
7    CHAIRMAN FITCH: Answer his question.
8 BY MR. SMITH:
9    Q. In neither one of these pieces of
10 correspondence do you profess your love for Ms.
11 Sataki, do you?
12    A. I do in the sense that --
13    Q. Do you say the words "I love you" in
14 this letter?
15    A. No, I don't say that. And that's a
16 different question than what you just asked me.
17 I'm care about her.
18    CHAIRMAN FITCH: I think he has the
19 right to finish that first answer.
20    THE WITNESS: Yeah, I'm caring about
21 her. You don't have to use the word "love" to let
22 someone know you're caring about them.

**Page 1498**

1 BY MR. SMITH:
2    Q. You're not telling her how beautiful
3 she is?
4    A. I always talked about that in context,
5 if I talked about it at all.
6    Q. You're not talking about how, you know,
7 much better your life is with --
8    A. The letter says what it says, Mr.
9 Smith. I'm sorry. You're trying to put words
10 into my mouth.
11    MR. SMITH: Alright, we have dealt with
12 Supplementary Exhibit 21 yesterday, so I will
13 conclude this aspect of the examination.
14    CHAIRMAN FITCH: We will stand in
15 recess as we prepare for an interruption of Mr.
16 Klayman's testimony in order to accommodate
17 another witness, if the witness is here.
18    One way or the other, we will stand in
19 recess for at least nine minutes until 11:10.
20    (Recess taken.)
21    CHAIRMAN FITCH: Back on the record,
22 please.

**Page 1499**

1    We are resuming Mr. Smith's examination
2 here at 11:12, with again the requisite persons
3 present.
4    CONTINUED CROSS-EXAMINATION
5    BY DISCIPLINARY COUNSEL:
6    BY MR. SMITH:
7    Q. Alright, take a look at Supplemental
8 Exhibit Number 7, please. And that is a two-page
9 document.
10    A. Supplemental Exhibit 7? I thought we
11 already went over that.
12    Q. Supplemental Exhibit 11.
13    A. Oh, 11:00.
14    THE WITNESS: She's calling me, your
15 Honor. Can I just take it real quickly?
16    CHAIRMAN FITCH: Go ahead.
17    (Brief pause.)
18    THE WITNESS: She's on her way. She
19 will wait in the witness room.
20 BY MR. SMITH:
21    Q. For the record, an email dated May
22 30th, 2010 from Ms. Sataki to Mr. Klayman.

**Page 1500**

1    (Witness reads document.)
2    CHAIRMAN FITCH: So it's the email that
3 starts at the bottom of Page 1.
4    MR. SMITH: Yes.
5    CHAIRMAN FITCH: And continues on.
6    MR. SMITH: Yes.
7 BY MR. SMITH:
8    Q. And also look at the one right above
9 it, I'm sorry, the May 30th to Mr. Klayman from
10 Ms. Sataki.
11    (Witness reads document.)
12    A. Ok.
13    Q. Alright, in this letter the subject
14 line says: "No More Arguments," and you're
15 suggesting to her that she should not communicate
16 with you any further.
17    A. You got a question?
18    Q. Yes.
19    That's what you're doing. Is that
20 right?
21    A. At that point in time I was saying
22 also, "Deal with my associate at that time because

23 (Pages 1497 to 1500)

In Re: Larry Klayman
June 27, 2018

| | Page 1501 | | Page 1503 |
|---|---|---|---|

Page 1501

1 you don't know how to talk to me or deal with me."
2     I wasn't pushing her away from legal
3 representation. No.
4     Q.  Ok, and you accused her of having a
5 diva mentality?
6     A.  I didn't accuse her.  She does have a
7 diva mentality.
8     Q.  You described her as having a diva
9 mentality?
10     A.  I said that, but she has a
11 self-centered approach to things.
12     Q.  You're saying, "Unfortunately you have
13 a sick mind and because of that you make my mental
14 state worse too, especially with your meaningless
15 accusations."
16     A.  Well, are you reading what she wrote?
17     Q.  Yes.
18     A.  Ok, you're not reading all of what she
19 wrote.  I mean, she's accusing me of having a sick
20 mind, of needing professional help.  It's
21 extremely insulting.
22     Q.  But she's saying that you're making her

Page 1502

1 mental state worse with all of your accusations?
2     A.  I didn't make her metal state worse.
3 Her mental state is what it was, and it continues
4 today, and we saw that, in my opinion, in court.
5     Q.  Alright, in the last paragraph of this
6 sentence, Ms. Sataki says, "Please let me finish
7 here by saying that please always remember you
8 will get 40 percent when you finish the case."
9     A.  I never accepted that.  I said I never
10 wanted to be paid.  It's pro bono.  She's trying
11 to lure me into continuing to represent her by
12 saying you'll get 40 percent.
13     We never got to the point of doing a
14 contingent fee agreement, because at that point we
15 went our separate ways.  But I never intended to
16 be paid.  I never intended to tae anything from
17 her.  We were simply looking for equitable relief
18 to get her back to Los Angeles.
19     There was no money in it anyway,
20 assuming there was every any money in it, for
21 many, many years.  And that was not what I was
22 attempting to do.  I never, ever said she had to

Page 1503

1 pay me.
2     To the extent that I said that at the
3 end, it was to try to jog her into --
4     Q.  Let's look at Supplementary --
5     A.  If I could finish the respond, please.
6     It was simply to jog her into realizing
7 how much I had done for her.
8     Q.  Let's take a look at Supplemental
9 Exhibit Number 12.  Perhaps that is the point
10 you're trying to make.
11     A.  I'll read it.
12     (Witness reads document.)
13     A.  Ok.
14     Q.  In the fifth line down it says, "Well,
15 this point I think that 50 percent of any recovery
16 is fair, and that is what I require."
17     You see that?
18     A.  If this matter was going to go forward,
19 yes, but the representation, at least in terms of
20 her --
21     Q.  Well --
22     A.  Let me finish.

Page 1504

1     At least in terms --
2     Q.  I haven't asked a question, Larry.
3     THE WITNESS:  I want to respond, your
4 Honor.
5     MR. SMITH:  I have not asked a
6 question?
7     CHAIRMAN FITCH:  I think the answer to
8 his question is that it does say that.
9     Now what's your question?
10 BY MR. SMITH:
11     Q.  Now the question is, this is a
12 counteroffer to Ms. Sataki's statement in her
13 letter to you the day before that 40 percent is
14 what you all had agreed upon.
15     A.  I never, ever agreed on 40 percent.  I
16 didn't want anything.  It was friendship, number
17 one.  Number two, I never asked for anything.  You
18 can see that, even to this day.
19     I could have brought a lawsuit if in
20 fact I thought I was owed anything to recuperate
21 it, because people were interfering with my
22 relationship -- I would never sue her -- my

24 (Pages 1501 to 1504)

In Re: Larry Klayman
June 27, 2018

## Page 1505

1 professional relationship. And that's clear.
2 But the relationship ended and we
3 never -- I mean, at this point, it was clear that
4 we had to go our separate ways. I'm just kind of
5 challenging her, trying to get her to see that I
6 had put in so much time and expense and that she
7 didn't appreciate it.
8 So therefore the terms of my previous
9 pro bono relationship, if it went forward, was
10 challenging her that it would have to change. But
11 it never went forward, other than the fact that I
12 tried to protect her interest, because we didn't
13 get any communication shortly thereafter.
14 But even then I wasn't sending her
15 anything to say I want to continue to represent
16 you under these circumstances. I was protecting
17 her. I was protecting her rights. And I think I
18 had an ethical duty to do that, not to let her
19 lose everything.
20 As you previously just saw a few
21 moments ago, she's telling Kathleen Staunton she
22 never wanted to go to LA, she never wanted to

## Page 1506

1 bring court cases. That is a blatant falsehood,
2 and that's what I was dealing with in terms of
3 getting communications from a number of people.
4 But it's clear at this point she had to
5 move on. I gave her other names. She was always
6 free to get the other names and interview them and
7 hire another lawyer. She had other people who
8 could help her.
9 MR. SMITH: Move to strike. My
10 question had nothing to do with any of that. My
11 question was whether or not it had to do with a
12 counteroffer.
13 CHAIRMAN FITCH: The part of the answer
14 that essentially consisted of the relationship
15 ended, other than my duty to protect her interest.
16 The rest will not be considered and
17 will be struck.
18 BY MR. SMITH:
19 Q. You said this case was not worth
20 anything. There was no expectation of making any
21 money out of this case?
22 A. No, because all my effort was geared to

## Page 1507

1 getting her back to LA. That was equitable relief
2 in terms of Wagner vs. Taylor. That's where my
3 effort was right from the beginning.
4 You saw the emails with Mr. Keya Dash,
5 where I said --
6 Q. You were --
7 A. Wait a minute. Let me finish.
8 -- where I said, "Look, what we really
9 want is a settlement here to get her to LA."
10 That's what the representation was gear to, the
11 extent that I put in damage claims and things like
12 that. That was to try to coax or properly coerce
13 VOA to do the right thing and the board of
14 governors.
15 But that was not my motivation here.
16 It was not to make money.
17 Q. Do you recall the addendum clause that
18 you had in your civil complaint against the
19 defendants in this case, Ms. Sataki vs.
20 Broadcasting Board of Governors case?
21 A. I generally remember that, but a lot of
22 what I did, based on my considerable experience,

## Page 1508

1 was to put pressure on VOA to settle the case.
2 Q. Do you remember how much you asked for
3 in damages for Ms. Sataki's case?
4 A. I'm sure it was a lot, because I wanted
5 them to realize they were at risk, so they would
6 settle this matter.
7 Q. You sought compensatory and actual
8 damages in excess of $150M. Is that right?
9 A. I don't know. I don't have the
10 complaint in front of me right now.
11 Q. Look at Bar Exhibit 4, at Page 4-12.
12 (Witness peruses document.)
13 A. Ok. Yes, I put that -- I didn't know
14 the amount because I hadn't seen the complaint for
15 quite a while.
16 Q. Did you have a basis in law or in fact
17 to ask for $150M?
18 A. Yes, in terms of what the damage may
19 have been. But I was also trying --
20 Q. So therefore you were entitled to,
21 according to your fee agreement, at last $75M in
22 the event that the case went to term and you got

In Re: Larry Klayman
June 27, 2018

## Page 1509

1  $150M, correct?
2      CHAIRMAN FITCH:  I'll strike that
3  question because of the use of the term "fee
4  agreement," which strikes me as not established,
5  at least not yet.
6      MR. TIGAR:  Could I --
7      CHAIRMAN FITCH:  But wait a minute,
8  let's if Mr. Smith -- he does have a perfectly
9  legitimate question.
10  BY MR. SMITH:
11     Q.   According to the terms of the fee
12  agreement set forth in Mr. Klayman's letter to Ms.
13  Sataki dated May 31st, Supplemental Exhibit Number
14  12, you say that you were entitled to 50 percent
15  of whatever is recovered in the case.
16     A.   There never was a fee agreement.  I was
17  throwing that out if I was to continue, and I was
18  trying to get her to see that I had put in so much
19  effort.
20          But there never was an agreement to pay
21  me 40 percent, or 50 percent.  It was clear from
22  the start that it was pro bono.  I was doing it

## Page 1510

1  from the standpoint of what I thought was right in
2  helping a woman that had no money, and again, the
3  goal was not to go all the way through.  I
4  couldn't have even afforded that.  I was by
5  myself, essentially.
6      CHAIRMAN FITCH:  Why did you title this
7  email "Legal Representation Agreement"?
8      THE WITNESS:  Well, because I'm saying
9  if we go forward, if we go forward.  We didn't
10  have an agreement before then.
11  BY MR. SMITH:
12     Q.   You don't say that in the letter --
13     A.   I'm saying, the representation ended --
14     Q.   The letter doesn't say, "if we go
15  forward," does it?
16     A.   The letter says what it says.
17     Q.   Ok.
18     A.   But I'm telling you where I was coming
19  from.
20      CHAIRMAN FITCH:  Mr. Tigar had a
21  question.
22      THE WITNESS:  My answer, if you put it

## Page 1511

1  in context that I'm also suggesting that she
2  should find another lawyer.  It's clear that if
3  I'm going to remain and if she's going to act in a
4  proper way, that obviously there has to be some
5  kind of an agreement.
6          But there never was an agreement up to
7  that point in time, and the relationship ended.
8  BY MR. SMITH:
9      Q.   I thought you were trying to get out of
10  the case because of your emotional attachments to
11  the --
12     A.   There were a lot of reasons why, and
13  also because of hers.
14      MR. SMITH:  I'm sorry, Mr. Tigar?
15      MR. TIGAR:  Two matters of
16  clarification.
17      THE WITNESS:  Sure.
18      MR. TIGAR:  The damages claim was
19  necessary if you had a Bivens action, correct?
20      THE WITNESS:  Correct.
21      MR. TIGAR:  Because you couldn't have a
22  Bivens action without damages?

## Page 1512

1      THE WITNESS:  Absolutely.
2      MR. TIGAR:  Number two, with respect to
3  Supplemental Exhibit Number 12, I have focused on
4  the language that "I will draw up the contract
5  evidencing this 50% arrangement and email it to
6  you.  Then sign it so I know we are on the same
7  page."
8      THE WITNESS:  Yeah.  Well, we never --
9      MR. TIGAR:  Did you ever send that to
10  her?
11      THE WITNESS:  No, we never got to that
12  point, because the relationship effectively ended
13  because of a lack of communication.
14      MR. TIGAR:  So at that point you
15  understood that the relationship was over?
16      THE WITNESS:  It was ending, yes.  And
17  as you see from the difference correspondence,
18  referral to Ms. Allred, referral to Mr. Shea,
19  letters of referral to Dr. Aviera.
20          So we never got to that point.
21      MR. TIGAR:  Thank you.
22      MS. LARKIN:  So I have a question.

26 (Pages 1509 to 1512)

In Re: Larry Klayman
June 27, 2018

## Page 1513

1 If that relationship had not ended,
2 then Ms. Sataki would have been eligible to
3 receive the entire -- what million?
4 MR. SMITH: One hundred and fifty
5 million.
6 MS. LARKIN: One hundred and fifty
7 million without you receiving any remuneration for
8 the money you had put out?
9 THE WITNESS: That was my
10 understanding.
11 Based on reality, I didn't think we
12 would be litigating this thing for ten years. We
13 were trying to get a resolution of her going back
14 to Los Angeles.
15 I cared about her. That's what I was
16 trying to do. Not get damages.
17 CHAIRMAN FITCH: If in your view at the
18 time, as you said, the relationship had ended, why
19 did you say, "I'll draw up the contract evidencing
20 this 50% arrangement and email it. Then sign it
21 so I know we are on the same page as I go
22 forward"?

## Page 1514

1 MR. KLAYMAN: Yeah, I was upset and
2 didn't mean that literally.
3 What I meant was I put in so much time
4 and expense. I put my heart and soul into this
5 and never asked to be compensated. So that was
6 kind of a way of saying that, but there was no
7 agreement that I would get a contingent fee.
8 I didn't -- if you see, the
9 negotiations with VOA, I'm never asking them to
10 pay money.
11 You've got a lot in the record there.
12 That was not -- I was demanding of the settlement.
13 We would have gone away if they put her back to
14 work in Los Angeles, and that was our objective.
15 MR. SMITH: I'm going to wrap this up.
16 BY MR. SMITH:
17 Q. I'll ask you to take a look at Bar
18 Exhibit Number 38, Supplemental Exhibit Number 38,
19 please.
20 For the record it is the correspondence
21 from Ms. Sataki to Mr. Klayman on September 11th,
22 2011.

## Page 1515

1 MR. TIGAR: This is Supplemental
2 Exhibit 38?
3 CHAIRMAN FITCH: The very last one.
4 MR. TIGAR: Mine says September 15,
5 2011.
6 MR. SMITH: The bottom portion.
7 MR. TIGAR: Oh.
8 MR. SMITH: This is from Ms. Sataki to
9 Mr. Klayman.
10 MR. TIGAR: Thank you.
11 (Witness reads document.)
12 THE WITNESS: Ok, I see it.
13 BY MR. SMITH:
14 Q. You testified yesterday that you felt
15 insulted by Ms. Sataki's statement that "I don't
16 know if you're a Christian or Jewish, because
17 whatever it suits you best, you become one. But I
18 do believe in karma."
19 A. I didn't testify to that.
20 What I testified to was that I didn't
21 understand why "Jewish" was being highlighted and
22 I didn't see why that was any different in the

## Page 1516

1 context of this, other than being Christian.
2 So what was in her mind, I don't know.
3 But I thought she was -- it was pejorative in a
4 sense to do that.
5 And this is the way she would talk to
6 me --
7 CHAIRMAN FITCH: Now stop there. He
8 asked you a question and you answered that
9 question --
10 THE WITNESS: Ok.
11 CHAIRMAN FITCH: -- about what's said
12 there.
13 Next question.
14 BY MR. SMITH:
15 Q. Do you think it would be pejorative to
16 say that "Jewish people think they know
17 everything. That's why I generally don't hang
18 around them"?
19 A. Well, I was joking with that. I'm
20 self-deprecating many times. It's part of my
21 humor I said.
22 I'm very proud of being Jewish. Let me

27 (Pages 1513 to 1516)

In Re: Larry Klayman
June 27, 2018

## Page 1517

1  tell you that.
2      Q.  I'm referring to Supplementary Exhibit
3  Number 10 where that's what you said.
4      A.  I remember something to that effect.
5      Q.  Well, take a look at Supplementary
6  Exhibit 10.
7      A.  That's fine.  I'm happy to do it.  You
8  know, I'm trying to make people feel comfortable
9  here.
10      Q.  I feel comfortable.
11      A.  Good.
12      CHAIRMAN FITCH:  What's the relevance
13  of this?
14      MR. SMITH:  I just wanted to know
15  whether, you know, the appropriateness with
16  respect to -- you know, the asserted allegation
17  that Ms. Sataki may have been saying something
18  anti-Semitic was inappropriate, given that he
19  seems to have talked loosely about the Jewish
20  faith, himself, in conversations with Ms. Sataki.
21      THE WITNESS:  This was what, your
22  Honor --

## Page 1518

1      CHAIRMAN FITCH:  Wait a minute, wait a
2  minute, wait a minute.
3      I'm certainly not going to allow a
4  question or answer about -- that could be
5  construed as suggesting feelings of religious
6  discrimination.
7      MR. SMITH:  And that was not the point.
8      CHAIRMAN FITCH:  Ok, so tell me again
9  what the relevance is.
10      MR. SMITH:  That it seems that they
11  both talked loosely about the Jewish faith.
12      CHAIRMAN FITCH:  Ok?
13      MR. SMITH:  And the first instance of
14  that appears in the Bar exhibit that Mr. Klayman
15  made to Ms. Sataki where he was talking about how
16  he didn't like hanging around Jewish people.
17      CHAIRMAN FITCH:  And what's the
18  relevance of that?
19      MR. SMITH:  Yesterday, when he was
20  commenting upon Ms. Sataki's testimony, he was
21  suggesting that it was inappropriate for her to
22  talk about Jewish -- and he thought there was

## Page 1519

1  something inappropriate about that.  It seems to
2  me that he had opened up the door.
3      And perhaps it was a bad line of
4  questioning.  I withdraw it and I will conclude
5  my --
6      CHAIRMAN FITCH:  I think that would be
7  best.
8      MR. SMITH:  I will conclude my
9  examination with that.
10      MR. KLAYMAN:  Let me see if my sister
11  is here.
12      CHAIRMAN FITCH:  Let's check on that.
13      MR. KLAYMAN:  Then I can do any
14  redirect that I may have.
15      CHAIRMAN FITCH:  Mm-hmm.
16      (Recess taken.)
17      (Joshua Ashley Klayman before the
18  hearing committee.)
19      CHAIRMAN FITCH:  We're back on the
20  record at 11:38.
21      And why don't you step up, please.
22      I'm speaking to a witness who we think

## Page 1520

1  is our next witness, which we're taking slightly
2  out of order before redirect of Mr. Klayman.
3      What is your name, please?
4      THE WITNESS:  Joshua Ashley Klayman.
5      CHAIRMAN FITCH:  Lean down to that
6  microphone.
7      THE WITNESS:  Joshua Ashley Klayman.
8      CHAIRMAN FITCH:  I missed your first
9  name.  Spell it.
10      THE WITNESS:  J-o-s-h-u-a.  It's just
11  like the man's name.
12      CHAIRMAN FITCH:  Would you raise your
13  right-hand.  I need to swear you in as a witness.
14      Do you solemnly swear or affirm that
15  the testimony you are about to give in this matter
16  will be the truth, the whole truth and nothing but
17  the truth?
18      THE WITNESS:  I do.
19      CHAIRMAN FITCH:  Now, sit down, if you
20  would, please.  Pull both of those microphones
21  kind of close to you and we'll go from there.
22      THE WITNESS:  By the way, I've never

28 (Pages 1517 to 1520)

In Re: Larry Klayman
June 27, 2018

**Page 1521**

1  given witness testimony before, so if there is
2  something I should be doing, please let me know.
3  Wherefore,
4         JOSHUA ASHLEY KLAYMAN
5  called as a witness on behalf of Respondent, and
6  after having been first duly sworn, was examined
7  and testified as follows:
8       EXAMINATION ON BEHALF OF THE RESPONDENT:
9            BY MR. KLAYMAN:
10      Q.  Please state your name.
11      A.  My name is Joshua Ashley Klayman.
12      Q.  Are we related, Ms. Klayman?
13      A.  Yes, you're my brother.
14      Q.  And how old are you?
15      A.  I'm 41.
16      Q.  Run us through briefly your educational
17  background.
18      A.  Sure.  I got a Bachelor's degree from
19  the University of Pennsylvania in 1999.  I
20  graduated summa cum laude.  I went to Temple Law
21  School.  I was a law faculty scholar and I was on
22  Law Review and I graduated in 2006.

**Page 1522**

1         CHAIRMAN FITCH:  Really I'm having
2  trouble hearing you.
3         THE WITNESS:  Oh, sorry.  I'll speak
4  up.
5         Do you want me to repeat that?
6         CHAIRMAN FITCH:  Mm-hmm.
7         THE WITNESS:  Ok, sure.
8         So I graduated in '99 from University
9  of Pennsylvania, summa cum laude with a Bachelor's
10  in arts.  I went to Temple Law School as a law
11  faculty scholar.  I graduated in 2006 cum laude on
12  the Law Review.
13  BY MR. KLAYMAN:
14      Q.  Can you run us through your employment
15  history after law school.
16      A.  Sure.
17      Q.  Take your time.
18      A.  Ok.  So after law school I initially
19  practiced for four years in Pennsylvania, at
20  Pepper Hamilton.  I then went to Cahill Gordon and
21  Reindel, in New York City, to do leverage finance.
22         I left there when some partners left

**Page 1523**

1  and went to Paul Hastings.  I then went --
2         CHAIRMAN FITCH:  It's the way of the
3  world these days.
4         THE WITNESS:  Yes, exactly.
5         I then went to Allen Overy.  My partner
6  there left and took us to Morrison Foerster where
7  I had a practice for five years.
8         I left on Friday and I just launched my
9  own law firm and consulting firm, and I'm now a
10  consultant to Shearman Sterling, as well.
11  BY MR. SMITH:
12      Q.  What is your legal specialty?  What is
13  your specialty, your expertise?
14      A.  So traditionally it was leveraging
15  finance and corporate, but I have in the past few
16  years been working on block chain and crypto
17  matters, and I actually founded Morrison
18  Foerster's global block chain and contracts group.
19  That's where I've taken this next step so that I
20  can do that all the time.
21      Q.  Did there come a point in time when you
22  met a Ms. Elham Sataki?

**Page 1524**

1      A.  Yes.
2      Q.  What was the circumstances of that?
3      A.  At the time I was dating someone in Los
4  Angeles, so I was frequently flying over the
5  weekend from Los Angeles to New York.
6         My brother lived in Pacific Palisades,
7  and I met her at his house.
8      Q.  During the meeting with Ms. Sataki, did
9  she discuss the issue of her case and what was
10  being done?
11      A.  Yes, quite openly.  And I met her
12  multiple times.  It wasn't that I just met her one
13  time.
14         Yes, she was quite open with what the
15  circumstances of her challenges were.
16      Q.  Did she discuss the issue of publicity
17  in her case?
18      A.  She did.  I mean, she was very, very
19  open, which -- I'm not a litigator.  I don't
20  really know anything about litigations, but I was
21  surprised that she was so open.
22      Q.  And did she say that she was approving

29 (Pages 1521 to 1524)

In Re: Larry Klayman
June 27, 2018

## Page 1525

1 of publicity of her case in trying to get a
2 settlement of her claims?
3          MR. SMITH: Objection. That's a
4 leading question.
5          THE WITNESS: Ok, so --
6          MR. SMITH: Objection. That's a
7 leading question.
8          CHAIRMAN FITCH: Rephrase the question.
9 BY MR. KLAYMAN:
10     Q. Did she make reference to using
11 publicity to try to get a positive result for her?
12          MR. SMITH: Objection. It's a leading
13 question.
14 BY MR. KLAYMAN:
15     Q. Ok, what did she say?
16     A. She was very interested in trying to
17 get a positive result and to pressure people into,
18 you know, giving her that result.
19          She certainly was publicizing
20 everything to my then boyfriend and me, but I
21 don't recall her explicitly saying, like, "Yes,
22 I," you know -- however she was actively

## Page 1526

1 publicizing it to me. And she seemed very onboard
2 with whatever the strategy was.
3     Q. But I also mentioned, did I not, the
4 publicity?
5     A. Yeah.
6     Q. Yes.
7     A. Yeah.
8     Q. She didn't object?
9          MR. SMITH: Objection.
10          THE WITNESS: I think --
11          CHAIRMAN FITCH: Wait, wait.
12          Did there come a time when you had
13 conversations, one or more conversations with Mr.
14 Klayman and Ms. Sataki.
15          THE WITNESS: Yes. Yes.
16          CHAIRMAN FITCH: On approximately how
17 many occasions would you say.
18          THE WITNESS: I'm not sure offhand how
19 many in-person times, however she and Larry were
20 friends. I mean, they were -- that's why she was
21 over my boyfriend's house there.
22          So, I frequently had conversations

## Page 1527

1 either directly with her or through Larry and her
2 saying hi to me or something like that. It wasn't
3 that -- they were friends.
4          CHAIRMAN FITCH: Now ask a question,
5 Mr. Klayman.
6          MR. KLAYMAN: Ok.
7          CHAIRMAN FITCH: You've got the
8 foundation.
9 BY MR. KLAYMAN:
10     Q. During the times that you met with her,
11 I discussed publicizing her case?
12     A. Yes. I think you always discussed
13 publicizing cases.
14     Q. And she didn't object?
15     A. No.
16     Q. What was your impression of Ms. Sataki
17 interacting with me?
18     A. A few things: I thought she was
19 beautiful, right. I thought she seemed -- I
20 thought she was using you, which I said to you on
21 multiple occasions. And she definitely seemed to
22 be in a very unstable sort of way.

## Page 1528

1          But I -- I mean, I vacillated between
2 kind of liking her and being suspicious of her,
3 quite frankly, as your sister.
4          MR. KLAYMAN: I have no further
5 questions.
6          MR. SMITH: I have no questions.
7          MR. TIGAR: I have a couple, if I may.
8          CHAIRMAN FITCH: Go ahead, Mr. Tigar.
9          MR. TIGAR: I'm not sure I heard the
10 word. You thought that Ms. Sataki was using Mr.
11 Klayman?
12          THE WITNESS: Yes.
13          MR. TIGAR: What do you mean by that?
14          THE WITNESS: Well, she was -- I don't
15 know what she looks like now, but she was very
16 beautiful and she was just very forward in her
17 demands. I guess -- I shouldn't say demands.
18          But I believe at one point she asked
19 him to buy her a car, like, just -- she was very
20 forward in terms of requesting different things
21 for her personally.
22          MR. TIGAR: Were you aware of expenses,

30 (Pages 1525 to 1528)

In Re: Larry Klayman
June 27, 2018

## Page 1529

1  of any expenses that Mr. Klayman was paying on her
2  behalf?
3        THE WITNESS:  I don't think I'm aware
4  independently of any kind of -- I don't know
5  whether I ever was aware, but I don't recall any
6  specific things.  I just know he was, in my view,
7  he was going above and beyond, and I didn't
8  understand exactly why, because I felt like she
9  was a little bit, I don't know, not -- I just had
10  my sisterly like, what's happening here, you know?
11        MR. TIGAR:  Did you ever have the
12  feeling that Mr. Klayman, that your brother, was
13  in love with Ms. Sataki?
14        THE WITNESS:  Was in love with her?
15        No.  I think he liked her a lot.  Think
16  they were friends, but I don't think he was in
17  love with her.
18        I didn't get that sense, but I think he
19  cared about her a lot.  Maybe I'm wrong.  I mean,
20  I thought he cared about her a lot.
21        MR. KLAYMAN:  Thank you.  No further
22  questions.

## Page 1530

1        Thank you, sister.
2        CHAIRMAN FITCH:  Well, a fairly long
3  trip for a short testimony.  I suppose it could
4  have been worse.  It could have been a long trip
5  for a long testimony.
6        We do appreciate witnesses helping us
7  out for these mattes, and I believe that you can
8  now be excused.
9        THE WITNESS:  Right, thank you very
10  much.
11        CHAIRMAN FITCH:  Thank you.
12        (Witness is excused.)
13        (Brief pause.)
14        CHAIRMAN FITCH:  We are back on the
15  record and, after off-the-record discussions, with
16  the hearing committee and counsel and parties, we
17  are going to stand in recess for about 15 minutes
18  'till about five minutes after 12:00, and then
19  resume and do our very best to complete redirect.
20        After that we will take a lunch break
21  and I'm assuming that the lunch break will be
22  adequate for any last minute preparation that

## Page 1531

1  counsel wish to do before delivering their
2  respective, approximately half-hour closing
3  arguments.
4        So let me ask again if all of that
5  tentative approach is satisfactory to everybody.
6        Mr. Smith?  Is all of that satisfactory
7  to you?
8        MR. SMITH:  Satisfactory, yes.
9        CHAIRMAN FITCH:  I see nodding on the
10  other side of the podium.
11        We stand in recess for approximately 15
12  minutes.
13        (Recess taken.)
14        CHAIRMAN FITCH:  We can go back on the
15  record.
16        It appears to me, and I'm very much
17  appreciative, that Mr. Klayman and Mr. Sujat are
18  prepared to proceed with redirect examination.
19        You don't need your coat, don't have to
20  put it on.  It's up to you.
21        MR. SUJAT:  Alright.  Thank you, your
22  Honor.

## Page 1532

1  CHAIRMAN FITCH:  Sure.
2  REDIRECT EXAMINATION BY RESPONDENT'S COUNSEL:
3        BY MR. SUJAT:
4        Q.  Mr. Klayman, reference was made in
5  Respondent's Supplemental Exhibit 7 to your
6  mother.
7        What is that all about?
8        A.  My mother had Alzheimer's, and my
9  stepdad had induced my grandmother, who was dying,
10  on her death bed, to give all of her money over to
11  him.  And I had to bring a case to get my
12  grandmother's money back, because she had no money
13  for her nursing home and for her subsidy.  She
14  saved a total of $80,000 her entire life.  She was
15  a dress salesman on Chestnut Street in
16  Philadelphia.  That's where I was born.
17        So it wasn't really a case against my
18  mother.  It was that she was next of kin.  I had
19  to do that to try to get my grandmother's money
20  back.
21        My grandmother subsequently died.  My
22  stepdad had also put a "do not resuscitate" order

App.0626

In Re: Larry Klayman
June 27, 2018

## Page 1533

1  on her chart. There was no reason she had to die
2  without treatment.
3          And that's what it was about. I was
4  standing in there for my grandmother.
5  So I wanted to explain that.
6  Q. Thank you, Mr. Klayman.
7          Mr. Klayman, I refer you to Bar Exhibit
8  Number 38, SX38.
9  A. Yes.
10  MS. LARKIN: Regular exhibit or Bar?
11  CHAIRMAN FITCH: This is SX38.
12  MR. SUJAT: Yes, SX38.
13  BY MR. SUJAT:
14  Q. Mr. Klayman, what did this mean to you
15  with respect to your interaction with Ms. Sataki?
16  A. It's demonstrative --
17  CHAIRMAN FITCH: Are we talking about
18  the Sataki email to Mr. Klayman?
19  THE WITNESS: Yes.
20  CHAIRMAN FITCH: At 5:28 p.m. on
21  9/11/11? I assume we are.
22  THE WITNESS: Yes.

## Page 1534

1  CHAIRMAN FITCH: Ok, go ahead.
2  THE WITNESS: It's demonstrative how
3  she treated me, how she talked to me many times
4  during the time period that I represented her.
5  It also displays that her ability to
6  write English is poor.
7          And the underlining of the word
8  "Jewish," I'm not saying she's anti-Semitic. I
9  never said that, and, you know, I joke about
10  things to o. I'm very proud of being of Jewish
11  heritage and coming to Christ. I'm both. But I
12  thought it was unnecessary to highlight the Jewish
13  part of it, and it was kind of like sticking it to
14  me, in a way.
15          At the bottom it says, "I'm nobody.
16  I'm just a little girl that was retaliated and
17  harassment by some VOA employee, and you see that
18  you can help me"... This is how she took me in to
19  help her, you know, because that's an approach to
20  get sympathy, which was warranted, but certainly I
21  wouldn't say she was just a "little girl." I
22  think she was quite sophisticated and knew what

## Page 1535

1  she was doing, and frankly I think she used me in
2  retrospect.
3          So that's what it meant to me.
4          But most of this, I just wanted the
5  hearing committee to know that this is
6  demonstrative of the issue of what I testified to
7  about respect, about talking to someone in the
8  right way, about treating me like you would treat
9  your other friends and having a way of
10  appreciating what I was trying to do for her.
11          And for her even to say that I took a
12  bribe, that's the worst thing you can say to a
13  lawyer, and it just kind of cuts your entire
14  psyche out.
15          So that's why I'm very, actually,
16  grateful that Mr. Smith got that from Ms. Sataki,
17  because this tells it all.
18  BY MR. SUJAT:
19  Q. Mr. Klayman, what was your ultimate
20  purpose in bringing the litigation for Ms. Sataki?
21  A. It was always to get her back to work
22  in Los Angeles. That was my goal. I cared about

## Page 1536

1  her.
2          Right from the start in communications
3  that are part of Exhibit 7, with Mr. Dash, I'm
4  saying that all we really want is settlement to
5  get her back to LA. We don't want to have to sue
6  anybody.
7          We tried very hard. We tried even with
8  a mutual friend who was on the board of governors.
9  We tried lobbying Capitol Hill, prominent
10  senators, congressman, including Mr. Boehner,
11  including Mr. McCain, including Mr. Coburn.
12          We tried to use publicity to coax them
13  into a settlement. And we continued, of course,
14  to try to coax them into a settlement until the
15  very end, but it wasn't possible.
16          In the interim, it was felt and agreed
17  by her that we would bring litigation and that we
18  would bring a Bivens type of case. And I didn't
19  name anyone in particular. I just named the
20  entire board of directors who are responsible, and
21  I put on notice the board of governors what was
22  going on, that they should resolve it.

32 (Pages 1533 to 1536)

In Re:  Larry Klayman
June 27, 2018

## Page 1537

1    So there was no attempt to single out
2  Hillary Clinton or anybody else.  My friend
3  Blanquita Cullum was also named, and I did it for
4  Ms. Sataki and actually destroyed a friendship.
5    But I did things based on what I think
6  are the merits, and I felt at that time that she
7  deserved my full and uncompromised representation.
8    That's what we were trying to do, was
9  to coax a settlement out of them, to tell the
10 board of governors that they're personally at risk
11 unless they settle this.  That was the goal.  It
12 wasn't for money.  I didn't ask for money.  You
13 can go through the exhibits, I went through them
14 several times to point it out.
15    I said, "You can go off and have a good
16 life," even at the time that I said you need to
17 get another lawyer, you know, and recommended Ms.
18 Allred and recommended Mr. Shea, and she was
19 always free to get another lawyer.
20    So, the fact that she would write me an
21 email like this, when you care about somebody,
22 even if that's your friend, it kind of cuts your

## Page 1538

1  heart out in a way.  Because you tried so hard for
2  somebody.  And that's the way I was being treated
3  throughout this case.
4    So that's what I wanted to say about
5  that.
6    MR. SUJAT:  Thank you, Mr. Klayman.  I
7  have no further questions.
8    CHAIRMAN FITCH:  We will now stand in
9  lunch recess.  We could do 45 minutes until 1:00,
10 or we could do an hour 'till 1:15.  You could
11 twist my arm for an hour and 15 minutes to 1:30.
12    MR. KLAYMAN:  We would like the latter,
13 your Honor, if that's agreeable.
14    CHAIRMAN FITCH:  And if 1:30 doesn't
15 present any problem for Mr. Smith, we'll see you
16 at 1:30.  We stand in recess --
17    You had a question.  I'm very sorry.
18    MR. TIGAR:  I wanted to add something
19 and the chair agrees.
20    I hate when I go and argue and then the
21 tribunal raises some point that they probably
22 should have asked me about as the aggregate, and

## Page 1539

1  so on.
2    So, Mr. Smith, please be sure to
3  address what secrets and/or confidences the Bar
4  contends were disclosed that ought not to have
5  been.
6    MR. SMITH:  Alright.
7    MR. TIGAR:  Please get to the question
8  of whether this was a contingent fee case, under
9  the rules.  You heard the testimony.
10    And then, please define with some
11 clarity what personal interests you believe were
12 involved, because that's what you've alleged.
13    MR. SMITH:  Alright.
14    MR. TIGAR:  Mr. Sujat and Mr. Klayman,
15 I'd like to get clear at what point Mr. Klayman
16 felt that he was no longer serving as counsel for
17 Ms. Sataki.  I think we've had a lot of testimony,
18 one way or another.  It would be good to nail that
19 down.
20    And then, to the extent you can do so
21 briefly, could you characterize the different
22 offices that are Larry Klayman offices at

## Page 1540

1  different points, just a list saying these were
2  all virtual offices or these were physical
3  offices, or whatever.
4    CHAIRMAN FITCH:  Now, wait a minute, on
5  that point, they can certainly, in their argument,
6  and/or in their briefs, say what they think the
7  evidence shows about that.
8    MR. TIGAR:  Yes.  Oh, yes, I'm not
9  suggesting --
10    CHAIRMAN FITCH:  We can request
11 additional evidence from Mr. Klayman on that right
12 now, if you think the record is unduly devoid.
13    MR. TIGAR:  No, I think --
14    CHAIRMAN FITCH:  Ok.  Go ahead.  Any
15 others?
16    MR. TIGAR:  I take the Chair's -- as a
17 matter of fact, I'll strike that entirely.  I
18 think the record is what the record is.
19    MR. KLAYMAN:  Ok.
20    CHAIRMAN FITCH:  Other points.
21    MR. TIGAR:  That's it.
22    CHAIRMAN FITCH:  Ok.  Alright, now we

33 (Pages 1537 to 1540)

In Re:  Larry Klayman
June 27, 2018

| Page 1541 | Page 1543 |
|---|---|
| 1  stand -- | 1  THE WITNESS:  Because it was |
| 2      MR. TIGAR:  Wait a minute.  I do want | 2  intending -- we were going to do a Title VII |
| 3  to ask -- may I ask Mr. Klayman one more question. | 3  administratively.  I would not go back. |
| 4      Would you turn to Supplemental Exhibit | 4      Based on my experience it's likely you |
| 5  SX38. | 5  will get a better result in court, where you have |
| 6      CHAIRMAN FITCH:  Let's make it clear | 6  discovery and everything, in a much greater |
| 7  that Mr. Klayman remains in his redirect | 7  extent.  By I'm not sure exactly of the appeal at |
| 8  examination and Mr. Tigar is asking a question | 8  this point, what it is, but I'm basically telling |
| 9  about an exhibit which was covered in redirect. | 9  her to appeal generally, ok. |
| 10      CONTINUED REDIRECT EXAMINATION OF MR. KLAYMAN: | 10      And it could be that -- and I'm just |
| 11      BY THE HEARING COMMITTEE MEMBERS: | 11  speculating -- that there was an aspect of Judge |
| 12      MR. TIGAR:  Yes.  I see, Mr. Klayman | 12  Kotelly's earlier decision-making that could have |
| 13  you write, "I believe you had a right of appeal | 13  been appealed in an interlocutory way, but also |
| 14  and could probably appeal the lower court's | 14  her ultimate decision in December could have -- |
| 15  decision.  The appeal will not be dismissed | 15  when she denied my motion for reconsideration of |
| 16  finally until October 24, 2011." | 16  her denial of sending Ms. Sataki back to LA, that |
| 17      What do you mean by that? | 17  could have been appealed, too. |
| 18      THE WITNESS:  I was trying to give her | 18      But in any event, I couldn't contact |
| 19  a deadline to get the appeal in so she didn't lose | 19  her, and so I -- on my own, at my expense, filed a |
| 20  her rights.  I couldn't communicate with her then. | 20  notice of appeal to protect her. |
| 21      MR. TIGAR:  What appeal were you | 21      If you might have noticed, she filed a |
| 22  talking about? | 22  notice of appeal, so, someone filed it.  And Judge |

| Page 1542 | Page 1544 |
|---|---|
| 1      THE WITNESS:  The appeal of Judge | 1  Kotelly put it in the file.  And Mr. Tigar noted |
| 2  Kotelly's dismissal of her case. | 2  that that was probably very timely, because of the |
| 3      MR. TIGAR:  Why did you choose the date | 3  fact that you have 60 days in a government case. |
| 4  the October 24th? | 4      But it also shows that what she was |
| 5      THE WITNESS:  I don't remember the | 5  saying to -- what she purports to be saying -- and |
| 6  calculation, but I obviously did a calculation and | 6  who knows who is saying it, because it wasn't in |
| 7  thought was the date to respond. | 7  her writing or syntax -- to drop everything was |
| 8      MR. TIGAR:  Thank you. | 8  not the case.  She was getting bad advice. |
| 9      THE WITNESS:  Thank you. | 9      And it also shows you what she said to |
| 10      CHAIRMAN FITCH:  Wait, wait, wait, Mr. | 10  Kathleen Staunton wasn't true, that "I never |
| 11  Klayman.  Mr. Tigar's got me confused. | 11  wanted to file suit." |
| 12      There is an email that's dated | 12      So this all bears on credibility and my |
| 13  September 15, '11.  I would have thought this time | 13  confusion about what to do. |
| 14  for appeal advice was about the civil rights | 14      CHAIRMAN FITCH:  But the notice of |
| 15  offices. | 15  appeal in Sataki vs. BBG, the notice of appeal was |
| 16      THE WITNESS:  You may be right about | 16  filed on January 19th, 2011. |
| 17  that.  You may be right.  I don't have that in | 17      THE WITNESS:  Right, that's what I'm |
| 18  front of me right now anyway.  I guess I was | 18  saying.  I'm saying it may have been with regard |
| 19  trying to communicate that.  You're probably | 19  to an earlier order. |
| 20  right.  And -- no, I wasn't talking about an | 20      CHAIRMAN FITCH:  No, this is nine |
| 21  appeal of the civil rights case. | 21  months later.  This is September 11th, 2000- -- |
| 22      MR. TIGAR:  Ok. | 22  maybe I have the wrong email.  What email -- |

In Re: Larry Klayman
June 27, 2018

---

**Page 1545**

1  You were asking about 38, weren't you?

2  MR. TIGAR:  Yes, SX38.

3  Judge Kotelly denied the

4  reconsideration motion on October 30th, 2010.

5  CHAIRMAN FITCH:  What?

6  MR. TIGAR:  2010, July 30.

7  CHAIRMAN FITCH:  So this is a year

8  later?

9  MR. TIGAR:  The notice of appeal was

10  filed January, 2011.

11  CHAIRMAN FITCH:  Yes.

12  MR. TIGAR:  I'm wondering what the 180

13  days were.  We can look at the record.  We don't

14  need to take the evidence, but the adverse OCR

15  decision was dated March 23rd, 2011.  October 24th

16  is seven months from that date, not six.

17  So 180 days --

18  THE WITNESS:  I may have miscalculated

19  that.  It's possible.  I don't remember.

20  MR. TIGAR:  Anyway the --

21  THE WITNESS:  Yeah, but that's a good

22  point, to appeal the OCR, 180 days.  So I may have

---

**Page 1546**

1  miscalculated.  But in any event I was constantly

2  trying to contact her, communicating with her

3  asking what to do.

4  CHAIRMAN FITCH:  Anything further on

5  that, Mr. Sujat?

6  MR. SUJAT:  No, your Honor.

7  CHAIRMAN FITCH:  We stand in recess

8  until 1:30.

9  MR. KLAYMAN:  Thank you, your Honors.

10  (Whereupon at 12:21 p.m. a luncheon

11  recess was taken.)

12

13

14

15

16

17

18

19

20

21

22

---

**Page 1547**

1  A F T E R N O O N   S E S S I O N

2  (Whereupon at 1:34 p.m. the hearing

3  resumed.)

4  CHAIRMAN FITCH:  We are reconvening.

5  All requisite persons are present.  I think there

6  are no preliminary matters.

7  We'll receive closing argument from

8  Disciplinary Counsel.

9  CLOSING ARGUMENT BY DISCIPLINARY COUNSEL:

10  BY MR. SMITH:

11  MR. SMITH:  Good afternoon.

12  In late 2009, early 2010, Elham Sataki

13  formed an attorney/client relationship with

14  Respondent, Mr. Klayman.  At the time they met,

15  she had been victimized at work, a victim of

16  sexual harassment.  She was vulnerable.  She was

17  fragile, and she needed and wanted to have her

18  name vindicated and to have her job situation

19  cleared up.

20  Mr. Klayman and she agreed that he

21  would represent her on a contingency fee basis for

22  40 percent of the recovery.  He did not provide

---

**Page 1548**

1  her with a writing setting forth the basis of the

2  rate of the fee.

3  Ms. Sataki told Mr. Klayman that,

4  because of her culture, she wanted the case to be

5  handled discreetly.  She did not want a lot of

6  people to know about it, because of the nature of

7  the allegations, the sexual assault allegations.

8  So she told him that.

9  Nonetheless, with Mr. Klayman, that's

10  not the way he practices law.  He doesn't practice

11  law in a quiet way.  I doesn't practice law in a

12  small way.  Ultimately part of the strategy in

13  advancing her claim meant that it was to going to

14  be tried Larry Klayman's way, and that was

15  politically, naming big names, naming big fish, in

16  this case, Hillary Clinton, it means rubbing

17  elbows with congressmen and senators, it means

18  getting his name in the newspaper.  He's going to

19  try this case Larry Klayman's way.

20  Ms. Sataki, relying on her counsel,

21  went along with it, for sure.  But not because she

22  wanted to, and not because that was the way she

---

35 (Pages 1545 to 1548)

In Re:  Larry Klayman
June 27, 2018

Page 1549

1    wanted to proceed.
2         In or about late February/March, Mr.
3    Klayman became smitten, if not before, with Ms.
4    Sataki.  You heard testimony that she was even
5    more attractive than she presented at the hearing
6    the other day.  And Mr. Klayman could not control
7    himself.
8         Mr. Klayman, as the emails and the
9    testimony demonstrates, from March through about
10   the end of May, sent her a series of emails
11   expressing his deep emotional attachment to her.
12   He called it love.  He even complained and sought
13   the intervention of the very psychologist that he
14   had referred Ms. Sataki to see in connection with
15   the trauma that she had experienced as a result of
16   the sexual harassment at her job.
17        So it's kind of ironic.  Ms. Sataki is
18   hiring Mr. Klayman to represent her in a sexual
19   harassment claim, and then becomes objectified by
20   Mr. Klayman, for a sustained period, day after
21   day, email after email, text message after text
22   message, conversation after conversation.

Page 1550

1         And when the love was not being
2    returned, when the love was unrequited, it started
3    turning ugly.  You started having incidents with
4    him bickering with her.  And you can see the
5    darkness of the emails how, as time moves on, he
6    becomes more accusatory, he becomes more bitter.
7    There's no more talk of love.
8         You can see from Ms. Sataki's
9    testimony, he got angry with her and started
10   arguing with her at some movie event, such that
11   she felt in fear and had to jump from his car.  He
12   chased her into the bathroom of the Hotel Luxe in
13   California.  And he joked about it, calling the
14   bathroom there his second office, or something to
15   that degree.
16        In any event, as it was clear that the
17   love was not going to be returned, the fee issue
18   became a little harsher.  Ms. Sataki reminded him
19   that he was entitled to a 40-percent recovery, and
20   he responded, "Well, now I think I'm going to get
21   50 percent."  And all of that's in his own
22   writing, in his own emails.

Page 1551

1         The conversations grew darker yet, and
2    it got to the point where Ms. Sataki was obviously
3    uncomfortable being around Mr. Klayman in his
4    presence, so much so that Ms. Kathleen Staunton, a
5    secretary at one of the congressman's offices that
6    he went to visit in connection with her case,
7    trying to push her case along, decided that she
8    needed to pull her to the side.  "What's going on?
9    Are you ok?  What's happening?"  And Ms. Sataki
10   told them about the harassment that she was
11   getting from her own attorney.
12        Sure, Ms. Staunton became her friend.
13   Ms. Staunton became her only ally at that point.
14   And Ms. Staunton encouraged her to file a Bar
15   complaint.  Ms. Staunton apparently encouraged her
16   to let go of this abusive relationship with Larry
17   Klayman.
18        So in July, July 30th, she sent an
19   email to him saying "It's over.  Dismiss all the
20   cases you have."  She sent a letter on August 4th
21   to the VOA director, Danforth Austin, "Look, I've
22   instructed Larry Klayman to withdraw all claims

Page 1552

1    against VOA."  Alright?
2         Now, there were questions, "Well, why
3    didn't she hire another lawyer?  Why didn't she
4    find new counsel?"  Well, I mean, not only was she
5    psychologically damaged and deteriorated even more
6    under this pressure that she was receiving from
7    Mr. Klayman for a sustained period of March
8    through July, 2010, when she was already in a
9    fragile state, but, you know, it's hard to find
10   somebody to take on your case at that stage of the
11   game, especially if it's at the stage of the game
12   that the litigation was pretty much lost, because
13   the court had already decided that, you know,
14   there was not a basis in law or fact to issue an
15   injunctive relief in connection with the request
16   to send Ms. Sataki to LA.
17        So, at that point, there really was no
18   case to even be had at that point.
19        So, after July and August, when you
20   would think that the emails would stop, when you
21   would think that the harassment would stop, Mr.
22   Klayman continued to send the emails to Ms.

36  (Pages 1549 to 1552)

In Re: Larry Klayman
June 27, 2018

## Page 1553

1  Sataki. And those are all laid out in the
2  supplemental exhibits.
3        By December of that year, Ms. Sataki
4  had had enough. She files a complaint and says,
5  "Look, please, I fired this lawyer and yet he
6  still sends me emails. He still sends me texts.
7  He's still using my case to promote his media
8  productions.
9        "Please tell him to stop. Please ask
10  him to leave me alone." That's what she asked Bar
11  Counsel to do for her.
12        Now, is this conduct actionable? Is
13  treating a woman the way Mr. Klayman treated Ms.
14  Sataki actionable? Under "Rule 1.74, Conflict of
15  Interest: A lawyer should not engage in a conflict
16  of interest where his professional judgment is
17  adversely affected by his personal interest."
18        In this case you can see that
19  Respondent's personal interest in Ms. Sataki, his
20  desire for a loving relationship, which began in
21  the earlier part of 2010 and ground its way
22  through June, wore his client down. Ms. Sataki

## Page 1554

1  was an emotional wreck. She did not want to carry
2  forward with her case. All she wanted him to do
3  was handle her case. He wouldn't do that without
4  becoming "a much better friend," of inserting
5  himself into her life, into her community, with
6  her friends, with her family. She didn't want any
7  of that. She just wanted him to concentrate on
8  the case.
9        But it got to the point, where, "Hey, I
10  can't deal with this anymore. I don't want you as
11  my lawyer anymore. Withdraw everything. I just
12  can't deal with it. I can't deal with you," and
13  so she essentially shut down.
14        She couldn't even respond to, not just
15  Mr. Klayman's continued emails -- I mean, what was
16  it that she was going to get out of that? You saw
17  how he had been treating her before that, and then
18  you saw the emails that he sent her afterwards,
19  where she just was emotionally able to open up
20  just this year, right before the hearing.
21        She didn't want to deal with him. She
22  shut down. She became whatever her emotional

## Page 1555

1  issues were at that time. She just couldn't cope
2  with this situation anymore. And a lot of that
3  has to do with the way that Mr. Klayman just
4  ground her down, as her lawyer, the guy who is
5  supposed to be representing her, the guy who is
6  supposed to be her champion, the guy who is
7  supposed to be her night in shining armor with
8  respect to the sexual harassment claim, he becomes
9  an inside harasser.
10        And I talked at the beginning about how
11  Ms. Sataki wanted this case handled quietly and
12  discreetly because of her cultural issues. She
13  testified about that. But of course this case was
14  going to be handled the Larry Klayman way.
15        Mr. Klayman has testified himself about
16  how he litigates matters. Everything's big.
17  Everything's grand. Everything is a federal case.
18  And in this case, what could have been a very
19  simple civil rights administrative proceeding, it
20  might not have moved along a fast track, but it
21  was going to be a case that could have moved along
22  that track, ultimately Mr. Klayman decided that it

## Page 1556

1  would be a good idea for Ms. Sataki to move to LA.
2  He thought it would be a good idea to file a
3  lawsuit naming the board of governors, including
4  his archnemesis, Hillary Rodham Clinton, who, he's
5  testified during his direct case, he sued scores
6  of times, and is his nemesis. He couldn't resist.
7  And so he made a mountain out of a molehill.
8        Ms. Sataki, when she was asked about
9  what kind of conversation she had with Mr. Klayman
10  about his strategy, she didn't really. He told
11  her, "This is what is best." That's not really
12  what we consider to be a satisfactory explanation.
13  The record will bear out exactly what she said
14  with respect to that. But there wasn't much.
15        "Rule 1.2: A lawyer must abide by a
16  client's decisions with respect to the objectives
17  of the representation."
18        Certainly a client can't consent to a
19  lawyer's strategy, and a lawyer is entitled to his
20  strategy. But a client's desires -- and in this
21  case desire to keep a matter discreet, to keep a
22  matter relatively low key -- that is something

37 (Pages 1553 to 1556)

App.0632

In Re:  Larry Klayman
June 27, 2018

## Page 1557

1  that the lawyer should respect.  That's not the
2  way Mr. Klayman practices law.
3          In this case we feel that was a
4  violation of Rule 1.2(a).
5          Again, on July 30th, Mr. Klayman was
6  fired.  He was told to withdraw all the cases, and
7  if he didn't get the message then, he certainly
8  got it when on August 4th Ms. Sataki sent the
9  letter to Mr. Danforth Austin, which he said he
10  also saw, and which of course you saw the email
11  where he's commenting on -- criticizing her for
12  the wisdom of withdrawing all of her cases, and
13  what that would mean for him and what that would
14  mean for his reputation at the VOA, et cetera.
15          But despite this, despite this, he
16  continued to push on with an aspect of the case
17  that he felt he wanted to handle.  "I'll dismiss
18  this stuff," he said, "but you know I'm going to
19  keep one part of this case alive, because, you
20  know," essentially that was the one that he was
21  going to pursue involving the judge, because he
22  wanted to show that the judge was corrupt, that

## Page 1558

1  the judge somehow -- that because the judge ruled
2  against him, that the judge must somehow be
3  corrupt, must somehow be a tool of the Clinton
4  administration, and that he is somehow the victim,
5  always the victim, always the one who's being
6  put-upon.
7          The WorldNetDaily: Ms. Sataki was not
8  at all happy about these articles in the
9  WorldNetDaily.  Whatever the discussion was they
10  had about publicity, whatever discussion there
11  was, nobody -- not Ms. Sataki, not Mr. Klayman,
12  not any of his witnesses -- said that him writing
13  his own articles for the WorldNetDaily was going
14  to be a part of the publicity scheme.
15          Perhaps, if there had been some
16  discussion about "Well, we'll get some interviews
17  on the Washington Post, we'll try to get on
18  Nightline," things like that, these are the kinds
19  of things that one might expect if you're talking
20  about publicity, effective publicity, to be
21  something that a lawyer who's trying to put some
22  pressure on government to do.

## Page 1559

1          But, no, instead what you have is you
2  have these articles that seem to come out almost
3  on a weekly basis in the WorldNetDaily.  And just
4  about every last one of them is hawking a book, a
5  book written by Mr. Klayman.
6          Now, the question of whether or not
7  this violates a rule, you know, assuming that this
8  was already a matter of public record, was this
9  really a confidence or secret that could be
10  violated?  Well, absolutely.  Rule 1.6 in the
11  District of Columbia, unlike other jurisdictions,
12  requires that confidences and secrets be given the
13  ultimate respect by a lawyer.  And "secret" is
14  defined as "information gained in the professional
15  relationship that the client has requested be held
16  inviolate, or disclosure of which would be
17  embarrassing or would be likely to be detrimental
18  to the client."
19          So it's not just confidences in the
20  District of Columbia.  It's also secrets.
21          In this case, Ms. Sataki again had
22  expressed to Mr. Klayman, "Hey, look.  I don't

## Page 1560

1  want a lot of publicity in this case."  And let's
2  say for the sake of argument, let's say for the
3  sake of argument that there had been informed
4  consent, that there had been Ms. Sataki signing
5  some form of a waiver saying, "Sure, go ahead and
6  publicize my case," after July, 2010, when Mr.
7  Klayman no longer represented Ms. Sataki in these
8  matters, his continued pinning of articles and
9  having them published in periodical, which has an
10  online circulation of over five million, was
11  totally inappropriate.
12          What kind of secrets were in these
13  articles?  Well, if you look at the articles, some
14  of them, they talked about, not just Ms. Sataki's
15  case, but the fact that she was experiencing
16  severe depression and that she had been sexually
17  harassed; the very kinds of things that people
18  might not want out there for the world to read and
19  see.
20          And you saw from Mr. Dash, you see how
21  people talk.  Mr. Dash was dealing in nothing but
22  rumors.  He has no personal knowledge of any of

In Re: Larry Klayman
June 27, 2018

## Page 1561

1 the things that he was talking about on the
2 witness stand the other day, and I don't know why
3 they brought him up here, other than to try to
4 smear Ms. Sataki's reputation. But people do
5 talk. People do talk. And this is the kind of
6 thing that Ms. Sataki does not want people talking
7 about. And yet Mr. Klayman felt that he had every
8 right to do so, even after he had been terminated
9 as her lawyer.
10     Finally we get to dishonesty.
11     CHAIRMAN FITCH: I missed the word.
12 Get to what?
13     MR. SMITH: Dishonesty. Finally we get
14 to the dishonesty, or the violation of dishonesty,
15 Rule 8.4(c).
16     The District of Columbia Court of
17 Appeals has held on a number of occasions that
18 members of the Bar are to be scrupulously honest,
19 that is more honest than a layperson.
20     Mr. Klayman in one of his WorldNetDaily
21 articles accused the judge of issuing an order
22 that had no basis in fact or law. And we're all

## Page 1562

1 lawyers here. So I didn't put on testimony for my
2 expert or cross examine Mr. Klayman about whether
3 or not there was a factual or legal basis for the
4 judge decision not to grant injunctive relief in
5 Ms. Sataki's case.
6     You have the order, the memorandum
7 order of opinion, both the June memorandum of
8 opinion order and the July memorandum of opinion
9 order. And in both the court goes through
10 excruciating detail in setting forth the findings
11 of fact in the case. In fact, she even accepts as
12 true many of the facts advanced by Mr. Klayman in
13 support of the relief that he was seeking. And
14 she also has an extraordinarily detailed legal
15 analysis of why the relief was not going to be
16 made available: essentially that we will not
17 create the agency creating the position for this
18 particular plaintiff at this time, especially not
19 when you're talking about injunctive relief,
20 preliminary injunctive relief. The court just
21 wasn't going to do that and it explained why.
22     It wasn't a false or dishonest opinion

## Page 1563

1 by the judge. It was, unlike Mr. Klayman's false
2 articles, based in both fact and law.
3     And that's Disciplinary Counsel's case.
4     You've heard the evidence. You've had
5 an opportunity to weigh the credibility of the
6 witnesses. You've seen witnesses who either don't
7 know what they're talking about or don't know all
8 of what it is they're talking about. You've seen
9 witnesses who have had genuine emotion. You've
10 had other witnesses who don't.
11     I ask you to find the facts as I have
12 described them and that have been presented to you
13 today, and that you find that Mr. Klayman violated
14 all of the rules set forth in Disciplinary
15 Counsel's Specification of Charges.
16     CHAIRMAN FITCH: Stay there for just a
17 minute, Mr. Smith, please.
18     Off the top of your head, in addition
19 to your theory that one of the secrets improperly
20 revealed was, you charge, that she had experienced
21 severe depression.
22     Off the top of your head, are there any

## Page 1564

1 other instances of secrets being revealed?
2     Let me point out to both parties, I
3 know that as you're doing your briefing and
4 parsing the record, additional facts, one side or
5 the other, may tend to support something. As long
6 as, you know, some notice is given, all that's
7 fair game.
8     So I'm not going to hold you just to
9 the one example, but are there any other examples
10 of that?
11     MR. SMITH: Well, the fact of the case
12 itself, any mention of Ms. Sataki, either in
13 connection with her political views, in connection
14 with her beauty, in connection with the fact that
15 she was, you know, having problems on the job, all
16 of this, this was nobody's business. This was
17 nobody's business.
18     Again, even if you find that there had
19 been some limited or some type of a -- well, this
20 is all in the public view now. The rules in DC
21 are a little bit different, especially with
22 respect to secrets. And certainly after July,

39 (Pages 1561 to 1564)

App.0634

In Re: Larry Klayman
June 27, 2018

## Page 1565

1 certainly after July there was to reason at all
2 for Mr. Klayman to be writing the articles at that
3 ended up in the WorldNetDaily, you know, on a
4 regular basis, as it were.
5 MR. TIGAR: Mr. Smith, is there any
6 assertion in any of the WorldNetDaily articles
7 about Ms. Sataki that is not also included in the
8 civil complaint that was filed in court and/or the
9 filings in the VOA OCR proceeding?
10 MR. SMITH: Off the top of my head, I
11 can't answer that question. I know certainly much
12 of it was, much of it was the same stuff, the same
13 subject matter.
14 MR. TIGAR: And second, you cite here,
15 1.6(a)(12) --
16 CHAIRMAN FITCH: Well, you would argue
17 that the severe depression was possibly post
18 lawsuit filing and therefore had not been put into
19 the law.
20 We may have to deal with --
21 MR. SMITH: I have to look at the
22 record to see that.

## Page 1566

1 CHAIRMAN FITCH: That's an honest
2 answer. That's fair.
3 MR. SMITH: But I don't think it
4 matters.
5 CHAIRMAN FITCH: I was going to say, I
6 understand that, because you're emphasizing
7 "secret," that the court of appeals has made it
8 clear that it doesn't mean totally exclusive
9 secret in that --
10 MR. SMITH: Well, we'll brief that.
11 CHAIRMAN FITCH: -- I guess the waiver
12 rules that apply to "confidences" may not apply to
13 "secret".
14 But we'll have to sort that through.
15 MR. SMITH: We'll sort that out in the
16 brief.
17 CHAIRMAN FITCH: Because it is crossing
18 my mind and I just want to let the other side know
19 that.
20 MR. SMITH: Alright.
21 MR. TIGAR: In addition to that,
22 1.6(a)(1) being applied to newspaper articles may

## Page 1567

1 raise questions of fair notice, as in the Gentile
2 case.
3 MR. SMITH: Well, I am sure that during
4 the briefing process we will keep that in mind.
5 CHAIRMAN FITCH: When you say newspaper
6 articles, did you mean the WorldNetDaily --
7 MR. TIGAR: The WorldNetDaily. The
8 WorldNetDaily media I should have said.
9 CHAIRMAN FITCH: Ok.
10 With respect to your 8.4(c) theory, I
11 take it your theory is that -- and you may have
12 said exactly this -- that, if the record shows --
13 I guess it probably does. I'm really not sure. I
14 don't have all that in memory...
15 But if the record shows that Judge
16 Kotelly did legal analysis and factual analysis,
17 and if Mr. Klayman said that there's no legal
18 factual basis, that that's your dishonesty theory?
19 MR. SMITH: As the Court of Appeals
20 again holds us to a higher standard, as we're
21 officers of the court, as we are required to help
22 and assist in the proper administration of justice

## Page 1568

1 for the respect of the courts and the system, the
2 legal system, yes. That to make that wild and
3 totally irresponsible an allegation was dishonest,
4 yes.
5 CHAIRMAN FITCH: I think I have no
6 further questions for you, Mr. Smith.
7 MR. SMITH: Thank you.
8 CHAIRMAN FITCH: Ok. Thank you --
9 Let Mr. Smith go back up there, please,
10 Mr. Klayman.
11 The way you've organized your
12 complaint, Mr. Smith, you've got a count two
13 regarding the Falahati case, and that's the one
14 that started in superior court and got removed.
15 And you've got a count three that is organized
16 around the BBG case, which is what, the board of
17 governors, or something along those lines. And in
18 both of those you've got a 1.2(a) charge and a
19 1.4(b) charge.
20 Is there any evidence, in support of
21 your charges and your theory, that applies to one
22 of those cases but not to the other cases, or is

40 (Pages 1565 to 1568)

In Re: Larry Klayman
June 27, 2018

## Page 1569

1 it just as these two cases were going along you
2 charged that Mr. Klayman --
3 MR. SMITH: The latter, that as they
4 were going along.
5 CHAIRMAN FITCH: Ok. I'm trying to
6 think that, you know, if, if we were to agree that
7 there is one of those violations, we would then
8 have to get to sanction analysis, and one of the
9 sanction factors is number of violations.
10 I'm curious as to whether, since there
11 are two cases, there would be two violations, or
12 whether there would just be one violation that
13 occurred with the same thing in two cases.
14 You'll need to address that if we get
15 that far.
16 MR. SMITH: We'll address that in our
17 brief.
18 CHAIRMAN FITCH: Thank you.
19 CLOSING ARGUMENT ON BEHALF OF RESPONDENT:
20 BY MR. KLAYMAN:
21 MR. KLAYMAN: May it please your
22 Honors. I want to thank you for your courtesy and

## Page 1570

1 the way you've conducted this proceeding.
2 I want to thank Mr. Fitch, Ms. Larkin,
3 and Mr. Tigar.
4 As your Honors know very well, Bar
5 Disciplinary Counsel, notwithstanding that I would
6 prevail in my view under any analysis, has to
7 prove by a clear and convincing evidence that a
8 violation was committed. That's very close to
9 beyond a reasonable doubt. It's a very high Bar
10 to jump over.
11 Coupled with that, we are now eight
12 years into this proceeding, and during those eight
13 years, they didn't see fit, at least for six of
14 them, to come forward with any complaint. If this
15 was so egregious, one, as a matter of common
16 sense, would have thought they would have moved
17 more quickly than that.
18 Thirdly -- these will equitable, and
19 I'm going to get to the Specification of Charges,
20 because that doesn't hold up.
21 Thirdly, Ms. Sataki, after she files
22 that initial complaint -- assuming she did,

## Page 1571

1 because we couldn't identify whose handwriting it
2 was -- was sent a letter that said, "When we get a
3 response from Mr. Klayman we're going to send it
4 to you, and if you don't respond" -- I'm just
5 paraphrasing in effect -- "we'll assume you're
6 abandoning your complaint."
7 She never responded.
8 And in fact it was Bar Counsel in 2014
9 that was asking, "Where is she? We haven't heard
10 from her in four years." And there's no evidence
11 that they even heard from her then when they tried
12 to get in touch with her.
13 The first time I find out about this
14 case is in 2016, and I thought it had been
15 dismissed, because -- and this is crucial -- both
16 the Florida Bar and the Pennsylvania Bar dismissed
17 it. No evidence was presented otherwise by Office
18 of Disciplinary Counsel. And I submitted my
19 disciplinary records in both jurisdictions,
20 because in fact if they had proceeded and found
21 any discipline, it would have shown up. Their
22 files had been destroyed by that point, because

## Page 1572

1 even they were not keeping files at that point.
2 That points out the prejudice and
3 inequity of this entire proceeding, because I
4 didn't keep my files either, for the most part. I
5 had to recreate them. And at the last minute, Mr.
6 Smith comes in -- I don't mean it in a personal
7 way -- but he comes in with all these
8 communications on the day of trial.
9 So you have to ask yourself the
10 question, notwithstanding the clear and convincing
11 standard, whether, as a matter, not just of law,
12 but equity, this matter does not warrant a finding
13 against me. It doesn't.
14 As a prefatory matter, we hear that
15 basically what's at issue here, and I have said
16 this in pleadings, is that Bar Counsel doesn't
17 like the way I practice law.
18 Well, I'm sure Mr. Tigar practices law
19 in a particular way. You do, Mr. Fitch. Ms.
20 Larkin, you're not a lawyer, fortunately for you.
21 But that's not for Bar Counsel to decide. What is
22 to be decided is whether you violated an ethical

App.0636

In Re: Larry Klayman
June 27, 2018

Page 1573

1 rule. It's not to be a vendetta that you don't
2 like the fact that I've sued Mrs. Clinton in the
3 past, or sued Mr. Clinton or sued George W. Bush
4 or sued Dick Cheney. I've been an equal
5 opportunity public advocate. I have a philosophy
6 that differs from a lot of people in the Bar
7 Counsel's office, but that's not a reason to try
8 to remove me from the practice of law, and that's
9 what they're trying to do here. You see, they
10 don't like the way I practice law, and they have
11 said that to me. I have proof of that. And they
12 said it again.
13     But let's get to the counts that were
14 pled. Because Mr. Smith went far beyond what he
15 pled in his Specification of Charges. I read them
16 again this morning.
17     Number one, there is no allegation of
18 sexual harassment, never has been. Nothing
19 appears in any documents to that effect.
20     I'm being accused of wanting to pursue
21 a romantic relationship. Well, I presented five
22 witnesses; five. He presented only Ms. Sataki.

Page 1574

1 I mean, he presented an expert, and that expert in
2 my view was discredited in a matter of 30 seconds,
3 and he presented a so-called investigator who
4 simply said there were articles on WorldNetDaily
5 on the website. Well, once you put something on
6 the internet -- I got him to admit to that -- you
7 can never get it off.
8     And we live in the real world, and we
9 know that publicity does influence tribunals. It
10 influences government agencies. It influences the
11 way we live today. We know that. We watch TV,
12 cable, 24/7. It can have a big impact on the way
13 people perceive things. So that argument doesn't
14 hold any weight.
15     What's clear here is that -- several
16 witnesses testified here -- Mr. Shamble, Mr. Dash,
17 Mrs. Klayman, and myself, four witnesses -- that
18 she approved of the publicity. In fact she even
19 admitted it during the testimony in
20 cross-examination, at Page 775 of the transcript.
21 I urge your Honors to read that. She admitted it.
22 She approved it.

Page 1575

1     Remember, she's in that business.
2 She's in the business of trying to influence
3 thought and action. That was her job as a
4 broadcaster at Voice of America.
5     So this allegation that somehow --
6     CHAIRMAN FITCH: Can I have the
7 transcript cite again.
8     MR. KLAYMAN: Page 775.
9     This is an example -- those are two
10 examples so far of how the Specification of
11 Charges doesn't match up with Mr. Smith just
12 argued. He didn't apply the facts and he didn't
13 apply the charges. He went way beyond that and
14 had -- in desperation I believe, no disrespect
15 intended -- is trying to manufacturer claims that
16 he never actually made and that don't hold up with
17 the great weight of the evidence, with four
18 witnesses, and none on his side, and including Ms.
19 Sataki, who admits that she agreed to publicity.
20     Case closed.
21     Now let's talk about what was
22 published. Mr. Tigar raised a good point.

Page 1576

1 Nothing was published that wasn't already public
2 in pleadings. She wasn't ashamed of this. She
3 used this to try to make her point.
4     In fact, she disclosed to Keya Dash
5 exactly what had happened. She asked for his
6 help. She went to Blanquita Cullum. She
7 disclosed it to Mrs. Klayman, my sister, and her
8 boyfriend, not even related to me, and she
9 disclosed it to others.
10     So, this is not something that was
11 confidential or secret.
12     Now let's talk about count one, which
13 is the contingent fee. It's all over the record
14 that I never intending to charge anything. I was
15 doing it pro bono. And that I didn't intend to
16 charge her expenses.
17     If some day they were recuperated, ok.
18 I made it clear, "You never owed me anything. You
19 never owed me anything."
20     It wasn't contingent, because what we
21 were trying to do was get her back to work in Los
22 Angeles. That was the objective. Because she had

In Re: Larry Klayman
June 27, 2018

## Page 1577

1 had a nervous reaction when she was denied to be
2 able to be transferred, and when they threatened
3 her that, unless she came back to Washington, D.C.
4 and worked in the presence of Mr. Falahati, that
5 she would be fired. She'd be AWOL'd.
6      She obviously admitted that she wanted
7 to be in Los Angeles. That's all over the record.
8      But then of course we find out from Ms.
9 Staunton, I find out that she told her something
10 else. Mrs. Sataki is simply not truthful, to put
11 it diplomatically. She says whatever she has to
12 say at any point in time to get people to do what
13 she wants them to do.
14      And the issue of the contingent fee, as
15 we testified in great detail -- I testified in
16 great detail this morning -- I was actually
17 thankful for Mr. Smith getting into that again --
18 it really didn't arise until the very end as to
19 whether or not I would continue. But at that
20 point I didn't view it as a possibility.
21      We never entered into an agreement
22 because I was pro bono up to that point in time.

## Page 1578

1 She said "I'll pay you 40 percent." I said, "Don't
2 worry. Don't pay me anything. I don't want to be
3 paid. We're trying to get you back to LA," and
4 that's all she really wanted.
5      But, as I think Mr. Tigar alluded to,
6 is that you bring Bivens cases on Constitutional
7 violations, and you have to put damages in there.
8 And I did that. I'm not attributing that to
9 anybody else's perception. But I did that because
10 I thought this would be, quote, "persuasive" of
11 getting Voice of America to put her back to work.
12      We heard testimony from Mr. Shamble.
13 Weigh his credibility. He's a very credible
14 individual: Union representative, president of the
15 union. He said, "This is the worst agency in
16 government. I'm still being treated badly on
17 behalf of the employees that I represent, and you
18 basically have to take them to the mat to get them
19 to do anything, and they still sometimes don't do
20 it."
21      So, when documents are coming through,
22 and I'm going to get to this, because this was

## Page 1579

1 raised by Mr. Smith, and when you get an email,
2 which obviously isn't written by Ms. Sataki --
3 that's Respondent's Exhibit 27 of July 30th --
4 that's not the way she writes. She can't write
5 English like that, and then you can't contact the
6 person to talk to them, you obviously can't deep
7 six all the cases. That would be unethical. You
8 have to protect her interest until you really find
9 out what's going on.
10      And that's why -- and this was a
11 question that Mr. Tigar asked -- that when did I
12 consider the representation to end? Well, it
13 ended after I had Mr. Shamble -- for myself and
14 also for him, because he was representing her. We
15 were partners in trying to get her relief. Every
16 step of the way she could have called him and
17 instructed him. She didn't do that either. So he
18 was in the dark. I was in the dark.
19      So on January 27th he wrote this email
20 saying, "Mr. Klayman's been trying to contact you.
21 I'm trying to contact you. We need to find out
22 where you want to go with this, because we don't

## Page 1580

1 want you to lose your rights, and you still have
2 rights. You didn't lose. You only lost round
3 one."
4      It's like a football game. You know,
5 let's say the Philadelphia Eagles score first. It
6 doesn't mean that the Boston Patriots or -- pick a
7 team -- New England Patriots can't score later and
8 win.
9      So we didn't lose this case. And
10 that's what I was concerned about, because I
11 wasn't getting communication and what was out
12 there obviously didn't come from her, and it was
13 contradictory. So therefore, you know, I sought
14 to find out what was going on.
15      So when did the representation end?
16 Quite a while after January 27th, 2011. I was
17 still hoping to hear from her. But at some point
18 I never heard from her. So it's not certain when
19 she actually surfaced. And in fact she didn't
20 surface until Exhibit 38, vilifying me, accusing
21 me of taking bribes. And that was in 2011, well
22 into 2011.

43 (Pages 1577 to 1580)

App.0638

In Re: Larry Klayman
June 27, 2018

## Page 1581

1　　So, the representation, in effect,
2　never ended. I never got actual notice.
3　　And I was continuing to try to help her
4　and to get a result, and that gets into the issue
5　of, again, how I practice law.
6　　CHAIRMAN FITCH: If you have it off the
7　top of your head, just for my convenience, what's
8　the exhibit number for the January 27th --
9　　MR. KLAYMAN: Thirteen, Bar Counsel's
10　exhibit I believe 13. This is a crucial
11　communication.
12　　CHAIRMAN FITCH: That's why I asked.
13　　MR. KLAYMAN: Ok. So consequently, we
14　never got to the point of having an agreement for
15　damages and splitting it up. That was not our
16　objective. That would have taken many years and
17　she couldn't withstand that.
18　　She had actually said -- it's in the
19　record -- that, "If I'm forced to go back to
20　Washington, DC, I'll kill myself. And the offer
21　that they made at Central News Bureau, that I
22　would then broadcast in English, they were setting

## Page 1582

1　me up to fire me." That's actually in her
2　testimony. Those are her admissions.
3　　So it's clear she wanted to be in LA
4　and she did not tell the truth to Ms. Staunton.
5　And these letters were reflecting things that were
6　completely contrary to what she's now admitted to
7　was her objective.
8　　Her credibility, in all due respect, is
9　very, very low, almost zero, given all the
10　contradictions, all the false testimony, given the
11　way she acted in regard to communicating with Mr.
12　Shamble and I. That has to be taken into account,
13　and of course the clear and convincing standard on
14　top of that.
15　　Now it's clear throughout, with regard
16　to the so-called romantic relationship, that, yes,
17　I cared very deeply about Ms. Sataki. We
18　considered each other friends. She says that
19　herself in one of the communications that we went
20　through this morning, and there is no crime in
21　loving someone. That's what kind of gets to me,
22　is that Bar Counsel's trying to make this into

## Page 1583

1　something which is dirty. Ok? It's not. It's a
2　beautiful thing that you care about somebody. And
3　I never, ever asked her for sexual relations. I
4　never, ever kissed her. I never touched her. I
5　never asked to hold her hand. That was absolutely
6　right. I respected her.
7　　But I wanted to be respected, too. And
8　that was the difficulty. And that's why we had to
9　move on. That's why, when she asked me to buy her
10　a car, that was beyond the pale. You heard Mrs.
11　Klayman say that she heard the same thing.
12　　And her testimony made no sense,
13　because first she said, "I didn't want you to buy
14　a car. My credit was bad. I wanted you to make
15　sure my car wasn't repossessed."
16　　Then she said, "I need to buy a cheaper
17　car, to lower the payments." Well, who was going
18　to buy that? Me. Because she had no credit. So
19　that was false.
20　　Consequently, there was no romantic
21　relationship, and we were friends, and I felt
22　deeply about her and I did love her and I still

## Page 1584

1　wish her well. And that's why I tried so hard.
2　And that's what's so ironic, because the Bar rules
3　suggest that some kind of relationship -- let me
4　read it. I'm going to go through the Bar rules,
5　because they weren't characterized correctly.
6　　It says "The lawyer's professional
7　judgment on behalf of the client will be or
8　reasonably may be adversely affected by the
9　lawyer's responsibilities to or interests in a
10　third party or the lawyer's own financial,
11　business, proprietary or personal interests."
12　　This is super important, because you
13　see, it never affected the way I was representing
14　her. I was representing herself zealously, within
15　the bounds of ethics and the law.
16　　And it wasn't for me. It wasn't my
17　personal interest. I believed in her. That's why
18　I put myself out, and got her an apartment, and
19　paid for moving expenses, and paid in part for her
20　psychologists, and found them, and paid for a
21　polygraph; why I expended over $30,000.
22　　I believed in her. That wasn't for me.

44 (Pages 1581 to 1584)

In Re: Larry Klayman
June 27, 2018

## Page 1585

1  I'm out $30,000.  There's testimony that put me in
2  a financial bad position.  I was going to get
3  apples at the Hyatt.  That's how little money I
4  had.  I was sleeping on couches for a period of
5  time.
6          And I didn't pursue my personal
7  interest.  What I was pursuing was to get her a
8  result because I cared about her.
9          So it's actually the reverse: the fact
10 that I deeply cared about her made me work harder.
11 But when I realized that we couldn't continue on,
12 that it was untenable, I then said, "Perhaps Ms.
13 Allred will represent you."
14         I contacted Ms. Allred.  You've seen
15 the communications.  Ms. Allred didn't take the
16 case.  Then I said there was Tim Shea.  And she
17 was always free.  She had Kathleen Staunton.  She
18 had her cousin.  There were others.  They could
19 have gotten another lawyer if she didn't feel
20 capable of doing that.
21         The case was not all that complex at
22 that point.  The case is not that complex.

## Page 1586

1          So consequently, my personal judgment
2  was not affected in terms of the relationship that
3  I had, this deep friendship that I had with her
4  and feeling that I had with her.  It actually made
5  my professional judgment more acute in trying to
6  get her relief.
7          And then there's the issue of -- and
8  this kind of shows you the motivation for this
9  case, to be respectful, is that Judge Kotelly -- I
10 advised her, it's in the record -- that I had had
11 problems with Judge Kotelly before, that she was a
12 very partisan judge and didn't like me because of
13 what I had done with Bill Clinton.  I advised her
14 right up front.  410, Page 410 of the transcript.
15 She admits that, that I told her about Kotelly.
16         And this is where Mr. Smith did not
17 read you every aspect of the rule that's
18 applicable, is that I reasonably believed that I
19 had authorization to move to get another judge,
20 which I did -- Ms. Sataki missed knowing about
21 that -- Judge Roberts.  And then, when the
22 decision came down and she wouldn't grant a

## Page 1587

1  hearing -- and we heard Judge Sporkin say he would
2  have granted a hearing, too much was at sake, and
3  this was not -- this was in effect -- he didn't
4  use those words, but he did with me, and I
5  testified to that -- "This is a chip shot.  Of
6  course I would put her back to work.  It Preserves
7  the status quo, under Wagner v. Taylor."
8          What harm would that do?  She was
9  agreeing to work in a facility away from the
10 harasser.  Usually they move the harasser himself
11 away.  She was being accommodating to VOA, and she
12 had a need to be here, to see her doctors and be
13 with her friends and everything else.
14         Mr. Smith did not read this, that "A
15 lawyer shall abide by a client's decisions
16 concerning the objective of representation,
17 subject to paragraph C, D and E, and shall consult
18 with the client as to the means by which they are
19 legally pursued.
20         "A lawyer may take" -- this is
21 crucial -- "The lawyer may take such action on
22 behalf of the client as is impliedly authorized to

## Page 1588

1  carry out the representation."  "Impliedly
2  authorized."
3          So, she knew of the problems with
4  Kotelly.  I told her about that.  She knew that I
5  tried to get the case transferred to another
6  judge.  That wasn't successful.  She knew the
7  decision was made against her.  I couldn't
8  communicate with her.  I had to make a decision to
9  try to get another judge to get those orders.  If
10 I succeeded in having her disqualified, there was
11 a good chance all of the orders would have been
12 vacated and I could have had the case decided by
13 another judge in the courthouse.
14         Now with respect to my statement in the
15 media, that column that I wrote, number one I
16 wasn't selling any book.  That's clear.  I got no
17 remuneration out of that.  There was no personal
18 interest.  I was trying to influence settlement
19 and move things along.  And VOA is a difficult
20 agency, to put it nicely.
21         But to give my opinion that there was
22 no factual or legal basis, lawyers do that all the

45  (Pages 1585 to 1588)

App.0640

In Re: Larry Klayman
June 27, 2018

Page 1589

1 time. That's something that they do outside the
2 courthouse when they don't get the ruling that
3 they want.
4 And this was in the context of a
5 lawsuit. It wasn't Larry Klayman just saying it
6 out of the blue. This was in a lawsuit and that
7 qualified privilege in that regard.
8 What was important was that, attached
9 to the motion of qualification, I had about 17
10 pages of factual errors that Judge Kotelly had
11 made. And she legally erred. She had no basis
12 not to preserve the status quo under Wagner v.
13 Taylor. That was my opinion, and I'm entitled to
14 it.
15 Factually and legally, there was no
16 basis to do what she did. And frankly, you know,
17 it was in line with what I had seen her before
18 with her. I had hoped, as I testified to, that as
19 a woman she would appreciate the gravity of this.
20 Women can appreciate it. I can appreciate it.
21 That's why Ms. Allred is my friend and why I've
22 done these cases before.

Page 1590

1 But I was hoping that would be the
2 case. But no, she couldn't put her own biases
3 aside.
4 So again, I was zealously representing
5 the client.
6 I did not engage in dishonesty. I was
7 giving my opinion, and that's a bizarre
8 interpretation. And the fact that I named Hillary
9 Clinton -- I mean, this tells you where Bar
10 Counsel's coming from. They don't like me because
11 I have been a thorn in the side of the powers to
12 be in this town, and they think I may have been
13 more of a thorn in the side of the Clintons than
14 others.
15 But I've been an equal opportunity guy,
16 and I don't think George Bush cared for me very
17 much either.
18 CHAIRMAN FITCH: Let me go back. I
19 don't want you to get too far away from 8.4(c).
20 I'd appreciate one or both of you, if
21 you can -- although I'll do it myself, I will
22 anyway -- where the statements about Judge

Page 1591

1 Kotelly's ruling appear, because I have a feeling
2 that there is a possibility that the exact wording
3 of Mr. Klayman's alleged statements, wherever they
4 may alleged appear, may be important?
5 MR. TIGAR: Perhaps it was in the
6 December 25th, 2010 posting: "Open Your Heart to
7 Him This Christmas."
8 I don't know if you had been referring
9 to "An ultra leftist, pro-Clinton and ethically
10 corrupt federal judge, Colleen Kollar-Kotelly."
11 MR. KLAYMAN: Yeah, it may have been
12 there.
13 CHAIRMAN FITCH: Well, Mr. Smith said
14 what he's charging is that -- these are my notes,
15 it's not a quote, unfortunately -- that Mr.
16 Klayman accused Judge Kotelly of having no legal
17 or factual basis.
18 That's different from what you read,
19 Mr. Klayman.
20 MR. SMITH: He didn't finish reading
21 the sentence. He just read the first half of the
22 sentence.

Page 1592

1 CHAIRMAN FITCH: Ok.
2 MR. KLAYMAN: I'll get back to that.
3 CHAIRMAN FITCH: Ok.
4 MR. KLAYMAN: Before I'm done.
5 In any event, I was doing that in the
6 context of litigation. I wasn't doing that in the
7 context of somebody at the White House or somebody
8 anywhere else that was trying to pursue a
9 political objective. I wasn't doing that.
10 I was representing my client. I was
11 trying to convince VOA and the courts when I would
12 go back that there was a valid claim. And that's
13 why I brought Judge Sporkin if here, because he
14 clearly felt that, when I talked to him, I gave
15 him the facts -- it's eight years ago -- and he
16 told me, "This is a chip shot. I'd put her back
17 to work."
18 But I'd urge you to read the factual
19 errors, to look at them in detail. So I didn't
20 have no basis for that. And the legal basis was
21 that Wagner v. Taylor required her to go back to
22 work. This is what equity is about in this

46 (Pages 1589 to 1592)

App.0641

In Re:  Larry Klayman
June 27, 2018

## Page 1593

1 country, not to let a woman sink into quicksand.
2       As far as Ms. Sataki's emotional
3 psyche, eight years later -- and certainly I've
4 been removed for eight years from any contact with
5 her -- it's still the same, and she still has
6 emotional issues.  You can tell.  I mean, we saw
7 that on the stand.  And she has a hard time
8 telling the truth.  And I cannot be held
9 accountable for that.
10      She herself, you know, claims "My
11 life's been ruined" to everybody.  She sent an
12 email to Gloria Allred in 2012, and this shows
13 that in fact she didn't want to abandon her
14 claims, and I was getting letters that obviously
15 didn't come from her.  She says, "Can you
16 represent me now?"  And Ms. Allred said, "It's too
17 late."  This is in our supplemental exhibits.
18      She then files a notice of appeal,
19 after she says drop everything.
20      You know, so what was I to believe?  I
21 couldn't let her rights go into the drain.
22      Quite apart from her, I have a

## Page 1594

1 professional duty and responsibility.  I respect
2 myself, I respect the legal system.  That's why I
3 do what I do, because I'm trying to make it a
4 little bit better, and I have an obligation not to
5 let her rights expire and to make it go away.
6       But the inconsistencies here, the false
7 testimony, the contradictions, the fact that I
8 didn't get letters from her obviously,
9 addresses... all those different things, I didn't
10 know what to think.  So I protected her interests.
11      To this day, I've never heard from her
12 directly that I was terminated, except on the
13 stand.
14      Now, to sum it all up -- let me just
15 make sure I covered all the Bar rules, because
16 your Honor asked us to do that.
17      The confidences which they claim --
18      CHAIRMAN FITCH:  I have one concern,
19 and I raise it now, and you could handle it the
20 way you want to.
21      MR. KLAYMAN:  Ok.
22      CHAIRMAN FITCH:  I think that we have

## Page 1595

1 not heard, and I don't understand necessarily Mr.
2 Smith's or his office's Rule 1.6(a)(3) charge in
3 count three, what the factual theory is.
4       So I wanted you to hear -- maybe you've
5 already heard and I just missed it -- but I wanted
6 you to hear it so you have a chance to answer it,
7 in case you don't understand it, because I don't
8 understand it.
9       MR. KLAYMAN:  No, I --
10      CHAIRMAN FITCH:  If you do, go ahead.
11      MR. KLAYMAN:  It's so confusing and so
12 murky --
13      CHAIRMAN FITCH:  Mr. Smith, if I may do
14 this -- it's a little unusual -- is your theory
15 about the Rule 1.16(a)(3) alleged violation in
16 connection with the BBG case that Mr. Klayman
17 should have filed a motion to withdraw at some
18 point in time after some occurrence?
19      MR. SMITH:  And he should have stopped
20 working on the case.  Yes, he should have
21 withdrawn from the case and he should have stopped
22 working on it.

## Page 1596

1       And he should have stopped working on
2 anything that had to do with -- Ms. Sataki was no
3 longer a client after July 30th.
4       CHAIRMAN FITCH:  As of -- so late July,
5 early August.
6       MR. SMITH:  Right.
7       Whatever a lawyer must do, if they've
8 been fired by the client, if there is no matter
9 pending in court, they just stop working on the
10 case.  If there is a matter pending in court --
11      CHAIRMAN FITCH:  Now, Mr. Klayman.
12      MR. KLAYMAN:  Your Honor, that begs the
13 issue.  I'm glad Mr. Smith said that.  I never got
14 definitive word that I was fired.
15      I was hearing from other people.  It
16 was contradictory.  Mr. Shamble was not
17 communicated with.  He was representing her too.
18 I couldn't let her rights go into the tank.
19      I'm surprised -- and I don't want to be
20 too facetious or humorous -- I'm surprised I'm not
21 getting an award from the Bar, as opposed to being
22 prosecuted with this, what I consider to be, a

47 (Pages 1593 to 1596)

App.0642

In Re: Larry Klayman
June 27, 2018

## Page 1597

1 non-meritorious and calculated attempt at
2 prosecution.
3 Let me just say a few other points and
4 I'll sum up.
5 I would like to turn your attention to
6 these pages of the transcript hat, at Page 496 of
7 the transcript, Ms. Sataki says that she wanted
8 revenge. That's not the purpose of why we're
9 here. She wanted revenge against me and Falahati.
10 And that tells you that, you know, what
11 I was dealing with, like in Exhibit 38, is that
12 Ms. Sataki has more than one -- I don't know how
13 to say it -- I'm not a doctor. I don't mean it in
14 a negative way -- she has more than one
15 personality. And you're not seeking revenge -- I
16 know you're not -- and we shouldn't be here for
17 that reason, and neither should Bar Counsel.
18 She admitted at Page 539 of the
19 transcripts that I was trying to reach her, even
20 though she never responded, to protect her legal
21 rights. She admitted that.
22 And remember, she wasn't responding to

## Page 1598

1 me, even when I had a near-fatal car cash. I
2 mean, look, whatever she may think, I'm a fellow
3 human being. Answer the phone when I try to call
4 her and leave a message that I'm seriously injured
5 and that I crashed my car.
6 But she didn't, because I was trying to
7 reach her to protect her legal rights.
8 And then, for all of her claims which
9 she's made, to Ms. Allred, in 2012 and elsewhere,
10 this seems to be a statement, "My life is ruined.
11 I want to kill myself. Mr. Klayman's
12 responsible."
13 The fact is, there was evidence that
14 was presented that from the very start she was
15 gainfully employed by Andisheh TV doing what she
16 did at Voice of America. She went back there
17 twice.
18 She's an accomplished salesman of
19 cosmetics. She works for Hermes and she's got a
20 new company. She's making $65,000 a year, plus
21 health insurance. Her life has not been ruined.
22 And that will tell you why, I told her,

## Page 1599

1 "You've got a lot of potential here, Ellie. Get
2 out and get something that will make your life
3 better."
4 So Larry Klayman -- if I may use the
5 third person -- should not be disciplined for, A,
6 caring deeply about somebody, putting himself on
7 the line, and doing everything he could to try to
8 help her, and then being called all these names,
9 that I took bribes and everything else, and then
10 being asked to buy a car. And that's really a
11 crucial point in terms of how she also reacted.
12 So let me sum it up --
13 CHAIRMAN FITCH: Let me observe that I
14 think that we know that you're not being charged
15 with destroying a life or so on, as a rule.
16 MR. KLAYMAN: It bears on credibility.
17 CHAIRMAN FITCH: I think some of those
18 statements, bear, one way or the other, on
19 credibility. You're right. And I think that
20 maybe, from Bar Counsel's view, they are relevant
21 to some other charges.
22 But we certainly are not judging you on

## Page 1600

1 destroying anybody's life.
2 Go ahead.
3 MR. KLAYMAN: Anyway, you asked about
4 the 1.16(3), the lawyer's discharge. There never
5 was any revelation from her, and we tried to get
6 one.
7 Here's the bottom line. Here's the
8 summary: There is clearly no clear and convincing
9 evidence that I violated any Bar rule.
10 Bar Counsel doesn't like the way I
11 practice law, they can do it the way they want to
12 practice law. And I do it the way I consider to
13 be appropriate and zealous and honest and fair.
14 I've always been up against very
15 powerful interests, and the Voice of America is a
16 very powerful agency that's been ranked the worst
17 in government by the GAO. It was published in the
18 Washington Post. That's an exhibit.
19 Mr. Shamble congratulated me and said
20 he's never seen a lawyer work that hard, and he
21 referred me to other broadcasters in VOA, who I
22 worked closely with.

48 (Pages 1597 to 1600)

In Re: Larry Klayman
June 27, 2018

## Page 1601

1   This case is eight years old. Memories
2   have faded. Documents have been lost, misplaced.
3   There's been a denial of due process, through no
4   fault of my own. Through no fault of your own,
5   Honors, but there has been a denial of due process
6   by virtue of the way this matter has been handled.
7       As set forth in the opinion of
8   Professor Ronald Rotunda, who was one of the top,
9   if not the top experts in professional ethics, of
10  the lawyers in the United States, before he
11  tragically and suddenly died, there are tens of
12  states that would not even allow this case to
13  proceed. They would have thrown it out.
14      And there are court decisions. There's
15  also one in Florida, where I'm also licensed, and
16  they dismissed Ms. Sataki's complaint alone in
17  Pennsylvania, immediately, early.
18      It says that Bar Counsel is to adhere
19  to the same rules that the accused, accused
20  lawyers are to adhere to. They have to adhere to
21  the same rules, and that's called respect for due
22  process and equal protection, and moving cases

## Page 1602

1   along to a conclusion, and not resurrecting them
2   when, for whatever reason, you think it may be
3   strategic to do so at that point in time.
4       And that's important, because Ms.
5   Sataki never, ever communicated with them. They
6   had to find her after the original complaint.
7       So that's a crucial point, also in
8   terms of credibility.
9       And of course I want you to consider
10  that they prejudged me. Before I was even
11  notified this case was still active -- I thought
12  it was dismissed -- they were writing a
13  Specification of Charges, which don't have bearing
14  on the ultimate Specification of Charges. Because
15  the first one said that I had abandoned her and
16  that I didn't represent herself zealously and
17  competently.
18      When I told Mr. Smith --
19      CHAIRMAN FITCH: I assure you're not
20  going to consider that, and I didn't even know
21  that until you told me.
22      MR. KLAYMAN: Yeah, all these documents

## Page 1603

1   are in the record. They were hiring experts.
2       CHAIRMAN FITCH: I wouldn't read the
3   superseding draft.
4       MR. KLAYMAN: Yeah, it shows you -- I'm
5   sorry.
6       CHAIRMAN FITCH: Mr. Klayman.
7       MR. KLAYMAN: It shows you that there's
8   an ulterior motive here eight years down the line.
9       We live in an age where it's very
10  polarized here in this country. And I'm on one
11  side, Bar Counsel appears to be on the other side.
12  But we should all be on the same side. And we
13  shouldn't seek revenge. We should respect each
14  other.
15      I respected Ms. Sataki. I wanted her
16  to respect me. I've been a member in good
17  standing of this Bar for 38 years. I currently
18  have no disciplinary record, no finding, final
19  finding.
20      This is a case that hinges as much on
21  the law and on the facts as just what's right.
22  What happened here was not right. And it's caused

## Page 1604

1   me a lot of emotional distress. It's caused me a
2   lot of financial loss. Not just, you know, with
3   regard to Mr. Sujat's time, with my time, because
4   I can't make a living and spend all of my time
5   defending what I view to be a non-meritorious case
6   that was brought for ulterior purposes, eight
7   years down the line, after two other bars have
8   dismissed it.
9       When I asked his supervisor, Elizabeth
10  Herman, who signed the Specification of Charges,
11  "Wasn't that relevant?" She said "We could care
12  less."
13      Thank you.
14      CHAIRMAN FITCH: Do you have rebuttal?
15      MR. SMITH: No thank you.
16      CHAIRMAN FITCH: Thank you, Mr.
17  Klayman. Thank you Mr. Smith.
18      We have the following obligation at
19  this point under Rule XI.11. At the conclusion of
20  the evidentiary portion of the hearing, and after
21  hearing such final argument as the hearing
22  committee chair shall permit, the hearing

In Re: Larry Klayman
June 27, 2018

## Page 1605

1  committee shall go into executive session and
2  decide preliminarily whether it finds a violation
3  of any disciplinary rule that has been proven by
4  Disciplinary Counsel.
5          I do what I'm told. The three of us
6  are ready to go into executive session, and this
7  is one of the few occasions when we have a little
8  work to do and you have no work to do, so please
9  accommodate us by letting us stay here and
10  stepping outside and waiting for us.
11         And we are off the record.
12         (Recess taken.)
13         CHAIRMAN FITCH: Back on the record.
14         The hearing committee has followed the
15  instructions in Rule XI.1 and conferred as to
16  whether it may find a violation of any, as in one
17  or more than one, disciplinary rule has been
18  proven by Disciplinary Counsel.
19         We think preliminarily that we may find
20  that Disciplinary Counsel has proven at least one
21  violation.
22         We need now to talk about briefing.

## Page 1606

1          The length of briefs is by rule 50
2  pages, with a reply brief of 20 pages, and I'm
3  inclined to go to 50 pages, unless someone's got a
4  real strong argument. I'd be happy to limit it to
5  10, but I'm inclined to go to 50.
6          MR. KLAYMAN: That's fine, your Honor.
7          MR. SUJAT: That's fine, your Honor.
8          CHAIRMAN FITCH: The briefs will
9  consist of an opposed finding of facts section and
10  a legal argument section. And when Mr. Smith
11  submits his brief and serves it, the Respondent's
12  expected to admit or deny, with explanation, with
13  each of those PFFs, proposed findings of fact, of
14  the ODC, and then probably should propose its own
15  additional findings of fact. And then in its
16  reply, ODC will make its response to those PFFs of
17  the Respondent's team and say whatever else it has
18  to say in its reply brief, which is limited to 20
19  pages.
20         Mr. Smith, you can file 19.99 pages if
21  you want, but 20 strikes me as long for this
22  amount. It's up to you. Obviously I won't do

## Page 1607

1  anything about that. Too much speculation.
2          The rule requires that this stage be
3  completed in 120 days. That is one of those rules
4  frankly that, from what very little I know, is
5  honored more in breach than in the observance.
6  But I think we should take a shot at it.
7          I propose 30 days from today for Mr.
8  Smith's brief, 40 days thereafter for Respondent's
9  brief, and 10 days thereafter for the reply brief.
10         Ten days alright, Mr. Smith?
11         MR. SMITH: Yeah, but I guess if
12  there's more --
13         CHAIRMAN FITCH: I'm sorry?
14         MR. SMITH: I do believe that should
15  be, but I'm sure that the committee will consider
16  motions for extension, if warranted.
17         CHAIRMAN FITCH: Well, I never had any
18  choice but to consider those.
19         Meghan, I misplaced it. Where is that
20  rule about 120 days?
21         MS. BORRAZAS: I believe it was Page
22  164?

## Page 1608

1          CHAIRMAN FITCH: No, that's not it.
2          MS. BORRAZAS: Sixty-four, at the
3  bottom. Is that it?
4          CHAIRMAN FITCH: That's in the
5  Board's -- the rules applying to the board.
6          Let's leave it at ten days.
7          MS. BORRAZAS: The date for -- do you
8  want the brief or the --
9          CHAIRMAN FITCH: Length of briefs or
10  scheduling of briefs.
11         MS. BORRAZAS: So 12 is scheduling but
12  also 19 point --
13         MR. TIGAR: Are we now talking days?
14         I calculate 30 days is the 27th of
15  July.
16         CHAIRMAN FITCH: Alright.
17         MR. TIGAR: I calculate 40 days
18  thereafter is the 5th of September.
19         MR. TIGAR: I calculate that ten days
20  after is the 15th of September -- or August,
21  August.
22         CHAIRMAN FITCH: What day of the week,

50 (Pages 1605 to 1608)

App.0645

In Re: Larry Klayman
June 27, 2018

## Page 1609

1  the 5th of September?

2  MS. BORRAZAS: That is a Wednesday.

3  MR. TIGAR: September 5th is a

4  Wednesday.

5  CHAIRMAN FITCH: So Labor Day is

6  Monday, September 3rd.

7  MR. TIGAR: That's right.

8  CHAIRMAN FITCH: I think that

9  Respondent's brief should be due on Monday,

10  September 10th, rather than --

11  MR. KLAYMAN: That's our opposition,

12  your Honor, or response?

13  CHAIRMAN FITCH: Your brief should be

14  filed or may be filed as late as September 10th.

15  MR. KLAYMAN: Alright.

16  CHAIRMAN FITCH: Otherwise you'd be

17  obligated to file a brief two days after Labor

18  Day.

19  So September 10, and we'll give Mr.

20  Smith 10 days for his reply.

21  MR. TIGAR: The 20th.

22  CHAIRMAN FITCH: June the 20th. And

## Page 1610

1  we'll do our best on our end. And we'll consider

2  whatever the parties have to tell us.

3  MR. KLAYMAN: Your Honor, may I address

4  a small issue?

5  CHAIRMAN FITCH: I'm sorry?

6  MR. KLAYMAN: When appropriate, may I

7  address a small issue.

8  CHAIRMAN FITCH: Sure, but I have one

9  other issue.

10  Does Bar Counsel have any information

11  about prior discipline?

12  MR. KLAYMAN: That's my issue. Before

13  he does that.

14  CHAIRMAN FITCH: What's your issue?

15  MR. KLAYMAN: The rule says, and this

16  is alluded to pleadings in the case -- I assume

17  you all have read them -- that bringing this case

18  was -- you want me to stand at the podium?

19  CHAIRMAN FITCH: Yeah, of course.

20  MR. KLAYMAN: As I said in the

21  pleadings, there is another disciplinary

22  proceeding, which is not final. It's still going

## Page 1611

1  through the process with Judicial Watch. That's

2  why they were sitting here, in part. I don't know

3  how they knew of it. Most people don't know of

4  these things, if they weren't told.

5  So there's two issues here actually,

6  and that is not complete. It's in front of the

7  Court of Appeals right now in this building.

8  So Mr. Smith advised me that he was

9  going to introduce the finding of the Board, which

10  is just a recommendation. It's not a final

11  decision.

12  I think that's inappropriate to put

13  that in the record at this time, and it's intended

14  to try to prejudice you in your ultimate

15  deliberations.

16  When I told him I didn't think that was

17  ethical, he screamed out in middle of the

18  courtroom, using the F word, "Leave me the F

19  alone." And there were several witnesses,

20  including the court reporter, and I believe Meghan

21  and others.

22  CHAIRMAN FITCH: Well, let me say the

## Page 1612

1  following. I think this will resolve the concern.

2  I think it's a legitimate issue.

3  If there is another proceeding and if

4  it has not been resolved by the Court of Appeals,

5  then, before anything else about that proceeding

6  is brought to the attention of the hearing

7  committee, I hereby require Disciplinary Counsel

8  to submit a pleading arguing why an incomplete

9  disciplinary proceeding constitutes prior

10  discipline.

11  There may be a Court of Appeals case

12  out there that says exactly that. But I'd like to

13  see it.

14  So, Mr. Smith, you have 10 days from

15  today for you and your office to submit that

16  pleading showing why information about incomplete

17  non-final disciplinary proceeding constitutes

18  prior discipline. Ok?

19  MR. SMITH: Ok.

20  MR. TIGAR: May I suggest, may I

21  suggest in that respect that you look at the

22  statement of judgements, because there is a

App.0646

In Re:  Larry Klayman
June 27, 2018

| Page 1613 | Page 1615 |
|---|---|

**Page 1613**

1  considerable body of literature on the preclusive
2  effect or non-effect of an interlocutory decision
3  that is still in the process of appeal.
4        That's one of the civil procedure
5  professor's nightmare scenarios, and there's a lot
6  of debate about that.
7        MR. KLAYMAN:  Thank you.  Thank you for
8  that suggestion.
9        I wanted to add one other thing, when I
10  asked him why he's doing that, I just want this on
11  the record, he told me "My supervisors told me to
12  do it."
13        MR. SMITH:  Jesus Christ.  You know
14  what?  I do have some public discipline that --
15        MR. KLAYMAN:  Well, I'm not finished
16  yet.  I'm not finished yet.
17        MR. SMITH:  Is he finished yet?
18        He's made his objection.  You've made
19  your ruling with respect to these documents.  And
20  I will respect that ruling.
21        Now I would like to do as you already
22  asked.  I want to submit public discipline in

**Page 1615**

1  it's a very low threshold to get to this section
2  of the proceeding, and I just wanted to make it
3  clear on the record that, because my former
4  colleagues may use this for publicity purposes,
5  that's why they were sitting here, just to put it
6  on the record that it is a low threshold, so if
7  anybody sees these transcripts or whatever, they
8  know that you didn't make a finding against me
9  yet.
10        CHAIRMAN FITCH:  Mr. Smith, I want to
11  hear from you in just a minute.
12        Are you representing that documents
13  that you have constitute final discipline?
14        MR. SMITH:  This is different from the
15  document that Ms. Sataki was talking about --
16        CHAIRMAN FITCH:  Well, you're mumbling.
17        MR. SMITH:  This is different from the
18  document that Mr. Klayman was referring to that
19  you have issued your order with respect to.
20        CHAIRMAN FITCH:  Well, I didn't ask you
21  that.
22        Does that material constitute -- don't

| Page 1614 | Page 1616 |
|---|---|

**Page 1614**

1  aggravation of misconduct.
2        CHAIRMAN FITCH:  I'm sorry?
3        MR. KLAYMAN:  I'm not finished yet.
4        MR. SMITH:  I said, he has made his
5  motion, you have made your ruling.  We are going
6  to respect that ruling, but there is public
7  discipline that I would like to submit in
8  aggravation of the misconduct at this time.
9        CHAIRMAN FITCH:  There is what that
10  constitutes --
11        MR. SMITH:  Public discipline.
12        MR. KLAYMAN:  Yes, I have no
13  disciplinary record, other than one in Florida,
14  which was a reprimand that I agreed to.  That's
15  the only one that has ever happened in 40 years,
16  and it was because I paid late on an agreement to
17  pay a small portion of a client matter.  I was in
18  financial difficulty.  I agreed to it.  That's the
19  only discipline in 40 years.
20        So if he's going to throw into the
21  record other things, that's inappropriate.
22        What I wanted to ask is, because I know

**Page 1616**

1  show it to me -- does it constitute final --
2        MR. SMITH:  Yes.
3        CHAIRMAN FITCH:  -- decision by a
4  disciplinary authority --
5        MR. SMITH:  Yes.
6        CHAIRMAN FITCH:  Such as the Board and
7  the Board's hearing committee?
8        MR. SMITH:  Yes, it does.
9        MR. KLAYMAN:  Yes, I'll stipulate to
10  that, your Honor.
11        That's what I said.  There's one in
12  Florida many years back where I was -- from 2008.
13        CHAIRMAN FITCH:  And what do your
14  submissions consist of?  What kinds of things?
15        MR. SMITH:  It is a consent judgment
16  from the Supreme Court of Florida, the Florida Bar
17  vs. Larry Eliott Klayman, number SC11 247.
18        CHAIRMAN FITCH:  I ask because it looks
19  to be kind of thick.
20        MR. SMITH:  It is kind of thick.  And I
21  have copies for everyone on the committee and for
22  the Board.  Respondent's already been given a

52  (Pages 1613 to 1616)

App.0647

In Re: Larry Klayman
June 27, 2018

## Page 1617

1  copy.
2      If may I approach?
3      CHAIRMAN FITCH: Probably, yes, but in
4  just a minute.
5      (Brief pause.)
6      CHAIRMAN FITCH: Yeah, Rule XI.11, as I
7  recall, in fact does instruct or direct the
8  "hearing committee shall immediately resume the
9  hearing after the executive conference and permit
10  Disciplinary Counsel to present evidence of prior
11  discipline, if any."
12      Even though the word "shall" does not
13  appear before "permit," the sentence does read
14  "shall immediately resume the hearing and permit
15  Disciplinary Counsel to present evidence of prior
16  discipline."
17      Now I read the rule to be saying "shall
18  permit."
19      You may tender a document constituting
20  final discipline by consent or otherwise --
21      MR. SMITH: Thank you.
22      CHAIRMAN FITCH: -- to the hearing

## Page 1618

1  committee and to Ms. Borrazas.
2      MR. SMITH: For the record, this has
3  been marked as Disciplinary Counsel Exhibit 53.
4      MR. KLAYMAN: Can I have a copy, Mr.
5  Smith? You got it?
6      MR. SUJAT: Yeah.
7      MR. KLAYMAN: Your Honor, the only
8  other thing I ask, because of the potential for
9  publicity here -- I'm not usually shy, one way or
10  the other -- my ex colleagues, I got a verdict
11  against them for defamation. I mentioned that in
12  my testimony.
13      CHAIRMAN FITCH: Mm-hmm.
14      MR. KLAYMAN: I just would ask you as a
15  courtesy just to state on the record that whatever
16  the low threshold is, it's a low threshold to get
17  to this point. It's just a tentative ruling.
18      CHAIRMAN FITCH: I'm sorry, what do you
19  want me to do?
20      MR. KLAYMAN: On the record, just state
21  what the threshold is to get to this part of the
22  proceeding.

## Page 1619

1      MR. TIGAR: Is it your application that
2  the Chair place on the record the text of XI.11.
3      CHAIRMAN FITCH: Yes.
4      MR. TIGAR: That "the determination
5  that was made is a preliminary nonbinding
6  determination"?
7      MR. KLAYMAN: Correct, that's it.
8      Because I know that my colleagues will
9  use it.
10      MR. TIGAR: Well, that's what rule
11  XI.11 says. And that's what it says.
12      MR. KLAYMAN: So thank you very much
13  for that.
14      And if I may address what Mr. --
15      CHAIRMAN FITCH: You may, but the order
16  of procedure is, is this anything else being
17  offered at this time in aggravation?
18      MR. SMITH: Given the Chair's ruling,
19  nothing else at this time.
20      CHAIRMAN FITCH: Does Respondent wish
21  to address at this time the allegedly aggravating
22  material that's been submitted and/or wish to

## Page 1620

1  address at this time any matters or bring to the
2  hearing committee's attention any matters in
3  potential mitigation of potential sanction
4  analysis.
5      MR. KLAYMAN: Yes, I do.
6      CHAIRMAN FITCH: Both parties should
7  keep in mind that these representations do not
8  preclude the repetition, elaboration or addition
9  of such considerations in the briefing.
10      MR. KLAYMAN: Understood, your Honor.
11      Did you give a copy to Mr. Sujat?
12  Apparently he misplaced it.
13      CHAIRMAN FITCH: You can have my copy,
14  Mr. Sujat.
15      MR. KLAYMAN: Here, I got it. I'm
16  borrowing this one.
17      To put this in context, your Honor, I
18  had a client in Florida named Natalia Hum. She
19  was charged with jumping bail and also making --
20  arranging for illegal marriages with immigrants to
21  get them citizenship. I defended her in a
22  criminal proceeding, and there was a $25,000

In Re:  Larry Klayman
June 27, 2018

## Page 1621

1  nonrefundable retainer, which you can take in
2  Florida.  It can be nonrefundable.  And I did a
3  considerable amount of work.
4       I had been the second lawyer.  She had
5  another lawyer who had actually negotiated a plea
6  agreement for her, and that's when she jumped bail
7  and went to Belize, and they had to bring her back
8  to Miami, and they arrested her.
9       Ultimately her case was transferred to
10 Orlando, and, for convenience purposes, she got a
11 lawyer up in Orlando.
12      I was going through financial
13 difficulty at the time.  It was in and around the
14 time period of the collapse in this country,
15 financially.  I was doing badly.  I have testified
16 to that.  And I entered into -- she wanted to get
17 her $25,000 back and said I hadn't done any work,
18 which wasn't true.
19      I agreed with a mediator to remit 5,000
20 back, and I couldn't pay it timely because I was
21 on the verge of bankruptcy, and I took longer to
22 do it than I had agreed to.

## Page 1622

1       I was moving around, as you've seen
2  from my different addresses.  I didn't actually
3  get notice that the Bar had started an action
4  here.  And things matured to the point that there
5  was a complaint that was filed.
6       And I agreed to -- I agreed, consent
7  agreement, to public reprimand.  And in that
8  public reprimand, you will see there is no showing
9  of any dishonesty.  There are a lot of mitigating
10 circumstances, including the fact that her lawyer
11 in Orlando had said to me, "Larry, if I were you,
12 I wouldn't pay it back."  Because, she tried the
13 same thing with her prior lawyer.  She had filed a
14 Bar complaint with him to get back the equivalent
15 of his $25,000 retainer.
16      So it's not, you know -- it's not a
17 matter of dishonesty.  It's not an egregious
18 thing.  I simply agreed to just to move on.  It's
19 cheaper to do that than to fight it.  So...
20      CHAIRMAN FITCH:  There appearing to be
21 no other matters, this evidentiary proceeding is
22 adjourned.

## Page 1623

1       (Whereupon at 3:21 p.m. the hearing was
2  adjourned.)

App.0649

In Re: Larry Klayman
June 27, 2018

## A

**a.m** 1413:3 1418:12
1419:16 1447:10
**abandon** 1593:13
**abandoned** 1602:15
**abandoning** 1571:6
**ABC** 1480:14
**abide** 1556:15
1587:15
**ability** 1534:5
**able** 1473:4 1486:18
1554:19 1577:2
**absolutely** 1425:21
1455:19 1466:6
1487:6,7 1512:1
1559:10 1583:5
**abuse** 1490:11
**abused** 1476:8
1477:11
**abusing** 1476:19,20
1476:21
**abusive** 1551:16
**Academy** 1468:18
**accepted** 1502:9
**accepts** 1562:11
**accident** 1457:15
1473:18 1474:9
1474:13 1484:1,2
**accommodate**
1498:16 1605:9
**accommodating**
1587:11
**accomplished**
1598:18
**account** 1447:15
1582:12
**accountable** 1593:9
**accurate** 1432:16
1476:6
**accusations**
1501:15 1502:1
**accusatory** 1550:6
**accuse** 1501:6
**accused** 1444:13
1478:4,4,21
1501:4 1561:21
1573:20 1591:16
1601:19,19
**accusing** 1501:19
1580:20
**acknowledge**
1451:10
**acknowledged**
1450:5
**acknowledges**
1450:21 1457:3

**acknowledging**
1469:2
**acknowledgment**
1453:1
**act** 1511:3
**acted** 1582:11
**action** 1511:19,22
1575:3 1587:21
1622:3
**actionable** 1553:12
1553:14
**active** 1602:11
**actively** 1525:22
**actual** 1508:7
1581:2
**acute** 1586:5
**Ad** 1413:3,10
**add** 1478:20
1538:18 1613:9
**added** 1423:9
**addendum** 1507:17
**addition** 1449:11
1563:18 1566:21
1620:8
**additional** 1540:11
1564:4 1606:15
**address** 1420:17,18
1421:1 1422:6,6
1539:3 1569:14
1569:16 1610:3,7
1619:14,21
1620:1
**addressed** 1420:4
**addresses** 1421:18
1594:9 1622:2
**addressing** 1485:1
**adequate** 1530:22
**adhere** 1601:18,20
1601:20
**adjourned** 1622:22
1623:2
**administration**
1558:4 1567:22
**administrative**
1555:19
**administratively**
1543:3
**admissions** 1582:2
**admit** 1574:6
1606:12
**admits** 1474:7
1575:19 1586:15
**admitted** 1420:3
1574:19,21
1577:6 1582:6
1597:18,21

**advanced** 1562:12
**advancing** 1489:21
1548:13
**adverse** 1545:14
**adversely** 1553:17
1584:8
**advice** 1477:14,16
1478:1 1542:14
1544:8
**advised** 1586:10,13
1611:8
**advocate** 1460:19
1573:5
**affirm** 1520:14
**Affirmative** 1424:8
**afforded** 1510:4
**afternoon** 1547:11
**age** 1603:9
**agencies** 1574:10
**agency** 1480:9
1562:17 1578:15
1588:20 1600:16
**aggravating**
1619:21
**aggravation** 1614:1
1614:8 1619:17
**aggregate** 1538:22
**ago** 1459:8 1490:3
1505:21 1592:15
**agree** 1427:4
1448:12,19,20
1449:1 1458:16
1474:20 1569:6
**agreeable** 1538:13
**agreed** 1504:14,15
1536:16 1547:20
1575:19 1614:14
1614:18 1621:19
1621:22 1622:6,6
1622:18
**agreeing** 1587:9
**agreement** 1502:14
1508:21 1509:4
1509:12,16,20
1510:7,10 1511:5
1511:6 1514:7
1577:21 1581:14
1614:16 1621:6
1622:7
**agrees** 1538:19
**ahead** 1419:21
1422:11 1423:19
1424:13 1430:6
1430:12 1442:14
1448:4 1463:2
1465:11 1469:12

1473:16 1478:12
1480:6 1486:11
1489:4,7 1493:12
1499:16 1528:8
1534:1 1540:14
1560:5 1595:10
1600:2
**alive** 1557:19
**allegation** 1428:15
1428:18 1430:15
1517:16 1568:3
1573:17 1575:5
**allegations** 1476:15
1548:7,7
**alleged** 1429:1
1491:12 1539:12
1591:3,4 1595:15
**allegedly** 1619:21
**Allen** 1523:5
**allow** 1470:12
1471:2 1518:3
1601:12
**Allred** 1460:20
1469:17 1512:18
1537:18 1585:13
1585:14,15
1589:21 1593:12
1593:16 1598:9
**alluded** 1578:5
1610:16
**ally** 1551:13
**alright** 1418:2
1419:14,17
1428:5 1467:1,17
1475:17 1495:1
1495:12 1498:11
1499:7 1500:13
1502:5 1531:21
1539:6,13
1540:22 1552:1
1566:20 1607:10
1608:16 1609:15
**Alzheimer's** 1532:8
**amended** 1425:10
1425:11
**America** 1446:20
1446:22 1464:18
1575:4 1578:11
1598:16 1600:15
**amount** 1508:14
1606:22 1621:3
**analysis** 1562:15
1567:16,16
1569:8 1570:6
1620:4
**and/or** 1539:3

1540:6 1565:8
1619:22
**Andisheh** 1598:15
**Angeles** 1473:20
1502:18 1513:14
1514:14 1524:4,5
1535:22 1576:22
1577:7
**angry** 1550:9
**announced** 1429:16
**anonymous**
1479:17,18
**answer** 1424:8
1425:16 1449:6
1452:3,7 1460:5
1469:15 1474:8
1474:13 1477:13
1489:2,6 1493:2,7
1497:4,7,19
1504:7 1506:13
1510:22 1518:4
1565:11 1566:2
1595:6 1598:3
**answered** 1516:8
**answers** 1494:20
**ANTHONY**
1413:11
**anti-Semitic**
1517:18 1534:8
**anybody** 1472:14
1536:6 1537:2
1578:9 1615:7
**anybody's** 1600:1
**anymore** 1554:10
1554:11 1555:2
**anyway** 1502:19
1542:18 1545:20
1590:22 1600:3
**apart** 1593:22
**apartment** 1439:6
1470:12,17,18
1471:4,10,13,20
1471:22 1474:4
1584:18
**apologizing**
1449:21
**apparently** 1419:16
1427:20 1468:6
1476:16 1551:15
1620:12
**appeal** 1541:13,14
1541:15,19,21
1542:1,14,21
1543:7,9,20,22
1544:15,15
1545:9,22

In Re: Larry Klayman
June 27, 2018

1593:18 1613:3
appealed 1543:13
1543:17
appeals 1412:1
1561:17 1566:7
1567:19 1611:7
1612:4,11
appear 1442:1
1591:1,4 1617:13
APPEARANCES
1413:9 1414:1
appearing 1622:20
appears 1429:13
1453:2 1476:4
1518:14 1531:16
1573:19 1603:11
apples 1585:3
applicable 1586:18
application 1619:1
applied 1566:22
applies 1568:21
apply 1566:12,12
1575:12,13
applying 1608:5
appreciate 1505:7
1530:6 1589:19
1589:20,20
1590:20
appreciating
1535:10
appreciation
1455:19
appreciative 1481:1
1531:17
approach 1491:21
1493:22 1494:1
1501:11 1531:5
1534:19 1617:2
appropriate
1600:13 1610:6
appropriateness
1517:15
approved 1574:18
1574:22
approving 1524:22
approximately
1421:14 1526:16
1531:2,11
April 1435:8 1441:4
1443:2
archnemesis 1556:4
areas 1496:1
arguably 1459:13
1478:11
argue 1538:20
1565:16

argued 1575:12
arguing 1550:10
1612:8
argument 1469:10
1540:5 1547:7,9
1560:2,3 1569:19
1574:13 1604:21
1606:4,10
arguments 1415:6
1500:14 1531:3
Arlene 1453:12
1488:11,16
1489:12
arm 1538:11
armor 1464:7
1555:7
arrangement
1512:5 1513:20
arranging 1620:20
arrested 1621:8
arrives 1418:13
articles 1558:8,13
1559:2 1560:8,13
1560:13 1561:21
1563:2 1565:2,6
1566:22 1567:6
1574:4
arts 1522:10
ashamed 1576:2
Ashley 1415:4
1519:17 1520:4,7
1521:4,11
aside 1590:3
asked 1425:3
1431:7,12
1435:21 1436:5
1455:6 1464:14
1471:12 1492:9
1497:16 1504:2,5
1504:17 1508:2
1514:5 1516:8
1528:18 1538:22
1553:10 1556:8
1576:5 1579:11
1581:12 1583:3,5
1583:9 1594:16
1599:10 1600:3
1604:9 1613:10
1613:22
asking 1430:4
1435:19 1442:21
1448:12 1450:14
1457:4,7 1514:9
1541:8 1545:1
1546:3 1571:9
asks 1490:16

aspect 1452:21
1489:11 1494:10
1498:13 1543:11
1557:16 1586:17
aspects 1433:11
1489:21
assault 1548:7
asserted 1517:16
assertion 1565:6
assimilate 1476:1
assist 1567:22
associate 1500:22
assume 1533:21
1571:5 1610:16
assuming 1502:20
1530:21 1559:7
1570:22
assure 1602:19
Attaby 1476:17
attached 1424:8
1589:8
attachment
1549:11
attachments
1426:22 1511:10
attempt 1537:1
1597:1
attempting 1502:22
attention 1424:18
1450:10 1597:5
1612:6 1620:2
attitude 1488:13
1491:21
attorney 1413:16
1413:18 1551:11
attorney/client
1547:13
attractive 1445:1
1549:5
attributing 1578:8
August 1551:20
1552:19 1557:8
1596:5 1608:20
1608:21
Austin 1551:21
1557:9
authority 1616:4
authorization
1586:19
authorized 1587:22
1588:2
auto 1473:18
available 1562:16
Avenue 1420:13
1422:8
Aviera 1433:22

1434:4,5,11
1442:22 1443:2
1443:10 1453:12
1453:18 1455:15
1465:17 1466:3
1488:22 1512:19
award 1596:21
Awards 1468:19
aware 1495:13
1528:22 1529:3,5
AWOL'd 1577:5

_____

B

B 1446:12
Bachelor's 1521:18
1522:9
back 1416:3
1421:21 1444:10
1453:7 1455:3
1457:13 1484:9
1490:14 1498:21
1502:18 1507:1
1513:13 1514:13
1519:19 1530:14
1531:14 1532:12
1532:20 1535:21
1536:5 1543:3,16
1568:9 1576:21
1577:3 1578:3,11
1581:19 1587:6
1590:18 1592:2
1592:12,16,21
1598:16 1605:13
1616:12 1621:7
1621:17,20
1622:12,14
background
1521:17
bad 1450:1 1482:2
1519:3 1544:8
1583:14 1585:2
badly 1434:19
1480:10 1487:18
1578:16 1621:15
Baehr 1468:21
Baehr's 1468:17
bail 1620:19 1621:6
bankruptcy
1621:21
Bar 1417:3,12
1420:18,19
1422:17,19
1425:14 1427:1,9
1433:4,6,7,17
1437:8 1444:15
1453:6 1459:9

1477:22 1508:11
1514:17 1518:14
1533:7,10 1539:3
1551:14 1553:10
1561:18 1570:4,9
1571:8,16,16
1572:16,21
1573:6 1581:9
1582:22 1584:2,4
1590:9 1594:15
1596:21 1597:17
1599:20 1600:9
1600:10 1601:18
1603:11,17
1610:10 1616:16
1622:3,14
bars 1604:7
based 1495:20
1507:22 1513:11
1537:5 1543:4
1563:2
basically 1455:16
1478:13 1543:8
1572:15 1578:18
basis 1426:6
1459:16,21
1460:7 1461:9,14
1461:22 1508:16
1547:21 1548:1
1552:14 1559:3
1561:22 1562:3
1565:4 1567:18
1588:22 1589:11
1589:16 1591:17
1592:20,20
bathroom 1550:12
1550:14
BBC 1480:14
BBG 1544:15
1568:16 1595:16
bear 1461:20
1556:13 1599:18
bearing 1602:13
bears 1544:12
1599:16
beautiful 1454:4
1498:2 1527:19
1528:16 1583:2
beauty 1564:14
becoming 1554:4
bed 1532:10
began 1553:20
beginning 1423:9
1475:8 1507:3
1555:10
begins 1426:4

In Re: Larry Klayman
June 27, 2018

1447:6 1454:21
**begs** 1596:12
**behalf** 1413:6,18
1414:2 1446:4
1521:5,8 1529:2
1569:19 1578:17
1584:7 1587:22
**belief** 1441:21
**believe** 1420:14,17
1428:18 1431:22
1456:12 1457:15
1458:5,7 1482:14
1482:16 1515:18
1528:18 1530:7
1539:11 1541:13
1575:14 1581:10
1593:20 1607:14
1607:21 1611:20
**believed** 1428:3
1437:16 1493:19
1584:17,22
1586:18
**believes** 1446:12
1458:5
**Belize** 1621:7
**Benjamin** 1475:6
**berated** 1436:4
1444:11
**berating** 1450:7
1451:5
**best** 1466:11 1475:6
1482:12 1485:6,7
1492:1 1515:17
1519:7 1530:19
1556:11 1610:1
**better** 1434:13
1441:19 1459:3
1478:1 1485:3
1492:18 1498:7
1543:5 1554:4
1594:4 1599:3
**Beverly** 1444:22
1468:8
**beyond** 1416:19
1436:5 1454:18
1529:7 1570:9
1573:14 1575:13
1583:10
**biases** 1590:2
**bickering** 1550:4
**big** 1548:15,15
1555:16 1574:12
**Bill** 1586:13
**binder** 1425:2
**bit** 1480:12 1529:9
1564:21 1594:4

**bitter** 1550:6
**Bivens** 1511:19,22
1536:18 1578:6
**bizarre** 1590:7
**black** 1479:22
**blame** 1458:21
1459:5
**Blanquita** 1537:3
1576:6
**blatant** 1506:1
**block** 1523:16,18
**blue** 1423:1,2,5
1453:7 1589:6
**board** 1412:2,4
1413:1 1468:22
1507:13,20
1536:8,20,21
1537:10 1556:3
1568:16 1608:5
1611:9 1616:6,22
**Board's** 1608:5
1616:7
**body** 1613:1
**Boehner** 1536:10
**bono** 1436:20
1502:10 1505:9
1509:22 1576:15
1577:22
**book** 1422:22
1423:1,2,5,7
1427:2 1453:7
1559:4,5 1588:16
**BOPR** 1414:14
**born** 1532:16
**Borrazas** 1414:13
1417:22 1607:21
1608:2,7,11
1609:2 1618:1
**borrowing** 1620:16
**Boston** 1580:6
**bottom** 1435:11
1450:14 1483:19
1500:3 1515:6
1534:15 1600:7
1608:3
**bounds** 1433:1
1435:5 1584:15
**box** 1420:4,13,14
1421:10,22
1422:4 1427:20
**boy** 1446:17
1455:12
**boyfriend** 1443:7
1443:10 1445:15
1452:19 1472:13
1525:20 1576:8

**boyfriend's**
1526:21
**Brantley** 1412:22
1413:4
**breach** 1607:5
**break** 1419:12
1471:20 1494:22
1530:20,21
**bribe** 1446:9
1535:12
**bribes** 1444:13
1580:21 1599:9
**brief** 1437:13
1499:17 1530:13
1566:10,16
1569:17 1606:2
1606:11,18
1607:8,9,9 1608:8
1609:9,13,17
1617:5
**briefing** 1564:3
1567:4 1605:22
1620:9
**briefly** 1521:16
1539:21
**briefs** 1540:6
1606:1,8 1608:9
1608:10
**bright** 1482:3
**bring** 1418:14
1506:1 1532:11
1536:17,18
1578:6 1620:1
1621:7
**bringing** 1535:20
1610:17
**broadcast** 1581:22
**broadcaster** 1575:4
**broadcasters**
1446:22 1600:21
**Broadcasting**
1507:20
**broke** 1490:13
**brother** 1471:17
1521:13 1524:6
1529:12
**brought** 1450:9
1497:1 1504:19
1561:3 1592:13
1604:6 1612:6
**building** 1611:7
**Bundy** 1463:4,12
**Bureau** 1581:21
**burying** 1474:17
**Bush** 1573:3
1590:16

**business** 1564:16,17
1575:1,2 1584:11
**buy** 1435:19
1457:10 1488:9
1490:16 1528:19
1583:9,13,16,18
1599:10

─────────────

**C**

**C** 1416:1 1587:17
**C.S.R** 1412:22
1413:4
**cable** 1574:12
**Cahill** 1522:20
**calculate** 1608:14
1608:17,19
**calculated** 1597:1
**calculation** 1542:6
1542:6
**California** 1422:3
1550:13
**call** 1419:2,3
1452:16 1454:18
1484:18 1485:13
1598:3
**called** 1467:9
1474:3,8 1475:14
1495:16 1521:5
1549:12 1579:16
1599:8 1601:21
**calling** 1499:14
1550:13
**calls** 1472:16
**camel's** 1490:13
**capable** 1453:4
1585:20
**capacities** 1463:6
**Capitol** 1536:9
**car** 1435:20 1451:3
1457:10 1468:8
1469:7 1473:19
1474:6 1488:9
1490:16 1528:19
1550:11 1583:10
1583:14,15,17
1598:1,5 1599:10
**care** 1435:14
1439:5 1446:12
1446:15 1454:2
1466:11 1497:17
1537:21 1583:2
1604:11
**cared** 1434:18
1439:7 1450:6
1452:11 1480:4
1490:9 1494:1

1513:15 1529:19
1529:20 1535:22
1582:17 1585:8
1585:10 1590:16
**career** 1489:21
**cares** 1455:9
1476:21
**caring** 1497:20,22
1599:6
**carry** 1554:1
1588:1
**case** 1416:9 1421:16
1425:22 1431:11
1436:21 1440:10
1442:8 1444:4,14
1446:12 1448:14
1449:15 1450:15
1451:1 1455:13
1455:14 1462:14
1465:7 1476:15
1478:3,7,15
1491:3 1492:16
1496:15 1502:8
1506:19,21
1507:19,20
1508:1,3,22
1509:15 1511:10
1524:9,17 1525:1
1527:11 1532:11
1532:17 1536:18
1538:3 1539:8
1542:2,21 1544:3
1544:8 1548:4,16
1548:19 1551:6,7
1552:10,18
1553:7,18 1554:2
1554:3,8 1555:11
1555:13,17,18,21
1556:5,21 1557:3
1557:16,19
1559:21 1560:1,6
1560:15 1562:5
1562:11 1563:3
1564:11 1567:2
1568:13,16
1571:14 1575:20
1580:9 1585:16
1585:21,22
1586:9 1588:5,12
1590:2 1595:7,16
1595:20,21
1596:10 1601:1
1601:12 1602:11
1603:20 1604:5
1610:16,17
1612:11 1621:9

In Re: Larry Klayman
June 27, 2018

cases 1460:13
  1506:1 1527:13
  1551:20 1557:6
  1557:12 1568:22
  1568:22 1569:1
  1569:11,13
  1578:6 1579:7
  1589:22 1601:22
cash 1598:1
caused 1603:22
  1604:1
CBN 1459:5
  1475:14
CBS 1480:14
cell 1419:6 1485:14
  1486:9
Central 1581:21
certain 1478:9
  1580:18
certainly 1418:1
  1518:3 1525:19
  1534:20 1540:5
  1556:18 1557:7
  1564:22 1565:1
  1565:11 1593:3
  1599:22
cetera 1557:14
chain 1523:16,18
chair 1413:12
  1424:19 1538:19
  1604:22 1619:2
Chair's 1540:16
  1619:18
CHAIRMAN
  1416:2,17,22
  1417:9,14,18,20
  1418:2,5,9,15,20
  1419:5,8,15,18,21
  1420:21 1421:4,6
  1421:8,13
  1422:11 1423:1
  1423:13,16,22
  1424:13,21
  1426:8,15,19
  1427:3 1429:9,13
  1429:20 1430:1,4
  1430:9,12 1432:8
  1441:3,21 1442:4
  1442:9,14
  1445:10 1447:12
  1447:21 1448:4
  1449:5 1451:8
  1452:1,5 1459:12
  1459:16 1460:5
  1461:4,17,20,22
  1463:2,20

1464:10,14,20
1465:11,20,22
1469:12 1470:3
1473:12,15
1478:8 1479:1,5,8
1481:14 1482:15
1482:18 1483:6
1483:10,12
1485:15,17,22
1486:4,8,11
1487:2,12,21
1489:7 1492:5,8
1492:21 1493:5,9
1493:12 1494:6,8
1494:12,16,21
1496:9 1497:7,18
1498:14,21
1499:16 1500:2,5
1504:7 1506:13
1509:2,7 1510:6
1510:20 1513:17
1515:3 1516:7,11
1517:12 1518:1,8
1518:12,17
1519:6,12,15,19
1520:5,8,12,19
1522:1,6 1523:2
1525:8 1526:11
1526:16 1527:4,7
1528:8 1530:2,11
1530:14 1531:9
1531:14 1532:1
1533:11,17,20
1534:1 1538:8,14
1540:4,10,14,20
1540:22 1541:6
1542:10 1544:14
1544:20 1545:5,7
1545:11 1546:4,7
1547:4 1561:11
1563:16 1565:16
1566:1,5,11,17
1567:5,9 1568:5,8
1569:5,18 1575:6
1581:6,12
1590:18 1591:13
1592:1,3 1594:18
1594:22 1595:10
1595:13 1596:4
1596:11 1599:13
1599:17 1602:19
1603:2,6 1604:14
1604:16 1605:13
1606:8 1607:13
1607:17 1608:1,4
1608:9,16,22

1609:5,8,13,16,22
1610:5,8,14,19
1611:22 1614:2,9
1615:10,16,20
1616:3,6,13,18
1617:3,6,22
1618:13,18
1619:3,15,20
1620:6,13
1622:20
challenges 1524:15
challenging 1505:5
  1505:10
champion 1555:6
chance 1424:15
  1433:17 1442:16
  1447:4 1449:4
  1453:14 1588:11
  1595:6
change 1505:10
changed 1420:18
characterization
  1478:9 1493:18
characterize
  1539:21
characterized
  1584:5
characterizing
  1448:17
charge 1440:19
  1563:20 1568:18
  1568:19 1576:14
  1576:16 1595:2
charged 1569:2
  1599:14 1620:19
charges 1424:9
  1425:17 1431:8
  1563:15 1568:21
  1570:19 1573:15
  1575:11,13
  1599:21 1602:13
  1602:14 1604:10
charging 1591:14
charity 1484:14
chart 1533:1
chased 1467:13
  1550:12
cheaper 1451:3
  1583:16 1622:19
check 1519:12
cheek 1479:19
Cheney 1573:4
Chestnut 1532:15
chip 1587:5
  1592:16
choice 1607:18

choose 1542:3
Christ 1534:11
  1613:13
Christian 1515:16
  1516:1
Christmas 1591:7
circulation 1560:10
circumstances
  1416:19 1453:19
  1505:16 1524:2
  1524:15 1622:10
cite 1565:14 1575:7
citizenship 1620:21
City 1418:11
  1522:21
civil 1433:13
  1507:18 1542:14
  1542:21 1555:19
  1565:8 1613:4
claim 1429:15
  1432:19 1511:18
  1548:13 1549:19
  1555:8 1592:12
  1594:17
claimed 1446:22
claiming 1462:15
claims 1511:1
  1525:2 1551:22
  1575:15 1593:10
  1593:14 1598:8
clarification
  1511:16
clarify 1463:14
clarity 1539:11
class 1496:1
clause 1507:17
CLAY 1413:20
clear 1429:21
  1430:15 1443:10
  1449:9,14 1471:9
  1505:1,3 1506:4
  1509:21 1511:2
  1539:15 1541:6
  1550:16 1566:8
  1570:7 1572:10
  1574:15 1576:18
  1582:3,13,15
  1588:16 1600:8
  1615:3
cleared 1547:19
clearly 1449:7
  1458:11 1592:14
  1600:8
client 1433:3
  1467:10 1481:18
  1553:22 1556:18

1559:15,18
1584:7 1587:18
1587:22 1590:5
1592:10 1596:3,8
1614:17 1620:18
client's 1556:16,20
  1587:15
clients 1446:19,21
  1461:12 1477:14
  1477:15
clinically 1456:10
Clinton 1537:2
  1548:16 1556:4
  1558:3 1573:2,3
  1586:13 1590:9
Clintons 1590:13
Cliven 1463:3
close 1434:17
  1438:22 1439:7
  1441:16 1452:11
  1460:20 1463:19
  1473:22 1477:16
  1478:8 1520:21
  1570:8
closed 1481:9
  1575:20
closely 1600:22
closing 1415:6
  1531:2 1547:7,9
  1569:19
Clyde's 1446:1
CNN 1480:8,8,14
coaching 1480:12
coat 1531:19
coax 1507:12
  1536:12,14
  1537:9
Coburn 1536:11
cocoon 1489:19
coerce 1507:12
collapse 1621:14
colleagues 1615:4
  1618:10 1619:8
Colleen 1591:10
Columbia 1412:1
  1413:6 1559:11
  1559:20 1561:16
column 1588:15
come 1446:21
  1450:18 1455:22
  1456:8 1470:12
  1471:3 1475:22
  1484:9 1523:21
  1526:12 1559:2
  1570:14 1580:12
  1593:15

In Re: Larry Klayman
June 27, 2018

Page 1628

comedy 1483:9
comes 1453:22
    1455:17 1458:1
    1572:6,7
comfortable 1517:8
    1517:10
coming 1418:17
    1431:4 1444:10
    1485:14 1487:17
    1510:18 1534:11
    1578:21 1590:10
commencing
    1413:3
comment 1463:13
    1463:21
commenting
    1518:20 1557:11
committed 1570:8
committee 1413:4
    1413:10 1416:20
    1497:2 1519:18
    1530:16 1535:5
    1541:11 1604:22
    1605:1,14
    1607:15 1612:7
    1616:7,21 1617:8
    1618:1
committee's 1620:2
common 1444:10
    1570:15
communicate
    1500:15 1541:20
    1542:19 1588:8
communicated
    1596:17 1602:5
communicating
    1546:2 1582:11
communication
    1466:20 1505:13
    1512:13 1580:11
    1581:11
communications
    1506:3 1536:2
    1572:8 1582:19
    1585:15
community 1475:3
    1487:10 1554:5
companion 1437:20
companionship
    1437:22
company 1598:20
compensated
    1514:5
compensatory
    1508:7
competently

1602:17
complained
    1549:12
complaining
    1434:12,15,16
    1443:6 1451:19
    1470:11,14
    1471:2 1486:17
    1487:4
complaint 1416:12
    1417:7,12
    1427:15,19
    1428:1,16,19
    1429:3,8,14
    1431:7 1507:18
    1508:10,14
    1551:15 1553:4
    1565:8 1568:12
    1570:14,22
    1571:6 1601:16
    1602:6 1622:5,14
complaints 1429:2
complete 1530:19
    1611:6
completed 1607:3
completely 1582:6
complex 1585:21,22
concentrate
    1448:14 1450:15
    1451:1 1554:7
concern 1491:11,11
    1491:14 1594:18
    1612:1
concerned 1444:1,1
    1467:21 1496:16
    1580:10
concerning 1587:16
conclude 1490:1
    1498:13 1519:4,8
conclusion 1433:16
    1602:1 1604:19
concussion 1474:2
conduct 1553:12
conducted 1570:1
conference 1617:9
conferred 1605:15
confidence 1559:9
confidences 1539:3
    1559:12,19
    1566:12 1594:17
confidential
    1576:11
confirms 1436:18
    1442:10
conflict 1553:14,15
confused 1426:9

1430:8 1431:6
    1542:11
confusing 1595:11
confusion 1544:13
congratulated
    1600:19
congressman
    1495:14,17
    1496:17 1536:10
congressman's
    1551:5
congressmen
    1548:17
connection 1432:11
    1549:14 1551:6
    1552:15 1564:13
    1564:13,14
    1595:16
consent 1556:18
    1560:4 1616:15
    1617:20 1622:6
consequently
    1581:13 1583:20
    1586:1
consider 1443:9
    1556:12 1579:12
    1596:22 1600:12
    1602:9,20
    1607:15,18
    1610:1
considerable
    1507:22 1613:1
    1621:3
considerations
    1620:9
considered 1506:16
    1582:18
consist 1606:9
    1616:14
consisted 1506:14
consistent 1455:7
constantly 1455:4
    1546:1
constitute 1437:16
    1615:13,22
    1616:1
constitutes 1612:9
    1612:17 1614:10
constituting
    1617:19
Constitutional
    1578:6
construction
    1418:21
construed 1518:5
consult 1587:17

consultant 1523:10
consulting 1523:9
contact 1434:5
    1543:18 1546:2
    1579:5,20,21
    1593:4
contacted 1585:14
contacts 1439:21
contends 1539:4
context 1445:6
    1456:15 1470:20
    1479:4,6 1498:4
    1511:1 1516:1
    1589:4 1592:6,7
    1620:17
contingency
    1547:21
contingent 1502:14
    1514:7 1539:8
    1576:13,20
    1577:14
continue 1505:15
    1509:17 1577:19
    1585:11
continued 1414:1
    1422:13 1499:4
    1536:13 1541:10
    1552:22 1554:15
    1557:16 1560:8
continues 1500:5
    1502:3
continuing 1502:11
    1581:3
contract 1512:4
    1513:19
contracts 1523:18
contradictions
    1582:10 1594:7
contradictory
    1433:11 1580:13
    1596:16
contrary 1462:11
    1582:6
control 1440:7
    1549:6
controlled 1456:9
convenience 1581:7
    1621:10
conventional
    1454:5
conversation
    1495:20 1549:22
    1549:22 1556:9
conversations
    1517:20 1526:13
    1526:13,22

1551:1
convey 1441:15
    1485:8
convince 1592:11
convincing 1570:7
    1572:10 1582:13
    1600:8
cope 1555:1
copies 1616:21
copy 1416:15
    1417:7 1423:10
    1423:12 1425:3
    1425:14 1466:2
    1617:1 1618:4
    1620:11,13
corporate 1523:15
correct 1427:15,16
    1428:17 1429:6
    1430:16,17,19,20
    1431:1,6,20
    1432:21,22
    1434:3,9 1444:7
    1448:14 1452:6
    1452:20 1456:14
    1468:10 1488:4
    1490:5,8 1491:3,8
    1492:2 1493:11
    1494:6 1495:15
    1495:16 1509:1
    1511:19,20
    1619:7
corrected 1473:15
correctly 1584:5
correspondence
    1495:8 1497:10
    1512:17 1514:20
corrupt 1557:22
    1558:3 1591:10
cosmetics 1598:19
cost 1468:21
couches 1585:4
council 1488:17
counsel 1416:16
    1417:16,21
    1418:8 1420:2
    1422:14,19
    1424:5 1427:1
    1499:5 1530:16
    1531:1 1532:2
    1539:16 1547:8,9
    1548:20 1552:4
    1553:11 1570:5
    1571:8,18
    1572:16,21
    1597:17 1600:10
    1601:18 1603:11

In Re: Larry Klayman
June 27, 2018

1605:4,18,20
1610:10 1612:7
1617:10,15
1618:3
**Counsel's** 1424:1
1427:14 1563:3
1563:15 1573:7
1581:9 1582:22
1590:10 1599:20
**count** 1449:9
1568:12,15
1576:12 1595:3
**counteroffer**
1504:12 1506:12
**country** 1473:21
1491:22 1593:1
1603:10 1621:14
**counts** 1573:13
**couple** 1450:13
1528:7
**Coupled** 1570:11
**course** 1434:5
1536:13 1555:13
1557:10 1577:8
1582:13 1587:6
1602:9 1610:19
**court** 1412:1 1413:5
1432:17 1496:14
1502:4 1506:1
1543:5 1552:13
1561:16 1562:9
1562:20 1565:8
1566:7 1567:19
1567:21 1568:14
1596:9,10
1601:14 1611:7
1611:20 1612:4
1612:11 1616:16
**court's** 1541:14
**courtesy** 1434:22
1444:10 1569:22
1618:15
**courthouse** 1418:19
1588:13 1589:2
**courtroom** 1611:18
**courts** 1568:1
1592:11
**cousin** 1459:4
1469:20 1585:18
**cover** 1416:12
1417:11,13
1425:9
**coverage** 1434:6
**covered** 1541:9
1594:15
**crashed** 1598:5

**create** 1562:17
**creating** 1562:17
**credibility** 1544:12
1563:5 1578:13
1582:8 1599:16
1599:19 1602:8
**credible** 1578:13
**credit** 1435:2
1451:3 1457:11
1583:14,18
**crime** 1582:20
**criminal** 1463:4
1620:22
**criticized** 1463:8
**criticizing** 1557:11
**cross** 1415:2 1562:2
**cross-examination**
1416:4 1419:10
1422:13 1499:4
1574:20
**crossing** 1566:17
**crucial** 1571:15
1581:10 1587:21
1599:11 1602:7
**crypto** 1523:16
**Cullum** 1537:3
1576:6
**cultural** 1555:12
**culture** 1548:4
**cum** 1521:20
1522:9,11
**curious** 1569:10
**currently** 1603:17
**cut** 1429:9
**cuts** 1535:13
1537:22

**D**

**D** 1415:1 1416:1
1424:7 1425:14
1425:19,20
1427:1,7,8
1587:17
**D.C** 1420:5 1577:3
**D26** 1426:1,4,9
**D28** 1427:8
**damage** 1507:11
1508:18
**damaged** 1552:5
**damages** 1508:3,8
1511:18,22
1513:16 1578:7
1581:15
**Danforth** 1551:21
1557:9
**dangerous** 1473:20

**dark** 1579:18,18
**darker** 1551:1
**darkness** 1550:5
**Dash** 1432:2 1475:1
1476:17 1507:4
1536:3 1560:20
1560:21 1574:16
1576:4
**date** 1542:3,7
1545:16 1608:7
**dated** 1416:10
1421:1 1422:18
1435:7 1453:10
1465:16 1467:3
1470:7 1472:20
1479:10 1483:17
1490:20 1495:8
1499:21 1509:13
1542:12 1545:15
**dates** 1422:9
**dating** 1524:3
**day** 1425:11,11
1458:13 1474:1
1491:17 1504:13
1504:18 1549:6
1549:20,21
1561:2 1572:8
1576:17 1594:11
1608:22 1609:5
1609:18
**daylight** 1447:13
**days** 1523:3 1544:3
1545:13,17,22
1607:3,7,8,9,10
1607:20 1608:6
1608:13,14,17,19
1609:17,20
1612:14
**DC** 1412:9 1413:2
1413:18 1564:20
1581:20
**dead** 1431:15,15
**deadline** 1541:19
**deal** 1476:14
1488:17 1497:5,6
1500:22 1501:1
1554:10,12,12,21
1565:20
**dealing** 1434:2
1476:18 1506:2
1560:21 1597:11
**dealt** 1434:8
1498:11
**dear** 1484:8,8,18,21
**death** 1532:10
**debate** 1613:6

**December** 1422:18
1424:5 1543:14
1553:3 1591:6
**decide** 1572:21
1605:2
**decided** 1551:7
1552:13 1555:22
1572:22 1588:12
**decision** 1541:15
1543:14 1545:15
1562:4 1586:22
1588:7,8 1611:11
1613:2 1616:3
**decision-making**
1543:12
**decisions** 1556:16
1587:15 1601:14
**declined** 1429:17
**deep** 1549:11
1579:6 1586:3
**deeply** 1454:1
1490:10 1582:17
1583:22 1585:10
1599:6
**defamation**
1618:11
**defendants** 1491:7
1507:19
**defended** 1620:21
**defending** 1604:5
**defense** 1491:5
**Defenses** 1424:8
**define** 1539:10
**defined** 1559:14
**defining** 1476:5
**definite** 1419:12
**definitely** 1527:21
**definitive** 1596:14
**degree** 1462:20
1521:18 1550:15
**deliberations**
1611:15
**delivering** 1531:1
**demanding** 1514:12
**demands** 1528:17
1528:17
**demonstrates**
1549:9
**demonstrative**
1533:16 1534:2
1535:6
**denial** 1543:16
1601:3,5
**denied** 1543:15
1545:3 1577:1
**deny** 1606:12

**depends** 1494:20
**depression** 1560:16
1563:21 1565:17
**describe** 1491:2
**described** 1501:8
1563:12
**deserved** 1537:7
**deserves** 1455:9
**desire** 1553:20
1556:21
**desires** 1556:20
**desperation**
1575:14
**despite** 1557:15,15
**destroy** 1464:6
**destroyed** 1537:4
1571:22
**destroying** 1599:15
1600:1
**detail** 1491:7
1562:10 1577:15
1577:16 1592:19
**detailed** 1562:14
**detector** 1432:10,13
**deteriorated** 1552:5
**determination**
1619:4,6
**detrimental**
1559:17
**devoid** 1540:12
**diamond** 1472:1
**Dick** 1573:4
**die** 1533:1
**died** 1479:21
1480:22 1481:19
1532:21 1601:11
**difference** 1512:17
**different** 1426:17
1458:17 1463:6
1497:16 1515:22
1528:20 1539:21
1540:1 1564:21
1591:18 1594:9
1615:14,17
1622:2
**differently** 1472:3
**differs** 1573:6
**difficult** 1445:22
1461:1 1492:14
1588:19
**difficulties** 1492:15
**difficulty** 1583:8
1614:18 1621:13
**diplomatically**
1577:11
**direct** 1415:2

In Re: Larry Klayman
June 27, 2018

1556:5 1617:7
**direction** 1492:18
**directly** 1527:1
1594:12
**director** 1551:21
**directors** 1536:20
**dirty** 1445:8 1583:1
**discharge** 1600:4
**disciplinary**
1413:18 1417:16
1417:21 1418:8
1420:2 1422:14
1423:22 1424:5
1427:14 1499:5
1547:8,9 1563:3
1563:14 1570:5
1571:18,19
1603:18 1605:3,4
1605:17,18,20
1610:21 1612:7,9
1612:17 1614:13
1616:4 1617:10
1617:15 1618:3
**discipline** 1571:21
1610:11 1612:10
1612:18 1613:14
1613:22 1614:7
1614:11,19
1615:13 1617:11
1617:16,20
**disciplined** 1599:5
**disclosed** 1539:4
1576:4,7,9
**disclosure** 1559:16
**discount** 1462:19
**discounts** 1468:21
**discovery** 1543:6
**discredited** 1574:2
**discreet** 1556:21
**discreetly** 1548:5
1555:12
**discriminated**
1447:1
**discrimination**
1518:6
**discuss** 1488:11,12
1524:9,16
**discussed** 1527:11
1527:12
**discussion** 1558:9
1558:10,16
**discussions** 1530:15
**dishonest** 1562:22
1568:3
**dishonesty** 1561:10
1561:13,14,14

1567:18 1590:6
1622:9,17
**dismiss** 1551:19
1557:17
**dismissal** 1542:2
**dismissed** 1428:3
1431:16 1541:15
1571:15,16
1601:16 1602:12
1604:8
**disparaged** 1456:19
**displays** 1534:5
**dispute** 1481:8
**disputing** 1421:3
**disqualified**
1588:10
**disrespect** 1575:14
**disrespectful**
1469:1
**distress** 1604:1
**District** 1412:1
1413:6 1559:11
1559:20 1561:16
**diva** 1501:5,7,8
**dive** 1444:13
**dizzy** 1474:2
**Docket** 1412:4
**doctor** 1597:13
**doctors** 1587:12
**document** 1416:8
1416:17 1417:16
1426:16 1428:12
1433:20 1436:13
1442:18 1448:10
1451:16 1453:9
1467:5 1472:22
1479:12 1486:21
1491:1 1495:6
1499:9 1500:1,11
1503:12 1508:12
1515:11 1615:15
1615:18 1617:19
**documentary**
1439:16,19
1440:8,10
1443:16,21
**documentation**
1431:13
**documents** 1573:19
1578:21 1601:2
1602:22 1613:19
1615:12
**doing** 1432:3
1433:19 1436:19
1441:19 1446:10
1454:17 1455:8

1455:20 1458:7
1486:22 1492:20
1500:19 1502:13
1509:22 1521:2
1535:1 1564:3
1576:15 1585:20
1592:5,6,9
1598:15 1599:7
1613:10 1621:15
**door** 1519:2
**doubt** 1468:11
1570:9
**Dr** 1433:22 1434:4
1434:5,11
1442:22 1443:2
1443:10 1453:11
1453:18 1455:15
1465:17 1466:3
1488:22 1512:19
**draft** 1429:3,8,14
1431:7 1603:3
**drain** 1466:22
1593:21
**draw** 1512:4
1513:19
**dress** 1532:15
**driving** 1469:7
**drop** 1544:7
1593:19
**due** 1582:8 1601:3
1601:5,21 1609:9
**dug** 1491:8
**duly** 1521:6
**duty** 1454:18
1505:18 1506:15
1594:1
**DX** 1470:3
**DX51** 1426:19
**DXD** 1426:9,19
**dying** 1532:9

_____

**E**

**E** 1412:5 1413:2
1414:10 1415:1
1416:1,1 1547:1,1
1587:17
**Eagles** 1580:5
**earlier** 1427:17
1428:4 1445:21
1543:12 1544:19
1553:21
**early** 1547:12
1596:5 1601:17
**editorializing**
1438:7
**educational**

1521:16
**effect** 1445:8
1470:22 1478:15
1482:6 1484:22
1517:4 1571:5
1573:19 1581:1
1587:3 1613:2
**effective** 1558:20
**effectively** 1512:12
**effort** 1506:22
1507:3 1509:19
**egregious** 1570:15
1622:17
**eight** 1421:16,21
1443:3 1447:19
1464:21 1466:7
1570:11,12
1592:15 1593:3,4
1601:1 1603:8
1604:6
**either** 1427:7
1429:1 1527:1
1563:6 1564:12
1572:4 1579:17
1590:17
**elaboration** 1620:8
**elbows** 1548:17
**Elham** 1435:2
1523:22 1547:12
**eligible** 1513:2
**Eliott** 1616:17
**Elizabeth** 1604:9
**Ellie** 1435:15
1436:15,22
1444:7 1453:19
1456:1,4 1457:17
1465:17 1467:4
1472:20 1484:8
1484:20 1488:20
1489:9 1599:1
**Ellie's** 1456:11
**else's** 1578:9
**email** 1414:8
1435:7 1441:4,6
1441:11,12,22
1442:2,5,21
1443:2 1453:2
1465:15 1466:2
1467:3 1470:7
1472:20 1479:10
1479:15 1483:17
1487:4 1496:7,10
1499:21 1500:2
1510:7 1512:5
1513:20 1533:18
1537:21 1542:12

1544:22,22
1549:21,21
1551:19 1557:10
1579:1,19
1593:12
**emails** 1473:11
1507:4 1549:8,10
1550:5,22
1552:20,22
1553:6 1554:15
1554:18
**embarrassing**
1559:17
**emotion** 1563:9
**emotional** 1455:14
1455:15 1456:7
1467:18,19,20,20
1511:10 1549:11
1554:1,22 1593:2
1593:6 1604:1
**emotionally**
1554:19
**emphasizing**
1566:6
**employed** 1598:15
**employee** 1534:17
**employees** 1578:17
**employment**
1522:14
**encouraged**
1551:14,15
**ended** 1505:2
1506:15 1510:13
1511:7 1512:12
1513:1,18 1565:3
1579:13 1581:2
**engage** 1553:15
1590:6
**England** 1580:7
**English** 1453:5
1534:6 1579:5
1581:22
**English-speaking**
1480:13
**enter** 1471:10
**entered** 1577:21
1621:16
**entire** 1454:10
1513:3 1532:14
1535:13 1536:20
1572:3
**entirely** 1540:17
**entitled** 1508:20
1509:14 1550:19
1556:19 1589:13
**entreaties** 1429:18

**equal** 1573:4
1590:15 1601:22
**equitable** 1502:17
1507:1 1570:18
**equity** 1572:12
1592:22
**equivalent** 1622:14
**erred** 1589:11
**errors** 1589:10
1592:19
**especially** 1501:14
1552:11 1562:18
1564:21
**ESQUIRE** 1413:11
1413:15,20
1414:3,10
**essentially** 1506:14
1510:5 1554:13
1557:20 1562:16
**establish** 1486:18
**established** 1509:4
**estimated** 1418:12
**et** 1557:14
**ethical** 1416:12
1417:7 1505:18
1572:22 1611:17
**ethically** 1591:9
**ethics** 1433:1
1584:15 1601:9
**evening** 1468:8
**event** 1468:16,17
1508:22 1543:18
1546:1 1550:10
1550:16 1592:5
**events** 1480:19
**everybody** 1457:2
1475:1 1531:5
1593:11
**Everybody's**
1460:16
**Everything's**
1555:16,17
**evidence** 1424:7
1432:18 1440:10
1491:7 1540:7,11
1545:14 1563:4
1568:20 1570:7
1571:10,17
1575:17 1598:13
1600:9 1617:10
1617:15
**evidencing** 1512:5
1513:19
**evidentiary**
1604:20 1622:21
**ex** 1458:19 1618:10

**exact** 1421:3 1422:9
1591:2
**exactly** 1417:8
1421:17 1458:22
1474:10 1490:5
1523:4 1529:8
1543:7 1556:13
1567:12 1576:5
1612:12
**examination**
1419:13 1426:6
1465:3,9 1485:18
1494:11 1498:13
1499:1 1519:9
1521:8 1531:18
1532:2 1541:8,10
**examine** 1562:2
**examined** 1521:6
**example** 1462:22
1564:9 1575:9
**examples** 1564:9
1575:10
**excess** 1508:8
**exclusive** 1566:8
**excruciating**
1562:10
**Excuse** 1424:19
1468:4
**excused** 1530:8,12
**executive** 1605:1,6
1617:9
**exhibit** 1417:3,6,12
1417:17,21
1420:2 1422:17
1422:20 1423:8
1423:21,21
1424:1,2,6 1425:1
1425:14 1427:1,1
1427:8,9 1433:4,6
1433:7,18 1435:1
1435:2,6,12
1437:8,9,10
1439:12,15
1442:17 1444:12
1444:15 1447:2
1448:22 1451:13
1453:3,7 1465:4,5
1465:15,18,21
1467:2 1468:3,5
1470:2 1472:19
1478:19 1481:15
1483:15 1485:9
1486:14 1490:19
1494:4 1495:3,4
1498:12 1499:8
1499:10,12

**1503:9** 1508:11
1509:13 1512:3
1514:18,18
1515:2 1517:2,6
1518:14 1532:5
1533:7,10 1536:3
1541:4,9 1579:3
1580:20 1581:8
1581:10 1597:11
1600:18 1618:3
**exhibited** 1435:3
**exhibits** 1417:10
1425:1 1485:21
1537:13 1553:2
1593:17
**exist** 1434:19
**exit** 1473:22 1474:4
**expect** 1444:9
1456:9 1457:13
1470:18 1558:19
**expectation**
1506:20
**expectations**
1453:21
**expected** 1436:20
1606:12
**expended** 1584:21
**expense** 1505:6
1514:4 1543:19
**expenses** 1528:22
1529:1 1576:16
1584:19
**experience** 1461:12
1507:22 1543:4
**experienced**
1549:15 1563:20
**experiencing**
1560:15
**expert** 1562:2
1574:1,1
**expertise** 1523:13
**experts** 1601:9
1603:1
**expire** 1594:5
**explain** 1449:5
1533:5
**explained** 1562:21
**explanation**
1556:12 1606:12
**explicitly** 1525:21
**express** 1481:6
**expressed** 1559:22
**expressing** 1549:11
**extension** 1607:16
**extent** 1446:3
1460:4 1503:2

**1507:11** 1539:20
1543:7
**extraordinarily**
1562:14
**extremely** 1463:19
1501:21
**eyes** 1481:9,10

**F**

**F** 1547:1 1611:18
1611:18
**face** 1475:13
1492:16
**facetious** 1596:20
**facility** 1587:9
**fact** 1432:12 1437:5
1444:20 1450:6
1452:8 1458:20
1471:15 1473:6
1475:7 1482:22
1485:2 1504:20
1505:11 1508:16
1537:20 1540:17
1544:3 1552:14
1560:15 1561:22
1562:11,11
1563:2 1564:11
1564:14 1571:8
1571:20 1573:2
1574:18 1576:4
1580:19 1585:9
1590:8 1593:13
1594:7 1598:13
1606:13,15
1617:7 1622:10
**facto** 1458:19
**factor** 1456:10
**factors** 1569:9
**facts** 1562:12
1563:11 1564:4
1575:12 1592:15
1603:21 1606:9
**factual** 1562:3
1567:16,18
1588:22 1589:10
1591:17 1592:18
1595:3
**Factually** 1589:15
**faculty** 1521:21
1522:11
**faded** 1601:2
**fail** 1479:5
**faint** 1474:3
**fair** 1434:12 1443:6
1451:18 1469:9
1473:2 1477:1

**1486:16** 1487:3
1493:14,21
1503:16 1564:7
1566:2 1567:1
1600:13
**fairly** 1530:2
**faith** 1480:16
1517:20 1518:11
**Falahati** 1433:9
1568:13 1577:4
1597:9
**fall** 1455:22
1456:18 1493:20
**falling** 1461:12
**falls** 1453:22
**false** 1429:21
1430:16 1496:15
1496:22 1562:22
1563:1 1582:10
1583:19 1594:6
**falsehood** 1506:1
**familiar** 1484:22
**family** 1452:17
1554:6
**far** 1569:15 1573:14
1575:10 1590:19
1593:2
**fast** 1555:20
**fault** 1459:11
1601:4,4
**favorable** 1440:8,22
1441:1
**fear** 1452:17
1550:11
**feasible** 1426:7
**February/March**
1549:2
**federal** 1463:11
1555:17 1591:10
**fee** 1502:14 1508:21
1509:3,11,16
1514:7 1539:8
1547:21 1548:2
1550:17 1576:13
1577:14
**feel** 1439:9 1446:7
1452:16 1456:4,5
1457:16 1458:11
1470:21 1480:5
1484:13,14
1517:8,10 1557:3
1585:19
**feeling** 1474:2
1484:12 1529:12
1586:4 1591:1
**feelings** 1518:5

In Re: Larry Klayman
June 27, 2018

fell 1457:17
fellow 1598:2
felt 1422:5 1436:7,8
  1437:3 1439:8
  1446:7 1489:17
  1515:14 1529:8
  1536:16 1537:6
  1539:16 1550:11
  1557:17 1561:7
  1583:21 1592:14
field 1491:18
Fifteen 1479:9
fifth 1503:14
fifty 1513:4,6
Fifty-one 1422:21
  1423:8,14
fight 1622:19
figure 1472:12
file 1423:17
  1431:13 1496:14
  1544:1,11
  1551:14 1556:2
  1606:20 1609:17
filed 1543:19,21,22
  1544:16 1545:10
  1565:8 1595:17
  1609:14,14
  1622:5,13
files 1553:4 1570:21
  1571:22 1572:1,4
  1593:18
filing 1565:18
filings 1565:9
final 1603:18
  1604:21 1610:22
  1611:10 1615:13
  1616:1 1617:20
finally 1541:16
  1561:10,13
finance 1522:21
  1523:15
financial 1584:10
  1585:2 1604:2
  1614:18 1621:12
financially 1621:15
find 1436:8 1461:18
  1475:8 1511:2
  1552:4,9 1563:11
  1563:13 1564:18
  1571:13 1577:8,9
  1579:8,21
  1580:14 1602:6
  1605:16,19
finding 1425:18
  1572:12 1603:18
  1603:19 1606:9

1611:9 1615:8
findings 1433:15
  1562:10 1606:13
  1606:15
finds 1605:2
fine 1430:11
  1475:17 1478:16
  1491:17 1493:3
  1517:7 1606:6,7
finish 1428:6
  1489:2 1497:19
  1502:6,8 1503:5
  1503:22 1507:7
  1591:20
finished 1613:15,16
  1613:17 1614:3
fire 1582:1
fired 1553:5 1557:6
  1577:5 1596:8,14
firm 1523:9,9
first 1416:5 1417:8
  1425:10,11
  1431:7 1442:20
  1463:7 1471:8
  1493:1 1497:19
  1518:13 1520:8
  1521:6 1571:13
  1580:5 1583:13
  1591:21 1602:15
fish 1548:15
fit 1570:13
Fitch 1413:11
  1416:2,17,22
  1417:9,14,18,20
  1418:2,5,9,15,20
  1419:5,8,15,18,21
  1420:21 1421:4,6
  1421:8,13
  1422:11 1423:1
  1423:13,16,22
  1424:13,21
  1426:8,15,19
  1427:3 1429:9,13
  1429:20 1430:1,4
  1430:9,12 1432:8
  1441:3,21 1442:4
  1442:9,14
  1445:10 1447:12
  1447:21 1448:4
  1449:5 1451:8
  1452:1,5 1459:12
  1459:16 1460:5
  1461:4,17,20,22
  1463:2,20
  1464:10,14,20
  1465:11,20,22

1469:12 1470:3
1473:12,15
1478:8 1479:1,5,8
1481:14 1482:15
1482:18 1483:6
1483:10,12
1485:15,17,22
1486:4,8,11
1487:2,12,21
1489:7 1492:5,8
1492:21 1493:5,9
1493:12 1494:6,8
1494:12,16,21
1496:9 1497:7,18
1498:14,21
1499:16 1500:2,5
1504:7 1506:13
1509:2,7 1510:6
1510:20 1513:17
1515:3 1516:7,11
1517:12 1518:1,8
1518:12,17
1519:6,12,15,19
1520:5,8,12,19
1522:1,6 1523:2
1525:8 1526:11
1526:16 1527:4,7
1528:8 1530:2,11
1530:14 1531:9
1531:14 1532:1
1533:11,17,20
1534:1 1538:8,14
1540:4,10,14,20
1540:22 1541:6
1542:10 1544:14
1544:20 1545:5,7
1545:11 1546:4,7
1547:4 1561:11
1563:16 1565:16
1566:1,5,11,17
1567:5,9 1568:5,8
1569:5,18 1570:2
1572:19 1575:6
1581:6,12
1590:18 1591:13
1592:1,3 1594:18
1594:22 1595:10
1595:13 1596:4
1596:11 1599:13
1599:17 1602:19
1603:2,6 1604:14
1604:16 1605:13
1606:8 1607:13
1607:17 1608:1,4
1608:9,16,22
1609:5,8,13,16,22

1610:5,8,14,19
1611:22 1614:2,9
1615:10,16,20
1616:3,6,13,18
1617:3,6,22
1618:13,18
1619:3,15,20
1620:6,13
1622:20
five 1523:7 1530:18
  1560:10 1573:21
  1573:22
flip 1445:1
Florida 1414:6
  1422:2 1425:2
  1431:16 1571:16
  1601:15 1614:13
  1616:12,16,16
  1620:18 1621:2
flying 1524:4
focus 1462:14
focused 1512:3
Foerster 1523:6
Foerster's 1523:18
followed 1605:14
following 1604:18
  1612:1
follows 1487:3
  1521:7
football 1580:4
footnote 1427:10
  1428:6,8,9,14
  1429:11 1430:2
forced 1581:19
forest 1435:16
forgotten 1443:14
form 1560:5
formed 1547:13
former 1615:3
forth 1441:10
  1509:12 1548:1
  1562:10 1563:14
  1601:7
fortunately 1572:20
forward 1441:7
  1503:18 1505:9
  1505:11 1510:9,9
  1510:15 1513:22
  1528:16,20
  1554:2 1570:14
foster 1434:13
  1473:4
found 1431:13
  1433:13 1453:20
  1469:20 1571:20
  1584:20

foundation 1527:8
founded 1457:20
  1523:17
four 1454:15
  1485:21 1522:19
  1571:10 1574:17
  1575:17
Fox 1480:15
fragile 1547:17
  1552:9
frankly 1528:3
  1535:1 1589:16
  1607:4
Frederick 1414:3,4
free 1455:20
  1469:18 1506:6
  1537:19 1585:17
Freedom 1420:15
  1457:22 1458:8
frequently 1460:12
  1524:4 1526:22
Friday 1523:8
friend 1435:22
  1437:17 1439:1,2
  1439:8 1441:17
  1449:9,12
  1450:17 1451:4
  1452:11,11
  1457:2,9 1460:20
  1462:15,15
  1474:12 1476:20
  1536:8 1537:2,22
  1551:12 1554:4
  1589:21
friends 1434:18,22
  1438:21,22
  1441:16,16
  1442:11,13
  1462:16 1463:19
  1471:19 1474:11
  1475:5,6 1477:8,8
  1477:11 1478:21
  1496:2 1526:20
  1527:3 1529:16
  1535:9 1554:6
  1582:18 1583:21
  1587:13
friendship 1437:22
  1441:7,12
  1449:10 1450:19
  1452:21 1457:3
  1494:3 1504:16
  1537:4 1586:3
friendships 1450:21
  1450:21 1451:11
front 1420:2 1425:8

1425:8 1452:17
1497:1 1508:10
1542:18 1586:14
1611:6
**frustrated** 1473:3
**fsujat@yahoo.com**
1414:8
**fulfill** 1458:14
**full** 1537:7
**fun** 1438:11
**function** 1455:18
**funny** 1481:11
**further** 1500:16
1528:4 1529:21
1538:7 1546:4
1568:6
**future** 1450:16
1480:16 1482:3
1492:19

**G**

**G** 1416:1
**gained** 1559:14
**gainfully** 1598:15
**game** 1552:11,11
1564:7 1580:4
**GAO** 1600:17
**gear** 1507:10
**geared** 1506:22
**general** 1461:11
1484:16
**generally** 1507:21
1516:17 1543:9
**Gentile** 1567:1
**genuine** 1563:9
**George** 1573:3
1590:16
**getting** 1455:3
1457:6 1473:2
1480:7 1489:19
1494:2,17 1506:3
1507:1 1544:8
1548:18 1551:11
1577:17 1578:11
1580:11 1593:14
1596:21
**ghetto** 1474:17
1475:19,20
**ghetto'** 1476:5
**ghetto,'** 1476:6
**girl** 1534:16,21
**girlfriend** 1452:19
1484:19
**gist** 1460:2
**give** 1417:22
1460:16 1462:22

1484:4 1485:13
1520:15 1532:10
1541:18 1588:21
1609:19 1620:11
**given** 1418:20
1425:4 1445:18
1452:15 1477:14
1477:15 1517:18
1521:1 1559:12
1564:6 1582:9,10
1616:22 1619:18
**giving** 1416:15
1477:22 1525:18
1590:7
**glad** 1450:9
1454:19 1455:6
1496:22 1596:13
**global** 1523:18
**Gloria** 1593:12
**go** 1418:13,13,18
1419:9,21
1422:11 1423:19
1424:13 1430:6
1430:12 1435:9
1436:17 1439:18
1440:5 1442:14
1443:15,19,22
1448:4 1451:2,4
1454:14,20
1455:2 1457:9
1463:2 1465:11
1466:21 1467:22
1469:12 1471:12
1471:16,16
1473:16 1478:12
1482:9 1486:11
1489:4,7 1491:6
1493:12 1496:14
1499:16 1503:18
1505:4,22 1510:3
1510:9,9,14
1513:21 1520:21
1528:8 1531:14
1534:1 1537:13
1537:15 1538:20
1540:14 1543:3
1551:16 1560:5
1568:9 1579:22
1581:19 1584:4
1590:18,21
1592:12,21
1593:21 1594:5
1595:10 1596:18
1600:2 1605:1,6
1606:3,5
**goal** 1510:3 1535:22

1537:11
**God** 1443:19
1458:5,8,11
1480:17 1490:2
**goes** 1421:21
1454:6 1465:3
1562:9
**going** 1416:8,14
1419:2,3 1433:2
1439:2,18 1440:9
1440:22 1444:11
1445:21 1446:15
1465:3 1466:14
1476:14 1480:2
1481:22 1483:1
1485:22 1486:1,6
1486:8 1492:17
1493:15 1494:21
1495:18 1503:18
1511:3,3 1513:13
1514:15 1518:3
1529:7 1530:17
1536:22 1543:2
1548:13,18
1550:17,20
1551:8 1554:16
1555:14,21
1557:18,21
1558:13 1562:15
1562:21 1564:8
1566:5 1569:1,4
1570:19 1571:3
1578:22 1579:9
1580:14 1583:17
1584:4 1585:2
1602:20 1610:22
1611:9 1614:5,20
1621:12
**good** 1416:2
1426:13 1433:3
1439:20 1446:7
1459:2 1463:5
1474:16 1477:5
1478:14,14
1480:11 1482:13
1491:15 1517:11
1537:15 1539:18
1545:21 1547:11
1556:1,2 1575:22
1588:11 1603:16
**Gordon** 1522:20
**gotten** 1473:11,17
1474:12 1585:19
**government**
1463:11 1480:10
1544:3 1558:22

1574:10 1578:16
1600:17
**governors** 1507:14
1507:20 1536:8
1536:21 1537:10
1556:3 1568:17
**grabbed** 1446:1
**grace** 1458:8
**graduated** 1521:20
1521:22 1522:8
1522:11
**grand** 1555:17
**grandmother**
1532:9,21 1533:4
**grandmother's**
1532:12,19
**grant** 1562:4
1586:22
**granted** 1587:2
**grateful** 1535:16
**gravity** 1589:19
**great** 1459:5 1480:9
1482:10,16
1575:17 1577:15
1577:16
**greater** 1543:6
**grew** 1551:1
**ground** 1553:21
1555:4
**group** 1420:15
1523:18
**guess** 1430:7
1447:15 1528:17
1542:18 1566:11
1567:13 1607:11
**guy** 1555:4,5,6
1590:15
**guys** 1476:8

**H**

**H** 1413:20
**h-e-l-l** 1483:3
**half** 1591:21
**half-hour** 1531:2
**Hamilton** 1522:20
**hand** 1446:1 1583:5
**handle** 1554:3
1557:17 1594:19
**handled** 1548:5
1555:11,14
1601:6
**handwriting**
1427:19 1571:1
**hang** 1477:6 1478:1
1516:17
**hanging** 1518:16

**happen** 1419:9
1456:17
**happened** 1445:2
1468:14,15
1576:5 1603:22
1614:15
**happening** 1529:10
1551:9
**happens** 1456:8
1460:11
**happy** 1517:7
1558:8 1606:4
**harassed** 1433:9
1560:17
**harasser** 1555:9
1587:10,10
**harassment** 1432:1
1432:20 1434:3,9
1460:13 1488:15
1491:13 1534:17
1547:16 1549:16
1549:19 1551:10
1552:21 1555:8
1573:18
**hard** 1421:17
1439:3 1445:14
1446:18 1449:16
1449:17 1450:5
1536:7 1538:1
1552:9 1584:1
1593:7 1600:20
**harder** 1437:2
1446:16 1585:10
**harm** 1444:3
1587:8
**harmed** 1476:9
**harsher** 1550:18
**Haskell** 1473:22
1474:4
**Hastings** 1523:1
**hat** 1597:6
**hate** 1538:20
**hawking** 1559:4
**head** 1455:4
1563:18,22
1565:10 1581:7
**health** 1439:5
1598:21
**hear** 1463:16
1572:14 1580:17
1595:4,6 1615:11
**heard** 1432:1
1440:1 1459:1
1468:7 1476:16
1528:9 1539:9
1549:4 1563:4

1571:9,11
1578:12 1580:18
1583:10,11
1587:1 1594:11
1595:1,5
**hearing** 1412:11
1413:1,3,10
1423:9 1519:18
1522:2 1530:16
1535:5 1541:11
1547:2 1549:5
1554:20 1587:1,2
1596:15 1604:20
1604:21,21,22
1605:14 1612:6
1616:7 1617:8,9
1617:14,22
1620:2 1623:1
**heart** 1435:20
1454:22 1457:12
1458:1 1514:4
1538:1 1591:6
**heaven** 1480:2
**held** 1559:15
1561:17 1593:8
**help** 1434:7 1436:4
1437:3 1446:2,5,7
1450:17 1451:4
1456:1 1457:17
1458:6 1474:5,7
1477:18 1480:7
1480:11,19
1482:11 1487:16
1488:15 1489:12
1489:15 1495:18
1495:19 1496:18
1501:20 1506:8
1534:18,19
1567:21 1576:6
1581:3 1599:8
**helped** 1436:15
1475:7
**helpful** 1488:19
1489:20
**helping** 1435:22
1469:19 1510:2
1530:6
**heritage** 1534:11
**Herman** 1604:10
**Hermes** 1598:19
**Hey** 1554:9 1559:22
**hi** 1527:2
**high** 1570:9
**higher** 1567:20
**highlight** 1534:12
**highlighted**

1515:21
**Hill** 1536:9
**Hillary** 1537:2
1548:16 1556:4
1590:8
**Hills** 1444:22
1468:9
**hinges** 1603:20
**hire** 1480:15 1506:7
1552:3
**hiring** 1549:18
1603:1
**history** 1522:15
**hit** 1455:3
**Hoc** 1413:3,10
**hold** 1564:8
1570:20 1574:14
1575:16 1583:5
**holds** 1567:20
**Hollywood** 1414:6
**home** 1422:2
1469:7 1532:13
**honest** 1462:4,5,6
1561:18,19
1566:1 1600:13
**honesty** 1496:1
**honor** 1418:4
1422:10 1426:3
1426:11 1435:19
1438:7 1440:16
1463:1 1467:9
1485:12 1489:6
1494:14 1499:15
1504:4 1517:22
1531:22 1538:13
1546:6 1594:16
1596:12 1606:6,7
1609:12 1610:3
1616:10 1618:7
1620:10,17
**honored** 1607:5
**Honors** 1546:9
1569:22 1570:4
1574:21 1601:5
**hoped** 1589:18
**hopefully** 1480:2
1483:1 1486:3
**hoping** 1488:16
1489:12 1580:17
1590:1
**Hopper** 1471:21
**hotel** 1467:8,8
1468:9 1550:12
**hour** 1538:10,11
**house** 1524:7
1526:21 1592:7

**Hum** 1620:18
**human** 1444:19
1455:1 1598:3
**humor** 1479:22,22
1483:7 1516:21
**humorous** 1482:8
1596:20
**hundred** 1432:16
1513:4,6
**hurts** 1476:1
**Hyatt** 1585:3

_____

**I**

**idea** 1439:21 1556:1
1556:2
**identified** 1427:18
**identify** 1461:10
1571:1
**III** 1413:20
**illegal** 1620:20
**imagine** 1449:4
**imagines** 1431:3
**imagining** 1431:2
**immediately** 1445:1
1601:17 1617:8
1617:14
**immigrants**
1620:20
**impact** 1574:12
**impliedly** 1587:22
1588:1
**importance**
1452:22
**important** 1443:13
1584:12 1589:8
1591:4 1602:4
**importantly** 1454:2
**impression** 1527:16
**improperly**
1563:19
**improve** 1496:1
**in-person** 1526:19
**inability** 1434:13
**inadvertently**
1431:11
**inappropriate**
1517:18 1518:21
1519:1 1560:11
1611:12 1614:21
**inaudible** 1449:18
**incidents** 1550:3
**inclined** 1606:3,5
**included** 1416:13
1565:7
**includes** 1441:11
**including** 1536:10

1536:11,11
1556:3 1575:18
1611:20 1622:10
**incomplete** 1612:8
1612:16
**inconsistencies**
1594:6
**incorrect** 1493:17
**independently**
1529:4
**index** 1425:8
**indicate** 1441:9
**indicating** 1495:22
**individual** 1578:14
**induced** 1532:9
**indulge** 1463:1
**inequity** 1572:3
**influence** 1574:9
1575:2 1588:18
**influences** 1574:10
1574:10
**inform** 1479:20
**information** 1419:9
1461:5 1559:14
1610:10 1612:16
**informed** 1560:3
**initial** 1427:18,21
1475:8 1570:22
**initially** 1522:18
**injunctive** 1552:15
1562:4,19,20
**injured** 1598:4
**inquire** 1465:4
**inquiry** 1427:14
**inserting** 1554:4
**inside** 1555:9
**inspiration** 1484:3
**inspired** 1484:2
1495:21
**instance** 1435:1
1463:1 1488:21
1489:18 1518:13
**instances** 1564:1
**instruct** 1617:7
**instructed** 1551:22
1579:17
**instructions**
1605:15
**insulted** 1476:12
1515:15
**insulting** 1474:20
1474:21 1501:21
**insurance** 1598:21
**intend** 1576:15
**intended** 1502:15
1502:16 1575:15

1611:13
**intending** 1543:2
1576:14
**intent** 1493:22
**interacting** 1527:17
**interaction** 1494:2
1533:15
**interest** 1505:12
1506:15 1553:15
1553:16,17,19
1579:8 1584:17
1585:7 1588:18
**interested** 1525:16
**interests** 1539:11
1584:9,11
1594:10 1600:15
**interfering** 1504:21
**interim** 1536:16
**interlocutory**
1543:13 1613:2
**internet** 1574:6
**interpretation**
1590:8
**interrupted** 1489:5
**interruption**
1498:15
**intersection**
1473:21
**intervene** 1488:22
**intervened** 1459:4
**intervention**
1549:13
**interview** 1506:6
**interviewing**
1433:14
**interviews** 1558:16
**introduce** 1416:9
1469:4 1611:9
**introduced** 1463:10
**investigation**
1416:11 1417:5
**investigator** 1574:3
**inviolate** 1559:16
**involved** 1477:22
1539:12
**involving** 1557:21
**Iran** 1443:21
**ironic** 1549:17
1584:2
**irrelevant** 1443:12
**irresponsible**
1568:3
**issue** 1468:19
1524:9,16 1535:6
1550:17 1552:14
1572:15 1577:14

1581:4 1586:7
1596:13 1610:4,7
1610:9,12,14
1612:2
**issued** 1615:19
**issues** 1434:2,8
1488:18 1555:1
1555:12 1593:6
1611:5
**issuing** 1561:21

_____

**J**

**J** 1414:3,4
**J-o-s-h-u-a** 1520:10
**January** 1416:10
1417:4 1421:8,14
1544:16 1545:10
1579:19 1580:16
1581:8
**Jesus** 1613:13
**Jewish** 1475:19
1515:16,21
1516:16,22
1517:19 1518:11
1518:16,22
1534:8,10,12
**Jewish-Christian**
1475:20
**job** 1459:5 1480:8
1488:15 1547:18
1549:16 1564:15
1575:3
**jobs** 1459:2,3
**jog** 1503:3,6
**John** 1484:21
**joke** 1467:11,12,13
1468:1 1534:9
**joked** 1550:13
**joking** 1479:21
1482:21 1516:19
**Joshua** 1415:4
1519:17 1520:4,7
1521:4,11
**judge** 1492:14
1542:1 1543:11
1543:22 1545:3
1557:21,22
1558:1,1,2
1561:21 1562:4
1563:1 1567:15
1586:9,11,12,19
1586:21 1587:1
1588:6,9,13
1589:10 1590:22
1591:10,16
1592:13

**judgemental**
1461:1
**judgements**
1612:22
**judges** 1462:8
**judging** 1599:22
**judgment** 1553:16
1584:7 1586:1,5
1616:15
**Judicial** 1457:21
1611:1
**July** 1495:8 1496:7
1545:6 1551:18
1551:18 1552:8
1552:19 1557:5
1560:6 1562:8
1564:22 1565:1
1579:3 1596:3,4
1608:15
**jump** 1550:11
1570:10
**jumped** 1621:6
**jumping** 1620:19
**June** 1412:8 1470:7
1472:21 1479:10
1483:18 1490:21
1553:22 1562:7
1609:22
**jurisdiction**
1416:20
**jurisdictions**
1559:11 1571:19
**justice** 1567:22

_____

**K**

**karma** 1515:18
**Kasanji** 1475:7
**Kathleen** 1469:19
1495:14,16,21
1496:8,19
1505:21 1544:10
1551:4 1585:17
**Kaveh** 1435:22
1451:4 1454:16
1454:16 1455:10
1477:4,6 1478:16
1491:16
**keep** 1419:1,11
1443:17 1485:22
1486:1 1556:21
1556:21 1557:19
1567:4 1572:4
1620:7
**keeping** 1572:1
**kettle** 1455:5
**key** 1473:8 1556:22

**Keya** 1507:4 1576:4
**keys** 1470:17,18
1471:14
**kill** 1481:22
1581:20 1598:11
**Kim** 1412:22
1413:4
**kin** 1532:18
**kind** 1438:8 1446:4
1446:6 1454:12
1462:20 1482:1
1484:22 1505:4
1511:5 1514:6
1520:21 1528:2
1529:4 1534:13
1535:13 1537:22
1549:17 1556:9
1560:12 1561:5
1582:21 1584:3
1586:8 1616:19
1616:20
**kindness** 1449:16
**kinds** 1469:14
1477:5 1558:18
1560:17 1616:14
**kissed** 1430:21
1583:4
**Klayman** 1412:5
1414:10 1415:3,4
1415:8 1416:4,18
1417:4,19 1418:4
1418:9,10,10,17
1419:3,6,18,20,22
1420:3 1422:16
1422:18 1423:18
1425:5,13
1429:11 1435:8
1435:11 1445:12
1453:6,11
1465:17 1467:4,9
1470:7 1472:20
1478:12 1479:11
1479:21 1481:16
1483:18,20
1487:6 1490:21
1492:21 1493:1
1495:9 1496:8
1499:22 1500:9
1514:1,21 1515:9
1518:14 1519:10
1519:13,17
1520:2,4,7 1521:4
1521:9,11,12
1522:13 1525:9
1525:14 1526:14
1527:5,6,9 1528:4

1528:11 1529:1
1529:12,21
1531:17 1532:4
1533:6,7,14,18
1535:19 1538:6
1538:12 1539:14
1539:15,22
1540:11,19
1541:3,7,10,12
1542:11 1546:9
1547:14,20
1548:3,9 1549:3,6
1549:8,18,20
1551:3,17,22
1552:7,22
1553:13 1555:3
1555:14,15,22
1556:9 1557:2,5
1558:11 1559:5
1559:22 1560:7
1561:7,20 1562:2
1562:12 1563:13
1565:2 1567:17
1568:10 1569:2
1569:20,21
1571:3 1574:17
1575:8 1576:7
1581:9,13
1583:11 1589:5
1591:11,16,19
1592:2,4 1594:21
1595:9,11,16
1596:11,12
1599:4,16 1600:3
1602:22 1603:4,6
1603:7 1604:17
1606:6 1609:11
1609:15 1610:3,6
1610:12,15,20
1613:7,15 1614:3
1614:12 1615:18
1616:9,17 1618:4
1618:7,14,20
1619:7,12 1620:5
1620:10,15
**Klayman's** 1498:16
1509:12 1548:14
1548:19 1554:15
1563:1 1579:20
1591:3 1598:11
**knew** 1462:8
1534:22 1588:3,4
1588:6 1611:3
**know** 1418:19
1421:4,6,16
1422:6 1428:6

1429:7 1432:3
1434:21 1437:3
1438:19 1439:7,9
1440:11,13,20,21
1441:18 1443:3
1443:11 1444:21
1445:12,13
1447:5,8,19
1449:22 1452:15
1453:1 1460:20
1461:17 1462:3
1463:17 1466:21
1467:18 1469:7
1471:15,17
1472:2 1474:7,12
1475:9,15
1477:19 1478:8
1481:4,13
1482:12,20
1483:4 1485:4,5
1487:9,17
1488:17 1489:10
1489:10 1490:9
1490:10 1492:18
1497:22 1498:6
1501:1 1508:9,13
1512:6 1513:21
1515:16 1516:2
1516:16 1517:8
1517:14,15,16
1521:2 1524:20
1525:18,22
1528:15 1529:4,6
1529:9,10 1534:9
1534:19 1535:5
1537:17 1548:6
1552:9,13
1557:18,20
1559:7 1561:2
1563:7,7 1564:3,6
1564:15 1565:3
1565:11 1566:18
1569:6 1570:4
1574:9,11 1580:4
1580:13 1589:16
1591:8 1593:10
1593:20 1594:10
1597:10,12,16
1599:14 1602:20
1604:2 1607:4
1611:2,3 1613:13
1614:22 1615:8
1619:8 1622:16
**knowing** 1417:8
1459:21 1460:7
1461:6 1462:1

1496:2 1586:20
**knowledge** 1459:21
  1560:22
**knows** 1475:1,2
  1544:6
**Kollar-Kotelly**
  1591:10
**Kotelly** 1492:15
  1544:1 1545:3
  1567:16 1586:9
  1586:11,15
  1588:4 1589:10
  1591:16
**Kotelly's** 1542:2
  1543:12 1591:1

**L**

**LA** 1475:6 1491:18
  1496:14 1505:22
  1507:1,9 1536:5
  1543:16 1552:16
  1556:1 1578:3
  1582:3
**Labor** 1609:5,17
**lack** 1434:16
  1451:19 1473:3
  1486:17 1487:5
  1490:10 1512:13
**laid** 1553:1
**language** 1512:4
**Larkin** 1413:13
  1436:11,17
  1482:19 1483:4
  1512:22 1513:6
  1533:10 1570:2
  1572:20
**Larry** 1412:5
  1414:10 1415:3
  1465:17 1467:4
  1472:8,10,20
  1492:1 1496:8
  1504:2 1526:19
  1527:1 1539:22
  1548:14,19
  1551:16,22
  1555:14 1589:5
  1599:4 1616:17
  1622:11
**Las** 1463:4
**late** 1471:9 1547:12
  1549:2 1593:17
  1596:4 1609:14
  1614:16
**laude** 1521:20
  1522:9,11
**launched** 1523:8

**law** 1414:4 1433:2
  1435:5 1481:16
  1508:16 1521:20
  1521:21,22
  1522:10,10,12,15
  1522:18 1523:9
  1548:10,11,11
  1552:14 1557:2
  1561:22 1563:2
  1565:19 1572:11
  1572:17,18
  1573:8,10 1581:5
  1584:15 1600:11
  1600:12 1603:21
**lawsuit** 1504:19
  1556:3 1565:18
  1589:5,6
**lawyer** 1436:8
  1446:11,18
  1452:8 1455:16
  1457:8 1469:19
  1469:21 1481:5
  1506:7 1511:2
  1535:13 1537:17
  1537:19 1552:3
  1553:5,15
  1554:11 1555:4
  1556:15,19
  1557:1 1558:21
  1559:13 1561:9
  1572:20 1585:19
  1587:15,20,21
  1596:7 1600:20
  1621:4,5,11
  1622:10,13
**lawyer's** 1556:19
  1584:6,9,10
  1600:4
**lawyers** 1463:16
  1466:15 1562:1
  1588:22 1601:10
  1601:20
**layperson** 1561:19
**leading** 1525:4,7,12
**lean** 1449:11 1520:5
**learned** 1474:1
**leave** 1419:6
  1553:10 1598:4
  1608:6 1611:18
**left** 1463:11 1474:9
  1522:22,22
  1523:6,8
**leftist** 1591:9
**legal** 1436:6 1462:7
  1501:2 1510:7
  1523:12 1562:3

1562:14 1567:16
  1567:17 1568:2
  1588:22 1591:16
  1592:20 1594:2
  1597:20 1598:7
  1606:10
**legally** 1587:19
  1589:11,15
**legitimate** 1509:9
  1612:2
**length** 1458:4
  1491:10 1606:1
  1608:9
**leper** 1470:21
  1487:15
**let's** 1439:11
  1444:15 1472:18
  1476:2 1477:3
  1485:22 1488:10
  1503:4,8 1509:8
  1519:12 1541:6
  1560:1,2 1573:13
  1575:21 1576:12
  1580:5 1608:6
**letter** 1416:9,10,12
  1417:4,11,13
  1421:1 1422:18
  1424:4 1428:10
  1434:11 1437:15
  1438:10,13,14
  1443:5 1444:5
  1445:17 1447:3
  1448:3,7,8,11,17
  1450:10 1451:18
  1453:10,16
  1456:15 1459:22
  1465:16 1466:3,4
  1468:6 1476:3
  1482:20 1483:17
  1488:11 1490:1
  1490:20 1491:2,9
  1492:12,13
  1493:2,10
  1495:22 1496:4
  1497:1,14 1498:8
  1500:13 1504:13
  1509:12 1510:12
  1510:14,16
  1551:20 1557:9
  1571:2
**letters** 1460:9
  1461:7 1462:2
  1495:12 1512:19
  1582:5 1593:14
  1594:8
**letting** 1466:21

1605:9
**leverage** 1522:21
**leveraging** 1523:14
**licensed** 1601:15
**lie** 1432:10,13
**life** 1420:12
  1439:10 1445:19
  1445:22 1456:17
  1458:21 1459:10
  1480:6 1481:1
  1482:10 1492:17
  1498:7 1532:14
  1537:16 1554:5
  1598:10,21
  1599:2,15 1600:1
**life's** 1593:11
**lift** 1456:1
**liked** 1426:12
  1529:15
**likelihood** 1419:12
**liking** 1528:2
**limit** 1606:4
**limited** 1564:19
  1606:18
**line** 1447:20
  1500:14 1503:14
  1519:3 1589:17
  1599:7 1600:7
  1603:8 1604:7
**lines** 1530:2
  1568:17
**lips** 1430:22
**list** 1540:1
**listening** 1433:10
**listing** 1437:15
**literally** 1514:2
**literature** 1613:1
**litigates** 1555:16
**litigating** 1513:12
**litigation** 1432:11
  1535:20 1536:17
  1552:12 1592:6
**litigations** 1524:20
**litigator** 1524:19
**little** 1455:19
  1480:12 1494:17
  1529:9 1534:16
  1534:21 1550:18
  1564:21 1585:3
  1594:4 1595:14
  1605:7 1607:4
**live** 1451:2 1491:16
  1574:8,11 1603:9
**lived** 1524:6
**living** 1471:19
  1478:5 1604:4

**lobbying** 1536:9
**located** 1420:19
**long** 1419:10
  1421:13,14
  1455:1 1490:3,11
  1530:2,4,5 1564:5
  1606:21
**longer** 1539:16
  1560:7 1596:3
  1621:21
**look** 1422:16
  1425:5,8 1427:8,9
  1427:10 1428:5
  1433:4,17
  1439:11 1442:16
  1442:21 1444:15
  1447:4,8 1448:6
  1448:21 1451:13
  1453:6 1465:14
  1467:1 1470:1
  1472:18 1476:2
  1477:3 1478:18
  1480:16 1483:14
  1485:9 1486:13
  1488:10 1490:19
  1494:4 1495:3
  1499:7 1500:8
  1503:4,8 1507:8
  1508:11 1514:17
  1517:5 1545:13
  1551:21 1553:5
  1559:22 1560:13
  1565:21 1592:19
  1598:2 1612:21
**looked** 1439:16
  1443:1
**looking** 1424:22
  1425:4 1427:6,7
  1435:12 1469:3
  1502:17
**looks** 1528:15
  1616:18
**loosely** 1517:19
  1518:11
**Los** 1473:19
  1502:18 1513:14
  1514:14 1524:3,5
  1535:22 1576:21
  1577:7
**lose** 1505:19
  1541:19 1580:1,2
  1580:9
**loss** 1604:2
**lost** 1552:12 1580:2
  1601:2
**lot** 1422:1 1433:14

In Re: Larry Klayman
June 27, 2018

1440:12 1457:7
1462:19 1463:8
1463:18 1464:1,4
1464:4,16
1468:20 1480:5
1484:5,6 1489:9
1507:21 1508:4
1511:12 1514:11
1529:15,19,20
1539:17 1548:5
1555:2 1560:1
1573:6 1599:1
1604:1,2 1613:5
1622:9
**love** 1436:15,22
1437:1,1,5 1439:8
1439:9 1444:7,9
1445:13 1446:9
1453:22 1455:22
1456:2,2,6,10,11
1456:17,18
1457:17 1458:18
1466:9,11 1475:3
1475:4 1481:6
1485:2 1490:2
1492:11 1493:10
1493:16,20
1497:10,13,21
1529:13,14,17
1549:12 1550:1,2
1550:7,17
1583:22
**loved** 1436:22
1444:21
**loves** 1453:20
1454:1 1476:22
**loving** 1445:7,18
1553:20 1582:21
**low** 1452:9 1556:22
1582:9 1615:1,6
1618:16,16
**lower** 1541:14
1583:17
**luck** 1474:17
**lunch** 1530:20,21
1538:9
**luncheon** 1546:10
**lure** 1502:11
**Luxe** 1467:8,8
1550:12
**lying** 1431:20
1438:16

―――――――――

**M**

**M** 1412:22 1413:4
**mad** 1438:18

**major** 1480:13
**making** 1470:21
1501:22 1506:20
1598:20 1620:19
**man** 1454:22
**man's** 1520:11
**manager** 1471:21
**manufacturer**
1575:15
**March** 1545:15
1549:9 1552:7
**marginally** 1459:13
**Mark** 1475:14
**marked** 1618:3
**marriages** 1620:20
**MARY** 1413:13
**masochist** 1484:10
**mat** 1578:18
**match** 1575:11
**material** 1615:22
1619:22
**matter** 1412:4
1416:11 1428:2
1431:14 1441:10
1441:22 1442:6
1447:22 1448:2
1503:18 1508:6
1520:15 1540:17
1556:21,22
1559:8 1565:13
1570:15 1572:11
1572:12,14
1574:2 1596:8,10
1601:6 1614:17
1622:17
**matters** 1416:5
1511:15 1523:17
1547:6 1555:16
1560:8 1566:4
1620:1,2 1622:21
**mattes** 1530:7
**matured** 1622:4
**McCain** 1536:11
**mean** 1421:1
1431:17 1432:16
1435:17 1440:9
1441:14 1443:19
1449:16 1458:2
1462:10 1463:10
1480:8 1488:21
1501:19 1505:3
1514:2 1524:18
1526:20 1528:1
1528:13 1529:19
1533:14 1541:17
1552:4 1554:15

1557:13,14
1566:8 1567:6
1572:6 1574:1
1580:6 1590:9
1593:6 1597:13
1598:2
**meaning** 1445:19
**meaningless**
1501:14
**meanings** 1456:7
**means** 1441:8,13
1442:6 1483:3,4
1548:16,17
1587:18
**meant** 1435:18
1437:17 1457:17
1458:15 1462:9
1514:3 1535:3
1548:13
**media** 1440:12
1444:3 1553:7
1567:8 1588:15
**mediator** 1621:19
**medicine** 1456:12
**meet** 1468:17
1480:19
**meeting** 1524:8
**meetings** 1467:10
**meets** 1453:20
**Meghan** 1414:13
1607:19 1611:20
**member** 1413:14,16
1603:16
**members** 1541:11
1561:18
**memorandum**
1562:6,7,8
**Memories** 1601:1
**memory** 1567:14
**mental** 1433:9
1501:13 1502:1,3
**mentality** 1501:5,7
1501:9
**mention** 1439:15
1564:12
**mentioned** 1526:3
1618:11
**merits** 1537:6
**message** 1474:9
1549:21,22
1557:7 1598:4
**met** 1457:15 1463:7
1471:18,18
1523:22 1524:7
1524:11,12
1527:10 1547:14

**metal** 1502:2
**Miami** 1621:8
**MICHAEL**
1413:15
**microphone** 1520:6
**microphones**
1520:20
**middle** 1611:17
**military** 1460:14
**million** 1513:3,5,7
1560:10
**mind** 1419:11
1425:19 1426:5
1438:20 1450:16
1501:13,20
1516:2 1566:18
1567:4 1620:7
**mine** 1439:21
1447:10,11,14,18
1515:4
**minimal** 1457:1
**minimum** 1464:9
**minute** 1418:5
1423:13 1492:8
1492:22 1507:7
1509:7 1518:1,2,2
1530:22 1540:4
1541:2 1563:17
1572:5 1615:11
1617:4
**minutes** 1485:15,16
1494:22 1498:19
1530:17,18
1531:12 1538:9
1538:11
**miscalculated**
1545:18 1546:1
**mischaracterizing**
1438:15 1451:22
**misconduct** 1614:1
1614:8
**misplaced** 1601:2
1607:19 1620:12
**missed** 1520:8
1561:11 1586:20
1595:5
**missing** 1448:2
**mistakes** 1458:10
**mitigating** 1622:9
**mitigation** 1620:3
**Mm-hmm** 1519:15
1522:6 1618:13
**molehill** 1556:7
**mom** 1471:18
**moment** 1449:19
**moments** 1505:21

**Monday** 1609:6,9
**money** 1436:15,19
1439:4 1468:20
1502:19,20
1506:21 1507:16
1510:2 1513:8
1514:10 1532:10
1532:12,12,19
1537:12,12
1585:3
**money's** 1468:19
**months** 1544:21
1545:16
**morning** 1460:2
1573:16 1577:16
1582:20
**Morrison** 1523:6,17
**mother** 1532:6,8,18
**motion** 1543:15
1545:4 1589:9
1595:17 1614:5
**motions** 1607:16
**motivation** 1507:15
1586:8
**motive** 1603:8
**mountain** 1556:7
**mouth** 1498:10
**move** 1466:14
1469:16 1478:6
1479:1 1481:5,13
1485:4 1490:14
1506:5,9 1556:1
1583:9 1586:19
1587:10 1588:19
1622:18
**moved** 1555:20,21
1570:16
**moves** 1550:5
**movie** 1550:10
**MovieGuide**
1468:16,18
1480:20
**moving** 1422:1
1584:19 1601:22
1622:1
**multiple** 1524:12
1527:21
**mumbling** 1615:16
**murky** 1440:18
1595:12
**mutual** 1536:8

―――――――――

**N**

**N** 1415:1 1416:1
1547:1,1,1
**nail** 1539:18

**naked** 1471:21
**name** 1520:3,9,11
  1521:10,11
  1536:19 1547:18
  1548:18
**named** 1536:19
  1537:3 1590:8
  1620:18
**names** 1506:5,6
  1548:15 1599:8
**naming** 1548:15,15
  1556:3
**Natalia** 1620:18
**nature** 1477:17
  1548:6
**NBC** 1480:14
**near** 1474:4
**near-fatal** 1473:18
  1598:1
**necessarily** 1595:1
**necessary** 1511:19
**need** 1418:18
  1437:3 1440:11
  1463:16 1481:13
  1520:13 1531:19
  1537:16 1545:14
  1569:14 1579:21
  1583:16 1587:12
  1605:22
**needed** 1422:4,5
  1436:8 1495:22
  1547:17 1551:8
**needing** 1501:20
**needs** 1455:16
**negative** 1417:6
  1456:20 1475:21
  1597:14
**negatively** 1460:17
**negotiated** 1621:5
**negotiations** 1514:9
**neither** 1497:9
  1597:17
**nemesis** 1556:6
**nervous** 1577:1
**networks** 1480:14
**Nevada** 1463:4
**never** 1423:6
  1429:1 1430:21
  1436:20 1443:7
  1445:2,12,14
  1446:17 1453:20
  1467:16 1470:18
  1471:12 1496:14
  1502:9,9,13,15,16
  1502:22 1504:15
  1504:17,22

1505:3,11,22,22
1509:16,20
1511:6 1512:8,11
1512:20 1514:5,9
1520:22 1534:9
1544:10 1571:7
1573:18 1574:7
1575:16 1576:14
1576:18,19
1577:21 1580:18
1581:2,2,14
1583:3,4,4,5
1584:13 1594:11
1596:13 1597:20
1600:4,20 1602:5
1607:17
**new** 1418:11 1420:6
  1422:20 1463:9
  1463:13 1494:15
  1522:21 1524:5
  1552:4 1580:7
  1598:20
**News** 1581:21
**newspaper** 1548:18
  1566:22 1567:5
**nice** 1479:19
**nicely** 1588:20
**night** 1464:7 1555:7
**Nightline** 1558:18
**nightmare** 1613:5
**nine** 1498:19
  1544:20
**NITV** 1476:17
**nobody's** 1564:16
  1564:17
**nodding** 1426:1
  1531:9
**non-effect** 1613:2
**non-final** 1612:17
**non-meritorious**
  1597:1 1604:5
**nonbinding** 1619:5
**nonrefundable**
  1621:1,2
**nonresponsive**
  1445:10 1451:9
  1475:16 1479:2
**normal** 1494:3
**Notary** 1413:5
**note** 1426:21
  1491:5
**noted** 1544:1
**notes** 1591:14
**notice** 1479:14
  1536:21 1543:20
  1543:22 1544:14

1544:15 1545:9
1564:6 1567:1
1581:2 1593:18
1622:3
**noticed** 1543:21
**notified** 1428:1
  1431:10 1602:11
**notwithstanding**
  1493:6 1570:5
  1572:10
**number** 1417:3
  1422:17 1429:11
  1433:5,18 1435:6
  1437:8,9,10
  1439:12 1442:17
  1444:16 1448:22
  1451:14 1463:5
  1467:2 1470:2
  1472:19 1474:22
  1478:19 1483:15
  1483:16 1485:9
  1490:20 1494:4
  1499:8 1503:9
  1504:16,17
  1506:3 1509:13
  1512:2,3 1514:18
  1514:18 1517:3
  1533:8 1561:17
  1569:9 1573:17
  1581:8 1588:15
  1616:17
**numbers** 1426:18
**nursing** 1532:13
**NW** 1413:2

------
**O**
------

**o** 1416:1 1534:10
  1547:1,1,1
**oath** 1419:22
  1462:7
**object** 1438:6
  1526:8 1527:14
**objectified** 1549:19
**objection** 1417:19
  1478:6 1525:3,6
  1525:12 1526:9
  1613:18
**objective** 1514:14
  1576:22 1581:16
  1582:7 1587:16
  1592:9
**objectives** 1556:16
**obligated** 1609:17
**obligation** 1594:4
  1604:18
**observance** 1607:5

**observation**
  1463:21
**observe** 1599:13
**obviously** 1435:20
  1436:1 1477:21
  1511:4 1542:6
  1551:2 1577:6
  1579:2,6 1580:12
  1593:14 1594:8
  1606:22
**occasions** 1526:17
  1527:21 1561:17
  1605:7
**occurred** 1569:13
**occurrence** 1595:18
**OCR** 1545:14,22
  1565:9
**October** 1541:16
  1542:4 1545:4,15
**ODC** 1606:14,16
**off-the-record**
  1530:15
**offended** 1474:19
**offense** 1448:16
  1476:7
**offer** 1581:20
**offered** 1619:17
**offhand** 1526:18
**office** 1414:4
  1420:4,12,13,14
  1420:22 1421:9
  1422:4,7,19
  1427:20 1433:13
  1491:19 1495:15
  1550:14 1571:17
  1573:7 1612:15
**office's** 1595:2
**officers** 1567:21
**offices** 1539:22,22
  1540:2,3 1542:15
  1551:5
**oh** 1423:14 1425:12
  1426:9 1428:11
  1448:3 1499:13
  1515:7 1522:3
  1540:8
**ok** 1417:14 1419:5
  1423:16 1424:6
  1424:10,12
  1425:12,21
  1428:11,22
  1429:22 1430:9
  1433:21 1437:14
  1438:4 1447:14
  1448:9,19,21
  1451:17 1452:3

1453:13 1456:4
1459:15 1463:15
1464:12 1465:10
1470:9 1471:6
1473:1,9,14,17
1479:7 1483:21
1486:10,15
1487:1,13,16
1490:22 1493:4,8
1494:12 1495:10
1496:11 1500:12
1501:4,18
1503:13 1508:13
1510:17 1515:12
1516:10 1518:8
1518:12 1522:7
1522:18 1525:5
1525:15 1527:6
1534:1 1540:14
1540:19,22
1542:22 1543:9
1551:9 1567:9
1568:8 1569:5
1576:17 1581:13
1583:1 1592:1,3
1594:21 1612:18
1612:19
**okay** 1456:5
**old** 1521:14 1601:1
**onboard** 1526:1
**once** 1486:16
  1574:5
**online** 1560:10
**open** 1524:14,19,21
  1554:19 1591:6
**opened** 1416:11
  1519:2
**opening** 1417:5
**openly** 1524:11
**opinion** 1502:4
  1562:7,8,8,22
  1588:21 1589:13
  1590:7 1601:7
**opportunity** 1563:5
  1573:5 1590:15
**opposed** 1454:3
  1596:21 1606:9
**opposition** 1609:11
**order** 1498:16
  1520:2 1532:22
  1544:19 1561:21
  1562:6,7,8,9
  1615:19 1619:15
**orders** 1588:9,11
**organization**
  1419:11

In Re: Larry Klayman
June 27, 2018

Page 1639

organized 1568:11
1568:15
original 1432:1
1441:12 1459:19
1602:6
Orlando 1621:10
1621:11 1622:11
ought 1539:4
outside 1589:1
1605:10
overlooked 1496:6
overly 1457:16
Overy 1523:5
owe 1485:5
owed 1504:20
1576:18,19
owing 1446:10

**P**

P 1416:1
p.m 1447:13 1496:7
1533:20 1546:10
1547:2 1623:1
Pacific 1447:13,13
1447:15 1524:6
page 1415:6 1427:8
1427:9 1428:9
1441:11 1444:19
1447:2 1449:13
1450:14 1455:21
1473:8,13
1474:16 1476:2
1480:13 1483:19
1488:11 1492:4
1500:3 1508:11
1512:7 1513:21
1574:20 1575:8
1586:14 1597:6
1597:18 1607:21
pages 1589:10
1597:6 1606:2,2,3
1606:19,20
paid 1432:12
1434:6 1436:20
1502:10,16
1578:3 1584:19
1584:19,20
1614:16
pain 1484:13
painful 1466:13
pale 1583:10
Palisades 1524:6
paragraph 1435:11
1436:13 1443:5
1444:18 1453:17
1454:14 1455:22

1457:14 1471:9
1473:9 1476:4
1484:7 1488:10
1502:5 1587:17
paragraphs
1454:20
paraphrasing
1438:5 1571:5
parsing 1564:4
part 1417:3 1424:7
1425:19 1426:14
1430:14 1432:6,6
1434:7 1441:10
1442:1,5,7
1506:13 1516:20
1534:13 1536:3
1548:12 1553:21
1557:19 1558:14
1572:4 1584:19
1611:2 1618:21
participate 1439:18
particular 1536:19
1562:18 1572:19
particularly
1454:22 1478:2
parties 1413:7
1530:16 1564:2
1610:2 1620:6
partisan 1586:12
partner 1523:5
partners 1522:22
1579:15
party 1584:10
passed 1432:13
1481:10
patently 1496:13
Patriots 1580:6,7
Paul 1523:1
pause 1437:13
1499:17 1530:13
1617:5
pay 1503:1 1509:20
1514:10 1578:1,2
1614:17 1621:20
1622:12
paying 1529:1
payments 1583:17
peace 1450:15
pejorative 1516:3
1516:15
pending 1428:2
1487:3 1596:9,10
Pennsylvania
1420:13 1422:8
1431:16 1521:19
1522:9,19

1571:16 1601:17
penultimate
1444:18
people 1431:4
1437:1 1439:9
1440:12 1441:18
1443:20 1444:3
1456:17,18
1458:7 1460:22
1462:19 1468:17
1469:4,4,19
1471:16,22
1475:4,21
1476:22 1477:6
1477:11 1478:1
1478:15 1480:10
1480:19 1484:18
1487:11,15
1504:21 1506:3,7
1516:16 1517:8
1518:16 1525:17
1548:6 1560:17
1560:21 1561:4,5
1561:6 1573:6
1574:13 1577:12
1596:15 1611:3
pep 1484:4
Pepper 1522:20
perceive 1574:13
perceived 1432:3
percent 1432:16
1502:8,12
1503:15 1504:13
1504:15 1509:14
1509:21,21
1547:22 1550:21
1578:1
perception 1578:9
perfectly 1509:8
period 1420:21
1455:17 1481:4
1534:4 1549:20
1552:7 1585:4
1621:14
periodical 1560:9
permeated 1489:18
permit 1604:22
1617:9,13,14,18
Persian 1452:17
1474:17 1475:2,3
1475:3,5,7 1476:5
1476:6,8 1484:21
Persians 1487:9
person 1454:3,7
1471:20 1477:5
1477:19 1478:16

1491:17 1579:6
1599:5
person's 1455:11
personal 1434:13
1451:19 1452:18
1477:14,15
1489:21 1539:11
1553:17,19
1560:22 1572:6
1584:11,17
1585:6 1586:1
1588:17
personality 1597:15
personally 1528:21
1537:10
persons 1499:2
1547:5
perspective
1477:13
persuasive 1578:10
peruses 1508:12
PFFs 1606:13,16
Philadelphia
1532:16 1580:5
philosophy 1573:5
phone 1419:6
1474:8,13
1485:14 1486:9
1598:3
phrase 1475:21
physical 1540:2
pick 1580:6
pieces 1497:9
pinning 1560:8
pity 1482:13
place 1440:18,19
1451:2 1458:6
1475:22 1480:9
1619:2
plaintiff 1562:18
plan 1439:17
planing 1418:16
playing 1482:1
plea 1621:5
pleading 1612:8,16
pleadings 1572:16
1576:2 1610:16
1610:21
please 1427:9
1428:6 1433:5
1435:7 1444:16
1448:21 1450:18
1451:13,21
1465:15 1467:2
1470:1 1478:19
1483:14 1486:13

1489:2 1494:5
1498:22 1499:8
1502:6,7 1503:5
1514:19 1519:21
1520:3,20 1521:2
1521:10 1539:2,7
1539:10 1553:5,9
1553:9 1563:17
1568:9 1569:21
1605:8
pled 1573:14,15
plus 1598:20
PNN 1434:3,9
1480:8 1491:18
podium 1531:10
1610:18
point 1421:9
1435:19 1436:7
1443:14 1457:5
1463:21,22
1464:2 1466:7,14
1479:22 1480:1
1481:21 1482:7
1483:11 1485:11
1488:6 1500:21
1502:13,14
1503:9,15 1505:3
1506:4 1511:7
1512:12,14,20
1518:7 1523:21
1528:18 1537:14
1538:21 1539:15
1540:5 1543:8
1545:22 1551:2
1551:13 1552:17
1552:18 1554:9
1564:2 1571:22
1572:1 1575:22
1576:3 1577:12
1577:20,22
1580:17 1581:14
1585:22 1595:18
1599:11 1602:3,7
1604:19 1608:12
1618:17 1622:4
pointed 1425:13
points 1540:1,20
1572:2 1597:3
polarized 1603:10
Polish 1475:20
political 1440:14
1564:13 1592:9
politically 1548:15
polygraph 1432:15
1584:21
poor 1534:6

App.0665

In Re:  Larry Klayman
June 27, 2018

portion 1471:6
1515:6 1604:20
1614:17
position 1562:17
1585:2
positive 1437:6
1446:14 1456:20
1480:16 1492:17
1525:11,17
possibility 1577:20
1591:2
possible 1536:15
1545:19
possibly 1565:17
post 1420:4,13,14
1420:22 1421:9
1422:4 1427:20
1458:19 1558:17
1565:17 1600:18
posting 1591:6
pot 1455:4
potential 1475:11
1475:12 1482:17
1484:5 1489:9
1491:3 1599:1
1618:8 1620:3,3
powerful 1600:15
1600:16
powers 1590:11
practice 1481:17
1523:7 1548:10
1548:11 1572:17
1573:8,10 1581:5
1600:11,12
practiced 1522:19
practices 1548:10
1557:2 1572:18
pray 1458:13
preclude 1620:8
preclusive 1613:1
prefatory 1572:14
prejudged 1602:10
prejudice 1572:2
1611:14
prejudicial 1438:7
preliminarily
1605:2,19
preliminary 1416:5
1547:6 1562:20
1619:5
preparation
1530:22
prepare 1498:15
prepared 1431:9
1432:18 1531:18
presence 1469:2

1551:4 1577:4
present 1413:6
1414:9 1499:3
1538:15 1547:5
1617:10,15
presented 1549:5
1563:12 1571:17
1573:21,22
1574:1,3 1598:14
preserve 1589:12
Preserves 1587:6
president 1578:14
pressure 1463:8
1508:1 1525:17
1552:6 1558:22
pretty 1494:8
1552:12
prevail 1570:6
previous 1505:8
previously 1425:5
1505:20
pride 1484:11
1490:4
primary 1496:5
prior 1453:3
1484:19 1610:11
1612:9,18
1617:10,15
1622:13
priority 1452:9
privilege 1589:7
pro 1436:19
1502:10 1505:9
1509:22 1576:15
1577:22
pro-Clinton 1591:9
pro-regime 1443:21
pro-Shah 1441:1
probable 1421:19
probably 1425:4
1440:16 1496:19
1538:21 1541:14
1542:19 1544:2
1567:13 1606:14
1617:3
problem 1426:3,12
1447:7 1472:9
1538:15
problems 1446:5
1466:20 1491:3
1564:15 1586:11
1588:3
procedure 1613:4
1619:16
proceed 1531:18
1549:1 1601:13

proceeded 1571:20
proceeding 1459:9
1477:22 1486:5
1555:19 1565:9
1570:1,12 1572:3
1610:22 1612:3,5
1612:9,17 1615:2
1618:22 1620:22
1622:21
process 1567:4
1601:3,5,22
1611:1 1613:3
produce 1439:18
productions 1553:8
profess 1492:11
1497:10
professations
1458:17
profession 1462:7
professional 1412:2
1413:1 1446:11
1449:11 1477:17
1501:20 1505:1
1553:16 1559:14
1584:6 1586:5
1594:1 1601:9
professionally
1491:22
Professor 1601:8
professor's 1613:5
projecting 1477:1
projects 1450:16
prominent 1536:9
promiscuous
1491:6
promise 1480:6
promote 1553:7
proof 1573:11
proper 1511:4
1567:22
properly 1507:12
property 1463:12
propose 1606:14
1607:7
proposed 1606:13
proprietary
1584:11
prosecuted 1596:22
prosecution 1597:2
protect 1505:12
1506:15 1543:20
1579:8 1597:20
1598:7
protected 1594:10
protecting 1505:16
1505:17

protection 1601:22
proud 1516:22
1534:10
prove 1491:6
1570:7
proven 1605:3,18
1605:20
proverbial 1435:16
1455:4
provide 1547:22
provided 1423:17
psyche 1535:14
1593:3
psychiatrist/psyc...
1488:14
psychological
1454:6 1489:11
psychologically
1552:5
psychologist
1433:22 1446:4
1475:8 1489:15
1549:13
psychologists
1584:20
public 1413:5,14
1559:8 1564:20
1573:5 1576:1
1613:14,22
1614:6,11 1622:7
1622:8
publicity 1524:16
1525:1,11 1526:4
1536:12 1558:10
1558:14,20,20
1560:1 1574:9,18
1575:19 1615:4
1618:9
publicize 1560:6
publicizing 1525:19
1526:1 1527:11
1527:13
published 1560:9
1575:22 1576:1
1600:17
pull 1520:20 1551:8
purports 1441:4
1544:5
purpose 1459:9
1496:3,5,12
1535:20 1597:8
purposes 1417:7
1494:14 1604:6
1615:4 1621:10
pursue 1430:18
1557:21 1573:20

1585:6 1592:8
pursued 1587:19
pursuing 1448:13
1585:7
pursuit 1438:17
push 1484:10
1551:7 1557:16
pushing 1501:2
put 1434:5 1489:19
1498:9 1505:6
1507:11 1508:1
1508:13 1509:18
1510:22 1513:8
1514:3,4,13
1531:20 1532:22
1536:21 1544:1
1558:21 1562:1
1565:18 1574:5
1577:10 1578:7
1578:11 1584:18
1585:1 1587:6
1588:20 1590:2
1592:16 1611:12
1615:5 1620:17
put-upon 1558:6
puts 1458:6
putting 1449:20
1450:17 1479:3
1599:6

Q

qualification
1589:9
qualified 1589:7
question 1424:20
1426:20 1427:3
1430:5,10 1432:8
1433:12 1436:11
1439:20 1441:3
1452:2 1453:18
1459:13,14,19
1460:1,3 1469:15
1482:15,18,19
1487:2,22 1492:9
1493:7 1497:4,7
1497:16 1500:17
1504:2,6,8,9,11
1506:10,11
1509:3,9 1510:21
1512:22 1516:8,9
1516:13 1518:4
1525:4,7,8,13
1527:4 1538:17
1539:7 1541:3,8
1559:6 1565:11
1572:10 1579:11

**questioning** 1519:4
**questions** 1468:3,5
  1481:15 1485:20
  1528:5,6 1529:22
  1538:7 1552:2
  1567:1 1568:6
**quick** 1486:2
**quickly** 1499:15
  1570:17
**quicksand** 1593:1
**quiet** 1443:18
  1548:11
**quietly** 1555:11
**quite** 1488:3
  1508:15 1524:11
  1524:14 1528:3
  1534:22 1580:16
  1593:22
**quo** 1587:7 1589:12
**quote** 1429:14
  1578:10 1591:15

**R**

**R** 1416:1 1547:1
**radical** 1443:20
**raise** 1520:12
  1567:1 1594:19
**raised** 1443:13
  1575:22 1579:1
**raises** 1538:21
**rambling** 1478:11
**ran** 1457:21
  1467:15
**ranked** 1473:21
  1600:16
**rate** 1548:2
**Razavi** 1459:3
**reach** 1597:19
  1598:7
**reached** 1435:18
**reacted** 1599:11
**reaction** 1459:22
  1460:8,10 1461:6
  1463:15 1496:12
  1577:1
**reactions** 1462:1
**reactive** 1458:20
**read** 1424:15,16,17
  1448:8 1451:15
  1453:8,14,15
  1454:19 1470:5
  1471:6 1473:1
  1486:20 1487:1
  1495:5 1503:11
  1560:18 1573:15
  1574:21 1584:4

1586:17 1587:14
1591:18,21
1592:18 1603:2
1610:17 1617:13
1617:17
**reading** 1428:7
  1447:9 1448:11
  1450:20 1501:16
  1518:11 1591:20
**reads** 1428:12
  1433:20 1442:18
  1448:10 1451:16
  1453:9 1467:5
  1472:22 1479:12
  1486:21 1491:1
  1495:6 1500:1,11
  1503:12 1515:11
**ready** 1416:3
  1605:6
**real** 1499:15 1574:8
  1606:4
**reality** 1513:11
**realize** 1426:13
  1454:21 1462:6
  1484:6 1508:5
**realized** 1469:16
  1585:11
**realizing** 1490:14
  1503:6
**really** 1421:21
  1443:11 1444:6
  1444:21 1459:5
  1462:10 1474:2
  1475:3 1487:18
  1507:8 1522:1
  1524:20 1532:17
  1536:4 1552:17
  1556:10,11
  1559:9 1567:13
  1577:18 1578:4
  1579:8 1599:10
**reason** 1496:17,19
  1533:1 1565:1
  1573:7 1597:17
  1602:2
**reasonable** 1570:9
**reasonably** 1584:8
  1586:18
**reasons** 1441:2
  1491:15 1511:12
**rebuttal** 1604:14
**recall** 1507:17
  1525:21 1529:5
  1617:7
**receive** 1513:3
  1547:7

**received** 1417:16
**receiving** 1513:7
  1552:6
**recess** 1498:15,19
  1498:20 1519:16
  1530:17 1531:11
  1531:13 1538:9
  1538:16 1546:7
  1546:11 1605:12
**recognition** 1457:1
  1457:6
**recognize** 1454:13
  1477:4
**recognized** 1449:19
**recognizing**
  1454:11
**recollect** 1421:15
**recommendation**
  1611:10
**recommended**
  1446:19 1537:17
  1537:18
**recommending**
  1466:15
**reconsideration**
  1543:15 1545:4
**reconvening** 1547:4
**record** 1416:3
  1422:17 1426:12
  1427:5 1433:15
  1435:7 1451:7
  1453:10 1465:15
  1467:3 1470:6
  1472:19 1479:10
  1483:15 1490:20
  1498:21 1499:21
  1514:11,20
  1519:20 1530:15
  1531:15 1540:12
  1540:18,18
  1545:13 1556:13
  1559:8 1564:4
  1565:22 1567:12
  1567:15 1576:13
  1577:7 1581:19
  1586:10 1603:1
  1603:18 1605:11
  1605:13 1611:13
  1613:11 1614:13
  1614:21 1615:3,6
  1618:2,15,20
  1619:2
**records** 1571:19
**recovered** 1509:15
**recovery** 1503:15
  1547:22 1550:19

**recreate** 1572:5
**recuperate** 1504:20
**recuperated**
  1576:17
**redirect** 1449:4
  1519:14 1520:2
  1530:19 1531:18
  1532:2 1541:7,9
  1541:10
**refer** 1427:13
  1533:7
**reference** 1425:20
  1525:10 1532:4
**referral** 1512:18,18
  1512:19
**referred** 1469:17
  1549:14 1600:21
**referring** 1425:19
  1431:9 1517:2
  1591:8 1615:18
**reflect** 1484:12
**reflecting** 1582:5
**reflects** 1451:18
**regard** 1464:17
  1544:18 1582:11
  1582:15 1589:7
  1604:3
**regarding** 1568:13
**registration**
  1420:19
**regret** 1479:20
**regular** 1533:10
  1565:4
**rehabilitation**
  1456:11
**Reindel** 1522:21
**relate** 1416:18,22
**related** 1465:8
  1521:12 1576:8
**relates** 1468:7
**relations** 1583:3
**relationship**
  1428:16,20
  1429:5,17
  1434:14 1448:13
  1449:10 1451:20
  1452:18 1454:5
  1454:12 1473:4
  1486:18 1487:5
  1489:1,16
  1504:22 1505:1,2
  1505:9 1506:14
  1511:7 1512:12
  1512:15 1513:1
  1513:18 1547:13
  1551:16 1553:20

1559:15 1573:21
1582:16 1583:21
1584:3 1586:2
**relationships**
  1477:18
**relatively** 1556:22
**relevance** 1517:12
  1518:9,18
**relevant** 1599:20
  1604:11
**relief** 1502:17
  1507:1 1552:15
  1562:4,13,15,19
  1562:20 1579:15
  1586:6
**religious** 1457:16
  1458:3 1518:5
**relying** 1548:20
**remain** 1511:3
**remains** 1419:22
  1541:7
**remarks** 1438:8
**remember** 1421:2
  1421:17,21
  1422:9 1425:2
  1468:11 1502:7
  1507:21 1508:2
  1517:4 1542:5
  1545:19 1575:1
  1597:22
**reminded** 1550:18
**remit** 1621:19
**remove** 1573:8
**removed** 1568:14
  1593:4
**remuneration**
  1513:7 1588:17
**renamed** 1467:8
**repeat** 1522:5
**repetition** 1620:8
**rephrase** 1459:14
  1525:8
**reply** 1447:3,8
  1606:2,16,18
  1607:9 1609:20
**Reported** 1412:21
**reporter** 1413:5
  1611:20
**repossessed**
  1583:15
**represent** 1435:4
  1442:12 1455:13
  1466:16 1502:11
  1505:15 1547:21
  1549:18 1578:17
  1585:13 1593:16

In Re: Larry Klayman
June 27, 2018

Page 1642

1602:16
**representation**
1436:6 1501:3
1503:19 1507:10
1510:7,13 1537:7
1556:17 1579:12
1580:15 1581:1
1587:16 1588:1
**representations**
1620:7
**representative**
1578:14
**represented**
1442:12 1460:12
1463:3 1534:4
1560:7
**representing**
1433:1 1491:11
1491:12 1555:5
1579:14 1584:13
1584:14 1590:4
1592:10 1596:17
1615:12
**reprimand** 1614:14
1622:7,8
**reputation** 1432:5,6
1475:2 1557:14
1561:4
**request** 1540:10
1552:15
**requested** 1559:15
**requesting** 1528:20
**require** 1503:16
1612:7
**required** 1567:21
1592:21
**requires** 1490:3
1559:12 1607:2
**requisite** 1499:2
1547:5
**resist** 1556:6
**resolution** 1513:13
**resolve** 1536:22
1612:1
**resolved** 1612:4
**respect** 1429:4
1434:17 1455:9
1461:2 1462:7
1464:9 1470:15
1470:20 1472:6
1490:4,10 1494:2
1512:2 1517:16
1533:15 1535:7
1555:8 1556:14
1556:16 1557:1
1559:13 1564:22

1567:10 1568:1
1582:8 1588:14
1594:1,2 1601:21
1603:13,16
1612:21 1613:19
1613:20 1614:6
1615:19
**respected** 1439:1
1487:9 1583:6,7
1603:15
**respectful** 1481:3
1487:10 1586:9
**respective** 1413:7
1531:2
**respond** 1448:3
1474:10 1503:5
1504:3 1542:7
1554:14 1571:4
**responded** 1550:20
1571:7 1597:20
**Respondent** 1412:6
1414:2,11
1416:15,18
1417:18 1521:5,8
1547:14 1569:19
1619:20
**Respondent's**
1423:17 1532:2,5
1553:19 1579:3
1606:11,17
1607:8 1609:9
1616:22
**responding** 1597:22
**response** 1427:14
1427:17,21,22
1428:15 1429:3,5
1430:14 1462:9
1482:4 1483:20
1571:3 1606:16
1609:12
**responsibilities**
1584:9
**responsibility**
1412:2 1413:2
1594:1
**responsible**
1536:20 1598:12
**responsive** 1459:13
1461:13 1478:11
1487:12
**rest** 1450:6 1506:16
**restaurant** 1446:2
**restroom** 1467:9
1469:8
**result** 1433:3
1463:5 1525:11

1525:17,18
1543:5 1549:15
1581:4 1585:8
**resulted** 1473:18
**resume** 1416:3
1418:22 1419:18
1530:19 1617:8
1617:14
**resumed** 1547:3
**resumes** 1419:20
**resuming** 1499:1
**resurrected**
1431:14
**resurrecting**
1431:10 1602:1
**resuscitate** 1532:22
**retained** 1434:1,4
1488:14
**retainer** 1621:1
1622:15
**retaliated** 1534:16
**retrospect** 1535:2
**return** 1470:19
1493:15
**returned** 1550:2,17
**revealed** 1563:20
1564:1
**revelation** 1600:5
**revenge** 1459:8
1597:8,9,15
1603:13
**reverse** 1585:9
**Review** 1521:22
1522:12
**revolves** 1460:15
**rich** 1452:17
**right** 1425:6,15
1429:12,19
1430:3,7 1431:3
1434:10 1435:13
1440:3,18 1442:1
1442:3 1445:4
1448:18 1449:14
1450:1 1452:1,5
1454:4,12 1456:8
1458:9 1461:18
1463:11 1470:16
1474:4,20
1477:16 1489:12
1490:5 1497:19
1500:8,20 1507:3
1507:13 1508:8
1508:10 1510:1
1527:19 1530:9
1535:8 1536:2
1540:11 1541:13

1542:16,17,18,20
1544:17 1554:20
1561:8 1583:6
1586:14 1596:6
1599:19 1603:21
1603:22 1609:7
1611:7
**right-hand** 1520:13
**rights** 1433:13
1505:17 1541:20
1542:14,21
1555:19 1580:1,2
1593:21 1594:5
1596:18 1597:21
1598:7
**ring** 1472:1
**risk** 1443:22 1508:5
1537:10
**Roberts** 1586:21
**Rodham** 1556:4
**Rohrabacher**
1495:17 1496:18
**Rohrabacher's**
1495:14
**role** 1452:8 1457:8
**romantic** 1428:16
1428:19 1429:5
1429:16 1454:13
1457:16,19
1458:3 1573:21
1582:16 1583:20
**Ronald** 1601:8
**room** 1467:10,14,16
1467:16,22
1499:19
**roommate** 1454:16
1471:21 1478:5
**Rotunda** 1601:8
**round** 1580:2
**rubbing** 1548:16
**ruined** 1593:11
1598:10,21
**rule** 1553:14
1556:15 1557:4
1559:7,10
1561:15 1573:1
1586:17 1595:2
1595:15 1599:15
1600:9 1604:19
1605:3,15,17
1606:1 1607:2,20
1610:15 1617:6
1617:17 1619:10
**ruled** 1432:6 1558:1
**rules** 1539:9
1563:14 1564:20

1566:12 1584:2,4
1594:15 1601:19
1601:21 1607:3
1608:5
**ruling** 1589:2
1591:1 1613:19
1613:20 1614:5,6
1618:17 1619:18
**rumors** 1476:16
1560:22
**run** 1521:16
1522:14

---

**S**
**S** 1416:1 1547:1,1,1
**sad** 1444:6,8
1453:19
**safety** 1444:1
**sake** 1560:2,3
1587:2
**salary** 1480:11
**salesman** 1532:15
1598:18
**Sam** 1459:3
**sanction** 1569:8,9
1620:3
**Sataki** 1429:16
1434:1,14 1435:3
1435:8 1438:16
1439:8,17 1441:5
1444:6 1458:16
1460:11 1464:1
1465:17 1466:3,5
1466:9 1467:4,14
1470:8 1472:20
1473:10 1474:18
1479:11,15
1480:4 1482:20
1483:18,20
1484:8 1486:17
1487:5 1489:1,16
1490:21 1493:15
1493:19 1495:9
1495:13,18,22
1497:11 1499:22
1500:10 1502:6
1507:19 1509:13
1513:2 1514:21
1515:8 1517:17
1517:20 1518:15
1523:22 1524:8
1526:14 1527:16
1528:10 1529:13
1533:15,18
1535:16,20
1537:4 1539:17

1543:16 1544:15
1547:12 1548:3
1548:20 1549:4
1549:14,17
1550:18 1551:2,9
1552:16 1553:1,3
1553:14,19,22
1555:11 1556:1,8
1557:8 1558:7,11
1559:21 1560:4,7
1561:6 1564:12
1565:7 1570:21
1573:22 1575:19
1577:10 1579:2
1582:17 1586:20
1596:2 1597:7,12
1602:5 1603:15
1615:15
**Sataki's** 1427:15
1428:15 1447:3
1504:12 1508:3
1515:15 1518:20
1550:8 1560:14
1561:4 1562:5
1593:2 1601:16
**satisfactory** 1531:5
1531:6,8 1556:12
**saved** 1532:14
**saw** 1444:12
1445:22 1446:18
1502:4 1505:20
1507:4 1554:16
1554:18 1557:10
1557:10 1560:20
1593:6
**saying** 1433:8,10
1434:20 1443:8
1446:10 1448:15
1449:8,8 1450:22
1451:1,2,4
1452:20,21
1456:22 1462:12
1466:17 1470:15
1474:22 1475:9
1476:10,19
1477:2 1478:14
1480:4,22 1481:4
1481:22 1482:2,5
1484:21 1487:8
1487:11 1489:8
1500:21 1501:12
1501:22 1502:7
1502:12 1510:8
1510:13 1514:6
1517:17 1525:21
1527:2 1534:8

1536:4 1540:1
1544:5,5,6,18,18
1551:19 1560:5
1579:20 1589:5
1617:17
**says** 1435:14
1436:14 1438:13
1438:13,14,14
1441:7 1448:1
1449:13 1450:14
1472:8 1479:17
1492:6 1498:8,8
1500:14 1502:6
1503:14 1510:16
1510:16 1515:4
1534:15 1553:4
1577:11 1582:18
1584:6 1593:15
1593:19 1597:7
1601:18 1610:15
1612:12 1619:11
1619:11
**SC11** 1616:17
**scenarios** 1613:5
**scheduling** 1494:14
1608:10,11
**scheme** 1558:14
**scholar** 1521:21
1522:11
**school** 1521:21
1522:10,15,18
**scope** 1436:5
**score** 1580:5,7
**scores** 1556:5
**screamed** 1611:17
**scrupulously**
1561:18
**second** 1423:20
1453:16 1455:21
1473:8,12
1480:13 1550:14
1565:14 1621:4
**seconds** 1574:2
**secret** 1559:9,13
1566:7,9,13
1576:11
**secretary** 1551:5
**secrets** 1559:3
1559:12,20
1560:12 1563:19
1564:1,22
**section** 1606:9,10
1615:1
**see** 1423:11 1425:1
1425:3,7,7,12
1428:8 1434:1

1437:21 1444:22
1445:2,5 1446:14
1449:15,16
1451:6 1458:10
1458:11 1464:19
1467:17 1479:5
1479:13 1484:6
1484:20 1485:13
1492:5 1503:17
1504:18 1505:5
1509:18 1512:17
1514:8 1515:12
1515:22 1519:10
1531:9 1534:17
1538:15 1541:12
1549:14 1550:4,8
1553:18 1560:19
1560:20 1565:22
1570:13 1573:9
1584:13 1587:12
1612:13 1622:8
**seeing** 1435:15
1472:10
**seek** 1603:13
**seeking** 1562:13
1597:15
**seen** 1423:6 1435:1
1508:14 1563:6,8
1585:14 1589:17
1600:20 1622:1
**sees** 1615:7
**segment** 1485:18
**self** 1490:4
**self-centered**
1460:15 1501:11
**self-deprecating**
1483:2 1516:20
**selfless** 1455:2
**selling** 1588:16
**Senate** 1457:21
**senators** 1536:10
1548:17
**send** 1422:4
1431:12 1486:2
1512:9 1552:16
1552:22 1571:3
**sending** 1466:2
1505:14 1543:16
**sends** 1553:6,6
**sense** 1497:12
1516:4 1529:18
1570:16 1583:12
**sent** 1417:4 1420:15
1423:7 1425:2,3
1427:19 1429:15
1431:11 1441:5

1442:21 1447:10
1447:11,17,17
1549:10 1551:18
1551:20 1554:18
1557:8 1571:2
1593:11
**sentence** 1442:20
1445:18 1447:6
1454:9 1467:7
1471:8 1472:8
1491:20 1492:4
1493:2 1502:6
1591:21,22
1617:13
**sentences** 1448:7
1450:13
**separate** 1502:15
1505:4
**September** 1514:21
1515:4 1542:13
1544:21 1608:18
1608:20 1609:1,3
1609:6,10,14,19
**series** 1460:8
1461:7 1549:10
**serious** 1474:9,13
**seriously** 1598:4
**serves** 1606:11
**serving** 1539:16
**session** 1605:1,6
**set** 1418:3 1441:10
1509:12 1563:14
1601:7
**setting** 1447:16
1548:1 1562:10
1581:22
**settle** 1508:1,6
1537:11
**settlement** 1507:9
1514:12 1525:2
1536:4,13,14
1537:9 1588:18
**seven** 1437:15
1545:16
**severe** 1560:16
1563:21 1565:17
**sexual** 1432:20
1434:3,9 1460:13
1488:15 1491:12
1547:16 1548:7
1549:16,18
1555:8 1573:18
1583:3
**sexually** 1431:4
1433:9 1560:16
**Shamble** 1439:4

1446:17 1574:16
1578:12 1579:13
1582:12 1596:16
1600:19
**She'd** 1577:5
**Shea** 1469:17
1512:18 1537:18
1585:16
**Shearman** 1523:10
**shining** 1464:7
1555:7
**short** 1496:7 1530:3
**shortly** 1419:15
1505:13
**shot** 1462:10 1587:5
1592:16 1607:6
**show** 1484:17
1485:1 1557:22
1616:1
**showing** 1612:16
1622:8
**shown** 1571:21
**shows** 1540:7
1544:4,9 1567:12
1567:15 1586:8
1593:12 1603:4,7
**shut** 1554:13,22
**shy** 1618:9
**sick** 1501:13,19
**side** 1435:2 1450:2
1450:3 1531:10
1551:8 1564:4
1566:18 1575:18
1590:11,13
1603:11,11,12
**sides** 1440:14
**sign** 1512:6 1513:20
**signed** 1604:10
**signing** 1560:4
**silent** 1419:7
**simple** 1555:19
**simply** 1446:9
1461:2 1502:17
1503:6 1574:4
1577:10 1622:18
**single** 1537:1
**sink** 1593:1
**sister** 1485:12
1494:14 1519:10
1528:3 1530:1
1576:7
**sisterly** 1529:10
**sit** 1486:9 1520:19
**sitting** 1611:2
1615:5
**situation** 1461:1

1462:21 1547:18
1555:2
**six** 1428:2 1476:7
1545:16 1570:13
1579:7
**Sixteen** 1483:17
**Sixty-four** 1608:2
**skip** 1476:3
**slammed** 1475:12
**sleeping** 1478:4
1585:4
**sleeve** 1455:1
**slightly** 1520:1
**small** 1548:12
1610:4,7 1614:17
**smear** 1561:4
**Smith** 1413:20
1415:7 1416:6,7
1416:21 1417:2
1417:11,15
1418:1,6,7 1419:8
1419:14,17,21
1422:11,12,15
1423:4,8 1424:2,3
1424:14 1425:10
1425:13,16,21
1426:4 1427:6,12
1430:4,6,12,13
1432:9 1435:9
1437:7 1438:8,9
1439:13 1442:14
1442:15 1445:6
1445:16 1448:4,5
1448:16 1450:12
1451:12 1452:14
1454:19 1459:18
1460:2 1465:2,6
1465:10,11,12,13
1465:21 1466:1
1468:2 1469:12
1469:13,22
1470:4,6,10
1474:15 1478:6
1478:17 1479:9
1479:14 1483:6
1483:10,12,13
1485:19,20
1486:4,11,12
1488:1 1489:14
1492:6,10
1493:12,13
1494:7,10,17,19
1495:1,2,7,11
1497:3,8 1499:1,9
1498:11 1499:6
1499:20 1500:4,6

1500:7 1504:5,10
1506:9,18 1509:8
1509:10 1510:11
1511:8,14 1513:4
1514:15,16
1515:6,8,13
1516:14 1517:14
1518:7,10,13,19
1519:8 1523:11
1525:3,6,12
1526:9 1528:6
1531:6,8 1535:16
1538:15 1539:2,6
1539:13 1547:10
1547:11 1561:13
1563:17 1564:11
1565:5,10,21
1566:3,10,15,20
1567:3,19 1568:6
1568:7,9,12
1569:3,16 1572:6
1573:14 1575:11
1577:17 1579:1
1586:16 1587:14
1591:13,20
1595:13,19
1596:6,13
1602:18 1604:15
1604:17 1606:10
1606:20 1607:10
1607:11,14
1609:20 1611:8
1612:14,19
1613:13,17
1614:4,11
1615:10,14,17
1616:2,5,8,15,20
1617:21 1618:2,5
1619:18
**Smith's** 1416:4
1459:14 1499:1
1595:2 1607:8
**smitten** 1549:3
**so-called** 1574:3
1582:16
**solely** 1461:17
**solemnly** 1520:14
**somebody** 1437:5
1440:22 1444:9
1446:2,6,15
1453:3 1455:8,13
1457:9 1458:21
1459:6 1475:14
1476:20,21
1485:1 1488:8
1537:21 1538:2

1552:10 1583:2
1592:7,7 1599:6
**someone's** 1606:3
**sone** 1558:21
**sophisticated**
1534:22
**sorry** 1436:16
1465:18 1480:5
1484:14 1498:9
1500:9 1511:14
1522:3 1538:17
1603:5 1607:13
1610:5 1614:2
1618:18
**sort** 1438:17
1527:22 1566:14
1566:15
**sought** 1508:7
1549:12 1580:13
**soul** 1514:4
**south** 1480:2
1483:1,3,4
**speak** 1461:17,19
1464:8 1522:3
**speaking** 1519:22
**speaks** 1491:9
1492:13 1493:2,6
**special** 1484:16
**specialty** 1523:12
1523:13
**specific** 1529:6
**specifically** 1421:22
**Specification**
1424:9 1425:17
1431:8 1563:15
1570:19 1573:15
1575:10 1602:13
1602:14 1604:10
**spectrum** 1440:14
1456:7
**speculating**
1421:20 1543:11
**speculation**
1438:19 1460:6
1607:1
**Spell** 1520:9
**spend** 1438:1,11
1604:4
**spending** 1439:4
**spent** 1468:19,20
**spiritual** 1458:5
**splits** 1473:19
**splitting** 1581:15
**Sporkin** 1587:1
1592:13
**Staff** 1414:14

**stage** 1552:10,11
1607:2
**stand** 1418:22
1419:19,20
1431:18 1438:13
1473:15 1498:14
1498:18 1530:17
1531:11 1538:8
1538:16 1541:1
1546:7 1561:2
1593:7 1594:13
1610:18
**stand-up** 1483:9
**standard** 1567:20
1572:11 1582:13
**standing** 1533:4
1603:17
**standpoint** 1510:1
**start** 1420:1 1484:7
1509:22 1536:2
1598:14
**started** 1446:1
1457:22 1472:9
1550:2,3,9
1568:14 1622:3
**starts** 1500:3
**state** 1422:2
1501:14 1502:1,2
1502:3 1521:10
1552:9 1618:15
1618:20
**statement** 1504:12
1515:15 1588:14
1598:10 1612:22
**statements** 1478:10
1590:22 1591:3
1599:18
**states** 1422:4
1496:6 1601:10
1601:12
**status** 1587:7
1589:12
**Staunton** 1469:20
1495:14,17,21
1496:19 1505:21
1544:10 1551:4
1551:12,13,14,15
1577:9 1582:4
1585:17
**stay** 1563:16 1605:9
**staying** 1474:16
**step** 1485:12
1519:21 1523:19
1579:16
**stepdad** 1532:9,22
**stepping** 1605:10

**Sterling** 1523:10
**sticking** 1534:13
**stipulate** 1616:9
**stole** 1472:1 1476:9
**stop** 1448:12
1451:21 1486:7
1516:7 1552:20
1552:21 1553:9
1596:9
**stopped** 1595:19,21
1596:1
**strategic** 1602:3
**strategy** 1526:2
1548:12 1556:10
1556:19,20
**straw** 1490:13
**street** 1413:2
1422:6 1444:22
1532:15
**stress** 1463:18
1464:1,5,16,22
**strike** 1478:6
1479:1 1506:9
1509:2 1540:17
**strikes** 1509:4
1606:21
**strong** 1483:8
1606:4
**strongest** 1456:12
**struck** 1445:11
1506:17
**structured** 1440:11
**stuff** 1557:18
1565:12
**subject** 1440:15
1441:7,10,22
1442:5 1447:21
1448:2 1465:16
1472:21 1500:13
1565:13 1587:17
**sublimating** 1446:6
**submissions**
1616:14
**submit** 1612:8,15
1613:22 1614:7
**submits** 1606:11
**submitted** 1571:18
1619:22
**subsequently**
1532:21
**subsidy** 1532:13
**succeed** 1491:21
**succeeded** 1588:10
**successful** 1588:6
**suddenly** 1601:11
**sue** 1504:22 1536:5

In Re: Larry Klayman
June 27, 2018

sued 1556:5 1573:2
1573:3,3,4
suggest 1584:3
1612:20,21
suggested 1431:19
1478:9
suggesting 1477:10
1488:12 1500:15
1511:1 1518:5,21
1540:9
suggestion 1477:20
1613:8
suicidal 1482:5
suit 1544:11
suits 1515:17
Sujat 1414:3,4
1419:1 1423:11
1423:15,16
1424:19,22
1425:12,15
1426:1,2 1531:17
1531:21 1532:3
1533:12,13
1535:18 1538:6
1539:14 1546:5,6
1606:7 1618:6
1620:11,14
Sujat's 1604:3
sum 1594:14 1597:4
1599:12
summa 1521:20
1522:9
summary 1600:8
Sunday 1465:16
super 1455:1
1584:12
superior 1568:14
superseding 1603:3
supervisor 1604:9
supervisors
1613:11
supplemental
1427:15 1428:1
1435:6 1437:8,10
1442:17 1444:15
1448:21 1451:13
1465:4,5,14,20,21
1467:2 1470:1
1472:18 1483:14
1499:7,10,12
1503:8 1509:13
1512:3 1514:18
1515:1 1532:5
1541:4 1553:2
1593:17
Supplementary

1439:11 1478:18
1485:9 1486:13
1490:19 1494:4
1495:4 1498:12
1503:4 1517:2,5
support 1432:19
1562:13 1564:5
1568:20
suppose 1453:22
1454:4 1530:3
supposed 1555:5,6
1555:7
Supreme 1616:16
sure 1424:21
1440:17 1443:4
1454:21 1466:6
1508:4 1511:17
1521:18 1522:7
1522:16 1526:18
1528:9 1532:1
1539:2 1543:7
1548:21 1551:12
1560:5 1567:3,13
1572:18 1583:15
1594:15 1607:15
1610:8
surface 1580:20
surfaced 1580:19
surprised 1524:21
1596:19,20
surprising 1429:15
suspicious 1528:2
sustained 1479:6
1549:20 1552:7
swallow 1490:4
swallowed 1488:6
swear 1520:13,14
sworn 1521:6
SX 1470:3,4
SX13 1470:4
SX15 1479:8
SX20 1494:6,7
SX38 1533:8,11,12
1541:5 1545:2
SX7 1465:22
sympathetic
1440:13
sympathy 1534:20
syndrome 1461:13
syntax 1544:7
system 1413:19
1568:1,2 1594:2

_____

**T**

T 1547:1
tae 1502:16

take 1424:18
1428:5,14 1435:6
1439:11 1444:13
1445:8 1448:16
1448:21 1462:10
1464:8 1465:14
1467:1 1468:20
1470:1 1472:18
1476:7 1477:3
1478:18 1480:18
1483:14 1485:16
1486:1,13
1490:19 1495:3
1499:7,15 1503:8
1514:17 1517:5
1522:17 1530:20
1540:16 1545:14
1552:10 1567:11
1578:18 1585:15
1587:20,21
1607:6 1621:1
taken 1413:1
1423:17 1498:20
1519:16 1523:19
1531:13 1546:11
1581:16 1582:12
1605:12
talk 1443:22 1469:3
1484:5 1501:1
1516:5 1518:22
1550:7 1560:21
1561:5,5 1575:21
1576:12 1579:6
1605:22
talked 1466:4,18
1496:8 1498:4,5
1517:19 1518:11
1534:3 1555:10
1560:14 1592:14
talking 1429:7
1449:21 1454:7
1471:7 1474:11
1492:14,15,16
1495:13 1498:6
1518:15 1533:17
1535:7 1541:22
1542:20 1558:19
1561:1,6 1562:19
1563:7,8 1608:13
1615:15
tank 1596:18
Taylor 1507:2
1587:7 1589:13
1592:21
team 1580:7
1606:17

tears 1481:9
Ted 1468:17,21
television 1480:14
tell 1420:8 1438:10
1449:1 1456:2
1461:10 1466:8
1480:3 1517:1
1518:8 1537:9
1553:9 1582:4
1593:6 1598:22
1610:2
telling 1432:19
1437:19 1455:15
1477:7 1478:7
1496:12 1498:2
1505:21 1510:18
1543:8 1593:8
tells 1443:7 1535:17
1590:9 1597:10
Temple 1521:20
1522:10
ten 1430:2 1513:12
1607:10 1608:6
1608:19
tend 1564:5
tender 1617:19
tens 1601:11
tentative 1531:5
1618:17
term 1456:6 1476:5
1476:6 1508:22
1509:3
terminated 1561:8
1594:12
terms 1419:10
1432:2 1439:2
1440:19 1447:16
1449:10 1464:5
1489:20 1490:14
1503:19 1504:1
1505:8 1506:2
1507:2 1508:18
1509:11 1528:20
1586:2 1599:11
1602:8
test 1432:10,13
testified 1432:5
1439:4 1445:20
1445:20 1446:19
1450:4 1458:4
1468:18 1471:19
1473:10,11
1474:18 1475:1
1487:19 1491:10
1515:14,20
1521:7 1535:6

1555:13,15
1556:5 1574:16
1577:15,15
1587:5 1589:18
1621:15
testifies 1459:7
testify 1443:16
1515:19
testimony 1416:18
1432:2,7 1433:10
1459:1 1468:7,12
1498:16 1518:20
1520:15 1521:1
1530:3,5 1539:9
1539:17 1549:4,9
1550:9 1562:1
1574:19 1578:12
1582:2,10
1583:12 1585:1
1594:7 1618:12
tests 1432:15
text 1486:3 1549:21
1549:21 1619:2
texts 1553:6
thank 1419:17
1420:20 1422:12
1433:19 1436:10
1450:16,20
1465:12 1469:13
1470:4 1483:5
1490:2 1512:21
1515:10 1529:21
1530:1,9,11
1531:21 1533:6
1538:6 1542:8,9
1546:9 1568:7,8
1569:18,22
1570:2 1604:13
1604:15,16,17
1613:7,7 1617:21
1619:12
thankful 1577:17
Thanks 1424:12
theme 1482:7
theory 1563:19
1567:10,11,18
1568:21 1595:3
1595:14
thick 1616:19,20
thing 1447:9
1478:20 1507:13
1513:12 1535:12
1561:6 1569:13
1583:2,11 1613:9
1618:8 1622:13
1622:18

In Re: Larry Klayman
June 27, 2018

things 1422:5
1426:22 1431:3
1432:4 1434:2
1435:22 1436:5
1437:16 1439:5
1448:17 1450:8
1456:17 1457:7
1457:11 1458:10
1458:12 1469:15
1480:21 1482:1
1487:17 1490:11
1496:13,21
1501:11 1507:11
1527:18 1528:20
1529:6 1534:10
1537:5 1558:18
1558:19 1560:17
1561:1 1574:13
1582:5 1588:19
1594:9 1611:4
1614:21 1616:14
1622:4
think 1418:3
1421:11 1426:13
1426:21 1428:20
1437:11 1442:7
1442:10 1448:1
1449:5 1451:8
1452:18 1456:3
1458:19,20
1459:12 1461:13
1463:13 1478:11
1484:9,11
1491:10 1497:18
1503:15 1504:7
1505:17 1513:11
1516:15,16
1519:6,22
1526:10 1527:12
1529:3,15,15,16
1529:18 1534:22
1535:1 1537:5
1539:17 1540:6
1540:12,13,18
1547:5 1550:20
1552:20,21
1566:3 1568:5
1569:6 1578:5
1590:12,16
1594:10,22
1598:2 1599:14
1599:17,19
1602:2 1605:19
1607:6 1609:8
1611:12,16
1612:1,2

thinking 1496:20
third 1428:9 1473:9
1476:3 1584:10
1599:5
Thirdly 1570:18,21
Thirteen 1581:9
thorn 1590:11,13
thought 1417:9
1431:15 1434:17
1434:18 1438:17
1438:22 1442:11
1457:19 1464:6
1481:11 1491:15
1499:10 1504:20
1510:1 1511:9
1516:3 1518:22
1527:18,19,20
1528:10 1529:20
1534:12 1542:7
1542:13 1556:2
1570:16 1571:14
1575:3 1578:10
1602:11
thoughtfulness
1449:17
thoughts 1445:1
threat 1472:14
threatened 1577:2
threatening
1472:17
three 1443:5 1459:8
1494:22 1568:15
1595:3 1605:5
threshold 1615:1,6
1618:16,16,21
throw 1614:20
throwing 1509:17
thrown 1601:13
ticket 1468:21
Tigar 1413:15
1420:1,8,20
1425:18,22
1426:5 1435:9,14
1436:10 1439:13
1440:1,5,20
1443:13 1465:2,7
1465:18 1468:2,4
1468:6,11,14
1469:9,15
1481:14,16
1482:4 1509:6
1510:20 1511:14
1511:15,18,21
1512:2,9,14,21
1515:1,4,7,10
1528:7,8,9,13,22

1529:11 1538:18
1539:7,14 1540:8
1540:13,16,21
1541:2,8,12,21
1542:3,8,22
1544:1 1545:2,6,9
1545:12,20
1565:5,14
1566:21 1567:7
1570:3 1572:18
1575:22 1578:5
1579:11 1591:5
1608:13,17,19
1609:3,7,21
1612:20 1619:1,4
1619:10
Tigar's 1542:11
till 1530:18 1538:10
Tim 1585:16
time 1418:12
1420:11,22
1421:9,19
1424:16 1427:18
1431:21 1435:4
1437:16 1438:1
1438:11 1440:15
1440:16 1443:3
1445:22 1447:13
1447:13,15,16
1449:14 1450:7
1450:22 1454:4
1454:12 1455:17
1456:8 1457:6
1458:9 1459:17
1459:21 1460:8
1461:6,14 1462:1
1462:4,14 1463:7
1464:16 1472:21
1473:5 1481:4,17
1484:11 1486:1
1488:3 1490:12
1500:21,22
1505:6 1511:7
1513:18 1514:3
1522:17 1523:20
1523:21 1524:3
1524:13 1526:12
1534:4 1537:6,16
1542:13 1547:14
1550:5 1555:1
1562:18 1571:13
1577:12,22
1585:5 1589:1
1593:7 1595:18
1602:3 1604:3,3,4
1611:13 1614:8

1619:17,19,21
1620:1 1621:13
1621:14
timeframe 1421:3
timely 1544:2
1621:20
times 1435:3
1440:12 1450:5
1463:9,14
1487:20 1516:20
1524:12 1526:19
1527:10 1534:3
1537:14 1556:6
timing 1449:22
title 1510:6 1543:2
today 1502:4
1563:13 1574:11
1607:7 1612:15
told 1431:22
1466:10 1472:1
1472:13,15
1480:3 1481:17
1548:3,8 1551:10
1556:10 1557:6
1577:9 1586:15
1588:4 1592:16
1598:22 1602:18
1602:21 1605:5
1611:4,16
1613:11,11
tongue 1479:18
tool 1558:3
top 1563:18,22
1565:10 1581:7
1582:14 1601:8,9
total 1532:14
totaling 1473:19
totally 1457:18
1560:11 1566:8
1568:3
touch 1571:12
touched 1484:15
1583:4
town 1590:12
track 1419:1
1555:20,22
traditionally
1523:14
tragically 1601:11
train 1418:17
training 1418:15
transcript 1574:20
1575:7 1586:14
1597:6,7
transcripts 1597:19
1615:7

transferred 1577:2
1588:5 1621:9
trauma 1549:15
treat 1480:10
1487:14,15
1488:8 1535:8
treated 1434:19,21
1441:17,19
1452:10 1454:15
1454:16 1457:1
1461:2 1462:16
1472:3,6 1490:15
1534:3 1538:2
1553:13 1578:16
treating 1487:14,18
1488:2 1489:10
1535:8 1553:13
1554:17
treatment 1533:2
trees 1435:16
trial 1463:4 1572:8
tribunal 1538:21
tribunals 1574:9
tried 1459:3
1460:17,21,22
1471:20 1480:11
1482:12 1505:12
1536:7,7,9,12
1538:1 1548:14
1571:11 1584:1
1588:5 1600:5
1622:12
trip 1530:3,4
trouble 1425:18
1435:15 1522:2
true 1442:4 1444:8
1445:18 1456:6
1544:10 1562:12
1621:18
truly 1453:20
1487:16
truth 1431:22
1432:20 1520:16
1520:16,17
1582:4 1593:8
truthful 1433:15
1577:10
try 1433:3 1439:5
1446:16 1461:18
1462:6 1468:16
1477:18 1479:21
1491:5 1496:18
1503:3 1507:12
1525:11 1532:19
1536:14 1548:19
1558:17 1561:3

App.0672

1573:7 1576:3
1581:3 1588:9
1598:3 1599:7
1611:14
**trying** 1435:4
1436:3,4 1437:18
1438:21 1441:15
1445:7 1446:1,5,9
1455:2 1456:16
1458:12,13
1464:6,7 1467:17
1469:3,4 1470:22
1472:12 1475:4
1475:12 1480:7
1481:2,12,21
1482:7,9 1484:4
1484:17 1485:1,7
1487:16,17
1492:17 1498:9
1502:10 1503:10
1505:5 1508:19
1509:18 1511:9
1513:13,16
1517:8 1525:1,16
1535:10 1537:8
1541:18 1542:19
1546:2 1551:7
1558:21 1569:5
1573:9 1575:2,15
1576:21 1578:3
1579:15,20,21
1582:22 1586:5
1588:18 1592:8
1592:11 1594:3
1597:19 1598:6
**Turkey** 1439:16,18
1439:22 1440:6
1440:18 1443:15
1443:19
**Turkish** 1444:3
**turn** 1458:22
1541:4 1597:5
**turning** 1550:3
**TV** 1574:11
1598:15
**twice** 1598:17
**twist** 1538:11
**twisted** 1444:2
**two** 1426:17 1448:6
1469:10 1485:21
1494:22 1495:7
1495:12 1504:17
1511:15 1512:2
1568:12 1569:1
1569:11,11,13
1575:9 1604:7

1609:17 1611:5
**two-page** 1499:8
**tying** 1479:19
**type** 1536:18
1564:19

---

**U**

**ugly** 1550:3
**ulterior** 1603:8
1604:6
**ultimate** 1535:19
1543:14 1559:13
1602:14 1611:14
**ultimately** 1548:12
1555:22 1621:9
**ultra** 1591:9
**unbelievable**
1490:18
**uncomfortable**
1551:3
**uncompromised**
1537:7
**underlining** 1534:7
**underneath**
1417:21
**understand** 1436:2
1445:6 1460:18
1460:21,22
1463:20 1464:20
1472:2,7 1477:12
1478:2 1484:12
1515:21 1529:8
1566:6 1595:1,7,8
**understandable**
1462:13
**understanding**
1450:17 1454:17
1455:10 1459:20
1460:7,11
1461:15 1464:13
1472:11 1481:19
1513:10
**understood** 1450:2
1462:17 1463:18
1463:22 1464:3
1464:15,15
1493:15 1512:15
1620:10
**unduly** 1540:12
**unemployed** 1459:2
**unethical** 1579:7
**unfair** 1473:6,7
**unfortunate** 1447:7
**unfortunately**
1501:12 1591:15
**unhappy** 1459:10

**union** 1578:14,15
**United** 1601:10
**University** 1521:19
1522:8
**unnecessary** 1443:8
1534:12
**unrequited** 1550:2
**unstable** 1527:22
**untenable** 1585:12
**untrue** 1496:13
**untruthful** 1433:11
**untruthfully**
1443:17
**unusual** 1595:14
**upset** 1469:5,6
1473:9 1474:14
1514:1
**urge** 1574:21
1592:18
**use** 1432:18 1433:2
1467:10 1476:5
1497:21 1509:3
1536:12 1587:4
1599:4 1615:4
1619:9
**uses** 1458:5
**usually** 1587:10
1618:9

---

**V**

**v** 1587:7 1589:12
1592:21
**vacated** 1588:12
**vacillated** 1528:1
**valid** 1592:12
**Vegas** 1463:4
**vendetta** 1573:1
**Ventura** 1473:20
**verbal** 1490:11
**verdict** 1618:10
**verge** 1621:21
**VI** 1412:6
**victim** 1461:12
1491:13 1547:15
1558:4,5
**victimized** 1547:15
**victims** 1460:12,13
**view** 1458:17,19
1460:17 1513:17
1529:6 1564:20
1570:6 1574:2
1577:20 1599:20
1604:5
**views** 1564:13
**VII** 1543:2
**vilifying** 1580:20

**vindicated** 1547:18
**violated** 1559:10
1563:13 1572:22
1600:9
**violates** 1559:7
**violation** 1557:4
1561:14 1569:12
1570:8 1595:15
1605:2,16,21
**violations** 1569:7,9
1569:11 1578:7
**virtual** 1420:12
1422:7 1540:2
**virtue** 1601:6
**visit** 1470:12 1471:3
1551:6
**VOA** 1464:6
1507:13 1508:1
1514:9 1534:17
1551:21 1552:1
1557:14 1565:9
1587:11 1588:19
1592:11 1600:21
**Voice** 1446:20,22
1464:18 1575:4
1578:11 1598:16
1600:15
**Vol** 1412:6
**vs** 1507:2,19
1544:15 1616:17
**vulnerable** 1547:16

---

**W**

**W** 1573:3
**Wagner** 1507:2
1587:7 1589:12
1592:21
**wait** 1418:5
1423:13,20
1465:8 1492:8,22
1499:19 1507:7
1509:7 1518:1,1,2
1526:11,11
1540:4 1541:2
1542:10,10,10
**waiting** 1605:10
**waiver** 1560:5
1566:11
**walk** 1444:21
**walked** 1463:12
**wall** 1475:21
**walled** 1482:13
**want** 1424:16
1437:19 1438:1
1438:11 1440:17
1452:16 1453:17

1454:15 1458:11
1461:2 1466:11
1475:22 1476:1
1477:18 1487:8
1496:14,21
1497:6 1504:3,16
1505:15 1507:9
1522:5 1536:4,5
1541:2 1548:5
1554:1,6,10,21
1560:1,18 1561:6
1566:18 1569:22
1570:2 1578:2
1579:22 1580:1
1583:13 1589:3
1590:19 1593:13
1594:20 1596:19
1598:11 1600:11
1602:9 1606:21
1608:8 1610:18
1613:10,22
1615:10 1618:19
**wanted** 1428:16,19
1429:16 1434:21
1440:3,5,20
1442:11 1443:15
1443:17,22
1445:14 1452:10
1458:22 1459:8
1462:8 1464:9,11
1472:5 1480:18
1485:2,5 1488:22
1489:15 1491:17
1496:14 1502:10
1505:22,22
1508:4 1517:14
1533:5 1535:4
1538:4,18
1544:11 1547:17
1548:4,22 1549:1
1554:2,7 1555:11
1557:17,22
1577:6 1578:4
1582:3 1583:7,14
1595:4,5 1597:7,9
1603:15 1613:9
1614:22 1615:2
1621:16
**wanting** 1573:20
**wants** 1430:9
1453:21 1454:2
1458:12,21
1577:13
**warm** 1484:22
**warrant** 1572:12
**warranted** 1534:20

1607:16
**WARREN** 1413:11
**Washington** 1412:9
  1413:2 1420:4
  1558:17 1577:3
  1581:20 1600:18
**wasn't** 1433:8
  1436:9 1441:16
  1459:1 1474:21
  1486:6 1494:2
  1496:3 1501:2
  1505:14 1524:12
  1527:2 1532:17
  1536:15 1537:12
  1542:20 1544:6
  1544:10 1556:14
  1562:21,22
  1576:1,2,20
  1580:11 1583:15
  1584:16,16,22
  1588:6,16 1589:5
  1592:6,9 1597:22
  1604:11 1621:18
**watch** 1420:15
  1457:21,22
  1458:8 1574:11
  1611:1
**way** 1414:5 1418:11
  1432:3 1433:8
  1446:6 1450:1
  1458:22 1467:7
  1469:3 1479:19
  1480:1 1482:8
  1483:7 1484:21
  1484:22 1487:9
  1488:3 1490:15
  1498:18 1499:18
  1510:3 1511:4
  1514:6 1516:5
  1520:22 1523:2
  1527:22 1534:14
  1535:8,9 1538:1,2
  1539:18 1543:13
  1548:10,11,12,14
  1548:19,22
  1553:13,21
  1555:3,14 1557:2
  1568:11 1570:1
  1572:7,17,19
  1573:10 1574:11
  1574:12 1575:13
  1579:4,16
  1582:11 1584:13
  1594:20 1597:14
  1599:18 1600:10
  1600:11,12

1601:6 1618:9
**ways** 1502:15
  1505:4
**we'll** 1520:21
  1538:15 1547:7
  1558:16,17
  1566:10,14,15
  1569:16 1571:5
  1609:19 1610:1,1
**we're** 1418:3
  1469:3 1519:19
  1520:1 1561:22
  1567:20 1571:3
  1578:3 1597:8
  1602:19
**we've** 1435:1
  1457:3 1477:16
  1539:17
**wear** 1475:10
**wears** 1454:22
**website** 1574:5
**Wednesday** 1412:8
  1609:2,4
**week** 1421:10
  1479:21 1608:22
**weekend** 1524:5
**weekly** 1559:3
**weeks** 1459:8
**weigh** 1563:5
  1578:13
**weight** 1574:14
  1575:17
**welcome** 1471:11
**well-being** 1456:11
**went** 1435:20
  1465:8 1467:16
  1468:9 1469:8
  1493:5 1499:11
  1502:15 1505:9
  1505:11 1508:22
  1521:20 1522:10
  1522:20 1523:1,1
  1523:5 1537:13
  1548:21 1551:6
  1573:14 1575:13
  1576:6 1582:19
  1598:16 1621:7
**weren't** 1481:1,2
  1484:18 1545:1
  1584:5 1611:4
**whipping** 1455:12
**White** 1592:7
**wife** 1484:19
**wild** 1568:2
**willing** 1451:20
  1482:11

**win** 1580:8
**Windjammer**
  1414:5
**wisdom** 1454:6
  1557:12
**wish** 1447:6
  1478:12 1485:6
  1491:22 1531:1
  1584:1 1619:20
  1619:22
**wished** 1485:6
**withdraw** 1519:4
  1551:22 1554:11
  1557:6 1595:17
**withdrawing**
  1557:12
**withdrawn** 1595:21
**withstand** 1581:17
**witness** 1420:7,11
  1421:2,5,7,11,15
  1423:2,20
  1426:11,17,21
  1427:4 1428:12
  1429:12,19,22
  1430:3,7,11
  1433:14,20
  1435:13,18
  1436:16,18
  1438:6 1439:20
  1440:3,7,21
  1441:14 1442:3,7
  1442:10,18
  1447:14 1448:1
  1448:10 1449:7
  1451:10,16
  1452:3,7 1453:9
  1459:15 1460:4
  1460:10 1461:16
  1461:19,21
  1462:3 1463:3
  1464:3,12,17,21
  1467:5 1468:10
  1468:13,15
  1469:11,14
  1470:5,9 1472:22
  1473:14,17
  1478:13 1479:3,7
  1479:12,13
  1481:20 1482:6
  1482:16,22
  1483:7,11
  1485:11,16
  1486:2,6,9,10,21
  1487:13 1489:6,8
  1491:1 1492:7
  1493:4,8,11

  1494:13 1495:6
  1495:10 1496:11
  1497:20 1498:17
  1498:17 1499:14
  1499:18,19
  1500:1,11
  1503:12 1504:3
  1508:12 1510:8
  1510:22 1511:17
  1511:20 1512:1,8
  1512:11,16
  1513:9 1515:11
  1515:12 1516:10
  1517:21 1519:22
  1520:1,4,7,10,13
  1520:18,22
  1521:1,5 1522:3,7
  1523:4 1525:5
  1526:10,15,18
  1528:12,14
  1529:3,14 1530:9
  1530:12 1533:19
  1533:22 1534:2
  1541:18 1542:1,5
  1542:9,16 1543:1
  1544:17 1545:18
  1545:21 1561:2
**witnesses** 1415:2
  1530:6 1558:12
  1563:6,6,9,10
  1573:22 1574:16
  1574:17 1575:18
  1611:19
**woman** 1444:20
  1445:1 1510:2
  1553:13 1589:19
  1593:1
**woman's** 1460:19
**Women** 1589:20
**women's** 1467:8,14
  1467:16,16,22
**wondering** 1545:12
**Woodland** 1475:14
**word** 1461:18
  1497:21 1528:10
  1534:7 1561:11
  1596:14 1611:18
  1617:12
**wording** 1591:2
**words** 1417:21
  1445:4,5 1456:13
  1484:3 1497:13
  1498:9 1587:4
**wore** 1553:22
**work** 1437:2
  1441:20 1449:17

  1449:17 1450:5
  1514:14 1535:21
  1547:15 1576:21
  1578:11 1585:10
  1587:6,9 1592:17
  1592:22 1600:20
  1605:8,8 1621:3
  1621:17
**worked** 1445:14
  1446:18 1577:4
  1600:22
**working** 1436:9
  1439:3 1491:18
  1523:16 1595:20
  1595:22 1596:1,9
**works** 1598:19
**world** 1456:21
  1460:15 1475:10
  1523:3 1560:18
  1574:8
**WorldNetDaily**
  1558:7,9,13
  1559:3 1561:20
  1565:3,6 1567:6,7
  1567:8 1574:4
**worried** 1494:17
**worry** 1578:2
**worse** 1501:14
  1502:1,2 1530:4
**worst** 1480:9
  1535:12 1578:15
  1600:16
**worth** 1506:19
**wouldn't** 1426:5
  1534:21 1554:3
  1586:22 1603:2
  1622:12
**wrap** 1494:20
  1514:15
**wreck** 1554:1
**write** 1453:4 1484:3
  1484:20 1495:21
  1534:6 1537:20
  1541:13 1579:4
**writes** 1579:4
**writing** 1417:20
  1453:4 1544:7
  1548:1 1550:22
  1558:12 1565:2
  1602:12
**written** 1453:2,11
  1559:5 1579:2
**wrong** 1437:1
  1447:9 1477:20
  1529:19 1544:22
**wrote** 1424:4

1429:14 1479:15
1484:1 1501:16
1501:19 1579:19
1588:15

**X**

X 1412:3,7 1415:1
**XI.1** 1605:15
**XI.11** 1604:19
 1617:6 1619:2,11

**Y**

y'all 1428:20
yeah 1420:7,11
 1421:4,7,12
 1426:17 1430:11
 1433:7 1437:18
 1440:21 1441:14
 1442:9 1454:11
 1464:4 1469:11
 1479:18 1487:13
 1489:8 1491:4
 1494:12 1495:5
 1497:20 1512:8
 1514:1 1526:5,7
 1545:21 1591:11
 1602:22 1603:4
 1607:11 1610:19
 1617:6 1618:6
year 1421:10
 1545:7 1553:3
 1554:20 1598:20
years 1421:16,21
 1428:2 1436:21
 1441:5 1443:4
 1447:19 1464:21
 1466:7 1502:21
 1513:12 1522:19
 1523:7,16
 1570:12,13
 1571:10 1581:16
 1592:15 1593:3,4
 1601:1 1603:8,17
 1604:7 1614:15
 1614:19 1616:12
Yep 1425:21
yesterday 1432:2
 1466:19 1498:12
 1515:14 1518:19
York 1418:11
 1463:9,14
 1494:15 1522:21
 1524:5

**Z**

zealous 1600:13

zealously 1432:22
 1435:5 1584:14
 1590:4 1602:16
zero 1582:9
Zia 1476:17

**0**

**1**

1 1417:3,6,12
 1435:7 1437:8,9
 1437:10 1476:2
 1500:3
1,000 1468:21
1.16(3) 1600:4
1.16(a)(3) 1595:15
1.2 1556:15
1.2(a) 1557:4
 1568:18
1.4(b) 1568:19
1.6 1559:10
1.6(a)(1) 1566:22
1.6(a)(12) 1565:15
1.6(a)(3) 1595:2
1.74 1553:14
1:00 1538:9
1:15 1538:10
1:30 1538:11,14,16
 1546:8
1:34 1547:2
10 1517:3,6 1606:5
 1607:9 1609:19
 1609:20 1612:14
10:42 1447:11
10th 1609:10,14
11 1499:12 1542:13
11:00 1418:12
 1419:15 1494:16
 1499:13
11:10 1498:19
11:12 1499:2
11:13 1447:10
11:38 1519:20
11th 1421:1
 1514:21 1544:21
12 1427:11 1503:9
 1509:14 1512:3
 1608:11
12:00 1530:18
12:21 1546:10
120 1607:3,20
13 1470:2 1581:10
14 1472:19
1422 1415:3
14th 1416:10
15 1465:5 1478:19

1515:4 1530:17
1531:11 1538:11
1542:13
150M 1508:8,17
 1509:1
1521 1415:4
1525 1414:5
1532 1415:3
1547 1415:7
1569 1415:8
15th 1608:20
16 1483:15
164 1607:22
16th 1472:21
17 1589:9
17-BD-063 1412:5
18 1485:10 1486:14
180 1545:12,17,22
18th 1467:4
19 1422:18 1490:20
 1608:12
19.99 1606:20
1999 1521:19
19th 1424:5
 1544:16
1st 1470:7

**2**

2 1439:12 1442:17
 1447:2 1474:16
 1488:11 1492:4
20 1494:5 1495:3,4
 1606:2,18,21
2000- 1544:21
200013 1420:5
2006 1521:22
 1522:11
2008 1616:12
2009 1547:12
2010 1435:8 1441:4
 1443:2 1453:11
 1465:16 1467:4
 1472:21 1479:10
 1483:18 1490:21
 1495:8 1496:7
 1499:22 1545:4,6
 1547:12 1552:8
 1553:21 1560:6
 1591:6
2011 1416:10
 1417:5 1421:8
 1514:22 1515:5
 1541:16 1544:16
 1545:10,15
 1580:16,21,22
2012 1593:12

1598:9
2014 1571:8
2016 1422:18
 1424:5 1571:14
2018 1412:8 1441:6
 1441:6
2019 1470:7
2020 1420:12
 1422:7
20th 1609:21,22
21 1498:12
21st 1479:10
23rd 1483:18
 1545:15
24 1433:5,6,7,18
 1435:12 1441:6
 1541:16
24/7 1574:12
247 1616:17
24th 1542:4
 1545:15
25 1453:7
25,000 1620:22
 1621:17 1622:15
25th 1591:6
26th 1495:8 1496:7
27 1412:8 1579:3
2788 1420:4
27th 1579:19
 1580:16 1581:8
 1608:14
29th 1490:21

**3**

3 1444:16 1447:2
 1450:14
3:21 1623:1
3:23 1496:7
30 1485:16 1545:6
 1574:2 1607:7
 1608:14
30,000 1584:21
 1585:1
30th 1499:22
 1500:9 1545:4
 1551:18 1557:5
 1579:3 1596:3
31st 1509:13
33019 1414:6
34 1459:14
38 1435:2,2 1444:12
 1514:18,18
 1515:2 1533:8
 1545:1 1580:20
 1597:11 1603:17
3rd 1609:6

**4**

4 1448:22 1451:14
 1508:11
4-12 1508:11
4/9/2010 1441:11
40 1502:8,12
 1504:13,15
 1509:21 1547:22
 1578:1 1607:8
 1608:17 1614:15
 1614:19
40-percent 1550:19
405 1473:19
41 1521:15
410 1586:14,14
430 1413:2
45 1538:9
496 1597:6
4th 1551:20 1557:8

**5**

5,000 1621:19
5:28 1533:20
50 1423:3 1503:15
 1509:14,21
 1550:21 1606:1,3
 1606:5
50% 1512:5
 1513:20
51 1422:17,22
 1423:6 1424:1,2
 1425:1,7,19
 1426:12,22
 1427:5,9
51-3 1427:9
52 1417:17,20
 1420:2
53 1618:3
539 1597:18
5th 1608:18 1609:1
 1609:3

**6**

60 1544:3
65,000 1598:20

**7**

7 1465:15,21 1499:8
 1499:10 1532:5
 1536:3
7:00 1447:13
75M 1508:21
775 1574:20 1575:8
7th 1443:2

**8**

In Re:  Larry Klayman
June 27, 2018

**8** 1465:4 1467:2
**8.4(c)** 1561:15
　1567:10 1590:19
**80,000** 1532:14
**815-5221** 1414:7

---
**9**
**9** 1441:4
**9/11/11** 1533:21
**9:32** 1413:3 1416:3
**954** 1414:7
**99** 1522:8
**9th** 1435:8 1453:11
　1465:16 1466:4

# ABOUT LARRY KLAYMAN

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: Harry Klaypool of Freedom Watch. His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "Larry Klayman - The One Man TEA Party," by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at www.FreedomWatchUSA.org**

## IN THE DISTRICT OF COLUMBIA COURT OF APPEALS

_____

In the Matter of:

    **LARRY E. KLAYMAN, ESQ.**

**Respondent.**

**A Member of the Bar of the District of
Columbia Court of Appeals
(Bar Registration No. 334581)**

         **No. 20-BG-583
         Board Docket No17-BD-063
         BDN: 2011-D028**

## EMERGENCY MOTION OF RESPONDENT LARRY KLAYMAN TO RESCIND TEMPORARY SUSPENSION ORDER OF JANUARY 7, 2021

_____

Respondent Larry Klayman, by and through counsel, respectfully moves on an emergency basis, given the continuing severe harm and damages to him and his clients as a result of the violation of his constitutional and other legal rights, to rescind the temporary suspension order based on the compelling and irrefutable substantial factual evidence and legal reasons and analysis set forth in detail in Respondent's Initial Brief of February 8, 2021.

The constitutional and other rights that were violated, through state action, include but are not limited to, as set forth in Respondent's Initial Brief of February 8, 2021, violation of his right to due process, equal protection based on sex and religion, his right to a Sixth Amendment counsel of his choice, and last but not least his First Amendment right to free speech, which he heretofore, before this Court imposed a non-meritorious temporary suspension, exercised in all courts and tribunals of the District of Columbia, including this Court, through his conservative and non-partisan public interest and private legal advocacy.

1

WHEREFORE Respondent Larry Klayman respectfully requests, on an emergency basis, that the January 7, 2021 temporary suspension order be rescinded no later than 5:00 p.m. Friday February 12, 2021, based on the substantial evidence showing  no clear and convincing evidence of a violation of  the District of Columbia Rules of Professional Responsibility, as well as the compelling legal reasons and analysis as set forth and detailed his Initial Brief of February 8, 2021.

This immediate recission of temporary suspension as ordered against Mr. Klayman is required to prevent further unnecessary and unjustified  severe harm and damages to him and his clients as this case proceeds to a final disposition.


Dated:  February 9, 2021                                 Respectfully submitted,

                                                         /s/ Melissa Isaak
                                                         Melissa Isaak, Esq.
                                                         2815-B Zelda Road
                                                         Montgomery, AL 36106
                                                         Tel: 334-262-8200
                                                         Melissa@protectingmen.com


                                                         _____


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true copy of the foregoing was filed electronically and served to all parties and counsel of record via the Court's e-service protocols on February 10, 2021.

/s/ Melissa Isaak, Esq..

AO 440 (Rev. 06/12; DC 3/15) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

<table>
<tr><td rowspan="11">
<br><br><br><br>
_____<br>
*Plaintiff(s)*<br>
v.<br><br><br><br>
_____<br>
*Defendant(s)*
</td><td>)</td><td rowspan="11"></td></tr>
<tr><td>)</td></tr>
<tr><td>)</td></tr>
<tr><td>)</td></tr>
<tr><td>)</td></tr>
<tr><td>)</td></tr>
<tr><td>)</td></tr>
<tr><td>)</td></tr>
<tr><td>)</td></tr>
<tr><td>)</td></tr>
<tr><td>)</td></tr>
</table>

Civil Action No. 

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____          _____
                                                                            *Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

### for the

_____ District of _____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

 

 

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

 

 

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____         _____

*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12; DC 3/15) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |
|---|---|
| Plaintiff(s) <br><br> v. <br><br> Defendant(s) | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Action No. 

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*
_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

_____ District of _____

|  |  |
|---|---|
| Plaintiff(s) <br><br> v. <br><br> Defendant(s) | ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

**SUMMONS IN A CIVIL ACTION**

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____     _____
                                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*
                                                                    .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

<table>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
<tr><td><em>Plaintiff(s)</em></td><td>)</td><td></td></tr>
<tr><td>v.</td><td>)</td><td>Civil Action No.</td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td></td><td>)</td><td></td></tr>
<tr><td>_____</td><td>)</td><td></td></tr>
<tr><td><em>Defendant(s)</em></td><td>)</td><td></td></tr>
</table>

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____          _____
                                                    *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

&#10065; I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

&#10065; I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

&#10065; I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

&#10065; I returned the summons unexecuted because _____ ; or

&#10065; Other *(specify):*
                                                                                      .


My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Plaintiff(s)* | ) |  |
| v. | ) | Civil Action No. |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Defendant(s)* | ) |  |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____        _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*
_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Plaintiff(s)* | ) |  |
| v. | ) | Civil Action No. |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Defendant(s)* | ) |  |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT
### for the

_____ District of _____

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Plaintiff(s)* | ) |  |
| v. | ) | Civil Action No. |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Defendant(s)* | ) |  |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*




A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:




If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.


*ANGELA D. CAESAR, CLERK OF COURT*


Date: _____          _____
                                                              *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Plaintiff(s)* | ) |  |
| v. | ) | Civil Action No. |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Defendant(s)* | ) |  |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| ) | |
| _____ ) | |
| *Plaintiff(s)* ) | |
| v. ) | Civil Action No. |
| ) | |
| ) | |
| ) | |
| _____ ) | |
| *Defendant(s)* ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*

.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____          _____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❐ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❐ I returned the summons unexecuted because _____ ; or

❐ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
|  | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Plaintiff(s)* | ) |  |
| v. | ) | Civil Action No. |
|  | ) |  |
|  | ) |  |
|  | ) |  |
| _____ | ) |  |
| *Defendant(s)* | ) |  |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____

_____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*
                                                                                    .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |
|---|---|
| Plaintiff(s) | ) ) ) ) ) ) ) ) ) ) ) ) |
| v. | Civil Action No. |
| Defendant(s) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

 

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

 

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____

         _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |
|---|---|
| Plaintiff(s)<br><br>v.<br><br>Defendant(s) | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*
.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# EXHIBIT B

**FILED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JUL 2 3 2021

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

In the Matter of Larry Klayman,
Member of the Bar of the
United States District Court
for the District of Columbia

Attorney Grievance
AG No. 21-07

## FINAL ORDER OF RECIPROCAL DISCIPLINE

PER CURIAM:

### I.

This matter came before the Court upon receipt of a certified/exemplified copy of an order of the District of Columbia Court of Appeals (DCCA) suspending Respondent Larry Klayman from the practice of law pending final resolution of the disciplinary proceedings. *See In the Matter of Larry E. Klayman,* 20-BG-583, dated January 7, 2021.

On April 6, 2021, this Court issued a Temporary Suspension and Show Cause Order (TSSC) directing Respondent to explain within thirty days why the imposition of identical discipline by this Court would be unwarranted and the reasons therefor. The Order was emailed and mailed by certified mail addressed to Respondent, and a timely response was received.

In response to the TSSC, Respondent submitted two pages of argument along with over 1,000 pages of exhibits, including, among other filings, a complaint he filed in another proceeding in this District, various filings he submitted before DCCA, the D.C. Board of Professional Responsibility's  (Board) opinion recommending his

suspension from the practice of law, an assortment of emails, and hundreds of pages of transcripts from D.C. bar disciplinary proceedings. Respondent argues reciprocal discipline is not appropriate, that the Court should defer any action pending a final decision by the DCCA, and that the temporary suspension should be vacated immediately. Specifically, Respondent contends that the DCCA's suspension pending final disposition is "a violation of his due process and equal protection rights, as he is presumed innocent until proven guilty." Respondent also argues that this Court should "defer consideration of" reciprocal discipline until his claims in *Klayman v. Blackburne-Rigsby, et al.*, 21-cv-409 (ABJ), challenging the legality of the DCCA interim suspension, are "fully litigated," and he "request[s] that the Court thoroughly review" the pleadings in that case.

II.

To begin, the complaint Respondent filed against several DCCA judges in *Klayman v. Blackburne-Rigsby*, has now been dismissed. *See* Memorandum Opinion at 9, Dkt. 29, *Klayman v. Blackburne-Rigsby*, 21-cv-409 (ABJ). As a result, Respondent's request that this Court defer ruling on the appropriateness of reciprocal discipline until the conclusion of that matter is now moot.

Turning to Respondent's due process arguments, the Court concludes that the procedure afforded Respondent was not "so lacking in notice and opportunity to be heard as to constitute a deprivation of due process." *See* LCvR 83.16(c)(4)(i). Respondent has failed to identify any deficiencies in D.C.'s disciplinary process. Instead, his response attaches 1,650 pages of transcripts from the underlying Hearing

Committee proceedings in which Respondent was granted the opportunity to present testimony, cross-examine the complainant, make legal arguments, and propose findings of fact and conclusions of law. The Hearing Committee's findings were then adopted by the Board in a 34-page report and recommendation that addressed each alleged violation and notably, that reduced Respondent's recommended sanction from a 33-month suspensory sanction to one of 18 months. Neither has Respondent identified any due process violation stemming from the DCCA's reliance on the Board's action to impose an interim suspension. Simply put, Respondent's disagreement with the Hearing Committee's findings of fact and conclusion of law, the Board's adoption of them, and the DCCA's determination that they supported an interim suspension pending final disposition does not constitute a due process violation. *See Sobin v. District of Columbia*, 480 F. Supp. 3d 210, 219 (D.D.C. 2020) ("Events may not have unfolded as [Respondent] wished, but such dissatisfaction does not inevitably form the basis for a due process violation.") (brackets and internal quotation marks omitted)); *cf. In re Klayman*, 991 F.3d 1289, 1293 (D.C. Cir. 2021) ("[T]he state court's substantive findings are entitled to a high degree of respect.").

The interim nature of Respondent's suspension does not make reciprocal discipline inappropriate in this matter. The D.C. Bar Rules authorize temporary suspension of an attorney "[u]pon receipt of a report from the Board recommending discipline in the form of disbarment, suspension requiring proof of fitness as a condition of reinstatement, or suspension of one year or more without a fitness requirement." D.C. Bar Rule XI, § 9(g). And this Court's Local Rules authorize

reciprocal discipline if an attorney "has been suspended for more than 30 days or disbarred by another court." LCvR 83.16(c)(1).  Based on the plain text of the rule, then, an interim suspension that lasts for more than 30 days triggers reciprocal discipline in this Court.  Other courts apply their own rules to impose reciprocal discipline in similar circumstances.  *See, e.g.*, *In re SimmsParris*, 448 F. App'x 268 (3d Cir. 2011); *In re Stafford*, 789 F. App'x 281 (2d Cir. 2019).

Likewise, Respondent's due process objections concerning the seven-year delay in instituting proceedings against him are unpersuasive.  As the D.C. Circuit has explained, "[u]ndue delay . . . result[s] in a due process violation when the respondent demonstrates *actual prejudice*—that is, that the delay in prosecution impaired [his] defense."  *See In re Klayman*, 991 F.3d at 1295 (emphasis added and internal quotation marks omitted).  Here, Respondent has made no specific showing of how delay impaired his defense.  Though he invokes the doctrine of laches in filings attached to his response, there is no case in the District of Columbia that "applies laches to disciplinary proceedings."  *Id.*  Even if the defense of laches applied, it "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121–22 (2002) (internal quotation marks omitted).  Respondent has not demonstrated either element here.[1]

---

[1] Respondent provides no argument as to why the DCCA's suspension pending final disposition of this disciplinary matter is "a violation of his . . . equal protection rights," and based on a review of the record, the Court concludes his other claims also lack merit.

Based on "the face of the record on which discipline is predicated," it does not "clearly appear[]" that any of the factors listed in LCvR 83.16 (c)(4)(i-v) exist. Thus, upon consideration of the entire record and Respondent's submission, the Court concludes that reciprocal discipline is appropriate under the standard set forth in LCvR 83.16(c)(5).

<div align="center">III.</div>

For the foregoing reasons, it is hereby

**ORDERED**, pursuant to LCvR 83.16, that the Temporary Suspension and Show Cause Order dated April 6, 2021, is vacated; and it is

**FURTHER ORDERED**, pursuant to LCvR 83.16, that Respondent is reciprocally suspended from the Bar of the United States District Court for the District of Columbia pending final resolution of the proceedings before the DCCA and this Court; and it is

**FURTHER ORDERED**, that Respondent shall promptly advise this Court of the final resolution of the proceedings before DCCA; and it is

**FURTHER ORDERED**, that reinstatement shall be conditioned upon satisfaction of the requirements listed in LCvR 83.18, including proof that Respondent has been reinstated in the Bar of the District of Columbia; and it is;

**FURTHER ORDERED**, that the Clerk shall cause a copy of this order to be served upon Respondent in accordance with LCvR 83.16(a), thereby giving Respondent notice of the provisions of LCvR 83.16 and 83.18.

So ORDERED, this 23rd day of July, 2021.

_____
Judge Timothy J. Kelly

2021.07.23
13:50:48 -04'00'
_____
Judge Trevor N. McFadden

_____
Judge Dabney L. Friedrich

EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
JOSEPH MICHAEL ARPAIO,             )
               Plaintiff,          )  Civil Action
vs.                                )  No. 18-2894
                                   )
JEFF ZUCKER, et al.,               )  July 25, 2019
                                   )
               Defendants.         )  10:36 a.m.
                                   )  Washington, D.C.
                                   )
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF MOTION HEARING**
**BEFORE THE HONORABLE ROYCE C. LAMBERTH,**
**UNITED STATES DISTRICT COURT SENIOR JUDGE**


**APPEARANCES:**

**FOR THE PLAINTIFF:**      LARRY E. KLAYMAN
                            2020 Pennsylvania Avenue, NW
                            Suite 800
                            Washington, DC 20006
                            (310) 595-0800
                            Email: Leklayman@gmail.com


**FOR J. ZUCKER,**          STEPHEN J. FUZESI
**C. CUOMO and CNN:**       KEVIN TAYLOR BAINE
                            NICHOLAS G. GAMSE
                            725 12th St. NW
                            Washington, DC 20005
                            (202) 434-5010
                            Email: Sfuzesi@wc.com


**FOR K. ROBILLARD,**       JEAN-PAUL JASSY
**HUFFINGTON POST:**        JASSY VICK CAROLAN LLP
                            800 Wilshire Boulevard, Suite 800
                            Los Angeles, CA 90017
                            310-870-7048


**(APPEARANCES CONTINUED)**

**APPEARANCES (continued)**:


-AND-

LAURA FRAHER
SHAIRPO, LIFSCHITZ & SCHRAM, PC
1742 N Street, NW
Washington, DC 20036-2912
(202) 689-1900
Email: Fraher@slslaw.com



**FOR ROLLING STONE,**   ALISON SCHARY
**TESSA STUART:**   Davis Wright Tremaine LLP
  1919 Pennsylvania Avenue, N.W.
  Suite 800
  Washington, DC 20006
  (202) 973-4248
  Email: Alisonschary@dwt.com




Court Reporter:   Elizabeth Saint-Loth, RPR, FCRR
  Official Court Reporter
  Washington, D.C.  20001


Proceedings reported by machine shorthand,
transcript produced by computer-aided transcription.

```
1              THE COURT:  Thank you very much, Mr. Jassy.

2              MR. JASSY:  Thank you, Your Honor.

3              THE COURT:  All right.  Mr. Klayman.

4              MR. KLAYMAN:  Thank you, Your Honor.

5              THE COURT:  I haven't had you here in a long time.

6     It's a pleasure to have you again.  I know some judges don't

7     say that to you, but I will say it.

8              MR. KLAYMAN:  Mutual, Your Honor.

9              At the outset, Your Honor, I want to point out an

10    inaccuracy by CNN's counsel; perhaps they inadvertently made

11    a mistake.  But, in paragraph 22, we allege:  As of today,

12    the CNN broadcast is still available through defendant's

13    CNN's website, and no efforts have been taken by defendant

14    CNN, defendant Cuomo, or defendant Zucker to correct this

15    false statement.  So, yes, it is in the complaint that this

16    is still up on the website.

17             THE COURT:  The original?

18             MR. KLAYMAN:  The original.

19             THE COURT:  The original four-minute segment --

20             MR. KLAYMAN:  Which does not have the correction

21    by Chris Cuomo at the end.

22             THE COURT:  Okay.

23             MR. KLAYMAN:  Now, let me get into this particular

24    issue, and I will move on generally.

25             Once something goes up on the Internet, it
```